IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                        )
CATHERINE GAUJACQ                                       )
9428 Meadow Shire Lane                                  )
Great Falls, Virginia  22066                            )
                                                        )
            Plaintiff,                                  )
                                                        )
        v.                                              )
                                                        )
ELECTRICITE DE FRANCE                                   )
   INTERNATIONAL NORTH AMERICA, INC.                    )
1730 Rhode Island Avenue, N.W., Suite 509              )        Civil Action No. _____
Washington, D.C.  20036                                )
                                                        )
Serve:      CT Corporation System                      )
            1015 15th Street, N.W., Suite 100          )
            Washington, D.C.  20005                     )
                                                        )
            and                                        )
                                                        )
ELECTRICITE DE FRANCE, S.A.                            )
22-30 Avenue de Wagram                                  )
75008 Paris France                                     )
                                                        )
Serve:      Yann Laroche                               )
            Executive Vice President,                  )
             Human Resources                           )
            22-30 Avenue de Wagram                     )
            75008 Paris France                         )
                                                        )
            and                                        )
                                                        )
CHRISTIAN NADAL                                        )
7811 Lonesome Pine Lane                                )
Bethesda, Maryland  20817                              )
                                                        )
            Defendants.                                )
_____ )

## COMPLAINT

1.      This is a civil action alleging discrimination and retaliation on the basis of gender, and discriminatory and retaliatory termination.  This action states federal claims against the corporate defendants under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.  This action is also brought under the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq.,  and the common law of the District of Columbia.  This action also alleges disparate and unequal pay, in violation of the Equal Pay Act, 29 U.S.C. § 206(d).

2.      This action also alleges common law claims of defamation *per* se against all defendants, breach of contract against the corporate defendants, and tortious interference with contractual relations and business expectancies against Defendants.

## PARTIES

3.      Catherine L. Gaujacq ("Ms. Gaujacq") is a resident of the Commonwealth of Virginia, and at all times relevant to this complaint, was employed by Electricite de France ("EDF"), and by its United States subsidiary, Electricite de France International North America, Inc. ("EDFINA") (collectively, "the Company").

4.      EDFINA is a wholly owned United States subsidiary of Electricite de France ("EDF").  EDFINA acts solely as a liaison office for EDF in the United States and as such, does not have its own profit and loss statements.  All EDFINA operating expenses, including employee salaries and benefits, are paid by EDF each month.

2

5.      EDFINA's annual strategic plan, missions, financial, administrative and human resources decisions and support is provided by EDF in France.  All board members of EDFINA are EDF executives.

6.      EDFINA is registered as a corporation in good standing in the District of Columbia, maintains a District of Columbia registered agent for service of process and maintains offices at 1730 Rhode Island Avenue, N.W., 5th Floor, Washington, D.C.  20036.

7.      EDFINA has fifteen (15) employees.

8.      The overlapping relationships between EDF and EDFINA, and the control exercised by EDF over EDFINA is substantial.  EDFINA does not operate as an independent company.  EDF and EDFINA essentially act as one company with common management, centralized control of human resource functions, common procedures, policies and interconnected operations.  There is sufficient interrelatedness of operations to view the companies as an integrated enterprise, to be considered as a single employer for purposes of this action.

9.      EDF management makes the final decision regarding career opportunities, transfers, compensation and bonus payments of the EDFINA employees.

10.     EDF and EDFINA have common management in the form of common directors and officers.

11.     EDFINA employees are principally assigned to carry out or to support consulting and engineering related contracts that EDF enters with energy companies in the United States.

12.     EDF principally uses the same workforce as EDFINA and regularly transfers employees between it and EDFINA.

13.     While in the United States, EDFINA French employees' salaries are paid from EDF's payroll and they continue to be covered under EDF's disability insurance plans, and continue to participate in the EDF pension plan.

14.     EDF has control over all personnel functions of EDFINA with respect to EDFINA's high level executives and sets and disseminates the policies that apply to these executives.

15.     EDF and EDFINA therefore constitute a single employer, an enterprise and/or a joint employer for purposes of this action.

16.     EDF has over 170,000 employees.

17.     Ms. Gaujacq was an "employee" of the Company within the meaning of 42 U.S.C. § 2000e(f) and 29 U.S.C. § 203(e)(1).

18.     EDFINA is an "employer" in the United States within the meaning of 42 U.S.C. §2000e(b) and 29 U.S.C. § 203(d).

19.     EDFINA is an "employer" within the meaning of D.C. Code § 2-1401.02(10).

20.     Christian Nadal ("Mr. Nadal") is a citizen of France and resident of the State of Maryland.  Mr. Nadal holds a L1A visa sponsored by EDFINA as a multinational manager/executive, which, by definition, is issued to individuals engaged in commercial activities.

21.     Mr. Nadal regularly transacts business in the District of Columbia, and works out of the District of Columbia.  Many of the torts alleged to have been committed by Mr. Nadal occurred in the District of Columbia.  Mr. Nadal is subject to personal jurisdiction of this Court pursuant to D.C. Code §§ 13-422 and 13-423.

**JURISDICTION AND VENUE**

22.      This Court has jurisdiction over Ms. Gaujacq's claims under Title VII of the Civil

Rights Act of 1964, as amended, pursuant to 42 U.S.C. § 2000e-5(f)(3), D.C. Code § 11-921; the

D.C. Human Rights Act, D.C. Code § 2-1401.01 et seq; and the Equal Pay Act, 29 U.S.C. §

206(d).

23.      The Company is present in and conducts business in the District of Columbia and the

acts complained of herein occurred in the District of Columbia.  Therefore, the Company is subject

to the personal jurisdiction of this Court.

24.      The unlawful employment practices in this case were committed in the District of

Columbia, employment records relevant to those practices are administered and maintained in the

District, and Ms. Gaujacq would have continued to work in the District but for the Company's

unlawful practices.  Therefore, venue is proper.

25.      EDFINA is a corporation incorporated under the laws of the District of Columbia.

Accordingly, foreign sovereign immunity from suit is not available to EDFINA under the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605.

26.      EDF, an "instrumentality" of the French government, has explicitly and implicitly

waived any foreign sovereign immunity it may have under the FSIA.

27.      EDF's only purposes and activities are to engage in the production of goods and

services, and to engage in commerce.  Therefore, EDF is subject to the commercial exception of

FSIA, 28 U.S.C. § 1605(a)(2).

28.      EDF is not a public governmental agency of France and does not serve a

governmental function.

5

29.     Rather, EDF is a state-owned multi-national company with uniquely commercial operations and missions and an integrated industrial and commercial energy company made up of a network of different companies.

30.     EDF is engaged in commercial activity for purposes of the exception to immunity under FSIA.

31.     EDF's employment of Ms. Gaujacq to EDFINA's operations in the United States constitutes commercial activity under the exceptions to FSIA immunity.

32.     Ms. Gaujacq is not a civil servant of France.  French statutes do not recognize EDF employees as French civil servants, and Ms. Gaujacq's position and duties differ from those of government civil servants.

33.      EDFINA is the permanent contact of the Company for doing business in the District of Columbia and in the United States and is the subject of this Complaint.

34.     The activities of Ms. Gaujacq were at all times exclusively commercial in nature, for the exclusive benefit of the Company.

35.     In her role as President of EDFINA, Ms. Gaujacq was responsible fore the executive management of EDFINA, directing all business activities of the Company, including, but not limited to: (1) hiring and firing clerical, marketing , accounting and technical staff; (2) retaining ad coordinating the work of outside contractors and consultants who were supplying services to EDFINA; (3) negotiating and coordinating contracts with vendors, subcontractors and business partners in connection with EDFINA's delivery of engineering, technical and other services to EDF customers in the U.S.; and (4) working in close collaboration wit leaders of U.S. electrical utilities

for the purpose of building and strengthening ties between the U.S. and French energy industries and undertaking collaborative research and development projects at a highly advanced level.

36.    None of the employees of EDFINA are French civil servants, French diplomatic personnel, or French military personnel.

37.    While in the U.S., Ms. Gaujacq, as well as other French Management level employees of EDF/EDFINA and other EDF subsidiaries in the U.S., hold L1A visas as multinational managers/Executives, which are issued to individuals engaged in commercial activities.

38.    Ms. Gaujacq's employment contract with the Company is explicitly and implicitly subject to United States law.  Therefore, the Company is subject to the contractual exception of FSIA, 28 U.S.C. § 1605(a)(1).

39.    Ms. Gaujacq's employment in the United States was governed by an Expatriation Contract with EDF.

40.    The Expatriation Contract specifically provides that the laws applicable to Ms. Gaujacq's employment are the ones of the country where her workstation is located – Washington, D.C.

41.    EDF, thereby, agreed that the laws of the District of Columbia and the United States govern the terms of Ms. Gaujacq's employment while performing her role at EDFINA.

42.    Jurisdiction and venue are proper in this Court.

## **PROCEDURAL STATUS**

43.    Ms. Gaujacq timely filed an administrative Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on July 30, 2004, and filed an Amended Charge of Discrimination by hand delivery on August 6, 2004.  Ms. Gaujacq

submitted a statement of further acts of retaliation by the Company to the EEOC on October 11, 2004.

44.    On April 15, 2005 the EEOC issued Ms. Gaujacq a Right to Sue letter, which Ms. Gaujacq received on April 20, 2005.

45.    This action is timely filed and all procedural prerequisites to suit have been met.

## BACKGROUND

46.    Ms. Gaujacq was President of EDFINA from August 1, 2000, until May 31, 2004, having risen through management positions within EDF and EDFINA in the core energy generation business, and, most recently, in strategic consulting on behalf of the Company in the United States.

47.    At all times, Ms. Gaujacq performed her job duties in an exemplary manner.

48.    Despite the size of the Company, Ms. Gaujacq was one of very few women to hold an executive level position and as President, was one of the highest ranked females in the Company.

49.    During her career, Ms. Gaujacq became the first woman in the world to possess overall operational responsibility for a nuclear plant.

50.    In 2002, Ms. Gaujacq was awarded the Chevalier de l'Ordre National du Merite, the highest national award given by the President of France.

51.    As President of EDFINA, Ms. Gaujacq was paid a salary of $169,750.00, plus benefits.

52.    Ms. Gaujacq's job responsibilities included full operational responsibility for all EDFINA activities and projects, identification of development opportunities in the American and Canadian electricity markets, representation of the Company in various trade associations

relevant to the energy field, serving as a Director of the Board for EDF Group's United States subsidiaries, and regularly making presentations on the nuclear energy industry and emerging technologies at industry conferences.

53.    During Ms. Gaujacq's four-year tenure as President, she was responsible for identifying and managing EDF's acquisition of enXco, a wind power company; the establishment and development of a United States presence for Dalkia, an EDF subsidiary; and the development of NuStart Energy Development, LLC, a strategic joint venture in the United States.

54.    As President, Ms. Gaujacq reported to Fernando Ponasso ("Mr. Ponasso"), Chairman of EDFINA and Executive VP of EDF Branch Americas.   Ms. Gaujacq was responsible for all operations in the United States, with specific responsibility for development and management of a multi-national nuclear power joint venture and a key, strategic initiative of EDFINA and EDF (the "Project").

55.    Ms. Gaujacq has been the executive responsible for the Project since its inception.

56.    In January 2004, Ms. Gaujacq contacted the Chairman of EDF, Mr. Francois Roussely ("Mr. Roussely") and Mr. Gerard Creuzet ("Mr. Creuzet"), COO of EDF, to confirm that the Company wanted her to stay in the United States to continue to work on the Project.

57.    Ms. Gaujacq was assured at that time that she was to remain in the United States with EDFINA to handle the Project because of its strategic importance.

58.    Both Mr. Roussely and Mr. Creuzet were well aware that it was extremely important for Ms. Gaujacq to know by January whether she was expected to remain in the United States, because Ms. Gaujacq's husband, who had taken leave from his job at the University in

France when Ms. Gaujacq became assigned to the United States, was required to give the University notice of Mr. Gaujacq's intent to return by January, 2004 in order to resume his position for the upcoming academic year (starting in September, 2004).

59.     If Ms. Gaujacq's husband failed to notify the University of his intent to return by January, he would be ineligible to return to his position.

60.     In February 2004, Mr. Roussely informed Ms. Gaujacq that in connection with EDF's restructuring associated with the Company's privatization, Christian Nadal, a high level executive with EDF, was being sent from France to the United States offices as a senior advisor to EDFINA.

61.     Mr. Roussely told Ms. Gaujacq that she would remain in the United States to work on the Project until 2005 or 2006, and Mr. Roussely also explicitly told Ms. Gaujacq that once she left the Project in 2005 or 2006, she would be promoted to a higher executive management role in the parent company, EDF.

62.     Despite Mr. Roussely's assurances and representations to Ms. Gaujacq, Mr. Nadal was appointed to replace Ms. Gaujacq's as President of EDFINA in the United States at the end of March 2004, without prior notice or explanation from the Company.

63.     Mr. Nadal did not even remotely possess the qualifications or experience of Ms. Gaujacq for the position of President, and there was nothing, no complaints or issues, giving rise to a need or reason for a change in leadership.

64.     Ms. Gaujacq was understandably shocked at the announcement, and asked the Chairman of EDF the reasons for this decision.

65.     Mr. Creuzet, who was present, assured Ms. Gaujacq the decision had nothing to do with her performance.

66.     Ms. Gaujacq made it clear to the Company that she wanted to continue to work on the Project and was even asked to propose to Mr. Creuzet a new role for herself in EDFINA.

67.     Mr. Creuzet directed Ms. Gaujacq to prepare and deliver a mission letter and expatriation contract that reflected her new role, which Ms. Gaujacq did.  Mr. Creuzet agreed in writing to the new expatriation contract for three years in the United States proposed by Ms. Gaujacq.

68.     During April and May 2004, Ms. Gaujacq contacted the company on several occasions to inquire of the status of her new contract.  Ms. Gaujacq was told that her new contract and mission letter were awaiting signature.

69.     On May 31, 2004, at the request of Mr. Roussely, Ms. Gaujacq tendered her written resignation as President.  Ms. Gaujacq submitted her resignation and concurrently assumed the position of Vice President, EDFINA and Manager of the Project, retaining management responsibility for generation and Nuclear Projects as stipulated in the new expatriation contract, awaiting signature.

70.     In doing so, Ms. Gaujacq became the only female Vice President of EDFINA reporting to Mr. Nadal.

71.     Ms. Gaujacq submitted her resignation based on written assurances from the Company that her continued mission in the United States at EDFINA for another three years had been approved, and that she would retain responsibility for the Project.

72.    Mr. Nadal assumed the position of President on June 1, 2004, and became Ms. Gaujacq's supervisor.

73.    Mr. Nadal's job responsibilities were the same as those held by Ms. Gaujacq for four years, with the exception that Ms. Gaujacq retained the responsibility of day-to-day management of the Project.  In other words, Mr. Nadal's job responsibilities were less than those Ms. Gaujacq possessed while she served as President.

74.    Mr. Nadal's starting salary as President was $271,163.00 -- 60% more than Ms. Gaujacq's salary for performing the same position with additional responsibility as compared to Mr. Nadal's position.

75.    In addition, Mr. Nadal did not possess the qualifications, educational background, training or experience in nuclear energy, or in the energy generation field, that Ms. Gaujacq possessed.  Instead, Mr. Nadal's qualifications, educational background, training and experience in nuclear energy, and specifically, in the energy generation field, were significantly less than that possessed by Ms. Gaujacq.

76.    Ms. Gaujacq was paid less for doing the same or greater work as President of EDFINA, because of her gender, female.

77.    Immediately after assuming the role of President, Mr. Nadal began subjecting Ms. Gaujacq to unfair and discriminatory treatment based on her gender, female.

78.    This treatment of Ms. Gaujacq by Mr. Nadal adversely impacted the terms and conditions of Ms. Gaujacq's employment.

79.    Mr. Nadal created an abusive and hostile work environment by subjecting Ms. Gaujacq to increasing harassment, including effectively removing Ms. Gaujacq's authority to

properly carry out her job, engaging in concerted efforts to impugn Ms. Gaujacq's record and to undermine her position in the Company, and transferring many of Ms. Gaujacq's duties to a less experienced, male colleague.

80.     During the first week after Mr. Nadal arrived at the Company, he demanded that Ms. Gaujacq provide him all of her business and company contacts, telling Ms. Gaujacq it was very urgent.

81.     In fact, there was no legitimate business justification for such a request, either in substance, or time.

82.     Subsequently, without any prior notice and without any legitimate business reason, Mr. Nadal had Ms. Gaujacq removed from the list of authorized officers of EDFINA with signature authority on the corporate bank accounts.

83.     Ms. Gaujacq learned her check signing authority had been revoked on June 11, 2004, after returning from a business trip, when she attempted to sign EDFINA checks that had been prepared by bookkeeping.

84.     Benoit Dreux ("Mr. Dreux"), the other vice president located in EDFINA's Washington, D.C. office, told Ms. Gaujacq she could not sign the checks as her name had been removed from the list of authorized officers of EDFINA on the corporate bank accounts.

85.     Mr. Dreux proceeded to rip up the checks signed by Ms. Gaujacq in front of others in the office.

86.     Ms. Gaujacq protested to Mr. Dreux that as Vice President, she is responsible for all matters, including payment of expenses, and needed to be able to sign checks to properly perform her job.

13

87. Ms. Gaujacq immediately notified Mr. Nadal by email of her concern that Mr. Dreux had removed her from the list of executives with check signing authority, apparently without Board approval, and asked that he correct the matter with the bank.

88. That evening, Mr. Nadal telephoned Ms. Gaujacq at home and told her that he had personally directed that she be withdrawn from the list of authorized officers on the bank accounts. When Ms. Gaujacq asked for an explanation, Mr. Nadal said he was not required to give her a reason.

89. The other vice presidents reporting to Mr. Nadal, all males, were not removed from the list of authorized officers on the bank accounts.

90. There was no legitimate business justification for removing Ms. Gaujacq's check signing authority – it was done purely to discriminate against Ms. Gaujacq on the basis of her gender, and for Mr. Nadal to exercise his contempt for women and his belief that women are inferior and should be treated so.

91. Ms. Gaujacq complained about Mr. Nadal's discriminatory and unfair treatment of her by sending an email to Fernando Ponasso, EDFINA's Chairman and EDF Senior Vice-President Branch Americas, and Didier Lamethe, EDF's in-house legal counsel and EDFINA Board member, advising them of the action taken by Mr. Nadal, which she regarded as unfair treatment and improper.

92. Shortly thereafter, Mr. Nadal began to attend all of Ms. Gaujacq's business meetings outside the office (both in the United States and in France) without any advance notice.

93. Mr. Nadal had no role at any of these meetings. He did not speak to Ms. Gaujacq before, during or after the meetings.

14

94.     Mr. Nadal's presence at Ms. Gaujacq's meetings was clearly intended to intimidate and harass Ms. Gaujacq on the basis of her gender, and to retaliate against for her complaint of discrimination.

95.     Mr. Nadal did not attend the meetings of the other (male) vice presidents under his supervision.

96.     On or about June 20, 2004, Ms. Gaujacq received a letter at her home address, dated June 18, 2004, from Mr. Nadal.  The letter was addressed to Ms. Gaujacq and Mr. Dreux (Mr. Dreux was the only other Vice President under Mr. Nadal's supervision in the D.C. office).

97.     In the letter, Mr. Nadal revoked all of Ms. Gaujacq's and Mr. Dreux' powers as vice presidents of EDFINA, including, but not limited to, the authority to enter into contracts with third parties, to make any representation and/or warranties on behalf of EDFINA, and to incur any expenses of behalf of EDFINA.

98.     The letter further stated that the authority for these actions rests only with the President, and in his absence, these transactions may be carried out by either Vice President, but only upon the express written consent of the President.

99.     Mr. Nadal then prepared another letter, also dated June 18, 2004, addressed solely to Mr. Dreux, which was hand-delivered to Mr. Dreux at EDFINA's offices in DC.

100.     The letter to Mr. Dreux granted him the authority to act on behalf of the President of EDFINA, and reinstated all authority and powers that had been rescinded by the first letter.

101.     Unlike the June 18, 2004 letter addressed to both Ms. Gaujacq and Mr. Dreux, the letter to only Mr. Dreux was copied to the Chairman of EDFINA, Mr. Ponasso.

102.    Mr. Nadal did not send a letter to the other (male) EDFINA vice president under his supervision (Richard Shomberg, who worked out of EDFINA's Palo Alto office), revoking his authority.

103.    The June 18, 2004 letter to Ms. Gaujacq was discriminatory and retaliatory and served no legitimate business purpose.

104.    The June 18, 2004 letter was addressed to Ms. Gaujacq and Mr. Dreux solely for the purpose of covering up the intentional discrimination and retaliation of Ms. Gaujacq by Mr. Nadal and the Company.

105.    At the end of June 2004, Ms. Gaujacq was advised that Mr. Nadal had requested the EDF auditors to come to the United States offices of EDFINA for the purpose of undertaking a special audit of EDFINA operations and finances during the period Ms. Gaujacq had served as EDFINA's President.

106.    There was no legitimate or justifiable business reason for requesting a special audit.

107.    Ms. Gaujacq enjoys a spotless performance record with the Company and has a reputation for demanding rigorous ethical conduct in connection with the operations of the business.

108.    Ms. Gaujacq was not consulted about the audit, despite the fact that the audit concerned matters for which she had been responsible.

109.    Although Ms. Gaujacq was not provided a copy of the formal audit report, she was verbally told by auditors that they found no improprieties or material deficiencies in the operations of EDFINA while she was President.

16

110.    Nevertheless, Mr. Nadal alleged there were wrongdoings under Ms. Gaujacq's watch.

111.    Mr. Nadal's requesting of the audit, refusing to involve Ms. Gaujacq in the audit, refusing to share the audit report with Ms. Gaujacq, and making false allegations against Ms. Gaujacq that there were wrongdoings under Ms. Gaujacq's watch, constituted discrimination and retaliation of Ms. Gaujacq by Mr. Nadal and the Company.

112.    Moreover, Mr. Nadal's statements that Ms. Gaujacq had engaged in wrongdoing, and that wrongdoing had been engaged in on her watch, were statements impugning Ms. Gaujacq's integrity and competency to perform her job, and maligned her reputation.  As such, this conduct constitutes defamation *per se*.

113.    In June 2004, Mr. Nadal changed the locks on the company book closet where the corporate books were kept without Ms. Gaujacq's knowledge, strongly and falsely implying wrong-doing on the part of Ms. Gaujacq.  Mr. Nadal took this action in the presence of other employees, as well as the company accountant.

114.    On July 9, 2004, Mr. Nadal falsely stated, in the presence of Ms. Gaujacq, that Ms. Gaujacq was paying fees to consultants and contractors of the company without services being performed.  Mr. Nadal characterized this alleged behavior by Ms. Gaujacq as "a very serious issue."

115.    Mr. Nadal made this statement and other similar statements to the corporate auditors and in the presence of the other (male) Vice President of the company, Benoit Dreux.

116.    Mr. Nadal also falsely alleged to Ms. Gaujacq, in the presence of Jean-Luc Foret on July 12, 2004, that the SEPTEN group in charge of nuclear reactor designs in Lyon (France)

within the France Energy Branch had complained on June 20, 2004 about a lack of information from Ms. Gaujacq.

117.    Starting in June 2004, and continuing for approximately three months, Mr. Nadal prevented Mike Slavitt ("Mr. Slavitt'), who had been the company's accountant for eleven years, access to the books, and then terminated Mr. Slavitt without notice.

118.    On or around July 17, 2004, Ms. Gaujacq received a telephone call from the Audit Director of EDF in France, Daniel Dubois ("Mr. Dubois"), who warned Ms. Gaujacq that the audit findings and recommendations report dated July 17, 2004 contained "strange" allegations, and that Ms. Gaujacq should be prepared to answer questions.

119.    Mr. Dubois further stated that Mr. Nadal was responsible for providing the report to Ms. Gaujacq.

120.    However, Mr. Nadal failed to give Ms. Gaujacq a copy of the audit findings and recommendations report, as he had been directed to do in order to solicit Ms. Gaujacq's comments.

121.    Throughout June and July, 2004, Ms. Gaujacq confronted Mr. Nadal on several occasions, complaining about his unfair, discriminatory and retaliatory treatment of her, and requesting an explanation.  Mr. Nadal's response was always the same – that he did not need to give any explanation for his decisions.

122.    Mr. Nadal's discrimination and retaliation was particularly intentional and egregious, which is evidenced by his arrogance and refusal to even attempt to provide a legitimate business justification for blatant and dishonest discrimination and retaliation.

123.    On July 9, 2004, Ms. Gaujacq wrote a letter, again requesting the Company provide prompt, corrective action relating to Mr. Nadal's discriminatory and unfair treatment of her.

124.    On July 9, 2004, Ms. Gaujacq emailed her formal complaint to Mr. Ponasso, Chairman of EDFINA, explicitly detailing some of the discriminatory and retaliatory actions taken against her by Mr. Nadal.

125.    Ms. Gaujacq explained to Mr. Ponasso in the July 9, 2004 e-mail that Mr. Nadal's actions seriously undermined her ability to perform her job and caused her grave concern.

126.    Ms. Gaujacq specifically requested that Mr. Ponasso take action to remedy the situation.

127.    Ms. Gaujacq received no response from Mr. Ponasso, and on information and belief, no steps were taken to investigate and address her complaints of discriminatory and unfair treatment by Mr. Nadal and the Company.

128.    After Ms. Gaujacq sent her email complaint to Mr. Ponasso, Mr. Nadal's unfair and discriminatory treatment of to Ms. Gaujacq worsened.

129.    On July 12, 2004, after receipt of the audit findings, Ms. Gaujacq was in the office preparing for a meeting with the joint venture partners on the Project.

130.    Mr. Nadal unexpectedly called Ms. Gaujacq into his office on the pretext of updating him on the project. After a brief interchange, Ms. Nadal demanded that Ms. Gaujacq remain in the office, and then asked Jean Luc Foret, a Nuclear engineer with EDFINA and one of Ms. Gaujacq's direct reports, to sit in on the meeting.

131.    Mr. Nadal demanded, in a demeaning tone, that Ms. Gaujacq bring all files, documents and any electronic email or other data she had at home or on her laptop relating to the Project to his office by the next day, before leaving for her scheduled vacation (still several days away) so that the documents would be available for his review and to be archived.

132.    There was no legitimate business purpose for such a request, and no excuse for treating and talking to Ms. Gaujacq in a demeaning tone of voice, in any event, but especially in front of Ms. Gaujacq's subordinates.

133.    Ms. Gaujacq explained that she would be working with the documents over the next two days and that it would be difficult to respond to his request before leaving on vacation.

134.    Ms. Gaujacq also explained to Mr. Nadal that the joint venture agreement specifically restricted disclosure of Project documents, and she therefore could not legally share many documents until confidentiality agreements were obtained.

135.    Mr. Nadal then rose from his chair pointing at Ms. Gaujacq, and in a harsh and threatening voice stated that if Ms. Gaujacq did not do what he had asked, she would be "accountable" for her actions.

136.    This conduct by Mr. Nadal was inexcusable, outrageous, discriminatory and retaliatory, and reflects Mr. Nadal's disgust and contempt for women, which is illegal.

137.    At the end of the business day on July 12, 2004, Ms. Gaujacq received a lengthy email from Mr. Nadal repeating his earlier demand for the delivery of all project documents to him within twenty-four hours.

138.    In the email, Mr. Nadal falsely alleged that the Energy Branch in France, with whom Ms. Gaujacq was in regularly contact in connection with the Project, "regularly complains" about a lack of information from Ms. Gaujacq.

139.    The fact that Mr. Nadal repeatedly lied to attempt to justify his discriminatory and retaliatory conduct is merely additional evidence that Mr. Nadal knew his contemptuous conduct was illegal, and that it was intentional.

140.    On July 16, 2004, after leaving for vacation, Ms. Gaujacq received another email from Mr. Nadal, stating that he had not received the requested documents, and repeating his demand that Ms. Gaujacq turn over the Project documents to him.

141.    Ms. Gaujacq replied to Mr. Nadal's emails, with a copy to Mr. Ponasso, explaining again the reasons why she could not immediately comply with his request.  Ms. Gaujacq also challenged Mr. Nadal's false accusations regarding complaints about her from the Energy Branch in France.

142.    Mr. Nadal has never made the same, or even remotely similar demands of the other (male) vice presidents in his reporting structure.

143.    On July 22, 2004, Ms. Gaujacq sent an email directly to Mr. Nadal, complaining and confronting him about harassing, discriminatory and unfair treatment of her.  Ms. Gaujacq requested that Mr. Nadal contact her to discuss her complaints against him.

144.    Ms. Gaujacq also sent an email to Mr. Creuzet, the COO of EDF, and to Mr. Ponasso, Chairman of EDFINA and President of EDFINA Branch Americas, asking that the Company confirm that it would take corrective and remedial measures to prevent further discriminatory, harassing and unfair conduct by Mr. Nadal.

145.    Ms. Gaujacq's email further requested that she be provided a signed expatriation contract extending her role on the Project, as previously agreed and represented to her as final.

146.    Ms. Gaujacq's email requested a response before Monday, July 25, 2004, explaining that the Company's failure to act had put her in a tenuous employment and immigration position, since she could no longer work for Mr. Nadal if the company did not take prompt, remedial corrective action.

147.    The following day, Ms. Gaujacq received an abrupt email response from Mr. Nadal, refusing to address her concerns.

148.    This continuing refusal to even attempt to explain his outrageous actions is additional evidence that Mr. Nadal's actions were intentional, and that he was aware that his conduct was illegal.

149.    On Friday, July 23, 2004, Ms. Gaujacq received telephone calls from several EDF officers.

150.    The first telephone call was from Mr. Creuzet.  After Ms. Gaujacq outlined her concerns and proposed solution (that the new March 2004 expatriation contract be executed and her reporting structure changed), Mr. Creuzet stated that the chairman of EDF would not tolerate a discrimination claim being filed against the Company.  He stated "I cannot waste my time in resolving a small dispute between managers of the Company."  Mr. Creuzet then threatened Ms. Gaujacq, saying "If you file a claim against the Company, your career with EDF is dead, it is over."

151.    Ms. Gaujacq was both shocked and angered by Mr. Creuzet's statements, and told him she could not understand how the Company could treat her this way after 24 years of dedicated service – treatment completely unjustified by her performance and loyalty.

152.    Mr. Creuzet said he would have Yann Laroche ("Mr. Laroche"), EDF Senior Vice President of Human Resources, call Ms. Gaujacq directly.

153.    When Mr. Laroche telephoned Ms. Gaujacq, he indicated he was aware of Mr. Creuzet's threat.  Mr. Laroche asked for Ms. Gaujacq's thoughts on the situation and her discussion with Mr. Creuzet.  Ms. Gaujacq told Mr. Laroche she was afraid and felt threatened by Mr. Creuzet.

154.    Ms. Gaujacq explained to Mr. Laroche the impossible position (because of her status as an expatriate) facing her because of the Company's failure to take corrective action.  Mr. Laroche agreed to speak with Mr. Creuzet right away.

155.    Later that same day, Ms. Gaujacq received a telephone call from Mr. Ponasso.  Mr. Ponasso stated that the Company would like to find a mutually agreeable solution to the situation, and he asked Ms. Gaujacq what she wanted.  Ms. Gaujacq again repeated her earlier proposed solution of the signed expatriation contract (the terms of which Mr. Creuzet had already agreed to in March) and a change in her reporting structure so she no longer reported directly to Mr. Nadal.

156.    Ms. Gaujacq requested a response by the following Monday, July 26, 2004.  Mr. Ponasso asked Ms. Gaujacq to refrain from taking any further action until they spoke on Monday.

157.    The next day, Saturday, July 24, 2004, Ms. Gaujacq sent an email to Mr. Creuzet,

Mr. Laroche and Mr. Ponasso, confirming that she would take no further action until Monday. However, Ms. Gaujacq emphasized the importance of having the matter resolved in writing before the end of the week.

158.    No one from the Company contacted Ms. Gaujacq, either verbally or in writing, on Monday, July 26, 2004

159.    On July 27, 2004, Ms. Gaujacq telephoned first, Mr. Creuzet, and, when she was unable to reach him, Mr. Ponasso.  Mr. Ponasso stated that Mr. Creuzet had prepared a letter extending Ms. Gaujacq's mission on the Project in the United States for three years.

160.    Contrary to Mr. Ponasso's statement, the letter received by Ms. Gaujacq by facsimile contained the following directives:

- the Company removed Ms. Gaujacq from her position on the Project with EDFINA in the United States;

- the Company directed Ms. Gaujacq to return to France immediately, without an assigned position;

- the Company refused to sign Ms. Gaujacq's expatriation contract as earlier promised, and expressly stated that Ms. Gaujacq's mission in the United States would end on August 1, 2004 – *just four days later;* and

- the Company refused to propose a position for Ms. Gaujacq in the EDF Energy Branch in France until November 1, 2004.  In addition, there was no mention of a promotion upon Ms. Gaujacq's return to France as Mr. Roussely had previously indicated.

161.    The Company made it clear to Ms. Gaujacq that her future at the Company was "dead" because of her complaints of discrimination and unfair treatment by Mr. Nadal.

162.    All of these actions were discriminatory, and in retaliation for Ms. Gaujacq's complaints of discrimination and retaliation.  None of the actions bore even a small crumb of a legitimate business justification.

163.    On July 29, 2004, Ms. Gaujacq received a telephone call from Bruno Lescoeur ("Mr. Lescoeur"), Senior Vice President, France Energy Branch, wherein Mr. Lescoeur repeatedly told Mr. Gaujacq that if she filed a claim, she would "have the whole institution against [her]."

164.    The Company removed Ms. Gaujacq from her position in the United States and ordered her immediate return to France in retaliation for her complaints of harassment, discrimination, unfair treatment and retaliation.

165.    Customary Company practice and procedure when reassigning an employee out of country on an expatriate contract is to provide no less than seven to eight months advance notice to the employee.

166.    In June 2004, Jean Luc Foret, a male engineer working with Ms. Gaujacq on the Project in the United States, was advised that he was being rotated to one of three projects of his choice effective summer, 2005.  The Company gave Mr. Foret one year's notice to transition his Project responsibilities and get his personal affairs in order.

167.    Ms. Gaujacq was given only four days' notice of the termination of her Project position.

168.    On information and belief, this lack of adequate notice was given in the hopes that Ms. Gaujacq would not have sufficient time to seek protection under the laws of the District of

Columbia or the United States – either from the discrimination and retaliation by the Company, or for her expatriate status.

169.    Other employees who had not complained of harassment, unfair treatment, discrimination or retaliation were not treated in the same manner.

170.    In August 2004, Mr. Nadal telephoned the business partners of the Project and informed them that Ms. Gaujacq no longer represented the company.

171.    On August 18, 2004, Mr. Nadal telephoned the business partners of the Project and requested that the call-in number be changed for the conference call to be held the next day so that Ms. Gaujacq would not have access to the teleconference meeting, again falsely suggesting wrongdoing on the part of Ms. Gaujacq.

172.    On September 8, 2004, Ms. Gaujacq was informed, for the first time, of certain financial details connected to her newly identified mission in France.

173.    Despite several requests, Ms. Gaujacq was not informed until October 1, 2004 of the content of her mission, on which date she received by facsimile, a letter dated September 24, 2004 from Laurent Stricker ("Mr. Stricker").

174.    In sharp contrast to the earlier representations made to Ms. Gaujacq that when she was no longer working on the Project, she would be promoted to a much higher position at EDF, Ms. Gaujacq was given a substantial demotion in title, position, responsibilities and compensation.

175.    In addition, Ms. Gaujacq had asked to remain in the United States for a period of time, to which Mr. Creuzet had previously agreed.  This was not done.

176.    Contrary to the promises and representations made to Ms. Gaujacq in January 2004, that when she returned to France she would occupy a management position of higher responsibility and compensation, the mission proposed to Ms. Gaujacq was a position of lower responsibility with decreased compensation.

177.    Ms. Gaujacq was offered the lower level position in retaliation for her complaints of discrimination, harassment and unfair treatment.

178.    Ms. Gaujacq was further told she would have to report to her new position by November 2, 2004.

179.    The intent of the Company in issuing these directives, was to force Ms. Gaujacq to resign, or to place her in a position that would appear to "justify" the Company terminating Ms. Gaujacq.

180.    The Company intended to force Ms. Gaujacq out of the Company, one way or another, in retaliation for her complaints of unfair, discriminatory and retaliatory treatment.

181.    By letter dated October 7, 2004, Ms. Gaujacq declined the mission since it did not take into account her qualifications and experience, was a demotion in every respect, and reneged upon the previous agreement of Mr. Creuzet that Ms. Gaujacq could remain in the United States. She also informed the Company of its breach of her expatriation and employment contract with the Company.

182.    Ms. Gaujacq confirmed her refusal of the position by letter dated October 28, 2004, and did not report to the new position as instructed on November 2, 2004.

183.    After declining the mission, Ms. Gaujacq received a letter, dated November 26, 2004, from Jacques Bouron ("Mr. Bouron"), who reported to Yann Laroche and who was in

charge of high level executives within the EDF Human Resources department, requesting her presence at a meeting in France on December 10, 2004, to consider her termination. Ms. Gaujacq was informed she would be allowed to have assistance at the meeting, but only if her chosen representative was an employee of the Company.

184. Ms. Gaujacq was not allowed to have outside counsel at the meeting to consider her termination.

185. After the meeting, by letter dated January 6, 2005, Ms. Gaujacq's employment was terminated, allegedly for performance related issues.

186. The termination of Ms. Gaujacq for "performance reasons" was false, the Company knew them to be false, impugned Ms. Gaujacq's competency to perform her job and general reputation, and therefore constituted defamation *per se*.

187. After Ms. Gaujacq was terminated, the Company issued an employment letter ("Employment Letter") that contains the history of Ms. Gaujacq's employment, including positions and compensation.

188. The Employment Letter is necessary for Ms. Gaujacq's employment with any other company, and must be shown to prospective employers under French law.

189. The Company issued the Employment Letter that contains false information that will be detrimental to Ms. Gaujacq's employment efforts.

190. Ms. Gaujacq requested the Company correct the false and negative information.

191. The Company has failed and refused to correct Ms. Gaujacq's Employment Letter.

192.    The Company has issued a false Employment Letter and refused to correct the false and negative information, in retaliation for Ms. Gaujacq's complaints of discrimination and retaliation.

193.    The Company, in knowingly creating and refusing to correct the Employment Letter, has committed defamation *per se*.

194.    The Company, in knowingly creating and refusing to correct the Employment Letter, has and is knowingly and wrongfully engaging in tortuous interference with Ms. Gaujacq's prospective business relationships.

195.    On April 4, 2005, Ms. Gaujacq began new employment at ENTERGY Nuclear as Director of Strategic Programs.

196.    As part of her new position, ENTERGY Nuclear requires a detailed background check.

197.    As part of this background check, ENTERGY Nuclear attempted to contact EDF to obtain information about Ms. Gaujacq's employment with EDF.  EDF, however, has failed or refused to return the telephone calls placed to them by ENTERGY Nuclear, without explanation or legitimate justification.

198.    EDF has not failed or refused to return the telephone calls from prospective or actual subsequent employers of other employees of EDF.

199.    EDF has failed and refused to return the telephone calls from ENTERGY Nuclear as further retaliation against Ms. Gaujacq, and in an attempt to tortiously interfere with Ms. Gaujacq's current business relationship with ENTERGY Nuclear.

200.    The Company also breached Ms. Gaujacq's expatriation contracts.  See Expatriation Contract, attached and incorporated as Exhibit A.

201.    Ms. Gaujacq's first expatriation contract, signed on June 20, 2000, was for a term of three (3) years, "renewable 1 year by implicit mutual agreement."  Exhibit A, article 4.

202.    In or about March 2004, Mr. Creuzet directed Ms. Gaujacq to prepare and deliver a mission letter and expatriation contract that reflected her new role, which Ms. Gaujacq did. Mr. Creuzet agreed in writing to the new expatriation contract for three years in the United States proposed by Ms. Gaujacq.

203.    During April and May 2004, Ms. Gaujacq contacted the company on several occasions to inquire of the status of her new contract at which time Ms. Gaujacq was told that her new contract and mission letter were awaiting signature.

204.    Both expatriation contracts (the original contract and the new expatriation contract) explicitly refer to the "Guide to EDF Employees Working Abroad" (the "Guide"), which is incorporated into, and a part of, Ms. Gaujacq's expatriation contracts.  See Exhibit A, article 1.

205.    The Expatriation Contract and the Guide clearly stipulates that expatriation contracts are subject to the law of the country where the expatriate performs under the contract. See Exhibit A, articles 2 and 6.

206.    The Guide also dictates that a specific interview will be held six months prior to the term of the contract, *at the latest*, for the purposes of evaluating performance and skill of the agent during the mission, and to propose a new position for the employee, taking into consideration the desires, skills and knowledge of the agent during the mission.

207.    During Ms. Gaujacq's annual evaluation on March 18, 2004 with Fernando Ponasso (EDF Branch Americas Senior Vice President), Ms. Gaujacq clearly articulated her desire to remain in the United States, and also her longer term objective for promotion to a high-level management position with the Company.

208.    The Guide also states that the six month interval prior to the term of the contract can be shortened to three months upon the express justified request of the EDF branch employing the expatriate during the mission.

209.    On March 18, 2004 in writing and on July 26, 2004, verbally, Mr. Ponasso confirmed he wanted Ms. Gaujacq to extend her mission in the United States.

210.    However, on July 27, 2004, contrary to the terms of the Guide, incorporated into the expatriation contracts, Ms. Gaujacq received a letter by facsimile wherein the Company removed Ms. Gaujacq from her position on the Project with EDFINA in the United States, the Company directed Ms. Gaujacq to return to France immediately, the Company refused to sign Ms. Gaujacq' s expatriation contract as earlier promised, and the Company expressly stated that Ms. Gaujacq's mission in the United States would end on August 1, 2004 – *just four days later*.

211.    The Expatriation Contract further provided that EDF would compensate Ms. Gaujacq for necessary expenses incurred in relation to her residence in Washington, D.C., her company vehicle and necessary business expenses.  See Exhibit A, articles 9 and 11.

212.    On or about August 9, 2004, Mr. Nadal cut off Ms. Gaujacq's business credit cards.  This action was taken notwithstanding assurances by the Company that during the "transition" period, she would continue to receive the same benefits of the compensation arrangement she had during her U.S. assignment.

213.    Business expenses incurred by Ms. Gaujacq, including business related travel, insurance premiums and utility expenses, totaling over $2,500.00, have not been reimbursed by the Company.

214.    In addition, the Company breached Ms. Gaujacq's French employment contract which stipulates that no **substantial** modification in employment conditions, including position and location, are permitted by the Company without the employee's approval, unless the Company can support such a modification with a legitimate economic or business justification.

215.    No legitimate economic or business justification was ever provided to Ms. Gaujacq.

216.    Ms. Gaujacq, who devoted 24 years to the Company and whose performance was excellent and her achievements many, is no longer employed, because she refused to tolerate the conduct of a man who believed women should be treated as lesser human beings, and when she exercised the rights recognized in the District of Columbia and the United States to complain when discrimination occurs, she was told her career was dead by a Company who condoned, and continues to condone discriminatory and retaliatory conduct.  The Company made good on its threat.

217.    Meanwhile, the man, who believes women should be treated as lesser human beings and are not capable of and should not be trusted holding high-level positions, remains employed in a high level position at the Company.   His discriminatory and retaliatory conduct has been sanctioned, approved, protected and fostered, by the Company.

218.    Moreover, because Ms. Gaujacq engaged in protected activity, that is, filed complaints of discrimination and retaliation as she was permitted to do by the laws of the District

of Columbia and the laws of the United States, Mr. Nadal and the Company, have engaged in conduct to attempt to discredit, defame her, and prevent Ms. Gaujacq from being gainfully employed in the future.

## COUNT ONE –
## GENDER DISCRIMINATION AND DISCRIMINATORY
## TERMINATION IN VIOLATION OF TITLE VII
### (against the Company)

219.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

220.    Ms. Gaujacq was removed from her position as President of EDFINA without justification, was replaced with a male with less qualifications but who was paid a higher salary for doing less work, and Ms. Gaujacq was demoted to a Vice President, then ultimately terminated.  The demotion, the disparate pay and ultimately the termination, and the conduct throughout the process, were taken because of Ms. Gaujacq' gender, female.

221.    Mr. Nadal, acting on behalf of the Company, harassed, demeaned and threatened Ms. Gaujacq, attended Ms. Gaujacq's business meetings purely to harass and demean her to her subordinates, spoke to Ms. Gaujacq in a demeaning, threatening, rude and harassing manner, took away Ms. Gaujacq's job responsibilities and authority (check signing, ability to enter into contracts, incur expenses, or make representations or warranties on behalf of the Company), defamed her, conducted audits without a shred of justification, engineered Ms. Gaujacq not receiving the expatriation contract she had been promised, and engineered her termination, all on the basis of Ms. Gaujacq's gender.

222.   No males, including specifically the other Vice Presidents, were treated as Ms.

Gaujacq was treated by Mr. Nadal, acting on behalf of the Company.

223. Mr. Nadal, acting on behalf of the Company, made clear to Ms. Gaujacq, as well as other employees of the Company, that he believed Ms. Gaujacq was inferior to males (and to Mr. Nadal, specifically) because she was a woman.

224. Mr. Nadal, acting on behalf of the Company, attempted to disguise his discrimination and later, his retaliation, which evidenced that Mr. Nadal engaged in the discriminatory conduct intentionally, and that he knew it violated the law.

225. Mr. Nadal, acting on behalf of the Company, stripped Ms. Gaujacq of her authority because of her gender, female.

226. The Company revoked its representations, agreements and promises made to Ms. Gaujacq, that she would remain President; that she would remain in the United States; that she would be in charge of the Project until 2005 or 2006; that the expatriation contract was signed and approved, permitting her to remain in the United States for three years, and serve in a high level capacity; that when she returned to France, she would be promoted to a position higher than she served as President of the operations in the United States; that she would be given sufficient time to relocate and would be aware of the details of her employment; and that she would be treated in a manner that she deserved for her accomplishments.

227. The Company failed and refused to investigate any of Ms. Gaujacq's complaints of discrimination or retaliation, and failed and refused to take corrective action.

228. The Company threatened Ms. Gaujacq that if she made a complaint of discrimination, her career was over, and she would be terminated.

229. The Company's conduct as set forth above and throughout this Complaint, in

furtherance of discrimination of Ms. Gaujacq on the basis of her gender, and in retaliation because Ms. Gaujacq engaged in protected activity, that is, complaining of the unfair and discriminatory conduct, and complaining of the retaliatory conduct.

230.    Ms. Gaujacq's employment was terminated as a result of the discriminatory and retaliatory treatment she suffered.  The Company made good on its threat.

231.    The Company's discriminatory and retaliatory actions were intentional, were actuated by malice, spite, and ill-will; were willful and wanton; and evinced a conscious and reckless disregard for Ms. Gaujacq's rights.

232.    As a direct and proximate result of the discriminatory environment, Ms. Gaujacq has suffered and will in the future suffer great damages, including loss of income, loss of employee benefits, lost career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, severe mental anguish, stress, pain and suffering.

233.    Due to the severity of the Company actions and consistent with the intentional discrimination and retaliation by the Company, Ms. Gaujacq is also entitled to punitive damages.

**COUNT TWO -
RETALIATORY ENVIRONMENT, ACTS OF RETALIATION
AND RETALIATORY TERMINATION IN VIOLATION OF TITLE VII
(against the Company)**

234.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

235.    Rather than remedy its harassing and discriminatory working environment, the Company engaged in a series of retaliatory acts against Ms. Gaujacq because she reported and sought remedy from defendants' discriminatory conduct.   These acts are more specifically set forth throughout this Complaint, but are also referenced in ¶¶ 220-30.

236.    In addition, in retaliation for Ms. Gaujacq' complaints of discrimination, Mr. Nadal, acting on behalf of the Company, ordered Ms. Gaujacq to turn over all of the Project documents to him.

237.    Mr. Nadal did not order other employees, who had not complained of harassment, discrimination and unfair treatment, to turn over the documents of projects on which they worked, or impose unreasonable and unnecessary constraints or directives.

238.    Mr. Nadal, acting on behalf of the Company, and also in furtherance of his own personal agenda, fabricated complaints against Ms. Gaujacq, saying that the Energy Branch in France had complained about her.

239.    Specifically, Mr. Nadal falsely alleged to Ms. Gaujacq, in the presence of Jean-Luc Foret on July 12, 2004, that the SEPTEN group in charge of nuclear reactor designs in Lyon (France) within the France Energy Branch had complained on June 20, 2004 about a lack of information from Ms. Gaujacq.  No one from the Energy Branch in France complained about Ms. Gaujacq.  The complaints were false, and Mr. Nadal knew they were false.

240.    Mr. Nadal defamed and fabricated complaints against Ms. Gaujacq in retaliation for her complaints of discrimination, harassment and unfair treatment.

241.    Mr. Nadal, acting on behalf of the Company and also in furtherance of his own personal agenda, alleged wrongdoing during Ms. Gaujacq's tenure as President, causing damage to her reputation within the Company and with its business partners.

242.    In addition, despite written and verbal assurances, the Company refused to grant Ms. Gaujacq a new expatriation contract after telling her it was approved, and did not change her reporting structure, taking her out of Mr. Nadal's line of direct reporting.

243.    The Company breached Ms. Gaujacq's Expatriation Contract as set forth in ¶¶ 200 - 215 above, refused to grant Ms. Gaujacq the new expatriation contract which had been previously agreed upon in March 2004, and did not change her reporting structure in retaliation for Ms. Gaujacq's complaints of discrimination, harassment and unfair treatment.

244.    Other acts of retaliation, in addition to those set forth in this Count, throughout the Complaint, and in ¶¶ 220-30, include the company removing Ms. Gaujacq from the Project, ordering her immediate return to France, and not giving Ms. Gaujacq the same amount of time to transition back to France as afforded to employees who had not complained of discrimination, harassment and unfair treatment.

245.    Ms. Gaujacq was then offered a position with a lower level of responsibility and a decrease in compensation, with the intent to force her to leave the Company, or to set her up to be fired, also in retaliation for her complaints of discrimination and retaliation.

246.    Ms. Gaujacq was offered a position with a lower level of responsibility and no pay raise in retaliation for her complaints of discrimination, harassment and unfair treatment. The Company knew the position offered would be unacceptable to Ms. Gaujacq.

247.    Ms. Gaujacq was then terminated, in further retaliation for her complaints of discrimination, harassment and unfair treatment.

248.    The Company engaged in the conduct as set forth above and throughout this Complaint, in furtherance of discrimination of Ms. Gaujacq on the basis of her gender, and in retaliation because Ms. Gaujacq engaged in protected activity, that is, complaining of the unfair and discriminatory conduct, and complaining of the retaliatory conduct.

249.     Ms. Gaujacq's employment was terminated as a result of the discriminatory and retaliatory treatment she suffered.  The Company made good on its threat.

250.     The Company's discriminatory and retaliatory actions were intentional, were actuated by malice, spite, and ill-will; were willful and wanton; and evinced a conscious and reckless disregard for Ms. Gaujacq's rights.

251.     As a direct and proximate result of the retaliatory environment, Ms. Gaujacq has suffered and will in the future suffer great damages, including loss of income, loss of employee benefits, lost career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, severe mental anguish, stress, pain and suffering.

252.     Due to the severity of the Company actions and consistent with the intentional discrimination and retaliation by the Company, Ms. Gaujacq is also entitled to punitive damages.

### COUNT THREE – GENDER DISCRIMINATION IN THE COURSE OF EMPLOYMENT IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT

253.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

254.     The Company, through its agents and officers, discriminated against Ms. Gaujacq on account of her gender, during the course of her employment by the Company.  This discrimination was with respect to the terms, conditions, and privileges of Ms. Gaujacq's employment at the Company creating a hostile and intolerable environment, in violation of D.C. Code § 2-1402.11.

255.     The discriminatory conduct is set forth throughout this Complaint, but also

specifically in ¶¶ 220-30 of this Complaint, which is realleged herein.

256.    The Company failed and refused to investigate any of Ms. Gaujacq's complaints of discrimination or retaliation, and failed and refused to take corrective action.

257.    The Company threatened Ms. Gaujacq that if she made a complaint of discrimination, her career was over, and she would be terminated.

258.    The Company's conduct as set forth above and throughout this Complaint, in furtherance of discrimination of Ms. Gaujacq on the basis of her gender, and in retaliation because Ms. Gaujacq engaged in protected activity, that is, complaining of the unfair and discriminatory conduct, and complaining of the retaliatory conduct.

259.    Ms. Gaujacq's employment was terminated as a result of the discriminatory and retaliatory treatment she suffered.  The Company made good on its threat.

260.    The Company's discriminatory and retaliatory actions were intentional, were actuated by malice, spite, and ill-will; were willful and wanton; and evinced a conscious and reckless disregard for Ms. Gaujacq's rights.

261.    As a direct and proximate result of the retaliatory environment, Ms. Gaujacq has suffered and will in the future suffer great damages, including loss of income, loss of employee benefits, lost career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, severe mental anguish, stress, pain and suffering.

262.    As a direct and proximate result of the discrimination, Ms. Gaujacq is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code §2-1403.13 and the Code of D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, et seq.

263.    Due to the severity of the Company actions, including the intentional nature of the conduct, Ms. Gaujacq is also entitled to punitive damages.

## COUNT FOUR –
## GENDER DISCRIMINATION IN THE COURSE OF EMPLOYMENT IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### (Against Christian Nadal)

264.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

265.    Through his individual actions, Christian Nadal aided and abetted the Company's discrimination against Ms. Gaujacq on account of her gender, during the course of her employment by the Company.  This discrimination was with respect to the terms, conditions, and privileges of Ms. Gaujacq's employment at the Company creating a hostile and intolerable environment and is described in more detail in Counts One and Three and throughout the complaint, in violation of D.C. Code § 2-1402.62.

266.    Christian Nadal's discriminatory and retaliatory conduct was intentional, and evinced ill will, recklessness, and willful disregard of Ms. Gaujacq's rights, wantonness, oppressiveness, maliciousness, and a spirit of mischief.

267.    Christian Nadal's discriminatory and retaliatory conduct had the effect and/or consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.1, et. seq., in violation of D.C. Code §§ 2-1402.68 and 2-1402.62.

268.    As a direct and proximate result of Christian Nadal's behavior, Ms. Gaujacq has suffered and will in the future suffer great damages, including loss of past and future income, loss of employee benefits, lost career and business opportunities and advancement, past

pecuniary expenses, future pecuniary expenses, medical expenses, embarrassment, humiliation, inconvenience, reputation, mental anguish, stress, pain and suffering.

269.    As a direct and proximate result of this discrimination, Ms. Gaujacq is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code § 2-1403.13 and the Code of the District of Columbia Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, et seq.

270.    Because of the Christian Nadal's conduct as set forth above, Ms. Gaujacq is also entitled to punitive damages.

**COUNT FIVE –**
**RETALIATION IN THE COURSE OF EMPLOYMENT IN**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**

271.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

272.    The Company, through its agents and officers, retaliated against Ms. Gaujacq on account of her gender, female, during the course of her employment by the Company.  This retaliation was with respect to the terms, conditions, and privileges of Ms. Gaujacq's employment at the Company, creating a hostile and intolerable environment, in violation of D.C. Code § 2-1402.11.

273.    Rather than remedy its harassing and discriminatory working environment, the Company engaged in a series of retaliatory acts against Ms. Gaujacq because she reported and sought remedy from defendants' discriminatory conduct, all in violation of D.C. Code § 2-1402.61.

274.    Other acts of retaliation, in addition to those set forth in this Count, throughout the

43

Complaint, and in ¶¶ 220-30, include the company removing Ms. Gaujacq from the Project, ordering her immediate return to France, and not giving Ms. Gaujacq the same amount of time to transition back to France as afforded to employees who had not complained of discrimination, harassment and unfair treatment.

275.    Ms. Gaujacq was then offered a position with a lower level of responsibility and a decrease in compensation, with the intent to force her to leave the Company, or to set her up to be fired, also in retaliation for her complaints of discrimination and retaliation.  The Company knew the position offered would be unacceptable to Ms. Gaujacq.

276.    Ms. Gaujacq was then terminated, in further retaliation for her complaints of discrimination, harassment and unfair treatment.

277.    The Company engaged in the conduct as set forth above and throughout this Complaint, in furtherance of discrimination of Ms. Gaujacq on the basis of her gender, and in retaliation because Ms. Gaujacq engaged in protected activity, that is, complaining of the unfair and discriminatory conduct, and complaining of the retaliatory conduct, in violation of D.C. Code §§ 2-1402.11, 2-1402.62 and 2-1402.68.

278.    Ms. Gaujacq's employment was terminated as a result of the discriminatory and retaliatory treatment she suffered.  The Company made good on its threat.

279.    This retaliation was with respect to the terms, conditions, and privileges of Ms. Gaujacq's employment at the Company, creating a hostile and intolerable environment, in violation of D.C. Code § 2-1402.11.

280.    The Company's actions had the effect and/or consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.1, et seq., in violation of D.C.

Code § 2-1402.68.

281.    The Company's discriminatory and retaliatory actions were intentional, were actuated by malice, spite, and ill-will; were willful and wanton; and evinced a conscious and reckless disregard for Ms. Gaujacq's rights.

282.    As a direct and proximate result of the retaliatory environment, Ms. Gaujacq has suffered and will in the future suffer great damages, including loss of income, loss of employee benefits, lost career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, severe mental anguish, stress, pain and suffering.

283.    As a direct and proximate result of this retaliation, Ms. Gaujacq is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code §2-1403.13 and the Code of D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, et seq.

284.    Due to the severity of the Company actions and consistent with the intentional discrimination and retaliation by the Company, Ms. Gaujacq is also entitled to punitive damages.

**COUNT SIX –**
**AIDING AND ABETTING RETALIATION IN THE COURSE OF EMPLOYMENT IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(Against Christian Nadal)**

285.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

286.    Through his individual actions, Christian Nadal aided and abetted the Company's retaliation against Ms. Gaujacq because of her engaging in protected activity, as described in more detail in Counts Two and Five and throughout the complaint, in violation of D.C. Code §

2-1402.62.

287.    Other acts of retaliation aided and abetted by Christian Nadal, in addition to those set forth in this Count, throughout the Complaint, and in ¶¶ 220-30, include the company removing Ms. Gaujacq from the Project, ordering her immediate return to France, and not giving Ms. Gaujacq the same amount of time to transition back to France as afforded to employees who had not complained of discrimination, harassment and unfair treatment.

288.    Ms. Gaujacq was then offered a position with a lower level of responsibility and a decrease in compensation, with the intent to force her to leave the Company, or to set her up to be fired, also in retaliation for her complaints of discrimination and retaliation.

289.    Ms. Gaujacq was then terminated, in further retaliation for her complaints of discrimination, harassment and unfair treatment.

290.    Christian Nadal's discriminatory and retaliatory conduct was intentional, and evinced ill will, recklessness, and willful disregard of Ms. Gaujacq's rights, wantonness, oppressiveness, maliciousness, and a spirit of mischief.

291.    Christian Nadal's discriminatory and retaliatory conduct had the effect and/or consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.1, et. seq., in violation of D.C. Code §§ 2-1402.68 and 2-1402.62.

292.    As a direct and proximate result of Christian Nadal's behavior, Ms. Gaujacq has suffered and will in the future suffer great damages, including loss of past and future income, loss of employee benefits, lost career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, medical expenses, embarrassment, humiliation, inconvenience, reputation, mental anguish, stress, pain and suffering.

47

293.     As a direct and proximate result of this retaliation, Ms. Gaujacq is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code § 2-1403.13 and the Code of the District of Columbia Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, et seq.

294.     Because of the Christian Nadal's conduct as set forth above, Ms. Gaujacq is also entitled to punitive damages.

### COUNT SEVEN - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS (against the Company)

295.     The foregoing allegations are incorporated as if realleged herein.

296.     Ms. Gaujacq is an engineer who has been in the nuclear energy field for over 24 years and was the first women in the world to have overall operational responsibility for a nuclear plant. Ms. Gaujacq holds a Master's of Science in Engineering, with a major in Energy and a minor in Economy, and an Executive MBA, and in 2002, was awarded the Chevalier de l'Ordre National du Merite, the highest national award given by the president of France.

297.     When and if Ms. Gaujacq was in a position to leave, Ms. Gaujacq possessed a contractual or business expectancy with future employers.

298.     Ms. Gaujacq had a business relationship and/or expectancy with future employers, with a probability of future economic benefit to Ms. Gaujacq.

299.     The Company and Mr. Nadal had knowledge of Ms. Gaujacq's business relationship and/or expectancy with future employers.

300.     The Company and Mr. Nadal employed improper methods to interfere with Ms. Gaujacq's business expectations and contractual relationships with future employers, by creating

a false and defamatory Employment Letter, and refusing to correct it, knowing Ms. Gaujacq must show the document to all prospective employers.

301.    Ms. Gaujacq specifically has a business relationship and/or expectancy with ENTERGY Nuclear, with a probability of future economic benefit to Ms. Gaujacq.

302.    The Company has knowledge of Ms. Gaujacq's business relationship and/or expectancy with ENTERGY Nuclear.

303.    The Company further employed improper methods in an attempt to interfere with Ms. Gaujacq's business expectations and contractual relationships with ENTERGY Nuclear by failing to return ENTERGY Nuclear's telephone calls requesting information necessary for Ms. Gaujacq's background check.

304.    But for the defendants' improper means, as set forth in detail in this Complaint, Ms. Gaujacq would have enjoyed employment relationships with prospective employers.

305.    In injuring Ms. Gaujacq' reputation, falsely stating that the Energy Branch in France had complaints about Ms. Gaujacq, falsely stating within the Company that there were wrongdoings during Ms. Gaujacq's tenure as president, demoting Ms. Gaujacq and stripping her authority, engaging in discrimination, and by ultimately terminating Ms. Gaujacq without justification and causing irreparable harm to her career and reputation, Defendants wrongfully, intentionally, and tortiously interfered with Ms. Gaujacq's potential future employers.

306.    The Company knew, or should have known, that the Company enjoys a monopoly over nuclear commercial operations in France.  Therefore, the Company knew, or should have known, that by its actions, Ms. Gaujacq will be unable to find an equivalent job in France and the United States.

307.    In injuring or attempting to injure Ms. Gaujacq's reputation by failing to return ENTERGY Nuclear's telephone calls requesting information necessary for Ms. Gaujacq's background check, the Company is wrongfully, intentionally, and tortiously interfered with Ms. Gaujacq's employment with ENTERGY Nuclear.

308.    As a direct and proximate result of the tortious interference, Ms. Gaujacq has suffered and will suffer in the future great damages, including loss of reputation, loss of her job, loss of income, loss of retirement benefits, loss of stock options, loss of employment benefits, lost career and business opportunities and advancement, other past pecuniary losses, emotional pain, embarrassment, humiliation, inconvenience, mental anguish, stress, pain, suffering, loss of enjoyment of life and other nonpecuniary injury.

309.    Because of the Defendants' conduct as set forth above, Ms. Gaujacq is also entitled to punitive damages.

## COUNT EIGHT -
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (against Mr. Nadal)

310.    The foregoing allegations are incorporated as if realleged herein.

311.    Ms. Gaujacq is an engineer who has been in the nuclear energy field for over 24 years and was the first women in the world to have overall operational responsibility for a nuclear plant.  Ms. Gaujacq holds a Master's of Science in Engineering, with a major in Energy and a minor in Economy, and an Executive MBA, and in 2002, was awarded the Chevalier de l'Ordre National du Merite, the highest national award given by the president of France.

312.    With Ms. Gaujacq's documented history of performance excellence in the industry, with increasing responsibilities and extremely high performance ratings, Ms. Gaujacq

had every reason to believe she would retain responsibility for the Project in the United States for at least another three years.  This belief was based on Ms. Gaujacq's qualifications and performances, as well as express representations made to her by the Company.

313.    As part of Ms. Gaujacq's employment and business expectancies with the Company, Ms. Gaujacq possessed a contractual relationship and expectancy with the Company.

314.    Ms. Gaujacq had a significant probability of continued and significant future economic benefit with the Company, including salary, raises, bonuses, stock options, stock, health and life insurance, pension and savings plans, and retirement benefits.

315.    Mr. Nadal had knowledge of Ms. Gaujacq's relationship with the Company.

316.    Mr. Nadal, specifically, acting outside the scope of his employment, employed improper means to interfere with Ms. Gaujacq's business expectancies and contractual relationships, including lying about Ms. Gaujacq's performance, lying about complaints that did not exist, committing discrimination and retaliation and then attempting to cover up both the discrimination and retaliation.

317.    But for Mr. Nadal's improper means, as set forth in detail in this Complaint, Ms. Gaujacq would have enjoyed continued employment at the Company, and would have continue to realize business expectancies and contractual relationships with the Company.

318.    In injuring Ms. Gaujacq' reputation, falsely stating that the Energy Branch in France had complaints about Ms. Gaujacq, falsely stating within the Company that there were wrongdoings during Ms. Gaujacq's tenure as president, demoting Ms. Gaujacq and stripping her authority, engaging in discrimination, and by ultimately terminating Ms. Gaujacq without justification and causing irreparable harm to her career and reputation, Mr. Nadal wrongfully,

intentionally, and tortiously interfered with Ms. Gaujacq's then-existing business expectancies and contractual relationships with the Company.

319.    As a direct and proximate result of the tortious interference, Ms. Gaujacq has suffered and will suffer in the future great damages, including loss of reputation, loss of her job, loss of income, loss of retirement benefits, loss of stock options, loss of employment benefits, lost career and business opportunities and advancement, other past pecuniary losses, emotional pain, embarrassment, humiliation, inconvenience, mental anguish, stress, pain, suffering, loss of enjoyment of life and other nonpecuniary injury.

320.    Because of Mr. Nadal's conduct as set forth above, Ms. Gaujacq is also entitled to punitive damages.

## COUNT NINE –
## BREACH OF CONTRACT
### (Against the Company)

321.    The foregoing allegations are incorporated as if realleged herein.

322.    The expatriation contracts (both the original contract and the new expatriation contract) and the "Guide to EDF Employees Working Abroad," which was specifically incorporated into the expatriation contracts, constitute the terms of Ms. Gaujacq's employment and the contractual obligations of the Company.

323.    The Company was obligated by the explicit terms of these contracts and the Guide.

324.    By failing to adhere to the obligations as set forth in ¶¶ 200 - 215 above, the Company breached its contracts with Ms. Gaujacq, including, but not limited to, failing to provide six months notice for any proposed new position, failing to reimburse legitimate

business and expatriate expenses, and substantially modifying Ms. Gaujacq's employment conditions without her approval or a legitimate economic or business justification.

325.    As a result of the Company's breaches of Ms. Gaujacq's contracts, Ms. Gaujacq is suffering, and will continue to suffer damages, including loss of reimbursement benefits, loss of retirement benefits, loss of income and loss of use of income, and interest on these amounts.

**COUNT TEN**
**<u>DUTY OF GOOD FAITH AND FAIR DEALING</u>**
**(Against the Company)**

326.    The foregoing allegations are incorporated as if realleged herein.

327.    The Company possessed a duty of good faith and fair dealing in honoring its Expatriation Contract with Ms. Gaujacq and the "Guide to EDF Employees Working Abroad," specifically incorporated therein.

328.    The Company breached its duty of good faith and fair dealing as set forth in detail throughout this Complaint, including but not limited to engaging in conduct to attempt to discredit her and prevent Ms. Gaujacq from being gainfully employed in the future, fabricating complaints against Ms. Gaujacq, taking away Ms. Gaujacq's job responsibilities and authority, defaming her, failing to sign the expatriation contract she had been promised in 2004, failing to rectify discriminatory and retaliatory practices against her, failing to provide agreed upon reimbursement, failing to provide Ms. Gaujacq with adequate notice of termination of her employment position and transfer back to France and terminating her.

329.    The Company evaded the spirit of the Expatriation Contract, willfully rendered imperfect performance under the Expatriation Contract and interfered with the performance by Ms. Gaujacq under the Expatriation Contract.  As such, its conduct constituted bad faith and

53

unfairness and had the effect of destroying and/or injuring Ms. Gaujacq's right to receive the fruits of the Expatriation Contract.

330.    As a direct and proximate result of the breach of good faith and fair dealing, Ms. Gaujacq has suffered and will in the future suffer great damages, including loss of income, loss of employee benefits, lost career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, damaged reputation, embarrassment, humiliation, inconvenience, severe mental anguish, stress, pain and suffering.

### COUNT ELEVEN –
### VIOLATION OF THE EQUAL PAY ACT

331.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

332.    Ms. Gaujacq was replaced as President of EDFINA by Mr. Nadal, a male.  Mr. Nadal was paid a salary that was approximately 60% higher than the salary paid to Ms. Gaujacq as President.  Mr. Nadal had the same responsibilities (or less, since Ms. Gaujacq retained all responsibility for the Project and Mr. Nadal did not pick up additional responsibilities to make up for that difference) as Ms. Gaujacq had as President.

333.    Ms. Gaujacq received a lower rate of compensation than Mr. Nadal on account of her gender, female, for the same position with the same (or greater) amount of responsibility, under similar working conditions.

334.    The unequal compensation paid to Ms. Gaujacq was not unequal due to a seniority system, a merit system, a system which measured earnings by quantity or quality of production, or a differential based on any factor other than gender.

335.    During the course of her employment by the Company, Ms. Gaujacq was discriminated against by the Company in violation of 29 U.S.C. § 206(d).

336.    The Company knew its conduct was illegal, or acted in reckless disregard of whether its conduct was illegal.

337.    The Company's unlawful conduct was willful.

338.    As a direct and proximate result of the unequal pay, and the Company's specific acts of discrimination, Ms. Gaujacq has suffered and will suffer in the future great damages, including loss of compensation, including salary, bonuses, benefits, stock options, stock, interest and differential valuations, and other past pecuniary losses.

339.    Because the Company's conduct was willful, Ms. Gaujacq is entitled to the full amount of damages recoverable under the Equal Pay Act, 29 U.S.C. § 206, et seq., including, but not limited to compensatory damages, liquidated damages in an amount equal to the compensatory damages and attorney fees and costs as described in 29 U.S.C. § 216(b).

**COUNT TWELVE –
DEFAMATION *PER SE*
(Against Nadal and the Company)**

340.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

341.    As set forth in detail throughout the complaint and in particular ¶¶ 110 – 118, 138, 171, 186-193, Mr. Nadal and the Company made false and defamatory statements to employees of the Company, and to prospective employers of Ms. Gaujacq, stating or implying that Ms. Gaujacq was dishonest and that wrongdoing was committed under her watch, sufficiently serious to warrant an audit, that Ms. Gaujacq was not competent and responsible

enough, or honest enough to be able to sign checks, approve contracts, expenses, or make warranties or representations on behalf of the Company, that there were complaints about Ms. Gaujacq from the Energy Branch, that Ms. Gaujacq was terminated for cause, and that Ms. Gaujacq's employment history, set forth in the Employment Letter was accurate and complete.

342.    Mr. Nadal and the Company engaged in these materially false and misleading statements and conduct knowing the claims were false, defamatory and particularly in the context of the conduct and communications, outrageous and incendiary.

343.    The Company is also responsible for all of the actions taken by Mr. Nadal, because Mr. Nadal is a high level supervisor at the Company; Mr. Nadal engaged in the defamatory actions during business hours; the Company was informed of the actions with sufficient time to attempt to diffuse, reverse or decrease the substantial harm caused to Ms. Gaujacq, yet chose to take no action and permitted Mr. Nadal to continue to engage in the action after Ms. Gaujacq's complaints; and the Company terminated Ms. Gaujacq after having been informed of the prior defamatory conduct, thereby creating additional harm to Ms. Gaujacq.

344.    Mr. Nadal and the Company's statements and conduct constituted defamation *per se*.

345.    Mr. Nadal and the Company's statements and conduct assert that Ms. Gaujacq was unfit to perform the duties of her employment, that she lacked integrity in her profession and that her reputation was impaired.  The effect of Defendants' words was prejudicial to Ms. Gaujacq in her reputation and her work.

346.    Any privilege connected to these statements was waived because (a) Defendants knew these statements were false or made these statements with reckless disregard as to whether

the statements were false or not; (b) the statements were deliberately made in such a way that they were heard by persons having no interest or duty in the subject of the statement; (c) the statements were unnecessarily insulting; (d) the language used was stronger or more violent than was necessary under the circumstances; (e) Defendants made the statements because of hatred, ill will or a desire to injure Ms. Gaujacq, rather than a fair comment on the subject; and/or (f) the statements were made because of personal spite, or ill will, independent of the occasion on which the communication was made.

347.    Any privilege connected to these statements is overcome by Mr. Nadal and the Company's malice in making these statements for personal motive of spite, ill-will, negligence and malice, with the intent to irreparably injure Ms. Gaujacq.

348.    Mr. Nadal and the Company repeated these defamatory statements to third parties.

349.    The statements made by Mr. Nadal were made while acting within the scope of his employment with the Company.

350.    Alternatively, the statements made Mr. Nadal were made while acting outside the scope of his employment with the Company.

351.    These materially false and misleading statements were made with an intent to harm Ms. Gaujacq's reputation for morality, and Ms. Gaujacq's reputation, integrity and competency in her employment and profession, and have done so.

352.    Said defamation was made in a reckless and negligent manner with a malicious intent and evinces a conscious disregard for the rights of Ms. Gaujacq.

353.    As a direct and proximate result of the defamation, Ms. Gaujacq has suffered and will in the future suffer great damages, including loss of income, loss of employee benefits, lost

career and business opportunities and advancement, past pecuniary expenses, future pecuniary

expenses, damaged reputation, embarrassment, humiliation, inconvenience, severe mental

anguish, stress, pain and suffering.

354.    Due to the severity of Mr. Nadal and the Company's defamatory conduct, Ms.

Gaujacq is also entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff  Catherine L. Gaujacq requests this Court enter judgment in her

favor, and against defendants Electricite de France, Electricite de France International North

America, Inc. and Christian Nadal, jointly and severally, on the above counts, and on each of

them, and further:

(a)    Award Ms. Gaujacq compensatory damages of $10,000,000 on each of the above-
       stated Counts; and in addition

(b)    Award Ms. Gaujacq punitive and exemplary damages of $15,000,000 on each of
       Counts One through Eight and Twelve; and in addition

(c)    Award Ms. Gaujacq liquidated damages pursuant to 29 U.S.C. § 216(b) on Count
       Eleven; and in addition

(d)    Award Ms. Gaujacq reasonable attorneys' fees and the costs of this action,
       including expert witness fees; and in addition

(e)    Award injunctive relief consisting of an order prohibiting the defendants from
       engaging in further employment practices that create or tolerate a sexually-hostile
       or retaliatory work environment, or from retaliating against any of its current,
       former, or future employees and correcting the Employment Letter; and in

58

addition

(f)     Award injunctive relief consisting of an order requiring the defendants to

establish and maintain a training program for supervisors and staff dealing with

sexual harassment and retaliation, to be approved of and monitored by Ms.

Gaujacq and the United States Equal Employment Opportunity Commission; and

in addition

(g)     Declare that defendant has violated District of Columbia Human Rights Act and

the Equal Pay Act; and in addition

(h)     Enjoin defendants from further violations of the District of Columbia Human

Rights Act and the Equal Pay Act; and in addition

(i)     Award Ms. Gaujacq such other and further relief as may be appropriate under the

circumstances.

## JURY DEMAND

**PLAINTIFF CATHERINE L. GAUJACQ DEMANDS A TRIAL BY JURY.**

May 13, 2005                              Respectfully submitted,


_____
Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, VA  20190
(703) 318-6800

Counsel for Plaintiff,
Catherine L. Gaujacq