# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CATHERINE GAUJACQ | ) |
| Plaintiff, | ) |
| v. | ) No. 1:05CV0969 (JGP) |
| ELECTRICITE DE FRANCE INTERNATIONAL NORTH AMERICA, INC., et al. | ) |
| Defendants. | ) |

## <u>MOTION TO AMEND PROTECTIVE ORDER</u>

Plaintiff, Catherine Gaujacq, by counsel, hereby moves this Court, pursuant to the Protective Order entered by the Court on December 14, 2005, to remove the "Highly Confidential" designations from documents produced by Defendant Christian Nadal ("Mr. Nadal") and amend the Protective Order entered by this Court on December 14, 2005. The grounds for this Motion are set forth in the attached Motion and Memorandum.

January 10, 2006

Respectfully submitted,

_Elaine Charlson Bredehoft_
Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive,
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
Catherine Gaujacq

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHERINE GAUJACQ | ) |
| Plaintiff, | ) |
| v. | ) No. 1:05CV0969 (JGP) |
| ELECTRICITE DE FRANCE INTERNATIONAL NORTH AMERICA, INC., et al. | ) |
| Defendants | ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO REMOVE "HIGHLY CONFIDENTIAL" DESIGNATIONS AND TO AMEND PROTECTIVE ORDER

The plaintiff, Catherine Gaujacq ("Ms. Gaujacq"), by counsel, hereby moves this Court, pursuant to the Protective Order entered by the Court on December 14, 2005, to remove the "Highly Confidential" designations from documents produced by Defendant Christian Nadal ("Mr. Nadal") and amend the Protective Order entered by this Court on December 14, 2005. The grounds for this Motion are set forth in the attached Motion and Memorandum.

## CERTIFICATE UNDER LOCAL RULE 37(E)

Counsel for the plaintiff hereby certifies that counsel have made good faith efforts verbally and in writing,[1] to resolve the discovery matters at issue prior to placing this matter before the Court. Despite counsel's best efforts, however, counsel have not been able to come to an agreement on this issue. Defendant Nadal has simply abused the use of the "Highly Confidential" designation,

---

[1] *See* Exhibit 1, letter from Ms. Bredehoft to Mr. Cooper dated December 21, 2005; Exhibit 2, letter from Mr. Cooper to Ms. Bredehoft dated January 3, 2006; and Exhibit 3, series of e-mails attempting to schedule a conference to discuss outstanding discovery issues.

in spite of his counsel's agreement not to do so and plaintiff's efforts to have Mr. Nadal re-designate his documents according to the definition of such designations as stated in the Protective Order.

## PROCEDURAL HISTORY

Ms. Gaujacq filed her Complaint on May 13, 2005. In her complaint, Ms. Gaujacq (i) alleges discrimination and retaliation on the basis of gender, and discriminatory and retaliatory termination, in violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq., and the common law of the District of Columbia; (ii) disparate and unequal pay, in violation of the Equal Pay Act, 29 U.S.C. § 206(d); (iii) defamation *per se*; (iv) breach of contract; (v) tortious interference with contractual relations and business expectancies; and (vi) breach of the duty of good faith and fair dealing.[2] Defendants filed their answers to this complaint on September 12, 2005. A scheduling order was entered on October 14, 2005. In this Order, the Court set the deadline for fact discovery on May 31, 2006. The trial is scheduled to begin on April 2, 2007.

Plaintiff served her first discovery requests on Mr. Nadal and Electricite De France International North America, Inc. ("EDFINA") on October 28, 2005. A Protective Order was filed in this Court on December 6, 2005 and accepted by the Honorable John Garrett Penn on December 14, 2005. Mr. Nadal and EDFINA served their written responses on December 13, 2005. Mr. Nadal produced responsive documents on December 16, 2005. EDFINA began producing documents on that same date. Many of the documents produced by both parties are in French.

---

[2] The claims of violations of Title VII and breach of contract and the duty of good faith and fair dealing are alleged only against the corporate defendants. The claim of tortious interference with contractual relations and business expectancies is alleged only against Mr. Nadal.

## STATEMENT OF FACTS

Ms. Gaujacq was President of EDFINA from August 1, 2000, until May 31, 2004, having risen through management positions within EDF and EDFINA in the core energy generation business, and, most recently, in strategic consulting on behalf of the Company in the United States. Despite the size of the Company, Ms. Gaujacq was one of very few women to hold an executive level position and as President, was one of the highest ranked females in the Company. As President of EDFINA, Ms. Gaujacq was paid a salary of $169,750.00, plus benefits.

Ms. Gaujacq's job responsibilities included full operational responsibility for all EDFINA activities and projects, identification of development opportunities in the American and Canadian electricity markets, representation of the Company in various trade associations relevant to the energy field, serving as a Director of the Board for EDF Group's United States subsidiaries, and regularly making presentations on the nuclear energy industry and emerging technologies at industry conferences. During Ms. Gaujacq's four-year tenure as President, she was responsible for identifying and managing EDF's acquisition of enXco, a wind power company; the establishment and development of a United States presence for Dalkia, an EDF subsidiary; and the development of NuStart Energy Development, LLC, a strategic joint venture in the United States.

In February 2004, Mr. Roussely informed Ms. Gaujacq that in connection with EDF's restructuring associated with the Company's privatization, Christian Nadal, a high level executive with EDF, was being sent from France to the United States offices as a senior advisor to EDFINA. Instead, Mr. Nadal was appointed to replace Ms. Gaujacq as President of EDFINA in the United States at the end of March 2004, without prior notice or explanation from the Company.

Ms. Gaujacq made it clear to the Company that she wanted to continue to work on the Project and was even asked to propose to Mr. Creuzet a new role for herself in EDFINA. Mr. Creuzet directed Ms. Gaujacq to prepare and deliver a mission letter and expatriation contract that reflected her new role, which Ms. Gaujacq did. Mr. Creuzet agreed in writing to the new expatriation contract for three years in the United States proposed by Ms. Gaujacq. On May 31, 2004, at the request of Mr. Roussely, Ms. Gaujacq tendered her written resignation as President. Ms. Gaujacq submitted her resignation and concurrently assumed the position of Vice President, EDFINA and Manager of the Project, retaining management responsibility for generation and Nuclear Projects as stipulated in the new expatriation contract, awaiting signature. Ms. Gaujacq submitted her resignation based on written assurances from the Company that her continued mission in the United States at EDFINA for another three years had been approved, and that she would retain responsibility for the Project.

Mr. Nadal's job responsibilities were the same as those held by Ms. Gaujacq for four years, with the exception that Ms. Gaujacq retained the responsibility of day-to-day management of the Project. In other words, Mr. Nadal's job responsibilities were less than those Ms. Gaujacq possessed while she served as President, yet Mr. Nadal's starting salary as President was $271,163.00 -- 60% more than Ms. Gaujacq's salary for performing the same position with additional responsibility as compared to Mr. Nadal's position. In addition, Mr. Nadal did not possess the qualifications, educational background, training or experience in nuclear energy, or in the energy generation field, that Ms. Gaujacq possessed. Instead, Mr. Nadal's qualifications, educational background, training and experience in nuclear energy, and specifically, in the energy generation field, were significantly less than that possessed by Ms. Gaujacq.

Immediately after assuming the role of President, Mr. Nadal began subjecting Ms.

Gaujacq to unfair and discriminatory treatment based on her gender, female. Mr. Nadal created

an abusive and hostile work environment by subjecting Ms. Gaujacq to increasing harassment,

including effectively removing Ms. Gaujacq's authority to properly carry out her job, engaging

in concerted efforts to impugn Ms. Gaujacq's record and to undermine her position in the

Company, and transferring many of Ms. Gaujacq's duties to a less experienced, male colleague.

Ms. Gaujacq complained about Mr. Nadal's discriminatory and unfair treatment of her by

sending an email to Fernando Ponasso, EDFINA's Chairman and EDF Senior Vice-President

Branch Americas, and Didier Lamethe, EDF's in-house legal counsel and EDFINA Board

member, advising them of the actions taken by Mr. Nadal, which she regarded as unfair

treatment and improper. Ms. Gaujacq received no response from Mr. Ponasso, and on

information and belief, no steps were taken to investigate and address her complaints of

discriminatory and unfair treatment by Mr. Nadal and the Company. On July 27, 2004, Ms.

Gaujacq telephoned first, Mr. Creuzet, and, when she was unable to reach him, Mr. Ponasso.

Mr. Ponasso stated that Mr. Creuzet had prepared a letter extending Ms. Gaujacq's mission on

the Project in the United States for three years. Contrary to Mr. Ponasso's statement, the letter

received by Ms. Gaujacq by facsimile contained the following directives:

- the Company removed Ms. Gaujacq from her position on the Project with EDFINA in the United States;

- the Company directed Ms. Gaujacq to return to France immediately, without an assigned position;

- the Company refused to sign Ms. Gaujacq' s expatriation contract as earlier promised, and expressly stated that Ms. Gaujacq's mission in the United States would end on August 1, 2004 – *just four days later,* and

- the Company refused to propose a position for Ms. Gaujacq in the EDF Energy Branch in France until November 1, 2004. In addition, there was no mention of a promotion upon Ms. Gaujacq's return to France as Mr. Roussely had previously indicated.

Contrary to the promises and representations made to Ms. Gaujacq in January 2004, that when she returned to France she would occupy a management position of higher responsibility and compensation, the mission proposed to Ms. Gaujacq was a position of lower responsibility with decreased compensation. Ms. Gaujacq was offered the lower level position in retaliation for her complaints of discrimination, harassment and unfair treatment. By letter dated October 7, 2004, Ms. Gaujacq declined the mission since it did not take into account her qualifications and experience, was a demotion in every respect, and reneged upon the previous agreement of Mr. Creuzet that Ms. Gaujacq could remain in the United States. She also informed the Company of its breach of her expatriation and employment contract with the Company. After declining the mission, Ms. Gaujacq received a letter, dated November 26, 2004, from Jacques Bouron ("Mr. Bouron"), who reported to Yann Laroche and who was in charge of high level executives within the EDF Human Resources department, requesting her presence at a meeting in France on December 10, 2004, to consider her termination. Ms. Gaujacq was informed she would be allowed to have assistance at the meeting, but only if her chosen representative was an employee of the Company. After the meeting, by letter dated January 6, 2005, Ms. Gaujacq's employment was terminated, allegedly for performance related issues. The termination of Ms. Gaujacq for "performance reasons" was false, the Company knew them to be false, impugned Ms. Gaujacq's competency to perform her job and general reputation, and therefore constituted defamation *per se*.

Ms. Gaujacq, who devoted 24 years to the Company and whose performance was excellent and her achievements many, is no longer employed, because she refused to tolerate the conduct of a man who believed women should be treated as lesser human beings, and when she exercised the rights recognized in the District of Columbia and the United States to complain

6

when discrimination occurs, she was told her career was dead by a Company who condoned, and continues to condone discriminatory and retaliatory conduct. The Company made good on its threat. Meanwhile, the man, who believes women should be treated as lesser human beings and are not capable of and should not be trusted holding high-level positions, remains employed in a high level position at the Company. His discriminatory and retaliatory conduct has been sanctioned, approved, protected and fostered, by the Company.

### DESCRIPTION OF DISCUSSIONS GIVING RISE TO PROTECTIVE ORDER

Prior to the parties requesting this Court to enter the agreed upon Protective Order, counsel for all parties had extensive discussions about all of the provisions, but particularly about the provision allowing Defendants to designate some documents "Highly Confidential" thereby prohibiting Ms. Gaujacq from viewing such documents. Defendants insisted that this was necessary because Ms. Gaujacq worked for a competitor, and there may be sensitive trade secrets that Ms. Gaujacq could not view. Although counsel for Defendants could not think of any example where this would come into play, they felt they needed to protect the business interests of their client from things that were not likely to come into play in the litigation, but may have to be produced.

Plaintiff's Counsel discussed the fact that this designation is particularly troubling in this case because many of the expected responsive documents would be written in French and Plaintiff's counsel, as opposed to Ms. Gaujacq, cannot speak, understand or read French. Counsel for all Defendants assured Plaintiff that this would be avoided at all costs, and that they could, again, not even think of any example where this would occur. It was agreed that the designation "Highly Confidential" would only be used only for the most extreme categories of documents.

7

Most of the discussions supporting the use of the "Highly Confidential" designation centered upon the corporate defendants' trade secrets. Just before finalization of the proposed Protective Order, counsel for Mr. Nadal requested that the "Highly Confidential" designation also be available for his client for something that may be extremely personal and unrelated to the litigation, but nonetheless potentially discoverable. The example given was a significant, embarrassing health issue, such as AIDS or herpes. Again, Defendants' counsel assured Plaintiff's counsel that they could not even think of something that would fit within this category, but wanted it "just in case." Accordingly, the Protective Order allowed for the "Highly Confidential" designation as to "highly private, personal information unrelated to the employment of a party or to a matter that the Producing Party has put in issue." *See* Exhibit 4, Protective Order at 2.

Within the next two weeks after this discussion leading to the finalization of the Protective Order, EDFINA and Mr. Nadal provided their discovery responses and documents. While EDFINA marked none of its documents "highly confidential," and EDF and EDFINA have not marked any documents in the first or second set of production of documents "Highly Confidential," the majority of Mr. Nadal's documents were designated "Highly Confidential," and most of those are in French.

Upon receipt of these documents, Ms. Gaujacq's counsel challenged the designations, asking counsel for a description and explanation for the designation of each document marked "highly confidential." Exhibit 1.[3]  Mr. Nadal refused, instead casting aspersions at Ms. Gaujacq,

---

[3]  The letter provides the context of the discussions leading up to the entry of the Protective Order, as well as the specific request to review, remove the designations, or provide a specific explanation for each document.

and raising an example, the tax returns, which on their face would relate to the claims in this litigation, as well as the calculation of damages. Exhibit 2.

A copy of these documents, filed under seal by separate delivery to the Court, is attached collectively as Exhibit 5.

Ms. Gaujacq asks that the designation of "Highly Confidential" be removed from these documents, that the Protective Order be modified to eliminate the category of "Highly Confidential" to avoid this issue in the future, especially given that the basis for the category of "Highly Confidential" was initially justified to protect highly sensitive trade secrets from being provided to Ms. Gaujacq because she worked for a competitor. Alternatively, Ms. Gaujacq asks that the provision permitting the designation of "highly private personal information" be deleted from the "Highly Confidential" designations.

**ARGUMENT**

**I.    None of the Documents Produced by Mr. Nadal Should Be Designated "Highly Confidential" and Such Designation should be Eliminated.**

Pursuant to ¶ 8 of the Protective Order, Plaintiff provided written notice of her challenge to Mr. Nadal's designating the majority of the documents he produced "Highly Confidential" in a letter dated December 21, 2005. *See* Exhibit 1, letter from Ms. Bredehoft to Mr. Cooper, dated December 21, 2005. In that letter, Plaintiff requested that Mr. Nadal remove the designation or provide his basis for the "Highly Confidential" designation, rather than the "Confidential" designation, as to each document produced with that designation. In a letter dated January 3, 2006, Mr. Nadal refused to remove the designation and failed to provide the basis for his designation of "Highly Confidential" for each document so labeled. *See* Exhibit 2, letter to Ms. Bredehoft from Mr. Cooper dated January 3, 2006. Counsel for Mr. Nadal merely claimed that such designation was justified as to all documents because "Mr. Nadal is only producing those

9

documents which are truly private and personal in nature" in that they are ones to which his co-defendants do not have access and because he boldly (and without factual basis) alleges that Ms. Gaujacq "has a history of absconding with, and publishing, such private information, which amply justifies our precaution." Exhibit 2 at 1-2. In addition, Counsel for Mr. Nadal asserts that his tax returns, which are part of those marked highly confidential, are not related to any claims in this action. Neither reasoning falls under the provisions of the Protective Order, i.e. "*highly* private or personal information unrelated to the employment of a party or to a matter the Producing Party has put in issue." Exhibit 4 at 2. Moreover, the tax returns clearly relate and need to be shared with Ms. Gaujacq: Not only is Ms. Gaujacq asserting an Equal Pay claim, directly implicating Mr. Nadal's compensation, but his income and benefits would also directly relate to the calculation of damages in this case, under many theories of recovery.

Mr. Nadal appears to be designating all documents which are personal to him as "Highly Confidential," and attempting to justify this departure from the Protective Order with a baseless allegation that Ms. Gaujacq will violate the Protective Order to which she is held bound and to which this Court will hold her accountable if such violation was to occur. This is not a proper basis for designating documents "Highly Confidential" under the Protective Order entered by this Court.

Furthermore, allowing such designation puts an indefensible financial and time burden upon counsel and Plaintiff. Since counsel cannot speak, read or understand French, there is no way to comprehend these documents without obtaining an interpreter. If this designation remains, counsel for Plaintiff will have to obtain the services of a translator to review and translate many of the designated documents. To do so, Plaintiff will have to obtain the permission of Defendants or the Order of this Court pursuant to ¶ 4 of the Protective Order. *See*

Exhibit 4 at 4-5. Specifically, Plaintiff will have to provide the translator's "name, (ii) address, (iii) resume or curriculum vitae, and (iv) information on prior and current employment, affiliations, and consultancies (including any cases in which he or she has testified at trial or by deposition within the preceding four years)." Exhibit 4 at 4. The Defendants would then have 10 business days to object to the designated translator, after which the parties are required to confer if any objection is made. *Id.* If no agreement can be reached, Plaintiff would have to seek relief from this Court with reasonable notice to Defendants and the documents could not be reviewed by the translator until this Court decided the matter. *Id.* at 4-5.

Obtaining an interpreter, as was learned in the forced translation of the Complaint, is extremely expensive, time-consuming, and unwarranted by the nature of the documents. Moreover, it is precisely what Defendants represented they would not do.

Ultimately, this could also mean that no one could review any of Mr. Nadal's documents designated "Highly Confidential" and written in French until well after depositions have been taken. This also gives an unfair advantage to Defendants and the potential for prejudicial surprise in motions and other discovery, having access to relevant documents about which neither Ms. Gaujacq nor her counsel have knowledge.

Because Mr. Nadal's basis for designating the majority of his documents "Highly Confidential" are not recognized under the Protective Order and because such designation places an unfair and prejudicial burden upon Plaintiff, this Court should remove the "Highly Confidential" designations from the documents produced by Mr. Nadal or alternatively change the designation to "Confidential."

11

**II.    The Protective Order Should be Amended to Delete**
**Any Reference to the Designation of "Highly Confidential"**

Pursuant to ¶ 17 of the Protective Order, Plaintiff hereby moves that this Court modify

the Protective Order deleting any reference to a designation of "Highly Confidential " Based

upon the above designations by Mr. Nadal, attached as Exhibit 5, coupled with counsel for Mr.

Nadal's refusal to provide explanations for why these should be considered highly confidential,

and why they cannot be seen by Ms. Gaujacq, coupled with Mr. Nadal's marking of a document

that can be identified which is clearly well within the documents that should and needs to be seen

by Ms. Gaujacq, it is clear that Defendants intend to abuse the use of the "Highly Confidential"

designation. This not only contributes to the delay and building acrimony of the relationship of

counsel, but also is a colossal waste of judicial resources and particularly, this Court's time

Mr. Nadal's use of the "Highly Confidential" designation is contrary both the words and

spirit of the Protective Order as agreed to by Counsel prior to the entering of this Order. It also

flies in the face of direct, specific representations made by counsel in inducing Plaintiff's counsel

to agree to the Protective Order. Particularly where so many of the documents are in French,

which Mr. Nadal is aware counsel for Ms. Gaujacq cannot speak, and Mr. Nadal has abjectly

refused to identify the documents to counsel when asked, or to provide specific reasons for the

designation, the removal of the designation is warranted, as well as the modification of the

Protective Order to prohibit further abuse and disputes. If EDF and EDFINA have not found a

document that rises to the level of Highly Confidential, and that was the sole basis for seeking

the second tier of the category initially, there is no true issue of protecting trade secrets in this

case. Since counsel for Mr. Nadal has described no document included in the designations that

would fall within the "Highly Confidential" designation as contemplated, such as medical

records reflecting a highly personal disease or condition, there is no reason to maintain this designation.

In the alternative, Plaintiff requests that the use of the "Highly Confidential" designation be no longer available for "highly private, personal information unrelated to the employment of a party or to a matter that the Producing Party has put in issue" and that those words be stricken from the Protective Order. *See* Exhibit 4 at 2, ¶ 3. In the event there is any document that requires translation, Plaintiff further seeks the Court's protection and direction that the Defendants have the document translated at their expense, to avoid further issues.

## CONCLUSION

Plaintiff's Motion to Remove "Highly Confidential" Designations from Mr. Nadal's documents, and to Amend Protective Order should be granted. The "Highly Confidential" designation should be reviewed from all documents produced by Mr. Nadal containing such designation and the Protective Order should be amended to prohibit such designation in the future.

January 10, 2006                         Respectfully submitted,

Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive,
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
Catherine Gaujacq

13