# HOGUET NEWMAN & REGAL, LLP

ATTORNEYS AT LAW

10 EAST 40TH STREET

NEW YORK, NEW YORK 10016

TEL (212) 689-8808

FAX (212) 689-5101

www.hnrlaw.com

hnr@hnrlaw.com

LAURA B. HOGUET
FREDRIC S. NEWMAN
DOROTHEA W. REGAL
JOSHUA D. RIEVMAN
EDWARD P. BOYLE
SHERYL B. GALLER
IRA J. LIPTON

SARAH K. BARICKMAN
KATHLEEN L. LOWDEN
RANDI B. MAY

EDNA R. SUSSMAN, OF COUNSEL

May 9, 2006

By Facsimile & By ECF
Hon. John Garrett Penn
United States District Judge
United States District Court for the District of Columbia
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: Gaujacq v. EDFINA, et al., No. 1:05CV0969(JGP)

Dear Judge Penn:

This firm represents the corporate defendants Electricité de France, S.A. ("EDF") and Electricité de France International North America, Inc. ("EDFINA"). I write on behalf of all defendants to request the Court's assistance to permit the defendants to continue their deposition examination of the Plaintiff, Catherine Gaujacq, for an additional half of a day (3.5 hours). Defendants have requested the additional time by letter of April 26, 2006 from Ronald S. Cooper of Steptoe & Johnson (counsel for defendant Christian Nadal) to plaintiff's counsel, Elaine Bredehoft (a copy of which is attached hereto as Exhibit 1). Plaintiff's counsel responded in a telephone conference of May 4, 2006, declining our request for the continuation.

Plaintiff's counsel and defense counsel are in agreement that we alert the Court to this issue by letter and request that the Court address it at the upcoming court conference scheduled for May 15 so that any continuation of the deposition can be completed before the May 31st discovery cut-off. With the permission of Mr. Anthony Hill given in a telephone conference this morning with counsel for all parties, we are submitting this letter to the Court by facsimile and by ECF filing.

The reasons that Defendants believe they need this additional time are as follows:

1.   Ms. Gaujacq's new claim of mental illness

Plaintiff was deposed on March 16 and March 17, 2006. Two weeks later (on March 31) Plaintiff, for the first time, indicated that she claims damages due to an alleged "major depression," which is asserted to have started immediately following her

HOGUET NEWMAN & REGAL, LLP

Hon. John Garrett Penn
May 9, 2006
Page 2

termination, and she submitted a report of her psychiatric expert, Dr. Gold, in support thereof. Defendants did not have any previous information regarding a claim of "major depression" and, therefore, were not able to cover this claim in their examination of Ms. Gaujacq. Indeed, the information previously provided by Plaintiff was to the contrary, as she had stated in her interrogatory responses that she "has not seen any health professional for any emotional or mental health reasons." We believe that it is necessary to examine Ms. Gaujacq under oath with regard to aspects of her new claim of "major depression."

2.  Ms. Gaujacq's substantive reversal of her sworn deposition testimony

Plaintiff has submitted "errata" to her deposition transcript that substantively reverse testimony she gave at the deposition on an important point. Defendants of course did not have the opportunity at the deposition to examine Ms. Gaujacq as to her proffered new testimony and any appropriate follow-up. In addition, Defendants believe they are entitled to examine her as to why she first testified one way and now seeks to change it.

The sworn testimony at issue concerns an excuse she had given to Defendant. Nadal for missing a scheduled meeting with him in Pittsburgh in June 2004. She had left him a note saying that she had to return to Washington and undoubtedly to France because her mother-in-law was ill. At her deposition, she testified under oath that she returned to France because of this emergency and testified at length about medical problems of her mother-in-law. See Gaujacq Tr. 337/7 – 340/6 & Ex. 56 (attached hereto collectively as Exhibit 2). At Mr. Nadal's deposition two weeks later, he testified that he had learned that this was not true and that the reason she left the meeting was that her dog was ill, and that he had learned this from someone in the EDFINA office, who had been told by Ms. Gaujacq's husband that it was the dog who was ill. See Nadal Tr. 332/13 – 335/7 (attached hereto as Exhibit 3). Ms. Gaujacq subsequently submitted her errata seeking to replace her testimony on this topic with a lengthy paragraph of scripted testimony in which she states, in a complete reversal, that she did not in fact go to France and that her dog was in fact ill at that time, allegedly in addition to her mother-in-law. See Gaujacq Errata to 3/17/06 Deposition Tr. 339/17-21 (attached hereto as Exhibit 4).

This matter obviously bears on Ms. Gaujacq's credibility, both as to the initial fabrication (now confirmed) of her excuse for missing the meeting and as to her continuation of that fabrication in her sworn testimony.

3.  Completion of examination on damages

Defendants were unable to conclude their examination on the issue of damages during the two days the parties had allotted for the plaintiff's deposition due to the

HOGUET NEWMAN & REGAL, LLP

Hon. John Garrett Penn
May 9, 2006
Page 3

multitude of plaintiff's factual allegations, the large number of writings relevant thereto and plaintiff's lengthy and often non-responsive answers.

In addition, prior to Ms. Gaujacq's deposition, her new employer, Entergy Nuclear, had refused to produce the documents defendants had subpoenaed. Entergy Nuclear has subsequently produced documents related to Ms. Gaujacq's claim of damages and mitigation. Defendants were not able to examine Ms. Gaujacq as to these aspects of her claim for damages and request the opportunity to do so now.

Plaintiff would not be unduly burdened by the additional 3.5 hours of deposition requested. Defendants have subjected Ms. Gaujacq to far less total discovery (1 deposition, 1 set of interrogatories and 2 requests for the production of documents) than Ms. Gaujacq has imposed on the defendants (5 depositions, 3 sets of interrogatories and 14 sets of requests for the production of documents).

For these reasons alone, allowing Defendants an additional half-day to conclude this critical deposition is reasonable. When Plaintiff's late-breaking psychiatric condition and substantive deposition testimony reversal are added into the mix, fairness requires the additional deposition time.

We thank the Court for its consideration of this issue.

Respectfully,

Dorothea W. Regal

DWR/ec

Attachments

cc: Elaine Bredehoft, Esq.
    Ronald S. Cooper, Esq.
    Morgan D. Hodgson, Esq.
    David A. Clark, Esq.

EXHIBIT 1

# STEPTOE & JOHNSON LLP
### ATTORNEYS AT LAW

Ronald S. Cooper
Tel 202.429.8075
Fax 202.261.0509
rcooper@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel 202.429.3000
Fax 202.429.3902
steptoe.com

April 26, 2006

**VIA EMAIL**

Elaine Charlson Bredehoft
Charlson Bredehoft & Cohen, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190

    Re    Gaujacq v. EDF - No. 1:05CV0969

Dear Elaine:

    We write on behalf of all defendants to request your assistance in coordinating a time convenient to your client Ms. Gaujacq to complete her deposition and to arrange for a medical evaluation of Ms. Gaujacq by our expert witness.

    <u>Deposition continuation:</u> At your insistence Ms. Gaujacq's testimony on March 17th ended without defendants having an adequate opportunity to cover several key areas of questioning. Under our initial agreement of two standard deposition days for deposition of Ms. Gaujacq, we have a modest amount of time (about 10-15 minutes) left. More importantly, however, we need an additional 3.5 hours to complete some essential areas of questioning, completion of which was hampered by delay caused by the deponent's non-responsive answers.

    The primary area we need to complete is damages. In addition, however, recent developments that have come to our attention since the deposition necessitate re-convening. First, on March 31st (two weeks after the deposition) Ms. Gaujacq for the first time indicated that she claims damages due to a "major depression" following her termination. This source of damages had not previously been identified, and is certainly an area that the defendants will need to explore under oath. Indeed, it appears from the psychiatric evaluation conducted by plaintiff's expert, Dr. Gold, that plaintiff was interviewed by Dr. Gold on March 3rd and had this report in her possession on March 8th. The fact that Ms. Gaujacq is now claiming damages for major depression and has been seen by a health care professional is information that was specifically called for in defendants' First Set of Interrogatories directed to the

Ex. 1 (1)

Elaine Bredehoft
April 26, 2006
Page 2

Plaintiff (See Interrogatory #13).[1] In response, plaintiff had previously represented that she "has not seen any health professional for any emotional or mental health reasons." Any new developments and documents in this regard should have been disclosed to defendants prior to the deposition through supplemental discovery responses.

Also of great concern are certain errata plaintiff has submitted to her deposition transcript which seek to alter the substance of her sworn testimony. These improper changes also require that the deposition be continued. Particularly troubling is her recanting of her sworn testimony regarding her justification for missing her scheduled meeting with Mr. Nadal in Pittsburgh and replacing it with a lengthy paragraph of scripted testimony (Errata Page at 2-3), a substantive reversal done after Mr. Nadal's testimony on the subject revealed that defendants knew that her justification and her testimony was false. Other substantive changes warranting further cross-examination include where she changed affirmative answers to negative ones (e.g., "It is" to "It is not") (id. at 1); changed the parties involved in certain discussions (e.g., Creuzet to Lescoeur, Baumgarten to Ponasso) (id. at 1-2); substituted information where she had testified to no recollection (e.g., supplying the name of Olivier Carret at page 55 of her transcript).

Expert evaluation: In light of your designation of an expert witness on the subject of plaintiff's mental health, we are planning to submit a rebuttal report prepared by an expert of our choosing. I have attached a proposed Rule 35 motion for your consideration consenting to such an examination. We estimate that the expert will need 6-8 hours of plaintiff's time to complete examination and related testing. For her convenience, we will endeavor to schedule the medical evaluation and deposition completion on adjacent days so that Ms. Gaujacq can do both on one trip.

---

[1] Interrogatory #13 reads: "Identify all medical professionals, including but not limited to, physicians, nurses, paramedics or other paraprofessionals, physical therapists, psychiatrists, psychologists, psycho-pharmacologists, psycho-therapists, or any other medical providers or social workers from whom you sought or received treatment in connection with any emotional, mental, psychological or psychiatric problems; and, as to each such medical provider or social worker, state the nature of the medical or social problem for which you sought or received treatment."

Ex. 1(2)

Elaine Bredehoft
April 26, 2006
Page 3


      Because fact discovery closes at the end of May, and our expert report is due then, we ask that you respond to these requests no later than April 28th, 2006, to give us sufficient time to file appropriate motions with the Court if required. We hope, however, that you will produce Ms. Gaujacq voluntarily for both purposes outlined above, and we are happy to work with you to schedule a mutually convenient date.


                           Sincerely,

                           Ronald S. Cooper /KFT

                           Ronald S. Cooper


cc:    Laura Hoguet
      Dorothea Regal
      Morgan Hodgson
      David Clark

Ex. 1(3)

EXHIBIT 2

In the U.S. District Court

For the District of Columbia

------------------------------x

Catherine Gaujacq              :

                            : NO. 1:05CV0969

        v.             :

                            :

Electricite de France          :
International, North           :
America, et al                 :

------------------------------x

          March 17, 2006

DEPOSITION OF:

        Catherine Gaujacq (Cont'd)

a witness, called by counsel pursuant to notice,

commencing at 8:41 a.m., which was taken at 11260

Roger Bacon Drive, Reston, VA

Page 334

1  bad, let's go.
2    Q. Who was going to drive to Pittsburgh with
3  Christian Nadal?
4    A. Jon Luc Foret.
5    Q. You were now going to have to come
6  independently, is that correct, to Pittsburgh?
7    A. The first arrangement for this meeting,
8  neither Jon Luc Foret nor I knew that Christian
9  Nadal was coming to this meeting.
10      Jon Luc Foret learned about it and I did not
11  learn about it because Christian Nadal didn't tell
12  me anything about coming to my meeting.
13      I learned of his coming to the meeting from
14  Jon Luc Foret and at this time -- and I was in
15  Orlando at the meeting -- I recall calling Jon Luc
16  to make sure that the arrangements were okay. I was
17  supposed to be the driver there and Jon Luc Foret
18  was to come with me.
19      I had the Jeep, a white car, and there was
20  this HVAC issue in June which I can't understand the
21  problem, so I was -- I was happy to let him know

Page 335

1  that we would have some comfort to ride there with
2  the car.
3      In the mean time Jon Luc Foret tells me no,
4  the arrangement are not those. Christian Nadal is
5  coming to the meeting.
6      He is also coming to the meeting in Leon,
7  France and to go to Pittsburgh, he does not want me
8  to come with you. He wants to come -- he wants me
9  to come with him.
10      And so I was left by myself.
11    Q. To get there on your own?
12    A. Yes.
13    Q. Was there any reason that you did not
14  think that Christian Nadal should go to the meeting
15  in Leon?
16    A. There were a lot of reasons. He was the
17  new president.
18      Obviously he doesn't know about the
19  organization. He was discovering it. Well, I guess
20  he had maybe a lot to do with all the other
21  employee, taking care of a meeting where I was

Page 336

1  assigned to.
2    Q. Was it offensive to you that he was going
3  to go to the meeting in Leon?
4    A. There are two things that I felt were
5  offensive to me when Jon Luc Foret called me. The
6  first thing I understood that Christian Nadal was
7  coming to the ANS meeting and coming to the Leon
8  meeting without telling me. We could have found
9  some other arrangement.
10      The other thing -- it was not offending for
11  me but I thought as a president of the company for
12  almost four years, that maybe it would be a better
13  idea to take care of the old business of the company
14  on your very first day rather than going and jumping
15  to meetings where other people were already going.
16    Q. But the offense to you as I understand
17  what you just said is that he didn't tell you
18  directly that he was going to the meetings; he left
19  Jon Luc Foret to tell you?
20    A. That was the point but I felt like he was
21  really, you know, absolutely inconsistent in his

Page 337

1  behavior.
2      He was just trying to -- well, it took a
3  great deal of attention to me instead of the others
4  at the office. He was only taking care of me.
5    Q. Let me put in front of you exhibit 56.
6      (Whereupon the proffered item was
7      marked as exhibit number 56.)
8    Q. I will say that -- I have scribbled a note
9  of translation on the left side which you are free
10  to disregard.
11      Exhibit 56 is an EDFINA document 771. It's
12  a handwritten note on the note paper of Omni Hotels.
13  Is Omni Hotels in Pittsburgh, Ms. Gaujacq?
14    A. Yes.
15    Q. Did you write this note in Pittsburgh at
16  the ANS meeting?
17    A. I did.
18    Q. Am I correct that it says: Christian, I
19  just learned that my mother-in-law is very sick.
20  I'm returning to D.C. and no doubt right away to
21  France.

Page 338

1  A. No, that's not a correct translation.
2  Q. Translate it better for me.
3  A. Maybe to France later.
4  Q. Because of this -- withdraw that.
5     Did you then leave Pittsburgh without seeing
6  Mr. Nadal?
7  A. I attended the ANS meeting from maybe 4 or
8  5 p.m. on Sunday until maybe 12 or around 12 when I
9  got a call from my husband about my mother-in-law's
10 situation.
11 Q. What was your mother-in-law's situation?
12 A. My mother-in-law is a cancer survivor.
13 She has had chemotherapy and following those
14 treatments she had a surgery because of her kidneys.
15 Q. Where does she live? She had surgery at
16 that time in June of 2004?
17 A. Yes.
18 Q. Where does she live?
19 A. She lives in France.
20 Q. Where in France?
21 A. The location is Miyair Moyon.

Page 339

1  Q. Is it correct that you left the meeting in
2  Pittsburgh around noon on that Monday without having
3  seen Christian Nadal?
4  A. Yes. I was even surprised because I met a
5  lot of people either on Sunday and on Monday and I
6  tried to meet with both Jon Luc and Christian and I
7  couldn't meet him.
8  Q. So you left, correct, the meeting, and did
9  you go back to Washington?
10 A. I did go back to Washington. I left the
11 message here to both Christian and Jon Luc Foret.
12 Q. You went back to Washington, correct?
13 Then did you later go to France?
14 A. Yes, I did.
15 Q. When did you go to France?
16 A. I don't recall. My husband left, I left.
17 We both went there.
18 Q. How long did you stay in France?
19 A. I came back the next week because for all
20 this time my mother-in-law was in a coma and she was
21 not recovering.

Page 340

1  Q. Was the surgery unexpected, unanticipated?
2  A. As I recall, no. It was expected because
3  she had some kidney issues because of stones or
4  something.
5     But it was not expected, of course. The
6  anesthesia was going wrong.
7     Along with those documents throughout this
8  time I also sent e-mails to the colleagues in France
9  to make sure that -- well, to tell them I could not
10 attend.
11    I didn't know what was going on.
12 Q. The meeting that you missed was the
13 meeting on June 21, correct?
14 A. Yes.
15 Q. That was the meeting in Leon?
16 A. Meeting in Leon was planned on June 21.
17 Q. SEPTEN is the acronym name for some part
18 of this EDF group. Could you explain it for the
19 record?
20 A. People are responsible for evaluating
21 designs of nuclear plants.

Page 341

1  Q. It's spelled in capital letters
2  S-E-P-T-E-N, correct?
3  A. Yes.
4  Q. Another place I saw in the file that I
5  didn't understand, there is some part of EDF with
6  nuclear business that's abbreviated sometimes DIN.
7  What does that stand for?
8  A. At this time it meant engineering division
9  and SEPTEN is a branch of this.
10 Q. SEPTEN is a branch of DIN?
11 A. Yes. And DIN is part of the energy
12 branch.
13 Q. I think you said previously that Mr. Nadal
14 had asked you to meet with him in the office in
15 Washington on June 18, is that correct?
16 A. That's correct.
17 Q. As a result of your mother-in-law's
18 illness were you obliged to not attend that meeting?
19 A. Yes.
20 Q. You let him know you couldn't make it,
21 correct?

EDFNA 000711

Christian,

I just learned that your mother in law is very sick. I am returning to DC and no doubt right DC and France. Very sorry, GP

number 12 —

(6/14)

---

Christian, Je viens d'apprendre que ma belle-mère est très mal. Je rentre sur DC et sans doute sur la France ensuite.

Désolé,

Catherine

→ Ch. NADAL

lundi 12 H00



Ex. 2 (4)

EXHIBIT 3

Page 270

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -x
                                 :
CATHERINE GAUJACQ,               :
                                 :
    Plaintiff,                   :
                                 :
  vs.                            : 1:05CV0969 (JGP)
                                 :
ELECTRICITE DE FRANCE            :
INTERNATIONAL NORTH AMERICA, INC.,:
et al.,                          :
                                 :
    Defendants.                  :
                                 :
- - - - - - - - - - - - - - - - -x

                            Washington, D.C.

                            Wednesday, April 5, 2006

    Deposition of CHRISTIAN NADAL, defendant, called for examination by counsel for the plaintiff, pursuant to notice, at the office of David A. Clark, Esq., Steptoe & Johnson, LLP, 1330 Connecticut Avenue, N.W., Washington, D.C., before Laurel P. Platt, a Registered Diplomate Reporter, beginning at 9:12 p.m., when were present on behalf of the respective parties:

Page 331

1   Q   Do you know who made travel arrangements
2   first, whether it was you and Mr. Foret or
3   Ms. Gaujacq?
4   A   I don't know. What I know is that I have
5   been told later, and she was with her husband in this
6   meeting.
7   Q   You were told that Catherine Gaujacq was with
8   her husband at this meeting?
9   A   At this meeting.
10  Q   Who told you that?
11  A   Well, I don't recall, but this is my
12  recollection.
13  Q   All right. Now, Catherine Gaujacq had to
14  leave the Pittsburgh meeting, did she not?
15  A   I received -- I found a small note saying
16  that.
17  Q   Do you recall what the note said?
18  A   Well, that she say I have to leave. The note
19  was in -- Monday morning. I found it Monday morning
20  or afternoon. And she say that she -- she had to
21  leave from -- to D.C. and possibly to France quickly.
22  And --

Page 332

1   Q   Do you recall why?
2   A   Well, the document is produced, and I don't
3   recall whether the reason why was mentioned in this
4   document or not.
5   Q   Do you recall having an understanding at the
6   time why Catherine Gaujacq was called away?
7       MS. REGAL: I am going to object to the form
8   of the question. You can answer.
9   A   I think, but I am not sure, she mentioned in
10  this paper. I would like to check. She mentioned in
11  this paper a problem or health problem -- I don't
12  know -- with her mother-in-law.
13  Q   Do you have any reason to doubt that in fact
14  Catherine Gaujacq's mother-in-law was seriously ill,
15  that there was a problem that called Catherine Gaujacq
16  away that was legitimate?
17      MR. CLARK: Object to the form.
18  A   You mean when I received the paper or later
19  or not?
20  Q   Well, let's take each date. At the time you
21  received the paper, did you have any reason to doubt
22  that Catherine Gaujacq was called away?

Page 333

1   A   At the time I received the paper, no.
2   Q   Do you have any reason to doubt today that
3   Catherine Gaujacq did not have to leave because of the
4   illness of her mother-in-law?
5   A   Yes.
6   Q   What do you base that on?
7   A   I got different information. I got different
8   information.
9   Q   What information did you get that caused you
10  to believe that Catherine Gaujacq was not legitimately
11  called away from Pittsburgh because of her
12  mother-in-law?
13  A   I had from two people all the different
14  explanations.
15  Q   Who were those two people?
16  A   Alexandre Audie. Alexandre is like Alexander
17  but at the end it's D-R-E, and Audie is A-U-D-I-E.
18  Q   Who is the other person?
19  A   Mrs. Ba, B-A.
20  Q   When did you hear information from Alexandre
21  Audie that caused you to doubt that Catherine Gaujacq
22  was legitimately called away because of the illness of

Page 334

1   her mother-in-law?
2   A   When I came back from Pittsburgh, to D.C., to
3   the office.
4   Q   What did Alexandre Audie say that caused you
5   to believe that Catherine Gaujacq was not legitimately
6   called away because of her mother-in-law?
7   A   He told me that he had inquired about -- I
8   don't know how, but by phone -- he had inquired to
9   Philippe Gaujacq -- Philippe is P-H-I-L-I-P-P-E --
10  about -- I don't remember what position he had that
11  conversation with him, but Philippe Gaujacq told
12  that -- I don't know about the details of the call,
13  but it was about the issue was the mother-in-law was
14  not -- Philippe's mother was not ill, but it was the
15  death of one of her dogs.
16  Q   So Alexandre Audie told you that he had asked
17  Philippe Gaujacq about his mother, the health of his
18  mother, and Philippe told him that it was the death of
19  one of the dogs?
20      MS. REGAL: Object.
21  A   I don't know how was the conversation --
22  initiated the conversation and about the -- about

17 (Pages 331 to 334)

PLATT & DAWSON, INC.   703-591-0007

d6079dfa-427e-44b4-af7b-2a407c8120ee

Ev 36

Page 335

1  exactly the mother-in-law. But I recall that the main
2  concern was and the reason why they left from -- was
3  the death of the dog, was she left Pittsburgh.
4  Q   Did Alexandre tell you who told him that?
5  A   Yes.
6  Q   Who did he say told him that?
7  A   Philippe Gaujacq.
8  Q   When did Ms. Ba tell you something about this
9  issue?
10 A   A bit later. I don't recall when, but a bit
11 later.
12 Q   Was it while Catherine Gaujacq was still the
13 vice-president of EDFINA?
14 A   I don't recall.
15 Q   What did Ms. Ba tell you?
16 A   She stated the same thing, but she got it
17 from Catherine herself.
18 Q   Did you ever speak with Catherine Gaujacq
19 about this issue?
20 A   No.
21 Q   Why not?
22     MS. REGAL: Object to the form. You may

Page 336

1  answer.
2  A   We were already -- you are asking me why.
3  It's not an easy and short answer.
4      At that time we were in a very, very strange
5  situation because we had arranged -- a first
6  misunderstanding in February and March. By the end of
7  March, she writes me everything is okay; I did not --
8  I apologize. I did not understand your situation, but
9  now I did. And you may come and we'll work out
10 according to business standards.
11     I come again. Difficulties and so on. And
12 we had a new -- I was invited by the president of the
13 company by the end of May. He was angry. What is
14 going on? What are you going to do and so on? Well,
15 I am trying to, but the visa has been delayed. So I
16 did not get to return with him. But I say I am
17 willing to go there.
18     Then he took it very clearly that he
19 instructed people in Paris, Buenos Aires. And we have
20 the document produced reflecting his decision and his
21 discussion with me. He asked me to go and see him.
22 And you have the result in the production saying now I

Page 337

1  want this situation cleared. It was the second or
2  third episode of difficulties.
3      And then I arrive in June. I thought, again,
4  that things were clarified because I was president;
5  she was vice-president; we were supposed to meet and
6  discuss how to manage our business from that moment
7  on.
8      And again, I am confronted to strange
9  behaviors because at the beginning of June she wasn't
10 in the office. She came I think once on about the
11 10th or 11th of June. I don't know.
12     She was supposed to come -- I called her
13 because I had a message from her. I called her back.
14 The conversation was not -- a bit strained. I did not
15 get into specifics, but I said, well, we must meet and
16 discuss now to clarify things and to work together.
17     And we had this meeting in Pittsburgh. And
18 at our meeting the 17th of June, and we had
19 arranged -- 18th of June maybe, in D.C., and we had
20 arranged a meeting with Georges Serviere, too. And
21 she did not show up again.
22     And I have these contradictory informations.

Page 338

1  I am not there to inquire about things. I was, again,
2  surprised, concerned. And then I did not know. And
3  then -- and still I don't know the facts, what really
4  happened.
5      And then I was prudent. And I couldn't call
6  her and say, hey, is your mother-in-law died. I could
7  not do that. Because if it were her mother-in-law --
8  and I may understand that she was really harmed or in
9  pain because of the loss of her dog. And then I did
10 not want to interfere in her personal affairs. I was
11 surprised because she did not do it according to
12 common businesses. The common business would have
13 been to tell I need a break -- or without explanation;
14 we didn't need an explanation.
15     Then I was really surprised. This is why I
16 am concerned, and I did not know what was going on,
17 and I did not want to interfere in her business. And
18 I -- I hoped again that now things have been
19 clarified, she would at one moment after these events,
20 personal events, whatever they were, she would again
21 show up and work with me. This is why I did not
22 inquire.

EXHIBIT 4

**ERRATA PAGE OF DEPONENT**

## March 17, 2006 Deposition of Catherine Gaujacq

| Page | Line | From | To |
|---|---|---|---|
| 270 | 14 | Jan | Yann |
| 290 | 7 | budget | bonuses |
| 291 | 13 | August | June |
| 306 | 1 | urgent | urging |
| 330 | 2 | it's make | it makes |
| 330 | 16 | Jon Luc | Jean-Luc |
| 331 | 2 | Leon. | Lyon |
| 331 | 5 | Leon | Lyon |
| 331 | 6 | Leon | Lyon |
| 332 | 13 | Jon Luc | Jean-Luc |
| 332 | 15 | Leon | Lyon |
| 333 | 4 | Jon | Jean- |
| 333 | 11 | Jon Luc | Jean-Luc |
| 333 | 13 | Jon | Jean- |
| 334 | 4 | Jon Luc | Jean-Luc |
| 334 | 8 | Jon Luc | Jean-Luc |
| 334 | 10 | Jon Luc | Jean-Luc |
| 334 | 14 | Jon Luc | Jean-Luc |
| 334 | 15 | Jon Luc | Jean-Luc |
| 334 | 17 | Jon Luc | Jean-Luc |
| 335 | 3 | Jon Luc | Jean-Luc |
| 335 | 6 | Leon | Lyon |
| 335 | 15 | Leon | Lyon |
| 335 | 21 | employee, taking | employees rather than taking |
| 336 | 5 | Jon Luc | Jean-Luc |
| 336 | 7 | Leon | Lyon |
| 336 | 19 | Jon Luc | Jean-Luc |
| 338 | 8 | maybe 12 or | monday |
| 338 | 21 | Miyair Moyon | Moyeuvre |
| 339 | 6 | Jon Luc | Jean-Luc |
| 339 | 11 | Jon Luc | Jean-Luc |
| 339 | 17-21 | | |

This does not read correctly. I came to Washington, but did not go to France at that time, although we anticipated I may have to leave at any time. Instead, I monitored the situation from home, because my mother-in-law was in a coma, and our dog became very ill, and died at this same time. This was very distressing as well, as Philippe and I are very close to our dogs - we have no children, so they are like our children to us. I stayed in contact with EDFINA and EDF and kept them advised of my status, as well as that of my mother-in-law, and my dog. Since I was not in France, I could not attend the June 21 meeting in Lyon, which

Ex. 46

they understood and were very reassuring to me and expressed their understanding (as did Mr. Nadal on this particular issue and my cancellation of the trip – please refer to my earlier deposition testimony on this). I returned to the office after approximately a week. Mr. Nadal was aware of this, and wrote the June 18 letter at this time, knowing I was in the area dealing with my mother-in-law's crisis, as well as the illness and death of my dog at the same time. It was a very difficult time for my husband and me.

| Page | Line | Original | Correction |
|---|---|---|---|
| 340 | 15 | Leon | Lyon |
| 342 | 18 | I was not in France | See the note above |
| 348 | 20 | notes | note |
| 354 | 1 | I never saw | I had never seen |
| 362 | 3 | Jon Luc | Jean-Luc |
| 362 | 16 | all | or |
| 363 | 8 | almost | almost all |
| 372 | 14 | of the | or |
| 372 | 20 | at | |
| 372 | 21 | last time | last time I talked to him alive |
| 373 | 19 | Dubois | Dreux |
| 375 | 7 | direction of four weeks | management |
| 377 | 18 | send | sent |
| 382 | 20 | the | to |
| 384 | 1 | EDF | EDFINA |
| 384 | 5 | this to | this time to |
| 389 | 11 | I | he |
| 390 | 11 | Jon Luc | Jean-Luc |
| 391 | 4 | Jon Luc | Jean-Luc |
| 392 | 14 | Jon Luc, was Jon Luc | Jean-Luc, was Jean-Luc |
| 395 | 6 | Jon Luc | Jean-Luc |
| 397 | 14 | me. | from him |
| 415 | 7 | what was | what I was |
| 416 | 2 | Jan | Yann |
| 416 | 18 | world | word |
| 416 | 20 | Jan | Yann |
| 417 | 1 | he | Gerard Creuzet |
| 417 | 6 | Jan | Yann |
| 417 | 12 | Jan LaRoche and Jan | Yann Laroche and Yann |
| 417 | 16 | LaRoche | Laroche |
| 423 | 12 | Jan | Yann |
| 423 | 13 | Jan | Yann |
| 423 | 14 | Metias | Metais |
| 423 | 15 | Jan | Yann |
| 423 | 18 | Metias | Metais |
| 424 | 5 | Metias | Metais |
| 424 | 20 | Metias | Metais |
| 425 | 8 | your position | in opposition |
| 425 | 17 | Metias | Metais |

Ex. 4(2)

Ex. 4/3

| | | | |
|---|---|---|---|
| 432 | 5 | Jon Luc | Jean-Luc |
| 433 | 17 | Metias | Metais |
| 442 | 3 | that | who |
| 442 | 6 | are | were |
| 451 | 19 | suborned | subpoenaed |
| 464 | 1 | delay | delete |
| 470 | 12 | you came | on the day you came |
| 473 | 19 | Jon Luc | Jean-Luc |
| 505 | 3 | he | Nadal |
| 509 | 12 | John Luc | Jean-Luc |
| 510 | 1 | Jon Luc | Jean-Luc |
| 510 | 3 | Jon Luc | Jean-Luc |
| 510 | 8 | Jon Luc | Jean-Luc |
| 510 | 13 | Jon Luc | Jean-Luc |
| 511 | 2 | Jon Luc | Jean-Luc |
| 513 | 7 | contribution | opposition |
| 513 | 18 | Jan | Yann |
| 514 | 9 | Jan | Yann |
| 520 | 3 | Jon Luc | Jean-Luc |
| 520 | 18 | Jon | Jean- |