# ATTACHMENT 8

Page 1

In the U.S. District Court

For the District of Columbia

-----------------------------x

Catherine Gaujacq                :

                                 : NO. 1:05CV0969

          v.                     :

                                 :

Electricite de France            :
International, North             :
America, et al                   :

-----------------------------x

March 16, 2006

DEPOSITION OF:

          Catherine Gaujacq,

a witness, called by counsel pursuant to notice,

commencing at 9:30 a.m., which was taken at 11260

Roger Bacon Drive, Reston, VA

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area            Fax - (301) 593-8353
                              www.DCCourtReporters.com
ccb4a962-60e8-4fa0-b2d8-f9cd3dd6d8ed

Case 1:05-cv-00969-HHK   Document 56-5   Filed 05/11/2006   Page 3 of 43
CATHERINE GAUJACQ DEPOSITION   March 16, 2006
Gaujacq v. EDFINA

Page 185

1   going to be president of EDFINA and there's nothing

2   else to say.  Raison d'etat.  That's what I heard.

3        Q.   Cut the bullshit is one thing and you said

4   that those were his words?

5        A.   No, cut the bullshit is an American

6   version of Je me vais pas tourner autour du not.  My

7   understanding --

8        Q.   You are going to have to --

9        A.   My understanding of this French expression

10  is you were right but the decision is the decision

11  I'm telling you now.  And I was very upset with the

12  decision, as you can imagine.

13       Q.   We are going to have to ask you to write

14  the French words that you just spoke down on a piece

15  of paper and give them to the reporter.  You might

16  as well do it now.

17            Were those words, and I'm just not sure what

18  I heard a minute ago, were those words at he used to

19  you or is that the substance of the way you felt?

20       A.   These are a quote.

21       Q.   That's a quote?

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area
Fax - (301) 593-8353
www.DCCourtReporters.com
ccb4a962-60e8-4fa0-b2d8-f9cd3dd6d8ed

Page 186

1      A.   Yes.

2      Q.   Those are the words that Mr. Creuzet used

3  to you, is that correct?

4      A.   Yes, and that's it.

5      Q.   Did you say anything to Mr. Creuzet?

6      A.   I cried first.  I was very upset, as you

7  can imagine.  I did not expect anything.

8           He said then you've got to make some

9  decisions on what you want to do and just sleep on

10  it and get back to me, which I did.

11      Q.   In the answer you gave a couple of minutes

12  ago you used another French expression, raison

13  d'etat, reason of state.

14      A.   Yes.

15      Q.   Did he say, Mr. Creuzet, that the reason

16  was in effect a reason of state, had something to do

17  with the organization?  Did he give you anything --

18      A.   He just says raison d'etat.

19      Q.   And that's all?

20      A.   That's all.  So I was demoted for this

21  reason.

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area              Fax - (301) 593-8353
                        www.DCCourtReporters.com
                        ccb4a962-60e8-4fa0-b2d8-f9cd3dd6d8ed

1          Q.    In an answer you gave, another answer you

2     gave a minute or two ago you used the word "liar."

3          I'd like to understand who you believe lied

4     to you.

5          A.    I don't know as of today.  I don't know.

6          Q.    If Mr. Nadal had been appointed director

7     general of the -- in Washington, General Delegate of

8     the Americas, whatever the term is, I'm trying to

9     remember, you would agree that he would have had

10    reason to believe that that was in fact going to be

11    his job, isn't that correct?

12              MS. BREDEHOFT:  Objection to form.

13         A.    I was General Delegate of EDF for Canada

14    and the US for two years, then director USA-Canada

15    and in the mean time from 2000 to 2004 I was

16    president of EDFINA.

17    BY MS. HOGUET:

18         Q.    Insofar as the part of this, the events

19    that we've been talking about so far, are you

20    accusing Mr. Nadal of having lied to you in any

21    respect?

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area              Fax - (301) 593-8353
                                    www.DCCourtReporters.com
ccb4a962-60e8-4fa0-b2d8-f9cd3dd6d8ed

Case 1:05-cv-00969-HHK Document 56-5 Filed 05/11/2006 Page 6 of 43
CATHERINE GAUJACQ DEPOSITION March 16, 2006 Gaujacq v. EDFINA

Page 188

1        A.    Mr. Nadal?  No.

2        Q.    Did Mr. Nadal lie to you about what his

3    job was going to be?

4        A.    I don't know because he didn't talk to me.

5        Q.    Did Mr. Nadal say anything to you which

6    you now believe was a lie?  I'm just talking about

7    the period up through March 22, 2004?

8        A.    I cannot answer your question.

9        Q.    Is there anything you can identify that

10    Mr. Nadal said to you that you now believe was a

11    lie?

12        A.    Honestly, I cannot answer this question.

13        Q.    I'm just asking you to see if you can --

14        A.    A lot of different facts that, you know,

15    you want me to talk about.  I don't know.  I don't

16    know.  It's really I don't know.

17        Q.    Did Mr. Creuzet lie to you?

18        A.    I don't know.

19        Q.    Did Mr. Roussely lie to you?

20        A.    I don't know.

21        Q.    What did you understand Mr. Creuzet to be

Overnite Court Reporting Service (301) 593-0671          Fax - (301) 593-8353
Washington, DC Metro Area          www.DCCourtReporters.com
ccb4a962-60e8-4fa0-b2d8-f9cd3dd6d8ed

Page 189

1    saying to when you he says raison d'etat?

2        A.    I don't know what he was meaning.

3        Q.    What did you understand him to mean?

4        A.    I understand it was discrimination from

5    the company.  That's exactly what -- how I felt.

6            Here is a guy coming up taking up your

7    position.  You don't know anything about and you've

8    got to be happy.  I was really upset, I can tell

9    you.

10        Q.    Earlier this morning we talked

11    about -- could we take a couple of minute break?

12                    (Short recess)

13                MS. HOGUET:  The next exhibit number

14    is 31.

15                (Whereupon the proffered item was

16        marked as exhibit number 31.)

17                MS. HOGUET:  I don't have copies of

18    this but we'll make do.  Exhibit 31, Ms. Gaujacq, is

19    an e-mail from Mr. Ponasso to a whole bunch of

20    people and I think you are one of them.  It attaches

21    the document signed by or -- EDF document which you

Overnite Court Reporting Service  (301) 593-0671        Fax - (301) 593-8353
Washington, DC Metro Area        www.DCCourtReporters.com
ccb4a962-60e8-4fa0-b2d8-f9cd3dd6d8ed

Page 225

1    me -- you know, I was disappointed, as I told you,

2    because of the discrimination of the company but I

3    felt like a three years contract on a mission you

4    are interested in, and this was really a project

5    that was gaining momentum at this time was a good

6    deal and was a good contract as far as my career,

7    yes.

8        Q.    Did you use the word "discrimination" at

9    the meeting in Buenos Aires?

10       A.    No.

11       Q.    You didn't complain to them at all, did

12   you, at that meeting?

13       A.    Oh, yes, I did cry, oh, yes.  I mean, the

14   meeting was tough but I think they were fair.

15           All along they said it's in no way related

16   to your performance.  There's nothing about you in

17   this -- in what's happening right now and we know

18   you have some kind of unique expertise with the

19   company so let's move forward.

20       Q.    Coming away from the experience, you felt

21   that you had arrived at a fair trade, is that fair?

Overnite Court Reporting Service  (301) 593-0671         Fax - (301) 593-8353
Washington, DC Metro Area         www.DCCourtReporters.com
                                         ccb4a962-60e8-4fa0-b2d8-f9cd3dd6d8ed

CATHERINE GAUJACQ DEPOSITION    March 16, 2006

Gaujacq v. EDFINA

1                                            Page 255
                    Certificate of Deponent
2        I hereby certify that I have read and
3    examined the foregoing transcript, and the same
4    is a true and accurate record of the testimony
5    given by me.
6        Any additions or corrections that I feel
7    are necessary I will attach on a separate sheet
8    of paper to the original transcript.
9

10                        _____/. Gaujacq_____
11                        Signature of witness
12        I hereby certify that the individual
13    representing him/herself to be the above named
14    individual, appeared before me this __17th__
15    day of __April__ and executed the above
16    certificate in my presence.
17
18
19
20
21                        _____
                                    Notary Public

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area                    Fax - (301) 593-8353
                              www.DCCourtReporters.com
                              ccb4a962-60e8-4fa0-b2d8-f9cd3dd6d8ed

In the U.S. District Court

For the District of Columbia

----------------------------x

Catherine Gaujacq              :

                               : NO. 1:05CV0969

              v.               :

                               :

Electricite de France          :
International, North           :
America, et al                 :

----------------------------x

March 17, 2006

DEPOSITION OF:

Catherine Gaujacq (Cont'd)

a witness, called by counsel pursuant to notice,

commencing at 8:41 a.m., which was taken at 11260

Roger Bacon Drive, Reston, VA

Page 408

1   wanted to be protected from Nadal's actions and that

2   they had an easy way to do that.  They only had to

3   change the reporting structure so that I would not

4   be faced with him on a daily basis and it was an

5   easy thing to do.

6         The suggestion of Gerard Creuzet scared me

7   to death because I understood at this point that

8   there was no way out.

9         Q.   Just a moment.  When it says what about

10  going back to France to be protected from CN, did

11  Mr. Creuzet suggest to you that one way to be

12  protected from Mr. Nadal would be for you to return

13  to France?

14        Is that what he said?

15        A.   That's what he said.

16        Q.   Then it says --

17        A.   But I was -- I could not even imagine I

18  would have to be protected.

19        Q.   Then it says, and I quote:  The company

20  knows CN is a bad guy.

21        Did Mr. Creuzet say that to you?

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area        Fax - (301) 593-8353
                                 www.DCCourtReporters.com
0c0f48af-5751-478a-b896-e6bbdf0dd6d8

Page 409

1          A.    Yes.

2          Q.    Had he ever previously said to you that

3    Mr. Nadal is a bad guy?

4          A.    Never.

5          Q.    Did he use the term "bad guy"?

6          A.    No, the conversation was in French and

7    it's not a quote.

8          Q.    Do you know the words he did use?

9          A.    Exact words I don't recall.

10          Q.    Then he says, or you say in your notes

11    that Mr. Creuzet said to you I tried to protect you

12    by having you reporting to the energy branch but the

13    chairman of EDF wanted you to report to CN

14    explicitly.

15          A.    Yes.

16          Q.    Had Mr. Creuzet ever told you that he

17    wanted you to report to the energy branch?

18          A.    No.

19          Q.    And --

20          A.    I mean, those were brand new information

21    for me.

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area                    Fax - (301) 593-8353
                                      www.DCCourtReporters.com
0c0f48af-5751-478a-b896-e6bbdf0dd6d8

Page 410

1          Q.    Then he says, and I quote:  The audit was

2     a way to protect you from the bad guy.

3          Did he say that to you?

4          A.    He did say that to me and I'm still

5     wondering what he was meaning.

6          Q.    Did you say to him that you thought the

7     audit was an effort by Mr. Nadal to discredit you?

8     Did you say to Mr. Creuzet that you thought that the

9     audit was a way by which Mr. Nadal had sought to

10    discredit you?

11         A.    Sure.  There were some stuff on the

12    letter, yes.  I was scared to death.

13         Q.    But my question is specifically did you

14    tell Mr. Creuzet that you were concerned that the

15    audit was being used by Mr. Nadal to harm you?

16         A.    That was my feeling at this time, yes.

17         Q.    He said to you the audit was a way to

18    protect you, didn't he?

19         A.    It confused me again.

20         Q.    If there was no problem that the auditors

21    found then would the audit not in fact protect you?

Overnite Court Reporting Service  (301) 593-0671          Fax - (301) 593-8353
Washington, DC Metro Area          www.DCCourtReporters.com
0c0f48af-5751-478a-b896-e6bbdf0dd6d8

Page 411

1       A.   I don't understand it this way.  I mean, I

2   understand now from the reading of the audit you've

3   got to remember that on the 22nd I had received a

4   call from the senior executive in charge of audit

5   telling me that I should be aware that there were

6   some wordings that were asking questions and he

7   wanted me to know this I guess based on our

8   friendship and good relations throughout our career

9   and he wanted me to know that before he left for

10  vacation.

11       When I had this conversation with Gerard

12  Creuzet I knew I had done nothing, that I was the

13  one who was asking the help of the parent company to

14  protect me from Nadal's action.

15       So I was not scared at all at calling the

16  parent company at this stage.

17       Q.   The last answer you gave, you said that

18  the auditor had spoken to you on the 22nd of July?

19       A.   No.

20       Q.   Or was that Mr. Dubois?  What conversation

21  were you referring to?

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area          Fax - (301) 593-8353
                                   www.DCCourtReporters.com
0c0f48af-5751-478a-b896-e6bbdf0dd6d8

Case 1:05-cv-00969-HHK    Document 56-5    Filed 05/11/2006    Page 15 of 43
CATHERINE GAUJACQ DEPOSITION    March 17, 2006              Gaujacq v. EDFINA

Page 412

1      A.    The conversation I'm referring to is the

2   conversation I had with Daniel Dubois following my

3   e-mail because Daniel Dubois called me back and it

4   was late in the evening in Paris.  It was on or

5   around maybe the 17th, July 17th or so and he gave

6   me a call and told me I'm going on vacation but I

7   want you to know that I had the opportunity to read

8   whatever documents they were preparing now and that

9   there are questions in the documents you should be

10  aware of.

11     Q.    Thank you.

12     A.    And I told him thanks for calling.

13     Q.    In this conversation that we're looking

14  at, exhibit 65, your conversation with Mr. Creuzet,

15  you asked for his help.

16        It says you can help me and it says I want

17  my three years expatriation contract, I want a

18  mission letter and I want the company to change the

19  reporting structure so that I do not have to report

20  to Nadal on a daily basis.

21        Those were the three things you told him you

Overnite Court Reporting Service (301) 593-0671          Fax - (301) 593-8353
Washington, DC Metro Area          www.DCCourtReporters.com
0c0f48af-5751-478a-b896-e6bbdf0dd6d8

Case 1:05-cv-00969-HHK    Document 56-5    Filed 05/11/2006    Page 16 of 43
CATHERINE GAUJACQ DEPOSITION    March 17, 2006    Gaujacq v. EDFINA

Page 413

1    wanted, correct?

2        A.    Yes.

3        Q.    You have him saying in italics here, the

4    words are written:  Your career is dead in EDF if

5    you file the claim.

6        A.    Yes.

7        Q.    What did he say to you?

8        A.    Exactly that:  Your career is dead if you

9    file a claim against Nadal.  That's exactly what he

10   said.

11       Q.    Since that time, that conversation that

12   you had with Mr. Creuzet in February -- withdraw

13   that.

14           After that conversation you had with

15   Mr. Creuzet reflected in exhibit 65, did you ever

16   talk to him again?

17       A.    No.

18       Q.    Where you ever from that day to this

19   talked to him?

20       A.    No.

21       Q.    Has anybody on your behalf contacted

Overnite Court Reporting Service  (301) 593-0671    Fax - (301) 593-8353
Washington, DC Metro Area    www.DCCourtReporters.com
0c0f48af-5751-478a-b896-e6bbdf0dd6d8

Case 1:05-cv-00969-HHK    Document 56-5    Filed 05/11/2006    Page 17 of 43
CATHERINE GAUJACQ DEPOSITION    March 17, 2006    Gaujacq v. EDFINA

Page 414

1    Mr. Creuzet that you know of?

2         A.    No.

3         Q.    He left EDF.  You're aware of that?

4         A.    I read the news.

5         Q.    You read the newspapers, right?

6         A.    The French ones.

7         Q.    You read the French newspapers.  You know

8    that Mr. Creuzet left EDF and you haven't talked to

9    him since July 24, 2004, correct?

10        A.    Yes.

11        Q.    Or e-mailed to him or communicated with

12   him in any way, is that correct?

13        A.    Yes, that's correct.

14        Q.    It appears that --

15        A.    The last communication I had with him was

16   his sending the letter on Friday, the 27th of July.

17   That's the last communication.

18        Q.    Is there anything you can remember about

19   your conversation with Mr. Creuzet in addition to

20   what is reflected in these notes?

21        A.    He told me he understood I was very

Overnite Court Reporting Service  (301) 593-0671          Fax - (301) 593-8353
Washington, DC Metro Area          www.DCCourtReporters.com
0c0f48af-5751-478a-b896-e6bbdf0dd6d8

Page 415

1    emotional, which I was, of course.

2         Q.    Were you crying on the phone?

3         A.    Almost, I guess, yes.

4         Because, you know, it's not usual for a

5    person with a 25 years career to call for the top

6    management of the company to help you out which is

7    what was going on with me with Mr. Nadal.  I did it

8    once.  I saw the result.

9         Q.    He said to you that he thought you were

10   very emotional, is that right?

11        A.    He said to me I can hear you are

12   emotional.

13        He also told me I have no time to spend on

14   disputes within -- between managers.  I recall

15   telling him just tell me when was the last time I

16   had asked for your help, if any.

17        He told me, you know, you need to be

18   protected.  We've got a good way to protect you by,

19   you know, going back to France.  I was really

20   wondering where this, in what world these guys were,

21   really.

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area                    Fax - (301) 593-8353
                              www.DCCourtReporters.com
0c0f48af-5751-478a-b896-e6bbdf0dd6d8

Page 416

1    Q.    Later that morning did you have a

2  conversation with Jan LaRoche?

3    A.    Yes.

4    Q.    And here the it at all lick words are:  I

5  want to know, in exhibit 65 that appear to refer to

6  that conversation, I want to know what are your

7  feelings about this situation and after the call

8  from Creuzet it says at the end of the call LaRoche

9  tells me he's going to talk to Creuzet and the

10  company will call back.

11    Did Mr. LaRoche ask what your feelings were

12  about the situation?

13    A.    Yes.

14    Q.    Did you then tell him the things that

15  appear in your notes?

16    A.    That's the recollection at this time and

17  my recollection, you know, at that time and now, the

18  only real world I recall is I told him Gerard

19  Creuzet scared me really, really scared me.

20    I know Jan LaRoche.  I had been working with

21  him also for, well, a lot of years and I even told

Overnite Court Reporting Service  (301) 593-0671
Washington, DC Metro Area
Fax - (301) 593-8353
www.DCCourtReporters.com
0c0f48af-5751-478a-b896-e6bbdf0dd6d8

Case 1:05-cv-00969-HHK    Document 56-5    Filed 05/11/2006    Page 20 of 43
CATHERINE GAUJACQ DEPOSITION    March 17, 2006
Gaujacq v. EDFINA

Page 417

1    him well, he scared me to death and I'm really, you

2    know, that's way worse now than it was before.  I

3    just tried to get your help.  We've got an easy way

4    to do that.  The only answer of the company is if

5    you file a claim, your career is dead.

6          My understanding was, and I told Jan

7    LaRoche, that it was already dead.  The only thing I

8    did was to try to get some help from the parent

9    company with what was going on with Nadal and the

10   only answer was well, I don't have any, you know,

11   any time or whatever.

12         So I told that to Jan LaRoche and Jan

13   LaRoche told me at the end I'm going to talk to

14   Gerard Creuzet right away.

15         That's what I recall.

16         Q.    Were you friendly with Jan LaRoche before

17   this call?

18         A.    I had business relationships with both

19   these people.  All along my career.

20         Q.    Then we have the call with Mr. Ponasso, is

21   that correct, reflected on exhibit 65?

Page 564

1                         Certificate of Deponent

2          I hereby certify that I have read and

3     examined the foregoing transcript, and the same

4     is a true and accurate record of the testimony

5     given by me.

6          Any additions or corrections that I feel

7     are necessary I will attach on a separate sheet

8     of paper to the original transcript.

9

10                    _____

11                    Signature of witness

12          I hereby certify that the individual

13    representing him/herself to be the above named

14    individual, appeared before me this _17th_

15    day of _April_ and executed the above

16    certificate in my presence.

17

18

19

20

21                    _____

                                Notary Public

Overnite Court Reporting Service   (301) 593-0671
Washington, DC Metro Area                        Fax - (301) 593-8353
                                   www.DCCourtReporters.com
                                   0c0f48af-5751-478a-b896-e6bbdf0dd6d8

# ATTACHMENT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CATHERINE GAUJACQ                    )
                                     )
        Plaintiff,                   )
                                     )
            v.                       )     No. 1:05CV0969 (JGP)
                                     )
ELECTRICITE DE FRANCE                )
    INTERNATIONAL NORTH AMERICA,     )
    INC., et al.                     )
                                     )
        Defendants                   )
                                     )

## PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO EDF AND EDFINA'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Plaintiff, Catherine Gaujacq ("Ms. Gaujacq"), pursuant to the Rule 33 of the Federal

Rules of Civil Procedure, hereby objects and responds to Defendants Electricite de France, S.A.

("EDF") and Electricite de France International North America ("EDFINA") First Set of

Interrogatories as follows

### GENERAL OBJECTIONS

The following objections apply to the Interrogatories as a whole, and to each of the

separate Interrogatories

The provision or identification of any document or information in connection with this

response does not constitute an admission that such document or information is relevant to any

issue in this case or is admissible at trial of this action

1       Ms. Gaujacq objects to the Interrogatories to the extent they would require Ms.

Gaujacq to provide or reveal the contents of any document or information privileged from

disclosure pursuant to the attorney-client privilege, the qualified immunity provided to litigation

work product, or any other applicable privilege  Ms  Gaujacq will not provide such information.

2    Ms. Gaujacq objects to the Interrogatories to the extent they seek to impose a duty

to supplement in addition to that required by the Rules  Ms. Gaujacq will supplement her

responses to the extent required by law

3    Ms. Gaujacq objects to the Interrogatories to the extent they seek information

which is not the proper subject of discovery.

## INTERROGATORIES

**1.    Identify all individuals whom you believe have information relating to the allegations contained within the pleadings in this matter and describe that information in detail.**

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent it seeks information

protected by the attorney-client privilege. Plaintiff also objects on the grounds that this

Interrogatory invades protected litigation work product and would require disclosure of core

opinion work product and mental impression of counsel, which is prohibited by Fed. R. Civ. P.

26(b)(3).

**RESPONSE:** Without waiving objections, in addition to Plaintiff, the following are

persons Plaintiff believes have knowledge:

| | |
|---|---|
| **Christian Nadal**<br>Replacement as President of EDFINA<br>Former supervisor as President of EDFINA | Harassment, discrimination, retaliation, defamation, interference. |
| **Fernando Ponasso**<br>EDF Senior VP<br>Chairman of EDFINA | Knowledge of discrimination, retaliation and unequal pay. Plaintiff's performance  Knowledge of EDF HR policies for high level executives. |

2

| | |
|---|---|
| **Yann Laroche**<br>Senior VP<br>Human Resources EDF<br>S.A. | Knowledge of expectations, retaliation and unequal pay<br>Knowledge of EDF HR policies for high level executives. |
| **Bernard Dupraz**<br>Senior VP EDF<br>Former | Knowledge of EDF R&D and Engineering businesses of EDF in the US.<br>Knowledge of harassment and discrimination. |
| **Laurent Stricker**<br>Senior VP EDF<br>Former supervisor | Knowledge of harassment and discrimination. |
| **Jean-Luc Foret**<br>Former co-worker | Knowledge of harassment and defamation<br>Knowledge of work environment. |
| **Walker Nolan**<br>Consultant with EDFINA | Plaintiff's performance and conduct   Knowledge of defamation. |
| **Mike Slavitt**<br>Former CPA with EDFINA | Knowledge of harassment, discrimination. Knowledge of EDF/EDFINA accounting. |
| **Adja MAME BA**<br>Former co-worker | Plaintiff's and Defendant's performance and conduct<br>Knowledge of harassment and discrimination<br>Knowledge of work environment. Knowledge of EDF/EDFINA accounting |
| **Benoit Dreux**<br>Co-worker<br>VP of EDFINA | Knowledge of harassment, discrimination. Knowledge of work environment. Knowledge of EDF/EDFINA accounting. |

2.    **Identify each Person whom you expect to call as a witness, or whom you have contacted about appearing as a witness, at trial in this matter and describe the subject matter on which he or she is expected to testify, the substance of the facts and opinions on which he or she is expected to testify, and an identification of any and all documents which he or she has considered or will rely upon.**

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent it seeks information

protected by the attorney-client privilege  Plaintiff also objects on the grounds that this

Interrogatory invades protected litigation work product and would require disclosure of core

opinion work product and mental impression of counsel, which is prohibited by Fed. R. Civ. P.

26(b)(3)

    **RESPONSE:** Without waiving objections, Plaintiff has made no determination of who

may be called as a witness. Any such person would be encompassed in Interrogatory No. 1

    **3.    State whether you are currently employed, engaged as a freelancer or
consultant (or have been since November 1, 2004) with any Person from November 1, 2004
through the present; the date or dates on which you became so employed or engaged;
where you have been so employed or engaged; and the compensation received from each
such employment from the date you began such employment or engagement to the present.**

    **OBJECTION:** Plaintiff objects to this Interrogatory on the grounds that this

Interrogatory is overly broad, unduly burdensome, and exceeds that which is relevant or likely to

lead to the discovery of admissible evidence

    **RESPONSE:** Without waiving objections, Plaintiff has not been employed or engaged

as a free lancer or consultant with any person or company other than EDF/EDFINA from August

1st, 2000 to April 3rd, 2005. Plaintiff has been employed with Entergy from April 4th, 2005 to the

present. Plaintiff received compensation from EDF/EDFINA in 2005 and expects EDF/EDFINA

to mail her the W2 in early 2006. To date, Plaintiff has received a net pay of $90,187.94 from

Entergy.

    When employed by Entergy in April 2005, the plaintiff was not permitted by Entergy to

relocate from Virginia, and worked 4 months in Jackson, Mississippi and 4 months in White

Plains, New York on a temporary position. Entergy authorized plaintiff to relocate in Mississippi

on November 21st, 2005. Plaintiff paid every other week for her weekly air trips to Mississippi

and New York, from April 4th, 2005 to November 21st, 2005. In the meantime, Plaintiff paid her

rent in Virginia from February 2005 until November 2005. Expenses incurred by Plaintiff during

this temporary period are $ 24,540.

4.    Identify any Person with whom you had any communication relating to opportunities for your employment or work for hire, by any Person other than EDF or EDFINA, from January 1, 2000 to the present, and describe in detail the substance of those communications.

**OBJECTION:** Plaintiff objects to this Interrogatory on the grounds that this Interrogatory is overly broad, unduly burdensome, and exceeds that which is relevant or likely to lead to the discovery of admissible evidence.

**RESPONSE:** Without waiving objections, Plaintiff had no conversation with any person outside of EDF/EDFINA regarding potential employment from August 2000 until August 2004 In the fall of 2004, as her situation with EDF/EDFINA continued to deteriorate, Plaintiff sent resumes to headhunters, companies, and institutions in the United States

Plaintiff had communications about employment opportunities with Entergy in late December 2004 with Pete Schneider VP Human Resources, Gary Taylor CEO Nuclear, and William Campbell COO Nuclear South. These conversations were exclusively about Plaintiff's potential employment with Entergy. During these communications and to the present, Plaintiff has had no communication with Entergy employees about her situation with EDF/EDFINA, other than indicating to Entergy in January 2005 that she was no longer with EDF/EDFINA

5.    Identify all visas, grants of immigrant status, residence cards or other documents issued by the United States Immigration and Naturalization Service permitting you to remain and work in the United States; and state when each such document was first requested by you and when it was issued.

**OBJECTION:** Plaintiff objects to this Interrogatory on the grounds that the information sought is neither relevant to any issue in this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:** Without waiving objections, Plaintiff requested a L1A visa in May 2000 and was granted an L1A visa in July 2000. Plaintiff requested Permanent Residency status on or

5

around December 2001 and was granted Permanent Residency in late August 2004  Plaintiff

requested an extension of her L1A visa and was granted an L1A extension in July 2003  EDF

approved all those requests and EDFINA sponsored all these requests.

**6.    Identify any Person with whom your husband has been employed and with whom your husband has had any communication relating to employment opportunities, or work for hire, from January 1, 2000 to the present, and describe in detail the substance of those communications.**

**OBJECTION:** Plaintiff objects on the grounds that this Interrogatory is overly broad,

unduly burdensome, and the information sought is neither relevant to any issue in this litigation,

nor reasonably calculated to lead to the discovery of admissible evidence

**RESPONSE:** Without waiving objections, Plaintiff's husband was not authorized to

work in the United States until the summer of 2002  He had conversations about employment

opportunities in the summer of 2002, when he was granted an Authorization to Work in the

process of their application for Permanent Residency. Plaintiff's husband is not employed and

has never been employed in the United States from August 2000 to the present.

**7.    Identify all security measures you took to maintain the confidentiality of and to prevent the loss or destruction of or damage to documents and things belonging to EDF and/or EDFINA while in your possession, custody or control.**

**OBJECTION:** Plaintiff objects on the grounds that this Interrogatory is overly broad,

unduly burdensome, and the information sought is neither relevant to any issue in this litigation,

nor reasonably calculated to lead to the discovery of admissible evidence

**RESPONSE:** Without waiving objections, Plaintiff had renter's and personal liability

insurance paid by EDFINA for each home lease contract provided by EDFINA for her lodging.

The houses were equipped with security systems  Proprietary documents were maintained in a

fire retardant closet in a safe room in Plaintiff's basement.

6

8.    State by what authority you deleted the contents of the EDF laptop that was in your possession, describe with particularity how and when said contents were deleted and identify all Persons with knowledge concerning such deletion and all software used in connection therewith.

**OBJECTION:** Plaintiff objects on the grounds that the information sought is neither relevant to any issue in this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:** Without waiving objections, like any other employee of EDF/EDFINA, Plaintiff would archive, destroy, or delete documents and files according to the company's policy and specific company's business agreements. Plaintiff was assigned four different computers in the course of her employment with EDF/EDFINA from August 1st, 2000 until January 8th, 2005 and had to use three personal computers and numerous others while traveling for business. In October 2004, Plaintiff reminded EDF/EDFINA of the inventory of company's properties at her residence, asking the company to remove these properties. That list included furniture, silverware, appliances, a company car, a laptop, and a cell phone. The company agreed to sell the laptop to Plaintiff, but the price proposed was not reasonable (it did not account for depreciation), so Plaintiff declined to buy it. On February 28th, 2005, Plaintiff gave the laptop, the cell phone, the car keys, and the car title to EDF/EDFINA lawyer while movers were picking up the company's household goods at Plaintiff's residence. At no time before September 2005 did the company ask Plaintiff to preserve any file or make any claim to Plaintiff about the laptop. In situations like this one, or in the case of a computer change at the office, the practices of the company were to sell the old computer to personnel for personal use, or to give the computer to charities. The company would ask the employee to wipe the computer clean, mostly for software licenses issues.

7

9.    **Identify all communications and attempted communications between or among any employee or representative of ENTERGY Nuclear and any employee or representative of EDF or EDFINA relating to your employment with EDF and/or with ENTERGY Nuclear.**

**OBJECTION:** Plaintiff objects on the grounds that this Interrogatory is vague and seeks information in EDF or EDFINA's possession.

**RESPONSE:** Without waiving objections, Plaintiff refers to Response to Interrogatory No. 4   Additionally, in August 2004, Plaintiff was a speaker at a nuclear conference to represent EDF with EDF/EDFINA knowledge and approval. The Nustart President told Plaintiff that EDFINA had contacted the President to have Plaintiff removed from the project. Other conference attendees and business partners were aware of the situation.

In late August 2004, as Plaintiff was preparing to attend a conference call scheduled with Nustart to represent EDF with EDF/EDFINA knowledge and approval, the Nustart Secretary told Plaintiff that EDFINA had contacted him to change the conference call dial-in number so Plaintiff could not attend the meeting. All other business partners were aware of this event. Plaintiff had to apologize for the inconvenience on behalf of the company.

Neither the Nustart President nor Nustart Secretary were Entergy employees. However, Entergy was a member of Nustart.

In late April or early May 2005, Plaintiff had a phone conversation with Entergy's contractor in charge of background checking. The contractor let Plaintiff know that all their attempts to contact or get information from EDF/EDFINA had failed. Entergy Nuclear policy does not allow Plaintiff to disclose the name of the company to which Entergy outsource background checking for nuclear power plants employees and contractors. This was an issue to grant Plaintiff unescorted access to Entergy's nuclear sites, which was required by US federal laws and regulations (CFR) to perform Plaintiff's job. Plaintiff learned in late April or early May

8

2005 that EDF/EDFINA did not provide this information because they did not want to admit in writing that they had terminated Plaintiff

**10.    Describe with particularity the damages to your reputation as alleged in paragraphs 268, 292, 302, 305, 308, 318, 330, and 352 of the Complaint.**

**OBJECTION:**  Plaintiff objects on the grounds that this Interrogatory is overly broad, unduly burdensome, and the information sought is neither relevant to any issue in this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff also objects on the grounds that this Interrogatory requests legal conclusions.  Since the conduct by EDF and EDFINA constitutes defamation *per se*, no proof of damage to reputation is required.

**RESPONSE:**  Without waiving objections, in early August 2004, Plaintiff was a speaker at a nuclear conference to represent EDF with EDF/EDFINA knowledge and approval. The Nustart President told Plaintiff EDFINA had contacted her to have Plaintiff removed from the project. Other conference attendees and business partners were aware of the situation  Some conference attendees asked embarrassing questions to Plaintiff about the reasons of her removal from the project. This conference has an attendance of 300/400 professionals every year

In early August 2004, while at the same conference, Plaintiff learned from the hotel attendant that Plaintiff's two company business cards had been canceled by EDFINA without Plaintiff's knowledge.  Plaintiff had to pay her business expenses with her personal credit card The company never reimbursed Plaintiff for these business expenses

In late August 2004, as Plaintiff was preparing to attend a conference call scheduled with Nustart to represent EDF with EDF/EDFINA knowledge and approval  The Nustart Secretary told Plaintiff that EDFINA had contacted him to change the conference call dial-in number so Plaintiff could not attend the meeting. All other business partners were aware of this event. Plaintiff had to apologize for the inconvenience on behalf of the company.

9

Due to the severity of Mr. Nadal and the Company's defamatory conduct, when interviewed about job opportunities, Plaintiff was asked why she was leaving or left after such a successful and promising career with EDF/EDFINA. Plaintiff felt like interviewers had understandable doubts about the integrity and honesty of Plaintiff, thinking that Plaintiff had been terminated for cause and/or wrongdoing.

The same damages to Plaintiff's reputation apply with regard to Plaintiff's EDF/EDFINA colleagues, professional acquaintances in the USA and in France. The alleged position proposed to Plaintiff by the company on 10/01/2004 was demeaning and below Plaintiff's qualifications and experience. Plaintiff's wrongful termination by the company tarnishes Plaintiff's reputation of integrity and honesty with regard to Plaintiff's former colleagues and executives with EDF/EDFINA.

Plaintiff's temporary employment with Entergy is not as senior in nature as Plaintiff's employment with EDF/EDFINA.

Plaintiff is suffering, and will continue to suffer from damaged reputation, embarrassment, humiliation, inconvenience, severe mental anguish, stress, pain and suffering due to the severity of Mr. Nadal and the Company's defamatory conduct.

**11.     Describe with particularity the damages to your career as alleged in paragraphs 292, 305, and 318 of the Complaint.**

**OBJECTION:** Plaintiff objects on the grounds that this Interrogatory is overly broad and unduly burdensome.

**RESPONSE:** Without waiving objections, Plaintiff refers to Response to Interrogatory No. 10.

**12.     Describe with particularity your claims for damages for "medical expense" as alleged in paragraphs 268 and 292 of the Complaint.**

10

**OBJECTION:**  Plaintiff objects on the grounds that this Interrogatory is overly broad,

unduly burdensome, and the information sought is neither relevant to any issue in this litigation,

nor reasonably calculated to lead to the discovery of admissible evidence

**RESPONSE:**  Without waiving objections, Plaintiff incurred $2,503 in expenses to cover

Health insurance from 11/01/2004 to 04/03/2005.

**13.    Identify all medical professionals, including but not limited to, physicians, nurses, paramedics or other paraprofessionals, physical therapists, psychiatrists, psychologists, psycho-pharmacologists, psycho-therapists, or any other medical providers or social workers from whom you sought or received treatment in connection with any emotional, mental, psychological or psychiatric problems; and, as to each such medical provider or social worker,  state the nature of the medical or social problem for which you sought or received treatment.**

**OBJECTION:**  Plaintiff objects to this Interrogatory on the grounds that the information

sought is neither relevant to any issue in this litigation, nor reasonably calculated to lead to the

discovery of admissible evidence  Plaintiff also objects on the grounds that this Interrogatory is

overly broad, unduly burdensome, and invades protected litigation work product requiring

disclosure of core opinion work product and mental impression of counsel, which is prohibited

by Fed. R. Civ. P. 26(b)(3)

**RESPONSE:**  Plaintiff has not seen any health professional for any emotional or mental

health reasons.

## VERIFICATION

I declare under penalty of perjury that my answers to the foregoing Interrogatories are true

and accurate to the best of my knowledge and belief

Date:  12-28-05

_l. Gaujacq_

Catherine L. Gaujacq

As to Objections:
December 21, 2005

Catherine L. Gaujacq,
  By Counsel

Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff,
  Catherine L. Gaujacq

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing PLAINTIFF'S SUPPLEMENTAL
OBJECTIONS AND RESPONSES TO EDF AND EDFINA'S FIRST SET OF
INTERROGATORIES TO PLAINTIFF by email (responses only) and Federal Express (with
documents) this 21st day of December 2005 on counsel for EDF and EDFINA addressed as follows:

Laura B. Hoguet, Esq.
Dorothea W. Regal, Esq.
HOGUET NEWMAN & REGAL, LLP
10 East 40th Street
New York, New York 10016
(212) 689-8808
lhoguet@hnrlaw.com
dregal@hnrlaw.com

Counsel for Defendants
  Electricite de France, S.A. and
  Electricite de France International North America

13

With a courtesy copy sent this same day by email (responses only) and Federal Express (with documents), addressed as follows:

> Ronald S. Cooper, Esq
> David Clark, Esq
> STEPTOE & JOHNSON LLP
> 1330 Connecticut Avenue, NW
> Washington, DC  20036
> (202) 429-3000
> rcooper@steptoe.com
> dclark@steptoe.com
>
> Counsel for Defendant
>  Christian Nadal

Elaine Charlson Bredehoft

14

# ATTACHMENT 10

LEXSEE 1990 U S. DIST. LEXIS 16071

**ZACK STAMP, Plaintiff, v. ISIDORE BROWN, et al., Defendants. WILLIAM
F. CARROLL, Plaintiff, v. ISIDORE BROWN, et al., Defendants**

**Nos. 81 C 1475, 80 C 6251**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*1990 U.S. Dist. LEXIS 16071*

**November 27, 1990
November 29, 1990, Docketed**

**JUDGES:** [*1]

Charles P. Kocoras, United States District Judge.

**OPINIONBY:**

KOCORAS

**OPINION:**

*MEMORANDUM OPINION*

This matter comes before the court on the plaintiffs
objections to the magistrate's decision of September 21,
1990, denying plaintiffs' motion to take certain deposi-
tions and reopen discovery. For the following reasons,
the magistrate's ruling is affirmed.

*BACKGROUND*

The history of this case is long and complicated. The
complaint was filed over nine years ago and asserts that
the numerous defendants participated in a rather complex
scheme of fraud. For purposes of this motion, it is un-
necessary to set forth all of the facts in detail. A more
elaborate recitation is embodied within the Seventh Cir-
cuit's opinion of *Schacht v. Brown, 711 F.2d 1343 (7th
Cir. 1983).*

The story began in late 1974 when the Illinois De-
partment of Insurance became aware that Reserve Insur-
ance Company ("Reserve") was on the verge of insol-
vency due to its practice of accepting extraordinarily
high-risk insurance business and failing to maintain ade-
quate reserves. Upon discovering Reserve's financial
condition, the Department of Insurance approached Re-
serve and its parent, American Reserve Corporation
("ARC"), and initiated [*2] discussions to develop a
plan for stabilizing Reserve.

It is also alleged that while participating in discus-
sions with the Department of Insurance, the officers and
directors of Reserve and ARC secretly devised their own
plan for dealing with Reserve's troubles. The officers and
directors entered into an agreement with defendant So-
ciete Commerciale De Reassurance ("SCOR"), which
was brokered by defendant SCOR Reinsurance Company
("SCOR Re"). Under the terms of the agreement, Re-
serve was to cede to SCOR a portion of its business; spe-
cifically, the most profitable and lowest risk policies.
SCOR was required to pay a commission to Reserve for
the cessions. Additionally, SCOR would secretly retro-
cede the policies back to ARC through a different sub-
sidiary, Guarantee Reserve Co., Ltd. ("Guarantee"). Fur-
ther, ARC agreed to cover Guarantee's obligations to
SCOR because Guarantee was not sufficiently capital-
ized to cover the losses which potentially could be gen-
erated by the retrocessions. In essence, the alleged plan
allowed SCOR to assume Reserve's most profitable busi-
ness at no risk and allowed Reserve to report to the De-
partment of Insurance a smaller volume of business and a
larger surplus. [*3] Consequently, Reserve appeared
solvent on paper.

As a result of this alleged plan and Reserve's ap-
pearance of solvency, Reserve was able to continue writ-
ing insurance despite its true financial condition. In April
of 1975, the Department of Insurance, believing Reserve
was solvent, entered into a consent agreement with Re-
serve which enabled the company to continue its opera-
tions under certain conditions. The SCOR scheme, how-
ever, allowed Reserve to secretly violate the conditions
of the consent agreement, plunging the company further
into insolvency. Reserve continued its operations for
several years after its initial trouble, racking up addi-

1990 U.S. Dist. LEXIS 16071, *

tional debt while at the same time ceding its most profitable business to SCOR

During this period, several other entities became involved in the plan. Specifically, three accounting firms performed work for Reserve and allegedly were aware of the insolvency. Coopers and Lybrand, Alexander Grant and Co., and Arthur Andersen and Co. worked for Reserve during this period, but instead of revealing Reserve's insolvency and the true nature and purpose of the SCOR agreement, these defendants prepared unqualified opinion letters, adding to the illusion [*4] of Reserve's financial health.

In 1979, however, the Department of Insurance discovered Reserve's insolvency. Consequently, the Director of Insurance was designated as the Liquidator of the estate and filed this action on behalf of Reserve. The complaint was filed in March of 1981 and asserts several claims.

In response to the allegations in the complaint, the defendants' filed a motion to dismiss for failure to state a cause of action under RICO. The district court, however, denied the motion, holding that the complaint did indeed state a claim under RICO. The Seventh Circuit affirmed the district court opinion in *Schacht v. Brown, 711 F.2d 1343 (7th Cir. 1983).* In its opinion, the Seventh Circuit set out in detail the parameters of plaintiff's RICO claim.

Discovery continued in this case under the direction of Magistrate Rosemond. After the close of discovery, plaintiffs moved to reopen discovery and allow depositions of three defendant witnesses and opposing counsel. Plaintiffs' motion was based on their receipt of certain anonymous letters. Plaintiffs allege that the letters suggested "foul-play" by certain witnesses, an attorney, and certain corporate defendants - specifically, [*5] monetary payments in exchange for favorable testimony. Magistrate Rosemond denied plaintiffs' amended motion on September 21, 1990. The Magistrate held that the plaintiffs could not take these depositions because: (1) deposition discovery had closed, (2) the deposition information sought did not address the merits of the claims presented in the complaint, but only went to the credibility of the witnesses, (3) the credibility evidence sought was cumulative, and (4) there was no evidence that SCOR had engaged in obstruction of justice. Now the plaintiffs object to the magistrate's order.

### ANALYSIS

Plaintiffs maintain that the requested depositions are critical to the credibility of the three who will be witnesses at trial, and the allegedly sinister events reflect certain defendants' consciousness of their culpability. Plaintiffs further maintain that before discovery closed they could not have discovered the transactions that they

are interested in obtaining information about. On the other hand, defendants contend that (1) the information that the plaintiffs seek has nothing to do with the merits of the litigation, (2) when plaintiffs earlier deposed Ballet and Negrier they could [*6] and should have asked about the alleged meetings, (3) plaintiffs fail to justify the extraordinary steps of deposing opposing counsel, and (4) plaintiffs fail to show that the magistrate's holding was "clearly erroneous or contrary to law."

The issues presented here are (1) whether the magistrate properly denied the plaintiffs request to reopen discovery to depose the lay witnesses and (2) whether the magistrate properly denied the plaintiffs' request to depose opposing counsel

To begin, a magistrate's ruling on a nondispositive matter, such as a decision not to reopen discovery, may be reversed only on a finding that the order is "clearly erroneous or contrary to law." *Fed. R. Civ. P. 72(a)*; e.g., Chaffee v. A&P Tea Co., No. 79 C 2735, slip op. at 2 (N.D. Ill. April 1, 1987) (J. Kocoras); *Johnson v. Old World Craftmen, Ltd., 638 F. Supp. 289, 291 (N.D Ill 1986)*

The present case is now nearly ten years old and fact discovery is finally closed. The depositions sought by the plaintiffs relate solely to meetings and conversations which took place a decade after Reserve's liquidation and do not involve the merits of this litigation, but instead address only the witnesses' [*7] credibility. We do not find "clearly erroneous or contrary to law" the magistrate's conclusion that the plaintiffs have sufficient credibility evidence." See *Fed. R. Civ. P. 72(a)*; See also *United States v. Diecidue, 603 F.2d 535, 551 (5th Cir. 1979)* (Cumulative evidence bearing on issues of credibility were not permitted at trial and would not be the subject of additional discovery after discovery cut-off)

Moreover, before the close of discovery, plaintiffs twice received anonymous letters referring to correspondence and meetings involving the witnesses the plaintiffs seek to dispose. Yet, plaintiffs waited until after the close of discovery to pursue this subject. Certainly, discovery should not be reopened to enable a party to deal with its own deposition mistakes. Lemelson v. General Mills, Inc., No. 77 C 4558, slip op. at 8 (N.D. Ill Dec. 1, 1977) (J. Kocoras)

Finally, plaintiffs have failed to make a factual showing that would justify the extraordinary steps of deposing opposing counsel. The party seeking to depose opposing counsel has a substantial factual burden to meet. Because of their disruptive effects on the attorney-client privilege, the attorney-client [*8] relationship, and the litigation process, depositions of opposing counsel, even with respect to non-privileged matters, are allowed only under highly restricted circumstances. See *Marco*

1990 U.S. Dist. LEXIS 16071, *

*Island Partners v. Oak Development Corp., 117 F.R.D. 418, 420 (N.D. Ill. 1987).* After evaluating their factual submissions, the magistrate found that "because [plaintiffs have] not presented a colorable claim of obstruction of justice through witness tampering, additional discovery is unwarranted. Most assuredly, deposing opposing counsel on the issue is unwarranted." Under these circumstances, we find that the magistrate's ruling on the issue of deposing opposing counsel is not "clearly erroneous or contrary to law." Accordingly, we affirm the magistrate's denial of plaintiffs' request to reopen discovery and depose the defense witnesses and opposing counsel.

# EXHIBIT 10

LEXSEE

**JAMAL J. KIFAFI, individually and on behalf of all others similarly situated, Plaintiffs, v. HILTON HOTELS RETIREMENT PLAN, et al., Defendants.**

**CIVIL ACTION 98-1517 (CKK/AK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2000 U.S. Dist. LEXIS 17967*

**December 7, 2000, Decided**
**December 7, 2000, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Kifafi v. Hilton Hotel Ret. Plan, 2004 U.S. Dist. LEXIS 28928* (D.D.C., Sept. 27, 2004)

**PRIOR HISTORY:** *Kifafi v. Hilton Hotels Retirement Plan, 189 F.R.D. 174, 1999 U.S. Dist. LEXIS 21022* (D.D.C., 1999)

**DISPOSITION:** [*1] Defendants' Motion for a Protective Order GRANTED.

**COUNSEL:** For JAMAL J. KIFAFI, plaintiff: Stephen Robert Bruce, Washington, DC

For HILTON HOTEL RETIREMENT PLAN, HILTON HOTELS CORPORATION, JAMES M. ANDERSON, MATTHEW J. HART, BARRON HILTON, DIETER HUCKESTEIN, SAM D. YOUNG, JR., defendants: Robert N. Eccles, Lynn E Parseghian, Gregory Yann Porter, O'MELVENY & MYERS, L.L.P, Washington, DC

**JUDGES:** ALAN KAY, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** ALAN KAY

**OPINION:**

### MEMORANDUM ORDER

Pending before the Court is Defendants' Motion for a Protective Order ("Motion") [95], Plaintiffs' opposition thereto ("Opposition") [96], and Defendants' reply ("Reply") [97]. Pursuant to *Federal Rule of Civil Procedure 26(c)*, Defendants have moved for a protective order staying the taking of discovery, by deposition or any other means, from Frank Cornelius, whose deposition Plaintiff noticed for November 2, 2000. n1 Defendants

oppose the deposition on two grounds: 1) it is out of time since discovery closed on April 21, 1999 and Plaintiff has offered no legitimate grounds for reopening it; 2) the record on the work product dispute before the Court has been closed for months and the undersigned's rulings [*2] on privilege and work product are now pending before the Court on motions that have been fully briefed Memorandum at 1-2. Alternatively, Defendants request that the deposition be stayed pending the outcome of the cross-motion for reconsideration of the undersigned's rulings on privilege and work product. Memorandum at 6-7.

n1 Mr. Cornelius was expected to testify about the substance of Aon Consulting's work for Defendants on the benefit-accrual issue in this litigation and his knowledge as to whether Aon's work was generated in anticipation of litigation Memorandum in Support of Motion ("Memorandum") at 1.

Plaintiffs allege that "no harm accrues to defendants if the deposition goes forward as noticed" since the record of the deposition will "allow the Court to make its determinations of relevance and privilege based on actual testimony." Opposition at 1-2. Notably, Plaintiffs offer no "exceptional and compelling circumstances" for violating the Court's schedule closing discovery on April 1, 1999. Reply at 1. [*3] Instead, Plaintiffs acknowledge that they have known about Mr. Cornelius since June of 1999 but that they did not realize his significance as a witness until February 2000. *See* Reply at 2.

This Court finds Plaintiffs' attempt to reopen discovery by noticing the deposition of Mr. Cornelius to be untimely and unjustified. *See Queen's University at Kingston v. Kinedyne Corporation, 161 F.R.D. 443, 445-446 (D. Kan. 1995)* (Defendant's request to reopen dis-

covery to take a deposition was denied where defendant offered no good cause for its failure to contact the witness until well after the close of discovery. Defendant did not allege that the witness was newly-discovered or previously unavailable.) *See generally Yrityspankki Skop Oyj v Delta Funding Corporation, 1999 U.S. Dist. LEXIS 17463, *11, 1999 WL 1018048 *4* (S.D.N.Y. 1999) ("In seeking to reopen discovery . . . , the defendant must demonstrate . . . what efforts the defendant has made during discovery to obtain this information [to defeat a summary judgment motion] and why it was unsuccessful in doing so."); *Stamp v Brown, 1990 U.S. Dist. LEXIS 16071, 1990 WL 205456* (wherein the Court upheld the magistrate's ruling not to reopen discovery [*4] for the purpose of taking depositions, noting that "discovery should not be reopened to enable a party to deal with its own deposition mistakes." (citation omitted)) n2

> n2 Since this Court has determined the Plaintiffs' notice of deposition of Mr. Cornelius to be untimely, there is no need to reach a determination on the issue of the privilege of the deponent's testimony. In the event that Plaintiffs call Mr. Cornelius as a witness at trial, the trial court may rule on the privilege of his testimony.

Based on the Plaintiffs' failure to justify an out-of-time deposition, more than a year after the discovery cutoff in this case, is this 7Th day of December 2000,

**ORDERED** that the Defendants' Motion for a Protective Order be and hereby is **GRANTED**. Plaintiffs may not pursue discovery from Frank Cornelius through deposition or by any other means. n3

> n3 This Court does not reach a determination on whether new evidence with regard to the undersigned's prior rulings on privilege and work product may be introduced before the trial court. The Court does however direct the parties' attention to *Aikens v. Shalala, 956 F. Supp. 14, 19 (D.D.C. 1997)* (wherein Judge Urbina ruled that "this rule [*Fed. R. Civ. P. 72(b)*] does not permit a litigant to present new initiatives to the district judge . . . therefore only those issues that the parties have raised in their objections to the Magistrate Judge's report will be reviewed by this court.") (citations omitted).

[*5]

ALAN KAY

UNITED STATES MAGISTRATE JUDGE