# EXHIBIT G

Page 566

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - -x
CATHERINE GAUJACQ,                  :
                                    :
     Plaintiff,                     :
                                    :
  vs.                               : 1:05CV0969 (JGP)
                                    :
ELECTRICITE DE FRANCE               :
INTERNATIONAL NORTH AMERICA, INC.,  :
et al.,                             :
                                    :
     Defendants.                    :
                                    :
- - - - - - - - - - - - - - - - - -x

Washington, D.C.

Friday, June 2, 2006

Continuing deposition of CATHERINE GAUJACQ, called for examination by counsel for the defendants, pursuant to notice, at the office of Steptoe & Johnson, LLP, 1330 Connecticut Avenue, N.W., Washington, D.C., before Laurel P. Platt, a Registered Diplomate Reporter, and Fada S. Chaconas, a notary public in and for Washington, D.C., beginning at 8:37 a.m., when were present on behalf of the respective parties:

Excerpts re: Exhibit 93
June 2, 2006 Deposition of Catherine Gaujacq

630

6  MS. HODGSON: The next exhibit is No. 93.
7      (The chronology of events was marked
8      Gaujacq Deposition Exhibit No. 93 for
9      identification.)
10     BY MS. HODGSON:
11  Q  Ms. Gaujacq, do you recognize Exhibit 93?
12  A  Yes.
13  Q  Can you tell me what Exhibit 93 is?
14  A  It's an event sheet I prepared following your
15 request for documents.
16  Q  When did you prepare Exhibit 93?
17  A  Sometime when you asked, which is -- I don't
18 know -- over the next month or so.
19  Q  Is it a chronology of certain events starting
20 in January of '04 through December of '05?
21  A  Yes, about two years.
22  Q  I have another question about April of '05.

631

1 Between the time you accepted the offer of employment
2 by Entergy and the time you started work on April 4,
3 what were you doing?
4  A  It's three weeks. I mean, I went to this
5 drug screening and didn't do anything else. I was at
6 home.
7  Q  You said you created Exhibit 93 in response
8 to the document request --
9  A  Yes.
10 Q  -- issued in this case by the defendants?
11 A  Yeah.
12 Q  Did you create this on your home computer?
13 A  Yeah.
14 Q  Okay. What application did you use to create
15 it?
16 A  This one was on Excel.
17 Q  Excel?
18 A  Yes.
19 Q  From what source or sources did you obtain
20 the information under the column events to fill in on
21 Exhibit 93?
22 A  Various recollections from previous, you

632

1 know, recollections and all that I had produced -- I
2 had built over time.

3   Q   Did anyone assist you in connection with the
4   preparation of Exhibit 93?
5   A   No. I did it by myself in my spare time.
6   Q   Did you attempt to be inclusive in terms of
7   describing the events in which you participated during
8   the period of time that is covered by this chronology?
9       MS. BREDEHOFT: Objection to form. Go ahead.
10      MS. HODGSON: Counsel, I would like to know
11  what the objection to form is. What is the nature of
12  the objection?
13      MS. BREDEHOFT: Could you just repeat the
14  question?
15      (The question was read.)
16      MS. BREDEHOFT: My objection was the
17  vagueness of the inclusive of events in which you
18  participated. That was the objection to form.
19      MS. HODGSON: That it was vague.
20      MS. BREDEHOFT: Yes.
21      BY MS. HODGSON:
22  Q   Ms. Gaujacq, do you understand my question?

633

1   A   Yes.
2   Q   Okay.
3   A   But I did my best to produce the documents
4   you were expecting. That's it.
5   Q   Well, let's, for example, look on the first
6   page of this Exhibit 93. There's a reference -- the
7   very first reference is to a GE meeting on project.
8   Do you see that reference?
9   A   Yes.
10  Q   Are there documents other than this
11  chronology that you have in your possession or control
12  that relate to that meeting?
13  A   I have produced lots of documents in this
14  case, and EDFINA may have some recall of these -- of
15  these events, of course.
16  Q   I'm just asking whether you used documents to
17  produce Exhibit 93.
18  A   No.
19  Q   Whether you used other documents.
20  A   I guess -- I don't recall. It was built over
21  time trying to keep -- to keep a chronology starting
22  with my complaint to the EEOC. So that's the best

634

1  recollection I have at this time.
2    Q   When you say it was "built over time," when
3  did you start creating Exhibit 93?
4    A   I told you, when -- right after the complaint
5  to the EEOC.
6    Q   So not in response to our document request.
7    A   Well, if you are talking about these
8  documents --
9    Q   Yes?
10   A   -- it was produced to answer your questions
11 about the document. If you asked me how I got to
12 the -- I had some pieces and bits around that I tried
13 to, you know, to keep -- to keep track of starting my
14 EEOC complaint.
15   Q   We may not have been communicating clearly.
16   A   I am sorry. My English is -- I mean I do the
17 best I can.
18   Q   No, it's excellent, but let me just start
19 again. When did you yourself start to create the
20 document that is Exhibit 93?
21   A   This one? This one? Over the last month or
22 so. Now. I mean. The Excel is sometime in May, I

                              635
1  would guess.
2    Q   May of 2006.
3    A   Yes.
4    Q   Was there a prior version of Exhibit 93, a
5  prior Excel file?
6    A   I don't even recall the name of this file.
7  There may be lots of documents with bits and pieces of
8  what I did. Yes, of course. There was already one
9  produced before. There was another one produced even
10 before, yeah. I mean, of course.
11   Q   Have you produced to us every version of the
12 exhibit which is Exhibit 93?
13   A   I don't know. I don't know.
14   Q   Have you provided every version of this
15 document to your counsel?
16   A   What are we talking about?
17      MS. BREDEHOFT: Objection to the extent that
18 calls for attorney-client communication.
19      MS. HODGSON: I'm not asking about
20 communications. I'm just asking what she produced for
21 discovery in this case, and I assume she gave it to
22 your law firm before it came to us. That's the reason

- 3 -

636

1  for my inquiry.
2      MS. BREDEHOFT: If that's your question, the
3  answer is we have produced whatever she has produced
4  to us that's not privileged.
5      BY MS. HODGSON:
6    Q  My question is have you produced all versions
7  of Exhibit 93?
8    A  And my answer is I don't know.
9      MS. HODGSON: We would request that to the
10 extent there are additional versions of Exhibit 93 or
11 any other documents that may have been created over
12 time, that you work with your client to obtain those,
13 and unless they are subject to objection, provide them
14 to us as soon as possible.
15     MS. BREDEHOFT: I would tell you that we have
16 produced whatever versions there are. We have
17 produced anything that's nonprivileged.
18     THE WITNESS: Hey, you want my own life?
19 What are you looking here? I just work to the best of
20 my --
21     MS. BREDEHOFT: Hold on. I think the
22 confusion here is when you're talking versions and

637

1  somebody --
2      THE WITNESS: Of course.
3      MS. BREDEHOFT: I think you're thinking of
4  versions where she's printed them out as opposed to
5  did she go into the document and add to things --
6      MS. HODGSON: Counsel, let's not coach the
7  witness.
8      THE WITNESS: I don't need any coaching on
9  that. I just know that when I have an extra sheet,
10 every time I touch it, there's a new version. Do I
11 know there are other versions? I don't know. Do I
12 know if there are other Adobe version or whatever
13 printouts? I don't know. And you know what? I may
14 have deleted those. And I don't even know if there is
15 something on my computer now. I just did my best to
16 answer your question.
17     BY MS. HODGSON:
18   Q  Is it your testimony you may have deleted
19 previous versions of Exhibit 93 that were created?
20   A  Of course.

- 4 -

21   Q  You deleted them by clicking delete on your
22  computer to destroy that file?

638

1   A  I don't know.
2   Q  You don't know.
3   A  I don't even know the name of this file.
4  Right? I don't know the version. I don't know the
5  name. I don't know anything. The only thing I know
6  is I produced this document; right?
7   Q  Ms. Gaujacq, I know you produced this
8  document.
9   A  What are you looking at?
10  Q  You have an obligation --
11  A  I tried to do my best, and I do my best, but
12  I don't know what you are looking for, honestly.
13  Q  I am looking for an answer to my question,
14  and here is my question. Do you know whether you have
15  any other versions of Exhibit 93 in hard copy or
16  electronic copy that you have not produced in this
17  litigation?
18  A  And my answer is I don't know.
19  Q  Do you not know because you concluded that
20  this was the most complete version and current
21  version?
22  A  No. I don't think I said anything about

639

1  that. That's the version I produced to answer to my
2  best your question.
3   Q  Why don't you know whether there are other
4  versions of this document?
5     MS. BREDEHOFT: Objection to form. Go ahead.
6   A  Why don't I know. Because I don't recall
7  what I am doing on my computer every day, wherever it
8  is, whatever computer it is. I don't recall that.
9  It's that simple. I mean, you know, it's that simple.
10     I don't recall what I -- you know, how
11  many -- how many files I touch on a daily basis. Do
12  you?
13  Q  This particular file you started in May,
14  sometime in May of 2006 creating this document? Is
15  that your testimony?
16  A  Yes.
17  Q  Did you ever create a document similar to
18  this prior to May 2006?

19   A  I have, yeah.
20   Q  Have you produced all of those documents to
21  defendants in this litigation?
22   A  I don't know. I don't know.

               640
1     MS. HODGSON: Well, I would again request
2  that if the witness has other documents in electronic
3  or hard copy form that relate in any way to a
4  chronology of events or information relating to the
5  issues in this lawsuit, that they be produced
6  immediately.
7     BY MS. HODGSON:
8   Q  Let me ask you this question, Ms. Gaujacq.
9  Is Exhibit 93 a subset of a more inclusive chronology?
10   A  What are you talking about? The file? The
11  printout?
12   Q  Anything. I'm asking whether you have a more
13  detailed chronology of events for the January 2004 to
14  December 2005 time period.
15   A  This is the best of my recollection.
16   Q  I am not asking whether this is the best.
17  I'm asking whether you have another chronology of
18  events for this time period that has not been
19  produced.
20   A  No.
21   Q  Why did you include -- let me back up. As I
22  understand this file, you have a date and then a

               641
1  column called "CG" and then a column called "events."
2  Do you see where I'm referring on Exhibit 93?
3   A  I do.
4   Q  CG refers to yourself?
5   A  Yes.
6   Q  And the column that follows under CG, is that
7  intended to show accurately where you were working on
8  each of the days that the column is filled in?
9   A  To the best of my knowledge, yes.
10   Q  Did you refer to other sources of information
11  in completing that column of information where you
12  indicate where you were working on the days listed
13  there in Exhibit 93?
14   A  I may have.
15   Q  Well, you created the document just a few
16  weeks ago. Do you recall whether you looked at other

17  sources to fill in the information in the CG column?
18    A   I did.
19    Q   What other documents or sources of
20  information did you look at?
21    A   Previous chronology. Previous chronology.
22    Q   Have all the previous chronologies that

642

1   you've just referred to in your answer, have they all
2   been produced to defendants in this case?
3     A   I don't know.
4     Q   Are all the references to "office" in the
5   second column of Exhibit 93 references to the EDFINA
6   office in Washington, D.C.?
7     A   Yes.
8     Q   If you spent part of the day in the office
9   and part of the day at home, did you list that day as
10  a day spent at the office or a day spent at home on
11  Exhibit 93?
12    A   I don't know. I don't know. To the best of
13  my -- it was the best of my recollection. You could
14  have the other way, you know, the other way around.
15  That's to the best of my recollection, I was at the --
16  I was at the office on these days.
17    Q   When you say you were at the office, were you
18  at the office for a full day?
19    A   I don't know.
20    Q   You don't know one way or the other?
21    A   No.
22    Q   Okay. With respect to the portion of Exhibit

643

1   93 that relates to your Entergy employment, when you
2   put Great Falls, Virginia, down, is that a reference
3   to whether you spent the day in Great Falls or whether
4   you slept at Great Falls?
5     A   Can you just give me a reference line to
6   answer your question?
7     Q   Look at page 2518 of Exhibit 93.
8     A   Yes.
9     Q   I'm looking at the second column. Can you
10  tell me whether this document shows that you spent the
11  day at Great Falls, or did you base it on where you
12  slept at night?
13    A   Oh, no. It means I did not move from Great
14  Falls. I did not move from my house during this

15  period, and I was in touch with -- waiting a call from
16  EDF. I did not move from my house, not even to go to
17  the grocery shop.
18    Q   Well, we are looking at December --
19    A   This period, I -- well, because this period
20  was 2004.
21    Q   Okay.
22    A   Yes.

                        644
1     Q   Then let's look a little bit later. Fair
2   point. Look at page 2522.
3     A   Yes.
4     Q   Okay. Do you see the reference on April 25,
5   2005, to being in Jackson, Mississippi, on that day,
6   April -- excuse me -- it's hard to read -- April 26,
7   2005?
8     A   Yes. It doesn't mean I was in Jacksonville
9   on this -- you know, in this period because I had some
10  business travel, too, right.
11    Q   So when it says you're in Jackson,
12  Mississippi, you may or may not be in Jackson,
13  Mississippi, on those days; is that correct?
14    A   On those days I was working from Jackson,
15  Mississippi. That's the meaning of this.
16    Q   But you could be traveling.
17    A   I could be in Arkansas or in Louisiana or
18  wherever.
19    Q   On that page you have certain portions of the
20  document which appear to be highlighted?
21    A   Yes.
22    Q   Is that highlighting highlighting that you

                        645
1   applied to the document? Is that your work to apply
2   the highlighting for this?
3     A   Yes. There is --
4     Q   A reason?
5     A   Yes.
6     Q   Could you tell me the reason?
7     A   It's when I paid for my own -- for my own
8   travel. It's when the company did not reimburse me to
9   come to work either to Jackson or to White Plains.
10    Q   So let me just go back to 2522 again. April
11  29th and April 30th were a weekend. You were in Great
12  Falls on the weekend; correct?

```
13    A    Well, I left for Jackson -- I fly back to
14 Dulles, was arriving at --
15    Q    Midnight?
16    A    12:30 or so.
17    Q    Correct.
18    A    Friday was in Jackson. And Saturday was in
19 Great Falls.
20    Q    Okay. So that was Friday the 28th you were
21 in Jackson and then flew back that night?
22    A    Yes, exactly. And I would flew back on the
```

                                646
```
 1 Saturday afternoon, something like 2 or so usually, to
 2 get back to Jackson when I was lucky.
 3    Q    On Saturday?
 4    A    On Sunday.
 5    Q    And then Monday through Saturday, you were
 6 based in Jackson?
 7    A    Monday through -- Monday through Friday,
 8 yeah. Yeah.
 9    Q    Well, you have May 1, May 2, May 3, May 4,
10 May 5, May 6.
11    A    Um-hum.
12    Q    Were you in Jackson those six days?
13    A    I was based in Jackson and flew to Jackson on
14 May 1st, hopefully, and flew back on the 6th.
15    Q    Typically when you flew to Jackson from your
16 home in Great Falls, you would take a flight to
17 Jackson late in the afternoon?
18    A    Or in the evening. 7 p.m. or so.
19    Q    So when you put Jackson down for May 1, that
20 was the day you spent in Great Falls but flew to
21 Jackson in the evening.
22    A    On May 1, I left my home at noon or 1 p.m, at
```

                                647
```
 1 the latest, to catch a -- to catch a flight on
 2 Sunday -- on Sunday afternoon. Tried to get some
 3 sleep on the night of Sunday through Mondy and be at
 4 work at 7:30 on the next Monday.
 5    Q    We have your travel itinerary, so we know
 6 exactly when you took your planes.
 7    A    Well, at least you've got the itinerary when
 8 I arrived. Believe me, you don't know, because I some
 9 nights in some airports.
10    Q    And Monday through Friday, or the time here
```

11  on page 2522 of Exhibit 93, are days that you say you
12  were required to pay for your living expenses?
13  A   For the -- the meals, I had to pay them
14  always. I was not reimbursed for the meals. I was --
15  I was -- I highlighted the -- I highlighted things
16  where the flights that I paid, and I was not
17  reimbursed for by the company.
18  Q   Okay.
19  A   And you have those in the production.
20  Q   But I'm still trying to understand. I
21  thought your previous testimony was you were not
22  reimbursed for expenses for the highlighted days.

648

1   A   Exactly, yeah. I was not.
2   Q   So the weeks that you spent in Jackson,
3   Mississippi, that are highlighted are weeks where no
4   expenses of yours were reimbursed?
5   A   The hotel was reimbursed.
6   Q   Okay. And was a rental car or a taxi
7   reimbursed?
8   A   Not a taxi, but the approved car of the
9   company. But I would get it only on Monday morning.
10  And I would have to leave it at the office. So I
11  needed a taxi to go back to the airport.
12  Q   Okay. So the weeks that are highlighted here
13  are weeks where your hotel was paid?
14  A   Yeah.
15  Q   Did that include your breakfast at the hotel?
16  A   There was a buffet.
17  Q   A buffet. Did it include your dinner?
18  A   No.
19  Q   So your breakfast, your room, and you had use
20  of a car during that week until Friday evening.
21  A   Yeah.
22  Q   Okay.

649

1   A   The highlighted is for the air travel that I
2   paid and was not reimbursed for by --
3   Q   Entergy.
4   A   -- Entergy.
5   Q   You talked about your raise in April of 2006
6   at Entergy as being average.
7   A   It's not a raise. Just, you know, inflation.
8   Q   You received a pay increase in April of 2006,

- 10 -

9  did you not?
10    A    I don't know when -- what is the exact
11  application date of the raise. It's on or around.
12    Q    On or around April of 2006?
13    A    April or May. Yeah.
14    Q    And it was a pay increase.
15    A    A base pay increase, yeah.
16    Q    And you described it as average.
17    A    Yeah.
18    Q    Do you -- is there --
19    A    Well, average is not a good word then. I
20  mean it just -- you know, to cover -- cover inflation.
21    Q    Okay.
22    A    So you would say most people would get this

650

1  type of thing, of pay raise.
2    Q    Okay. Do you expect that you will get a pay
3  increase next April?
4    A    I don't know. I don't know if I am going to
5  be with Entergy next April.
6    Q    Has anyone at Entergy indicated to you in any
7  way that your employment is in jeopardy?
8    A    Well, it is in jeopardy --
9    Q    I'm asking if anybody has said to you that
10  your employment is in jeopardy?
11    A    Then my answer is yes.
12    Q    Who has said to you that your employment at
13  Entergy is in jeopardy?
14    A    The policy of the company is explicit. It's
15  an at-will work, meaning that anyone knows that and
16  everybody would have told me that. I mean I know that
17  depending on my results and depending on a lot of
18  different things going on with the company, I can lose
19  this job. Of course.
20    Q    Has anyone at Entergy told you or written to
21  you to say that your employment at Entergy is in
22  jeopardy?

651

1    A    And my answer is yes. Again, because of the
2  restructuring going on, you know, I am on a temporary
3  position. And we all know that if this restructuring
4  goes on, you know, you are going to have candidates
5  for some positions, and you are going to select
6  people. And obviously, the number is just not the

- 12 -

7  same, you know.