# EXHIBIT H

In the U.S. District Court

For the District of Columbia

----------------------------------x

Catherine Gaujacq                 :

                                  : NO. 1:05CV0969

            v.                    :

                                  :

Electricite de France             :
International, North              :
America, et al                    :

----------------------------------x

March 16, 2006

DEPOSITION OF:

        Catherine Gaujacq,

a witness, called by counsel pursuant to notice,

commencing at 9:30 a.m., which was taken at 11260

Roger Bacon Drive, Reston, VA

Page 2

Appearances

Elaine C. Bredehoft, Esq.
Charlson, Bredehoft and Cohen
11260 Roger Bacon Drive
Reston, VA 20190
for the Plaintiff

Laura B. Hogeut, Esq.
Steptoe and Johnson
1330 Connecticut Ave., NW
Washington, DC 20036-1795
for the Defendant

Page 3

INDEX OF EXAMINATIONS
WITNESS                                   PAGE

Catherine Gaujacq

    Direct Examination By Ms. Hoguet

Index of Exhibits
Description                               Page
exhibit number 1 .......................... 9
exhibit number 2 .......................... 10
exhibit number 3 .......................... 11
exhibit number 4 .......................... 12
exhibit number 5 .......................... 13
exhibit number 6 .......................... 22
exhibit number 7 .......................... 31
exhibit number 8 .......................... 56
exhibit number 9 .......................... 63
exhibit number 10 ......................... 65
exhibit number 11 ......................... 77
exhibit number 12 ......................... 80

Page 4

Index of Exhibits (cont.)
Description                               Page
exhibit number 13, 14 ..................... 86
exhibit number 15 ......................... 89
exhibit number 16 ......................... 90
exhibit number 17 ......................... 98
exhibit number 18 ......................... 103
exhibit number 19 ......................... 112
exhibit number 20 ......................... 120
exhibit number 21 ......................... 127
exhibit number 22 ......................... 135
exhibit number 23 ......................... 142
exhibit number 25 ......................... 153
exhibit number 26 ......................... 155
exhibit number 27 ......................... 169
exhibit number 28 ......................... 169
exhibit number 29 ......................... 172
exhibit number 30 ......................... 174
exhibit number 31 ......................... 189

Page 5

Index of Exhibits (cont.)
Description                               Page
exhibit number 32 ......................... 191
exhibit number 33 ......................... 193
exhibit number 34 ......................... 196
exhibit number 35 ......................... 198
exhibit number 36 ......................... 198
exhibit number 37 ......................... 203
exhibit number 38 ......................... 211
exhibit number 39 ......................... 216
exhibit number 40 ......................... 218
exhibit number 41 ......................... 221
exhibit number 42 ......................... 227
exhibit number 43 ......................... 231
exhibit number 44 ......................... 234
exhibit number 45 ......................... 247
exhibit number 46 ......................... 248

Page 6

1      (Morning Session)
2         Stipulations
3      (It is stipulated and agreed by and
4  between counsel for the respective parties that
5  the reading and signing of this transcript by the
6  witness be and the same are hereby waived.
7      It is further stipulated and agreed
8  that the filing of this transcript with the clerk
9  of the court be and the same is hereby waived.)
10            * * * * *
11
12  Whereupon,
13         Catherine Gaujacq
14
15  was called for examination by counsel and,
16  after having been duly sworn, was examined
17  and testified as follows:
18
19  DIRECT EXAMINATION:
20  BY MS. HOGUET:
21     Q. My name is Laura Hoguet. I represent EDF

Page 7

1  and EDFINA.
2     A. Fine.
3     Q. If I ask you a question that isn't clear
4  to you, by all means stop me and tell me and I'll
5  rephrase it.
6     If you would like to consult with your
7  attorney, you are welcome to do that. Just tell me
8  you want a break and we'll have one but please if
9  you want to stop, answer the pending question before
10 you ask for the break.
11    Is that understood?
12    A. That's fine.
13    Q. What is your residence address?
14    A. Today?
15    Q. Yes.
16    A. It's 125 Livingston Drive, Madison,
17 Mississippi.
18    Q. Do you have any other residence?
19    A. I have a residence in France.
20    Q. But no other residence in the
21 United States?

Page 8

1     A. No.
2     Q. What is your current employment?
3     A. I am acting vice-president of operations
4  support with Entergy Nuclear.
5     Q. Where is that located?
6     A. Jackson, Mississippi.
7     Q. When did you commence that employment?
8     A. On April 4, 2005.
9     Q. Do you have any present intention of
10 leaving that job?
11    A. No.
12    Q. Are you a French citizen?
13    A. Yes.
14    Q. What is your immigration status?
15    A. I am a permanent resident of the
16 United States.
17    Q. When did you become a permanent resident?
18    A. By the end of August 2004.
19    Q. You have filed a charge, an amended charge
20 with the EEOC that preceded the filing of this
21 action, correct?

Page 9

1     A. Yes.
2     Q. I'm going to mark the charges as the first
3  exhibits and just confirm with you what they are for
4  the record.
5     The first one is dated July 30, 2004 and
6  it's addressed to the EEOC. It's Bates numbered 191
7  to 198 in this action. I guess that could be
8  exhibit one.
9         (Whereupon the proffered item was
10        marked as exhibit number 1.)
11    Q. Ms. Gaujacq, is that the first charge you
12 filed with the EEOC?
13    A. There's no way I can tell you. The
14 document is obviously --
15    Q. Take a moment to look at it, please.
16    A. Even if I look at it, I'm sorry. I don't
17 even remember the number of pages.
18    Q. Can you look at the last page of it,
19 please?
20    A. Yes.
21    Q. Does your signature appear on that last

Page 90

1  gives that authority to you, correct?
2     A. That's what it says.
3     Q. Thank you. One more of these formal
4  documents. I'm going to mark exhibit 16.
5         (Whereupon the proffered item was
6     marked as exhibit number 16.)
7     Q. I'm also supplying it to you, counsel.
8  Have you seen exhibit 16 before, Ms. Gaujacq? This
9  one had EDFINA production numbers 1557 to 1559.
10    A. Yes.
11    Q. This document is another written consent
12 signed by you, is it not, on the third page?
13    A. Yes.
14    Q. And also by Mr. Ponasso?
15    A. Yes.
16    Q. It's dated March 1, 2003, correct?
17    A. Yes.
18    Q. It elects Beonit Dreux as the
19 vice-president and secretary of EDFINA, correct?
20    A. Yes.
21    Q. He replaced Louie Rovarsee who departed,

Page 91

1  correct?
2     A. Yes.
3     Q. It also on the next page then
4  gives -- revokes Louie Rovarsee's authority to act
5  as signatory on checking accounts and appoints
6  Benoit Dreux in his place, is that correct?
7     A. Yes.
8     Q. There were then two officers of EDFINA
9  with authority to sign checks, yourself and
10 Mr. Beonit Dreux, is that correct?
11    A. Yes.
12    Q. Is there a reason why there needed to be
13 two signatories for checks?
14    A. Reason why? I don't know.
15    Q. Do you know whether as a matter of EDF
16 policy and organization there needed to be two
17 signatories so that no one would sign things that
18 were of benefit to themself?
19    A. Yes, you are right. The minimum of two
20 was just by EDFINA. You know, when a VP was
21 traveling or when the president was traveling, you

Page 92

1  needed to have someone to sign.
2     Q. Let me just see if I can make sure I
3  understand what you are saying.
4         There needed to be at least two signatories,
5  correct?
6     A. Yes. And there were a lot more in the
7  history of EDFINA.
8         MS. HOGUET: Move to strike that last
9  part of the witness' answer.
10 BY MS. HOGUET:
11    Q. Let me come back to exhibit 13 which I
12 started with before the break. Exhibit 13 has
13 Ms. Gaujacq's Bates numbers 645 on it and there's an
14 informal translation in the copy I've given to
15 Ms. Bredehoft.
16        Ms. Gaujacq, is this an e-mail that you sent
17 to somebody at EDF on or about January 28, 2002?
18    A. It is.
19    Q. In this e-mail you advised EDF in France I
20 take it that you wished to apply for a green card,
21 is that correct?

Page 93

1     A. Yes.
2     Q. The green card being an informal synonym
3  for permanent resident of the United States, is that
4  correct?
5     A. I ask on this e-mail and got the approval
6  for by the HR department, yes, a request for
7  permanent residency in the United States as
8  executive or manager, yes.
9     Q. At the time you had -- at the time you had
10 an L1 visa, is that correct?
11    A. Yes.
12    Q. That enabled you to work in the
13 United States because you were sponsored by EDFINA,
14 correct?
15    A. Yes.
16    Q. If I'm understanding this correctly, when
17 you first came to the United States under your
18 expatriate contract you received an indemnity in
19 respect of your spouse for two years because he
20 would presumably not be able to work, correct?
21    A. The L1A visa at this time did not allow

Page 94

1  the spouse to work. It was really, you know.
2     So my husband was a professor at the
3  university in France and that's one of the reasons
4  why we really thought about accepting the position
5  in the United States, because he lost his job for an
6  unknown period.
7     Q. As part of the expatriate contract did EDF
8  pay an indemnity which was supposed to represent
9  some portion of his lost earnings?
10    A. Very small portion.
11    Q. Did there come a time when that indemnity
12 ended under the terms of the contract?
13    A. There were two reasons for which this
14 indemnity would stop. The first was my husband
15 finding a job and the second was two years.
16    Q. It would be no later than -- withdrawn.
17 The indemnity would last no longer than two years,
18 correct?
19    A. Exactly.
20    Q. At the end of the two years had your
21 husband had any work during those two years?

Page 95

1     A. No.
2     Q. At that point then as reflected in exhibit
3  13 you applied for permanent resident status which
4  would enable your husband to work, get a work
5  permit, is that correct?
6     A. Exactly.
7     Q. Did he then obtain a work permit?
8     A. Yes, he did.
9     Q. Did he work in the United States?
10    A. No, he did not work in the United States.
11 He tried to find a job at the International High
12 School of Bethesda, couldn't find a job there, tried
13 with US high school in northern Virginia and could
14 not find.
15    Q. Has he ever found work in the
16 United States?
17    A. No.
18    Q. Is he living in Mississippi with you now?
19    A. Yes.
20    Q. And not working?
21    A. Yes.

Page 96

1     Q. That's correct, he's not working?
2     A. That's correct, he's not working.
3     Q. At the time that you made the application
4  to become a permanent resident of the United States
5  did you have any intention of staying in the
6  United States permanently?
7     A. The term permanent in the United States,
8  if I recall, it is six months.
9     So the intention was obviously to allow my
10 husband to get a work permit and that was the reason
11 why we did that.
12    Q. You hadn't made any decision in your own
13 mind about where you wanted to live on a long term
14 basis, is that correct?
15    A. I knew that I would be working in the
16 United States for another three years at this time.
17 I wanted my husband to find a job there.
18    Q. In your expatriate contract your three
19 years extended until July 31, 2003, is that correct?
20    A. My contract was for three years, plus one
21 year.

Page 97

1     Q. At mutual consent?
2     A. I guess so, yes.
3     Q. Did you have any discussion with anybody
4  at EDF about the one year extension, that is from
5  July 31, 2003 to July 31, 2004?
6     A. No. I had a discussion -- I had an
7  evaluation every year with Fernando Ponasso and I
8  would talk with Gerard Creuzet on what my future was
9  with the company and early 2004 and early 2000,
10 again -- 2005, the decision was we want you to stay
11 there.
12    Q. Before you get there, because we're
13 moving -- I just wanted to focus on my little picky
14 questions about early periods of time.
15    In 2002 and 2003 did you talk to anybody at
16 EDF on the subject of whether you would remain for a
17 year past July 31, 2003?
18    A. Yes, I did talk with Gerard Creuzet about,
19 you know, but not 2002.
20    Q. In 2003 was there any writing exchanged
21 between you and Creuzet concerning the one year

# EXHIBIT I

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - -x
                                   :
CATHERINE GAUJACQ,                 :
                                   :
        Plaintiff,                 :
                                   :
    vs.                            : 1:05CV0969 (JGP)
                                   :
ELECTRICITE DE FRANCE              :
INTERNATIONAL NORTH AMERICA, INC., :
et al.,                            :
                                   :
        Defendants.                :
                                   :
- - - - - - - - - - - - - - - - - -x

                        Washington, D.C.

                        Friday, June 2, 2006

   Deposition of PHILIPPE GAUJACQ, called for examination by counsel for the defendants, pursuant to notice, at the office of Steptoe & Johnson, LLP, 1330 Connecticut Avenue, N.W., Washington, D.C., before Laurel P. Platt, a Registered Diplomate Reporter, and Fada S. Chaconas, a notary public in and for Washington, D.C., beginning at 1:40 p.m., when were present on behalf of the respective parties:

Page 2

1  FOR THE PLAINTIFF:
2    ELAINE CHARLSON BREDEHOFT, ESQ.
     Charlson, Bredehoft & Cohen, P.C.
3    11260 Roger Bacon Drive
     Suite 201
4    Reston, Virginia 20190
5  FOR THE DEFENDANT CHRISTIAN NADAL:
6    MORGAN D. HODGSON, ESQ.
     DAVID A. CLARK, ESQ.
7    Steptoe & Johnson, LLP
     1330 Connecticut Avenue, N.W.
8    Washington, D.C. 20036
     202-429-3000
9
   FOR THE DEFENDANTS ELECTRICITE DE FRANCE, S.A. AND
10 ELECTRICITE DE FRANCE INTERNATIONAL NORTH AMERICA:
11   DOROTHEA W. REGAL, ESQ.
     Hoguet, Newman & Regal, LLP
12   10 East 40th Street
     New York, New York 10016
13   212-689-8808
14 ALSO PRESENT:
15   Jessica T. Abreu
     Abreu Language Services, Ltd.

Page 3

                 INDEX

       EXAMINATION BY COUNSEL FOR
       THE DEFENDANTS:

                 EDF, EDFINA,   MR. NADAL,
   WITNESS       MS. REGAL.     MS. HODGSON.
   Philippe Gaujacq     4         66

                 EXHIBITS
   PHILIPPE GAUJACQ             FOR IDENTIFICATION
   No. 1 (Subpoena)              6
   No. 2 (Resume of Philippe Gaujacq)   22
   No. 3 (Employment Application)       24
   No. 4 (Pages)                 32

Page 4

1                PROCEEDINGS
2     (Jessica T. Abreu was sworn as the French
3     interpreter.)
4  Whereupon,
5         PHILIPPE GAUJACQ,
6  witness, was called for examination by counsel for the
7  defendants, and after having been first duly sworn,
8  was examined and testified through the French
9  interpreter as follows:
10      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
11      ELECTRICITE DE FRANCE, S.A. AND ELECTRICITE
12      DE FRANCE INTERNATIONAL NORTH AMERICA
13      BY MS. REGAL:
14   Q  Mr. Gaujacq, my name is Dorothea Regal. I am
15 one of the attorneys for EDF and EDFINA in this
16 litigation. EDF, I am referring to Defendant
17 Electricity de France, and EDFINA is EDFINA, which I
18 believe you're familiar with. I am going to be asking
19 questions on behalf of all the defendants, which are
20 EDF, EDFINA, and Mr. Nadal.
21   A  Okay.
22   Q  What is your citizenship?

Page 5

1   A  I am French, a French citizen.
2   Q  Do you understand that the oath that you just
3  gave means that you are subject to the laws of the
4  United States with respect to perjury for the
5  testimony you are giving here today?
6   A  Absolutely.
7   Q  Have you ever had your deposition taken
8  before?
9   A  No, never.
10  Q  Have you ever given testimony in a court
11 before?
12  A  Where?
13  Q  Anywhere.
14  A  No, never.
15  Q  At this deposition I will be asking you
16 questions, and the interpreter will be interpreting
17 them and stating them for you in French.
18  A  That's fine.
19  Q  And then you will be answering the questions,
20 and she will translate them into English. Do you
21 understand that?
22  A  Absolutely.

2 (Pages 2 to 5)

PLATT & DAWSON, INC.    703-591-0007

f368097e-9937-4c03-9cfc-bff6519c40da

Page 6

1  Q  When you answer my questions, I will assume
2  that you understand the questions. If you do not
3  understand the questions, I ask that you will let me
4  know, and I will do my best to rephrase the questions
5  so that you do understand them. Will you do that?
6  A  Yes. If I had a problem, I would do it.
7  Q  And one other general instruction is that if
8  at any time you want to stop and take a break, please
9  let me know and we will do that except that if there
10  is a question pending, you need to answer that
11  question first before we can take a break. Do you
12  understand that?
13  A  Absolutely.
14     MS. REGAL: I am going to mark this subpoena
15  as I guess this should be Exhibit 1.
16     (The Subpoena was marked Philippe Gaujacq
17     Deposition Exhibit No. 1 for
18     identification.)
19     BY MS. REGAL:
20  Q  Mr. Gaujacq, did you receive this subpoena,
21  which has been marked as Exhibit 1 in this deposition?
22  A  Is it the one that was addressed in

Page 7

1  Mississippi to Madison? Is this the one that was sent
2  to Madison in Mississippi?
3  Q  Well, let me direct your attention in Exhibit
4  1 to the address at the top left of the first page.
5  Do you see that address under your name?
6  A  Yes, I see it. Yes.
7  Q  Does looking at that address help you recall
8  whether this is a subpoena that you have received?
9  A  It's the right address, yes.
10  Q  The question was did you receive a subpoena
11  in this case?
12  A  Yes. I received a subpoena in Madison at my
13  home.
14  Q  Does it appear to you that Exhibit 1 is a
15  copy of the subpoena that you received?
16  A  Yes, it's possible.
17  Q  Are you appearing here today pursuant to
18  subpoena?
19  A  Yes, of course.
20  Q  Please look at the last page of Exhibit 1.
21  This is a list of documents to be produced. Do you
22  see this?

Page 8

1  A  Yes, I see it.
2  Q  After you received the subpoena in this case,
3  did you do anything to look for the documents that
4  were requested in the subpoena?
5  A  No, I did not specifically look for all the
6  documents.
7  Q  Please explain what you mean by that.
8  A  Because I don't understand the interest of
9  asking for these documents.
10     MS. BREDEHOFT: Let me just jump in here.
11  Although it's not due yet, we filed on behalf of
12  Mr. Gaujacq -- I represent him, and we have filed
13  objections and responses to the document request
14  that's attached to the subpoena, and we have provided
15  that this morning to counsel so that you would have
16  some time to look at it before the deposition.
17     We have objected, in fact, to all four
18  requests, although we have produced responses -- we
19  have responded in the first three -- number 3 was
20  produced by Ms. Gaujacq, and we stand on the objection
21  to number 4. So everything is subject to that.
22     MS. HODGSON: Can I ask a point of

Page 9

1  clarification? Did you file this in court?
2     MS. BREDEHOFT: No.
3     MS. HODGSON: You just served it.
4     MS. BREDEHOFT: Right.
5     MS. HODGSON: You said we filed it. That's
6  why I want to be sure.
7     MS. BREDEHOFT: No, no, no.
8     MS. HODGSON: And your objection is you were
9  not obligated to object by today's date?
10     MS. BREDEHOFT: Right. Under the Mississippi
11  rules, the Federal Rules of Evidence, and we believe
12  that 30 days governs it. There's nothing in
13  Mississippi local rules that makes that a shorter
14  period of time.
15     MS. REGAL: Well, let me just say that we
16  believe that the Federal Rules of Civil Procedure
17  apply, and that requires any objections under -- Rule
18  4:5 requires any objections to be made within 14 days
19  of service of the subpoena. So the objections that
20  you delivered today we believe are ineffective and
21  untimely and ineffective. That is a --
22     MS. REGAL: Mr. Gaujacq, that is a -- stop.

Page 10

1  You should translate of all of that, if you can.
2      BY MS. REGAL:
3  Q  All right. Mr. Gaujacq, if I understand
4  correctly what your counsel has just said, you have
5  objected to producing the documents that are described
6  in paragraph 4 of Exhibit 1 of the attachment to
7  Exhibit 1. Is that correct?
8  A  Correct.
9  Q  And is it your position that you will refuse
10 to produce the documents described in number 4 of
11 Exhibit 1?
12 A  I really don't see the connection to the
13 case, and so no.
14 Q  What is the answer?
15 A  No.
16 Q  No, you will not refuse to produce the
17 documents?
18 A  I don't see the interest in producing the
19 documents on the one hand; and on the other, some of
20 the documents go back to April 2000, and I am simply
21 not sure that I can find them.
22 Q  Mr. Gaujacq, the defendants in this case are

Page 11

1  entitled to these documents. The relevance of the
2  documents is not a sufficient ground for you to refuse
3  to produce them. If required, we will make a motion
4  in the appropriate court to require you to produce
5  them. I'm simply trying to get on the record your
6  statement of whether you will produce them pursuant to
7  the subpoena or not.
8      MS. BREDEHOFT: Before you start, since I'm
9  representing him and I have filed a pleading on his
10 behalf and filed an objection, I think the more
11 appropriate person to direct that to is me. But I'll
12 go ahead and let him answer the question.
13     Just do the best you can.
14     And I am also objecting to the form of the
15 question.
16 A  Okay. If -- well, I am, of course,
17 completely willing to cooperate.
18 Q  Now, where do you have any bank accounts?
19 A  In the United States and in France.
20 Q  And where in the United States? At what bank
21 or banks do you have bank accounts in the United
22 States?

Page 12

1  A  I have an issue with remembering the name of
2  the bank. We have an account with Trustmark Bank of
3  Madison and an account with Bank of America. In fact
4  I'm not sure exactly where that is. I think it's
5  Cascade, but I'm not sure. It should be Cascade. I
6  think that Cascade is the name of the place. I'm not
7  sure.
8  Q  Cascade in what state?
9  A  Oh. In Virginia, of course.
10 Q  Is the account that you have at Bank of
11 America in Cascade currently in existence? Is that a
12 current account?
13 A  Yes, it's a current account, yes.
14 Q  How long have you had that account?
15 A  I don't remember exactly.
16 Q  Did you have that account while you were
17 living in Virginia?
18 A  I am not sure. Ask her to be more specific.
19 What period of time is she speaking of here?
20 Q  Do you recall when you moved to Virginia?
21 A  Yes, of course.
22 Q  And when was that?

Page 13

1  A  We arrived September 2000.
2  Q  When did you move from Virginia to
3  Mississippi?
4  A  You want an official date?
5  Q  I'm not sure what you mean by "official
6  date." I would like to know when you moved your
7  residence from Virginia to Mississippi.
8  A  Well, I -- if you're -- if it's about the
9  time that we left Virginia, I can give an approximate
10 date for that. What I don't know is in the United
11 States when you are considered to have officially
12 moved from one place to another. In France, it's very
13 clear. I leave one place, I say I'm leaving, and then
14 when I arrive in the next place, I go to town hall,
15 and I say I am here. That's why I would like to have
16 the question be more specific in that regard.
17 Q  Is it correct that you bought the house in
18 Mississippi where you now reside in or around November
19 of 2005?
20 A  That's correct.
21 Q  All right. Then the period of time I want to
22 focus on is between September of 2000 and November of

Page 14

1  2005. During that period of time, at any time did you
2  have the account at Bank of America in Cascade,
3  Virginia, that you still have today?
4  A   We had when we arrived -- we did not have a
5  Bank of America account, but we did have a bank
6  account at Riggs Bank.
7  Q   And at some point during the five years you
8  were in Virginia, you opened another account at Bank
9  of America; is that correct?
10  A   That's correct.
11  Q   During --
12  A   Just another detail. We closed the account
13  at Riggs Bank and opened the account at Bank of
14  America, so we changed banks.
15  Q   During that period of time that you were in
16  Virginia from September of 2000 until sometime in
17  November of 2005, did you have any bank account at any
18  other banks in the United States other than Riggs Bank
19  and Bank of America?
20  A   No.
21  Q   Do you presently have any bank account
22  anywhere outside of the United States?

Page 15

1  A   Yes.
2  Q   And what account or accounts do you have
3  outside of the United States?
4  A   What type of account?
5  Q   Bank accounts.
6  A   We have a bank account in France.
7  Q   And what bank is that account held at?
8  A   Credit Mutuel.
9  Q   And is there any other bank account that you
10  maintain in France other than the one at Credit
11  Mutuel?
12  A   No.
13  Q   Do you have two accounts at Credit Mutuel?
14  A   Do you mean two accounts with two different
15  names?
16  Q   I mean two different types of accounts. Do
17  you have, say, a checking account and a money market
18  account?
19  A   We have an account. I don't really see what
20  the equivalent is of a money market in France, but we
21  do have an account, and there is money in that
22  account.

Page 16

1  Q   You use the word "we" with respect to the
2  account at Credit Mutuel. Is this an account that you
3  hold jointly with Catherine Gaujacq?
4  A   With my wife, yes.
5  Q   Let me ask the same question with respect to
6  the account that you have presently at Bank of
7  America. Is that a joint account with your wife?
8  A   I think it's a joint account, yes.
9  Q   Was that also the case with respect to the
10  account at Riggs Bank? Was it a joint account held by
11  you and your wife?
12  A   I think so.
13  Q   Do you personally have any other bank
14  accounts other than the accounts that you hold jointly
15  with your wife?
16  A   No.
17  Q   Do you have any brokerage or investment
18  accounts?
19  A   I don't understand. A bank account where I
20  specifically have money to be invested? Is that what
21  you mean?
22  Q   I would not limit it to bank account. Do you

Page 17

1  have any accounts with any institution that invests
2  money on your behalf in securities, in stock or bonds
3  or mutual funds or any kind of public investment
4  vehicles?
5  A   I put money into -- I'm an investor in a
6  small company.
7  Q   What is the name of that company?
8  A   TireVan.
9  Q   Other than the investment that you have in
10  TireVan, do you have any other investments anywhere?
11  A   No.
12  Q   During the period of time from September of
13  2000 until today, have you had any investments in any
14  funds or companies other than TireVan?
15  A   No.
16  Q   Mr. Gaujacq, what is your immigration status?
17  A   I have a green card.
18  Q   When did you receive the green card?
19  A   I received it at the end of 2005. No, the
20  end of 2004. Excuse me, the end of 2004.
21  Q   Please explain the circumstances of how you
22  applied for and received, obtained your green card.

Page 18

1  A  The circumstances or the reasons?
2  Q  The reasons.
3  A  Well, Catherine, my wife, with the
4  authorization or agreement of EDF, took steps for both
5  of us to obtain green cards.
6  Q  Was that in 2002?
7  A  I don't recall.
8  Q  Do you recall the reason that Catherine
9  Gaujacq obtained the approval to apply for a green
10 card for the two of you?
11 A  She made that request so that I could work
12 more easily in the United States.
13 Q  What do you mean by that?
14 A  Okay, fine. When I arrived in the United
15 States, I had a visa, a visa as a spouse, which in
16 order to find work, had to be -- which did not enable
17 me to find work directly.
18 Q  How do you know that?
19 A  Simply because I understood it and learned
20 it.
21 Q  When you first arrived in the United States
22 in 2000, had you not already made an application for

Page 19

1  employment in the United States?
2  A  I had applied to teach at the Lycee Francais
3  of Washington, French Lycee of Washington, in the
4  context of a transfer.
5  Q  Was it your understanding that if you had
6  been hired by the Lycee Francais in Washington, that
7  you would have been able to do that even without a
8  green card?
9  A  I do not know exactly the status of the Lycee
10 Francais of Washington, but I think so.
11 Q  I would like you to explain to me your
12 understanding of in what way getting a green card
13 would make it so that you could work more easily in
14 the United States.
15 A  In order to work in the United States, I
16 would have to do -- I would have to obtain an H1B
17 visa, and to obtain an H1B visa, you need a sponsor.
18 Q  Am I correct that the green card that you
19 have now is not an H1B visa?
20 A  Those are two totally different things.
21 Q  So then all that you needed to be able to
22 work more easily in the United States was an H1B visa;

Page 20

1  correct?
2  A  With an H1B visa, it was probably easier to
3  work in the United States, and with a green card it's
4  even easier.
5  Q  When you arrived in the United States in
6  September of 2000, did you at that time have a visa of
7  any kind?
8  A  Of course I had a visa. That's required.
9  Q  What kind of visa did you have?
10 A  I had an L1A visa.
11 Q  And did you make any application at any time
12 for an H1B visa?
13 A  I applied to find a sponsor in order to be
14 able to find work with an H1B visa, yes.
15 Q  Did you ever receive an H1B visa?
16 A  No.
17 Q  Did you ever have someone sponsor you for an
18 H1B visa?
19 A  No.
20 Q  Did you ever try to get someone to sponsor
21 you for an H1B visa?
22 A  Yes, absolutely.

Page 21

1  Q  And who or what companies did you ask to
2  sponsor you for an H1B visa?
3  A  I applied at Loudoun County Public Schools
4  and Fairfax County Public Schools.
5  Q  What is your profession, Mr. Gaujacq?
6  A  Currently?
7  Q  No. Let me ask another question. What are
8  your professional qualifications?
9  A  Well, before arriving in the United States, I
10 was a teacher in France with a master's of education.
11 Q  What was your field?
12 A  Electrical engineering.
13 Q  What was your last position as a professor of
14 electrical engineering? Where was your last position
15 as professor of electric engineering?
16 A  In Normandy.
17 Q  Was that Dieppe, D-I-E-P-P-E?
18 A  In Dieppe.
19 Q  What was the name of the educational
20 institution where you were teaching in Dieppe?
21 A  It's the Lycee Technique Pablo Neruda.
22 Q  Would you give me that again?

### Page 22

1  A   L-Y-C-E-E Technique P-A-B-L-O N-E-R-U-D-A.
2      MS. REGAL: I'd like to have this document
3  marked as Exhibit 2.
4      MS. BREDEHOFT: Two pages?
5      MS. REGAL: Two pages.
6      (The resume of Philippe Gaujacq was marked
7      Philippe Gaujacq Deposition Exhibit No. 2 for
8      identification.)
9      BY MS. REGAL:
10 Q   Mr. Gaujacq, can you identify for the record
11 what Exhibit 2 is?
12 A   It's not a CV, in any case. It's background
13 information on what I've done.
14     MS. REGAL: For the record, let me state that
15 Exhibit 2 is a two-page document with Bates stamps EDF
16 4713 to 4714.
17     BY MS. REGAL:
18 Q   Did you prepare the document which is Exhibit
19 2?
20 A   I don't remember this document.
21 Q   Would you look at the information on the
22 document and tell me if there is anything that seems

### Page 23

1  incorrect to you.
2  A   No. It seems correct to me.
3  Q   Then is it correct that you had been involved
4  in teaching from sometime in 1983 to sometime in 2000?
5  A   Yes, that was my profession.
6  Q   When was the last time that you held a
7  teaching post?
8  A   It was at the Lycee Technique Pablo Neruda in
9  Dieppe.
10 Q   When did you stop teaching at the Lycee
11 Technique in Dieppe?
12 A   Officially beginning of September 2000.
13 Q   What was your salary immediately before you
14 quit the Lycee Technique in 2000?
15 A   In euros, in francs, because there was
16 recently a change in Europe and so I would have to
17 translate that. And then also to be more specific,
18 when you're talking about a salary, are you talking
19 about the total salary, the average salary?
20 Q   What was your base salary as of the last
21 month or the last year, whichever is most appropriate,
22 that you were teaching? And you can tell me in francs

### Page 24

1  or euros or dollars or whatever makes the most sense
2  for you to state it in.
3  A   I can give you an estimate of my annual
4  salary, but it's an estimate. Around 180,000 francs.
5  Q   Let me show you one of these documents that
6  your counsel gave us today, being produced in response
7  to the subpoena. This is a document that is Bates
8  stamped P Gaujacq 7 through 10. Do you have a copy of
9  it?
10     MS. BREDEHOFT: Yes, I have a copy. I can
11 use this.
12     MS. REGAL: Would you mark this, please, as
13 Exhibit 3.
14     (The Employment Application was marked
15     Philippe Gaujacq Deposition Exhibit No. 3 for
16     identification.)
17     BY MS. REGAL:
18 Q   Mr. Gaujacq, could you state what this
19 document is?
20 A   It's an application to be a tutor.
21 Q   All right. And this is a document that you
22 filled out; is that correct?

### Page 25

1  A   It is my handwriting, yes.
2  Q   Now, would you look at the page that is
3  numbered 9 at the bottom of the page? I would like to
4  draw your attention to the top of the page to the
5  block of writing under the first entry for the French
6  National Education Ministry. Would you look at that
7  section? And particularly I want to focus on what
8  information you stated there with respect to your
9  salary.
10 A   If I remember correctly, it must be reference
11 to an estimated beginning salary and an estimated
12 ending salary after a long career, but I'm not sure.
13 Q   All right. Well, there is a reference there
14 to ending base salary where you have written $40,000
15 per year. The question is, is that approximately
16 correct as your ending salary as a professor in the
17 French Education Ministry?
18 A   It's an estimate. No more than that. I
19 don't know. It's an estimated value of salary at the
20 end of a career, but I would be -- I would not be able
21 to tell you if it's still accurate. Today, as far as
22 a final salary -- final base salary would be for --

Page 26

1  after a long career. It's an estimate.
2  Q  So then is it fair to say that the final base
3  salary could have been a little less than 40,000 U.S.
4  dollars a year?
5  A  In my opinion it would be above that value.
6  Q  Do you have in your possession or in your
7  custody or in your control any record or document that
8  would tell us what the last base salary was that you
9  earned in the Ministry of Education in France?
10 A  Yes. I have my last salary reports -- my
11 last pay vouchers.
12 Q  Now, looking again at Exhibit 2, I would like
13 to ask you about some of the items listed under the
14 heading Competences.
15    In the middle of that section is a reference
16 to competency in English. Do you see that? Would you
17 explain what that statement means?
18 A  It simply means that I was taking English
19 courses with a view to improving my level.
20 Q  What is the level 500 TOEFL?
21 A  It's the level to be reached in order to take
22 courses at a university, for example.

Page 27

1  Q  Did you obtain that level?
2     THE INTERPRETER: The interpreter asks for
3  clarification.
4  A  I did not try to take the exam.
5  Q  Now, why is it that you stopped teaching?
6  A  I would like her to be -- I don't understand
7  the question.
8  Q  Why did you leave your post in the National
9  Ministry of Education?
10 A  First of all, I did not leave it.
11    And I agreed by a common agreement to follow
12 my wife, who had been named as president of EDF
13 International in Washington.
14 Q  Please explain what you mean when you say
15 that you did not leave your post at the Ministry of
16 Education.
17 A  What I mean is that I applied -- or I
18 submitted an application called an availability
19 application in order to be able to follow my wife and
20 spend several years in the United States. And this
21 would allow me, if needed, to find a position in
22 France upon my return.

Page 28

1  Q  I take it that application, the availability
2  application was granted; is that correct?
3     THE INTERPRETER: The application is
4  correctly called an application for space
5  availability. Actually, sorry. Wrong context.
6  A  That's correct.
7  Q  Did the permitted leave have a time limit on
8  it?
9  A  There must be a time limit, but I don't know
10 what the situation is currently.
11 Q  So let me make sure I understand. As of
12 today, you do not know whether or not you are still on
13 a permitted leave of absence from the French Ministry?
14 A  No. I don't know that. Simply since my wife
15 was sanctioned and fired from EDF, I no longer know if
16 I am in that category.
17 Q  Is that because the leave of absence was
18 conditioned upon your wife being assigned by EDF to a
19 position in the United States?
20 A  To obtain such a leave of absence or
21 availability is subject to the fact that my wife held
22 a position with EDF overseas.

Page 29

1  Q  Since the time that your wife left EDF, have
2  you made any inquiry to the National Ministry of
3  Education regarding your status?
4  A  No. I have not done any research or made any
5  request in that regard.
6  Q  You have mentioned previously that you made
7  an application for a position at the Lycee Francais in
8  Washington; correct?
9  A  Yes, that's correct.
10 Q  And you did not obtain that position;
11 correct?
12 A  I did not obtain that position because there
13 were no positions available in applied physics, which
14 is my area; only in physics at that time.
15 Q  Other than the application that you made for
16 employment with the Lycee Francais, and you mentioned
17 two schools in Virginia; I don't recall the names
18 right now. Other than those three institutions, have
19 you applied for any other teaching job in the United
20 States?
21 A  Yes, of course.
22 Q  And please identify them for me.

Page 30

1  A  This is another one here (indicating).
2  Q  Please give me what you're referring to.
3  A  (Indicating.)
4     MS. BREDEHOFT: Let the record reflect it's
5  Deposition Exhibit No. 3 that he's referring to.
6  Q  And this was the application to The Learning
7  Center for a job being a tutor; is that correct?
8  A  That one, yes.
9  Q  All right. So I now have four institutions
10 that we have identified as institutions where you
11 applied for positions as a teacher. One is Lycee
12 Francais. One is the Fairfax County Schools. One is
13 the Loudoun County Schools. And the fourth is The
14 Learning Center as a tutor. Are there any others than
15 those four where you applied for a teaching position
16 in the United States?
17 A  Yes. Yes, there are others.
18 Q  What were the others?
19 A  I applied to teach at the middle school of
20 Herndon in an immersion program for French. And I had
21 interviews with the various high schools around Great
22 Falls.

Page 31

1  Q  Well, were those interviews in connection
2  with your application for employment with the Fairfax
3  County and the Loudoun County School Systems?
4  A  They were in addition. I, in fact, applied
5  directly at the schools themselves rather than going
6  through Fairfax County Public Schools or Loudoun
7  County Public Schools. So I had direct contact in the
8  high school with principals and representatives of
9  these schools around the issue of a position.
10 Q  I would like to mark as Exhibit 4 a
11 collection of documents which were produced in
12 response to the subpoena, were produced to us today in
13 response to the subpoena. I have just looked through
14 these documents, and it appears to me that this
15 collection that we are marking as Exhibit 4 is the
16 rest of the documents concerning job applications for
17 teaching posts that you produced. I would like you to
18 mark this as Exhibit 4.
19    For the record, I believe what these numbers
20 are are P. Gaujacq 2 through P. Gaujacq 16 with the
21 exception of the pages that we removed to mark as
22 Exhibit 3 which are P. Gaujacq 7 through 10.

Page 32

1  Hopefully, he can sort that out.
2     (The pages were marked Philippe Gaujacq
3     Deposition Exhibit No. 4 for
4     identification.)
5     MS. REGAL: This would be a good time to take
6  a break.
7     (A short recess was taken.)
8     MS. REGAL: Okay. Back on the record.
9     I just want to clarify on the Bates numbers
10 for Exhibit 4, I see I misstated. The Bates numbers
11 for Exhibit 4 are P. Gaujacq 1 through P. Gaujacq 6
12 and then P. Gaujacq 11 through 16.
13    BY MS. REGAL:
14 Q  Now, Mr. Gaujacq, would you go through
15 Exhibit 4 and just describe for me, for us, what these
16 documents are.
17 A  Yes, absolutely, yes. I'll go slowly for the
18 interpreter.
19    The first page is an application or some
20 documents required by the Human Resources Department
21 of Loudoun County.
22    After page 6, so these are the documents

Page 33

1  submitted in response to this correspondence or
2  rather, this application.
3  Q  If I may, let me stop you there so that we
4  can do this in separate sections. With respect to
5  this first part, pages 1 through 6, was this all with
6  respect to an application for employment that you made
7  in 2001?
8  A  I don't recall the exact date of the
9  document.
10 Q  Do you recall when you were applying for a
11 job with the Loudoun County Public Schools?
12 A  I must have made my first application during
13 2001.
14 Q  Okay. Is it correct that you were not
15 offered a job at the Loudoun County Public Schools?
16 A  Yes. Because, if I recall correctly, at the
17 time Loudoun County was not sponsoring.
18 Q  You mean Loudoun County was not sponsoring in
19 terms of sponsoring a person for a visa. Is that what
20 you mean?
21 A  I think that's correct, yes.
22 Q  Okay. Then please continue with the rest of

PLATT & DAWSON, INC.    703-591-0007

Page 34

1  the documents in Exhibit 4.
2  A  The page that is numbered P. Gaujacq 011 is,
3  in fact, part of the document that's marked Exhibit 3.
4  Q  Okay. And then please tell me what pages 12
5  through 16 are.
6  A  It's an application to teach at the Northern
7  Virginia Community College.
8  Q  And is that the entire remainder of this
9  exhibit from pages 12 through 16?
10  A  I think so.
11  Q  And what happened with the application to the
12  Northern Virginia Community College?
13  A  They didn't have any positions in my area of
14  specialization.
15  Q  I notice on page 12, there are the words,
16  "position as Adjunct Faculty French teacher." Do you
17  see that?
18  A  Yes, yes, of course.
19  Q  Were you applying to the Northern Virginia
20  Community College for a position as a teacher of the
21  French language?
22  A  I did indeed apply, submitted an application

Page 35

1  to be a French teacher.
2  Q  Did you also apply to the Northern Virginia
3  Community College for a position as teacher of
4  electrical engineering?
5  A  No, because they don't have that area of
6  specialization at the Loudoun campus.
7  Q  All right. When was it that you made the
8  application for the position at Northern Virginia
9  Community College?
10  A  It's probably 2001 or 2002. Probably end of
11  2001 or beginning of 2002. I don't know.
12  Q  Okay. I have just seen a date at the bottom
13  of page 14 which appears to be November 2002. Does
14  that sound right to you as the time that you applied
15  for that position?
16  A  Yes, it must be correct, I think.
17  Q  Did you make any application for teaching
18  jobs after August of 2002 other than this one to the
19  Northern Virginia Community College?
20  A  I must have submitted other applications, but
21  I don't recall.
22  Q  Other applications for teaching positions?

Page 36

1  A  Yes, yes. Absolutely, yes.
2  Q  Can you name any of the other places where
3  you applied for teaching positions?
4  A  Yes, absolutely.
5     I had an interview at Falls Church High
6  School. I had an interview at Reston High School. I
7  also had an interview in Falls Church for the Herndon
8  immersion program.
9  Q  Anything else?
10  A  Not that I recall now.
11  Q  Is it correct that since you came to the
12  United States in September of 2000, you have not
13  actually been employed as a teacher in the United
14  States? Is that right?
15  A  That's correct.
16  Q  Now, when your wife was appointed to come to
17  the United States, isn't it correct that she was given
18  an indemnity to compensate for your giving up your
19  position in France?
20     MS. BREDEHOFT: Objection to form. Go ahead.
21  A  In her expatriation contract, it was
22  stipulated that I could indeed receive a small

Page 37

1  indemnity as a result of my loss of employment for two
2  years.
3  Q  If you obtained employment during that period
4  of two years, was the procedure that the indemnity
5  would stop?
6  A  That's probable, yes.
7  Q  Do you recall what the amount of the
8  indemnity was that was provided with respect to the
9  loss of the spouse's position?
10  A  Yes, yes. I remember, yes. It represented
11  approximately 5,000 francs at the time.
12  Q  5,000 francs per month?
13  A  Yes, yes, per month.
14  Q  Okay. And I take it that that indemnity was
15  paid for each month for the two-year period from the
16  beginning of your wife's expatriation until the end of
17  the two years. Is that right?
18  A  Yes, that's correct. The contract stipulated
19  that this indemnity for loss of employment would
20  continue for two years unless I were to find other
21  employment.
22  Q  I'd like to return to the matter of your

Page 38

1  leave of absence from the Ministry of Education.
2  Would you please describe the conditions or
3  circumstances under which you would be able to return
4  to a position in France in the Ministry of Education?
5    A   I will try.
6        When I left my position to follow my wife, I
7  benefited from where I applied for the leave of
8  absence. Then I was granted the leave of absence.
9  This leave of absence would continue to run as long as
10 my wife continued to be employed by a French company
11 overseas, which means that I'm not at all certain that
12 I would be able to find a position again if I were to
13 return today to France.
14   Q   I'd like you to focus on the period of time
15 before your wife left EDF. What were the requirements
16 or circumstances under which you would be able to go
17 back to France then and resume your position in the
18 Ministry of Education?
19       MS. BREDEHOFT: Objection to form.
20   A   I'm not sure I understood the question
21 correctly.
22   Q   Well, let me try it this way. Assume the

Page 39

1  period of time is somewhere between September 2000 and
2  August of 2004. During that period of time, if you
3  wanted to go back to France to teach within the
4  Ministry of Education, what procedure did you
5  understand you had to follow?
6    A   I will try to explain. During the normal
7  period of time -- let's say for those four years that
8  my wife worked for EDF -- I would have to apply for a
9  position, make a transfer request or application
10 before mid January of a given year so as to apply for
11 a position in September.
12   Q   Have you finished?
13   A   (Indicating.)
14   Q   Is there something written that gives that
15 requirement about notifying the ministry by mid
16 January to commence a post in September?
17   A   Yes, of course. It's a completely standard
18 procedure, whatever the case may be, whether you're
19 inside France, in another country of Europe, or
20 overseas. It's a completely normal procedure.
21   Q   Is the leave of absence that you were granted
22 by the French Ministry reflected in a letter, any kind

Page 40

1  of written document that the ministry provided to you?
2    A   Yes, of course. There is a document that I
3  had to fill out in order to make that application.
4    Q   And is the grant of that application also in
5  writing?
6    A   Yes, of course.
7    Q   Is it a separate document than the
8  application?
9    A   I believe there's a mix-up happening here.
10 These are two different things. First of all, there's
11 the availability request or leave of absence request
12 that is made in the context of a spouse traveling
13 overseas, and specifically in this case for a public
14 company, such as was EDF at the time in France.
15       And on the other hand, there's an application
16 in order to go back to a position in the case of a
17 transfer, for example.
18   Q   Okay. The availability request is a single
19 document that you prepared; correct?
20   A   I must have indeed, yes, prepared a document
21 which must have been handled by my boss at the time.
22   Q   Okay. And did you receive a separate

Page 41

1  document from the ministry approving the request?
2    A   Probably, yes.
3    Q   And you believe that those documents, the
4  application and the approval, are still in your
5  possession?
6    A   Yes, probably, yes.
7    Q   Now, did you ever have any employment in the
8  United States from September 2000 until today?
9    A   No.
10   Q   Have you had any sources of income since you
11 have arrived in the United States?
12   A   Other than the indemnity, which was paid to
13 me by EDF for that two-year period, no, I have not
14 received any other salary here in the United States.
15   Q   Have you been involved in a construction job
16 of some kind during the period of time you've been in
17 the United States?
18   A   I participated. I gave a friend a hand in
19 the construction of a house, yes.
20   Q   Where was the house that you're referring to?
21   A   In Great Falls.
22   Q   Was the house that you're referring to a new

Page 42

1  house being built?
2  A  Absolutely. It was a new house that uses a
3  new construction process.
4  Q  For what period of time did you give a hand
5  to the friend with respect to constructing this house?
6  A  Over the course of several months, I think,
7  but irregularly.
8  Q  What period of time?
9  A  Well, I'm not sure that I know exactly when
10 it began or when my friend considered this
11 construction project. I would say end of 2003 to
12 almost end of 2004.
13 Q  What was your role in constructing this
14 house?
15 A  I didn't have a defined role. In fact, I
16 participated and learned the process for building this
17 house.
18 Q  Was this house being built for sale?
19 A  No. It was built -- it's a house that my
20 friend David built for himself.
21 Q  What is David's last name?
22 A  Leslie.

Page 43

1  Q  Would you spell that, please?
2  A  Okay. D --
3  Q  No, the surname.
4  A  (In English) Okay. I can spell it directly.
5  L-E-S-L-I-E.
6  Q  And is Mr. Leslie in Great Falls, Virginia?
7  A  Oh, yes, of course.
8  Q  What is his occupation?
9  A  What is the connection? What is the
10 relation?
11 Q  Please give me his occupation.
12 A  He is manager of TireVan.
13 Q  During the time that the construction of the
14 house was going on, what was Mr. Leslie's occupation?
15 A  At the time he had no occupation, and he did
16 the design of the house, and he put his house up with
17 a foreman and myself and a whole group of contractors
18 of companies.
19 Q  Did Mr. Leslie compensate you for your
20 participation in the construction of the house in
21 Virginia?
22 A  Do you mean a salary?

Page 44

1  Q  I mean any kind of compensation.
2  A  No.
3  Q  Did he give you gifts?
4  A  Gifts? That means -- I don't understand. Do
5  you mean like a Coca-Cola?
6  Q  No. I mean like, say, a video projector.
7  A  Yes, he did give me a video projector but as
8  a friend; that's all.
9  Q  What would you say is the value of the video
10 projector that he gave to you?
11 A  It's a gift, so I don't have any idea what
12 the value is, and I trust him to have given me a
13 proper gift.
14 Q  What is the brand?
15 A  I don't remember. I remember the model, but
16 I don't remember the name of the brand.
17 Q  Okay. What was the model?
18 A  I'm not sure. Sony, maybe it's Sony PLD
19 something.
20 Q  What is the model?
21 A  The model is the PLD, but I'm not sure.
22 Q  And would you describe it? What is the size

Page 45

1  or the capabilities?
2  A  It's a video projector with a lens, with all
3  the connections. It's a video projector. I don't
4  know how much more you can describe a video projector.
5  If she wants a complete description of a video
6  projector, I can make an effort, but I'm not a
7  specialist.
8  Q  Have you ever seen that same model in any
9  stores?
10 A  The same model? I haven't paid attention.
11 Q  Have you ever seen the same model in any
12 catalogs or newspapers or marketing material of any
13 kind?
14 A  No. I -- I only take interest in this type
15 of thing when I buy this type of thing.
16 Q  So is it your testimony that you have no idea
17 what the value of the video projector is that
18 Mr. Leslie gave you?
19 A  I didn't ask him, and I know it's a good
20 product.
21 Q  Well, that actually wasn't the question. The
22 question is do you have any idea what its value is?

12 (Pages 42 to 45)

PLATT & DAWSON, INC.   703-591-0007

f368097e-9937-4c03-9cfc-bff6519c40da

Page 46

1  A  Of its current value?
2  Q  No. Of its value when it was given.
3  A  I can't -- no. I have no idea of the
4  approximate value of such -- sorry, excuse me. I have
5  no idea of the precise value of such a device at the
6  time that David gave it to me.
7  Q  Do you have any idea of the approximate value
8  of the video projector that Mr. Leslie gave to you
9  when he gave it to you?
10  A  I am going to give a range because she wants
11  an answer. So I would say that it's between a
12  thousand and $3,000.
13  Q  And when was it that Mr. Leslie gave you the
14  video projector?
15  A  It was at Christmas. Probably 2003.
16  Q  So this was during the period of time that
17  you were helping him with the construction of the
18  house?
19  A  It was during that period.
20  Q  Did you understand that this was in some way
21  thanking you for helping with the construction of the
22  house?

Page 47

1  A  It was a way of thanking me for having helped
2  him. I also took care of his dog for a little while
3  when he would go away, the kind of favor you do to
4  friends -- or do for friends or among friends. So it
5  was a way of thanking me for the various things that I
6  had helped him with.
7  Q  Now, did Mr. Leslie give you any other gifts?
8  A  "Other gifts" meaning? Money?
9  Q  Money or things or services, anything of
10  value other than the video projector?
11  A  Well, he invited me several times to a
12  restaurant, for example, that type of thing, but I
13  really don't remember the details.
14  Q  Do you recall him ever giving you travel to
15  France?
16  A  No. That's not how it happened.
17  Q  How did it happen?
18  A  I invited him to stay at my chalet in France
19  with some friends. And he participated in covering
20  the expenses.
21  Q  And when was that?
22  A  It was probably in February 2003.

Page 48

1  Q  Did you go on that trip with your wife?
2  A  No.
3  Q  So it was you and Mr. Leslie and who else?
4  A  So there was some friends, David and myself
5  and then his dad and his son.
6  Q  And how long did that trip last?
7  A  I was with my friends for a week, and I left
8  them to go to Lorraine to see my family.
9  Q  Where is your chalet that you invited
10  Mr. Leslie and his family to stay?
11  A  It is in the high Alps deep above Briancon in
12  a little area called Mont Genevre.
13  Q  Now, when you were working on the
14  construction for Mr. Leslie's house, how long of a day
15  did you put in when you worked?
16  A  It varied a lot. It depended on what we were
17  doing in the assembly process. It could take an hour
18  or several hours a day.
19  Q  Did you ever work as much as six hours a day?
20  A  I must have had days where I worked, yes,
21  more than six hours a day.
22  Q  And did you in good weather, did you go every

Page 49

1  day of the workweek to the construction site?
2  A  No. No, because it depends entirely on
3  what's being done in the process at a given time.
4  Q  Now, did you ever report on your income tax
5  returns the value of the video projector that
6  Mr. Leslie gave you?
7  A  No. Of course not.
8  Q  Did you ever report on your income tax
9  returns the value of the expenses he paid for on your
10  trip to France?
11  A  I have no idea what David spent during that
12  trip, and my participation in that trip was to welcome
13  my friends in my home.
14  Q  Now, did Mr. Leslie ever provide to you any
15  cash, any money?
16  A  Never.
17  Q  Did he ever deposit money into investment
18  accounts or for brokerage accounts, for bank accounts
19  for you?
20  A  Never.
21  Q  Did the house that you were working on for
22  Mr. Leslie get finished?

13 (Pages 46 to 49)

PLATT & DAWSON, INC.    703-591-0007

f368097e-9937-4c03-9cfc-bff6519c40da