Page 50

1  A  There are still things to be done.
2  Q  Was the house ever sold?
3  A  No. He lives in that house. It's his house.
4  Q  What is the address of the house?
5  A  I don't know the address by heart.
6  Q  Do you know the name of the street?
7  A  I think it must be Lake Windermere Court or
8  Drive. I'm not sure.
9  Q  Does 800 Lake Windermere Court sound correct
10 to you?
11 A  No.
12 Q  What do you think the number is?
13 A  I don't know. What I do know is that 800 is
14 his old house.
15 Q  So he has two houses on Lake Windermere
16 Court; is that correct?
17 A  No, that's incorrect.
18    He sold his house at 800 Windermere Court in
19 order to have the money to start up the new project.
20 Q  Where was he living in the meantime?
21 A  He started -- went in his new house before
22 selling his old one.

Page 51

1  Q  Do you know someone named Mr. Breneman?
2  A  Bill Breneman, yes, I know him.
3  Q  Who is he?
4  A  Okay. It's a long story.
5    He's a friend I've known for a very long
6  time, an American, who for a long time was a friend or
7  a boyfriend of my sister-in-law and who came to spend
8  a few days in Lorraine with me.
9  Q  Did you work for Mr. Breneman in some
10 capacity at any time?
11 A  No, never. I've never worked for him.
12 Q  Well, I'd like you to take a look at Exhibit
13 4, page 14. If you look at item 10, References.
14 There is a Mr. Breneman listed as a reference, and the
15 relationship says ex-boss. Now, does that refresh
16 your recollection that you, in fact, worked for him at
17 some point?
18 A  I never worked for him. He simply told me
19 that if I needed references, I could put his name down
20 as a friend.
21 Q  Well, then why did you indicate on your
22 application that he was your ex-boss instead of just

Page 52

1  friend?
2  A  Because I thought it was better to put
3  ex-boss on the application than to put friend or
4  anything else.
5  Q  Even though that was not true?
6  A  Even if it wasn't true, yes. But he
7  suggested it, and it was nice, and so I put his name
8  as a reference.
9  Q  Well, take a look at paragraph 13 on Exhibit
10 4, page 14, under the heading Certification.
11 A  Page 14?
12 Q  Yes, at the bottom.
13 A  Yes.
14 Q  Well, I'm referring to the beginning of it
15 where it says, quote, "I hereby certify that all
16 entries on both sides and attachments are" -- you are
17 going to have to help me here.
18    MS. HODGSON: "Are true and complete."
19 Q  -- "are true and complete, and I agree and
20 understand that any falsification of information
21 herein regardless of time of discovery, may cause
22 forfeiture on my part of my employment in the service

Page 53

1  of the Commonwealth of Virginia."
2    Did you not have some concern that you were
3  making an untrue statement in this application when
4  you indicated Mr. Breneman was your ex-boss when he
5  never had been?
6    MS. BREDEHOFT: Objection to form.
7  A  I had no problems with getting a
8  recommendation from Bill Breneman. And in any case, I
9  didn't get the job.
10 Q  At the bottom of page 14 of Exhibit 4, is
11 that your signature, Mr. Gaujacq?
12 A  That's my signature, yes.
13 Q  Now, you mentioned TireVan. Would you
14 explain what that is, please?
15 A  Yes, of course. It's a company started up by
16 David Leslie which does tire sales and installation at
17 home or at people's homes anywhere.
18 Q  I'm sorry. Tires and what?
19    THE INTERPRETER: Sales and installation.
20 Q  And did you have any participation in the
21 development of TireVan?
22 A  I contributed at the very beginning when

Page 54

1  David was starting up his business, and he had --
2  well, how would you say this. He had some technical
3  electrical issues that I helped him resolve. But that
4  was my only participation.
5      Q   Did you invest money in this company?
6      A   Yes, yes. I invested some money, yes.
7      Q   How much did you invest in this company?
8      A   I invested $15,000.
9      Q   Are there other investors in TireVan besides
10 yourself?
11     A   Yes, absolutely, yes.
12     Q   How many?
13     A   I have no idea. I'm not the company manager.
14     Q   It's not a public company, is it?
15     A   Not yet.
16     Q   And did you do any design work with respect
17 to TireVan?
18     A   More specifically, what does she mean by
19 design? Could you ask her?
20     Q   Well, did you do any engineering design with
21 respect to any part of the hard assets of the company?
22     A   I participated in the electrical design of

Page 55

1  TireVan.
2      Q   What does that mean?
3      A   It means David bought a secondhand truck.
4  And he wanted to upgrade it as far as the electrical
5  and mechanical aspects were concerned. And I worked
6  on the electrical part, which is my field. And I
7  fixed at the very, very beginning a very specific
8  problem.
9      Q   What do you mean?
10     A   I offered. He had some compressed air
11 materials or groups which systematically would be
12 destroyed when powered by an independent or autonomous
13 generator. And so I told him that I would look into
14 it to see if I could find what wasn't working, and I
15 found what wasn't working.
16     Q   Good for you. Good for you both. Tough
17 translation.
18         When was TireVan started?
19     A   I don't know exactly.
20     Q   Was it sometime in 2004?
21     A   It's difficult to say, to give an official
22 date because it's an idea that was floating around,

Page 56

1  and difficult to say as of what date it was officially
2  a company.
3          To be specific, it's a new concept. And so
4  it took a long time for David to put together the -- I
5  don't know how to say this -- the economic viability
6  of this concept to do that work. And that's why I
7  really can't say when exactly he actually started up
8  the company.
9      Q   Is TireVan incorporated?
10     A   I'm not sure that I can answer that kind of
11 question because I don't understand the question,
12 actually.
13     Q   Does it have a president?
14     A   Yes, of course.
15     Q   Does it have employees?
16     A   Yes, yes, of course.
17     Q   How many employees?
18     A   I don't know currently.
19     Q   Is it under ten?
20     A   I don't know. I can't give you a theory of
21 this on the fly. I don't know. I'm an investor in
22 this company. I invested a little bit of my time at

Page 57

1  the beginning. But after that, it's my friend David
2  who's managing that.
3      Q   Does it have an office or a garage where it
4  is located?
5      A   Yes, of course.
6      Q   And where is that?
7      A   I don't know the exact address because he
8  moved the location a few months ago, I think, at the
9  time where I moved to -- or I had already moved to
10 Mississippi.
11     Q   Is TireVan located in Virginia?
12     A   Yes, yes.
13     Q   Does it have any locations other than
14 Virginia?
15     A   I don't understand the question.
16     Q   Well, is there any part of Tire Van's
17 operations that takes place in California?
18     A   Unfortunately, not yet.
19     Q   What do you mean by that? Is there a plan
20 for operations to be commenced in California?
21     A   No. There are no specific plans now for the
22 development of the company, but I hope that -- excuse

15 (Pages 54 to 57)

PLATT & DAWSON, INC.   703-591-0007

f368097e-9937-4c03-9cfc-bff6519c40da

Page 58

1  me -- but I think that if the company over the next
2  few years grows and becomes much larger, I would think
3  there would be the possibility that it would spread, I
4  would hope, even to all of the U.S.
5      Q  And I take it TireVan owns or operates one or
6  more vans; is that right?
7      A  Yes. They have or must have a few trucks,
8  but I don't know exactly how many.
9      Q  Did you get some sort of share ownership for
10 the $15,000 that you invested in TireVan?
11     A  Yes, of course. Yes.
12     Q  What is the percentage of your ownership in
13 the company?
14     A  I don't know exactly.
15     Q  Is it a minor percentage?
16     A  Yes. It's a little percentage.
17     Q  Mr. Gaujacq, are you familiar with Alexandre
18 Audie?
19     A  Yes, I know Alexandre Audie.
20     Q  When was the last time that you had any
21 communication with Mr. Audie?
22     A  I have no idea.

Page 59

1      Q  So I take it you have not communicated with
2  him recently?
3      A  More specifically, what does Madam, whose
4  name I don't recall, mean by "recently"?
5      Q  Not a problem. What I'd like to know is
6  since the time Catherine Gaujacq left EDF, have you
7  had any communication with Mr. Audie?
8      A  No. I have had no communication whatsoever
9  with Alexandre Audie.
10     Q  During the time that your wife was working at
11 EDF, what was your relationship with Alexandria Audie?
12 How would you describe it?
13     A  It was a friendly relationship.
14     Q  And did you and Mr. Audie visit with each
15 other outside the presence of your wife?
16     A  We met. He came to the house, and we also
17 met, or it could also be that we met when Catherine
18 was traveling, but I have no specific memory of that.
19     Q  I'd like to take you back to June of 2004.
20 Do you recall an occasion when your wife was in
21 Pittsburgh, and there was a problem with one of your
22 dogs, and she left the conference in Pittsburgh to

Page 60

1  come home? Do you recall that occasion?
2      MS. BREDEHOFT: Objection to form.
3      A  Yes, yes. I remember that occasion, of
4  course.
5      Q  Do you remember in connection with that
6  occasion, you calling Alexandre Audie and telling him
7  about the reason that your wife was leaving the
8  conference in Pittsburgh?
9      A  I don't specifically recall a conversation
10 with Alexandre Audie at that time.
11     What actually happened, my mom had just had
12 an operation, and she was doing quite poorly. And so
13 we were expecting to get bad news from France. I was
14 in contact with my family. Catherine left. And
15 unfortunately, one of my Perinese dogs became gravely
16 ill. She was really very bad off.
17     Catherine left in the afternoon, and Ixia --
18 that's her name, was -- did very, very badly
19 overnight. In the morning I took her very early to
20 the vet. And he told me that she wasn't going to last
21 very long. So I took my dog urgently to Falls Church
22 for intensive care. And I called Catherine to tell

Page 61

1  her.
2      Q  And then did you subsequently have a
3  conversation with Alexandre Audie about this event
4  with your dog?
5      A  I have no specific memory of a conversation
6  with Alexandre. Between the problem with my mom and
7  the problem with my puppy, I was very stressed, to say
8  the least, and so I don't have any recollection of a
9  specific conversation with Alexandre.
10     Q  I'm going to read from Mr. Audie's
11 deposition. This is page 109, line -- well, I'll
12 start with line 15. This is a question. And it's
13 Ms. Bredehoft asking Mr. Audie a question about a
14 conversation that Mr. Audie had with Mr. Nadal.
15     "What do you recall of that
16 conversation?
17     "A  Well, the fact I told him that I
18 had a conversation with Philippe, Philippe
19 Gaujacq, and that Philippe asked me if --
20 told me that Catherine left Pittsburgh. I
21 didn't know she was in Pittsburgh. He told
22 me that she left Pittsburgh because one of

Page 62

1  her dogs -- I can't remember which one, if it
2  was Isis, I-S-I-S, and Ixia, I-X-I-A; that
3  was the name of her dogs. And one of them
4  was dying, and that Catherine left in a -- in
5  an emergency from Pittsburgh to take care of
6  her dog; and she -- that he would appreciate
7  if I talked to Christian Nadal and let him
8  know that she was not doing so well, so to
9  give her a break.
10     "Q   So Philippe called you and told
11 you that Catherine Gaujacq left Pittsburgh in
12 an emergency because her dog was sick --
13     "A   Was dying.
14     "Q   -- was dying and that Philippe
15 would appreciate your talking to Christian
16 Nadal to let him know that Catherine was not
17 doing so well so to give her a break?
18     "A   Yeah."
19     So does Mr. Audie's description of that
20 conversation reflect your recollection?
21     MS. BREDEHOFT: Objection to form. Go ahead.
22  A   I have no recollection of that conversation.

Page 63

1   Q   Do you dispute that this conversation took
2  place?
3      MS. BREDEHOFT: Objection to form.
4   A   I am saying I don't remember that
5  conversation.
6   Q   Do you believe that Mr. Audie is not telling
7  the truth in his description of the conversation?
8      MS. BREDEHOFT: Objection to form.
9   A   I cannot say whether Alexandre Audie is
10 telling the truth.
11  Q   Do you have any reason to believe that he is
12 not telling the truth?
13     MS. BREDEHOFT: Objection to form. Go ahead.
14  A   Could you repeat the question, please?
15  Q   Do you have any reason to believe that
16 Mr. Audie is not telling the truth?
17     MS. BREDEHOFT: Objection to form.
18  A   In the current context, I must honestly admit
19 that I wonder who I can trust.
20  Q   What do you mean by that?
21  A   What I mean is that I don't know if the
22 people that I met at EDF or EDFINA were -- are capable

Page 64

1  of lying or not.
2   Q   The question was: Do you have any reason now
3  today to believe that Mr. Audie was not telling the
4  truth in the description of the conversation that he
5  gave?
6      MS. BREDEHOFT: Objection to form.
7   A   I would repeat once again that I have no
8  recollection of this conversation and no reason to
9  believe that Audie or -- Alexandre Audie would invent
10 such a conversation.
11  Q   Okay. Thank you.
12     I would like to talk now about your wife's
13 laptop computer. Did you have some involvement in the
14 erasing of data, documents, that were on the laptop
15 computer that she was using before she turned it back
16 to EDFINA?
17  A   Yes, I participated in cleaning up, as madam
18 said, this computer.
19  Q   What was your participation? What did you
20 do?
21  A   Catherine asked me to clean it so as to put
22 it back to its initial state.

Page 65

1   Q   Did she tell you why?
2   A   She told me that she didn't want to leave any
3  personal data on that computer.
4   Q   Did she ask you to get all of the data off or
5  just the personal data?
6      MS. BREDEHOFT: Objection to form.
7   A   She asked me to put it -- to return it to its
8  original state, that is, as it was when she got it at
9  the beginning.
10  Q   You did that?
11  A   Yes, of course.
12  Q   How did you do that?
13  A   I am not an expert in information systems.
14 First of all, I went onto the Internet to look for
15 freeware for doing that. I had to ask for some advice
16 from a computer company regarding a certain program.
17 And I bought a specific program to clean up the
18 computer.
19  Q   Do you recall what the name of that program
20 was that you used?
21  A   It might be something like PC Clean.
22  Q   Was there anybody else involved in cleaning

Page 66

1  up the laptop besides you?
2  A   No. I was the only one involved in the
3  operation.
4  Q   So you never gave the laptop that Catherine
5  gave to you to another person to clean the data off?
6  A   No, no. Absolutely not. I did it myself.
7      (A short recess was taken.)
8      EXAMINATION BY COUNSEL FOR THE DEFENDANT
9      CHRISTIAN NADAL
10     BY MS. HODGSON:
11 Q   Mr. Gaujacq, my name is Morgan Hodgson. We
12 were introduced earlier. I am counsel for Christian
13 Nadal, and I have a few questions, just a few to ask.
14     Mr. Gaujacq, did you and your wife purchase a
15 home in Madison, Mississippi, in November of 2005?
16 A   We bought a house in Madison, Mississippi, in
17 November 2005.
18 Q   Could you tell me the price you paid?
19 A   Yes. Yes.
20 Q   Would you tell me what was that price?
21 A   The price is a little bit more than $500,000.
22 Q   And you have a mortgage on that home.

Page 67

1  A   Mortgage, you mean a loan?
2  Q   Yes.
3  A   Yes.
4  Q   And the amount of the mortgage?
5  A   It's on the order of a little more than
6  $3,000 a month.
7  Q   Are you performing any type of work outside
8  the home at this point?
9  A   I mow the lawn.
10 Q   Other than taking -- is it fair to say that
11 you take care of most things around your home for you
12 and your wife?
13 A   Yes, of course, inside and outside.
14 Q   And your wife is working very hard at Entergy
15 these days?
16 A   Yes. She's working every day all day.
17 Q   Does she also work on weekends and in the
18 evenings?
19 A   More specifically, when -- work, what does
20 she mean by work?
21 Q   Is she performing her job for Entergy at home
22 in the evenings and on the weekends?

Page 68

1  A   No. She works all day. She might once in a
2  while have a phone call, receive a phone call at home,
3  but it's quite rare.
4  Q   Does Catherine Gaujacq work more hours in her
5  position at Entergy than she did when she worked for
6  EDF in the States?
7  A   It's very difficult to compare what she does,
8  well, in terms of hours, that is. It's very difficult
9  to compare what she did at EDF and what she does at
10 Entergy. It's difficult to compare what she did in
11 terms of hours.
12 Q   Why is it difficult to compare?
13 A   Because when she worked for EDF, in addition
14 to her work at the office, she had to travel. She had
15 to participate in telephone conferences. And then she
16 had the work that she had to do at home in addition.
17 So there was a whole set of things. And the travel
18 took her a lot of time.
19 Q   Does your wife travel frequently in her
20 position at Entergy?
21 A   She does travel regularly, but to say whether
22 it's more or less than with EDF, that's difficult for

Page 69

1  me to say.
2  Q   Overall, would you say that she works harder
3  now than she did at EDF or about the same?
4      MS. BREDEHOFT: Objection to the form.
5  A   Once again, it's very difficult for me to
6  determine; for example, when she worked at EDF, she
7  could spend hours and hours working on her computer
8  without my realizing that she was doing work for EDF.
9  Q   Except for the fact that you and your wife
10 have moved from Great Falls to Mississippi, is your
11 home life in your view similar?
12 A   I don't understand the question. In what
13 specific area?
14 Q   In terms of your free time and how you spend
15 you spend family time.
16 A   It's another region, another house, but to
17 say that it's different from the way -- well, it's
18 definitely different in terms of the location but not
19 in terms of occupation.
20 Q   You had an interview with a Dr. Gold on the
21 telephone two weeks ago; is that correct?
22 A   I spoke to Dr. Gold, yes.

Page 70

1  Q  And how long was your conversation with
2  Dr. Gold?
3  A  It's difficult to say. A few minutes.
4  Q  Less than ten minutes?
5  A  I -- I -- I don't know. I don't remember.
6  More or less ten minutes. Maybe a little more than
7  ten minutes.
8  Q  What did Dr. Gold say to you?
9  A  What she said to me?
10 Q  Yes. Let me try something different. Could
11 you describe the substance of what she said and what
12 you said in the conversation?
13 A  Yes. We spoke about Catherine. We spoke
14 about my wife.
15 Q  And what did you say about your wife to
16 Dr. Gold?
17 A  I said that my wife was -- that it was very
18 difficult for her, that this was a very -- that what
19 was happening was very difficult for her and for us,
20 that she was very depressed, that she was really sad.
21 I don't recall specifically, but that she was very
22 sad, very disappointed, and it was a very difficult

Page 71

1  period for her.
2  Q  What period -- when you say "period for her,"
3  what time period are you referring to?
4  A  To the time when she asked me the question.
5  Q  So spring of 2006.
6  A  Yes, spring 2006.
7  Q  Did Dr. Gold ask you how you and Catherine
8  spent time together?
9  A  No. I don't think so. I don't think that
10 she asked me that type of question.
11 Q  Did she ask you whether there were any other
12 events in your life that would cause Catherine to be
13 sad?
14 A  I don't have an exact recollection of what
15 she asked me in that regard. I simply said that she
16 was really -- that it was an extremely difficult
17 period for her and for us.
18 Q  Does your wife engage in any kind of physical
19 exercise on a regular basis?
20 A  Is that really your question? Is that really
21 her question?
22    We play golf together from time to time. We

Page 72

1  are members of a club. Other than that, she's not a
2  member of any kind of sports club. And we -- other
3  than that, we don't participate in any sports
4  actively.
5  Q  Does your wife have any current hobbies or
6  personal interests that she pursues when she's not
7  working?
8  A  Unfortunately, she's lost interest in many
9  things.
10 Q  Like what?
11 A  Catherine likes reading a lot. She likes to
12 read historical books, biographies. And I notice that
13 for a certain period of time now where she was no
14 longer reading, and that was something that she always
15 would do with me. That's an example.
16 Q  Do you currently have any dogs?
17 A  No, we no longer have dogs at the moment.
18 Q  Is there a reason you no longer have any
19 dogs?
20 A  The reason is very simple. The climate in
21 Mississippi is excessively hot in the summer, and we
22 really like mountain dogs, so it's not an appropriate

Page 73

1  climate for mountain dogs.
2  Q  Is the absence of dogs in your home a source
3  of disappointment to your family?
4  A  The loss of our dogs was indeed a sad moment
5  for the two of us. But we know very well, because we
6  know the Perinese breed very well, we know their life
7  span, and we knew what would happen.
8  Q  Do you and your wife have friends with whom
9  you socialize in Mississippi?
10 A  I have met my wife's colleagues during
11 dinner. I played golf, participated in a golf contest
12 with the people from Entergy. But other than that, we
13 don't -- we have not really made friends yet. Our
14 friends are in Virginia.
15    MS. HODGSON: I have no further questions.
16    MS. REGAL: Nor do I. Thank you very much
17 for coming. I will say that we have open an issue
18 regarding the banking records that you did not
19 produce. And it is possible that we, once we get
20 them, that we will have additional questions and
21 require additional testimony, but we don't know until
22 we see the documents. So subject to that, we are done

19 (Pages 70 to 73)

PLATT & DAWSON, INC.   703-591-0007

f368097e-9937-4c03-9cfc-bff6519c40da

Page 74

1  with this deposition.
2      (At 5:13 p.m. the taking of the deposition
3  was concluded.)

Page 75

1      I have examined and read the foregoing 74
2  pages and find the answers contained therein with
3  changes made by me, if any, to be true and correct.

_____
Philippe Gaujacq

Page 76

1
2      CERTIFICATE OF REPORTER
3      I, Laurel P. Platt, do hereby certify that the
4  foregoing proceedings were taken by me in machine
5  shorthand and thereafter reduced to typewriting by
6  means of computer-aided transcription; that said
7  proceedings are a true record of the testimony given
8  by said witness; that I am neither counsel for,
9  related to, nor employed by any of the parties to the
10 action in which these proceedings were taken; and
11 further, that I am not a relative or employee of any
12 attorney employed by the parties hereto, nor
13 financially or otherwise interested in the outcome of
14 the action.
15     Given under my hand this 7th day of June, 2006.

_____
Laurel P. Platt,
Registered Diplomate Reporter

Page 77

1      CERTIFICATE OF NOTARY PUBLIC
2
3      I, Fada S. Chaconas, do hereby certify that the
4  witness whose testimony appears in the foregoing
5  deposition was duly sworn by me.
6      Given under my hand this _____ day of
7  _____ 2006.

_____
Notary Public in and for
Washington, D.C.
My commission expires:
July 14, 2006.

20 (Pages 74 to 77)

PLATT & DAWSON, INC.    703-591-0007

f368097e-9937-4c03-9cfc-bff6519c40da

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA

| | |
|---|---|
| CATHERINE GAUJACQ ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v ) | Civil Action No.1:05CV0969 (JGP) |
| ) | |
| ELECTRICITE DE FRANCE ) | |
| INTERNATIONAL NORTH AMERICA, ) | |
| et al. ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF'S INITIAL DISCLOSURE STATEMENT

Plaintiff, Catherine Gaujacq, by counsel and pursuant to Fed.R.Civ. P. 26 (a) submits the following initial disclosures:

Subpart (a): Individuals who may have information in support of Plaintiff's claims in addition to the Plaintiff:

| Name/Role | Address/Phone | Subject |
|---|---|---|
| **Christian Nadal** Replacement as President of EDFINA Former supervisor as President of EDFINA | Washington, DC-USA | Harassment, discrimination, retaliation, defamation, interference. |
| **Fernando Ponasso** EDF Senior VP Chairman of EDFINA | Washington, DC-USA Paris(FRANCE) | Knowledge of discrimination, retaliation and unequal pay. Plaintiff's performance. Knowledge of EDF HR policies for high level executives. |

| Yann Laroche<br>Senior VP<br>Human Resources EDF S.A. | Paris(FRANCE) | Knowledge of expectations, retaliation and unequal pay. Knowledge of EDF HR policies for high level executives. |
|---|---|---|
| Bernard Dupraz<br>Senior VP EDF<br>Former | Paris(FRANCE) | Knowledge of EDF R&D and Engineering businesses of EDF in the US. Knowledge of harassment and discrimination. |
| Laurent Stricker<br>Senior VP EDF<br>Former supervisor | Paris(FRANCE) | Knowledge of harassment and discrimination. |
| Jean-Luc Foret<br>Former co-worker | Lyon (FRANCE) | Knowledge of harassment and defamation. Knowledge of work environment |
| Walker Nolan<br>Consultant with EDFINA | Washington, DC-USA | Plaintiff's performance and conduct. Knowledge of defamation. |
| Mike Slavitt<br>Former CPA with EDFINA | Washington, DC-USA | Knowledge of harassment, discrimination. Knowledge of EDF/EDFINA accounting. |
| Adja MAME BA<br>Former co-worker | Washington, DC-USA | Plaintiff's and Defendant's performance and conduct. Knowledge of harassment and discrimination Knowledge of work environment. Knowledge of EDF/EDFINA accounting. |
| Benoit Dreux<br>Co-worker<br>VP of EDFINA | Washington, DC-USA | Knowledge of harassment, discrimination. Knowledge of work environment. Knowledge of EDF/EDFINA accounting |

2

**Subpart (b):** Documents that may support the Plaintiff's claims are as follows:

1. Plaintiff's Employment contracts EDF and EDFINA 2000

2. Plaintiff's Employment contracts EDF and EDFINA 2004

3. EDFINA Plaintiff's housing lease contract

4. EDFINA applications for L1A visas Plaintiff's and Defendant Christian Nadal to the INS

5. Plaintiff's Pay-stubs and W2s

6. CG performance evaluation documents 2002 2003 2004 and 2000

7. Plaintiff's diplomas and recognitions

8. EDFINA Defendant Christian Nadal housing lease contract

9. EDFINA applications for L1A visas Plaintiff's and Defendant Christian Nadal to the INS

10. Defendant Christian Nadal Pay-stub

11. Insurance policy protecting EDFINA Officers from personal civil liability when acting in the course of their employment

12. EDFINA Business credit cards statements and activities related to the period of the dispute

13. List of EDFINA employees

14. EDFINA monthly financial statements to EDF S.A over the period

15. EDF compensation policy for high level executives over the period of the dispute

16. Guide of French EDF employees working abroad relevant to the period of the dispute

17. Statistics on EDF S.A. gender discriminatory practices with high level executives.

18. Corporate documents related to EDF S.A and EDFINA businesses in the USA and worldwide

19. Documents related to Plaintiff's current revenues and expenses

3

20. Documents related to damages incurred

21. Documents received from EEOC

22. Letters, e-mails, transcripts, records of phone conversations related to the events asserted and described in the Complaint.

**Documents anticipated to be produced by Defendants**

23. Plaintiff's Employment contracts EDF and EDFINA 2000 and 2004

24. EDFINA housing lease contracts Plaintiff's and Defendant Christian Nadal

25. EDFINA applications for visas Plaintiff's and Defendant Christian Nadal to the Department of Homeland Security

26. EDF/EDFINA Plaintiff's and Defendant Christian Nadal Pay-stubs and W2s

27. Checks voided in the company's books because of Benoit Dreux shredding in front of other employees.

28. EDFINA monthly financial statements to EDF S.A. over the period of the dispute

29. EDFINA Business credit cards statements and activities related to the period of the dispute

30. List of EDFINA employees

31. Christian Nadal employment contracts with EDF and EDFINA June, 1st, 2004

32. CG performance evaluation documents 2002 2003 and 2000

33. EDF compensation policies for high level executives

34. Guide of French EDF employees working abroad

35. Statistics on EDF S.A. gender discriminatory practices with high level executives.

36. NUSTART agreements

37. EPRI agreements

38. Letters, e-mails, transcripts and records of phone conversations related to the events

4

39. EDFINA active visa applications of all employees over the period

40. Pay-stubs and W2 Christian Nadal 2004

41. Christian Nadal performance evaluation documents 2000 to 2004

42. CN employment contract EDF and EDFINA 2004

43. EDF compensation policy for high level executives describing ranking and seniority system, as well as EDFINA President position place in the system

44. EDFINA articles of incorporations, by-laws and board decisions 2004.

45. Guide of French EDF employees working abroad

46. EDF internal financial Audit report of EDFINA July 2004

47. List of EDFINA employees over the period with indication of active visas sponsored employees.

48. Corporate documents related to EDF S.A and EDFINA businesses in the USA and worldwide such as the official document prepared for the partial IPO of the company.

49. Insurance policy protecting EDFINA Officers from civil personal liability when acting in the course of their employment.

50. Letters, e-mails, transcripts and records of phone conversations related to the events

Subpart (c):

A.  Plaintiff's damages claim, and method of computation, are set forth as follows (these are subject to supplementation through discovery):

| Relief EPA TITLE VII until September 30th, 2005: | |
|---|---|
| 11/01/2001 to 10/31/2004 3-years back-pay difference in compensation male/female President EDFINA | $ 359,958 |
| 11/01/2004 to 01/07/2005 difference in compensation male President EDFINA Plaintiff's | $ 37,761 |
| 01/07/2004 to 04/04/2005 difference in compensation male President EDFINA Plaintiff unemployed | $ 84,314 |
| 04/04/2005 to 09/30/2005 front pay difference in compensation male President EDFINA Plaintiff's new job | $ 112,737 |
| TOTAL: | $ 594,770 |

6

| Actual monetary losses until September 30th, 2005: | |
|---|---|
| Differed bonus at termination owed and not paid | $ 114,384 |
| Moving expenses differential male President of EDFINA and Plaintiff | $ 45,118 |
| Unpaid expenses EDFINA-EDF | $ 1,721.30 |
| Loss of 27 vacation days | $ 29,996 |
| Health insurance 11/01/2004 to 04/03/2005 | $ 2,503 |
| Moving expenses following EDF breach of housing lease contract | $ 4,500 |
| Unpaid bonus and profit sharing 2004 | $ 21,975 |
| 4 round trips Washington-Paris 2004 airfares not paid | $ 16,000 |
| Loss of Husband's one year salary because of company's action | $ 38,519 |
| Expenses to find a job | $ 500 |
| Expenses in the new job caused by Defendants' action | $ 24,540 |
| TOTAL: | $ 299,756.30 |

**All calculations are based on the following template for which all documents are available in EDF and EDFINA books and Plaintiff's documents:**

| Net compensation male President of EDFINA | $ 337,254 |
|---|---|
| Net compensation Plaintiff President and Vice-President of EDFINA until 10/31/2004 | $ 217,268 |
| Net compensation Plaintiff EDF 11/01/2004 to 01/07/2005 | $ 110,688 |
| Net compensation Plaintiff unemployed 01/08/2005 to 04/04/2005 | $ 0 |
| Net compensation Plaintiff new job 04/04/2005 to 09/30/2005 | $ 111,780 |

7

B. Future lost income and expenses: Ms. Gaujacq will be claiming future lost income and expenses. The amounts would be based upon the information above, as well as below:

| Future Monetary losses after September 30th, 2005: | | |
|---|---|---|
| Preferential Stock owed and not proposed | | Still in calculation |
| 04/04/2005 to 07/31/2007 front pay difference in compensation male President EDFINA Plaintiff's new job | | $ 453,238 |
| Pension differential from termination at 47 instead of 60 years old | | Still in calculation |
| Moving of furniture in the USA stored under contract with EDF in France | | $ 20,000 |
| Expenses in the new job caused by Defendants' action | | $ 11,400 |
| TOTAL: | | $ 484,638 |

C. Compensatory damages other than lost income and benefits: Ms Gaujacq is requesting emotional distress and other compensatory damages. This amount is determined by the jury.

D. Punitive damages: Ms. Gaujacq is requesting punitive damages. The jury determines this amount.

E. Attorney fees and costs: Ms. Gaujacq is requesting attorneys' fees and costs. These amounts will continue to be incurred, and are to be determined by the Court upon Petition submitted after trial.

**Subpart (d):** Insurance information is not applicable to Plaintiff.

8

October 27, 2005                    Respectfully submitted,

                                    _____ /JAH
                                    Elaine Charlson Bredehoft
                                    Virginia Bar No. 23766
                                    Kathleen Z. Quill
                                    Virginia Bar No. 66323
                                    CHARLSON BREDEHOFT & COHEN, P.C.
                                    11260 Roger Bacon Drive
                                    Suite 201
                                    Reston, Virginia 20190
                                    (703) 318-6800

                                    Counsel for Plaintiff,
                                      Catherine Gaujacq

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing PLAINTIFF'S INITIAL DISCLOSURE STATEMENT by first class mail, postage pre-paid, this 27th day of October, 2005 on counsel for defendants addressed as follows:

> Laura B. Hoguet, Esq
> HOGUET NEWMAN & REGAL, LLP
> 10 East 40th Street
> New York, New York 10016
> (212) 689-8808
>
> Counsel for Defendants
>   Electricite de France, S.A. and
>   Electricite de France International North America, Inc.
>
> Ronald S. Cooper, Esq.
> STEPTOE & JOHNSON LLP
> 1330 Connecticut Avenue, NW
> Washington, DC 20036
> (202) 429-3000
>
> Counsel for Defendant
>   Christian Nadal

                                    _____ /JAH
                                    Elaine Charlson Bredehoft