# ATTACHMENT 2

*Charge #100-2004-00776*

July 30, 2004

**EXHIBIT**

**#1**

VIA FACSIMILE (202) 275-6834
Director
Equal Employment Opportunity Commission
Washington Field Office
1400 L Street NW, Suite 200
Washington, DC 20005

Re: <u>CHARGE OF DISCRIMINATION/RETALIATION</u>

TO WHOM IT MAY CONCERN:

Please accept for filing my following **Charge Of Discrimination and Retaliation**

1    Charging Party:
   Name:        **Catherine Gaujacq**
   Address:     10801 Sycamore Springs Lane
                Great Falls, VA 22066
   Contact Tel : Home: (703) 433-9755
                Cell:   (703) 981-1049

2.    Employer:
   Name:        Electricite de France International North America, Inc.
                (EDFINA)/ Electricite de France (EDF) (over 100,000 employees)
   Address:     1730 Rhode Island Avenue NW.
                Suite 509
                Washington, DC 20036
                c/o Mr. Christian Nadal, President
                Tel (202) 429-2527
                        and
                Yann Laroche, VP Human Resources EDF Group
                22-30 Avenue de Wagram
                75008 PARIS
                FRANCE
                Tel (33) 1 40 42 22 22

3.   Nature of the Complaint: Discrimination based on gender, Hostile Work
     Environment, Retaliation

000191

## BACKGROUND FACTS

From April 2000 until May 2004, I was the President of Electricite de France International North America ("EDFINA"), United States subsidiary of Electricite de France ("EDF"), one of the largest power companies in the world with offices throughout the world (for simplification, EDFINA and EDF will collectively be referred to as "Company"). I have been an employee of the Company for over 24 years, having risen through management positions within EDF and EDFINA in the core energy generation business, and, most recently, in strategic consulting on behalf the Company in the United States. Despite the size of the Company, I am one of only very few women who hold an executive level position. As President, I reported to Fernando Ponasso, Chairman of EDFINA and Executive VP of EDF Branch Americas. I was responsible for all operations in the United States, with specific responsibility for development and management of a multi-national nuclear power joint venture and a key initiative of EDFINA and EDF (the "Project").

In February 2004, the chairman of EDF, Mr. Francois Roussely, advised me that in connection with EDF's restructuring, Christian Nadal, a high level executive with EDF, was being sent to the US offices as a senior advisor to EDFINA. However, in March, without explanation from the Company, I learned that Mr. Nadal was given my job as President of EDFINA in the US. I was told I was being demoted to Vice President of EDFINA.

On May 31, 2004, at the request of the Chairman of EDF, I tendered my written resignation as President. I accepted the position of Vice President, EDFINA and Manager of the Project, retaining management responsibility for generation and Nuclear Projects, which I accepted based on a written assurances from the Company that I was to stay in U.S. for another three years and to remain responsible for the Project.[1]

Mr. Nadal assumed the position of President on June 1, 2004. From the moment he arrived in the United States and became my supervisor, he systematically subjected me to unfair and discriminatory treatment that has adversely impacted the terms and conditions of my employment; and created an abusive and hostile work environment by subjecting me to increasing harassment, including effectively

---

[1] I had contacted the Chairman of EDF and Mr Gerard Creuzet, COO of EDF in January of 2004 to confirm that the Company wanted me to stay in the US to continue to work on the Project. I was assured at that time that I was to remain in the US with EDFINA to handle the Project because of its strategic importance. Both the Chairman and Mr. Creuzet were well aware that it was extremely important for me to know by January that I was expected to continue my work in the US because my husband, who had taken leave from his job at the University in France when I was assigned to the US, was required to give the University notice of his intent to return in January for the upcoming school year. If he did not notify the University by January, he would be unable to return to his position until September 2005.

Jul 30 04 10:38a    Resolution Law Group plc    (703) 748-3121    p.4

removing my authority to properly carry out my job, engaging in concerted efforts to impugn my record and to undermine my position in the Company, and transferring many of my duties to my male peer.

## DISCRIMINATORY TREATMENT BY NADAL

In the first week of his arrival, Christian Nadal demanded that I provide him with all my business and company contacts, telling me it was very urgent. I thought he was joking, he said he was not. Subsequently, without any prior notice and without any legitimate business reason, Christian Nadal had me removed from the list of authorized officers of EDFINA with signature authority on the corporate bank accounts.

I learned of the revocation of my authority on June 11, 2004 after returning from a business trip, when I attempted to sign EDFINA checks that had been prepared by bookkeeping. Mr. Dreux, the other vice president located in EDFINA's DC office[2], curtly told me I could not sign the checks as he had me removed from the list of authorized officers of EDFINA on the corporate bank account. He then summarily ripped up the checks I signed in front of others in the office. I told Mr. Dreux that this action was improper and that as Vice President, I am responsible for all matters, including payment of expenses, and need to be able to sign checks to properly perform my job.

I immediately notified Mr. Nadal by email of my concern about the action taken by Mr. Dreux, apparently without Board approval, and asked that he correct the matter with the bank. That evening, Mr. Nadal called me at home and informed me that he personally directed that I be withdrawn from the list of authorized officers on the bank account. When I questioned this decision, and asked for an explanation, he said he did not need to give me a reason. Of the three vice presidents who report to Mr. Nadal, I am the only woman vice president. No similar action was taken against any other Vice Presidents of EDFINA in the US.[3]

After that interchange, Mr. Nadal began to attend all of my business meetings outside the office (both in the United States and in France) without any advance notice to me. He had no role at these meetings. He did not speak to me before, during or after the meetings. Rather his presence was clearly intended to intimidate and harass me.

---

[2] There are three vice presidents who report to Christian Nadal. Mr. Dreux and I work at EDFINA's DC office, and Richard Shomberg works in EDFINA's Palo Alto office.
[3] I sent an email to Fernando Ponasso and EDF legal counsel to advise the actions taken by Mr. Nadal, which I regarded as improper.

000193

On or about June 20th, 2004, I received a letter dated June 18th 2004 from Mr. Nadal on EDFINA letterhead. The letter was addressed to me and to Mr. Dreux. The letter, a copy of which is attached as Exhibit A, was mailed to my home. In the letter, Mr. Nadal revoked all of our powers as vice presidents of EDFINA, including but not limited to the authority to enter into contracts with third parties, to make any representation and/or warranties on behalf of EDFINA, or to incur any expenses of behalf of EDFINA. It further stated that this authority rests only with the President, and in his absence, these transactions may be carried out by either Vice President only upon the express written consent of the President.

I later learned that Mr. Nadal prepared another letter also dated June 18, 2004, addressed solely to Mr. Dreux, which was hand-delivered to Mr. Dreux at EDFINA's offices in DC. This letter, a copy of which is attached as Exhibit B, granted Mr. Dreux authority to act on behalf of the President of EDFINA, and reinstated all authority and powers that had been rescinded by the other letter. Unlike the June 18th letter addressed to Mr. Dreux and me, this letter was copied to the Chairman of EDFINA. Mr. Nadal did not send a letter to the other EDFINA vice president that revoked his authority.

At the end of June, I was advised that Mr. Nadal had requested the EDF auditors to come to the US offices of EDFINA for the purpose of undertaking a special audit of EDFINA operations and finances during the period I served as EDFINA's President. There was no justifiable business reason for requesting a special audit. Indeed, I have a spotless performance record with the Company and have a reputation for demanding rigorous ethical conduct in connection with the operations of the business. Despite the fact that the audit concerned matters for which I was responsible, I was not consulted in connection with the audit, and I was not provided a copy of the formal audit report. However, the auditors verbally disclosed to me that they found no improprieties or material deficiencies in the operations of EDFINA while I was President.

Throughout June and July, I confronted Mr. Nadal on several occasions, complaining about his treatment toward me and asked for an explanation. His response was always that he did not need to give me any explanation for his decisions. His harassment continued.

On July 9, 2004, I notified Fernando Ponasso, Chairman of EDFINA, by email, of the discriminatory actions taken against me by Mr. Nadal that seriously undermined my ability to perform my job and caused me grave concern. I asked that he take measures to correct this situation. I received no response from Mr. Ponasso, and no steps were taken to investigate and address the situation with Mr. Nadal. Regrettably, things got worse after my email to Mr. Ponasso.

000194

On July 12, 2004, after receipt of the audit findings, I was in the office to prepare for a meeting with the joint venture partners on the Project. Mr. Nadal unexpectedly called me into his office on the pretext of updating him on the project. After a brief interchange, he demanded that I remain in the office, and then asked Jean Luc Foret, a Nuclear engineer with EDFINA and one of my direct reports, to sit in on the meeting. Mr. Nadal demanded, in a demeaning tone, that I bring all files, documents and any electronic email or other data I have at home or on my laptop relating to the Project to his office by the next day, before I left for my scheduled vacation so that the documents are handy for his review and so that they can be archived. I explained that I was in over the next two days and that I could not see how I could respond to this request before I left for vacation. I also explained that the joint venture agreement specifically restricts disclosure of Project documents, and I therefore could not legally share many documents until confidentiality agreements were obtained. At that point, he rose from his chair pointing at me, and in a harsh and threatening voice stated that if I did not do what he asked, I would be accountable for my actions. He did not explain what he meant.

At the end of the business day on July 12th, I received a lengthy email from Mr. Nadal repeating his earlier demand for the delivery of all project documents to his attention in 24 hours. In it, he falsely alleged that the Energy Group in France, with whom I regularly liaison in connection with the Project, "regularly complains" of a lack of information from me. The July 16th email, which I received after leaving for vacation, stated that he did not get the documents he had requested and he was repeating his demand to comply. I replied to Mr. Nadal's emails, with a copy to Fernando Ponasso, explaining again the reasons why I could not meet his demands immediately and challenging his false accusations. Christian Nadal never made the same demands of the other vice presidents in his reporting structure.

## PROTECTED ACTIVITY AND RETALIATORY RESPONSES

Until my email of July 9 to Fernando Ponasso, I had not raised the issue formally within the Company because I wanted to try to preserve the working relationship with my supervisor and with the team, and I feared that by complaining, I would invite retaliation. In light of Mr. Nadal's intention to continue to undermine and marginalize me, and because my prior verbal requests for assistance from the Company fell on deaf ears, I decided to formally notify the Company of the need for prompt, corrective action.

On July 22, 2004, I sent an email to Christian Nadal complaining about his harassing and discriminatory behavior and asked him to contact me to discuss the matter. I also sent an email to Gerard Creuzet, the COO of EDF, and to Fernando Ponasso, Chairman of EDFINA and President of EDFINA Branch Americas, asking the Company to confirm that it would take measures to prevent further discriminatory

conduct by Mr. Nadal and that I was to receive a signed Expatriation Contract extending my role on the Project, as previously agreed. I told them that I needed to have a response before Monday, July 25th because the Company's failure to act had put me in a tenuous employment position. I could no longer work for Mr. Nadal, and if I were to be able to carry out my assigned responsibility as Manager of the Project, I needed the Company to intercede on my behalf. I explained that if they did not get back to me, I had no option but to file a charge with the appropriate agency in the US to prevent further wrongdoing. I asked them to call me.

The next day, I received a short email response from Mr. Nadal. He refused to address my concerns.

On Friday, July 23rd, I received calls from several EDF officers. The first call was from Gerard Creuzet. After briefly discussing my concerns and my proposed solution (sign my new expatriation contract and change my reporting structure), Mr. Creuzet stated that the chairman of EDF would not tolerate a claim being filed against the Company. He then threatened me, saying "If you file a claim against the Company, your career is dead, it is over". I was shocked and told him that I could not understand how the Company could treat me this way after 24 years of dedicated service. Mr. Creuzet said he would have Yann Laroche from Human Resources call me directly.

When Yann Laroche called me, he indicated he was aware of Mr. Creuzet's comments to me. He asked for my thoughts on the situation and my reaction to my discussion with Gerard Creuzet. I told him that I was scared and felt threatened based on my call with Mr. Creuzet. I again explained the impossible position I faced because of the Company's failure to help me. He said he would speak to Mr. Creuzet right away.

Later that day, I received a call from Fernando Ponasso. His tone was quite different, telling me that the Company was trying to find an agreement with me and asked what I wanted. I again repeated how this situation could be easily corrected -- send me the signed expatriation contract, the terms of which Gerard Creuzet had agreed to in March, and change my reporting structure to resemble that of the EDFINA vice president located in the Palo Alto office so I am no longer reporting directly to Christian Nadal. I explained that I needed an answer on Monday. He requested that I take no action until we spoke further on Monday. He said someone would get back to me, leaving me with the impression that the Company would take the requested corrective measures.

The next day I sent a confirming email to Gerard Creuzet, Yann Laroche and Fernando Ponasso, stating that I would not do anything until they contacted me

on Monday, but emphasizing the importance of getting the matter resolved in writing before the end of the week.

## FURTHER RETALIATION

On Monday, July 26th, following my conversations with the EDF officers, I did not receive any call or a letter from the Company confirming the corrective action to be taken as we had discussed. Instead, the Company took further retaliatory action against me.

The Company sent me a letter stating the following:

- the Company removed me from my position with EDFINA in the U.S.,
- the Company directed me to return to France immediately, without an assigned position – in fact, they did not tell me where in France I am expected to go;
- the Company refused to sign my expatriation contract and expressly stated that my mission in the U.S. ends August 1, 2004, an action taken for one purpose - to frustrate my ability to seek protection under U.S. law against further retaliation, and to shield the Company;
- the Company said it would not propose a position for me in the EDF Energy Branch until November 1, 2004

The Company made it clear that my future at the Company was dead because of my efforts to seek corrective action of my situation

## SUMMARY

To summarize, since the time of my demotion in May 2004 and the arrival of my replacement as President of EDFINA, I have been the target of discriminatory treatment because I am a woman. Since complaining about discrimination in June 2004, I have been subjected to repeated harassment and intimidation, discrimination and retaliation, including loss of my functional role and authority within the Company and threatened termination, all in violation of Title VII of the Civil Rights Act, as amended

4. The names, addresses and telephone numbers of witness:

Washington DC:
Mr. Christian Nadal, President EDFINA
Mr. Benoit Dreux, VP EDFINA
Mr. Jean Luc Foret, Manager, EDFINA

Ms. Mame Ba, legislative analyst, EDFINA
Mr. Alexandre Audiee, market analyst, EDFINA

Address: 1730 Rhode Island Ave., NW
      Suite 509
      Washington, DC
      (202) 429-2527
France:
Mr. Gerard Creuzet, COO, EDF
Mr. Yann Latoche, VP Human Resources, EDF
Mr. Fernando Ponasso, Chairman EDFINA and President EDF Americas

Address: 22-30 Avenue de Wagram
      75008 PARIS
      FRANCE
      Tel (33) 1 40 42 22 22

5. No other charges have been filed by me.

6. Alternate Contact:    Kathryn T. Harris
                    Resolution Law Group, plc
                    1749 Old Meadow Rd.
                    Suite 300
                    1749 Old Meadow Rd.
                    McLean, Va. 22102

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 30, 2004

Catherine Gaujacq



EXHIBIT
2

August 6, 2004

VIA HAND DELIVERY

U.S. Equal Employment Opportunity Commission
1801 L Street, N.W.
Suite 100
Washington, D.C. 20507
Attention: Dana Hutter, Acting Director



RECEIVED
AUG  6 2004
By  WFO

Re: **CHARGE OF DISCRIMINATION,
RETALIATION/VIOLATION OF EQUAL PAY ACT**

TO WHOM IT MAY CONCERN:

Please accept for filing my amended **Charge Of Discrimination, Retaliation and
Violation of the Equal Pay Act** against the named respondents. My original charge
for was filed with the EEOC Washington Field office on July 30, 2004. This
amended charge adds a claim for violation of the Equal Pay Act, 29 U.S.C. 206(d) et
seq. and names Christian Nadal as respondent.

1.    **Charging Party:**
      Name:        **Catherine Gaujacq**
      Address:     10801 Sycamore Springs Lane
                   Great Falls, VA 22066

      Contact Tel.:  Home: (703) 433-9755
                     Cell:    (703) 981-1049

2.    **Employer/Respondent:**
      Name:        **Electricite de France International North America, Inc.**
                   **(EDFINA)** and **Electricite de France (EDF)** (over 100,000
                   employees) and **Christian Nadal, President EDFINA**

      Address:     1730 Rhode Island Avenue NW.
                   Suite 509
                   Washington, DC 20036
                   c/o Mr. Christian Nadal, President
                   Tel (202) 429-2527
                                  and

000007

Yann Laroche, VP Human Resources EDF Group
22-30 Avenue de Wagram
75008 PARIS
FRANCE
Tel (33) 1 40 42 22 22

3. **Nature of the Complaint:** Discrimination based on gender, Hostile Work
Environment, Retaliation and Violation of Equal Pay Act.

## BACKGROUND FACTS

From August 1, 2000 until May 2004, I was the President of Electricite de
France International North America ("EDFINA"), United States subsidiary of
Electricite de France ("EDF"), one of the largest power companies in the world with
offices throughout the world (for simplification, EDFINA and EDF will collectively
be referred to as "Company"). I have been an employee of the Company for over 24
years, having risen through management positions within EDF and EDFINA in the
core energy generation business, and, most recently, in strategic consulting on behalf
the Company in the United States.

Despite the size of the Company, I am one of only very few women who
hold an executive level position. As President, I reported to Fernando Ponasso,
Chairman of EDFINA and Executive VP of EDF Branch Americas. I was
responsible for all operations in the United States, with specific responsibility for
development and management of a multi-national nuclear power joint venture and a
key, strategic initiative of EDFINA and EDF (the "Project"). I have been the
EDFINA executive responsible for this project since its inception.

In February 2004, the chairman of EDF, Mr. Francois Roussely, informed
me that in connection with EDF's restructuring associated with the Company's
privatization, Christian Nadal, a high level executive with EDF, was being sent to the
U.S. offices as a senior advisor to EDFINA. While I thought this was odd, I was
assured that I would stay in the U.S. to work on the Project until 2005 or 2006, when
I would be given a higher executive management role in the parent company.

However, at the end of March, without prior notice or explanation from the
Company, I learned that Mr. Nadal was given my job as President of EDFINA in the
US. I was shocked at this announcement and asked the Chairman of EDF the reasons
for this decision. The COO assured me it had nothing to do with my performance. I
was told the decision was necessitated due to "national interests". I made it clear to
the Company that I wanted to continue to work on the Project and proposed a new
role for me in EDFINA to Gerard Creuzet, the COO of EDF. He agreed to the

000008

2

proposal and directed me to prepare and deliver a mission letter and expatriation contract that reflected this new role. I did this.

During April and May, I contacted the company on several occasions to inquire of the status of my contract. I was told that my new contract and mission letter were awaiting signature. On May 31, 2004, at the request of the Chairman of EDF, I tendered my written resignation as President. I submitted my resignation and concurrently assumed the position of Vice President, EDFINA and Manager of the Project, retaining management responsibility for generation and Nuclear Projects, based on written assurances from the Company that it had approved my continued mission in the U.S. at EDFINA for another three years, retaining responsibility for the Project.[1]

Mr. Nadal assumed the position of President on June 1, 2004. From the moment he arrived in the United States and became my supervisor, he systematically subjected me to unfair and discriminatory treatment that has adversely impacted the terms and conditions of my employment. He created an abusive and hostile work environment by subjecting me to increasing harassment, including effectively removing my authority to properly carry out my job, engaging in concerted efforts to impugn my record and to undermine my position in the Company, and transferring many of my duties to my male peer.

## DISCRIMINATORY TREATMENT BY NADAL

In the first week of his arrival, Christian Nadal demanded that I provide him with all my business and company contacts, telling me it was very urgent. I thought he was joking, he said he was not. Subsequently, without any prior notice and without any legitimate business reason, Christian Nadal had me removed from the list of authorized officers of EDFINA with signature authority on the corporate bank accounts.

I learned of the revocation of my authority on June 11, 2004 after returning from a business trip, when I attempted to sign EDFINA checks that had been prepared by bookkeeping. Mr. Dreux, the other vice president located in EDFINA's

---

[1] I had contacted the Chairman of EDF and Mr. Gerard Creuzet, COO of EDF in January of 2004 to confirm that the Company wanted me to stay in the US to continue to work on the Project. I was assured at that time that I was to remain in the US with EDFINA to handle the Project because of its strategic importance. Both the Chairman and Mr. Creuzet were well aware that it was extremely important for me to know by January that I was expected to continue my work in the US because my husband, who had taken leave from his job at the University in France when I was assigned to the US, was required to give the University notice of his intent to return in January for the upcoming school year. If he did not notify the University by January, he would be unable to return to his position until September 2005.

000009

DC office[2], curtly told me I could not sign the checks as he had me removed from the list of authorized officers of EDFINA on the corporate bank account. He then summarily ripped up the checks I signed in front of others in the office. I told Mr. Dreux that this action was improper and that as Vice President, I am responsible for all matters, including payment of expenses, and need to be able to sign checks to properly perform my job.

I immediately notified Mr. Nadal by email of my concern about the action taken by Mr. Dreux, apparently without Board approval, and asked that he correct the matter with the bank. That evening, Mr. Nadal called me at home and informed me that he personally directed that I be withdrawn from the list of authorized officers on the bank account. When I questioned this decision, and asked for an explanation, he said he did not need to give me a reason. Of the three vice presidents who report to Mr. Nadal, I am the only woman vice president. No similar action was taken against any other Vice Presidents of EDFINA in the US.[3]

After that interchange, Mr. Nadal began to attend all of my business meetings outside the office (both in the United States and in France) without any advance notice to me. He had no role at these meetings. He did not speak to me before, during or after the meetings. Rather his presence was clearly intended to intimidate and harass me.

On or about June 20th, 2004, I received a letter dated June 18th 2004 from Mr. Nadal on EDFINA letterhead. The letter was addressed to me and to Mr. Dreux. The letter, a copy of which is attached as Exhibit A, was mailed to my home. In the letter, Mr. Nadal revoked all of our powers as vice presidents of EDFINA, including but not limited to the authority to enter into contracts with third parties, to make any representation and/or warranties on behalf of EDFINA, or to incur any expenses of behalf of EDFINA. It further stated that this authority rests only with the President, and in his absence, these transactions may be carried out by either Vice President only upon the express written consent of the President.

I later learned that Mr. Nadal prepared another letter also dated June 18, 2004, addressed solely to Mr. Dreux, which was hand-delivered to Mr. Dreux at EDFINA's offices in DC. This letter, a copy of which is attached as Exhibit B, granted Mr. Dreux authority to act on behalf of the President of EDFINA, and reinstated all authority and powers that had been rescinded by the other letter. Unlike the June 18th letter addressed to Mr. Dreux and me, this letter was copied to

---

[2] There are three vice presidents who report to Christian Nadal. Mr. Dreux and I work at EDFINA's DC office, and Richard Shomberg works in EDFINA's Palo Alto office.

[3] I sent and email to Fernando Ponasso and EDF legal counsel to advise the actions taken by Mr. Nadal, which I regarded as improper.

000010

the Chairman of EDFINA. Mr. Nadal did not send a letter to the other EDFINA vice president that revoked his authority.

At the end of June, I was advised that Mr. Nadal had requested the EDF auditors to come to the US offices of EDFINA for the purpose of undertaking a special audit of EDFINA operations and finances during the period I served as EDFINA's President. There was no justifiable business reason for requesting a special audit. Indeed, I have a spotless performance record with the Company and have a reputation for demanding rigorous ethical conduct in connection with the operations of the business. Despite the fact that the audit concerned matters for which I was responsible, I was not consulted in connection with the audit, and I was not provided a copy of the formal audit report. However, the auditors verbally disclosed to me that they found no improprieties or material deficiencies in the operations of EDFINA while I was President.

Throughout June and July, I confronted Mr. Nadal on several occasions, complaining about his treatment toward me and asked for an explanation. His response was always that he did not need to give me any explanation for his decisions. His harassment continued.

On July 9, 2004, I notified Fernando Ponasso, Chairman of EDFINA, by email, of the discriminatory actions taken against me by Mr. Nadal that seriously undermined my ability to perform my job and caused me grave concern. I asked that he take measures to correct this situation. I received no response from Mr. Ponasso, and no steps were taken to investigate and address the situation with Mr. Nadal. Regrettably, things got worse after my email to Mr. Ponasso.

On July 12, 2004, after receipt of the audit findings, I was in the office to prepare for a meeting with the joint venture partners on the Project. Mr. Nadal unexpectedly called me into his office on the pretext of updating him on the project. After a brief interchange, he demanded that I remain in the office, and then asked Jean Luc Foret, a Nuclear engineer with EDFINA and one of my direct reports, to sit in on the meeting. Mr. Nadal demanded, in a demeaning tone, that I bring all files, documents and any electronic email or other data I have at home or on my laptop relating to the Project to his office by the next day, before I left for my scheduled vacation so that the documents are handy for his review and so that they can be archived. I explained that I was in over the next two days and that I could not see how I could respond to this request before I left for vacation. I also explained that the joint venture agreement specifically restricts disclosure of Project documents, and I therefore could not legally share many documents until confidentiality agreements were obtained. At that point, he rose from his chair pointing at me, and in a harsh and threatening voice stated that if I did not do what he asked, I would be accountable for my actions. He did not explain what he meant.

000011

At the end of the business day on July 12th, I received a lengthy email from Mr. Nadal repeating his earlier demand for the delivery of all project documents to his attention in 24 hours. In it, he falsely alleged that the Energy Group in France, with whom I regularly liaison in connection with the Project, "regularly complains" of a lack of information from me. The July 16th email, which I received after leaving for vacation, stated that he did not get the documents he had requested and he was repeating his demand to comply. I replied to Mr. Nadal's emails, with a copy to Fernando Ponasso, explaining again the reasons why I could not meet his demands immediately and challenging his false accusations. Christian Nadal has never made the same demands of the other vice presidents in his reporting structure.

## PROTECTED ACTIVITY AND RETALIATORY RESPONSES

Until my email of July 9 to Fernando Ponasso, I had not raised the issue formally within the Company because I wanted to try to preserve the working relationship with my supervisor and with the team, and I feared that by complaining, I would invite retaliation. In light of Mr. Nadal's intention to continue to undermine and marginalize me, and because my prior verbal requests for assistance from the Company fell on deaf ears, I decided to formally notify the Company of the need for prompt, corrective action.

On July 22, 2004, I sent an email to Christian Nadal complaining about his harassing and discriminatory behavior and asked him to contact me to discuss the matter. I also sent an email to Gerard Creuzet, the COO of EDF, and to Fernando Ponasso, Chairman of EDFINA and President of EDFINA Branch Americas, asking the Company to confirm that it would take measures to prevent further discriminatory conduct by Mr. Nadal and that I was to receive a signed Expatriation Contract extending my role on the Project, as previously agreed. I told them that I needed to have a response before Monday, July 25th because the Company's failure to act had put me in a tenuous employment and immigration position. I could no longer work for Mr. Nadal, and if I were to be able to carry out my assigned responsibility as Manager of the Project, I needed the Company to intercede on my behalf. I explained that if they did not get back to me, I had no option but to file a charge with the appropriate agency in the U.S. to prevent further wrongdoing. I asked them to call me.

The next day, I received a short email response from Mr. Nadal. He refused to address my concerns.

On Friday, July 23rd, I received calls from several EDF officers. The first call was from Gerard Creuzet. After briefly discussing my concerns and my proposed solution (sign my new expatriation contract and change my reporting structure), Mr.

000012



Creuzet stated that the chairman of EDF would not tolerate a claim being filed against the Company. He then threatened me, saying "If you file a claim against the Company, your career is dead, it is over". I was shocked and told him that I could not understand how the Company could treat me this way after 24 years of dedicated service. Mr. Creuzet said he would have Yann Laroche from Human Resources call me directly.

When Yann Laroche called me, he indicated he was aware of Mr. Creuzet's comments to me. He asked for my thoughts on the situation and my reaction to my discussion with Gerard Creuzet. I told him that I was scared and felt threatened based on my call with Mr. Creuzet. I again explained the impossible position I faced because of the Company's failure to help me. He said he would speak to Mr. Creuzet right away.

Later that day, I received a call from Fernando Ponasso. His tone was quite different, telling me that the Company was trying to find an agreement with me and asked what I wanted. I again repeated how this situation could be easily corrected – send me the signed expatriation contract, the terms of which Gerard Creuzet had agreed to in March, and change my reporting structure to resemble that of the EDFINA vice president located in the Palo Alto office so I am no longer reporting directly to Christian Nadal. I explained that I needed an answer on Monday. He requested that I take no action until we spoke further on Monday. He said someone would get back to me, leaving me with the impression that the Company would take the requested corrective measures.

The next day I sent a confirming email to Gerard Creuzet, Yann Laroche and Fernando Ponasso, stating that I would not do anything until they contacted me on Monday, but emphasizing the importance of getting the matter resolved in writing before the end of the week.

## FURTHER RETALIATION

On Monday, July 26th, following my conversations with the EDF officers, I did not receive any call or a letter from the Company confirming the corrective action to be taken as we had discussed. I again called Fernando Ponasso and Gerard Creuzet on July 27th. While I did not reach Gerard Creuzet, I did reach Mr. Ponasso who told me that Gerard Creuzet had prepared a letter extending my mission on the Project in the U.S. I thought a solution had been reached. Instead, the Company took further retaliatory action against me.

000013

The Company sent me a letter stating the following:

- the Company removed me from my position on the Project with EDFINA in the U.S.,
- the Company directed me to return to France immediately, without an assigned position – in fact, they did not tell me where in France I am expected to go;
- the Company refused to sign my expatriation contract and expressly stated that my mission in the U.S. ends August 1, 2004, an action taken for one purpose - to frustrate my ability to seek protection under U.S. law against further retaliation, and to shield the Company;
- the Company said it would not propose a position for me in the EDF Energy Branch until November 1, 2004, and there was no mention of a promotion upon my return to France as the Chairman had previously indicated to me.

The Company made it clear that my future at the Company was dead because of my efforts to protect my rights and seek corrective action of my situation.

Incredibly, the Company has given me no more than three weeks to transition the Project and all other business matters I have been handling and return my family to France. Customary Company practice and procedure when reassigning an employee out of country on an expatriate contract is to provide no less than seven to eight months advance notice to the employee. In fact, in June, Jean Luc Foret, a male engineer working with me on the Project in the U.S. was advised that he was being rotated to one of three projects of his choice effective summer 2005. The Company gave Mr. Foret one year's notice to transition his Project responsibilities and get his personal affairs in order. I have been given less than one month, yet I have no position to go to. Clearly, this action was intended to be punitive.

## VIOLATION OF EQUAL PAY ACT

As President of EDFINA, I was paid total salary of $169,750 (US). My job responsibilities included full operational responsibility for all EDFINA activities and projects. As president, my responsibilities included the identification of development opportunities in the U.S. and Canadian electricity markets, representation of the Company in various trade associations relevant to the energy field, serving as a Director of the Board for EDF Group's US Subsidiaries, and regularly making presentations on the nuclear energy industry and emerging technologies at industry conferences. During my four-year tenure as President, I was responsible for identifying and managing EDF's acquisition of enXco, a wind power company; the establishment and development of a U.S. presence for Dalkia, an EDF

8

000014

subsidiary; and the development of NuStart Energy Development, LLC , a strategic joint venture in the U.S.

Christian Nadal replaced me as President of EDFINA in June 2004. His job responsibilities are the same as those I had for four years, less the day-to-day management of the Project. Mr. Nadal, however, is being paid a salary of $271,163, 60% more than I was paid for performing the same role. Mr. Nadal does not have educational background, training or experience in nuclear energy, or the energy generation field. Mr. Nadal has been with the Company since 1988 in various roles in the corporate strategy and communications. Prior to joining EDF, he held various positions with state and local boards and agencies.

I am an engineer and have been in the nuclear energy field for over 24 years. From 1994 to 2000, I managed a nuclear power plant in Penly, France. I am the first women in the world to have overall operational responsibility for a nuclear plant. Prior to that, I managed a coal fire power plant and held numerous engineering and management roles in the core area of the Company's business. I hold a Master's of Science in Engineering, Energy and Economy and an Executive MBA. In 2001, I was awarded the Chevalier de l'Ordre National du Merite, the highest national award given by the president of France.

Although I performed the same (if not greater) work as President of EDFINA than the work being performed by Mr. Nadal, and although the position requires equal skill, effort, and responsibility under similar working conditions, I was paid significantly less in salary than Mr. Nadal is currently paid as President.

## SUMMARY

To summarize, since the time of my demotion in June 2004 and the arrival of my replacement as President of EDFINA, I have been the target of discriminatory treatment because I am a woman. I was paid over 60% less in salary than the salary paid to my male successor for the same work, although I have far more experience in the energy field. Moreover, since complaining about discrimination in June 2004, I have been subjected to repeated harassment and intimidation, discrimination and retaliation, including loss of my functional role and authority within the Company, loss of promised promotion and threatened termination, all in violation of Title VII of the Civil Rights Act, as amended.

4. The names, addresses and telephone numbers of witness:

Washington DC:
Mr. Christian Nadal, President EDFINA

000015

9

Mr. Benoit Dreux, VP EDFINA
Mr. Jean Luc Foret, Manager, EDFINA
Ms. Mame Ba, legislative analyst, EDFINA
Mr. Alexandre Audiee, market analyst, EDFINA

Address: 1730 Rhode Island Ave., NW
        Suite 509
        Washington, DC
        (202) 429-2527

France:
Mr. Gerard Creuzet, COO, EDF
Mr. Yann Laroche, VP Human Resources, EDF
Mr. Fernando Ponasso, Chairman EDFINA and President EDF Americas

Address: 22-30 Avenue de Wagram
        75008 PARIS
        FRANCE
        Tel (33) 1 40 42 22 22

5. No other charges have been filed by me.

6. Alternate Contact:     Kathryn T. Harris
                         Resolution Law Group, plc
                         1749 Old Meadow Rd.
                         Suite 300
                         1749 Old Meadow Rd.
                         McLean, VA. 22102

I declare under penalty of perjury that the foregoing is true and correct.

Amended charge
Executed on August 6, 2004

_Catherine Gaujacq_
Catherine Gaujacq

 *The Resolution Law Group, plc*

 EXHIBIT 3

October 11, 2004

**VIA FACSIMLE (202-419-0739)**

U.S. Equal Employment Opportunity Commission
1801 L Street, N.W.
Suite 100
Washington, D.C. 20507
Attention: Hyacinth Clarke, Federal Investigator

> Re:   Catherine Gaujacq v. EDFINA, et al.
>       EEOC Charge No. 100-2004-00776

Dear Ms. Clarke:

The following is submitted in further support of the referenced EEOC Charge No. 100-2004-00776. The information in this supplemental submission is provided as additional or new evidence of:

- Further intentional retaliatory actions taken against Ms. Gaujacq by her employer, EDFINA/EDF (hereafter collectively "Company") after the filing of her written charge with the EEOC; and

- Relevant demographic and corporate data concerning the Employer.

I.   Additional Evidence of Retaliation under title VII and the EPA.

As a direct result of filing of a charge with the EEOC on July 30, 2004, as amended on August 6, 2004, the Company's retaliation against Ms. Gaujacq has increased, resulting in significant adverse impact to the terms of her employment, her professional reputation and standing, and her long term career prospects at the Company.

> A.   Discriminatory Actions Against Ms. Gaujacq
>      because a Charge was Filed.

Between July 28 and July 30, 2004, following the Company's refusal to sign her revised expatriation contract and to extend her mission in the U.S. for another three years, as agreed by Gerard Creuzet in March

*1749 Old Meadow Road*
*Suite 300*
*McLean, Virginia 22102*

tel: *703.760.4000*

fax: *703.748.3121*

*www.resolutionlaw.com*

Oct 14 04 12:31p     Resolution Law Group plc     (703)_689-0874          p.3

Ms. Hyacinth Clarke
October 11, 2004
Page 2 of 8

2004,[1] Ms. Gaujacq made numerous attempts to work out a solution with
executives of EDF to address her situation and to avoid filing a charge
with the EEOC. Ms Gaujacq had in fact refrained from filing a charge
with this agency until July 30th, the last day under her contract, because
the Company had for weeks asked her not to file a charge on the pretense
that the Company was working to address the matter internally.[2] Yet, it
was not until the 30th that the Company made any overture to meet with
Ms. Gaujacq concerning her claims.

On July 30th, Ms. Gaujacq received a phone call from Igor Czerny,
the international representative to the Chairman of EDF. Mr. Czerny
proposed that Ms. Gaujacq travel to France in the next 15 days to meet
with Gerard Creuzet, Yann Laroche and Bruno Lescouer to work out a
solution, and to have a personal interview with the Chairman. However,
Mr. Czerny made it clear that this proposal was only good if no claim is
filed with the EEOC. Ms. Gaujacq informed Mr. Czerny that she did not
know if the charge had been filed and that she needed to call him back.
Later that day, Ms. Gaujacq called Mr. Czerny and told him she was ready
to come to France immediately to work out a solution, including
negotiating the terms of her departure from the Company. She explained

---

[1] By Letter dated July 27, 2004, Gerard Creuzet of EDF notified Ms. Gaujacq
that she had been removed from her position on the U.S. nuclear energy joint venture
project "Project"). *See* Tab 1. This action was in direct contradiction to Mr. Creuzet's
earlier written acknowledgement of the Company's agreement to a three-year extension
to Ms. Gaujacq's mission as head of the Project. *See* Tab 2. It also was in direct
contradiction to the verbal confirmation of Fernando Ponasso, Chairman of EDFINA, to
Ms. Gaujacq, only hours earlier, that a letter had been prepared extending her mission.
This action, giving notice of a transfer upon three days notice, is in direct violation of the
terms of her employment pursuant to her expatriation contract – which requires no less
than six (6) months prior notice of transfer. It is clear that the Company's termination of
Ms. Gaujacq's position as Vice President of EDFINA was taken in direct retaliation for
her complaints to the Company regarding her supervisor's discriminatory actions and her
notice to them that absent the intervention and assistance she requested, she would have
no recourse but to file a charge with the EEOC to prevent further wrongdoing.

[2] On July 28, still reeling from the actions taken by the Company, Ms. Gaujacq
sent an email to Francois Metais, the EDF HR executive that Mr. Creuzet told her to
contact regarding her situation. *See* Tab 3. Ms. Gaujacq expressed her shock and dismay
over the retaliatory actions of the Company. In light of Company's threats that her career
in the Company would be over if she filed a charge, threats that were materializing more
and more each day, she advised Mr. Metais that she was prepared to refrain from filing a
charge against the Company if the Company agreed to a written severance agreement
setting forth the terms of her departure.

12110 Sunset Hills Rd., Suite 160          (703) 760-4000/689-0845 (O)
Reston, Virginia                            (703) 689-0874 (F)

Ms. Hyacinth Clarke
October 11, 2004
Page 3 of 8

that the charge had already been filed on her behalf. She reiterated that
she would of course act in the best interest of the Company at all times,
but that there was no reason to withdraw her charge at that time.

On July 31, after hearing nothing from the Company, Ms. Gaujacq
forwarded an email to Mr. Czerny confirming that she was ready to find
an internal solution to resolve her situation in the next 15 days, that she
would act in the best interests of the Company, and would withdraw the
charge as soon as an agreement was reached. *See* Tab 4. Mr. Czerny sent
a short email response to her on August 3, 2004, indicating no meeting
was now possible because Ms. Gaujacq had filed the charge. *See* Tab 5.

While the July 27th letter from Gerard Creuzet indicated that Ms.
Gaujacq was to have three months to arrange for the orderly transition of
her files and duties in the U.S., Christian Nadal prevented her from
effectuating this transition. In an email dated August 5, 2004, Mr. Nadal
advised Ms. Gaujacq that since her mission ended as of August 1st, he had
selected an engineer in France to assume her responsibilities on the
nuclear energy project and that he expected her to transition her files and
duties no later than August 31st. *See* Tab 6. Ms Gaujacq was previously
scheduled to participate in meetings and conference calls with business
partners during August and September. In light of Mr. Nadal's email, she
planned to personally advise her business partners and professional
colleagues with whom she had worked in her role as President of EDFINA
of her pending transition during the scheduled meetings in August.

On August 19, 2004, however, she learned from several members
of the managing committee for the Project that Mr. Nadal, without
notifying Ms. Gaujacq, had called them on the evening of August 18th and
abruptly informed them that Ms. Gaujacq was no longer representing the
Company, that she was not to be involved in the conference call scheduled
for the next morning and demanded that the call in number for the call be
changed so that she could not participate. She notified the Company of
these actions by email dated August 20, 2004. *See* Tab 7. As a result of
Mr. Nadal's completely unprofessional, unjustified and targeted actions,
Ms. Gaujacq was personally and professionally embarrassed and
humiliated, and prevented from transitioning her role in a way that

Ms. Hyacinth Clarke
October 11, 2004
Page 4 of 8

maintained her reputation and dignity within the Company and with its
business partners.[3]

      B.    The Company's Last Minute Transfer Constitutes a
             Demotion and Was Clearly Punitive and Retaliatory

The Company gave Ms. Gaujacq only three days notice of her
removal from her position as Vice President of EDFINA and her return to
France. Not only was the notice insufficient pursuant to her contract, and
contrary to the practices of the Company, but the Company advised that it
was returning her to a yet undetermined position that would be proposed
to her by November 1, 2004. See Tab 1. In other words, there was no
position planned for her; she was essentially in limbo.

In the beginning of September, following several inquiries by Ms.
Gaujacq about the details of her new mission, the Company only provided
her with certain of the financial terms of her position and of her more than
vague new title – "Chargée de mission auprès du Directeur de la Division
Production Nucléaire de la Branche Energies" (Advisor reporting to the
Director of the Nuclear Generation Division of the Energy Branch of
EDF). See Tab 9. No information was provided as to the nature and
scope of her new role.

Ms. Gaujacq again contacted Bruno Lescoeur on September 10,
2004, and again asked for specific details concerning the new position she
was to assume within the Energy Branch of the Company. See Tab 10. It
was not until October 1, 2004 that the Company notified her of the details
of her new mission when it faxed her a letter dated September 24th from
Laurent Stricker, the Director of EDF Nuclear Generation, and the person

---

[3] On or about August 9, when Ms. Gaujacq was in Florida on business to speak at an
energy conference on behalf of the Company, she learned that Christian Nadal had cut off
her business credit cards, forcing her to use her own funds for hotel and other business
expenses and causing her undue humiliation and embarrassment. These actions were
taken notwithstanding assurances by the Company that during the "transition" period, she
would continue to receive the same benefits of the compensation arrangement she had
during her U.S. assignment. On August 14, 2004, Ms. Gaujacq notified EDFINA's
Chairman of the Company's failure to pay her expenses. See Tab 8. Despite her regular
requests, and despite an email from EDFINA's Chairman, dated August 26, 2004, stating
that EDFINA informed him that her expenses were paid and "everything is in order, I
guess", these expenses, as well as some benefits (including insurance premiums and
utility expenses) totaling over $2500.00 have never been paid to this day. See Tab 8.

Ms. Hyacinth Clarke
October 11, 2004
Page 5 of 8

to whom she would report. *See* Tab 11. The letter made it patently clear
that the position proposed to Ms. Gaujacq constituted a demotion.

The Company was assigning her to an advisory role developing
"experience feed-back" analysis for a proposed EPR nuclear project, a
project slated for development in 2015 at the earliest. The new position is
at a level of responsibility significantly lower than the last three positions
she held in the EDF Group. This is evident by simply comparing the
position described in the September 24, 2004 mission letter with the
mission letter for her mission from 2000 to 2004, and the mission letter
she prepared for her mission in the U.S. from 2004 to 2007. The real
message from such an assignment is more than clear -- Ms. Gaujacq has
been removed from management positions of responsibility and her career
track is doomed.

Unlike her role as President of EDFINA, or even her role as Vice
President of EDFINA and Manager of the NuStart Project, where she had
responsibility for a separate P & L, for asset management and capital
investments, and had a technical and administrative staff reporting to her,
the new position involves supervising studies for a project that has no
partners, is not financed and has no definite long-term prospects – possibly
never materializing at all. In fact, in this position, Ms. Gaujacq would
report to an individual who was her former boss before she was promoted
to President of EDFINA in 2000.[4]

Furthermore, while in January 2004, Ms. Gaujacq had been
promised that upon her return to France she would occupy an executive
management position of higher responsibility and would be given a pay
raise, no pay raise was offered to her in this new position. In fact the total
compensation and benefits of this new position are significantly less than
that paid to Ms. Gaujacq in her last positions. In contrast to this transfer,
at no time in her twenty-four years of excellent and devoted service to the
Company has Ms. Gaujacq been offered anything other than clearly
defined missions, with ever increasing responsibilities and with
commensurate increases in pay.

---

[4] The punitive nature of this demotion is further highlighted by the fact that in 2002,
before being reappointed as President of EDFINA, Ms. Gaujacq had been offered a job in
France, as a peer to Laurent Stricker, running the Engineering Section of EDF, with her
own P&L, with a dedicated staff (Finance and HR) and managing 4000 employees

Ms. Hyacinth Clarke
October 11, 2004
Page 6 of 8

mission, she was provided at least six months to transition to the new job.
The Company then worked closely with her to assist with any necessary
logistics, including locating movers and housing. None of the normal
practices have been followed in connection with the Company's eleventh
hour termination of Ms. Gaujacq as Vice President of EDFINA.

There is no credible business reason for the actions taken by the
Company against Ms Gaujacq. Her return to the position in France has
no economic justification. The facts clearly show that the management of
the Company refused to intervene and promptly address the discriminatory
and intimidating actions of Mr. Christian Nadal against Ms. Gaujacq,
forcing her to file a charge with this agency. Instead of taking corrective
measures - measures that Ms. Gaujacq proposed early on - the Company
punished her. It followed through on its threat that Ms. Gaujacq's career
would be over if she filed a charge with the EEOC by transferring her to a
support position that has no certain mission or future, and of a lower level
of responsibility and pay. To make matters worse, Mr. Nadal's refusal to
permit an orderly transition of her role and of the EDFINA business she
ran for four years has harmed her reputation and effectively placed her on
administrative leave. This has further cast a shadow over Ms Gaujacq
within the organization.

II.    EDF, EDFINA and EDF affiliates in the United States.

EDFINA is a wholly owned subsidiary of EDF, one of the largest
energy generation, transmission and distribution company's in the world.
EDF has more than 30 million customers in France and more than 15
million customers outside France. The EDF Group, made up of
subsidiaries and affiliate companies employs more than 170,000 people
worldwide and has gross annual revenues equivalent to more than $45
billion (U.S.). Since 1989, EDF has developed an international policy
leading to offices throughout the world, including the establishment of a
number of subsidiaries in several countries.

In the U.S., EDF has three wholly owned subsidiaries, EDFINA,
Easenergy, Inc. and International Energy Services, Inc. It also owns 50%
or more of two other U.S. affiliate companies, enXco, Inc. (50% owned
with 200 U.S. employees) and Dalkia International USA, Inc. (58% owned
with eight U.S. employees). EDFINA has 15 employees, with four
officers appointed from EDF management. Easenergy, Inc. has 13
employees with two officers appointed from EDF. International Energy

Oct. 14 04 12:32p     Resolution Law Group plc     (703) 689-0874     p.8

Ms Hyacinth Clarke
October 11, 2004
Page 7 of 8

Services, Inc. has eight employees. With respect to the EDF subsidiaries,
most if not all of their funding and administrative support is provided by
EDF, and their French expatriate employees are on the EDF payroll. All
EDF subsidiaries and affiliates are highly dependent on EDF, such that all
business transactions are subject to approval and sign off by EDF.

EDFINA acts solely as a liaison office for EDF in the U.S.
EDFINA does not have its own P&L and has never made a profit. Rather,
its sole function is to deliver consulting and lobbying services to EDF
companies worldwide. All EDFINA operating expenses, including
employee salaries and benefits, are paid by EDF each month via wire
transfer. EDF determines EDFINA's annual strategic plan, and all
decisions relating to EDFINA's mission are made by the EDF
Management Committee in France. In addition, all financial,
administrative and human resources support is provided by EDF. With
exception of the two U.S. nationals employed at EDFINA, EDF
management makes the final decision regarding career opportunities,
transfers, compensation and bonus payments of the EDFINA employees
All board members of EDFINA are EDF executives.

*[handwritten: EDF makes all decisions]*

As the liaison office of EDF, EDFINA sits on the board of every
EDF subsidiary and affiliate in the U.S. It also organizes a yearly meeting
of the U.S. subsidiaries and affiliates to insure that all company policies
are in conformance with EDF's strategic plan and policies, and it provides
consulting services to them in the U.S. in their field of operations.

The overlapping relationships between EDF and its U.S.
subsidiaries and affiliates, and the control exercised by EDF over these
entities is substantial. The subsidiaries are not operating as independent
small companies. EDF and its subsidiaries essentially act as one company
with common management, centralized control of human resource
functions, common procedures, policies and interconnected operations.
There is sufficient interrelatedness of operations to view the companies as
an integrated enterprise for purposes of this matter

Respectfully submitted,

Kathryn Harris
Resolution Law Group, plc

12110 Sunset Hills Rd., Suite 160          (703) 760-4000/689-0845 (O)
Reston Virginia                            (703) 689-0874 (F)

Oct. 14 04 12:33p        Resolution Law Group plc        (703)_689-0874        p.9

FROM : GAUJACQ CATHERINE PHILIPPE        FAX NO. : 7034339755        Oct. 12 2004 08:53AM P1

Ms Hyacinth Clarke
October 11, 2004
Page 8 of 8

I declare under penalty of perjury that the foregoing is true and correct.

Supplemental Submission
Executed on October 11, 2004

Catherine Gaujacq



November 24, 2004

VIA FACSIMLE (202-419-0739)

U.S. Equal Employment Opportunity Commission
1801 L Street, N.W.
Suite 100
Washington, D.C. 20507
Attention: Hyacinth Clarke, Federal Investigator

<div style="text-align:right">
2004 NOV 24 P 5: 03
1400 L ST NW
WASHINGTON D.C. 20005
EEOC
WASHINGTON FIELD OFFICE
</div>

   Re: Catherine Gaujacq v. EDFINA, et al
     EEOC Charge No. 100-2004-00776

Dear Ms. Clarke:

The Charging Party, Catherine Gaujacq, submits the following additional information in rebuttal to the affirmative defenses of Respondents EDFINA, EDF and Christian Nadal, as identified in the summary of Respondents' position statement provided by your office. This additional information is submitted solely to assist the EEOC in its investigation of the charge. Given the affirmative defenses raised by Respondents in this matter, Charging Party reserves the right to amend its position or raise additional arguments at a later time. Accordingly, Charging Party respectfully requests that this submission not be provided to Respondents; the EEOC may provide a summary of this submission to Respondents and their counsel.

As set forth in the EEOC summary of Respondents' position statement, respondents raise several affirmative defenses to Charging Party's claims for discrimination, violation of the EPA and related retaliation. Charging Party addresses the issues presented by the defenses alleged in the order identified in the EEOC's summary of Respondents' position.

<div style="text-align:left; font-style:italic">
12110 Sunset Hills Road
Suite 160
Reston Virginia 20190

tel: 703.760.1000

fax: 703.689.0874

www.resolutionlaw.com
</div>

I. **Whether EDF is immune from suit under the Foreign Sovereign Immunities Act.**

   **Answer: No**

   A. *EDF is Not a Public Governmental Agency of France, but a State Owned Multinational Company whose Operations and Mission are Uniquely Commercial.*

    By definition EDF is an instrumentality of the Government of France. *See Colonial Bank v. Compagnie Generale Maritime et*

*Financiere*, 645 F. Supp. 1457, 1460 (S.D. NY 1986); 1986 U.S. Dist.
LEXIS 19078 (Oct. 1986) (A "foreign state," as defined in the Foreign
Sovereign Immunities Act of 1976, includes an agency or
instrumentality of a foreign state, 28 U.S.C. § 1603(a), which is any
entity a majority of whose shares or other ownership interest is owned
by a foreign state or political subdivision thereof. 28 U.S.C. §
1603(b)(2)).

However, contrary to the claims of Respondents, EDF is not a
public agency of France and does not serve a governmental function.
EDF has no monopoly in the power generation market in France. It is
not a regulatory body. In fact, regulation of the French electricity and
gas markets is the responsibility of the Commission de Regulation de
L'energie (CRE), whose mission is similar to that of FERC and the PUC
in the U.S. *See* the CRE website at http://www.cre.fr.

EDF is an integrated industrial and commercial energy company
made up of a network of different companies. [1]  While currently
government owned like many companies in France, it is, and has always
been engaged in uniquely commercial activities focused on energy
generation, distribution and sale throughout the world for profit. In fact,
EDF was privatized pursuant to a French law passed in August 2004 that
became effective November 2004. In the next year, EDF will seek
capital market financing through an initial public offering of stock. *See
Wall Street Journal Article,* dated November 19, 200, attached as
**Exhibit A.**  Like other private companies, EDF has a Board of Directors
that manages the direction of the company, it issues annual company
reports and financial statements, has shareholders, can issue dividends,
and has applied for U.S. trademark[2] protection. *See* EDF 2003 Annual
Report, which can be viewed at
http://www.edf.fr/index.php4?coe_i_id=20405 or downloaded at
http://www.edf.fr/download.php4?coe_i_id=41645;  Marked-up Draft of
EDF's Application for Trademark in the United States, attached as
**Exhibit B.**  The company had €44.9 billion in consolidated sales and
made €857 million in net operating profit in 2003. *See* EDF 2003
Financial Statement; English version available at
http://www.edf.fr/download.php4?coe_i_id=41565.  It employs over
167,000 employees worldwide and has a global sales and marketing
force.

---

[1]  The 1946 French law cited by Respondents in their position statement at the following URL:
http://www.industrie.gouv.fr/energie/anglais/ang_loi_elec.htm, and subsequent amendments thereto,
govern the regulation of the electricity and gas markets in France and authorizes French Electricity and
Gas companies to have access to the capital markets through public offerings of stock. This law has
nothing to do with the employment laws that govern the relationship between EDF and its employees.

[2]  A draft version of EDF's trademark application in the United States includes classifications for
protection in clearly commercial areas of operation.

EDF is indistinguishable both internally and externally from a commercial entity, and in its 2003 annual report describes its corporate vision as follows:

> "As one of the *world's leading electricity company[sic]*, the EDF Group has geared itself for success by building synergies in its core European market. We are concentrating on five priority countries: France, the UK, Germany, Italy and Spain. **Our strategy** centred [sic] on *core businesses* gives us staying power and a decisive *competitive edge*. To meet customer needs, we also expect to be a major player in the *European gas market*. **Our staff** of highly qualified professionals are committed to values of excellence, responsibility and innovation. They are the key actors in our *drive to succeed in increasingly competitive markets*." (emphasis supplied)

EDF operates as a competitor with other power generation companies to supply electricity to French industrial and commercial customers and to the world.[3]  It competes for 70% of the French electricity market that is open to competition, and over 40% of EDF's sales come from business activities outside France.  *See* EDF 2003 Annual Report.  Unlike a government agency, EDF owns shares of publicly traded companies and invests in private companies in various countries, providing equity and technical resources to accelerate market presence and growth for entrepreneurial ventures.  *See websites for EDF Affiliates at* www.enXco.com *and* www.easenergy.com  Unlike a government agency, EDF competes both in France and throughout the world with investor owned companies in the gas and electricity industry.  While French law previously restricted EDF to the sale of electricity within the French market, those laws did not restrict EDF's presence and commercial operations in other parts of the world.  In fact, EDF has been engaged in energy mining and trading activities in the US since early 1990.

In Europe, EDF's competitors include companies such as Endesa, E.On, ENEL, Suez, RWE, Gas de France (GDF), and others.  *See* EDF 2003 Annual Report.  Indeed, in the last three years, EDF, through its wholly owned subsidiary, EDF Trading, has become the leading trader in Europe of gas, coal and oil.  Like other commercial

---

[3] EDF's legal status in France was a public industrial and commercial entity, which limited the company to the sale of electricity in France. However, due to recent statutory changes, EDF can now offer its French customers the full range of energy offerings and services. See EDF 2003 Annual Report, Statement of Chairman, which can be viewed in English at www.edf.fr/html/ra_2003/uk/pdf/edf_ra2003_full_va.pdf.

enterprises, EDF enters into joint ventures and strategic partner arrangements with private companies in the energy field to expand its service offerings to its customer base. *See* EDF 2003 Annual Report. And EDF pays state and local taxes just like any other private company in France that is engaged in commercial activity (income tax, property tax and local taxes.)

B     *EDF is engaged in Commercial Activity for Purposes of the Exception to Immunity under the FSIA.*

Commercial activity is defined in the Foreign Sovereign Immunities Act, 28 U.S.C.S. § 1602 et seq., as a regular course of commercial conduct or a particular commercial transaction or act. 28 U.S.C. § 1602(d). In making this determination, a relevant inquiry is whether the specific act under consideration is of the type in which private parties normally engage. *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 149-50 (2d Cir. 1991); *aff'd*, 504 U.S. 607, 119 L. Ed. 2d 394, 112 S. Ct. 2160 (1992); *Rajaa Al Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations*, 111 F. Supp. 2d 457, 462 (D.C.S.D.N.Y.)

It is difficult to conceive how EDF can argue that it is a purely governmental agency not engaged in commercial activities. By the company's own admission on its website, in its annual report and in press releases, its activities as an entity are uniquely commercial in nature. As for the acts under consideration before the EEOC - EDF's employment of Ms. Gaujacq to run EDFINA's operations in the U.S. -- her employment constitutes commercial activity under the exceptions to FSIA immunity.

C.     *Ms. Gaujacq is not a Civil Servant of France*

Respondents incredibly claim that Ms. Gaujacq's employment is governmental in nature and that she was essentially operating as a civil servant of France. They make this claim in an attempt to find protection from suit under the line of cases that hold that the employment of civil servants is noncommercial for purposes of the restrictive immunity under the FSIA. *See Broadbent*, 628 F.2d at 34-36. The facts do not support this claim.

1.     *French Statutes do not Recognize EDF Employees as French Civil Servants*

Employees of EDF, along with the employees of all other companies in the electricity and gas industry in France are subject to a specific collective bargaining agreement which is memorialized in the

"Statut National du Personnel des industries Electriques et Gazières".
*See* http://www.industrie.gouv.fr/energie/electric/statut/sommaire.htm
This statute is similar in nature and scope to the collective bargaining
agreements of employees of investor owned companies in other
industries in France (water industry, airline industry). It does not relate
to and is completely separate from the French statutes that govern
French Government civil servants known as "Statut de la Fonction
Publique". This statute can be viewed at http://www.fonction-
publique.gouv.fr/fp/statut/statut_index.htm; http://www.fonction-
publique.gouv.fr/fp/statut/statut_particulier/statut_particulier_index.htm
*And* http://vosdroits.service-public.fr/particuliers/F431.html .

The French Government web portal for French Civil Servants
describes the categories of civil servants employed by France. *See*
http://vosdroits.service-public.fr/particuliers/F431.html. This website
clearly defines three civil service categories, each with its own rules: 1)
civil servants from the State, which includes civil servants who work in
the Department of State, in an administrative public establishment
dependant on the State and the Postal Service; 2) local civil servants,
which includes civil servants who work in a department of a county, and
in an establishment that depends on a County; and 3) hospital civil
servants. The employment of these civil servants is financed as part of
the State or County budget respectively. EDF's employees are paid
from the revenues generated by EDF's industrial and commercial
operations. Employment disputes of Government civil servants fall
under the exclusive jurisdiction of the administrative courts for civil
servants under the Statut de la Fonction Publique. In contrast,
employment disputes of state owned industrial and commercial entities
in France, including EDF principally fall under the jurisdiction of the
French private court known as the Conseil des Prud'hommes. It is most
critical to point out that the French Government website specifically
states that personnel of national companies that have a public service
mission in France (EDF, GDF, etc) are **not civil servants**, but are
governed by their own rules. *Id.* France's own laws make it clear that
employees of EDF are not civil servants.

> 2. *Ms. Gaujacq's Position and Duties are not like those of*
> *Government Functionaries or Civil Servants*

In her role as President of EDFINA Ms. Gaujacq was responsible
for the executive management of EDFINA, directing all the business
activities of the Company. This included, but was not limited to (1)
hiring and firing clerical, marketing, accounting and technical staff, (2)
retaining and coordinating the work of outside contractors and
consultants who were supplying services to EDFINA (such as an outside
accountant and lawyer), (3) negotiating and coordinating contracts with

vendors, subcontractors and business partners in connection with EDFINA's delivery of engineering, technical and other services to EDF customers in the U.S., (4) working in close collaboration with leaders of U.S. electrical utilities for the purpose of building and strengthening ties between the U.S. and French energy industries, and undertaking collaborative research and development projects at a highly advanced level. Examples of her latter responsibility include Ms. Gaujacq's successful negotiation and development of a new nuclear energy initiative in the U.S. through the NuStart Energy Development ("NuStart") strategic joint venture. NuStart is a consortium of energy companies in the U.S. (including EDFINA) that, through funding provided by the U.S. Department of Energy, will advise the DOE on new nuclear power plant designs and technologies for future plants and will seek a license to build and operate such plants in the U.S. *See* NuStart Press Release, attached as Exhibit C; EDF website, www.edf.fr. Ms. Gaujacq was also responsible for evaluating and developing proposed EDF acquisitions of other energy focused companies in North America, and she sat on the Board of several U.S. affiliates. [4]

Contrary to Respondent's position statement, Ms. Gaujacq was not performing a governmental or diplomatic liaison role limited to lobbying work on behalf of the French energy industry. She was performing the role of executive officer of a U.S. company that delivered industry specific services to energy and energy related companies in the U.S and Canada. Her efforts in strengthening EDF's ties in the U.S. through her role at EDFINA were not targeted to the U.S. Administration or to federal or state governments, but were directed at energy trade associations, energy research and development institutes and various energy companies in the U.S. such as Southern Company, Exelon, Entergy, and Westinghouse Nuclear. The goal of these efforts was to establish business opportunities for EDF in the U.S. as well as developing joint initiatives with U.S companies on new energy projects.

While in the U.S., Ms. Gaujacq, as well as other French management level employees of EDF/EDFINA and other EDF subsidiaries in the U.S., do not hold diplomatic visas as do French Government civil servants. Rather, they hold L1A visas as multinational managers/Executives, which by definition are issued to individuals engaged in commercial activities. [5] *See* EDFINA's I-129 Petition for L-1 Classification for Ms. Gaujacq and Christian Nadal, attached as

---

[4] Following her demotion to the position of Vice President of EDFINA and Manager of NuStart, Ms. Gaujacq's duties were focused on her efforts to develop and manage the Company's role in the NuStart joint venture, which duties, as described above, were commercial in nature.

[5] Engineers and researchers of EDF who are transferred on assignments at EDFINA hold L1B or H1B visas.

Exhibits **D** and **E**; *and see* http://uscis.gov/graphics/services/visas.htm.
Her title and duties while working at EDFINA make clear that she was
not a civil servant under French law, nor had a job involving activities of
a purely governmental nature. Her job was clearly commercial in focus
and in scope.

        3.    *Ms. Gaujacq's Employment in the U.S. was Governed by*
            *an Expatriation Contract with EDF*

      During her assignment in the U.S., Ms. Gaujacq was an
employee of EDF and of EDFINA. As explained above, her
employment with EDF is governed by the industry specific collective
bargaining agreement provided in the *Statut National du Personnel des
industries Electriques et Gazières*. However, during the period that she
was employed abroad in the U.S. as an executive of EDFINA, the terms
and conditions of Ms. Gaujacq's employment were specifically
governed by a written expatriation contract with EDF. That employment
contract replaced the French collective bargaining agreement of the
*Statut National du Personnel des Industries Electriques et Gazières* for
the duration of the expatriation contract. *See* Gaujacq Expatriation
Contract, attached as **Exhibit F**. The contract addresses the nature and
terms of her assignment, her compensation and fringe benefits such as
lodging, automobile, insurance, etc. Moreover, the contract has a
section that specifically provides that the laws applicable to her
employment are the ones of the country where the workstation of the
employee is located, in her case – Washington, DC. *See* Gaujacq
Expatriation Contract, Article 2 - Legislation applicable, **Exhibit F**.

      By its terms, Ms Gaujacq's expatriation contract is essentially an
executive employment agreement. It is exactly the type of agreement
that private parties routinely enter into. It is clear her employment
activity with EDF/EDFINA is commercial and not governmental in
nature, and comes within the commercial activity exception to the FSIA.

D.    *EDF/EDFINA Have Waived Immunity under the FSIA*

      The FSIA provides, in pertinent part, that a foreign state shall not
be immune from the jurisdiction of courts of the United States or of the
States in any case ... in which the foreign state has waived its immunity
either explicitly or by implication. 28 U.S.C. § 1605 (a)(1). The
legislative history of the FSIA gives three examples of cases in which
courts have found implied waivers: (1) a foreign state has agreed to
arbitration in another country; (2) a foreign state has agreed that a
contract is governed by the law of a particular country; and (3) a foreign
state has filed a responsive pleading in a case without raising the defense
of sovereign immunity.

The expatriation contract entered into by EDF and Ms. Gaujacq has a governing law provision that expressly provides that all maters relating to the performance of her job at EDFINA shall be governed by the laws of the applicable place of work. EDF, by contract, agreed that the laws of the District of Columbia and the United States will govern the terms of her employment while performing her role at EDFINA. Accordingly, not only has EDF and EDFINA waived immunity from suit in the U.S. based on their commercial activity in the U.S., they have also waived immunity from suit by the express terms of its contract with Ms. Gaujacq. *See Lafarge Can., Inc. v. Bank of China,* 2000 U.S. Dist. LEXIS 14253 (D.N.Y., September 27, 2000, Decided)

II.     **Whether EDFINA is Immune From Suit Under the Foreign Sovereign Immunities Act.**

    Answer:     NO

    A.     *EDFINA is a U.S. Corporation, Subject to U.S. law and therefore the FSIA Does Not Apply*

The summary of Respondent's position statement is unclear as to whether Respondents seek immunity from suit under the FSIA for EDFINA, EDF's wholly owned subsidiary. However, immunity from suit under the FSIA is not available for EDFINA. EDFINA is a corporation incorporated under the laws of the District of Columbia. *See Articles of Incorporation for EDFINA,* attached as **Exhibit G** (which establish EDFINA was organized to perform commercial activities as any private entity). As such, it is a citizen of the United States and subject to all applicable laws in the U.S. as well as to suit in state and federal courts.

To the extent that EDF claims that EDFINA is nothing more than a branch office of EDF (a mere instrumentality of EDF), for the reasons previously stated, any claimed immunity has been waived by contract and by the fact that EDF and EDFINA's activities generally, and for this particular matter, constitute commercial activities under the FSIA.

III.     **Whether EDF and EDFINA are properly subject to claims under Title VII and the EPA**

    Answer: Yes

    A.     *EDFINA Employs the Minimum Number of Employees for a Claim under Title VII*

Ms. Gaujacq asserts that EDFINA's employee listing for August 2004 evidences that EDFINA employs 15 employees at its various offices in the United States. *See August 2004 Employee List,* attached as **Exhibit H**

B.    *EDF and EDFINA comprise an Integrated Enterprise - the EEOC Must Consider the Employees of EDF and EDFINA Together In This Case*

Whether EDFINA has 15 employees on the EDFINA payroll, however, is not dispositive because under the facts presented (and by EDF's own admission), EDF and EDFINA are an integrated enterprise and therefore considered as a single employer for purposes of evaluating Ms. Gaujacq's Title VII and retaliation claims.[6] *See, E.E.O.C. v. St. Francis Xavier Parochial School,* 928 F. Supp. 29, 33 (D.D.C. 1996). As set forth in Charging Parties' October 8, 2004 Supplemental Submission, EDF and EDFINA have interrelated operations, centralized control of labor relations and human resources functions, common, overlapping management and common financial control. In addition, the facts also support the conclusion that EDFINA is an instrumentality of EDF such that EDF should be considered the employer for purposes of Ms. Gaujacq's claims. *See*

1. *Interrelated Operations and EDF Financial Control*

The parties agree that while EDFINA engages in commercial activity throughout the U.S., it does so on behalf of EDF. Indeed EDFINA's business cards and letterhead are captioned with the EDF logo, advertising a unified image to the public. *See* EDF Business Letterhead, attached as **Exhibit I.** EDFINA employees, which include executives, engineers and other staff, are principally assigned to carry out or to support consulting and engineering related contracts that EDF enters with energy companies in the U.S. Some examples of this are EPRI Solutions, Inc., Westinghouse Corporation and Southern Nuclear. EDFINA's delivery of services for EDF resulted in over $6 million of annual revenue for the Company. The remainder of the project work performed by EDFINA staff, such as the work with NuStart and EPRI, is pursuant to contracts entered by EDFINA directly with those U.S. entities.

---

[6] As DC is a deferral jurisdiction, the filing with the EEOC constitutes a filing with the District of Columbia Office of Human Rights for violations of the District if Columbia Human Rights Act. That statute provides relief to employees employed by DC employers with two or more employees, who are subjected to, *inter alia,* discrimination and retaliation.

Although a separate corporate entity, EDFINA's operations (like those of other EDF subsidiaries) are funded by EDF through annual budget allocations that are ultimately determined by EDF. Although EDFINA can recommend initial budget amounts and request additional budget allocations to support projects on which EDFINA employees are working, it is the parent company that determines the annual budget for EDFINA. As to those EDF contracts that EDFINA employees perform, EDF is paid the compensation for the services rendered by EDFINA in the U.S. For those contracts entered into by EDFINA with U.S. customers and partners directly, EDF requires EDFINA to be paid with "in-kind" compensation, rather than cash. So while the gross volume of business revenue that EDFINA generates for the Company exceeds $6M, through this financial control, EDF insures that EDFINA shows no income for U.S. tax purposes.

EDF and EDFINA have common management in the form of common directors and officers. EDFINA has a three-member board. Its chairman is the Executive Vice President in charge of EDF Branch Americas, and the other two board members are the president of EDFINA and the Legal Counsel for EDF Branch Americas. The President of EDFINA also serves on the Board of other EDF subsidiaries and affiliates along with EDF executives.

### 2   *Integrated Labor Management and HR Functions*

The evidence of significant integration of EDF's and EDFINA's labor management and human resource functions abounds. EDFINA has no human resource staff. Human resource matters are handled by EDFINA's president, with assistance from HR Group in France. At least ten of EDFINA's employees are French nationals who have been sent to the U.S. by EDF on expatriation contracts. Their missions in the U.S. were proposed and ultimately approved by the EDF branch in France for whom they worked prior to their assignment in the U.S. (i.e. – many of the engineers are from EDF Energy Division and EDF R&D Division)

EDF principally uses the same workforce as EDFINA and regularly transfers employees between it and its subsidiary in Washington. While in the U.S., EDFINA French employees' salaries are paid from EDF's payroll and they continue to be covered under EDF's disability insurance plans, and continue to participate in the EDF pension plan.[7] EDF purchases separate global health insurance

---

[7] EDF attempts to equate the national health plan and the pension plan in which EDF and other similar French companies participate with those provided to French Government Civil Servants. As already explained, this argument has no substance. Moreover, pursuant to statute, private U.S. companies pay

coverage for the French employees working abroad that is delivered by various health care providers in the U.S. While EDFINA's president evaluates their job performance and recommends the employees' annual bonus payment, the actual bonus is ultimately decided by the employees' supervisors in the EDF branch from which they were transferred. Local benefits for the expatriate employees, including car, car insurance, liability insurance, housing expense, including rent and repairs, utilities, and vacation expenses of the French employees and their families, are paid by EDFINA with the allocated budget funds provided by EDF. *See* EDFINA 2003 Budget Report, attached as **Exhibit J**.

In addition to the French employees, EDFINA also hires several U.S. employees to provide accounting, administrative and clerical support for the revenue generating activities being performed by the French employees. These employees are on the EDFINA payroll and are provided health and disability insurance coverage, a company sponsored 401(k) and other benefits by EDFINA. The president of EDFINA has authority over the hiring, promotion and firing decisions affecting these employees.

EDF has control over all personnel functions of EDFINA with respect to EDFINA's high level executives, including both Ms. Gaujacq and Mr. Nadal. Career decisions for Ms. Gaujacq and Mr. Nadal, such as transfers and promotions, are determined by the Executive Committee of EDF in France. Annual evaluations are the responsibility of the Chairman of EDFINA, Executive VP of EDF Branch Americas. Issues and concerns of the high level executives of EDFINA regarding their employment are handled by EDF's VP of HR for High Level Executives. Further EDF sets and disseminates the policies that apply to all high level executives of EDF, whether employed by EDF or its subsidiaries.

At all times, EDF retained control of the terms and conditions of employment as well as the conduct of Ms. Gaujacq while employed by EDFINA in the U.S. The facts in this case support a finding that EDF and EDFINA are indeed integrated enterprises for purposes of evaluating Charging Party's claims. *See e.g., Scheidecker v. Arvig Enterprises, Inc.*, 122 F. Supp. 2d 1031, 6 Wage & Hour Cas. 2d (BNA) 999 (D. Minn. 2000); *Johnson v. West Virginia Baking Company*, 814 F 2d 978 at 981; *Armbruster v. Quinn*, 711 F 2d 1332, 1338 (6th Cir. 1983); *Hoffman v. United Telecomm, Inc.*, 575 F. Supp. 1463, 1472-76 (D. Kan. 1983).

---

into the federal social security pension plan for U.S. employees and many provide self funded and insured pension plans.

C.    *EDF and EDFINA Constitute an Enterprise or Joint Employer for Purposes of the EPA and Have Violated the Act*

Under the facts presented, EDF and EDFINA are properly considered a single enterprise or joint employers for purposes of evaluating Ms. Gaujacq's EPA claim under the Fair Labor Standards Act.
*See Equal Pay Act,* 29 U.S.C.A. Sec. 1620 7; *Civil Rights Act of 1964,* § 701(b), as amended, 42 U.S.C.A. § 2000e(b); Scheidecker v. Arvig Enterprises, Inc., 122 F. Supp. 2d 1031, 6 Wage & Hour Cas. 2d (BNA) 999 (D. Minn. 2000). Accordingly, Respondents' claim that Ms. Gaujacq was paid by EDF in France is irrelevant.

Moreover, Respondents' claims that Ms. Gaujacq was not engaged in commerce have been shown as wholly without merit. As to its claim that EDFINA did not have the necessary gross volume of sales required under the EPA, this claim also fails when considering the gross volume of sales generated by EDF and EDFINA as an integrated enterprise.[8] To find otherwise under the facts in this case would permit EDF, a huge multinational company, to take advantage of substantial commercial opportunity and gain in the U.S., yet avoid compliance with U.S. employment and civil rights laws. That is not what Congress intended in enacting the EPA. *See Wirtz v Columbian Mut. Life Ins. Co.* (1965, WD Tenn) 246 F Supp 198, 52 CCH LC P 31727, affd (1967, CA6 Tenn) 380 F2d 903, 55 CCH LC P 31941 (annual gross volume of sales in 29 USCS § 203(s)(3) should be given an interpretation which would carry out intention of Congress that coverage depends on size of business.)

Respondent's claim that Mr. Nadal has more relevant experience than Ms. Gaujacq is false. When Mr. Nadal replaced Ms. Gaujacq as President of EDFINA, he had substantially less experience both at EDF and in the energy industry than Ms. Gaujacq. Contrary to Respondent's assertions, Mr. Nadal was hired by EDF in 1991 as a high level executive. From 1988 to 1991, he was employed by an advertising and communications company that was an affiliate of EDF. He holds no technical or scientific degrees and has no energy expertise. He has no experience in the core energy business of the Company. *See* **Exhibit E** (EDFINA visa petition on behalf of C. Nadal).

In contrast, Ms. Gaujacq joined EDF in 1980 as an executive level engineer in the core energy business. She progressed though the ranks, and in 1994 was promoted to a high level executive with EDF,

---

[8] Due to EDF's financial requirement that EDFINA receive only "in-kind" compensation in exchange for the services it performs pursuant to EDFINA contracts in the U.S., determination of the level of EDFINA's gross volume of sales on such contracts is not readily discernable.

when she became the first woman in the world to manage a nuclear facility. She holds a Masters of Science degree in Energy and Economy. *See* Resume of C. Gaujacq, attached as **Exhibit K**; **Exhibit D** (EDFINA visa petition on behalf of C. Gaujacq).

Contrary to Respondent's claims, Mr. Nadal and Ms. Gaujacq have the exact same employee classification known as "Hors Classe", which applies to EDF's high level executives. This fact is evidenced by both individual's paystubs from EDF. *See* EDF Paystubs for C. Nadal and C. Gaujacq, attached as **Exhibit L**. Contrary to Respondents' claim, the position of president of EDFINA does not report directly to the Chairman of EDF, but rather reports directly to the VP of EDF Americas Branch. Moreover, the compensation decisions for both Mr. Nadal and Ms. Gaujacq are made by EDF's Executive Committee in France, and annual evaluations and bonus decisions are made by the Executive VP of Branch Americas. [9]

Respondents' claim that Ms. Gaujacq's mission as President of EDFINA is not comparable to Mr. Nadal's mission as President is totally false. By the Company's own admission, Mr. Nadal, as president of EDFINA, is performing the exact same job, with the exact same responsibilities that Ms. Gaujacq had before she was replaced by Mr. Nadal and demoted to VP. *See* **Exhibit D and E** (EDFINA visa petition on behalf of Gaujacq and Nadal respectively). Consequently, EDF's decision to pay Mr. Nadal almost 60% more than it paid Ms. Gaujacq for the same position, with the same mission and responsibilities clearly violates the EPA.

D.    *Respondent's Claim that Ms. Gaujacq was reassigned to France due to the expiration of the assignment in the U.S. is pretext*

Charging Party's prior submissions set forth sufficient facts to rebut Respondents' claim that Ms. Gaujacq's reassignment to France was due to the expiration of her U.S. mission. The facts show that Ms. Gaujacq was replaced by Mr. Nadal on June 1, two months before her original mission was set to expire. The facts also show that the Company had agreed to assign Ms. Gaujacq to a new mission in the U.S. to continue her role in the NuStart joint venture project. In fact, the company appointed her as VP of EDFINA, specifically responsible for that project. All indications were that the Company had agreed to her new mission and contract until she complained to EDF about Mr. Nadal's discriminatory and harassing behavior and demanded that EDF

---

[9] Perhaps Respondent's incorrect information regarding the parties' respective experience and level may be due to the fact that this information was not verified by EDF. Respondent's counsel has advised Charging Party's counsel on two occasions after its submission of Respondents' Position Statement that he had not spoken to anyone at EDF regarding this matter.

take steps to ameliorate the problem. When EDF failed to take any
action on her behalf and she advised the Company that she felt
compelled to file a charge in the U S, the Company abruptly, and
without the mandatory six month notice required by EDF's policies,
terminated her mission and reassigned her to a job in France of lesser
responsibility and scope

Respectfully submitted,

Kathryn Harris
Resolution Law Group, plc

I declare under penalty of perjury that the foregoing is true and correct.

Response to Position Statement of EDF/EDFINA and Nadal
Executed on November 23, 2004.

Catherine Gaujacq