## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHERINE GAUJACQ,                )
                                  )
**Plaintiff**                     )
                                  )
v.                                )
                                  )
ELECTRICITE DE FRANCE             )
INTERNATIONAL NORTH               )          Civil Action No. 1:05CV0969
AMERICA, INC.                     )
                                  )
ELECTRICITE DE FRANCE, S.A.       )
                                  )
and                               )
                                  )
CHRISTIAN NADAL                   )
                                  )
**Defendants**                    )

--------------------------------------------------

## REPORT OF JONATHAN WALKER

### Introduction

The Defendants, Electricite De France International North America Inc. ("EDFINA"), Electricite De France, S.A. ("EDF") and Christian Nadal retained me to assess whether Catherine Gaujacq ("Plaintiff") suffered financial damages as a result of the conduct she alleges in her Complaint, and, if so, to quantify such financial damages. They have also asked me to review any financial damages-related analysis proffered by Plaintiff. I assume for purposes of this report that the conduct alleged by Plaintiff occurred although I have no opinion that this assumption is true. I adopt it merely for purposes of analyzing the potential financial impact that the conduct might have. My analysis shows that Plaintiff has not suffered any financial loss as a result of the conduct she alleges.

My qualifications for this task include my training in economics and my experience as an economist. I have a PhD. in economics from the Massachusetts Institute of Technology. Labor economics, that field of economic study concerned with

1

discrimination and with pay setting, was one of my primary fields of specialization. I have been retained on several occasions to analyze issues related to salaries, pay and alleged discrimination. I have worked for plaintiffs and defendants alike. My clients have included individuals, corporations, professional sports leagues, and government agencies.

I am the President and Chief Executive Officer of Economists Incorporated ("EI"). EI employs twenty-eight economists with doctorates in economics and six additional professionals with other advanced degrees working from offices in Washington DC and the San Francisco Bay Area. Defendants are compensating EI for the time I spend on this case at my standard hourly rate of $475. I have attached my curriculum vitae as an exhibit to this report. Therein I discuss my qualifications and experiences in greater detail and list all of the cases in which I have ever testified at deposition or trial.

### Summary of Conclusions

Plaintiff now earns much more with Entergy than she was earning working for EDF. This is consistent with the general tendency for American companies to pay higher executive salaries than French companies.[1] Not only is Plaintiff earning more now that she has left EDF, but there is no reliable economic evidence that Plaintiff was underpaid while she was at EDF either. As a consequence, there is no basis to conclude that Plaintiff suffered any financial damages related to EDF's decision to assign Mr. Nadal as Plaintiff's superior in the EDF reporting structure, to any alleged misconduct by Mr. Nadal, or to any alleged retaliation by the Defendants.

Plaintiff's damages theory rests entirely on her conclusion that she should have been paid as though she were two levels higher in the EDF management hierarchy than she actually was. She claims she should have been paid as though she were an R1, an EDF job classification with approximately 50 members world wide, rather than an R3, an EDF job classification with approximately 350 members world wide. Mr. Nadal was an R1, and his new 2004 assignment overlapped with her prior assignment. According to Plaintiff, this fact implies that she should also have been an R1 retroactive to 2000. Plaintiff's theory makes no economic sense.

---

[1]    See for example, David Reilly, "At Top Levels U.S. Still Leads in Pay-American Executives Earn Nearly 3 Times as Much as European Counterparts," Wall Street Journal, November 24, 2003, and "Who's On Top of the Pay Pile," Management Today, September 1, 2005.

First, pay within a hierarchy such as EDF is affected by rank and prior accomplishments and not just the tasks related to the current job assignment. For example, a GS-12 within the federal government who accepts a new government job will generally be paid more for that job than she would if her prior job had been a GS-10. The same is true within EDF. Base salaries do not typically go down. Mr. Nadal was going to be paid as an R1 in his next assignment regardless of Plaintiff's pay up to that time or her treatment.

Second, it is explicit in the Complaint that Plaintiff was not doing the same thing as Director USA/Canada of the Americas Branch as Mr. Nadal planned to do as General Delegate of EDF for North America.[2] Plaintiff personally attended to the day-to-day management of EDF's participation in a joint venture, NuStart. Mr. Nadal delegated that responsibility to someone else and focused on other activities. Contrary to Plaintiff's mistaken inference that Mr. Nadal delegating day-to-day management of the joint venture to someone else and focusing his attention elsewhere meant that Mr. Nadal's job was *less* than hers, the valid conclusion is that his job was *different* from hers. By demonstrating that Mr. Nadal's job was different, Plaintiff herself shows why Mr. Nadal's pay is irrelevant to her own and why his pay tells nothing about whether her pay was affected by her gender. Moreover, the fact that Mr. Nadal was able to delegate the specific tasks that primarily occupied Plaintiff to someone else suggests further that the job Plaintiff was doing in North America was not the same as the job Mr. Nadal is doing.

Third, it is uncommon at Mr. Nadal's level for successors to be paid the same as their predecessors. Senior executives are distinguishable from each other in terms of expected performance and bargaining power. For reasons demonstrably unrelated to sex, executives at the highest levels do not generally earn the same pay as their predecessors. As a consequence, even if the jobs were comparable, it would not follow that Mr. Nadal's predecessor must have been discriminated against if his pay exceeded hers.

Fourth, time matters. Salaries change. Plaintiff signed her contract setting her pay in 2000. Mr. Nadal negotiated his pay in 2004. Not only may expected job requirements change for a given position, but also the skills required to perform a fixed set of activities may change, thereby prompting a change in pay for the same job responsibilities. Of

---

[2]    C. Gaujacq Appointment (EDF 004683) and C. Nadal Appointment (EDF 000685).

course, inflation may affect pay even if job requirements and inflation-adjusted salaries stay the same.

There is further evidence tending to show that Plaintiff's pay was unaffected by her sex and that one would expect Mr. Nadal to earn more than her. Plaintiff herself never asserted or complained to EDF that she was underpaid or misclassified within the EDF hierarchy prior to filing a discrimination claim. Plaintiff has never asserted or complained that any of her supervisors before 2004 limited her advancement in any way. To the contrary, Plaintiff agreed that her career advancement was noteworthy,[3] and she earned achievements at EDF that no other woman in the world had achieved with any other energy company.[4]

Plaintiff retained Neil Demchick, a CPA, to estimate her financial damages. Mr. Demchick's analysis is irreparably flawed. As a threshold matter, all of his analysis assumes that Plaintiff would have been paid from 2000 forward as though she were an R1 but for sex discrimination. As discussed above, the assumption is invalid that Mr. Nadal's pay is a reasonable proxy for Plaintiff's nondiscriminatory pay as General Delegate for the United States and Canada. Moreover, Plaintiff's true successor for many of the counts in the Complaint is not Mr. Nadal anyway. Many of the counts concern alleged conduct from June 1, 2004 forward. At that time, Plaintiff was not serving as President of EDFINA or as EDF's General Delegate for the United States and Canada. At that time Plaintiff's job duties were ill defined at best, but she wanted to continue as EDF's representative to NuStart. Ultimately, Mr. Serviere succeeded her in that role.

Not only is Mr. Demchick's assumption about Mr. Nadal fatal to his analysis, but his work is also further flawed. Mr. Demchick's alternative damages estimates presuppose facts that are not alleged in the Complaint and that tend to conflict with the discovery record. For example, the majority of his estimates assume that Plaintiff would have continued serving in an expatriate status as President of EDFINA beyond July 2007. According to Plaintiff herself, EDF told her in late 2003 or early 2004, that she could remain in North America until 2005 but that the extension was only temporary as EDF sought out a suitable new position for her elsewhere. Going back to 1990 and perhaps

---

[3]    Gaujacq deposition transcript pages 43-44.
[4]    Complaint paragraph 49.

earlier, U.S. postings with chief executive responsibilities at EDFINA lasted four years or less. EDF has also testified through its 30(b)(6) witness in this case that expatriate assignments as a general rule never go beyond five years. If a person were to remain in a country for a longer period of time, that person would need to be treated as an employee local to that country.[5] Plaintiff's own proposals to EDF in the first half of 2004 called for her to continue with EDFINA only through 2007. Mr. Demchick's assumption that Plaintiff would have continued serving at EDFINA for years beyond the time indicated in the Complaint or discovery record results in damages estimates that are more than double the damages estimates without such an assumption.

For many of Mr. Demchick's damages estimates, he illogically assumes that the damages predate the bad conduct. For example, Mr. Nadal never had any involvement in setting Plaintiff's pay, and he had no substantive involvement with any aspect of her employment prior to 2004. To my knowledge, this fact is undisputed. Nevertheless, for certain counts, Mr. Demchick claims that Mr. Nadal's conduct in 2004 caused Plaintiff to be underpaid from 2000 through 2003. Similarly, Mr. Demchick assumes that other Defendants' conduct in 2004 also caused damages in 2003 and earlier.

In addition to his many conceptual errors, Mr. Demchick overstates Mr. Nadal's pay and understates the pay Plaintiff is actually earning at Entergy. As a result, Mr. Demchick overstates the amount of damages that would apply if his other invalid or illogical assumptions were true.

### Factual Background and Plaintiff's Allegations

As of the end of 2003, Plaintiff was employed as Americas Branch's Director USA/Canada and served as EDFINA's President. A written expatriation contract set to expire on or about August 1, 2004 governed plaintiff's employment terms and conditions.[6] Late in 2003 or early in 2004, Plaintiff asked for an extension to her assignment in North America, and EDF declined. According to Plaintiff, EDF's senior managers told her that her continued stay in North America would be evaluated on a year-by-year basis as the company waited for suitable positions for Plaintiff to become

---

[5]     Patrick de Botherel deposition transcript page 80.
[6]     Specific Conditions Applicable to the Long Term Assignment of Mrs. Catherine Gaujacq to Washington.

available elsewhere in EDF.[7] According to Plaintiff, the Chairman of EDF told her in February 2004 that he expected her to continue working in North America through 2005 or 2006. He also told her that Mr. Nadal would be assigned to North America to facilitate restructuring associated with EDF's privatization.[8]

During late March 2004, Plaintiff met with EDF's chief operating officer, Gerard Creuzet. Mr. Creuzet told her that Mr. Nadal would be replacing her including serving as President of EDFINA. According to Plaintiff, Mr. Creuzet asked Plaintiff to prepare a new job assignment for herself. She drafted the document that Mr. Demchick now refers to as her "current employment agreement." Plaintiff's proposal specified that she would stay in the United States for a three year term commencing in April 2004 as EDF's representative participating in NuStart. Salary would be 90,740 euros per year (approximately $100,000 to $119,000 per year at the exchange rates Mr. Demchick uses in his analysis for the March to July 2004 time period). EDF never signed Plaintiff's proposal although the Complaint alleges that "Mr. Creuzet agreed in writing to the new expatriation contract for three years in the United States proposed by Plaintiff."[9]

On May 31, 2004, Plaintiff resigned from serving as President and began serving as Vice President of EDFINA and, she claims, manager of NuStart. She was to report to Mr. Nadal. Plaintiff alleges that Mr. Nadal's treatment of her after this time was discriminatory. For example, she alleges Mr. Nadal demanded that she provide him a list of her business and company contacts and told her that the request was urgent,[10] and he also allegedly withdrew Plaintiff's right to sign checks on behalf of EDFINA but did not do so for the male Vice Presidents reporting to him.[11] Plaintiff complained to upper level EDF management. Plaintiff alleges that Mr. Nadal retaliated and further discriminated against her, for example by requesting an internal audit of EDFINA's operations over a period of time during which Plaintiff had been serving as EDFINA's President.[12]

Plaintiff alleges that in late July of 2004 she proposed to Mr. Creuzet a solution to her concerns—that Mr. Nadal be removed from her reporting structure and that EDF sign

---

[7]    Gaujacq deposition transcript pages 125-6.
[8]    Paragraph 60 of the Complaint.
[9]    Paragraph 67 of the Complaint.
[10]   Paragraphs 80 and 81 of the Complaint.
[11]   Paragraphs 88-90 of the Complaint.
[12]   Paragraph 111 of the Complaint.

the expatriation contract she had written paying her 90,740 euros per year. In the alternative, Plaintiff told EDF that she would file a discrimination claim.[13]

According to Plaintiff, Defendants allegedly further retaliated, including by removing her from the NuStart project and directing her to return to France immediately.[14] In September or October 2004, EDF notified Plaintiff in writing about her new position with the company.[15] Plaintiff refused the assignment.[16] After her continued refusal to accept the new assignment, EDF notified Plaintiff that her employment with EDF was terminated. Plaintiff asserts that EDF terminated her wrongfully.

Defendants deny that any of their conduct was discriminatory or retaliatory. For purposes of estimating damages, I assume Plaintiff's allegations as summarized above are correct.

Notably, none of the factual allegations about specific misconduct concern Plaintiff's rate of pay while employed at EDF. There is no discussion in the entire Complaint, Plaintiff's deposition testimony, or Plaintiff's Disclosure Statement about the process that led to her final pay level while serving as President of EDFINA let alone any allegation that that process was discriminatory in some way. The closest that the Complaint comes to the topic is to observe that Mr. Nadal was higher ranked and more highly paid than Plaintiff, at least comparing the contract he negotiated in 2004 against the contract she negotiated in 2000. As I discuss in detail elsewhere, as a matter of economics, it does not follow from this fact alone that Plaintiff's pay was affected by her gender.

All of the purported misconduct by Mr. Nadal and virtually all of the purported misconduct by the corporate Defendants concern Plaintiff's treatment in her new position as Vice President. Consequently, damages would only concern diminution in pay while she served in that position or lost earnings related to wrongful termination from that position. However, there is no discussion whatsoever in the Complaint that Plaintiff was underpaid while serving as Vice President of EDFINA. Moreover, as discussed in more detail below, Plaintiff's damages witness does not attempt to show that Plaintiff suffered

---

[13]     Paragraph 150 of the Complaint.
[14]     Paragraph 164 of the Complaint.
[15]     Paragraph 173 of the Complaint.
[16]     Paragraph 181 of the Complaint.

financial damages from her termination from that job. All of Plaintiff's damages estimates are predicated on the allegation that it was discriminatory for EDF to reassign Plaintiff's supervisory authority to Mr. Nadal. They concern pay Plaintiff supposedly would have earned if she had continued serving as President of EDFINA and pay she supposedly should have earned prior to the conduct giving rise to this litigation.

### Plaintiff's Pay at EDF and Entergy

Plaintiff earned $162,343 in salary and bonus in 2004 from EDF by Mr. Demchick's accounting. In addition, she received certain benefits, some attributable to her status as an expatriate. These include four round trip air tickets between the United States and France, free U.S. housing including utilities and insurance, use of a company car, and reimbursement for auto insurance. These and other benefits were worth $84,687 per year according to Mr. Demchick's calculations. I understand that Defendants dispute whether Plaintiff was entitled to certain of these benefits under her contract, e.g., $100 per month for DirecTV. Other categories are not actually compensation. For example, Plaintiff would not need to fly home if she were permanently assigned to France. The benefit merely reimburses a cost of the job. Nevertheless, if these various amounts did constitute pay, Mr. Demchick's calculations would imply total pay of $247,030.

Plaintiff also received tax equalization, a pay characteristic that would only apply during the temporary period of expatriation. Mr. Demchick mistakenly includes this as a benefit, but it is not. EDF attempts to make its expatriate employees as well off after taxes as they would be if they worked in France. EDF deducts from each expatriate's pay the amount he or she would have owed in French taxes if he or she were employed at the same salary in France. Simultaneously, EDF pays the expatriate's actual income tax liability in their place of work. Most or all of the money EDF pays towards the expatriate's local taxes is offset by the amount EDF holds back from the expatriate in exchange. Essentially, the equalization has the effect of subjecting the expatriate to the typical French income tax burden rather than a U.S. income tax burden. If the French burden is higher, the expatriate is worse off because of tax equalization. If the U.S. income tax burden is higher, the expatriate is better off because of tax equalization.

Tax payments that EDF would have made to the government if the Plaintiff's expatriate salary were higher are not a direct damage element to Plaintiff anyway. The

money would have gone to the government, not Plaintiff. The payments are only relevant in light of the fact that an award in this litigation may be taxable. In the but-for world, Plaintiff would not have paid U.S. taxes on EDF salary, but, in the real world, Plaintiff will pay taxes on any damages award. The problem with Plaintiff's approach is that there are many tax-related differences between money paid as a damages award and money earned directly as salary from EDF. Only accounting for the single tax-related difference that unambiguously favors Plaintiff is biased and incorrect.

In addition to the offsetting deduction EDF would make to account for French income taxes, other factors that would have to be accounted for in an after-tax analysis include changes in French, U.S. and state tax rules that occur over time, differences in tax rules that occur by place of work, and differences in tax liability that are related to personal circumstances. Time is relevant because any award will be paid in one lump sum while the salary it is replacing would have accrued over years. Mr. Demchick's damages models concern earnings from 2000 to 2041. The effect of differences in tax rules that have already occurred since 2000 is at least calculable in theory. On the other hand, the differences in tax rules that will occur from the time of trial through 2041 are anyone's guess. One reason that geography is relevant is that some or all of Plaintiff's but-for pay may have been earned in France. The overall French tax burden is approximately 70% higher than the U.S. tax burden as a percentage of gross domestic product.[17] Geography is also relevant because U.S. state tax liability varies by state of residence. Personal circumstances are relevant because U.S. and French income tax rules take into account factors such as total income (not just income from Entergy or EDF), tax-loss carry forwards, expenditures on tax preferred items such as mortgage interest, number of dependents, head of household status, participation in tax advantaged savings plans such as 401(k)'s, etc.

The appropriate way to proceed is either to conduct an after-tax damages analysis that accounts for all of the relevant tax factors or to conduct a before-tax analysis. It is improper to conduct an analysis that only accounts for one tax-related factor that benefits Plaintiff and ignore all others.

---

[17]    OECD Factbook 2006: Economic, Environmental and Social Statistics.

In comparison to the $247,030 that Mr. Demchick asserts Plaintiff earned in salary, bonus, and reimbursements from EDF in 2004, Plaintiff is targeted to earn approximately $291,029 in salary, bonus, matching 401(k) contribution, and stock options during her first full calendar year at Entergy.[18] Moreover, Plaintiff's expatriate assignment would have ended as soon as spring of 2005 but no later than early to mid-2007 according to Plaintiff's allegations. If she were to continue with EDF, Plaintiff would have eventually returned to France and certain benefits and pay adjustments associated with an expatriate contract would end. According to EDF's September 2004 written offer, the housing subsidy would have declined substantially from the $54,000 per year level as of 2004 in the United States to 18,000 euros per year in France, (approximately $21,600 at the exchange rates Mr. Demchick uses).[19] Over time, the housing allowance would be phased out entirely. Plaintiff's expatriate pay included a geographic cost of living differential and a "far from home" allowance. These two adjustments totaled 18,494 euros (approximately $22,192 per year at Mr. Demchick's exchange rates) and would have been eliminated upon Plaintiff's return to France. In addition, EDF would no longer pay for personal trips between the U.S. and France (a value of $2,613 per year according to Mr. Demchick). In total, based on Mr. Demchick's calculations and EDF's September 2004 offer, Plaintiff would forgo approximately $57,000 per year in temporary benefits related to her assignment abroad upon her return to France. The surplus of her annual Entergy pay over her EDF pay would grow by this $57,000.

Plaintiff's Entergy pay also exceeds the pay she would have earned if the company had accepted her July 2004 proposal. According to Mr. Demchick's calculations, Plaintiff's salary and expected bonus under this proposal would be 128,151 euros per year, approximately $153,781 at current exchange rates.[20] Adding Mr. Demchick's $84,687 valuation of the largely temporary benefits and reimbursements discussed above, Plaintiff's proposal would have yielded her $238,468 in annual compensation, defining compensation as Mr. Demchick does, versus the $291,029 she

---

[18]     See Table 1, Partial Correction of Demchick Exhibit B and Table 1, Partial Correction of Demchick Exhibit B.2.

[19]     See the September 8, 2004 e-mail concerning Plaintiff's transfer to EDF's Energy Branch in France. Bates numbered 00063-00064.

[20]     See Exhibit B1 to Mr. Demchick's report.

can expect this year from Entergy. Under her proposal, Plaintiff would still have had to return to France in the first half of 2007. At that time, her housing allowance would fall, and she would lose the other pay adjustments related to a foreign assignment.

These comparisons of Entergy pay to EDF pay understate the true financial benefit Plaintiff derived by switching jobs. EDF pay includes adjustments to account for the cost of living in the Washington DC metropolitan area, but Plaintiff works for Entergy in Mississippi where the cost of living is much less. The federal government pays a geographic pay differential for various high cost localities including Washington DC. Salaries are 4.4% higher in Washington than Mississippi. Plaintiff's $291,029 Entergy pay in Mississippi corresponds to $303,834 in Washington based on the OPM geographic pay adjustment. However, this $12,805 adjustment appears to grossly understate the true differences in cost of living. For example, Plaintiff's rent in Virginia was $4,500 per year. The most expensive house in Jackson Mississippi advertised in the local newspaper as of June 1, 2006 was only $2,300 per month.[21] The median house value in Great Falls, where Plaintiff lived while she served at EDFINA, was $596,100 as of 2000 while median house value in Madison was $133,900.[22] The OPM adjustment clearly understates differences in cost of living.

Infoplease.com, an internet based reference site, reports cost of living indexes by geography. Infoplease relies on ACCRA for data. ACCRA is a data source used for academic studies of economic differences by geography. Overall, the cost of living is 49.3% greater in Washington DC than in Jackson, Mississippi. Costs for five out of six expense categories were higher in Washington: groceries, housing, transportation, health care, and miscellaneous goods and services. The only expense component which was more costly in Jackson was utilities.[23] A 49.3% cost of living differential implies that Plaintiff's $291,029 pay in Jackson, Mississippi has similar purchasing power as pay of $434,506 in Washington DC. The New York Times also maintains a cost of living calculator on its web site that converts a specified income in one location to a cost-of-

---

[21]    Information downloaded from clarionledger.com on June 1, 2006.

[22]    Median housing values for Great Falls, Virginia and Madison, Mississippi from http://www.city-data.com/city/Great-Falls-Virginia.html and http://www.city-data.com/city/Madison-Mississippi.html, respectively.

[23]    http://www.infoplease.com/ipa/A0883960.html

living-adjusted salary someplace else.[24] The New York Times estimates that the cost of living in Washington is 37.4% higher than the cost of living in Jackson. At this rate, a $291,029 salary in Jackson, Mississippi corresponds to a salary of $399,957 in Washington DC.

Notwithstanding that she now earns much more than she earned at EDF and lives in an area where her pay buys more goods and services, Plaintiff may have suffered certain types of financial loss that may offset her increased pay and decreased cost of living. For example, she lost pay as a result of being out of work for the first four months of 2005. In addition, she may have paid some expenses that she would not have, and her EDF retirement annuity will be less than it would have been if she had continued with the company longer. Nevertheless, these losses are swamped by the increased income she will earn as a result of her much higher pay at Entergy and the Entergy pension she will draw in addition to her EDF pension. I have used Mr. Demchick's general methodology to show the difference in net present value of earnings and benefits from working to retirement at age 60 for Entergy versus working to retirement at age 60 for EDF assuming that EDF had accepted Plaintiff's July 2004 proposal. I assumed that Plaintiff would have returned to France in 2007 at which time she would have relinquished all of the reimbursements and allowances associated with a foreign assignment. I report the results in Table 1.

The analysis indicates that Plaintiff is over $900,000 better off now than she would have been continuing on with EDF and returning to France in 2007. I conducted the analysis on a strictly before-tax basis, but the treatment of tax equalization is not driving the results. The benefits from switching jobs far outweigh the present value of U.S. tax payments that EDF would have paid for Plaintiff from 2005 through her return to France in 2007. Even if I had treated taxes in the one-sided way Mr. Demchick did by adding a crude estimate of the EDF tax payment as a benefit but ignoring the offsetting tax effects, the result would stand that Plaintiff is hundreds of thousands of dollars better off having switched jobs. Of course, there are such offsetting tax effects, so Mr. Demchick's approach would be wrong. For example, Plaintiff would have owed either French taxes or French tax equalization if she had stayed at EDF. State taxes are lower in

---

[24]        http://salary.nytimes.com/CostOfLivingWizard/layoutscripts/coll_start.asp

Mississippi than they are in Virginia, and Plaintiff's mortgage interest is deductible against U.S. federal and state taxes.

The $900,000 figure resulting from the net present value analysis discussed above is not precise because it is based on Mr. Demchick's general methodology and certain of Mr. Demchick's methodological assumptions are invalid. For example, it is inappropriate and unrealistic to use a risk-free discount rate because future pay and retirement benefits are not risk free. In addition, Mr. Demchick adds to his damage figure an estimate for what he refers to as Mr. Nadal's "Differed Capital Plan." It is my understanding that this plan is a form of life insurance and is scheduled to be paid out to Mr. Nadal at the time he turns 60. It is also my understanding that Plaintiff would only have been entitled to a similar amount if she had achieved R1 rank and similar bargaining power as Mr. Nadal by the time of her retirement. Even then, the amount would be payable at her 60th birthday, and not his. It is also my understanding that an EDF employee must make contributions in order to participate in this plan. None of these factors were taken into consideration by Mr. Demchick. He merely assumed that Plaintiff would have received on Mr. Nadal's 60th birthday and not her own, the same lump-sum as he but without the contributions in the interim. These various errors regarding the life insurance benefit in conjunction with others discussed elsewhere herein tend to bias the results towards understating the benefit Plaintiff truly derived by switching jobs. The particular $900,000 quantification of the benefit is not precise, but the key result is reliable—there is no financial loss in this case.

The results would be somewhat less pronounced if Plaintiff had accepted the new assignment that EDF proposed in 2004 and returned to France. Mr. Demchick's general methodology implies that Plaintiff is over $700,000 better off now than she would have been accepting EDF's new assignment and returning to France in the fall of 2004.

### Mr. Nadal's Pay

The only fact that Plaintiff and Mr. Demchick point to to support a claim of unequal pay is that the rate of pay Mr. Nadal negotiated in 2004 exceeds the rate of pay that Plaintiff agreed to in 2000. They conclude from this fact not only that Plaintiff was discriminated against, but also that Mr. Nadal's pay in 2004 is a reasonable proxy for the nondiscriminatory pay Plaintiff should have been paid while serving as President of

EDFINA retroactive to 2000 and into the future. These conclusions are economically unsound.

Differences in pay occur for reasons unrelated to gender. Reliable studies of pay differences at Plaintiff's level or Mr. Nadal's level must control for differences in job responsibilities, differences in value of work, and differences in achievement within the corporate hierarchy. Reliable studies must also account for differences in time. They must correct not only for inflation but also for differences in labor market conditions. In other words, people who do different things are paid differently. People who are legitimately expected to deliver different valued results are paid differently. People in hierarchical organizations who are at different ranks are paid differently, and people who negotiate their pay when the price level or labor market conditions are different are paid differently. The mere fact that there is partial overlap in job responsibilities and similarity in title does not imply that Mr. Nadal and Plaintiff were identical in any of these key respects.

Paradoxically, Plaintiff asserts in the Complaint that Mr. Nadal's delegating to someone else the responsibilities that primarily occupied Plaintiff's time showed that Mr. Nadal was doing less work. This reasoning is specious. There are many alternative ways other than overseeing NuStart that Mr. Nadal could occupy his time productively. For one, he could spend time on the various obligations and responsibilities that Plaintiff did not have when she was serving as president of EDFINA, the most obvious being preparing for EDF's IPO. In addition, he could spend more time than Plaintiff did on the other tasks that she had been responsible for. To know whether one person is working more or less than another requires a tally of how much time they spend on all tasks. In and of itself, it does not answer the question of who is working more to know that there is some particular thing that one person is doing and the other is not doing.

Plaintiff's assertion about Mr. Nadal doing less is not only baseless, but it is ultimately off point. High-level executives are not paid by the hour. Their pay reflects the value of their expected contribution to the enterprise, competitive pay levels for similarly skilled people, and their rank within the corporate hierarchy. The ultimate consideration from the company's perspective is the extra profit attributable to the executive's performance and not necessarily how much effort the executive expended to achieve it.

Not surprisingly, we observe vast discrepancies in chief executive officer pay that cannot be explained by relative effort, and that no one tries to justify in that way. There are only so many hours in each day, and most chief executives work long hours to begin with. It would be physically impossible for there to be sufficient variation in effort to explain the variation in pay.

As a practical matter, large organizations like EDF tend to be hierarchical, and there are economically-based nondiscriminatory reasons for pay to be affected by rank rather than varying from day to day or year to year based solely on current productivity, task at hand, and immediate labor market conditions. The explanations concern difficulties determining exactly how productive an individual is on a day-to-day or even year-to-year basis. Many projects within a large organization are collective efforts, so it is hard to isolate the value of an individual's contribution. In addition, the ultimate benefits or consequences of an individual's efforts may not occur in the short term. By observing the results of a large number of projects over a long period of time, relative differences in contribution can become more apparent. These factors make it worthwhile to pay people based more on overall rank and record of achievement rather than solely on current results or responsibilities. It is even more difficult to accurately gauge how valuable outsiders will be as opposed to how valuable current team members are. Consequently, it is to a corporation's economic advantage to take steps to retain key people who have demonstrated their talents.

All of these facts about real world labor markets mean it may be economically rational for a corporation to keep paying an accomplished senior executive at his historical pay level even if there were no immediate tasks warranting someone of his skills. It is not common in large hierarchies for base pay to vary from day to day or year-to-year based on the particular tasks at hand notwithstanding that the value of the specific projects executives are focusing on must change at least that rapidly. More importantly to this case, nominal salaries in hierarchies only rarely decline.[25]

The mere fact that Mr. Nadal was an R1 long before Plaintiff accepted her U.S. assignment while Plaintiff herself was no higher ranked than R3 at that time renders Mr.

---

[25]    George Baker, Michael Gibbs, Bengt Holmstrom, "The Wage Policy of the Firm," Quarterly Journal of Economics 109, November 1994, 921-956.

Nadal's pay incomparable for determining what the company would be expected to pay Plaintiff. Published economic research demonstrates that rank may affect pay within a hierarchical company. Baker, Gibbs and Holmstrom obtained proprietary data concerning management personnel at a single company over the period 1969 to 1988.[26] There were over 60,000 person-years of data to work with. They found that 90% of the observations fell into 17 job titles. These 17 job titles corresponded to eight hierarchical job levels from Level 1 at the entry level to Level 8, the CEO. Especially important for our purposes, Levels 4 through 8 were comprised of one job title each.

Baker, Gibbs and Holmstrom's analytical results are, first, that rank matters. Job level explained 70% of the variation in pay among managers as a group. By way of comparison, studies that try to explain pay differences based on factors such as age, education and experience tend to explain approximately 25% of the variation in pay across people over time. The second relevant result is that pay still varies substantially within job levels notwithstanding that job level itself is an important determinant of pay. In particular, there was a tremendous range of pay among jobs within the upper levels, Levels 5 though 8. Each of these levels represented a single job title; therefore, people within a hierarchy who are at the same level at the same time with the same title may earn vastly different amounts of pay. For illustrative purposes, the authors reported the range of pay by level in one year. The bottom 5% of Level 5 managers in terms of pay earned less than half of what the top 5% Level 5 managers earned. The same was true of Level 6. The top 5% earned more than double what the bottom 5% earned. The spread narrowed substantially for Level 7, but there was still wide variation in pay. The top 5% earned a third more than the bottom 5%. Level 8 is a single person, the CEO, so there could not be any variation within that category. The final relevant result is that people tended to be promoted into the lower end of the pay range for their new job levels. For example, sixty-four point five percent (64.5%) of the Level 1s who were promoted into Level 2 were paid below the median for Level 2 after they were promoted. Seventy-three to eighty-nine percent of the Level 2s, 3s or 4s who were promoted also were promoted into the lower end of the pay range for their new jobs. Translating that to our case, an R3 promoted into

---

[26]      George Baker, Michael Gibbs and Bengt Holmstrom, "The Internal Economics of the Firm: Evidence From Personnel Data," Quarterly Journal of Economics, November 1994, 881-919.

an R1 position may be expected to be paid less than someone who is already an R1 would be paid who transferred into that same position. There are other reasons discussed elsewhere in this report why Mr. Nadal's pay is irrelevant to damages in this case, but his and Ms. Gaujacq's prior ranks, plus the dispersion in pay within ranks that is observed in hierarchies other than EDF, are additional sufficient reasons to reach that conclusion.

### The CEO Market

I conducted an analysis of U.S. chief executive officers to demonstrate that there is high variation in pay even within the exact same job between an incumbent and his or her successor. I identified all new CEO hiring announcements by Fortune 1000 firms between January 2002 and May 13, 2004. The specific announcement dates and identity of the newly appointed CEO were publicly available at www.ceogo.com. I limited my attention to the cases in which the new CEO was promoted internally rather than hired from the outside. Publicly traded firms disclose officer pay information in their annual Definitive Proxy Statements. These statements are available online at the U.S. Securities and Exchange Commission ("SEC") web site. I constructed a database concerning all 100 cases in which a Fortune 1000 company promoted someone to the CEO position between January 2002 and May 13, 2004 and reported the pay for the incoming and outgoing CEO in definitive proxy statements posted at the SEC web site. Pay included salary, bonus, deferred compensation, restricted stock awards, and, in cases where the company reported their dollar value, option grants. The CEO pay data are attached as Appendix 1 to this report.

Incoming and outgoing CEOs were never paid the same, and they were rarely even close. There were only 9 instances out of 100 in which the incoming CEO's pay was within 10% of the outgoing CEO's pay. It was more common that the new CEO was paid twice as much as the outgoing CEO, 17 instances out of 100, than that the two CEOs' pay were close together.

Limiting attention to cases where men replaced men eliminates the possibility that the results are attributable to rampant sex discrimination in the CEO market. The conclusions are unaffected. There were 95 cases where men replaced men. Obviously, there were no cases where the outgoing male CEO and the incoming male CEO were paid the same. There were 9 cases in which pay for the incoming and outgoing male

17

CEOs respectively were within 10% of each other and 16 cases in which the incoming was paid over twice as much as the outgoing. There were four cases where women replaced men. In two cases the new female CEO earned substantially more than her male predecessor, and in two cases the new female CEO earned substantially less than her male predecessor. The one instance of a woman replacing a woman concerned Sharon Patrick replacing Martha Stewart at Martha Stuart Living Omnimedia. Ms. Patrick' pay was approximately 30% less than Martha Stewart's.

The analysis excludes option grants that are reported in terms of shares rather than dollar values because there is insufficient information to calculate dollar values for all such grants. However, there is sufficient information to conclude that it would generally widen the disparity between incoming and outgoing CEO pay to account for the grants as pay. In most cases in which companies reported options grants but did not report a value for those grants, the higher paid between the incoming and outgoing CEO in terms of dollar denominated pay (salary, bonus, etc.) was also the higher paid in terms of options.

Two cases have special bearing on Plaintiff's theory that Mr. Nadal should have been paid less because he delegated certain tasks to others. These are the two cases in the dataset involving co-CEOs. In one case, Steve Temares replaced co-CEOs Warren Eisenberg and Leonard Feinstein at Bed Bath and Beyond. By Plaintiff's theory, Mr. Temares' pay ought to have been equal to the sum of Messrs. Eisenberg's and Feinstein's pay. In fact, Mr. Temares earned less as sole CEO than either Mr. Eisenberg or Mr. Feinstein earned when they shared the job. Similarly, two co-CEOs, Gregory Johnson and Martin Flanagan, replaced the sole-CEO, Charles Johnson, at Franklin Resources Inc. By Plaintiff's theory, Gregory Johnson and Martin Flanagan combined should have earned what Charles Johnson earned alone. In fact, Gregory Johnson and Martin Flanagan, the incoming co-CEOs, each earned approximately twice what Charles Johnson earned when he occupied the CEO position alone. Gregory Johnson earned slightly less than double what Charles Johnson earned, and Martin Flanagan earned slightly more than double what Charles Johnson earned. Altogether, CEO pay quadrupled when Gregory Johnson and Martin Flanagan replaced Charles Johnson as CEO.

Plaintiff's fundamental premise does not comport with real world data concerning CEO pay. It is not true at upper levels of management that incoming and outgoing employees are paid the same.

Plaintiff may not have been comparable to the CEO of a large independent company in terms of experience, but Mr. Nadal was. Immediately prior to accepting her assignment to the United States, Plaintiff was senior manager at a power plant. At that same time, Mr. Nadal was the CEO of Edenor, the Argentinean electric utility responsible for transmitting power to a market area that is home to 20% of Argentina's population. Edenor was not an EDF power plant or even a division or subsidiary. Edenor was an independent corporation in which EDF was a minority shareholder. Data available over the internet indicate that as of 2004 Edenor had 2,400 employees, 2.2 million clients and $1.1 billion in annual sales.[27] Prior to his position at Edenor, Mr. Nadal had been CEO of Sodel Consultants and, prior to this, General Secretary of Charbonnages de France (the French National Coal Board).[28] The analysis pertaining to CEOs reasonably pertains to Mr. Nadal. The data concerning CEO pay suggest that it would be expected that Mr. Nadal's pay would be different from his predecessors or successors, even assuming the same position.

## More Relevant Comparisons

Plaintiff's relatively recent predecessors who served as President of EDFINA office were all men, and they were all paid less than she. Pay stubs were provided for the four people who served in that capacity since 1990.[29] I have calculated pay for each of the four people for the final twelve months for which each person's pay stub indicates an American address. In Plaintiff's case, I calculated pay over the first twelve months for which her pay stub indicated an American address, September 2000 through August 2001. I defined pay alternatively as salary plus bonus or as net pay after all payments and withholdings. By either pay measure, Plaintiff was the highest paid of the five people serving her general function since 1990.

---

[27] See http://translate.google.com/translate?hl=en&sl=es&u=http://www.edenor.com.ar/ and http://translate.google.com/translate?hl=en&sl=es&u=http://www.edenor.com.ar/. See also curriculum vitae of Christian R. Nadal and deposition and errata sheet of Christian R. Nadal, p. 33.

[28] Curriculum vitae of Christian R. Nadal.

[29] EDF 005025-5258.

Plaintiff was paid 610,807 francs in salary and bonus and 752,627 in net pay. Jean Cottave was Plaintiff's immediate predecessor. He was paid 550,166 francs in salary and bonus and 565,101 in net pay. Pierre Boussard preceded Mr. Cottave. Mr. Boussard was paid 437,507 francs in salary and bonus and 511,862 in net pay. Marc Gery preceded Mr. Boussard. Mr. Gery was paid 519,712 francs in salary and bonus and 420,263 in net pay. Henry Herbin preceded Mr. Gery. Mr. Herbin was paid 411,563 francs in salary and bonus and 518,162 in net pay.

Plaintiff earned 11% to 79% more in her first year in the United States than her recent predecessors had been paid while domiciled in the United States, depending on whom she is compared to and how pay is defined. This fact not only directly contradicts the idea that Plaintiff was paid less as a woman than her male counterparts, but it also tends to reinforce that there is something singularly different about Mr. Nadal and his assignment to the United States compared to the other people who had served as President of EDFINA.

### Additional Conceptual Errors in Mr. Demchick's Analysis

Mr. Demchick's analysis of backpay suffers from additional conceptual errors besides the ones discussed so far. First, there cannot be any backpay for the period August 1, 2000 through June 1, 2004 arising solely from the retaliation claims. The alleged retaliation had not occurred yet. It cannot be that Plaintiff was underpaid prior to June 1, 2004 as a result of conduct that would not occur until after June 1, 2004.

Similarly, Mr. Nadal's pay cannot be the appropriate benchmark for assessing retaliation-related damages after Plaintiff left EDF either. The alleged retaliation is not the reason that Plaintiff resigned her position as President of EDFINA. Plaintiff does not even allege that this is so. Consequently, it would not be accurate to use the salary of Mr. Nadal while he was serving as the President of EDFINA as a benchmark for the pay Plaintiff would have earned while she was serving as the Vice President of EDFINA.

### Mr. Demchick's Overstatements of Mr. Nadal's Pay and Understatement of Plaintiff's Entergy Pay

In addition to the various flaws and errors discussed above, Mr. Demchick's analysis is further flawed because it overstates the length of time Plaintiff could have

continued earning the various adjustments attributable to her expatriate status, understates Plaintiff's pay from Entergy, and overstates Mr. Nadal's pay.

Prior to Mr. Nadal's arrival, Plaintiff purportedly expected that her stay in the U.S. would end as soon as a suitable position elsewhere became available. After she became aware that Mr. Nadal would be her supervisor, she alleges that EDF agreed to extend her expatriate status until mid-2007 and purports that she perceived such an extension to be consolation for her more limited job responsibilities.[30] Mr. Demchick assumes that Plaintiff would have continued as an expatriate for two to seven years after her own proposed extension would have expired. Absent this assumption, Mr. Demchick has four damages estimates ranging from $1.7 million to $2.7 million. With the assumption that Plaintiff would continue on as an expatriate beyond 2007, Plaintiff adds eight additional damages estimates ranging from $2.3 million to $5.1 million.

As for Plaintiff's pay from Entergy, Mr. Demchick ignored Plaintiff's $20,000 signing bonus, her stock options and the matching 401(k) contributions of up to 6% of base salary that Entergy makes on her behalf. The value of an option grant depends upon volatility of the grantor's stock price, the risk free rate of interest, the strike price of the option, time remaining until the option expires, and vesting rules. Entergy publishes in its 10-K filing its per-share valuation of the stock options it awards. The weighted average value per share has been increasing annually for the past three years. The most recent valuation is $8.17 per share. Plaintiff was awarded 1,500 stock options as part of her compensation for her work in 2005 at Entergy. At $8.17 per share, these 1,500 shares would be worth $12,255. In addition to the weighted average valuation published in its 10-K, Entergy also provided Plaintiff with a valuation of the options it awarded her, $11.86 per share.[31] At this higher valuation, Plaintiff's option grant is worth $17,790.

The target stock option award for someone at Plaintiff's level at Entergy this year is 5,100. At $8.17 per share, 5,100 options would be worth $41,667. At $11.86 per share, 5,100 options would be worth $60,486. The 5,100-share award is a target. Plaintiff could earn less, but she could also earn more, up to twice the target level.

---

[30]    Gaujacq deposition transcript pages 223-6.
[31]    Gaujacq00149.

Mr. Demchick wrongly assumed that the pension benefit Plaintiff may earn from Entergy is based solely on base salary while it is actually based on final average base salary plus bonus. This error causes him to understate the pension that Plaintiff would earn from Entergy under his various scenarios. This error is offset by another error in the opposite direction. Entergy pension is not based on final salary, as Mr. Demchick assumes, but rather it is based on the average salary and bonus over the 5 years before retirement. Entergy pension is also reduced if the employee begins to draw pension payments before age 65.

Turning to Mr. Nadal's pay, the purported nondiscriminatory benchmark, Mr. Demchick considers as damages the extra taxes that EDF would have paid if Plaintiff's salary had been higher, but he ignores the French tax equalization deduction and all of the other tax-related factors that are relevant to a true after-tax analysis. For reasons discussed in greater detail above, this analysis is wrong.

Mr. Demchick ignores that the deduction from employees to finance the EDF retirement increased from 11.1% to 12% in 2005 and to 12.13 % in 2006. The risk that the deduction could increase again is one of the many risks that render Mr. Demchick's use of the risk-free discount rate inappropriate for his present value calculations.

Mr. Demchick made offsetting errors in calculating Plaintiff's EDF retirement benefits. He assumes that Plaintiff will receive 50,027 euros per year beginning at age 57 ($60,033), but the correct annual amount is 51,845 euros ($62,049). On the other hand, had Plaintiff departed from EDF in mid-2007 she would have been entitled to receive 57.5% of her final base salary at the age of 57, and not 55% as stated by Mr. Demchick.[32] The first of these two retirement-related errors biases the damages estimate upwards, and the second biases it downwards.

Mr. Demchick calls the difference between Mr. Nadal's housing costs and Plaintiff's housing costs damages although there is no evidence that Defendants denied Plaintiff a more expensive residence. Mr. Nadal's rent may have been higher, but it was Plaintiff's choice to live where she did, and there is nothing to suggest she could not have chosen a similar residence to the one that Mr. Nadal chose. Differences in rent are also affected by timing. Plaintiff rented in 2000 and was able to secure an extension based on

---

[32]     Dossier Gaujacq (CNIEG) (EDF 004935-37).

the original 2000 rent level. Defendant rented in 2004 after a boom in the Washington area real estate market. Plaintiff is not damaged by the fact that her preferred house was not more expensive.

Mr. Demchick includes among damages moving costs that Entergy already reimbursed. He relied on the pay stub from Entergy showing the reimbursement as the source for his estimate of the costs themselves. Obviously, Plaintiff does not need to be reimbursed again by Defendants to be made whole for expenses that Entergy has already paid.

I have replicated certain of Mr. Demchick's calculations to demonstrate the impact of these errors. For reasons listed above, I ignore those calculations in which Mr. Demchick assumes that Plaintiff would have continued as an expatriate beyond 2007. In his remaining calculations, Mr. Demchick assumes that Plaintiff would have left EDF in 2007 and joined some other U.S. company with the same starting salary as her actual Entergy job. This is obviously speculative. It is possible that starting salaries for job openings in 2007 will be less. In such case, estimated damages would be lower. This risk is another reason that Mr. Demchick's use of a risk free rate of interest is incorrect. (It is also possible salaries will be higher in 2007 than they were in 2005, but Plaintiff has not been denied the opportunity to switch jobs again if that is the case.) Despite their speculative nature, I adopt all of Mr. Demchick's assumptions about how much this hypothetical job would pay over time and what its retirement plan would be like.

I correct for some of the errors Mr. Demchick made calculating Plaintiff's actual pay and estimating how much she will make at Entergy in the future. That is, I add the signing bonus, the stock option award she has already received and the matching 401(k) contribution from Entergy as an offset against backpay. I use the lower of the two Entergy stock option valuations. I treat future stock awards in a similar way as Mr. Demchick treats bonuses, i.e., I assume that Plaintiff will earn this year's target level and that the value of the target award increases at 3% per year. Similarly, I assumed that the 401(k) contribution would grow by 3% per year too. I based the Entergy pension on the sum of base salary and bonus as the pension documentation describes rather than base salary only.

I assumed that Plaintiff will work until age 60. For his calculations, Mr. Demchick assumes that Plaintiff will voluntarily retire at age 57 in the "actual" case but that she would have to continue working until 60 in the "but-for" case in order to secure a second pension in addition to the one from EDF. Mr. Demchick's reasoning is that Plaintiff would have to work at least 10 years at a new employer to get a second pension to supplement the EDF pension that she is scheduled to receive. Given that she left EDF at age 47, she will reach the 10-year mark with Entergy at age 57. If she had stayed another three years at EDF and left at age 50, she would have to work until 60 to qualify for a pension at her hypothetical new employer.

Mr. Demchick's comparison between an "actual" scenario in which Plaintiff voluntarily retires at 57 and a "but-for" case in which she chooses to work until 60 is distorted. Plaintiff cannot be worse off in the real world at Entergy because she has the option of retiring early, yet that is what Mr. Demchick implicitly assumes. Mr. Demchick's "actual" case is undervalued because it ignores the value of early retirement. Early retirement is a voluntary exchange by the retiree. The cost to the retiree is the money that could be earned by working more years. The benefit to the retiree is the leisure enjoyed during the early retirement. Mr. Demchick's analysis accounts for the price paid, i.e., the forgone pay and lower pension benefit, but it ignores the benefit received, i.e., the leisure. The fact that retirement is voluntary necessarily implies that the benefit he ignores is more valuable than the cost he accounts for.

I excluded from damages the payments EDF would presumably make for U.S. taxes. These payments are not damages as they are payments that would go to the U.S. and Virginia governments and not the Plaintiff. The fact that EDF expatriates are relieved of their U.S. income tax obligations would be relevant to an after-tax analysis, but it is inappropriate to account for the relief from U.S. taxes without considering the imposition of a French tax offset. It would be additional error to consider the one tax factor benefiting Plaintiff but to ignore the other tax ramifications affecting damages. A good faith effort at an after-tax damages model would require more information about the Plaintiff's tax circumstances than exists in the discovery record, and a non-speculative after-tax model is simply impossible.

Plaintiff's foregone tax benefit, if any, would equal the taxes Plaintiff will pay on any damages award less the taxes and other tax-related costs Plaintiff would have paid but-for the alleged discrimination. Calculating the taxes Plaintiff would pay on any damages award requires consideration of her filing status as of the year any damages award is paid, state tax rules in Mississippi including not only rates, deductions and credits but also tax treatment of damages awards, Plaintiff's eligibility for federal tax deductions such as mortgage interest in the year any damages award would be paid, consideration of any federal tax credits Plaintiff is eligible for, and consideration of Plaintiff's other income besides the damages award. The only thing Mr. Demchick did to determine Plaintiff's potential tax liability related to any damages award was to estimate the average tax rate EDF paid on Plaintiff's behalf in 2004. EDF's 2004 tax payment on Plaintiff's behalf was affected by her state of residence, her eligibility for deductions, and her eligibility for tax credits in 2004 as opposed to the corresponding values for Plaintiff at the time of trial. Certain of Plaintiff's circumstances have changed such that her future average tax rate may be lower than her historical rate. Plaintiff lives in a lower tax rate locality than she used to, and Plaintiff now has deductions associated with homeownership.[33] In addition, EDF did not itemize upon filing Plaintiff's 2004 returns further indicating that using the 2004 average rate may be an upwardly biased estimator of Plaintiff's future average tax rates.

On the other side of the ledger, even less information is available about the taxes and tax-related costs that Plaintiff would have paid but-for the alleged discrimination. From 2000 through 2007, she would have had money deducted from her paycheck to account for French taxes under the tax equalization program. This factor alone may totally offset the taxes Plaintiff may pay on any damages award related to a shortfall in EDF pay. Even more problematical for Mr. Demchick's analysis or any valid after-tax analysis, is that Mr. Demchick's damages model extends through 2041. It is pure guesswork what Plaintiff's tax circumstances would have been from 2007 through the rest of her life. No one can say whether she would have lived in a state with no income tax such as Nevada or a jurisdiction with high income taxes such as Washington. No one

---

[33]    Local tax rates at http://www.taxadmin.org/fta/rate/ind_inc.html.

can reliably say how federal tax rates will change over the decades remaining in the damages model or what choices Plaintiff would have made that would have affected her tax liability. For example, many economists believe that future tax increases are inevitable given federal budget constraints. In that case, a lump sum damages award subject to 2006 or 2007 tax rates may result in more money for the Plaintiff after taxes than salary that is paid over decades and taxed at higher rates. For all of the reasons discussed above, there is insufficient information in the discovery record to accurately assess financial impact in this case on an after-tax basis, so the following calculation is entirely before-tax.

I removed the difference in housing cost between Plaintiff and Mr. Nadal from the damages categories, also for reasons discussed above. Similarly, I did not include as damages out-of-pocket costs that Entergy reimbursed. The net result of these partial corrections to Mr. Demchick's analysis, before addressing the more serious flaws discussed in the preceding sections of this report, is to reduce his purported damages from a range of $1.7 million to $5.1 million to a partially corrected range of $1.1 million to $1.8 million. These results are shown in Table 2.

These estimates are still overstated due to a) Mr. Demchick's fundamental error of assuming that Mr. Nadal's pay level is a reasonable proxy for Plaintiff's nondiscriminatory pay level, b) Mr. Demchick's calculation of damages that precede their cause, and c) additional technical errors left uncorrected, such as the overstated discount rate and differed capital plan. Given these flaws, it is impossible to correct Mr. Demchick's analysis fully.

My own analysis indicates that there are no financial damages. Plaintiff is earning more at Entergy than she was earning prior to Mr. Nadal's North American assignment and the ensuing events giving rise to her separation from EDF. In terms of buying power, she may be hundreds of thousands of dollars per year better off than she would have been if EDF had accepted her proposed terms for continued employment. If Plaintiff had remained at EDF, her expatriate status would have ended some time between 2005 and 2007. At that time the various allowances and adjustments related to a foreign posting would cease. Pay, as measured by Mr. Demchick, would fall by over $50,000 per year

thereby widening the already substantial gap between Plaintiff's Entergy pay and the pay she would have earned at EDF.

June 15, 2006

Jonathan Walker

*Table 1*
*Partial Correction of Demchick Exhibit A*
*Employment at Entergy vs. EDF*

| Damages Start Date | EDF End Date | Compensation Exhibit B | Retirement Funds Exhibit C | "Out of Pocket" Costs Exhibit D | Other Benefits Exhibit E | Prejudgement Interest as of 4/30/2007 | Total Estimated Loss |
|---|---|---|---|---|---|---|---|
| 1/7/2005 | 9/30/2017 | -$989,862 | $33,944 | $7,789 | $3,750 | $0 | **-$944,380** |

*Table 1*
*Partial Correction of Demchick Exhibit B*
*Employment at Entergy vs. EDF*

| Period | | Actual Earnings | | | | | | | |
| | | Gaujacq EDF Base Salary, Bonus, Indemnity[2] | | Gaujacq Base Salary, Bonus, Indemnity[2] | | Difference in Earnings | Difference in Benefits[3] | Total Difference | Reduced for Potential of Death[4] | Present Value as of |
| Start Date | End Date | Euro | USD | Euro | USD | USD | USD | USD | USD | 1/7/2005[5] |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/7/2005 | 12/31/2005 | 129,463 | 161,360 | 172,493 | 214,992 | -53,632 | 80,902 | 27,271 | 27,271 | 26,644 |
| 1/1/2006 | 12/31/2006 | 135,954 | 162,683 | | 283,469 | -120,786 | 81,824 | -38,962 | -38,962 | -36,226 |
| 1/1/2007 | 12/31/2007 | 130,158 | 155,747 | | 291,973 | -136,226 | 64,759 | -71,467 | -71,272 | -63,138 |
| 1/1/2008 | 12/31/2008 | 119,824 | 143,381 | | 300,732 | -157,351 | 37,909 | -119,442 | -118,778 | -100,174 |
| 1/1/2009 | 12/31/2009 | 123,419 | 147,683 | | 309,754 | -162,072 | 38,400 | -123,672 | -122,594 | -98,432 |
| 1/1/2010 | 12/31/2010 | 127,121 | 152,113 | | 319,047 | -166,934 | 38,905 | -128,028 | -126,494 | -96,690 |
| 1/1/2011 | 12/31/2011 | 130,935 | 156,677 | | 328,618 | -171,942 | 39,426 | -132,515 | -130,427 | -94,912 |
| 1/1/2012 | 12/31/2012 | 134,863 | 161,377 | | 338,477 | -177,100 | 39,963 | -137,137 | -134,425 | -93,128 |
| 1/1/2013 | 12/31/2013 | 138,909 | 166,218 | | 348,631 | -182,413 | 38,362 | -144,051 | -140,529 | -92,685 |
| 1/1/2014 | 12/31/2014 | 143,076 | 171,205 | | 359,090 | -187,885 | 36,777 | -151,108 | -146,731 | -92,133 |
| 1/1/2015 | 12/31/2015 | 147,368 | 176,341 | | 369,863 | -193,522 | 35,210 | -158,312 | -152,876 | -91,385 |
| 1/1/2016 | 12/31/2016 | 151,789 | 181,631 | | 380,959 | -199,328 | 33,660 | -165,667 | -159,013 | -90,493 |
| 1/1/2017 | 9/30/2017 | 117,257 | 140,310 | | 293,484 | -153,174 | 24,030 | -129,144 | -123,105 | -67,111 |
| **TOTAL** | | | $2,076,727 | | $4,139,089 | -$2,062,363 | $590,128 | -$1,472,235 | -$1,437,935 | -$989,862 |

**Source:** Report by Neil Demchick; Entergy-0011, 0014-16; Gaujacq Entergy Employee Pay Stub, 04/01/2006 (2175).

**Notes:**  1. Exchange rates provided by Demchick Report.
2. Salaries, bonuses, and indemnities from Exhibit B.1 adjusted for partial years and growth at 3% per year.
3. Benefits from B.2 adjusted for partial years and 3% annual growth with the exception that the housing allowance in France is fixed at 1500 euros per month and phases out by 150 euros per year beginning in 2013.
4. Reduction for potential of death based on method used in Demchick report.
5. Present value calculation based on approximate 5% rate for all purposes, pursuant to Demchick methodology.

*Table 1*
*Partial Correction of Demchick Exhibit B.1*
*Employment at Entergy vs. EDF*

| | Gaujacq Americas Branch (Euro) July 2004 Proposal | Gaujacq EDF - France (Euro) July 2004 Proposal | Gaujacq Entergy (USD) 2005 | Gaujacq Entergy (USD) 2006 |
|---|---|---|---|---|
| **Monthly Salary:** | | | | |
| Base Salary (Monthly) | 6,980 | 6,980 | 15,000 | 15,420 |
| "Former Business Unit" indemnity (Monthly) | 93 | 93 | | |
| "De mobilite internationale" indemnity | | | | |
| "Far from home" indemnity (monthly) | 1,134 | | | |
| "Cost of Living differential" Indemnity (monthly) | 407 | | | |
| "Fonction internationale" indemnity (monthly) | | | | |
| **Total Monthly Salary** | **8,614** | **7,073** | **15,000** | **15,420** |
| | | | | |
| **Total Annual Salary**[1] | **110,350** | **91,856** | **180,000** | **185,040** |
| Stock Options[2,3] | | | 12,255 | 42,917 |
| Signing Bonus | | | 20,000 | |
| Annual Bonus[4] | 17,800 | 17,800 | 48,600 | 55,512 |
| | | | | |
| **Total Annual Salary and Bonus (€)**[5] | **€128,150** | **€109,656** | **€217,997** | **€236,895** |
| **Total Annual Salary and Bonus ($)**[6] | **$153,344** | **$131,214** | **$260,855** | **$283,469** |

**Sources:** Report by Neil Demchick; 552-562; Deposition of Peter Schneider and Exhibits; Entergy 10-K Filing for Fiscal Year Ending 12/31/2005
**Notes:**   1. EDFINA annual salary includes 13 months of monthly salary plus 12 months of indemnity appropriations.
         2. Ms. Gaujacq received 1,500 stock options from Entergy valued at $8.17 per share in 2005.
         3. Ms. Gaujacq has an annual target of 5,100 stock options in 2006.
         4. Ms. Gaujacq's Entergy Bonus is 30% of her Base Salary.
         5. Summations may not be exact due to rounding.
         6. Dollar Amounts for Americas Branch Salaries and Bonuses calculated using an exchange rate of approximately 1.2 dollars per euro.

*Table 1*
*Partial Correction of Demchick Exhibit B.2*
*Employment at Entergy vs. EDF*

| | Gaujacq - Americas Branch | Gaujacq - EDF (in France) | Gaujacq - Entergy | Estimated Difference of Benefits | |
| | | | | Gaujacq (Americas Branch) - Gaujacq (Entergy) | Gaujacq (EDF) - Gaujacq (Entergy) |
|---|---|---|---|---|---|
| **Annual Benefits:** | | | | | |
| Annual Air Fare allowance | 2,613 | | | 2,613 | 0 |
| Housing Allowance | 54,000 | 21,539 | | 54,000 | 21,539 |
| Automobile Allowance | 6,787 | 6,787 | | 6,787 | 6,787 |
| Storage of furniture in France | 4,621 | | | 4,621 | 0 |
| Utilities (heating, cooling, satellite TV, Home phone line, lease, trash) | 9,748 | 9,748 | | 9,748 | 9,748 |
| Profit Sharing | 2,579 | 2,579 | | 2,579 | 2,579 |
| Company car registration, property taxes, gas | 1,800 | 1,800 | | 1,800 | 1,800 |
| Insurance premiums for residence and automobile | 2,539 | 2,539 | | 2,539 | 2,539 |
| 401(K) Company Contribution | 0 | | 7,560 | (7,560) | (7,560) |
| **Total Annual Benefits** | **$84,687** | **$44,992** | **$7,560** | **$77,127** | **$37,432** |

**Sources:**  Report by Neil Demchick; Savings Plan of Entergy Corporation and Subsidiaries (Entergy 0072-0092);
Gaujacq Entergy Pay Stub, 9/30/05 (1254).

*Table 1*

***Partial Correction of Demchick Exhibit C.1***

***Employment at Entergy vs. EDF***

***US Dollar ($)***

| Year | Age | But-for Retirement | | | Actual Retirement | | Net Lost Retirement Funds[2] | Reduced for Potential of Death[2] | Adjusted to January 7, 2005[3] |
|---|---|---|---|---|---|---|---|---|---|
| | | EDF Contribution | EDF Annuity | Entergy Retirement Annuity | Gaujacq's Current Retirement Annuity | Entergy Retirement Annuity | | | |
| 2005 | 48 | (13,979) | | | | | (13,979) | (13,979) | (13,979) |
| 2006 | 49 | (13,958) | | | | | (13,958) | (13,958) | (13,632) |
| 2007 | 50 | (14,217) | | | | | (14,217) | (14,179) | (13,183) |
| 2008 | 51 | (14,392) | | | | | (14,392) | (14,312) | (12,668) |
| 2009 | 52 | (14,824) | | | | | (14,824) | (14,695) | (12,383) |
| 2010 | 53 | (15,268) | | | | | (15,268) | (15,085) | (12,102) |
| 2011 | 54 | (15,726) | | | | | (15,726) | (15,479) | (11,822) |
| 2012 | 55 | (16,198) | | | | | (16,198) | (15,878) | (11,545) |
| 2013 | 56 | (16,684) | | | | | (16,684) | (16,276) | (11,267) |
| 2014 | 57 | (12,889) | 25,039 | | (15,512) | | (3,362) | (3,265) | (2,152) |
| 2015 | 58 | | 100,154 | | (62,049) | | 38,106 | 36,797 | 23,086 |
| 2016 | 59 | | 100,154 | | (62,049) | | 38,106 | 36,575 | 21,846 |
| 2017 | 60 | | 100,154 | | (62,049) | (13,683) | 24,423 | 23,281 | 13,238 |
| 2018 | 61 | | 100,154 | | (62,049) | (54,730) | (16,624) | (15,733) | (8,517) |
| 2019 | 62 | | 100,154 | | (62,049) | (54,730) | (16,624) | (15,607) | (8,043) |
| 2020 | 63 | | 100,154 | | (62,049) | (54,730) | (16,624) | (15,469) | (7,590) |
| 2021 | 64 | | 100,154 | | (62,049) | (54,730) | (16,624) | (15,320) | (7,156) |
| 2022 | 65 | | 100,154 | | (62,049) | (54,730) | (16,624) | (15,156) | (6,740) |
| 2023 | 66 | | 100,154 | | (62,049) | (54,730) | (16,624) | (14,979) | (6,341) |
| 2024 | 67 | | 100,154 | | (62,049) | (54,730) | (16,624) | (14,791) | (5,961) |
| 2025 | 68 | | 100,154 | | (62,049) | (54,730) | (16,624) | (14,583) | (5,595) |
| 2026 | 69 | | 100,154 | | (62,049) | (54,730) | (16,624) | (14,362) | (5,246) |
| 2027 | 70 | | 100,154 | | (62,049) | (54,730) | (16,624) | (14,120) | (4,910) |
| 2028 | 71 | | 100,154 | | (62,049) | (54,730) | (16,624) | (13,858) | (4,588) |
| 2029 | 72 | | 100,154 | | (62,049) | (54,730) | (16,624) | (13,583) | (4,281) |
| 2030 | 73 | | 100,154 | | (62,049) | (54,730) | (16,624) | (13,284) | (3,986) |
| 2031 | 74 | | 100,154 | | (62,049) | (54,730) | (16,624) | (12,963) | (3,703) |
| 2032 | 75 | | 100,154 | | (62,049) | (54,730) | (16,624) | (12,617) | (3,431) |
| 2033 | 76 | | 100,154 | | (62,049) | (54,730) | (16,624) | (12,245) | (3,170) |
| 2034 | 77 | | 100,154 | | (62,049) | (54,730) | (16,624) | (11,852) | (2,921) |
| 2035 | 78 | | 100,154 | | (62,049) | (54,730) | (16,624) | (11,430) | (2,682) |
| 2036 | 79 | | 100,154 | | (62,049) | (54,730) | (16,624) | (10,982) | (2,453) |
| 2037 | 80 | | 100,154 | | (62,049) | (54,730) | (16,624) | (10,501) | (2,233) |
| 2038 | 81 | | 100,154 | | (62,049) | (54,730) | (16,624) | (9,985) | (2,022) |
| 2039 | 82 | | 100,154 | | (62,049) | (54,730) | (16,624) | (9,453) | (1,822) |
| 2040 | 83 | | 100,154 | | (62,049) | (54,730) | (16,624) | (8,866) | (1,627) |
| 2041 | 84 | | 100,154 | | (62,049) | (54,730) | (16,624) | (8,294) | (1,449) |
| 2042 | 85 | | 100,154 | | (62,049) | (54,730) | (16,624) | (7,670) | (1,276) |
| 2043 | 86 | | 100,154 | | (62,049) | (54,730) | (16,624) | (7,028) | (1,113) |
| 2044 | 87 | | 100,154 | | (62,049) | (54,730) | (16,624) | (6,378) | (961) |
| 2045 | 88 | | 100,154 | | (62,049) | (54,730) | (16,624) | (5,726) | (822) |
| 2046 | 89 | | 100,154 | | (62,049) | (54,730) | (16,624) | (5,081) | (694) |
| 2047 | 90 | | 100,154 | | (62,049) | (54,730) | (16,624) | (4,452) | (579) |
| 2048 | 91 | | 100,154 | | (62,049) | (54,730) | (16,624) | (3,848) | (477) |
| 2049 | 92 | | 100,154 | | (62,049) | (54,730) | (16,624) | (3,277) | (386) |
| 2050 | 93 | | 100,154 | | (62,049) | (54,730) | (16,624) | (2,746) | (308) |
| 2051 | 94 | | 100,154 | | (62,049) | (54,730) | (16,624) | (2,261) | (242) |
| 2052 | 95 | | 100,154 | | (62,049) | (54,730) | (16,624) | (1,828) | (186) |
| 2053 | 96 | | 100,154 | | (62,049) | (54,730) | (16,624) | (1,449) | (140) |
| 2054 | 97 | | 100,154 | | (62,049) | (54,730) | (16,624) | (1,124) | (104) |
| 2055 | 98 | | 100,154 | | (62,049) | (54,730) | (16,624) | (853) | (75) |
| 2056 | 99 | | 100,154 | | (62,049) | (54,730) | (16,624) | (631) | (53) |
| 2057 | 100 | | 100,154 | | (62,049) | (54,730) | (16,624) | (455) | (36) |
| Capital Account[1] | | | 288,000 | | | | 288,000 | 281,149 | 204,428 |
| **Total** | | **($148,136)** | **$4,619,673** | **$0** | **($2,683,601)** | **($2,202,888)** | **($414,952)** | **($124,141)** | **$33,944** |

**Assumptions:**

| Discount Rate | Wage Growth Rate | Exchange Rate, 2006-2057 | 2004 Gaujacq Annual Base Salary (France) ($) | EDF Retirement Plan Annuity Rate | EDF Contribution pre - 2/6/06 | EDF Contribution beginning 2/6/06 | Actual Gaujacq Entergy Last 60 Month Annual Average ($) | Actual Entergy Annuity % | Early Withdrawal Penalty |
|---|---|---|---|---|---|---|---|---|---|
| 5.0% | 3.0% | 1.20 | 108,579 | 75.0% | 12.0% | 12.13% | 311,853 | 19.5% | 10% |

**Source:** Report by Neil Demchick; Simulation of Pension; Entergy Retirement Plan (Entergy 0096 - 0140); Dossier Guajacq (CNIEG).

**Notes:** 1. Assumes loss of Capital Fund of $288,000 payable in 2012.
2. Reduction for potential of death based on method used in Demchick report.
3. Present value calculation based on approximate 5% rate for all purposes pursuant to Demchick methodology.

### *Table 1*
### *Partial Correction of Demchick Exhibit D*
### *Employment at Entergy vs. EDF*

| Item | Amount (USD) |
| --- | --- |
| Business Expenses Not Reimbursed by EDF | $1,721 |
| Health Insurance Premiums During Unemployment Period | $885 |
| Expenses to Find New Employment | $600 |
| Travel Expenses Related to New Employment | $4,583 |
| **Total "Out of Pocket" Costs** | **$7,789** |

**Source:**  Report by Neil Demchick.

## *Table 1*
## *Partial Correction of Demchick Exhibit E*
## *Employment at Entergy vs. EDF*

| Item | Amount (USD) |
|---|---|
| Preferential Stock | $3,749.52 |
| **Total Other Lost Benefits** | **$3,749.52** |

**Source:** Report by Neil Demchick.

*Table 2*
*Partial Correction of Demchick Exhibit A*
*Departure from EDF 7/31/2007*

| Damages Start Date | EDF End Date | Compensation Exhibit B | Retirement Funds Exhibit C | "Out of Pocket" Costs Exhibit D | Other Benefits Exhibit E | Prejudgement Interest as of 4/30/2007 | Total Estimated Loss |
|---|---|---|---|---|---|---|---|
| 8/1/2000 | 7/31/2007 | $1,002,775 | $573,786 | $7,789 | $3,750 | $184,860 | **$1,772,959** |
| 8/1/2004 | 7/31/2007 | $383,846 | $573,786 | $7,789 | $3,750 | $112,815 | **$1,081,985** |
| 5/13/2002 | 7/31/2007 | $765,194 | $573,786 | $7,789 | $3,750 | $157,205 | **$1,507,724** |
| 5/13/2003 | 7/31/2007 | $608,110 | $573,786 | $7,789 | $3,750 | $138,920 | **$1,332,354** |

*Table 2*
*Partial Correction of Demchick Exhibit B*
*Departure from EDF 7/31/2007*

| Period | | Actual Earnings | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Nadal/Gaujacq EDF-Entergy Base Salary, Bonus, Indemnity[2] | | Gaujacq Base Salary, Bonus, Indemnity[2] | | Difference in Earnings | Difference in Benefits[3] | Total Difference | Reduced for Potential of Death[4] | Present Value as of[5] |
| Start Date | End Date | Euro | USD | Euro | USD | USD | USD | USD | USD | 1/7/2005 |
| 8/1/2000 | 12/31/2000 | 100,270 | 85,230 | 53,409 | 45,397 | 39,832 | 3,950 | 43,782 | 43,782 | 53,901 |
| 1/1/2001 | 12/31/2001 | 246,383 | 206,962 | 127,413 | 107,027 | 99,935 | 9,705 | 109,640 | 109,640 | 130,353 |
| 1/1/2002 | 12/31/2002 | 253,775 | 241,561 | 127,413 | 121,281 | 120,280 | 9,996 | 130,276 | 130,276 | 147,456 |
| 1/1/2003 | 12/31/2003 | 261,388 | 295,102 | 127,413 | 143,847 | 151,255 | 10,296 | 161,551 | 161,551 | 174,081 |
| 1/1/2004 | 12/31/2004 | 269,230 | 340,559 | 128,150 | 162,102 | 178,457 | 10,605 | 189,062 | 189,062 | 193,951 |
| 1/1/2005 | 12/31/2005 | 277,306 | 345,630 | 174,950 | 218,055 | 127,575 | 89,021 | 216,595 | 216,595 | 211,534 |
| 1/1/2006 | 12/31/2006 | 285,626 | 341,780 | | 283,469 | 58,311 | 90,364 | 148,674 | 148,674 | 138,234 |
| 1/1/2007 | 12/31/2007 | 171,613 | 334,378 | | 291,973 | 42,405 | 52,988 | 95,393 | 95,133 | 84,208 |
| 1/1/2008 | 12/31/2008 | | 283,469 | | 300,732 | -17,263 | -460 | -17,724 | -17,625 | -14,852 |
| 1/1/2009 | 12/31/2009 | | 291,973 | | 309,754 | -17,781 | -474 | -18,255 | -18,096 | -14,518 |
| 1/1/2010 | 12/31/2010 | | 300,732 | | 319,047 | -18,315 | -488 | -18,803 | -18,578 | -14,189 |
| 1/1/2011 | 12/31/2011 | | 309,754 | | 328,618 | -18,864 | -503 | -19,367 | -19,062 | -13,860 |
| 1/1/2012 | 12/31/2012 | | 319,047 | | 338,477 | -19,430 | -518 | -19,948 | -19,554 | -13,536 |
| 1/1/2013 | 12/31/2013 | | 328,618 | | 348,631 | -20,013 | -534 | -20,547 | -20,044 | -13,209 |
| 1/1/2014 | 12/31/2014 | | 338,477 | | 359,090 | -20,613 | -550 | -21,163 | -20,550 | -12,893 |
| 1/1/2015 | 12/31/2015 | | 348,631 | | 369,863 | -21,232 | -566 | -21,798 | -21,049 | -12,573 |
| 1/1/2016 | 12/31/2016 | | 359,090 | | 380,959 | -21,869 | -583 | -22,452 | -21,550 | -12,254 |
| 1/1/2017 | 9/30/2017 | | 276,637 | | 293,484 | -16,847 | -601 | -17,448 | -16,632 | -9,060 |
| **TOTAL** | | | $5,347,631 | | $4,721,807 | $625,824 | $271,646 | $897,470 | $901,975 | $1,002,775 |

**Source:** Report by Neil Demchick; Entergy-0011, 0014-16; Gaujacq Entergy Employee Pay Stub, 04/01/2006 (2175).

**Notes:** 1. Exchange rates provided by Demchick Report.
2. Salaries, bonuses, and indemnities from Exhibit B.1 adjusted for partial years and growth at 3% per year.
3. Benefits from B.2 adjusted for partial years and 3% annual growth.
4. Reduction for potential of death based on method used in Demchick report.
5. Present value calculation based on approximate 5% rate for all purposes, pursuant to Demchick methodology.

*Table 2*
*Partial Correction of Demchick Exhibit B.1*
*Departure from EDF 7/31/2007*

| | Nadal Americas Branch (Euro) 2004 | Gaujacq Americas Branch (Euro) 2000 | Gaujacq Americas Branch (Euro) 2004 | Gaujacq Entergy (USD) 2005 | Gaujacq Entergy (USD) 2006 |
|---|---|---|---|---|---|
| **Monthly Salary:** | | | | | |
| Base Salary (Monthly) | 13,050 | 5,993 | 6,980 | 15,000 | 15,420 |
| "Former Business Unit" indemnity (Monthly) | | 541 | 93 | | |
| "De mobilite internationale" indemnity | 2,121 | | | | |
| "Far from home" indemnity (monthly) | | 974 | 1,134 | | |
| "Cost of Living differential" Indemnity (monthly) | 236 | 1,127 | 407 | | |
| "Fonction internationale" indemnity (monthly) | 3,700 | | | | |
| **Total Monthly Salary** | **19,107** | **8,635** | **8,614** | **15,000** | **15,420** |
| | | | | | |
| **Total Annual Salary**[1] | **242,330** | **109,613** | **110,350** | **180,000** | **185,040** |
| Stock Options[2,3] | | | | 12,255 | 42,917 |
| Signing Bonus | | | | 20,000 | |
| Annual Bonus[4] | 26,900 | 17,800 | 17,800 | 48,600 | 55,512 |
| | | | | | |
| **Total Annual Salary and Bonus (€)**[5] | **€269,230** | **€127,413** | **€128,150** | **€209,290** | **€236,895** |
| **Total Annual Salary and Bonus ($)**[6] | **$322,160** | **$152,462** | **$153,344** | **$260,855** | **$283,469** |

**Sources:**  Report by Neil Demchick; 552-562; Deposition of Peter Schneider and Exhibits; Entergy 10-K Filing for Fiscal Year Ending 12/31/2005
**Notes:**  1. EDFINA annual salary includes 13 months of monthly salary plus 12 months of indemnity appropriations.
2. Ms. Gaujacq received 1,500 stock options from Entergy valued at $8.17 per share in 2005.
3. Ms. Gaujacq has an annual target of 5,100 stock options in 2006.
4. Ms. Gaujacq's Entergy Bonus is 30% of her Base Salary.
5. Summations may not be exact due to rounding.
6. Dollar Amounts for Americas Branch Salaries and Bonuses calculated using an exchange rate of approximately 1.2 dollars per euro.

*Table 2*
*Partial Correction of Demchick Exhibit B.2*
*Departure from EDF 7/31/2007*

| | Nadal - Americas Branch | Gaujacq - Americas Branch | Gaujacq - Entergy | Estimated Difference of Benefits | |
|---|---|---|---|---|---|
| | | | | Nadal - Gaujacq at Americas Branch | Nadal/Gaujacq at Americas Branch - Gaujacq at Entergy |
| **Annual Benefits:** | | | | | |
| Annual Air Fare allowance | 9,599 | 2,613 | | 6,986 | 9,599 |
| Housing Allowance | 70,800 | 54,000 | | n/a | 54,000 |
| Automobile Allowance | 10,406 | 6,787 | | 3,619 | 10,406 |
| Storage of furniture in France | 4,621 | 4,621 | | 0 | 4,621 |
| Utilities (heating, cooling, satellite TV, Home phone line, lease, trash) | 9,748 | 9,748 | | 0 | 9,748 |
| Profit Sharing | 2,579 | 2,579 | | 0 | 2,579 |
| Company car registration, property taxes, gas | 1,800 | 1,800 | | 0 | 1,800 |
| Insurance premiums for residence and automobile | 2,539 | 2,539 | | 0 | 2,539 |
| 401(K) Company Contribution | 0 | 0 | 7,560 | 0 | (7,560) |
| **Total Annual Benefits** | **$112,092** | **$84,687** | **$7,560** | **$10,605** | **$87,732** |

**Sources:**  Report by Neil Demchick; Savings Plan of Entergy Corporation and Subsidiaries (Entergy 0072-0092);
Gaujacq Entergy Pay Stub, 9/30/05 (1254).

*Table 2*
*Partial Correction of Demchick Exhibit C.1*
*Departure from EDF 7/31/2007*
*US Dollar ($)*

| Year | Age | But-for Retirement | | | Actual Retirement | | Net Lost Retirement Funds | Reduced for Potential of Death | Adjusted to January 7, 2005 |
|---|---|---|---|---|---|---|---|---|---|
| | | EDF Contribution | EDF Annuity | Entergy Retirement Annuity | Gaujacq's Current Retirement Annuity | Entergy Retirement Annuity | | | |
| 2005 | 48 | (25,091) | | | | | (25,091) | (25,091) | (25,091) |
| 2006 | 49 | (26,096) | | | | | (26,096) | (26,096) | (25,486) |
| 2007 | 50 | (15,696) | | | | | (15,696) | (15,653) | (14,554) |
| 2008 | 51 | | | | | | 0 | 0 | 0 |
| 2009 | 52 | | | | | | 0 | 0 | 0 |
| 2010 | 53 | | | | | | 0 | 0 | 0 |
| 2011 | 54 | | | | | | 0 | 0 | 0 |
| 2012 | 55 | | | | | | 0 | 0 | 0 |
| 2013 | 56 | | | | | | 0 | 0 | 0 |
| 2014 | 57 | | 30,959 | | (15,512) | | 15,447 | 14,999 | 9,885 |
| 2015 | 58 | | 123,835 | | (62,049) | | 61,787 | 59,665 | 37,434 |
| 2016 | 59 | | 123,835 | | (62,049) | | 61,787 | 59,305 | 35,422 |
| 2017 | 60 | | 123,835 | 9,921 | (62,049) | (13,663) | 58,025 | 55,312 | 31,452 |
| 2018 | 61 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 44,233 | 23,945 |
| 2019 | 62 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 43,878 | 22,614 |
| 2020 | 63 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 43,493 | 21,339 |
| 2021 | 64 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 43,072 | 20,119 |
| 2022 | 65 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 42,611 | 18,949 |
| 2023 | 66 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 42,114 | 17,829 |
| 2024 | 67 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 41,586 | 16,761 |
| 2025 | 68 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 41,000 | 15,732 |
| 2026 | 69 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 40,380 | 14,751 |
| 2027 | 70 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 39,699 | 13,806 |
| 2028 | 71 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 38,963 | 12,900 |
| 2029 | 72 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 38,188 | 12,037 |
| 2030 | 73 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 37,347 | 11,207 |
| 2031 | 74 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 36,445 | 10,411 |
| 2032 | 75 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 35,474 | 9,648 |
| 2033 | 76 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 34,426 | 8,913 |
| 2034 | 77 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 33,322 | 8,214 |
| 2035 | 78 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 32,135 | 7,541 |
| 2036 | 79 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 30,876 | 6,898 |
| 2037 | 80 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 29,523 | 6,279 |
| 2038 | 81 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 28,073 | 5,684 |
| 2039 | 82 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 26,577 | 5,123 |
| 2040 | 83 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 24,927 | 4,575 |
| 2041 | 84 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 23,319 | 4,074 |
| 2042 | 85 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 21,563 | 3,587 |
| 2043 | 86 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 19,760 | 3,129 |
| 2044 | 87 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 17,932 | 2,703 |
| 2045 | 88 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 16,099 | 2,310 |
| 2046 | 89 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 14,286 | 1,952 |
| 2047 | 90 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 12,518 | 1,628 |
| 2048 | 91 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 10,819 | 1,340 |
| 2049 | 92 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 9,212 | 1,086 |
| 2050 | 93 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 7,720 | 866 |
| 2051 | 94 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 6,358 | 679 |
| 2052 | 95 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 5,141 | 523 |
| 2053 | 96 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 4,074 | 395 |
| 2054 | 97 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 3,161 | 291 |
| 2055 | 98 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 2,397 | 210 |
| 2056 | 99 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 1,774 | 148 |
| 2057 | 100 | | 123,835 | 39,683 | (62,049) | (54,730) | 46,740 | 1,279 | 102 |
| Capital Account | | | 288,000 | | | | 288,000 | 281,149 | 204,428 |
| **Total** | | **($66,883)** | **$5,643,884** | **$1,597,257** | **($2,683,601)** | **($2,202,888)** | **$2,287,769** | **$1,429,346** | **$573,786** |

**Assumptions:**

| Discount Rate | Wage Growth Rate | Exchange Rate, 2006-2057 | 2004 Nadal Annual Base Salary (€) | EDF Retirement Plan Annuity Rate | EDF Contribution pre - 2/6/06 | EDF Contribution beginning 2/6/06 | But-For Gaujacq Entergy Last 60 Month Annual Average ($) | Actual Gaujacq Entergy Last 60 Month Annual Average ($) | But-For Entergy Annuity % | Actual Entergy Annuity % | Early Withdrawal Penalty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5.0% | 3.0% | 1.20 | 169,650 | 57.5% | 12.0% | 12.1% | 293,951 | 311,853 | 15% | 19.5% | 10% |

**Source:** Report by Neil Demchick; Simulation de Pension; Entergy Retirement Plan (Entergy 0096 - 0140); Dossier Gaujacq (CNIEG).
**Notes:** 1. Assumes loss of Capital Fund of $288,000 payable in 2012.
2. Reduction for potential of death based on method used in 2012.
3. Present value calculation based on approximate 5% rate for all purposes pursuant to Demchick methodology.

### *Table 2*
### *Partial Correction of Demchick Exhibit D*
### *Departure from EDF 7/31/2007*

| Item | Amount (USD) |
|---|---|
| Business Expenses Not Reimbursed by EDF | $1,721 |
| Health Insurance Premiums During Unemployment Period | $885 |
| Expenses to Find New Employment | $600 |
| Travel Expenses Related to New Employment | $4,583 |
| **Total "Out of Pocket" Costs** | **$7,789** |

**Source:** Report by Neil Demchick

### *Table 2*
### *Partial Correction of Demchick Exhibit E*
### *Departure from EDF 7/31/2007*

| Item | Amount (USD) |
|------|-------------:|
| Preferential Stock | $3,749.52 |
| **Total Other Lost Benefits** | **$3,749.52** |

**Source:**  Report by Neil Demchick

**Appendix 1:**
**New CEO Appointments**

| CEO | Company | Ticker | Start Date | Year | Incoming CEO Total Compensation ($) | Option Grants (# of Shares)[1] | Year | Outgoing CEO Total Compensation ($) | Option Grants (# of Shares) | Compensation Difference | Option Grant Difference | Male replaced by male? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vernon J. Nagel | Acuity Brands, Inc | AYI | 9/1/2004 | 2005 | 1,102,528 | 0 | 2004 | 1,586,518 | 300,000 | (483,990) | (300,000) | Yes |
| Donald J. Shippar | Allete, Inc. (formerly Minnesota Power | ALE | 1/26/2004 | 2004 | 995,911 | 13,905 | 2003 | 1,474,076 | 121,006 | (478,165) | (107,101) | Yes |
| Timothy R. Eller | Centex Corp. | CTX | 3/31/2004 | 2004 | 15,658,873 | 216,000 | 2003 | 9,220,530 | 253,306 | 6,438,343 | (37,306) | Yes |
| E. Neville Isdell | Coca-Cola | KO | TBA | 2004 | 10,918,193 | 450,000 | 2004 | 5,864,593 | 0 | 5,053,600 | 450,000 | Yes |
| Larry Kellner | Continental Airlines | CAL | 1/1/2005 | 2005 | 1,025,857 | 0 | 2004 | 34,253,780 | 0 | (33,227,923) | 0 | Yes |
| Kevin Rollins | Dell, Inc. | DELL | 7/16/2004 | 2005 | 2,969,398 | 1,200,000 | 2004 | 3,008,973 | 800,000 | (39,575) | 400,000 | Yes |
| Steven Alesio | Dun & Bradstreet Corp. | DNB | 5/2/2005 | 2005 | 4,299,542 | 104,400 | 2004 | 5,721,422 | 161,230 | (1,421,880) | (56,830) | Yes |
| Douglas M. Baker Jr. | Ecolab, Inc. | ECL | 7/1/2004 | 2004 | 1,534,000 | 314,000 | 2003 | 2,857,538 | 650,000 | (1,323,538) | (336,000) | Yes |
| Anthony J. Alexander | FirstEnergy Corp. | FE | 1/13/2004 | 2004 | 2,370,835 | 257,100 | 2003 | 2,694,387 | 266,800 | (323,552) | (9,700) | Yes |
| Stan A. Askren | HNI Corp. | HNI | 5/4/2004 | 2004 | 1,447,335 | 50,000 | 2003 | 1,908,297 | 150,000 | (460,962) | (100,000) | Yes |
| Henry H. Gerkens | Landstar System, Inc. | LSTR | 7/1/2004 | 2004 | 3,374,240 | 204,000 | 2003 | 1,307,288 | 60,000 | 2,066,952 | 144,000 | Yes |
| Robert J. Stevens | Lockheed Martin | LMT | TBA | 2004 | 7,220,863 | 175,000 | 2003 | 13,762,840 | 375,000 | (6,541,977) | (200,000) | Yes |
| Robert A. Niblock | Lowe's Companies | LOW | 1/28/2005 | 2005 | 7,840,409 | 72,000 | 2004 | 6,561,522 | 87,000 | 1,278,887 | (15,000) | Yes |
| James Hambrick | The Lubrizol Corp. | LZ | 4/26/2004 | 2004 | 1,580,708 | 0 | 2003 | 2,109,189 | 0 | (528,481) | 0 | Yes |
| Charlie Bell | McDonald's Corp. | MCD | 4/20/2004 | 2004 | 4,648,138 | 350,000 | 2003 | 5,986,800 | 400,000 | (1,338,662) | (50,000) | Yes |
| Janet L. Robinson | The New York Times Co | NYT | 1/1/2005 | 2005 | 3,522,000 | 149,000 | 2004 | 2,352,315 | 55,000 | 1,169,685 | 94,000 | No, Male to Female |
| James Myers | PETCO Animal Supplies | PETC | 3/1/2004 | 2003 | 801,639 | 50,000 | 2002 | 1,715,010 | 0 | (913,371) | 50,000 | Yes |
| Robert B. McGehee | Progress Energy, Inc | PGN | 3/1/2004 | 2004 | 5,090,342 | 0 | 2003 | 7,323,604 | 258,000 | (2,233,262) | (258,000) | Yes |
| Jeffrey W. Shaw | Southwest Gas Corp. | SWX | 6/1/2004 | 2004 | 1,031,844 | 75,000 | 2003 | 1,582,098 | 50,000 | (550,254) | 25,000 | Yes |
| Michael Bradley | Teradyne | TER | 5/27/2004 | 2004 | 1,108,013 | 450,000 | 2003 | 1,045,168 | 300,000 | 62,845 | 150,000 | Yes |
| Mel G. Brekhus | Texas Industries | TXI | 6/1/2004 | 2005 | 880,724 | 156,645 | 2004 | 1,131,171 | 0 | (250,447) | 156,645 | Yes |
| Richard Templeton | Texas Instruments, Inc. | TXN | 5/1/2004 | 2004 | 5,714,049 | 700,000 | 2003 | 1,897,822 | 1,300,000 | 3,816,227 | (600,000) | Yes |
| Gerald Paul | Vishay Intertechnology | VSH | TBA | 2004 | 1,896,527 | 0 | 2003 | 1,779,123 | | 117,404 | 0 | Yes |
| David P. Steiner | Waste Management, Inc | WMI | 3/8/2004 | 2004 | 3,654,393 | 90,000 | 2003 | 2,194,616 | 335,000 | 1,459,777 | (245,000) | Yes |
| John R. Peeler | Acterna | ACTR | 3/13/2003 | NA[2] | NA | NA | NA | NA | NA | NA | NA | NA |
| James L. Wainscott | AK Steel Holding | AKS | TBA | 2003 | 1,677,685 | 430,000 | 2002 | 7,336,153 | 150,000 | (5,658,468) | 280,000 | Yes |
| William S. Ayer | Alaska Air Group | ALK | 5/20/2003 | 2003 | 487,391 | 55,000 | 2002 | 661,160 | 0 | (173,769) | 55,000 | Yes |
| Zev Weiss | American Greetings Corp. | AM | 6/1/2003 | 2004 | 612,230 | 100,000 | 2003 | 1,903,074 | 0 | (1,290,844) | 100,000 | Yes |
| Clifton H Morris | AmeriCredit Corp. | ACF | 4/23/2003 | 2003 | 557,265 | 190,000 | 2002 | 2,653,337 | 0 | (2,096,072) | 190,000 | Yes |
| Gerard Arpey | AMR Corp. | AMR | 4/24/2003 | 2003 | 686,295 | 0 | 2002 | 811,125 | 520,000 | (124,830) | (520,000) | Yes |
| Robert J. Allison Jr. | Anadarko Petroleum Corp | APC | 3/26/2003 | 2003 | 4,874,093 | 0 | 2002 | 3,119,751 | 500,000 | 1,754,342 | (500,000) | Yes |
| William Leonard | Aramark Corp. | RMK | 1/1/2004 | 2004 | 6,088,698 | 370,000 | 2003 | 2,704,453 | 0 | 3,384,245 | 370,000 | Yes |
| Steven H Temares[3] | Bed, Bath & Beyond | BBBY | 4/2/2003 | 2003 | 931,000 | 400,000 | 2002 | 1,120,810 | 300,000 | (189,810) | 100,000 | Yes |
| Harry C. Stonecipher | Boeing Co. | BA | TBA | 2003 | 1,083,615 | 3,000 | 2002 | 3,877,955 | 0 | (2,794,340) | 3,000 | Yes |
| Timothy M. Manganello | BorgWarner, Inc. | BWA | TBA | 2003 | 1,810,112 | 0 | 2002 | 3,646,420 | 10,557 | (1,836,308) | (10,557) | Yes |
| Douglas (Doug) H. Brooks | Brinker International | EAT | 1/1/2004 | 2004 | 2,107,912 | 125,000 | 2003 | 3,517,218 | 275,000 | (1,409,306) | (150,000) | Yes |
| James Owen | Caterpillar, Inc. | CAT | TBA | 2004 | 4,123,058 | 230,000 | 2003 | 3,011,176 | 250,000 | 1,111,882 | (20,000) | Yes |
| David S. Potruck | The Charles Schwab Corp. | SCH | 5/9/2003 | 2003 | 3,622,042 | 1,417,100 | 2002 | 893,584 | 1,300,000 | 2,728,458 | 117,100 | Yes |
| Scott D. Farmer | Cintas Corp. | CTAS | TBA | 2003 | 507,165 | 0 | 2002 | 573,013 | 0 | (65,848) | 0 | Yes |
| Robert (Bob) B. Willumstad | Citigroup | C | 1/1/2004 | 2004 | 18,559,230 | 329,611 | 2003 | 26,812,148 | 436,042 | (8,252,918) | (106,431) | Yes |
| Charles O. Prince III | Citigroup | C | 10/1/2003 | 2003 | 26,812,148 | 436,042 | 2002 | 30,674,065 | 2,516,003 | (3,861,917) | (2,079,961) | Yes |
| Gerald (Jerry) E. Johnston | The Clorox Co. | CLX | 7/1/2003 | 2003 | 2,835,399 | 88,000 | 2002 | 7,375,171 | 1,100,001 | (4,539,776) | (1,012,001) | Yes |
| David A. Stockman | Collins & Aikman Corp. | CKC | 8/11/2003 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Michael J. Ward | CSX Corp. | CSX | 1/31/2003 | 2003 | 991,065 | 400,000 | 2002 | 9,744,515 | 0 | (8,753,450) | 400,000 | Yes |
| Timothy M. Ring | C.R. Bard, Inc. | BCR | 8/7/2003 | 2004 | 3,283,398 | 166,250 | 2003 | 15,947,318 | 600 | (12,663,920) | 165,650 | Yes |
| Gary L. Paxton | Dollar Thrifty Automotive Group | DTG | 10/1/2003 | 2004 | 1,560,041 | 0 | 2003 | 1,063,307 | 0 | 496,734 | 0 | Yes |
| Bob Sasser | Dollar Tree Stores | DLTR | 1/1/2004 | 2004 | 867,340 | 60,000 | 2003 | 1,079,329 | 60,000 | (211,989) | 0 | Yes |
| Paul M. Anderson | Duke Energy Corp. | DUK | TBA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Mitchell H. Caplan | E*TRADE Group, Inc | ET | 2/24/2003 | 2003 | 7,902,085 | 1,312,500 | 2002 | 12,213,994 | 0 | (4,311,909) | 1,312,500 | Yes |
| Charles (Chip) D. McClure | Federal-Mogul Corp. | FDMLQ | 7/10/2003 | NA | NA | NA | NA | NA | NA | NA | NA | Yes |
| Terry J. Lundgren | Federated Department Stores | FD | 2/26/2003 | 2003 | 5,029,256 | 250,000 | 2002 | 2,700,629 | 0 | 2,328,627 | 250,000 | Yes |
| George E. Deese | Flowers Foods, Inc. | FLO | 1/4/2004 | 2004 | 2,343,001 | 0 | 2003 | 1,155,743 | 244,000 | 1,187,258 | (244,000) | Yes |
| Martin L. Flanagan[3] | Franklin Resources, Inc. | BEN | 1/1/2004 | 2004 | 5,850,722 | 45,000 | 2003 | 2,898,447 | 0 | 2,952,275 | 45,000 | Yes |
| Gregory E. Johnson[4] | Franklin Resources, Inc. | BEN | 1/1/2004 | 2004 | 5,794,627 | 45,000 | 2003 | 2,898,447 | 0 | 2,896,180 | 45,000 | Yes |
| Gregory J. Parseghian | Freddie Mac | FRE | 6/9/2003 | NA | NA | NA | NA | NA | NA | NA | NA | Yes |
| Richard C. Adkerson | Freeport-McMoRan Copper & Gold, Inc | FCX | 12/10/2003 | 2004 | 6,963,776 | 0 | 2003 | 13,180,626 | 0 | (6,216,850) | 0 | Yes |
| Richard M. Scrushy | HealthSouth Corp. | HRC | 1/6/2003 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| John Faraci | International Paper | IP | 10/31/2003 | 2004 | 6,554,202 | 8,000 | 2003 | 8,977,337 | 312,500 | (2,423,135) | (304,500) | Yes |
| David Bell | Interpublic Group | IPG | 2/27/2003 | 2003 | 2,389,403 | 200,000 | 2002 | 6,767,473 | 375,000 | (4,378,070) | (175,000) | Yes |
| Dennis R. Glass | Jefferson-Pilot Corp. | JP | 3/1/2004 | 2004 | 2,179,769 | 100,000 | 2003 | 4,108,863 | 250,000 | (1,929,094) | (150,000) | Yes |
| James C. Thyen | Kimball International, Inc | KBALB | 1/1/2004 | 2004 | 1,778,665 | 0 | 2003 | 817,836 | 106,500 | 960,829 | (106,500) | Yes |
| Julian C. Day | Kmart Corp. | KMRTQ | 1/19/2003 | NA | NA | NA | NA | NA | NA | NA | NA | Yes |
| David B. Dillon | Kroger Co. | KR | TBA | 2003 | 3,661,841 | 0 | 2002 | 3,934,147 | 600,000 | (272,306) | (600,000) | Yes |
| Sharon L. Patrick | Martha Stewart Living Omnimedia, Inc | MSO | 6/5/2003 | 2003 | 1,654,310 | 0 | 2002 | 2,361,088 | 150,000 | (706,778) | (150,000) | No, Female to Female |
| Paul J. Tufano | Maxtor Corp. | MXO | 1/6/2003 | 2003 | 4,225,570 | 750,000 | 2002 | 7,492,132 | 680,000 | (3,266,562) | 70,000 | Yes |
| Bruce L. Hammonds | MBNA America Bank | KRB | 12/30/2003 | 2004 | 12,710,472 | 0 | 2003 | 42,811,755 | 1,500,000 | (30,101,283) | (1,500,000) | Yes |

**Appendix 1:**
**New CEO Appointments**

| CEO | Company | Ticker | Start Date | Year | Total Compensation ($) | Option Grants (# of Shares)[1] | Year | Total Compensation ($) | Option Grants (# of Shares) | Compensation Difference | Option Grant Difference | Male replaced by male? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Incoming CEO** | | | **Outgoing CEO** | | | | | |
| Robert (Bob) E. Lee | Millennium Chemicals, Inc | MCH | TBA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Mark Hurd | NCR Corp. | NCR | 3/14/2003 | 2003 | 1,526,808 | 55,000 | 2002 | 1,157,398 | 210,000 | 369,410 | (155,000) | Yes |
| Ronald D. Sugar | Northrop Grumman | NOC | 4/1/2003 | 2003 | 5,867,245 | 150,000 | 2002 | 9,229,615 | 125,000 | (3,362,370) | 25,000 | Yes |
| Dennis R Wraase | Pepco Holdings, Inc | POM | 6/1/2003 | 2003 | 895,942 | 0 | 2002 | 1,922,595 | 119,900 | (1,026,653) | (119,900) | Yes |
| Surya N. Mohapatra | Quest Diagnostics | DGX | TBA | 2004 | 2,216,334 | 173,141 | 2003 | 7,308,279 | 700,000 | (5,091,945) | (526,859) | Yes |
| William H Swanson | Raytheon Co. | RTN | 7/1/2003 | 2003 | 6,469,904 | 265,300 | 2002 | 3,264,056 | 416,500 | 3,205,848 | (151,200) | Yes |
| Mary F Sammons | Rite Aid Corp. | RAD | 6/25/2003 | 2004 | 2,866,839 | 0 | 2003 | 3,371,614 | 500,000 | (504,775) | (500,000) | No, Male to Female |
| James O. Staley | Roadway Corp. | ROAD | 3/26/2003 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Keith Nosbusch | Rockwell Automation, Inc | ROK | 2/4/2004 | 2004 | 1,963,668 | 250,000 | 2003 | 2,005,567 | 350,000 | (41,899) | (100,000) | Yes |
| Michael S. (Sam) Gilliland | Sabre Holdings Corp. | TSG | TBA | 2004 | 3,299,214 | 0 | 2003 | 2,567,022 | 200,000 | 732,192 | (200,000) | Yes |
| David M. Ratcliffe | Southern Co. | SO | 12/1/2004 | 2005 | 3,893,704 | 550,000 | 2004 | 4,022,815 | 519,115 | (129,111) | 30,885 | Yes |
| Daniel Starks | St. Jude Medical, Inc | STJ | TBA | 2004 | 1,339,717 | 868,438 | 2003 | 1,013,007 | 715,656 | 326,710 | 152,782 | Yes |
| Trevor Fetter | Tenet Healthcare Corp. | THC | TBA | 2003 | 6,122,680 | 350,000 | 2002 | 948,977 | 0 | 5,173,703 | 350,000 | Yes |
| Dominic J. Pileggi | Thomas & Betts Corp. | TNB | 1/16/2004 | 2004 | 2,231,965 | 77,232 | 2003 | 2,639,631 | 0 | (407,666) | 77,232 | Yes |
| Wayland R. Hicks | United Rentals | URI | TBA | 2004 | 4,756,971 | 0 | 2003 | 1,050,550 | 0 | 3,706,421 | 0 | Yes |
| Thomas R Watjen | UnumProvident Corp. | UNM | 3/31/2003 | 2003 | 2,534,193 | 600,000 | 2002 | 1,107,234 | 550,000 | 1,426,959 | 50,000 | Yes |
| Frank Lazaran | Winn-Dixie | WIN | 6/26/2003 | 2003 | 1,282,845 | 437,792 | 2002 | 2,477,008 | 144,568 | (1,194,163) | 293,224 | Yes |
| Paul T. Hanrahan | The AES Corp. | AES | 6/18/2002 | 2002 | 1,445,610 | 874,600 | 2001 | 1,551 | 960,646 | 1,444,059 | (86,046) | Yes |
| Patrick T. Stokes[5] | Anheuser-Busch Companies, Inc. | BUD | 7/1/2002 | 2002 | 4,572,088 | 1,354,200 | 2001 | 4,740,277 | 1,083,400 | (168,189) | 270,800 | Yes |
| Richard C. Green Jr. | Aquila, Inc. | ILA | 10/1/2002 | 2003 | 1,060,983 | 0 | 2002 | 8,976,305 | 0 | (7,915,322) | 0 | Yes |
| James J. O'Brien | Ashland, Inc. | ASH | 10/1/2002 | 2003 | 1,327,959 | 200,000 | 2002 | 1,223,146 | 0 | 104,813 | 200,000 | Yes |
| David W Dorman | AT&T Corp. | T | TBA | 2002 | 6,553,240 | 1,247,416 | 2001 | 9,588,985 | 1,098,442 | (3,035,745) | 148,974 | Yes |
| Stephen Riggio | Barnes & Noble, Inc. | BKS | 2/13/2002 | 2003 | 800,583 | 0 | 2002 | 1,428,725 | 0 | (628,142) | 0 | Yes |
| James R. Houghton | Corning, Inc. | GLW | 4/25/2002 | 2002 | 1,329,333 | 0 | 2001 | 7,489,941 | 0 | (6,160,608) | 0 | Yes |
| William S. Stavropoulos | The Dow Chemical Co | DOW | 12/13/2002 | 2003 | 11,443,832 | 350,000 | 2002 | 1,550,020 | 150,000 | 9,893,812 | 200,000 | Yes |
| Jeffrey A. Ludrof | Erie Indemnity Co | ERIE | 5/8/2002 | 2002 | 1,312,829 | 0 | 2001 | 2,147,150 | 0 | (834,321) | 0 | Yes |
| Gary Loveman | Harrah's Entertainment, Inc | HET | 1/1/2003 | 2003 | 2,109,162 | 130,000 | 2002 | 5,895,833 | 0 | (3,786,671) | 130,000 | Yes |
| Samuel J. Palmisano | International Business Machines Corp | IBM | 3/1/2002 | 2002 | 6,995,174 | 300,000 | 2001 | 12,573,707 | 0 | (5,578,533) | 300,000 | Yes |
| William C. Weldon | Johnson & Johnson | JNJ | 4/25/2002 | 2002 | 3,140,909 | 450,000 | 2001 | 5,348,062 | 0 | (2,207,153) | 450,000 | Yes |
| Thomas J. Falk | Kimberly-Clark Corp. | KMB | 9/12/2002 | 2002 | 6,578,040 | 300,000 | 2001 | 9,483,504 | 500,000 | (2,905,464) | (200,000) | Yes |
| James J. Cantalupo | McDonald's Corp. | MCD | 1/1/2003 | 2003 | 5,986,800 | 400,000 | 2002 | 2,456,413 | 600,000 | 3,530,387 | (200,000) | Yes |
| Stanley O'Neal | Merrill Lynch & Co., Inc | MER | 12/2/2002 | 2003 | 25,344,265 | 137,221 | 2002 | 12,504,971 | 172,444 | 12,839,294 | (35,223) | Yes |
| David D. Wesselink | Metris Companies, Inc. | MXT | 12/15/2002 | 2003 | 2,103,827 | 400,000 | 2002 | 2,237,029 | 470,842 | (133,202) | (70,842) | Yes |
| Daniel C. Ustian | Navistar International Corp. | NAV | 2/19/2003 | 2003 | 795,353 | 167,000 | 2002 | 1,223,351 | 411,429 | (427,998) | (244,429) | Yes |
| Wallace R. Barr | Park Place Entertainment Corp | PPE | 11/19/2002 | 2003 | 2,273,921 | 2,085,000 | 2002 | 7,888,381 | 0 | (5,614,460) | 2,085,000 | Yes |
| Louis C. Camilleri | Philip Morris Companies, Inc | MO | 4/25/2002 | 2002 | 3,377,563 | 600,000 | 2001 | 5,867,163 | 1,831,293 | (2,489,600) | (1,231,293) | Yes |
| Richard Bravman | Symbol Technologies, Inc | SBL | 7/16/2002 | 2002 | 3,234,315 | 800,000 | 2001 | 394,580 | 90,000 | 2,839,735 | 710,000 | Yes |
| Richard J. Schnieders | SYSCO Corp. | SYY | 1/1/2003 | 2003 | 3,878,491 | 100,000 | 2002 | 4,584,582 | 115,000 | (706,091) | (15,000) | Yes |
| Michael J. Birck | Tellabs, Inc. | TLAB | 6/17/2002 | 2002 | 749,850 | 200,000 | 2001 | 646,152 | 400,000 | 103,698 | (200,000) | Yes |
| James W. Griffith | The Timken Co. | TKR | 7/30/2002 | 2002 | 2,270,885 | 50,000 | 2001 | 1,051,123 | 135,000 | 1,219,762 | (85,000) | Yes |
| Dennis J. FitzSimons | Tribune Co. | TRB | 1/1/2003 | 2003 | 2,174,705 | 442,889 | 2002 | 3,170,435 | 655,971 | (995,730) | (213,082) | Yes |
| John Sidgmore | WorldCom, Inc | WCOM | 4/30/2002 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Mary L. Forte | Zale Corp. | ZLC | 8/1/2002 | 2002 | 472,473 | 200,000 | 2001 | 10,609,581 | 505,000 | (10,137,108) | (305,000) | No, Male to Female |
| Patricia F. Russo | Lucent Technologies, Inc | LU | 1/7/2002 | 2002 | 14,275,895 | 5,369,963 | 2001 | 1,208,241 | 3,544,512 | 13,067,654 | 1,825,451 | No, Male to Female |

**Notes:**

[1] Options were included in the total compensation if they were listed in dollars. Options in shares are included to the right of total compensation.

[2] NA = DEF 14A proxy statement not available on the SEC website.

[3] Mr. Temares replaced Co-CEOs Warren Eisenberg and Leonard Feinstein. Total compensation for outgoing CEO is an average of Mr. Eisenberg and Mr. Feinstein's total compensation ($1,136,721 and $1,104,898, respectively).

[4] Mr. Flanagan and Mr. Johnson became Co-CEOs of Franklin Resources, Inc. Charles B. Johnson was the outgoing CEO.

[5] A.A. Busch III was Chairman of the Board and President; the CEO position did not exist until Mr. Stokes assumed the position. Mr. Busch's total compensation was used for outgoing CEO.

**Source:** www.ceogo.com and annual compensation tables from DEF 14A proxy statements.

## Documents Relied Upon

Answer of Christian Nadal to Complaint of Catherine Gaujacq, 9/12/2005
Answer of Electricite de France, S.A and Electricitie de France International North America, Inc. to the Complaint of Catherine Gaujacq, 9/12/2005
Complaint of Catherine Gaujacq, 5/13/2005
Defendant Christian Nadal's Responses to Plaintiff's First Set of Interrogatories, 12/12/2005
Defendant Christian Nadal's Supplemental Responses to Plaintiff's First Set of Interrogatories, 9/12/2005
Expert Report of Neil H. Demchick, Exhibits, and Supporting Material, 3/31/2006
EEOC complaint filing of Catherine Gaujacq, 7/30/2004
Intial Disclosures of Defendant Christian Nadal, 10/27/2005
Plaintiff's Initial Disclosure Statement, 10/27/2005
Plaintiff's Objections and Responses to EDF and EDFINA's First Set of Interrogatories to Plaintiff, 12/12/2005

Plaintiff's Supplemental Objections and Responses to EDF and EDFINA's First Set of Interrogatories to Plaintiff, 12/21/2005

Deposition of Catherine Gaujacq and Exhibits (3/16/2006 and 3/17/2006)
Deposition of Christian Nadal (4/4/2006 and 4/5/2006)
Errata Sheets for Deposition of Christian Nadal (4/4/2006 and 4/5/2006)
Deposition of Patrick de Botherel and Exhibits (3/23/2006)
Deposition of Peter Schneider and Exhibits (5/24/2006)

Special Conditions Applicable to Long-Term Assignment of Catherine Gaujacq to Washington (6/20/2000)
Particular Conditions Applicable to the Long-Term Assignment of Christian Nadal in Washington (USA) (2/4/2004)
Catherine Gaujacq EDF Career History (12/2004)
Translated Documents: T93,T194,T201-203,T178,T184-185, T180,T199,T190,T167,T181,T242,T103, T93, T203
EDF Human Resources Annual Report, 2004
Entergy 10-K Filing for Fiscal Year Ending 12/31/2005

www.fortune.com
www.ceogo.com
http://salary.nytimes.com/CostOfLivingWizard/layoutscripts/coll_start.asp
http://www.edenor.com.ar, translated via http://translate.google.com
http://www.clarionledger.com
http://www.city-data.com/city/Great_Falls_Virginia.html
http://www.city-data.com/city/Madison-Mississippi.html
http://www.taxadmin.org/fta/rate/ind_inc.html
"Cost of Living Index for Selected US Cities," http://www.infoplease.com/ipa/A0883960.html
Baker, George; Gibbs, Michael; Holmstrom, Bengt; "The Wage Policy of the Firm," Quarterly Journal of Economics, Vol. 109, November 1994, pp. 921-956.
Baker, George; Gibbs, Michael; Holmstrom, Bengt; "The Internal Economics of the Firm: Evidence from Personnel Data," Quarterly Journal of Economics, Vol. 109, November 1994, pp. 881-919.
Reilly, David, "At Top Levels, US Still Leads in Pay -- American Executives Earn Nearly 3 Times as Much as European Counterparts," The Wall Street Journal Europe, Nov. 24, 2003, pg. A1.
"Human Resources: Compensation," Country Commerce France 2005, Economist Intelligence Unit, June 22, 2005, Part 86.

Hymowitz, Carol, "Foreign-Born CEOs Are Increasing in US, Rarer Overseas," The Wall Street Journal, May 25, 2004, pg. B1.
"Who's Top of the Pay Pile?" Management Today, Sept. 1, 2005, pg. 42.
OECD Factbook 2006: Economic, Environmental, and Social Statistics

CN00259, Curriculum Vitae of Christian Nadal

EDF 001120-1121, Letter from Laurent Stricker to Catherine Gaujacq, 9/24/2004

### Documents Relied Upon

EDF 001144, Email from Stephane Marchandon to Michel Sondag, 10/12/2004
EDF 001146, Emails from Michel Sondag, 10/18/2004
EDF01147, Letter from Bruno Lescoeur to Catherine Gaujacq, 10/21/2004
EDF 001152, Emails between Jacques Bouron and Catherine Gaujacq, 10/21/2004
EDF 001154, Email from Michel Sondag to Catherine Gaujacq, 10/27/2004
EDF 001156-7, Email between Michel Sondag and Francois Rognier, 10/27/2004
EDF 001168, Email from Michel Sondag to Christine Gaudiche, 11/3/2004
EDF 001169, Letter from Jacques Bouron to Catherine Gaujacq, 11/15/2004
EDF 001180, Letter from Jacques Bouron to Catherine Gaujacq, 12/30/2004
EDF 001188, Letter from Francois Rognier to Catherine Guajacq, 1/26/2005
EDF 001189, EDF Pay Stub, 1/2005
EDF 001190-1196, Attestation Destinee A L'Assedic, 1/2005
EDF 001218, Letter from Stephane Marchandon to Catherine Gaujacq, 5/9/2005
EDF 004603-4, Letter from Francois Rognier to Christian Binet, 1/31/05
EDF 004912-34 Guide de Affilie, Caisse Nationale des Industries Electriques et Gazieres, (1/2005)
EDF 004935-7, Dossier Gaujacq (CNIEG)
EDF 005013, Email from Patrick De Botherel, 6/13/06
EDF 005014-24, Particular Conditions Applicable to Long-Term Assignment of Jean Cottave Claudet to Washington
EDF 005025-50, Pay Stubs of Jean Cottave at EDF for period of 7/1998 through 7/2000
EDF 005051-79, Pay Stubs of Pierre Broussard at EDF for period 1/1996 through 12/1997
EDF 005080-132, Pay Stubs of Marc Gery at EDF for period of 9/1992 through 8/1996
EDF 005133-65, Pay Stubs of Henry Herbin at EDF for period of 8/1990 through 12/1992
EDF 005166-258, Pay Stubs of Catherine Gaujacq at EDF for period of 1/1998 through 1/2005, Reimbursement Notices for 2/05, 5/05, 6/05 & 11/05


Entergy 0008, Letter from Jon Lastra to Catherine Gaujacq, 3/1/2005
Entergy 0009, Acceptance letter sent to Catherine Gaujacq by Entergy
Entergy 0010, Email from Catherine Gaujacq to Peter Schneider, 3/2/2005
Entergy 0011, Email from Peter Schneider to Catherine Gaujacq, 3/2/2005
Entergy 0012, Letter from Jon Lastra to Catherine Gaujacq, 3/1/2005
Entergy 0013, Acceptance letter sent to Catherine Gaujacq by Entergy
Entergy 0014-16, Letter (with acceptance letter) from Jon Lastra to Catherine Gaujacq, 2/24/2005
Entergy 0018, Email from Catherine Gaujacq to Peter Schneider, 2/17/2005
Entergy 0021-22, 2005 IRS Form W-2 of Catherine Gaujacq at Entergy
Entergy 0023-60, Pay Stubs of Catherine Gaujacq at Entergy for period 4/10/2005 through 12/17/2005
Entergy 0072-140, Savings Plan of Entergy Corporation and Subsidiaries, Summary Plan Description and Retirement Plan
Entergy 0141-0147, 2005 Entergy Benefits Enrollment Form for Catherine Gaujacq, 4/8/2005


Gaujacq 00149

63-64, Email from Jacques Bouron to Catherine Gaujacq, 9/8/2004
145, Christian Nadal EDF Pay Stub, 12/30/2003
166, Catherine Gaujacq EDF Employee Pay Stub, 1/28/2005
608, Letter from Catherine Gaujacq
621, Letter from Catherine Gaujacq to Yann Laroche, 1/28/2005
784-786, "2.3 End of Mission"
802-3, Letter from Catherine Gaujacq to Francois Roussely, 2/2/2004
839, Letter from Catherine Gaujacq to Francois Metais, 4/8/2004
997, Letter from Catherine Gaujacq to Christian Nadal, 6/11/2004
1070, Resolution Naming Catherine Gaujacq as the replacement to Jean Cottave

# CURRICULUM VITÆ

## Jonathan L. Walker

| | |
|---|---|
| **Office** | Economists Incorporated<br>EmeryStation North<br>5980 Horton Street<br>Emeryville, CA  94608<br>(510) 547-6910<br>walker.j@ei.com |
| **Home** | 670 Duncan Street<br>San Francisco, CA  94131<br>(415) 642-0446 |
| **Education** | Ph.D., Economics, Massachusetts Institute of Technology, 1991<br><br>A.B., Economics, University of California, Berkeley, 1983 |
| **Fellowships, Honors, and Awards** | 1986:  American Economics Association Doctoral Fellowship<br><br>1983:  National Science Foundation Graduate Fellowship<br><br>1983:  Honors in General Studies, University of California, Berkeley |
| **Fields of Concentration** | Industrial Organization, Labor Economics, Economic History |
| **Professional Experience** | 2003 – Present:  President, Economists Incorporated<br><br>2001 – 2002:  Principal, Economists Incorporated<br><br>1998 – 2000:  Senior Vice President, Economists Incorporated<br><br>1996 – 1998:  Vice President, Economists Incorporated<br><br>1990 – 1996:  Senior Economist, Economists Incorporated<br><br>1988 - 1990:  Management Consultant, Monitor Company; Cambridge, Massachusetts |

<table>
<tr><td><b>Professional<br>Experience<br>(continued)</b></td><td>1987 - 1988:  Visiting Research Fellow, Federal Reserve Bank of Boston,<br>Boston, Massachusetts<br><br>1987:  Teaching Assistant, Massachusetts Institute of Technology</td></tr>
</table>

|  |  |
|---|---|
| **Dissertation** | *Essays on the Commercial Banking Industry* |
| **Publications** | "Event Studies, Toxic Stock and Non-Compete Provisions," *Economists Ink*, Fall 2005 |
|  | "Statistical Evidence and a Daubert Challenge in a Recent Discrimination Case," *Economists In*k, Summer 2004 |
|  | "Price increases Attributable to Patent Infringement or Entry," *Economist*s Ink, Spring 2004 (with Tessie Su) |
|  | "Ninth Circuit Expounds on Antitrust Injury," *Economists Ink,* Fall 2003 |
|  | "The Deterrence Value of Punitive Damages," *Economists Ink,* Fall 2001 (with Laura Malowane) |
|  | "Recent Developments in Bank Merger Competition Policy," *Banking Law Review*, Spring 1992 (with Bruce Snapp and David Balto) |
|  | "U.S. Bank Merger Competition Policy," *International Merger Law 16,* December 1991 (with Bruce Snapp) |
|  | "Not So Safe Harbor for Bank Mergers," *Economists Ink,* Winter 1991 |
| **Panels** | *American Law Institute – American Bar Association Course of Study, "Antitrust Law in the 21st Century," September 14-15, 2000 –* Presentation concerning the economics of professional sports leagues |
|  | *American Bar Association Antitrust Section Annual Meetings, April 14, 1999 –* Presentation concerning the economic foundations of antitrust law |
|  | *National Economists Club Educational Foundation, "What Effect Will Financial Restructuring Have On Banks?" August 13, 1991 –* Moderator |

| | |
|---|---|
| **Expert Reports and Testimony** | *John D. Wee v. Charles Schwab & Co., Inc.* – Arbitration testimony on behalf of claimant concerning damages |

*In Re: Robin Singh d/b/a Test Masters* – Expert report and declaration on behalf of plaintiff concerning damages

*Patrick J. Cunningham and Anton N. Zanki v. International Business Machines Corporation* – Expert report and deposition testimony on behalf of defendant concerning alleged breach of contract

*Mark Hodges, et al. v. Greater Canton Ford Mercury, Inc., et al.* – Expert report on behalf of defendant concerning punitive damages

*In Re: Frank T. Vega* – Declaration on behalf of defendant concerning damages

*Martin Leach v. Ford Motor Co.* – Expert report on behalf of defendant concerning the corporate officer labor market in a breach of contract suit

*Westways World Travel, Inc. and Sundance Travel Service v. AMR Corp., et al.* – Expert report and deposition testimony on behalf of defendants concerning compensatory damages

*Traci A. Savage v. Ford Motor Co.* – Expert report on behalf of defendant concerning the economics of punitive damages

*Randy Eugene Wheeler v. Ford Motor Co.* – Deposition testimony on behalf of defendant concerning lost NFL earnings and other alleged damages

*David Braswell v. Holley Performance Products Inc.* – Expert report and rebuttal on behalf of defendant concerning antitrust liability and antitrust

*Ertha Mae Williams v. CSX Transportation Inc., et al.* – Deposition testimony on behalf of defendants concerning the economics of punitive damages

*R. Straman Co. and Newport Convertible Engineering, Inc. v. Volkswagen of America, et al.* – Deposition testimony on behalf of defendants concerning antitrust liability and antitrust injury

**Expert Reports and Testimony (continued)**

*Roll International Corporation and Paramount Farms, Inc. v. Unilever United States, Inc. and Conopco, Inc.* – Testimony at jury trial on behalf of defendants regarding compensatory damages for alleged breach of contract and false promise

*Newhall Land and Farming Co. v. Kerr McGee Operating Corporation, et al.* – Deposition testimony on behalf of defendants concerning the economics of punitive damages

*Marcia Spielholz, et al. v. Los Angeles Cellular Telephone Company, et al.* – Expert report on behalf of defendants concerning remedies in a class action false advertising suit

*David N. Orrik  v. Stryker Corporation, et al.* – Deposition testimony on behalf of defendants concerning the economics of punitive damages

*Agneta Karlsson, et al. v. Michael A. Savage* – Deposition testimony on behalf of defendants concerning the economics of punitive damages and product liability

*Homestore, Inc. v. America Online* – Expert report and arbitration testimony on behalf of respondent concerning damages from breach of contract

*Michael Meitus, et al. v. Dain Rauscher Wessels, Dain Rauscher Corporation and Dain Rauscher Inc.* – Arbitration testimony on behalf of claimants concerning the competitive structure of the securities industry and other economic matters

*In Re:  1994 Exxon Chemical Plant Fire* – Expert report on behalf of defendant concerning the economics of punitive damages

*Avis Buchanan, et al. v. Consolidated Stores Corp.* – Declaration and deposition testimony on behalf of defendant concerning statistical and other economic analyses in a class action public accommodations suit

*State of Alabama v. Exxon Corporation* – Affidavit and testimony at post-trial hearing on behalf of defendant concerning the economics of punitive damages

**Expert Reports and Testimony (continued)**

*Aspen Knolls Corp. et al. v. McDermott Will & Emery* – Expert report on behalf of defendant concerning damages in a legal malpractice suit

*Legi-Slate Inc. v. Thomson Information Services Inc.* – Expert reports (2) and deposition testimony on behalf of plaintiff concerning damages from breach of contract

*United States of America,* ex. rel., *William I. Koch and William A. Presley v. Koch Industries, Inc., et al.* - Expert report, deposition testimony and testimony at jury trial on behalf of defendants concerning economic issues in a False Claims Act suit

*Ronald O. Lewis v. Booz-Allen & Hamilton Inc.* – Expert reports (4) and deposition testimony on behalf of plaintiff regarding statistics and damages in an employment discrimination suit

*Richard Rodgers Mason v. Ford Motor Company* - Expert report and deposition testimony on behalf of defendant regarding liability in a product liability suit

*Dr. Michael J. Galvin v. The New York Racing Association, Inc., et al.* – Expert report and declaration on behalf of defendant regarding commercial damages in breach of due process and tortious interference suit

*Roll International Corporation and Paramount Farms, Inc. v. Unilever United States, Inc., et al.* - Deposition and bench trial testimony on behalf of defendants regarding business valuation and damages in a breach of contract and fraudulent misrepresentation suit

*Yvonne Trout, et al. v. John Dalton, et al.* - Affidavit and declaration on behalf of the United States concerning prejudgment interest

*Willie Brown Jr., et al. v. General Motors Corporation* – Testimony at deposition and jury trial concerning lost NFL player earnings

*Royer Homes of Mississippi, Inc., et al. v. Redman Homes, Inc., et al.* - Affidavits (2), expert reports (2) and deposition testimony on behalf of defendants concerning antitrust liability and damages

**Expert Reports
and Testimony
(continued)**

*W. C. and A. N. Miller Companies v. United States of America* - Expert report and deposition testimony on behalf of defendant concerning commercial damages in a Federal Tort Claims Act suit

*SMS Systems Maintenance Services, Inc. v. Digital Equipment Corporation* - Expert report and deposition testimony on behalf of defendant concerning antitrust damages and liability

*Francis W. Murray and FWM Corporation v. National Football League, et al.* - Expert report and deposition testimony on behalf of defendants regarding market definition, alleged anticompetitive conduct and alleged antitrust injury

*Michael A. Willner v. Dow Jones & Company, Inc., et al.* - Deposition testimony on behalf of defendants regarding damages in a breach of contract and unfair dealing suit

*Dream Team Collectibles, Inc. v. NBA Properties, Inc.* - Expert reports (2) and deposition testimony on behalf of NBA Properties regarding damages and other economic issues in a trademark infringement suit and counter suit

*Breezevale Limited v. Timothy L. Dickinson*, et al. – Deposition and jury trial testimony on behalf of defendants regarding commercial damages in a legal malpractice suit

*Sonja Lumpkin v. Citizens Bank of Maryland, Incorporated* –Affidavit on behalf of defendant regarding damages in a wrongful termination suit

*Carolee Brady Hartman, et al., v. Joseph Duffey* – Declarations (7) and live testimony at four Teamsters Hearings on behalf of the defendant, the United States government, regarding damage estimation in a class action sex discrimination suit

*Robert B. Reich, v. Charles I. Brown, Peter M. Mazula, and Ronald F. Nuzman* – Affidavit and deposition testimony for United States Department of Labor regarding alleged breach of fiduciary responsibility under ERISA

| | |
|---|---|
| **Expert Reports and Testimony (continued)** | *United Farmers Agents Association, Inc., v. Farmers Insurance Exchange, et al. and Thomas J. Vinson, et al., v. Farmers Insurance Exchange, et al.* – Affidavit and deposition testimony for plaintiffs regarding antitrust liability |

*Anthony Brown, et al. v. Pro Football, Inc.* – Testimony for defendants, the member clubs of the NFL, at jury trial regarding antitrust damages

*Robert E. Connor, et al. v. Harris County, et al.* – Deposition testimony and a written declaration for plaintiffs, members of a class of job applicants, regarding a cost defense for allegedly discriminatory employment practices

*Laura Kelber against Forest Electric Corp. and Forest Datacom* – Affidavit in opposition to defendants' motion for summary judgment in a sex discrimination suit

**Selected Consulting Matters**

*Ernst & Young/KPMG* – Antitrust consulting regarding potential consolidation

*NASCAR Souvenirs* – Consulting for defendants concerning class certification in an antitrust matter

*First Databank* – Antitrust consulting regarding acquisition of Medi-Span Inc.

*Metal Supermarkets* – Consulting for plaintiff regarding commercial damages arising from legal malpractice

*Vulcan* – Antitrust consulting regarding the acquisition of an Atlanta quarry

*Brodus v. Children's National Medical Center* – Consulting regarding damages in a wrongful termination suit

*International Paper* – Antitrust consulting regarding photographic paper and other photographic material

**Selected Consulting Matters (continued)**

*St. Louis Convention and Visitors Commission v. National Football League, et al.,* – Antitrust consulting regarding franchise relocation

*The Baltimore City Paper* – Consulting regarding commercial damages allegedly arising from libel

*Allied Domecq* – Consulting for liquor supplier regarding terminated dealer's lost profits

*National Football League* – Consulting regarding trademark and antitrust issues in suits between the Dallas Cowboys and its affiliates and the NFL

*Indy Car Racing* – Antitrust consulting

*Albertson's* – Antitrust consulting for potential plaintiff in a price-fixing matter

*New Orleans Hospitals* – Antitrust consulting regarding a joint venture among New Orleans hospitals

*General Dynamics* – Consulting for plaintiff regarding damages in commercial litigation

*Telecom Technical Services, et al. v. ROLM* – Consulting for plaintiffs in antitrust litigation

*The Boston Herald* – Consulting regarding damages allegedly caused by publication of a news story

*Automotive Dismantlers and Recyclers Association v. ADP Claims Solutions Group, Inc.* – Antitrust consulting regarding used automobile parts databases

*Mercy/St. Vincent* – Consulting regarding the merger of two hospital systems in Toledo, Ohio

*Kalium/IMC* – Consulting regarding the merger of Kalium and IMC

**Selected Consulting Matters (continued)**

*Agricultural Chemicals Antitrust Litigation* – Antitrust consulting for defendants, Zeneca Corp., Helena Corp. and Terra Corp. in an RPM class action suit

*The Clorox Company v. Sterling Winthrop, Inc. et al.* – Antitrust consulting for plaintiffs in litigation alleging misuse of trademark protections for anticompetitive gain

*Chittenden Corporation* – Antitrust consulting regarding a bank holding company's acquisition plans

*National Basketball Association* - Damage estimation for the NBA in antitrust suit brought against it by Independent Entertainment Group Incorporated

*Magic Line Inc.* - Merger of ATM networks

*Home Shopping Network* - Ex-post valuation of contingent contract concerning software and consulting services

*Lenfest Group, Comcast Corporation and Tele-communications Incorporated* - Consultation regarding Delaware Public Service Commission rules to implement the Telecommunications Technology Investment Act

*Worthen Financial Corporation* - Acquisition of Union National Bank of Arkansas

*Intrust Bank* - Merger with Kansas State Bank & Trust

*Iowa National Bankshares* - Merger with MidAmerica Savings Bank

*First National Bank of Kerrville* - Acquisition of Bank of Kerrville

*Peoples Heritage Financial Group* - Acquisitions of Mid Maine Savings Bank, Bank of New Hampshire, CFX, and certain branches of Fleet Bank of Maine

**Selected Consulting Matters (continued)**

*Potash Antitrust Litigation* - Antitrust consulting for defendants in a class action suit alleging price fixing in the potash industry

*R&D Business Systems, et al. v. Xerox Corporation* - Antitrust consulting for plaintiffs in a class action suit alleging tying and monopolization in the copier and printer industries

*Society Corp.* - Acquisition of Ameritrust

*VDDE Holm, Voest Alpina, Bohler* - Antitrust consulting in connection with the merger of two European steel manufacturers

*McNeil, et al. v. NFL* - Estimation of damages resulting from player reservation system

*U.S. Department of Justice v. City of Alhambra, California* - Analysis of evidence of discriminatory hiring practices

*Christiana Mortgage Brokers, et al. v. Delaware Trust, et al.* - Estimation of damages resulting from tortious interference in the mortgage brokerage industry in New Castle County, Delaware

*Merger of Two Savings and Loan Assns.* - Antitrust consulting in connection with the merger of two thrift institutions

*Mid Atlantic Coca-Cola* - Analysis of evidence of price fixing and estimation of resulting damages

**Professional Societies**

American Economics Association
American Bar Association
Industrial Organization Society
Western Economics Association
American Law and Economics Association