## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CATHERINE GAUJACQ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05CV0969 (JGP) |
| | ) | |
| ELECTRICITE DE FRANCE | ) | |
| INTERNATIONAL NORTH AMERICA, | ) | |
| INC., et al. | ) | |
| | ) | |
| Defendants | ) | |

## MOTION TO COMPEL

Plaintiff Catherine Gaujacq, by counsel, hereby moves this Court for an Order, pursuant

to Fed. R. Civ. P. 37, to compel production of documents in response to discovery requests from

defendants Electricite de France International North America ("EDF") and Electricité de France

International North America, Inc. ("EDFINA") (collectively "Defendants"). The grounds for

this Motion are set forth in the attached Memorandum.

July 28, 2006                          Respectfully Submitted,

Elaine Charlson Bredehoft
D.C. Bar No. 441425
S. Christian Wickwire
D.C. Bar No. 488797
Kathleen Z. Quill
D.C. Bar No. 489079
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
    Catherine Gaujacq

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CATHERINE GAUJACQ | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:05CV0969 (JGP) |
| ELECTRICITE DE FRANCE INTERNATIONAL NORTH AMERICA, INC., et al. | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Plaintiff, Catherine Gaujacq ("Ms. Gaujacq" or "Plaintiff"), by counsel, hereby moves

this Court for an Order compelling the production of documents from defendants Electricite de

France International North America ("EDF") and Electricité de France International North

America, Inc. ("EDFINA") (collectively "Defendants"). Specifically, Plaintiff moves this Court

to compel Defendants to produce all documents in response to certain requests set forth in

Plaintiff's Fourth and Fifth Requests for the Production of Documents.[1]

### PRELIMINARY STATEMENT

This action involves actions taken by Defendants against plaintiff Ms. Gaujacq in

connection with her employment with Defendants as the President and Treasurer of EDFINA,

including discrimination and retaliation on the basis of gender, and discriminatory and retaliatory

---

[1]  Counsel for Plaintiff hereby certifies that counsel have made good faith efforts verbally and in writing, to resolve the discovery matters at issue prior to placing this matter before the Court. Despite counsel's best efforts, however, counsel have not been able to come to an agreement on the below issues. See Plaintiff's Meet and Confer Letter, dated June 15, 2006, Attachment ("Att.") 1.

termination, disparate and unequal pay, defamation *per* se; and several claims relating to breaches of the agreements between Ms. Gaujacq and Defendants.

In connection with Ms. Gaujacq's claims against Defendants, Ms. Gaujacq has propounded requests for production of documents relating to issues integral to her claims, which Defendants have refused to produce. At a bare minimum, these documents sought are relevant and likely to lead to the discovery of admissible evidence. These requests can be categorized as follows:

First, Ms. Gaujacq seeks documents related to the payment, responsibilities and evaluations of certain EDF and EDFINA employees, including their employment/expatriate agreements, resumes, evaluations and pay-stubs. These documents are necessary to add further support to the assessment of the amount Ms. Gaujacq should have received absent Defendants' discriminatory conduct and to defend against assertions by Defendants that the terms of these documents are different than what Ms. Gaujacq believes and has alleged, and to defend against legitimate business justifications asserted by Defendants.

Second, Ms. Gaujacq seeks production of all emails to and from Mr. Nadal during the period January through September 2004 and audits of divisions of which Mr. Nadal was a part of, because such documents will necessary reflect to the payment, responsibilities, performance and evaluations of Mr. Nadal, who replaced Ms. Gaujacq, assumed only a portion of her responsibilities and was paid more than two times her compensation, respecting the Equal Pay claims as well as discrimination and retaliation, and the comparative data which Defendant has selectively used about Mr. Nadal, while refusing to provide the relevant documentation. These documents are necessary to further support the assessment of the amount Ms. Gaujacq should have received absent Defendants' discriminatory conduct. In addition, the emails, which are

limited to their scope in time, will be invaluable in adding further support to the fact that Mr Nadal actively sought the termination of Ms. Gaujacq for discriminatory reasons and without any business justification, prior to even knowing Ms. Gaujacq. Based on emails during this timeframe that have been discovered, Mr. Nadal was communicating with Ms. Gaujacq's bosses about her and her position, and his intentions with respect to Ms. Gaujacq. Finally, there is a void of communications explaining the sudden appearance of Mr. Nadal in the position, including the timing. While the Chairman of EDF was telling Ms Gaujacq she would continue in that position that Mr. Nadal suddenly appeared and took for himself.

Third, Ms. Gaujacq seeks documents reflecting and explaining documents related to Defendants' policies regarding discrimination and retaliation and other instances in which Defendants have engaged or have been accused of engaging in discriminatory or retaliatory conduct against other employees. These documents are necessary to support that Defendants have a history of treating employees in the same discriminatory and retaliatory manner that they treated Ms Gaujacq. This is relevant to the standards of knowledge and willfulness, and to punitive damages

Fourth, Ms. Gaujacq seeks documents related to the policy and practice with respect to the treatment of confidential and proprietary information and the collection of computers and computer information for each employee transferring to another position. These documents are necessary to further support the fact that Ms. Gaujacq was singled out for unequal treatment and more significantly, defend against Defendants' unsubstantiated assertions that Ms. Gaujacq has engaged in improper or illegal conduct and/or violated policies and procedures, which Defendants have refused to provide.

Fifth, Ms. Gaujacq seeks documents related to the manner in which Defendants treated

other employees in similar situations to Ms. Gaujacq, including other employees that were terminated for "destruction" of EDF property, other employees that were terminated for refusing transfers to other positions, other employees that were terminated after more than 23 years of experience with the company, other employees who were requested to return to France after the expiration of their contracts, and other employees who worked for more than six months without a written job description or mission statement. These documents are necessary to further support the fact that Ms. Gaujacq was singled out for discriminatory and unequal treatment and, significantly, to disprove Defendants' proffered legitimate business justification.

Ms. Gaujacq anticipates that Defendants will argue that several of these requests for production should be denied because Ms. Gaujacq filed a motion to compel documents in February 2006 ("Prior Motion to Compel"), which was deemed by the Court to be withdrawn. This argument is a red-herring. To the extent the Prior Motion to Compel was withdrawn, it was done so without prejudice and without any determination as to its merits. In addition, the Prior Motion to Compel dealt with Plaintiff's First Requests, while the present Motion only concerns Plaintiff's Fourth and Fifth Requests for Production. Any withdrawal by Plaintiff of her preliminary round of discovery request has no affect on her ability to pursue an entirely new set of document requests, and any arguments to the contrary should be denied.

## PROCEDURAL HISTORY

Ms. Gaujacq filed her Complaint on May 13, 2005. In her complaint, Ms. Gaujacq alleges (i) discrimination and retaliation on the basis of gender, and discriminatory and retaliatory termination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq., and the common law of the District of Columbia; (ii) disparate and unequal pay, in violation of the Equal

Pay Act, 29 U.S.C. § 206(d); (iii) defamation *per* se; (iv) breach of contract; (v) tortious interference with contractual relations and business expectancies; and (vi) breach of the duty of good faith and fair dealing. Defendants filed an answer to the complaint on September 12, 2005. Trial is scheduled to begin on April 17, 2007.

Plaintiff served her preliminary discovery requests on Defendants on November 21, 2005. Defendants served written objections and responses stating that Defendants would not respond to and would not produce any documents with respect to certain discovery requests.

On February 16, 2006, Ms. Gaujacq filed a motion to compel responses and the production of documents, which was opposed by Defendants. Around this time, the parties filed additional motions regarding issues that were wholly unrelated to this motion to compel, including Defendants' Motion to Compel and for Protective Order relating to deposition scheduling and Ms. Gaujacq's Supplement to Alert this Court to New Developments Impacting the Motions Before this Court and Motion for Enforcement of the Rules. In settlement of the disputes regarding these unrelated issues, the parties entered into a consent order on March 8, 2006 ("Consent Order") which primarily acted to set forth a deposition schedule for the parties. Att. 2. The Court approved this Consent Order in an Order dated March 10, 2006. Att. 3. However, in its March 10 Order approving the Consent Order, the Court stated that in addition to the motions addressed by the Consent Order, the motion with the docket number that corresponded to Ms. Gaujacq's Prior Motion to Compel was also deemed "withdrawn," even though the Prior Motion to Compel and the issues therein were never intended by the parties to be addressed or affected by the Consent Order. This "withdrawal" of the Prior Motion to Compel was without prejudice and without any regards to the merits.

Ms. Gaujacq had not intended to withdraw her Prior Motion to Compel. However, though

she was under no obligation to do so and had every right to pursue enforcement of her original discovery requests, Ms. Gaujacq decided to take that opportunity to re-draft her discovery requests in order to address Defendants' objections raised in their various meet and confer correspondence and their opposition to Ms. Gaujacq's Prior Motion to Compel.

To that end, on April 7, 2006, Ms. Gaujacq served on Defendants her Fourth Request for Production ("Fourth RFP"). Att. 4. On May 1, 2006, Ms. Gaujacq served on Defendants her Fifth Request for Production ("Fifth RFP"). Att. 5. Defendants responded and objected to these requests on May 11, 2006 and June 5, 2006, respectively. Atts. 6 & 7. In their responses, Defendants stated that they would not produce documents with respect to certain of the Requests. Despite several detailed discussions relating to these requests, and any efforts to resolve them without Court intervention, Defendants have continued to refuse to produce these documents. These refusals by Defendants to produce responsive documents form the basis for this Motion.

## STATEMENT OF FACTS

A.    Catherine Gaujacq, President of EDFINA

Ms. Gaujacq was employed by EDF from 1991 until January 6, 2005. *See* Gaujacq resume, Bates No. 000213, Att. 8. Ms. Gaujacq was appointed Delegue General for the United States and Canada on August 1, 2000 and Directeur USA/Canada of the Americas Branch in August 1, 2002. *See* Exhibits 9 and 10 to Deposition of Catherine Gaujacq ("Gaujacq Dep"), Att. 9. Additionally, Ms. Gaujacq served as President and Treasurer of EDFINA from August 1, 2000, until May 31, 2004, when she was appointed vice president of EDFINA *See* Exhibits 15, 16 and 46 to Gaujacq Dep, Att. 10. Throughout her tenure as President of EDFINA, Ms. Gaujacq performed her duties in an exemplary manner, and received high evaluations. *See* Exhibit 49 to Gaujacq Dep, Att. 11. EDF was very satisfied with Ms. Gaujacq and there was

never any suggestion of performance issues. Laroche Dep at 21-22, 33, 35-36, 38, 78, Att. 15; Deposition of de Botherel ("de Botherel Dep") at 124, Att. 13. In fact, in November 2002, Ms. Gaujacq received the decoration of a French Merit Order "Ordre national du Merite"), Att. 16. *See also* Gaujacq resume, Bates No. 000213, Att. 8; Deposition of Yann Laroche ("Laroche Dep") at 78-9 (general description of Order), Att. 17. Prior to being appointed President of EDFINA and starting in 1991, Ms. Gaujacq rose through management positions within EDF and EDFINA in the core energy generation business, and, most recently, in strategic consulting on behalf of the Company in the United States. *See* Gaujacq resume, Bates No. 000213, Att. 8. As President of EDFINA and Director of Americas Branch, Ms. Gaujacq was paid a salary of $169,750.00, plus benefits and held an R3 Ranking.

Despite the size of the Company, Ms. Gaujacq was one of a small group of women to hold an executive level position and as President of EDFINA, was the only female manager of a subsidiary outside of France. Specifically, of the 50 EDF executives holding R1 rankings, only 5 were women, whereas of the total 160,000 employees at EDF, approximately 45 to 50 percent were women. *See* De Botherel Dep at 36, 66-69, 74. Att. 13. In fact, Mr. Yann Laroche, Deputy General Manager of EDF, could name no female manager of a subsidiary or any other expatriate female manager. *See* Laroche Dep at 25-29. Att. 15. Further, Mr. Laroche knew of only "one female manager that ranked R1, but she was deputy general manager, she was not the person in charge." *See* Laroche Dep at 64. Att. 15.

In January 2004, Ms. Gaujacq spoke with Mr. Gerald Creuzet, EDF's COO and the number two person at EDF reporting to Mr. Francois Roussely, who told Ms. Gaujacq that as their were no EDF manager position into which she could be promoted presently, he wanted her to continue on in her position as President of EDFINA and Director to the Americas Branch until

at least 2005. Gaujacq Dep at 108-111, Att. 14. In late January and mid-February 2004, Ms.

Gaujacq was informed that Mr. Nadal would be joining EDFINA as a Senior Advisor and Ms.

Gaujacq was requested to prepare a mission statement for Mr. Nadal. Gaujacq Dep at 122-23,

126-132, 153, Att.14. Ms. Gaujacq was never told that Mr. Nadal was to be replacing her in any

manner. *Id.* Ms. Gaujacq incorporated into the draft of Mr. Nadal's mission the areas of

EDFINA that she felt should be expanded. Gaujacq Dep. at 126-27, Att.14; Exhibit 20 to

Gaujacq Dep, Att. 18. On or around February 18, 2004, Ms. Gaujacq met with Mr. Roussely

who approved the mission suggested by Ms. Gaujacq. Gaujacq Dep at 129-134, Att.14.

B.    Christian Nadal.

Mr. Nadal was hired by EDF in 1989 and, unlike Ms. Gaujacq, given a salary which was

later determined to be within an R1 ranking. Deposition of Christian Nadal ("Nadal Dep") at 16-

17, Att.16. Mr. Nadal served as CEO of an EDF subsidiary in Argentina from September 1999

until early 2002. *Id.* at 22, 27, Att.16. Upon his return to EDF in France in early 2002, Mr.

Nadal accepted a temporary assignment, but also discussed the possibility of leaving EDF with

EDF officials at that time. *Id.* at 98-101, Att. 16. In May 2002, Mr. Nadal accepted the position

of a general controller, which was a demotion. *Id.* at 105-09, Att.16. In late 2003, Mr. Roussely

offered Mr. Nadal a position working with Ms. Gaujacq and EDFINA in the United States. *Id.* at

138-39, 153-56, 158-61, Att. 16. During this discussion, Mr. Nadal was told that Ms. Gaujacq

had been told that she would stay at EDFINA until at least the summer of 2004 and Mr. Roussely

stated that it was left to determine how to "manage" Mr. Nadal's situation with Ms. Gaujacq's

situation. *Id.* at 162-63, Att.16. Effective January 1, 2004, Mr. Nadal was appointed "General

Representative of EDF for North America," reporting to the "Director of Branch Americas."

Exhibit 23 to Gaujacq Dep, Att 19; *see also* Nadal Dep at 132-33, Att.16. On June 1, 2004, Mr.

Nadal became President of EDFINA. Bates Nos. 584-85, Att. 20; *see also* Nadal Dep at 132-33, Att. 16.

C.    EDF's Discriminatory Acts Against Ms. Gaujacq Begin

From early 2004 until Ms. Gaujacq's termination in January 2005, Mr. Nadal and EDF worked in concert to discriminate against Ms. Gaujacq by replacing her with Mr. Nadal while paying Mr. Nadal over two times the amount paid to Ms. Gaujacq, by harassing Ms. Gaujacq and creating a hostile work environment for her, and by retaliating against Ms. Gaujacq for filing a complaint with the EEOC.

Specifically, soon after his appointment as General Representative of EDF for North America and without any rational business justification, Mr. Nadal decided that Ms. Gaujacq had to go. Christian Nadal first met with Ms. Gaujacq on February 25, 2004. Prior to that, he had met Ms. Gaujacq only once or twice in company settings and had no knowledge of her background and expertise. Nadal Dep at 189-90, 211-12, Att. 16. Mr. Nadal never spoke to anyone regarding Ms. Gaujacq prior to this meeting. *Id.* On February 25, 2004, Mr. Nadal met with Ms. Gaujacq at the offices of EDFINA and during lunch afterwards for a total of approximately 3 hours. *Id.* at 199-200, 209; *see also* Exhibit 26 to Gaujacq Dep, Att 21. Mr. Nadal was disappointed in this meeting in that it seemed to him that Ms. Gaujacq was not aware of his future position with EDFINA. Nadal Dep. at 209, Att.16. Mr. Nadal, however, did not express this disappointment to Ms. Gaujacq. *Id.* at 249-50. Instead, he spoke with and wrote an e-mail to Mr. Metais requesting that EDF clear up the confusion. *Id.* at 238-39.

However, despite the evident confusion by Ms. Gaujacq, through no fault of her own and despite Mr. Nadal's lack of information about and contact with Ms. Gaujacq, Mr. Nadal proceeded swiftly to rid EDFINA of Ms. Gaujacq completely. On March 5, 2004, Mr. Nadal

9

met with Mr. Betouret. Bates No. EDF 945, Att. 22. To that end, Mr. Nadal requested clarification of the scope of his mission and whether it would include the responsibilities previously set forth in Ms. Gaujacq's mission, either partially or totally. EDF 945, Att. 22. On March 10, 2004, prior to any further discussions with Ms. Gaujacq or even about Ms. Gaujacq with other EDF individuals,[2] Mr. Nadal wrote to Mr. Metais and stated, in no uncertain terms, that he was convinced that he would be unable to share responsibilities with Ms. Gaujacq. EDF 947, Att. 23. In this e-mail, Mr. Nadal admitted that the "nuclear competence of Catherine" was "very strong," but declared that "the only situation perfectly matching our agreements is Catherine leaving North America in the very near future, at a date to be determined now, to take a position in a completely different sector...." and that they need to be "rigorous" with her departure and "be held to with it." EDF 947 (quoting translation), Att. 23.

Between March 22 and 23, 2004, Ms. Gaujacq was summoned to Buenos Aires to meet with Mr. Ponasso and Mr. Creuzet. Gaujacq Dep at 179, Att. 14. It was during this meeting that EDF's discriminatory actions first became evident to Ms. Gaujacq. *Id* at 184. Specifically, Mr. Creuzet told Ms. Gaujacq that, contrary to her previous conversations with Mr. Creuzet and Mr. Roussely, Mr. Nadal was going to be President of EDFINA. *Id* at 181-86. Specifically, after speaking with Mr. Roussely on the telephone, Mr. Creuzet told Ms. Gaujacq that she was correct when she told them the Chairman of EDF had admitted he told Ms. Gaujacq she was to be President and approved the mission statement for Mr. Nadal to be solely an advisor, but Mr. Creuzat told Ms. Gaujacq "the decision is the decision" and that "Nadal was going to be president of EDFINA and there's nothing else to say." *Id* at 184-85. While Ms. Gaujacq was

---

[2] Mr. Nadal admits that between February 25, 2004 and June 2004, he did not speak to Ms. Gaujacq either by telephone or in person. Nadal Dep. at 211-12. Att. 16.

understandably upset by EDF's treatment of her, Mr. Creuzet suggested that she propose a new mission for herself in the United States. *Id* at 223. Accordingly, Ms. Gaujacq proposed, and Mr. Creuzet agreed to, a three year contract continuing to work on the NuStart project in the United States. *Id* at 223-26.[3]

In an e-mail dated March 25, 2004, Ms. Gaujacq apologized to Mr. Nadal for the misunderstanding and recognized Mr. Nadal's current and future positions with EDFINA. Exhibit 32 to Gaujacq Dep, Att.25. Mr. Nadal admitted that Ms. Gaujacq did, in fact, admit the "mistake," and proceed in an appropriate manner by way of this March 25, 2004 e-mail. Nadal Dep at 253, 278, 336, Att. 16.[4] On Friday, March 26, 2004, Mr. Nadal wrote to Mr. Metais to explain that he believed Ms. Gaujacq now understood what his position was to be and stated that EDF needed to be patient and watch what would happen over the near future. EDF 969. Att. 26. Despite this recognition, just three business days later, on Wednesday, March 31, 2004, just after the confusion about Mr. Nadal's position was cleared up with Ms. Gaujacq, Mr. Nadal met with Mr. Betouret and confirmed his position that he thinks that it is not possible for him to work with

---

[3] This agreement was confirmed by Mr. Creuzet both verbally and in writing. *See* Exhibits 34-36 to Gaujacq Dep, Att. 24. Despite this, EDF stalled the process of finalizing the mission letter, indicating to Ms. Gaujacq that there was no hurry and then broke this agreement when it ordered Ms. Gaujacq back to France at the end of July, after she told them of her complaints of discrimination and that she intended to file an EEOC Charge in he United States. Gaujacq Dep at 216-19, Att. 14.

[4] Mr. Nadal testified that he believes that the misunderstanding may have been because Ms. Gaujacq's supervisor, Mr. Ponasso, originally told Ms. Gaujacq about Mr. Nadal's mission, but was unable to adequately communicate the information to Ms. Gaujacq because Mr. Ponasso (who spoke Spanish) did not speak either English or French well. Nadal Dep at 239, Att.16. Therefore, according to Mr. Nadal, Mr. Creuzet "corrected" the information given to Ms. Gaujacq, sometime in March 2004. *Id.* It is passing strange that Ms. Gaujacq was able to communicate with Ms. Gaujacq throughout her employment, except on that one particular, rather significant issue.

Ms. Gaujacq because of his lack of trust regarding her and because he thinks someone else could do an as-good or better job than her.[5] EDF 977. Att 30.

Further, in an e-mail dated April 1, 2004, Mr. Nadal stated that Ms. Gaujacq "created the conditions which make it extremely difficult her staying with us or collaboration, either with me, with the employees or with the business partners with which she had conversations incompatible with my arrival as Delegue General.... The only suitable position is for her to have new responsibilities in a different area." EDF 978-80 at 978 (quoting translation) Att 31. He continues: "It appears to me that a quick and complete stop of all Catherine's activities is by far the best solution." *Id* at 978 (quoting translation). Att 31.

Despite Mr. Nadal's baseless request that Ms. Gaujacq be removed from EDFINA, Mr. Metais wrote on April 6, 2004, that a decision had been made -- Ms. Gaujacq

> is assigned on the project 'premium 2015' (US-French cooperation on nuclear generation 4). She reports to Energy Branch and will received a mission letter. This new assignment does not report to Branch Americas nor EDFINA Inc. Her mission will lead to spending most of her time in the USA with terms and conditions defined by Energy Branch.

EDF 983 (quoting translation), Att 32. However, Mr. Nadal refused to accept the decision. In an e-mail dated April 7, 2004, Mr. Nadal stated that "Premium 2015" was an important activity of EDFINA and that the decision was not acceptable to him. EDF 985, Att 33. He further stated that it was unacceptable for Ms. Gaujacq to remain in charge of this project, that her doing so

---

[5] "Someone else" was obviously a male, as demonstrated by the fact that males replaced Ms. Gaujacq in all her prior areas of responsibility. Mr. Nadal replaced Ms. Gaujacq with respect to some of her responsibilities as President. Mr. Serviere and Mr. Foret replaced Ms. Gaujacq on the NuStart project and Mr. Dreux replace Ms. Gaujacq as the officer at EDFINA with signature authority. *See* Gaujacq Dep at 471, 509; Att.14; Bates No. 000057; Att. 27; EDFINA 000774; Att 28; EDFINA 001040-41. Att 29.

was a major obstacle for him and that such a solution was one he wanted to avoid. EDF 985, Att.33.

On May 25, 2004, the Chairman of EDF met with Mr. Nadal and informed him that, contrary to Mr. Nadal's wishes, Ms. Gaujacq was to continue on at EDFINA as Vice President although Mr. Nadal would replace her as President and board member of EDFINA and Ms. Gaujacq was to report to Mr. Nadal. EDF 1016-17, Att.34. Moreover, Mr. Nadal was explicitly discouraged from trying to further renegotiate this arrangement. EDF 1016-17, Att.34.

D    Discrimination by Mr. Nadal as President of EDFINA

While the Chairman of EDF may have discouraged Mr. Nadal from further negotiating Ms. Gaujacq's arrangement with EDF, he clearly was not discouraged from getting Ms. Gaujacq out of EDFINA. When disagreeing with the position EDF had given to Ms. Gaujacq failed to work, Mr. Nadal began harassing and discriminating against Ms. Gaujacq in his continuing efforts toward removing Ms. Gaujacq entirely from EDFINA.

Mr. Nadal began to discriminate against and harass Ms. Gaujacq as soon as he took over as President of EDFINA on June 1, 2004. First, on June 4, 2004, Mr. Nadal stated to Riggs Bank that only he and the other male vice president of EDFINA were to have signature authority on the account, thereby taking away Ms. Gaujacq's ability to sign checks on behalf of EDFINA. EDFINA 005346, Att.35. On June 11, 2006, Ms. Gaujacq discovered that her signature authority was taken away during a hostile encounter with Mr. Dreux, the other VP at EDFINA, who announced the fact in front of other EDFINA employees and voided checks that Ms. Gaujacq had unknowingly signed. Deposition of Mame Bawo Ba ("Ba Dep") at 215-16, Att.12; Gaujacq Dep at 310-11, Att.14; see also Bates No. 997, Att.36; EDFINA 000933-37, Att.37. In early June 2004, Ms. Gaujacq was informed by Mr. Floret that rather than driving with Ms. Gaujacq to

a conference in Pittsburg as planned on June 13, 2004, Mr. Floret would be driving to the conference with Mr. Nadal and Ms. Gaujacq was not invited to accompany them. Gaujacq Dep at 333-35. Att.14. Later, on June 18, 2004, Mr. Nadal took away Ms. Gaujacq's authority to enter into contracts or incur expenses on behalf of EDFINA while simultaneously and secretly permitting the other male vice president of EDFINA to retain that authority. EDFINA 001040-41, Att. 38; *see also* de Botherel Dep at 218 (relating these facts) and de Botherel Dep at 138 ("there were rumors that Mr. Nadal would treat Mrs. Gaujacq very badly."), Att.13.

Starting in June and continuing into early July, EDF ordered that an audit be conducted of EDFINA in an attempt to further harass Ms. Gaujacq. Gaujacq Dep at 343-45, Att.14. In fact, Mr. Nadal used the audit to suggest that Ms. Gaujacq had done something inappropriate related to one or more of EDFINA's contractors. Gaujacq Dep at 376-77, 482-84, Att.14.

On July 12, 2006, Mr. Nadal continued his discriminatory and harassing behavior toward Ms. Gaujacq in the first face-to-face meeting he had with Ms. Gaujacq since they first met in February 2006. Gaujacq Dep at 76-79, 389-93, Att.14. Specifically, Mr. Nadal met with Ms. Gaujacq and demanded that she bring thousands of documents into the EDFINA offices within 24 hours. *Id*, *see also* Exhibit 11 to Gaujacq Dep , Att.39. This request was unreasonable and practically impossible in its urgency and not sensible in that many of the documents he requested related to NuStart and were subject to a confidentiality agreement to which Mr. Nadal, as well as many other EDFINA employees, were not a signatory. Gaujacq Dep at 477-78, Att.14. After Mr. Nadal made this demand in an aggressive and demeaning manner, he brought Mr. Floret into the meeting and continued to demean Ms. Gaujacq in front of a junior EDFINA employee. Gaujacq Dep at 76-79, 389-93, Att.14.

·

E.    Ms. Gaujacq Complains to Superiors about Discrimination and Harassment

Ms. Gaujacq complained about the first of these discriminatory acts by Mr. Nadal against her to her manager, Mr. Ponasso, in an e-mail dated July 9, 2004. EDF 001039, Att. 40. On July 22, 2004, Ms. Gaujacq complained in writing to Mr. Nadal, Mr. Ponasso, Mr. Creuzet and Mr. Roussely. Bates Nos. 946-47, 849-50, Att 41. She also voiced her complaints of discrimination and harassment to Mr. Creuzet, Mr. Laroche and Mr. Ponasso on July 23, 2004. Bates Nos. 2035-36, Att.42; *see also* Bates Nos. 731-735, Att.43.[6] In response to Ms. Gaujacq's verbal complaints, Mr. Creuzet stated that EDF knew Mr. Nadal was a bad guy and suggested to Ms. Gaujacq that she return to France to be "protected" from Mr. Nadal. Mr. Creuzet further stated that Ms. Gaujacq's career would be dead if she filed a claim with the EEOC. *Id., see also* Gaujacq Dep at 407-19, Att.14.

F.    EDF Retaliates Against Ms. Gaujacq

EDF's response, however, was not to investigate the matter but rather generally: (1) to order Ms. Gaujacq back to France, contrary to all prior agreements and discussions related to her future work assignment; (2) offer Ms. Gaujacq a demotion, contrary to earlier promises of a promotion; and (3) to eventually force Ms. Gaujacq's retirement in January 2005.[7] Specifically, Mr. Laroche treated Ms. Gaujacq's complaints of discrimination and harassment as "blackmail" and responded accordingly by sending Ms. Gaujacq "a letter demanding that she return back to France, since the renewal or extension of her contract was about to come to an end, on 31st July

---

[6] Ms. Gaujacq followed the procedure for filing complaints at EDF. *See* Laroche Dep at 76-77, Att. 15. However, EDF conducted no official investigation. De Botherel Dep at 191-92, Att. 13

[7] In the meantime, Ms. Gaujacq also complained of Mr. Nadal's and EDF's discriminatory and retaliatory actions to EDF's ethics officer on December 10, 2004, who admittedly did nothing to investigate Ms. Gaujacq's complaints. De Botherel Dep at 178-80, Att.13

2004." Laroche Dep at 88, Att 15; *see also* July 27, 2004 letter to Ms. Gaujacq and translation, Bates Nos. 00304-05, Att.44. Ms. Gaujacq's "blackmail" was simply that "she threatened to file a complaint" with the Unites States authorities. Laroche Dep at 92, Att.15.

Ms Gaujacq was thereafter ordered to return to France, ordered to take a position that was a clear demotion without management responsibility and without any real substance and terminated on or about January 5, 2005. *See* Exhibit 71 to Gaujacq Dep, Att 45; Exhibit 6 to Laroche Dep, Att 46.

G    Mr. Nadal's Discriminatory Actions Continue

While Ms. Gaujacq attempted to transition the NuStart assignment and her other duties to her successors, Mr. Nadal continued his discriminatory behavior toward Ms. Gaujacq. Although EDF clearly wanted Ms. Gaujacq to transition her responsibilities to her successor, and although Mr. Serviere and Ms. Gaujacq had every intention of doing so, Mr Nadal made this impossible. Gaujacq Dep at 498-522, Att 14; EDFINA 000876, Att.47, Bates No. 000057, Att.48; EDF 001086, Att 49  On August 9, 2004, Ms. Gaujacq attended a conference in Florida on behalf of EDFINA. While there, Mr. Nadal, through EDFINA, canceled her business credit cards and Ms. Gaujacq had to pay for her business expenses personally. Gaujacq Dep at 506-07, Att.14. On August 19, 2004, Ms. Gaujacq was to attend a conference call related to NuStart. Gaujacq Dep at 509-11, Att.14; EDFINA 000726, Att.50. However, on August 18, 2004, Mr. Nadal contacted the NuStart administrative personnel and requested that the call-in number be changed so that Ms. Gaujacq could not attend and further ordered Ms Gaujacq not to attend, thereby embarrassing Ms. Gaujacq to the third parties involved in the conference call by refusing to allow her the ability to inform her colleagues of her departure from the project. Gaujacq Dep at 512-17, Att.14; Bates Nos. 728-30, 853, 854, Att.14.

Moreover, in August and then again in January 2005, Mr. Nadal, through his attorneys and EDFINA, attempted to interfere with Ms. Gaujacq's immigration status by communicating negatively with the USCIS. Gaujacq Dep at 456-57. Att. 14.

H.    The Position Offered to Ms. Gaujacq was Actually a Demotion and Further Retaliation by EDF

In EDF's July 27, 2004 letter to Ms. Gaujacq, EDF states that a position within the Energy Branch will be proposed by November 1, 2004, at the latest. Bates Nos. 000049-50. Att. 52. In August and September, 2004, Ms. Gaujacq requested on several occasions information concerning the details of this position. Bates Nos. 000034-39 at 37, Att 53; 1223-24, Att.54. On September 8, 2004, Mr. Bouron of EDF's Human Resources Department, sent Ms. Gaujacq an e-mail informing Ms. Gaujacq of certain of the financial terms of the new position and giving her a vague title for the new position. Bates Nos. 000063-65, Att 55. Ms. Gaujacq responded on September 10, 2004, by requesting more details about the actual position and her new mission letter for that position. Bates No. 000066, Att.56.

Finally, on October 1, 2004, through a letter dated September 24, 2004, EDF provided Ms. Gaujacq with the actual content of her mission with her proposed new position. Bates Nos. 000067-70, Att.57. Contrary to promises previously made to Ms. Gaujacq of higher management responsibility and a raise, the proposed new mission was at a lower level of responsibility than her three previous missions at EDF and offered no pay raise. *Id.*; Bates Nos. 000034-39 at 38, Att.53. The new mission consisted of supervising studies for a project that was not even financed, that had no real content, and that had no long-term prospective. Bates Nos. 000067-70, Att 57; Bates Nos. 000034-39 at 38, Att.53; see also Bates Nos. 000375-78 at 378 (indicating that no one was put in position that Ms. Gaujacq rejected), Att 53 The new position was clearly a demotion and represented a sanction and retaliation by EDF against Ms. Gaujacq.

Bates Nos. 000034-39 at 38, Att.53; *see also* Nadal Dep at 109 (testifying that he received a demotion after being CEO of Edenor, EDF's subsidiary in Argentina, when his new assignment did not entail "operational responsibility" and held "less active responsibility"), Att 16.

In a letter dated October 7, 2004 and again in a letter dated October 28, 2004, Ms Gaujacq justified her refusal of EDF's proposed new position. Bates Nos. 000034-39, Att. 53; 000075-77, Att.59. Ms. Gaujacq did not report to this retaliatory position on November 1, 2004, which under EDF policy and procedures, she had every right to reject. Rather than proposing a new mission and position that would reflect Ms. Gaujacq's capabilities and comply with EDF's previous promises of a promotion and raise, EDF started termination proceedings at that time By letter dated November 26, 2004, EDF ordered Ms Gaujacq to Paris for a meeting to discuss her termination. Bates Nos. 147-48, Att.60. On December 10, 2004, Ms Gaujacq appeared at this meeting and justified her refusal of the position offered to her by EDF in retaliation for filing a complaint with the EEOC Gaujacq Dep at 438-42, Att.14; Gaujacq Dep Exhibit 71, Att 45.

I.    EDF Defames Ms. Gaujacq Through Termination Papers

Following the meeting of December 10, 2004, EDF terminated Ms Gaujacq for what it claimed were performance reasons. Bates Nos. 000149-52, Att.45. At that time, EDF knew that Ms. Gaujacq had no performance issues and that the position offered to, and refused by, Ms. Gaujacq, was a demotion given in retaliation against Ms Gaujacq for filing a complaint with the EEOC. The termination of Ms. Gaujacq for "performance reasons" was false, the Company knew them to be false, impugned Ms. Gaujacq's competency to perform her job and general reputation, and therefore constituted defamation *per se*

J.    EDF Paid Ms. Gaujacq Less than Mr. Nadal for the Same Position

Mr. Nadal's job responsibilities were less than those Ms. Gaujacq possessed while she served as President, yet Mr. Nadal's starting compensation as President was over two times greater than Ms. Gaujacq's salary for performing the same position with additional responsibility as compared to Mr. Nadal's position. *See* Revised Demchick Report at Exhibit B, Att 61.[8] Specifically, in conjunction with Mr. Nadal's placement as President of EDFINA, the position was reclassified as R1 Ranking. EDF claims that the strategic importance of EDFINA suddenly changed thereby requiring a manager with an R1 Ranking. However, EDFINA's mission and activities did not change or increase since Mr. Nadal's appointment as President of EDFINA and Defendants cannot provide any activities that Mr. Nadal does that Ms. Gaujacq did not.

In a March 16, 2004 letter from Ms. Gaujacq, on behalf of EDFINA, to the U.S. Citizenship and Immigration Services, the position of President of EDFINA is described as follows:

> As the top-ranking executive of EDF International North America, Mr. Nadal will direct all business activities of the organization. He will review administrative and personnel decisions and coordinate the work of outside contractors who provide services to meet the needs of EDF International North America, Inc. ... as President, Mr. Nadal will work in close collaboration with leaders of U.S. electrical utilities, building and strengthening ties between the U.S. And French energy industries. ... Mr. Nadal will be charges with explaining the policies, experiences, and goals of Electricite de France to high-level U.S. energy executives and to the leading U.S. national organization in the energy industry
>
> He will play a critical role in defining the different avenues to be pursued by Electricite de France in cooperation with the U.S. energy industry in pursuit collaborative research and development projects at a highly advance level ...

Exhibit 33 to Gaujacq Dep, Att 62; 000246-50 at 247-48, Att 62. This was the job description submitted to and approved by the USCIS in order to obtain Mr. Nadal's VISA. Gaujacq Dep at

193-95, Att. 14. This was also Ms. Gaujacq's job description when she was president of EDFINA. *Id.* at 194-95.

Moreover, Mr. Nadal actually performed fewer functions in that Ms. Gaujacq was both President and headed EDF's initiative with NuStart. After Mr. Nadal was appointed as President, Ms. Gaujacq continued in the NuStart initiative that she had been working on as President. As President, Mr. Nadal did not take on any other responsibilities to compensate for his lesser responsibilities that were being handled by Ms. Gaujacq. Moreover, when Ms. Gaujacq was terminated, Mr. Georges Serviere replaced Ms. Gaujacq on the NuStart initiative. Furthermore, Mr. Nadal and Ms. Gaujacq had the same reporting structure, held the same exact titles and supervised the same amount of employees at EDFINA. *See* Laroche Dep at 47 (same reporting structure), Att. 15.[9]

---

[8] In addition, Mr. Nadal was not as qualified as Ms. Gaujacq with regard to nuclear facilities. *See* Nadal Dep at 150-52. Att.16.

[9] Additionally, EDF states that "the difference in responsibility level of an R3 and an R1 is so big that it is impossible to go from an R3 to an R1." *See* de Botherel Dep at 64, Att.13 Accordingly, it is difficult to believe how the same exact position of President of EDFINA and Delegate General to North America could suddenly carry the responsibilities of an R1 ranking when it had, in all the years previous to June 2004, carried an R3 ranking. Defendants' explanation for the radically different salaries between Ms. Gaujacq and Mr. Nadal is implausible.

## ARGUMENT

The Rules of Civil Procedure and the Local Rules of this Court permit, and indeed require, Plaintiff to move the Court to compel proper responses to Plaintiff's discovery requests. The Federal Rules provide that a party "may apply for an order compelling disclosure or discovery . . . if a party, in response to a request for inspection submitted under Rule 34, fails to respond that inspection will be permitted as requested or fails to permit inspection as requested . . ." Fed. R. Civ. P. 37(a)(2)(A). Moreover, if a party objects to a request for production, "the part [of the objection] shall be specified and inspection permitted of the remaining parts." Fed. R. Civ. P. 34(b).

## I.    MS. GAUJACQ IS ENTITLED TO DISCOVERY OF COMPARABLES

Ms. Gaujacq is entitled to documents related to the payment, responsibilities and evaluations of certain EDF and EDFINA employees, including their employment/expatriate agreements, resumes, evaluations and pay-stubs ("Comparables"). Documents concerning these Comparables are necessary to assess the compensation Ms. Gaujacq should have received absent Defendants' discriminatory conduct. The Requests for the Comparables includes from the Fourth RFP, Nos. 1-3, 13, 18- 21, 33-5, and 38 and from the Fifth RFP, Nos. 7, 25-7, 44-5, 53, 71, and 79. A summary of Ms. Gaujacq's Requests for such Comparables and Defendants' responses are attached hereto as Att. 63. In addition, we believe some of these individuals are employees of EDF or EDFINA, whose pay or contracts were significantly increased after Mr. Nadal was hired as President, which creates a strong incentive or motivation to be untruthful or biased in their testimony. For example, Ms. Gaujacq learned during the course of the depositions that Mr. Audie and Ms. Ba both received double their salary after Mr. Nadal took over and Ms. Gaujacq was terminated. Moreover, EDF has contended that Ms. Gaujacq is not permitted to extend an expatriate contract for more than a certain period of years. We believe several of these

21

individuals did, which directly refutes the contention.

The relevance of Ms. Gaujacq's requests for documents concerning the Comparables cannot be in serious contention. A key element of Ms. Gaujacq's damages assessment is based on the difference between what her compensation should have been but for Defendants' discriminatory conduct, and her lower salary at Entergy. See Revised Expert Report of Neil H. Demchick, at 8-11, Att. 61. In order for Mr. Demchick, CPA, the damages expert retained by Ms. Gaujacq, to assess what Ms. Gaujacq would have been paid, "individuals/ positions in EDF that are 'comparable' or similar to Ms. Gaujacq's potion, without the discrimination, retaliation, or wrongful termination, are identified and their compensation and benefits levels are used as estimates of what Ms. Gaujacq should have received had it not been for the discrimination, retaliation, or wrongful termination." Id. at 8. Because Defendants have refused to provide documents in response to Ms. Gaujacq's requests for such Comparables, Mr. Demchick has been forced to rely on Mr. Nadal and his salary and responsibilities as the only comparator to Ms. Gaujacq. Id.

Defendants themselves admit that such comparables are relevant and necessary to determine what Ms. Gaujacq would have been compensation but for Defendants' discriminatory conduct. Defendants have submitted their own damages report by Mr. Walker which expressly relies on Comparables by EDF/EDFINA employees other than Mr. Nadal. For example, Mr. Walker "concludes" that Plaintiff's "true successor" as President of EDFINA was not the subsequent President Mr. Nadal, but was instead Mr. Serviere. As such, Mr. Walker concludes that any Comparables should be to Mr. Serviere and not Mr. Nadal. Walker Report, at 4, Att. 64.

In addition, Mr. Walker concludes in Defendants' damages report that there are even "More Relevant Comparisons." Id. at 19 –20. Defendants' identify these "more relevant"

Comparables as the prior four Presidents of EDFINA, including Jean Cottave, Pierre Boussard, Marc Gery and Henry Herbin. Mr. Walker then states their "salary and bonus" and a second number as their "net pay." Ironically, even though Defendants prop up these individuals front and center as the ultimate Comparables, Defendants have refused to produce any documents concerning their net pay, employment/expatriate contracts, resumes or job responsibilities.

Further, Defendants through Mr. Walker's report rely on comparables outside of EDF and EDFINA, including compensation of "all new CEO hiring" as announced by Fortune 1000 firms, including the replacement of Martha Stuart in Martha Stuart Living Omnimedia, and other companies. If Defendants believe that the discrepancy in salaries Martha Stewart and the CEO who replaced her is a rational proxy for the difference between Ms. Gaujacq's salary and Mr. Nadal's salary, they would be hard pressed to deny that Comparables of Ms. Gaujacq to other employees within EDF/EDFINA itself are relevant as well.

In addition to the Comparables with specific employees, Ms. Gaujacq propounded several requests concerning the identity, qualifications and factors considered in determining the pay rankings of such individuals. These include Request Nos. 44, 45 and 71 to Ms. Gaujacq's Fifth RFP. These Requests are also relevant to a determination of why Ms. Gaujacq only received an R3 ranking instead of the higher R1 ranking awarded to Mr. Nadal for essentially the same title but with lesser responsibilities, or why Ms. Gaujacq failed to earn an R1 ranking as the head of a major subsidiary, while the Presidents of other subsidiaries received R1 rankings. See, e.g., Yann Laroche Dep. Tr. at 13-21, 25-32, 42-44, Att.15.

## II.    MS. GAUJACQ IS ENTITLED TO DISCOVERY OF MR. NADAL'S EMAILS AND AUDITS PERFORMED OF HIS DIVISIONS OF EDF

Ms. Gaujacq requested in her Fifth Request, No. 31 the following documents with respect to emails sent or received by Mr. Nadal:

**Copies of all emails sent or received by Christian Nadal during the period January 2004 through September 2004.**

Defendants refused to produce such documents, stating as follows:

> Defendants object to this Request on the grounds that it is oppressive and vexatious in that it seeks documents beyond and outside the scope of the extensive number of e-mails related to issues in this litigation that were sent or received by this individual and that have already been produced herein in response to Plaintiff's Prior Document Requests.

In addition, Ms. Gaujacq requested in her Fourth RFP, Nos. 27-29, certain documents

pertaining to the audits of his divisions in 1992-1994 and regarding audits conducted of the

Development position at EDF in 1997 while Mr. Nadal was Vice President of Strategy and

Development:

> **NO. 27.:  Please produce all documents regarding the audit(s) conducted of Mr. Nadal's division of EDF in 1992.**
>
> **REQUEST NO. 28:  Please produce all documents regarding the audit(s) conducted of Mr. Nadal's division of EDF in 1993 and 1994 while Mr. Nadal was an Executive Vice President.**
>
> **REQUEST NO. 29:  Please produce all documents regarding the audit(s) conducted of the Development position at EDF in 1997 while Mr. Nadal was Vice President of Strategy and Development.**

Defendants also refused to produce documents regarding such audits. The grounds for Defendants' objections to Request Nos. 27-29 were identical:

> Defendants object to this Request on the grounds that it is oppressive, vexatious and harassing in that the information it seeks is not relevant or reasonably likely to lead to the discovery of admissible evidence. Defendants further object to this Request on the ground that it is ambiguous.

These emails and audits requested by Ms. Gaujacq are necessary because they reflect the

responsibilities, performance and evaluations of Mr. Nadal, who replaced Ms. Gaujacq, assumed

only a portion of her responsibilities and was compensated more than two times that of Ms.

Gaujacq. These documents are necessary to assess the amount Ms. Gaujacq should have

received absent Defendants' discriminatory conduct.

In addition, the emails specifically will be invaluable in proving that Mr. Nadal actively sought the termination of Ms. Gaujacq for discriminatory reasons and without any business justification. Discovery in this action has already uncovered emails from Mr. Nadal to EDF authorities, shortly upon his arrival at EDFINA and with minimum contact with Ms. Gaujacq, requesting that Ms. Gaujacq be removed as President of EDFINA and recalled to France. Atts 26,30, 31, 33. Such emails demonstrate that Mr. Nadal's treatment of Ms. Gaujacq was discriminatory and without business justification. As such, the production of Mr. Nadal's emails for the nine-month period is essential to proving once and for all that Mr. Nadal had a secret agenda with respect to Ms. Gaujacq that was disclosed only to the upper echelon of EDF management.

Further, these emails will provide times, places, scope of work, travel schedules, and communications with others. As set forth in more detail below, the comparisons between Ms. Gaujacq and Mr. Nadal's emails in this time period are relevant for a number of the causes of action, defenses raised and affixing time, place and context.

With respect to the audits, they too are necessary to prove that Mr. Nadal, who was paid over twice as much in compensation as Ms. Gaujacq, was less qualified and assumed less responsibility than Ms. Gaujacq. For example, in furtherance of his discrimination against Ms. Gaujacq, Defendants ordered in 2004 an audit of her work. Mr. Nadal stated that such an audit was necessary because he believed the audit was ordered because Ms. Gaujacq had engaged in unsatisfactory performance. Nadal Tr. at 528, Att.16. Mr. Nadal then testified that he had been audited himself "several" times while working for EDF, including in 1992, 1993-4, and 1997 Id. at 528-30. Yet Defendants refuse to produce these for comparison or to assess Mr. Nadal's qualifications, performance and credibility.

III.    **MS. GAUJACQ IS ENTITLED TO DISCOVERY REGARDING OTHER
        INSTANCES OF DISCRIMINATION BY DEFENDANTS**

Ms Gaujacq seeks documents related to Defendants' practices and policies regarding

discrimination and other instances in which Defendants have engaged or have been accused of

engaging in discriminatory conduct against employees. These documents are necessary to

demonstrate that Defendants have a history of treating employees in the same discriminatory

manner to as they treated Ms Gaujacq. The Requests for the instances of discrimination by

Defendants includes Requests from the Fourth RFP, Nos 14-16 and from the Fifth RFP, Nos. 58-

9. A summary of Ms. Gaujacq's Requests for such instances of discrimination and Defendants'

responses are attached hereto as Att 65.

Such documents are clearly relevant to show that Defendants have a practice of

discriminatory practice and the unequal treatment of Ms Gaujacq conformed to that practice.

Further, such documents are relevant to the manner in which Defendants respond to claims of

discrimination and retaliation, which in turn is relevant to any claim by Defendants that they

effectively enforce any policy they have with respect to such conduct.

Moreover, the Supreme Court has spoken on this issue and has made clear that acts of

discrimination against co-workers are critical to an understanding of the Defendants' hostile

work environment:

> We have emphasized, moreover, that the objective severity of
> harassment should be judged from the perspective of a reasonable
> person in the plaintiff's position, considering "all the circumstances."
> In same-sex (as in all) harassment cases, that inquiry requires careful
> consideration of the social context in which particular behavior occurs
> and is experienced by its target .. The real social impact of workplace
> behavior often depends on a constellation of surrounding circumstances,
> expectations, and relationships which are not fully captured by a simple
> recitation of the words used or the physical acts performed. Common
> sense, and an appropriate sensitivity to social context, will enable courts
> and juries to ... [determine what] a reasonable person in the plaintiff's
> position would find severely hostile or abusive.

26

Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81-82, 118 S.Ct. 998, 1003 (1998)

(*quoting* Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 371 (1993) (Ginsburg,

J. concurring).[10]

## IV. MS. GAUJACQ IS ENTITLED TO DISCOVERY REGARDING ALL EMAILS THAT SHE SENT AND RECEIVED

Ms. Gaujacq requested in her Fifth RFP, No. 36 the following:

> **Copies of all emails sent or received by Catherine Gaujacq during the period January 2004 through September 2004.**

Defendants objected, stating as follows:

> Defendants object to this Request on the grounds that it is oppressive and vexatious in that it seeks documents beyond and outside the scope of the extensive number of e-mails related to issues in this litigation that were sent or received by this individual and that have already been produced herein in response to Plaintiff's Prior Document Requests. Defendants further object to this Request on the ground that it calls for documents in the possession, custody or control of the Plaintiff.

There are multiple reasons why these are relevant, particularly in this limited timeframe

being requested. First, Ms. Gaujacq had extensive communications with officials at EDF about

renewing her contract, continuing as President of EDFINA, revising her contract after the March

---

[10]    *See also* National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed 2d 106 (June 10, 2002), McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Harris v. Forklift Systems, Inc., 114 S.Ct. 367 (1993); *see also* White v. United States Catholic Conference, 1998 WL 429842 *5 (D.D.C. May 22, 1998); Robinson v. Runyon, 149 F.3d 507 (D.D.C. 1998); Miller v. Poretsky, 595 F.2d 780 (D.C. Cir.1978), Johnson v. The Washington Times, 2002 WL 1335239 (D.D.C. June 18, 2002)(a legitimate inference of motive or intent may be drawn from such evidence), Hairston v. WMATA, 1997 WL 411946 (D.D.C. April 10, 1997); Webb v. Hyman, 861 F. Supp. 1094 (D.D.C. 1994); Rauh v. Coyne, 744 F. Supp. 1186, 1189 (D.D.C. 1990) (allegation that supervisor "made inappropriate remarks to a number of hotel employees **other than the plaintiffs**" "suggests that an investigation might well have uncovered the problem," and is relevant to employer's liability) (emphasis added) (denying motion to dismiss); Dougherty v. Barry, 604 F. Supp. 1424, 1439 (D.D.C. 1985) (other acts of retaliation probative that a custom or policy of retaliation existed); Morris v. WMATA, 702 F.2d 1037 (D.C. Cir. 1983).

meeting, the approval of the contract after the March 2004 meeting, preparing the Mission Statement for Mr. Nadal, preparing Mr. Nadal's immigration papers, his visits to the United States and where she was during these visits.

Second, Ms. Gaujacq had extensive communications relating to her job responsibilities, and the emails will reflect the nature, scope, substance and importance of her duties and responsibilities.

Third, Defendants, particularly Mr. Nadal in his defamatory communications to EDF officials, have suggested that Ms. Gaujacq was not working during much of this timeframe. The emails will reflect communications at night, on weekends and extensively throughout the days, and will reflect Ms. Gaujacq's consistently strong work ethic while at EDF.

Fourth, Defendants contend that the job changes significantly when Mr. Nadal came on board, justifying his R1 rating, because the scope and importance and focus significantly increased. Comparing Ms. Gaujacq and Mr. Nadal's emails will show differently, including the level of contact with high level individuals, the contracts worked on, the amount of work, the scope, duties and responsibilities entrusted to them.

Fifth, the defendants have contended that Ms. Gaujacq hid or did not return documents. These emails will reflect how the documents were kept, to whom sent, and the actual existence and non-existence of documents in this timeframe (Defendants contend some fictitious documents are "missing.").

Sixth, two of the EDFINA employees, both of whom received raises double their prior salaries when Mr. Nadal took over, have made statements negative to Ms. Gaujacq which we believe will be disproved by the emails (this is a justification for the emails set forth below as

well), and will also establish their vacation and sick leave, for times they have claimed they were present in the office.

Finally, these emails (Ms. Gaujacq's and Mr. Nadal's) will show their travels, their schedules, when they were in the office and when they were out, which defendants contend is different than Ms. Gaujacq's recollection. Since Ms. Gaujacq was unable to obtain her calendars or records because of her sudden and unexpected termination, and therefore never returned to the office, and defendants have failed to produce or explain the absence of these calendars and records, the emails may be the only sources to establish this.

## IV.   MS. GAUJACQ IS ENTITLED TO DISCOVERY REGARDING ALL EMAILS SENT AND RECEIVED BY MESSRS. FORET, DREUX, AUDIE, AND BA

In her Fifth RFP, Nos. 32-35, Ms. Gaujacq sought from Defendants: "[c]opies of all emails sent or received by [Jean Luc Foret, Benoit Dreux, Alexandre Audie, and Adja Ba] during the period January 2004 through September 2004."

Defendants' responses to Request Nos. 32-35 were identical:

> Defendants object to this Request on the grounds that it is oppressive and vexatious in that it seeks documents beyond and outside the scope of the extensive number of e-mails related to issues in this litigation that were sent or received by this individual and that have already been produced herein in response to Plaintiff's Prior Document Requests.

Defendants do not attempt to object on relevance grounds, and therefore concede that they are relevant. The only objection appears to be that such a production would be "oppressive and vexatious." To the contrary, how can these Requests be "vexatious" if, as Defendants concede, they are relevant to Plaintiff's claims? Indeed, the emails of these individuals during the discrete timeframe are particularly relevant as set forth above (bias, inconsistencies, and vacation schedules). Moreover, the employee's emails will reflect the schedules, what was being worked on, their level of communications with Ms. Gaujacq, the substance of what Mr. Nadal

was directing them to do and not do with respect to Ms. Gaujacq (e.g., exclude her from

meetings and conference calls, take away her responsibilities, obtain copies of her documents,

etc.). These all relate to the issues raised by Defendants as defenses, and will refute much of

what has been testified to, without supporting documentation.

Further, Defendants objection on "oppressive" grounds should be denied as well. All

discovery is burdensome, however the standard is that such burden must be "undue."

Defendants cannot demonstrate that the production of such a limited-in-time production of

emails is "unduly burdensome" in light of their significance to this case.

## V.    MS. GAUJACQ IS ENTITLED TO DISCOVERY REGARDING DEFENDANTS' POLICIES AND PRACTICES WITH RESPECT TO TREATMENT OF CONFIDENTIAL INFORMATION AND COLLECTION OF COMPUTERS AND COMPUTER INFORMATION FROM EMPLOYEES

Ms. Gaujacq seeks documents related to the policy and practice with respect to the

treatment of confidential and proprietary information and the collection of computers and

computer information for each employee transferring to another position. A summary of Ms.

Gaujacq's Requests for such documents and Defendants' responses are attached hereto as Att.66

These documents are necessary to demonstrate that Ms. Gaujacq was singled out for unequal

treatment.

Such production of documents is necessary because Defendants have repeatedly stressed

that Ms. Gaujacq's erasure of her lap-top hard drive, which was standard procedure to protect

unnecessary disclosure of confidential an proprietary EDF/EDFINA information, Ms. Gaujacq

somehow acted improperly. Indeed, Defendants spent an inordinate amount of time, taking up

over 30 pages of deposition testimony, questioning Ms. Gaujacq on the return of her laptop

computer, notwithstanding that EDF offered to sell Ms. Gaujacq the laptop, and only after she

declined the offer and returned the computer, and only months after her termination did

Defendants raise any issue with respect to the laptop. *See* Ms. Gaujacq Dep. Tr., pp. 17-31, 462-72, 496-97, Att 14. As such, Ms. Gaujacq is entitled to discovery into Defendants' practices with respect to treatment of confidential information, especially with respect to retrieval of such information from computers of employees transferred to other positions, to be able to establish that she followed policy and procedure, and that defendants' claims to the contrary are malicious, discriminatory and retaliatory, and without factual basis.

In response to Plaintiff's Fourth RFP Request No. 36 for all documents reflecting the documents obtained from Ms. Gaujacq's laptop and desk computers, Defendants first stated that it would cost Plaintiff's five hundred dollars to obtain such documents (*see* Attachment 68), but then agreed to produce and did produce a hard drive, which would cost even more money by Plaintiff's to access. Plaintiff therefore requests a print out of all such documents, as requested by Request No. 36.

## VI.    MS. GAUJACQ IS ENTITLED TO DISCOVERY REGARDING TREATMENT OF EMPLOYEES IN SIMILAR SITUATIONS TO MS. GAUJACQ'S

Ms. Gaujacq seeks, and Defendants have refused to produce documents related to the manner in which Defendants treated other employees in similar situations to Ms. Gaujacq. The Requests for the treatment of similarly situated employees includes Requests from the Fifth RFP, Nos. 54, 57, 62-4, and 72. A summary of Ms. Gaujacq's Requests for such documents and Defendants' responses are attached hereto as Att 67.

Such similarly situated employees include other employees that were terminated for "destruction" of EDF property, other employees that were terminated for refusing transfers to other positions, other employees that were terminated after more than 23 years of experience with the company, other employees who were requested to return to France after the expiration of their contracts, and other employees who worked for more than six months without a written

job description or mission statement. These documents are essential to demonstrate that Ms.

Gaujacq was singled out for unequal treatment and that there was no business justification for

her termination. Defendants have stated unequivocally that Ms. Gaujacq could not remain in the

U.S., that she had to accept the position offered and that they were permitted to terminate her for

these reasons. In fact, all these contentions are false and we believe these documents will help

prove that the contentions are false. These issues are at the heart of the case, and should be

provided. Defendants cannot assert something is true and a given, and then refuse to provide

supporting documentation when it is requested by the other side who challenges the assertions.

This is the very nature and underpinnings of discovery and proof in our judicial system.

## CONCLUSION

Plaintiff's motion to compel should be granted. Plaintiff requests that Defendants be

required to respond fully and completely to all outstanding discovery requests no later than August

31, 2006, including delivering copies of all responsive pleadings and documents.

July 28, 2006                                Respectfully Submitted,

                                            Elaine Charlson Bredehoft
                                            D.C. Bar No. 441425
                                            S. Christian Wickwire
                                            D.C. Bar No. 488797
                                            Kathleen Z. Quill
                                            D.C. Bar No. 489079
                                            CHARLSON BREDEHOFT & COHEN, P.C.
                                            11260 Roger Bacon Drive
                                            Suite 201
                                            Reston, Virginia 20190
                                            (703) 318-6800

                                            Counsel for Plaintiff
                                              Catherine Gaujacq

32