# ATTACHMENT 1

## Christian Wickwire

**From:** RMay@hnrlaw.com
**Sent:** Wednesday, June 14, 2006 6:55 PM
**To:** Elaine Bredehoft; Christian Wickwire; Jessica Bogo
**Cc:** Hodgson, Morgan; DRegal@hnrlaw.com; dclark@steptoe.com
**Subject:** Meet and Confer Request

Counsel:

Please let me know when you are available tomorrow to meet and confer to discuss Dr Gold's report.

As you know, Rule 26(a)(2)(B) requires that Dr. Gold's report "contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions . ." Dr. Gold's report does not comply with these requirements: (1) its only opinion is conclusory; (2) it is grossly incomplete; and (3) it states no bases or reasons for the conclusory opinion. The purposes of a providing a full and complete expert report are: (1) to eliminate, or at least greatly reduce, the need for extensive deposition testimony; and (2) to avoid unfair surprise. Because Dr. Gold's report does not comply with the rule, defendants cannot adequately prepare for her cross-examination and deposition Accordingly, we request that you provide a complete report no later than June 22, 2006.

As you know, we have cooperated in making ourselves available to you for meet and confer's on very short order and would very much appreciate the same courtesy

Thank you in advance for your cooperation

Randi

---

Randi B. May
Hoguet Newman & Regal, LLP
10 East 40th Street
New York, NY 10016

Phone: (212) 689-8808
Fax:   (212) 689-5101

08/21/06

# ATTACHMENT 2

Case 1:05-cv-00969-HHK   Document 93-2   Filed 08/21/2006   Page 4 of 16

CATHERINE GAUJACQ v EDFINA, et al.
Yann Laroche                                    Friday, April 21st, 2006

```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - - - -
IN THE MATTER OF                   )
                                   )
CATHERINE GAUJACQ                  )
              Plaintiff,           )
                                   )CIVIL ACTION NO:
v.                                 )1:05CV0969 (JGP)
                                   )
ELECTRICITE DE FRANCE              )
INTERNATIONAL NORTH AMERICA        )
INC., et al                        )
              Defendants.          )
- - - - - - - - - - - - - - - - - -



              DEPOSITION OF YANN LAROCHE




              Friday, April 21st, 2006
                  at   8.30 am



            Taken at the offices of:


              Gide Loyrette Nouel
              26, cours Albert 1er
                 Location 4
                75008, Paris
                   France
```

Case 1:05-cv-00969-HHK   Document 93-2   Filed 08/21/2006   Page 5 of 16

CATHERINE GAUJACQ v EDFINA, et al.
Yann Laroche                              Friday, April 21st, 2006

Page 55

| | | |
|---|---|---|
| 12:14:54 | 1 | I believe even more so he probably had an interview with |
| | 2 | Catherine Gaujacq herself. |
| | 3 | Q. Have you seen any document that reflects any |
| | 4 | investigation of Catherine Gaujacq's claims of |
| 12:15:01 | 5 | discrimination and retaliation? |
| | 6 | A. There were some documents, obviously, and |
| | 7 | there were exchanges of mails, in particular, issued by |
| | 8 | Jean-Louis Betouret, and this is why I knew that he was |
| | 9 | actively seeking a solution to the problem, since I was |
| 12:17:30 | 10 | systematically CC'ed on the exchanges or mail or |
| | 11 | correspondence. |
| | 12 | But as far as discrimination or retaliation is |
| | 13 | concerned, I was never aware of these claims. I only became |
| | 14 | aware of those, of anything pertaining to discrimination, |
| 12:17:46 | 15 | after July of 2004, and I daresay I was extremely surprised |
| | 16 | since, as perceived from our point of view -- and by "our |
| | 17 | point of view" I mean myself, Mr. Creuzet, Mr. Ponasso and |
| | 18 | Mr. Betouret -- there had been no discrimination. |
| | 19 | As to the second word, "retaliation", I'm not sure |
| 12:18:19 | 20 | that I really understand what you mean by this. |
| | 21 | Q. Is it the policy of EDF that individuals who |
| | 22 | are employees of EDF should not discriminate against anyone |
| | 23 | else, on the basis of gender or other factors? |
| | 24 | MR. CLARK: Objection to form. |
| 12:21:20 | 25 | A. Well, there are several things involved here. |

Page 56

| | | |
|---|---|---|
| 12:21:26 | 1 | The first thing is EDF culture. It might be difficult to |
| | 2 | understand from the outside, but as we said earlier EDF is |
| | 3 | a public company that has its own culture. It is a culture |
| | 4 | that has been developed over decades and which has served in |
| 12:21:49 | 5 | establishing -- I should call them "humanitarian values" |
| | 6 | within the group. Those are values of proximity to the |
| | 7 | staff, consideration, understanding, et cetera. |
| | 8 | It is a very important feature of the way EDF |
| | 9 | functions. There is nothing in writing, but it is something |
| 12:22:06 | 10 | which is very strong and very important; all the more so as |
| | 11 | most of our staff, as I indicated before, join EDF when they |
| | 12 | are young and do all of their career at EDF, all the way |
| | 13 | through to retirement. |
| | 14 | The second thing has to do with ethics. There is |
| 12:22:34 | 15 | a document reflecting the group values, and there is a list |
| | 16 | of a number of recommendations, which are formulated not |
| | 17 | only for employees but for employers alike. This document |
| | 18 | is systematically circulated within the company. I think it |
| | 19 | started being circulated around 2002 or 2003, probably 2003, |
| 12:22:59 | 20 | and it picks up the five major values of the group and the |
| | 21 | way they should be complied with within the group. |
| | 22 | Q. Does EDF believe that women should be treated |
| | 23 | the same as men? |
| | 24 | MS. HOGUET: I object to the form of the question. |
| 12:23:25 | 25 | But you may answer. |

Page 57

```
12:25:51   1           A.  Well, first of all this is mandatory under
           2    French law.  Secondly, amongst our values as I depicted them
           3    earlier, we find respect, of course, for each other, and
           4    equity.  But when I say "equity" I don't mean this in the
12:26:16   5    equalitarian meaning of the word.
           6           Secondly, this type of question has never arisen
           7    within EDF, because it's part of our culture and has never
           8    given rise to any specific difficulty.
           9           When I talk about being equalitarian, as opposed
12:26:37  10    to grant equality or being equitable, I mean that we give
          11    equal chance or equal possibility of access to
          12    responsibilities, an equal chance of leading a career or of
          13    reaching managerial practice to everyone.  It doesn't mean
          14    that we want everybody to be on the same equal footing --
12:27:07  15    they are on an equal footing, but we don't want to put
          16    everybody on the same level; this being a fundamental value
          17    within EDF, which is not something recent, it's something
          18    that dates back years and is part and parcel of our EDF
          19    culture.
12:27:21  20           Q.  What is mandatory under French law?
          21           MR. CLARK:  Objection to the form of the question.
          22           A.  French law has it that there should be
          23    equality in the way we deal with men and women, and we
          24    should make no difference between one and the other.  As far
12:31:01  25    as we are concerned at EDF there has never been any
```

Case 1:05-cv-00969-HHK   Document 93-2   Filed 08/21/2006   Page 8 of 16

CATHERINE GAUJACQ v EDFINA, et al.
Yann Laroche                                    Friday, April 21st, 2006

Page 58

| Time | Line | Text |
|---|---|---|
| 12:31:06 | 1 | discrimination between men or women. This is a concept that |
|  | 2 | simply does not apply. |
|  | 3 | Furthermore, within EDF -- and that obviously |
|  | 4 | would apply to any industrial company -- for years -- and |
| 12:31:34 | 5 | obviously this changed over the last ten to fifteen years -- |
|  | 6 | technical colleges and training centers or engineering |
|  | 7 | schools trained mainly men. This goes without saying, this |
|  | 8 | is obvious. This is why obviously in the past EDF, like |
|  | 9 | anybody else, recruited a majority of males. And this also |
| 12:32:05 | 10 | explains why, 30 years down the road, there is such |
|  | 11 | an important proportion of males within our management team, |
|  | 12 | or top management team. |
|  | 13 | But as time went by more and more women were |
|  | 14 | trained, and colleges as well as business schools churned |
| 12:32:31 | 15 | out more and more qualified women, whether it be from the |
|  | 16 | commercial standpoint or the technical standpoint. And |
|  | 17 | therefore EDF made sure that it recruited these women and |
|  | 18 | gave them the opportunity of being promoted within the |
|  | 19 | company to top responsibilities. |
| 12:32:49 | 20 | Although this is perfectly natural, we pay great |
|  | 21 | attention to this, because we want to make sure that, little |
|  | 22 | by little, women be recruited at the same rate as they |
|  | 23 | actually graduate from various schools. |
|  | 24 | THE INTERPRETER: Would that be a nice time to |
| 12:33:13 | 25 | stop? |

Case 1:05-cv-00969-HHK   Document 93-2   Filed 08/21/2006   Page 9 of 16

CATHERINE GAUJACQ v EDFINA, et al.
Yann Laroche                                    Friday, April 21st, 2006

Page 59

| Time | Line | Text |
|---|---|---|
| 12:33:16 | 1 | MS. HOGUET: I must say, for a deposition to start |
|  | 2 | at 8.30, to go to 12.30 without a lunch break is a bit much, |
|  | 3 | so we should have the lunch break now, if that's alright. |
|  | 4 | (12.35 pm) |
| 12:35:28 | 5 | (The luncheon adjournment) |
|  | 6 | (1.40 pm) |
|  | 7 | Q. Mr. Laroche, you testified earlier that you |
|  | 8 | believed that EDFINA had no equivalent subsidiary; do you |
|  | 9 | recall that testimony? |
| 13:38:54 | 10 | A. Yes. Indeed, I cannot think of a subsidiary |
|  | 11 | with which I could establish a comparison in terms of type |
|  | 12 | or size. |
|  | 13 | Q. What makes EDFINA so unique among the |
|  | 14 | subsidiaries of EDFINA? |
| 13:39:12 | 15 | MS. HOGUET: I object to the form of the question, |
|  | 16 | but you may answer. |
|  | 17 | A. When, as I indicated earlier, you have |
|  | 18 | distribution subsidiaries or production subsidiaries, |
|  | 19 | whether you are supplying electricity to Hungary or to |
| 13:40:47 | 20 | Brazil, in fact you're actually carrying out the same job, |
|  | 21 | albeit with external conditions that are slightly different. |
|  | 22 | While, if you take EDFINA, in fact it was purely |
|  | 23 | linked to the North American or to the United States |
|  | 24 | context, and therefore I can think of no equivalent to |
| 13:41:14 | 25 | EDFINA anywhere else in the world. |

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------X
CATHERINE GAUJACQ                   :
        Plaintiff                   : No.
    v.                              : 1:05CV0969
ELECTRICITE DE FRANCE               : (JGP)
INTERNATIONAL NORTH AMERICA, INC.,  :
ET AL                               :
        Defendants                  :
------------------------------------X


Washington, D.C.

Thursday, March 23, 2006


Deposition of:

        PATRICK DE BOTHEREL,

    The witness, was called for examination by

counsel for the Plaintiff, pursuant to notice,

commencing at 8:47 a.m., at the law office of

Steptoe & Johnson, 1330 Connecticut Avenue, N.W.,

Washington, D.C., 20036, before Sheri C. Stewart,

Registered Professional Reporter and Notary Public

in and for the District of Columbia, when were

present on behalf of the respective parties:

1   Q   Can you recount for me the conversations your boss had with Yann Laroche?

3   A   Well, in summary -- I can only tell you that in summary there was lots of reflections going on, what to do about -- how to handle a separation from Mrs. Gaujacq.

And the conclusion of it was that in fact there was nothing which would remain to be done other than separating with her.

10   Q   But you don't -- you can't tell me any exact words that Mr. Laroche or your boss used in any of those communications; is that correct?

13   A   No.

14   Q   No, you cannot, right?

THE WITNESS: Cannot.

16   BY MS. BREDEHOFT:

17   Q   Do you have an understanding that it's illegal for -- does EDF and EDFINA have an understanding that it is illegal to treat a woman worse than a man?

MS. REGAL: I object to the question, I object to the form. And I object to your

1    calling for legal conclusions or testimony
2    from this witness.
3        A    I am not a lawyer.  I am somewhat
4    familiar with the practice in France.  But not at
5    all in the United States.  That's the way I can
6    respond.
7    BY MS. BREDEHOFT:
8        Q    Do you know whether anyone else at EDF
9    understood that the laws in the United States
10   don't allow a man to treat a woman worse in an
11   employment context?
12           MS. REGAL:  Are you going to translate?
13           THE INTERPRETER:  I haven't yet
14       started.
15           MS. REGAL:  I object, I object on the
16       same basis as my immediately prior objection,
17       and I object as well because of what I
18       consider to be a misstatement of the law in
19       the United States.
20   BY MS. BREDEHOFT:
21       Q    Let me phrase it -- let's make life
22   easy.

1     Do you think that it's okay for a man
2  at EDF to treat a female employee worse.  Worse
3  than other male employees.
4          MS. REGAL:  Object to the form of the
5      question.
6     A     I don't see any reason for something
7  like that.  Men and women ought to be treated the
8  same way.
9  BY MS. BREDEHOFT:
10    Q     And did you have any knowledge or
11 understanding that Catherine Gaujacq had
12 complained that Christian Nadal was treating her
13 poorly because she was a woman?
14         MS. REGAL:  I object to the form of the
15     question.  I don't know what you mean either
16     by the word "you," whether you're talking
17     about Mr. Bouron or the institution.
18         And I object to the lack of a time
19     frame as to the awareness that you're
20     seeking.
21    A     Well, just as a summary, I can say that
22 there has been knowledge within the group, but

PATRICK DE BOTHEREL
Gaujacq v. Electricite de France, et al                    3/23/2006

Page 138

1  this knowledge based on hearsay, which that's
2  always very dangerous because it can be based just
3  only upon rumors.
4          And, indeed, there were rumors that
5  Mr. Nadal would treat Mrs. Gaujacq very badly.
6  BY MS. BREDEHOFT:
7      Q     If a male employee at EDF is treating a
8  female employee at EDF worse than other males, do
9  you think that that female has the right to
10 complain about that conduct -- let me finish --
11 without punishment or retribution for having
12 complained?
13         MS. REGAL: I'm going to object. This
14     is a 30(b)(6) deposition, and you are now
15     asking this individual personal views.
16         MS. BREDEHOFT: You're making a
17     speaking objection. If you want to make an
18     objection to the form, then you can go ahead
19     and do that, but you're now making a speaking
20     objection. Or outside the scope, you can
21     make that objection.
22         MS. REGAL: The topics that you're

Page 139

1    asking me -- just let me finish.
2            MS. BREDEHOFT: It's inappropriate.
3            MS. REGAL: -- are topics to which I
4    alerted you in my e-mail of two days ago that
5    this witness was not being designated for.
6            So it is improper for you to be asking
7    him 30(b)(6) questions on those topics.
8    A    The only thing which I want to say here
9    is that I find that this is a topic which is
10   extremely severe. And it's very dangerous to
11   treat such topic outside of the -- of a legal
12   framework.
13           The only thing I can say -- and I'm
14   talking in the name of the group and not in my own
15   capacity -- is that this group has ethical
16   principles, and the group is very attentive to the
17   fact that male and female workers, employees, need
18   to be treated the same way.
19           And there exists -- there even exists
20   guidelines, ethical guidelines with the manager
21   and the -- as a manager who's in the direction --
22   whose job function is to get complaints addressed

```
 1    to him by employees if they feel that they are not
 2    well treated.
 3              This is what I can say.
 4    BY MS. BREDEHOFT:
 5        Q     In what way would the job offer that
 6    was provided to Catherine Gaujacq in the
 7    September/October 2004 time frame have expanded
 8    her development or been a promotion?
 9        A     I told you this morning that there were
10    three possibilities for a new job, for a new job
11    function for a person, for an employee.
12        Q     I'm asking about just that one that you
13    said was in a letter and an e-mail, had the exact
14    position, title, salary level.  That's the one I'm
15    asking about you.
16              How was that a promotion or a greater
17    development to Catherine Gaujacq's skills and
18    abilities moving her up in the company?
19              MS. REGAL:  I object to your
20         interrupting the witness's answer.
21              MS. BREDEHOFT:  What did she say in
22         French?
```