IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CATHERINE GAUJACQ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05CV0969 (JGP) |
| | ) | |
| ELECTRICITÉ DE FRANCE, S.A., | ) | ORAL ARGUMENT REQUESTED |
| INTERNATIONAL NORTH AMERICA, | ) | |
| INC., and | ) | |
| CHRISTAIN NADAL | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS ELECTRICITÉ DE FRANCE, S.A. AND ELECTRICITÉ DE FRANCE INTERNATIONAL NORTH AMERICA'S MOTION FOR SUMMARY JUDGMENT

Defendants Electricité de France, S.A. ("EDF") and Electricité De France International North America, Inc. ("EDFINA"), by and through their undersigned counsel hereby move for summary judgment, pursuant to Federal Rule Civil Procedure 56. Summary judgment is appropriate because based on material facts not in dispute for purposes of summary judgment,[1] Plaintiff lacks sufficient evidence for a jury to find in her favor on any of her claims. The bases for Defendants' Motion are set forth in the accompanying Memorandum of Law in Support of Motion for Summary Judgment of Defendants Electricité de France, S.A., and Electricité De France International North America, Inc.

---

[1] Defendants refer the Court to Defendants' Statement Pursuant to FRCP 56.1 and Local Rule (7)(h), and the Declarations of Yann Laroche, Christian Nadal and Patrick De Botherel.

Wherefore, Defendants EDF and EDFINA respectfully request that the Court enter summary judgment in their favor and dismiss the Complaint, as against EDF and EDFINA, in its entirety, with prejudice.

Dated:  October 15, 2006

HOGUET NEWMAN & REGAL, LLP

By:  _____/s/_____
Laura B. Hoguet (D.C. Bar No. 200915)
Dorothea W. Regal (D.C. Bar No. NY0064)
Randi S. May (D.C. Bar No. NY0063)

10 East 40th Street
New York, New York 10016

*Attorneys for Defendants*
*Electricité de France, S.A. and Electricité de France*
*International North America, Inc.*

Of Counsel:

Kathleen L. Lowden

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CATHERINE GAUJACQ,

   Plaintiff,

  v.

ELECTRICITE DE FRANCE
INTERNATIONAL NORTH AMERICA
INC., ELECTRICITE DE FRANCE, S.A.
and CHRISTIAN NADAL

No. 1:05CV0969 (JGP)

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT OF
DEFENDANTS ELECTRICITE DE FRANCE, S.A. AND
ELECTRICITE DE FRANCE INTERNATIONAL NORTH AMERICA, INC.**

Laura B. Hoguet *(D.C. Bar No. 200915)*
Dorothea W. Regal *(D.C. Bar No. NY0064)*
Randi Seltzer May *(D.C. Bar No. NY0063)*

Hoguet Newman & Regal, LLP
10 East 40th Street
New York, New York 10016
(212) 689-8808

*Attorneys for Defendants Electricité de
France, S.A. and Electricité de France
International North America, Inc.*

Of Counsel:
Kathleen L. Lowden

## TABLE OF CONTENTS

Table of Authorities.................................................................................iii

Preliminary Statement..............................................................................1

Statement of Facts....................................................................................3

ARGUMENT

I.    US EMPLOYMENT LAWS DO NOT
      APPLY TO EDF'S DECISIONS AND ACTIONS
      IN FRANCE PERTAINING TO GAUJACQ......................................................16

II.   EDFINA WAS NOT GAUJACQ'S EMPLOYER
      AND SO IS NOT LIABLE TO HER UNDER US
      EMPLOYMENT LAWS .................................................................................20

III.  EDF IS ENTITLED TO SUMMARY JUDGMENT
      DISMISSING GAUJACQ'S DISCRIMINATION  CLAIMS ...........................22

      A.    Gaujacq Has Not Showed Disparate
            Treatment Based on Gender..........................................................23

            1.    EDF Was Entitled To Appoint Nadal
                  To Succeed Gaujacq ...........................................................23

            2.    Gaujacq's Claim of Disparate Pay Fails
                  Under Title VII .....................................................................24

            3.    Gaujacq was Not "Demoted"................................................25

            4.    The Termination of Gaujacq's Employment
                  Was Not Discriminatory ......................................................26

      B.    Gaujacq Cannot Make Out a Case of Hostile
            Environment Discrimination Based On Gender Bias .............................27

IV.   PLAINTIFF'S RETALIATION CLAIM CANNOT STAND ............................32

V.    PLAINTIFF HAS NOT SHOWN A GENUINE ISSUE OF
      MATERIAL FACT REQUIRING TRIAL OF HER CLAIM
      UNDER THE EQUAL PAY ACT ..................................................................36

      A.    Nadal's Job In Washington Was Different From Gaujacq's .................36

       B.     The Pay Differential Between Gaujacq and Nadal
               Is Based On *Bona Fide* Factors Other Than Sex .......................................38

VI.    DEFENDANTS ARE ENTITLED TO SUMMARY
       JUDGMENT ON GAUJACQ'S COMMON-LAW CLAIMS ...........................39

       A.     Gaujacq's  Claim Of Tortious Interference Fails......................................39

       B.     Plaintiff's Breach of Contract Claims Fail As A Matter of Law .............40

       C.     Plaintiff's Claim of Breach of an Implied Duty of
               Good Faith and Fair Dealing Fails As A Matter of Law ........................41

       D.     Plaintiff's Defamation Claim Fails As A Matter of Law.........................42

CONCLUSION....................................................................................................44

# TABLE OF AUTHORITIES

## CASES

Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002) ................................................................31

Allworth v. Howard University, 890 A.2d 194 (D.C. 2006) ............................................44

American Medical International, Inc. v. Giurintano, 821 S.W.2d 331 (Tex. App. 1991) ........................................................................................................................40

Amiri v. Stoladi Prop. Group, 407 F. Supp. 2d 119 (D.D.C. 2005) ................................21

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ....................................................16

Balk v. U.S. Information Agency, Civ. A. No. 81-1565, 1985 WL. 1634 (D.D.C. Mar. 26, 1985) ....................................................................................................38

Ball v. Tanoue, 133 F. Supp. 2d 84 (D.C. 2001) .............................................................25

Barbour v. Browner, 181 F.3d 1342 (D.C. Cir. 1999) .....................................................24

Benic v. Reuters America, Inc., 357 F. Supp. 2d 216 (D.C.C 2004) ................................42

Black v. National Football League Players Association, 87 F. Supp. 2d 1 (D.D.C. 2000) ..........................................................................................................43

Bradley v. Widnall, 232 F.3d 626 (8th Cir. 2000) ...........................................................32

Broderick v. Donaldson, 437 F.3d 1226 (D.C. Cir. 2006) ...............................................32

Brown v. Brody, 199 F.3d 446 (D.C. Cir. 1999) ..............................................................23

Brug v. National Coal. for the Homeless, 45 F. Supp. 2d 33 (D.D.C. 1999) ...................21

Bryant v. Brownlee, 265 F. Supp. 2d 52 (D.D.C. 2003) ..................................................31

Bryant v. Orkand Corp., 407 F. Supp. 2d 29 (D.D.C. 2005) ...........................................22

Cambridge Holdings Group, Inc. v. Federal Insurance Co., 357 F. Supp. 2d 89 (D.D.C. 2004) ...............................................................................................40

Carpenter v. Federal National Mortgage Association, 165 F.3d 69 (D.C. Cir. 1999) ................................................................................................................23

Carter v. George Washington Univ., 387 F.3d 872 (D.C. Cir. 2004) ..........................16, 23

<u>Chandamuri v. Georgetown Univ.</u>, 274 F. Supp. 2d 71 (D.D.C. 2003) ........................... 33

<u>Clackamas Gastroenterology Associates, P.C. v. Wells</u>, 538 U.S. 440 (2003) .......... 21, 22

<u>Clark v. Lewis</u>, No. 80-1636, 1982 WL. 2000 (D.D.C. Mar. 1, 1982)............................. 38

<u>Coleman v. Potomac Electric Power Co.</u>, 422 F. Supp. 2d 209 (D.D.C. 2006) ............... 33

<u>Corning Glass Works v. Brennan</u>, 417 U.S. 188 (1974)..................................................... 37

<u>County of Washington v. Gunther</u>, 452 U.S. 161 (1981) ........................................... 25, 38

<u>Davis v. Coastal International Security, Inc.</u>, 275 F.3d 1119 (D.C. Cir. 2002)................ 31

<u>Fleming v. AT&T Information Services, Inc.</u>, 878 F.2d 1472 (D.C. Cir. 1989).............. 43

<u>Dey v. Colt Construction & Development Co.</u>, 28 F.3d 1446 (7th Cir. 1994)................. 38

<u>Donahue v. Piedmont Aviation, Inc.</u>, 723 F.2d 921 (D.C. Cir. 1983) .............................. 26

<u>EEOC v. America Pharmaceutical Association</u>, 589 F. Supp. 23 (D.D.C. 1983) ............ 37

<u>EEOC v. Arabian American Oil Co.</u>, 499 U.S. 244 (1991)............................................... 17

<u>EEOC v. Shell Oil Co.</u>, 466 U.S. 54 (1984) .................................................................... 22

<u>Elliot v. Healthcare Corp.</u>, 629 A.2d 6 (D.C. 1993) ....................................................... 43

<u>Environmental Defense Fund, Inc. v. Massey</u>, 772 F. Supp. 1296 (D.D.C. 1991),
    rev'd, 986 F.2d 528 (D.C. Cir. 1993) ........................................................................ 17

<u>Fowler v. District of Columbia</u>, 404 F. Supp. 2d 206 (D.D.C. 2005)................... 33, 34, 35

<u>Fox v. Giaccia</u>, 424 F. Supp. 2d 1 (D.D.C. 2006)............................................................. 33

<u>George v. Leavitt</u>, 407 F.3d 405 (D.C. Cir. 2005) ........................................................... 32

<u>Goodrich v. IBEW</u>, 815 F. 2d 1519 (D.C. Cir. 1987)....................................................... 37

<u>Goodrich v. IBEW</u>, 712 F.2d 1488 (D.C. Cir. 1983)........................................................ 25

<u>Hardy v. Bowen, Civ. A. 85-2119</u>, 1986 WL. 15710 (D.D.C. Nov. 19, 1985),
    aff'd, 889 F.2d 291 (D.C. Cir. 1989)......................................................................... 37

<u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17 (1993) ....................................................... 32

Hatcher-Capers v. Haley, 762 F. Supp. 393 (D.D.C. 1991) ...............................................38

Hazward v. Runyon, 14 F. Supp. 2d 120 (D.D.C. 1998)....................................................27

Hoffman v. Hill & Knowlton, Inc., 777 F. Supp. 1003 (D.D.C. 1991) ...........................42

Holbrook v. Reno, 196 F.3d 255 (D.C. Cir. 1999) ............................................................26

Howard University v. Green, 652 A.2d 41 (D.C. 1994)................................23, 32, 33, 41

Hussain v. Nicholson, 435 F.3d 359 (D.C. Cir. 2006)..........................................23, 27, 32

Jaffe v. Pallotta Teamworks, 374 F.3d 1223 (D.C. Cir. 2004) .........................................18

Johnson v. Dong Moon Joo, No. Civ. A. 01-0004, 2006 WL. 627154 (D.D.C. Mar. 12, 2006)........................................................................................................24, 25

King & King, Chartered v. Harbert International, Inc., 436 F. Supp. 2d 3 (D.D.C. 2006) ..............................................................................................................40

Kroger v. Legalbill.com, LLC, 436 F. Supp. 2d 97 (D.D.C. 2006)...................................18

Logan v. Department of Veteran Affairs, 404 F. Supp. 2d 72 (D.D.C. 2005).............33, 35

Mason v. African Development Foundation., 355 F. Supp. 2d 85 (D.D.C. 2004) ............22

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986)...............................................32

Mianegaz v. Hyatt Corp., 319 F. Supp. 2d 13 (D.D.C. 2004) ...........................................22

Moncrief v. Daro Realty, Inc., No. Civ. A. 03-762, 2005 WL. 1119794 (D.D.C. Apr. 28, 2005)..........................................................................................................37

Mungin v. Katten Muchin & Zavis, 116 F.3d 1549 (D.C. Cir. 1997) .........................23, 24

Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507 (D.C. Cir. 1995)...............24

Nichols v. Truscott, 424 F. Supp. 2d 124 (D.D.C. 2006) ..................................................31

Novecon Ltd. v. Bulgarian-America Enterprise Fund, 190 F.3d 556 (D.C.Cir. 1999)....44

Oncale v. Sundowner Offshore Services, 523 U.S.75 (1998) .....................................22, 30

Oshiver v. Norton, No. Civ.A. 00-02284, 2005 WL. 3454336 (D.D.C. Dec. 16, 2005) .................................................................................................................25

Psychiatric Institute of Washington v. District of Columbia Commission on
    Human Rights, 871 A.2d 1146 (D.C. 2005) ..........................................22, 23

Redd v. Summers, 232 F.3d 933 (D.C. Cir. 2000) .......................................21, 22

Robinson v. Davis Mem'l Goodwill Industries, 846 F. Supp. 104 (D.D.C. 1994) ...........37

Schmidt v. Chao, Civ. Action No. 04-892, 2006 WL. 1663389 (D.D.C. June 13,
    2006) .............................................................................................35

Schrader v. Tomlinson, 311 F. Supp. 2d 21 (D.D.C. 2004) ...............................25

Shamey v. Administrator, GSA, 732 F. Supp. 122 (D.D.C. 1990), aff'd, 925 F.2d
    490 (1991) (table) ...........................................................................38

Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27 (D.D.C.
    1999) ............................................................................................40

Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48 (D.D.C. 2004)..................25

Smith v. District of Columbia, 430 F.3d 450 (D.C. Cir. 2005) ..........................35

Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979) ................................20, 21

Stewart v. Evans, 275 F.3d 1126 (D.C. Cir. 2002) ..............................................31

Stith v. Chadbourne & Parke, LLP, 160 F. Supp. 2d 1 (D.D.C. 2001)..............................43

Suarez v. Pueblo International, Inc., 229 F.3d 49 (1st Cir. 2000) .....................31

Sullivan-Obst v. Powell, 300 F. Supp. 2d 85 (D.D.C. 2004)..................................31

Taylor v. Small, 350 F.3d 1286 (D.C. Cir. 2003) .............................................16

Torrico v. International Bus. Machines Corp., 213 F. Supp. 2d 390 (S.D.N.Y.
    2002) ............................................................................................19

Tsehaye v. William C. Smith & Co., 402 F. Supp. 2d 185 (D.D.C. 2005)..................31, 35

Turner v. District of Columbia, 383 F. Supp. 2d 157 (D.D.C. 2005) ..........................22, 31

Vargas v. Martinez, No. Civ. 03-1259, 2005 WL. 975732 (D.D.C. Apr. 26, 2005) .........25

Washburn v. Lavoie, 357 F. Supp. 2d 210 (D.D.C. 2004) ...................................42

Waterhouse v. District of Columbia, 298 F.3d 989 (D.C. Cir. 2002)...........................23, 26

Welzel v. Bernstein, 436  F. Supp. 2d 110 (D.D.C. 2006) ...........................................33, 34, 35

Whetstone Candy Co., v. National Consumers League, 360 F. Supp. 2d 77 (D.D.C. 2004) ....................................................................................................................40

Zuurbier v. MedStar Health, Inc., 306 F. Supp. 2d 1 (D.D.C. 2004) ...............................20

## STATUTES

42 U.S.C. §§2000e-1(c)(2)..............................................................................................17

42 U.S.C. §2000e(b) .......................................................................................................20

42 U.S.C. § 2000e(f) .......................................................................................................21

42 U.S.C. §2003(a) ..........................................................................................................32

29 U.S.C. §203(e)(1)........................................................................................................21

29 U.S.C. §206(d) ............................................................................................................35

29 U.S.C. § 206(d)(1) ..................................................................................................36, 38

29 U.S.C. §213(f)..............................................................................................................17

D.C. Code §2-1401.02(9).................................................................................................21

D.C. Code §1-2525(b).......................................................................................................32

Fed. R. Civ. P. 56(c) ........................................................................................................16

Fed. R. Civ. P. 56.1 .........................................................................................................3

Defendants Electricité de France, S.A. ("EDF") and Electricité de France International North America, Inc. ("EDFINA") submit this memorandum in support of their motion for summary judgment dismissing this action pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

Despite the intensity with which plaintiff's 60-page, 354-paragraph Complaint is pleaded, this lawsuit is without merit. No jury could find that defendant EDF, a French state-owned utility which sent a well-regarded nuclear engineer, Catherine Gaujacq, on a four-year assignment to Washington, discriminated against her based on her sex because it decided, at the scheduled end of her assignment when its needs had changed, to send another, even higher-ranking executive to succeed her. Nor, on the undisputed facts in this record, could a jury find that EDF retaliated against plaintiff Gaujacq based on any protected activity on her part when it decided, in July 2004, to recall her to France after she refused to cooperate with the new head of the US delegation, defendant Christian Nadal. Not only do the undisputed facts preclude a finding in plaintiff's favor, but Title VII, the D.C. Human Rights Act and the Equal Pay Act, which she invokes, do not apply to EDF's decisions to send Nadal to Washington and to recall Gaujacq, or to its decisions concerning his compensation and hers, because these decisions were made in France by a French company under procedures that pertain to French employees whose relationship with their employer was governed by French law.

Evidently seeking to avoid the reality that US employment laws do not apply extraterritorially to a French company such as EDF, the Complaint defines EDF and its Washington subsidiary, defendant EDFINA, together as "the Company," implying that the US

---

[1] EDF and EDFINA adopt the arguments and authorities of Defendant Christian Nadal in his Motion for Summary Judgment.

citizenship of EDFINA is imputable to EDF. This is not the case. As this brief shows, EDFINA was not an "employer" of Gaujacq and Nadal, who were employees of EDF at all times, and EDFINA made no decisions affecting them.

While the Complaint also seeks to hold EDF and EDFINA liable for what plaintiff contends was Nadal's discriminatory treatment of her after he arrived in Washington, the discovery record refutes these claims crushingly. Far from providing evidence from which an inference of discrimination could be drawn, the record demonstrates that Nadal displayed considerable forbearance in dealing with an employee who challenged his authority, lied to him and about him, and systematically sabotaged his ability to assume responsibility for the mission of EDF in Washington.

In hindsight, Gaujacq's actions were driven by an unwavering determination on her part to stay in the US and hold onto not only her expatriate compensation package but also her control of EDF's relationship with a nuclear power consortium called NuStart. Early in her tenure in Washington, Gaujacq applied for a green card, and also asked EDF to extend her US assignment. In 2004, when EDF appointed Nadal to succeed her, Gaujacq delayed his arrival by delaying his visa application, and at the same time pressed EDF again to agree to a new long-term assignment for her in Washington. While EDF officials in Paris were prepared to accommodate her wishes, they decided that, if Gaujacq stayed in Washington, she must report to Nadal as the new head of its delegation here. Gaujacq accepted this decision in theory but frustrated it in fact by refusing to work with Nadal and continuing to insist that she have exclusive control of the NuStart project. On July 30, when EDF recalled her to France rather than accept her terms, Gaujacq filed discrimination and retaliation charges with the EEOC.

Then, in August 2004, her green card was approved. This freed Gaujacq first, to turn down the significant new position that EDF had proposed to her in France, and then to find a new job, with a US company called ENTERGY, which is a member of the NuStart consortium.

After Gaujacq started her new job in April 2005, she brought this action against EDF, EDFINA and Nadal, seeking $10,000,000 in compensatory damages that she did not in fact sustain, and punitive damages of $15,000,000 as well. This lawsuit makes a mockery of our American laws against employment discrimination, and it should be summarily dismissed.

## STATEMENT OF FACTS

The following is a summary of the facts contained in the joint Statement of Defendants EDF, EDFINA and Nadal pursuant to FRCP Rule 56.1 and Local Rule 7(b) ("Def. 56.1"), and in the Declarations of Christian Nadal, Yann Laroche and Patrick De Botherel submitted in support of this motion.

### EDF Assigns Gaujacq To Washington

At the times pertinent to this action, defendant EDF was a French state-owned power company that provides electric power to homes and businesses in France and in many other countries in the world. Def. 56.1, ¶¶ 1, 2, 4. It had over 160,000 employees worldwide. Def. 56.1, ¶ 3. Catherine Gaujacq, a French citizen, joined EDF as an engineer in 1980 and had a successful career in the company's French nuclear power generation business, becoming the first woman to manage a nuclear plant in France. Def. 56.1, ¶¶ 5-8; Laroche Decl. ¶ 8; De Botherel Decl. ¶¶ 23-24.

Effective August 1, 2000 EDF appointed Gaujacq its "Déléguée Générale" (Delegate General) for the United States and Canada. Def. 56.1, ¶¶ 9. Following a 2002 reorganization,

this title was changed to "Directeur" (Director). Def. 56.1, ¶9;  De Botherel Decl. ¶ 27.  With the 2002 reorganization, Gaujacq reported to the head of EDF's Americas Branch, Fernando Ponasso, in Buenos Aires.  Her EDF career, however, continued to be directed by EDF officials in Paris.  Def. 56.1, ¶¶ 16, 68).

Pursuant to a written agreement between Gaujacq and EDF, the duration of her expatriate assignment to Washington was fixed at three years ending July 31, 2003, renewable for a fourth year by mutual consent.  Def. 56.1, ¶¶ 10-11.  The agreement also detailed the compensation and benefits package that Gaujacq would receive while in Washington, which included, in addition to base salary (paid in France in Euros), an expatriate supplement, cost of living supplement, rent (for a home in Great Falls, Virginia), living and car expenses, tax equalization, a supplement for her spouse's lost earnings, two round-trip tickets per year to France, moving expenses and so forth.  Def. 56.1, ¶¶ 10-11.

As EDF's Delegate General (after 2002 Director) in Washington, Gaujacq was appointed, effective August 2000, President of EDFINA.  This company, organized some ten years previously under District of Columbia law, serves as a representative office for EDF in Washington.  EDFINA does not generate revenue (all of its expenses are paid by EDF in France), but maintains the Washington, D.C. liaison office for EDF.  Def. 56.1, ¶¶ 19-21; Laroche Decl. ¶ 6.  EDF rotated the leadership of its delegation in Washington every few years: in the ten years prior to Gaujacq's appointment, there had been four previous EDF delegates who had served as President of EDFINA. De Botherel Decl. ¶ 31; Def. 56.1, ¶ 12. EDF employees who, like Gaujacq, came to the United States on expatriate assignments carried EDFINA business cards while continuing, as Gaujacq did, to be employees of EDF in France.  EDFINA

4

only had two employees who were hired and paid "locally," that is, in the United States. Def. 56.1, ¶¶ 23-24; Nadal Decl. ¶¶ 33-37.

### Gaujacq's Tenure in Washington

In 2000 EDF's mission in Washington was to study US energy developments and reinforce its reputation in the US for nuclear expertise, thereby positioning itself for future business when the US nuclear industry became reinvigorated. Def. 56.1, ¶¶ 17; Laroche Decl. ¶ 7. Accordingly, as EDF's representative in Washington, Gaujacq became active in representing its interests as a member of a consortium of power companies, organized as NuStart Energy Development LLC ("NuStart"), which is an initiative for the design of a nuclear power plant that might be built in the US regulatory environment. Def. 56.1, ¶ 18.

Gaujacq and her husband Philippe, also a French citizen, came to the United States in 2000 on visas obtained on the basis of Gaujacq's assignment here. In March 2002, Gaujacq and her husband applied to the US Immigration and Naturalization Service for permanent resident ("green card") status. Def. 56.1, ¶¶ 26-27. In January 2003, Guajacq requested EDF to extend her Washington mission for an additional three years. EDF did not accept this request, but extended her stay in the US for one further year, that is, through July 31, 2004. Def. 56.1, ¶¶ 29-30.

### EDF Appoints Nadal To Succeed Gaujacq

Effective January 1, 2004, EDF appointed Christian Nadal to the position of Délégué Général (Delegate General) for North America, assigned to Washington, D.C. Def. 56.1, ¶ 31. Nadal was one of EDF's most senior executives, who had been a member of its Executive Committee and who had served, from 1999 to 2001, as the CEO of an Argentinean energy

company in which EDF had an equity interest, and that had approximately $1 billion in annual revenues. Def. 56.1, ¶¶ 33-36; Nadal Decl. ¶¶ 3-7; Laroche Decl. ¶¶ 4-16. While Gaujacq was an "R-3" in EDF's pay grade system (third rung from the top of the top executive category, occupied by about 350 of the company's entire French workforce), Nadal was one of approximately 50 EDF employees who were classified "R-1."   Def. 56.1, ¶¶ 151-152, 156; Laroche Decl. ¶ 16; De Botherel Decl. ¶¶ 11-13.

EDF appointed Nadal as its Delegate General in Washington in order to upgrade and broaden its presence in the United States in response to strategic changes that were taking place within the company in France and in response to global political changes in the energy industry. Def. 56.1, ¶ 37; Laroche Decl. ¶¶ 11-14; Nadal Decl. ¶9.   In 2004 EDF was planning for its privatization, and for an offering of a portion of its stock to the public in the US and elsewhere. Def. 56.1, ¶ 37.   With EDF's move toward privatization, the company wanted to increase its profile in the US, attract Wall Street investors, and move into commercial ventures with energy partners in the US.   Laroche Decl. ¶¶ 12-17.   For this purpose, EDF wanted to be represented in the US by an "ambassador"-level executive who had capital markets exposure and experience in dealing with top level financial and industry leaders and government officials.   Def. 56.1, ¶ 37; Laroche Decl. ¶¶ 12-14.

On February 18, 2004, EDF's then Chairman, President and CEO, François Roussely, told Gaujacq of Nadal's appointment and that the company was amenable to her remaining in the US if she wished to do so.   Def. 56.1, ¶¶ 41-42.   The next day, February 19, Gaujacq emailed EDF officials in Paris that she expected them to send her a new expatriate contract (as her current agreement expired on July 31, 2004).   Def. 56.1, ¶ 43.   She also instructed EDFINA's

6

immigration lawyer to apply for an L-1A visa for Nadal to work in the US as a "senior advisor" to analyse gas issues, and she told the employees in EDFINA's office that Nadal would be arriving to work as a "gas analyst" under her supervision. Def. 56.1, ¶¶ 45, 50. Nadal was not, however, and never had been a "gas analyst," and Gaujacq was aware that he was an "R-1," that is to say, a very senior officer of the company, of a pay grade superior to hers. Def. 56.1, ¶¶ 46-47.

On February 25, Nadal came to Washington for an introductory visit, during which he met Gaujacq for lunch. According to Gaujacq's testimony, Nadal's behavior to her on that occasion was "business like" and he "did not discriminate or harass [her] in any way." Def. 56.1, ¶¶ 48-49. During the lunch meeting, however, she told him that her job was not changing. Def. 56.1, ¶ 48; Nadal Decl. ¶ 18.

Not surprisingly, after his February 25 lunch meeting in Washington with Gaujacq, Nadal went back to EDF in Paris to seek clarification of his role in Washington in relation to hers. Def. 56.1, ¶ 52; Nadal Decl. ¶ 19. This issue became even more problematic on March 11, when the immigration lawyer telephoned Nadal in France to say that his L-1A visa application could not be processed because his resume did not support an application for a position as a "gas analyst," as he had no experience in that field. Def. 56.1, ¶ 50; Nadal Decl. ¶ 20.

On March 22, EDF's then Chief Operating Officer, Gérard Creuzet, met in Buenos Aires with Gaujacq and her superior, to address the issue of Nadal's mission in the United States. Gaujacq admits that, at this meeting, Creuzet told her to "cut the bullshit" and that Nadal was to be the head of EDF's delegation in Washington and the President of EDFINA. Def. 56.1, ¶¶ 53-55.

7

When Gaujacq met with Creuzet in Buenos Aires on March 22, she told him she wanted to remain in the US and to continue to work on NuStart. Def. 56.1, ¶ 59. At Creuzet's invitation, Gaujacq emailed him on March 25 a proposed new expatriate contract for a three-year assignment for herself as "Director of Generation and Nuclear Projects, EDFINA" reporting, not to Nadal as the new President of EDFINA, but to the heads of EDF's Energy Branch in France and its Americas Branch in Buenos Aires. Def. 56.1, ¶ 60. Creuzet responded that the proposal appeared to be in accordance with their discussion in Buenos Aires, but that he was passing it on for consideration to EDF's senior human resources director, Yann Laroche, in Paris. Def. 56.1, ¶ 61.

After Laroche and his staff reviewed Gaujacq's proposal, Creuzet emailed Gaujacq on April 7 that it would be "more appropriate" for her to be detached from EDFINA when reporting to the Energy Branch, and on April 8 that she needed to discuss her future "mission" (job responsibilities) with Bruno Lescoeur, the head of the Energy Branch in Paris, and her proposed contract with François Metais, an EDF official responsible for such matters. Def. 56.1, ¶ 61; Laroche Decl. ¶¶ 20-25. Later in April EDF's Executive Committee, of which Laroche was a member, decided for organizational reasons that, if Gaujacq remained in Washington after Nadal became head of the EDF delegation, she would have to report operationally to him. Def. 56.1, ¶¶ 63; Laroche Decl. ¶ 26.

At a meeting in Paris on May 18, the head of EDF's Energy Branch, Lescoeur, told Gaujacq that EDF wanted her to return to France to head up an important new initiative implementing the introduction of European Pressurized Reactors (EPR). Gaujacq expressed no interest, saying that she had been promised that she could stay in the United States. Def. 56.1, ¶¶

8

65-66.   On May 25, EDF's Chairman Roussely directed that Nadal take up his post in Washington by June 1 and that Gaujacq report to him if she stayed in the US.  Def. 56.1, ¶¶ 67-68; Laroche Decl. ¶ 29; Nadal Decl. ¶ 24.

### Nadal Arrives In Washington

In accordance with Chairman Roussely's decision, effective May 31, 2004, Gaujacq resigned as President of EDFINA and Nadal became President effective June 1.   Gaujacq became a Vice President of the company.  Def. 56.1, ¶ 69.

With Nadal's arrival in Washington around June 1, Gaujacq's "mission" or job responsibilities needed to be defined.  On June 10, without notice to Nadal, Gaujacq distributed a memo that assigned to him responsibility for "gas and finance" while reserving the NuStart project to herself.  Def. 56.1, ¶¶ 70, 72.  Gaujacq did not meet with Nadal in June and she did not go to EDFINA's office after his arrival, except for one day, June 11, when he was in Colorado at a conference.  Def. 56.1, ¶ 71; Nadal Decl. ¶ 39.  On that day, Gaujacq went into the office for about an hour, on which occasion she signed several EDFINA checks.  Def. 56.1, ¶ 71, 75.

Prior to Nadal's becoming President of EDFINA, two persons had been authorized to sign checks on EDFINA's bank accounts:  Gaujacq as President of the company, and a Vice President named Benoit Dreux.  Upon becoming President of EDFINA, Nadal replaced Gaujacq as one of the two signatories on the checking accounts, leaving Dreux as the other.  Def. 56.1 ¶¶ 73-74; Nadal Decl. ¶¶ 40-41.  Consequently, the checks that Gaujacq wrote on June 11 were voided, and the word "void" was written across them.  Def. 56.1, ¶ 76.

Upon discovering that she no longer had check-signing authority for EDFINA, Gaujacq demanded that Nadal telephone her at home.  Nadal did telephone Gaujacq from Colorado on

June 11 and they had a conversation in which he told her she did not need check signing authority in her current position and that she should not have sent out the June 10 memo without discussion with him. Def. 56.1, ¶¶ 77- 78; Nadal Decl ¶¶ 42-43.

Both Nadal and Gaujacq were scheduled to attend a conference in Pittsburgh on Monday, June 14. Gaujacq left the conference without meeting with Nadal, leaving a note saying that her mother-in-law was ill and that she had to return to Washington, and undoubtedly leave for France thereafter. Def. 56.1, ¶ 79. However, Alexandre Audie, who worked at the EDFINA office, told Nadal that Philippe Gaujacq had said that his wife had left the conference because one of the Gaujacqs' dogs had died and that Philippe had said nothing about any illness of his mother. Def. 56.1, ¶¶ 80-81; Nadal Decl. ¶ 47. At her deposition in this case, Gaujacq first testified that her mother-in-law had been ill and that she had gone to France, but then changed her testimony (via an errata sheet), and subsequently admitted under oath that she did not tell the truth to Nadal about why she left the Pittsburgh conference because they had "quarreled" in the June 11 phone call and were on bad terms. She also admitted that she had not traveled to France at the time. Def. 56.1, ¶¶ 82-83.

Nadal and Gaujacq were scheduled to meet on Friday, June 18 at the EDFINA office (the two had met only once before on February 25). Def. 56.1, ¶ 84. Gaujacq testified that she was not able to meet Nadal on June 18 due to her mother-in-law's illness, but subsequently admitted that she had not gone to France at the time. Def. 56.1, ¶ 85. Both Nadal and Gaujacq were also scheduled to attend a meeting on June 21 in France to update EDF's nuclear division about the NuStart project, Nadal Decl. ¶ 47, but Gaujacq sent an email that she was unable to attend this meeting due to her mother-in-law's illness. Def. 56.1, ¶¶ 92. Her deposition errata changed her

10

testimony on this issue to say that she was not able to attend the June 21 meeting because she was not in France at the time.  Def. 56.1, ¶¶ 92.  Evidently, Gaujacq was at home in Great Falls, Virginia on both June 18 and June 21.

On June 18, to ensure that the new lines of authority were clear before he left for a three-week trip to France, Nadal sent out a memo setting forth the powers and responsibilities of himself as EDFINA's President and of Dreux and Gaujacq, who were now both Vice Presidents of the company.  Def. 56.1, ¶¶ 86-88; Nadal Decl. ¶ 44.  The June 18 letter was sent to Gaujacq at her home because she did not come into the office that day.  Nadal gave Dreux a second letter, also dated June 18, authorizing him to act in Nadal's stead during his absence in France.  Nadal considered Dreux to be the appropriate repository of this authority because, unlike Gaujacq, he was regularly in the office and because since his arrival Gaujacq had made herself unavailable to Nadal and had behaved unprofessionally towards him.  Def. 56.1, ¶¶ 89-90; Nadal Decl. ¶¶ 45-47.

While Nadal was in France in early July, EDF's internal Audit Department at the request of Ponasso conducted an audit of the EDFINA office.  The auditors found that documents were missing from EDFINA's files, including documents pertaining to EDF's role in NuStart, and that the missing documents were maintained by Gaujacq at her residence.  The auditors asked Gaujacq to bring the documents to the office, which she did, but after showing the documents to the auditors, Gaujacq took them back to her home.  Def. 56.1, ¶¶ 93, 95.

On July 12, Gaujacq came into the EDFINA office, and Nadal took that opportunity to meet with her, in the presence of Jean-Luc Forêt, an alternate EDF representative to NuStart, to discuss business matters.  Def. 56.1, ¶¶ 98; Nadal Decl. ¶¶ 50-54.  During this meeting Nadal

11

asked Gaujacq to return the NuStart files and other business documents to the EDFINA office. Def. 56.1, ¶ 100.  Gaujacq refused to comply, saying that Nadal did not need them and could not see them because the NuStart documents were confidential and that it would be too big a job for her to do before leaving for vacation the next day.  Nadal Decl. ¶¶ 52-53.  When Gaujacq said that a NuStart conference call was scheduled for the next day, Nadal instructed her to have Forêt participate in the call, which she refused to do, on the stated ground that Forêt was not authorized.  Def. 56.1, ¶ 101; Nadal Decl. ¶ 51.

By emails on July 12 and July 16, Nadal repeated his instructions that Gaujacq return the EDFINA files, including NuStart documents, to the office.  Def. 56.1, ¶ 103.  Gaujacq by email on July 20 refused these instructions on the ground that she did not have time to gather the documents before leaving on vacation, that the EDFINA office was not a secure facility and that Nadal was not authorized to see the documents.  She also insisted that Forêt was not authorized to participate in NuStart conference calls.  Def. 56.1, ¶ 104.

In fact, the NuStart agreements permit EDF and EDFINA access to all documents concerning the project.  Def. 56.1, ¶ 106.   In fact, as Gaujacq admits, she did not leave for vacation in July-August 2004, but remained at her Great Falls, Virginia home throughout that period.  Def. 56.1, ¶ 105.

### Gaujacq's Complaints About Nadal

During the audit, Gaujacq learned of Nadal's second June 18 letter that delegated certain authority to Dreux in his absence.  During a July 9 conference call with the auditors, Gaujacq became alarmed that Nadal was accusing her of "wrongdoing".  After this call, she wrote an email to Ponasso in Buenos Aires complaining about Nadal's June 18 letters and that Dreux had

check signing authority when she did not. While her email used the word "discriminatory" ("these facts are discriminatory in regard my position, as compared to the situation of Benoit Dreux.," Def. 56.1, ¶¶ 108-109), it did not claim that this difference in treatment between herself and Dreux was based on her sex, as it patently was not.

After Nadal's July 12 and July 16 emails demanding return of the NuStart and other files and her July 20 email refusing to provide them, Gaujacq by email on July 22 complained to Nadal about his treatment of her and she also emailed the Chairman of EDF, François Roussely, and its Chief Operating Officer, Gérard Creuzet, that she had decided to "defend [her]self against [Nadal] by filing a complaint before the US authorities" because "being without any contract as of August 1 would leave me at the mercy of Christian Nadal who would be able, with the stroke of a pen, to render my presence on US territory illegal." Def. 56.1, ¶ 113. Gaujacq's July 22 email to Roussely and Creuzet made no complaint of discrimination based on sex or any other protected characteristic, and nor did she describe the "US authorities" as any governmental agency with responsibility for enforcing US antidiscrimination laws. Her concern appeared, rather, to be that if she did not have a new expatriate agreement in place before her existing agreement expired on July 31, Nadal could report her non-employment with EDFINA to the INS, and she could lose her L-1A visa status.

On July 23, Gaujacq had phone conversations with Laroche and Creuzet in Paris, as well as with Ponasso in Buenos Aires. In these conversations, and in a follow-up email dated July 25, Gaujacq again demanded that EDF give her a new three-year contract in the US and put her in charge of NuStart but not reporting to Nadal, saying that, if EDF did not accede to her demands, she would file a complaint with unspecified US authorities. Def. 56.1, ¶ 115. Gaujacq claims

13

that Creuzet told her in their phone conversation on July 23 that, if she filed a complaint, her "career would be dead". Def. 56.1, ¶ 115. However, she admits that Creuzet regarded the issues she put before him as a "dispute between two managers," and a July 26 memo by Ponasso's human resources aide similarly summed up the "situation" between Gaujacq and Nadal as one of "reciprocal hostility" between these two individuals. Def. 56.1, ¶¶ 115, 121. There is no evidence in the record that Creuzet, Laroche, Ponasso or their staffs dealing with Gaujacq at this time, or Nadal himself, had any awareness that Gaujacq was making a claim that she had been discriminated against based on her sex. Def. 56.1, ¶¶ 108, 111, 114, 116, 119, 121; Nadal Decl. ¶¶ 56-57; Laroche Decl. ¶¶ 30-35.

By letter dated July 27, Creuzet notified Gaujacq that her Washington assignment would end on July 31 in accordance with her expatriate agreement and that she would have three months with continued full benefits to organize her affairs and return to France for a new assignment, which she was instructed to discuss with the head of the Energy Branch, Lescoeur. Def. 56.1, ¶ 123. Lescoeur telephoned Gaujacq on July 27 to urge her to come to Paris and said that he wanted her to take on the important EPR assignment he had previously discussed with her. Lescoeur told Gaujacq that the company did not violate any law by changing her assignment and encouraged her not to "take a decision against the company too quickly," as this was a dispute between two managers. Def. 56.1, ¶ 124.

Effective August 1, 2004, EDF appointed Gaujacq to the position of "Chargée de Mission" (Mission Representative) of the Nuclear Generation Division of the Energy Branch, and subsequently defined her role in that position as having responsibility for the EPR project, which EDF considered crucial to the development of power generation in the company. Def.

14

56.1, ¶¶ 128, 129, 133.  Gaujacq admits that EPR was important to EDF, though she says it was not important to her.  Def. 56.1, ¶ 134.

Gaujacq filed a charge of discrimination and retaliation with the EEOC on July 30, 2004 and an amended charge which the EEOC received on August 6, 2004.  Prior to receiving the EEOC charge, defendants did not know that Gaujacq had asserted a complaint of sex discrimination, harassment or retaliation under US employment laws. Def. 56.1, ¶¶ 126-127; Laroche Decl. ¶¶ 34-35; Nadal Decl. ¶¶ 56-57.  After learning of Gaucjacq's discrimination charge, EDF did not withdraw this assignment but, rather, continued to urge her to accept it. Def. 56.1, ¶ 131.

In August 2004, Gaujacq's "green card" application was approved.  Def. 56.1, ¶ 143.  In October she refused EDF's EPR assignment, and she began looking for a new job in the US  Def. 56.1, ¶ 144.  When Gaujacq failed to report to the new position on November 2,  EDF commenced a disciplinary procedure under the company's rules and in accordance with French law, and her employment was terminated effective January 7, 2005 due to "faute grave" ("grave fault").  Def. 56.1, ¶ 141; Laroche Decl. ¶ 41.

On March 1, 2005 Gaujacq was offered, and she accepted, a new position as Director, Strategic Programs for ENTERGY Operations, Inc., a US nuclear energy company that is a member of the NuStart consortium.  In her new position, Gaujacq supervises 170 people.  Def. 56.1, ¶¶ 24-25.

## ARGUMENT

Summary judgment should be granted dismissing this case in its entirety because the evidence shows that "'there is no genuine issue as to any material fact' and . . . 'the moving party

is entitled to a judgment as a matter of law,'" and that no "reasonable jury could return a verdict for [plaintiff]". Taylor v. Small, 350 F. 3d 1286, 1290 (D.C. Cir. 2003) (citing Fed. R. Civ. P. 56(c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Carter v. George Washington Univ., 387 F.3d 872, 872 (D.C. Cir. 2004).

## I.

### US EMPLOYMENT LAWS DO NOT APPLY TO EDF'S DECISIONS AND ACTIONS IN FRANCE PERTAINING TO GAUJACQ

EDF is a French company, and Gaujacq and Nadal are French citizens who worked for EDF in France for many years before EDF decided to send first Gaujacq, and subsequently Nadal, to Washington, D.C. to represent its interests in this country. EDF sent Gaujacq to Washington pursuant to an agreement, written in French, that fixed the terms of her assignment. Gaujacq readily testified, moreover, that the decisions of which she complains in this lawsuit were made by EDF officials in France: the decision to send Nadal to succeed Gaujacq in Washington was made by EDF's Chairman Roussely in Paris, while decisions concerning Gaujacq's "mission" (job content or duties) after Nadal's appointment were made by Gérard Creuzet, EDF's Chief Operating Officer, in Paris, in conjunction with Yann Laroche, the company's senior human resources officer, and their staffs in Paris. Def. 56.1, ¶¶ 1, 5, 9, 31, 37, 54, 68, see also, Laroche Decl. ¶¶ 9-12, 19-24; Nadal Decl. ¶¶ 9-12, 19-24. Bruno Lescoeur, the head of EDF's Energy Branch in Paris, selected Gaujacq for a new assignment on the EPR project in France, and the decision to recall her was made by Creuzet, Laroche and their staffs in Paris with input from Ponasso and his aide in Buenos Aires. Def. 56.1, ¶¶ 122, 124, 128; Laroche Decl. ¶¶ 31-39. And, the termination of Gaujacq's employment followed a disciplinary

16

proceeding under French law that arose because she failed to report to take up her new assignment in France. Def. 56.1, ¶¶ 139-141; De Botherel Decl. ¶¶ 42-46; Laroche Decl. ¶¶ 40-41.

Title VII does not apply to the foreign operations of a foreign employer or to aliens employed in a foreign country. 42 U.S.C. §§2000e-1(c)(2), 2000e(f), and 2000e-1(a). The Fair Labor Standards Act, to which the Equal Pay Act is an amendment, also does not apply to a workplace in a foreign country, see 29 U.S.C. §213(f). Title VII, the Equal Pay Act (and the D.C. Human Rights Act for the same reason) therefore do not apply to employment decisions made by EDF, a French company, in France that pertained to the job duties of Gaujacq and Nadal, EDF employees who are citizens of France, or to agreements that EDF entered into with these employees in France regarding their compensation.

Both Title VII and the Fair Labor Standards Act are silent about application of the law where, as here, a foreign company sends a foreign employee to work in the US for a defined period of time. Are the foreign employer's employment decisions, which are outside the purview of US law, brought inside that purview when the employee travels to the US? This question is answered by the long-standing principle of American law that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) ("Aramco"); Envtl. Def. Fund, Inc. v. Massey, 772 F. Supp. 1296, 1297 (D.D.C. 1991), rev'd on other grounds, 986 F.2d 528 (D.C. Cir. 1993). In applying this rule, courts must "assume that Congress legislates against the backdrop of the presumption against extraterritoriality." Aramco, 499 U.S. at 248. If the statutory language "does not speak directly to the question presented," courts should not infer

extraterritorial application. Id. at 250.

   In Aramco, the Supreme Court held that Title VII did not apply extraterritorially to regulate the employment practices of United States firms that employ American citizens abroad. 499 U.S. at 258. Without clear evidence of congressional intent, the Court was "unwilling to ascribe to Congress a policy which would raise difficult international law issues by imposing this country's employment-discrimination regime upon foreign corporations operating in foreign commerce." Id.[2]    Aramco teaches that it is for Congress, not the courts, to decide how US employment laws should be applied to foreign employees of foreign companies who come to the US on expatriate assignments.

   Under the "substantial interest" test of the Restatement (Second) of Conflict of Laws (1971) §145, a court must "balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more 'substantial interest' in the resolution of the issue." Jaffe v. Pallotta Teamworks, 374 F.3d 1223, 1227 (D.C. Cir. 2004); Kroger v. Legalbill.com, LLC, 436 F. Supp. 2d 97, 104 (D.D.C. 2006). In Kroger, the court held that Tennessee, rather than French, law applied to tort claims by a US plaintiff against a Tennessee company that hired him to act as its representative in France. 436 F. Supp. 2d at 104. Notwithstanding plaintiff's physical presence in France, the court held that Tennessee was the jurisdiction "most central to the parties' relationship" because most communications took place between plaintiff and the employer's headquarters in Tennessee. Id. The court had already determined that the parties' relationship was governed by Tennessee law, which reinforced its conclusion that Tennessee was

---

[2] The Aramco opinion concluded with an invitation to Congress to amend Title VII to cover US employees working for US employers abroad, 499 U.S. at 259, and that is exactly what Congress did in the Civil Rights Act of 1991. Congress similarly amended the Age Discrimination In Employment Act, also originally part of the Fair Labor Standards Act, in 1984 to provide for limited extraterritorial effect, but made no such change to the Equal Pay Act or to the FLSA generally.

the jurisdiction with the "more significant relationship to the parties' dispute." Id. See also, Torrico v. Int'l Bus. Machs. Corp., 213 F. Supp. 2d 390, 403 (S.D.N.Y. 2002) (employment law of US as country where employment relationship has center of gravity applies notwithstanding employee's three-year expatriate assignment in Chile).

Applying the "center of gravity" test here, it is France, rather than the District of Columbia, which has a "substantial interest" in the employment relationship between EDF and Gaujacq.  Throughout Gaujacq's 24-year employment with EDF, she worked in France except for her fixed-term expatriate assignment in Washington.  De Botherel Decl. ¶ 22.  Assuming for purposes of argument that the alleged "injury" to Gaujacq occurred in the US because she was working in Washington when Nadal was sent there and when she was recalled to France, still the "place where the conduct causing the injury occurred" was France, because EDF's decision makers were located there and all decisions affecting Gaujacq's employment and compensation were made in that country.  EDF and Gaujacq are both French citizens, and "the place where their relationship is centered" was France because Gaujacq remained an EDF employee expected, as her agreement with EDF provided, to return permanently to France at the conclusion of her expatriate mission to Washington.  Def. 56.1, Exhibit 13, p. 2. Gaujacq's expatriate agreement with EDF recognizes the company's (and French law's) continuing relationship with an expatriate employee by providing that the local law of the place where the expatriate is assigned, in this instance Washington, applies to the "conditions under which the work will be provided, in particular the provisions relating to work hours, weekly break, holidays and days off," leaving French law applicable to the employee's work assignments, compensation, promotion, termination, etc. which, during an expatriate assignment, continue to be directed by

19

EDF in Paris and to be subject to French law.   Def. 56.1, Ex. 13, p. 2.

Points III, IV and V of this memorandum show that, on the undisputed facts of this case, plaintiff's claims under Title VII and the Equal Pay Act are totally lacking in merit.   Since summary judgment should be granted as to all defendants in any event, economy of effort dictates that the court not now be burdened with a presentation of the French law that applies to the claims Gaujacq asserts against EDF in this lawsuit.   It suffices here to say that Gaujacq is not among the class of persons that Title VII, the Equal Pay Act and the D.C. Human Rights Act are designed to protect, and that her manifestly conscious choice of this court over a court in France (she had French counsel to deal with EDF, see Def. 56.1, ¶ 136 is a classic instance of forum shopping that is undeserving of respect.

## II.

### EDFINA WAS NOT GAUJACQ'S EMPLOYER AND SO IS NOT LIABLE TO HER UNDER US EMPLOYMENT LAWS

Although EDF, Gaujacq's employer, assigned her to work at the office of its subsidiary EDFINA in Washington, Gaujacq remained an employee of EDF and was not an employee of EDFINA.   This fact is fatal to her federal employment law claims against EDFINA because, where plaintiff and defendant do not have an employer/employee relationship, defendant cannot be liable under federal employment laws. Spirides v. Reinhardt, 613 F. 2d 826, 829 (D.C. Cir. 1979) (Title VII); Zuurbier v. MedStar Health, Inc., 306 F. Supp. 2d 1, 6 (D.D.C. 2004) (Title VII & Equal Pay Act).[3] Gaujacq's claims under the D.C. Human Rights Act must be dismissed as well, because only an "employer" may be held liable for violations of this statutue. Zuurbier,

---

[3] EDFINA is not subject to Title VII for the additional reason that it had only 2 employees.  Nadal Decl. ¶¶ 33-35. Title VII does not apply to an employer that has fewer than 15 employees.  42 U.S.C. §2000e(b).

306 F. Supp. 2d at 6.[4]

Both Title VII and the Equal Pay Act define an "employee" as an "individual employed by an employer." 42 U.S.C. § 2000e(f); 29 U.S.C. §203(e)(1). When a federal statute contains such a "circular" definition of the term "employee," courts look to the common law for guidance. Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 444 (2003). The D.C. Circuit, applying common law agency principles to determine employee status under federal employment laws, has held that the most important consideration is "the extent of the employer's right to control the 'means and manner' of the worker's performance." Spirides, 613 F.2d at 831 (citation omitted); see also, Redd v. Summers, 232 F. 3d 933, 938 (D.C. Cir. 2000).

Application of the factors outlined in Spirides[5] demonstrates that Gaujacq was an employee of EDF but not of EDFINA because EDF, not EDFINA, controlled Gaujacq's performance. It was EDF, and not EDFINA, that hired her, promoted her, assigned her to Washington, determined her salary and benefits, and ultimately fired her. See, Amiri v. Stoladi Prop. Group, 407 F. Supp. 2d 119, 124 (D.D.C. 2005) (plaintiff not employee of defendant that did not "hire, train, supervise, evaluate, transfer or demote" him); Brug v. Nat'l Coal. for the Homeless, 45 F. Supp. 2d 33, 37 (D.D.C. 1999) (plaintiff was employee of entity that established her employment agreement, paid her salary and benefits and fired her); Redd, 232 F.2d at 940 (defendant not plaintiff's employer where another entity assigned plaintiff to work there, and

_____

[4] Similar to Title VII, the D.C. Human Rights Act defines an employee as "any individual employed by or seeking employment from an employer," D.C. Code §2-1401.02(9).

[5] The Spirides factors, outlined at 613 F.2d at 832, are: "(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" ... furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties."

21

paid the salary and benefits and had authority to fire the plaintiff); Bryant v. Orkand Corp., 407

F. Supp. 2d 29, 35 (D.D.C. 2005) (same); see also, Mason v. African Dev. Found., 355 F. Supp.

2d 85, 98 (D.D.C. 2004) (individual who could not participate in defendant's retirement or

insurance programs not employee). The place of employment does not determine who the

employer is. See, Redd, 32 F.3d at 940 (employee of tour guide company assigned to work

giving tours at defendant's location not defendant's employee). Nor does the fact that Gaujacq

held the title of President of EDFINA make her EDFINA's employee. See, Clackamas, 538 U.S.

at 450 ("mere fact that a person has a particular title -- such as...vice president" does not

determine whether she is an employee).

In short, because Gaujacq was not EDFINA's employee, her claims against EDFINA

under Title VII, the Equal Pay Act and the D.C. Human Rights Act must be dismissed.

### III.

### EDF IS ENTITLED TO SUMMARY JUDGMENT
### DISMISSING GAUJACQ'S DISCRIMINATION CLAIMS

Title VII's purpose is "to root out discrimination in employment." EEOC v. Shell Oil

Co., 466 U.S. 54, 77 (1984). Title VII is not concerned with whether employees are treated

fairly, Waterhouse v. Dist. of Columbia, 298 F.3d 989, 995 (D.C. Cir. 2002); Mianegaz v. Hyatt

Corp., 319 F. Supp. 2d 13, 21 n.2 (D.D.C. 2004), and does not function as "a general civility

code for the American workplace," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80

(1998), or "guarantee a utopian workplace, or even a pleasant one." Turner v. Dist. of Columbia,

383 F. Supp. 2d 157, 175 (D.D.C. 2005).

Measured against this standard, Gaujacq's claims under Title VII and the D.C. Human

Rights Act[6] fail because she has put forward no evidence from which a jury could conclude that the actions of which she complains were taken because of her sex.

### A.    Gaujacq Has Not Showed Disparate Treatment Based on Gender

The discovery record shows that EDF had legitimate, good faith business reasons for its actions and provides no basis for a finding that these reasons were a pretext for a hidden discriminatory purpose. Hence, summary judgment is warranted. See, e.g., Carter v. George Washington Univ., 387 F. 3d 872, 880 (D.C. Cir. 2004) (summary judgment for employer absent admissible evidence from which jury could infer that employer's good-faith reason for decision was pretextual); Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006) (same); Brown v. Brody, 199 F.3d 446, 458-59 (D.C. Cir. 1999) (summary judgment affirmed where plaintiff's attempt to discredit employer's legitimate reason was nothing but her speculations); Waterhouse, 298 F.3d at 994 (summary judgment for employer where plaintiff failed to offer sufficient evidence for reasonable fact finder to reject employer's legitimate reason).

### 1.    EDF Was Entitled To Appoint Nadal To Succeed Gaujacq

Gaujacq was assigned to Washington pursuant to an expatriate agreement that stipulated that her assignment would extend for three years and for an additional year upon "tacit agreement." Gaujacq admitted in deposition testimony that EDF's practice was to rotate senior executive assignments to Washington. Def. 56.1, ¶ 12; see also De Botherel Decl. ¶ 31. Hence she had every reason to expect and anticipate that, when her assignment came to an end, EDF

---

[6] Because of the similarity between the D.C. Human Rights Act and Title VII, both federal and District of Columbia courts "generally follow Title VII analysis in discrimination cases brought under the DCHRA." Psychiatric Inst. of Washington v. Dist. of Columbia Comm'n on Human Rights, 871 A.2d 1146, 1152 n.2 (D.C. 2005) (hostile environment harassment); Carpenter v. Fed. Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (sex discrimination); Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1553 (D.C. Cir. 1997) (disparate treatment, including disparate pay); Howard Univ. v. Green, 652 A.2d 41, 45 (D.C. 1994) (retaliation).

would give the Washington job to another EDF executive. The fact that EDF appointed Nadal to succeed Guajacq as its representative in Washington when her assignment expired does not, therefore, afford Gaujacq any basis for a claim of sex discrimination.

While the Complaint intones as a mantra that Gaujacq was replaced because of her sex by a man who was less qualified than she (because she was a nuclear engineer and he was not), the discovery record establishes without contradiction that Nadal was appointed to succeed Gaujacq for business reasons: the company was moving towards privatization and the appointment of an "ambassador"-level executive to Washington with experience and contacts in the financial world and with industry leaders was in its interest. Laroche Decl. ¶¶ 11-17; Nadal Decl. ¶¶ 9-10. EDF's decision as to which of its executives could best represent it in the US is uniquely its prerogative, and Gaujacq's naked claim that she was more qualified for the job than Nadal does not warrant a trial of this action. See, Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (court should not serve as "super-personnel department" that reexamines employer's judgment" as to employees' qualifications); Brown, 199 F.3d at 458-59 ("courts are not free to second-guess an employer's business judgment" regarding employees' qualifications); Fischbach v. Dist. of Columbia Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (same).

### 2.    Gaujacq's Claim of Disparate Pay Fails Under Title VII

To establish a *prima facie* case of disparate pay in violation of Title VII, Gaujacq must show that she was paid less than a male and that "all of the relevant aspects of [the male's] employment situation were 'nearly identical'" to hers. Johnson v. Dong Moon Joo, No. Civ. A. 01-0004, 2006 WL 627154, at *23 (D.D.C. Mar. 12, 2006) (citation omitted) (citing Mungin, 116 F.3d at 1554; Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir.

1995)).

While Gaujacq was a high-ranking EDF executive with a successful background as a nuclear engineer, Nadal was an even-higher ranking executive with years of experience as a manager of large enterprises ranging from France's National Coal Board to a commercial Argentinean power company that had annual revenues of $1 billion plus.  Def. 56.1, ¶¶ 33-36; Laroche Decl. ¶¶ 7-8, 13-16; Nadal Decl. ¶¶ 3-8.  Where, as here, the plaintiff's comparator has a higher grade level or different employment experience and expertise, summary judgment for the employer should be granted on disparate pay claims under Title VII.   Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 60 (D.D.C. 2004). See also, Schrader v. Tomlinson, 311 F. Supp. 2d 21, 29 (D.D.C. 2004) (summary judgment for employer on Title VII disparate pay claim where male was a higher grade than plaintiff); Johnson, 2006 WL 627154, at *24 (summary judgment for employer where comparator had different job title, duties and level of experience); see also, Oshiver v. Norton, No. Civ.A. 00-02284, 2005 WL 3454336, at *14 (D.D.C. Dec. 16, 2005) (plaintiff not similarly situated to employees receiving bonuses due to different grade levels); Vargas v. Martinez, No. Civ. 03-1259, 2005 WL 975732, at *4 (D.D.C. Apr. 26, 2005) (comparator not similarly situated to plaintiff because of higher grade level); Ball v. Tanoue, 133 F. Supp. 2d 84, 88 (D.D.C. 2001) (plaintiff not similarly situated to accepted candidates due to different grade levls).[7]

### 3.    Gaujacq was Not "Demoted"

Gaujacq was not "demoted" by Nadal's appointment; she was succeeded by him, because the term of her assignment expired.  Based on EDF Chairman Roussely's decision that she could

---

[7] Because Title VII disparate pay claims are subject to the same affirmative defenses as EPA claims,   County of Washington v. Gunther, 452 U.S. 161, 168 (1981); Goodrich v. IBEW, 712 F.2d 1488, 1491 n.5 (D.C. Cir. 1983), Gaujacq's Title VII disparate pay claim fails as well for the reasons set forth in Point V below.

stay in Washington if she reported to her successor, Nadal, Gaujacq resigned her position as President of EDFINA. She continued, however, to hold her position and pay rank with EDF, and her salary was unchanged. De Botherel Decl. ¶ 29. Once again there is no evidence that EDF's actions were due to plaintiff's gender and nor was she "demoted" in any event. See, Brown, 199 F.3d at 457 (no demotion where employee retains same salary and rank). Nor was the new EPR job in France a demotion. The base salary was higher than her present base salary, the rank was the same "R-3" as her present rank, and EDF considered it a very important job. Def. 56.1, ¶ 130.

### 4.    The Termination of Gaujacq's Employment Was Not Discriminatory

No reasonable juror could find that the termination of Gaujacq's employment resulted from sex discrimination. EDF had a legitimate reason for terminating Gaujacq's employment, which was that she refused, when her assignment to the US ended, to return to France to take up the new position that EDF assigned to her. Her failure to appear to take up her new position triggered a disciplinary proceeding under French law, and the termination of her employment was the consequence of this proceeding. Def. 56.1, ¶¶ 139-141; Laroche Decl. ¶¶ 41-43; De Botherel Decl. ¶¶ 42-46.

Defying an employer's legitimate work directions is a good-faith, non-discriminatory basis for terminating the employment of an employee. See, Donahue v. Piedmont Aviation, Inc., 723 F.2d 921, 922 (D.C. Cir. 1983); Holbrook v. Reno, 196 F.3d 255, 263-64 (D.C. Cir. 1999). As Gaujacq has failed to adduce any evidence from which it could be inferred that EDF's disciplinary proceeding was a pretext for a hidden discriminatory motive, her claim must be dismissed. See, Waterhouse, 298 F.3d at 994 (summary judgment for employer where plaintiff

failed to offer sufficient evidence for reasonable fact finder to reject employer's legitimate reason).

**B.     Gaujacq Cannot Make Out a Case of Hostile
Environment Discrimination Based On Gender Bias**

Gaujacq's Complaint alleges that Nadal "harassed, demeaned and threatened" her on the basis of her gender (Comp. ¶221), but notably she does *not* allege that Nadal subjected her to physical contact, made sexual advances, said disparaging things about women, or made any reference to sex at all.  Her allegation of "harassment" is completely conclusory and cannot forestall summary judgment, as no facts are alleged to support her assertion that Nadal's actions were motivated by gender bias. See, Hussain, 435 F.3d at 365 (on motion for summary judgment court need not assume truth of "conclusory allegations lacking any factual basis in the record"); Brown, 199 F.3d at 458-59 ("mere speculations" insufficient to create genuine issue of fact); Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C. 1998) (conjecture and surmise will not defeat summary judgment).

The essence of Gaujacq's complaint is that Nadal treated her in a manner that she considered rude and demeaning of the status to which she believed she was entitled. Thus, plaintiff alleges that Nadal:

> attended Ms. Gaujacq's business meetings purely to harass or demean her to her subordinates, spoke to [her] in a demeaning, rude, threatening and harassing manner, took away her job responsibilities and authority (check signing, ability to enter into contract, incur expenses, or make representations or warranties on behalf of the company), defamed her, conducted audits without a shred of justification, engineered Ms. Gaujacq not receiving the expatriation contract she had been promised, and engineered her termination, all on the basis of [her] gender. (Comp. ¶221).[8]

---

[8] The complaint makes a host of further allegations about Nadal after the expiration of Gaujacq's mission – that he cancelled Gaujacq's credit cards, changed a call-in member for a NuStart conference call, attempted to interfere with her immigration status, etc. The discovery record does not substantiate any of these allegations, and we assume that

27

The discovery record answers each of these allegations as follows:

**"He attended [her] business meetings"**:  When Nadal arrived in Washington, it became his job to attend business meetings---Gaujacq had no exclusive right to attend them.  The record shows, in any event, that Gaujacq and Nadal did not attend <u>any</u> business meeting together.  Nadal went to a nuclear power conference in Pittsburgh on June 14 (she left on the pretext that her mother-in-law was ill) and to an EDF meeting in France on June 21 that she had been expected to attend (she used the same pretext to skip the meeting), <u>see</u> Def. 56.1, ¶¶ 79, 80, 85, 92.  Surely Nadal cannot be taxed with sex discrimination because Gaujacq could not bring herself to attend these meetings with him.

**"He spoke to her in a demeaning, rude, threatening and harassing manner"**:  After arriving in Washington, Nadal spoke to Gaujacq only twice on the phone, and he met her only once in person.  According to Gaujacq, they "quarreled" in their June 11 phone call, she felt he was accusing her of "wrongdoing" in the July 9 call with the auditors, and he was angry with her at their July 12 meeting and shook his finger at her and raised his voice.  Def. 56.1, ¶¶ 78, 109, 102.  It is clear from Gaujacq's account of each of these conversations, as from his, that she was resisting his incursion onto what she perceived as her turf and he was understandably frustrated by her lies and evasions.   Def. 56.1, ¶¶ 78, 83, 96, 100-104; Nadal Decl. ¶¶ 42-43, 50-54.  Assuming he expressed anger, there is no basis to infer from that fact that anger was actuated by gender bias.

**"He took away her job responsibilities and authority"**:  When Nadal arrived in Washington, he succeeded Gaujacq as President of EDFINA, which meant that he had the power to enter into contracts, incur expenses, act on behalf of the company and sign checks on its bank

---

Plaintiff will accordingly not pursue these points.

accounts that she had formerly had in that position.  These changes were an incident of Nadal's appointment as EDF's Delegate General in Washington and had nothing to do with Gaujacq's gender.  Gaujacq was infuriated to learn that Nadal had designated Benoit Dreux, another EDF expatriate who was a Vice President of EDFINA, to act in his stead when he was in France, but her testimony affords no basis for concluding that Nadal's choice of Dreux was based on her gender. Rather, the evidence is compelling that Gaujacq did not come to the office when Nadal was there and refused to deal with him, so he naturally preferred to appoint a more cooperative employee as his backup.  See, Nadal Decl. ¶¶ 45-46.

"**He defamed her**":  there is no evidence that Nadal "defamed" Gaujacq.  See Point VI (c) below.

"**He conducted audits without a shred of justification**":  The July 2004 audit of EDFINA was ordered by Ponasso, head of the Americas Branch, not Nadal, as part of the transition from Gaujacq to Nadal.  Def. 56.1, ¶ 94.  There is no basis for believing that the audit was conducted to hurt Gaujacq---and certainly no basis to believe that it was ordered because she was a woman.

"**He engineered Ms. Gaujacq not receiving the expatriation contract she had been promised**":  Nadal initially told EDF that he was amenable to Gaujacq remaining in Washington after his arrival, Nadal Decl. ¶ 15---it was only after their February 25 meeting, and her instruction to the immigration lawyer that he would be working for her as a "gas analyst," that he told EDF she had made it extremely difficult for him to work with her.  Later, when she insisted to EDF that she wanted to stay at EDFINA and retain control of NuStart, he pushed back by saying to those same officials that he did not want his position diminished in this way.  Def. 56.1,

¶¶ 61, 64; Nadal Decl. ¶¶ 23-24.  However, the record reflects that Nadal did not make EDF's decision regarding Gaujacq's expatriation contract.  Rather, EDF's Chairman, together with its Chief Operating Officer, its senior human resources officer, the head of its Energy Branch and their staffs collectively decided not to enter into the contract Gaujacq proposed, and instead to permit her to remain in Washington if she so chose, but reporting to Nadal because having a manager bypass the head of her business unit was not workable in their view.  Def. 56.1, ¶¶ 61, 63, 67-68; Laroche Decl. ¶¶ 21-29.  This decision was a compromise that balanced the value that EDF's topmost management placed upon Gaujacq as well as Nadal; their desire to accommodate her wish to stay in the US and to be involved with NuStart; their desire that Nadal promptly assume the role of head of the Washington delegation, their unwillingness to depart from a hierarchical reporting line, and their preference that Gaujacq return to France to take up the EPR assignment.  The e-mail record that lays this decision-making process bare, while exposing the disagreements, misunderstandings and mutual adjustments that are inherent in such a process, is devoid of any shred of evidence that EDF's decision-makers were affected, in any way, by Gaujacq's gender.

"**He engineered her termination**":  There is no evidence that Nadal had anything to do with the termination of Gaujacq's employment, which came about because her failure to report to her new post as head of the EPR project in France on November 1, 2004 triggered a disciplinary proceeding under the company's rules and French law.  Def. 56.1, 139-141.

Because Gaujacq has not offered evidentiary facts to show, as she must, that any of the conduct she alleges had any link to discrimination on the basis of sex,  she has not raised a triable issue of fact under Title VII.  Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80 (1998).  As

this Court has recognized:

> Everyone can be characterized by sex, race, ethnicity, or (real or
> perceived) disability; and many bosses are harsh, unjust, and rude.
> It is therefore important in hostile work environment cases to
> exclude from consideration personnel decisions that lack a linkage
> of correlation to the claimed ground of discrimination. Otherwise,
> the federal courts will become a court of personnel appeals.

Bryant v. Brownlee, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting Alfano v. Costello, 294 F.

3d 365, 377 (2d Cir. 2002)). Mere employee discord, without causal linkage to sex or other

protected status, is not actionable under Title VII. See, Davis v. Coastal Int'l Sec., Inc., 275 F.3d

1119, 1121 (D.C. Cir. 2002) ("workplace grudge match"); Stewart v. Evans, 275 F.3d 1126,

1133 (D.C. Cir. 2002) (angry reaction at workplace conduct); Nichols v. Truscott, 424 F. Supp.

2d 124, 140 (D.D.C. 2006) (severe harassment but not linked to plaintiff's protected status);

Turner, 383 F. Supp. 2d at 175 (quotation omitted) ("[p]ersonality conflicts between employees

are not the business of the Federal courts"); Tsehaye v. William C. Smith & Co., 402 F. Supp. 2d

185, 197 (D.D.C. 2005) (employer's intense disdain for plaintiff); Sullivan-Obst v. Powell, 300

F. Supp. 2d 85, 97 (D.D.C. 2004) (no evidence transfer of plaintiff's duties to a man was based

on gender); Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000) ( "inter-office politics and

personality conflicts"). See also, Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000)

(ADEA does not "guarantee a workplace free from the usual ebb and flow of power relations and

inter-office politics").

Gaujacq admits, finally, that the entirety of Nadal's communications with her from the

time of his appointment until the end of her mission transpired in less than 3 hours. Def. 56.1, ¶

99. This interaction, however unpleasant Gaujacq found it, falls far short of the "'discriminatory

intimidation, ridicule, and insult'" that is sufficiently abusive to affect the "terms, conditions, or

31

privileges of employment" and hence to violate Title VII.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)); George v. Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005); Hussain, 435 F.3d at 366; Bryant, 265 F. Supp. 2d at 62-63.

## IV.

## PLAINTIFF'S RETALIATION CLAIM CANNOT STAND

An employer may not retaliate against an employee who "has opposed any practice made unlawful by" Title VII or the D.C. Human Rights Act, 42 U.S.C. §2003(a); D.C. Code §1-2525(b).  To make out a *prima facie* case of retaliation under either statute, Gaujacq must demonstrate that (1) she engaged in statutorily protected activity, (2) the employer took an adverse employment action against her, and (3) a causal connection existed between the two. Broderick v. Donaldson, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006) (Titled VII); Howard Univ., 652 A.2d at 45 (DCHRA). Gaujacq cannot make out a *prima facie* case of retaliation because she did not engage in protected activity and because there is no causal connection between any complaints she may have made and any adverse employment action she may have suffered.  But in any case, EDF had legitimate non-discriminatory reasons for all of its actions.

While Gaujacq complained in July 2004 about Nadal's treatment of her, neither he, nor Creuzet, Laroche and Lescoeur in Paris, nor Ponasso in Buenos Aires, perceived or knew that Gaujacq was making a claim that Nadal was discriminating against her or harassing her based on her gender.  Def. 56.1, ¶¶ 108, 111, 114, 116, 117, 119; Laroche Decl. ¶¶ 31-35; Nadal Decl. ¶¶ 57-58. On the contrary, the notes of Ponasso's aide Betouret, Ponasso's report to Creuzet of his call with Gaujacq, and Gaujacq's notes of her calls with Creuzet and Lescoeur, all reflect an

understanding that what was at issue was a dispute between two managers who did not want to share turf. Def. 56.1, ¶¶ 116, 121. Gaujacq complained to EDF that Nadal was treating her in a way that she considered demeaning, but she did not say, and EDF did not understand her to be saying, that she believed he was doing this because of her sex in violation of US antidiscrimination laws.

As the D.C. Circuit has held, "[n]ot every complaint garners its author protection under Title VII." Broderick, 437 F.3d at 1232 ("the complaint must in some way allege unlawful discrimination, not just frustrated ambition") (collecting cases). The employee must put the employer on notice that she is opposing discrimination that violates federal or local laws. Howard Univ., 652 A.2d at 46 ("employer awareness" that employee is opposing violation of the DCHRA is "essential"); Chandamuri v. Georgetown Univ., 274 F. Supp. 2d 71, 84 (D.D.C. 2003) (plaintiff's complaint that he was being treated "unfairly" and "differently than other students" not sufficient to put defendant "on notice that the allegations . . . had anything to do with discrimination"); see also, Fox v. Giaccia, 424 F. Supp. 2d 1, 10 (D.D.C. 2006) (summary judgment for employer where plaintiff's mention of race not sufficient to put supervisor on notice that she was complaining of discrimination); Coleman v. Potomac Elec. Power Co., 422 F. Supp. 2d 209, 213-14 (D.D.C. 2006) (because the plaintiff complained about his supervisors and harassment, but not about matters protected by anti-discrimination laws, he did not engage in protected activity); Logan v. Dep't of Veteran Affairs, 404 F. Supp. 2d 72, 77 (D.D.C. 2005) (no protected activity because complaint did not include claim of unlawful discrimination).

Nor has Gaujacq demonstrated, as she must, that she had "a reasonable belief that she was opposing practices made unlawful" by Title VII or the D.C. Human Rights Act. Welzel v.

Bernstein, 436 F. Supp. 2d 110, 121 (D.D.C. 2006) (citing George, 407 F.3d at 417). Indeed, Gaujacq identified the purported wrong of which she complained as "harcèlement moral" (moral harassment or bullying), not sexual harassment or sex discrimination, as she wrote in the statement she delivered at her pre-termination interview. Def. 56.1, ¶ 140. Nadal's behavior, unpleasant as Gaujacq evidently found it, did not, in her own view of the matter, constitute sex discrimination or sexual harassment, and thus she did not believe she was opposing a practice made unlawful by these statutes. See, George, 407 F.3d at 417 (no protected activity where incidents of which plaintiff complained "could not reasonably be thought to constitute an abusive working environment"); Welzel, 436 F. Supp. 2d at 122 (complaining about what plaintiff "perceived to be unprofessional and abusive behavior" that does not violate Title VII is not a protected activity); Fowler v. Dist. of Columbia, 404 F. Supp. 2d 206, 210-11 (D.D.C. 2005) (complaining of conduct that is not severe and pervasive is not protected activity).

Finally, Gaujacq's purpose in writing and calling EDF officials in July 2004 was not to "oppose" discrimination, but was rather to induce EDF to continue her employment in Washington on the terms that she laid down, which were that she remain in sole control of EDF's participation in the NuStart project. Repeatedly she demanded that EDF give her a new three-year expatriate agreement and a "mission letter" giving her control of NuStart. Although Chairman Roussely had decided, in May, that she must report to Nadal if she stayed in Washington, she sought in July to reverse that decision by attacking Nadal's actions, threatening unspecified legal action, and then telling EDF that the way to "correct my situation" was for the company to give her the three-year expatriate contract it had been unwilling to provide to her and, in addition, change the reporting structure that Roussely had decided she must accept if she

was to remain in the US, so as to leave her in charge of NuStart without having to report to Nadal. Def. 56.1, ¶ 116, 118, 120; see Gaujacq Tr. 731-32; 422:10-15. Laroche, a member of EDF's Executive Committee and its senior human resources officer, regarded Gaujacq's tactic as "blackmail", and EDF refused to give into it. Laroche Decl. ¶¶ 33, 38.

Where plaintiff's purpose in writing a memo is "to advance her self-interest, rather than to voice any opposition to a discriminatory employment practice," the memo does not constitute protected activity. Welzel, 436 F. Supp. 2d at 123. The court does not look favorably upon plaintiffs' attempts to "insulate" or "immunize" themselves from adverse action by filing, or threatening to file, EEOC charges. Id. at 128; see also, Fowler, 404 F. Supp. 2d at 211 ("Congress did not enact [Title VII's] opposition clause for employees to use as retaliation against their employers").

Finally, Gaujacq has failed to offer evidence from which a trier of fact could conclude that the legitimate non-retaliatory reason articulated by EDF for recalling Gaujacq to France---that it had a business need to put an end to the discord in Washington, and wanted Gaujacq to take up the EPR project in France---was a pretext for a hidden retaliatory motive. Smith v. Dist. of Columbia, 430 F.3d 450, 454 (D.C. Cir. 2005) (no retaliation where plaintiff did not refute evidence that employer denied sick leave for a non-discriminatory reason and instituted disciplinary actions in response to her insubordination); Holbrook, 196 F.3d at 263-64 (judgment for employer where no evidence that employer's non-discriminatory reliance on plaintiff's lying, disobedience, poor judgment and insubordination was pretextual); see also, Schmidt v. Chao, Civ. Action No. 04-892, 2006 WL 1663389, at *7 n.7 (D.D.C. June 13, 2006); Logan, 404 F. Supp. 2d at 77; Tsehaye, 402 F. Supp. 2d at 198.

35

**V.**

**PLAINTIFF HAS NOT SHOWN A GENUINE ISSUE OF MATERIAL
FACT REQUIRING TRIAL OF HER CLAIM UNDER THE EQUAL PAY ACT**

Count XI of the Complaint alleges that EDF violated the Equal Pay Act, 29 U.S.C. §206(d), by paying Nadal more to take the job of representing the company in Washington than it paid Gaujacq, but Point I of this brief shows that, because these decisions were made in France by a French company under French law and procedures with respect to employees who were French citizens, they are not subject to extraterritorial regulation under the Equal Pay Act or the D.C. Human Rights Act. This Point V shows that, even if subjected to scrutiny under these statutes, plaintiff's claim must be dismissed because (1) she and Nadal were not performing "substantially equal" jobs, and (2) the difference in compensation between Gaujacq and Nadal was based on EDF's executive pay ranking system and other factors unrelated to sex.

**A.   Nadal's Job In Washington Was Different From Gaujacq's**

Though Gaujacq and Nadal were each appointed as head of EDF's delegation to Washington, they were not performing "equal work" within the meaing of the Equal Pay Act[9] because, when Nadal received the appointment, EDF conceived his "mission" (job duties) differently, and more broadly, than the "mission" of Gaujacq had been conceived four years earlier. Def. 56.1, ¶ 17-18, 37; Laroche Decl. ¶¶ 6-8, 11-15; Nadal Decl. ¶¶ 9-13. While they both held the title President of EDFINA, that was an unpaid position. Gaujacq was paid as Director, not as President of EDFINA. De Botherel Decl. ¶ 28. Since their jobs were not "equal," plaintiff cannot make out a *prima facie* claim that Nadal's compensation violated her

---

[9] The Equal Pay Act provides that: "No employer ... shall discriminate ... between employees on the basis of sex by paying ... employees ... less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1).

rights under the Equal Pay Act. Goodrich v. IBEW, 815 F.2d 1519, 1523 (D.C. Cir. 1987) (burden of proving job equality on plaintiff) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974)); see also, Moncrief v. Daro Realty, Inc., No. Civ. A. 03-762, 2005 WL 1119794, at *9 (D.D.C. Apr. 28, 2005); Robinson v. Davis Mem'l Goodwill Indus., 846 F. Supp. 104, 108 (D.D.C. 1994); EEOC v. Am. Pharmaceutical Ass'n, 589 F. Supp. 23, 30 (D.D.C. 1983) ("APHA").

In APHA, this Court granted the employer's motion for summary judgment, holding that it was "abundantly clear from the submissions of each party that the two were not substantially equal as envisaged by the drafters of the EPA." 589 F. Supp. at 25. As here, the plaintiff in that case and her male comparator had different professional backgrounds; indeed, the comparator's salary had been negotiated based on his educational and professional qualifications and his salary at his previous job. Id. at 25. Finally, as here, they had different duties, as set forth in the affidavit of the employer's CEO. Id. The Court granted summary judgment to the employer because plaintiff had failed to meet her burden of showing that the two positions were "substantially equal." Id. at 30. The missions assigned to Gaujacq and to Nadal were different. Laroche Decl. ¶¶7-8, 11-17.

The courts of this district have consistently found a failure to establish the *prima facie* requirement of "substantial equality" on facts similar to those present here. Goodrich, 815 F.2d at 1525 (comparators had additional duties were "significant and essential to the operation and mission" of the employer); Moncrief, 2005 WL 1119794, at *9 (comparator's position had "significantly broader range of responsibilities"); Robinson, 846 F. Supp. at 108 (different responsibilities and day to day duties); Hardy v. Bowen, Civ. A. 85-2119, 1986 WL 15710, at *9

(D.D.C. Nov. 19, 1985), aff'd, 889 F.2d 291 (D.C. Cir. 1989) (judgment for employer where plaintiff could not meet burden of showing successor "only performed the same duties as she performed"); Balk v. U.S. Info. Agency, Civ. A. No. 81-1565, 1985 WL 1634, at *6 (D.D.C. Mar. 26, 1985) (judgment for employer where higher-paid employees had additional and more complex duties and plaintiff had never been "recognized by the [employer] as one to whom such responsibilities may be given"); Clark v. Lewis, No. 80-1636, 1982 WL 2000, at *7 (D.D.C. Mar. 1, 1982) (comparator had more complex tasks and more responsibility).

### B.    The Pay Differential Between Gaujacq and Nadal Is Based On Bona Fide Factors Other Than Sex

A difference in compensation does not violate the Equal Pay Act where the differential is based on "any factor other than sex." 29 U.S.C. §206(d)(1). This affirmative defense is intended, among other things, to preserve the utility of *bona fide* job-evaluation systems. Gunther, 452 U.S. at 170 n.11 (and authorities cited therein). The law does not "second-guess the employer's business judgment" in paying one employee more than another so long as it is based on any reason other than sexual discrimination. Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1462 (7th Cir. 1994).

This Court has consistently rejected Equal Pay Act claims where a pay disparity for equal work was due to differences in the employees' levels in an employer's grade level system. Hatcher-Capers v. Haley, 762 F. Supp. 393, 399-400 (D.D.C. 1991); Balk, 1985 WL 1634, at *6-7; Shamey v. Adm'r, GSA, 732 F. Supp. 122, 135 (D.D.C. 1990), aff'd, 925 F.2d 490 (1991) (table).

EDF has a *bona fide* pay grade level system governed, in part, by French statute, with set salary ranges fixed for the different ranks. De Botherel Decl. ¶¶ 5-16 & Exs. A-B. As detailed in

the De Botherel Declaration, for EDF executives, the ranks go from "R-4" to "R-1" (the highest). There are only 50 people with the rank of "R-1" in EDF's entire French workforce, while there are 350 with the rank of "R-3." De Botherel Decl. ¶¶ 11-13. Nadal is an "R-1" and Gaujacq was an "R-3" in this system. Gaujacq started with EDF as an engineer in 1980 at the statutory grade of 10 and worked her way up the scale, until in 2000, when she was posted to Washington, she was promoted to the executive ranks at level "R-3". De Botherel Decl. ¶¶ 23-25. Nadal, by contrast, came into EDF in 1988 in its executive ranks based on his previous experience. Nadal was ranked at the highest echelon of EDF's executive ranks for many years before he was appointed to Washington. De Botherel Decl. ¶ 36. When EDF appointed Nadal to head its delegation in Washington, he was already two grades above Gaujacq and earning considerably more than she was, De Botherel Decl. ¶¶ 18-19, 37, and their salaries were within the ranges set for their ranks. De Botherel Decl., Ex. C. In addition, Nadal negotiated his expatriate agreement with EDF to arrive at a compensation package that was satisfactory to him. Nadal Decl. ¶ 11. On these facts, there is simply no basis for a claim that Nadal was paid more than Gaujacq because he is a man.

## VI.

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON GAUJACQ'S COMMON-LAW CLAIMS

#### A.    Gaujacq's  Claim Of Tortious Interference Fails

In Count Seven, Gaujacq claims tortious interference with "contractual relationships with future employers" (Compl. ¶¶ 295-309), alleging that defendants created a "false and defamatory Employment Letter" (Comp. ¶ 300) and failed "to return ENTERGY Nuclear's telephone calls" about her. (Compl. ¶ 303). Both charges are frivolous. The "Employment Letter" to which the

39

Complaint refers is a "certificat de travail" (literally, "work certificate") that French law requires an employer to provide to a former employee. Gaujacq complained that the work certificate that EDF in Paris originally provided to her was "false" due to an incomplete career history, and a replacement was duly provided which, evidently, was satisfactory. De Botherel Decl. ¶ 13 & Ex. H. As to the reference checks, EDF and EDFINA were under no legal duty to return phone calls from Gaujacq's prospective employers, if indeed they failed to do so (and the discovery record is barren of evidence on this subject). See, Am. Med. Int'l, Inc. v. Giurintano, 821 S.W.2d 331, 337 (Tex. App. 1991) ("The law imposes no duty on anyone to talk about a former employee.").

On these facts – and on the additional fact that Gaujacq was not prevented from going to work for Entergy, but got her job and works there today, it is apparent that she cannot establish that any business relationship that she had, actually or prospectively, was interfered with. Hence her tortious interference claim cannot survive. Whetstone Candy Co. v. Nat'l Consumers League, 360 F. Supp. 2d 77, 82 (D.D.C. 2004) (applying D.C. law); Cambridge Holdings Group, Inc. v. Fed. Ins. Co., 357 F. Supp. 2d 89, 96 (D.D.C. 2004) (applying D.C. law); King & King, Chartered v. Harbert Int'l, Inc., 436 F. Supp. 2d 3, 16 (D.D.C. 2006) (applying DC law). The record is also barren of facts that would establish "egregious" conduct by the defendants, which is also fatal to the tortious interference claim. Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 34 (D.D.C. 1999) (applying D.C. law).

**B.**    **Plaintiff's Breach of Contract Claims Fail As A Matter of Law**

For the reasons stated in Point I, French law applies to the "contract" claims asserted in Count Nine of the Complaint. Since these claims are patently deficient on the facts, no legal discussion is presented here.

First, Gaujacq alleges that EDF breached an alleged obligation to provide six months advance notice of her required return to France.  Compl. ¶ 324.  However, her expatriate agreement contained no six-month notice requirement and by its terms, expired on July 31, 2004.  EDF's expatriate policy guide suggests that "it is appropriate" for home management in France, to have an "evaluative discussion" with the expatriate "if possible annually, at the latest 6 months before the return" to France.  That suggestion, however, is not a requirement and does not bind the company contractually.  De Botherel Decl. ¶ 40 & Ex. G.  In any event, EDF did in fact have extensive communication with Gaujacq throughout the first 6 months of 2004 as to her next mission, as the record reflects.

Second, Gaujacq alleges that EDF breached an alleged obligation not to modify substantially her "employment conditions, including position and location … without her approval, unless the Company can support such a modification with a legitimate economic or business justification." Compl. ¶¶ 214, 324.  Again, no such obligation exists.  EDF's expatriate policy guide expressly retains for the company discretion to terminate an expatriate assignment "at any time" "if the interest of EDF requires it or for any other justifiable reason." De Botherel Decl. ¶ 41 & Ex. G.  Gaujacq cannot refute EDF's legitimate business justifications for recalling her to France upon the expiration of her Washington assignment.

### C.    Plaintiff's Claim of Breach of an Implied Duty of Good Faith and Fair Dealing Fails As A Matter of Law

In Count Ten, Gaujacq asserts that defendants breached an alleged duty of good faith and fair dealing allegedly by failing to sign a draft new expatriation contract that she sent to Gérard Creuzet on March 25, 2004.  Def. 56.1, ¶ 61.  Plaintiff has made no showing that EDF was contractually required under French law to enter into this agreement, and under District of

Columbia law, an implied contractual duty of good faith and fair dealing assumes a pre-existing contract in force, not a contract that has never been entered into. See, Allworth v. Howard Univ., 890 A.2d 194 (D.C. 2006). Since the implied covenant of good faith and fair dealing does not arise until a contract exists and Gaujacq's proposal for a new expatriation agreement never ripened into a contract, her claim fails under US law.

### D.    Plaintiff's Defamation Claim Fails As A Matter of Law

In Count Twelve, Gaujacq alleges that EDF and EDFINA and Nadal made "false and defamatory" statements to employees of EDF and EDFINA alleged to be:

> "stating or implying that Ms. Gaujacq was dishonest and that wrongdoing was committed under her watch, sufficiently serious to require an audit, that Ms. Gaujacq was not competent enough, or honest enough, to be able to sign checks, approve contracts, expenses, or make warranties or representations on behalf of the Company, that there were complaints about Ms. Gauajacq from the Energy Branch, that Ms. Gaujacq was terminated for cause, and that Ms. Gaujacq's employment history, set forth in the Employment Letter, was accurate and complete." (Compl. ¶343.)

Count Twelve must be dismissed because it does not plead the making of a defamatory statement with the particularity that the law requires, Hoffman v. Hill & Knowlton, Inc., 777 F. Supp. 1003, 1005 (D.D.C. 1991), and because plaintiff has not met her burden of showing that any statement was false, defamatory in the legal sense, and made to third persons without privilege, Washburn v. Lavoie, 357 F. Supp. 2d 210, 213 n.5 (D.D.C. 2004); Benic v. Reuters Am., Inc., 357 F. Supp. 2d 216, 222 n.4 (D.D.C. 2004) ("believing that an individual did 'something wrong' is distinct from thinking that the individual was 'odious, infamous or ridiculous', or guilty of a crime.").

To support a claim for defamation, it is necessary to identify the statement that is

complained of with particularity---the words used, the speaker, the audience, and the time and date must all be identified. "[I]nference and conjecture" that statements may have been made is not enough. See, Hoffman, 777 F. Supp. at 1005. Measured against this standard, plaintiff's claim that defendant Nadal "stat[ed] or impl[ied] that [she] was dishonest" and that "wrongdoing was committed under her watch" does not sufficiently plead a defamatory statement See, Black v. Nat'l Football League Players Ass'n, 87 F. Supp. 2d 1, 6 (D.D.C. 2000) (sports agent's allegation that he had been called a "bad and corrupt agent" who had engaged in "illegal activities" dismissed for lack of "factual allegations" that particular, defined statements had been made). Plaintiff's claims that defendants' actions (such as changing the lock on the closet where corporate books were kept, Compl. ¶113) implied wrongdoing on her part are also manifestly insufficient to plead actionable defamatory statements. Hoffman, 777 F. Supp. at 1005. Plaintiff's claim that defendant "defamed" her by issuing a "Certificat de Travail" (work certificate, or "Employment Letter" as described in the Complaint) that omitted to state her full work history also does not satisfy the law's threshold test that a statement that is the subject of an action for defamation be *defamatory*, Fleming v. AT&T Info. Servs., Inc., 878 F.2d 1472, 1475 (D.C. Cir. 1989); Benic, 357 F. Supp. 2d at 222 n.4.

Plaintiff further alleges that, in connection with EDF's audit of the EDFINA office, Nadal said, in a conference call with the auditors on July 9, that she "was paying fees to consultants and contractors of the company without services being performed" and that this was a "very serious issue." Compl. ¶114. Statements made in connection with an internal audit are privileged, as are statements Nadal made to plaintiff that expressed his views about her job performance. Elliot v. Healthcare Corp. 629 A.2d 6, 9 (D.C. 1993) (defamation claim failed

43

where statement was published only to company employees who had valid interest in audit); Stith v. Chadbourne & Parke, LLP, 160 F. Supp. 2d 1, 9 (D.D.C. 2001). No facts are pleaded here that would show "malice" sufficient to defeat this privilege. "District of Columbia law makes it very difficult for a plaintiff to overcome a qualified privilege.... And 'unless the statement itself is "so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice," malice must be proven by extrinsic evidence.'" Novecon Ltd. v. Bulgarian-Am. Enter. Fund, 190 F.3d 556, 567 (D.C. Cir. 1999) (citations omitted).  Plaintiff's allegations do not meet this standard, and her claims must therefore be dismissed.

## CONCLUSION

For the foregoing reasons, defendants EDF and EDFINA are entitled to summary judgment dismissing the complaint.

Dated: Washington, D.C.
      October 16, 2006

HOGUET NEWMAN & REGAL, LLP

By:     _____/s/_____
        Laura B. Hoguet *(D.C. Bar No. 200915)*
        Dorothea W. Regal *(D.C. Bar No. NY0064)*
        Randi S. May *(D.C. Bar No. NY0063)*

        10 East 40th Street
        New York, New York 10016

        *Attorneys for Defendants*
        *Electricité de France, S.A. and Electricité de France*
        *International North America, Inc.*

Of Counsel:

Kathleen L. Lowden

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CATHERINE GAUJACQ,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRICITE DE FRANCE<br>INTERNATIONAL NORTH AMERICA,<br>INC., ELECTRICITE DE FRANCE, S.A.<br>and CHRISTIAN NADAL,<br><br>Defendants. | Civil Action No. 1:05CV0969 (JGP)<br><br>**DEFENDANTS'<br>STATEMENT<br>PURSUANT TO FRCP RULE 56.1<br>AND LOCAL RULE 7(h)** |

Pursuant to Rule 56.1 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h) of the United States District Court for the District of Columbia, defendants Electricité de France, S.A., Electricité de France International North America, Inc. and Christian Nadal state that the following material facts are not in dispute for the purpose of defendants' summary judgment motions only:

### The Record Basis For This Motion

This motion is based on (1) Declarations submitted herewith of Patrick de Botherel ("De Botherel Decl."), Yann Laroche ("Laroche Decl.") and Christian Nadal ("Nadal Decl."); (ii) depositions taken in this action of plaintiff Catherine Gaujacq (**Exhibit 1**), Christian Nadal (**Exhibit 2**), Patrick de Botherel (**Exhibit 3**), Yann Laroche (**Exhibit 4**), Alexandre Audie (**Exhibit 5**), and Adja Ba (**Exhibit 6**), and Phillipe Gaujacq (**Exhibit 7**) and (iii) documents produced in discovery.  Laroche, De Botherel and Nadal each gave testimony pursuant to Rule 30(b)(6) on topics designated as reflected in **Exhibit 96**.

Documents attached as exhibits are identified by Bates number. Translations of French language documents are submitted with the documents as exhibits on this motion. For the convenience of the court, e-mails included as exhibits are physically marked with the paragraph number(s) of this Statement that references them, to aid in identifying the portion of the exhibit that the paragraph relies on.

### Defendant EDF

1.      Defendant Electricité de France, S.A. ("EDF") is a corporation organized under French law and headquartered in Paris. (Nadal Tr. 469:18-19; *see also* **Exhibit 8**, EDF 4159-4182) (excerpts).

2.      At all times relevant to the Complaint, EDF generated and supplied electric power to commercial and residential customers in France and in many other countries (not, however, including the United States). (*see* **Exhibit 9**, excerpts from EDF's website www.edf.fr; Laroche Tr. 59:13-60:12).

3.      EDF has more than 160,000 employees. (**Exhibit 10**, EDF 4338-4446 (excerpts); De Botherel Tr. 74:6-9).

4.      At the time of the events alleged in the Complaint, EDF was a governmental entity under French law. A law enacted on November 17, 2004 changed EDF to a private corporation ("société anonyme"). (**Exhibit 8**, EDF 4162; *see* **Exhibit 9**, excerpts from EDF's website, www.edf.fr). Shares in EDF were sold to the public in 2005. However, EDF remains 87.3% owned by the Republic of France. (**Exhibit 11**, EDF 5679-5783 (excerpts).

### Plaintiff Gaujacq's Career With EDF

5.      Plaintiff Catherine Gaujacq is, and was at all times pertinent to this action, a citizen exclusively of France. (Gaujacq Tr. 8:12-16).

2

6.    Gaujacq became employed by EDF as an engineer in France in 1980. (**Exhibit 12**, EDF 4673-74; De Botherel Decl. ¶ 23).

7.    EDF repeatedly promoted Gaujacq. She was the first woman in France to have operational responsibility for a nuclear power plant, 1994-2000. (Gaujacq Tr. 37:3-5, 38:1-4, 40:6-42:21; Complaint ¶ 49).

8.    Gaujacq considers that from 1980 until 2000 she made a "good progression" through six different positions within EDF, and that she had a very successful career at the company. She had no complaints about her career or the terms of her employment at EDF prior to 2004. (Gaujacq Tr. 43:11-20: 44:1-5; 44:13- 20).

### Gaujacq's Expatriate Assignment To Washington

9.    Effective August 1, 2000, EDF appointed Gaujacq to the position of "Déléguée Générale" (Delegate General) for the United States and Canada of EDF's International Branch – Client Division. (**Exhibit 13**, EDF 0009, Gaujacq Tr. 43:7-10). Her title was changed, in 2002, to "Directeur" (Director) USA/Canada for EDF's then newly-organized Americas Branch. (**Exhibit 14**, EDF 0008).

10.    In connection with Gaujacq's expatriate assignment to Washington, she and EDF entered into an agreement titled "Conditions Particulières Applicables à la Mission de Longue Durée de Catherine Gaujacq à Washington" ("Particular Conditions Applicable to Catherine Gaujacq's Long Term Mission to Washington," hereafter the "Gaujacq Expatriation Contract"). (**Exhibit 15**, EDF 438-47).

11.    The Gaujacq Expatriation Contract provided that the duration of plaintiff's assignment in the US was three years, from August 1, 2000 through July 31, 2003, and

that the assignment could be extended for one additional year "by tacit agreement" of the parties. (**Exhibit 15**, at 438-39).

12.    It is the practice of EDF to rotate executives who are assigned to head its delegation in Washington.   (Gaujacq Tr. 55:9-16).  In the ten years prior to Gaujacq's appointment, four EDF executives had had this assignment.  (De Botherel Decl. ¶ 31; *see also* Gaujacq Tr. 52:13-55:8).

13.    The  Gaujacq  Expatriation  Contract  provided  Gaujacq  with  a compensation and benefits package that was consideration for her undertaking to serve EDF on an international assignment, that included the following:  (1) base salary (39,313 French francs per month in 2000, raised annually to € 7330 per month in July 2004);[1]  (2) an expatriation supplement; (3) cost of living supplement for Washington, D.C.; (4) rent for a residence; (5) local living expenses (such as taxes, utilities and insurance); (6) the cost of leasing and maintaining a car; (7) tax equalization; (8) a supplement for her spouse's loss of income due to relocating abroad; (9) storage of furniture and personal belongings in France; (10) two round-trip tickets each year to France for her and her spouse; (11) costs and fees for her husband's visa application; (12) a one-time declining indemnity for her prior service as director of a power plant; and (13) a one-time lump sum moving indemnity.  (**Exhibit 15**, at 440-444; **Exhibit 93**, EDF 4679; De Botherel Decl. ¶ 30).

14.    Consistent with EDF's practice concerning expatriate compensation, Gaujacq's base salary and other remueration under the expatriation contract while she was in Washington was paid in Euros in France, while some US-based expenses, such as housing, were paid in the US.  (Gaujacq Tr. 71:17-2, 529:14-530:2; Nadal Tr. 441: 14-19, 451:2-8).

---

[1]  At the exchange rate prevailing in August 2000, 39,313 French francs was $5,558.72.  At the exchange rate prevailing in July 2004, € 7330 was $8,941.13.

15.     Pursuant to EDF policy pertaining to expatriate assignments, Gaujacq continued to be an EDF employee while stationed in Washington.  She retained her EDF pay ranking at all times, and EDF was committed to employ her in France at the end of her Washington assignment.  (**Exhibit 12,** EDF 4673-**74; Exhibit 15**; EDF 438-447; **Exhibit 16,** EDF 041; **Exhibit 17**, EDF 412, **Exhibit 18**, EDF 414; **Exhibit 19**, EDF 415; **Exhibit 20**, EDF 5185; De Botherel Decl. ¶¶ 22-26).

### Gaujacq's Role In The US; Defendant EDFINA

16.     While serving as EDF's Director in Washington, Gaujacq reported, beginning in 2002, to the head of EDF's Americas Branch, Fernando Ponasso[2] in Buenos Aires. (Gaujacq Tr. 65:15 – 66:4-67:20).  EDF officials in France continued to make all decisions pertaining to her "mission" (job responsibilities), her career, the duration of her stay in Washington and her next assignment.  (Complaint   ¶¶ 5, 14; *see also* Gaujacq Tr. 107:17– 109:11, 124:21–126:21, 140:2-141:9, 179:1-186:4, 240:14-241:7, 243:17-245:8, 246:8-14, 248:3-6, 269:8-17, 409:10-15).

17.     As EDF's Director in Washington, Gaujacq was responsible for collaborating with leaders of US electrical utilities for the purpose of building and strengthening ties between the US and French energy industries and undertaking collaborative research and development projects.  (Complaint ¶ 35).

18.     In particular, Gaujacq served as a representative to a consortium of energy companies, called NuStart Energy Development, LLC ("NuStart"), which worked on the development of a design for a nuclear energy plant that could be built in the US.  (*See* Complaint ¶ 54; Gaujacq Tr. 206:21-208:6).

---

[2] Ponasso left EDF in 2005.  (De Botherel Decl. ¶ 47).

19.     As EDF's Director in Washington, Gaujacq was appointed President of defendant Electricité de France International North America, Inc. ("EDFINA"). **Exhibit 21**, EDFINA 5385-87).   Four previous EDF representatives in Washington had also served as President of this company.   (De Botherel Decl. ¶ 31; *see* Gaujacq Tr. 52:13-55:8).

20.     EDFINA is a corporation organized under District of Columbia law that maintains its office in Washington, D.C.   (Complaint ¶ 6).

21.     EDFINA acts as EDF's liaison office in the US.   EDFINA does not generate income.   EDF pays EDFINA's expenses.   (Complaint ¶ 4, Answer ¶ 4).

22.     As President of EDFINA, Gaujacq was responsible for managing its office in Washington, "local" staff (that is, staff who were not expatriates sent to Washington by EDF in France), and the work of outside contractors and consultants who supplied services to EDF in the US.   (*See* Complaint ¶ 35; Answer ¶ 35).

23.     At all times relevant to the Complaint, EDFINA had two "local" employees (that is, employees who were hired, paid and managed by EDFINA in Washington): Adja Ba and, for some time, Alexandre Audie. (Nadal Decl. ¶¶ 33-34; Nadal Tr. 467:12-468:1; 486:20-487:3; Audie Tr. 22:6-11, 30:1-8; Ba Tr. 26:5-7, **Exhibit 22**, EDFINA 4557- 59 at 58).

24.     Other than Ba and Audie, the employees who worked in EDFINA's office in Washington, including Gaujacq, were individuals in the employ of EDF in France who were working in the US on expatriate assignments.  (**Exhibit 22**, EDFINA 4557- 59 at 58; Nadal Decl. ¶¶ 36-37; *see also* Nadal Tr. 416:7-11, 467:12-468:1).

**Gaujacq's First Request to Extend Her Washington Mission**

25.     While stationed in Washington, Gaujacq and her husband, Philippe Gaujacq, occupied as their residence a house in Great Falls, Virginia.   EDF (through EDFINA)

paid the rent for the house pursuant to the Gaujacq Expatriation Contract.  (Complaint ¶ 58; P. Gaujacq Tr. 4:22-5:1; Gaujacq Tr. 71:17-72:13).

26.     Gaujacq and her husband, Philippe Gaujacq, came to the US on visas obtained by reason of her employment as EDF's representative in Washington.  (Complaint ¶ 37; P. Gaujacq Tr. 18:13-17, 20:5-19).

27.     On March 15, 2002, Gaujacq and her husband applied to the US Immigration and Naturalization Service for permanent resident ("green card") status.  (**Exhibit 23**, EDFINA 1034-1071 (excerpts); **Exhibit 24**, EDF 432; Gaujacq Tr. 92:19-93:8; *see also* P. Gaujacq Tr. 17:16-18:17).  Gaujacq was granted permanent resident status in August 2004. (Gaujacq Tr. 8:14–18, 33:16-34:4, *see also* P. Gaujacq Tr. 17:16-18:17; G2529-2532).

28.     Gaujacq told EDF that she was applying for permanent resident status in order for her husband to be employed in the US.  (**Exhibit 24**, EDF 432).  However, Philippe Gaujacq did not become so employed.  (Gaujacq Tr. 94:20-95:17; P. Gaujacq Tr. 36:11 – 15; 41:7-9).

29.     Because her Expatriation Contract "was set to expire at the latest for the summer of 2004," Gaujacq requested in January, 2003, a new contract permitting her to remain in her Washington post for an additional three years.  (Gaujacq Tr. 124:21 – 125:17). Gaujacq admits that Gérard Creuzet,[3] the Chief Operating Officer of EDF in Paris, "did not accept" this request  (Gaujacq Tr. 125:18-21), but said that any renewal or extension of her contract would be on "a year by year basis." (Gaujacq Tr. 107:17-108:8, 126:1-9; *see also* **Exhibit 25**, EDF 4577).

---

[3] Creuzet left EDF in September 2004. (De Botherel Decl. ¶ 47).

30.     While not accepting Gaujacq's request to extend her mission in the US for an additional three years, EDF did agree to a one-year extension, that is, until July 31, 2004. (**Exhibit 26**, EDF 4681; Gaujacq Tr. 106:11-16, 107:17-108:8, 126:5-9).

**EDF Appoints Nadal To Washington**

31.     On January 1, 2004, by an order signed by François Roussely,[4] the Chairman, President and CEO of EDF, EDF appointed defendant Christian Nadal to the position of "Délégué Général" (Delegate General) of EDF for North America, assigned to Washington, D.C.  (**Exhibit 27**, EDF 685) **(confidential)**.

32.     Nadal is a French citizen.  (Complaint ¶ 20).

33.     He joined EDF in 1988, having previously served as the General Secretary of the French National Coal Board.  (**Exhibit 28**, CN 187-192, at 191; **Exhibit 29**, CN 259; Nadal Decl. ¶ 4).

34.     Nadal was a member of EDF's Executive Committee, which constitutes the top management of the company, from 1995-1999.  (Nadal Decl. ¶ 6; *see also* Laroche Tr. 11:8 – 13:14).

35.     From 1999 to 2001, Nadal was the Chief Executive Officer of EDENOR, a commercial Argentinean energy company in which EDF held a partial equity interest.  **Exhibit 28**, CN 187-192, at 188; **Exhibit 29**, CN 259; Nadal Tr. 5:11-15, 18:18-19:21). EDENOR had approximately $1 billion in annual revenue.  (Nadal Tr. 32:20-33:7).

36.     In 2002-03 Nadal served as EDF's Executive Vice-President for General Controlling in Paris, reporting to the President and CEO.  (Nadal Tr. 105:3-10; 126:8-14; **Exhibit 28**, CN 187-192, at 188 -189; **Exhibit 29**, CN 259).

---

[4] Roussely left EDF in September 2004. (De Botherel Decl. ¶ 47).

37.    EDF appointed Nadal its Delegate General in Washington in 2004 as a top-level "ambassador" to develop high-level contacts with the investment community and governmental decision-makers in the US. (Laroche Tr. 65:16-66:11). Because EDF anticipated in 2004 that privatization and a public offering of its shares would take place in the near future, it saw need to expand the focus of its mission in Washington, and upgrade and broaden this mission in order to create new opportunities for investment. (Laroche Tr. 30:19 – 31:1; De Botherel Tr. 115:21-116:7; Nadal Tr. 156:11-161:8, 164:3-8). EDF's Chairman wanted to appoint an "R-1" executive (that is, an individual in the company's highest pay grade rank, *see* ¶¶ 148-162 below for a description of EDF's pay grade rank system) who had "quite a lot of experience in terms of development and strategy" to head the US delegation. (Laroche Tr. 31:22 – 32:12; Laroche Decl. ¶¶ 11-17; Nadal Decl. ¶¶ 9-10; *see also* Laroche Tr. 33:6 – 39:2).

38.    The terms of Nadal's assignment to Washington, including his compensation, are contained in an agreement that he negotiated with EDF. (Nadal Decl. ¶ 11; Nadal Tr. 170:11-21). Under this agreement, Nadal's assignment to Washington extends for five years beginning January 1, 2004. (Nadal Decl. ¶ 12).

39.    Nadal's base salary and the value of his compensation and benefits package under his expatriation agreement are greater than that provided to Gaujacq under her Expatriation Contract.

40.    While on expatriate assignment to Washington, Nadal continues to be an EDF employee. (**Exhibit 30**, EDF 705 (**confidential**); Nadal Tr. 450:20-451:8; Nadal Decl. ¶¶ 36-37).

**Gaujacq's Actions In Response To Nadal's Appointment: January-February, 2004**

41.     In January 2004, Ponasso and his human resources assistant in Buenos Aires, Jean-Louis Betouret, informed Gaujacq of Nadal's appointment as Delegate General in Washington.  (**Exhibit 31**, EDF 941; *see also* Gaujacq Tr. 115:2-116:20).

42.     On February 18 EDF's Chairman, Roussely, told her that Nadal was appointed to Washington.  Roussely told Gaujacq that she could stay in the US after Nadal arrived.  (Gaujacq Tr. 126:16-135:4).

43.     On February 19, Gaujacq advised EDF that "I expect a new contract from you" as her assignment to the US was to expire on July 31, 2004 under the Gaujacq Expatriation Contract.  (**Exhibit 32**, G1273).

44.     Nadal met Gaujacq on a visit to Washington on February 25. (Gaujacq Tr. 157:13-158:2).

45.     Prior to Nadal's February 25 visit, Gaujacq informed those working in the Washington office that Nadal would be coming to Washington as a "gas analyst" and "advisor" under her supervision.  (Audie Tr. 112:9-113:5; Ba Tr. 143:1-18).  When Nadal arrived on February 25, Gaujacq introduced him as a "gas analyst." (Nadal Decl. ¶¶ 16-17).

46.     Nadal was not a "gas analyst" in February 2004 or at any time. Nadal's experience and career have nothing to do with gas.  (Nadal Tr. 205:12-206:21; **Exhibit 28**, CN 187-92).

47.     Prior to her meeting with Nadal on February 25, Gaujacq knew that Nadal occupied the pay grade rank at EDF of "R-1" (the top pay grade at EDF) and that he had previously been the CEO of EDENOR.  (Gaujacq Tr. 147:5 – 152:3; **Exhibit 33**, EDFINA 753).

48.    During a meeting with Nadal at lunch on February 25, Gaujacq told him (as reflected in Betouret's memo after speaking with her) that her assignment was unchanged and that she reported to Creuzet and Ponasso. (**Exhibit 34**, EDF 945-46). She did not discuss EDFINA's organization and business with Nadal on February 25. (Nadal Tr. 199:12-203:16, 205:12-207:12).

49.    Gaujacq admits that, during their meeting on February 25, Nadal was "business-like," was not rude, and "did not discriminate or harass [her] in any way." (Gaujacq Tr. 161:8-16, 472:14 - 473:5).

50.    Roussely directed Gaujacq to facilitate Nadal's arrival in the US and to over*see* the making of a visa application for him to work in the US. (Gaujacq Tr. 149:13-16). Gaujacq informed EDFINA's immigration attorney responsible for processing his visa application that Nadal was coming to the United States to be a "senior advisor" who "analyses the US gas markets...." (Nadal Tr. 242:9 – 244:15; **Exhibit 35**, EDFINA 5398-5401, at 5399). On March 11,  the attorney telephoned Nadal in France to say that his visa could not be processed based on the information Gaujacq had provided because Nadal's *curriculum vitae* was devoid of any experience that would qualify him to work as a "gas analyst." (Nadal Tr. 242:9-244:15; **Exhibit 36**, EDF 960).

51.    By e-mail dated January 28, Gaujacq told EDF officials in Paris that US immigration laws did not permit Nadal to start work in Washington until he received his visa. (**Exhibit 31**, EDF 941). Gaujacq further advised EDF officials by e-mail dated February 19 that Nadal could not come to the US as a tourist while his visa application was pending. (**Exhibit 37**, EDF 943). In fact, as Gaujacq later admitted, Nadal was permitted to enter the US for up to 90 days during the pendency of his visa application. (**Exhibit 38**, EDF 969-70).

52.     Prior to his February 25 meeting with Gaujacq, Nadal told Betouret, the human resources officer for EDF's Americas Branch in Buenos Aires, that he was open to the possibility of Gaujacq's remaining in the US after he assumed his duties in Washington. (**Exhibit 39**, EDF 1228A; Nadal Decl. ¶ 15).

### EDF Reinstructs Gaujacq: March 2004

53.     On March 22, Creuzet, the Chief Operating Officer of EDF in France, went to Buenos Aires to meet with Gaujacq. During the meeting, Creuzet called EDF's Chairman, Roussely, in Paris. (Gaujacq Tr. 179:1-186:4).

54.     Creuzet told Gaujacq during the March 2004 meeting in Buenos Aires: "He said cut the bullshit. Nadal is going to be President of EDFINA and there is nothing else to say. Raison d'état.[5] That's what I heard." (Gaujacq Tr.184:21-185:4).

55.     Following her meeting with Creuzet, Gaujacq understood that Nadal was to be the new head of EDF's delegation in Washington. (Audie Tr. 120:22-121:9, 124:12-125:1; Nadal Tr. 252:22-253:9). She told the people at the EDFINA office that she had been "in error" in her previous statements that Nadal would be working as a "gas analyst" under her supervision. (**Exhibit 38**, EDF 969-70; Gaujacq Tr. 191:18-193:2). She also directed the company's immigration attorney to draft Nadal's application for a visa to work as "President of EDFINA." (**Exhibit 40**, G 1334).

56.     Nadal and Gaujacq did not meet or speak to each other on the telephone in March 2004. (Nadal Decl. ¶39; *see also* Gaujacq Tr. 389:18-390:10, 472:14- 473:8).

---

[5] "Raison d'état" translates as "reason of state."

57.    In April 2004, Nadal came from Paris to visit the EDFINA office for approximately two weeks. At Gaujacq's request, Nadal provided her in advance with the dates of his visit. (**Exhibit 38**, EDF 969-70).

58.    Gaujacq did not come in to the EDFINA office while Nadal was in Washington in April 2004. (Gaujacq Tr. 537:8-9). She and Nadal did not meet or speak on the telephone during that month. (Nadal Decl. ¶ 39; Nadal Tr. 227:10-19; *see also* Ba Tr. 144:1-146:17; Audie Tr.122:7-20).

**Gaujacq's Proposal For A New Mission in the US**

59.    At the March 22 meeting in Buenos Aires, Gaujacq discussed with Creuzet her desire to remain in the United States and to continue to work with NuStart, and Creuzet invited Gaujacq to propose a new mission for herself. (*see* Gaujacq Tr. 179:1-10, 184:8-16).

60.    By e-mail dated March 25, Gaujacq proposed to Creuzet in Paris a new three-year expatriation assignment in the US as "Directeur Production et Projets Nucleaires, EDFINA" (Director of Generation and Nuclear Projects, EDFINA). (**Exhibit 41**, EDF 965-67, at 965; **Exhibit 42**, EDF 4684-91). Gaujacq proposed that she report, not to Nadal as head of EDF's delegation in the US and President of EDFINA, but to EDF's "Branche Energies" (Energy Branch) in France as well as to the Director of the Americas Branch in Buenos Aires. (**Exhibit 42**, EDF 4684-91 at 4685).

61.    Creuzet by e-mail on March 29 responded initially that Gaujacq's proposal appeared to be in accord with their discussion. (**Exhibit 41**, EDF 965-67). By e-mail dated April 7, however, he told Gaujacq that, after discussing the matter with Yann Laroche, EDF's senior Human Resources officer, and François Metais, who supervised a group

13

responsible for executive affairs, it would appear "more appropriate" to name her to the post "Projets Nucleaires generation 4" (Nuclear Projects 4th Generation) attached to the Energy Branch, that is, not to EDFINA. (**Exhibit 41** at 966). By e-mail dated April 8, Creuzet informed Gaujacq that more detailed analysis was required and that she should determine her future "mission" (job duties or responsibilities) with Bruno Lescoeur, head of the Energy Branch, and then discuss her contract with Metais. (**Exhibit 41** at 967).

62.    Gaujacq refused to accept the position suggested by Creuzet and reiterated her request that EDF enter into the agreement she requested for a three-year assignment in the US. (**Exhibit 41** at 966; Gaujacq Tr. 203:8-206:15, 209:4-210:14).

63.    In April 2004 EDF's Executive Committee, of which Laroche was a member, decided that Gaujacq could report functionally to the Energy Branch, but must report operationally to Nadal. (**Exhibit 43**, EDF 998).

64.    After meeting with Gaujacq on February 25, Nadal sought clarification from EDF of what his role in the US was to be. On April 1, he wrote that her actions had made it extremely difficult for them to work together and that he would prefer that she be assigned elsewhere. When Nadal learned that it had been proposed that Gaujacq remain at EDFINA in charge of nuclear projects, but not reporting to him, he objected by e-mail dated April 7 to Metais that this would diminish the scope of his responsibilities and was not acceptable to him. (**Exhibit 44**, EDF 947-49 at 947-48; **Exhibit 45**, EDF 978; **Exhibit 46**, EDF 985; Nadal Decl ¶¶ 22-23).

65.    In April 2004, EDF executives in France and London expressed interest in talking with Gaujacq about new assignments for her. (**Exhibit 47**, EDF 997; Laroche

Tr. 89:19 – 25). Gaujacq refused to consider any option other than remaining in the United States. (Gaujacq Tr. 221:9-222:14).

66.     In a meeting in Paris on May 18, Bruno Lescoeur, head of EDF's Energy Branch, told Gaujacq that EDF wanted her to return to France, and they discussed a new EDF initiative for the introduction to France of European Pressurized Reactors ("EPR"). *See* (Laroche Tr. 89:16-90:3, 91:12-18; Gaujacq Tr. 232:5-233:10, 235:14-237:9). Gaujacq refused to consider returning to France, saying that she had been promised she could stay in the US. (Gaujacq Tr. 233:11-16).

67.     On May 25, Chairman Roussely directed that Nadal take up his duties in Washington and that, if Gaujacq stayed in the US, she would be required to report to him. Otherwise, she would return to France. (**Exhibit 48**, EDF 1016-17; Gaujacq Tr. 409:10-15).

68.     Gaujacq understood that Roussely made the decision that she would report to Nadal. (Gaujacq Tr. 245:1-8, 275:13-20, 409:10-15). Gaujacq also knew that missions, proposals and employment decisions for executives must be approved by the highest-level executives of EDF in France. (Gaujacq Tr. 140:2-141:3-9, 160:1-9, 194:3-16, 230:18- 231:20, 241:20-242:1).

69.     In accordance with Roussely's decision, effective May 31 Gaujacq resigned the title of President of EDFINA and Nadal assumed the title of President effective June 1. Gaujacq was appointed a Vice President of the company. (**Exhibit 49**, EDFINA 5355, 5358-62; Gaujacq Tr. 248:3 – 249:8).

**Nadal Takes Office in Washington: June 2004**

70.     Although Gaujacq held the title of Vice-President of EDFINA effective May 31, 2004, that position did not have defined responsibilities or duties associated

with it. (Gaujacq Tr. 265:3-9, 350:15-351:2). Gaujacq was expected to discuss with Nadal what her duties and responsibilities would be.  (Nadal Tr. 360:8 – 361:2; 365:20-367:14, 368:3-12; Gaujacq Tr. 350:15 – 351:2).

71.    After Nadal's arrival in Washington on or about June 1, he and Gaujacq did not meet and Gaujacq did not go to the EDFINA office in June except on one day, June 11, when Nadal was out of town at a conference in Colorado.  (Gaujacq Tr. 310:6-12, Nadal Tr. 369:1-371:13; 505:20 – 506:2; **Exhibit 50**, EDF 4573-76 at 4574).

72.    On June 10, Gaujacq distributed to Ponasso and the EDFINA office a memorandum purporting to assign responsibility for gas and finance to Nadal and responsibility for NuStart to herself.  (**Exhibit 51**, EDFINA 836-48 at).  Gaujacq did not show this memorandum to Nadal or discuss it with him before circulating it.  (Gaujacq Tr. 294:11-295:20; **Exhibit 50**, EDF 4573-76).

73.    Before Nadal assumed the title of President of EDFINA, there were two persons who were authorized to sign checks on EDFINA's bank account: Gaujacq as President, and Benoit Dreux, a Vice-President. (**Exhibit 52**, EDFINA 5350-52; **Exhibit 53**, EDF 1557-59; Ba Tr. 30:1-32:5; *see also* Gaujacq Tr. 89:1-91:11).

74.    After Nadal assumed the title of President of EDFINA, he was authorized in her place to sign checks on behalf of EDFINA.  (**Exhibit 54**, EDFINA 5346-48; **Exhibit 49**, EDFINA 5358-5359; Nadal Tr. 372:6 – 374:14).

75.    Gaujacq went to the EDFINA office on June 11, 2004 for approximately one hour, at which time she signed EDFINA checks.  (Complaint ¶ 83; Gaujacq Tr. 310:6-311:20).

76.     Because Gaujacq was no longer an authorized signatory on EDFINA's accounts, the checks Gaujacq signed on June 11 were voided, and the word "void" was written on each of them. (**Exhibit 55**, EDFINA 933-37; Ba Tr. 215:8-216:22; Gaujacq Tr. 326:2-330:15).

77.     By e-mail on June 11, Gaujacq requested that Nadal telephone the bank to reinstate her check-signing authority. (**Exhibit 56**, EDF 1025).

78.     In response to Gaujacq's e-mail, Nadal telephoned her from the conference he was attending in Colorado and said that she had no need for check signing authority until her functions and responsibilities were determined, and also that he was unhappy that she had sent out the June 10 memo without discussing it with him. (Nadal Decl. ¶¶ 42-43; Nadal Tr. 369:1-372:5; 375:18-376:4, 376:18-377:2). Gaujacq viewed the phone conversation she and Nadal had on June 11 as a "quarrel." (Gaujacq Tr. 703:3-705:20).

79.     Gaujacq and Nadal both went to Pittsburgh for a conference on Monday, June 14. Gaujacq departed before meeting with Nadal, leaving a note that her mother-in-law was ill and she had to return home to Washington, D.C. and undoubtedly thereafter to France. (**Exhibit 57**, EDFINA 771).

80.     Nadal learned from Alexandre Audie, during the week of June 14, that Philippe Gaujacq had told Audie that his wife had left Pittsburgh because one of their dogs had died. Philippe Gaujacq had said nothing about his mother being ill. (Nadal Tr. 332:13- 335:7; Audie Tr. 109:7-111:14; *see also* P. Gaujacq Tr. 59:10-64:10).

81.     Gaujacq testified at her deposition in this action that she wrote the note when she left the Pittsburgh conference on June 14 because she had "just learned that [her]

mother-in-law is very sick;" that she had returned to Washington, and that she and her husband both traveled to France, where her mother-in-law was "in a coma." (Gaujacq Tr. 337:5–339:21).

82.    Following the contrary deposition testimony of Nadal and Audie, Gaujacq submitted errata to her deposition testimony to change her testimony about why she left the Pittsburgh conference. (Gaujacq Errata 339:17-21).

83.    Gaujacq testified in a subsequent deposition that she had not told the truth to Nadal about the reason for her sudden departure from the conference in Pittsburgh because she had quarreled with him in their call on June 11 and she was not on good terms with him. (Gaujacq Tr. 703:3-705:20).

84.    In their June 11 phone call, Nadal and Gaujacq scheduled a meeting for June 18 at the EDFINA office to discuss her job responsibilities. (Gaujacq Tr. 341:13-16; **Exhibit 58**, EDFINA 800). Gaujacq did not come into the EDFINA office on June 18. (Nadal Tr. 337:17-21, 366:14-367:12, 536:18-537:1; Gaujacq Tr. 341:1-342:1).

85.    Gaujacq testified that she was not able to meet Nadal on June 18 due to the illness of her mother-in-law. (Gaujacq Tr. 341:13-19). At the second session of her deposition, Gaujacq admitted that she had not gone to France on June 18 for this reason. (Gaujacq Tr. 705:18-20).

86.    Nadal had to leave for France after June 18 for three weeks. (Nadal Tr. 409:15-410:7; Nadal Decl. ¶ 45).

87.    Nadal prepared a letter dated June 18 for Gaujacq and Dreux, setting forth his powers and authority as President and theirs as Vice-Presidents of EDFINA. (**Exhibit 59**; EDF 1026; Nadal Tr. 409:5–412:6).

88.    Nadal prepared the June 18 letter to ensure that they both understood the change in authority after his appointment as President of EDFINA and to prevent unauthorized actions by Gaujacq during his absence.  (Nadal Tr. 409:5-412:6; Nadal Decl. ¶ 44).

89.    Nadal prepared a separate letter dated June 18 authorizing Dreux to act on his behalf as President in certain particulars during his absence if necessary.  (**Exhibit 60**, EDF 1027; Nadal Tr. 409:5-412:6; Nadal Decl. ¶¶ 45-46).

90.    Nadal considered Dreux to be the appropriate person to be authorized to act for EDFINA in his absence because Dreux was generally available for regular consultation with Nadal on business matters in the office.   Gaujacq, by contrast, had repeatedly been unavailable to Nadal, and had demonstrated unprofessional behavior since Nadal's arrival at EDFINA and had repeatedly taken action undermining his authority.  (Nadal Decl. ¶¶ 45-47).

91.    Nadal left for France on June 18, 2004 for a three-week trip to France. (Nadal Tr. 409:20-410:7).

92.    Gaujacq and Nadal were both scheduled to attend a meeting in Lyon, France on June 21, to provide an update on the NuStart program to SEPTEN, a subdivision of the EDF Engineering Division responsible for nuclear design.  (Nadal Tr. 339:13-340:1; Gaujacq Tr. 340:12-341:12).  On June 18 Gaujacq advised EDF by e-mail that that she could not attend the meeting due to the "serious and unexpected" health problem of her mother-in-law.  (**Exhibit 61**, EDFINA 813).  In her second deposition, she admitted that her mother in law's illness had not caused her to leave the US in June.  (Gaujacq Tr. 706:13—708:3).

93.    EDF's Audit Department in France conducted an on-site audit of EDFINA in July 2004, which included interviews and document review by EDF auditors on June 28 to July 9.  (**Exhibit 62**, EDF 1266-88) (excerpts).

94.    EDF's audit of EDFINA was ordered by Ponasso, the Director of EDF's Americas Branch in Buenos Aires. (**Exhibit 63**, EDF 4556; Gaujacq Tr. 417:20-418:12; Nadal Tr. 405:19-406:6). Nadal did not order EDF's audit of EDFINA. (Nadal Tr. 405:19-406:6; De Botherel Tr. 156:7-158:20).

95.    During the audit, the EDF auditors discovered that "all files relating to [NuStart] (agreement, commitment letter, [Memorandum of Understanding], operating agreement and BP...) are not available at the office and are archived at the domicile of [Gaujacq]." (**Exhibit 50** at 4575; Nadal Tr. 347:3-349:8, 355:16-356:11). Gaujacq did bring the NuStart documents to the office for the auditors' review, but after the auditors reviewed them, and signed confidentiality agreements at her insistence, Gaujacq took the documents back to her residence. (Gaujacq Tr. 377:20-380:6; **Exhibit 50** at 4575; Nadal Tr. 352:4-9, 353:3-6).

96.    During an audit telephone conference on July 9, in which Nadal and Gaujacq participated, the EDF auditors stated that certain expenditures that had been authorized by Gaujacq were not documented. Gaujacq explained that the documentation was at her residence, and Nadal stated to Gaujacq that it was very important to bring in the documents and that the situation involving lack of documentation was "very serious." (Gaujacq Tr. 376:3-377:8, 483:8-484:8; Nadal Decl.¶ 48).

97.    Prior to July 12, Nadal had not had a single meeting with Gaujacq since they had first met on February 25. (Nadal Decl. ¶ 39; Nadal Tr. 360:12-361:5, 365:20-367:14, 535:5-537:1; Gaujacq Tr. 389:18-390:10, 475:3-6, 537:19-538:2; **Exhibit 50**, EDF 4573-76 at 4574). Since June 1 when Nadal became President of EDFINA, Gaujacq had not come to the EDFINA office on any day when he was there. (Nadal Tr. 368:3-17, Gaujacq Tr. 389:18-21).

98.     On July 12, Gaujacq came into the EDFINA office, and Nadal and she met. (Nadal Tr. 364:5-13). At Nadal's request, Jean-Luc Forêt, an EDF expatriate who was an alternate EDFINA representative to NuStart, joined the portion of the meeting having to do with NuStart. (Nadal Tr. 364:5-365:16; Nadal Decl. ¶ 50; Gaujacq Tr. 390:7-18).

99.     The total amount of time that Gaujacq and Nadal met face to face, combining their February 25 meeting and their meeting on July 12, was less than three hours. (Gaujacq Tr. 475:12-15).

100.     Nadal advised Gaujacq during their July 12 meeting that the NuStart and other documents needed to be in the EDFINA office, and instructed her to return to the office immediately all files pertaining to the NuStart project, and other work-related documents that she maintained at her personal residence, on her company-owned computer or anywhere else. (Nadal Decl. ¶ 52; Nadal Tr. 377:17-380:21; Gaujacq Tr. 391:18–394:3; 394:8-395:14; 396:15-397:8, 459:4-17; **Exhibit 64**, EDF 1032-33).

101.     Also during their July 12 meeting, Nadal instructed Gaujacq to arrange for Forêt to participate in a scheduled NuStart conference call, but she refused. (Nadal Decl. ¶ 51; Gaujacq Tr. 396: 5-14, **Exhibit 64**, EDF 1032-33).

102.     Gaujacq refused to comply with Nadal's instruction to return the NuStart and other documents to the EDFINA office on the stated grounds that he did not need them, there were too many documents for her to bring to the office before she left for vacation the next day, and because the NuStart documents were confidential such that only she was permitted access to them under the NuStart agreement. (Nadal Decl. ¶ 52; *see* Nadal Tr. 304:6-307:4, 364:1-13, 378:18-382:11; *see also* Gaujacq Tr. 392:21-397:8). Gaujacq testified that, in response, Nadal told her "I'm the General Delegate of EDFINA and you have to comply my

orders . . . ." (Gaujacq Tr. 392:2-6, *see also* Nadal Decl. ¶ 54).  She also said that Nadal stood and pointed his finger at Gaujacq.  (Gaujacq Tr. 79:19-80:2).

103.    By e-mails dated July 12 and July 16, Nadal repeated his instruction to Gaujacq to return the EDFINA files (including NuStart documents) to the EDFINA office and to have Forêt participate in the conference call. (**Exhibit 64**, EDF 1032-33; Nadal Tr. 377:17-380:21).  Nadal copied his e-mail to Ponasso and Betouret in Buenos Aires noting that he had requested Gaujacq (1) to meet with him and Forêt to brief them about NuStart, and (2) to gather NuStart documents "to provide to [France] so as to remedy the lack of information they regularly refer to." (**Exhibit 64**, EDF 1032-33).

104.    By e-mail dated July 20, Gaujacq refused to comply with Nadal's instruction to return the documents on the grounds that she did not have time to gather them before leaving on vacation, the EDFINA office was not secure for maintaining them, and the NuStart documents were subject to disclosure restrictions.  She also insisted that Forêt was not authorized to participate in the NuStart conference call on July 13.  (**Exhibit 65**, EDF 1035-37).

105.    Gaujacq  did not go anywhere on her vacation in July 2004.  (Gaujacq Tr. 397:9- 398:6, 432:2-433:7).

106.    The NuStart agreements permit EDFINA and EDF access to all documents concerning the NuStart project including the agreements, and do not in any way restrict access to the documents to Gaujacq personally.  (**Exhibit 66**, EDFINA 1271-1334 (excerpts) (**confidential**); *see also* Nadal Tr. 305:21–307:4, 383:17-384:4).

107.    Gaujacq was responsible for maintaining office security at EDFINA during the time she was serving as President of the company.  (Gaujacq Tr. 380:21-383:2).

**Gaujacq's Complaints About Nadal**

108.    On July 9, Gaujacq e-mailed Ponasso in Buenos Aires, saying that Nadal's delegation of authority to Dreux in his second June 18 letter, and the reduced scope of authority given to herself and to Dreux in his June 18 letter to each of them, was not justified. Gaujacq's e-mail states that "[t]hese facts are discriminatory in regard my position, as compared to the situation of Benoit Dreux." (**Exhibit 67**, EDF 1039).    Gaujacq's July 9 e-mail does not state that the difference between herself and Dreux in respect of their authority was due to her gender.

109.    Gaujacq admits that she complained to Ponasso on July 9 following the audit debriefing call because she thought that during that call Nadal was "alleging wrongdoing" in her administration of EDFINA.  (Gaujacq Tr. 482:7-482:21).  Gaujacq knew about Nadal's second letter to Dreux dated June 18 several days before her July 9 e-mail to Ponasso.  (Gaujacq Tr. 358:13-360:12; *see also* **Exhibit 50** at 4574).

110.    By e-mail to Nadal dated July 22, copied to Ponasso, Gaujacq brought up again his "discriminatory letter" of June 18 to Dreux, and said that he had ordered the audit to embarrass her, that he wanted to attend "[her]" meetings, and that he was looking for illegalities in immigration documents prepared under her supervision.  Gaujacq demanded that Nadal explain his actions, and stated that she would record their conversation if he called her.  (**Exhibit 68**, EDF 1044-45).

111.    Gaujacq's July 22 e-mail reference to "discriminatory letter" pertains to the second June 18 letter to Dreux; Gaujacq's e-mail does not state that the second letter was sent to Dreux and not to her because of her gender.

112.    Nadal responded via e-mail to Gaujacq's e-mail of July 22 stating that he did not share her point of view, or her understanding of the events at issue. Nadal also confirmed that Gaujacq had agreed to continue their discussions at a meeting on August 18 following her vacation. (**Exhibit 68**, EDF 1044-45).

113.    On July 22, Gaujacq e-mailed EDF's Chairman, Roussely, and Chief Operating Officer, Creuzet, in Paris stating that she had decided to "defend [her]self against [Nadal] by filing a complaint before the US authorities" because "[b]eing without any contract as of August 1, 2004 would leave [her] at the mercy of Christian Nadal who would be able, with the stroke of a pen to render [her] presence on the US territory illegal." (**Exhibit 69**, EDF 4580-81).

114.    Gaujacq's July 22, 2004 e-mail did not state that the "complaint" she said she was filing concerned sexual harassment or sex discrimination under US employment laws.

115.    On July 23 Gaujacq spoke by telephone with EDF's Chief Operating Officer, Creuzet, and then with its senior Human Resources officer Yann Laroche in Paris, as well as with Ponasso in Buenos Aires. (Gaujacq Tr. 406:8-411:16, 416:1-3, 417:20-419:9).

116.    Gaujacq told Creuzet on July 23:  "I want my three years expatriation contract. I want a mission letter. I want the company to change the reporting structure so that I do not have to report to Nadal on a daily basis." (**Exhibit 70**, G 2035-37 at 2035). She told Creuzet that EDF had an "easy way" to protect her from Nadal, which was to change her reporting structure. (Gaujacq Tr. 407:19-408:6). Gaujacq's notes reflect that Creuzet told her that "I do not have the time to discuss the differences of views between two managers" and "Your career is dead if you file a claim." (**Exhibit 70**, G 2035-38 at 2035; Gaujacq Tr. 415:13-

16). Gaujacq's notes do not say that the "claim" she raised to Creuzet was a claim under the US antidiscrimination laws.

117.    Gaujacq testified that, in her conversation with Laroche on July 23, she told him about her conversation with Creuzet. Laroche understood from this telephone conversation that Gaujacq "did not wish to return to France, and in the process she was endeavoring to . . . blackmail us." (Laroche Tr. 88:13-16; Laroche Decl. ¶¶ 31-35). Gaujacq said nothing in this conversation that indicated that she had asserted a claim of sex discrimination or sexual harassment against Nadal. (Laroche Decl. ¶¶ 31-35).

118.    In her telephone conversation with Ponasso on July 23, Gaujacq continued to insist that EDF change the reporting structure so that she could remain in the United States under a new three-year expatriation contract without reporting to Nadal.    She refused Ponasso's suggestion that she come to Buenos Aires to discuss the matter. (Gaujacq Tr. 419:1-8; **Exhibit 71**, EDF 1046).

119.    Ponasso's e-mail report of this conversation to Creuzet repeats Gaujacq's requests and says that Gaujacq "was clearly upset and hurt" that Nadal had excluded her from the checking accounts.  Ponasso's report does not state or imply that Gaujacq had accused Nadal of discriminating against her based upon her gender.  (**Exhibit 71**, EDF 1046).

120.    By e-mail dated July 25 to Creuzet, Laroche and Ponasso (in English), Gaujacq stated again that she would take unspecified "legal action" in the United States unless EDF took the following actions by July 27: (1)  sign a three-year expatriation contract by July 31, allowing her to remain in the United States, (2) provide that she have no direct reporting relationship to Nadal, (3) sign the mission letter, which she had previously proposed, (4) have

EDFINA overrule Nadal's change in her check-signing authority and Nadal's June 18, 2004 letter, and (5) pay her attorneys' fees. (**Exhibit 72**, EDF 1047A-50; Gaujacq Tr. 420:12-422:15).

121.    On July 26 Ponasso's aide, Betouret, wrote a an analysis of the matter captioned "Gaujacq-Nadal Situation July 2004," expressing his understanding that the "very bad relationship" that had existed between Gaujacq and Nadal before June 1 had worsened thereafter "due either to a total absence of communication, or by only formal communication (e-mails, letters…) based on suspicion and reciprocal hostility." Betouret further addressed Gaujacq's "independent behavior" regarding the NuStart project, noting "she behaved as if it was her personal project." (**Exhibit 72**, EDF 4588-89). Betouret's memorandum gives no indication of awareness on his part that Gaujacq had complained at any time that Nadal had discriminated against her or harassed her because of her sex.

122.    On July 27 EDF decided, with the advice of its counsel in France, to rely upon the Gaujacq Expatriation Contract, which expired by its terms on July 31, and to require Gaujacq to return to France for a new assignment after that date. (Laroche Decl. ¶¶ 38-39; **Exhibit 73**, EDF 4588-89).

123.    By letter dated July 27, Creuzet notified Gaujacq that her overseas assignment was terminated effective August 1, but that she would have an additional three months, with the full expatriation remuneration package, to organize her affairs to return to France.    In the same letter, EDF advised Gaujacq that her new position would be in the Energy Branch in France, which she should continue to discuss with Lescoeur, the head of the Energy Branch in France. (**Exhibit 74**, EDF 1052).

124.    On July 27, Lescoeur called Gaujacq from Paris to urge her to accept the EPR project in France as her next assignment.    Lescoeur told Gaujacq, according to her

notes, that "I want you on the EPR project in France", and that "A company can remove its Directors and Officers in a subsidiary at any time. It's its privilege. There is nothing illegal in these decisions." Lescoeur also told Gaujacq that he did not know about her situation "but it's a dispute between two managers" and that she should not "take a decision against the company too quickly." (**Exhibit 75**, G600-01; Gaujacq Tr. 426:8-430:8).

125.    On August 3, 2004, Gaujacq sought direction from Nadal and Ponasso as to whether she would continue to represent EDF's and EDFINA's interests at a number of meetings and conference calls, including NuStart meetings, and was informed by Nadal that she should not attend those events. (**Exhibit 76**, EDFINA 876; **Exhibit 77**, EDF 1101A-02; **Exhibit 95**, EDF 1073).

### Gaujacq Files Her EEOC Charge

126.    Gaujacq filed a charge of discrimination and retaliation with the EEOC on July 30, naming EDF and EDFINA as respondents. (Complaint ¶ 43). Gaujacq filed an amended charge that the EEOC received on August 6, 2004. (**Exhibit 78**, EDFINA 4756-67 (excerpt).

127.    Until August 6, neither EDF, nor Nadal and EDFINA, knew that Gaujacq had asserted a complaint of sex discrimination or sexual harassment under US employment laws. (Laroche Tr. 92:17-19; De Botherel Tr. 186: 4-187:3, 221:13- 222:14; *see also* Laroche Decl. ¶¶ 34-35; Nadal Decl. ¶ 57).

### The EPR Assignment

128.    EDF appointed Gaujacq, effective August 1, 2004, to the position of "Chargée de Mission" (Mission Representative) reporting to the Director of Nuclear Generation in the Energy Branch. (**Exhibit 79**, EDF 007). Lescoeur told her that he was proposing that her

assignment be on the "preparation of the commercial operation of the EPR project." (**Exhibit 75**, G 600).

129.    By letter dated September 24, 2004, Laurent Stricker, the Director of EDF's Nuclear Division in France, provided Gaujacq with a mission statement for her new position with the Energy Branch in which she would be in charge of the strategic leadership of the EPR project. (**Exhibit 80**, EDF 1120-22).

130.    The base salary offered with the new position offered Gaujacq was E100,800 annually, which was higher than Gaujacq's last base salary as Director during her expatriate assignment in Washington.    (**Exhibit 81**, G0063-64; **Exhibit 80**, EDF 1120-22; **Exhibit 94**, EDF 4679).

131.    After learning of Gaujacq's EEOC charge, EDF continued to urge her to accept the new assignment as head of the EPR project. (**Exhibit 82**, G578; **Exhibit 83**, EDF 1147-48; *see also* Laroche Tr. 91:19-24).

132.    EDF selected Gaujacq to head the EPR project based on her experience in the nuclear field and her knowledge of the international environment concerning nuclear energy, and considered the job a positive career step for her.    (De Botherel Tr. 124:1-9, 132:9-133:5, 208:15-209:11; 140:5–142:5).

133.    From EDFs standpoint, the EPR project was a "very major project" and considered "extremely interesting" and "very necessary" in light of the French government's decision to launch the project, which has since been launched on a European scale and worldwide. (Laroche Tr.  89:25-90:3, 91:12 – 24; De Botherel Tr. 132:14-22).

134.    Gaujacq testified that the EPR project was important to EDF, though she said it was not important to herself. (Gaujacq Tr. 428: 10-14).

135.    In October, Gaujacq refused to accept the EPR position.  (**Exhibit 84**, EDF 1129-31; **Exhibit 85**, EDF 1160-64).

136.    Instead, by e-mail dated October 28, Gaujacq told Lescoeur to contact her lawyer in France to reach a settlement.  (**Exhibit 85**, EDF 1160-64).

137.    Gaujacq failed to report to take up her new position in France on November 2, or thereafter.  (Gaujacq Tr. 543:14-544:9; De Botherel Tr. 133:12-134:5; Laroche Tr. 96:22-97:19).

138.    The EPR job was filled by another EDF executive, whose pay rank, like Gaujacq's, was "R-3." (De Botherel Tr. 129:21-132:8).

**Gaujacq's Employment Termination**

139.    Gaujacq's failure to present herself to take up her new post in France on November 2 was ground for dismissal under French law.  (Laroche Decl. ¶ 41).  By letter dated November 26, EDF notified Gaujacq to attend a pre-termination interview in Paris on December 10 pursuant to EDF procedures established under French law.  (**Exhibit 86**, EDF 1170).

140.    Gaujacq appeared for her pre-termination interview in Paris on December 10,  where she read a prepared statement which, asserted that she had refused the EPR job for a number of reasons (because she claimed she had the right, under EDF internal guidelines for expatriate assignments, to six months' notice of the termination of such an assignment; the right to remain in the US, because EDF had promised her a three-year extension of her assignment in the US; because her departure from the US was not in the company's interest, etc.). (De Botherel Tr. 182:1- 184:2).  Gaujacq further asserted that she had been the victim of "discrimination and moral harassment" on the part of Nadal.  (**Exhibit 87**, EDF 1176-

79).    After Gaujacq read her statement, Bouron asked her questions, which she refused to answer.  (De Botherel Tr. at 183:10-184:2).

141.    Gaujacq's employment was terminated effective January 7, 2005 due to "faute grave" (grave fault).  (**Exhibit 88**, EDF 1186-87; Laroche Decl. ¶ 41).

142.    Gaujacq was paid by EDF her full salary and expatriation benefits through January 7, 2005.  (Gaujacq Tr.  435:14-16; De Botherel Decl. ¶ 45).

**Gaujacq's New Job at ENTERGY**

143.    During August 2004, Gaujacq's application for permanent resident status in the US was approved.  (Gaujacq Tr. 8:17-18).

144.    Gaujacq began looking for employment in October 2004.   (Gaujacq Tr. 436:5-437:2).

145.    Gaujacq was offered a job at ENTERGY Operations, Inc. as Director, Strategic Programs on March 1, 2005.  She started working at ENTERGY on April 1, 2005.  (Gaujacq Tr. 627:2-18).

146.    Gaujacq supervises 170 people in her position at Entergy.   (Gaujacq Tr. 595:7-9).

147.    ENTERGY is in the nuclear power business and is a member of the NuStart consortium.   (**Exhibit 89**, excerpts from ENTERGY's website, www.entergy.com; **Exhibit 90**, G1369-71).

**Facts Pertaining To Plaintiff's Equal Pay Act Claim**

148.    EDF has a grade level ranking system for all its French employees throughout its workforce, which is governed, in part, by a French statute that applies to French

employees of EDF.  (De Botherel Decl. ¶ 5 & Ex. A thereto).  Ranks 1 through 20 are established and regulated by French statute.  (De Botherel Decl. ¶ 6).

149.    Executives are classified pursuant to EDF's Executive Compensation Policy ("La politique de rémunération des cadres dirigeants" (EDF's Executive Compensation Policy).  (**Exhibit 91**, EDF 4447-62; De Botherel Decl. ¶ 6).

150.    EDF's executive ranking system goes from "R-1" (which is the highest possible rank) to "R-4."  (De Botherel Decl. ¶ 11).

151.    In 2004, when Nadal was appointed to Washington, he was at the highest echelon in the company, "R-1," and Gaujacq was an "R-3," two ranks lower. (De Botherel Decl. ¶ 11).

152.     In 2004 there were only 50 people out of all of EDF's French employees with the rank of "R-1." Approximately 350 were ranked "R-3."  (De Botherel Decl. ¶¶ 12-13; De Botherel Tr. 33:21- 34:3, 48:18-49:8, 73:15-18).

153.    Executive salaries are determined according to the executive's classification. Salary ranges for the base salaries of executives in ranks "R-1" to "R-3" are determined annually by EDF's Executive Committee.  (De Botherel Decl. ¶ 17).  In 2004, the salaries for Gaujacq and Nadal were within the ranges for their respective ranks.  (**Exhibit 92**, EDF 4463-64; De Botherel Decl. ¶¶ 17-19).

154.    EDF has maintained a pay grade ranking system throughout the time that Gaujacq was employed by EDF (1980-2005). (De Botherel Decl. ¶10). The current denominations of the EDF executive ranking system became effective in 2000. (De Botherel Tr. 117:9-118:7; De Botherel Decl. ¶¶ 11, 14).

155.     During her employment with EDF Gaujacq rose steadily in pay grade rank, starting at the statutory grade 10 for engineers and reaching her first management position in 1994, when she was appointed to manage EDF's nuclear power plant in Penly, France.  This was not an executive position.  (De Botherel Decl. ¶¶ 23-24; **Exhibit 12**, EDF 4673-74; **Exhibit 16**, EDF 041).

156.     Gaujacq was promoted to the executive level, with the rank ultimately denominated "R-3" in August 2000 when EDF appointed her to her expatriate position in Washington.  (De Botherel Decl. ¶ 25).

157.     Gaujacq's base salary in August 2000 when she began her assignment in Washington was 39,313 French francs per month.  **(Exhibit 15** at 440-44).  EDF's pay records reflect that Gaujacq was paid as "Déléguée Générale (Delegate General) from August 1, 2000 to July 31, 2002 and as "Directeur" (Director) from August 1, 2002 to July 31, 2004.  She was never paid as "President" of EDFINA.  (De Botherel Decl. ¶28 & Ex. E attached thereto).

158.     When Gaujacq's position was changed on August 1, 2002 to "Directeur" (Director), her base monthly salary did not change.  When Gaujacq resigned the title of President of EDFINA and assumed the title of Vice President on May 31, 2004, EDF similarly did not change Gaujacq's compensation as a result.  (De Botherel Decl. ¶¶27-29 & Exhibit E attached thereto).

159.     On July 26, 2004 EDF notified Gaujacq that her base salary was increased effective July 1, 2004.  (**Exhibit 93**, EDF 4679).

160.     As of July 1, 2004 Gaujacq's base salary was € 7330 per month.  This amount was within the salary range then in effect for executives within the rank "R-3."  (De Botherel Decl. ¶ 18; **Exhibit 92**, EDF 4463-64; **Exhibit 93**, EDF 4679).

161.     Nadal's base salary as of July 1, 2004 was € 13,050[6] per month, which was within the salary ranges for executives within the rank of "R-1." (De Botherel Decl. ¶ 19; **Exhibit 30**, EDF 705 **(confidential)**; **Exhibit 92,** EDF 4463-64).

162.     Nadal negotiated the terms and compensation of his expatriation contract with EDF officials in Paris.  (Nadal Decl. ¶ 11, Nadal Tr. 170:11-21).

**Facts Pertaining To Gaujacq's Tortious Interference Claim**

163.     French law requires an employer to provide a departing employee with a "Certificat de Travail" (work certificate) setting forth certain information about the employee's work history with the employer.  (Complaint ¶¶ 187, 188).

164.     EDF initially provided Gaujacq with a work certificate that did not contain all of the information concerning her career with the company.  Gaujacq complained that the work certificate was "false," and in response to her complaint, EDF provided a replacement work certificate.  (De Botherel Decl. ¶ 48; EDF 249-250; EDF 231-32).

165.     Gaujacq made no complaint concerning the replacement work certificate.

**Facts Pertaining to Gaujacq's Breach of Contract Claim**

166.     EDF provides employees with a statement of policies generally applicable to overseas assignments (commonly referred to as "expatriate" assignments) titled Guide de gestion des agents travaillant a l'étranger" ("Management Guide for Representatives Working Abroad," hereafter the "Guide").  The Guide suggests that "it is appropriate" for home management in France to have an "evaluative discussion" with an employee "if possible annually, at the latest six months" before the employee's return to France.  (**Exhibit 94**; EDF 1289- 1385 (excerpts); De Botherel Decl. ¶ 40).

---

[6] At the exchange rate prevailing in July 2004, € 13,050  was $15,918.40 .

167.     The Guide states that EDF may in its discretion terminate an expatriate assignment "at any time" "if the interest of EDF requires it or for any other justifiable reason." (**Exhibit 94**; EDF 1289- 1385 (excerpts); De Botherel Decl. ¶ 41).

HOGUET NEWMAN & REGAL, LLP

By:     _____/s/_____
         Laura B. Hoguet *(D.C. Bar No. 200915)*
         Dorothea W. Regal *(D.C. Bar No. NY0064)*
         Randi S. May *(D.C. Bar No. NY0063)*

         10 East 40th Street
         New York, New York 10016

         *Attorneys for Defendants*
         *Electricité de France, S.A. and Electricité de France*
         *International North America, Inc.*

Of Counsel:
Kathleen L. Lowden

By:     _____/s/_____
         Morgan D. Hodgson *(D.C. Bar No. 186528)*
         David A. Clark *(D.C. Bar No. 473279)*
         1330 Connecticut Avenue, N.W.
         Washington, D.C. 20036
         (202) 429-3000

         *Attorneys for Defendant Christian Nadal*