# DECLARATION OF YANN LAROCHE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CATHERINE GAUJACQ,

        Plaintiff,

        v.

ELECTRICITE DE FRANCE
INTERNATIONAL NORTH AMERICA,
INC.,ELECTRICITE DE FRANCE, S.A. and
CHRISTIAN NADAL,

        Defendants,

Civil Action No. C5-969 (JGP)

**DECLARATION DE
YANN LAROCHE**

**YANN LAROCHE**,  par la présente, sous peine de perjure en vertu de la loi des Etats-Unis, en accord avec le titre 28 du U.S. Code, Section 1746 (28 U.S.C. Section 1746), ce qui suit :

       1.    Je suis le directeur-adjoint de la société défenderesse, Electricité de France, S.A. (« EDF »), en seconde position à la direction d'EDF. J'exerce mes fonctions au siège social d'EDF à Paris, en France.  Je suis membre du Comité exécutif d'EDF (« COMEX ») depuis 2001. En 2003 et 2004, j'ai exercé les fonctions de Directeur des ressources humaines et de la communication et à ce titre, j'étais en charge, entre autres, de gérer les questions de ressources humaines pour les hauts cadres dirigeants de l'entreprise. Je travaille à EDF depuis 1968. J'ai une connaissance directe des faits ici rapportés.

       2.    Je fais cette déclaration à l'appui de la motion en jugement sommaire déposée par EDF et par la société défenderesse, Electricité de France International North

America, Inc. (« EDFINA »), afin de rejeter la requête de la plaignante, Catherine Gaujacq (« Gaujacq »).

3.    EDF est une entreprise de production énergétique française dont le siège social se trouve à Paris, en France.  Entreprise publique jusqu'en novembre 2004, EDF est par la suite devenue une société privée. Cette « société anonyme », détenue par l'Etat français, a ouvert en 2005 une partie de son capital au public et elle est entrée sur le marché financier mondial.

4.    EDF a des filiales et des sociétés affiliées dans un grand nombre de pays en dehors de la France.  EDF envoie fréquemment ses employés en mission à l'étranger dans le but de mettre en œuvre ses objectifs stratégiques et ses plans de développement dans les pays en question.

### Le poste de Gaujacq à Washington

5.    EDF a envoyé Gaujacq aux Etats-Unis en 2000 pour diriger son bureau de représentation à Washington D.C. Il s'agissait en fait d'une filiale d'EDF, du nom d'EDFINA.

6.    En 2000, EDFINA n'était pas considérée comme une filiale d'une grande importance pour EDF : entreprise non commerciale, EDFINA ne produisait aucun revenu et jouait plutôt le rôle d'un bureau de représentation d'EDF à Washington.

7.    In 2000, EDF s'intéressait aux développements nucléaires potentiels dans l'industrie énergétique américaine ainsi qu'à certaines initiatives prometteuses prises par le gouvernement américain dans le but de revigorer l'industrie nucléaire aux Etats-Unis. Le but d'EDF était d'étudier les développements en cours en matière d'énergie aux Etats-Unis, de renforcer sa réputation d'expert en matière nucléaire au sein de la communauté de l'industrie énergétique américaine et de se positionner en vue d'une éventuelle participation commerciale dans le domaine nucléaire aux Etats-Unis.

8.    Gaujacq avait une expérience significative et était hautement qualifiée dans

le domaine de l'énergie nucléaire. Elle avait été, plusieurs années durant, à la tête de l'une des centrales d'énergie nucléaire d'EDF, située en France. De fait, elle était la première femme en France à avoir jamais dirigé une centrale nucléaire. En raison de son expérience dans le domaine nucléaire et de son renom en tant que première femme en France à avoir dirigé une centrale nucléaire, Gaujacq semblait parfaitement convenir aux objectifs d'EDF de l'époque.

9.       Au moment de sa nomination au poste de Washington, Gaujacq a été classée au grade « R-3 » dans le système de classement d'EDF pour ses cadres dirigeants, grade situé deux échelons au-dessous du plus haut grade pour les employés en question, celui de « R-1 ».

10.      La nomination de Gaujacq à Washington portait sur un mandat de trois ans, qui a été étendu à quatre. Suivant le cours normal des choses, EDF avait l'intention d'envoyer quelqu'un d'autre pour diriger sa délégation à Washington, une fois le mandat de Gaujacq arrivé à son terme (voire plus tôt si cela était justifié par les besoins de la société).

### La nomination de Nadal par EDF

11.      A la fin de l'année 2003, les objectifs stratégiques ainsi que les plans de développement d'EDF à l'égard des Etats-Unis avaient évolué.  Entité autrefois détenue par l'Etat français, EDF était en train de devenir une société privée, qui allait bientôt faire l'objet d'une offre publique initiale (OPI) sur le marché financier. La privatisation ouvrait  la possibilité pour EDF d'être un acteur commercial sur le marché mondial de l'énergie, et notamment aux Etats-Unis. En outre, le climat politique mondial sur les questions d'énergie était en plein évolution et devenait de plus en plus complexe. L'énergie nucléaire, domaine dans lequel EDF jouait un rôle de premier plan dans le monde, était devenue un problème politique d'une grande importance au niveau global.

12.      EDF souhaitait accroître sa présence aux Etats-Unis, conclure des

opérations lucratives avec des investisseurs de Wall Street et essayer de former des associations commerciales profitables avec de potentiels partenaires dans le domaine énergétique, implantés aux Etats-Unis. EDF souhaitait envoyer à Washington un cadre dirigeant du plus haut niveau en qualité d' « ambassadeur ». Cette personne aurait le sens de la diplomatie, le savoir-faire ainsi que l'expertise nécessaires pour faire face aux problèmes stratégiques, financiers et politiques qu'impliquait, selon nous, l'accomplissement de nos objectifs aux Etats-Unis.

13.    Par conséquent, EDF recherchait quelqu'un pour diriger l'équipe de Washington D.C., une personne qui aurait la stature et les compétences requises pour mettre EDF en bonne place pour son OPI, dotée d'une expérience significative dans le domaine de la finance, du marketing et de la stratégie, et qui établirait de bonnes relations avec les cadres supérieurs et les hauts dirigeants des banques d'investissement. Par ailleurs, pour ce qui est des objectifs commerciaux d'EDF, nous voulions quelqu'un qui ait la stature, les compétences et l'expérience commerciale nécessaires pour rechercher et négocier des marchés avec de potentiels partenaires américains. S'agissant enfin des questions politiques mondiales qui traversent le domaine de l'énergie et l'activité d'EDF, notre société voulait un représentant à Washington dans le but d'établir et de maintenir des contacts avec les décideurs de la sphère politique ou de celle des affaires, et de jouer le rôle d' « ambassadeur » d'EDF.

14.    Compte tenu de l'importance de cette nouvelle mission, EDF souhaitait y placer un haut cadre dirigeant, avec le grade le plus élevé du classement des cadres, celui de R-1, montrant ainsi au marché américain l'importance qu'EDF accordait à sa nouvelle mission.

15.    EDF décida que son choix se porterait sur Christian Nadal (« Nadal ») qui succèderait donc à Gaujacq à la direction de l'équipe basée à Washington. Celui-ci disposait des compétences, de la stature, de l'expérience, de la formation commerciale et du grade qu'EDF exigeait pour mettre en œuvre ses nouveaux objectifs stratégiques ainsi que ses plans de

développement aux Etats-Unis. Cette décision a été prise par le PDG d'EDF, François Roussely, et ce, à la suite d'une consultation du Comité exécutif.

16.     A l'époque, Nadal était un haut cadre dirigeant, situé au plus haut niveau du classement des cadres d'EDF, c'est-à-dire au grade R-1. Il avait été membre du Comité Exécutif d'EDF pendant de nombreuses années ; il avait exercé les fonctions de PDG d'EDENOR, une grosse société commerciale énergétique établie en Argentine, à Buenos Aires, et dont EDF était actionnaire; en outre, il avait acquis à EDF une grande expérience en matière financière et stratégique, et avait l'habitude de travailler aussi bien avec les hauts fonctionnaires d'Etat qu'avec les hommes d'affaires étrangers de premier plan.

17.     Nadal a été nommé Délégué Général d'EDF pour l'Amérique du Nord, à compter du 1er janvier 2004.

### Le poste de Gaujacq après la nomination de Nadal

18.     Les projets et les objectifs d'EDF évoluent sans cesse en fonction du climat économique, financier et politique. Par conséquent, il arrive parfois qu'une filiale d'EDF, d'importance secondaire à un moment donné, devienne par la suite extrêmement importante. Dans de telles circonstances, EDF a coutume d'envoyer un employé d'un plus haut niveau pour reprendre la direction de la filiale, comme cela a été le cas pour Nadal et Gaujacq. Dans ces circonstances, il n'est pas rare que l'ancien directeur de la filiale devienne l'adjoint du cadre supérieur nouvellement nommé. C'est une éventualité qu'EDF avait envisagée pour Gaujacq lors de la nomination de Nadal. Cela ne s'est toutefois pas produit à cause du refus de Gaujacq.

19.     A la suite de la nomination de Nadal, mais avant sa mutation à Washington, EDF a discuté avec Gaujacq de la nature de sa future mission. Celle-ci a exprimé le désir de rester aux Etats-Unis et nous avons fait tout notre possible pour lui trouver une mission qui lui permettrait d'y demeurer.

20.    En mars 2004, Gaujacq a envoyé une proposition à Gérard Creuzet, alors Directeur Général Opérations d'EDF à Paris, proposition que celui-ci m'a fait suivre pour avoir mon avis. La proposition de Gaujacq se présentait sous la forme d'un projet de nouveau contrat d'expatriation. Cela ne correspondait pas du tout à la procédure ordinaire. Normalement, lorsque la mission d'un employé touche à sa fin, EDF détermine quel poste il serait souhaitable que l'employé occupe au vu des besoins de la société et de l'évolution future de l'employé en question. EDF prend ensuite sa décision finale en tenant compte, dans une certaine mesure, des désirs de l'employé. Ensuite, une fois que la décision est prise, l'autorité d'EDF responsable en la matière procède à une nomination officielle, et enfin, un contrat est rédigé et signé. En outre, je n'aurais normalement pas été du tout impliqué dans l'affectation des employés de niveau R-3, tel que Gaujacq. La seule raison pour laquelle je me suis retrouvé partie dans cette affaire tient au fait que c'est à cause de la nomination de Nadal (un R-1) qu'il a fallu réassigner Gaujacq ; cela est également dû au fait que Gaujacq a contourné ses supérieurs hiérarchiques (Fernando Ponasso, directeur de la Branche Amériques d'EDF) pour traiter directement avec Creuzet à Paris.

21.    La proposition de Gaujacq consistait dans une nouvelle mission d'expatriée aux Etats-Unis pour trois années supplémentaires, pendant lesquelles elle occuperait le poste de directrice du projet nucléaire d'EDFINA mais ne serait pas sous l'autorité d'EDFINA. A la place, elle proposait d'être sous la double autorité du Directeur d'EDF Branche Amériques (contournant ainsi EDFINA) et du Directeur de la Branche Energie d'EDF, établie en France.

22.    J'ai transmis la proposition de Gaujacq à François Métais, qui, en tant que directeur de la Délégation aux cadres dirigeants (« DELCADIR »), était alors chargé de l'évolution de carrière des cadres dirigeants, et ce afin que DELCADIR puisse l'examiner et émettre un avis.    La réponse de DELCADIR était que certains des termes de la proposition

pouvaient être admissibles si nous tenions à accepter sa proposition; en revanche, il faudrait faire valider par d'autres personnes la proposition selon laquelle Gaujacq serait à la fois sous l'autorité du directeur de la Branche Amériques et de celle du directeur de la Branche Energie. Cette réponse est exposée dans un email qui m'a été adressé par Métais le 31 mars 2004 et dont une copie figure en **Annexe A,** ci-jointe.

23.    Le fait d'avoir, comme Gaujacq le proposait, un employé d'une filiale qui ne soit pas sous l'autorité de la filiale en question, posait un problème à EDF car cela n'était pas cohérent avec notre organisation.

24.    Métais proposa alors une autre structure pour éviter ce problème d'autorité hiérarchique. Il proposa une affectation qui ne la ferait dépendre que de la branche Energie, en France, en dehors de la structure d'EDFINA et de la Branche Amériques. Tout en étant en poste dans la Branche Energie, en France, elle serait affectée au projet nucléaire aux Etats-Unis. La proposition de Métais est exposée dans un email en date du 6 avril 2004 qui m'est adressé ainsi qu'à d'autres dirigeants d'EDF, et dont une copie figure en **Annexe B**, ci-jointe.  Creuzet a transmis cette proposition à Gaujacq.  Une copie de son email en date du 7 avril 2004 figure en **Annexe C,** ci-jointe.

25.    Cependant, cette proposition n'a jamais abouti dans les faits à une affectation, car elle était inacceptable pour Gaujacq autant que pour Nadal.  Elle était inacceptable pour Gaujacq parce que celle-ci tenait à conserver son statut de cadre d'EDFINA tout en étant sous l'autorité d'une autre branche (cf. Annexe C). Elle était inacceptable pour Nadal parce que, dans la mesure où, comme il l'indiqua à Métais, le projet nucléaire étant l'une des activités principales de la délégation de Washington, on ne pouvait pas accepter que Gaujacq continue d'être responsable de ce projet tout en étant sous l'autorité de la Branche Energie, en dehors de la structure d'EDFINA.

26.     Le Comité Exécutif (« COMEX ») s'est chargé de répondre au problème en avril 2004. COMEX, dont je faisais partie, a conclu que Gaujacq pouvait être sous l'autorité de la Branche Energie sur le plan fonctionnel mais qu'elle devait être sous l'autorité de Nadal sur le plan opérationnel.

27.     Entre-temps, Gaujacq avait été dirigée vers Bruno Lescoeur, Directeur de la Branche Energie d'EDF, pour discuter de sa mission. Lorsqu'elle rencontra Lescoeur en France en mai 2004, EDF avait déjà décidé qu'il serait préférable de nommer Gaujacq à un nouveau poste nucléaire de haut niveau, en France. Lescoeur informa Gaujacq qu'EDF souhaitait qu'elle rentre en France pour être à la tête d'une nouvelle initiative importante pour EDF, dans le domaine de l'énergie nucléaire : la mise en oeuvre de l'introduction en France des Réacteurs Pressurisés Européens (« EPR »). Il s'agissait là d'un important projet pour EDF, important en ce qui concernait l'évolution future de la production nucléaire au sein d'EDF.

28.     Cependant, Gaujacq insistait toujours pour rester aux Etats-Unis sans être sous l'autorité de Nadal et soutenait que Creuzet lui avait promis que cela était possible. Tel n'était pas le cas. EDF ne s'était pas engagée de la sorte auprès de Gaujacq et n'avait conclu avec elle aucun contrat au sujet de sa future mission. Tout du long, depuis le moment où Gaujacq avait envoyé sa proposition à Creuzet en mars 2004, EDF s'entretenait avec elle sur les différentes possibilités pour sa mission suivante et faisait tout son possible pour satisfaire ses désirs tout en répondant aux besoins et aux intérêts de la société. EDF lui proposa également de participer à un projet à Londres, qu'elle a là encore refusé.

29.     Le Président Directeur Général, M.Roussely, a définitivement résolu la question à la fin du mois de mai. Il a décidé que si Gaujacq voulait rester aux Etats-Unis, celle-ci devrait être sous la seule autorité opérationnelle de Nadal et qu'autrement, elle devait rentrer en France. Cette décision est exposée dans un email d'Igor Czerny (l'adjoint du PDG Roussely) en

date du 25 mai 2004, et dont une copie figure en **Annexe D**, ci-jointe.

**La plainte de Gaujacq**

30.    Dans un email envoyé en juillet 2004 au Président Directeur Général, M. Roussely, et au Directeur Général Opérations, M. Creuzet, Gaujacq s'est plainte du fait qu'EDF n'avait pas respecté son « engagement de principe » s'agissant de sa mission à Washington. Elle soutenait que Nadal avait pris des mesures « discriminatoires » contre elle, qu'elle avait décidé d'intenter une action auprès les « autorités américaines » et que cette plainte aurait des « effets négatifs » sur la participation d'EDFINA dans le projet nucléaire aux Etats-Unis. Elle exigeait qu'EDF signe le contrat qu'elle lui avait proposé et que la société avait définitivement rejeté dans la décision du Président Directeur Général, Roussely, comme cela a été précédemment évoqué. Une copie de l'email de Gaujacq à MM. Roussely et Creuzet figure en **Annexe E**, ci-jointe.

31.    Le lendemain, le 23 juillet 2004, j'ai parlé à Gaujacq au téléphone, et ce, à la demande de Creuzet. C'était la première fois que je parlais à Gaujacq. Au cours de notre entretien, Gaujacq a menacé de porter plainte auprès des autorités américaines si EDF ne signait pas le contrat d'expatriation proposé, lequel lui permettait de rester à Washington sans pour autant faire partie d'EDFINA ni être sous l'autorité de Nadal, ce qui avait déjà été rejeté par le Président Directeur Général, M. Roussely. Elle a également indiqué que Creuzet l'avait « menacée » en lui disant que si elle continuait de rejeter les affectations qu'EDF lui proposait, sa carrière était en jeu.  Bien que je ne puisse pas me prononcer sur la teneur de la conversation qui a eu lieu entre Gaujacq et Creuzet, je doute fort que Creuzet ait proféré quelque menace que ce soit. Toutefois, EDF est parfaitement en droit de mettre fin à l'emploi d'une personne qui refuse d'accepter le poste que nous souhaitons qu'elle occupe, surtout lorsque le poste en question est adapté à la carrière de l'employé, comme c'était le cas pour toutes les propositions faites par EDF à Gaujacq.

32.    J'ai essayé, au cours de notre entretien, de convaincre Gaujacq d'accepter le poste de direction du projet EPR en France que Lescoeur lui avait proposé. Je lui ai dit que c'était un excellent poste dans le domaine de la génération nucléaire, d'un grand intérêt, et qui convenait parfaitement à Gaujacq. Le poste en question est depuis occupé par une autre personne et le projet avance de manière remarquée en Europe et dans le monde entier. Gaujacq, toutefois, ne voulais pas entendre parler d'un retour en France et continuait d'exiger qu'EDF accepte sa proposition, déjà rejetée.

33.    J'ai estimé que Gaujacq était en train d'essayer de « faire du chantage » à EDF, dans la mesure où elle a dit que si nous n'acceptions pas ses conditions, elle allait porter plainte ou poursuivre la société. Elle menaçait de porter plainte pour essayer d'obtenir le poste qu'elle voulait.

34.    Au cours de notre conversation, Gaujacq n'a jamais fait mention d'une quelconque forme de « discrimination » ni d'un quelconque « harcèlement sexuel ». Je n'avais aucune idée que la plainte que Gaujacq menaçait de déposer auprès des « autorités américaines » serait une plainte pour discrimination sexuelle ou pour harcèlement sexuel en application du droit américain.

35.    C'est seulement lorsque EDF a reçu une copie de la plainte déposée auprès de la *United States Equal Employment Opportunity Commission* (« EEOC ») que j'ai appris que Gaujacq portait plainte pour discrimination sexuelle et harcèlement sexuel en application du droit américain. Autant que je sache, aucun des cadres dirigeants qui ont été impliqués dans l'affaire de la mission de Gaujacq ne savait non plus qu'elle se plaignait de discrimination sexuelle ou de harcèlement sexuel, du fait que le sujet n'a jamais été abordé avant réception de la plainte déposée auprès de l'EEOC.

36.    Dans une lettre écrite en anglais et envoyée le 25 juillet 2004 à Creuzet, à

Ponasso et à moi-même, Gaujacq a de nouveau exigé qu'EDF signe la proposition déjà refusée par le passé. Celle-ci consistait dans un contrat d'une durée de trois ans chez EDFINA, mais non sous l'autorité de Nadal. Gaujacq exigeait également qu'EDF paie ses frais d'avocats. Une copie de la lettre en question figure en **Annexe F**, ci-jointe.  Dans la lettre du 25 juillet, Gaujacq se plaignait du fait que Nadal avait eu à son égard un « comportement méprisant, discriminatoire et illégal », mais encore une fois, rien ne laissait penser qu'elle se plaignait de discrimination ni de harcèlement sexuels.

37.    EDF estimait que le problème entre Gaujacq et Nadal relevait simplement d'un malentendu entre deux directeurs concernant leurs responsabilités respectives. EDF a transmis l'email de Gaujacq du 22 juillet 2004, ainsi que la lettre du 25 juillet 2004 évoquée plus haut, à Jean-Louis Betouret, chargé des ressources humaines pour la Branche Amériques, afin que ce dernier enquête au sujet de la plainte de Gaujacq. Son rapport conclut que la controverse entre Gaujacq et Nadal était fondée sur « une hostilité réciproque ». Le rapport de Betouret, en date du 26 juillet 2004, figure en **Annexe G,** ci-jointe.

38.    EDF n'a pas cédé au « chantage » de Gaujacq et n'a pas fait à celle-ci d'autre proposition pour une mission aux Etats-Unis. Après consultation de son conseil juridique français, EDF a décidé de plutôt invoquer le terme du mandat du contrat d'expatriation de Gaujacq qui était alors en cours et qui est intervenu le 31 juillet 2004, puis de notifier à Gaujacq qu'au-delà de cette date, elle devait rentrer en France pour sa mission suivante.

39.    Par une lettre du 27 juillet 2004 de Creuzet, EDF a envoyé à Gaujacq une notification officielle de résiliation de son affectation à l'étranger, prenant effet le 31 juillet 2004 et lui a donné jusqu'au 1er novembre 2004, soit trois mois supplémentaires, pour préparer son retour en France. Nous l'avons informée qu'EDF lui offrirait un poste adapté dans la Branche Energies, ce dont elle devrait continuer de s'entretenir avec Lescoeur. Une copie de la lettre de

Creuzet à Gaujacq en date du 27 juillet figure en **Annexe H,** ci-jointe.

### Le nouveau poste d'affectation de Gaujacq en France

40.     Par une décision prenant effet le 1er août 2004 et mise en oeuvre par Lescoeur, EDF a nommé Gaujacq au poste de Chargée de Mission auprès du Directeur de la Division Production Nucléaire de la Branche Energies en France. Une copie de la décision figure en **Annexe I,** ci-jointe.   Comme nous lui avons expliqué dans un email du 8 septembre 2004, envoyé par Jacques Bouron, alors directeur de DELCADIR, son nouveau poste était classé au grade R-3 dans le système de classement des cadres d'EDF, et donnerait lieu à une hausse du salaire de base par rapport à celui qu'elle recevait à l'époque. Son poste de travail était situé au Cap Ampère, en France. Une copie de l'email de Bouron figure en **Annexe J,** ci-jointe.  Le poste consistait à diriger le projet nucléaire EPR d'EDF en France.

### La mise à la retraite de Gaujacq

41.     Gaujacq a fini par défier les instructions d'EDF. Elle a refusé d'accepter le poste d'EPR où EDF l'avait affectée, elle n'est pas rentrée en France et ne s'est pas présentée pour commencer ses nouvelles fonctions le 1er novembre, une fois écoulés les trois mois. Au vu de ces circonstances, le fait qu'elle soit absente de son poste depuis le 2 novembre est constitutif d'une faute grave et justifie un renvoi conformément aux dispositions de droit français du Statut National du Personnel des Industries Electriques et Gazières. En conséquence, EDF en a conclu que Gaujacq devait être mise à la retraite. Le 6 janvier 2005, nous avons envoyé à Gaujacq une notification officielle de licenciement, dont je suis moi-même l'auteur. Une copie de la notification de mise à la retraite, ainsi que sa traduction anglaise, figurent en **Annexe K**, ci-jointe. En application du droit français, une telle notification entre en vigueur à la date de sa réception, ce qui me semble-t-il, était le 7 janvier 2005.

42.     Le licenciement de Gaujacq a pris la forme d'une « mise à la retraite

13.

d'office », ce qui signifie que celle-ci aura droit à une pension de retraite EDF le jour où elle atteindra l'âge de la retraite, quand bien même elle serait employée par une autre société.

43.  EDF était parfaitement dans son droit en tant qu'employeur et était parfaitement justifiée, au regard des principes, des lois et des réglementations de droit social qui gouvernent EDF, à agir comme elle l'a fait par rapport aux conditions générales du contrat de travail de Gaujacq, à nommer Nadal à Washington, à rappeler Gaujacq en France et à la mettre en retraite d'office à la suite de son refus de se présenter à son nouveau service en France. EDF a parfaitement respecté toutes les lois et les procédures.

44.  Pour l'ensemble de ces raisons, ainsi que pour celles posées dans les autres documents soumis à l'appui de la motion d'EDF et d'EDFINA, je demande humblement à la Cour d'accorder un jugement sommaire, rejetant la demande de Gaujacq.

En date du : **12** octobre 2006
       Paris, France

YANN LAROCHE

# LAROCHE ENGLISH

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

CATHERINE GAUJACQ,

Plaintiff,

v.

ELECTRICITE DE FRANCE
INTERNATIONAL NORTH AMERICA,
INC.,ELECTRICITE DE FRANCE, S.A. and
CHRISTIAN NADAL,

Defendants,

---

Civil Action No. C5-969 (JGP)

**DECLARATION OF**
**YANN LAROCHE**

---

**YANN LAROCHE** hereby declares, under penalty of perjury under the
laws of the United States, in accordance with 28 U.S.C. Section 1746, as follows:

1.    I am a Deputy General Manager of Defendant Electricité de
France, S.A. ("EDF"), second in command of EDF. I work at EDF headquarters in Paris,
France. I have been a member of EDF's Executive Committee ("COMEX") since 2001.
In 2003 and 2004, I was EDF's General Manager of Human Resources and
Communications, responsible for (among other things) managing the human resources
aspects of the company's top executives. I have been with EDF since 1968. I have
personal knowledge of the facts set forth herein.

2.    I make this Declaration in support of the motion of EDF and of
Defendant Electricité de France International North America, Inc. ("EDFINA") for

summary judgment, dismissing the Complaint of Plaintiff Catherine Gaujacq ("Gaujacq").

3.     EDF is a French energy company headquartered in Paris, France. Until November 2004, EDF was a governmental entity.  Then it became a private corporation, a "société anonyme," owned by the Republic of France, and in 2005 it sold a portion of its shares to the public in the global market.

4.     EDF has subsidiaries and affiliates in many other countries outside France.  EDF often sends its employees to other countries on missions intended to implement the strategic goals and business plans of EDF in those countries.

## Gaujacq's Position in Washington

5.     EDF had sent Gaujacq to the United States in 2000 to head its representative office in Washington, D.C., which was an EDF subsidiary called EDFINA.

6.     In 2000, EDFINA was not considered a subsidiary of major importance to EDF. Not a commercial enterprise, EDFINA did not generate any revenue. Rather, EDFINA acted as a representative office for EDF in Washington.

7.     In 2000, EDF was interested in potential nuclear developments in the U.S. energy industry and certain promising initiatives of the U.S. government to reinvigorate the nuclear industry in the United States.  EDF's goal was to study the U.S. energy developments, reinforce its reputation for nuclear expertise within the U.S. energy industry community and position itself for possible business involvement in the nuclear area in the United States.

8.     Gaujacq had substantial experience and was highly qualified in the area of nuclear energy.  She had managed one of EDF's nuclear power plants in France

2

for several years.  In fact, she was the first woman in France to run a nuclear power plant.
Gaujacq's experience in the nuclear field and her reknown as the first woman in France
to run a nuclear power plant made her well-suited for EDF's goal at that time.

9.     When Gaujacq was appointed to the position in Washington, she
was classified at the executive level of "R-3" within EDF's executive ranking system,
which is two grades below the top executive level of "R-1."

10.     Gaujacq's appointment to Washington was for a term of three
years, extended to four years.  In the normal course of events, EDF intended to send
someone else to head its delegation in Washington upon the expiration of Gaujacq's term
(or earlier if the needs of the company should so warrant).

### EDF's Appointment of Nadal

11.     By the end of 2003, EDF's strategic goals and business plans with
respect to the United States had changed.  EDF was changing from a French government
entity to a privately held company, moving toward an Initial Public Offering ("IPO") in
the global market. EDF's privatization offered new potential for EDF to become involved
commercially in the energy market worldwide, including in the United States.  And the
global political climate regarding energy was changing and increasing in complexity,
Nuclear energy, in which EDF is a world leader, had become an important political issue
globally.

12.     EDF wanted to increase its profile in the United States, deal
successfully with Wall Street investors and attempt to enter into beneficial commercial
ventures with potential energy partners in the United States. EDF wanted to send a top-
level executive to Washington as its "ambassador" who would have the diplomacy,

"savoir-faire" and expertise to deal with the strategic, financial and political issues we envisioned would be involved in achieving our new goals in the United States.

13.    Accordingly, EDF wanted someone to lead its delegation in Washington, D.C. with the stature and skill to position EDF most advantageously for its IPO, someone with substantial financial, marketing and strategic experience, as well as someone who could establish relationships with senior management and executives at investment firms and banks.   In addition, concerning EDF's commercial goals, we wanted someone with the stature, skill and business experience to explore and negotiate business deals with potential energy partners in the United States.   And, as regards the global political issues affecting energy and EDF's business, EDF wanted a representative in Washington, D.C. to establish and maintain high-level contacts with U.S. decision-makers in government and business and act as EDF's "ambassador."

14.    Because of the importance of this new mission, EDF wanted to place a top-level senior executive there, at the top executive rank of "R-1," thereby demonstrating to the U.S. market the importance EDF attached to its new mission.

15.    EDF determined that Christian Nadal ("Nadal") was its choice to head its delegation in Washington following Gaujacq.   He had the skills, stature, experience, business background and rank that EDF required to implement its new strategic goals and business plans in the United States.   This decision was made by EDF's Chairman, President and CEO, François Roussely, following consultation with the Executive Committee.

16.    At that time, Nadal was a top-level senior executive, classified at the highest level of EDF's executive ranks, at the level "R-1."   He had been a member of

the Executive Committee of EDF for many years; he had been the CEO of an important and substantial commercial energy company in Buenos Aires, Argentina, called EDENOR, in which EDF owned a part interest; and he had extensive financial and strategic experience at EDF and extensive experience working with high-level governmental officials and business leaders in foreign countries.

17.    Nadal was appointed as EDF's Délégué Général (Delegate General) for North America as of January 1, 2004.

### Gaujacq's Position After Nadal's Appointment

18.    EDF's global missions and goals are constantly evolving in response to the economic, financial and political climate. Accordingly, at times an EDF subsidiary of less significance at one point in time may become extremely significant later. In such situations, it is common for EDF to send a higher-ranking employee to take over running that subsidiary, as it did in the case of Nadal and Gaujacq. In such situations, it is not uncommon for the former head of that subsidiary to become the deputy of the newly appointed senior executive. This was a possibility that EDF thought could have happened with Gaujacq upon the appointment of Nadal. This did not happen in this case due to Gaujacq's refusal.

19.    After Nadal's appointment but before he relocated to Washington, EDF discussed with Gaujacq what her next mission would be. She had expressed her desire to stay in the United States, and we made our best efforts to try to find a mission for her that would enable her to stay in the United States.

20.    In March 2004 Gaujacq sent a proposal to Gérard Creuzet in Paris, then the Chief Operating Officer of EDF, which he forwarded to me for my

consideration. Gaujacq's proposal was in the form of a draft new expatriation contract. This was not at all the normal procedure. Normally, when an employee's mission is coming to an end, EDF determines what position it wants the employee to fill in the interests of the company's needs and the employee's future development, and it takes into account the employee's wishes, as appropriate, in reaching its final decision. Then, once a determination is made, there would be a formal nomination by the responsible authority of EDF and then a contract would be drafted and signed. Also, I would normally not be involved at all in the posting of an "R-3" level employee, such as Gaujacq. I became involved in this case only because the need to reassign Gaujacq was a consequence of the assignment of Nadal (an "R-1") and because Gaujacq had bypassed her hierarchy (Fernando Ponasso, head of EDF's Americas Branch) and was dealing directly with Creuzet in Paris.

21.    Gaujacq's proposal was for a proposed new expatriation assignment in the United States for three more years, as head of the EDFINA nuclear project but not reporting within EDFINA. Instead she proposed a dual reporting relationship to the Director of EDF's Americas Branch (bypassing EDFINA) and to the Director of EDF's Energy Branch in France.

22.    I forwarded Gaujacq's proposal to François Metais, who was then in charge of executive career development as the Director of EDF's Delegation for Management of Executives ("DELCADIR"), for review and consideration by DELCADIR. The response of DELCADIR was that certain of the proposed terms could be acceptable if we wished to accept her proposal except that the proposal that Gaujacq would report to the Director of the Americas Branch and to the Director of the Energy

6

Branch would have to be further validated. This response is set forth in an e-mail from Metais to me dated March 31, 2004, a copy of which is attached hereto as **Exhibit A.**

23.    It was a problem for EDF to have an employee in a subsidiary not reporting to the head of the subsidiary as Gaujacq had proposed because it is inconsistent with our organization.

24.    Metais then proposed a different structure, which would avoid this reporting problem. He proposed an appointment attaching her solely to the Energy Branch in France, outside of the EDFINA structure and outside of the Americas Branch. While she would be posted to the Energy Branch in France, she would be assigned to work on the nuclear project in the United States. Metais' proposal is set forth in an e-mail from him to me and other EDF leadership dated April 6, 2004, a copy of which is attached hereto as **Exhibit B**. Creuzet communicated this proposal to Gaujacq. A copy of his e-mail to her dated April 7, 2004 is attached hereto as **Exhibit C.**

25.    This proposal never resulted in an actual appointment, however, because it was unacceptable to Gaujacq and it was unacceptable to Nadal. It was unacceptable to Gaujacq because she insisted on remaining an officer of EDFINA although reporting to another branch. (See Ex. C). It was unacceptable to Nadal because, as he advised Metais, the nuclear project was one of the significant activities of the Washington delegation and it was not acceptable for Gaujacq to keep this matter and report outside EDFINA to the Energy Branch.

26.    The matter was addressed by EDF's Executive Committee ("COMEX") in April 2004. COMEX, of which I am a member, concluded that Gaujacq could report functionally to the Energy Branch but that she must report operationally to

Nadal.

27.     In the meantime, Gaujacq had been directed to discuss her mission with Bruno Lescoeur, head of the EDF Energy Branch.   By the time she met with Lescoeur in France in May 2004, EDF had decided that it would be better to appoint Gaujacq to a new and important nuclear position in France.   Lescoeur told Gaujacq that EDF wanted her to return to France to head up an important new initiative for EDF in the nuclear energy field, implementing the introduction of European Pressurized Reactors ("EPR") in France.   This was a very important project for EDF, important to future development of nuclear production within EDF.

28.     Gaujacq, however, continued to press to stay in the United States without reporting to Nadal and claimed that Creuzet had engaged with her that she could do so.  This was not the case.  EDF did not make any such engagement with Gaujacq and did not enter into any contract with her concerning her next mission.  All along, from the time she first sent her proposal to Creuzet in March 2004, EDF was discussing with her possibilities for her next mission and making its best efforts to accommodate her wishes while meeting the needs and interests of EDF.   EDF also suggested to her a project in London, but she turned that down as well.

29.     Chairman Roussely resolved the matter definitively at the end of May.   He decided that if Gaujacq were to stay in the United States, she must have operational reporting solely to Nadal and that otherwise she must return to France.  This decision is set forth in an e-mail from Igor Czerny (Chairman Roussely's deputy) dated May 25, 2004, a copy of which is attached hereto as **Exhibit D**.



### Gaujacq's Complaint

30.    In July 2004 Gaujacq sent an e-mail to Chairman Roussely and COO Creuzet in Paris complaining that EDF had not fulfilled what she called "agreements in principle" concerning her mission in Washington. She said that Nadal was taking "discriminatory" measures against her and that she had decided to file a complaint before "the American authorities" and that the complaint would have "negative effects" on EDFINA's participation in the nuclear project in the United States. She demanded that EDF sign the contract she had proposed in March that EDF had already definitively rejected, by decision of Chairman Roussely, as discussed above. A copy of Gaujacq's e-mail to Messrs. Roussely and Creuzet is attached hereto as **Exhibit E**.

31.    The next day, July 23, 2004, I spoke with Gaujacq on the telephone at Creuzet's request. This was the first time I had ever spoken to Gaujacq. In our conversation Gaujacq threatened that she would file a complaint with the American authorities if EDF did not sign her proposed expatriation contract permitting her to remain in Washington but without being integrated into EDFINA and without reporting to Nadal, which had already been rejected by Chairman Roussely. She also said that Creuzet had "threatened" her that her career was at stake if she continued to reject the assignments EDF was proposing to her. While I cannot speak to whatever conversation Gaujacq had with Creuzet, I believe it extremely unlikely that Creuzet threatened anything. However, it certainly would be legitimate for EDF to terminate the employment of any employee who refused to accept the assignment we wanted her to take, particularly where the assignment is suited to the employee's career, as were all the proposals EDF made to Gaujacq.

32.    In our conversation, I tried to persuade Gaujacq to accept the position that Lescoeur had proposed to her to lead the EPR project in France. I told her it was an extremely good, interesting position in the nuclear generation field and very well-suited for Gaujacq. It has since been filled by another person, and the project is proceeding at a high profile in Europe and indeed worldwide. However, Gaujacq would not consider returning to France, and continued to demand that EDF agree to the proposal she had made that had already been rejected.

33.    I considered that Gaujacq was attempting to "blackmail" EDF because she said that if we did not accept her terms, she would file a complaint or sue the company. She threatened to file a complaint to try to get the position she wanted.

34.    In our conversation, Gaujacq never said anything about "sex discrimination" or "sexual harassment." I had no idea that the complaint Gaujacq threatened to file with "the American authorities" would be a complaint about sex discrimination or sexual harassment under United States laws.

35.    The first time I knew that Gaujacq was complaining about sex discrimination and sexual harassment under United States law was after EDF received a copy of the claim she filed with the United States Equal Employment Opportunity Commission ("EEOC"). To my knowledge, none of the other EDF executives who had any involvement with the matter of Gaujacq's mission or her complaints knew that she was complaining about sex discrimination or sexual harassment either, since that topic never came up in discussions about the matter prior to receipt of her EEOC claim.

36.    On July 25, 2004 Gaujacq sent a letter in English to me, Creuzet and Ponasso demanding, again, that EDF sign the proposal it had already rejected for a

three-year contract at EDFINA without reporting to Nadal and also demanding that EDF pay Gaujacq's attorneys' fees. A copy of this letter is attached hereto as **Exhibit F**. She complained in her July 25 letter that Nadal had subjected her to "demeaning, discriminatory and illegal conduct," but, again, there was no indication that she was complaining about sex discrimination or sexual harassment.

37.    EDF considered that the problem between Gaujacq and Nadal was simply a dispute between two managers over their areas of responsibility. EDF directed Gaujacq's July 22, 2004 e-mail and her July 25, 2004 letter discussed above to the person in charge of human resources for the Americas Branch, Jean-Louis Betouret, to investigate Gaujacq's claims. His report concluded that the discord between Gaujacq and Nadal was based on "reciprocal hostility." Betouret's report, dated July 26, 2004, is attached hereto as **Exhibit G**.

38.    EDF did not give in to Gaujacq's "blackmail" and did not make any other proposals to her for a mission in the United States. Instead, EDF determined, after consultation with French counsel, to rely upon the expiration term of Gaujacq's then current expatriation contract, which expired July 31, 2004, and to notify Gaujacq that she must return to France for her next mission thereafter.

39.    By letter from Creuzet dated July 27, 2004, EDF sent Gaujacq formal notice of the termination of her overseas assignment as of July 31, 2004, giving her until November 1, 2004 -- three additional months -- to prepare to return to France. She was advised that EDF would offer her an appropriate position in the Energy Branch, which she should continue to discuss with Lescoeur. A copy of Creuzet's July 27 letter to Gaujacq is attached hereto as **Exhibit H**.

### Gaujacq's New Assigned Position in France

40.    Effective August 1, 2004, EDF appointed Gaujacq to the position of Chargée de Mission (Mission Representative) to the Director of the Nuclear Production Division in the Energy Branch in France, by decision executed by Lescoeur. A copy of the Decision is attached hereto as **Exhibit I**. As was explained to her in an e-mail dated September 8, 2004 from Jacques Bouron, then Director of DELCADIR, her new position was classified as an "R-3" position in EDF's executive ranking system and would involve an increase in base salary over her current base salary. The work station was at Cap Ampère in France. A copy of Bouron's e-mail is attached hereto as **Exhibit J**. This position was to head EDF's nuclear EPR project in France.

### Gaujacq's Termination

41.    Ultimately, Gaujacq defied EDF's directions. She refused to accept the EPR job that EDF had assigned to her, she failed to return to France and she failed to report to her new assignment on November 1 when her three months concluded. Under the circumstances, her absence from her new post since November 2 constituted a grave fault, which warranted dismissal under the French national statute governing personnel in the industries of electricity and gas ("Le Statut National du Personnel des Industries Electriques et Gazières"), and, as a result, EDF concluded that her employment must be terminated. Gaujacq was given a formal notice of termination dated January 6, 2005, which I executed. A copy of her termination notice, together with an English translation thereof, is attached hereto as **Exhibit K**. According to French law, such notice becomes effective upon the date of receipt, which I understand was January 7, 2005.

42.    Gaujacq's termination was a "forced retirement," which means that she will still be entitled to her EDF pension benefits when she reaches retirement age even though she is then employed by another company.

43.    EDF was completely within its rights as an employer and completely justified under the employment policies, laws and regulations under which EDF operates in France to take the actions it did with respect to the terms and conditions of Gaujacq's employment, to appoint Nadal to Washington, to recall Gaujacq to France and to terminate Gaujacq's employment upon her refusal to report to her new post in France. EDF fully complied with all such procedures and laws.

44.    For all of these reasons, and those set forth in the other papers submitted in support of the motion of EDF and EDFINA, I respectfully request that this Court grant summary judgment dismissing Gaujacq's complaint.


Dated:  October 12, 2006
        Paris, France

                              /s/
                    _____
                    YANN LAROCHE



13



# Trustforte Language Services

## CERTIFICATE OF ACCURACY

STATE OF NEW YORK    )

                                )SS:

COUNTY OF NEW YORK )

        Sabine Serre, being duly sworn, deposes and says:
I am fluent in both the English and French languages. I have reviewed the attached English translation of the *DECLARATION OF YANN LAROCHE* from a copy of the original documents in the French language and hereby certify that the same is a true translation to the best of my knowledge, ability, and belief.

_____
Sabine Serre
Trustforte Language Services

Sworn before me this
13th day of October, 2006

_____
Notary Public

MOHAMMED MUJUMDER MSS LLB
Notary Public, State of New York
No. 03-4962808
Qualified in Bronx County
Commission Expires Feb. 26, 2010