# DECLARATION OF CHRISTIAN NADAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHERINE GAUJACQ,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRICITE DE FRANCE INTERNATIONAL NORTH AMERICA, INC., ELECTRICITE DE FRANCE, S.A. and CHRISTIAN NADAL,<br><br>Defendants, | Civil Action No. C5-969 (JGP)<br><br>**DECLARATION OF**<br>**CHRISTIAN NADAL** |

      **CHRISTIAN NADAL** hereby declares, under penalty of perjury under the laws of the United States, in accordance with 28 U.S.C. Section 1746, as follows:

      1.     I am Délégué Général (Delegate General) of Defendant Electricité de France, S.A. ("EDF") to North America and serve as President of Defendant Electricité de France International North America, Inc. ("EDFINA"). I have also been named personally as a defendant in this action.

      2.     I have personal knowledge of the facts set forth herein.

**Professional Background**

3. My executive rank at EDF is "R-1," which is the highest executive rank at EDF. I have had that rank since the "R-1" designation was introduced at EDF. Throughout my career at EDF I have been ranked as a high echelon executive.

4. I joined EDF in 1988 at the executive level. Prior to that time, I had been the General Secretary of the French National Coal Board for four years. I was recruited by EDF and brought in as a high-level executive.

5. I have had many different executive positions at EDF. It is EDF's custom and practice to assign its employees, particularly management and executive level employees, to positions of certain duration and then to new positions, consistent with the interests of EDF. All of my positions at EDF have been high-level executive positions. These are described in detail in my *curriculum vitae*, a copy of which is attached hereto as **Exhibit A**. My positions up until my appointment as Delegate General include (in reverse order) the following:

> Executive VP for General Controlling [2002-2003];
> CEO of EDENOR (EDF affiliate) [1999-2001];
> Executive VP for Corporate Strategy & Development [1997-1999];
> Executive VP for Corporate Strategy & Communications [1996-1997];
> Executive VP for Communications, European Affairs & Trade Strategy [1995-1996];
> VP for Development & Commercial Strategy [1994-1995];
> Head of EDF's Communication Division [1991-1994]; and
> CEO of Sodel Consultants (EDF affiliate) [1988-1991].

6. In addition, I was a member of EDF's Executive Committee for four years (1995-1999) before leaving Paris for the EDENOR position in Argentina. For all of my prior positions, with the exception of the EDENOR position, I had been stationed in France. I have been an Advisor to the French Trade Council (Paris section, and Argentina section, and now the Washington, D.C. section). I have a degree in Law and Public Finance. I have been awarded by

the Republic of France the high honor of "Chevalier de l'Order National du Mérite" (Knight of the National Order of Merit) in recognition of distinguished service to the Republic.

7. When I was the CEO of EDENOR, an Argentinean energy company in which EDF held a partial equity interest, I was responsible for managing and policy-making for a large commercial enterprise, with 2,500 employees, selling electricity to more than 2,000,000 customers in the Buenos Aires metropolitan area. EDENOR had approximately $1 Billion in annual revenue. I was also responsible for dealing with high-level officials of the Argentine Government and industry and union leaders in Argentina.

8. EDF recalled me to France at the end of 2001, and I returned to Paris. There was not immediately a position available for me, but in 2002 I was assigned to be one of EDF's Executive Vice-Presidents for General Controlling, reporting directly to the Chairman, President and CEO of EDF, François Roussely ("Roussely"). In that position, among other things, I co-headed EDF's initiative to undertake a project with Finland for the development of a new kind of nuclear reactor, called the European Pressurized Reactor ("EPR") and provided advice and consultation on issues relating to the opening of the French and European energy markets and the restructuring and sale of EDF investments in affiliated companies.

### Appointment as Delegate General

9. In 2003 Chairman Roussely told me that EDF wished to send me to Washington, D.C. on a long-term mission. Roussely told me that EDF wanted to upgrade and broaden EDF's representation in the United States to optimize EDF's ability to take advantage of opportunities in North America that may be available to EDF as a result of changes affecting EDF. In particular, at that time, EDF was looking ahead to the upcoming change of EDF from a governmental entity to a private company in 2004 and the subsequent offering of stock to the

public. This change introduced the possibility that EDF could become involved in interesting commercial ventures -- particularly in the United States where the energy industry was poised to exploit commercially viable alternatives to oil, including a new approach to nuclear energy. EDF wanted me to upgrade the relationships of EDF with potential energy partners in the United States and Canada. EDF wanted me to develop investment opportunities for EDF in the North American energy market. And EDF wanted me to prepare the North American investment market for EDF's planned Initial Public Offering ("IPO"), by establishing relationships with potential investors and investment bankers in the United States.

10. In addition, the imminent privatization of EDF also meant that EDF would likely be facing many of the issues arising out of deregulation that many energy companies in the United States had already been through, and EDF wanted to have the benefit of insights from government and industry leaders in the United States for its strategic planning going forward. EDF also wanted me to develop information and strategic options in this area of deregulation.

11. I negotiated the terms and compensation for my expatriate assignment to Washington with the EDF executives responsible for such matters.

12. EDF appointed me Delegate General, effective January 1, 2004, in a Decision signed by Chairman Roussely. I entered into a written contract with EDF, effective February 1, 2004, regarding compensation and other particular conditions affecting my expatriate assignment, entitled "Conditions Particulières Applicables à la Mission de Longue Durée de Christian Nadal à Washington" (Particular Conditions Applicables to the Long-Term Mission of Christian Nadal in Washington) (hereafter referred to as "Expatriation Contract"), with an express duration of five years, from February 1, 2004 through January 31, 2009.

13.     I did not take up my post in the United States until June 1, 2004. This is because there was a period of confusion and uncertainty as to my role in Washington vis-à-vis that of Gaujacq that was not resolved with certainty until the end of May, with a decision by Chairman Roussely.

### Confusion Regarding Gaujacq's Role

14.     Chairman Roussely had decided that my title was to be Delegate General of EDF for North America. From my discussion with Chairman Roussely in 2003, I understood that I was to be in charge of EDF's delegation in Washington. The very title signifies that, and of course our discussions in 2003 about the mission made it clear to me as well. I did not at that time discuss with Chairman Roussely the role of Catherine Gaujacq ("Gaujacq") in Washington. He told me that she expected to remain until the summer of 2004.

15.     In a telephone conversation on February 10, 2004 with the person in charge of human resources for the Americas Branch (Jean-Louis Betouret), I said that I had an open mind about having Gaujacq continue working at EDFINA in some capacity. A copy of his notes of our telephone conversation, in which he expressly noted my comment (together with an English translation thereof), is attached hereto as **Exhibit B**.

16.     My first encounter with Gaujacq was on February 25, 2004, when I first visited the EDFINA office. My visit had been scheduled with Gaujacq in advance, but she did not receive me in the conference room or her office and did not make any kind of formal introduction of the people working at the EDFINA office, as would have been expected under normal protocol within the EDF culture. Instead, she talked to me standing in the hallway with my coat on. I found this strange and, within EDF culture, quite rude.

5

17. Gaujacq did not introduce me as EDF's Delegate General to the people working at EDFINA whom I met while standing in the hallway. Instead, she said to these people, in my presence, that I was coming to the United States to work on matters involving gas and finance. This also was very strange and disturbing because she did not acknowledge my title or my position as head of the delegation; rather, she implied that I had a minor mission and that I would be involved in gas, an area that had nothing to do with me or with the responsibilities I had been given by EDF. Gaujacq and I then had a private meeting at a restaurant, at which I raised with her this point and the entire matter of transitioning to my position as Delegate General.

18. I explained to Gaujacq that I had been appointed by written decision of Chairman Roussely, to be the Delegate General and that this meant, as I understood it, that I would be in charge of EDF's delegation in Washington. Gaujacq did not acknowledge my appointment. Instead, she said that she understood that my mission would be limited to gas and financial matters and that she was entitled to keep her position. She said she was entitled to do so because she had discussed it with her hierarchy, the details of which she resisted revealing to me until ultimately naming Gérard Creuzet, Chief Operating Officer of EDF. I told Gaujacq that this was incompatible with what I understood from Roussely, the Chairman and CEO, and I told her that I must discuss this with EDF in Paris to clarify the situation.

19. After meeting Gaujacq on February 25, I returned to Paris, where I spoke with François Metais, the head of EDF's Delegation for Management of Executives ("Délégation des Cadres Dirigeants") ("DELCADIR"), to clarify my mission vis-à-vis that of Gaujacq. He had told me that Gaujacq had been previously informed of my appointment and that he had in fact previously provided to Fernando Ponasso, head of EDF's Americas Branch, at his request

6

for purposes of informing Gaujacq, a copy of Chairman Roussely's appointment of me to that position. Metais undertook to make sure that the confusion on the part of Gaujacq was cleared up.

20.   However, I learned several weeks later that the matter had evidently not been resolved. Gaujacq had undertaken to arrange for an immigration lawyer to process my application for a visa permitting me to work in the United States. (In fact, Gaujacq had told me on February 25 that I was not permitted under US immigration law to come back to the United States to work until my visa application was approved, and she had said she would handle it.) On March 11, I received a call at my home in Paris from the immigration lawyer, Michael McVicker, in which he told me that it would be very difficult for me to get a visa because my background did not support an application for a position as a "gas analyst," which is how Gaujacq had described my position. This, of course, was not my position. The news from McVicker was very surprising to me and extremely unsettling since it indicated that Gaujacq was for some reason working against me and that, evidently, EDF had not yet clarified the situation adequately with Gaujacq. I communicated this news to Metais and, again, requested that the situation be clarified.

21.   Finally, in late March, Gaujacq was summoned to Ponasso's office in Buenos Aires to meet with Creuzet from Paris, who, I was informed, clarified the situation to Gaujacq definitively. After the meeting in Buenos Aires, Gaujacq admitted her error in an email to me, and said that she had told the others working at EDFINA of her error concerning my appointment as Delegate General of EDF. She also said that the lawyer would prepare proper papers for my visa application. She said that she would retain the title of President of EDFINA only until my visa was obtained and the legal and banking formalities for the change at EDFINA

7

were completed. A copy of her email to me, dated March 25, 2004 (together with an English translation thereof) is attached hereto as **Exhibit C**.

### Continuing Problem With Gaujacq's Proposed Role

22. The situation was still not resolved, however. At the end of March, I learned that Gaujacq had asked EDF, without discussing with me, for permission to remain at EDFINA with responsibility for nuclear matters, including EDFINA's participation on behalf of EDF in NuStart Energy Development LLC ("NuStart"), a consortium of US energy companies dedicated to developing new nuclear power plants in the US, that I considered an important part of my mission. I informed Metais of my view that Gaujacq had created a situation at EDFINA and with me where it would be extremely difficult to work with her, and I now preferred that she not stay at EDFINA and that Jean-Luc Forêt, her highly qualified deputy, handle the continuing representation to NuStart under my supervision. My email to Metais dated April 1, 2004 (together with an English translation thereof) is attached hereto as **Exhibit D**.

23. I then learned that it was proposed that Gaujacq continue to be responsible for nuclear matters for EDFINA, but that she report on nuclear matters to the Energy Branch in Paris and not through EDFINA. I considered the subject of nuclear matters to be an important part of the scope of my mission. This proposal was not acceptable to me because it would carve out from my responsibilities the important element of nuclear matters and it would in effect diminish the overall mission that I would have in the United States. I informed Metais of my objection in an email dated April 7, 2004, a copy of which (together with an English translation thereof), is attached hereto as **Exhibit E**.

24. In April and May it remained unresolved what EDF would do regarding my responsibility for EDFINA's nuclear matters. At the end of May, Chairman Roussely and I

8

discussed the status of my mission. I told him that I preferred not to leave for Washington until the scope of my authority regarding nuclear matters, relative to that of Gaujacq, had been decided. Chairman Roussely told me that he would resolve the matter immediately, with Gaujacq reporting to me on nuclear matters if she stayed at EDFINA, and that he wanted me in place in Washington at the beginning of June. Chairman Roussely's decision was communicated to Creuzet, Metais and Ponasso by email dated May 25, 2004. A copy of this email (together with an English translation thereof) is attached hereto as **Exhibit F**.

25.     Gaujacq then resigned as President and took the title Vice President of EDFINA as of the end of May. I became President of EDFINA effective June 1, 2004 and came to Washington at the beginning of June to assume my responsibilities as head of EDF's delegation.

### My Mission as Delegate General

26.     Consistent with the mission initially entrusted to me by Chairman Roussely, my responsibilities as EDF's Delegate General to North America include pursuing financial opportunities for EDF in North America. I have succeeded in negotiating, along with EDF teams, a very important commercial venture for EDF in the United States with Constellation Energy for the development in the United States of a new type of nuclear power plant, the European Pressurized Reactor, which EDF had developed in Europe (in a project that I was involved in as Executive VP for General Controlling). The first EPR in the world is under construction in Finland, and the second is now being built by EDF in France. In the United States the name "EPR" will be changed to "Evolutionary Power Reactor." Press releases concerning this venture are attached hereto collectively as **Exhibit G**.

9

27. In addition, my responsibilities have included representing EDF to Wall Street investors and investment bankers from the time of my arrival in Washington through the IPO, which took place in November 2005.

28. I am responsible for establishing and maintaining a high visibility for EDF to US business leadership and government officials involved in energy. In that regard, I maintain high-level contacts with US authorities and academics in the energy field, including but not limited to the following: the US Nuclear Regulatory Commission; the Federal Energy Regulatory Commission (FERC); the National Academy of Sciences; the US Environmental Protection Agency; the US Senate, the US House of Representatives; the US Department of Energy (DOE); the Commodities Futures Trading Commission (CFTC), the Massachusetts Institute of Technology; the Nuclear Energy Institute; the Edison Electric Institute; the Electric Power Research Institute; and various utility companies in the United States. I have been invited to deliver speeches and/or to organize and chair panels on nuclear energy, including an October, 2005 European Institute with panels of Undersecretaries and other members of the United States administration, Ambassadors, and various think tanks, and on Electricity Trading at a September, 2005 annual meeting of the CFTC in Chicago. I am a member of a high-level panel of academics, industrialists and groups of interests named "GROCC" (Global Roundtable on Climate Change) led by the eminent Professor Jeffrey Sachs, Director of the Earth Institute at Columbia University.

29. I am also responsible for expanding EDF's role in Canada and maintain the position of Associate of the Industrial Board of Electricity of Quebec.

30. I am frequently in contact with the French Embassy and the French Ambassador and also welcome delegations to the United States from France, including

Ministers, members of Parliament, and various corporate delegations. In France, I make speeches in meetings of EDF's top executives in Paris and maintain contact with Chairmen and Commissioners of top authorities in the energy field in France (including the French equivalents of FERC, DOE and Nuclear Waste Management Authority and Parliament.). On occasion I represent the Chairman and President of EDF at meetings or conferences in the United States and in France when he is unable to attend.

31. After Gaujacq's mission in the United States expired, I assigned day-to-day activity in the NuStart program to a deputy, but supervised that deputy and retained primary responsibility for EDFINA's role in the NuStart program. I also appointed someone from the EDF Energy Branch as a Member of the Management Committee of NuStart.

32. In addition, I serve as President of EDFINA, in which capacity I am the executive responsible for the management of EDFINA and its finances, the administration of the office and the employment of local employees.

### EDFINA's Employees

33. EDFINA had two employees when I arrived in June 2004 and as of the time Gaujacq filed her claim with the EEOC. One was Adja Ba, then a legislative analyst and administrative assistant, who had been hired by EDFINA as a local employee. As President of EDFINA, I gave her a raise in salary and a written contract with EDFINA concerning the terms and conditions of her employment. The other EDFINA employee in June 2004 was Alexandre Audie, then a sector analyst. Audie was an ex-EDF expatriate employee who had given up his EDF status and become a localized employee of EDFINA under written contract with EDFINA. After my arrival, I supported Audie's request to EDF in Paris to have his EDF status restored. He is today an EDF expatriate employee working at EDFINA and no longer has a contract with

EDFINA.

34. As of the time Gaujacq filed the Complaint in this lawsuit, in May 2005, there were still only two EDFINA employees. They were Adja Ba and Maura Stadem, a new employee whom I had hired as an administrative assistant.

35. EDFINA pays the salaries and benefits of the EDFINA employees. As President of EDFINA, I determine the salaries and benefits and working conditions for these employees. They are not included in EDF's grade level ranking system. They are under written contract with EDFINA.

36. The other people working at the EDFINA office, like myself and Gaujacq, were and are EDF expatriate employees in the United States on expatriate assignments from EDF. Their salaries are not paid by EDFINA. Their salaries, like mine, are paid by EDF in France in Euros, and their benefits, like mine, are determined by EDF in France pursuant to EDF policies and the French law that applies to personnel in the electric and gas industries ("Le statut national du personnel des industries électriques et gazières"). My salary is paid by EDF in Euros into an account I maintain in France. The amount of my salary and expatriation benefits are pursuant to the Expatriation Contract that I signed with EDF, as adjusted by increases to which I am entitled on account of my "R-1" grade level.

37. When I arrived in June 2004 and as of the time Gaujacq filed her EEOC charge, there were four EDF expatriate employees at the EDFINA office. In addition to Gaujacq and myself, there were Benoit Dreux and Jean-Luc Forêt, neither of whom is still there. As of the time Gaujacq filed her Complaint in May 2005, there were also four EDF expatriate employees. In addition to myself, they were Alexandre Audie, Benoit Dreux and Jean-Luc Forêt.

### Encounters with Gaujacq

38. From the time I was appointed Delegate General until EDF terminated Gaujacq's employment in January 2005, I had very little contact with her. Counting all meetings and telephone conversations in that entire period of nearly a year, I believe the totality of my contact with Gaujacq was not more than a few hours.

39. Following my first meeting with her in Washington on February 25, 2004, I had no meeting or telephone conversation with Gaujacq during the months of March, April or May 2004. When I visited the United States during these months, she did not come into the office whenever I was there. In fact, by email she had asked me in advance when I would arrive for a two-week stay in April, and I responded by email, but she did not come to the EDFINA office while I was there. Nor did I see her any time in June 2004. I did speak to her once over the telephone during that month (on June 11), as discussed below. In July, we had two encounters: first, we were both on a conference call on July 9 with EDF's auditors (discussed below); and, second, we had a brief meeting in the EDFINA office on July 12 (discussed below). I did not see or speak with her thereafter until her deposition in this case.

### The June 11 Telephone Call

40. Upon assuming the leadership of EDF's delegation and the office of President of EDFINA, I signed bank forms permitting me to be substituted for Gaujacq, in the capacity of EDFINA President, as authorized signator of checks drawn on EDFINA's bank account. I took this action as a routine business procedure to permit me in my position as President to sign checks for EDFINA.

41. I did not add Gaujacq as a signator because, as head of the office, I did not believe there was a need for more than two signators (which was the number of signators

13

previously), and there was no need for Gaujacq to sign any EDFINA checks. She had not informed me of any need and as of that time her responsibilities going forward had not been defined. Benoit Dreux, who was at that time serving as Vice President of EDFINA, had been authorized to sign checks while Gaujacq was President, and Dreux's authority did not change when I became President.

42. On June 11, I received an email from Gaujacq asking me to call her at her home to reinstate her check-signing authority. I called her that day from a business conference in Colorado and explained to her that the change in check-signing authority was the result of my having become the President of EDFINA and that we needed to meet to discuss what her responsibilities would be first and then, if they required check-signing authority, we would deal with that then. I told Gaujacq that, now that this difficult period was over, I would like to start a normal working relationship. We arranged a meeting for June 18 in the office and agreed to talk the following Monday, June 14, at a nuclear conference that we were both scheduled to attend in Pittsburgh, Pennsylvania. However, Gaujacq did not meet with me on either date (as discussed below), and we never had a discussion to define her responsibilities.

43. In the June 11 telephone conversation, I also discussed with Gaujacq a document she had distributed the day before without my authorization. On June 10, Gaujacq had distributed to Fernando Ponasso, head of EDF's Americas Branch, and to the people working at the EDFINA office, a document regarding the organization of EDFINA in which she purported to assign responsibility to me for gas and finance and reserve to herself nuclear matters. I considered this very strange and antagonistic to me. I had not asked her to propose any organization; she already knew I was not to be a gas analyst; and it was not her role to distribute such a proposal about EDFINA and my responsibilities without my authorization. I told her

during our telephone conversation on June 11 that she should not have distributed this organization document, as it was confusing to the others working at EDFINA and undermined my authority.

### The June 18 Letters

44.     On June 18, 2004 I signed a letter addressed to Gaujacq and Dreux, then the two Vice-Presidents of EDFINA, delineating their authority as Vice Presidents and mine as President. I did this for the sake of good order and to avoid any confusion as to authority to act on behalf of EDFINA. I was leaving for France for three weeks and wanted to be sure that both Dreux and Gaujacq understood the new lines of authority incident to my appointment, and would not take any unauthorized actions during my absence. I sent Gaujacq's letter to her home because she was not in the office. In fact, she had not been in the EDFINA office at all on any day that I was there since my arrival at the beginning of June.

45.     Because I had to be in France for almost three weeks, I needed someone in the office to be empowered to act on my behalf if necessary during my absence. Accordingly, in another letter dated June 18, 2004 addressed to Dreux, I gave my written authorization to Dreux to act on my behalf concerning certain particulars. I gave both letters to Dreux at the office..

46.     The reason I chose to authorize Dreux and not Gaujacq had nothing to do with gender. Dreux and Gaujacq were the only two Vice Presidents of EDFINA at that time. As between them, I chose Dreux because he came regularly to the office and I had a working relationship with him, whereas Gaujacq did not come regularly to the office, had not met with me since February, had taken actions to undermine my authority and had demonstrated unprofessional behavior since my arrival.

47. Indeed, Gaujacq had lied to me just that week. Before I could meet with Gaujacq at the nuclear conference in Pittsburgh on June 14, she had already departed. She had left me a note saying that her mother-in-law was ill and that she had to return to Washington and probably thereafter to France. I learned that this was not true when I returned to Washington. Alexandre Audie, who worked at EDFINA, told me that Gaujacq's husband, Philippe Gaujacq, had told him that Catherine Gaujacq had left the conference because one of their dogs had died and that Philippe had not said anything to Audie about his mother being ill. I do not know why Gaujacq lied to me about this; EDF permits personal leave for any reason, but she chose to give me a lie. She also relied upon this lie to avoid meeting with me on June 18 and to excuse her absence from a meeting in Lyon, France on June 21 that she and I were both scheduled to attend. I considered this behavior of Gaujacq's to be extremely unprofessional, and I was not willing to entrust my authority in my absence to someone who had lied to me.

### The July 9 Audit Conference Call

48. While I was in France, I participated in a telephone conference call on July 9 with EDF internal auditors who were conducting an audit of EDFINA. Gaujacq and Dreux were also on the call. The auditors reported in this call that they had discovered that certain important documents were missing from the office, including documentation for certain expenditures authorized by Gaujacq. Gaujacq responded that she had the documents at her home or on her laptop. I said to Gaujacq during this call that this was very serious and that she must bring the documents to the office. I did not accuse Gaujacq of any financial wrong-doing. I was surprised to learn that important financial documents were not maintained at the office, as they should have been under standard business practice, and I wanted to be sure that Gaujacq understood the importance of bringing these documents to the office for the EDF auditors.

16

49. I did not order or even ask for the audit, as Gaujacq has claimed. The audit was done by the EDF audit department in Paris. I understand that it was ordered by Fernando Ponasso, head of EDF's Americas Branch, and that it was done in the ordinary course of business as part of an audit of the Americas Branch, of which EDFINA was a part.

### The July 12 Meeting

50. On July 12, 2004, upon my return from France, I encountered Gaujacq in the EDFINA office. She declined to talk with me then about defining her responsibilities. She informed me that she was leaving in the next day or two for a month's vacation and that there were upcoming NuStart calls or meetings during that time that she planned to handle, including one call the next day. I then asked Jean-Luc Forêt, EDFINA's Alternate Representative to NuStart, to join us to talk about the status of NuStart. I wanted Forêt and myself to be knowledgeable about the status of this matter so that we could deal with it professionally.

51. Gaujacq was extremely confrontational in this meeting and evasive. I told Gaujacq that I wanted Forêt to be on the NuStart conference call the next day and requested that she make the necessary arrangement. She refused this request, saying that he was not authorized to participate in NuStart conference calls.

52. She also refused to give me documents I requested. I told her that I needed to have the NuStart documents in the EDFINA office and asked her to bring them from her home or wherever else she kept them immediately so that we would have them while she was on vacation. Gaujacq refused my instruction. In fact, she said (in French) "Are you kidding?" I assured her that I was serious. She said I didn't need them, I couldn't see them and she couldn't bring them in before she left on vacation anyway because there were too many of them. She said that the NuStart documents were confidential under the NuStart Memorandum of Understanding

and that I was not authorized to see them. I did not believe that this could be possible and told her that she must show me the agreement that she thinks prevents me from seeing NuStart documents. I have since seen the NuStart documents and have confirmed that there is and was no prohibition on my seeing the documents.

53. I repeated my direction to bring in the documents. I also told her to bring in the documents that the EDF auditors had asked to see and any other EDFINA documents or business records that she had at her home or anywhere else that she may have them. Gaujacq refused all of this on the ground that it was too much and she could not bring them in before she left for her vacation. I offered to provide her with assistance to collect the documents, but she refused that too.

54. At all times in this meeting I was professional and did not raise my voice with her, even though she was refusing to follow my very reasonable instructions and even when she said to me "Are you kidding?" I told Gaujacq that she must do as I instructed because I was the head of EDF's delegation and that I needed this information to perform my mission. As to the NuStart documents, I told her that I particularly needed them so that I could keep the Energy Branch in France adequately informed of the status and developments of this matter. Gaujacq said that she took care of informing the Energy Branch about nuclear matters, and I told her that the Energy Branch had complained during the meeting in Lyon on June 21 about not having adequate information and that I had agreed to provide the information they needed.

55. By emails on July 12 and July 16, I repeated my instructions that Gaujacq return the EDFINA documents and files to the office. Gaujacq, by email on July 20, refused these instructions on the ground that she did not have time to gather the documents before leaving on vacation, that the EDFINA office was not a secure facility and that I was not

authorized to see the NuStart documents. She also insisted that Forêt was not authorized to participate in NuStart conference calls.

### Gaujacq's Complaints

56. Gaujacq had sent me an email on July 22, 2004, with a copy to Ponasso, complaining about the incidents described above as hindering her from her work. In this email she referred to my June 18 letter to her as "discriminatory." I did not agree with her statements and I so responded to her in an email dated July 23. I did not understand from Gaujacq's email that she had any complaint about sex discrimination or sexual harassment.

57. It was not until August 6, 2004, the date on which EDFINA received a copy of Gaujacq's charge filed with the Equal Employment Opportunity Commission, that I knew that Gaujacq had a complaint of sex or gender discrimination or sexual harassment under US employment laws.

Dated: October 13, 2006

_____
CHRISTIAN NADAL

19