# DECLARATION OF PATRICK DE BOTHEREL

IN THE UNITED STATES DISCTRICT COURT
FOR THE DISTRICT OF COLUMBIA


CATHERINE GAUJACQ,

Plaintiff,

v.


ELECTRICITE DE FRANCE
INTERNATIONAL NORTH AMERICAS.
INC., ELECTRICITE DE FRANCE. S.A. et
CHRISTIAN NADAL

Defendants,

**Civil Action No. C5-969 (JPG)**


**DECLARATION DE
PATRICK DE BOTHEREL**

**PATRICK DE BOTHEREL** par la présente, déclare, sous peine de parjure en vertu de la loi des Etats-Unis, en accord avec le titre 28 du U.S. Code, Section 1746 (*28 U.S.C, Section 1746,* ce qui suit:

1. Je suis Vice- Président du Défendeur, Electricité de France, S.A. ("EDF") et Directeur des Rémunérations des Dirigeants au sein de la Direction Développement des Dirigeants. J'occupe cette fonction depuis avril 2004. J'ai une connaissance directe des faits qui suivent, excepté en ce qui concerne les faits qui se sont déroulés avant que je ne rejoigne EDF et, j'estime, sur la base des documents EDF que j'ai revus au cours de mon emploi au sein d' EDF, que ces faits sont véridiques.

2. Je fais cette Déclaration à l'appui de la motion en jugement sommaire (*motion for summary judgment*) déposée par EDF et par le Défendeur, Electricité de France International North America, Inc. (« EDFINA ») afin de rejeter la requête de la plaignante, Catherine Gaujacq (« Gaujacq »).

3. Je travaille au siège social d'EDF à Paris, en France. Je suis en charge de la rémunération des cadres-dirigeants d'EDF et de la rémunération, en vertu de

contrats d'expatriation, des cadres-dirigeants d'EDF qui sont affectés à des postes d'expatriés en dehors de la France.

4.  La différence dans les compensations attribuées respectivement à Gaujacq et Nadal pour leurs expatriations à Washington D.C., n'est pas due à une différence de sexe. Cette différence est due au fait qu'ils avaient un classement différent au sein du système d'échelons applicable aux cadres-dirigeants d'EDF et qu'ils avaient des postes et des antécédents professionnels différents.

### Système d'échelons d'EDF

5.  EDF a un système d'échelons adopté de bonne foi pour l'ensemble de ses employés français constituant la main d'œuvre d'EDF. Ce système est régi en partie par le statut national du personnel des industries électriques et gazières (« le Statut National ») qui s'applique aux employés français d'EDF. Des extraits du Statut National (ainsi que leur traduction en anglais) figurent ci-joints à la présente Déclaration (ensemble, l'**Annexe A**).

6.  Le Statut National fixe et réglemente un système hiérarchique pour les employés non-cadres et les employés cadres de premier rang. Celui-ci consiste en une classification ou un classement des employés reposant sur le type d'emploi, avec des niveaux s'échelonnant de l'échelon 1 (le plus bas) à l'échelon 20 (**Annexe A, art. 8**). Les niveaux statutaires pour les non-cadres comprennent expressément les ingénieurs. L'éventail des salaires de base pour les employés de niveaux statutaires 1 à 20 est fixé, par niveau, par accord entre EDF et le syndicat national représentant les employés des industries électriques et gazières (**Annexe A, art. 9**).

7.  Les employés de niveau cadre sont exclus de ces classements statutaires (« hors de la classement ») fixés par l'article 8 du Statut National. En ce qui concerne ces employés, le Statut National prévoit que leur rémunération est déterminée par le Conseil d'administration (*Board of Directors*) d'EDF. (**Annexe A, Art. 36**).

8.  EDF applique le système statutaire pour ses employés aux échelons 1 à 20 et utilise également un système de classement en échelons pour ses employés cadres. EDF détermine le salaire de base des employés cadres selon leur niveau, au sein d'une fourchette de salaires fixée pour différents niveaux.

9.  Le système de classement en échelons d'EDF, tant au niveau statutaire qu'au niveau non statuaire est un élément important qu'EDF utilise afin de déterminer le niveau de responsabilité d'un employé et afin d'assurer que les employés de niveaux comparables constituant la main d'œuvre d'EDF sont payés à des niveaux de salaires de base généralement comparables.

10. EDF utilisait un système de classement en échelons tout au long de la période au cours de laquelle Gaujacq était employée par EDF (1980-2005).

11. Le système de classement en échelons d'EDF pour les cadres-dirigeants en vigueur au cours de la période d'août 2000 à Juillet 2004 comportait quatre niveaux de cadres-dirigeants : « R-1 », « R-2 », « R-3 » et « R-4 » avec « R-1 » le niveau le plus élevé.   Au cours de cette période, le Défendeur, Christian Nadal (« Nadal ») était « R-1 » et Gaujacq « R-3 ».

12. Seules 50 personnes parmi l'ensemble des employés français d'EDF sont, comme Nadal, « R-1 ».  C'était également le cas en 2004. Le PDG de EDF décide de qui devient « R-1 ». Les cadres-dirigeants qui sont « R-1 » en réfèrent directement au PDG d'EDF.

13. Il y a environs 350 personnes employées par EDF qui, comme Gaujacq, sont au niveau « R-3 ».  C'était également le cas en 2004. La décision selon laquelle un employé sera classé « R-3 » est prise au niveau de la branche ou du département.

14. Les classements des cadres-dirigeants désignés ci-dessus sont entrés en vigueur en 2000.  Avant cette date,  EDF désignait le niveau de ses directeurs et de ses cadres par un nombre. Les directeurs non-cadres étaient classés de l'échelon 50 (le plus bas) à l'échelon 53 et les cadres étaient tous à l'échelon 60.

15. Il existe un niveau d'échelon et un niveau de poste. Le niveau ou la classification individuel est propre à une personne. Dès lors qu'une personne a atteint un niveau particulier, elle reste à ce niveau ou bien peut être promue au niveau supérieur. En règle générale, nous ne rétrogradons pas une personne à un niveau de salaire inférieur indépendamment du niveau du poste auquel cette personne est affectée à moins que cette personne n'ait commis une faute lourde.

16. Indépendamment du classement individuel, EDF classe les postes par échelon. Tout comme les employés-cadres, les postes de cadres-dirigeants sont également classés en quatre niveaux : « R-1 », « R-2 », « R-3 », et « R-4 », « R-1 » étant le plus élevé. Au niveau des cadres-dirigeants, le classement des postes de cadres-dirigeants repose sur la contribution du poste à l'atteinte des objectifs financiers et stratégiques de EDF,  sur le niveau d'autonomie du poste et l'importance du poste au regard de l'avenir de EDF. Ces critères sont expressément posés par la Politique de Rémunération des Cadres-dirigeants, dont une copie (ainsi que sa traduction en anglais) figure ci-jointe à l'**Annexe B**.

## Salaires des Cadres-Dirigeants

17. Les fourchettes de salaires de base pour les cadres-dirigeants de niveaux « R-1 » à  « R-3 » sont décidées une fois par an par le *Executive Committee* d'EDF (« COMEX »). Les fourchettes de salaires de base pour les cadres-dirigeants à compter du 1$^{er}$ juillet 2004 sont prévues par un document EDF intitulé « Plages de salaires R1 R2 R3 à compter du 1$^{er}$ juillet 2004 », dont une copie (ainsi que sa traduction en anglais) figure ci-jointe à **l'Annexe C**. Ce document délimite les

fourchettes de salaires de base par ordre au sein de chaque classement par niveau. Pour chaque niveau et chaque sous-niveau, ce document liste les fourchettes de salaires de base annuelles et mensuelles compte tenu du plancher et du plafond au sein de chaque niveau et sous-niveau. Ces niveaux ne sont pas absolus. Ils constituent une ligne directrice pour les salaires de base de cadres dirigeants. Le supérieur du cadre dirigeant doit recommander un niveau de salaire pour un cadre dirigeant parmi les fourchettes ainsi délimitées. La détermination finale est effectuée par le responsable du département ou du comité.

18. Le salaire mensuel de base de Gaujacq au 1er juillet 2004 était de 7.330 euros, correspondant au niveau médian bas « D01 » de la fourchette de salaires alors en vigueur pour les cadres-dirigeants de niveau « R-3 » (**Cf. Annexe C**).

19. Le salaire mensuel de base de Nadal en vigueur au 1er juillet 2004 était de 13.050 euros, correspondant au niveau plafond « DEP2 » de la fourchette de salaires alors en vigueur pour les cadres-dirigeants de niveau « R-1 » (**Cf. Annexe C**).

20. Les bonus et autres avantages pour les cadres-dirigeants diffèrent également selon leurs niveaux. A titre d'exemple, le bonus est déterminé sous forme de pourcentage du salaire de base et le pourcentage est établit par EDF à des pourcentages plus élevés pour les cadres-dirigeants « R-1 » que pour les cadres-dirigeants de niveaux inférieurs.

21. Les cadres-dirigeants EDF reçoivent une compensation supplémentaire au delà du salaire de base en accord avec les différents droits issus de leurs antécédents professionnels, de leur lieu de travail ou de leur statut familial. A titre d'exemple, Gaujacq avait le droit à une indemnité spéciale au titre d'un certain nombre d'années passées en tant que directeur au service d'une centrale nucléaire. Les cadres-dirigeants ont également le droit à une compensation pour chaque enfant au cours de la minorité de l'enfant au titre de sa dépendance vis-à-vis de ses parents. En outre, le cadre-dirigeant peut négocier avec EDF d'autres composantes de sa compensation.

### Antécédents professionnels de Gaujacq

22. Gaujacq fut employée par EDF de septembre 1980, après avoir terminé ses études, et ce jusqu'en janvier 2005 au moment de sa mise à la retraite. Tout au long de son emploi par EDF, Gaujacq a travaillé en France à l'exception de son expatriation d'une durée déterminée à Washington, D.C. du 1er Août 2000 au 31 juillet 2004. Elle est restée aux Etats-Unis à l'issue de son expatriation d'une durée déterminée et a continué à être payée par EDF jusqu'à la date de sa mise à la retraite en janvier 2005.

23. Selon le document relatif aux antécédents professionnels de Gaujacq dont une copie figure ci-jointe à l'**Annexe D**, Gaujacq a été embauchée par EDF en 1980 en tant qu'ingénieur. A l'issue de la période d'essai statutaire, le premier classement individuel de Gaujacq était de Niveau 10 et son premier poste classé était un poste d'ingénieur à l'échelon 10. Pendant les 11 années suivantes, elle a avancé progressivement en niveaux jusqu'à ce qu'elle soit promue à des niveaux de direction en 1994.

24. En 1994, Gaujacq a été nommée pour diriger la centrale nucléaire EDF à Penly en France. Lors de cette nomination, elle a été promue à un niveau de direction alors appelé Niveau 52 ou « U2 » (**Annexe D**). Il ne s'agissait pas d'un poste de cadre-dirigeant.

25. Gaujacq a été promue cadre-dirigeant, au niveau qui prendra l'appellation « R-3 » au mois d'août 2000 lorsque EDF l'a nommée à un poste d'expatrié à Washington D.C.

## Nomination de Gaujacq à Washington

26. EDF a initialement nommé Gaujacq, à compter du 1er août 2000 en tant que Déléguée Générale pour les Etats-Unis et le Canada à la Direction Internationale du Pôle Clients d'EDF. Au moment de sa nomination en 2000, le poste de Délégué Général à Washington était classé niveau 60 ou « HC » (hors-classement). A cette époque, EDF commençait juste à classer les cadres-dirigeants et les postes de cadres-dirigeants sous les désignations « R-1 », « R-2 », « R-3 » et « R-4 », et n'avait pas encore classé ce poste.

27. Le poste de Gaujacq a été par la suite changé à compter du 1er août 2002 en celui de « Directeur » USA/Canada de la Branche Amériques de EDF. Son salaire mensuel de base n'a pas été modifié en conséquence de ce changement de poste à compter du 1er août 2002.

28. Les fiches de salaires montrent que Gaujacq était rémunérée en tant que Déléguée Générale du 1er août 2000 au 31 juillet 2002 et en tant que Directeur du 1er août 2002 au 31 juillet 2004. Elle n'a jamais été rémunérée en tant que « Président » d'EDFINA. Les copies des bulletins de paie de Gaujacq d'août 2000 et d'août 2002 et de mai à juillet 2004 figurent ci-jointes à l'**Annexe E**.

29. En 2004, lorsque Gaujacq a renoncé à son titre de Président d'EDFINA au profit du titre de Vice-Président d'EDFINA, EDF n'a pas modifié la rémunération de Gaujacq. Ses bulletins de paie pour mai et juin 2004 ne reflètent pas un changement de son salaire de base (cf. **Annexe E**).

30. Tout au cours de son expatriation à Washington, Gaujacq était une employée de EDF. EDF la rémunérait en francs français, puis en euros déposés sur son

compte en banque en France. Gaujacq continuait à percevoir des indemnités d'assurance de la part d'EDF et à accumuler des prestations de retraite. Les conditions générales de son emploi par EDF continuaient à être régies par les règles, procédures et politiques applicables à l'ensemble des employés d'EDF.

### Les représentants précédents d' EDF à Washington

31. EDF a successivement envoyé, depuis que EDFINA a été établi en 1991 en tant que bureau de représentation de EDF, des cadres-dirigeants EDF au poste assurant la délégation à Washington. Avant la nomination de Gaujacq en 2000, la délégation d'EDF à Washington était assurée par une série de quatre cadres-dirigeants EDF affectés par EDF, chacun d'eux ayant occupé le poste de Président d'EDFINA pour des périodes s'échelonnant de deux à quatre ans. Il s'agissait de: Henri Herbin (août 1990 - octobre 2002), Marc Géry (octobre 1992 - juin 1996), Pierre Boussard (juillet 1996 - juin 2000) et Jean Cottave (juillet 1998 – juillet 2000). Chacun de ces précédents chefs de la délégation de Washington était un employé d'EDF. Cottave occupait un échelon équivalent à ce moment au niveau actuel « R-3 ». Les autres occupaient des niveaux inférieurs.

### Contrat d'expatriation de Gaujacq

32. EDF a conclu un contrat avec Gaujacq applicable à son expatriation, intitulé « Conditions Particulières Applicables à la Mission de Longue Durée de Catherine Gaujacq à Washington » (ci-après le « Contrat d'Expatriation de Gaujacq »).

33. Le Contrat d'Expatriation de Gaujacq prévoit que son expatriation avait une durée déterminée de trois ans, commençant le 1er août 2000, renouvelable pour un an par tacite reconduction et qu'il cesserait de plein droit à la fin de son affectation. Il prévoyait également, comme cela est de rigueur pour les contrats d'expatriés EDF, que les règles locales concernant les horaires de travail, les congés hebdomadaires et les congés s'appliqueraient.

34. Le Contrat d'Expatriation de Gaujacq fixait également certaines indemnités d'expatriation que Gaujacq devait recevoir au cours de son expatriation. Ces indemnités comprenaient, en sus de son salaire de base et de son bonus, une indemnité d'expatriation, une indemnité compensatrice du différentiel du coût de la vie, le paiement par EDF du logement et du véhicule dans la région de Washington, une indemnité compensatrice du revenu de son mari, une prime exceptionnelle de déménagement, les frais de voyage en France pour elle-même et son mari et des indemnités de péréquations. Ses indemnités d'expatriation étaient limitées à la durée de son expatriation et cessaient au moment de la cessation de son affectation et de son retour subséquent en France.

35. EDF a renouvelé l'expatriation de Gaujacq pour une année supplémentaire par tacite reconduction (c'est-à-dire sans avenant écrit), comme cela était prévu par le Contrat d'Expatriation de Gaujacq lui-même. La décision de renouvellement de l'expatriation de Gaujacq a été prise début 2003 par Gérard Creuzet, alors directeur d'exploitation d'EDF à Paris. Avec ce renouvellement d'un an, l'expatriation de Gaujacq devait prendre fin au 31 juillet 2004.

### Antécédents professionnels de Nadal

36. Nadal était au niveau cadre-dirigeant lorsqu'il a été embauché par EDF en 1988 et tous les postes occupés par lui au sein d'EDF par la suite étaient au niveau cadre-dirigeant. Pendant plusieurs années avant sa nomination à Washington, Nadal était classé à l'échelon équivalent à « R-1 », qui est l'échelon le plus élevé du système de classement pour les cadres dirigeants d'EDF.

37. Fin 2003, juste avant sa nomination à Washington, le salaire mensuel de base de Nadal était de 11,150 euros. Les copies des bulletins de paie de Nadal de décembre 2003 à juillet 2004 figurent ci-jointes à l'**Annexe F**.

38. En 2004, Nadal fut nommé Délégué Général d'EDF pour l'Amérique du Nord. Il a été nommé par le PDG d'EDF, François Roussely, à compter du 1$^{er}$ janvier 2004.

### Cessation de l'expatriation de Gaujacq

39. La mission d'expatriation de Gaujacq a pris fin, en accord avec ses dispositions, au 31 juillet 2004. Bien que les dirigeants d'EDF eurent beaucoup d'échanges avec Gaujacq concernant sa proposition de rester aux Etats-Unis avec un nouveau poste après que son affectation ait pris fin, aucun accord en vue d'une nouvelle expatriation n'a été atteint et, l'affectation de Gaujacq a pris fin au 31 juillet 2004 conformément à ses conditions générales. EDF a accordé à Gaujacq trois mois supplémentaires après la cessation de son affectation afin d'arranger son retour en France.

40. EDF n'est pas tenu de respecter un quelconque préavis en cas de rapatriement requis en France d'un employé expatrié. EDF exige que ses expatriés retournent en France à l'issue de leur expatriation à moins que l'employé ne soit affecté à un autre poste à l'étranger. Le Contrat d'Expatriation de Gaujacq fait référence à un guide de gestion qui contient les politiques applicables à l'affectation des employés d'EDF à l'étranger, intitulé : Guide de Gestion des Agents Travaillant à l'Etranger (le « Guide »). Un extrait du Guide, ainsi que sa traduction en anglais, figurent ci-joints à l'**Annexe G**. Le Guide ne contient aucune condition de préavis en cas de rapatriement en France. Il prévoit qu'il est « approprié » pour la direction en France d'avoir un «entretien bilan» avec l'expatrié si possible une fois par an, au plus tard 6 mois avant le retour en France (**Annexe**

7

**G, art. 2.31**). Ceci signifie généralement que la direction d'EDF devrait rester en contact avec l'expatrié et recommander une discussion (qui peut inclure une discussion concernant le rapatriement) 6 moins avant le retour, sans que cela ne constitue une condition.

41. Bien que l'expatriation de Gaujacq ait pris fin en accord avec ses conditions générales, après un renouvellement jusqu'au 31 juillet 2004, EDF aurait pu mettre un terme à l'expatriation de Gaujacq plus tôt si EDF l'avait jugé dans l'intérêt d'EDF. En fait, le Guide prévoit qu'EDF dispose du pouvoir de décider discrétionnairement de faire cesser une expatriation « à tout moment », et ce même avant l'expiration de l'expatriation si les intérêts de EDF le justifient ou pour toute autre « raison justificative » (**Annexe G art. 2.32-1(2)**).

### Mise à la retraite de Gaujacq

42. A compter du 1er août 2004, Gaujacq fut nommée Chargée de Mission auprès du Directeur de la Division Production Nucléaire de la Branche Energies d' EDF en France. Cette nomination a été décidée par Bruno Lescoeur, alors Directeur de la Branche Energies d'EDF à Paris. Il fut demandé à Gaujacq de se présenter à ce poste en France au 1$^{er}$ novembre 2004. Gaujacq a refusé d'accepter ce poste, n'est pas retournée en France comme requis et a manqué de se présenter à la Branche Energies d' EDF comme requis.

43. En novembre 2004, Jacques Bouron, alors chef de la Direction des Cadres-Dirigeants (« DELCADIR ») à Paris a notifié à Gaujacq qu'EDF pensait à la mettre à la retraite d'office et l'invitait à se présenter, comme requis par la loi et la procédure françaises, à un entretien préalable de mise à la retraite d'office à Paris.

44. Gaujacq s'est présentée à l'entretien préalable de mise à la retraite d'office en présence de Jacques Bouron et de moi-même. Au cours de cet entretien Gaujacq nous a lu une déclaration pré-rédigée. Elle a refusé de répondre aux questions de Jacques Bouron autrement que par la menace qu'EDF entendrait parler d'elle à l'avenir. EDF a par la suite décidé que Gaujacq devait être mise à la retraite d'office pour faute grave et qu'il convenait de procéder à sa mise à la retraite d'office conformément à la loi et à la procédure françaises.

45. Entre la cessation de son expatriation en date du 31 juillet 2004 et la date de sa mise à la retraite d'office le 7 janvier 2005, EDF a continué à verser à Gaujacq son salaire y compris l'ensemble de ses indemnités d'expatriation.

46. Gaujacq a été mise à la retraite d'office le 7 janvier 2005. Sa mise à la retraite d'office a été qualifié de départ forcé à la retraite, ce qui lui permettra de bénéficier des prestations de retraite dès lors qu'elle aura atteint l'âge de la retraite tel que fixé par EDF et, ce même si elle est employée ailleurs.

8

### Certains cadres-dirigeants EDF

47. Certains cadres-dirigeants EDF impliqués dans l'affaire Gaujacq ne travaillent plus pour EDF. François Roussely, PDG d'EDF au moment de la nomination de Nadal, a quitté EDF en septembre 2004. Gérard Creuzet, le Directeur d'Exploitation d'EDF, a quitté EDF en septembre 2004. De même, Fernando Ponasso, chef de la Branche Amériques d'EDF au cours de l'expatriation de Gaujacq, a quitté EDF en 2005.

### Certificat de Travail de Gaujacq

48. A suite de la mise à la retraite d'office de Gaujacq en janvier 2005, EDF a préparé un certificat de travail comprenant tous les éléments de son emploi au sein d'EDF, comme requis par la loi française. Gaujacq a fait grief à EDF que le certificat de travail était « faux » et demandait à ce qu'il soit corrigé. Il était clair que les premiers postes occupés par Gaujacq au sein d'EDF avaient été omis par inadvertance dans le certificat de travail et qu'ils auraient dus y être inclus. Le 9 février 2005, EDF a émis un certificat de travail corrigé comprenant tous les postes occupés par Gaujacq au sein d'EDF depuis le début de son emploi en 1980. Une copie du certificat corrigé (ainsi que sa traduction en anglais) figure ci-jointe à l'**Annexe H**.

49. EDF a satisfait toutes les conditions prévues par la loi et par la procédure françaises dans le cadre de la mise à la retraite d'office de Gaujacq.

50. Pour toutes ces raisons, ainsi que pour celles posées dans les autres documents soumis à l'appui de la motion d'EDF et d'EDFINA, je demande respectueusement à la Cour d'accorder un jugement sommaire déboutant Gaujacq de sa plainte.

En date du : 12 octobre 2006
Paris, France.

PATRICK DE BOTHEREL

# DE BOTHEREL ENGLISH

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CATHERINE GAUJACQ,

        Plaintiff,

        v.

ELECTRICITE DE FRANCE
INTERNATIONAL NORTH AMERICA,
INC.,ELECTRICITE DE FRANCE, S.A. and
CHRISTIAN NADAL,

        Defendants,

Civil Action No. C5-969 (JGP)

**DECLARATION OF
PATRICK DE BOTHEREL**

**PATRICK DE BOTHEREL**  hereby declares, under penalty of perjury under the laws of the United States, in accordance with 28 U.S.C. Section 1746,  as follows:

    1.    I am a Vice President of Defendant Electricité de France, S.A. ("EDF") and the Director of Executive Compensation and Benefits in EDF's Senior Executive Development Department.  I have held that position since April 2004.  I have personal knowledge of the facts set forth herein, except as to matters occurring before I joined EDF, and as to them, I believe them to be true based on EDF records I have reviewed in the course of my employment at EDF.

    2.    I make this Declaration in support of the motion of EDF and of Defendant Electricité de France International North America, Inc. ("EDFINA") for summary judgment, dismissing the Complaint of Plaintiff Catherine Gaujacq ("Gaujacq").



3.    I work at EDF headquarters in Paris, France. I am in charge of remuneration for EDF executives and I am in charge of the remuneration pursuant to expatriation contracts for EDF executives who are assigned to expatriate positions outside France.

4.    The difference in the compensation EDF paid to Gaujacq and to Nadal during their expatriate assignments in Washington, D.C. is not due to gender. It is due to the fact that they had different ranks in EDF's executive grade-level ranking system and to the fact that they had different jobs and different employment histories.

### EDF's Grade-Level Ranking System

5.    EDF has a *bona fide* grade-level ranking system for all its French employees throughout its work force. This system is governed, in part, by a French statute, the National Statute of Personnel of the Electric and Gas Industries ("Le statut national du personnel des industries électriques et gazières") (hereafter referred to as the "National Statute"), which applies to French employees of EDF. Excerpts from the National Statute are attached hereto (together with English translations thereof) collectively as **Exhibit A**.

6.    The National Statute established and regulates a hierarchical system for EDF's non-management employees and the employees at the first level of management. This consists of a classification or ranking of employees based on type of job, with the ranks ranging from grade 1 (the lowest) to grade 20. (**Ex. A, Art. 8**). The statutory non-management ranks expressly include engineers. The basic salary ranges for employees in the statutory ranks 1-20 are established, by rank, by agreement between EDF and the national union representing employees in the electrical and gas industries. (**Ex. A, Art. 9**).

7.    Employees at the executive level are outside of the statutory classifications ("hors de la classification") established in Article 8 of the National Statute. As to these

employees, the National Statute provides that their remuneration is to be determined by the Board of Directors of EDF. (**Ex. A, Art. 36**).

8.      EDF follows the statutory system for its employees from grade 1 through grade 20 and also uses a grade-level ranking system for its executive employees. EDF determines the base salary of its executive employees, according to their rank, within salary ranges established for the different ranks.

9.      EDF's grade-level ranking system, both at the statutory level and the non-statutory level,  is an important tool EDF uses to signify the level of an employee's responsibilities and to ensure that throughout EDF's extensive employee work force employees at comparable ranks are paid at generally comparable base salary levels.

10.      EDF utilized a grade-level ranking system for the entire time that Gaujacq was employed by EDF (1980-2005).

11.      EDF's grade-level ranking system for executives in effect during the period August 2000 through July 2004 had four executive ranks: "R-1," "R-2," "R-3" and "R-4," with "R-1" being the highest.  During that period of time, Defendant Christian Nadal ("Nadal") was an "R-1," and Gaujacq was an "R-3."

12.      There are only 50 people out of all of EDF's French employees who, like Nadal, have the rank "R-1."  This was also the case in 2004.  The Chairman and CEO of EDF determines who will become an "R-1." Executives who are "R-1" report directly to the Chairman and CEO of EDF.

13.      There are approximately 350 people employed by EDF who, like Gaujacq, have the rank "R-3." This was also the case in 2004.  The decision as to whether an employee will be classified as an "R-3" is made at the branch or department level.

14.    The executive ranking denominations described above became effective in 2000.  Prior to that time, EDF had denominated the ranks of its management and executive employees by number.  The non-executive managers were ranked from grade 50 (the lowest) to grade 53, and the executives were all ranked at grade 60.

15.    There is a personal grade-level rank and a position rank.  The personal rank or classification is specific to the person.  Once a person achieves a particular level, he or she retains that level or may move to a higher level.  As a general rule, we do not degrade someone to a lower pay-grade level, regardless of the level of the position to which he or she may be assigned, unless that person has committed a serious offense.

16.    Separate and apart from the ranking of the individual, EDF classifies positions by grade-level rank.  Like the executive employees, executive positions are also classified into four levels: "R-1," "R-2," "R-3" and 'R-4," with "R-1" being the highest.  At the executive level, the classification of executive positions is based upon the contribution of the position toward achieving EDF's financial and strategic goals, the level of autonomy of the position and the importance of the position to the future of EDF.  These criteria are expressly stated in EDF's written Executive Compensation Policy ("La politique de rémunération des cadres dirigeants"), a copy of which (together with an English translation thereof) is attached hereto as **Exhibit B**.

### Executive Salaries

17.    The salary ranges for base salaries for executives in Ranks "R-1" to "R-3" are determined annually by the Executive Committee ("COMEX") of EDF. The executive base salary ranges in effect as of July 1, 2004 are set forth in an EDF document entitled "Salary Levels R1 R2 R3 Effective July 1, 2004" ("Plages de salaires R1 R2 R3 à compter du 1er juillet

2004"), a copy of which (together with an English translation thereof) is attached hereto as **Exhibit C**. This document delineates the base salary ranges by rank broken down within each rank by level. For each level and sub-level it lists the annual and monthly base salary ranges, giving the floor and ceiling within each level and sub-level. These levels are not absolute; they are guidelines for executive base salaries. The executive's superior should recommend a salary level for the executive within the ranges delineated and the determination is ultimately made by the responsible department or committee.

18.    Gaujacq's base monthly salary as of July 1, 2004 was Euros 7,330, which is at the low median level "D01" of the salary range then in effect for executives in the rank of "R-3." (See **Ex. C**).

19.    Nadal's base monthly salary as of July 1, 2004 was Euros 13,050, which is at the top level "DEP2" of the salary range then in effect for executives ranked "R-1." (See **Ex. C**).

20.    Bonuses and certain other benefits for executives also differ by rank. For example, the bonus is determined as a percentage of base salary, and the percentage rate is established by EDF at higher percentages for "R-1" executives than for the lower-level executives.

21.    EDF executives are paid additional compensation beyond base salary according to various entitlements arising from their work history, work location or family status. For example, Gaujacq was entitled to a special indemnity for a number of years for her prior service as director of a nuclear power plant. And executives are entitled to certain supplemental compensation for each child during the child's minority and dependency on the parents. In addition, the executive may negotiate other compensation components with EDF.

### Gaujacq's Employment History

22.     Gaujacq was employed by EDF from September 1980, when she completed her schooling, until January 2005, when her employment was terminated. Throughout her employment by EDF, she worked in France except for her fixed-term expatriate assignment in Washington, D.C. from August 1, 2000 through July 31, 2004. She remained in the United States after the expiration of her fixed-term assignment and continued to be paid by EDF until her termination date in January 2005.

23.     According to Gaujacq's EDF employment history sheet, a copy of which is attached hereto as **Exhibit D**, Gaujacq was hired by EDF in 1980 as an engineer. After a statutory probation period, Gaujacq's first personal grade-level rank was Level 10, and her first classified position was the grade 10 position of Engineer. Over the next 11 years, she advanced gradually in ranks until, in 1994, she was promoted to the management ranks.

24.     In 1994, Gaujacq was appointed to manage EDF's nuclear power plant in Penly, France.   With this appointment she was promoted to a management level then denominated Level 52, or "U2." (**Ex. D**.). This was not an executive position.

25.     Gaujacq was promoted to the executive level, with the rank ultimately denominated "R-3," in August 2000 when EDF appointed her to her expatriate position in Washington, D.C.

### Gaujacq's Appointment to Washington

26.     EDF initially appointed Gaujacq, effective August 1, 2000, as "Déléguée Générale" (Delegate General) for the United States and Canada in EDF's International Branch, Client Division.  At the time of her appointment in 2000, the position of Delegate General in Washington was ranked at the level 60 or "HC" (outside classification).  At that time, EDF was

just beginning to classify executives and executive positions into the denominations "R-1," "R-2," "R-3" and "R-4" and had not yet classified this position.

27.    Gaujacq's position was subsequently changed, effective August 1, 2002, to "Directeur" (Director) USA/Canada of the Americas Branch of EDF.  Her base monthly salary did not change as a result of the change in her position as of August 1, 2002.

28.    EDF's pay records reflect that Gaujacq was paid as "Déléguée Générale" (Delegate General) from August 1, 2000 to July 31, 2002 and as "Directeur" (Director) from August 1, 2002 to July 31, 2004. She was never paid as "President" of EDFINA.  Copies of Gaujacq's pay bulletins for August 2000, August 2002 and May - July 2004 are attached hereto collectively as **Exhibit E.**

29.    In 2004 when Gaujacq resigned the title of President of EDFINA and assumed the title of Vice President of EDFINA, EDF did not change Gaujacq's compensation. Her pay bulletins for May and June 2004 reflect an unchanged base salary. (See **Ex. E**).

30.    Throughout Gaujacq's expatriate assignment in Washington, she was an employee of EDF. EDF paid her salary and benefits in French Francs and then in Euros, deposited into her bank account in France. Gaujacq continued to receive insurance benefits from EDF and to accrue rights to EDF pension benefits. The terms and conditions of her employment with EDF continued to be subject to all the rules, procedures and policies that apply to all of EDF's employees.

## Prior EDF Representatives in Washington

31.    EDF has rotated EDF executives in the position heading its delegation in Washington since EDFINA was established in 1991 as its representative office. Prior to Gaujacq's appointment in 2000, EDF's delegation in Washington had been headed by a series of

four prior EDF executives assigned by EDF, each of whom served as President of EDFINA for periods ranging from two to four years. They were: Henri Herbin (August 1990 - October 1992), Marc Géry (October 1992 - June 1996), Pierre Boussard (July 1996 - June 1998) and Jean Cottave (July 1998 – July 2000). Every one of those prior heads of EDF's delegation in Washington was an EDF employee. Cottave occupied the pay grade level at the time equivalent to the current "R-3." The others occupied inferior pay grade levels.

### Gaujacq's Expatriation Contract

32.    EDF entered into a contract with Gaujacq applicable to her expatriate assignment, entitled "Conditions Pariculières Applicables à la Mission de Longue Durée de Catherine Gaujaccq à Washington" (hereafter referred to as the "Gaujacq Expatriation Contract").

33.    The Gaujacq Expatriation Contract provided that her expatriate assignment had a fixed term of three years, beginning August 1, 2000, extendable for one year by tacit agreement and that it would automatically terminate at the end of the assignment. It also provided, as is normal for EDF's expatriate contracts, that the local rules concerning matters related to hours of work, weekly breaks and local holidays will apply.

34.    The Gaujacq Expatriation Contract also set forth certain expatriation benefits which Gaujacq would receive during her expatriation. These included, in addition to her base salary and bonus, an expatriate indemnity, a cost of living differential, payment by EDF of housing and automobile in the Washington area, unemployment compensation for the loss of her husband's income, a one-time relocation indemnity, travel for herself and her husband back to France and tax equalization benefits. Her expatriation benefits were limited to the period of her

expatriation and were to terminate upon the expiration of her mission and her consequent return to France.

35.    EDF extended Gaujacq's expatriation assignment for one additional year. This was done by "tacit agreement" (that is, without a formal written amendment), as was expressly permitted in the Gaujacq Expatriation Contract itself. The decision to extend Gaujacq's expatriate term was made in the beginning of 2003 by Gérard Creuzet, then the Chief Operating Officer of EDF in Paris. With the one-year extension, Gaujacq's expatriate assignment was to expire July 31, 2004.

### Nadal's Employment History

36.    Nadal was at the executive level when he was hired by EDF in 1988, and all his positions at EDF have been at the executive level.   For many years prior to his appointment to Washington, Nadal was ranked at the pay grade level that is the equivalent of "R-1," the highest echelon of EDF's executive ranking system.

37.    As of the end of 2003, immediately prior to his appointment to Washington, Nadal's base monthly salary was 11,150 Euros.  Copies of  Nadal's pay bulletins for December 2003 and for July 2004 are attached hereto collectively as **Exhibit F**.

38.    In 2004, Nadal was appointed as "Délégué Général" (Delegate General) of EDF to North America. He was appointed by EDF's Chairman and CEO François Roussely, effective January 1, 2004.

### Expiration of Gaujacq's Expatriate Assignment

39.    Gaujacq's expatriate assignment ended, according to its terms, on July 31, 2004.  Although EDF executives had had many communications with Gaujacq in 2004 about her proposal to stay in the United States with a new position after her mission expired, no agreement

for another expatriate assignment was reached, and Gaujacq's assignment expired according to its terms as of July 31, 2004. EDF gave Gaujacq an additional three months after the expiration of her assignment to arrange for her relocation back to France.

40.    EDF is not obligated to provide any particular advance notice to the expatriate employee of his or her required repatriation to France. EDF requires that its employees return to France upon the expiration of their expatriate assignment unless the employee is assigned to another position abroad. The Gaujacq Expatriate Contract refers to a management guide that contains EDF policies generally applicable to the assignment of EDF employees to work abroad, entitled "Guide de Gestion des Agents Travaillant à l'Etranger" (Management Guide for Representatives Working Abroad" (hereafter, the "Guide"). An excerpt from the Guide, together with an English translation thereof, is attached hereto as **Exhibit G**. The Guide does not contain any requirement to give any particular advance notice of repatriation. It states that "it is appropriate" for home management in France to have an "evaluative discussion" with the expatriate "if possible annually, at the latest 6 months before the return" to France. (**Ex. G, art. 2.31**). This generally means that EDF home management should stay in communication with the expatriate and recommends a discussion (which may include discussion about repatriation) 6 months before the return, but it is not a requirement.

41.    Although Gaujacq's expatriate assignment expired according to its terms on the extended date of July 31, 2004, EDF could have terminated Gaujacq's assignment earlier if EDF decided it was in its interest to do so. In fact, the Guide expressly provides that EDF retains the discretion to terminate an expatriate assignment "at any time," even before the expiration of the assignment, "if the interest of EDF requires it or for any other justifiable reason." (**Ex. G, art. 2.32-1(2)**).

**Gaujacq's Termination**

42.    Effective August 1, 2004, Gaujacq was appointed "Chargée de Mission" (Mission Representative) to the Director of the Nuclear Production Division of EDF's Energy Branch in France. This appointment was made by Bruno Lescoeur, then the Director of EDF's Energy Branch in Paris. She was directed to report to this position in France by November 1, 2004. Gaujacq refused to accept this position, failed to return to France as directed and failed to report to work in the EDF Energy Branch as directed.

43.    In November 2004 Jacques Bouron, then head of EDF's Delegation for Management of Executives ("DELCADIR") in Paris notified Gaujacq in writing that EDF was considering terminating her employment and invited her, as required under French law and procedure, to attend a pre-termination interview in Paris .

44.    Gaujacq appeared on December 10, 2004 in Paris, France at her pre-termination interview with Jacques Bouron and myself. At this interview Gaujacq read a prepared statement to us. She refused to answer Bouron's questions, responding only with the threat that EDF would hear from her in the future.  EDF subsequently determined that Gaujacq should be terminated for grave fault and proceeded in accordance with French law and procedure to terminate her employment.

45.    From the expiration of her expatriate assignment as of July 31, 2004 through the date of her termination, January 7, 2005, EDF continued to pay Gaujacq her salary, including her full expatriation benefits.

46.    Gaujacq was terminated effective January 7, 2005. Her termination is treated as a forced retirement, which preserves all of her EDF pension and retirement benefits once she reaches the EDF retirement age, even though she is employed elsewhere.

**Certain EDF Executives**

47.     Certain of the EDF executives that were involved in the Gaujacq matter
are no longer with EDF.  Francois Roussely, EDF's Chairman and CEO at the time of Nadal's
appointment, left EDF in September 2004.  Gerard Creuzet, EDF's Chief Operating Officer, left
EDF in September 2004.  And Fernando Ponasso, head of EDF's Americas Branch during
Gaujacq's expatriate assignment, left EDF in 2005.

**Gaujacq's Work Certificate**

48.     Following Gaujacq's termination in January 2005, EDF prepared a work
certificate ("certificat de travail") with the elements of her employment at EDF, as required by
French law. Gaujacq complained to EDF that the work certificate was "false" and demanded that
it be corrected.  It was evident that Gaujacq's early positions had been inadvertently omitted
from the work certificate, and they should have been included. On February 9, 2005, EDF issued
a corrected work certificate including all of the positions Gaujacq had held at EDF from the
beginning of her employment in 1980. A copy of the corrected certificate (together with an
English translation thereof) is attached hereto as **Ex. H**.

49.     EDF fully complied with all of the requirements of French law and
procedure in the termination of Gaujacq's employment.

50.     For all of these reasons, and those set forth in the other papers submitted
in support of the motion of EDF and EDFINA, I respectfully request that this Court grant
summary judgment dismissing Gaujacq's complaint.

Dated: October 12, 2006
        Paris, France

_____/ S /_____
PATRICK DE BOTHEREL

 **Trustforte Language Services**

# CERTIFICATE OF ACCURACY

STATE OF NEW YORK    )

                   )SS:

COUNTY OF NEW YORK )

       Sabine Serre, being duly sworn, deposes and says:
I am fluent in both the English and French languages. I have reviewed the attached
English translation of the *DECLARATION OF PATRICK DE BOTHEREL* from a copy of
the original documents in the French language and hereby certify that the same is a true
translation to the best of my knowledge, ability, and belief.

_____
Sabine Serre
Trustforte Language Services

Sworn before me this
13th day of October, 2006

_____
Notary Public

MOHAMMED MUJUMDER MSS LLS
Notary Public, State of New York
No. 03-4962808
Qualified in Bronx County
Commission Expires Feb. 26, 2010

271 Madison Avenue • Third Floor • New York, New York 10016
Telephone: (212) 481-4980 • Facsimile: (212) 481-4971, 683-4801
www.trustfortelanguages.com • e-mail: info@trustfortelanguages.com