IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CATHERINE GAUJACQ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05CV0969 (JGP) |
| | ) | |
| ELECTRICITÉ DE FRANCE | ) | ORAL ARGUMENT REQUESTED |
| INTERNATIONAL NORTH AMERICA, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT CHRISTIAN NADAL'S
## MOTION FOR SUMMARY JUDGMENT ON COUNTS IV, VI, VIII, and XII

Defendant Christian Nadal hereby moves for summary judgment on Counts IV, VI, VIII, and XII of Plaintiff's Complaint pursuant to Fed. R. Civ. P. 56. Summary judgment is appropriate because, based on material facts not in dispute for purposes of summary judgment,[1] Plaintiff Catherine Gaujacq lacks sufficient evidence for a jury to find in her favor on any of her claims. In addition, the same undisputed record supports affirmative defenses to certain of her claims. The bases for Nadal's Motion are set forth in the accompanying Memorandum.[2]

---

[1] Defendant Nadal refers the Court to Defendants' Statement Pursuant To Fed. R. Civ. P. Rule 56.1 and Local Civil Rule 7(h), setting forth the material facts not in dispute for purposes of Defendants' summary judgment motions.

[2] Defendant Nadal also joins in the Motion for Summary Judgment filed by the corporate defendants, Electricité de France, S.A. ("EDF") and Electricité de France International North America, Inc. ("EDFINA").

Wherefore, Defendant Nadal respectfully requests that the Court enter summary judgment in his favor on the above counts of the Complaint and dismiss all claims against him. Pursuant to Local Civil Rule 7(f), Defendant Nadal requests oral argument on this Motion.

Respectfully submitted,

_____/s/_____

Morgan D. Hodgson (*D.C. Bar No.* 186528)
David A. Clark (*D.C. Bar No.* 473279)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 429-3000

*Counsel for Defendant Christian Nadal*

October 16, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHERINE GAUJACQ ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:05CV0969 (JGP) |
| ) | |
| ELECTRICITÉ DE FRANCE ) | |
| INTERNATIONAL NORTH AMERICA, ) | |
| INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANT CHRISTIAN NADAL'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNTS IV, VI, VIII, and XII

Morgan D. Hodgson (*D.C. Bar No.* 186528)
David A. Clark (*D.C. Bar No.* 473279)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000

*Counsel for Defendant Christian Nadal*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 2

STATEMENT OF UNDISPUTED FACTS.................................................................................. 4

ARGUMENT............................................................................................................................... 14

I.     SUMMARY JUDGMENT STANDARD ......................................................................... 14

II.    GAUJACQ CANNOT SHOW THAT NADAL SUBJECTED HER TO A
       HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE
       DISTRICT OF COLUMBIA HUMAN RIGHTS ACT. ................................................... 15

       A.    Gaujacq's Evidence Underlying Her Claim Against Defendant
             Nadal.................................................................................................................... 17

       B.    Gaujacq Cannot Make Out a Prima Facie Case. .................................................. 18

             1.    Gaujacq's and Nadal's Contacts Were Isolated and
                   Sporadic and Did Not Alter a Term or Condition of Her
                   Employment................................................................................................ 18

             2.    Gaujacq's Speculation That Nadal's Actions Were Based
                   On Her Gender Cannot Establish Harassment in Violation
                   of the Act. ................................................................................................... 20

       C.    Nadal's Legitimate Non-Discriminatory Reasons For the Actions
             Complained Of Are Not Pretextual. .................................................................... 22

III.   GAUJACQ CANNOT SHOW THAT NADAL AIDED AND ABETTED
       EDF IN ANY ACTS OF RETALIATION IN VIOLATION OF THE D.C.
       HUMAN RIGHTS ACT................................................................................................... 23

IV.    PLAINTIFF CANNOT PREVAIL ON HER CLAIMS OF
       DEFAMATION OR TORTIOUS INTERFERENCE AGAINST NADAL. ..................... 27

       A.    Plaintiff Was Not Defamed by Nadal................................................................... 27

             1.    Nadal's Description Of Audit Issues As "Very Serious"
                   Did Not Defame Gaujacq. .......................................................................... 29

             2.    Preventing Gaujacq From Participating in a Conference
                   Call Did Not Defame Her. .......................................................................... 30

             3.    Nadal Did Not Defame Gaujacq By Stating That There Had
                   Been Complaints From France About the Sufficiency of
                   Her Reporting on the Status of Company Activities in the
                   United States............................................................................................... 32

             4.    Removing Gaujacq's Check-Signing Authority Did Not
                   Defame Her................................................................................................. 34

B.  Nadal Is Entitled to Summary Judgment on Gaujacq's Tortious Interference Claim. ....................................................................................... 35

1.  Nadal, Having Acted Properly and Justifiably as Gaujacq's Superior and Fellow EDF Employee, Cannot Be Held Responsible In Tort Even If He Caused Gaujacq's Employment With EDF To End. ............................................................ 37

2.  Gaujacq Cannot Prevail On a Tortious Interference Claim For The Additional Reason That Gaujacq Herself Admits That She Refused Continued Employment With EDF For Reasons Unrelated To Nadal. ................................................................. 38

CONCLUSION ........................................................................................................ 39

## TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Alade v. Borg-Warner Protective Servs. Corp.,*
   28 F. Supp. 2d 655 (D.D.C. 1998)......................................................................................28

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................................................15

*Austin v. 3M,*
   193 F.3d 992 (8th Cir. 1999)..........................................................................................20

*Batson v. Powell,*
   912 F. Supp. 565, 578 (D.D.C. 1996), *aff'd mem.,* 203 F.3d 5 (D.C. Cir. 1999) ..................19

*\*Beckwith v. Career Blazers Learning Ctr.,*
   946 F. Supp. 1035 (D.C. 1996)................................................................................19-21, 24

*\*Ben-Kotel v. Howard Univ.,*
   319 F.3d 532 (D.C. Cir. 2003)........................................................................................16

*Benic v. Reuters Am., Inc.,*
   357 F. Supp. 2d 216 (D.D.C. 2004)...............................................................................28

*Bortell v. Eli Lilly & Co.,*
   406 F. Supp. 2d 1 (D.D.C. 2005)...............................................................................15, 31

*Bowie v. Gonzales,*
   433 F. Supp. 2d 24 (D.D.C. 2006)..................................................................................24

*Broderick v. Donaldson,*
   437 F. 3d 1226 (D.C. Cir. 2006).....................................................................................24

*Brown v. Brody,*
   199 F.3d 446 (D.C. Cir. 1999).......................................................................................24

*\*Burlington Northern & Santa Fe Ry. v. White,*
   126 S. Ct. 2405 (2006)....................................................................................................24

*Cabiness v. YKK (USA), Inc.,*
   859 F. Supp. 582 (M.D. Ga. 1994), *aff'd mem.,* 98 F.3d 1354 (11th Cir. 1996).....................22

*\*Cambridge Holdings Group, Inc. v. Fed. Ins. Co.,*
   357 F. Supp. 2d 89 (D.D.C. 2004)..............................................................................36-37

---

\* Cases chiefly relied upon are denoted with an asterisk.

*Casco Marina Dev., L.L.C. v. Dist. of Columbia Redevelopment Land Agency,*
    834 A.2d 77 (D.C. 2003) ...................................................................................................36

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ....................................................................................................14-15

*Chandamuri v. Georgetown Univ.,*
    274 F. Supp. 2d 71 (D.D.C. 2003) .....................................................................................24

*Davis v. Coastal Int'l Sec., Inc.,*
    275 F.3d 1119 (D.C. Cir. 2002) ................................................................................... 16, 21

*Diamond v. Atwood,*
    43 F.3d 1538 (D.C. Cir. 1995) ............................................................................................14

*Dickens v. Whole Foods Market Group, Inc.,*
    No. Civ. A. 01-1054 (RMC), 2003 WL 21486821 (D.D.C. Mar. 18, 2003) ...........................29

*Faragher v. City of Boca Raton,*
    524 U.S. 775 (1998) .............................................................................................. 16, 21

*George v. Leavitt,*
    407 F.3d 405 (D.C. Cir. 2005) ...................................................................................16, 19-20

*Goss v. George Washington Univ.,*
    942 F. Supp. 659 (D.D.C. 1996) .........................................................................................22

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) ............................................................................................26

*Harris v. Forklift Sys., Inc.,*
    510 U.S. 17 (1993) .............................................................................................. 16, 19

*Haynes v. Williams,*
    392 F.3d 478 (D.C. Cir. 2004) ..................................................................................... 15, 26

*Howard Univ. v. Best,*
    484 A.2d 958 (D.C. 1984) .................................................................................28, 31, 33, 35

*Johnson v. Curtis Dworken Chevrolet,*
    242 B.R. 773 (D.D.C. 1999) ......................................................................................... 22, 24

*Jones v. Billington,*
    12 F. Supp. 2d 1 (D.D.C. 1997), *aff'd,* No. 98-5014,
    1998 U.S. App. LEXIS 15459 (D.C. Cir. June 30, 1998) ...................................................... 16

*Kerzer v. Kingly Mfg.,*
    156 F.3d 396 (2d Cir. 1998) .......................................................................................... 15, 26

*Klayman v. Segal*,
   783 A.2d 607 (D.C. Cir. 2001) ................................................................................ 28

*Mbulu v. Bureau of National Affairs, Inc.*,
   No. Civ. A. 04-1540(JDB), 2006 WL 2507029 (D.D.C. Aug. 31, 2006) ............................... 20

*McDonnell Douglas v. Green*,
   411 U.S. 792 (1973) ........................................................................................ 22, 25

*McKinney v. Dole*,
   765 F.2d 1129 (D.C. Cir. 1985), *abogated on other grounds by*
   *Stevens  v. Dep't of Treasury*, 500 U.S. 1, 7 (1991) ................................................. 21

*Meyerson v. Hurlbut*,
   98 F.2d 232 (D.C. Cir. 1938) ................................................................................. 28

*Mitchell v. Baldrige*,
   759 F.2d 80 (D.C. Cir. 1985) ................................................................................. 24

*Morgan v. Fed. Home Loan Mortg. Corp.*,
   328 F.3d 647 (D.C. Cir. 2003) ............................................................................... 22

*\*Moss v. Stockard*,
   580 A.2d 1011 (D.C. 1990) ............................................................................... 29, 33

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) ............................................................................................ 19

*Rizzo-Puccio v. College Auxiliary Servs., Inc.*,
   71 F. Supp. 2d 47  (N.D.N.Y. 1999) .......................................................................... 19

*\*Russell v. Principi*,
   257 F.3d 815 (D.C. Cir. 2001) ............................................................................... 25

*Schwartz v. Paralyzed Veterans of America*,
   930 F. Supp. 3 (D.D.C. 1996) ............................................................................. 16, 21

*Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*,
   59 F. Supp. 2d 27 (D.D.C. 1999) ........................................................................... 36-38

*\*Smith v. District of Columbia*,
   430 F.3d 450 (D.C. Cir. 2005) ............................................................................. 25-26

*\*Sorrells v. Garfinkel's, Brooks Bros., Miller & Rhoads, Inc.*,
   565 A.2d 285 (D.C. 1989) ..................................................................................... 37

*Stith v. Chadbourne & Parke, LLP*,
   160 F. Supp. 2d 1 (D.D.C. 2001) ............................................................................. 16

*Washburn v. Lavoie,
  437 F.3d 84 (D.C. Cir. 2006)........................................................................28, 34

*Washburn v. Lavoie,
  357 F. Supp. 2d 210, 213 n.5 (D.D.C. 2004), aff'd,
  437 F.3d 84 (D.C. Cir. 2006)...............................................................................28

Whetstone Candy Co. v. Nat'l Consumers League,
  360 F. Supp. 2d 77 (D.D.C. 2004).........................................................................36

Wiley v. United States,
  20 F.3d 222 (6th Cir. 1994) ..................................................................................15

Williams v. County of Westchester,
  171 F.3d 98 (2d Cir. 1999) ....................................................................................21

**STATUTES**

D.C. Code § 2-1401.11 (2001) ................................................................................15

D.C. Code § 2-1402.61-62 (2001) ...........................................................................23

**RULES**

Fed. R. Civ. P. 56...................................................................................................1

Fed. R. Civ. P. 56(c) ...............................................................................................14

Fed. R. Civ. P. Rule 56.1 ........................................................................................1

Local Civil Rule 7(f)................................................................................................2

Local Rule 7(h)...................................................................................................1, 4

**BOOKS AND ARTICLES**

Restatement (Second) of Torts § 767 (1979) ............................................................37

### DEFENDANT CHRISTIAN NADAL'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNTS IV, VI, VIII, and XII

Defendant Christian Nadal ("Nadal"), through undersigned counsel, submits this memorandum in support of his Motion for Summary Judgment on Counts IV, VI, VIII, and XII. Nadal adopts the arguments and authorities of the corporate defendants, Electricité de France, S.A. ("EDF") and Electricité de France International North America, Inc. ("EDFINA") insofar as they relate to claims involving him and addresses below only those Counts specifically brought against him:

- Count IV (gender discrimination in the course of employment in violation of the District of Columbia Human Rights Act);
- Count VI (aiding and abetting retaliation in the course of employment in violation of the District of Columbia Human Rights Act);
- Count VIII (tortious interference with contractual relations alleged against Nadal); and
- Count XII (defamation) (alleged against both Nadal and the corporate defendants).

### PRELIMINARY STATEMENT

Defendant EDF is a French energy company with well over 160,000 employees. In early 2004, EDF, then wholly owned by the government of France, anticipated the impending privatization of its business and expanded prospects for worldwide capital financing and international business development flowing from its transformation to a private company. To exploit these opportunities, EDF appointed Defendant Christian Nadal, as one of its highest-level executives, to be its General Delegate for North America, to include heading EDF's delegation in Washington, D.C. and serving as President of its local subsidiary, EDF International North America, Inc., or EDFINA. At the time of this decision, Plaintiff Catherine Gaujacq, whose

special expertise was in the nuclear energy field, was the EDF employee assigned as head of EDF's U.S. delegation, and her assignment was coming to an end pursuant to contract.

In February 2004, Nadal made an advance trip to the States to meet with Gaujacq and his new staff. Rather than introducing him to the office as the new head of the U.S. delegation and incoming EDFINA President, however, Gaujacq introduced him – in the office hallway – as a gas analyst and did not explain that Nadal was coming to head the United States delegation. In the private luncheon with Nadal that followed, Gaujacq made it clear that she intended to remain in the United States for EDF and to continue serving as President of EDFINA.

Confronted with this bizarre turn of events, Nadal returned to France, sought clarification of his role vis-à-vis Gaujacq, and was assured that he was, indeed, to head EDF's U.S. delegation. After EDF reinstructed Gaujacq that Nadal was to become the President of EDFINA, Gaujacq still wished to remain in the United States, and both EDF and Nadal were prepared to accommodate her wishes if an appropriate arrangement could be fashioned. However, on a subsequent visit by Nadal to Washington in April, and after Nadal took up the Presidency of EDFINA in June, Gaujacq continued to avoid Nadal and to challenge and undermine his authority. On the few occasions on which the two spoke by phone or communicated by e-mail, and on the single further occasion at which they spoke face-to-face, Gaujacq refused Nadal's legitimate business requests and complained to Nadal and to Nadal's superiors about his decisions. When EDF ultimately made it clear to Gaujacq that she would have to return to a position in France, Gaujacq filed a complaint with the EEOC and, after being let go, brought this action.

The undisputed record reflects that, in all, Nadal spent less than three hours in Gaujacq's company during but two face-to-face meetings. The majority of that limited interaction was in

connection with their first meeting in February, which Gaujacq characterizes as business-like and pleasant. The remaining few telephone calls and e-mails between them, as well as the only other face-to-face meeting in the EDFINA offices on July 12, are well documented in the record. That record reflects considered, reasonable, and, under trying circumstances, even restrained actions on Nadal's part, all taken in an effort to manage EDF and EDFINA affairs in the face of Gaujacq's admitted refusals to adhere to his requests and directions. Nothing in this record reflects hostile treatment of Gaujacq by Nadal because of her gender, shows retaliation by Nadal against her for opposing practices unlawful under Title VII, or supports Gaujacq's tort claims of defamation and tortious interference by Nadal.

Following a full airing of the facts in discovery, Gaujacq cannot substantiate any of the Counts brought against Nadal. Accordingly, Nadal should be granted summary judgment on those claims and Counts IV, VI, VIII, and XII dismissed.

## STATEMENT OF UNDISPUTED FACTS[1]

### Background Regarding EDF and EDFINA

At the times pertinent to this action, defendant EDF was a French, state-owned power company operating in France and other countries. Def. 56.1, ¶ 4. EDF had over 160,000 employees worldwide. Def. 56.1, ¶ 3. EDF North America, Inc., or EDFINA, serves as a representative office for EDF in Washington, D.C. Def. 56.1, ¶ 21. It has been the practice of EDF to rotate the leadership of its U.S. delegation every few years. Indeed, in the nine years

---

[1] This section summarizes, for purposes of summary judgment only, the material undisputed facts of record, granting all reasonable inferences in favor of the non-moving party, as such facts pertain specifically to the claims involving Nadal. Nadal incorporates those facts and exhibits stated in the Statement of Defendants pursuant to FRCP 56.1 and Local Rule 7(h) ("Def. 56.1") by reference, as well as the arguments and authorities cited by the corporate defendants. References are to the numbered paragraphs contained in that Statement or to the accompanying Declarations. Also, for the Court's convenience, the relatively fewer documents cited within the argument sections of this brief are attached as exhibits, denominated as "Ex. ___".

prior to Gaujacq's appointment, there had been four previous EDF employees assigned to head the delegation. De Botherel Decl. ¶ 31.

In 2000, when Gaujacq was appointed, EDF's mission in Washington was to study U.S. energy developments, reinforce its reputation in the United States for nuclear expertise and, thereby, to position itself for possible business involvement in the nuclear area in the United States as the nuclear industry was reinvigorating. Laroche Decl. ¶ 7. This included representing EDF's interests in a consortium of power companies, organized as NuStart Energy Development LLC ("NuStart"), whose goal was to pursue an initiative for the design of a nuclear power plant that could be built within the restraints of the United States regulatory environment. Def. 56.1, ¶ 18.

By 2004, however, EDF had determined to enhance and broaden its presence in the United States in response to strategic changes that were taking place within the company in France and in response to global political changes regarding energy. Laroche Decl. ¶ 11. More particularly, by early 2004, EDF was planning for its privatization and the offering of a portion of its stock to the public in the United States and elsewhere. Def. 56.1, ¶ 37. With EDF's move toward privatization, the company wanted to increase its profile in the United States, attract Wall Street investors and move into commercial ventures with energy partners in the United States. Laroche Decl. ¶ 12, Nadal Decl. ¶ 9. For this, EDF wanted its United States presence to be headed by an "ambassador"-level executive who had capital markets exposure and experience in dealing with top level financial and industry leaders and government officials. Def. 56.1, ¶ 37. Accordingly, effective January 1, 2004, EDF appointed Nadal to the position of Délégué Général (Delegate General) of EDF to North America, assigned to Washington, D.C. Def. 56.1, ¶ 37.

- 5 -

Nadal was one of EDF's most senior executives, reporting to EDF's Chairman and CEO. He had been a member of EDF's Executive Committee. Def. 56.1, ¶ 34. He had extensive executive management experience, having served, from 1999 to 2001, as the CEO of an Argentinean energy company in which EDF had an equity interest and which had approximately $1 billion in annual revenues. Def. 56.1, ¶ 35. While Gaujacq was an "R-3" in EDF's executive grade system (third rung down from the top category, occupied by about 350 of the company's entire French workforce), Nadal was one of approximately 50 EDF employees worldwide classified as "R-1," the top executive level. Def. 56.1, ¶ 37, Nadal Decl. ¶¶ 16-17.

**Gaujacq's Efforts to Remain at EDFINA**

Gaujacq's expatriation employment agreement with EDFA had a three year term, expiring July 31, 2003. Def. 56.1, ¶ 11. However, in January 2003, Guajacq had sought from EDF a three-year extension of her Washington assignment. EDF declined to do so, although it extended her United States stay for one additional year, through July 31, 2004. Def. 56.1, ¶¶ 29-30.

On February 18, 2004, EDF informed Gaujacq of Nadal's appointment. Def. 56.1, ¶ 42. The next day, Gaujacq again requested that EDF extend her expatriate mission. Def. 56.1, ¶ 43. Unbeknownst to Nadal at the time, she also instructed EDFINA's immigration lawyer to apply for a visa for Nadal to work in the United States as a "gas analyst," and she described to EDF and EDFINA employees that Nadal would be arriving to work as a "gas analyst" and "advisor" in Washington under her supervision. Def. 56.1, ¶¶ 45, 50. Nadal was not, however, and never had been, a "gas analyst." Def. 56.1, ¶ 46. Gaujacq was aware that Nadal was an "R-1," that is to say a very senior official of EDF, a full two rankings superior to hers. Def. 56.1, ¶ 47.

**Developments Between Nadal's Appointment and His Arrival in D.C.**

On February 25, Nadal traveled to Washington for an introductory visit. Rather than introducing him to the office as the new head of the U.S. delegation and incoming President of EDFINA, Gaujacq greeted him in the office hallway and again referred to him as a gas analyst, giving no indication to those present that Nadal was coming to the United States to head the delegation. Nadal Decl. ¶¶ 16-17. Nadal and Gaujacq then went out for lunch; she considered that his behavior was "business like" and concedes that he did not discriminate against or harass her in any way. Def. 56.1, ¶ 49. During lunch, however, Gaujacq told Nadal that she was not relinquishing her position as head of the EDF delegation in Washington and President of EDFINA, and she would not discuss EDFINA's organization and business with Nadal. Def. 56.1, ¶ 48.

Predictably, after this February 25 lunch, Nadal returned to France to seek clarification from EDF of his role in Washington in relation to Gaujacq's. Def. 56.1, ¶ 64. Additionally troubling to Nadal, on March 11, 2004, EDFINA's immigration lawyer, with whom Gaujacq was dealing ostensibly to facilitate Nadal's visa, telephoned Nadal in France to report that Nadal's visa application could not be processed because his resume did not support an application for a "gas analyst" position because it reflected no experience in that field. Def. 56.1, ¶ 50.

Meanwhile, on March 22, 2004, EDF's then Chief Operating Officer, Gérard Creuzet, met in Buenos Aires with Gaujacq and her superior, Fernando Ponasso, to address her concerns regarding Nadal's mission in the United States. Gaujacq admits that, at this meeting, she was told that Nadal was to be the head of EDF's delegation in Washington and President of EDFINA. Def. 56.1, ¶¶ 53-55.

Gaujacq told Creuzet that she wanted to remain in the United States and continue to work on NuStart. Def. 56.1, ¶ 59. At Creuzet's invitation, Gaujacq then emailed him on March 25 a draft new expatriation contract proposing a three-year assignment for herself as "Director of EDFINA Nuclear Projects." Def. 56.1, ¶ 59. Gaujacq drafted a mission, and proposed that she report not to Nadal, but rather to the head of the Energy Branch in France as well as to the head of the Americas Branch. Def. 56.1, ¶ 60. Her request ultimately made its way to the level of EDF's Executive Committee, which decided in April that if Gaujacq remained in Washington after Nadal became head of the EDF delegation there, she would have to report operationally to him. Def. 56.1, ¶ 63. EDF ultimately rejected the reporting line that Gaujacq proposed because it bypassed Nadal as the head of EDFINA. Def. 56.1, ¶ 67.

Other than the February 2004 lunch, Nadal did not see Gaujacq between January 2004 and his meeting with her on July 12 – over a month after Nadal's arrival in Washington. Def. 56.1, ¶¶ 48, 97.

### Nadal's Arrival In Washington

Effective May 31, 2004, Gaujacq resigned as President of EDFINA. Nadal became President effective June 1, and he arrived in Washington to assume his position. Gaujacq became a Vice President at her same salary and benefits. Def. 56.1, ¶ 69. Her "mission" or job responsibilities as Vice President needed to be defined. Def. 56.1, ¶ 70. Gaujacq, however, did not meet with Nadal to discuss a role for her. Instead, on June 10, without discussing the matter with Nadal in advance, Gaujacq distributed a memo to Ponasso (the head of the Americas Branch) and to people working at EDFINA that purported to assign to Nadal responsibility for "gas and finance," while reserving the NuStart nuclear project to herself. Def. 56.1, ¶ 72.

- 8 -

Gaujacq never met with Nadal in June, nor did she appear in EDFINA's offices in June except on one day, when Nadal was in Colorado at a conference.[2] Def. 56.1, ¶ 71.

On June 11, 2004 Gaujacq went into the EDFINA office for about an hour, during which time she signed several EDFINA checks. Def. 56.1, ¶ 75. Prior to Nadal's becoming President of EDFINA, two people had been authorized to sign checks for EDFINA – Gaujacq as President, and then Vice President Benoit Dreux. Def. 56.1, ¶ 73. Upon becoming President of EDFINA, with Nadal assuming the title of President, he replaced Gaujacq (as the former President) as a signatory on the checking accounts, leaving Dreux as the other. Def. 56.1, ¶ 74. Gaujacq was advised by Dreux that she no longer had signature authority, and the checks that Gaujacq signed on June 11 were subsequently voided, with "void" written across them. Def. 56.1, ¶ 76. Upon learning that she no longer had check-signing authority for EDFINA, Gaujacq demanded that Nadal telephone her at home to discuss this matter. Def. 56.1, ¶ 77. Nadal did so from Colorado on that day. Def. 56.1, ¶ 78. Nadal and Gaujacq planned to meet the following Monday, June 14, at a Pittsburgh conference that they were both attending. Def. 56.1, ¶ 79. Nadal asked Jean Luc Forêt, another EDF employee, to accompany him on the drive to the conference in Pittsburgh but did not ask Gaujacq to join them. *See* Ex. 1 (Gaujacq Tr. at 333:3-335:12).

Although Gaujacq went to Pittsburgh on June 14, she left the conference before meeting with Nadal. Def. 56.1, ¶ 79. Gaujacq told Nadal via a note that her mother-in-law was very ill, that she had to return to Washington, and that she would undoubtedly leave for France thereafter. Def. 56.1, ¶ 79. Nadal subsequently learned from an EDFINA employee that Gaujacq's husband, Philippe, had advised the employee that Gaujacq had left the conference because one of

---

[2] Shortly after assuming his U.S. assignment, Nadal telephoned Gaujacq and asked her to provide him with a list of her business contacts in preparation for his attendance at this Colorado conference. *See* Ex. 1 (Gaujacq Tr. at 299:3-13, 308:16-309:9). Other than a document outlining the organization of EDFINA, Gaujacq never complied with this request. *Id.*

their dogs had died; Philippe Gaujacq had said nothing about any illness of his mother. Def. 56.1, ¶ 80. Nadal's suspicions regarding Gaujacq were justified. Gaujacq, in the course of this case, after testifying about her initial reason for leaving the conference, later retracted her prior sworn testimony and admitted that she had lied to Nadal about the reason for leaving and that she had not traveled to France at the time. Def. 56.1, ¶¶ 81-83.

Following Gaujacq's failure to meet him on June 14, Nadal scheduled yet another meeting with her, this time in the office on June 18, to discuss her role and responsibilities within EDFINA. Def. 56.1, ¶ 84. Once again, Gaujacq broke the appointment.[3] Def. 56.1, ¶ 84. And yet one more time, Nadal and Gaujacq were scheduled to attend a meeting on June 21 in France, to update EDF's nuclear division about the NuStart project, but Gaujacq e-mailed that she was unable to attend that meeting as well, again purportedly due to her mother-in-law's illness. Def. 56.1, ¶ 92.[4]

During this period of unresolved questions regarding Gaujacq's new responsibilities as an EDFINA Vice President, and to ensure that the new lines of authority were clear before he left for a three-week trip to France, Nadal sent a letter on June 18 to Dreux and Gaujacq, then both Vice Presidents of EDFINA, setting out his powers and responsibilities as EDFINA's President. Def. 56.1, ¶¶ 87-88. The June 18 letter was sent to Gaujacq at her home because she did not come into the office. Nadal gave Dreux a second letter, also dated June 18, authorizing him to act in Nadal's stead during Nadal's absence in France. Def. 56.1, ¶ 89. Nadal considered Dreux to be the appropriate repository of this authority because, unlike Gaujacq, Dreux was regularly in

---

[3] Gaujacq testified that she was not able to meet Nadal on that date due to her mother-in-law's illness, but she subsequently admitted that she had not gone to France on June 18. Def. 56.1, ¶ 85.

[4] Gaujacq's deposition errata sheet changed her testimony on this issue to say that she was not able to attend the June 21 meeting because she was not in France at the time. Def. 56.1, ¶ 92. Evidently, Gaujacq was at home in Great Falls, Virginia on both June 18 and June 21.

the office and appeared ready and willing to handle matters as necessary in his absence. In contrast, Nadal perceived that Gaujacq had not made herself available to Nadal, that she had behaved in a manner that he viewed as unprofessional, and that the scope of her new position was as yet to be determined. Def. 56.1, ¶ 90.

Nadal was in France from June 18 through July 10, 2004. In that time frame EDF's internal audit department, at the request of Fernando Ponasso, Gaujacq's and Nadal's superior, conducted an audit of the EDFINA office. Def. 56.1, ¶ 94. The auditors found documents missing from EDFINA's files, including documents pertaining to EDF's role in NuStart, and learned that the missing documents were maintained by Gaujacq at her residence. The auditors asked Gaujacq to bring the documents into the office, which she did. After showing the documents to the auditors, however, Gaujacq returned the documents to her home. Def. 56.1, ¶ 95. On or around July 9, 2004, during a phone call between Gaujacq, Nadal, Dreux, and two internal EDF auditors, one of the auditors raised the issue that there were two contracts that EDFINA had entered into for which they could not locate any documentation. Nadal commented that the lack of documentation was a "serious" issue. *See* Ex. 1 (Gaujacq Tr. at 376:21-377:8, 484:5-8); Def. 56.1, ¶ 96.

On July 12, 2004, Gaujacq finally appeared at the EDFINA office. Def. 56.1, ¶ 97. Nadal took that opportunity to meet with her to discuss pending issues, with Jean-Luc Forêt, an alternate representative to NuStart, present for part of the meeting. Def. 56.1, ¶ 98. As of the July 12 meeting, Nadal and Gaujacq had met only once before, on February 25, when Nadal made his first visit to Washington. Def. 56.1, ¶¶ 48, 97. Since Nadal's arrival in Washington around June 1, Gaujacq had not come to the office on any day when Nadal was there. Def. 56.1, ¶ 97. July 12 was the last time Nadal saw Gaujacq during her employment. At that meeting

Nadal told Gaujacq that her failure to keep business documents in the office was unacceptable and directed her to return all such documents to the office. Def. 56.1, ¶¶ 24-25. Gaujacq refused, saying that there were too many documents and that it would be too big a job for her to do before departing for vacation the next day. She also asserted that the NuStart documents were confidential under a NuStart Memorandum of Understanding and that Nadal – although now President of EDFINA, the putative member of the NuStart LLC – was not authorized to see them. Def. 56.1, ¶ 102. And when Gaujacq informed Nadal that a NuStart conference call was scheduled for the next day, Nadal instructed her to have Forêt participate in the call, which Gaujacq refused, again on the stated ground of confidentiality. Def. 56.1, ¶ 101.

By e-mails on July 12 and July 16, Nadal repeated his instructions that Gaujacq return EDFINA's documents and files to the office. Def. 56.1, ¶ 103. Gaujacq by e-mail on July 20, however, refused these instructions on the ground that she did not have time to gather the documents before leaving on vacation, that the EDFINA office was not a secure facility, and that Nadal was not authorized to see the documents. She also continued to insist that Forêt was not authorized to participate in NuStart conference calls. Def. 56.1, ¶ 104.

In a July 12 e-mail, Nadal also summarized the other requests he made of Gaujacq in person at the meeting earlier in the day. These requests included a request that Gaujacq participate in a further meeting with Nadal and Forêt (1) to update them on the status of EDFINA's participation in the NuStart nuclear consortium and (2) to gather NuStart documents "to provide to [France] so as to remedy the lack of information they regularly refer to." *See* Ex. 2 (July 12 e-mail); Def. 56.1, ¶ 103.

It is noteworthy that the NuStart agreements permitted both EDF and EDFINA access to all documents concerning the project. Def. 56.1, ¶ 106. Equally telling, Gaujacq has since

- 12 -

admitted that rather than leave for vacation – the stated ground for her inability to comply with Nadal's instruction to return EDFINA's only copies of important documents – she remained at her Great Falls, Virginia home for her vacation in July-August 2004. Def. 56.1, ¶ 105. Gaujacq further acknowledges that she refused to "speak, hear" or "listen to" Nadal and that she would ignore any direction from him concerning her job in this time frame. *See* Ex. 1 (Gaujacq Tr. at 511:2-17).

**Gaujacq's Complaints About Nadal**

After learning of Nadal's June 18 letter delegating certain authority to Vice President Dreux in his absence, Gaujacq on July 9 complained to her superior, Ponasso, who was also Nadal's superior, that "these facts are discriminatory in regard to my position, as compared to the situation of Benoit Dreux." Def. 56.1, ¶ 108. Later, by e-mail dated July 22, 2004, Gaujacq complained directly to Nadal about his "treatment" of her, claiming that her loss of authority when Nadal and Dreux retained such authority was "discriminatory," that Nadal had ordered the audit of the EDFINA office, that Nadal intended to attend "her" meetings, and that Nadal was looking for illegalities in immigration documents prepared under her supervision. Def. 56.1, ¶ 110.  Also on July 22, Gaujacq complained about Nadal to the Chairman of EDF and to EDF's Chief Operating Officer. Def. 56.1, ¶ 113.  In each communication, Gaujacq's point was that Nadal unfairly gave responsibilities to Dreux or assumed work that she wished to have to herself – and she never suggested that the "discrimination" was based on her gender or was unlawful under equal employment opportunity laws.

EDF ultimately decided, with the advice of French counsel, to adhere to Gaujacq's Expatriation Contract, which term ended July 31, 2004, and to require her return to France for a new assignment following its expiry. Def. 56.1, ¶ 122.  On July 27, 2004, COO Creuzet so

notified Gaujacq. Gaujacq was granted three months with continued full compensation and benefits to organize her affairs before her return to France. Def. 56.1, ¶ 123.

Three days after learning of her new assignment and transfer to France, Gaujacq filed an EEOC charge alleging discrimination and retaliation; EDFINA received notice of the charge on August 6, 2004. Prior to August 6, Nadal (as well as EDF and EDFINA) had no knowledge that a charge had been filed or that Gaujacq had any complaint of sex discrimination or sexual harassment under U.S. employment laws. Def. 56.1, ¶¶ 125-127. Meanwhile, on August 3, Nadal advised Gaujacq not to attend upcoming meetings and conference calls regarding EDF's and EDFINA's interests, including NuStart meetings. *See* Def. 56.1, ¶ 125.

Effective August 1, 2004, EDF appointed Gaujacq to the position of "Chargée de Mission" (Mission Representative) of the Nuclear Production Division of the Energy Branch. Def. 56.1, ¶ 128. Gaujacq failed to report to her new position on November 2, 2004. Def. 56.1, ¶ 137. Under French law and company rules, EDF commenced a disciplinary procedure and terminated her employment effective January 7, 2005. Def. 56.1, ¶¶ 139-141. Shortly thereafter, Gaujacq accepted a new position as Director, Strategic Programs for ENTERGY Operations, Inc., a U.S. nuclear energy company that is a member of the NuStart consortium. Def. 56.1, ¶ 145.

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are

material, the Court must first examine the substantive law underlying the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense, thereby affecting the outcome of the action. *See Celotex*, 477 U.S. at 322. If the material facts are not in dispute, the plaintiff must then show that her evidence is substantive enough that a "fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" and instead, the plaintiff must provide "substantial evidence" to support her claim. *Id.*

In discussing the "substantial evidence" standard, this Court has cautioned that only admissible evidence may be considered. *See Bortell v. Eli Lilly & Co.*, 406 F. Supp. 2d 1, 11 (D.D.C. 2005). Hearsay and other inadmissible evidence cannot be considered on a motion for summary judgment. *See id.* at 11 (*citing Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). So, too, the plaintiff's case may not rest on her own speculation and conjecture. *See Haynes v. Williams*, 392 F.3d 478, 485 (D.C. Cir. 2004) ("The possibility that a jury might speculate in the Plaintiff's favor is insufficient to defeat summary judgment."); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.").

## II.    GAUJACQ CANNOT SHOW THAT NADAL SUBJECTED HER TO A HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT.

Nadal is entitled to entry of summary judgment in his favor on Count IV, which alleges that he is liable for creation of a hostile work environment on the basis of gender under the District of Columbia Human Rights Act, D.C. Code § 2-1401.11 (2001) ("DCHRA" or the "Act"). The undisputed record, viewed most favorably to Gaujacq, simply fails to meet the standard for such a claim against Nadal.

- 15 -

A hostile work environment claim under the DCHRA must meet the same standard as under Title VII. *See Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 534-35 (D.C. Cir. 2003); *Stith v. Chadbourne & Parke, LLP*, 160 F. Supp. 2d 1, 11 (D.D.C. 2001). Thus, for a *prima facie* case Gaujacq must establish (1) that she is a member of a protected class (2) subjected to unwelcome harassment (3) based upon her sex (4) that unreasonably interfered with her work performance and created an intimidating, hostile, or offensive working environment. *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002); *Jones v. Billington,* 12 F. Supp. 2d 1, 11 (D.D.C. 1997), *aff'd,* No. 98-5014, 1998 U.S. App. LEXIS 15459 (D.C. Cir. June 30, 1998).

In considering such claims, courts examine the "totality of the circumstances." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 782 (1998). The frequency of the alleged discriminatory conduct, its severity, whether the behavior is physically threatening or humiliating, or a mere offensive utterance, and whether it reasonably interferes with the employee's work performance are all considered. *See id.* To make out a claim, the harassment must not only be subjectively offensive to the claimant but also objectively offensive to a reasonable person. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Unless the evidence, viewed most favorably to Gaujacq, shows that gender-based harassment created a workplace so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment," *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005), summary judgment should be granted to Nadal. And Gaujacq must also provide a "solid evidentiary base" – not speculation – that the offensive conduct directed at her was the result of Nadal's discriminatory animus on the basis of her sex. *See Schwartz v. Paralyzed Veterans of America*, 930 F. Supp. 3, 8 (D.D.C. 1996).

- 16 -

In the face of these requirements, Gaujacq's hostile work environment claim against Nadal fails as a matter of law. First, she cannot show that she was subjected to actions by Nadal sufficiently severe or pervasive to create an offensive working environment. Second, even assuming Nadal's sporadic encounters with Gaujacq could be viewed as meeting this standard based on undisputed evidence, Gaujacq cannot show that his actions were based on her gender.

A.    **Gaujacq's Evidence Underlying Her Claim Against Defendant Nadal.**

Granting all reasonable inferences in her favor, Gaujacq strings together the following conduct by Nadal to justify her claim of a hostile work environment:

- After he was appointed to serve as President of EDFINA, Nadal substituted himself for Gaujacq on the two-person list of EDFINA officers authorized to have signature authority over EDFINA's bank accounts. *See* Ex. 3 (June 4 letter from Nadal to Riggs Bank). These letters copied, almost verbatim, previous letters sent by Gaujacq when she substituted herself as an authorized signatory for previous presidents of EDFINA. *See* Ex. 4 (letters from Gaujacq to Riggs Bank).

- Nadal asked Jean Luc Forêt, another EDF employee, to accompany him on the drive to a conference in Pittsburgh, but did not ask Gaujacq, who was also attending the conference, to join them. *See* Ex. 1 (Gaujacq Tr. at 333:3-335:12).

- Shortly after assuming his U.S. assignment in June 2004, Nadal telephoned Gaujacq and asked her to provide him with a list of her business contacts. *See* Ex. 1 (Gaujacq Tr. at 299:3-13, 308:16-309:9).

- On June 18, 2004 Nadal sent a letter to Gaujacq and Benoit Dreux, as EDFINA Vice Presidents, informing them of the respective powers and authorities of the President and Vice President positions. *See* Ex. 5 (letter from Nadal to Gaujacq and Dreux). On the same date, Nadal sent Dreux a separate letter granting him limited authority to act on Nadal's behalf while Nadal was out of town. *See* Ex. 6 (letter from Nadal to Dreux).

- On or around July 9, 2004, during a phone call between Gaujacq, Nadal, Dreux, and two internal EDF auditors, an auditor raised the issue that there were two contracts that EDFINA had entered into for which they could not locate any documentation. Nadal commented that the lack of documentation was a "serious" issue. *See* Ex. 1 (Gaujacq Tr. at 376:21-377:8, 484:5-8).

- On July 12, Nadal asked Gaujacq to provide him with certain business records for an upcoming meeting on NuStart and to immediately return relevant files she maintained at her home to company premises. *See* Ex. 1