(Gaujacq Tr. at 394:12-395:2).    When Gaujacq refused to comply with Nadal's directive, Nadal "jumped out of his office where he was sitting and he tells me I'm the General Delegate of EDFINA and you have to comply to my orders. . . ." Ex. 1 (Gaujacq Tr. at 392:2-6). Gaujacq claims that Nadal pointed his finger at her and made his request in a demeaning tone. *See* Ex. 1 (Gaujacq Tr. at 79:4-80:3).[5]

## B.    Gaujacq Cannot Make Out a Prima Facie Case.

Granting all reasonable inferences in Gaujacq's favor, and even viewed in their totality, the claimed conduct by Nadal fails to meet the "severe or pervasive" standard necessary to support a hostile work environment claim. And even if these acts could be considered severe or pervasive, none of the conduct or words used by Nadal can reasonably be viewed as motivated by discrimination due to Gaujacq's gender.

### 1.    Gaujacq's and Nadal's Contacts Were Isolated and Sporadic and Did Not Alter a Term or Condition of Her Employment.

Gaujacq's claims are based solely on verbal and written exchanges between June and mid-August 2004. Those contacts in their totality were meager at best – remarkably, she had only had one face-to-face encounter with Nadal. *See* Ex. 1 (Gaujacq Tr. at 472:14-475:18).[6] That meeting, on July 12, lasted less than an hour. *See id.* Gaujacq had phone conversations with Nadal on only five or six occasions in this period – all prior to July 12, and had none after that date. *See id.; see* Ex. 1 (Gaujacq Tr. 508:9-18). Any remaining interaction was written – by e-mail or letter. Given the absence of *any* extreme or hostile interaction in any of these communications, the threshold question is whether Gaujacq had sufficient contact *of any type*

---

[5] In discovery, Gaujacq also has asserted that on August 9, 2004, while traveling, Gaujacq's company credit cards were rejected as cancelled, although she acknowledges that either Nadal or Dreux could have cancelled them. *See* Ex. 1 (Gaujacq Tr. at 507:13-508:8). She also claims that a conference call number for an August 19, 2004 conference call with NuStart personnel was changed after Nadal told her that she need not attend. There is no admissible evidence on either claim in the record linking Nadal to these claims. In any event, whether viewed alone or with other claims, these events, if true, would not support Gaujacq's hostile environment claim.

[6] Even before this period Gaujacq had met only with Nadal once prior on February 25, 2004, when, by her admission they had a "pleasant" or "business like" lunch at the Mayflower Hotel. *See* Ex. 1 (Gaujacq Tr. at 161:8-16, 472:14-473:8).

with Nadal sufficient to prove a working environment so rife with insult that it was "'pervasive so as to alter the conditions of employment.'" The answer is that she did not. *See Beckwith v. Career Blazers Learning Ctr.*, 946 F. Supp. 1035, 1047 (D.C. 1996) (citation omitted). Without "'[m]ore than a few isolated incidents,'" "'genuinely trivial occurrences will not establish a prima facie case.'" *Id.* at 1047 (citation omitted).

Title VII was never intended to function as a workplace civility code. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998). For an actionable hostile work environment, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment . . . ." *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (citation omitted). The harassment must be unjustly discriminatory, and not the product of legitimate business-related criticisms or reprimands. "An employer has every right to criticize an employee's failure to meet its legitimate business expectations" and "is entitled to expect cooperation from its employees regarding business matters." *Beckwith*, 946 F. Supp. at 1051; *id.* at 1047 (*citing Batson v. Powell*, 912 F. Supp. 565, 578 (D.D.C. 1996)), *aff'd mem.*, 203 F.3d 5 (D.C. Cir. 1999)). Criticisms which merely engender offended feelings in an employee "[do] not sufficiently affect the conditions of employment to implicate Title VII. *Harris*, 510 U.S. at 21. Nor does a cause of action lie because an employee is treated rudely or harshly. *Rizzo-Puccio v. College Auxiliary Servs., Inc.*, 71 F. Supp. 2d 47, 51-52, 55-57 (N.D.N.Y. 1999) (in case involving treating employee in a harsh and demanding fashion, reprimanding her for lateness, cutting her off in front of coworkers, and demeaning her; employee's unsubstantiated allegations that her supervisor did not treat men as harshly insufficient to carry her burden). Even when physical touching (not claimed in this case) accompanies verbal statements, that may still be insufficient

- 19 -

as a matter of law. *See Beckwith*, 946 F. Supp. at 1048 (four incidents of physical touching and several verbal comments made by Director of organization were insufficient as a matter of law). These cases are consistent with a long line of decisions holding firm that isolated incidents, or business related criticisms – even when coupled with evidence of limited gender-discriminatory comments – are insufficient to create a hostile work environment.[7]

Gaujacq's evidence, viewed most favorably to her, consists of a short list of encounters involving Nadal that in some way displeased her. Some – such as Nadal's requests for information and documents – are plainly within the scope of normal interactions between a supervisor and his subordinate. Other conduct she claims as hostile – the change in check signing authority – reflects activity consistent with Nadal's assumption of the presidency of EDFINA. Appointing Dreux instead of Gaujacq to act in Nadal's absence, while arguably embarrassing to her, falls far short of a severe, hostile act given her absences from the office and the lack of definition of her current responsibilities. None qualifies as harassment under the law nor is evidence a workplace rife with insult and ridicule.

### 2. Gaujacq's Speculation That Nadal's Actions Were Based On Her Gender Cannot Establish Harassment in Violation of the Act.

Nothing in the record links Nadal's actions to Gaujacq's gender. Gaujacq offers only her theories and speculation – not facts – to support her position. In the absence of admissible evidence by Gaujacq, such unsupported suppositions are insufficient to sustain her burden of

---

[7] *See George v. Leavitt*, 407 F.3d at 416 (no hostile work environment when plaintiff had confrontations with co-workers and was thrice told to "'go back where she came from'") (citation omitted); *Mbulu v. Bureau of National Affairs, Inc.*, No. Civ. A. 04-1540(JDB), 2006 WL 2507029 (D.D.C. Aug. 31, 2006) (no hostile work environment when supervisor confronted plaintiff about his use of e-mail during lunch and break periods, imposed a limitation on plaintiff's personal use of BNA's telecommunications and computer equipment, requested documentation to support plaintiff's use of sick leave, and engaged in 'surveillance' of plaintiff during the workday); *Austin v. 3M*, 193 F.3d 992 (8th Cir. 1999) (no hostile work environment when plaintiff was disciplined for violating safety procedures, not provided with a convenient portable toilet, subjected to co-workers' comments that her department was not for women, and had her promotion test scores distributed within the workplace).

proof. *See Beckwith*, 946 F. Supp. at 1045; *Schwartz v. Paralyzed Veterans of Am.*, 930 F. Supp. 3, 8 (D.D.C. 1996) (supervisor's description of female employee as "passive" and not aggressive enough was insufficient to form *prima facie* case; "discrimination cannot be found by speculation but must be inferred from a solid evidentiary base.").

Claims of hostile work environment harassment must have some connection to the sex (or protected status) of the alleged victim. In *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002), the D.C. Circuit examined a case of egregious physical and verbal conduct by two employees which included repeated slashing of the plaintiff's tires and vulgar comments and gestures. The court stated that "[w]hile [the plaintiff and aggressors] 'obviously hated each other' and 'were fighting like scorpions in a bottle,' . . . [the aggressors'] behavior 'ha[d] nothing to do with sexual harassment.'"[8] *Davis*, 275 F.3d at 1122 (alteration in original).

The undisputed facts here are far milder. The limited interactions between Gaujacq and Nadal may be characterized as curt, even angry, but not based on her sex. Gaujacq's only "evidence" that Nadal's actions towards her were motivated by discriminatory animus is her subjective observation that Nadal seemed to rely more heavily upon the males in the office, particularly the male vice-president, Dreux.[9] *See* Ex. 1 (Gaujacq Tr. at 361:19-363:6, 365:21-

---

[8] "[T]he plaintiff must show 'more than a few isolated incidents of gender based enmity,' 'there must be a steady barrage of opprobrious [gender-based] comments,' . . . evidence solely of 'sporadic gender-based slurs' does not suffice." *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (citations omitted). Gaujacq has no evidence whatsoever of any gender-based slurs.

[9] While conduct need not always be overtly sexual in nature to constitute unlawful harassment, *see McKinney v. Dole*, 765 F.2d 1129 (D.C. Cir. 1985), *abrogated on other grounds by Stevens v. Dep't of Treasury*, 500 U.S. 1, 7 (1991), evidence of disparate treatment can only form the basis for a hostile work environment claim when it is "sufficiently patterned or pervasive" to violate the individual's conditions of employment, and it is proved that the discrepancy in treatment is because of the individual's gender. *Id.* at 1138. Gaujacq's claims here reflect nothing more than "'ordinary tribulations of the workplace'" that Title VII was not intended to address. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

366:15).  Given her extremely limited contacts with the office over the period in which she claims a hostile environment existed, her theorizing is highly suspect.  In the complete absence of any specifics, gender-based slurs, comments, or actions, such speculation is inadequate as a matter of law.

### C.    Nadal's Legitimate Non-Discriminatory Reasons For the Actions Complained Of Are Not Pretextual.

Under the burden shifting mechanism articulated by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), even if Gaujacq could make out a *prima facie* case of unlawful harassment, Nadal has proffered legitimate, non-discriminatory reasons for all of his actions.  This is a minimal burden of production, not a burden of persuasion.  *See Goss v. George Washington Univ.*, 942 F. Supp. 659, 663 (D.D.C. 1996) (burden on employer is one of production, not persuasion); *Johnson v. Curtis Dworken Chevrolet*, 242 B.R. 773 (D.D.C. 1999) (burden of proof on plaintiff to establish employer's explanation is pretextual).  Legitimate nondiscriminatory reasons can include an employer's ignorance of certain facts.  *See Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647 (D.C. Cir. 2003).  Reprimanding an employee for violating company rules can also establish a legitimate, non-discriminatory reason.  *See Cabiness v. YKK (USA), Inc.*, 859 F. Supp. 582, 588 (M.D. Ga. 1994), *aff'd mem.*, 98 F.3d 1354 (11th Cir. 1996).

The actions of which Gaujacq complains as harassment reflected Nadal's and her mutual mistrust and absence of personal interaction.  Nadal's confidence in Gaujacq's judgment and motives had eroded early in their relationship due to Gaujacq's handling of Nadal's visa application, initial mischaracterization of his responsibilities, and her unsuccessful efforts to retain her position as EDFINA President.  *See* Ex. 7 (Nadal Tr. at 241:13-244:18).  Their lack of interaction during the claimed period of harassment after Nadal assumed his duties in June 2004

also contributed to Nadal's decisions. Nadal chose Dreux to act in his stead while he was on travel because Dreux came regularly to the office and Nadal had a working relationship with him, in contrast to Gaujacq, whose office visits were infrequent and who had not met with Nadal since February. Nadal Decl. ¶ 46. Likewise, because Gaujacq so rarely came to EDFINA's offices, it made little sense to deputize her as the secondary check signer on behalf of the organization. Nadal's requests as President for his predecessor's business contacts and files were likewise legitimate, business-related actions.

There is not a shred of record evidence that discredits Nadal's legitimate business-related justifications, nor could there be. Gaujacq cannot dispute her extended absences from the EDFINA office, both during and before the period of claimed harassment by Nadal, nor can she dispute the explanation by Nadal as to why Vice President Dreux was granted check signing and temporary supervisory authority for the office. Nor is there record evidence that Nadal's insistence that she return EDFINA files that she was maintaining at home, and that she provide him with her business contacts, was a pretext for unlawful discrimination based on sex. Nadal's actions, viewed favorably to Gaujacq, were both expected and explainable as sound business practices. On the basis of the undisputed record, Nadal is entitled to summary judgment in his favor on Count IV.

### III.   GAUJACQ CANNOT SHOW THAT NADAL AIDED AND ABETTED EDF IN ANY ACTS OF RETALIATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT.

In Count VI Gaujacq alleges that Nadal, in violation of the District of Columbia Human Rights Act ("DCHRA"), unlawfully aided and abetted EDF in acts of retaliation against Gaujacq for pursuing a complaint of sex discrimination. Compl. ¶¶ 285-94; *see* D.C. Code § 2-1402.61-

62 (2001). Because Gaujacq lacks any evidence that Nadal was involved in any of EDF's decisions with regard to Gaujacq, Nadal is entitled to summary judgment on Count VI.[10]

The elements for retaliation under the DCHRA follow federal employment discrimination laws. *Beckwith v. Career Blazers Learning Ctr.*, 946 F. Supp. 1035 (D.D.C. 1996); *Bowie v. Gonzales*, 433 F. Supp. 2d 24 (D.D.C. 2006); *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 85 (D.D.C. 2003). Title VII's anti-retaliation provision prohibits discrimination against an employee who "has [either] 'opposed' a practice that Title VII forbids" or has filed a charge or otherwise participated in the complaint process under Title VII. *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2410 (2006). For a *prima facie* case Gaujacq must prove (1) that she engaged in a statutorily protected activity; (2) an adverse employment action by Nadal against her; and (3) a causal relationship between the two. *Brown v. Brody*, 199 F.3d 446, 455 (D.C. Cir. 1999). Any adverse actions must be "materially adverse to a reasonable employee" and "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 126 S. Ct. at 2409, 2417. *Broderick v. Donaldson*, 437 F. 3d 1226, 1233 (D.C. Cir. 2006) (disciplinary memo and refusal to change supervisory relationship not adverse actions). A causal connection requires that plaintiff prove defendant's knowledge of the protected activity. *See Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).

Applied to Nadal and on the undisputed record, Gaujacq falls short in meeting her burden of proof for a retaliation claim on multiple grounds. The record shows that EDF and Nadal had

---

[10] As for the reasons why Gaujacq cannot meet her burden of proof on this claim against EDF, Nadal adopts and incorporates by reference EDF's Motion for Summary Judgment and accompanying Memorandum. Because there is no retaliation by EDF, *a fortiori*, Nadal cannot be found to have aided and abetted such conduct. *See Johnson v. Curtis Dworken Chevrolet*, 242 B.R. at 783.

no knowledge of Gaujacq's Title VII charge until August 6, 2004, Def. 56.1, ¶ 127, and the undisputed facts do not implicate Nadal in EDF's subsequent actions with respect to Gaujacq. Nor did Nadal have interaction whatsoever with Gaujacq after that date. Her claims that Nadal canceled a credit card and precluded her access to a conference call both lack admissible evidentiary support and are not actions "materially adverse to a reasonable employee" or harmful as required by the Supreme Court.

Even backing up to July 9, 2004, and assuming *arguendo* that Nadal could reasonably have interpreted Gaujacq's earlier e-mails as statutorily protected activity, the record is similarly devoid of materially adverse subsequent conduct by Nadal. Nadal's sole actions *vis-a-vis* Gaujacq in this period were their July 12 meeting and Nadal's ensuing e-mails directing her to return business documents regarding the NuStart project to EDFINA offices, directing her to have another employee, Fôret, participate in NuStart conference calls, and asking her to participate in a further meeting on NuStart. With these facts, Gaujacq's claim of actionable retaliation by Nadal is shown to be a fiction. "[N]ot everything that makes an employee unhappy is an actionable adverse action. Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit." *Russell v. Principi,* 257 F.3d 815, 818 (D.C. Cir. 2001) (internal quotation marks omitted) (citation omitted).

Finally, the undisputed record contains reasonable business explanations for all of Nadal's challenged conduct. *See Smith v. District of Columbia,* 430 F.3d 450, 455 (D.C. Cir. 2005) (once *prima facie* case shown, burden shifts to the defendant to assert legitimate, non-discriminatory reasons for challenged actions).[11]    Nadal's explanations –wanting to be kept

---

[11] Once a legitimate, non-discriminatory explanation is offered for the alleged retaliatory conduct at issue, the *McDonnell Douglas* framework disappears, and the issue becomes "whether a reasonable

informed about company business, to have company files available at the business location, and to assign tasks to subordinates with delegated job responsibilities -- are indisputably valid business justifications.

Finally, there is no evidence whatsoever that Nadal aided and abetted EDF with respect to any of the actions it took with respect to Gaujacq. In the tort context, "aiding and abetting" liability stems from a defendant's concerted action with the primary actor. *Halberstam v. Welch*, 705 F.2d 472, 476 (D.C. Cir. 1983). The plaintiff must show three elements: 1) that the party whom the defendant aids performs a wrongful act that causes injury; 2) that the defendant has knowledge of his role as part of an illegal activity at the time he provides assistance; and 3) that the defendant substantially assists the principal violation. *See id.* Five factors are considered to determine whether a defendant "substantially assisted" the violation: (1) the nature of the act encouraged; (2) the amount of assistance given by the defendant; (3) his presence or absence at the time of the tort; (4) his relation to the other tortfeasor; and (5) his state of mind. *See id.*

Gaujacq conclusorily asserts that Nadal aided and abetted in that he "engineered" her departure from EDF. Her case may not rest on such rank speculation and conjecture. *See, e.g., Haynes v. Williams*, 392 F.3d 478, 485 (D.C. Cir. 2004) ("The possibility that a jury might speculate in the plaintiff's favor is insufficient to defeat summary judgment."); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."). No evidence shows that Nadal was "substantially" involved in actions in France that led to Gaujacq's separation. Given the absence

---

jury could infer intentional discrimination from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were discriminatory or that the non-discriminatory justification was pretextual." *Smith v. District of Columbia*, 430 F. 3d at 455.

of admissible evidence supporting Gaujacq's speculation, Nadal is entitled to summary judgment on Count VI.

## IV. PLAINTIFF CANNOT PREVAIL ON HER CLAIMS OF DEFAMATION OR TORTIOUS INTERFERENCE AGAINST NADAL.

### A. Plaintiff Was Not Defamed by Nadal.

Nadal is entitled to summary judgment in his favor on Gaujacq's defamation Count because no jury could find the statements or actions identified by her to constitute defamation by him. Moreover, beyond the facially innocuous character of the statements and actions challenged, all were confined to persons with a legitimate interest in their subject matters and are thus legally privileged.

Granting all reasonable inferences in Gaujacq's favor, Nadal's four allegedly defamatory statements or actions are these:

- *First*, that Nadal – during a conference call among EDF employees to discuss the preliminary findings of an internal audit of EDFINA – characterized as "very serious" the report of the auditors that supporting documentation could not be located for certain EDFINA expenditures, which she apparently interpreted as suggesting that she had behaved inappropriately.

- *Second*, that Nadal embarrassed Gaujacq by preventing her from participating in a conference call with NuStart consortium representatives (a function previously but no longer performed by Gaujacq), which would have allowed her to inform them of her departure from the project.

- *Third*, that Nadal communicated to certain EDF employees that EDF's Energy Branch in France – a division as to which Gaujacq had certain reporting obligations – had complained repeatedly that Gaujacq was not reporting information satisfactorily.

- And *fourth*, that Nadal informed Riggs Bank that he and Vice President Dreux were to have signature authority on the EDFINA account, thereby taking away Gaujacq's ability to sign checks on behalf of EDFINA – a fact later learned by other employees.

Even assuming Gaujacq's facially benign facts to be true, and further granting Gaujacq the benefit of all reasonable inferences about their effects, there is simply no evidence to support a finding that Nadal defamed her. Indeed, none of Nadal's challenged statements or actions

satisfies the multiple prongs of the District of Columbia's four-part test for actionable defamation.

To make out a successful defamation action under District of Columbia law, a plaintiff must show that the "(1) defendant made a false and defamatory statement concerning the plaintiff; (2) defendant published the statement without privilege to a third party; (3) defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Washburn v. Lavoie*, 357 F. Supp. 2d 210, 213 n.5 (D.D.C. 2004) (*citing Klayman v. Segal*, 783 A.2d 607, 613 n.4 (D.C. Cir. 2001)), *aff'd*, 437 F.3d 84 (D.C. Cir. 2006).[12]

A statement is defamatory if its publication "'tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community,' '[b]ut an allegedly defamatory remark must be more than unpleasant or offensive;' the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard Univ. v. Best*, 484 A.2d 958, 988-89 (D.C. 1984) (citations omitted). And, of course, "[t]ruth is an absolute defense to [a] defamation claim[]." *Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004) (citation omitted). Furthermore, "[the] 'common interest' privilege is an absolute defense to an action for defamation if the statement was made without malice or excessive publication." *Alade v. Borg-Warner Protective Servs. Corp.*, 28 F. Supp. 2d 655, 656 (D.D.C. 1998). The privilege

---

[12] So as to avoid the requirement of proving "special harm," or actual pecuniary damage, from the challenged actions, Gaujacq has pled her defamation count against Nadal as one of defamation "per se." *See* Compl. ¶¶ 344-45; *see also Meyerson v. Hurlbut*, 98 F.2d 232, 233 (D.C. Cir. 1938) (citations omitted) (holding that words that are "prejudicial in a pecuniary sense . . . to a person engaged as a livelihood in a profession or trade" are considered to be actionable per se) (citation omitted). However, even if any of the actions or statements attributed to Nadal could reasonably be viewed as impugning Gaujacq's professional reputation in the eyes of third parties (which they cannot), Gaujacq's proffered actions and statements fail other prongs of the test for actionability.

exists for a statement "otherwise defamatory, made by a person who shares a common interest with the person to whom the statement is made." *Dickens v. Whole Foods Market Group, Inc.*, No. Civ. A. 01-1054 (RMC), 2003 WL 21486821 (D.D.C. Mar. 18, 2003); *see also Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990). For the privilege to apply, "the statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest." *Moss*, 580 A.2d at 1024 (citations omitted).

### 1. Nadal's Description Of Audit Issues As "Very Serious" Did Not Defame Gaujacq.

In support of her defamation claim, Gaujacq points to a statement Nadal made in a discussion among EDF employees (and EDF employees only) about the preliminary findings of an internal audit of the books of EDFINA.[13] Gaujacq claims that Nadal, participating by telephone, falsely stated, in a meeting involving her, the two corporate EDF auditors, and Benoit Dreux, that she was "paying fees to consultants and contractors of the company without services being performed" and that this was a serious issue. Compl. ¶ 114. However, she concedes that it was the auditors who "talked about the issue of the contracts" and that it was an auditor who said "there are some contracts [sic] we couldn't find any related documentation." Ex. 1 (Gaujacq Tr. at 484:5-8, 483:9-13). Upon hearing the auditors talk about this matter, Nadal is purported to have said over the phone "oh, this is very serious." Ex. 1 (Gaujacq Tr. at 484:5-8).

---

[13] EDF, not Nadal, ordered the audit. Gaujacq originally alleged that Nadal ordered the audit, Compl. ¶ 112, but now acknowledges that not to be the case *See* Plaintiff's Memorandum in Support of Plaintiff's Motion to Compel Production of Documents, Dkt #86 at 14 ("EDF ordered that an audit be conducted. . . ").

It was unquestionably within Nadal's province, as President of the entity being audited, to comment on the auditors' concerns. Missing documents associated with financial expenditures is significant, which it why auditors flag it. No reasonable jury could conclude that stating "oh, this is very serious," in response to learning of reports of missing financial documents, would be defamatory to Gaujacq or imply personal responsibility on her. And even if the fact of missing financial documents were not "serious" on its face, the statement is protected by the common interest privilege because the only people present besides Nadal and Gaujacq when the statement was made were individuals with an vested interest in the results of the audit – the internal EDF auditors themselves and Dreux, a vice-president of the audited entity with signature authority for EDFINA's bank account.

Other than this one comment, Gaujacq has identified no other allegedly defamatory statement by Nadal in connection with the audit. To the contrary, Gaujacq indicated that although Daniel Dubois (EDF's audit director) told her that the audit report raised some quality assurance and security issues and that she would have to answer some questions, she was also informed that the audit concluded that there was no wrongdoing during her tenure. Ex. 1 (Gaujacq Tr. at 419:15-420:2). Accordingly, this incident provides no support for Gaujacq's defamation claim against Nadal.

## 2. Preventing Gaujacq From Participating in a Conference Call Did Not Defame Her.

Whether by requesting that a conference call number be changed or by expressly ordering Gaujacq not to participate, Gaujacq claims that Nadal somehow defamed her by preventing her from participating in a meeting of representatives of the NuStart consortium (a function previously performed by Gaujacq). This was defamatory, Gaujacq contends, because it

prevented her informing those representatives that she would no longer be involved on the project.

First, Gaujacq has no evidence, other than hearsay, that Nadal ever requested that the conference call-in number be changed.[14] Second, even if Nadal had done so, Gaujacq's claimed harm at being denied the opportunity to continue to participate in NuStart meetings or advise others of that fact does not, as a matter of law, rise to the level of an actionable claim. *Howard Univ.*, 484 A.2d at 988-89 ("an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous'")(citation omitted). Thus, while Gaujacq might have preferred an opportunity to bid her former colleagues in the NuStart consortium farewell, the fact that she was prevented from doing so cannot support a claim for defamation.

Third, Nadal's alleged conduct would fall within the common interest privilege, for, as described by Gaujacq, it would have been made to the organizers of the conference call in the interest of clarifying which individuals were authorized to represent EDFINA/EDF's interests in an official meeting of the organization, something Nadal was entitled to determine as President of EDFINA. Gaujacq herself had sought direction as to whether she would be permitted to continue to represent EDF's and EDFINA's interests at a number of meetings and conference calls, including NuStart meetings, and Nadal had informed her that she should not attend those events. *See* Ex. 8 (Gaujacq's e-mail requesting instructions regarding conference call participation); Ex. 9 (Nadal's response to Gaujacq informing her that Georges Servière would represent EDF on the call); Ex. 10 (second Nadal e-mail to Gaujacq stating she is not authorized to participate in the call).

---

[14] Only admissible evidence may be considered on summary judgment. *See Bortell v. Eli Lilly & Co.*, 406 F. Supp. 2d 1, 11 (D.D.C. 2005).

**3.    Nadal Did Not Defame Gaujacq By Stating That There Had Been Complaints From France About the Sufficiency of Her Reporting on the Status of Company Activities in the United States.**

Gaujacq also claims that Nadal defamed her by stating in a July 12, 2004 meeting and thereafter that individuals in EDF's Energy Branch in France (a division as to which Gaujacq had reporting obligations) had complained that Gaujacq was not properly reporting information back to France regarding EDF activities in the United States. Nadal maintains that he did in fact receive such complaints, which would make his challenged statements true and thus not possibly defamatory. But even assuming Gaujacq could create a fact issue as to the complaints, Gaujacq cannot prevail because: (1) the nature of the statements is insufficiently derogatory as a matter of law to rise to the level of defamation and (2) Nadal made these statements only to EDF employees with an interest in that subject matter.

The undisputed facts doom this claim. Although Gaujacq could recall nothing about this supposedly defamatory aspect of her July 12, 2004 meeting with Nadal when asked about it in her deposition, *see* Ex. 1 (Gaujacq Tr. at 390:14-391:3, 391:18-392:9 (discussing meeting)), there is no dispute that Gaujacq, while serving as the head of EDF's U.S. delegation and as President of EDFINA, had reporting obligations to EDF's Energy Branch in France. *See* Ex. 1 (Gaujacq Tr. at 272:16-273:9). It is likewise undisputed that only Nadal, Gaujacq, and Forêt (the EDF employee with direct responsibility for participation in NuStart activities) were present during the July 12 meeting. *See* Ex. 1 (Gaujacq Tr. at 390:14-391:3). Additionally, Nadal does not dispute the statements. In the e-mail Nadal sent to Gaujacq on the day of their July 12 meeting, Nadal summarized in writing the requests he made of Gaujacq in person at the meeting. These included a request that Gaujacq participate in a further meeting with Nadal and Forêt (1) to update them on the status of EDFINA's participation in the NuStart nuclear consortium and (2) to gather NuStart documents "to provide to [France] so as to remedy the lack of information

they regularly refer to." *See* Ex. 2 (e-mail from Nadal to Gaujacq). Nadal also asked that Gaujacq "attend the August 17, 2004 meeting, which is scheduled at 9:00 am, to answer to concerns from Engineering which deems to remain insufficiently informed." *Id.* The July 12 e-mail was copied only to Ponasso (an EDF employee to whom Nadal and Gaujacq reported), and blind copied to Betouret (an EDF human resources officer in Buenos Aires who reported to Ponasso) and to Forêt. *Id.*

The statements above simply do not make out a defamation claim. Even assuming that no one in France had in fact complained regarding a lack of information, Nadal's suggestion that France had certain unfulfilled needs for information about EDF's activities in the United States was not of a character that would injure Gaujacq "'in [her] trade, profession or community standing, or lower [her] in the estimation of the community,'" much less of a character that would "make the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard Univ.*, 484 A.2d at 988-89 (citations omitted). Permitting Gaujacq to elevate these kinds of performance-related criticisms, made in the employment context, to the level of actionable tort would be unprecedented.

Additionally, although made in the presence of others, the challenged statements are all also protected by the common interest privilege because they were made only to EDF employees with an interest in the subject matter and thus not excessively published. *See Moss*, 580 A.2d at 1024 (listing requirements necessary to come under the protection of the common interest privilege). Even assuming, *arguendo*, that the tone of the July 12 meeting or e-mail could have been considered by Gaujacq to have been harsh or unnecessary, no reasonable jury could conclude that Nadal's comments were made with malice. Indeed, "[u]nder District of Columbia law, where 'the language of the communication and the circumstances attending its publication

- 33 -

by the defendant are as consistent with the non-existence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.'" *Washburn v. Lavoie*, 437 F.3d 84, 92 (D.C. Cir. 2006) (citations omitted). Accordingly, Gaujacq's claims of false attributions of poor information reporting on her part cannot support a defamation claim against Nadal.

### 4. Removing Gaujacq's Check-Signing Authority Did Not Defame Her.

Gaujacq's claim here is apparently premised on Nadal's actions with Riggs Bank to arrange that only he and the other vice president of EDFINA were to have signature authority on the EDFINA account, thereby taking away Ms. Gaujacq's signatory authority, and dissemination of that fact to EDFINA personnel when the vice president informed Gaujacq of the change. The unadorned communication by EDFINA's President to EDFINA's bank of a new slate of authorized check signers, as well as the subsequent dissemination of this information among office personnel by someone other than Nadal, could not support a defamation verdict in Gaujacq's favor. *See* Ex 3 (letter from Nadal to Riggs Bank).

Gaujacq cannot attribute to Nadal tort liability for any embarrassment Gaujacq may have experienced when Vice President Dreux informed her of the change in check-signing authority. *See* Ex. 1 (Gaujacq Tr. 310:9-311:19) (Gaujacq complains of being "shocked" by the circumstances in which Dreux informed her that she was no longer authorized to sign checks). Accordingly, the only possible communication on which Gaujacq could base a defamation claim against Nadal would be the letter Nadal wrote to Riggs informing the bank of the change.

Nadal's letter – which describes a change in authorized signatories occasioned by a change in EDFINA's corporate office holders – is devoid on its face of any defamatory statements and could not possibly reflect badly on Gaujacq. Ex. 3 (letter from Nadal to Riggs Bank). Nor does any evidence suggest, or is it reasonable to infer, that the bank would have

understood the change to be anything other than in the ordinary course of business. Indeed, Nadal, in effecting the change in signatories, simply modified the form letter Gaujacq herself had used when signatories were changed on previous occasions. *See* Ex. 4 (previous letters from Gaujacq to Riggs Bank). It is absurd to suggest that the fact of the change in signature authority "[made] the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard Univ.*, 484 A.2d at 988-89 (citation omitted). And, in any event, the information was communicated only to those with good reason to know – namely, the bank charged with deciding whether to honor checks drawn on EDFINA's account, Dreux (an EDFINA corporate officer with authority) and Adja Ba (an EDFINA employee charged with preparing checks and securing signatures).

In sum, this "incident," like the others Gaujacq points to, falls far short of the kind of statement or action that could ever support a finding of defamation liability against Nadal at trial. And because none of the incidents cited by Gaujacq could support a defamation award against Nadal, Count VIII should be dismissed.

**B.    Nadal Is Entitled to Summary Judgment on Gaujacq's Tortious Interference Claim.**

Gaujacq's tortious interference claim against Nadal is premised on a theory that Nadal caused EDF to terminate Gaujacq's employment, leading to damages in the form of lost salary and employment benefits. *See, e.g.*, Compl. ¶ 317. For two separate and independently sufficient reasons, Gaujacq cannot prevail against Nadal on a claim that he tortiously interfered with her employment at EDF. First, Nadal, acting as an agent of EDF, enjoys a qualified privilege to act properly and justifiably toward a fellow employee without fear of liability under a tortious interference theory. Second, even if Gaujacq could point to evidence to create a jury issue as to whether Nadal acted outside the scope of his authority as an agent of the company, such fact could not save Gaujacq's claim. This is true because Gaujacq herself attributes the

cause of her separation to acts or omissions by EDF executives in France – and not to any action taken in the United States by Nadal.

In the District of Columbia a tortious interference claim requires proof of four elements: 1) existence of a contract; 2) knowledge of the contract; 3) intentional procurement of its breach by the defendant; and 4) damages resulting from the breach. *Cambridge Holdings Group, Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 96 (D.D.C. 2004). "The elements of tortious interference with prospective business advantage mirror those of interference with contract. To prevail, however, a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction." *Casco Marina Dev., L.L.C. v. Dist. of Columbia Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003) (citation omitted). Accordingly, under District of Columbia law, "[a] claim for tortious interference with business relations requires proof of four elements: '(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach of termination of the relationship or expectancy, and (4) resultant damage.'" *Whetstone Candy Co. v. Nat'l Consumers League*, 360 F. Supp. 2d 77, 81 (D.D.C. 2004) (citation omitted).

In making such claims the defendant's "'[m]otive or purpose to disrupt ongoing business relationships is of central concern. . . .'" *See Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 34 (D.D.C. 1999). Accordingly, "'a strong showing of intent to disrupt ongoing business relations'" is required, and a "general intent to interfere or knowledge that the conduct will injure the plaintiff's business dealings is insufficient to impose liability." *Sheppard*, 59 F. Supp. 2d at 34. Indeed, for liability to attach, the defendant's conduct "'must be more egregious. . . it must involve libel, slander, physical coercion, fraud, misrepresentation, or

disparagement.'" *Id.* When determining whether there has been an "improper" interference, a court may take into account: "1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interests sought to be advanced by the actor; 5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; 6) the proximity or remoteness of the actor's conduct to the interference; and 7) the relations of the parties." *Cambridge Holdings*, 357 F. Supp. 2d at 96 n.3 (citation omitted); *see also Sorrells v. Garfinkel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 290 (D.C. 1989) (*citing Restatement (Second) of Torts* § 767 (1979)).

Finally, and significantly, the law affords to a supervisor such as Nadal a qualified privilege to act properly and justifiably toward a fellow employee without fear of liability for interference with the other employee's relationship with their mutual employer. *Sorrells*, 565 A.2d at 290-91.

1. **Nadal, Having Acted Properly and Justifiably as Gaujacq's Superior and Fellow EDF Employee, Cannot Be Held Responsible In Tort Even If He Caused Gaujacq's Employment With EDF To End.**

At the time of the events that form the factual predicate for this claim, it is undisputed that Gaujacq was an EDF employee serving as a vice president of EDFINA, with Nadal as the General Delegate for EDF for North America and holding the title of EDFINA President. Accordingly, as her superior, Nadal's proper and justifiable actions were privileged, and he cannot be liable for bringing about the end of Gaujacq's employment relationship with EDF even if it were shown that his actions caused that result (which, as shown below, they did not).[15]

Granting all reasonable inferences in Gaujacq's favor, all of Nadal's actions she identifies (addressed elsewhere in this brief and that of Defendants EDF and EDFINA) fall squarely within

---

[15] While Gaujacq earlier *alleged* that Nadal acted outside the scope of his employment (*see* Compl. ¶ 316), at summary judgment such unsupported allegations cannot suffice to create a jury issue.

the reasonable bounds of the employment relationship and involve, at most, internal company politics motivated on Nadal's part by a belief that, following her actions in Spring 2006 with respect to assumption of his position and her later defiance of his directives, Gaujacq could not workably remain under his supervision at EDFINA and would be better placed elsewhere within EDF. Knowing that his views might affect her business prospects is not enough. Here Gaujacq cannot point to evidence that would establish Nadal's malice or egregious conduct (such as defamation, physical coercion, fraud) required for liability. *Sheppard*, 59 F. Supp. 2d at 37. As such, Nadal's actions as Gaujacq's supervisor were privileged, and the tortious inference claim against him should be dismissed.

2.   **Gaujacq Cannot Prevail On a Tortious Interference Claim For The Additional Reason That Gaujacq Herself Admits That She Refused Continued Employment With EDF For Reasons Unrelated To Nadal.**

Even apart from the undisputed fact that, as her supervisor, Nadal enjoyed qualified immunity with respect to actions affecting Gaujacq's employment with EDF, a separate and independently sufficient reason justifies summary judgment in Nadal's favor. The fact is this: Gaujacq admits that she could have continued her employment with EDF in France and that she rejected that continued employment for reasons unrelated to Nadal.

At the end of July, 2004, EDF management in France informed Gaujacq that EDF had decided that she should return to France to work in a position within the Energy Branch at EDF. Def. 56.1, ¶¶ 123, 128. Throughout September, EDF and Gaujacq corresponded about the financial terms of such a position and her anticipated job responsibilities. Def. 56.1, ¶¶ 129-130. Thereafter she chose not to accept the position offered, notwithstanding that it was at the same or higher salary and with full benefits, because, in her view, the new position did not represent a promotion and a raise. Def. 56.1, ¶¶ 130, 135.; *see also* Plaintiff's Memorandum in Support of Plaintiff's Motion to Compel Production of Documents, Dkt #86 at 17-18 (wherein Gaujacq

contends that, "[c]ontrary to promises previously made to Ms. Gaujacq of higher management responsibility and a raise, the proposed new mission was at a lower level of responsibility than her previous missions at EDF and offered no pay raise" and that Gaujacq refused the position for those reasons)). Gaujacq's unambiguous admissions about the proximate cause of the end of her employment relationship with EDF thus preclude any finding that Nadal somehow caused that termination, or any resulting pecuniary damages Gaujacq claims, under a tortious interference theory. Accordingly, this Count should be dismissed against Nadal for this reason as well.

## CONCLUSION

For the reasons above, Nadal respectfully requests that this Court enter summary judgment in his favor on Counts IV, VI, VIII and XII.

Dated: October 16, 2006                    Respectfully submitted,


_____/s/_____
Morgan D. Hodgson (*D.C. Bar No.* 186528)
David A. Clark (*D.C. Bar No.* 473279)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000

*Counsel for Defendant Christian Nadal*

- 39 -