**ATTACHMENT 1**

## > NOS MÉTIERS

- **Production d'électricité**

- **Négoce d'énergie**
  sur les marchés de gros

- **Commercialisation d'électricité**

- **Gestion et exploitation de réseaux**
  de transport et de distribution d'électricité

- **Commercialisation de gaz**
  en Italie, en Allemagne et au Royaume-Uni
  Activité en développement en France

- **Services énergétiques**

## > NOS PRIORITÉS

- **Proposer**
  une offre énergétique élargie, compétitive
  et adaptée à chaque type de clientèle

- **Développer**
  des services de maîtrise de l'énergie

- **Renforcer**
  les coopérations internes au groupe EDF

- **Faire évoluer**
  le portefeuille des participations du
  Groupe pour développer sa rentabilité
  et assurer son futur à long terme

## > NOS VALEURS

- Respect de la personne

- Respect de l'environnement

- Performance

- Solidarité

- Intégrité

### > BRANCHE AMÉRIQUES

**Argentine**
> Vente distribution d'électricité
- Edenor : 2 310 474 clients
- Edemsa : 313 007 clients
> Production hydroélectrique indépendante
> Transport de l'énergie

**Brésil**
> Vente, distribution d'électricité
- Light 3 350 037 clients
> Production hydroélectrique : 852 MWe installés

**Mexique**
> Production thermique indépendante
- Anahuac 495 MWe installés
- Saltillo 248 MWe installés
- Altamira 495 MWe installés
> Transport du gaz

> Vente de services d'ingénierie et de conseil
  (hydraulique thermique à flamme)

### > BRANCHE ASIE PACIFIQUE

**Chine**
> Production : FIGLEC 720 MWe installés
**Vietnam**
> Construction d'une centrale à cycle combiné  mise en
  service en 2004
**Laos**
> Projet de grand hydraulique en développement, mise en
  service en 2008

> Vente de services d'ingénierie et de conseil (nucléaire
  hydraulique, thermique à flamme transport "city
  management )

13

### > BRANCHE DÉVELOPPEMENT

Regroupement des activités liées aux énergies renouvelables à la
propreté à la distribution non nationalisée aux transports
électriques et aux activités émergentes "business innovation".
EDEV rassemble ses filiales dont Électricité de Strasbourg, TIRU SIIF
Energies, EnXco (États-Unis - 105 MWe 94 salariés)

### > DALKIA

Filiale commune EDF (34 %)m et Véolia Environnement (66 %)
leader européen des services énergétiques aux collectivités et aux
entreprises industrielles et tertiaires La contribution de Dalkia à
l'activité d'EDF se fait essentiellement au travers de Dalkia
International et Dalkia Investissement

EDF 4093

**ATTACHMENT 2**

82



Annual Report 2004

# 2. Significant events of 2004

The EDF Group serves 42 1 million customers, with its generating plants supplying more than 20% of the requirements of the 15 pre-2004 EU countries It occupies a key position in transmission and distribution networks

The Group's objective, as reaffirmed at the end of 2004 is to build up a dynamic, profitable energy group with a solid base in France and Europe

EDF's strategy is to achieve a well-balanced distribution of its activities between four areas:

– integrated generation and supply/sales services: the reorganisation of the British market provides the best example;

– regulated and deregulated activities with a balanced risk-return profile that is attractive to investors;

– gas and electricity services, with natural gas supply synergies making combined offers possible;

– equally balanced French and international activities centred geographically in Europe

## 2 1  France

The law of 9 August 2004 changed the status of EDF and required its transmission operation business as currently carried out by the *Réseau de transport d'électricité* (RTE)  to be transferred to a subsidiary in preparation for the IPO announced by the government, this law abolishes the principle of specialisation restricting EDF in France to the electricity business  reforms the financing of the pension system and clarifies the boundaries between the transmission and distribution networks

The total opening of the market for French business customers to competition was the other major event of the year  This brought about significant changes in organisation, particularly for the distribution activity: the split between the supply of electricity and the operation for the distribution network is designed to guarantee all actors equal access to the network, without losing the most important synergies gained through past joint operation  "French regulated" operations are therefore split into three Divisions: EDF Distribution Network, Island Power Systems and Local Development Market and EDF Gaz de France Distribution  the joint operator with Gaz de France  On a commercial level  for a more flexible response in the face of competition, EDF launched two new brands: *EDF Pro®* and *EDF Entreprises®* for professional and business customers respectively

[1] *European Pressurized Reactor*

Concerning production, an agreement running until 2007 was signed with AREVA for reprocessing of used nuclear fuel from EDF's power plants

EDF considers continuation of the nuclear option as a strategic solution  providing an economically efficient way to meet future economic needs in the long term without contributing to the greenhouse effect

The Group therefore decided in 2004 to launch an EPR[1] nuclear reactor project with a view to renewing existing generation plant

Following negotiations with workforce representatives, five company-level agreements were signed  as well as one at Group level  The pension financing reform was finalised  EDF management has undertaken to recruit 3,500 new staff to its core activities between June 2004 and December 2005  in view of the large number of retirements expected in the next few years

The 'Altitude 7500" performance improvement plan launched in late 2004 is designed to improve competitivity and profitability by stabilising total French personnel expenses and general purchasing expenses in real terms, through synergies built on additional upstream/downstream optimisation and reducing working capital requirements  This will give the Group more room for financial manoeuvre (+€7 5 billion)

## 2 2  Other European countries

### United Kingdom

EDF Energy, a wholly-owned EDF subsidiary and the leading distributor with 5 million customers  operates in a totally deregulated market

In 2004  high rises in energy  prices affected the company's purchases and sales

Meanwhile, EDF Energy continued to successfully apply its rationalisation programme launched in 2003

### Germany

EnBW, Germany's third-largest electricity company with 5 4 million customers, achieved significant increases in profit  largely thanks to its "Topfit " productivity improvement programme  The social aspect of this programme was finalised in late January 2004

As part of its strategy to refocus on core activities, EnBW sold off its interest in Hidrocantabrico and non-strategic investments during the year

**ATTACHMENT 3**

## Articles of incorporation  EDFINA,Inc

**ARTICLES OF INCORPORATION**
**OF**
**ELECTRICITÉ DE FRANCE INTERNATIONAL**
**NORTH AMERICA, INC.**

TO:      Department of Consumer and Regulatory Affairs
         Corporation Division
         614 H Street, N.W.
         Washington, D.C.  20001

         We, the undersigned natural persons of the age of
eighteen years or more acting as incorporators of a corporation
under the BUSINESS CORPORATION ACT (D.C. Code, 1981 edition,
Title 29, Chapter 3), adopt the following Articles of
Incorporation:

FIRST:    The name of the corporation is: Electricité de France
          International North America, Inc.

SECOND:   The period of its duration is perpetual.

THIRD:    The purposes for which the corporation is organized are
          to perform market studies, to locate clients, customers
          and other parties to work with and sell to, to engage
          in international business, to import technology, know
          how, goods and services into the United States, and to
          import or obtain, but not to render directly,
          engineering and engineering services;

          To apply for, obtain, register, purchase, lease, or
          otherwise acquire, and to hold, exploit, use, operate
          and introduce, and to sell, assign, or otherwise
          dispose of any trademarks, trade names, service marks,
          copyrights, patents, inventions, improvements, and
          processes used in connection with the corporation;

          To develop, design, manufacture, produce, build,
          purchase, sell, transfer, lease, assign, pledge,
          mortgage, grant licenses and rights in respect of, own,
          operate, hold, enjoy, or otherwise, acquire, use,
          dispose of or deal in products, devices, processes,
          apparatus, machinery, equipment, supplies, goods,
          merchandise, buildings, plants, factories, or other
          property of any and every kind capable of being used in
          connection with the corporation;

568

To investigate, develop, consummate, undertake and carry on any enterprise, business, transactions, or operation, commonly carried on or undertaken by contractors, syndicates, merchants, importers or exporters, and to acquire the good will, rights and property, and to acquire all or part of the assets and to assume all or any part of the liabilities of any person, firm, association, or corporation, and to pay for the same in cash, stock, bonds, or notes, or otherwise, and generally, to institute, enter into, carry on, assist, promote and participate in financial, commercial, mercantile, and other business, works, contracts, undertakings and operations, but only to the extent permitted by law;

To carry on, and license others to carry on all or any part of the several businesses enumerated in this paragraph, to wit:  the business of manufacturers, merchants, traders, importers, exporters, and dealers in and with goods, wares and merchandise of every description; of establishing, developing, operating and carrying on industrial, commercial, construction, trading, manufacturing, mechanical, metallurgical, building, electrical, research and development, contracting, mining, smelting, quarrying, refining, chemical, logging, lumbering, and agricultural undertakings, propositions, concessions or franchises in all their respective branches; and also, so far as necessary or incidental to, or connected with any or all of the corporate purposes, to undertake any lawful business transaction or operation undertaken or carried out by manufacturers, merchants, traders, commission men and agents;

To enter into any lawful arrangements for sharing profits, union of interest, reciprocal concession or cooperation, with any corporation, association, partnership, syndicate, entity, person or governmental, municipal or public authority, domestic or foreign, in the carrying on of any business which the corporation is authorized to carry on or any business or transaction deemed necessary, convenient or incidental to carrying out any of the purposes of the corporation; to create and/or participate with other corporations, individuals, and/or entities for the performance of all undertakings, as partner, joint venturer, or otherwise, and to share or delegate control therewith or thereto.

To enter into and perform contracts; to acquire rights of all kinds and related and other interests; to

- 2 -

acquire, use, deal in and with, encumber and dispose of
real and personal property without limitation including
obligations and/or securities; to borrow and lend money
for its corporate purposes; to invest and reinvest its
funds, and take, hold and deal with real and personal
property as security for the payment of funds loaned or
invested, or otherwise; to vary any investment or
employment of capital of the corporation from time to
time;

To purchase (or otherwise acquire), hold, sell, retire,
reissue or otherwise dispose of shares of its own stock
of any class in any manner now or hereafter authorized
by law, and to pay therefor, with cash or other
property.

To borrow or raise money and to issue bonds,
debentures, notes or other obligations of any nature
(and in any manner permitted by law) including
obligations convertible into stock of the corporation,
for money so borrowed or in payment for property
purchased, or for any other lawful consideration, and
to secure the payment thereof, and of the interest
thereon, by mortgage upon, pledge, conveyance or
assignment of trust of, the whole or any part of the
property of the corporation, real or personal,
including contract rights, whether at the time owned or
thereafter acquired; to sell, pledge, discount or
otherwise dispose of such bonds, debentures, notes or
other obligations of the corporation.

To pay pensions and establish and carry out pension,
profit sharing, stock option, stock purchase, stock
bonus, retirement, benefit, incentive or commission
plans, trusts and provisions for any or all of its
directors, officers and employees, and for any or all
of the directors, officers, and employees of its
subsidiaries; and to provide insurance for its benefit
on the life of any of its directors, officers or
employees, or on the life of any stockholder for the
purpose of acquiring at his or her death shares of its
stock owned by such stockholder;

To invest in and merge or consolidate with any
corporation in such manner as may be permitted by law;
to aid in any manner any corporation whose stocks,
bonds or other obligations are held or in any manner
guaranteed by this corporation, or in which this
corporation is in any way interested; to do any other
acts or things for the preservation, protection,

- 3 -

570

improvement or enhancement of the value of any such stock, bonds or other securities; and while owner of any such stock, bonds or other securities to exercise all the rights, powers and privileges of ownership thereof, and to exercise any and all voting powers thereon; and to guarantee the indebtedness of others and the payment of dividends upon any stock, the principal or interest or both of any bonds or other securities, and the performance of any contracts;

To have and to exercise all the powers conferred by the laws of the District of Columbia upon corporations organized under the District of Columbia Business Corporation Act.

To do all and everything necessary, suitable and proper for the accomplishment of any of the purposes or the attainment of any of the objects or the furtherance of any of the powers hereinbefore set forth, either alone or in association with other corporations, firms, partnerships or individuals, and to do every other act and thing incidental or appurtenant to or growing out of or connected with the aforesaid business or powers or any part or parts thereof, to the extent permitted by the laws of the District of Columbia, and to do all such acts and things and conduct business and have one or more offices and exercise its corporate powers in any and all places within the United States and elsewhere throughout the world, without limitation.

571

**ATTACHMENT 4**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -

IN THE MATTER OF                        )
                                       )
CATHERINE GAUJACQ                       )
                  Plaintiff,            )
                                       ) CIVIL ACTION NO:
v.                                      ) 1:05CV0969 (JGP)
                                       )
ELECTRICITE DE FRANCE                   )
INTERNATIONAL NORTH AMERICA             )
INC., et al                            )
                  Defendants.           )

- - - - - - - - - - - - - - - - -

DEPOSITION OF YANN LAROCHE

Friday, April 21st, 2006
at  8.30 am

Taken at the offices of:

Gide Loyrette Nouel
26, cours Albert 1er
Location 4
75008, Paris
France

Case 1:05-cv-00969-HHK    Document 111-2    Filed 11/20/2006    Page 12 of 28
CATHERINE GAUJACQ v EDFINA, et al
Yann Laroche                                    Friday, April 21st, 2006

10:21:34   1   At the same time, the worldwide energetic scene was being

           2   restructured, and tried to adapt to new strategies.

           3          All of this meant that EDF felt that it needed to

           4   send to the United States a representative that would not

10:21:54   5   only be high-ranking but would have the capacity of dealing

           6   with all of these subject matters and follow them all

           7   closely. This is precisely what led to the appointment of

           8   Mr. Nadal, who was appointed to the job in Washington as

           9   general delegate of EDF for the United States.

10:22:20   10         Q    What was Catherine Gaujacq not capable of

           11  doing that Christian Nadal was capable of doing for the

           12  strategy for EDF for EDFINA?

           13         A.   Again, you see, Catherine Gaujacq, being who

           14  she was and being somebody who ranked R3, I have, as

10:25:53   15  I indicated earlier, no specific knowledge either of her

           16  performance or the results that were obtained under her

           17  management period of time. But I would say that

           18  Catherine Gaujacq was certainly deemed to be competent in

           19  the nuclear field. I can't remember exactly, but I seem to

10:26:20   20  remember that she was involved in a nuclear project in the

           21  United States, the name of which escapes me as I speak now.

           22         But what the group management actually wanted was

           23  someone who would guarantee that high-level relations could

           24  be established with the various parties, such as, of course,

10:26:44   25  American companies, also global energetic operations,

CATHERINE GAUJACQ v EDFINA, et al

Yann Laroche                                           Friday, April 21st, 2006

| | | |
|---|---|---|
| 10:53:11 | 1 | the context of all of this?  What was not being done between |
| | 2 | 2000 and 2004, while Catherine Gaujacq was the President, |
| | 3 | that was now going to be done as part of the mission of |
| | 4 | EDFINA? |
| 10:53:53 | 5 | MR. CLARK:  Objection to form. |
| | 6 | A    Again, between 2000 and 2004, as I indicated |
| | 7 | earlier, I have no detail at my disposition, but I cannot |
| | 8 | say anything about Catherine Gaujacq's performance, nor can |
| | 9 | I say that she did not perform. |
| 10:56:44 | 10 | But in 2003 the company wished to evolve, and it |
| | 11 | had the feeling that it needed to adopt or move to another |
| | 12 | stage of its development, as I indicated earlier.  And one |
| | 13 | can say that there were several periods of time, if you |
| | 14 | like.  From 2000 to 2003, as I know, there was absolutely no |
| 10:57:21 | 15 | reason to criticize Catherine Gaujacq for anything she had |
| | 16 | done, certainly not anything she did in the nuclear field. |
| | 17 | But towards the end of 2003 the group merely had the feeling |
| | 18 | that it should in fact give a greater bearing to its |
| | 19 | activities in the United States, and therefore that it |
| 10:57:44 | 20 | needed to appoint a high-ranking manager -- which, by the |
| | 21 | by, was not incompatible with the remaining presence of |
| | 22 | an R3 manager who was already on the spot -- since of course |
| | 23 | within the group over the years there have been constant |
| | 24 | evolutions, whether it be concerning its activities in |
| 10:58:10 | 25 | France or abroad.  I would say that this is a totally common |

CATHERINE GAUJACQ v EDFINA, et al.

Yann Laroche                                                    Friday, April 21st, 2006

11:45:40    1    the situation and an annual interview, sometimes taking

            2    place twice a year, depending.

            3           As far as high-ranking staff are concerned, and of

            4    course this would apply to R1, traditionally this interview

11:45:58    5    is informal   In parallel to this there is a review of the

            6    performance of the staff in question, which could be done on

            7    a quarterly basis, twice a year, or a monthly basis,

            8    depending on the importance of the unit concerned.

            9           To put it this way, the meeting between a boss --

11:46:19   10    let's call him N -- and all of the people that report to

           11    him -- who would be N minus 1 -- would equally take place on

           12    a regular basis, and this would mean that all of the

           13    achievements or accomplishments of N1 would be compared to

           14    the objectives as set at the beginning of the year, thus

11:46:46   15    giving an assessment of the accomplishment of the employee

           16    in question.

           17           This system was actually put in place back at the

           18    beginning of 2002, when the group was reorganized.

           19           Q.  So what has Christian Nadal accomplished since

11:47:11   20    he has been President of EDFINA?

           21           A.  Obviously, if you wish to obtain a detailed

           22    answer to your question you would have to turn to his direct

           23    manager, because I was never party to these performance

           24    reviews as I have just depicted them.  But I can say that

11:49:06   25    within the group -- and that applies to R1-ranking staff

Page 48

CATHERINE GAUJACQ v EDFINA, et al.

Yann Laroche                                      Friday, April 21st, 2006

| 11:52:30 | 1 | staff and his supervising manager, but this does not |
| | 2 | necessarily lead to a written report. |
| | 3 | Q. Have you ever seen a written performance |
| | 4 | review on Christian Nadal? |
| 11:53:43 | 5 | A. No, I only see written reports of that type |
| | 6 | when naturally I have drafted them myself, concerning some |
| | 7 | of my reporting staff; and also when we have performance |
| | 8 | review meetings. For instance, during the meeting of the |
| | 9 | executive committee, the members of the executive committee |
| 11:54:08 | 10 | might come with their own documents, but I neither see them |
| | 11 | nor check them; it does not come within my purview. |
| | 12 | Q. Are you able to tell me anything specific |
| | 13 | about the accomplishments of Christian Nadal since he became |
| | 14 | President of EDFINA with respect to strategic thinking, |
| 11:54:25 | 15 | high-level contacts, or any other measurement of |
| | 16 | performance? |
| | 17 | MR. CLARK: Objection to form. |
| | 18 | A. I don't totally understand the word |
| | 19 | "specific". What do you mean by "specific"? |
| 11:55:09 | 20 | Q. Any detail, anything specific to his job |
| | 21 | performance; not generally. |
| | 22 | A. Well, you need to understand that my mission, |
| | 23 | my responsibility is that of a general manager. I belong to |
| | 24 | the top four managers of the group, as I explained earlier, |
| 11:57:33 | 25 | so it is certainly not within my purview to check all the |

CATHERINE GAUJACQ v EDFINA, et al.

Yann Laroche                                                    Friday, April 21st, 2006

| | | |
|---|---|---|
| 11:57:38 | 1 | writings or reports that are written on the various |
| | 2 | managers. |
| | 3 | Now, as far as R1 managers are concerned, we hold |
| | 4 | regular meetings, for instance within the meetings of the |
| 11:57:50 | 5 | executive committee, where we take this opportunity to |
| | 6 | review the performance. In fact what happens is that each |
| | 7 | of the members of the executive committee gives a report on |
| | 8 | the R1 staff under their responsibility. Of course so to do |
| | 9 | they have all sorts of elements at their disposal. |
| 11:58:14 | 10 | Now, during these meetings that took place during |
| | 11 | the period of time that you are interested in, I have always |
| | 12 | heard information or opinions that were positive concerning |
| | 13 | the strategic reflection or high level contacts, whatever |
| | 14 | else you put in your list of questions, concerning the |
| 11:58:37 | 15 | missions that have been entrusted to Christian Nadal, and |
| | 16 | I certainly never heard a negative comment. |
| | 17 | Q. Can you tell me any strategic strategy that |
| | 18 | Christian Nadal implemented since he has been President of |
| | 19 | EDFINA? |
| 11:58:59 | 20 | MS. HOGUET: I object to the form of the question. |
| | 21 | A. I think I have to make things absolutely |
| | 22 | clear. I am not N plus 1 vis-à-vis Christian Nadal; in |
| | 23 | other words, I am not the person he reports to directly. It |
| | 24 | is up to that person to assess the added value which is |
| 12:00:29 | 25 | contributed by Christian Nadal in his position and his |

CATHERINE GAUJACQ v EDFINA, et al

Yann Laroche                                                                Friday, April 21st, 2006

| | | |
|---|---|---|
| 15:18:59 | 1 | of these categories there are 1, 2 or 3, different levels |
| | 2 | Now, when you refer to D1 concerning your example, |
| | 3 | I do not know whether this "D" corresponds to "dominate", ie |
| | 4 | the second tier, or to the third one, "dépasser". |
| 15:19:29 | 5 | Q. Do you know what Catherine Gaujacq's |
| | 6 | performance evaluation ratings were while she was President |
| | 7 | of EDFINA? |
| | 8 | A. No, I have no knowledge of that. As |
| | 9 | I indicated to you earlier, that are hundreds of employees |
| 15:20:15 | 10 | that rank R3, and there's no way I could have any precise |
| | 11 | knowledge of who ranks what. |
| | 12 | Q. I'm going to show you what has been marked as |
| | 13 | deposition Exhibit 3. |
| | 14 | (Exhibit LAROCHE 3 marked for identification) |
| 15:20:35 | 15 | MS. HOGUET: The document has "19" on it, so |
| | 16 | I think you mean it has been marked 3 today. |
| | 17 | Q. Do you recall receiving this document? |
| | 18 | A. Can I look through it? The second page is |
| | 19 | a translation? |
| 15:22:12 | 20 | MS. BREDEHOFT: Yes. |
| | 21 | A. This dates back a long time, since it dates |
| | 22 | back to 2004. But as I indicated earlier, I keep all of my |
| | 23 | mails so I must have read it. This one in particular is |
| | 24 | very explicit, since it concerns an R1, Mr. Nadal, that it |
| 15:23:07 | 25 | was CC'ed to Mr. Ponasso and even to Mr. Métais. So, yes, |

**ATTACHMENT 5**

 **EDF**  BRANCHE AMERIQUES
BRANCH AMERICAS

*FAX*

Date:
Total Pages: 4 (four)

| FROM | |
|---|---|
| Name: | Fernando PONASSO |
| Phone: | (+54 11) 41 32 85 01 |
| Fax: | (+54 11) 41 32 85 61 |
| Re : | Washington |

| TO | |
|---|---|
| Name: | M. Gérard CREUZER |
| | DGO |
| Phone: | 33 1 40 42 74 18 |
| Fax: | 33 1 40 42 17 94 |

Dear Gérard,

I think this is what triggered the situation
Best regards,

Fernando

EDF 001038

De:         <EDFINACG@aol com>
A:          <fponasso@edfamericas.com>
Fecha:      03/07/2004 16:33
Tema:       edfina confidential

Dear Fernando,

Sorry to bother you with the daily operations of EDFINA.However, I think you
should know about the attached letters all dated June,18th.I received mine at
home at the end of June.
I discovered the others thanks to the audit at EDFINA this week
These decisions are not in compliance with the Board decisions dated
June,1st.They prevent me from doing my job as Vice President of the company They were
not justified by any fact that I'm aware of. I was also removed from the list
of officers of the company at the Bank of EDFINA without justification or even
information.These facts are discriminatory in regard of my position, as
compared to the situation of Benoît Dreux
I wanted you to know about that  I'm sure you've got a lot of more important
stuff to deal with but these are important for me.
Best regards,
catherine


The information contained in this message is confidential and is intended for
the addressee(s) only  If you have received this message in error please
notify the originator immediately  The unauthorized use, disclosure, copying
or
alteration of this message is strictly forbidden



Catherine GAUJACQ
Vice President
EDF International North America,Inc
suite 509
1730 Rhode Island Avenue, NW
WASHINGTON DC20036
tel 202 429 2527
fax 202 429 2532
e-mail: cgaujacq@edfina com or edfinacg@aol com

EDF 001039

ELECTRICITÉ DE FRANCE INTERNATIONAL
NORTH AMERICA, INC.

June 18, 2004





ATTN: Ms. Catherine Gaujacq, Vice President
Mr. Benoit Dreux, Vice President

RE: Officer Transition

Dear Ms. Gaujacq and Mr. Dreux,

In order to facilitate the smooth transition of officers, I would like to review the following policies and practices of Electricite de France, International North America ("EDFINA") with respect to the offices of President and Vice-President.

Only the President is permitted to enter into contracts with third parties on behalf of EDFINA; make representations and/or warranties on behalf of EDFINA; or incur expenses on behalf of EDFINA. In the President's absence, the above transactions may be carried out by either Vice-President upon the express written consent of the President. The President's consent, however, is not necessary for either Vice-President's use of their corporate credit cards for the incurrence or reimbursement of daily expenses. If any electronic payment is needed for corporate expenses, the Assistant will use the President's credit card for such purpose, as usual.

In addition, it is the duty of the President to supervise the daily operations of EDFINA, including all operations of Electricite de France in the United States and Canada. Therefore, it is important that the President is kept informed of the status of all pending or current contract negotiations and agreements involving Electricite de France in the United States or Canada. All files, letters, contracts, correspondence, bills, and similar documents must be maintained at the principal office of EDFINA, International North America in Washington, D.C. Mail directed to EDFINA should also be delivered to and maintained at the principal office in Washington, D.C., including a copy of important emails and other relevant pieces of informal information.

For convenience and efficiency, all publications, reviews, newspapers (in print or electronically) must be delivered to the office of which they are to be redistributed.

Sincerely,

Electricite De France International North America
Christian Nadal, President

ELECTRICITÉ DE FRANCE INTERNATIONAL NORTH AMERICA, INC.
1730 RHODE ISLAND AVENUE N.W.   SUITE 503 - WASHINGTON D.C.   20036   TEL: (202) 429-2522 - FAX: (202) 429-2532

EDF 001040

ELECTRICITÉ DE FRANCE INTERNATIONAL
NORTH AMERICA, INC



COPY

<br/>

*Via Hand Delivered*                                                          June 18, 2004
Electricite De France
International North America
1730 Rhode Island Ave., NW
Suite 509
Washington, DC 20036
ATTN: Mr. Benoit Dreux, Vice President

Re: *Delegation of Authority*

Dear Mr Dreux:

Let this correspondence serve as your authority to act on my behalf as President of Electricite De France International North America. Said authority shall include the power to make representations and warranties on behalf of Electricite de France International, North America; the power to legally enter into contracts on behalf of Electricite de France International, North America; and the power to incur expenses on behalf of Electricite de France International, North America.

Electricite De France
International North America

By: _____
Christian Nadal, President

cc: F Ponasso EDF Americas

EDF 001041

23 JUL. 2004 11:49

SU NOMBRE            : EDF AMERICAS
SU NUMERO DE TELEFONO : 54 11 41 32 85 61

| N° | OTRO FACSIMIL | HORA INICIO | DURACION | MODO | PAGINAS | RESULTADO |
|----|---------------|-------------|----------|------|---------|-----------|
| 01 | 9*0033140421794 | 23 JUL. 11:48 | 01'18 | ENVIO | 04 | ACEPTAR |

PARA DESACTIVAR EL INFORME, PULSE 'MENU' #04 FIJAR.
A CONTINUACION, SELECCIONE OFF UTILIZANDO EL 'DIAL GIRATORIO'.

EDF 001042

**ATTACHMENT 6**

In the U.S. District Court

For the District of Columbia

-----------------------------x

Catherine Gaujacq            :

                             : NO. 1:05CV0969

            v.               :

                             :

Electricite de France        :
International, North          :
America, et al               :

-----------------------------x

                March 17, 2006

DEPOSITION OF:

            Catherine Gaujacq (Cont'd)

a witness, called by counsel pursuant to notice,

commencing at 8:41 a.m., which was taken at 11260

Roger Bacon Drive, Reston, VA

Page 420

1    will have to answer questions, correct?

2        A.    Yes.

3        Q.    That's the substance of what he told you?

4        A.    Yes.  I want you to be aware of this

5    because he had no reason to call me.

6                MS. BREDEHOFT:  Are you just about

7    ready for the break?

8                MS. HOGUET:  Yes.  Can I just finish

9    this topic?  It should take three minutes.

10                MS. BREDEHOFT:  Sure.

11    BY MS. HOGUET:

12        Q.    Exhibit 66 is in front of you.

13                (Whereupon the proffered item was

14        marked as exhibit number 66.)

15        Q.    Exhibit 66 is an e-mail with Bates numbers

16    from Ms. Gaujacq's production 731 and 732.  It's an

17    e-mail dated July 25 from herself to Mr. Creuzet,

18    Mr. LaRoche and Mr. Ponasso.  Did you send this

19    e-mail to these gentlemen?

20        A.    Yes, I did.

21        Q.    In this e-mail you say:  As we agreed, I

Page 421

1    will postpone my decision to file a claim until we

2    speak further on Monday has to the steps to be taken

3    to resolve the current situation.

4          Is that something that you had agreed with

5    them or with any of them?

6          A.    Yes.   They had asked me not to file a

7    claim and I did agree not to.

8          Q.    Then you said --

9          A.    Until, you know, Monday.

10          Q.    Then you said what you wanted, correct?

11          A.    Yes.

12          Q.    What you wanted was, first, that Creuzet

13    and LaRoche sign your three year expatriation

14    contract, correct?

15          A.    Yes.

16          Q.    And that contract would have to state that

17    there be no direct reporting relationship with

18    Mr. Nadal, correct?

19          A.    Yes.

20          Q.    And also on the second bullet point the

21    top of the second page you ask that the parent

Page 422

1    company, EDF, sign your new mission letter, the

2    original of which was dated May 12.  That is the

3    document that you sent in May to Mr. Creuzet that we

4    marked as an exhibit earlier, correct?  Lescoeur,

5    I'm sorry.

6         A.    Excuse me.

7         Q.    You said the May 12 proposed mission was

8    sent to Mr. Lescoeur in May, correct?

9         A.    And Mr. Creuzet, LaRoche and all of them.

10        Q.    You were asking for EDF to sign the three

11   year contract and the mission letter that you

12   proposed to them and those were your requirements

13   that would have to be met to prevent you from filing

14   a claim against Mr. Nadal, correct?

15        A.    That's correct.

16        Q.    The next one then -- I'm almost done.  I'm

17   putting in front of you exhibit 67.

18              (Whereupon the proffered item was

19        marked as exhibit number 67.)

20        Q.    Are these notes, exhibit 67 is Bates

21   numbered 600 and 601 from your production,