IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHERINE GAUJACQ )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ELECTRICITE DE FRANCE )<br>  INTERNATIONAL NORTH AMERICA, )<br>  INC., et al. )<br>)<br>Defendants. )<br>) | No. 1:05CV0969 (JGP) |

## GENUINE MATERIAL FACTS IN DISPUTE – DE BOTHEREL DECLARATION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rules 56.1 and 7(h) of the United States District Court for the District of Columbia, plaintiff, Catherine Gaujacq, states that the following material facts are in dispute for the purpose of opposing Patrick de Botherel's Declaration. The numbered paragraphs below correspond to the numbered paragraphs in the Declaration of Patrick de Botherel submitted jointly by Defendants in support of their motions for Summary Judgment. Because Defendants rely upon these declarations as if they are undisputed facts within their factual and legal argument as noted below, Plaintiff submits this document to demonstrate that these statements are also in dispute.[1]

 1. As discussed more fully below, Mr. de Botherel's declarations contain alleged "facts" not within his past or present knowledge.

 2. Ms. Gaujacq does not dispute this statement.

---

[1] Ms Gaujacq further incorporates the arguments contained in her Motion to Strike Defendants' declarations filed in conjunction with this opposition to Mr. de Botherel's declaration

3.     Ms. Gaujacq does not dispute this statement.

4.     Objection, this is a legal conclusion to which de Botherel cannot attest. Without waiving the objection, according to the "EDF compensation policy for Senior executives," the ranking of the Executive is determined by the position they assume. According to this policy, the employment history of the Executive can make a difference in compensation to a maximum of 30% on the same position. Ms. Gaujacq successfully held the exact same job as the male President of EDFINA for four years. (Def. Exh. 91). None of Ms. Gaujacq's male predecessors were succeeded in the position they left by a male paid more than twice their own compensation.

5.     Objection to relevance. Without waiving this objection, EDF's employment policies are set out by a French labor contract called "National Statutes of the Employees of the gas and electricity industries." This contract applies to employees of all companies in the French gas and electricity industries. This contract also applies to all employment decisions regarding EDF French High level Executives (Personnel de Direction, "Dirigeant", Director). This contract is not a law. The translations of pages 12 of 26 to 26 of 26 of De Botherel Declaration Exhibit A – AI are misleading and incorrect. (See Gaujacq's Translations, Att. 1.) Within this contract, EDF has a grade level ranking system for all its Ranks, 1 through 20, of French employees. French employees JL Foret, Stephane Kergutuyl, Alexandre Audie and most of the EDFINA and Easenergy were ranked in this system. Ms Gaujacq was promoted out of this ranking system on May 1, 1994. Beginning May 1, 1994, Ms. Gaujacq was a high level Executive (Personnel de Direction, "Dirigeant", Director) and this ranking system did not apply to her anymore, nor to the positions she had been assigned since May 1, 1994 (de Botherel Declaration, Exh. A, but see Att. 1, Plaintiff's translation).

EDF Executives and employees are also bound to EDF Corporate policies such as Ethics policies (Att. 2, EDF 1289, 1319 ~ EDF subject to territoriality principle of employment laws for its employees abroad; Att.3, EDF 1454,1446, and 1565 ~ compliance with local laws; Att. 4, EDF 278, Att. 5, EDF 4824, and Att. 6, EDFINA 1382-83).

  6. Objection to relevance. *See* response to paragraph 5 above.

  7. EDF Executive Compensation is governed by "EDF Executive Compensation Policy" ("La politique de rémunération des Dirigeants") (EDF's Executive Compensation Policy). Executive employment decisions such as termination, disciplinary actions are governed (1) by the French labor contract for "Employees in the gas and electricity industries" (2) by specific contracts like in her case "the guide for employees working abroad" and (3) by the "Gaujacq expatriation contract." *See* Gaujacq Decl. at ¶¶ 85, 86, and 87. EDF Executives and employees are also bound to EDF Corporate policies such as ethics policies (Att. 2, EDF 1289, 1319 ~ EDF subject to territoriality principle of employment laws for its employees abroad; Att. 3, EDF 1454-1446-1565 ~ compliance with local laws; Att. 4, EDF 278, Att. 5, EDF 4824, and Att. 6, EDFINA 1382-83).

  8. Objection, relevance. *See* response to paragraph 5 above.

  9. Objection, *see* Gaujacq Decl. ¶¶ 85, 90, 93.

  10. Objection, relevance. Without waiving this objection, EDF uses different ranking systems, and has used various ranking systems during the time Ms. Gaujacq was employed by EDF, *See* Gaujacq Decl. ¶¶ 85, 90, 93.

  11. Objection, this is a legal conclusion to which de Botherel cannot attest. Beginning in August 2000, EDF Executive Compensation was governed by "EDF Executive Compensation Policy" ("La politique de rémunération des cadres Dirigeants"). (Def. Exh. 91).

3

The compensation of Executives is individualized (Att. 7, de Botherel Dep. at 50-51. Defendants did not produce any EDF document indicating the ranking of the positions of "President of EDFINA" or "General Delegate USA-Canada." The HR organization stipulates that on March 31, 2004, the position of Vice-President EDFINA "Nuclear Projects" will be her third R3 position (Director of Penly – President of EDFINA – VP EDFINA) (de Botherel Declaration, Exh. A, but see Att. 1, Plaintiff's translation). Despite the size of the Company, Ms. Gaujacq was one of a small group of women to hold an executive level position and, as President of EDFINA, was the only female manager of a subsidiary outside of France. Of the 50 EDF executives holding R1 rankings, only 5 were women, although of the total 160,000 employees at EDF, approximately 45 to 50 percent were women. *See* Att. 7, De Botherel Dep at 36, 66-69, 74. In fact, Yann Laroche, Deputy General Manager of EDF, could name no female manager of a subsidiary or any other expatriate female manager. *See* Att. 8, Laroche Dep at 25-29. Further, Mr. Laroche knew of only "one female manager that ranked R1, but she was deputy general manager, she was not the person in charge." *See* Att. 8, Laroche Dep at 64.

The Defendants produced one document regarding the position of "Directeur du bureau de Washington." In this document, the position of President of EDFINA, appears to be ranked in August 2003 at the R2+ level, when Ms. Gaujacq was President of EDFINA. EDF has maintained numerous pay grade ranking systems throughout the time Ms. Gaujacq was employed by EDF. (Def. Exh. 12, Def. Exh. 13, Def. Exh. 14, Def. Exh. 15, Def. Exh. 16). If the current denominations of the EDF Executive ranking system became effective on August 1, 2000, then they did not apply to the positions Ms. Gaujacq assumed.

4

12. *See* response to paragraph 11 above. Nadal cannot be an R1 as he does not report to the CEO but rather to Ponasso (Chairman of Branch Americas) and then Creuzet (EDF COO).

13. *See* response to paragraph 11 above.

14. EDF has maintained numerous pay grade ranking systems throughout the time Ms. Gaujacq was employed by EDF. (Def. Exh. 12, Def. Exh. 13, Def. Exh. 14, Def. Exh. 15, Def. Exh. 16). If the current denominations of the EDF Executive ranking system became effective in 2000, then they apparently did not apply to the positions Ms. Gaujacq assumed nor to Nadal (reference to another ranking system in his expatriation contract (*See* Gaujacq Decl. at ¶ 90).

15. Contrary to these statements, in his own deposition, de Botherel says "There is no R1 on a R2 position". . "No R2 on a R3 position". (Att. 7, de Botherel Dep. at 138.)

16. Objection, *see* Gaujacq Decl. at ¶ 93.

17. Executive compensation and benefits are determined according to the EDF Executive compensation policy by the ranking of the position they assume. The EDF compensation policy states that the referenced salaries are individualized. From 2000 to 2004, Ms. Gaujacq never received this document. To the contrary, Ms. Gaujacq received the document for a different ranking system in 2002, which was effective July 1, 2002. (Def. Exh. 91).

18. Executive compensation and benefits are determined according to the EDF Executive compensation policy by the ranking of the position they assume. There is no R1 Executive on R2 position, there is no R2 Executives on R3 positions: (Att. 7, de Botherel Dep. at 138) The salary referenced for Ms. Gaujacq appears to be in the lower range of

"R3." (Def. Exh. 92, Def. Exh. 93.) The position of Vice-President EDFINA "Nuclear Projects" was her third R3 position (Director of Penly – President of EDFINA – VP EDFINA) and Ms. Gaujacq was underpaid. (de Botherel Decl, Exh. A, but see Att. 1, Plaintiff's translation.)

19  Executive compensation and benefits are determined according to the EDF Executive compensation policy by the ranking of the position they assume. There is no R1 Executive on R2 position, there is no R2 Executives on R3 positions: (Att. 7, de Botherel Dep. At 138; Def Exh. 91). Nadal's referenced salary as of July 1, 2004 appears to be in the very upper ranges of "R-1."

20  Ms. Gaujacq does not dispute this statement.

21  Objection, *see* Gaujacq Decl. at ¶¶ 86, 87.

22  Though Ms. Gaujacq continued to be an EDF employee, Ms. Gaujacq was also an employee of EDFINA, Inc. (Att. 9, Plaintiff 1421-25 with the implementation of the "EDF policy for compensation of High level Executives."

23  EDF hired her on September 1, 1980 as a Junior Executive Employee in training. (Def. Exh. 12) during her employment with EDF Ms. Gaujacq rose steadily in various pay grade ranks, starting at the statutory grade 10 for Junior Executive and reaching her first ("Dirigeant" "Personnel de Direction") Executive position on May 1, 1994, when Ms. Gaujacq was appointed as "Director" or Site Vice-President of EDF's nuclear power plant in Penly, France. *See* Gaujacq Decl. ¶ 85. This position was an Executive position, one of the 350 highest level Executive positions with the company. *Id.* Ms. Gaujacq was an Officer of the company and had the responsibility for about 100 managers positions at the plant. *Id.* The position of Vice-President EDFINA "Nuclear Projects" was her third R3 position (Director of

6

Penly – President of EDFINA – VP EDFINA) and Ms. Gaujacq was underpaid (de Botherel Decl, Exh. A, but see Att. 1, Plaintiff's translation; Def. Exh. 12, Def. Exh. 16.)

24      On May 1, 1994 Ms. Gaujacq was appointed as "Director" or Site Vice-President of EDF's nuclear power plant in Penly, France. This position was an Executive position, one of the 350 highest level Executive positions with the company. Ms. Gaujacq was an Officer of the company.

25      Though Ms. Gaujacq continued to be an EDF employee, she was also an employee of EDFINA, Inc. (Att. 9, Plaintiff 1421-25). With the implementation of the "EDF policy for compensation of High level Executives", she was never been notified of the ranking of the position Ms. Gaujacq assumed. EDF emailed Ms. Gaujacq on March 31, 2004, informing her that her new expatriation would be her third assignment on an R3 position, and that she was underpaid. (de Botherel Decl, Exh. A, but see Att. 1, Plaintiff's translation). She was never notified of her personal ranking. *See* Gaujacq Decl. at ¶ 94. Ms. Gaujacq was granted merit pay raises in July 2002 and again in July 2004. (Att. 10, EDF 4679). The only time Ms. Gaujacq was notified of the ranking of the position she was "offered" was in September 2004 when HR branch Energy Jacques Bouron informed her that the position of "Charge de mission au Directeur de la Production Nucleaire" was ranked R3. *See* Gaujacq Decl. at ¶ 87. EDF had no commitment to employ Ms. Gaujacq in France at the end of her U.S. assignment. To the contrary, EDF HR (Metais, Laroche) contacted Ms. Gaujacq in April 2004 for a potential position with EDF Energy in London (UK). Ms. Gaujacq reached her first ("Dirigeant" "Personnel de Direction") position on May 1, 1994 when she was appointed as "Director" or Site Vice-President of EDF nuclear power plant in Penly, France. This position was an executive position, one of the 350 highest level executive positions with the

7

company. Ms. Gaujacq was an officer of the company and had the responsibility for about 100 manager positions at the plant. Ms. Gaujacq was also promoted in August 2000 when EDF appointed her as "General Delegate to the USA-Canada" and President of EDFINA. Starting in August 2000, EDF Executive Compensation evolved and became governed by "EDF Executive Compensation Policy" ("La politique de rémunération des cadres Dirigeants") (Def. Exh. 12, Def. Exh. 13, Def. Exh. 91). The position of Vice-President EDFINA "Nuclear Projects" was Ms. Gaujacq's third R3 position (Director of Penly – President of EDFINA – VP EDFINA) and she was underpaid.

26. Ms. Gaujacq does not dispute this statement.

27. Ms. Gaujacq does not dispute this statement.

28. EDF "Salaire mensuel de base" is not a monthly salary. (Def. Exh. 15). EDF's pay records reflect that Gaujacq was paid as "Déléguée Générale (Delegate General) from August 1, 2000 to July 31, 2002 and as "Directeur" (Director) from August 1, 2002 to July 31, 2004.

29. On July 1, 2004, Ms. Gaujacq was granted a merit increase from Fernando Ponasso. (Att. 10, EDF 4679).

30. The terms and conditions of Ms. Gaujacq's employment were also subject to "The Guide for employees working abroad" and her "Expatriation contract"

31. Objection, this is a legal conclusion to which de Botherel cannot attest. It is the

practice of EDF to rotate its Executives on all positions everywhere in the world. Ms. Gaujacq's previous executive position in France was for a period of six years. Ms. Gaujacq's predecessors on the French position were two years and four years. In the ten years prior to

Gaujacq's appointment, three EDF executives were assigned as Vice-Presidents of EDFINA Nadal's 2004 expatriation contract is five years. An extension to seven years was not an issue for EDF/EDFINA. (de Botherel Decl., Exh. A, but see Att. 1, Plaintiff's translation.) Ms. Gaujacq was appointed President of defendant Electricité de France International North America, Inc. (Def. Exh. 21).

32.    Ms. Gaujacq had three contracts (1) the French labor contract for "Employees in the gas and electricity industries" (2) "the guide for employees working abroad" and (3) the "Gaujacq expatriation contract." *See* Gaujacq Decl at ¶¶ 42, 85.

33.    The contract had an expected duration of, at least, three years. The contract specified that employment laws applicable are the laws of the work station of the employee. EDF Executives and employees are also bound to EDF Corporate policies such as Ethics policies EDF Executives and employees are also bound to EDF Corporate policies worldwide. (Att. 3, EDF 1454-1441-1446-1565; Att. 4, EDF 278; Att. 5, EDF 4824, Att. 6, EDFINA 1382-83.) EDF contract for employees working abroad recognizes it is subject to territoriality principle of employment laws for its employees abroad (Att. 2, EDF 1289, 1319). EDF Executives and employees are also bound to EDF Corporate policies such as Ethics policies. *See* Gaujacq Decl. at ¶¶ 85, 86, 87.

34.    The Gaujacq Expatriation Contract provided Gaujacq with a compensation and benefits package to serve as President of EDFINA in Washington. (Def. Exh. 15, at 440-444; Def. Exh. 93.) Fernando Ponasso granted her merit pay raises during this contract, one in July 2002 and the second in July 2004 (Def. Exh. 93). She was also granted annual bonuses based on Fernando Ponasso appreciation of her annual performance. Some compensation and benefits under the expatriation contract were paid in Euros by EDF International Branch from

9

France (2000-2002) then from EDF Branch Americas in Argentina (2002-2004) on her bank account in France. Other benefits, such as housing, US income taxes, air fares, utilities, car, worker's comp, home renter insurance, were provided by EDFINA, Inc. in the US. For three years, Healthcare insurance was provided in the US (AIG-Houston) under a contract with EDF. *See* Gaujacq Decl. at ¶ 91.

35. The new contract, from June 2004 to July 31, 2004 was executed by decision of the EDF Chairman and the Executive Committee in April 2004 and again on June 1, 2004. *See* Gaujacq Decl. at ¶ 42, 44, 58.

36. The Defendants did not produce any documents related to Nadal work history and should be precluded from asserting facts relating to these documents.

37. Ms. Gaujacq does not object to this statement.

38. Ms. Gaujacq does not object to this statement.

39. Objection, hearsay.

40. This is a legal conclusion to which de Botherel cannot attest. The "Guide for employees working abroad" is a contract. This contract states that it is mandatory for the management to have an evaluative discussion with the employee at the latest six months before the expiration of the employee expatriation contract. (Def. Exh. 94). Ms. Gaujacq had this discussion with Creuzet on January 14, 2004 and with Ponasso on March 18, 2004, who agreed to a new expatriation contract on March 29, 2004, confirmed by the decision of EDF Executive Committee in April and again the Decision of the EDF Chairman on May 25, 2004, and the Chairman of EDFINA, Ponasso, on June 1, 2004. This contract does not stipulate that an employee has to go back to France at the expiration of the contract. The EDF "statutes" stipulate that the EDF employee remains at his or her assigned position unless he or she is

10

proposed a relocation in the Company's interest. In this case, and in this case only, the EDF employee is offered three new work locations. (EDF Motion for Summary Judgment, ¶ 41).

41.   This is a legal conclusion to which de Botherel cannot attest.

42.   Objection, hearsay.

43.   Objection, hearsay.

44.   Objection, not based upon de Botherel's personal knowledge. EDF knew that its termination of Ms. Gaujacq was illegal under French laws. Ms. Gaujacq did not threaten the company.

45.   From November 1, 2004 to January 6, 2005, Ms. Gaujacq did not have the benefit of an expatriation package. (Att. 11, 1021-22, 1173-74.)

46.   The retirement age is not the right term under "Statutes of the employees of the gas and electricity industries".

47.   Ms. Gaujacq does not dispute this statement.

48.   Objection, see Gaujacq Decl. at ¶ 97.

49.   This is a legal conclusion to which de Botherel cannot attest.

50.   This is a legal request, which de Botherel cannot make.

11

November 20, 2006					Respectfully Submitted,

*/s/ Carla Brown*

Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
Carla D. Brown
D.C. Bar No. 474097
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
    Catherine Gaujacq

12