IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHERINE GAUJACQ | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No  1:05CV0969 (JGP) |
| | ) |
| ELECTRICITE DE FRANCE | ) |
| INTERNATIONAL NORTH AMERICA, | ) |
| INC , et al. | ) |
| | ) |
| Defendants | ) |
| | ) |

**GENUINE MATERIAL FACTS IN DISPUTE – NADAL DECLARATION**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rules 7(h)
and 56.1 of the United States District Court for the District of Columbia, plaintiff, Catherine
Gaujacq, opposes Christian Nadal's Declaration and states that the following material facts
are in dispute [1]  The numbered paragraphs below correspond to the numbered paragraphs in
the Declaration of Christian Nadal submitted jointly by Defendants in support of both
Defendants' motions for Summary Judgment  Because Defendants rely upon the below
declarations as if they are undisputed facts within their factual and legal argument as noted
below, Plaintiff submits this document to demonstrate that these statements are also in
dispute.

1       Ms. Gaujacq does not dispute this statement

2       Ms. Gaujacq does not dispute this statement except to the extent set forth in her
Motion to Strike filed in conjunction with this Opposition

---

[1] Ms  Gaujacq incorporates the arguments and opposition to Nadal's declaration as set forth in her Motion to
Strike filed in conjunction with this Opposition

### Nadal's Background

3.    EDF has not produced any documentation of Nadal's work history or successive ranks and should be precluded asserting facts relating to these documents.

4.    Ms. Gaujacq does not dispute this statement.

5.    The positions Nadal was assigned with EDF from 1991 through 1995 were not high level executive positions. *See* Gaujacq Decl. at ¶108.

6.    Ms. Gaujacq does not dispute this statement.

7.    Ms. Gaujacq does not dispute this statement.

8.    EDF and/or Nadal have not produced any evidence of this Finish EPR project and should be precluded from asserting facts relating to this project. *See* Gaujacq Decl. at ¶ 109.

9.    Objection, inadmissible hearsay. Without waiving this objection, *see* Gaujacq Decl. at ¶¶ 4, 21-39, and 110.

10.    Objection, inadmissible hearsay.

11.    The terms of Nadal's expatriation contract were negotiated with EDF and EDFINA (Def. Exh. 34 and 37). Nadal's reporting structure as President of EDFINA is the same as Ms. Gaujacq's when she was President and extended for five years beginning January 1, 2004. However, against EDF policies and unlike EDF practices for employees working abroad, Nadal's expatriation contract appears to have been signed after his nomination as "General Delegate to the USA-Canada." (Def. Exh. 30). Nadal also negotiated some terms and compensation of his expatriation contract with EDFINA's Chairman, including his housing contract. (Def. Exh. 34).

12.    The terms of Nadal's expatriation contract were negotiated with EDF and

EDFINA (Def. Exh. 34 and 37). Nadal's reporting structure as President of EDFINA

is the same as Ms. Gaujacq's when she was President and extended for five years beginning

January 1, 2004. However, against EDF policies and unlike EDF practices for employees

working abroad, Nadal's expatriation contract appears to have been signed after his

nomination as "General Delegate to the USA-Canada." (Def. Exh. 30). *See* also, Gaujacq

Decl. at ¶¶ 110, 111.

13.    Nadal could not be appointed President of EDFINA until he was authorized to

work and reside in the United States with a L1-A visa. *See* Gaujacq Decl. at ¶ 112.

### Nadal Refuses to Acknowledge Ms. Gaujacq's Role

14.    Objection, inadmissible hearsay.

15.    Ms. Gaujacq disputes that Nadal had an open mind with regard to her work at

EDF and she objects to Exhibit B referenced herein as inadmissible hearsay.

16.    Ms. Gaujacq disputes the circumstances surrounding Nadal's visit to EDFINA

offices on February 25, 2004. *See* Gaujacq Decl. at ¶¶ 47, 48.

17.    Ms. Gaujacq formally introduced Nadal to the people at EDFINA. *See*

Gaujacq Decl. at ¶ 47.

18.    Objection, inadmissible hearsay. Without waiving this objection, *see* Gaujacq

Decl. at ¶¶ 47, 48.

19.    Objection, inadmissible hearsay. Without waiving this objection, *see* Gaujacq

Decl. at ¶ 51.

20.    Objection, inadmissible hearsay.

21.    Objection, *see* Gaujacq Decl. at ¶¶ 49, 51.

22.    At the end of March 2004, the Nustart consortium did not exist. The MOU

was signed on March 19, 2004 and the company was incorporated on April 23, 2004. Ms.
Gaujacq was the EDFINA Representative to the Management Committee and George
Servieres was her alternate (Def. Exh. 66).

     23.     The EDF Executive Committee appointed Ms. Gaujacq as reporting on the
"hard line" to EDFINA/Nadal and on the "dotted line" to the Energy Branch in April, 2004.
(Def. Exh. 46). This information was intercepted by Metais. Without the knowledge of the
EDF Executive Committee, without Ms. Gaujacq's knowledge, and with the complicity of the
HR organization (Laroche, Metais, Bouron, and Bethouret), Nadal seized every opportunity to
discredit Ms. Gaujacq and to try and have her thrown out of the company in the United States.
(Def. Exhs. 34, 36, 38, 41, 43, 44, 45, 46, and 48). On May 25, 2004, Chairman Roussely
directed that Nadal take up his duties in Washington. He confirmed Ms. Gaujacq was
appointed as Vice-President of EDFINA reporting to Nadal, and he wrote "If Gaujacq wants
to come back to France, it's her decision." The EDF Chairman and CEO also deterred Nadal
from renegotiating Ms. Gaujacq's position with EDFINA. (Def. Exh. 48). Roussely also
directed the HR organization to implement his decisions.

     24.     Objection, inadmissible hearsay.

     25.     Ms. Gaujacq disputes that her resignation from President was voluntary.

## The Duties Nadal Performed as Delegate General are Similar to Those Performed by Ms. Gaujacq

     To the extent that paragraphs 26-32 seeks to limit Ms. Gaujacq's involvement in the
projects listed, she objects to each and every one of them. Ms. Gaujacq continued working on
many of the projects and had been the catalyst as far as their growth and development. Ms.
Gaujacq further objects to this section as self-serving and irrelevant.

**EDFINA Employees**

33. Adja Ba was only employed by EDFINA. Alexandre Audie was employed by EDF and EDFINA from 1999 to 2003. He was employed by EDFINA only from 2003 to October 2004. Alexandre Audie was rehired by EDF in October 2004, while remaining an EDFINA employee. (Def. Exh. 22 at 4558.) Nadal rehired Audie at EDF and almost doubled his compensation with the EDFINA benefits of his new EDF expatriation contract (income taxes, day care for his son, car). Nadal also invited the Audie family along with his family on vacation on the West Coast at the company's expense during this same period.

34. Adja Ba was only employed by EDFINA. Alexandre Audie was employed by EDF and EDFINA from 1999 to 2003. He was employed by EDFINA only from 2003 to October 2004. Alexandre Audie was rehired by EDF in October 2004, while remaining an EDFNA employee. (Def. Exh. 22 at 4558.)

35. These activities are not restricted to these people.

36. The French statute did not apply to Ms. Gaujacq. Starting May 1, 1994, Ms. Gaujacq was a High level Executive (Personnel de Direction, "Dirigeant",Director) and the statute did not apply to her position, nor to any of the positions that Ms. Gaujacq would have been assigned with the company since May 1, 1994. (de Botherel Decl., Exh. A, but see Att. 1, Plaintiff's translation.) (Exhibit A). EDF employment policies are described by a French labor contract called "National Statutes of the Employees of the gas and electricity industries." This contract applies to employees of all companies in the French gas and electricity industries. This contract also applies to all employment decisions regarding EDF French High level Executives (Personnel de Direction, "Dirigeant", Director). This contract is

not a law. The translation of page 12/26 to 26/26 is voluntarily misleading and incorrect (*See* Att. 1, Plaintiff's translation.) Ms. Gaujacq was promoted out of this ranking system on May 1, 1994.

37.    All EDF employees working in the United States were either EDINA employees, or Easenergy employees and were under the oversight of EDFINA, responsible for all EDF businesses in the United States. (Def. Exh. 22; Att. 2, EDF 4525-26.) While on expatriation contract to Washington, D.C., Nadal continued to be an EDF employee while also an employee and President of EDFINA. Nadal was granted an L1-A visa to work as President of EDFINA in April and once authorized to work in the United States, was appointed EDFINA President by written consent of the Board of Directors of EDFINA on June 1, 2004. This procedure is unique to my knowledge as compared to all the transfers and appointments I saw in my career as an EDF "Dirigeant". *See* Gaujacq Decl. at ¶ 62.

### Without Knowing Anything About Ms. Gaujacq Other than her Sex, Nadal Immediately Decides Ms. Gaujacq Must Leave EDFINA

38.    Ms. Gaujacq does not dispute this statement, but adds that she and Mr. Nadal exchanged numerous emails during the year. *See* Gaujacq Decl. at ¶ 61.

39.    See response to paragraph 38 above.

### Nadal's Abusive June 11 Telephone Call to Ms. Gaujacq

40.    Ms. Gaujacq objects to Nadal's statement that his decision to replace her as a authorized check writer was "routine." *See* Gaujacq Decl. at ¶ 63.

41.    See response to number 40 above.

42.    Gaujacq's responsibilities were defined by the decision of the EDF Executive Committee in April and by the EDFINA Board decision on June 1, 2004, of which Nadal was well aware (Def. Exh. 63.)

43.    *See* Gaujacq Decl. at ¶ 63, 64.

**The June 18 Letters**

44.    Nadal called Ms. Gaujacq at home on June 4, 2004. He asked Ms. Gaujacq to give him all information pertaining to her business contacts and the networks EDINA were dealing with. Ms. Gaujacq told him all the information was at the office and she would prepare a detailed memo describing the EDFINA organization as of May 31, 2004, so that he could make the necessary adjustments (Def. Exh. 51, Def. Exh. 63). On June 10, 2004, Ms. Gaujacq provided a detailed memo in response to Nadal's request, copying Ponasso, as Chairman of EDFINA, to make sure the duties were consistent with her mission as outlined in her Mission Letter of May 12, 2004 (Att.3, Plaintiff 904-910). Additionally, other EDFINA employees were copied to give them an opportunity to provide input to Nadal before adjustments took place. (Def. Exh. 51).

45.    Nadal did not tell Ms. Gaujacq he was leaving for France for three weeks beginning June 18, 2004. Nadal prepared a separate letter dated June 18, 2004, to provide to Dreux all authority to act on Nadal's behalf without limitation as to the scope of authority or relation to Nadal's absence. (Def. Exh. 60) Ms. Gaujacq discovered Nadal's second letter to Dreux after the fact, early the morning of July 8, 2004 in EDFINA offices. *See* Gaujacq Decl. at ¶ 66.

46.    The second, separate letter Nadal prepared dated June 18, 2004, provided to Dreux all authority to act on Nadal's behalf without limitation as to the scope of authority or relation to Nadal's absence. (Def. Exh. 60). Ms. Gaujacq discovered Nadal's second letter to Dreux after the fact, early the morning of July 8, 2004 in EDFINA offices. Nadal well knew what Ms. Gaujacq's duties were as Vice President of EDFINA (Def. Exh. 63) and admitted to

7

the EDF auditors that all responsibilities are clarified by his two letters dated June 18, 2004
(Def. Exh. 22)  Ms. Gaujacq never demonstrated unprofessional behavior or encountered any
problems with check writing in the four years that she was President  Moreover, Ms
Gaujacq's absences from the office were limited as compared to Nadal and were business
related – Nadal assigned his authority and responsibilities to other individuals because they
were male  *See* Gaujacq Decl. at ¶ 68, 115

47     Nadal was timely informed of Ms. Gaujacq's personal leave and, in fact,
acknowledged her leave in writing (Def. Exh. 58)

### Nadal's Defamation Arising from the July 9 Audit Conference Call

48. On July 9, 2004, during the audit telephone conference, in which Ms. Gaujacq
participated in person at EDFINA offices and Mr. Nadal participated over the telephone, the
EDF auditors stated that certain expenditures that had been authorized by Ms. Gaujacq were
not documented.  The auditors did not ask her about those documents during the audit. In fact,
most of documents, with the exception of the latest, were at the EDFINA Washington office
Mr. Nadal stated that paying for services without a service actually being performed was very
serious. *Id*  The alleged "undocumented" services were consulting services from Walker
Nolan and consulting services from Francois Ailleret (Def. Exh. 22 at EDF4558; Att. 4,
Plaintiff 1289-97)

The audit was not done in the ordinary course of business.  (Def. Exh. 62, 63, and 70.)

### Nadal's Hostility During the July 12 Meeting

50.     The meeting was a planned meeting (Att. 5, Nadal Dep. at 361), and was
requested by Ms. Gaujacq  At Nadal's request, Jean-Luc Foret joined the meeting  Foret was
not the EDFINA alternate Managing Executive to Nustart  Foret was an experienced

Engineer who was working under an H1B visa (professional)  George Servieres was Ms.
Gaujacq's alternate  (Def. Exh. 66)

     51.     Nadal was confrontational during our July 12, 2004 meeting, not
Ms. Gaujacq. *See* Gaujacq Decl. at ¶ 68.

     52.     Nadal ordered Ms. Gaujacq to return all files and other work related documents
she maintained at her residence or anywhere else, including those on her company-owned
computer, to the office immediately  (Def. Exh. 64; *see also* Gaujacq Decl. at ¶ 69)  In
response to Ms. Gaujacq's refusal to include Mr. Foret in a NuStart conference call because
he was not a signatory to the NuStart confidentiality agreement, Mr. Nadal jumped off from
his chair, pointed his finger at her, threatened her, in the presence of JL Foret yelling, "I'm the
General Delegate of EDFINA and you have to comply with my orders otherwise, . . . "  (Att.
6, Gaujacq Dep. at 392.)

     53.     See response to paragraph 52 above

     54.     Objection, hearsay, and see response to paragraph 52 above.

     55.     Ms. Gaujacq does not dispute this statement

### Nadal Refused to Acknowledge Ms. Gaujacq's Discrimination Complaints

     56.     Nadal was well aware of Ms. Gaujacq's complaints regarding his illegal and
discriminatory behavior towards her based on her sex  *See* Gaujacq Decl. at ¶¶ 74, 77; Def.
Exhs. 68, 69 and 70.)

     57.     Nadal was well aware of Ms. Gaujacq's complaints regarding his illegal and
discriminatory behavior towards her prior to August 6, 2004.  On July 22, 2004, she outlined
her complaints to him (Def. Exh. 68)

November 20, 2006                    Respectfully Submitted,

                                     Elaine Charlson Bredehoft
                                     D.C. Bar No. 441425
                                     Kathleen Z. Quill
                                     D.C. Bar No. 489079
                                     Carla D. Brown
                                     D.C. Bar No. 474097
                                     CHARLSON BREDEHOFT & COHEN, P.C.
                                     11260 Roger Bacon Drive
                                     Suite 201
                                     Reston, Virginia 20190
                                     (703) 318-6800

                                     Counsel for Plaintiff
                                        Catherine Gaujacq