# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CATHERINE GAUJACQ | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:05CV0969 (JGP) |
| ELECTRICITE DE FRANCE INTERNATIONAL NORTH AMERICA, INC., et al. | ) | |
| Defendants | ) | |

## DECLARATION OF CATHERINE GAUJACQ

1.    My name is Catherine Gaujacq and I am the plaintiff in the above referenced matter.

2.    I was hired by EDF on September 1, 1980 as a Junior Executive Employee in training.

3    I was the President of EDFINA and head of EDF's delegation to Washington from August 2000 until May 31, 2004.

4.    As President of EDFINA, I was responsible for managing all employees, including EDF employees working in the United States sponsored by EDFINA, Inc. and the work of outside contractors and consultants who supplied services to EDF and EDFINA in the US  These employees were located in various states.

5    During my employment with the company, I was promoted based on the demonstration of my managerial and strategical skills and performances in the different positions I was assigned during my twenty-four years with the company.  The representations

of the company for a significant managerial promotion based upon my success as "Directeur CNPE Penly" (Director) and as President of EDFINA were in line with my career expectations.

## EDF and EDFINA Act as One Company

6.    I have personal knowledge about the business relationship between EDF and EDFINA, including, but not limited to, EDF's involvement in EDFINA's administration, employees, and budget.

7.    EDFINA's annual strategic plan, missions, financial, administrative and human resources decisions and support is provided by EDF in France.

8    EDF and EDFINA essentially act as one company with common management, centralized control of human resource functions, common procedures, policies and interconnected operations

9.    EDF management makes the final decision regarding career opportunities, transfers, compensation and bonus payments of the EDFINA employees

10    EDF employees are assigned to carry out and to support consulting and engineering related contracts that EDFINA, on behalf of EDF, enters into with energy companies in the United States.

11.    EDF has control over all personnel functions of EDFINA with respect to EDFINA's high level executives and sets and disseminates the policies that apply to these executives.

12.    The overlapping relationships between EDF and EDFINA, and the control exercised by EDF over EDFINA, and particularly its personnel, is substantial.

2

13. EDF employed the following number of employees in the United States: 20 EDF employees as of March 2003; 24 EDF employees as of October 2003; and 24 EDF employees as of July 28, 2004. While employed by EDF in the United States, EDF issued me W-2s for the years 2000-2004, and I filed Federal and state taxes.

**EDF and EDFINA Engage in Commerce in the U.S.**

14. I also have direct knowledge of the EDF and EDFINA's engagement in commerce in the United States and the number of EDF and EDFINA employees in the United States while I was President of EDFINA.

15. With EDFINA, EDF buys and sells products and services in the United States, including, but not limited to, Management, Engineering and Research & Development ("R&D"). The products and services bought and sold by the Company include (1) strategic and economic intelligence (3 years business development plan, M&A, ventures); (2) commercial intelligence; (3) legal intelligence; and (4) regulatory intelligence. The annual business of the Company in the United States in 2004 in excess of $14 Million.

16. Examples of the service contracts entered into by EDF, directly and through EDFINA, are contracts with EPRI and EPRI Solutions, EnXco and International Energy Services ("IES") (an EDF affiliate operating small dams in California), EasEnergy, NuStart, Westinghouse and Southern Company. See Att 1 (website of EPRI Solutions); Att 2 (website of EnXco); Att 3 (website of EasEnergy).

17. With EPRI and EPRI Solutions, EDF sells services (Engineering, R&D) to most US utilities.[1] The annual base value of the EDF/EPRI business in the United States was about $ 6-8 Million in 2004. The products and services related to these contracts are used virtually in every state in the United States. EDF has engineers based at EPRI both in Palo

---

[1] All US utilities are members of EPRI and buy and sell those services.

Alto (CA) and Charlotte (NC)  This Contract was first entered into by EDF in 1998 and was

renewed in 2002.

18.    With enXco and IES, EDF sells services (Management, Engineering, R&D) to

U.S. wind companies and utilities in California, Minnesota and Hawaii. The annual base value

of this business, during the time I was President of EDFINA, was about $4-$5 Million.

EDF's contract with EnXco has been in place since 2002.

19.    With EasEnergy, EDF sells services (Management, Engineering, R&D) to

dozens of start-ups in various states throughout the U.S.[2] These services are used virtually in

every state in the US. The base value of this business is approximately $ 2 to 3 Million.

EasEnergy was incorporated in 2000 and EDF began entering into contracts through

EasEnergy at that time.

20.    With EDFINA, EDF buys and sells services (Management, Engineering,

R&D) through its contract with Nustart, Westinghouse(PA), and Southern Nuclear(AL). The

annual business for those activities in the U.S. in 2004 was approximately $ 2 Million. The

Company's contract with NuStart began in April 2004 when that entity was incorporated.

The contracts with Southern Nuclear and Westinghouse have been in place since 2001.

**Ms. Gaujacq's Work During her Mission as Head of EDF's Washington Delegation is**
**Filled with Unprecedented Achievement and Development for EDF and EDFINA**

21.    As EDFINA President and head of EDF's delegation to Washington, I fulfilled

many functions and had many responsibilities.  A list of my accomplishments while President

of EDFINA are detailed in Att 4

22.    In general, while President of EDFINA, I was responsible for pursuing and

investigating financial opportunities for EDF and EDFINA. Specifically, in October 2000, I

---

[2] A good example is Serveron

4

had provided EDF Executive committee with a detailed report on the "California electricity crisis and the potential consequences on the industry in the USA" and made recommendations to the EDF Chairman for business alliances proposed to EDF following the California crisis.

23. In December 2000 at the request of EDF Chairman, I presented a business case to the EDF Executive committee for the strategic option to buy and operate nuclear plants in the USA. This recommendation was approved.

24. In 2001, I built a business case with Dalkia for its organic growth in the USA in energy services and facilities management. This recommendation was approved.
In October 2001, I built and presented the first strategic plan for EDF in the USA (3 years) to the EDF Executive committee. I also presented the business case to refuse the acquisition of a Independent electricity generator company in California. This recommendation was approved.

25. In November 2001, I provided EDF Executive committee with a detailed report on the "Enron bankruptcy and the potential consequences for the industry in the USA and in Europe."

26. In 2002, I have contributed to the EDF joint venture with Dreyfus for building EDF energy trading business in Europe (London). In 2002, I also built and presented a business case to the EDF Executive committee for the strategic option to build and operate nuclear plants in the USA. Additionally, I presented the business case to refuse the acquisition of a nuclear plant in the Washington State. This recommendation was approved.

27. In 2002, I presented a business case to EDF Executive committee for the strategic option to build and operate wind power plants in the USA. The recommendation was approved and was followed by the acquisition of EnXco in Palm Springs (California). I

further contributed as an enXco Board member to the integration of EnXco within EDF and the integration of IES to enXco.

28.    In 2003, I contributed to the World Bank EDF project of the Nam-Theun 2 (Laos).

29    In August 2003, I provided a detailed report on the "August 2003 blackout in the North-East and the potential consequences in Europe and for EDF" and contributed through EPRI/EDF contacts to the creation of companies to build "Smarter electric Grids."

30.    In September 2003, I presented the first strategic business plan for EDF in the USA (5 years) to the EDF Executive committee. I built the business cases for three scenarios, including the choice of acquisition targets and joint-venture partners. The recommendations were approved and one on three options accepted: A venture with US nuclear utilities to license, build and operate new nuclear plants in the US. EDF also had plans to expand its renewable portfolio in the USA through enXco. I further contributed to the Americas strategic plan, studying gas synergies with the Mexican power plants operations.

31    In September 2003, I provided a detailed report about "the activities of Areva in the USA and the potential consequences for EDF" to the EDF Executive committee. I further contributed to the success of two significant nuclear procurement and services contracts in France through benchmarking with US companies (Steam generator replacements and steam generators non destructive examinations)

32.    In October 2003, I provided a detailed report on "The economics of the nuclear fuel cycle and nuclear waste in the USA" to the EDF Executive committee. Recommendations are approved.

6

33.    In February 2004, I provided a detailed report about "the activities of nuclear vendors and the potential consequences for EDF worldwide" to the EDF Executive committee.

34.    Further, in 2004, I was instrumental in EDF and EDFINA's involvement in the NuStart U.S. Consortium regarding which the Memorandum of Understanding was signed on March 19, 2004 and NuStart was incorporated on April 23, 2004. From the NuStart success, other opportunities arose for EDF after my resigning as President, including the "very important commercial venture for EDF in the United Stats with Constellation Energy" (Nadal Decl ¶ 26; Att. 5, Plaintiff 904-910).

35.    In general, while President of EDFINA, I represented EDF to investors on Wall Street and elsewhere. Specifically, I participated in the annual "road show" of the EDF Chairman and CFO with the Wall-Street investment banks to present the evolutions and the projects of the Company to Wall Street, and test the US opportunities with regard to EDF development. I represented EDF to the annual EEI financial conference to inform the analysts on the Company and its future. In 2003, I provided assistance with the new EDF Director of Investor Relations to prepare the EDF IPO.

36.    In general, I was also responsible for establishing contacts and maintaining visibility, on behalf of EDF, with US business leadership and government officials involved in energy. Specifically, I attended numerous meetings with the European Institute and gave a speech on nuclear security issues in 2002 to this attendance. I contributed to the education of targeted US lawmakers and of the Federal energy administration on EDF: I met personally with some the most influential US Senators and House Representatives on the most important Committees influencing energy and environmental developments in the USA such as US

Senators, Commissioners and Chairmen of FERC and NRC. I met numerous times with the DOE Senior Staff and I, along with the chairman of EDF met with Secretary of Energy Abraham on February 18, 2004. I also met with the US Vice President Staff working on the energy task force. Through NEI, ANS and EEI, I had regular monthly meetings with the Senior Executives of all major US utilities. I held presentations on numerous focus issues to these audiences.

37. As President of EDFINA, I had regular contacts with the NERC Chairman who happened to be the former Chairman of Hydro-Quebec (Electric Utility in Canada).

38. Generally, I also had frequent contact with the French Embassy and the French Ambassador as well as welcome delegations to the U.S. from France. Specifically, I Contributed to the success of French companies in the US through regular meetings with the French Embassy, and had at least three meetings a year with the French Ambassador to the USA. I had monthly contacts with the Nuclear Attaché to the French Ambassador to the United States of America. I held regular presentations to the EDF Executive Committee on issues as diverse as US wind energy regulatory prospectives, US grid 2003 Black-out, US energy regulatory framework, US nuclear generation status and issues, California energy crisis, and Enron bankruptcy consequences on European energy markets. I held regular presentations in the French industry on nuclear issues (SFEN) and actively contributed to the education of targeted French lawmakers and of the French Administration: I was in charge of organizing educational tours in the USA for the French Deputies in charge of restructuring the European and French energy markets with an average of two delegations a year.

39. As President of EDFINA, Inc., I reported, beginning in 2002, to the Senior Executive EDF Americas Branch and Chairman of EDFINA, Fernando Ponasso in Buenos

Aires  Ponasso was my direct Superior. He was responsible for my annual evaluations, merit raises, bonuses, and had immediate input into the decisions regarding my transfer. The final decision maker for my transfer was Gerard Creuzet, direct Superior of Fernando Ponasso through the EDF Executive Committee (Roussely-Creuzet-Laroche). Beginning on June 1, 2004, as Vice-President of EDFINA, my direct superior was Nadal, as President of EDFINA, and then Ponasso, as Chairman of EDFINA. Nadal had decision-making authority on my merit raises, bonuses, and immediate direct input to my transfer. When he was assigned to President of EDFINA on June 1, 2004, Nadal had the same reporting structure as I had as President of EDFINA.

40.    I was a founding member of the consortium incorporated as Nustart in April 2004. I was the EDFINA managing Representative to the consortium of energy companies called NuStart Energy Development, LLC ("NuStart") (Def. Exh. 66, Def. Exh. 90). I was also appointed a Board member of enXco and IES by Fernando Ponasso.

41.    In early January 2003, Gerard Creuzet agreed to a three year contract with me, from August 1, 2003 to July 31, 2006, renewable on a year-by-year basis, no later than mid-January, for the period August to July of the next year. Ponasso and Creuzet knew that my husband had given up his employment in France and needed to know any changes in her employment by January in order to find a suitable teaching job for the upcoming school year. In January 2003, Creuzet agreed to the period August 1, 2003 through July 31, 2004. Creuzet also pointed out that I should expect a substantial promotion for my next assignment, but probably not before the summer of 2005.

42    I met with Gerard Creuzet on January 14, 2004. In direct line with our previous agreements, he agreed to extend my contract for another year (for the period August

9

1, 2004 to July 31, 2005). He again indicated that I could expect a substantial promotion for my next assignment and was very appreciative of the project I was working on that lead to the creation of the nuclear venture consortium Nustart. At this time, Creuzet did not know anything about Nadal's appointment.

**EDF Appoints Ms. Nadal as President Despite Previous Promises to Ms. Gaujacq**

43. On January 28, 2004, Ponasso's human resource assistant in Buenos Aires, Jean-Louis Betouret, called me while he was in France and told me Nadal had been appointed General Delegate to USA-Canada. We agreed he would wait for further official information. Creuzet did not know about the appointment until early February 2004. (Def. Exh. 41, but see Att. 6, Plaintiff's translation). The official French appointment of Nadal was announced in late March 2004. This was not within EDF practices for transfers of high-level Executives. I proposed to facilitate Nadal's United States work permit as it was my duty for every EDF employee assigned to EDFINA. (Def. Exh. 31, Def. Exh. 32).

44. On or around February 2, 2004, while on my way to New York City to meet with investment bankers and CFO's of energy companies, Igor Czerny, EDF Chairman International Advisor, called me to tell me Nadal was coming to Washington, D.C. He requested that I prepare a memo about Nadal's possible assignment with EDFINA to be discussed with Chairman Roussely on February 18, 2004 when the Chairman was scheduled to visit EDFINA and United States officials. I prepared this memo (Att. 7, Plaintiff 1267, Att. 8, Plaintiff 1079-1080) and met with Chairman Roussely on February 18, 2004 in Washington, D.C. He was very appreciative of my work on the nuclear project. He confirmed Creuzet's engagement and career representation to me, telling me again I could expect a significant promotion in 2005. (Def. Exh. 34). Also on this day, we had a meeting

with Secretary of Energy Abraham Spencer and his staff, a lunch with some media reporters, and a meeting with EDFINA office employees. On his way back to his hotel, Chairman Roussely told me about Nadal coming to join EDFINA. He insisted on his expectations that Nadal come to Washington, D.C. as quickly as possible. He agreed on the framework of responsibilities I had provided to him earlier in February at his request. (Att. 7, Plaintiff 1267, Att. 8, Plaintiff 1079-1080).

45. Creuzet learned about Nadal's appointment from HR on or around February 2, 2004.

46. Also on February 18, 2004, I met with U.S. Secretary of Energy, Abraham Spencer, and his staff, as well as met with EDFINA employees. On the way back to his hotel, Chairman Roussely told me about Nadal coming to join EDFINA. He insisted on his expectations that Nadal join EDFINA in Washington, D.C. as quickly as possible.

47. Nadal came to the office on February 25, 2004 to go to lunch. He arrived around 11:30 a.m. I introduced Nadal as a Senior Advisor, focusing on gas and equity markets to all EDFINA employees present in the office. I showed Nadal around the offices and showed him where his office would be. Before his arrival, we had to shuffle the offices to accommodate Nadal's arrival and create a new, wider office for him. When we were through with introductions and looking at the office space, Nadal and I left for lunch at about 12:15 p.m.

48. Prior to Nadal's February 25, 2004 visit, I introduced Nadal as a Senior Advisor, focusing on gas and equity markets. Alexandre Audie made an unprofessional comment about Nadal and I corrected him.

49.    On or about February 25, 2004, I signed a retainer with EDFINA's immigration attorney, Michael McVicker, to process Nadal's visa application as an International Manager to be employed with EDFINA as a Senior Advisor focusing on gas and equity markets    I told McVicker to call Nadal about his personal information, as was common practice for all EDF employees coming to work as EDFINA employees. On March 5, 2004, Nadal complained about me to HR Bethouret regarding visa issues.  In an email dated March 11, 2004, Nadal indicated he received a call from the immigration attorney on March 10th for the first time. The immigration attorney did not inform me of any issues, yet Nadal immediately reacted by complaining about me to HR Bethouret on March 12th   (Def Exh. 36).

50    On March 18, 2004, I had my annual evaluation in Washington, D.C. with Fernando Ponasso.  I confirmed, and Ponasso agreed, on my contract in the United States lasting until July 31, 2005

51.    In our meeting on March 23, 2004 in Buenos Aires, Ponasso communicated to me the official announcement of Nadal's appointment as "General Delegate" and President of EDFINA.

52    Also during our meeting on March 23, 2004, Creuzet left the office to call EDF Chairman and CEO Roussely. Creuzet said: "**I** will cut the bullshit. Nadal is going to be President of EDFINA and there is nothing else to say. Raison d'état.[3] "

53.    I was invited to meet with Creuzet and Ponasso in Buenos Aires or in Rio de Janeiro before the end of March, not summoned.

---

[3] "Raison d'état" translates as "reason of state."

54.    Laroche knew nothing about my position and performance as I was under the responsibility of Creuzet and Ponasso. To the contrary, Creuzet and Ponasso approved Nadal's appointment as President of EDFINA on the exact same terms as my mine as President of EDFINA in 2000 on March 29, 2004. The Executive Committee, likewise, approved these same terms in April 2004. To my knowledge, the position of "General Delegate to USA-Canada" or "Director USA-Canada" and President of EDFINA were not ranked in the new 2000 "EDF compensation policy for high-level Executives".

55    On April 13, 2004, without EDF Executive Committee knowledge, the HR organization (Metais and Bethouret) expressed interest in speaking with me about a new assignment in London, England. (Def. Exh. 47, Att. 9 Laroche Dep, p 89). I confirmed to HR (Bethouret and Metais) that I had a new assignment from Creuzet with EDFINA in the United States, with a mission letter pending to Lescoeur (Branch Energy). I confirmed with Bethouret that I was not on the market for 2004 and Bethouret agreed. With this proposal, I was not expected to go back to France, but rather to England.

56.    During the month of April 2004, Nadal did not come to the EDFINA offices and I did not meet with Nadal at EDFINA's office in Washington, D.C.

57.    Creuzet and Laroche both were members of the EDF Executive Committee in April 2004, together with Chairman Roussely.

58.    The April decision of the Executive committee was not communicated to me on purpose, because of interference from Nadal, Metais, Laroche, and Bouron  The April decision was acceptable to me and Nadal had no business reason to refuse it  I was to become his direct report, skilled and experienced on nuclear matters and United States energy

markets. From early April until the end of May, the company had ample time to communicate its decision to me.

59. When the Executive Committee made its decision in April 2004, Laroche's direct report, Metais, intercepted the information. Without my knowledge and with the complicity of the HR organization (Laroche, Metais, Bouron, and Bethouret), Nadal seized every occasion to discredit me and to try to have me thrown out of the company in the United States. (Def. Exh. 34, Def. Exh. 36, Def. Exh. 38, Def. Exh. 43, Def. Exh. 44, Def. Exh. 45, Def. Exh. 46, and Def. Exh. 48).

60. On May 18, 2004, I met in Paris with Bruno Lescoeur, Head of EDF's Energy Branch in order for him to approve my mission letter dated May 12, 2004 on the United States nuclear projects. I told Lescoeur that my assignment in the United States on the project was very interesting and that I enjoyed what I was doing and being a player in the United States nuclear energy renaissance. Lescoeur told me that he wanted me to return to France on July 1, 2004 in connection with the European Pressurized Reactors projects ("EPR"). I refused, saying that I was promised to be able to stay on the project in the United States. I contacted Creuzet and he told me to forget about Lescoeur's proposal because the EDF Executive Committee had made a final decision on my reporting structure to report to EDFINA President with EDF Branch Energy as Engineering Services provider to EDFINA. I immediately confirmed this agreement with Creuzet. (Def. Exh. 48).

61. During the period January 1, 2004 to May 31, 2004, Nadal was polite with me to my face, which was only once, during his February visit. Nadal never complained to me about me either verbally or in writing. However, without my knowledge and with the complicity of the HR organization (Laroche, Metais, Bouron, and Bethouret), Nadal seized

every occasion to discredit me and to try to throw me out of the company in the United States.

62.    Once authorized to work in the United States, Nadal was appointed President of EDFINA by written consent of the Board of Directors of EDFINA on June 1, 2004. To my knowledge, this procedure is unique as compared to all the transfers and appointments I saw in my career as an EDF "Dirigeant". EDF practices were (1) to have the predecessor in the position agreed on assigned a new position (2) to have the candidate agree on his expatriation contract (3) the visa petition approved (4) the French nomination is signed (5) the Board of the subsidiary EDFINA appoints the new president.

63.    On June 11, 2004, Nadal called me and confirmed it was his decision to remove my check signing authority and he had no reason to give me for doing so. Nadal also never indicated or stated to me his desire to begin a "normal working relationship".

64.    Nadal never told me he was leaving for France for three weeks beginning June 18, 2004.

65    On July 2, 2004, during the audit, Nadal asked lots of questions to the auditors from Paris. (Def. Exh. 22)

### EDF and EDFINA Condone Mr. Nadal's Discriminatory Treatment of Ms. Gaujacq

66    I discovered the second letter to Dreux early the morning of July 8, 2004, at the EDFINA offices. I complained to Ponasso on July 9, 2004 about the sex discrimination following the audit debriefing because at this point I knew Nadal had no legitimate business reason(s) to discriminate and harass me as he had been doing since at least June 1, 2004. I was very distressed. I also discovered Nadal was buying household furnishings for his personal use with an EDFINA business card.

15

67.     On July 12, 2004, I requested to meet with Nadal to update him on the status of my projects and activities. At Nadal's request, Jean-Luc Forêt joined the meeting. Foret was not the EDFINA alternate managing Executive to Nustart. Foret was an experienced Engineer and was working under an H1B visa (professional). George Servieres was my alternate starting April 19, 2004 (Def. Exh. 66).

68.     During our meeting on July 12, 2004, Nadal was the one who was confrontational, not me.

69.     During our meeting on July 12, 2004, in response to my refusal to immediately turn over documents and papers, Nadal jumped from his chair and pointed his finger at me. He threatened me, in the presence of JL Foret, "I'm the General Delegate of EDFINA and you have to comply with my orders otherwise, . . . " (Att. 10, Gaujacq Dep, p 392).

70.     Nadal did not propose any assistance to me to facilitate bringing any of the requested documents to the office.

71.     Also during this July 12th meeting, I never claimed a personal restricted access to the proprietary documents related to Nustart. What I did claim was compliance to the confidentiality rules set forth in the various agreements (Def. Exh. 66). Nadal knew that some Nustart documents required a high level of security (Def. Exh. 64, Def. Exh. 65).

72.     There is no evidence that Nadal copied his July 12, 2004 email to Ponasso and/or Betouret (Def. Exh. 64).

73.     Creuzet called me on Friday July 23, 2004, at 9:15 a.m. EST. I had asked for the protection of the Company from Nadal's actions. He told me the audit had been ordered to protect me from Nadal. (Def. Exh. 75). Creuzet threatened me: "Your career is dead if you file a claim." I explicitly told Creuzet that Nadal was discriminating against me because of

my gender, was harassing me, was defaming me, and was discharging me. I gave Creuzet all the facts. He asked me: "Why is he doing that?" and I said "Because I am a woman." Creuzet stated that he knew Nadal was a bad guy. (Def. Exh. 70) De Botherel admitted in his deposition testimony that "Executives in France knew Nadal was treating me badly" (Att. 11, de Botherel Dep, p 138)

74. Laroche then called me on July 23, 2004, at 10:30 a.m. EST to get my impressions after Creuzet's call. I told Laroche that Creuzet had threatened me and that I was more scared than ever after my conversation with Creuzet because he had told me "Your career is dead if you file a claim." I told Laroche that at this stage, I was not convinced not to file my claim because it appeared the company did not want to protect me from Nadal's gender discriminatory illegal actions. Laroche told me he would talk with Creuzet right away. Laroche did not talk to me about the French nuclear project. He could not ignore the decisions of the Executive Committee in April, reinforced by the decision of the EDF Chairman on May 25, 2004.

75. The telephone "interview" conducted by Laroche on July 23, 2004, was the telephone conversation described above.

76. I asked Ponasso directly "Are you going to stop the illegal behavior of Christian Nadal against me?" (Def. Exh. 69) Ponasso acknowledged that he knew my complaint was about sex discrimination and harassment (Att. 12, EDF 1038-42). In his e-mail, Ponasso refers to the two letters of June 18th and tells Creuzet: "I think this is what triggered it all."

77. EDF knew about my potential EEOC charge on July 22, 2004. The company was aware that the charge was filed on July 30, 2004. Laroche received a courtesy copy of

the EEOC charge on August 8, 2004. The company proposal was a "placard". (Def. Exh. 79, Def. Exh. 80, Def. Exh. 82 at G578). I refused the position (Def. Exh. 84). Lescoeur e-mailed me asking that I reconsider and to clarify the position and offer (Def. Exh. 83). I again refused the position (Def. Exh. 85).

78     I was not blackmailing the company by indicating I was going to file an EEOC complaint. Without the protection of the company, I had no recourse or protection against Nadal's illegal and discriminatory actions against me, except to file an EEOC complaint (Exhibit 72). I believe I had a legal right to file a charge with the EEOC

79     I was granted permanent resident status on August 26, 2004. My husband, Philippe Gaujacq, was granted permanent resident status on September 24, 2004

80     I did not receive Laurent Strickler's September 24, 2004 mission statement until September 30, 2004, via facsimile

81     My husband, Philippe Gaujacq, was not successful in obtaining employment with the local public and/or private high schools in Loudoun County and/or Fairfax County, Virginia.

82     On October 7, 2004, I refused to accept the position of "Chargée de Mission" (Mission Representative) reporting to the Director of Nuclear Generation within the Energy Branch. (Def. Exh. 84) In October, Bouron (Energy Branch HR) called me and told me my U.S. claim had no value. I then received a second letter with an e-mail from Lescoeur on October 28, 2004 (Def. Exh. 83) and I confirmed my refusal to accept the position on October 28, 2004. (Def. Exh. 85).

83     EDF had no grounds to terminate me under French law. It would have been illegal in France. The company proposed a severance package for my voluntary departure

18

from the company in exchange for a release, which was a settlement proposal. I declined, because they refused to provide me with a letter of recommendation from the EDF Chairman. This package did not exist pursuant to EDF procedures established under French law. EDF practices and policies are that when an employee refuses an offer, the employee stays on in his or her current position until another position satisfactory to the employee is found. The French contract kicks in only when the employee is physically relocated to France

84.    I was offered a position with ENTERGY Operations, Inc. as Director, Strategic Programs on March 1, 2005. I started working at ENTERGY on April 4, 2005.

85.    EDF employment policies are described by a French labor contract called "National Statutes of the Employees of the gas and electricity industries." This contract applies to employees of all companies in the French gas and electricity industries. This contract also applies to all employment decisions regarding EDF French High level Executives (Personnel de Direction, "Dirigeant", Director). This contract is not law. The translation of pages 12 of 26 to 26 of 26 of DeBotherel's Exh. A are voluntarily misleading and incorrect. EDF has a grade level ranking system for all its Ranks, 1 through 20. I was promoted out of this ranking system on May 1, 1994. Beginning May 1, 1994, I was a High-level Executive (Personnel de Direction, "Dirigeant," Director) and this ranking system did not apply to me anymore, nor to any of the positions I was assigned to from May 1, 1994 forward. (de Botherel Dec., Exh. A, but see Att. 19, Plaintiff's translation) EDF Executives and employees are also bound to EDF corporate policies such as EDF 1454-1441-1446-1565; EDF 278; EDF 4824; EDFINA 1382-83, EDFINA 1349-59. The EDF contract for employees working abroad recognizes it is subject to territoriality principle of employment laws for its employees abroad (Att. 13, EDF 1289, EDF 1319).

86    EDF Executive Compensation is governed by "EDF Executive Compensation Policy" ("La politique de rémunération des Dirigeants") (EDF's Executive Compensation Policy). Executive employment decisions such as termination and disciplinary actions are governed as follows: (1) by the French labor contract for "Employees in the gas and electricity industries"; (2) by specific contracts such as in my case "the guide for employees working abroad"; and, (3) by the "expatriation contract". EDF Executives and employees are also bound to EDF Corporate policies worldwide. (Att. 14, EDF 1454-1441-1446-1565, Att. 15, EDF 278, Att. 16, EDF 4824, Att. 17, EDFINA 1382-83, Att. 18.) The EDF contract for employees working abroad recognizes it is subject to territoriality principle of employment laws for its employees abroad (Att. 13, EDF 1319).

87.    EDF Executive Compensation was governed by "EDF Executive Compensation Policy" ("La politique de rémunération des cadres Dirigeants") (Def. Exh. 91). The compensation of executives is individualized (Att. 11, de Botherel dep, pp 50-51, Def. Exh. 91). Defendants did not produce any EDF document indicating the ranking of the positions of "President of EDFINA" or "General Delegate." The HR organization stipulated on March 31, 2004, that the position of Vice-President EDFINA "Nuclear Projects" was my third R3 position (Director of Penly – President of EDFINA – VP EDFINA) (de Botherel Decl., Exh. A, but see Att. 19, Plaintiff's translation). The company statistics on gender equal pay speak for themselves.

88.    EDENOR was supplying and distributing electricity for one part of the city of Buenos Aires. Ponasso was the Chairman of EDENOR and Nadal was his direct report. During Nadal's tenure, EDF held a partial equity interest and became a majority investor in 2001. This position was equivalent to the position of "Directeur, Director" one of the 350

highest level Executives with EDF (Def. Exh. 28, Def. Exh 29). Penly Nuclear plant

generated approximately Euros 615 millions in annual revenues (Euros 30.00 *2600 MW *

90% * 24 hours *365 days).

89.    The compensation of executives is individualized (Att. 11, de Botherel Dep, pp

50-51, Def. Exh. 91). Defendants did not produce any EDF document indicating the ranking

of the positions of "President of EDFINA" or "General Delegate." The HR organization

stipulated on March 31, 2004, that the position of Vice-President EDFINA "Nuclear Projects"

was my third R3 position (Director of Penly – President of EDFINA – VP EDFINA) (de

Botherel Decl., Exh. A, but see Att. 19, Plaintiff's translation). Defendants produced one

document where the position of "Directeur du bureau de Washington," then the position of

President of EDFINA, appears to be ranked in August 2003 at the R2+ level, when I was

President of EDFINA. I have attached the company statistics on gender equal pay. It reflects

that women are treated less favorably than men.

90.    EDF maintained numerous pay grade-ranking systems throughout the time I

was employed by EDF. (Def. Exh. 12, Def. Exh 13, Def. Exh. 14, Def. Exh. 15, Def. Exh.

16). If the current denominations of the EDF Executive ranking system became effective in

2000, then they did not apply to the positions I assumed or those that Nadal assumed. The

company refers to another Executive ranking system in Nadal's expatriation contract.

91.    EDF "Salaire mensuel de base" is not a monthly salary (Def. Exh. 15). EDF's

pay records reflect that Gaujacq was paid as "Déléguée Générale (Delegate General) from

August 1, 2000 to July 31, 2002 and as "Directeur" (Director) from August 1, 2002 to July 31,

2004. EDFINA books also show the benefits and compensations I received from EDFINA

including the W2 delivered by EDFINA for income taxes purpose (Att. 18, Plaintiff 1228).

92.    Nadal's referenced salary as of July 1, 2004 appears to be in the very upper ranges of "R-1."

93.    EDF uses different ranking systems currently and when I was employed by them, and use an "Executive compensation policy" for its high level executives. For example, in 1994, non-executives were ranked 1 to 19, while executives were ranked in a different system from 50 to 60.

94.    Defendants did not produce any document indicating the ranking of the positions of "President of EDFINA" or "General Delegate to the USA-Canada "

95    Executives also negotiate with the affiliate(s) to whom they are assigned

96.    Defendants did not produce any document related to Nadal's work history.

97.    The "omission" of a corrected certificate in the materials sent me was willful. The corrected certificate was never mailed to me. Instead, the company requested that I make an appointment to go to Paris, France to pick it up. I was unemployed, uninsured, and almost homeless and this was not possible.

98.    EDF goals were also to understand the impact of the restructuring of the United States electricity and gas markets on the European restructuring of those markets. EDF's goal was also to understand the energy trading business, and new technologies with regards to energy trading. EDF's goal was also to understand the evolution of the United States regulatory framework regarding renewable energy and trading of emissions (SOX, NOX, $CO_2$).

99.    I never bypassed my hierarchy for any reason. Ponasso and Creuzet were always informed about what I was doing.

100.    The company did not know what my reporting structure should be. Therefore, I left the option open to my superiors, Ponasso and Creuzet, to determine. (Def. Exh. 42)

101.    I was never copied with Exhibit B to Laroche's Declaration and Exhibit C, which I was copied on, is different from Exhibit B and is incomplete and misleading.

102.    I never refused to report to Nadal under the terms of the March 2004 Expatriation Contract.

103.    Laroche never spoke to me about the French nuclear project. He could not ignore the decisions of the Executive Committee in April, reinforced by the decision of the EDF Chairman on May 25, 2004.

104.    The compensation package offered to me was unacceptable and the job offer was not as the head of the EPR project in France.

105.    The company was not within its rights to terminate my employment. The company recalled me to France after I complained about Nadal's illegal and discriminatory actions against me. The company was aware of these actions and did nothing.

106.    Defendant EDF did not produce any evidence of Nadal's EDF work history or evidence regarding his rank or successive ranks in EDF.

107.    Nadal holds a Bachelor of French public finance law. Under EDF Executive policies and practices in 1991, Nadal could not have been hired at the Junior Executive level with his experience and diplomas.

108.    The positions to which Nadal was assigned at EDF from 1991 until 1995 were not high-level executive positions (Director-Dirigeant). The position of EDENOR CEO was a Director position, equivalent to the level of French regional director for electricity supply/distribution (300 director positions in the EDF high level executive ranks, including myself,

starting in 1994). Nadal's predecessors and successors in this position were all ranked equivalent to the level of French regional Director for electricity supply/distribution.

109. EDF and Nadal have not produced any evidence regarding this EPR project. The completed EPR project was not an EDF project. The Finnish company, TVO, had an RFP for the design and construction of a nuclear reactor and AREVA won the bid in 2003.

110. The "interesting commercial ventures with the United States nuclear renaissance" were the product of my work on the EDF USA Branch Americas strategic plan presented and approved by the EDF Executive Committee. Laroche admits he did not know about my position, performance, and who was under the responsibility of Creuzet and Ponasso. (Att. 9, Laroche Dep, pp 11, 14, 31, 38, 81) To the contrary, Creuzet and Ponasso approved Nadal's appointment as President of EDFINA on March 29, 2004 on the exact same terms as my appointment as President of EDFINA in 2000. To my knowledge, the positions of "General Delegate to USA-Canada" or "Director USA-Canada" and President of EDFINA were not ranked in the new "EDF compensation policy for high level Executives,

111. My understanding as of this date is that Nadal signed his expatriation contract first with Laroche on January 28th, 2004. After this, Roussely signed Nadal's French nomination as "General Delegate." I do not believe that the EDF Chairman signed Nadal's appointment on January 1, 2004, especially in light of his discussion with me in February in which he approved the draft I presented of Nadal's mission statement. I cannot imagine that he would have approved it, if he had signed more than a month earlier, a document that contradicted his subsequent approval of the mission statement. I challenge the authenticity of the document, particularly the date.

112. Nadal could not be appointed as President of EDFINA until he was authorized to work and reside in the United States with an L1-A visa, and thus could not execute his expatriation contract. I obtained this L1-A visa as expeditiously as I possibly could.

113. I did not resist telling Nadal who my manager was. He knew it as well as I did.

114. I was not working against Nadal in any way. As EDFINA President, I was processing as swiftly as I could, his visa petition to come to the United States and work in Washington, D.C. for EDFINA.

115 I never displayed or demonstrated unprofessional behavior towards Nadal.

Pursuant to 28 U.S.C §1746, I declare under penalty of perjury that the foregoing is

true and correct

11 - 19 . 06

Date

I. Lyaujarg

Catherine Gaujacq

26