**ATTACHMENT 9**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -

IN THE MATTER OF )
)
CATHERINE GAUJACQ )
            Plaintiff, )
)CIVIL ACTION NO:
)1:05CV0969 (JGP)
v. )
)
ELECTRICITE DE FRANCE )
INTERNATIONAL NORTH AMERICA )
INC., et al )
            Defendants. )

- - - - - - - - - - - - - - - -

DEPOSITION OF YANN LAROCHE

Friday, April 21st, 2006
     at  8.30 am

Taken at the offices of:

Gide Loyrette Nouel
26, cours Albert 1er
Location 4
75008, Paris
France

Yann Laroche                                                      Friday, April 21st, 2006

```
08:45:43   1    responsibilities evolved somewhat    For instance, it was as

           2    of 2003 -- and I daresay this was not the case before that

           3    date -- I started supervising the management of the managers

           4    of the management team of the group.  In 2004, when

08:46:06   5    Mr. Gadonneix was appointed Chairman of the Group, I became

           6    not only in charge of human resources but also of

           7    communications.

           8           Q.  Can you describe for me what the role of

           9    a member of the executive board is?

08:48:00  10           A.  Well, a member of the executive board would

          11    have two fields of responsibilities; the first one has to do

          12    with the management -- the general management of the group,

          13    and it consists in taking part in the strategic decisions

          14    that I make for the entire group.  And this of course

08:48:19  15    applies not only for France but also for foreign operations.

          16           Secondly, a member of the executive board would

          17    also have a more specific field of responsibility, for

          18    instance: finance, human resources, operations.  These are

          19    the two main responsibilities of the executive board.

08:48:45  20           Now, within the executive board itself there is

          21    a subgroup, to put it this way, made up of the three

          22    directeurs généraux délégués and the Chairman himself, who

          23    in fact constitute the top management of the group.

          24           Q.  And are you part of the top management group?

08:49:11  25           A.  Yes, absolutely.
```

Trevor McGowan

CATHERINE GAUJACQ v EDFINA, et al

Yann Laroche                                                      Friday, April 21st, 2006

| | | |
|---|---|---|
| 08:57:00 | 1 | A    At the time the company was called London |
| | 2 | Electricity, and today the name has changed; it has been |
| | 3 | restructured, et cetera.  It is now called EDF Energy. |
| | 4 | Q.  And the individual who was the President of |
| 08:57:18 | 5 | London Electricity held an R1 ranking? |
| | 6 | A.  Quite so, yes. |
| | 7 | Q.  And why did the President of the London |
| | 8 | Electricity subsidiary hold the R1 position, ranking? |
| | 9 | A.  Quite simply because R1 managers are those |
| 08:58:35 | 10 | managers who hold a certain level of responsibility or who |
| | 11 | are entrusted with very important missions, and they all |
| | 12 | systematically belong to that R1 rank.  It means that |
| | 13 | obviously they have a high level of responsibility and |
| | 14 | recognized professional competence.  Also, obviously, it is |
| 08:59:04 | 15 | a post that they hold which faces a lot of major |
| | 16 | responsibilities. |
| | 17 | Q.  And Christian Nadal held the R1 ranking |
| | 18 | because he headed the Edenor in Argentina? |
| | 19 | A    No    He already held that rank before, or the |
| 09:00:06 | 20 | equivalent thereof, because of his responsibilities, as |
| | 21 | I indicated earlier, as manager for communications, |
| | 22 | development, and strategic marketing; and of course |
| | 23 | naturally, after that, when he took over the Edenor |
| | 24 | subsidiary.  So that justified being R1 anyway. |
| 09:00:34 | 25 | Q.  The Edenor subsidiary, taking over that and |

Yann Laroche                                                    Friday, April 21st, 2006

| | | |
|---|---|---|
| 10:21:34 | 1 | At the same time, the worldwide energetic scene was being |
| | 2 | restructured, and tried to adapt to new strategies. |
| | 3 | All of this meant that EDF felt that it needed to |
| | 4 | send to the United States a representative that would not |
| 10:21:54 | 5 | only be high-ranking but would have the capacity of dealing |
| | 6 | with all of these subject matters and follow them all |
| | 7 | closely. This is precisely what led to the appointment of |
| | 8 | Mr. Nadal, who was appointed to the job in Washington as |
| | 9 | general delegate of EDF for the United States. |
| 10:22:20 | 10 | Q. What was Catherine Gaujacq not capable of |
| | 11 | doing that Christian Nadal was capable of doing for the |
| | 12 | strategy for EDF for EDFINA? |
| | 13 | A. Again, you see, Catherine Gaujacq, being who |
| | 14 | she was and being somebody who ranked R3, I have, as |
| 10:25:53 | 15 | I indicated earlier, no specific knowledge either of her |
| | 16 | performance or the results that were obtained under her |
| | 17 | management period of time. But I would say that |
| | 18 | Catherine Gaujacq was certainly deemed to be competent in |
| | 19 | the nuclear field. I can't remember exactly, but I seem to |
| 10:26:20 | 20 | remember that she was involved in a nuclear project in the |
| | 21 | United States, the name of which escapes me as I speak now. |
| | 22 | But what the group management actually wanted was |
| | 23 | someone who would guarantee that high-level relations could |
| | 24 | be established with the various parties, such as, of course, |
| 10:26:44 | 25 | American companies, also global energetic operations, |

CATHERINE GAUJACQ v EDFINA, et al

Yann Laroche                                                    Friday, April 21st, 2006

| 10:53:11 | 1 | the context of all of this?  What was not being done between |
| | 2 | 2000 and 2004, while Catherine Gaujacq was the President, |
| | 3 | that was now going to be done as part of the mission of |
| | 4 | EDFINA? |
| 10:53:53 | 5 | MR. CLARK:  Objection to form. |
| | 6 | A.  Again, between 2000 and 2004, as I indicated |
| | 7 | earlier, I have no detail at my disposition, but I cannot |
| | 8 | say anything about Catherine Gaujacq's performance, nor can |
| | 9 | I say that she did not perform. |
| 10:56:44 | 10 | But in 2003 the company wished to evolve, and it |
| | 11 | had the feeling that it needed to adopt or move to another |
| | 12 | stage of its development, as I indicated earlier.  And one |
| | 13 | can say that there were several periods of time, if you |
| | 14 | like.  From 2000 to 2003, as I know, there was absolutely no |
| 10:57:21 | 15 | reason to criticize Catherine Gaujacq for anything she had |
| | 16 | done, certainly not anything she did in the nuclear field. |
| | 17 | But towards the end of 2003 the group merely had the feeling |
| | 18 | that it should in fact give a greater bearing to its |
| | 19 | activities in the United States, and therefore that it |
| 10:57:44 | 20 | needed to appoint a high-ranking manager -- which, by the |
| | 21 | by, was not incompatible with the remaining presence of |
| | 22 | an R3 manager who was already on the spot -- since of course |
| | 23 | within the group over the years there have been constant |
| | 24 | evolutions, whether it be concerning its activities in |
| 10:58:10 | 25 | France or abroad.  I would say that this is a totally common |

Trevor McGowan

CATHERINE GAUJACQ v EDFINA, et al

Yann Laroche                                    Friday, April 21st, 2006

| 15:18:59 | 1 | of these categories there are 1, 2 or 3, different levels. |
|----------|---|---|
| | 2 | Now, when you refer to D1 concerning your example, |
| | 3 | I do not know whether this "D" corresponds to "dominate", ie |
| | 4 | the second tier, or to the third one, "dépasser". |
| 15:19:29 | 5 | Q. Do you know what Catherine Gaujacq's |
| | 6 | performance evaluation ratings were while she was President |
| | 7 | of EDFINA? |
| | 8 | A. No, I have no knowledge of that. As |
| | 9 | I indicated to you earlier, that are hundreds of employees |
| 15:20:15 | 10 | that rank R3, and there's no way I could have any precise |
| | 11 | knowledge of who ranks what. |
| | 12 | Q. I'm going to show you what has been marked as |
| | 13 | deposition Exhibit 3. |
| | 14 | (Exhibit LAROCHE 3 marked for identification) |
| 15:20:35 | 15 | MS. HOGUET: The document has "19" on it, so |
| | 16 | I think you mean it has been marked 3 today. |
| | 17 | Q. Do you recall receiving this document? |
| | 18 | A. Can I look through it? The second page is |
| | 19 | a translation? |
| 15:22:12 | 20 | MS BREDEHOFT: Yes. |
| | 21 | A. This dates back a long time, since it dates |
| | 22 | back to 2004. But as I indicated earlier, I keep all of my |
| | 23 | mails so I must have read it. This one in particular is |
| | 24 | very explicit, since it concerns an R1, Mr. Nadal, that it |
| 15:23:07 | 25 | was CC'ed to Mr. Ponasso and even to Mr. Métais. So, yes, |

CATHERINE GAUJACQ v EDFINA, et al

Yann Laroche                                                    Friday, April 21st, 2006

| | | |
|---|---|---|
| 15:54:10 | 1 | THE INTERPRETER:  I had to choose, and I chose |
| | 2 | wrongly. |
| | 3 | A.  Together with this return to France obviously |
| | 4 | came a proposal for a new mission which was -- which |
| 15:57:33 | 5 | concerned a major project that would be of interest or value |
| | 6 | to her.  Secondly, I daresay that she had asked either |
| | 7 | Mr. Betouret or Mr. Creuzet or Mr. Ponasso -- I can't |
| | 8 | remember which one, or maybe all of them -- to be able to |
| | 9 | stay on in the United States for another few months in order |
| 15:57:34 | 10 | to make personal arrangements.  This was granted, if |
| | 11 | I remember rightly, and she had been allowed to stay |
| | 12 | an extra three months, after which time we commanded that |
| | 13 | she come back to take over a new position which had been |
| | 14 | defined for her. |
| 15:57:34 | 15 | Q.  What was the blackmail? |
| | 16 | A.  During our communication, I had the feeling |
| | 17 | that she was trying to create some difficulties or create |
| | 18 | some incidents that would give her grounds to turn down the |
| | 19 | mission that was being offered to her.  Now, over and above |
| 16:00:19 | 20 | the possibility of staying in the United States at EDFINA |
| | 21 | and continuing to deal with the nuclear side of things, she |
| | 22 | had been offered a mission in Great Britain, another one |
| | 23 | within the energy branch; and of course, on top of that, if |
| | 24 | she returned to France she was offered a position within the |
| 16:00:42 | 25 | EPR project.  The EPR project is in fact an English acronym |

**ATTACHMENT 10**

In the U.S. District Court

For the District of Columbia

----------------------------x

Catherine Gaujacq                :

                                 : NO. 1:05CV0969

              v.                 :

                                 :

Electricite de France            :
International, North             :
America, et al                   :

----------------------------x

                       March 17, 2006

DEPOSITION OF:

              Catherine Gaujacq (Cont'd)

a witness, called by counsel pursuant to notice,

commencing at 8:41 a.m., which was taken at 11260

Roger Bacon Drive, Reston, VA

Page 392

1           What did he say to you?

2      A.    The only thing I recall today, now, that

3   we are speaking is when he jumped out of his office

4   where he was sitting and he tells me I'm the General

5   Delegate of EDFINA and you have to comply to my

6   orders or you are going to have to, you know.

7           That's the only thing I recall from this

8   meeting.  That's the only thing I recall from this

9   meeting.

10          The rest of the meeting -- and even at this

11  time I tried to stay calm but I just couldn't

12  believe what he was doing in front of another male

13  again.  I mean --

14     Q.    Jon Luc, was Jon Luc Foret present when

15  Christian Nadal said you have to comply with my

16  orders?

17     A.    Yes.

18     Q.    The part of the meeting when just you and

19  Nadal were present, do you have any recollection of

20  what he said to you and what you said to him?

21     A.    Just came out with I've got some

**ATTACHMENT 11**

PATRICK DE BOTHEREL

Gaujacq v. Electricite de France, et al                                    3-23-2006

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3      ---------------------------------X  ORIGINAL

        CATHERINE GAUJACQ                  :

 4                      Plaintiff          : No.

                   v.                      : 1:05CV0969

 5      ELECTRICITE DE FRANCE              : (JGP)

        INTERNATIONAL NORTH AMERICA, INC.,:

 6      ET AL                              :

                      Defendants          :

 7      ---------------------------------X

 8

 9                   Washington, D.C.

10               Thursday, March 23, 2006

11

12      Deposition of:

13                   PATRICK DE BOTHEREL,

14          The witness, was called for examination by

15      counsel for the Plaintiff, pursuant to notice,

16      commencing at 8:47 a.m., at the law office of

17      Steptoe & Johnson, 1330 Connecticut Avenue, N.W.,

18      Washington, D.C., 20036, before Sheri C. Stewart,

19      Registered Professional Reporter and Notary Public

20      in and for the District of Columbia, when were

21      present on behalf of the respective parties:

22
```

PATRICK DE BOTHEREL

Gaujacq v. Electricite de France, et al                                3-23-2006

50

1    the hierarchy, higher will be their salaries,

2    their compensation.  That's the first point.

3              The second point with regards to the

4    dirigent, compensation is completely

5    individualized.

6              The only existing element is that we

7    have a system in place, and this is more a

8    guideline that defines a range of fixed salaries

9    classified by the high rank of the dirigent.

10        Q    Do you recall what the range was for R1

11   employees in 2004?

12        A    I do not specifically recall, but what

13   I would like to point out is that this range is

14   more a guideline than anything else.

15        Q    Is it possible that an R2 could have

16   the same salary as an R1?

17        A    No.

18        Q    Is that because the salaries are

19   defined in minimum and maximum?

20        A    There is a minimum salary, and that's

21   with regards to the level of the dirigent.  There

22   is no maximum a priori.

PATRICK DE BOTHEREL

Gaujacq v. Electricite de France, et al                              3-23-2006

51

1          It is possible that a young person who

2      has been appointed R1 has a slightly -- a slightly

3      inferior compensation to -- who has a slightly

4      inferior fixed salary to -- when compared with a

5      person of high level experience.

6              But the difference will reflect on the

7      variable portion of the compensation.

8          Q      What do you mean by that?

9          A      By that I mean the percentage applied

10     on the salary with regards to the variable portion

11     of the salary is different.

12             For example, in 2004, the variable

13     portion for the R1 was 25 percent, for the R2 it

14     was 20 percent, and for the R3 category it was

15     18 percent.

16         Q      And is the variable portion like a

17     bonus given at the end of the year?

18         A      Yes.

19         Q      Okay.  And then the fixed portion is

20     the salary that's paid over -- on a monthly or

21     biweekly basis, bimonthly basis?

22         A      Yes.

138

1    this knowledge based on hearsay, which that's

2    always very dangerous because it can be based just

3    only upon rumors.

4            And, indeed, there were rumors that

5    Mr. Nadal would treat Mrs. Gaujacq very badly.

6    BY MS. BREDEHOFT:

7        Q    If a male employee at EDF is treating a

8    female employee at EDF worse than other males, do

9    you think that that female has the right to

10   complain about that conduct -- let me finish --

11   without punishment or retribution for having

12   complained?

13           MS. REGAL:  I'm going to object.  This

14           is a 30(b)(6) deposition, and you are now

15           asking this individual personal views.

16           MS. BREDEHOFT:  You're making a

17           speaking objection.  If you want to make an

18           objection to the form, then you can go ahead

19           and do that, but you're now making a speaking

20           objection.  Or outside the scope, you can

21           make that objection.

22           MS. REGAL:  The topics that you're

**ATTACHMENT 12**



| EDF<br>Électricité<br>de France  BRANCHE AMERIQUES<br>BRANCH AMERICAS | *FAX* | Date: <br>Total Pages:  4 (four) |

|  | **FROM** |
|---|---|
| *Name:* | Fernando PONASSO |
| *Phone:* | (+54 11) 41 32 85 01 |
| *Fax:* | (+54 11) 41 32 85 61 |
| *Re :* | **Washington** |

|  | **TO** |
|---|---|
| *Name:* | M  Gérard CREUZEE |
|  | DGO |
| *Phone:* | 33 1 40 42 74 18 |
| *Fax:* | 33 1 40 42 17 94 |

Dear Gérard,

I think this is what triggered the situation
Best regards,

Fernando

EDF 001038

De:        <EDFINACG@aol com>
A:         <fponasso@edfamericas com>
Fecha:     09/07/2004 16:33
Tema:      edfina confidential

Dear Fernando,

Sorry to bother you with the daily operations of EDFINA.However, I think you
should know about the attached letters all dated June,18th I received mine at
home at the end of June.
I discovered the others thanks to the audit at EDFINA this week
These decisions are not in compliance with the Board decisions dated
June,1st.They prevent me from doing my job as Vice President of the company They were
not justified by any fact that I'm aware of. I was also removed.from the list
of officers of the company at the Bank of EDFINA without justification or even
information.These facts are discriminatory in regard of my position, as
compared to the situation of Benoit Dreux
I wanted you to know about that I'm sure you've got a lot of more important
stuff to deal with but these are important for me.
Best regards,
catherine

The information contained in this message is confidential and is intended for
the addressee(s) only. If you have received this message in error please
notify the originator immediately The unauthorized use, disclosure, copying
or
alteration of this message is strictly forbidden

Catherine GAUJACQ
Vice President
EDF International North America,Inc
suite 509
1730 Rhode Island Avenue, NW
WASHINGTON DC20036
tel 202 429 2527
fax 202 429 2532
e-mail: cgaujacq@edfina com or edfinacg@aol com

EDF 001039

ELECTRICITÉ DE FRANCE INTERNATIONAL
NORTH AMERICA, INC.
June 18, 2004





ATTN: Ms. Catherine Gaujacq, Vice President
Mr. Benoit Dreux, Vice President

RE: Officer Transition

Dear Ms. Gaujacq and Mr. Dreux,

In order to facilitate the smooth transition of officers, I would like to review the following policies and practices of Electricite de France, International North America ("EDFINA") with respect to the offices of President and Vice-President.

Only the President is permitted to enter into contracts with third parties on behalf of EDFINA; make representations and/or warranties on behalf of EDFINA, or incur expenses on behalf of EDFINA. In the President's absence, the above transactions may be carried out by either Vice-President upon the express written consent of the President. The President's consent, however, is not necessary for either Vice-President's use of their corporate credit cards for the incurrence or reimbursement of daily expenses. If any electronic payment is needed for corporate expenses, the Assistant will use the President's credit card for such purpose, as usual.

In addition, it is the duty of the President to supervise the daily operations of EDFINA, including all operations of Electricite de France in the United States and Canada. Therefore, it is important that the President is kept informed of the status of all pending or current contract negotiations and agreements involving Electricite de France in the United States or Canada. All files, letters, contracts, correspondence, bills, and similar documents must be maintained at the principal office of EDFINA, International North America in Washington, D.C. Mail directed to EDFINA should also be delivered to and maintained at the principal office in Washington, D.C., including a copy of important emails and other relevant pieces of informal information.

For convenience and efficiency, all publications, reviews, newspapers (in print or electronically) must be delivered to the office of which they are to be redistributed.

Sincerely,

Electricite De France International North America
Christian Nadal, President

ELECTRICITÉ DE FRANCE INTERNATIONAL NORTH AMERICA, INC.
1730 RHODE ISLAND AVENUE N.W.   SUITE 509 · WASHINGTON D.C. 20036   TEL: (202) 429-2527 · FAX: (202) 429-2532

EDF 001040

ELECTRICITÉ DE FRANCE INTERNATIONAL
NORTH AMERICA, INC



COPY

*Via Hand Delivered*
Electricite De France
International North America
1730 Rhode Island Ave., NW
Suite 509
Washington, DC 20036
ATTN: Mr. Benoit Dreux, Vice President

June 18, 2004

Re: *Delegation of Authority*

Dear Mr Dreux:

Let this correspondence serve as your authority to act on my behalf as President of Electricite De France International North America. Said authority shall include the power to make representations and warranties on behalf of Electricite de France International, North America; the power to legally enter into contracts on behalf of Electricite de France International, North America; and the power to incur expenses on behalf of Electricite de France International, North America.

Électricite De France
International North America

By: _____
Christian Nadal, President

cc: F Ponasso, EDF Americas

ELECTRICITÉ DE FRANCE INTERNATIONAL NORTH AMERICA, INC
1730 RHODE ISLAND AVENUE  N.W. - SUITE 509 - WASHINGTON  D.C.  20036 - TEL: (202) 429-2527 - FAX: (202) 429-2532

EDF 001041

23 JUL. 2004 11:49

SU NOMBRE          : EDF AMERICAS
SU NUMERO DE TELEFONO : 54 11 41 32 85 61

| N° | OTRO FACSIMIL | HORA INICIO | DURACION | MODO | PAGINAS | RESULTADO |
|----|---------------|-------------|----------|------|---------|-----------|
| 01 | 9*0033140421794 | 23 JUL 11:48 | 01'18 | ENVIO | 04 | ACEPTAR |

PARA DESACTIVAR EL INFORME, PULSE 'MENU' #04 FIJAR.
A CONTINUACION, SELECCIONE OFF UTILIZANDO EL 'DIAL GIRATORIO'.

EDF 001042