IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CATHERINE GAUJACQ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05CV0969 (JGP) |
| | ) | |
| ELECTRICITE DE FRANCE | ) | |
| INTERNATIONAL NORTH AMERICA, | ) | |
| INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

# PLAINTIFF'S OPPOSITION TO DEFENDANT CHRISTIAN NADAL'S MOTION FOR SUMMARY JUDGMENT

Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
Carla D. Brown
D.C. Bar No. 474097
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
    Catherine Gaujacq

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT .......................................................... 1

STATEMENT OF DISPUTED FACTS................................................ 2

    EDF Group ........................................................................ 3

    Catherine Gaujacq, President of EDFINA ................................. 3

    Christian Nadal ................................................................. 5

    Discriminatory Acts Against Ms. Gaujacq Begin ....................... 6

    Discrimination by Mr. Nadal as President of EDFINA ............... 10

    Ms. Gaujacq Complains to Superiors Regarding Mr. Nadal's
    Discrimination and Harassment ............................................ 12

    Retaliation Against Ms. Gaujacq .......................................... 13

    Ms. Gaujacq Makes an Official Complaint to the EEOC ............ 13

    Mr. Nadal's Discriminatory and Retaliatory Actions Continue ..... 14

    The Position Offered to Ms. Gaujacq was Actually a
    Demotion and Constituted Further Retaliation .......................... 15

    Additional Retaliatory Actions by EDF ................................... 16

    At Nadal's Behest, EDF Wrongfully Terminates
    Ms. Gaujacq in Retaliation ................................................. 16

    Ms. Gaujacq and Mr. Nadal Performed the Same Position .......... 17

ARGUMENT ......................................................................... 18

I.    SUMMARY JUDGMENT STANDARD ................................... 18

II.    VIOLATIONS OF THE DISTRICT
    OF COLUMBIA HUMAN RIGHTS ACT .............................. 18

    A    Count IV: Aiding and Abetting Gender Discrimination
        in Violation of DC Human Rights Act .............................. 19

B.  Count VI: Aiding and Abetting Retaliation
in Violation of DC Human Rights Act ......................................... 29

III.  COUNT VIII: TORTIOUS INTERFERENCE
WITH CONTRACTUAL RELATIONS ........................................... 33

A.  Tortious Interference with 2000 Expatriate Contract .................. 34

B.  Tortious Interference with 2004 Expatriate Contract and/or
Business Expectancies of Benefits of 2004 Expatriate Contract ....... 36

C.  Mr. Nadal Was Acting Outside the Scope of His
Employment with EDF ................................................................... 40

D.  Mr. Nadal's Actions were not Privileged .................................... 42

IV.  COUNT XII: DEFAMATION *PER SE* ............................................. 43

A.  Mr. Nadal's Verbal and Non-Verbal Statements Were
Defamatory *Per Se* ...................................................................... 44

B.  Mr. Nadal's Defamatory Statements Are Not Privileged ............ 46

CONCLUSION ...................................................................................... 47

Plaintiff Catherine Gaujacq ("Ms. Gaujacq"), by counsel and hereby opposes Defendant Christian Nadal's Motion for Summary Judgment. Ms. Gaujacq also adopts and incorporates the arguments contained in her Opposition to the corporate defendants' Motion for Summary Judgment, her Declaration, and the Statement of Genuine Material Facts in Dispute, to the extent they relate to the specific claims against Mr. Nadal.[1]

## SUMMARY OF ARGUMENT

Although EDF had earlier promised Ms. Gaujacq that she would continue on in her position as President of EDFINA, and the Chairman and highest ranking employee at EDF, Mr. Roussely, had approved Ms. Gaujacq's draft mission for Mr. Nadal's move to the United States as a senior advisor, suddenly Ms. Gaujacq is told that Mr. Nadal will be replacing her as President, even though he had virtually no nuclear power experience. Once Mr. Nadal secured this appointment, he determined, without any substantive knowledge of Ms. Gaujacq's qualifications and having had no meaningful interaction with her, that Ms. Gaujacq must be removed from not only the United States and EDFINA, but from the entire continent of North America. Mr. Nadal hid from Ms. Gaujacq his succession of emails and complaints seeking to discredit her in advance of his taking over. In fact, Mr. Nadal took multiple steps after stepping in as President to sabotage Ms. Gaujacq's authority and reputation, without her knowledge. When Ms. Gaujacq ascertained Mr. Nadal's intentions and refused to accept his discriminatory and hostile conduct, she raised it with several high-level EDF officials in her chain of command. EDF did nothing to help her, and instead, retaliated against her and ultimately assisted Mr. Nadal in his efforts to remove Ms. Gaujacq from EDF.

---

[1] Ms. Gaujacq further incorporates the arguments in her Motion to Strike filed in conjunction with her Opposition. She further incorporates her Declaration filed in conjunction with this Opposition. The specific counts against Mr. Nadal are: Count IV - Gender Discrimination in violation of the District of Columbia Human Rights Act; Count VI - Aiding and abetting retaliation in violation of the District of Columbia Human Rights Act; Count VIII - Tortious Interference with Contractual Relations; and Count XII - Defamation.

The only plausible explanation for Mr. Nadal's premature and vehement stated intent to rid North America of Ms. Gaujacq is that Mr. Nadal does not respect women in high positions, and chooses instead to surround himself with males. In fact, after engaging in a concerted plot to discredit and harass Ms. Gaujacq, Mr. Nadal replaced Ms. Gaujacq's responsibilities with only males, and while acting in a hostile manner to Ms. Gaujacq, mentored and fostered good relations with the male employees, to the exclusion of Ms. Gaujacq.

So intent on his destruction of Ms. Gaujacq, Mr. Nadal even acted contrary to the instructions and directions of EDF with respect to a number of his actions relating to Ms. Gaujacq, and at all times aggressively pursued his stated intention of having Ms. Gaujacq removed from North America (or EDFINA), ultimately succeeding. Mr. Nadal remains employed and in a position of honor at EDF and EDFINA; Ms. Gaujacq was dismissed for cause, her official papers were incorrect and EDF has refused to correct them, and Ms. Gaujacq has had to pursue a career anew, after 24 years of stellar performance, marked by a consistent rise to the top of the largest and most powerful company in France. EDF's track record for promoting women into the top ranks is poor, and Mr. Nadal has no history of being able to work with high-level females on a sustained basis. Mr. Nadal's motion for summary judgment, plagued by omission of the material facts genuinely in dispute, should be denied.

## STATEMENT OF DISPUTED FACTS

Ms. Gaujacq was employed by Electricite de France ("EDF"), and by its United States subsidiary, Electricite de France International North America, Inc. ("EDFINA") (collectively, "EDF") at all times relevant to this complaint.

2

A.    EDF Group

EDFINA is a wholly owned United States subsidiary of EDF. Answer ¶ 4; Laroche Decl. ¶ 5. It

"acts as a liaison office for EDF in the United States, ... receives money to pay expenses,

including salaries and benefits of EDFINA employees, from EDF." Answer ¶ 4; *see also* Nadal

Dep at 488-89, Att. 1 ("EDFINA has no income," rather, EDFINA's income comes from "wire

transfers from EDF").[2]

B.    Catherine Gaujacq, President of EDFINA

Ms. Gaujacq was employed by EDF from 1980 until January 6, 2005. *See* Gaujacq

resume, Def. Exh. 12. Ms. Gaujacq was appointed Delegue General for the United States and

Canada on August 1, 2000 and Directeur USA/Canada of the Americas Branch in August 1,

2002. *See* Def. Exhs. 13, 14 [3]  Additionally, Ms. Gaujacq served as President and Treasurer of

EDFINA from August 1, 2000, until May 31, 2004, when she was appointed Vice-President

("VP") of EDFINA. *See* Exhibits 15, 16 and 46 to Gaujacq Dep, Att. 2. Throughout her tenure

as President of EDFINA, Ms. Gaujacq performed her duties in an exemplary manner, and

received high evaluations. *See* Exhibit 49 to Gaujacq Dep, Att. 4. EDF was very satisfied with

---

[2] EDF and EDFINA essentially act as one company with common management, centralized control of human resource functions, common procedures, policies and interconnected operations. Gaujacq Decl ¶¶ 6-12; *see also* Answer ¶ 8 ("EDFINA is available to represent EDF in the United States"); de Botherel Dep at 40, Att. 3 (for HR and ranking purposes, "EDF Group" includes headquarters, all of the EDF subsidiaries and all the affiliated companies). EDF, through EDF, EDFINA, and other EDF subsidiaries, buys and sells services in the United States, including, but not limited to, management, engineering and research and development ("R&D") products and services  *Id* at ¶

[3] "Def. Exh" shall refer to the exhibits attached to the Defendants' Rule 56.1 Statement of "Undisputed Facts." Whenever referenced, Ms. Gaujacq is relying upon the translated versions of the documents attached as part of the exhibit and not bates numbered

Ms. Gaujacq and there was never any suggestion of performance issues. Defendants' Statement

Pursuant to FRCP 56 1 and Local Rule 7(h) ("Def. Facts") at ¶ 8.[4]

Prior to being appointed President of EDFINA, Ms. Gaujacq rose through management

positions within EDF and EDFINA in the core energy generation business, and, most recently, in

strategic consulting on behalf of EDF in the United States See Def. Exh 12 As President of

EDFINA and Director of Americas Branch, Ms. Gaujacq was paid a salary of $169,750.00, plus

benefits, and held an R3 Ranking

In connection with Ms. Gaujacq's appointment to the United States, EDF and Ms

Gaujacq entered into an agreement entitled "Particular Conditions Applicable to Catherine

Gaujacq's Long Term Mission to Washington." ("2000 Expatriate Contract"). Def. Facts at ¶ 10.

The 2000 Expatriate Contract was effective for three years, with the option to extend it one year

if mutually agreeable. *Id* at ¶ 11. The contract was extended for one year in January 2003 and

was effective until July 31, 2004  *Id* at 30. The "Guide to EDF Employees Working Abroad"

(the "Guide") was specifically incorporated into the 2000 Expatriate Contract. See Def. Facts,

Exhibit 15, Bates EDF 438, Article 1.

Despite the size of EDF, Ms. Gaujacq was one of a small group of women to hold an

executive level position and, as President of EDFINA, was the only female manager of a

subsidiary outside of France. Of the 50 EDF executives holding R1 rankings, only 5 were

women, although of the total 160,000 employees at EDF, approximately 45 to 50 percent were

women. *See* De Botherel Dep at 36, 66-69, 74. Att. 3.[5]

---

[4] In fact, in November 2002, Ms. Gaujacq received the decoration of a French Merit Order "Ordre national du Merite." *See* Def. Exh. 12; *see also* Deposition of Yann Laroche ("Laroche Dep") at 78 (general description of Order), Att. 5.

[5] In fact, Yann Laroche, Deputy General Manager of EDF, could name no female manager of a subsidiary or any other expatriate female manager. *See* Laroche Dep at 25-29. Att. 5. Further, Mr. Laroche knew of only "one female manager that ranked R1, but she was deputy general manager, she was not the person in charge." *See* Laroche Dep at 64. Att. 5.

In January 2004, Ms. Gaujacq spoke with Gerard Creuzet, EDF's COO and the second highest ranking (No. 2) person at EDF, who reported directly to Francois Roussely, the highest ranking (No. 1) person at EDF. Mr. Creuzet told Ms. Gaujacq that because there were no EDF manager positions into which she could be promoted at that time, he wanted her to continue in her position as President of EDFINA and Director to the Americas Branch until at least 2005 [6] Gaujacq Dep at 108-11, Att. 6. In late January and mid-February 2004, Ms. Gaujacq was informed that Mr. Nadal would be joining EDFINA as a Senior Advisor and Ms. Gaujacq was requested to prepare a mission statement for Mr. Nadal. Gaujacq Dep at 122-23, 126-32, 153, Att. 6. Ms. Gaujacq was never told that Mr. Nadal was to be replacing her in any aspect of her position. *Id.* Ms. Gaujacq incorporated into the draft of Mr. Nadal's mission the areas of EDFINA that she felt should be expanded. Gaujacq Dep. at 126-27, Att. 6; Exhibit 20 to Gaujacq Dep, Att. 7. Around February 18, 2004, Ms. Gaujacq met with Mr. Roussely, who approved Ms. Gaujacq's mission statement for Mr. Nadal. Gaujacq Dep at 129-34, Att. 6.

C    Christian Nadal

Mr. Nadal was hired by EDF in 1989 and, unlike Ms. Gaujacq, was given a salary later determined to be within an R1 ranking. Deposition of Christian Nadal ("Nadal Dep") at 16-17, Att. 1 [7]. In late 2003, Mr. Roussely offered Mr. Nadal a position working with Ms. Gaujacq and EDFINA in the United States. *Id.* at 138-39, 153-56, 158-61, Att. 1. During this discussion, Mr. Nadal learned that Ms. Gaujacq had been told that she would stay at EDFINA until at least the summer of 2004. Mr. Roussely stated it would be determined how to "manage" Mr. Nadal's

---

[6] Mr. Nadal offers no support for his allegation that Ms. Gaujacq requested to stay in the United States. The sole evidence is that EDF/EDFINA requested Ms. Gaujacq to remain in the United States

[7] Mr. Nadal served as CEO of an EDF subsidiary in Argentina from September 1999 until early 2002. *Id.* at 22, 27, Att. 1. Upon his return to EDF in France in early 2002, Mr. Nadal accepted a temporary assignment, but also discussed the possibility of leaving EDF. *Id.* at 98-101, Att. 1. In May 2002, Mr. Nadal accepted the position of a General Controller, which was a demotion. *Id.* at 105-09, Att. 1.

situation with Ms. Gaujacq's situation. *Id.* at 162-63, Att. 1. Effective January 1, 2004, Mr.

Nadal was appointed "General Representative of EDF for North America," reporting to the

"Director of Branch Americas." Exhibit 23 to Gaujacq Dep, Att. 8; *see also* Nadal Dep at 132-

33, Att.1. On June 1, 2004, Mr. Nadal became President of EDFINA. Bates Nos. 584-85, Att.

20; *see also* Nadal Dep at 132-33, Att. 1.

D.    Discriminatory Acts Against Ms. Gaujacq Begin

Soon after his appointment as General Representative of EDF for North America, but

well before his effective starting date, without any rational or legitimate justification, Mr. Nadal

decided that Ms. Gaujacq had to leave. Mr. Nadal first met with Ms. Gaujacq on February 25,

2004. Mr. Nadal had no knowledge of her background and expertise. Nadal Dep at 189-90,

211-12, Att. 1. Mr. Nadal did not speak to anyone about Ms. Gaujacq prior to this meeting. *Id.*

On February 25, 2004, Mr. Nadal met with Ms. Gaujacq at the offices of EDFINA and during

lunch, for a total of approximately three hours. *Id.* at 199-200, 209; *see also* Exhibit 26 to

Gaujacq Dep, Att. 9. Mr. Nadal was disappointed in this meeting, in that it appeared to him that

Ms. Gaujacq was not aware of his future position with EDFINA.[8]

Despite the evident "confusion" by Ms. Gaujacq, through no fault of her own, and despite

Mr. Nadal's lack of information about and contact with Ms. Gaujacq, Mr. Nadal proceeded

swiftly with his plan to rid EDFINA of Ms. Gaujacq. On March 5, 2004, Mr. Nadal met with

Mr. Betouret. Def. Exh. 34. Mr. Nadal requested clarification of the scope of his mission and

whether it would include the responsibilities previously set forth in Ms. Gaujacq's mission,

either partially or totally. *Id.* On March 10, 2004, prior to any further discussions with Ms.

---

[8] Nadal Dep. at 209, Att. 1. Mr. Nadal did not express this disappointment to Ms. Gaujacq. *Id.* at 249-50. Instead, he spoke with and wrote an email to Mr. Metais requesting that EDF clear up the confusion. *Id.* at 238-39.

Gaujacq or even about Ms. Gaujacq with other EDF individuals,[9] Mr. Nadal wrote to Mr. Metais and stated, in no uncertain terms, that he was convinced that he would be unable to share responsibilities with Ms. Gaujacq. Def. Exh 44. In this email, Mr. Nadal admitted that the "nuclear competence of Catherine" was "very strong," but declared that "the only situation perfectly matching our agreements is Catherine leaving North America in the very near future, at a date to be determined now, to take a position in a completely different sector ..." EDF 947 (quoting translation), Def. Exh. 44.

Between March 22 and 23, 2004, Ms. Gaujacq was summoned to Buenos Aires to meet with Mr. Ponasso and Mr. Creuzet. Gaujacq Dep at 179, Att. 6. Specifically, Mr. Creuzet told Ms. Gaujacq that, contrary to her previous conversations with Mr. Creuzet and Mr. Roussely, Mr. Nadal was going to be President of EDFINA. *Id* at 181-86. After speaking with Mr. Roussely on the telephone, Mr. Creuzet told Ms. Gaujacq that what she had told he and Mr. Ponasso was correct – that the Chairman of EDF (Mr. Roussely) had admitted in this telephone conversation that he had earlier told Ms. Gaujacq she was to be President and had approved the mission statement for Mr. Nadal to be solely an advisor. Notwithstanding, Mr. Creuzat told Ms. Gaujacq that now, "the decision is the decision" and that "Nadal was going to be president of EDFINA and there's nothing else to say." *Id.* at 184-85. While Ms. Gaujacq was understandably upset by EDF's treatment of her, Mr. Creuzet suggested that she propose a new mission for herself in the United States. *Id* at 223.

On March 25, 2004, Ms. Gaujacq sent an email to Mr. Creuzet attaching the details of this new mission for Mr. Creuzet's signature. Def. Exh 41, Exh 42 ("2004 Expatriate Contract"). In an email dated March 29, 2004, Mr. Creuzet, on behalf of EDF, accepted Ms. Gaujacq's

---

[9] Mr. Nadal admits that between February 25, 2004 and June 2004, he did not speak to Ms. Gaujacq either by telephone or in person. Nadal Dep. at 211-12. Att. 1.

proposal, writing that it was "well in line" with the agreement he and Ms. Gaujacq discussed in

Buenas-Aires. Def. Exh. 41, EDF 000965. He further indicated his acceptance of the 2004

Expatriate Contract, and that he would forward the final contract as soon as it was signed. *Id.*

The 2004 Expatriate Contract provided that Ms. Gaujacq's new mission as "Production and EDF

International North America Nuclear Projects Director" began on April 1, 2004. Def. Exh. 42.

   In an email dated March 25, 2004, Ms. Gaujacq "apologized" to Mr. Nadal for the

"misunderstanding," acknowledging Mr. Nadal's current and future positions with EDFINA.

Exhibit 32 to Gaujacq Dep, Att. 10. Mr. Nadal conceded that Ms. Gaujacq did, in fact, admit the

"mistake," and proceeded in an appropriate manner through this March 25, 2004 email. Nadal

Dep at 253, 278, 336, Att. 1.[10] On Friday, March 26, 2004, Mr. Nadal wrote to Mr. Metais,

telling him that he believed Ms. Gaujacq now understood what his position was to be. He also

wrote that EDF needed to be patient and watch what would happen over the near future. Def.

Exh. 38. Despite this acknowledgement, just three business days later, on Wednesday, March

31, 2004, after the "confusion" about Mr. Nadal's position was cleared up with Ms. Gaujacq, Mr.

Nadal met with Mr. Betouret and confirmed his position that he thought it was not possible for

him to work with Ms. Gaujacq because of his lack of trust of her and because he thought

someone else could do an equal or better job than Ms. Gaujacq.[11] EDF 977, Att. 11.

---

[10] Mr. Nadal testified that he believed that the "misunderstanding" may have been because, according to Mr. Nadal, Ms. Gaujacq's supervisor, Mr. Ponasso, originally told her about Mr. Nadal's mission, but was unable to adequately communicate the information to Ms. Gaujacq because Mr. Ponasso (who spoke Spanish) did not speak English or French well. Nadal Dep at 239, Att. 1. Therefore, according to Mr. Nadal, Mr. Creuzet "corrected" the information given to Ms. Gaujacq, sometime in March 2004. *Id.* Of course, Mr. Ponasso was able to communicate with Ms. Gaujacq throughout her employment, with apparently this one "exception."

[11] "Someone else" meant a male, as demonstrated by the fact that males replaced Ms. Gaujacq in all her prior areas of responsibility. Mr. Nadal replaced Ms. Gaujacq in some of her responsibilities as President. Mr. Serviere and Mr. Foret replaced Ms. Gaujacq on the NuStart project and Mr. Dreux replaced Ms. Gaujacq as the officer at EDFINA with signature authority. *See* Gaujacq Dep at 471, 509; Att. 6; Bates No. 000057; Att. 12; EDFINA 000774; Att. 13; EDFINA 001040-41 Att. 14; *see also* EDF 000978, Def. Exh. 45-I (Jean Luc Foret should "handle the nuclear development matters of interest to EDF" instead of Ms. Gaujacq).

Further, in an email dated April 1, 2004, Mr. Nadal stated that Ms. Gaujacq "created the conditions which make it extremely difficult her staying with us or collaboration, either with me, with the employees or with the business partners with which she had conversations incompatible with my arrival as Delegue General ... The only suitable position is for her to have new responsibilities in a different area " EDF 978-80 at 978 (*quoting* Gaujacq translation), Def. Exh. 45. He continued: "It appears to me that a quick and complete stop of all Catherine's activities is by far the best solution." *Id.* at 978 (*quoting* Gaujacq translation).

As a result of Mr. Nadal's complaints, on April 7, 2004, after the official effective date of the 2004 Expatriate Contract and in an effort to change the terms of the already agreed upon 2004 Expatriate Contract, Mr. Creuzet sent an email to Ms. Gaujacq, attempting to change the title of Ms. Gaujacq's mission, as well as her reporting structure. Def. Facts, Exh. 41, EDF 000966. In response, Ms. Gaujacq indicated she was open to potential revisions of the 2004 Expatriate Contract, but pointed out the practical fact that in order to be able to participate in the NuStart U.S. Consortium, she would need to be affiliated with EDFINA, because EDFINA was the named participant in the NuStart confidentiality agreements and operating agreements. *Id.* On April 8, 2004, Mr. Creuzet attempted to renege on the already agreed upon mission, by requesting that Ms. Gaujacq "finalize" her assignment letter with the head of the Energy Department, Bruno Lescoeur. *Id.* at EDF 000967

Despite Mr. Nadal's baseless request on April 1, 2004 for a "quick and complete stop" of Ms. Gaujacq's employment at EDFINA (Def. Exh. 45), Mr. Metais wrote on April 6, 2004, that a decision had been made; Ms. Gaujacq:

> is assigned on the project 'premium 2015' (US-French cooperation on nuclear generation 4). She reports to Energy Branch and will received a mission letter. This new assignment does not report to Branch Americas nor EDFINA Inc. Her mission will lead

to spending most of her time in the USA with terms and conditions defined by Energy Branch

EDF 983 (*quoting* Gaujacq translation), Att. 15. However, Mr. Nadal refused to accept the decision. In an email dated April 7, 2004, Mr. Nadal stated that "Premium 2015" was an important activity of EDFINA and that the decision was not acceptable to him. EDF 985, Att. 16. He further stated that it was unacceptable for Ms. Gaujacq to remain in charge of this project, that her doing so was a major obstacle for him and that such a solution was one he wanted to avoid. EDF 985, Att. 16.

On May 25, 2004, the Chairman of EDF met with Mr. Nadal and informed him that, contrary to Mr. Nadal's wishes, Ms. Gaujacq was to continue on at EDFINA as VP although Mr. Nadal would replace her as President and Board Member of EDFINA and Ms. Gaujacq was to report to Mr. Nadal. Def. Exh. 48. Mr. Nadal was explicitly directed to cease trying to further renegotiate this arrangement. *Id.*

E.    Discrimination by Mr. Nadal as President of EDFINA

While the Chairman of EDF may have directed Mr. Nadal to cease efforts to further negotiating Ms. Gaujacq's arrangement with EDF, Mr. Nadal was undaunted, and continued relentlessly in his mission of forcing Ms. Gaujacq out of EDFINA. After his efforts with EDF failed, Mr. Nadal began harassing and discriminating against Ms. Gaujacq using his new position as her superior to further his efforts to have Ms. Gaujacq removed entirely from EDFINA.

Mr. Nadal assumed his position as President of EDFINA on June 1, 2004. On June 4, 2004, Mr. Nadal stated to Riggs Bank that only he and the other male VP of EDFINA were to have signature authority on the account, taking away Ms. Gaujacq's ability to sign checks on behalf of EDFINA. Def. Exh. 54. On June 11, 2006, Ms. Gaujacq discovered that her signature authority was taken away during a hostile encounter with Mr. Dreux, the other VP at EDFINA,

10

who announced the fact in front of other EDFINA employees and voided checks that Ms

Gaujacq had signed, not knowing her authority had been stripped. Deposition of Mame Bawo

Ba ("Ba Dep") at 215-16, Att. 17; Gaujacq Dep at 310-11, Att. 6; see also Bates No. 997, Att.

18; Def Exh 55. In early June 2004, Ms. Gaujacq was informed by Mr. Foret that, rather than

driving with Ms. Gaujacq to a conference in Pittsburgh as planned on June 13, 2004, Mr. Foret

would be driving to the conference with Mr. Nadal and Ms. Gaujacq was not invited to

accompany them. Gaujacq Dep. at 333-35, Att. 6.[12] Later, on June 18, 2004, Mr. Nadal took

away Ms. Gaujacq's authority to enter into contracts or incur expenses on behalf of EDFINA

while simultaneously and secretly permitting the other male VP of EDFINA to retain that

authority. EDF 001040-41, Att. 14; *see also* de Botherel Dep at 218 (relating these facts) and de

Botherel Dep at 138 ("there were rumors that Mr. Nadal would treat Mrs. Gaujacq very badly "),

Att. 3.

From June 28 to July 9, 2004, EDF conducted an audit of EDFINA concerning the time

period that Ms. Gaujacq had been President of EDFINA. Gaujacq Dep at 343-45, Att. 6; Def.

Exh. 62 and 63. Mr. Nadal used the audit to falsely suggest that Ms. Gaujacq had done

something inappropriate with EDFINA's contractors. Gaujacq Dep at 376-77, 482-84, Att. 6.

On July 12, 2006, Mr. Nadal continued his discriminatory and harassing behavior toward

Ms. Gaujacq in the first face-to-face meeting he had with Ms. Gaujacq since they first met in

February 2006. Gaujacq Dep at 76-79, 389-93, Att. 6. Specifically, Mr. Nadal met with Ms.

Gaujacq and demanded, in a demeaning and aggressive manner highly inappropriate for Mr.

Nadal and Ms. Gaujacq's respective positions, that Ms. Gaujacq bring thousands of documents

into the EDFINA offices within 24 hours. *Id.; see also* Exhibit 11 to Gaujacq Dep , Att. 6. This

---

[12]  Contrary to Mr. Nadal's claim that he and Ms. Gaujacq planned to meet at the conference to discuss matters, Ms.
Gaujacq did not know Mr. Nadal would be attending the conference until Mr. Foret informed her that he would be
driving to the conference with Mr. Nadal. *Id, see also* Nadal's Memo 9.

request was unreasonable and practically impossible in its urgency and not sensible in that many

of the documents he requested related to NuStart and were subject to a confidentiality agreement

to which Mr. Nadal, as well as many other EDFINA employees, were not a signatory. Gaujacq

Dep at 477-78, Att. 6. After Mr. Nadal made this request that he was unable to provide any

legitimate basis for the timing and urgency, he brought Mr. Foret, a subordinate to Ms. Gaujacq,

into the meeting and continued to demean Ms. Gaujacq in front of Mr. Foret. Gaujacq Dep at

76-79, 389-93, Att. 6.

> F.    Ms. Gaujacq Complains to Superiors Regarding
>        Mr. Nadal's Discrimination and Harassment

Ms. Gaujacq complained about the first of these discriminatory acts by Mr. Nadal against

her to her manager, Mr. Ponasso, in an email dated July 9, 2004. Def. Exh. 67. On July 22,

2004, Ms. Gaujacq complained in writing to Mr. Nadal, Mr. Ponasso, Mr. Creuzet and Mr.

Roussely. Bates Nos. 946-47, 849-50, Att. 19. She also voiced her complaints of discrimination

and harassment to Mr. Creuzet, Mr. Laroche and Mr. Ponasso on July 23, 2004 by telephone

Bates Nos. 2035-36, Att. 20; *see also* Bates Nos. 731-735, Att. 21.[13]  In response to Ms.

Gaujacq's verbal complaints, Mr. Creuzet stated that EDF knew Mr. Nadal was a bad guy and

suggested to Ms. Gaujacq that she return to France to be "protected" from Mr. Nadal. Mr.

Creuzet further stated that Ms. Gaujacq's career would be dead if she filed a claim with the

EEOC. *Id.*, *see also* Gaujacq Dep at 407-19, Att. 6.   On July 25, 2004, Ms. Gaujacq reiterated

complaints made to Mr. Creuzet, Mr. Laroche and Mr. Ponasso on July 23, 2004 by telephone

and requested again that EDF address Mr. Nadal's discriminatory behavior toward Ms. Gaujacq

Def. Exh. 72, Bates 1047A-1049 at 1049 (requesting, amongst other relief, that EDF

---

[13] Ms. Gaujacq followed the procedure for filing complaints at EDF. *See* Laroche Dep at 76-77, Att. 5.  However, EDF conducted no official investigation.  De Botherel Dep at 191-92, Att. 3.

"acknowledg[e] [Ms. Gaujacq's] equal status and treatment with the other *male* VPs of EDFINA.").

H.    Retaliation Against Ms. Gaujacq.

EDF's response, however, was not to investigate the matter but rather: (1) to order Ms. Gaujacq back to France, contrary to all prior agreements and discussions related to her future work assignment; (2) offer Ms. Gaujacq a demotion, contrary to earlier promises of a promotion; and (3) to eventually force Ms. Gaujacq's "retirement" in January 2005.[14]  Specifically, Mr. Laroche treated Ms. Gaujacq's complaints of discrimination and harassment as "blackmail" and responded by sending Ms. Gaujacq "a letter demanding that she return back to France, since the renewal or extension of her contract was about to come to an end, on 31st July 2004." Laroche Dep. at 88, Att. 5; *see also* July 27, 2004 letter to Ms. Gaujacq and translation, Bates Nos. 00304-05, Att. 22. Ms. Gaujacq's "blackmail" was simply that "she threatened to file a complaint" with the United States authorities, Laroche Dep. at 92, Att. 5, an activity explicitly protected.

Ms. Gaujacq was thereafter ordered to return to France, ordered to take a position that was a clear demotion without management responsibility and without any real substance, and then terminated on or about January 5, 2005. *See* Exhibit 71 to Gaujacq Dep., Att. 22; Exhibit 6 to Laroche Dep., Att. 23.

I.    Ms. Gaujacq Makes an Official Complaint to EEOC

Ms. Gaujacq timely filed an administrative Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on July 30, 2004, Att. 24, and filed an Amended Charge of Discrimination by hand delivery on August 6, 2004. Def. Exh. 25.

---

[14] In the meantime, Ms. Gaujacq also complained of Mr. Nadal's and EDF's discriminatory and retaliatory actions to EDF's ethics officer on December 10, 2004, who admitted that he did nothing to investigate Ms. Gaujacq's complaints. De Botherel Dep. at 178-80, Att. 3.

Ms. Gaujacq submitted a statement of further acts of retaliation by EDF to the EEOC on October

11, 2004 and November 24, 2004. *See* Nov. 24, 2004 Suppl., Att. 26.

      J      <u>Mr. Nadal's Discriminatory and Retaliatory Actions Continue</u>

      While Ms. Gaujacq attempted to transition the NuStart assignment and her other duties to

her successors, Mr. Nadal continued his discriminatory behavior toward Ms. Gaujacq. Although

EDF clearly wanted Ms. Gaujacq to transition her responsibilities to her successor, and although

Mr Serviere and Ms. Gaujacq had every intention of doing so, Mr. Nadal made this impossible.

Gaujacq Dep at 498-522, Att. 6; EDFINA 000876, Att. 27, Bates No 000057, Att. 28; EDF

001086, Att. 29. On August 9, 2004, Ms. Gaujacq attended a conference in Florida on behalf of

EDFINA While there, Mr. Nadal, through EDFINA, canceled her business credit cards and Ms.

Gaujacq had to pay for her business expenses personally Gaujacq Dep at 506-07, Att. 6. On

August 19, 2004, Ms. Gaujacq was to attend a conference call related to NuStart Gaujacq Dep

at 509-11, Att. 6; EDFINA 000726, Att. 30. However, on August 18, 2004, Mr. Nadal

contacted the NuStart administrative personnel and requested that the call-in number be changed

so that Ms. Gaujacq could not attend and further ordered Ms. Gaujacq not to attend, thereby

embarrassing Ms. Gaujacq to the third parties involved in the conference call by refusing to

allow her the ability to inform her colleagues of her departure from the project. Gaujacq Dep at

512-17, Att. 6; Bates Nos 728-30, 853, 854, Att. 31

      Moreover, in August and October 2004, and then again in January 2005, Mr. Nadal,

through his attorneys and EDFINA, attempted to interfere with Ms Gaujacq's immigration status

by communicating negatively with the USCIS. Gaujacq Dep at 456-57. Att. 6.

14

K.    The Position Offered to Ms. Gaujacq was Actually a
      Demotion and Constituted Further Retaliation

In EDF's July 27, 2004 letter to Ms. Gaujacq, EDF stated that a position within the

Energy Branch would be proposed by November 1, 2004, at the latest. Bates Nos. 000049-50.

Att. 32. In August and September, 2004, Ms. Gaujacq requested on several occasions

information concerning the details of this position. Bates Nos. 000034-39 at 37, Att. 33; 1223-

24, Att. 34. On September 8, 2004, Mr. Bouron of EDF's Human Resources Department, sent

Ms. Gaujacq an email informing Ms. Gaujacq of the financial terms of the new position and

providing a vague title for the new position. Bates Nos. 000063-65, Att. 35. Ms. Gaujacq

responded, on September 10, 2004, by requesting more details about the actual position and her

new mission letter for that position. Bates No. 000066, Att. 36.

Finally, on October 1, 2004, through a letter dated September 24, 2004, EDF provided

Ms. Gaujacq with the actual content of her mission with the proposed new position. Bates Nos.

000067-70, Att. 37. Contrary to promises previously made to Ms. Gaujacq of higher

management responsibility and a raise, the proposed new mission was at a lower level of

responsibility than her three previous missions at EDF and offered no pay raise. *Id.*; Bates Nos

000034-39 at 38, Att. 33. The new mission consisted of supervising studies for a project that

was not even financed, that had no real content, and that had no long-term prospective. Bates

Nos. 000067-70, Att. 37; Bates Nos. 000034-39 at 38, Att. 33; *see also* Bates Nos. 000375-78 at

378 (indicating that the position Ms. Gaujacq rejected was never filled), Att. 38. The new

position was actually a demotion, and represented a sanction and retaliation by EDF against Ms.

Gaujacq. Bates Nos. 000034-39 at 38, Att. 33; *see also* Nadal Dep at 109 (testifying that he

received a demotion after being CEO of Edenor, EDF's subsidiary in Argentina, when his new

assignment did not entail "operational responsibility" and held "less active responsibility") Att. 1.

In a letter dated October 7, 2004 and again in a letter dated October 28, 2004, Ms. Gaujacq justified her refusal of EDF's proposed new position. Bates Nos. 000034-39, Att. 33; 000075-77, Att. 39. Ms. Gaujacq did not report to this retaliatory demotion position on November 1, 2004, which under EDF policy and procedures, she had every right to reject. *See* Gaujacq Decl. ¶ 83; Def. Exh. 84. Rather than proposing a new mission and position that would reflect Ms. Gaujacq's capabilities and comply with EDF's previous promises of a promotion and raise, EDF initiated termination proceedings. By letter dated November 26, 2004, EDF ordered Ms. Gaujacq to Paris for a meeting to discuss her termination. Bates Nos. 147-48, Att. 40. On December 10, 2004, Ms. Gaujacq appeared at this meeting and justified her refusal of the position offered to her by EDF in retaliation for filing a complaint with the EEOC. Gaujacq Dep. at 438-42, Att. 6; Gaujacq Dep Exhibit 71, Att. 22.

L.    Additional Retaliatory Actions by EDF

In retaliation for her complaints of and refusal to tolerate the discriminatory treatment at the hands of Mr. Nadal, EDF caused Ms. Gaujacq to lose her housing, health care, provided untrue information to her professional community regarding her work, and abupted stopped paying the storage fees for her furniture in France. Gaujacq Dep. at 542, 613, 619-621 [15]

M.    At Nadal's Behest, EDF Wrongfully Terminates Ms. Gaujacq in Retaliation

Following the meeting of December 10, 2004, EDF terminated Ms. Gaujacq for alleged performance issues. Def. Exh. 88. At that time, EDF knew that Ms. Gaujacq had no performance

---

[15] Although EDF was aware that Ms. Gaujacq's husband needed ample notice of any of her employment changes to find work for the school year, EDF gave Ms. Gaujacq only a few days notice of termination. Def Exhs. 26 and 74

issues and that the position offered to, and refused by, Ms. Gaujacq, was a demotion meted out in retaliation for complaining about discrimination and filing a complaint with the EEOC.

### N.    Ms. Gaujacq and Mr. Nadal Performed the Same Position

Mr. Nadal and EDF worked together to discriminate against Ms. Gaujacq. Mr. Nadal's starting compensation as President was more than two times greater than Ms. Gaujacq's salary for performing the same position with more responsibility, as compared to Mr. Nadal's position. *See* Att. 44.[16] Yet EDFINA's mission and activities did not change or increase after Mr. Nadal's appointment as President of EDFINA and there have been no activities or responsibilities that Mr. Nadal performs that Ms. Gaujacq did not.[17]

Instead, Mr. Nadal actually performed *fewer* functions than did Ms. Gaujacq. Ms. Gaujacq was President of EDFINA and head of EDF's initiative with NuStart, as well as enXco and IES Board Director. After Mr. Nadal was appointed as President, Ms. Gaujacq continued in the NuStart initiative that she had been working on as President. As President, Mr. Nadal did not take on any other responsibilities to compensate for his lesser responsibilities being handled by

---

[16] Mr. Nadal conceded that he was less qualified than Ms. Gaujacq in background and experience with nuclear facilities. *See* Nadal Dep at 150-52. Att. 1.

[17] In a March 16, 2004 letter from Ms. Gaujacq, on behalf of EDFINA, to the U.S. Citizenship and Immigration Services, Mr. Nadal's position of President of EDFINA is described as follows:

> As the top-ranking executive of EDF International North America, Mr. Nadal will direct all business activities of the organization. He will review administrative and personnel decisions and coordinate the work of outside contractors who provide services to meet the needs of EDF International North America, Inc. . . as President, Mr. Nadal will work in close collaboration with leaders of U.S. electrical utilities, building and strengthening ties between the U.S. and French energy industries. . . Mr. Nadal will be charged with explaining the policies, experiences, and goals of Electricite de France to high-level U.S. energy executives and to the leading U.S. national organization in the energy industry.
>
> He will play a critical role in defining the different avenues to be pursued by Electricite de France in cooperation with the U.S. energy industry in pursuit collaborative research and development projects at a highly advance level. . .

Exhibit 33 to Gaujacq Dep, Att. 42. This was the job description submitted to and approved by the USCIS in order to obtain Mr. Nadal's VISA. Gaujacq Dep at 193-95, Att. 6. This was also Ms. Gaujacq's job description as president of EDFINA. *Id* at 194-95.

Ms. Gaujacq. Moreover, when Ms. Gaujacq was terminated, Mr. Georges Serviere, not Mr.

Nadal, replaced Ms. Gaujacq on the NuStart initiative. Mr. Nadal and Ms. Gaujacq had the same

reporting structure, held the same exact titles, and supervised the same amount of employees at

EDFINA. *See* Laroche Dep at 47 (same reporting structure), Att. 5.[18]

## ARGUMENT

### I.     Summary Judgment Standard

"Summary judgment should be granted only where there are no genuine issues of

material fact, and all inferences must be viewed in a light most favorable to the non-moving

party." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). This Court is obligated to view "the

evidence 'as favorably to [Ms. Gaujacq] as reason will permit." *Aka v. Washington Hospital*

*Center*, 156 F.3d 1284, 1295 (D.C.Cir. 1998) (*quoting Shager v. Upjohn Co.*, 913 F.2d 398, 401

(7th Cir. 1990). "If material facts are at issue, or, though undisputed, are susceptible to divergent

inferences, summary judgment is not available." *Tao*, 27 F.3d at 638. Moreover, "at the

summary judgment stage, a judge may not make credibility determinations, weigh the evidence,

or draw inferences from the facts - these are jury functions, not those of a judge ruling on a

motion for summary judgment." *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005).

### II.    Violations of District of Columbia Human Rights Act

"In the District of Columbia, it is an unlawful discriminatory practice for any person to

aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of

the District of Columbia Human Rights Act ("DCHRA") or to attempt to do so." D.C. Code § 2-

---

[18] Additionally, EDF claims that "the difference in responsibility level of an R3 and an R1 is so big that it is impossible to go from an R3 to an R1." *See* de Botherel Dep at 64, Att. 3. Accordingly, it is difficult to believe how the position of President of EDFINA and Delegate General to North America could suddenly carry the responsibilities of an R1 ranking when it had, in all the years while Ms. Gaujacq held the position, carried an R3 ranking. This supports Ms. Gaujacq's position that she should have received the R-1 ranking for her job responsibilities, consistent with Mr. Laroche's testimony on the criteria for those heading foreign initiatives

1402.62. "[T]he law in the District of Columbia prohibits employer discrimination and provides for individual liability pursuant to the DCHRA." *Macintosh v. Bldg. Owners & Managers Ass'n Int'l*, 355 F. Supp. 2d 223, 225 (D.D.C. 2005); *see also Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998) (finding DCHRA allows for individual liability for partners in law firm). "An aider or abettor is one who 'in some sort associates himself with the venture, . . . participates in it as something he wishes to bring about, [and] seeks by his action to make it succeed.'" *Wallace*, 715 A.2d at 888 (*quoting Roy v. United States*, 652 A.2d 1098, 1104 (D.C. 1995). Because Mr. Nadal "participated in the discrimination and sought to make it succeed," he is liable under the DCHRA for discrimination. *See Id.*

A.    Count IV: Aiding and Abetting Gender Discrimination in violation of DC Human Rights Act

Mr. Nadal is individually liable for aiding and abetting gender discrimination in violation of the DCHRA for disparate treatment and for creating a hostile work environment – the first ultimately leading to Ms. Gaujacq's termination and the second, resulting in her termination.

1    Mr. Nadal is Individually Liable for Aiding and Abetting EDF in the Disparate Treatment of Ms. Gaujacq in Violation of the DCHRA

"To establish a prima facie case of discrimination under the DCHRA, a plaintiff must show that: (1) she is a member of a protected class: (2) she suffered an adverse employment action; and (3) employees who were not members of the protected class were not subjected to similar treatment." *Lempres v. CBS Inc.*, 916 F. Supp. 15, 21 (D.D.C. 1996); *see also American University v. District of Columbia Comm'n on Human Rights*, 598 A.2d 416, 422 (D.C. 1991) ("In deciding cases brought under the [DCHRA], we follow the allocations of burdens and order of proof prescribed for cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. (1982).")

19

As a woman, Ms. Gaujacq is a member of a protected class.

Mr. Nadal caused Ms. Gaujacq to suffer multiple adverse employment actions ultimately leading to her termination. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Brown v. Brody*, 199 F.3d 446, 456 (D.C. Cir. 1999) (*quoting Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1999)).

After Mr. Nadal became President, he stripped Ms. Gaujacq of her ability to write checks on behalf of EDFINA, and advised Riggs Bank that only he and the other male Vice-President of EDFINA were to have signature authority on the account. EDFINA 005346, Def. Exh. 54. Later, on June 18, 2004, Mr. Nadal took away Ms. Gaujacq's authority to enter into contracts or incur expenses on behalf of EDFINA, but behind Ms. Gaujacq's back, permitted the other male VP of EDFINA that authority. EDF 001040-41, Att. 14; *see also* de Botherel Dep at 218, Att. 3.

Mr. Nadal then attempted to have Ms. Gaujacq removed from the NuStart project to which she had been assigned. Mr. Nadal was aware that Ms. Gaujacq's participation in the NuStart program was part of her contract to work in the United States and that removing her from the project would adversely affect her employment. On July 12, 2004, he demanded that she bring thousands of documents into the EDFINA offices within 24 hours. Gaujacq Dep at 76-79, 389-93, Att. 6. Given the volume of confidential documents that required individual sensitivity to ensure compliance, the request was unreasonable. Gaujacq Dep. at 477-78, Att 6.

Thereafter, on August 18, 2004, Mr. Nadal contacted the NuStart administrative personnel and requested that the call-in number be changed so that Ms. Gaujacq could not attend

a scheduled conference call, ordered her not to attend, and refusing to allow her to inform her colleagues of her project transition. Gaujacq Dep. at 512-17, Att. 6; EDF 1101A, Def. Exh. 77.

On August 9, 2004, Ms. Gaujacq attended a conference in Florida on behalf of EDFINA. While there, Mr. Nadal, through EDFINA, canceled her business credit cards and Ms. Gaujacq had to pay for her business expenses personally. Gaujacq Dep at 506-07, Att. 6. Moreover, in August and then again in January 2005, Mr. Nadal and his attorneys, attempted to interfere with Ms Gaujacq's immigration status by communicating negatively with the USCIS. Gaujacq Dep. at 456-57. Att. 6. Mr. Nadal was aware that such actions and communications would negatively affect Ms. Gaujacq's employment.

As a result of Mr. Nadal's constant baseless, discriminatory complaints about Ms. Gaujacq, EDF ordered her to return to France at a lesser position. When Ms. Gaujacq complained of his treatment and refused the demotion and transfer, EDF terminated her for alleged performance issues. Def. Exh. 88. At that time, EDF knew that Ms. Gaujacq had no performance issues and that the position offered to, and refused by, Ms. Gaujacq, was a demotion in retaliation against Ms. Gaujacq for complaining that Mr. Nadal was discriminating against her. Ms. Gaujacq suffered several adverse employment actions.

As discussed more fully in Section (2) immediately below, Mr. Nadal did not subject Ms. Gaujacq's male colleagues to similar treatment. Accordingly, Ms. Gaujacq has properly stated a claim against Mr. Nadal for disparate treatment in her demotion, removal from her projects and in her ultimate termination.

      2      Mr. Nadal is Individually Liable for Creating a Hostile Work Environment in Violation of the DCHRA

To establish a claim for hostile work environment based on gender, the plaintiff must show: "(1) that defendant engaged in offensive and disparaging conduct; (2) that the conduct was

based on sex; and (3) that it was 'sufficiently severe or pervasive that a reasonable person in her position would find her work environment to be hostile or abusive.'" *See Dickerson v. SECTEK, Inc., et al*, 238 F.Supp.2d 66. 83 (D.D.C. 2002)(holding the court is "obligated to consider the whole picture, not just particular pixels.") A plaintiff may prevail on a hostile work place claim when she proves that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . that is 'sufficiently sever or pervasive to alter the conditions of the victim's employment and create an abusive working environment." S*ee Armstrong v. Reno*, 172 F.Supp.2d 11, 24 (D.D.C. 2001) *citing Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993) "[G]iven how fact-intensive most hostile work environment cases are, such claims are often not appropriate for disposition on summary judgment." *Dickerson*, 238 F.Supp. 2d at 85; *see also Armstrong*, 172 F.Supp. 2d at 24.

      *a*     *Mr. Nadal Engaged in Offensive and Disparaging Conduct which was Severe and Pervasive*

Without knowing anything about Ms. Gaujacq -- other than her gender -- Mr. Nadal made the decision that he could not work with Ms. Gaujacq. Specifically, soon after his appointment as General Representative of EDF for North America and without any rational business justification, Mr. Nadal decided that Ms. Gaujacq had to leave. Mr. Nadal first met with Ms. Gaujacq on February 25, 2004. Prior to that, he had met Ms. Gaujacq only once or twice in company settings and had no knowledge of her background and expertise. Nadal Dep at 189-90, 211-12, Att. 1. Mr. Nadal never spoke to anyone regarding Ms. Gaujacq prior to this three-hour encounter. *Id.* Mr. Nadal was disappointed in this lunch meeting, only because it appeared that Ms. Gaujacq was not aware of his future position with EDFINA. Nadal Dep. at 209, Att. 1.

Despite the evident confusion by Ms. Gaujacq, through no fault of her own, and despite Mr. Nadal's lack of information about and contact with Ms. Gaujacq, Mr. Nadal proceeded

swiftly to rid EDFINA of Ms. Gaujacq. On March 10, 2004, prior to any further discussions with Ms. Gaujacq or even about Ms. Gaujacq with other EDF individuals, Mr. Nadal wrote to Mr. Metais and stated, in no uncertain terms, that he was convinced that he would be unable to share responsibilities with Ms. Gaujacq. EDF 947, Att. 19. In this email, Mr. Nadal admitted that the "nuclear competence of Catherine" was "very strong," but declared that "the only situation perfectly matching our agreements is Catherine leaving North America in the very near future, at a date to be determined now, to take a position in a completely different sector.…" EDF 947 (quoting translation), Att. 19. Mr. Nadal met with Mr. Betouret and confirmed his position that he thought that it is not possible for him to work with Ms. Gaujacq because of his lack of trust regarding her and because he thought someone else could do an as-good or better job than her.[19] EDF 977, Att. 11.

Further, in an email dated April 1, 2004, Mr. Nadal stated that "The only suitable position is for her to have new responsibilities in a different area." EDF 978-80 at 978 (*quoting* Gaujacq translation). Att. 43. He continued: "It appears to me that a quick and complete stop of all Catherine's activities is by far the best solution." *Id.* at 978 (*quoting* Gaujacq translation). *Id.*

Based on Mr. Nadal's complaint, on April 7, 2004, after the official effective date of the 2004 Expatriate Contract, Mr. Creuzet sent an email to Ms. Gaujacq attempting to change the title of Ms. Gaujacq's mission, as well as her reporting structure. Def. Facts, Exh. 41, EDF 000966. In response, Ms. Gaujacq indicated she was open to potential revisions of the 2004 Expatriate Contract, but pointed out the fact that in order to be able to participate in the NuStart U.S. Consortium, she would need to be affiliated with EDFINA. *Id.* On April 8, 2004, Mr. Creuzet attempted to renege on the already agreed upon mission by requesting that Ms. Gaujacq

---

[19] "Someone else" meant a male, as demonstrated by the males replacing Ms. Gaujacq in all her responsibilities

"finalize" her assignment letter with the head of the Energy Department, Bruno Lescoeur. *Id* at
EDF 000967

Despite Mr. Nadal's baseless request on April 1, 2004 for a "quick and complete stop" of
Ms. Gaujacq's employment at EDFINA (*see* Bates 978-80 at 978), Mr. Metais wrote on April 6,
2004, that a decision had been made; Ms. Gaujacq would be assigned to the Premium 2015
project. EDF 983 (*quoting* Gaujacq translation), Att. 44. In response, on April 7, 2004, Mr.
Nadal wrote that it was unacceptable for Ms. Gaujacq to remain in charge of the project, that her
doing so was a major obstacle for him, and that such a solution was one he wanted to avoid.
EDF 985, Att. 16

On May 25, 2004, the Chairman of EDF met with Mr. Nadal and informed him that,
contrary to Mr. Nadal's wishes, Ms. Gaujacq was to continue on at EDFINA as VP although Mr.
Nadal would replace her as President and board member of EDFINA and Ms. Gaujacq was to
report to Mr. Nadal. Def. Exh. 48. Moreover, Mr. Nadal was explicitly directed to cease trying
to further renegotiate this arrangement. *Id.*

Undaunted, Mr. Nadal used his influence in the office to make Ms. Gaujacq's work
environment severely hostile and abusive. On August 9, 2004, Ms. Gaujacq attended a
conference in Florida on behalf of EDFINA. While there, Mr. Nadal, through EDFINA,
canceled her business credit cards and Ms. Gaujacq had to pay for her business expenses
personally. Gaujacq Dep at 506-07, Att. 6. Moreover, in August and then again in January
2005, Mr. Nadal and his attorneys, attempted to interfere with Ms. Gaujacq's immigration status
by communicating negatively with the USCIS. Gaujacq Dep. at 456-57, Att. 6.

Mr. Nadal demanded that Ms. Gaujacq bring confidential documents to EDFINA's
unsecured offices in a matter of hours, in an aggressive and demeaning manner, and then brought

Mr Foret into the meeting and continued to demean and yell at Ms. Gaujacq in front of this junior EDF employee. Gaujacq Dep at 76-79, 389-93, Att. 6. Mr. Nadal put his fingers in Ms Gaujacq's face and refused to accept her legitimate justification for being unable to bring in the documents. He attempted to change the call-in numbers to prevent her from attending scheduled conference calls, at which he knew third parties would expect her. Gaujacq Dep. at 512-17, Att. 6; *see also* Def. Exh. 76. Mr Nadal refused to allow Ms. Gaujacq to notify the other participants that she would not be present. *Id.*

### b. Mr Nadal's Conduct was Directed at Ms. Gaujacq Based on Her Gender

At the same time that Mr. Nadal was abusing Ms. Gaujacq, he made a concerted effort to get to know and work with the men working in or with the EDFINA office. Specifically, Mr. Nadal drove with Mr Foret to a work related conference, while specifically excluding Ms. Gaujacq, who was also going to the conference and who had planned to drive to the conference with Mr Foret prior to Mr. Nadal's decision to attend the same conference. Gaujacq Dep. at 333-35. Att. 6. Mr. Nadal further recommended that Mr. Foret, a less qualified male, to handle all nuclear development matters at EDF. Def. Exh. 45. Also, although he took away Ms. Gaujacq's check signing authority, he allowed the other male EDFINA vice-president, Mr. Dreux, to retain this authority. EDF 5346. Despite Ms Gaujacq's history of effective service as EDFINA's President, Mr Nadal assigned authority to the male vice-president, Benoit Dreux, instead of Ms. Gaujacq. EDF1027 [20]

The documents and evidence make clear that Mr. Nadal was on a mission from the outset to remove Ms. Gaujacq, and relentlessly continued even after being explicitly directed from the

---

[20] The only woman Mr Nadal allowed to stay in the EDFINA office was Ms Ba, then Mr Nadal's office assistant

top of EDF to cease. Unfortunately, he succeeded in his mission. Mr. Nadal's treatment of Ms.
Gaujacq was severe, pervasive and based on her gender.

> c.    *A Reasonable Person in Ms. Gaujacq's Position Would*
> *Perceive her Work Environment to be Hostile and Abusive*

Based on Mr. Nadal's treatment of Ms. Gaujacq, a reasonable person in her position
would find her work environment to be hostile and abusive. In addition to the unjustified
hostility Mr. Nadal displayed toward Ms. Gaujacq by attempting to have her terminated even
before he had any meaningful opportunity to work with her, Mr. Nadal then engaged at abusive
conduct with an obvious end goal focused on eliminating her from EDF.

As discussed above, Mr. Nadal refused to work with Ms. Gaujacq, and, instead, turned to
less experienced males. EDF1101A-1102T. Mr. Nadal went out of his way to exclude Ms.
Gaujacq, while including her male colleagues. Gaujacq Dep. at 333-35. Att 6. He recommended
a less qualified male to handle all nuclear development matters at EDF despite Ms. Gaujacq's
achievements and experience. EDF 978, Def. Exh. 45. Also, although he took away Ms.
Gaujacq's check signing authority, he permitted the other male EDFINA vice-president, Mr.
Dreux, previously a subordinate of Ms. Gaujacq's, this authority. EDF 5346. Mr. Nadal
assigned authority to act in his stead to the male vice-president, Benoit Dreux, a subordinate,
instead of Ms. Gaujacq, who previously held the position. EDF1027.

Mr. Nadal demeaned and yelled at Ms. Gaujacq in front of a junior male EDF employee,
putting his finger in her face. Gaujacq Dep at 76-79, 389-93, Att. 6. He made unreasonable,
inexplicable requests, refused to allow Ms. Gaujacq to transition her responsibilities although
directed to by his superiors, changed the call-in number for a scheduled conference call in an
effort to remove her from a project, and cancelled her business credit cards while she was on
business travel, causing Ms. Gaujacq to incur expenses that remain unreimbursed.

26

As a result of the Mr. Nadal's conduct and complaints, and Ms. Gaujacq refusal to accept the abuse, EDF ordered Ms. Gaujacq back to France with little notice. Def. Exh. 86. When she refused to return and accept a demotion, EDF, at Mr. Nadal's behest, terminated her. Def. Exh. 81. A reasonable person in Ms. Gaujacq's position would find that her work environment was abusive and hostile

### 3.    Mr. Nadal's Alleged Justifications for His Behavior are Pretextual

"[T]he task of assessing whether a plaintiff has presented enough evidence to permit an inference of discriminatory intent is, as the author of the dissent herself observed in her panel dissent, 'intensely fact bound '" *Aka v. Wash. Hosp. Ctr*, 156 F.3d 1284, 1294 n.9 (D.C. Cir. 1998)(*quoting* descent). In an appropriate case, 'the factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination ... and [i]f 'disbelief is accompanied by a suspicion of mendacity,' ... the likelihood of intentional discrimination is increased, permitting the factfinder to infer discrimination more readily " *Aka*, 156 F.3d at 1294 (*quoting St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)) (internal citations omitted). "Usually, proffering 'evidence from which a jury could find that [the employer's] stated reasons ... were pretextual ... will be enough to get a plaintiff's claim to a jury '" *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) (*quoting Carpenter v. Fannie Mae*, 165 F.3d 69, 72 (D.C. Cir. 1999). However, "the plaintiff is not limited to challenging the employer's explanation, but can also avoid summary judgment (and prevail at trial) by presenting other evidence, either direct or circumstantial, that permits an inference of discrimination " *Aka*, 156 F.3d at 1295 n.11.

Mr. Nadal's stated reasons for his action are pretextual. Throughout her tenure as President of EDFINA, Ms. Gaujacq performed her duties in an exemplary manner, and received

high evaluations  *See* Exhibit 49 to Gaujacq Dep, Att. 4   Prior to Mr. Nadal joining EDF, EDF
was very satisfied with Ms Gaujacq and there was never any suggestion of performance issues.
Def. Facts ¶ 8.

Despite Mr Nadal's claims that Ms. Gaujacq's office visits were too infrequent to make
her useful or to deputize her to sign checks, in the four years that Ms. Gaujacq had the main
check signing authority as President, there is no evidence that there was ever an issue regarding
check signing  Accordingly, Ms. Gaujacq's alleged absence from the office (much of which was
business related) provides absolutely no justification for Mr Nadal's abusive treatment

Similarly, Mr Nadal's request to have Ms. Gaujacq return confidential documents cannot
provide an after-the-fact justification for his discriminatory conduct   Mr Nadal's demand that
Ms Gaujacq bring thousands of documents into the unsecured EDFINA offices within 24 hours
was unreasonable and practically impossible in its urgency and not sensible in that many of the
documents he requested related to NuStart and were subject to a confidentiality agreement to
which Mr Nadal, as well as many other EDFINA employees, were not a signatory. Gaujacq
Dep. at 477-78, Att 6. Notably, Mr. Nadal offers no evidence that he attempted to obtain the
necessary clearance after Ms. Gaujacq informed Mr. Nadal of the confidentiality issues that
prevented Ms. Gaujacq from returning the documents to the office without a detailed review and
parsing for confidentiality and protection of the relevant documents. Rather, Mr. Nadal's claim
that Ms. Gaujacq failed to appropriately return documents is pretextual and intended to disguise
the obvious – that there were no performance or other issues attributable to Ms. Gaujacq that
would justify his conduct or that should lead to her termination   Accordingly, Mr Nadal is liable
for aiding and abetting discriminatory treatment under the DCHRA.

28

B.    Count VI: Aiding and Abetting Retaliation in Violation of DC Human Rights Act

"Under the DCHRA it is an unlawful discriminatory practice for an employer to retaliate against a person on account of that person's opposition to any practice made unlawful by the DCHRA." *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994); *see also* D.C. Code § 2-1402.61. "To make out a prima facie case of retaliation, the plaintiff must establish: (1) she was engaged in a protected activity, or that she opposed practices made unlawful by the DCHRA; (2) the employer took an adverse personnel action against her; and (3) a causal connection existed between the two." *Id.*

"The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2412 (U.S. 2006). "In order to establish a prima facie case of retaliation, a plaintiff must show: 1) that she engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two." *McKenna*, 729 F.2d at 790; *see also Kalinoski*, 435 F.Supp.2d at 62 (same); *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994) (same prima facie case required by DCHRA). Importantly, "this standard does not require a reviewing court or jury to consider 'the nature of the discrimination that led to the filing of the charge.'" *Burlington*, 126 S. Ct at 2416 (*quoting* Alito, J., concurring in judgment).[21]

1.    Ms. Gaujacq Engaged in Statutorily Protected Activity

Ms. Gaujacq engaged in a number of statutorily protected activities, including providing Mr. Nadal with notice on several occasions that she was being subjected to discrimination,

---

[21] "No 'magic words' are required" to oppose discriminatory conduct; rather, a complaint must only "in some way allege unlawful discrimination." *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).

verbally complaining, and ultimately filing a charge and supporting documents with the EEOC. A jury may easily conclude that Ms. Gaujacq engaged in several protected activities.

On July 9, 2004, Ms. Gaujacq notified Fernando Ponasso, of EDF, that Mr. Nadal was treating her in a manner that was "discriminatory in regard of [her] position, as compared to the situation of Benoit Dreux," her male counterpart. Def. Exh. 67. On July 22, 2004, Ms. Gaujacq again pleaded to Mr. Roussely and Mr. Creuzet for protection from Mr. Nadal's conduct stating he "takes discriminatory measures against [her]" and stating that she would defend herself, "by filing a complaint before the US Authorities." Def. Exh. 69. That same day, Ms. Gaujacq wrote Mr. Nadal detailing the discriminatory conduct on his part and requesting an explanation. Def. Exh. 68.[22]

On July 30, 2004, Ms. Gaujacq filed a charge of discrimination with the EEOC and amended the charge as EDF continued to conduct discriminatory and retaliatory acts against her. Def. Exh. 78. Throughout October and November of 2004, Ms. Gaujacq supplemented her charge. The notices of discrimination and the EEOC charge all constitute protected activities.

2.    Ms. Gaujacq Suffered Adverse Personnel Actions

"[T]he anti-retaliation provision [of TitleVII] does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington*, 126 S.Ct. at 2409. However, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*

---

[22] Mr. Nadal's claim that Ms. Gaujacq reported the discrimination to "blackmail EDF" is particularly egregious given that her twenty-four (24) year history at EDF without a single complaint from or against any other employee. Def.'s Rule 56.1 Statement ¶ 8. The purported "blackmail" is legally protected activity, but more importantly, evidences the disdain Mr. Nadal, EDF and EDFINA showed towards Ms. Gaujacq because she complained of discrimination. This "attitude" and ensuing conduct is patently illegal. Defendants have effectively conceded the retaliation, by continuing to admit their anger and hostility against Ms. Gaujacq and that their conduct was because she complained of discrimination and exercised her legally protected rights, including telling them she was going to exercise her legally protected rights by filing a complaint in the United States with the EEOC.

Shortly after Ms. Gaujacq complained in June of 2004, Mr. Nadal refused her requests to reinstate her ability to write checks on behalf of EDFINA, thereby leaving only he and the other male Vice-President of EDFINA with signature authority on the account. EDFINA 005346, Def. Exh. 54. On June 18, 2004, Mr. Nadal took away Ms. Gaujacq's authority to enter into contracts or incur expenses on behalf of EDFINA, but allowed the other male VP of EDFINA to retain that authority. EDF 001040-41, Att. 14; *see also* de Botherel Dep at 218, Att. 3

Mr. Nadal then attempted to have Ms. Gaujacq removed from the NuStart project to which she had been assigned. On July 12, 2004, he unreasonably demanded that she bring thousands of confidential documents into EDFINA's unsecured offices within 24 hours. Gaujacq Dep at 76-79, 389-93, Att. 6. Thereafter, on August 18, 2004, Mr. Nadal contacted the NuStart administrative personnel and requested that the call-in number be changed so that Ms. Gaujacq could not attend and further ordered Ms. Gaujacq not to attend, in direct violation of his superiors' directive, and to retaliate further against Ms. Gaujacq. Gaujacq Dep at 512-17, Att. 6; Def. Exh. 76.

On August 3, 2004, Ms. Gaujacq sought direction from Nadal and Ponasso as to whether she should continue to represent EDF and EDFINA's interests at a number of meetings and conference calls, including NuStart and enXco meetings. Def. Exhs. 76, 77 and 95. She asked Nadal and the immigration attorney to get a letter of continuous employment from EDFINA if she were to travel to France either for family or business purposes. Att. 45. Nadal, notwithstanding the orders of Creuzet and Ponasso, refused my two requests.

On August 9, 2004, Ms. Gaujacq attended a conference in Florida on behalf of EDFINA. While there, Mr. Nadal, through EDFINA, canceled her business credit cards and Ms. Gaujacq had to pay for her business expenses personally. Gaujacq Dep at 506-07, Att. 6. In August and

31

then again in January 2005, Mr Nadal and his attorneys attempted to interfere with Ms.

Gaujacq's immigration status by communicating negatively with the USCIS. Gaujacq Dep. at

456-57, Att. 6  Mr. Nadal was aware that such communications and actions would negatively

affect Ms Gaujacq's employment.

Mr. Nadal then sent emails and complained to EDF's management who, in response,

demanded that she return to France at a lesser position, and terminated her when she refused. At

that time, EDF knew that Ms. Gaujacq had no performance issues and that the position offered

to, and refused by, Ms. Gaujacq, was a demotion given in retaliation against Ms Gaujacq

complaining that Mr. Nadal was discriminating against her. As discussed above, Mr. Nadal

subjected Ms. Gaujacq to numerous adverse employment actions that affected her employment

and the benefits of her employment shortly after she complained.

### 3.    A Causal Connection Exists Between the Adverse Actions and Ms. Gaujacq's Protected Activity

"Courts have held that '[a] plaintiff may satisfy this third element of a prima facie case

[of retaliation] by showing 'the employer had knowledge of the employee's protected activity,

and .. the adverse personnel action took place shortly after that activity.''" *Kalinoski v*

*Gutierrez*, 435 F. Supp. 2d 55, 69 (D.D.C. 2006) (quoting *Holcomb v. Powell*, 433 F.3d 889, 903

(D.C. Cir. 2006)); *see also Baker v. Potter*, 294 F Supp 2d 33, 41 (D.D.C. 2003) (same); *Castle*

*v. Bentsen*, 867 F.Supp. 1, 3 (D.D.C. 1994) (causal connection found where adverse action

occurred 3-5 months after the protected activity) [23]

---

[23] In *Mansfield*, a causal connection was found when, similar to the case at hand, after "the plaintiff hand delivered a letter to the defendant claiming that she suffered from discriminatory pay and asking for a response within 10 business days .. ., 16 days later, the defendant informed the plaintiff that it had abolished her position." *Mansfield*, 432 F. Supp. 2d at 73

The adverse employment actions against Ms. Gaujacq occurred within days of her reporting Mr. Nadal's conduct to EDF and Mr. Nadal. After Ms. Gaujacq complained on July 9, 2004, Mr. Nadal used an EDF audit to suggest that Ms. Gaujacq had done something inappropriate related to one or more of EDFINA's contractors. Gaujacq Dep at 376-77, 482-84, Att. 6. On July 22, 2004, Ms. Gaujacq specifically demanded that Mr. Nadal explain himself and cease his conduct. Def. Exh. 68. Just five days later, on July 27, 2004, Ms. Gaujacq received notice that her contract in the United States would be repudiated and that EDF was ordering her to return to France by August 1, 2004.[24] Def. Exh. 74

After she filed a formal EEOC Charge on July 30, 2004, Mr. Nadal canceled her business credit cards while she was traveling for EDFINA and she had to pay for her business expenses personally. Gaujacq Dep at 506-07, Att. 6. On August 19, 2004, he forbade her to attend a NuStart conference call, changed the call-in number, and prevented her from participating on the project. Gaujacq Dep. at 512-17, Att.; Def. Exh. 76. Moreover, in August and then again in January 2005, Mr. Nadal and his attorneys, attempted to interfere with Ms. Gaujacq's immigration status by communicating negatively with the USCIS. Gaujacq Dep., *Id.* at 456-57.

Two days after her last supplement to her EEOC Charge, EDF notified Ms. Gaujacq that she would be terminated. Def. Exh. 86. A little more than a month later and at Mr. Nadal's behest, on January 6, 2006, EDF terminated her. Def. Exh. 88.

    4    Nadal's Explanations for Ms. Gaujacq's Treatment are Pretextual.

SEE SECTION II(C) ABOVE.

---

[24] EDF's demand that Ms. Gaujacq return to France immediately and within days was also intended to penalize Ms. Gaujacq because EDF had previously noted, on April 1, 2004, that it "would need to plan ahead sufficiently so that her husband, a teacher, can find another job in France." EDF T345; Ex. 26

## III.    Count VIII: Tortious Interference with Contractual Relations

To establish a claim for intentional interference with contract rights, a plaintiff must establish "'(1) the existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach.'" *Nickens v. Labor Agency of Metro. Wash.*, 600 A.2d 813, 819 (D.C. 1991) (*quoting Sorrells v. Garfinckel's, Brooks Bros., Miller and Rhoads, Inc.*, 565 A.2d 285, 289 (D.C. 1989)); *see also Tuxedo Contractors, Inc. v. Swindell-Dressler Co.*, 613 F.2d 1159, 1162 (D.C. Cir. 1979) (same). Mr. Nadal, through his improper actions, has interfered with both Ms. Gaujacq's 2000 Expatriate Contract and her 2004 Expatriate Contract.[25]

### A.    Tortious Interference with 2000 Expatriate Contract

Mr. Nadal had knowledge of Ms. Gaujacq's 2000 Expatriate Contract and its extension until the summer of 2004. See Nadal Decl. at ¶ 14, Nadal Dep. at 163. As early as March 2004, Mr. Nadal made clear his intention to force Ms. Gaujacq to return to France "as soon as possible" despite this contract. Def. Exh. 44 (March 10, 2004 demand that Ms. Gaujacq "leav[e] North America in the very near future ... ")(*quoting* Gaujacq translation); Def. Exh. 45-T, EDF000978 (March 31, 2004: "the quick and total termination of Catherine's activity is by far the preferable solution"). While he did not succeed in procuring the breach of the length of the contract, he did succeed in procuring EDF's breach of its obligation under the 2000 Expatriate Contract, which incorporated the Guide, to give Ms. Gaujacq 6 months' notice of any return to France.

---

[25] As described in detail below, Ms. Gaujacq has sufficient proof of all the elements of this claim. At the minimum, there are genuine issues of material facts sufficient to prevent summary judgment. Nowhere in Mr. Nadal's argument does he cite any undisputed facts, instead merely making several conclusory statements that Mr. Nadal was acting within the scope of his employment and was not acting improperly.

The Guide dictates that a specific interview will be held six months prior to the return of the expatriate to France, "*at the latest,*" for the purposes of evaluating performance and skill of the agent during the mission, and to propose a new position for the employee, taking into consideration the wishes, expectations and qualifications of the agent during the mission. Def. Exh. 94, Article 2 31. On July 27, 2004, contrary to the terms of the Guide and the 2000 Expatriate Contract which incorporated the Guide's terms, Ms. Gaujacq received a letter by facsimile in which EDF removed Ms. Gaujacq from her position on the Project with EDFINA in the United States, EDF directed Ms. Gaujacq to return to France immediately, expressly stating that Ms. Gaujacq's mission in the United States would end on August 1, 2004 – *just four days later.* Def. Exh. 74, EDF 001052.

Further, Mr. Nadal succeeded in intentionally procuring the breach of the 2000 Expatriate Contract when he and EDF refused to reimburse Ms. Gaujacq for business expenses incurred, including business related travel, insurance premiums and utility expenses, totaling over $2,500.00. *See* Def. Exh. 15, Bates EDF 441-43, articles 9 and 11 (articles of 2000 Expatriate Contract providing for reimbursement of expenses); Exhibit 46, Bates 61-62, 670-73 [26]

Based upon this tortuous interference, Ms. Gaujacq suffered damages in the amount of the unreimbursed expenses and damages relating to EDF's failure to give her adequate notice of her next position and her return to France, and ultimately resulting in Ms. Gaujacq not receiving an appropriate position in France, and one that would have been described in detail, to ensure Ms. Gaujacq's satisfaction. It also resulted in Ms. Gaujacq not obtaining a position as earlier promised, moving up the corporate ladder, rather than the termination of Ms. Gaujacq.

---

[26] See also Bates 1262-64, 2053-66 (expenses related to storage of furniture and medical expenses), Att. 47.

B.    Tortious Interference with 2004 Expatriate Contract and/or Business Expectancies
      of Benefits of 2004 Expatriate Contract

Mr. Nadal was also aware of Ms. Gaujacq's 2004 Expatriate Contract or at least Ms.

Gaujacq's expectancy of the terms of the 2004 Expatriate Contract. *See* Bates 983, 985, 1016-17

(described in detail below). Through his discriminatory and improper actions, Mr. Nadal

succeeded in procuring the complete breach of the 2004 Expatriate Contract and Ms. Gaujacq's

business expectancy of the terms of that contract. *See Brown v. Carr*, 503 A.2d 1241, 1247

(D.C. 1986) ("The tort of intentional interference with a prospective business advantage runs

'parallel to that for interference with existing contracts.'") (*quoting* W. PROSSER, LAW OF

TORTS § 130, at 952 (4th ed. 1971)) [27]

1.    The 2004 Expatriate Contract and Business Expectancy

On or about March 23, 2004, Ms. Gaujacq proposed, and Mr. Creuzet agreed to, a three-

year contract, where Ms. Gaujacq would continue to work on the NuStart project in the United

States. Gaujacq Dep. at 223-26; *see also* Gaujacq Dep at 179-86 (meeting and discussions

leading up to agreement). This agreement was confirmed by Mr. Creuzet both verbally and in

writing. *See* Exhibits 34-36 to Gaujacq Dep, Att. 48. Specifically, on March 25, 2004, Ms.

Gaujacq sent an email to Mr. Creuzet attaching the details of this new mission for Mr. Creuzet's

signature. Def. Exh. 41, Exh. 42 ("2004 Expatriate Contract"). In an email dated March 29,

2004, Mr. Creuzet, on behalf of EDF, accepted Ms. Gaujacq's proposal, stating that it was "well

---

[27] "To establish a claim for tortious interference with economic advantage under District of Columbia law, the
evidence must show: (1) the existence of a valid business relationship or expectancy, (2) knowledge of the
relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or
termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enters. v. Domino's Pizza*, 45 F.3d
493, 499 (D.C. Cir. 1995); *see also Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978) ("business expectancies, not
grounded on present contractual relationships but which are commercially reasonable to anticipate, are considered to
be property and therefore protected from unjustified interference"). Consequently, Ms. Gaujacq's claim for
damages based upon EDF breach of the 2004 Expatriate Contract are the same whether this is a contract (as
evidenced in Plaintiff's opposition to EDF/EDFINA's motion for summary judgment) or a business expectancy.

in line" with the agreement he and Ms. Gaujacq discussed in Buenas-Aires. Def. Exh. 41, EDF
000965. Mr. Creuzet further indicated his acceptance of the 2004 Expatriate Contract stating
that he would forward the final contract as soon as it was signed. *Id.* The 2004 Expatriate
Contract provided that Ms. Gaujacq began her new mission as "Production and EDF
International North America Nuclear Projects Director" on April 1, 2004. Def. Exh. 42. While
Ms. Gaujacq never received a signed copy of the 2004 Expatriate Contract, Ms. Gaujacq and
EDF had a valid, binding contract that even Mr. Laroche cannot deny signing.

> 2     Mr. Nadal's Intentional Interference

However, around the same time as EDF and Ms. Gaujacq were entering into the 2004
Expatriate Contract, Mr. Nadal began his discriminatory and improper actions, interfering with
Ms. Gaujacq's contractual relations and/or business expectancies related to the terms and
benefits of the 2004 Expatriate Contract. On March 10, 2004, Mr. Nadal wrote to his superior
that "the only situation perfectly matching our agreements is Catherine leaving North America in
the very near future, at a date to be determined now, to take a position in a completely different
sector. .." *See* EDF 000947, Att. 49 (quoting Gaujacq translation). On March 31, 2004, Mr.
Nadal reiterated his opinion when he met with his superior, Mr. Betouret, and stated that the
"only appropriate solution is for [Ms. Gaujacq] to exercise new responsibilities in a different
area" and that "the quick and total termination of Catherine's activity is by far the preferable
solution." Def. Exh. 45-T, EDF000978. In an email dated April 1, 2004, Mr. Nadal stated that
Ms. Gaujacq "created the conditions which make it extremely difficult her staying with us . ...
The only suitable position is for her to have new responsibilities in a different area." EDF 978-
80 at 978 (quoting Gaujacq translation). Att. 49. He continued: "It appears to me that a quick

and complete stop of all Catherine's activities is by far the best solution." *Id* at 978 (quoting

Gaujacq translation). Att. 49.

Despite Mr. Nadal's baseless request that Ms. Gaujacq be removed from EDFINA, Mr.

Metais wrote on April 6, 2004, that a decision had been made; Ms. Gaujacq:

> is assigned on the project 'premium 2015' (US-French cooperation on nuclear generation
> 4). She reports to Energy Branch and will received a mission letter. This new
> assignment does not report to Branch Americas nor EDFINA Inc. Her mission will lead
> to spending most of her time in the USA with terms and conditions defined by Energy
> Branch.

EDF 983 (quoting translation), Att. 32. However, Mr. Nadal refused to accept the decision. In

an email dated April 7, 2004, Mr. Nadal stated that "Premium 2015" was an important activity of

EDFINA and that the decision was not acceptable to him. EDF 985, Att. 16. He further stated

that it was unacceptable for Ms. Gaujacq to remain in charge of this project, that her doing so

was a major obstacle for him and that such a solution was one he wanted to avoid. EDF 985,

Att. 16.

On May 25, 2004, the Chairman of EDF met with Mr. Nadal and informed him that,

contrary to Mr. Nadal's wishes, Ms. Gaujacq was to continue on at EDFINA as VP although Mr.

Nadal would replace her as President and Board Member of EDFINA and Ms. Gaujacq was to

report to Mr. Nadal. Def. Exh. 48. Moreover, Mr. Nadal was explicitly directed not to try to

further renegotiate this arrangement. *Id.* However, when disagreeing with the position EDF had

given to Ms. Gaujacq failed to work, Mr. Nadal began harassing and discriminating against Ms.

Gaujacq in his continuing efforts toward removing Ms. Gaujacq entirely from EDFINA.

Mr. Nadal continued to discriminate against and harass Ms. Gaujacq as soon as he took

over as President of EDFINA on June 1, 2004. First, on June 4, 2004, Mr. Nadal stated to Riggs

Bank that only he and the other male VP of EDFINA were to have signature authority on the

account, thereby taking away Ms. Gaujacq's ability to sign checks on behalf of EDFINA,

without informing Ms. Gaujacq. EDFINA 005346, Att. 50.[28] Ms. Gaujacq discovered that her

signature authority was taken away on June 11, 2006, during a hostile encounter with Mr. Dreux,

the other VP at EDFINA, who announced the fact in front of other EDFINA employees and

voided checks that Ms. Gaujacq had unknowingly signed. Deposition of Mame Bawo Ba ("Ba

Dep") at 215-16, Att. 17; Gaujacq Dep at 310-11, Att. 6; Def. Exh. 47; EDFINA 000933-37, Att.

51. Later, on June 18, 2004, Mr. Nadal took away Ms. Gaujacq's authority to enter into

contracts or incur expenses on behalf of EDFINA while simultaneously and secretly permitting

the other male VP of EDFINA to retain that authority. EDF 001040-41, Att. 14; *see also* de

Botherel Dep at 218 (relating these facts) and de Botherel Dep at 138 ("there were rumors that

Mr. Nadal would treat Mrs. Gaujacq very badly."), Att. 3.

From June 28-July 9, 2004, EDF conducted an audit of EDFINA concerning the time

period Ms. Gaujacq had been President of EDFINA. Gaujacq Dep at 343-45, Att. 6; Def. Exh.

62 and 63. Mr. Nadal then used this audit to suggest that Ms. Gaujacq had done something

inappropriate related to one or more of EDFINA's contractors. Gaujacq Dep at 376-77, 482-84,

Att. 6.

On July 12, 2006, Mr. Nadal continued his discriminatory and harassing behavior toward

Ms. Gaujacq in the first face-to-face meeting he had with Ms. Gaujacq since they first met in

February 2006. Gaujacq Dep at 76-79, 389-93, Att. 6. Specifically, Mr. Nadal met with Ms.

Gaujacq and unreasonably demanded that she bring thousands of documents into the EDFINA

offices within 24 hours. *Id.*, *see also* Exhibit 11 to Gaujacq Dep, Att. 52; Gaujacq Dep at 477-

78, Att. 6. After Mr. Nadal made this demand in an aggressive and demeaning manner, he

---

[28]    Mr. Nadal's claim that "[o]n June 11, 2004 Gaujacq into the EDFINA office for about an hour, during which
time she signed several EDFINA checks" which were subsequently voided is patently false. On June 11, 2004, Ms.
Gaujacq received notice that Mr. Nadal had stripped her of her ability to write checks and she did not write any
checks on that day.

brought Mr. Foret into the meeting and continued to demean Ms. Gaujacq in front of the junior EDF employee. Gaujacq Dep at 76-79, 389-93, Att. 6.

On July 27, 2004, after Ms. Gaujacq complained to EDF executives about Mr. Nadal's discriminatory and improper behavior, Mr. Nadal obtained his goal: EDF officials ordered Ms. Gaujacq back to France and away from EDFINA, thereby breaching the 2004 Expatriate Contract. Mr. Nadal, therefore, successfully prevented Ms. Gaujacq from obtaining the business expectancies related to the terms and conditions of the promised 2004 Expatriate Contract. Ms. Gaujacq's damages include the loss of her job as contemplated by the 2004 Expatriate Contract, and the loss of income, retirement and other employment benefits, stock options, career and business opportunities and advancement related directly to the terms and benefits of the 2004 Expatriate Contract.[29] She has also suffered loss of reputation, emotional pain, embarrassment, humiliation, inconvenience, mental anguish, stress, pain, suffering, and loss of enjoyment of life.

C.    Mr. Nadal Was Acting Outside the Scope of his Employment with EDF

As Ms. Gaujacq's supervisor, Mr. Nadal is afforded "a qualified privilege to act properly and justifiably toward a fellow employee and that employee's true employers -- those who have the power to hire and fire." *Sorrells*, 656 A.2d at 291. However, "this privilege is vitiated when the supervisor acts with malice for the purpose of causing another employee's contract to be terminated." *Id.* ("It serves no purpose to immunize supervisory employees for their tortious conduct when they are neither parties to the contract between other employees and their common

_____

[29] In his summary judgment motion, Mr. Nadal bases much of his claim for summary judgment on the assertion that Mr. Nadal did not interfere with Ms. Gaujacq's overall employment relationship with EDF as he had no say in the position to which Ms. Gaujacq was being transferred nor did he have any say in her ultimate termination from EDF. In so arguing, Mr. Nadal attempts to confuse the contractual relations and/or business expectancies upon which this claim is based – namely, the 2000 Expatriate Contract and the 2004 Expatriate Contract or business expectancy related thereto. Because DC Courts do not recognize a claim for tortious interference based upon an at-will employment relationship, Ms. Gaujacq's ultimate termination from EDF, while the subject damages of other claims against Mr. Nadal, are not (and cannot be) the damages claimed pursuant to Ms. Gaujacq's claim against Mr. Nadal for tortuous interference. *See Riggs v. Home Builders Inst.*, 203 F. Supp.2d 1, 24-25 (D.D.C. 2002)

employer, nor empowered by the employer to act as its alter ego with authority to abrogate contractual relationships.") Because Mr. Nadal "maliciously procure[d] the discharge" of Ms. Gaujacq by EDF, he "is not shielded from liability by his or her status as a supervisory employee." *Id.*; *see also Nickens*, 600 A.2d at 819 ("a person who procures the discharge of another by their common employer for an improper or illegal purpose is not shielded from liability by his or her status as a supervisor or agent of the employer").

Moreover, despite this qualified privilege, Mr. Nadal is "personally liable if he acts against the corporation's interest, for his own pecuniary benefit, or with the intent to harm the plaintiff." *Id.* Because Mr. Nadal's actions against Ms. Gaujacq were "adverse to the corporate interests" of EDF and EDFINA and were done to harm Ms. Gaujacq, any qualified privilege he would have enjoyed is lost. *See Curaflex Health Services, Inc. v. Bruni P.C.*, 899 F. Supp 689, 696-97 ("When a supervisor or corporate officer fires an employee out of malice or ill will, it ordinary constitutes conduct that is generally adverse to the interests of the corporation.") Specifically, on May 25, 2004, Mr. Nadal was told by the Chairman of EDF that, contrary to his wishes, Ms. Gaujacq was to remain at EDFINA and continue working on the NuStart U.S. Consortium. Def. Exh. 48; *see also* EDF 983, Att. 53 (April 6, 2004 Decision). Because Ms. Gaujacq was highly qualified in the nuclear area and because she was the most familiar with this very important NuStart project, EDF's corporate interests were in keeping Ms. Gaujacq in the United States working on the NuStart project as is reflected by the April 6, 2004 and May 25, 2004 decisions. *See* EDF 983, Att. 53; Def. Exh. 48; *see also* EDF 947, Att. 19 (recognition by Mr. Nadal that the "nuclear competence of Catherine" was "very strong"). Mr. Nadal, therefore, was acting against EDF's corporate interests and outside of the scope of his employment.

41

D.    Mr. Nadal's Actions were not Privileged

"'Once a prima facie case has been established,' it becomes the defendant's burden

to prove 'that his [or her] conduct was legally justified or privileged.'" *Sorrells*, 656 A.2d

at 289-90 (*quoting Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d

284, 288 (D.C. 1977). To determine if a defendant's conduct is legally justified as

opposed to "improper," this Court looks to certain factors:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference, and
>
> (g) the relations between the parties."

*Sorrells*, 656 A.2d at 290 (*quoting* Restatement (Second) of Torts § 767). It "is clear

that claims of justification are vitiated if malice is proved." *Id.*

Because all of Mr. Nadal's conduct, described in detail above, was motivated by malice,

none of the conduct is privileged. Specifically, Mr. Nadal made clear that he did not want Ms.

Gaujacq at EDFINA after he was assigned his position in the United States.[30] Further, as

detailed above, Mr. Nadal's actions were not only malicious, but also discriminatory based upon

Ms. Gaujacq's gender. *See* Section II, *supra*.

---

[30] *See* EDF 000947, Att. 19 (Mr. Nadal writes to his superior on March 10, 2004, that "the only situation perfectly matching our agreements is Catherine leaving North America in the very near future, at a date to be determined now, to take a position in a completely different sector. . .") (*quoting* Gaujacq translation); Def. Exh. 45-T, EDF000978 (Mr. Nadal reiterates his opinion on April 1, 2004, that the "only appropriate solution is for [Ms. Gaujacq] to exercise new responsibilities in a different area" and that "the quick and total termination of Catherine's activity is by far the preferable solution")

Mr. Nadal argues that none of his actions involved "libel, slander, physical coercion, fraud, misrepresentation, or disparagement" so they are not improper. *See* Nadal SJ Motion at 36-38; *see also Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 34-35 (D.D.C. 1999).[31] First, however, it is Mr. Nadal's burden to prove that his conduct was legally justified, not Ms. Gaujacq's burden to prove that they were improper. *See Sorrells*, 656 A.2d at 289-90. Furthermore, while Mr. Nadal correctly cites examples of what is improper conduct, including "libel, slander, physical coercion, fraud, misrepresentation, or disparagement," Mr. Nadal has no bases for asserting that discriminatory acts in violation of the DCHRA, are not also improper. Furthermore, as is explained in detail below, some of Mr. Nadal's conduct interfering with Ms. Gaujacq's contracts and business expectancies, were defamatory and disparaging. *See* section IV, *infra*. Consequently, Ms. Gaujacq has presented adequate proof of Mr. Nadal's tortuous action to, at a minimum create a genuine issue of material fact.

## IV.    Count XII:  Defamation *Per Se*

In the District of Columbia, a "plaintiff bringing a defamation action (libel or slander) must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant 'published' the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its

---

[31] Mr. Nadal suggests that DC Courts require, at a minimum, that a defendant's actions constitute "libel, slander, physical coercion, fraud, misrepresentation, or disparagement" in order to be improper. However, Mr. Nadal does not cite to any DC state cases for this proposition. *See* Nadal SJ Motion at 36-38. Furthermore, the quote in *Sheppard* is a direct quote from *Genetic Systems Corp. v. Abbott Laboratories*, 691 F. Supp. 407 (D.D.C. 1988), which was a case involving plaintiff's claim against a competitor and in that context stated "A competitor's conduct must be more egregious, for example, it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement." *Genetic Systems*, 651 F. Supp at 423. Other DC federal courts citing *Sheppard* for this proposition have treated this list merely as examples of egregious conduct, not required factors. *See Pm Servs. Co. v. Odoi Assocs.*, 2006 U.S. Dist. LEXIS 655, 112 (D.D.C. 2006) ("As the Sheppard court described, the conduct at issue must involve egregious conduct such as 'libel, slander, physical coercion, fraud, misrepresentation, or disparagement.'") (*quoting Sheppard*, 59 F. Supp 2d at 34).

publication caused the plaintiff special harm." *Prins v. Int 'l Tel. & Tel Corp.*, 757 F. Supp. 87, 90 (D.D.C. 1991); *see also Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 877 (D.C. 1998) (same); *Beeton v. Dist. of Columbia*, 779 A.2d 918, 923 (D.C. 2001) (same). "'[A] statement is defamatory if it tends to injure [the] plaintiff in his [or her] trade, profession or community standing or lower him in the estimation of the community.'" *Beeton,* 779 A.2d at 923 (*quoting Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000)) (omitting internal quotations)

DC Courts have "not specifically adopted the heightened pleading rule for defamation cases." *Oparaugo v. Watts*, 884 A.2d 63, 76-77 (D.C. 2005). Rather, with claims of defamation on summary judgment, DC Courts "continue to adhere to the standard of whether, construing the complaint in the light most favorable to the plaintiff, 'it appears beyond doubt that [plaintiff] can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* at 77 (*quoting Crowley v. N. Am. Telcoms. Ass'n*, 691 A.2d 1169, 1172-1173 (D.C. 1997)); *see also Crowley*, 691 A.2d at 1172 (recognizing that "the principal reason some [other] courts demand a heightened standard of pleading in defamation cases" is to ensure that the "factual allegations are sufficient to permit the opposing party to form responsive pleadings")

A.    Mr. Nadal's Verbal and Non-Verbal
Statements Were Defamatory *Per Se.*

Mr. Nadal, individually and/or on behalf of EDF, made false and defamatory statements to employees of EDF, stating or implying, through his words and actions, that Ms. Gaujacq was dishonest and that wrongdoing was committed under her watch, sufficiently serious to warrant an audit and that Ms. Gaujacq was not competent and responsible enough, or honest enough to be

able to sign checks, approve contracts, expenses, or make warranties or representations on behalf of EDF.[32]

Specifically, on June 4, 2004, Mr. Nadal took away Ms. Gaujacq's ability to sign checks on behalf of EDFINA, suggesting she was incompetent for this aspect of her position as VP. *See* EDFINA 005346, Att. 50. On June 11, 2006, Mr. Dreux announced this fact in front of other EDFINA employees in the office at the time and voided checks that Ms. Gaujacq had unknowingly signed. Ba Dep at 215-16, Att. 17; Gaujacq Dep at 310-11, Att. 6; *see also* Def Exh. 47 and 55. On June 18, 2004, Mr. Nadal took away Ms. Gaujacq's authority to enter into contracts or incur expenses on behalf of EDFINA, again suggesting she was incompetent to handle this aspect of her position with EDFINA. EDF 001040-41, Att. 14.

From June 28-July 9, 2004, EDF conducted an audit of EDFINA concerning the time period Ms. Gaujacq had been President of EDFINA. Gaujacq Dep at 343-45, Att.14; Def. Exh 62 and 63. On July 9, 2004, Mr. Nadal then used the audit to suggest that Ms. Gaujacq had done something inappropriate related to one or more of EDFINA's contractors, when he stated on a conference call to the auditors, Mr. Dreux and Ms. Gaujacq that Ms. Gaujacq was paying fees to consultants and contractors of EDFINA without services being rendered and that this was a very serious issue. Gaujacq Dep at 376-77, 482-84, Att. 6.

Moreover, after Mr. Nadal made a demand to Ms. Gaujacq that she return the NuStart documents, he brought Mr. Foret, a subordinate to Ms. Gaujacq, into the meeting and demeaned Ms. Gaujacq in front of Mr. Foret. Gaujacq Dep at 76-79, 389-93, Att. 6. In addition, her sudden removal from the NuStart project also created fear in her that members in the business community would receive a negative, albeit unfounded, impression of her work.

---

[32] *See Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 878 (D.C. 1998) (stating that "actionable defamation is not necessarily restricted to verbal conduct" and finding non-verbal action of inactivating plaintiff's access key thereby locking her out of the office could be defamatory)

Because all of these statements tend to injure Ms. Gaujacq in her "'trade, profession or community standing or lower [her] in the estimation of the community,'" they are defamatory *per se. See Beeton,* 779 A.2d at 923; *see also Wallace,* 715 A.2d at 877-78 ("'One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect [her] fitness for the proper conduct of [her] lawful business, trade or profession . . . is subject to liability without proof of special harm '") (*quoting* Restatement (Second) of Torts § 573 (1977)).

###### B.    Mr. Nadal's Defamatory Statements Are Not Privileged

"The common interest privilege protects otherwise defamatory statements made '(1) . . . in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest '" *Mastro v. Potomac Elec. Power Co.,* 447 F.3d 843, 858 (D.C. Cir. 2006) (*quoting Moss v. Stockard,* 580 A.2d 1011, 1024 (D.C. 1990)). "Two circumstances fore-close asserting the privilege: first, excessive publication, defined as 'publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest,' . . . and, second, publication with malice, which, within the context of the common interest privilege, is 'the equivalent of bad faith.'" *Id.* (*quoting Moss,* 580 A.2d at 1024-25) at 1024-25. Mr. Nadal bears the burden of proving its statements were protected by the common interest privilege. *Id.*

Because all of the verbal and non-verbal defamatory statements were made in bad faith and with malice, none are privileged. Specifically, Mr. Nadal made clear that he did not want Ms. Gaujacq at EDFINA after he was assigned his position in the United States. *See* EDF 000947, Att. 23 (Mr. Nadal writes to his superior on March 10, 2004, that "the only situation

perfectly matching our agreements is Catherine leaving North America in the very near future, at

a date to be determined now, to take a position in a completely different sector….") (quoting

Gaujacq translation); Def. Exh. 45-T, EDF000978 (Mr. Nadal reiterates his opinion on April 1,

2004, that the "only appropriate solution is for [Ms. Gaujacq] to exercise new responsibilities in

a different area" and that "the quick and total termination of Catherine's activity is by far the

preferable solution"). Further, as detailed above, Mr. Nadal's actions were not only malicious,

but also discriminatory based upon Ms. Gaujacq's gender. *See* Section II, *supra*.

## CONCLUSION

For all of the above reasons, Ms. Gaujacq respectfully requests that Mr. Nadal's Motion

be denied.

November 20, 2006                          Respectfully Submitted,


Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
Carla D. Brown
D.C. Bar No. 474097
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
   Catherine Gaujacq

47