**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CATHERINE GAUJACQ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05CV0969 (JGP) |
| | ) | |
| ELECTRICITE DE FRANCE | ) | |
| INTERNATIONAL NORTH AMERICA, | ) | |
| INC., et al. | ) | |
| | ) | |
| Defendants | ) | |

# PLAINTIFF'S OPPOSITION TO DEFENDANTS EDF AND EDFINA'S MOTION FOR SUMMARY JUDGMENT

Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
Carla D. Brown
D.C. Bar No. 474097
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
    Catherine Gaujacq

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................. 1

STATEMENT OF DISPUTED FACTS .................................................... 3

    EDF and EDFINA RELATIONSHIP .................................................. 3

    Catherine Gaujacq, President of EDFINA ........................................ 4

    Christian Nadal .................................................................................. 4

    Discriminatory Acts Against Ms. Gaujacq Begin ............................. 4

    Discrimination by Mr. Nadal as President of EDFINA ..................... 4

    Ms. Gaujacq Complains to Superiors Regarding Mr. Nadal's
    Discrimination and Harassment ........................................................ 4

    Retaliation Against Ms. Gaujacq ...................................................... 4

    Ms. Gaujacq Makes an Official Complaint to the EEOC .................. 4

    Mr. Nadal's Discriminatory and Retaliatory Actions Continue ........ 4

    The Position Offered to Ms. Gaujacq was Actually a
    Demotion and Constituted Further Retaliation ................................. 4

    Additional Retaliatory Actions by EDF ............................................ 4

    At Nadal's Behest, EDF Wrongfully Terminates
    Ms. Gaujacq in Retaliation ............................................................... 4

    EDF Paid Ms. Gaujacq Less than Mr. Nadal for the Same Position ...... 4

ARGUMENT ........................................................................................ 5

I    SUMMARY JUDGMENT STANDARD ........................................ 5

II    EDF AND EDFINA ARE TREATED AS A SINGLE COMPANY
    FOR PURPOSES OF TITLE VII AND EQUAL PAY ACT .......... 6

III.    JURISDICTIONAL PREREQUISITES ........................................ 8

    A    Title VII ............................................................................... 8

B.    District of Columbia Human Rights Act ............................................... 13

C.    Equal Pay Act .................................................................................... 13

IV.    COUNTS I AND III:  GENDER DISCRIMINATION AND
DISCRIMINATORY TERMINATION IN VIOLATION OF
TITLE VII AND DC HUMAN RIGHTS ACT .......................................... 17

A.    Ms. Gaujacq Has Met Her Burden of Establishing a Claim
For Disparate Treatment Under Title VII and the DCHRA ........... 17

B.    Ms. Gaujacq Has Met Her Burden of Establishing Claims for
A Hostile Work Environment Based on Her Gender Under
Title VII and the DCHRA ............................................................ 21

C.    Pretext and Ultimate Issue of Discrimination ............................... 24

V.    COUNTS II AND V:  RETALIATION AND RETALIATORY
TERMINATION IN VIOLATION OF TITLE VII AND DC
HUMAN RIGHTS ACT ........................................................................ 27

A.    Ms. Gaujacq Engaged in a Statutorily Protected Activity ............ 28

B.    Ms. Gaujacq Suffered Adverse Personnel Actions ...................... 30

C.    A Causal Connection Exists Between the Adverse Actions
And Ms. Gaujacq's Protected Activity .......................................... 30

D.    EDF's Explanations for Ms. Gaujacq's Demotion, Punitive
Transfer, and Termination are Pretextual ..................................... 31

VI.    COUNT IX:  BREACH ON CONTRACT .............................................. 31

A.    Ms. Gaujacq's 2000 Expatriate Contract ..................................... 32

B.    Ms. Gaujacq's 2004 Expatriate Contract ..................................... 34

C.    Guide to EDF Employees Working Abroad .................................. 35

VII.    COUNT X:  DUTY OF GOOD FAITH AND FAIR DEALING ............. 36

VIII    COUNT XI:  VIOLATION OF EQUAL PAY ACT ............................... 38

A    Ms. Gaujacq Performed Substantially Equal Work as Mr. Nadal .... 40

B. Ms. Gaujacq Performed *Her* Job Under Similar Working Conditions as Mr. Nadal ......... 46

C. Ms. Gaujacq's Total Compensation was Lower than Mr. Nadal's .... 46

D. EDF's Defenses Fail ......... 47

E. Title VII Standard ......... 49

F. Genuine Issues of Fact Prevent Summary Judgment On EPA Claim ......... 50

IX. COUNT IXI: DEFAMATION *PER SE* ......... 51

A. EDF's Verbal and Non-Verbal Statements Were Defamatory *Per Se* ......... 52

B. EDF's Defamatory Statements Are Not Privileged ......... 53

CONCLUSION ......... 55

Plaintiff Catherine Gaujacq ("Ms. Gaujacq"), by counsel, hereby opposes Defendants Electricite de France, S.A. and Electricite de France International North America, Inc.'s (collectively "EDF") Motion for Summary Judgment [1]

## SUMMARY OF ARGUMENT

Defendants have filed several hundreds of pages of documents, declarations and statements, which, their protestations to the contrary, reflect rather starkly that the material facts in this case are heavily in dispute. The sheer volume of the Defendants' submissions suggests that summary judgment is not appropriate.

In violation of applicable Unites States' laws, EDF, EDFINA and Christian Nadal worked in concert to discriminate against Ms. Gaujacq by replacing her with Mr. Nadal while classifying him two ranks above Ms. Gaujacq, paying him over two times the amount paid to Ms. Gaujacq, promising her positions and then reneging, harassing her, creating a hostile work environment for her, and then terminating her in retaliation for complaining about the discrimination, seeking a solution, and for filing a complaint with the EEOC. The evidence supporting Ms. Gaujacq's claims is alarming and overwhelming. Mr. Nadal intended to force Ms. Gaujacq out of North America before he had any meaningful contact with her, while surrounding himself and mentoring an all-male executive team. The proffered legitimate business justifications are false and pretextual, and significantly, unsupported by any admissible evidence. In sharp contrast, Ms. Gaujacq provides substantial evidence that Mr. Nadal was working behind her back throughout, even when directed not to by his superiors, to rid EDF of Ms. Gaujacq. EDF and EDFINA, instead of investigating or questioning the conduct, condoned and ultimately joined in on the discriminatory and retaliatory campaign against Ms. Gauajcq,

---

[1] Ms. Gaujacq further incorporates the arguments in her Opposition to Christian Nadal's Motion for Summary Judgment and her Motion to Strike, and her Declaration, both filed conjuction with this Opposition.

including pretending agreements they had made with Ms. Gaujacq did not exist, and departing from all practices and policies in forcing Ms. Gaujacq out of EDF/EDFINA.

EDF, as with all companies availing themselves of United States business opportunities, are subject to the United States' jurisdiction and laws. In fact, in drafting the Expatriate contacts with Ms. Gaujacq, EDF chose to include language reflecting that United States and District of Columbia laws apply. EDF changed its mind, however, when Ms. Gaujacq complained of discriminatory conduct, and after receiving no relief, told EDF that she was going to file a charge with the EEOC. Recognizing the laws applied to them, EDF attempted to renege on the contract it had already agreed to and under which Ms. Gaujacq and EDF had been operating since April 2004, claiming Ms. Gaujacq's earlier contract was instead in place, and that it expired, justifying EDF to order Ms. Gaujacq to return to France with very little notice, apparently in an effort to eschew the EEOC charge and jurisdiction. When Ms. Gaujacq did not immediately return to France as illegally directed, and instead filed the EEOC Charge, including amendments, EDF took the unprecedented step of terminating Ms. Gaujacq under the pretext that she had failed to accept a demotion that was her right to refuse under EDF policy, and was inconsistent with at least two agreements EDF had earlier made with Ms. Gaujacq. Gaujacq Decl. ¶ 83. EDF now contends that Ms. Gaujacq "blackmailed" EDF by threatening to file the EEOC Charge. Notwithstanding EDF's arrogant attitude towards the retaliation laws in the United States, the conduct EDF calls "blackmail," is actually "protected activity" in the District of Columbia and the United States, the fora EDF earlier wanted to apply, but does not now because of the legal consequences.

Summary judgment is not appropriate in this action as to any of the claims. Ms. Gaujacq is entitled to the opportunity to air the substantial evidence, much of which is laid out in these

pleadings, to a jury of her peers, as recognized by the Seventh Amendment of the United States

Constitution and urged by the teachings of the United States Supreme Court in *Reeves v.*

*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2109 147 L.Ed.2d 105

(2000).

## STATEMENT OF DISPUTED FACTS

Catherine L. Gaujacq ("Ms. Gaujacq"), was employed by Electricite de France ("EDF"),

and by its United States subsidiary, Electricite de France International North America, Inc.

("EDFINA") (collectively, "EDF") at all times relevant to this Complaint.

A.    EDF and EDFINA Relationship

EDFINA is a wholly owned United States subsidiary of EDF. Answer ¶ 4; Laroche Decl

¶ 5. It "acts as a liaison office for EDF in the United States, . . . receives money to pay expenses,

including salaries and benefits of EDFINA employees, from EDF." Answer ¶ 4; *see also* Nadal

Dep at 488-89 ("EDFINA has no income" rather EDFINA's income comes from "wire transfers

from EDF"). EDF and EDFINA essentially act as one company with common management,

centralized control of human resource functions, common procedures, policies and

interconnected operations. Gaujacq Decl. ¶¶ 6-12.

¶ 4; *see also* Answer ¶ 8 ("EDFINA is available to represent EDF in the United States"); de

Botherel Dep at 40 (for HR and ranking purposes, "EDF Group" includes headquarters, all of the

EDF subsidiaries and all the affiliated companies) [2]

---

[2] EDF, through EDF, EDFINA, and other EDF subsidiaries, buys and sells services in the United States, including, management, engineering and research and development ("R&D") products and services. Gaujacq Decl at ¶ 12. The products bought and sold by EDF include (1) strategic and economic intelligence; (2) commercial intelligence; (3) legal intelligence; and (4) regulatory intelligence. *Id.* The annual base value of business of EDF in the United States in 2004 was in excess of $14 Million *Id.* at ¶¶ 14-17.

B-M.    Sections B. – M.

Ms. Gaujacq incorporates Sections B through M of her Statement of Disputed Facts from her Opposition to Mr. Nadal's Motion for Summary Judgment filed in Conjunction with this Opposition.

N.    EDF Paid Ms. Gaujacq Less than Mr. Nadal for the Same Position

In conjunction with Mr. Nadal's placement as President of EDFINA, EDF claims that the strategic importance of EDFINA suddenly changed thereby requiring a manager with an R1 Ranking. However, EDFINA's mission and activities did not change or increase since Mr. Nadal's appointment as President of EDFINA and Defendants cannot provide any activities that Mr. Nadal does that Ms. Gaujacq did not.[3]

As EDFINA President and head of EDF's delegation to Washington, Ms. Gaujacq performed all the functions Mr. Nadal claims to have performed. *See* Gaujacq Decl ¶¶ 21-40 as compared to Nadal Decl. ¶¶ 26-32. Ms. Gaujacq details her job responsibilities and accomplishments in her declaration and attachment A thereto. Gaujacq Decl. ¶¶ 21-40 and Decl. Exh. 4.[4] Mr. Nadal took over where Ms. Gaujacq left off and continued working on the same and/or similar business projects and opportunities as did Ms. Gaujacq.

---

[3] In fact, Mr. Nadal, in some respects, performed fewer functions in that Ms. Gaujacq was both President and headed EDF's initiative with NuStart. After Mr. Nadal was appointed as President, Ms. Gaujacq continued in the NuStart initiative that she had been working on as President. When Ms. Gaujacq was terminated, Mr. Georges Serviere replaced Ms. Gaujacq on the NuStart initiative

[4] Generally, Ms. Gaujacq (1) was responsible for pursuing and investigating financial opportunities for EDF and EDFINA; (2) represented EDF to investors on Wall-Street and elsewhere; (3) was responsible for establishing contacts and maintaining visibility, on behalf of EDF, with US business leadership and government officials involved in energy; (4) had regular contacts with the NERC Chairman, who was the former Chairman of Hydro-Quebec; and (5) had frequent contact with the French Embassy and the French Ambassador as well as welcomed delegations to the U.S. from France. *See Id*. Ms. Gaujacq participated in similar or the same associations, gave similar presentations, both within and outside of EDF, and supervised and contributed to similar or the same business projects and business opportunities important to EDF. *Id*. In fact, many of the business projects on which

4

Although the position held by Mr. Nadal was substantially equal to the position held by Ms. Gaujacq when she served as President, Mr. Nadal's starting compensation as President was roughly two times greater than Ms. Gaujacq's salary for performing the same position with additional responsibility as compared to Mr. Nadal's position. In addition, Mr. Nadal was not as qualified as Ms. Gaujacq with regard to nuclear facilities and business practices. *See* Nadal Dep at 150-52, Att. 2; Def. Exh 73 at EDF 4589.[5]

The "system" under which Mr. Nadal's and Ms. Gaujacq's salaries were determined is a completely subjective system, which has the result of giving the highest salaries to a group which is mainly occupied by men [6] As discussed above, of the 50 EDF executives holding R1 rankings (Mr. Nadal's rank), only 5 were women, whereas of the total 160,000 employees at EDF, approximately 45 to 50 percent were women. *See* De Botherel Dep at 36, 66-69, 74; Att. 3

## ARGUMENT

## I.    Summary Judgment Standard

"Summary judgment should be granted only where there are no genuine issues of material fact, and all inferences must be viewed in a light most favorable to the non-moving party." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). This Court is obligated to view "the evidence 'as favorably to [Ms. Gaujacq] as reason will permit." *Aka v. Washington Hosp.*

---

Mr. Nadal claims to work, were initiated by Ms. Gaujacq. *See* Nadal Decl. ¶¶ 26, 31; Gaujacq Decl. ¶ 21; *see also* Exh 1 Draft Mission letter of 5/12/04

[5] According to the Declaration of Mr. de Botherel and Exhibit E attached thereto, Ms. Gaujacq's salary when she was President of EDFINA and "head of EDF's delegation to Washington" was 6,980 euros per month (*see* exhibit E to de Botherel Decl, May 2004 pay slip) as compared to Mr. Nadal's salary of 13,050 euros per month. *See* de Botherel Decl. ¶ 19; *see also id.* ¶ 18

[6] In his deposition, Mr. de Botherel described the subjective nature of the executive ranking "system." de Botherel Dep at 39-49. He admits that the system is "at the same time objective and subjective" and that there "is always a subjective part to when you evaluate a person's competence level." *Id.* at 46; *see also Id.* at 48 ("not a mathematical calculation"); *Id.* at 49 ("not a mathematic formula"); de Botherel Decl Exh. B-I at EDF 4449 ("by personalizing the compensation management and decentralizing decisions down to the various levels of management, . . ."), de Botherel Decl Exh. B-I, generally.

*Center*, 156 F.3d 1284, 1295 (D.C Cir. 1998) (*quoting Shager v. Upjohn Co*, 913 F.2d 398, 401

(7th Cir. 1990). "If material facts are at issue, or, though undisputed, are susceptible to divergent

inferences, summary judgment is not available." *Tao*, 27 F.3d at 638. Moreover, "at the

summary judgment stage, a judge may not make credibility determinations, weigh the evidence,

or draw inferences from the facts - these are jury functions, not those of a judge ruling on a

motion for summary judgment." *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005).

## II.    EDF and EDFINA are Treated as a Single Company for Purposes of Title VII and Equal Pay Act

The "Supreme Court set out four factors to consider when determining whether multiple

entities should be considered as a single employer    : (1) interrelation of operations; (2)

common management; (3) centralized control of labor relations; and (4) common ownership of

financial control. *Dean v. AFGE Local 476*, 402 F. Supp.2d 107, 112 (D.D.C. 2005) (citing

*Radio & Television Broadcast Technicians Local 1264 v. Broadcast Serv. of Mobil, Inc.*, 380

U.S. 255, 256 (1965)) (denying employer's motion to dismiss Title VII claim); *see also Tewelde*

*v. Albright*, 89 F. Supp.2d 12, 17 (D.D.C. 2000) (noting that "predominant trend in determining

"single employer status under Title VII, is to apply the standard promulgated by the National

Labor Relations Board in NLRB cases" and listing same four factors). "'Although the absence

or presence of any single factor is not conclusive, control over the elements of labor relations is a

central concern.'" *Hunter v. Ark Rest. Corp.*, 3 F. Supp.2d 9, 18 (D.D.C. 1998) (*quoting EEOC*

*v. St. Francis Xavier Parochial Sch.*, 928 F. Supp. 29, 33 (D.D.C. 1996)).

EDFINA is a wholly owned United States subsidiary of EDF. Answer ¶ 4; Laroche Decl.

¶ 5.[7] Further, EDF and EDFINA have common management in the form of common directors

---

[7] It "acts as a liaison office for EDF in the United States,    does not generate income from operations and    receives money to pay expenses, including salaries and benefits of EDFINA employees, from EDF." Answer ¶ 4; *see also* Nadal Dep at 488-89, Att. 2 ("EDFINA has no income" rather EDFINA's income comes from "wire

and officers: "all members of EDFINA Board of Directors are EDF employees" and the

President of EDFINA, as well as all officers of EDFINA, have always been EDF employees.

Answer ¶ 5; de Botherel Decl. ¶¶ 29-31.

EDF and EDFINA essentially act as one company with common management,

centralized control of human resource functions, common procedures, policies and

interconnected operations. Gaujacq Decl ¶¶ 6-12; *see also* Answer ¶ 8 ("EDFINA is available to

represent EDF in the United States"); de Botherel Dep at 40 (for HR and ranking purposes,

"EDF Group" includes headquarters, all of the EDF subsidiaries and all the affiliated

companies). Specifically, EDF management makes the final decision regarding career

opportunities, transfers, compensation and bonus payments of the EDFINA employees. Gaujacq

Decl. ¶ 9. EDF employees are assigned to carry out and to support consulting and engineering

related contracts that EDFINA, on behalf of EDF, enters into with energy companies in the

United States. Gaujacq Decl. ¶ 10. For example, EDFINA entered into an agreement with the

NuStart U.S Consortium, but all the personnel and budget to fulfill EDFINA's obligations under

this contract are supplied by EDF and EDF's engineering and research and development

divisions. Nadal Dep at 383-84, Att. 2. Further, EDF regularly transfers employees between it

and EDFINA. Answer ¶ 12 ("EDF employees are from time to time delegated to EDFINA...");

*see also* Nadal Decl ¶ 33 (relating that, while working in generally the same position for

EDFINA, Mr. Audie first was an EDF employee, then an EDFINA employee and later an EDF

employee again). While in the United States, the salaries of EDF employees working at

EDFINA are paid from EDF's payroll and they continue to be covered under EDF's disability

---

transfers from EDF"). EDFINA's annual strategic plan, missions, financial, administrative and human resources
decisions and support is provided by EDF in France. Gaujacq Decl. ¶ 3; Answer ¶ 5 ("EDF approves EDFINA's
annual strategic plan and certain financial and administrative decisions, . EDF makes the human resources
decisions regarding EDF employees delegated to EDFINA ...")

7

insurance plans, and continue to participate in the EDF pension plan. *See* Answer ¶13 ("the salaries and certain benefits of EDF employees delegated to EDFINA are paid and provided by EDF…"); de Botherel Decl. ¶ 30. EDF, therefore, has control over all personnel functions of EDFINA with respect to EDFINA's high level executives and sets and disseminates the policies that apply to these executives. *Id.*; *see also* Gaujacq Decl. ¶ 11.

The overlapping relationships between EDF and EDFINA, and the control exercised by EDF over EDFINA, and particularly its personnel, is substantial. Gaujacq Decl ¶ 12; *see also* Nadal Dep (describing Mr. Nadal's business card as having the EDF logo, while listing EDF name as EDFINA). Accordingly, there is sufficient interrelatedness of operations to view the companies as an integrated enterprise and for EDF and EDFINA to be considered as a single employer for purposes of this action. *See Dean*, 402 F. Supp. 2d at 112; *Tewelde*, 89 F. Supp. 2d at 17; *Hunter*, 3 F. Supp. 2d at 18.

**III.    Jurisdictional Prerequisites**

    A.    <u>Title VII</u>

        1    <u>Number of Employees</u>

During the relevant time period, EDFINA had sixteen (16) individuals that it either employed directly or sponsored while in the United States during the relevant time frame. *See* Bates Nos. 272-73, 2181, Att. 4; *see also* EDF 004525-26. EDF has over 160,000 employees, of which 18 to 23 EDF employees were working in the United States for twenty (20) or more weeks during the years 2003 and 2004.[8] Gaujacq Decl ¶ 13; Nadal Dep. at 484 (18 EDF employees working in the United States at time of deposition), Att. 2, Bates No. 2181, Att. 4 (listing 23 EDF employees in the U.S. in first quarter of 2004) Because there is sufficient interrelatedness of

---

[8] *See* 42 USCS § 2000e ("The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person")

operations to view EDF and EDFINA as a single employer for purposes of this action, Plaintiff has clearly met the jurisdictional requirement of minimum number of employees.

2.    This Action Does Not Involve an
      Extraterritorial Application of Title VII.

The principle of extraterritoriality "provides that 'rules of the United States statutory law, whether prescribed by federal or state authority, apply only to conduct occurring within, or having effect within, the territory of the United States.'" *Environmental Defense Fund v Massey*, 986 F.2d 528, 530 (D.C. Cir. 1993) (*quoting* Restatement (Second) of Foreign Relations Law of The United States § 38 (1965); Restatement (Third) of Foreign Relations Law of The United States § 403, Com. (g) (1987)). However, the presumption against applying a statute extraterritorially "is not applicable when the conduct regulated by the government occurs within the United States." *Id.* at 531. "By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders." *Id.* "Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States." *Massey*, 986 F.2d at 531-32 (*citing* Restatement (Second) of Foreign Relations Law of The United States § 38 (1965) for proposition that "rules of U.S. statutory law apply 'to conduct occurring within, or having effect within the territory of the United States'" and finding that the case did not "present an issue of extraterritoriality").

In *Torrico v. IBM*, 213 F. Supp. 2d 390 (D.N.Y. 2002), a case cited by Defendants, the New York District Court dealt directly with the question of what constituted extraterritorial application of a similar statute, the Americans with Disabilities Act. *Torrico*, 213 F.Supp.2d at 396-406. The *Torrico* Court found that, even though Mr. Torrico spent much of his actual time working outside of the United States, he had pleaded facts sufficient to show that he was not

9

employed in a foreign country. *Id.* at 406. Specifically, the Torrico Court stated that the focus of the issue of whether a statute is being applied extraterritorially is "whether a claim concerns 'employment in a foreign country.'" *Id.* at 400. Part of this inquiry rested upon whether the alleged acts of discrimination occurred in the United States. *Id.* However, in this case, either focus – the locus of Ms. Gaujacq's employment or the locus of the discriminatory effects – demonstrates that this case does not involve an extraterritorial application of Title VII. Ms. Gaujacq both was employed in the United States and felt the discriminatory effects of EDF's actions in the United States.[9]

As a "foreign corporation doing business within the United States," EDF must "reasonably expect[] that its United States operations will be regulated by United States law." *See Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 235 U.S. App. D.C. 207 (D.C. Cir. 1984) (finding that "although some of the business decisions affecting United States operations may be made outside the forum state, the entire transaction is not ordinarily immunized").

Moreover, in this case, EDF's contract with Ms. Gaujacq specifically recognized that her employment was regulated by United States and District of Columbia law. *See* Def. Exh. 15, EDF 438-46, Articles 2 & 6 (2000 Expatriate Contract); Def. Exh 42, EDF 4684-91, Articles 2 & 6 (2004 Expatriate Contract); *see also* EDF 1319, Att. 6 ("3.1. Working hours. In application of the territoriality principle of Laws and regulations, the EDF employees working abroad are subject to the employment laws of the host country.") (*quoting* Gaujacq translation); EDF 446, Att. 7 ("compliance with national laws ... is an absolute imperative. ... Every Group employee shall behave in accordance with the laws ... applicable in the countries where the Group

---

[9] Further, a company's "representations to the U.S. immigration officials are particularly telling ... ; a factfinder could well weigh them particularly heavily. ..." *Torrico*, 213 F.Supp.2d at 405 n. 7; *see also* Bates 242-44, EDFINA 53-60, EDFINA 1041, EDFINA 1096-98, EDFINA 1103 (documents submitted to the United States immigration officials certifying that Ms. Gaujacq was employed in the United States), Att. 5.

operates."); EDF 1454 & 1565, Att. 8 (Company prohibition against harassment). "The District of Columbia Court of Appeals has adopted the general rule 'that parties to a contract may specify the law they wish to govern, as part of their freedom to contract, as long as there is some reasonable relationship with the state specified.'" *Kroger v. Legalbill.com LLC*, 436 F. Supp. 2d 97, 103 (D.D.C. 2006) (*quoting Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980)). Accordingly, the law of the Contract, that of the District of Columbia and the United States, applies to Ms. Gaujacq's claims.

Contrary to Defendants' suggestion that French law applies because the discriminatory decision originated in France (*see* SJ Motion at 16-17), the law of the United States and of the District of Columbia applies because Ms. Gaujacq: (1) worked in the District of Columbia; (2) resided in the United States; (3) her Contract specified that the District of Columbia and federal law applied; and (4) the effects of Defendants' discriminatory actions were felt in the District of Columbia and the United States. *See Shekoyan v. Sibley Int'l*, 409 F.2d 414, 422 (D.C. Cir. 2005) (finding that the place of employment written in an employee's employment contract and the place where the employee resided was controlling as to whether he worked in a foreign country and **rejecting** plaintiff's argument that he was actually employed in the United States because he was "hired and trained in the United States" and because "many of the decisions related to his employment were made in the United States").

Defendants attempt to obscure the jurisdictional argument by citing choice of law cases and claiming that French law should apply to this case. *See* SJ Motion at 16-18.[10] While ignoring the law regarding jurisdictional requirements, EDF emphasizes irrelevant facts

---

[10] Even if French law had applied, the Defendants' discriminatory conduct would still have been prohibited. *See* Laroche Dep at 56-57, Att. 9; de Botherel at 317, Att. 3 (recognizing that French law prohibits treating employees differently based upon their gender).

concerning Ms. Gaujacq's status as a French citizen and her employment relationship prior to her placement in the United States, prior to the relevant time period, and prior to EDF's violations of state and federal law, through its discriminatory, retaliatory and tortious conduct.[11] The only law cited by Defendants is irrelevant because it merely dictates that Title VII does not apply to foreign operations of a foreign employer or to aliens employed in a foreign country and that the Equal Pay Act does not apply to employees who have a workplace in a foreign country. *See* SJ Motion at 17-18. Ms. Gaujacq worked in the United States, *not* a foreign country. Furthermore, EDF's cites to cases interpreting choice of law issues are completely inapplicable and fail to support their baseless claim that Ms. Gaujacq's claim somehow represents an extraterritorial application of Title VII and the Equal Pay Act. *See Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (applying substantial interest test in wrongful death claim presenting "classic choice of law question"); *Kroger*, 436 F.Supp.2d at 103-04 (applying federal law specified in contract rather than French law where plaintiff worked).[12]

EDF discriminated against Ms. Gaujacq in her employment in the District of Columbia and the United States. Because Ms. Gaujacq worked and resided in the United States at all

---

[11] Where Ms. Gaujacq worked prior to her assignment in the U.S., during which she experienced the discrimination and retaliation, is irrelevant. *See Torrico*, 213 F.Supp.2d at 400-01 (string citing cases finding that the focus of inquiry is on location of employment position where plaintiff worked at time of discriminatory conduct or would have worked absent discriminatory conduct). The fact that Ms. Gaujacq was paid in France in francs and later in euros is also irrelevant. The United States Government considers Ms. Gaujacq to have been paid in the United States and EDF issues W-2s recognizing this fact. Bates 1228 (2004 W-2s); EDFINA 1042 (2001 W-2), Att. 10 *see also* Gaujacq Decl. ¶ 10. Ms. Gaujacq has paid federal and state taxes on her salary while stationed in the United States at EDFINA. Bates 1255-56 (2004 VA tax return), 1257-58 (2004 US tax return), Att. 11; *see also* Gaujacq Decl. ¶ 10.

[12] Rather than applying the appropriate standards to determine whether application of federal statutes to this case is extraterritorial as is required under District of Columbia law, Defendants choose to apply New York State's "center of gravity" test. *See* at SJ Motion at 19. A later New York federal court recognized that the use of this test in determining the extraterritorial application of a statute was specifically rejected by the District of Columbia court in *Shekoyan v. Sibley International*, 409 F.3d 414, 421-22 (D.C. Cir. 2005). *See Ofori-Tenkorang v. Am. Int'l Group, Inc.*, 2005 U.S. Dist. LEXIS 20415, *21 n7 (D.N.Y. 2005), *vacated in part on other grounds*

relevant times and the effects of EDF's discrimination were felt in the United States, EDF is properly subject to Title VII.

      B      District of Columbia Human Rights Act

The purpose of the District of Columbia Human Rights Act ("DCHRA") is "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit .. " D C. Code § 2-1401 01  For purposes of the DCHRA, an "employer" is defined as "any person who, for compensation, employs an individual,.. any person acting in the interest of such employer, directly or indirectly; and any professional association." D.C. Code § 2-1401 02. EDF is subject to the DCHRA as an "employer" who discriminated against Ms. Gaujacq, based upon her gender, in the District of Columbia

      C      Equal Pay Act

In order to be subject to the Equal Pay Act ("EPA"), an employer need only be subject to any provision of the Fair Labor Standards Act. 29 U S C. § 206(d)(1) (EPA applies to any "employer having employees subject to any provisions of" the FSLA)  The only time the EPA does not apply is "where the employer has no employees who are engaged in commerce or in the handling of goods that have moved in commerce and the employer is not an enterprise engaged in commerce or in the production of goods for commerce." 29 CFR 1620.1(b). Importantly, Defendants have never claimed that neither EDF nor EDFINA are subject to the Fair Labor Standards Act. They merely argue, without support, that Ms. Gaujacq's claim constitutes an extraterritorial application of the EPA

1.    EDF engages in commerce.

EDF engages in commercial activity in the United States. *See* Nadal Dep at 485, Att. 2

("Q: Do[es EDF] engage in commercial activities in the United States? . . A. Some—to some

extent, yes.").

> "Commerce" is broadly defined in section 3(b) of the FLSA. It includes both
> interstate and foreign commerce and is not limited to transportation across State
> lines, or to activity of a commercial character. All parts of the movement among
> the several States, or between any State and any place outside thereof, of persons
> or things, tangibles or intangibles, including communication of information and
> intelligence, constitute movement in "commerce" within the statutory definition

29 CFR 1620.2; *see also* 29 CFR 1620.7 (defining "enterprise") and Section II, *supra*. EDF is

engaged in commerce in that it, through both the entities of EDF and EDFINA, has secured and

fulfilled numerous contracts for the sale and/or purchase of services and intelligence with

companies based in the United States throughout the relevant time period. Gaujacq Decl ¶¶ 15-

20.

Specifically, through EDF, EDFINA, and other EDF subsidiaries, EDF buys and sells

products and services in the United States, including, but not limited to, management,

engineering and research and development ("R&D") products and services. *Id.* at ¶ 12. The

products and services bought and sold by EDF include: (1) strategic and economic intelligence;

(3 years business development plan, M&A, ventures); (2) commercial intelligence; (3) legal

intelligence; and (4) regulatory intelligence. *Id.* The annual base value of business of EDF in

the United States in 2004 was in excess of $14 Million. *Id.* at ¶¶ 14-17.[13]

---

[13] Examples of the service contracts entered into by EDF, directly and through EDFINA, are contracts with EPRI
and EPRI Solutions, EnXco and International Energy Services ("IES") (an EDF affiliate operating small dams in
California), EasEnergy, NuStart, Westinghouse and Southern Company. *See* Gaujacq Decl ¶ 13; *see also* Def. Exh
9 at 2 (explaining EDF's presence in the United States, indicating EDF is one of 8 electricity generators that created
NuStart, and affirming that "The [EDF] Group is also present in the United States through the companies EasEnergy
and enXco "); Def. Exh 9 at 3 (EasEnergy provides "the expertise of a dozen skilled engineers"); Def. Exh 9 at 4
(EnXco "develops, builds and operates wind power projects [and] is a leading industrial player in the development

14

With EPRI and EPRI Solutions, EDF sold services (Engineering, R&D) to most US utilities beginning in 1998  Gaujacq Decl ¶ 20.  The products and services related to these contracts are used virtually in every state in the United States. *Id*  EDF has engineers based at EPRI both in Palo Alto (CA) and Charlotte (NC)  *Id*.  With enXco and IES, EDF has been selling services (Management, Engineering, R&D) to U S. wind companies and utilities in California, Minnesota and Hawaii since 2002; enXco and IES sell electricity in various US States with an installed capacity of approximately 350 MW. *Id*  at ¶ 15.  Since 2000 when EasEnergy was incorporated, EDF sells services (Management, Engineering, R&D), through EasEnergy, to dozens of start-ups in various states throughout the U S. *Id*  at ¶ 16  With EDFINA, EDF buys and sells services (Management, Engineering, R&D) through its contracts with Nustart, Westinghouse(PA), and Southern Nuclear(AL).[14]  *Id*. at ¶ 17.

2    This Action Does Not Involve an
        Extraterritorial Application of the EPA

Defendants claim globally that EDF is not subject to federal laws in general and to the EPA in particular based loosely on the concepts of a presumption against applying federal statutes extraterritorially and choice of law principles  *See* SJ Motion at 17-19, 36.  However, as detailed above, the facts of this case do not involve an extraterritorial application of any federal statute, including the EPA  The choice of law concepts are completely inapplicable to this cases. *See* Section III.A.2, *supra*.

Furthermore, the EPA is very clear – if a company is subject to the any provision of the FLSA, it is subject to the provisions of the EPA  *See* 29 U.S.C. § 206(d)(1).  Defendants

---

and construction of wind farms "); Def. Exh  90 (identifying EDF's participation in NuStart which has 50 % of its funding through the Department of Energy).

[14] EDF's contract with NuStart began in April 2004 when that entity was incorporated  The contracts with Southern Nuclear and Westinghouse have been in place since 2001. *Id*  at ¶ 17

incorrectly cite 29 USC § 213(f) in support of their argument that the EPA does not apply to EDF. *See* SJ Motion at 17. However, 29 USC § 213(f) merely dictates that the EPA "shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country . . . ." 29 USC § 213(f). Because it is clear that Ms. Gaujacq's workplace was not a foreign country, but rather the District of Columbia and the United States, the exception related to foreign employment is not applicable to this case.[15]

In addition, Ms. Gaujacq's contract with EDF and all of EDF's policies or guides related to expatriates such as Ms. Gaujacq, state that the law of the locality applies. While not excluding the applicability of other provisions of US employment laws, the examples given by the contracts between EDF and Ms. Gaujacq are exactly the areas of employment that are directly addressed by the Fair Labor Standards Act, i.e. hours, workweek, etc. *See* Def Exh. 15, EDF 438-46, Articles 2 & 6 (2000 Expatriate Contract) (law of the work place applicable "in particular the provisions relating to work hours, weekly break, holidays and days-off"); Def. Exh. 42, EDF 4684-91, Articles 2 & 6 (2004 Expatriate Contract) (same); EDF 1319, Att. 6 ("3.1. Working hours. In application of the territoriality principle of Laws and regulations, the EDF employees working abroad are subject to the employment laws of the host country.") (*quoting* Gaujacq translation).[16] Accordingly, this action does not involve an extraterritorial

---

[15] *See Pfeiffer v. Wm. Wrigley Jr. Co.*, 755 F.2d 554, 556 (7th Cir. 1985) ("the wages a worker is paid and the hours he works are unambiguously associated with a place in which the work is done, and therefore the only question in applying section 213(f) to a wage or hour violation is, where was the worker working when the violation occurred?"); *Torrico v. IBM*, 213 F. Supp. 2d 390, 402 (D.N.Y. 2002) (FLSA violations are unambiguously connected to place where employee works).

[16] Defendants' argument that these provisions somehow dictate that French employment law applies to all employment issues, other than those cited as specific examples in the 2000 and 2004 Expatriate Contracts, is non-sensical. If EDF meant for French law to apply, it could have, and should have, stated so explicitly. *See Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1486 (D.C. Cir. 1997) ("It is also accepted that ambiguous provisions are construed against the drafter of the contract").

application of the EPA. EDF is subject to the EPA and fully responsible for all violations it has committed.

### IV.    Counts I and III: Gender Discrimination and Discriminatory Termination in violation of Title VII and DC Human Rights Act

Under Title VII and the DCHRA, EDF and EDFINA are liable for disparate treatment, for creating and permitting a hostile work environment, and Ms. Gaujacq's discriminatory termination. Accordingly, their request for summary judgment on these claims has no merit.

### A.    Ms. Gaujacq Has Met Her Burden of Establishing a Claim for Disparate Treatment Under Title VII and the DCHRA

"To establish a prima facie case of unlawful discrimination under Title VII, a plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action . and (3) that the unfavorable action occurred under circumstances that give rise to an inference of discrimination." *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 62 (D.D.C. 2006). This same prima facie case applies to Ms. Gaujacq's claims pursuant to the DCHRA. *Am. Univ. v. Dist. of Columbia Comm'n on Human Rights*, 598 A.2d 416, 422 (D.C. 1991) ("In deciding cases brought under the [District of Columbia Human Rights] Act, we follow the allocations of burdens and order of proof prescribed for cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. (1982).") *see also Perkins v. Dist. of Columbia*, 769 F. Supp. 11, 14 (D.D.C. 1991) (same).[17]

#### 1.    Ms. Gaujacq is a Member of a Protected Class

As a woman, Ms. Gaujacq is a member of a protected class.

---

[17] Ms. Gaujacq's Disparate Pay claim under Title VII is addressed below In Section VII: Violations of Equal Pay Act.

2.    Ms. Gaujacq was Affected by Multiple Adverse
      Employment Actions

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Brown v. Brody*, 199 F.3d 446, 456 (D.C. Cir. 1999) (*quoting Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1999)).

EDF/EDFINA subjected Ms. Gaujacq to multiple adverse employment actions.[18] Between March 22 and 23, 2004, Ms. Gaujacq was summoned to a meeting in Buenos Aires, where EDF's discriminatory intent was first shown and during which Mr. Creuzet made it clear that Mr. Nadal was to be President of EDFINA despite previous promises made to Ms. Gaujacq. *Id* at 181-86. As part of the demotion, EDF forced Ms. Gaujacq to resign as member of EDFINA's Board of Directors and replaced her with Mr. Nadal. EDF 5355, Def. Exh. 49.[19]

During this time, at Mr. Creuzet's invitation, Ms. Gaujacq proposed, and Mr. Creuzet agreed to, a three-year contract continuing to work on the NuStart project in the United States as well as other responsibilities. Gaujacq Dep. at 223-26.[20] EDF's decision to unjustifiably terminate the contract constituted an adverse employment action.

---

[18] Defendants' argument that there is no support in the record regarding Mr. Nadal's canceling Ms. Gaujacq's credit cards, changing call-in numbers for conference calls, and attempting to interfere with Ms. Gaujacq's immigration status is contradicted by Ms. Gaujacq's testimony, documents and other evidence as discussed more fully below. The Defendants do not dispute that Mr. Nadal committed these acts and, when viewed alone, these acts present claims of adverse treatment that are sufficient to reach a jury.

[19] Despite EDF and EDFINA's claim that Ms. Gaujacq "continued, however, to hold her position," even Mr. de Betherel recognizes in his Declaration that Ms. Gaujacq's position changed from President to Vice-President. Def. Memo at 26; de Botherel Dec. ¶ 29. Moreover, Ms. Gaujacq was performing the duties of an R1 as the President of EDFINA despite EDF/EDFINA's self-serving decision to classify her as an R3. Accordingly, Ms. Gaujacq's demotion to a Vice-President with R3 classification and her contract to return to France as an R3 both constitute adverse employment actions.

[20] This was confirmed by Mr. Creuzet verbally and in writing.

Shortly after Mr. Nadal became President, on June 4, 2004, he stripped Ms. Gaujacq of her ability to write checks on behalf of EDFINA, and advised Riggs Bank that only he and the other male Vice-President of EDFINA were to have signature authority on the account. *See* Def. Exh. 54. Later, on June 18, 2004, Mr. Nadal took away Ms. Gaujacq's authority to enter into contracts or incur expenses on behalf of EDFINA, but allowed the other male VP of EDFINA to retain that authority. *See* EDF 001040-41, Att. 13; *see also* de Botherel Dep at 218, Att. 3.

On August 9, 2004, Ms. Gaujacq attended a conference in Florida on behalf of EDFINA. While there, Mr. Nadal, through EDFINA, canceled her business credit cards and Ms. Gaujacq had to pay for her business expenses personally. Gaujacq Dep at 506-07, Att. 12.

EDF, through Mr. Nadal, attempted to remove Ms. Gaujacq from the NuStart project. Mr. Nadal and EDF were aware that Ms. Gaujacq's participation in the NuStart program was part of her contract to work in the United States and that removing her from the project would adversely affect her employment. Gaujacq. Dep. at 223-26, Att. 12. Yet, on July 12, 2004, Mr. Nadal demanded that she bring thousands of documents into the EDFINA offices within 24 hours. Gaujacq Dep at 76-79, 389-93, Att. 12. This request was unreasonable because the documents were voluminous and subject to a confidentiality agreement to which Mr. Nadal, as well as many other EDFINA employees, were not a signatory. Gaujacq Dep. at 477-78, Att. 12.

On August 18, 2004, Mr. Nadal contacted the NuStart administrative personnel and requested that the call-in number be changed so that Ms. Gaujacq could not attend and further ordered Ms. Gaujacq not to attend. Gaujacq Dep. at 512-17, Att. 12; EDF 1101A, Exh. 76.

When she complained that Mr. Nadal was treating her in a discriminatory fashion, Ms. Gaujacq was ordered to return to France and to take a position that was a clear demotion without management responsibility and without any real substance. When she refused to accept the

19

demotion, which was Ms. Gaujacq's right under EDF policy, (Gaujacq Decl. ¶ 83), EDF

terminated her. EDF 1187, Def. Exh. 88. At that time, EDF knew that Ms. Gaujacq had no

performance issues and that the position offered to, and refused by, her was a demotion given in

retaliation against Ms. Gaujacq for filing a charge with the EEOC.

Moreover, in August, in October and then again in January 2005, EDF/EDFINA, through

Mr. Nadal and his attorneys, attempted to interfere with Ms. Gaujacq's immigration status by

communicating negatively with the USCIS. Gaujacq Dep. at 456-57, Att. 12 [21] Thus,

EDF/EDFINA subjected Ms. Gaujacq to numerous adverse actions that affected her employment

and the benefits of her employment.

### 3. EDF's Actions Give Rise to an Inference of Discrimination

"Although 'a plaintiff in a discrimination case need not demonstrate that she was

replaced by a person outside her protected class in order to carry her burden of establishing a

prima facie case under McDonnell Douglas,' where a plaintiff does make such a showing, she

normally will satisfy her burden of establishing an inference of discrimination based on class

status." *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 67, n.4 (D.D.C. 2006) (*quoting Stella v.

Mineta*, 284 F.3d 135, 146 (D.C. Cir. 2002)).

Mr. Nadal replaced Ms. Gaujacq with respect to some of her responsibilities as President.

Mr. Serviere and Mr. Foret replaced Ms. Gaujacq on the NuStart project and Mr. Dreux replaced

Ms. Gaujacq as the officer at EDFINA with signature authority. *See* Gaujacq Dep at 471, 509;

Att. 12; Bates No. 000057; Att. 14; EDFINA 000774; Att.15; EDF 001040-41. Att. 13; *see also*

EDF 000978, Def. Exh. 45-T, Att. 16 (stating that Jean Luc Foret should "handle the nuclear

---

[21] Furthermore, EDF was aware that Ms. Gaujacq's husband had given up his employment when Ms. Gaujacq accepted her assignment in the United States. *See* Def. Exh 15, Article 10; Def Exh. 26, EDF4681 ("We will need to plan ahead sufficiently so that her husband, a teacher, can find another job in France, unless she finds another job in the USA.").

development matters of interest to EDF" instead of Ms. Gaujacq). Accordingly, EDF and EDFINA's actions give rise to an inference of discrimination.

### B.    Ms. Gaujacq Has Met Her Burden of Establishing Claims for a Hostile Work Environment Based on Her Gender Under Title VII and the DCHRA

To establish a claim for hostile work environment based on gender, the plaintiff must show: "(1) that defendant engaged in offensive and disparaging conduct; (2) that the conduct was based on sex; and (3) that it was 'sufficiently severe or pervasive that a reasonable person in her position would find her work environment to be hostile or abusive.'" *See Dickerson v. SECTEK, Inc., et al.*, 238 F.Supp.2d 66. 83 (D.D.C. 2002)(holding the court is "obligated to consider the whole picture, not just particular pixels.) A plaintiff can prevail on a hostile work place claim when she proves that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently sever or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Armstrong v. Reno*, 172 F.Supp 2d 11, 24 (D.D.C 2001), *citing Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993) "[G]iven how fact-intensive most hostile work environment cases are, such claims are often not appropriate for disposition on summary judgment." *Dickerson*, 238 F Supp 2d at 85; *see also Armstrong*, 172 F.Supp 2d at 24.

#### 1    EDF and EDFINA Allowed Offensive and Disparaging Conduct that was Severe and Pervasive

Without knowing anything about Ms. Gaujacq -- other than her gender -- Mr. Nadal made the decision that he could not work with Ms. Gaujacq. Mr. Nadal met with Mr. Betouret and confirmed his position that he thought that it is not possible for him to work with Ms. Gaujacq, because of his lack of trust regarding her and because he thought someone else could do an as-

good or better job than her.[22]  EDF 977, Att. 17.  Further, in an email dated April 1, 2004, Mr.

Nadal stated that " . a quick and complete stop of all Catherine's activities is by far the best

solution"  EDF 978-80 at 978 (*quoting* Gaujacq translation).  Att. 16.

On April 7, 2004, after the official effective date of the 2004 Expatriate Contract and in

an effort to change the terms of the already agreed upon 2004 Expatriate Contract, Mr. Creuzet

sent an email to Ms. Gaujacq attempting to change the title of Ms. Gaujacq's mission, as well as

her reporting structure.  Def. Facts, Exh. 41, EDF 000966   In response, Ms. Gaujacq indicated

she was open to potential revisions of the 2004 Expatriate Contract, but pointed out that she

would need to be affiliated with EDFINA, because EDFINA was the named participant in the

NuStart confidentiality agreements and operating agreements  *Id*  On April 8, 2004, Mr. Creuzet

attempted to renege on the already agreed upon mission by requesting that Ms. Gaujacq

"finalize" her assignment letter with the head of the Energy Department, Bruno Lescoeur.  *Id* at

EDF 000967.

Despite Mr. Nadal's baseless request on April 1, 2004 for a "quick and complete stop" of

Ms. Gaujacq's employment at EDFINA (*see* Bates 978-80 at 978), Mr. Metais wrote on April 6,

2004, that a decision had been made to assign Ms. Gaujacq to the 'premium 2015,' spending

most of her time in the USA with terms and conditions defined by Energy Branch.

EDF 983, Att. 18.  However, Mr Nadal refused to accept the decision.  In an email dated April

7, 2004, Mr Nadal stated that it was unacceptable for Ms. Gaujacq to remain in charge of this

project, that her doing so was a major obstacle for him and that such a solution was one he

wanted to avoid.  EDF 985, Att. 19.

---

[22] "Someone else" was obviously a male, as demonstrated by the fact that males replaced Ms. Gaujacq in all her prior areas of responsibility.

On May 25, 2004, the Chairman of EDF met with Mr. Nadal and informed him that, contrary to Mr. Nadal's wishes, Ms. Gaujacq was to continue on at EDFINA as VP although Mr. Nadal would replace her as President and Board Member of EDFINA and Ms. Gaujacq was to report to Mr. Nadal. Def. Exh. 48. Moreover, Mr. Nadal was explicitly discouraged from trying to further renegotiate this arrangement. *Id.*

### 2    *The Conduct was Directed at Ms. Gaujacq Based on Her Gender*

At the same time Mr. Nadal was attempting to rid EDFINA and EDF of Ms. Gaujacq, he made a concerted effort to get to know and work with the men working in or with the EDFINA office. Specifically, he drove with Mr. Foret to a work related conference, while specifically excluding Ms. Gaujacq, who was also going to the conference and had planned to drive to the conference with Mr. Foret, prior to Mr. Nadal's decision to attend the same conference. Gaujacq Dep. at 333-35. Att. 12. Mr. Nadal further recommended that Mr. Foret, a less qualified male, handle all nuclear development matters at EDF. EDF 978, Def. Exh. 45. Also, although he took away Ms. Gaujacq's check signing authority, he allowed the other male EDFINA vice-president, Mr. Dreux, to retain this authority. EDFINA 5346, Att. 20. Despite Ms. Gaujacq's history of effective service as EDFINA's President, Mr. Nadal also assigned his authority to the male vice-president, Benoit Dreux, instead of Ms. Gaujacq. Def. Exh. 60.

### 3    *A Reasonable Person in Ms. Gaujacq's Position Would Find that her Work Environment was Hostile and Abusive*

In addition permitting and encouraging the acts described above, EDF did nothing to investigate the matter and hardly seemed surprised by Mr. Nadal's behavior. Instead, EDF told Ms. Gaujacq that if she pursued her claims of discrimination, her career at EDF would be dead. Def. Exh. 70 and 72.

EDF then carried out its threat by ordering Ms. Gaujacq back to France without notice, attempting to force her to take a demotion, and then terminating her when she refused to accept the demotion. EDF 63, Def. Exh. 81. A reasonable person would conclude that Ms. Gaujacq's work environment was hostile and abusive.

### C.    Pretext and Ultimate Issue of Discrimination

"[T]he task of assessing whether a plaintiff has presented enough evidence to permit an inference of discriminatory intent is, as the author of the dissent herself observed in her panel dissent, 'intensely fact bound.'" *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 n.9 (D.C. Cir. 1998)(*quoting* descent). In an appropriate case, 'the factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination . . . and [i]f 'disbelief is accompanied by a suspicion of mendacity,' . . . the likelihood of intentional discrimination is increased, permitting the factfinder to infer discrimination more readily." *Aka*, 156 F.3d at 1294 (*quoting St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)) (internal citations omitted). "Usually, proffering 'evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury.'" *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) (*quoting Carpenter v. Fannie Mae*, 165 F.3d 69, 72 (D.C. Cir. 1999).[23]

---

[23] However, "the plaintiff is not limited to challenging the employer's explanation, but can also avoid summary judgment (and prevail at trial) by presenting other evidence, either direct or circumstantial, that permits an inference of discrimination." *Aka*, 156 F.3d at 1295 n.11. Moreover, "Where a woman is frustrated in her attempts to work cooperatively by the sexist attitudes and actions of her male co-workers, she is a victim of discrimination [and] [h]er dismissal, even where the work environment has degenerated completely, would be in violation of Title VII." *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). "If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate--something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Aka*, 156 F.3d at 1294.

EDF/EDFINA's stated reason for Ms. Gaujacq's termination is pretext. Throughout her tenure as President of EDFINA, Ms. Gaujacq performed her duties in an exemplary manner, and received high evaluations. *See* Exhibit 49 to Gaujacq Dep, Att. 12. Prior to Mr. Nadal joining EDF, EDF was very satisfied with Ms. Gaujacq and there was never any suggestion of performance issues. Def. Facts ¶¶ 7-8.

Mr. Nadal, on the other hand, was not as qualified as Ms. Gaujacq with regard to nuclear facilities or US business practices. *See* Nadal Dep at 150-52. Att. 2. His job responsibilities were less than those Ms. Gaujacq possessed while she served as President, yet his starting compensation as President was over two times greater than her salary for performing the same position with additional responsibility as compared to his position.[24] In a March 16, 2004 letter from Ms. Gaujacq, on behalf of EDFINA, to the U.S. Citizenship and Immigration Services, she described the position of President of EDFINA as follows:

> As the top-ranking executive of EDF International North America, Mr. Nadal will direct all business activities of the organization. He will review administrative and personnel decisions and coordinate the work of outside contractors who provide services to meet the needs of EDF International North America, Inc. ... as President, Mr. Nadal will work in close collaboration with leaders of U.S. electrical utilities, building and strengthening ties between the U.S. And French energy industries. ... Mr. Nadal will be charges with explaining the policies, experiences, and goals of Electricite de France to high-level U.S. energy executives and to the leading U.S. national organization in the energy industry.
>
> He will play a critical role in defining the different avenues to be pursued by Electricite de France in cooperation with the U.S. energy industry in pursuit collaborative research and development projects at a highly advanced level.

(Exhibit 33 to Gaujacq Dep.); EDF 0246-50, Att. 21. This was the job description submitted to and approved by the USCIS in order to obtain Mr. Nadal's VISA. Gaujacq Dep at 193-95, Att.

---

[24] Specifically, in conjunction with Mr. Nadal's placement as President of EDFINA, the position was reclassified as R1 Ranking. EDF claims that the strategic importance of EDFINA suddenly changed thereby requiring a manager with an R1 Ranking. However, EDFINA's mission and activities did not change or increase since Mr. Nadal's appointment as President of EDFINA and Defendants cannot provide any activities that Mr. Nadal does that Ms. Gaujacq did not.

12. Ms. Gaujacq's job description was the same as the above description when she was president of EDFINA. *Id.* at 194-95.[25]

Furthermore, "evidence that the defendant employs women at rates far below their numbers in the applicant pool and the general population may well help [Ms. Gaujacq's] case." *Aka*, 156 F.3d at 1295, n.11. Despite the size of EDF, Ms. Gaujacq was one of a small group of women to hold an executive level position and as President of EDFINA, was the only female manager of a subsidiary outside of France. Specifically, of the 50 EDF executives holding R1 rankings, only 5 were women, whereas of the total 160,000 employees at EDF, approximately 45 to 50 percent were women. *See* de Botherel Dep. at 36, 66-69, 74, Att. 3.

Moreover, EDF/EDFINA's additional subjective reasons for Ms. Gaujacq's termination are false. "[A]n employer's heavy use of "highly subjective" criteria, such as "interpersonal skills," could support an inference of discrimination." *Aka*, 156 F.3d at 1298.

Despite EDF/EDFINA's ambiguous claim that Mr. Nadal preferred to work with Mr. Dreux because he was "a more cooperative employee" who came to the office more than Ms. Gaujacq, neither entity can identify a single email indicating Ms. Gaujacq failed to complete a project assigned to her. Despite Mr. Nadal's claims that Ms. Gaujacq's office visits were too infrequent to make her useful or to deputize her to sign checks, in the four years that Ms. Gaujacq held the main check signing authority as President, there is no evidence that there was ever an issue regarding check signing. Accordingly, Ms. Gaujacq's alleged absence from the office (much of which is disputed and was business related) provides absolutely no justification for Mr. Nadal's abusive treatment.

---

[25] Moreover, Mr. Nadal actually performed fewer functions. Ms. Gaujacq was both President of EDFINA and headed EDF's initiative with NuStart. After Mr. Nadal was appointed President, Ms. Gaujacq continued in the NuStart initiative that she had been working on as President. As President, Mr. Nadal did not take on any other responsibilities to compensate for his lesser responsibilities that were being handled by Ms. Gaujacq.

Similarly, Mr. Nadal's request to have Ms. Gaujacq return confidential documents cannot provide an after-the-fact justification for his discriminatory conduct. Mr. Nadal's demand that Ms. Gaujacq bring thousands of documents into the EDFINA unsecured offices within 24 hours was unreasonable and practically impossible in its urgency and not sensible, in that many of the documents he requested related to NuStart and were subject to a confidentiality agreement to which Mr. Nadal, as well as many other EDFINA employees, were not a signatory. Gaujacq Dep. at 477-78, Att 12.[26] Accordingly, all of EDF and EDFINA's stated reasons for Ms. Gaujacq's treatment and termination are pretext.

## V.   Counts II and V: Retaliation and Retaliatory Termination in violation of Title VII and DC Human Rights Act

"The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2412 (U.S. 2006). "In order to establish a prima facie case of retaliation, a plaintiff must show: 1) that she engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two." *McKenna*, 729 F.2d at 790; *see also Kalinoski*, 435 F.Supp.2d at 62 (same); *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994) (same prima facie case required by DCHRA). Importantly, "this standard does not require a reviewing court or jury to consider 'the nature of the discrimination that led to the filing of the charge.'" *Burlington*, 126 S. Ct at 2416 (*quoting* Alito, J., concurring in judgment)

---

[26] Notably, Mr. Nadal offers no evidence that he attempted to obtain the necessary clearance after Ms. Gaujacq informed Mr. Nadal of the confidentiality issues preventing her from returning the documents to the office. Rather, Mr. Nadal's claim that Ms. Gaujacq failed to appropriately return documents is pretext and intended to disguise the obvious – that there were no performance or other issues attributable to Ms. Gaujacq that would justify his conduct or that led to her termination

A    Ms. Gaujacq Engaged in a Statutorily Protected Activity

"No 'magic words' are required" to oppose discriminatory conduct, rather a complaint must only "in some way allege unlawful discrimination." *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Complaining of discrimination is a protected activity, and the filing of a charge of unlawful discrimination based on sex discrimination "clearly qualifies" as a protected activity. *Id, see also E.E.O.C. v. Zellerback Corp., et al.*, 720 F.2d 1008, 1013 (9th Cir. 1983)(holding "the assertedly unlawful employment practices protested by the appellants' could be discerned from the context of the letter" raising their concerns.) "Whether or not Plaintiff's [notice] was sufficiently detailed to put [the employer] on notice that she believed she had been the victim of [discrimination] is a question of fact for the jury." *See Martin v. Howard Univ.*, 1999 U.S. Dist. LEXIS 19516 (D.D.C 1999).

Ms. Gaujacq engaged in a number of statutorily protected activities, including providing EDF/EDFINA with notice on several occasions that she was being subjected to discrimination, providing verbal complaints and ultimately filing a charge, and supporting documents with the EEOC. A jury could easily conclude that Ms. Gaujacq sufficiently opposed EDF's discriminatory conduct.

Defendants' claim that Mr. Ponasso, Creuzet, Laroche and other EDF/EDFINA officers did not know Ms. Gaujacq believed that Mr. Nadal was discriminating against her based on her sex is patently untrue. Rather, EDF/EDFINA, through its officers, was well aware of Ms. Gaujacq's complaints and should suffer the consequences of choosing to ignore them.

On July 9, 2004, Ms. Gaujacq notified Fernando Ponasso, of EDF/EDFINA, that Mr. Nadal was treating her in a manner that was "discriminatory in regard of [her] position, as compared to the situation of Benoit Dreux," her male counterpart. Def. Exh. 67. On July 22,

28

2004, Ms. Gaujacq again pleaded to Mr. Roussely and Creuzet for protection from Ms. Nadal's

conduct stating he "takes discriminatory measures against [her]" and stating that she would

defend herself, "by filing a complaint before the US Authorities." Def. Exh. 69. That same day,

Ms. Gaujacq wrote Mr. Nadal detailing the discriminatory conduct on his part and requesting an

explanation. Def. Exh. 68. On July 25, 2004, after their July 23, 2004 conversations, Ms.

Gaujacq again wrote to Mr. Creuzet, Ponasso, and Laroche telling them she was deeply

concerned by Mr. Creuzet's statements that, "EDF would not tolerate a claim against EDF, and

that [her] career with EDF is dead if [she] filed a claim." EDF 1048, Exh. 72. Ms. Gaujacq also

complained to EDF's ethics officer, on December 10, 2004, who admittedly did nothing to

investigate Ms. Gaujacq's complaints. de Botherel Dep at 178-80, Att. 3. Ms. Gaujacq

continued to attempt to obtain relief regarding her punitive transfer, by again appealing to

EDF/EDFINA and suggesting actions that would allow her to continue to work at EDF. EDF

1047-49, Def. Exh. 72. [27]

On July 30, 2004, Ms. Gaujacq filed a charge of discrimination with the E.E.O.C. and

amended the charge as EDF/EDFINA continued to conduct discriminatory acts against her. Def.

Exh. 78; Gaujacq Decl. ¶ 77, 78. Throughout October and November of 2004, Ms. Gaujacq

supplemented her charge.

Ms. Gaujacq clearly engaged in protected activities.

---

[27] EDF/EDFINA's claim that Ms. Gaujacq's reported the discrimination to "blackmail EDF" is a clear concession of the strength of the retaliation claim. The filing of the EEOC charge, or intent to file an EEOC charge, is protected activity. Ms. Gaujacq had an excellent twenty-four (24) year history at EDF without a single complaint from or against any other employee. Def. Rule 56.1 Statement ¶ 8. Given her history at EDF, Ms. Gaujacq cannot be penalized for demanding that EDF/EDFINA address Mr. Nadal's discriminatory conduct and, in the face of EDF's inaction, for suggesting various methods that were necessary in order to prevent Ms. Nadal's unfettered discriminatory conduct toward her. As she explained in her July 25, 2004 email to Mr. Mr. Creuzet, Laroche and Ponasso, Ms. Gaujacq wanted to resolve the situation stating "EDF can quickly correct [the] situation by taking the following actions. . . ." EDF 1048, Exh. 72. Despite the defendant's claim that Ms. Gaujacq was extorting a new contract, her suggested remedies focused on removing Mr. Nadal from her chain of command and eliminating his ability to interfere with her work. *Id. Apparently, under EDF and EDFINA's analysis any person who complains of discriminatory treatment following an adverse employment action is doing so to "blackmail" EDF. This is retaliation.*

B.    Ms. Gaujacq Suffered Adverse Personnel Actions

"[T]he anti-retaliation provision [of TitleVII] does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington*, 126 S.Ct. at 2409. However, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Burlington*, 126 S.Ct at 2417 (*quoting Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (U.S. 1998))

As discussed in Section IV(A)(2) above, EDF/EDFINA subjected Ms. Gaujacq to numerous adverse employment actions that affected her employment and the benefits of her employment.

C.    A Causal Connection Exists Between the Adverse Actions
      and Ms. Gaujacq's Protected Activity

"Courts have held that '[a] plaintiff may satisfy this third element of a prima facie case [of retaliation] by showing 'the employer had knowledge of the employee's protected activity, and ... the adverse personnel action took place shortly after that activity.'" *Kalinoski v Gutierrez*, 435 F. Supp. 2d 55, 69 (D.D.C. 2006) (quoting *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006)); *see also Baker v Potter*, 294 F.Supp.2d 33, 41 (D.D.C. 2003) (same); *Castle v. Bentsen*, 867 F.Supp. 1, 3 (D.D.C. 1994) (causal connection found where adverse action occurred 3-5 months after the protected activity) [28]

---

[28] In *Mansfield*, a causal connection was found when, similar to the case at hand, after "the plaintiff hand delivered a letter to the defendant claiming that she suffered from discriminatory pay and asking for a response within 10 business days ... , 16 days later, the defendant informed the plaintiff that it had abolished her position." *Mansfield*, 432 F. Supp. 2d at 73

On July 9, 22, 23 and 25, 2004, Ms. Gaujacq notified EDF and Mr. Nadal that Mr. Nadal's conduct was discriminatory. EDF 1039, Def. Exh. 67; EDF 4589, Exh. 69; and Def. Exh. 74. Just two days after her last complaint to EDF, on July 27, 2006, Ms. Gaujacq received notice that her contract in the United States would be repudiated and that EDF was ordering her to return to France by August 1, 2004 and accept a demotion.[29] Def. Exhs. 74 and 81. As described above, after Ms. Gaujacq reported Mr. Nadal's conduct, Mr. Nadal then subjected Ms. Gaujacq to numerous adverse actions including removing her from the NuStart project, removing her from the enXco Board of directors, canceling her authority to enter into contracts, and other discriminatory acts.

On November 26, 2006, two days after she filed her last supplement to her formal charge with the EEOC charge, EDF notified her that she would be terminated. Def. Exh. 86; EEOC Charge, Att. 22; EEOC Charge Suppl. Dated Nov. 24, 2006, Att. 23. A little more than a month later, on January 7, 2006, EDF terminated her. Def. Exh. 88. The close temporal proximity between Ms. Gaujacq's complaints and the companies' actions demonstrates that she suffered retaliation, including a discriminatory termination.

     D     EDF's Explanations for Ms. Gaujacq's Demotion, Punitive Transfer and Termination are Pretextual.

     [SEE SECTION IV D. ABOVE]

## VI.   **Count IX:  Breach of Contract**

Contrary to EDF/EDFINA's unsupported claim that French law applies to the contract between Ms. Gaujacq and EDF, both the 2000 Expatriate Contract and the 2004 Expatriate Contract, specifically state that the applicable law is that of the District of Columbia, the work

---

[29] EDF/EDFINA's demand that Ms. Gaujacq return to France immediately and within days was intended to penalize Ms. Gaujacq because EDF had previously noted, on April 1, 2004, that it "would need to plan ahead sufficiently so that her husband, a teacher, can find another job in France." EDF T345; Exh. 26

location of Ms. Gaujacq. Def. Exh. 15 and 42, Articles 2 and 6. "For an enforceable contract to exist in the District of Columbia, there must be both agreement as to all material terms and the intention of the parties to be bound." *Redwood Ctr. Ltd. P'ship v. Riggs Nat'l Bank*, 737 F. Supp. 671, 674 (D.D.C. 1990); *see also Georgetown Entm't Corp. v. Dist. of Columbia*, 496 A.2d 587, 590 (D.C. 1985) (same). Further, any "ambiguous provisions are construed against the drafter of the contract," in this case, EDF. *See Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1486 (D.C. Cir. 1997).

A.    Ms. Gaujacq's 2000 Expatriate Contract

On August 1, 2000, Ms. Gaujacq was appointed Delegue General for the United States and Canada on August 1, 2000 and Directeur USA/Canada of the Americas Branch in August 1, 2002. *See* Exhibits 9 and 10 to Deposition of Catherine Gaujacq ("Gaujacq Dep"), Att. 9; Def. Facts ¶ 9. Additionally, Ms. Gaujacq served as President and Treasurer of EDFINA from August 1, 2000, until May 31, 2004, when she was appointed VP of EDFINA. *See* Exhibits 15, 16 and 46 to Gaujacq Dep, Att. 10; Def. Facts ¶¶ 19, 69.

In connection with Ms. Gaujacq's appointment to the United States, EDF and Ms. Gaujacq entered into an agreement entitled "Particular Conditions Applicable to Catherine Gaujacq's Long Term Mission to Washington." ("2000 Expatriate Contract") Def. Facts at ¶ 10. The 2000 Expatriate Contract was effective for three years, with provision to extend it one year if mutually agreeable. *Id.* at ¶ 11. The contract was extended for one year in January 2003 and was effective until July 31, 2004. *Id.* at 30. The 2000 Expatriation Contract provided that EDF would compensate Ms. Gaujacq for necessary expenses incurred in relation to her residence in Washington, D.C., her company vehicle and necessary business expenses. *See* Def. Facts, Exhibit 15, Bates EDF 441-43, articles 9 and 11. Contrary to this contractual obligation, EDF

32

failed to reimburse Ms. Gaujacq for business expenses that she incurred, including business related travel, insurance premiums and utility expenses, totaling over $2,500.00. *See* Exhibit 23, Bates 61-62, 670-73, 2148-52. EDFINA 322-23, EDFINA 472, EDFINA 742.[30] Accordingly, EDF breached the 2000 Expatriate Contract.

Moreover, the "Guide to EDF Employees Working Abroad" (the "Guide") was specifically incorporated into the 2000 Expatriate Contract. See Def. Facts, Exhibit 15, Bates EDF 438, Article 1; *see also Lance v. UMW 1974 Pension Trust*, 355 F. Supp. 2d 358, 361 n. 3 (D.D.C. 2005) ("District of Columbia contractual terms may be implied from an employee handbook or manual. . . In general, whether a handbook or manual creates contractual rights is a question for a jury."). Under the terms of the 2000 Expatriate Contract, the "general conditions" in the Guide "are applicable to the extent that the specific conditions" in the 2000 Expatriate Contract "are not inconsistent therewith." *Id.*

The Guide dictates that a specific interview will be held six months prior to the return of the expatriate to France, "*at the latest*," for the purposes of evaluating performance and skill of the agent during the mission, and to propose a new position for the employee, taking into consideration the wishes, expectations and qualifications of the agent during the mission. Def. Facts, Exhibit 94, Article 2.31. On July 27, 2004, contrary to the terms of the Guide and the 2000 Expatriate Contract which incorporated the Guide's terms, Ms. Gaujacq received a letter by facsimile wherein EDF removed Ms. Gaujacq from her position on the Project with EDFINA in the United States, EDF directed Ms. Gaujacq to return to France immediately, expressly stating

---

[30] See also Bates 1262-64, 2053-66, Att. 24 (expenses related to storage of furniture and medical expenses.)

that Ms. Gaujacq's mission in the United States would end on August 1, 2004 – *just four days later*. Def. Exh. 74, 1052. Accordingly, EDF again breached the 2000 Expatriate Contract.[31]

B.    Ms. Gaujacq's 2004 Expatriate Contract

Between March 22 and 23, 2004, Mr. Creuzet made it clear that Mr. Nadal was to be President of EDFINA despite previous statements made to Ms. Gaujacq. *Id.* at 181-86. In an attempt to make things right for Ms. Gaujacq, despite EDF's discriminatory actions, Mr. Creuzet suggested that Ms. Gaujacq propose a new mission for herself in the United States. *Id.* at 223. Accordingly, at that time, Ms. Gaujacq proposed, and Mr. Creuzet agreed to, a three-year contract continuing to work on the NuStart project in the United States. *Id.* at 223-26.[32]

On March 25, 2004, Ms. Gaujacq sent an email to Mr. Creuzet attaching the details of this new mission for Mr. Creuzet's signature. Def. Exh 41, Exh 42 ("2004 Expatriate Contract"). In an email dated March 29, 2004, Mr. Creuzet, on behalf of EDF, accepted Ms. Gaujacq's proposal stating that it was "well in line" with the agreement he and Ms. Gaujacq discussed in Buenas-Aires. Def. Exh. 41, EDF 000965. He further indicated his acceptance of the 2004 Expatriate Contract stating that he would forward the final contract to Ms. Gaujacq as soon as it was signed. *Id.* The 2004 Expatriate Contract provided that Ms. Gaujacq began her new mission as "Production and EDF International North America Nuclear Projects Director" on April 1, 2004. Def, Exh. 42. While Ms. Gaujacq never received a signed copy of the 2004 Expatriate Contract, Ms. Gaujacq and EDF had a valid contract at that time because there was "agreement

---

[31] Providing three months for Ms. Gaujacq to "organize serenely" her return to France while giving her no information about her new assignment and putting her immigration status in jeopardy so that she was, at times, not able to travel between the United States and France, does not change the fact that EDF breached the 2000 Expatriate Contract in the first place.

[32] This agreement was confirmed by Mr. Creuzet verbally and in writing. *See* Exhibits 34-36 to Gaujacq Dep, Att 24.

as to all material terms and the intention of the parties to be bound." *See Redwood Center*, 737 F.

Supp. at 674; *see also Georgetown Entm't Corp.*, 496 A.2d at 590 (same).

On April 7, 2004, after the official effective date of the 2004 Expatriate Contract and in

an effort to change the terms of the already agreed upon 2004 Expatriate Contract, Mr. Creuzet

sent an email to Ms. Gaujacq attempting to change the title of Ms. Gaujacq's mission, as well as

her reporting structure. Def. Exh. 41, EDF 000966. On April 8, 2004, Mr. Creuzet attempted to

renege on the already agreed upon mission by requesting that Ms. Gaujacq "finalize" her

assignment letter with the head of the Energy Department, Bruno Lescoeur. *Id.* at EDF 000967.

Despite EDF's attempt to modify or simply breach the 2004 Expatriate Contract, such

contract was valid, enforceable and effective from April 1, 2004 for three years until March 31,

2007. On July 27, 2004, contrary to the terms of the 2004 Expatriate Contract, Ms. Gaujacq

received a letter by facsimile wherein EDF removed Ms. Gaujacq from her position on the

NuStart Project, removed her from her position with EDFINA in the United States, and directed

Ms. Gaujacq to return to France immediately, expressly stating that Ms. Gaujacq's mission in the

United States would end on August 1, 2004. Def. Exh. 74, EDF 1052. Accordingly, EDF

breached the 2004 Expatriate Contract by canceling the contract, without economic or business

justification, two years and eight months premature. By doing so, EDF additionally breached the

terms of the Guide, which was incorporated into the 2004 Expatriate Contract, by failing to give

Ms. Gaujacq six months notice of her next assignment as described above. *See* Def. Exh. 42,

article 1, Def. Exh. 94, Article 2.31.

C.    Guide to EDF Employees Working Abroad

The "Guide to EDF Employees Working Abroad" was specifically incorporated into both

Ms. Gaujacq's 2000 Expatriate Contract and her 2004 Expatriate Contract. However, to the

35

extent the Guide's terms and conditions are not a part of the 2000 and 2004 Expatriate Contract,

the Guide itself is a contract between Ms Gaujacq and EDF and is enforceable as such. *See* Def.

Exh. 94; *see also Lance*, 355 F. Supp. 2d at 361 n. 3 ("District of Columbia contractual terms

may be implied from an employee handbook or manual. ... In general, whether a handbook or

manual creates contractual rights is a question for a jury."). As such, EDF violated the terms and

conditions of the Guide as explained above.

**VII.    Count X: Duty of Good Faith and Fair Dealing**

"Under District of Columbia law, 'all contracts contain an implied duty of good faith and

fair dealing, which means that neither party shall do anything which will have the effect of

destroying or injuring the right of the other party to receive the fruits of the contract.'"

*Cambridge Holdings Group, Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 95 (D.D.C. 2004) (*quoting*

*Paul v. Howard University*, 754 A.2d 297, 310-11 (D.C. 2000)) (internal quotations removed);

*see also Hoffman v. Hill & Knowlton, Inc.*, 777 F. Supp. 1003, 1005 (D.D.C. 1991) (same); *Hais*

*v. Smith*, 547 A.2d 986, 987 (D.C. 1988) (same). Accordingly, the duty of good faith and fair

dealing is implied into both the 2000 Expatriate Contract and the 2004 Expatriate Contract.

"'Good faith performance or enforcement of a contract emphasizes faithfulness to an

agreed common purpose and consistency with the justified expectations of the other party; it

excludes a variety of types of conduct characterized as involving 'bad faith' because they violate

standards of decency, fairness or reasonableness.'" *Allworth v. Howard Univ.*, 890 A.2d 194,

201-202 (D.C. 2006) (*quoting* Restatement (Second) of Contracts § Id. § 205 cmt. a.).

Consequently, to the extent that Defendants assert that the terms of the Guide, specifically

incorporated into both the 2000 and 2004 Expatriate Contracts, are not contractual obligations,

Defendants' violation of the terms of the Guide constitute breaches of the Duty of Good Faith

and Fair Dealing. The Guide dictates that a specific interview was to be held six months prior to the return of Ms. Gaujacq to France, "*at the latest,*" for the purposes of evaluating her performance and skill during the mission, and to propose a new position for her, taking into consideration her wishes, expectations and qualifications during the mission. Def. Exh 94, Article 2.31. On July 27, 2004, contrary to EDF's obligation to deal with Ms. Gaujacq in good faith, Ms. Gaujacq received a letter by facsimile wherein EDF removed Ms. Gaujacq from her position on the Project with EDFINA in the United States, EDF directed Ms. Gaujacq to return to France immediately, expressly stating that Ms. Gaujacq's mission in the United States would end on August 1, 2004 – *just four days later*. Def. Exh. 74, EDF 001052. Accordingly, EDF breached the duty of good faith and fair dealing owed to Ms. Gaujacq.

EDF claims that an interview was held six months prior to Ms. Gaujacq's ordered return to France. *See* SJ Motion at 41. Yet, all discussions held during any annual evaluation between EDF and Ms. Gaujacq related to staying in the United States for the foreseeable future. In fact, the 2004 Expatriate Contract was proposed and accepted based upon these discussions in early 2004. Accordingly, when EDF failed to send Ms. Gaujacq a signed copy of the 2004 Expatriate Contract and then later breached the 2004 Expatriate Contract, EDF additionally breached its duty of good faith and fair dealing it owed Ms. Gaujacq under the 2000 Expatriate Contract which incorporated the terms of the Guide.[33]

By giving Ms. Gaujacq notice of her immediate transfer, first at the end of July 2004, thereby preventing Mr. Gaujacq from obtaining employment in France in a timely manner, EDF

---

[33] *See Allworth*, 890 A.2d at 202 ("'[B]ad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.'") (*quoting* Restatement (Second) of Contracts § Id. § 205 cmt. d.)

violated its duty of good faith and fair dealing [34] *See Allworth*, 890 A.2d at 202 (*quoting*

Restatement (Second) of Contracts § Id. § 205 cmt. d.) ("'Bad faith' involves 'evasion of the

spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect

performance, abuse of a power to specify terms, and interference with or failure to cooperate in

the other party's performance.'")

Moreover, EDF promised Ms. Gaujacq that upon the completion of her mission in the

United States, she would receive a promotion. *See* Gaujacq Dep at 107, 125-26. As described

above in detail, the position offered to Ms. Gaujacq was clearly a demotion, with less overall

responsibility and no supervisory responsibilities. *See* Statement of Dispute Facts, *supra*.

Finally, "'fair dealing' involves reasonable rather than arbitrary or capricious action."

*Allworth*, 890 A.2d at 202 (*citing Adler v. Abramson*, 728 A.2d 86, 90 (D.C. 1999)) EDF

violated its duty to act in good faith with Ms. Gaujacq when it acted capriciously and terminated

her based upon her justified refusal to report to a position assigned to her in retaliation of her

threatening, and then filing, a complaint of discrimination and violation of the EPA with the

EEOC [35]

## VIII.  Count XI:  Violation of Equal Pay Act

In Count XI, Ms. Gaujacq alleges that EDF violated the Federal Equal Pay Act. The

equal pay provisions of the Fair Labor Standards Act, 29 U.S.C. § 206(d) ("Equal Pay Act"),

require that an employer provide equal pay to men and women who perform equal work, unless

---

[34] Furthermore, EDF was aware that Ms. Gaujacq's husband had given up his employment when Ms. Gaujacq accepted her assignment in the United States. *See* Def. Exh 15, Article 10; Def.Exh. 26, EDF4681 ("We will need to plan ahead sufficiently so that her husband, a teacher, can find another job in France, unless she finds another job in the USA."). Accordingly, Company officials had agreed to give Ms. Gaujacq notice of any transfer back to France by January 1 of the year the transfer was to occur, thereby allowing her husband to reclaim his employment in National Education in France. Def. Exh. 15, Art 10; Def. Exh. 26.

[35] To the extent Ms. Gaujacq's claims for reimbursement for business expenses do not fall under the letter of the Expatriate Contracts, EDF's failure to reimburse such expenses after promising to do so, would also violate their duty of good faith.

the pay difference is based on a factor other than sex.  *See* 29 U.S.C. § 206(d). "To establish a *prima facie* violation of the Equal Pay Act, Ms. [Gaujacq has] . . . to show that: (1) she was employed by the [Company] doing substantially equal work on a job, the performance of which required substantially equal skill, effort, and responsibility as jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) she was paid at a lower wage than members of the opposite sex doing equal work." *Nyman v. F.D.I.C.*, 967 F. Supp. 1562, 1577 (D.D.C. 1997); *see also Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) (same). Positions can be substantially equal even if there are insubstantial or minor differences in the degree or amount of skill, effort, or responsibility required for the performance of the job. *Goodrich v. IBEW*, 815 F.2d 1519, 1524 (D.C. Cir. 1987) ("The inquiry focuses on the primary duties of each job"); *see also Nyman*, 967 F. Supp. at 1578 ("*Equal* does not mean identical, but substantially equal."); 29 C.F.R. § 1620.14(a) (1992). "A wage differential is justified only if it compensates for an appreciable variation in skill, effort or responsibility between otherwise comparable job work activities." *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 449 (D.C. Cir. 1976).

Although Defendants start their argument with a recognition of the standard applicable to claims pursuant to the EPA, they fail to present any evidence that the actual jobs of Ms. Gaujacq and Mr. Nadal were not substantially equal.[36] Defendants merely make several conclusory statements, claiming Mr. Nadal's job had additional responsibilities and point to after-the-fact statements, based entirely on hearsay statements, which claim that Mr. Roussely, the then CEO

---

[36] In Defendants' 3 ½ page argument, which claims that no genuine issues of material fact exist with regard to Ms. Gaujacq's claim under the Equal Pay Act, they only once cite to a alleged "undisputed fact" from their 56.1 statement (*see* SJ Motion at 36), relying mainly on Mr. de Botherel's Declaration, which is both disputed and should be stricken as hearsay, legal conclusions and irrelevant. *See* SJ motion at 36, 38-39; *see also* Motion to Strike Portions of Declarations. Even the one cite to their 56.1 statement relies on disputed facts and hearsay and does not support the conclusory sentence preceding the cite.

of EDF, envisioned a different mission for Mr. Nadal versus Ms. Gaujacq.[37] *See Laffey*, 567

F.2d at 450 ("The employer may not fabricate an after-the-fact rationalization for a sex-based

pay difference.") Even if this "vision" by Mr. Roussely was admissible evidence, the "vision" of

an employee's job is not relevant to the inquiry under the EPA standards. *See Laffey*, 567 F.2d

at 449 ("equal pay standard, ... depends ...on *actual* job requirements and performance")

(emphasis added); *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 288 (4th Cir. 1974)

("Actual job requirements and performance are controlling.") "It is not sufficient that an

increased workload might hypothetically have commanded a higher salary if it is not in fact the

basis for a significantly greater wage." *Laffey*, 567 F.2d at 450.

    A.    <u>Ms. Gaujacq Performed Substantially Equal Work as Mr. Nadal.</u>

        1.    <u>Ms. Gaujacq's position as EDFINA President was similar in skill, effort, and responsibility compared to Mr. Nadal's position as EDFINA President</u>

"*Skill* entails such factors as experience, training, education and ability. Moreover, in

comparing two positions, *only the skills actually required by the position* are relevant. That is,

the abilities of the persons in the positions *are not relevant.*" *Nyman*, 967 F.Supp. at 1578 (*citing*

29 C.F.R. § 1620.15 (1992)) (emphasis added); *see also Goodrich*, 712 F.2d at 1524 (same).

"*Effort* means the physical or mental exertion needed to perform the job." *Id.* (*citing* 29 C.F.R. §

1620.16 (1992)); *see also Goodrich*, 712 F.2d at 1524 (same). "*Responsibility* is the degree of

---

[37] One of the most interesting, after-the-fact explanations for Mr. Nadal receiving double the salary of Ms. Gaujacq for the same position, is that Mr. Nadal was somehow EDF's "ambassador" to the United States. It is strange that such an allegedly important aspect of Mr. Nadal's position is now first just being mentioned in Defendants' summary judgment papers. Nowhere previously have Defendants used this term to reference Mr. Nadal. To the extent Mr. Nadal was actually such an "ambassador," Plaintiff would submit that Ms. Gaujacq, as "head of EDF's delegation to Washington," was also EDF's "ambassador" in the United States. Based merely upon the fact that EDF is creating new ways to distinguish the jobs of Mr. Nadal and Ms. Gaujacq this late in the litigation, a factfinder could infer a discriminatory motive behind the substantial pay differential. *See Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext"), *opinion amended by* 97 F.3d 833 (6th Cir. 1996); *Kobrin v. University of Minnesota*, 43 F.3d 698, 703 (8th Cir. 1994) ("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext.") *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

accountability required in the performance of the position " *Id.* (*citing* 29 C.F.R. § 1620.17 (1992)); *see also Goodrich*, 712 F.2d at 1524 (same).

Ms. Gaujacq is only required to show that she performed work that was substantially equal to one male employee who was paid more, namely – Mr. Nadal. *See Goodrich v. IBEW*, 815 F.2d 1519, 1524 (D.C. Cir. 1987); *see also* 29 CFR 1620.13(4) ("If a person of one sex succeeds a person of the opposite sex on a job at a higher rate of pay than the predecessor, and there is no reason for the higher rate other than difference in gender, a violation as to the predecessor is established and that person is entitled to recover the difference between his or her pay and the higher rate paid the successor employee "); *Peltier v. Fargo*, 533 F.2d 374, 377 (8th Cir. 1976) ("The Equal Pay Act does not require that the jobs being compared be performed simultaneously but encompasses situations where an employee of one sex is hired for a particular job to replace an employee of the opposite sex.").[38]

Defendants emphasize that, while Mr. Nadal and Ms. Gaujacq were both President of EDFINA, this was an unpaid position, and that Mr. Nadal was General Delegate as compared to Ms. Gaujacq who was only Director. However, from August 2000 until August 2002, Ms. Gaujacq also held the title of General Delegate[39] and neither her duties, nor her compensation changed when her title was changed from General Delegate to Director. This partial title discrepancy is truly a difference without a distinction. Even the Defendants agree that, whatever their title, Mr. Nadal and Ms. Gaujacq "were each appointed as head of EDF's delegation to

---

[38] The prior Presidents of EDFINA referenced in Mr. de Botherel's declaration (*see* de Botherel Decl ¶31) are irrelevant because: 1) Defendants have failed to provide any documentation showing that the positions held by these individuals required substantial equal work as the position held by Ms. Gaujacq; and (2) the EPA recognizes comparison only between immediate successors. *See* 1620.13(4); *Peltier*, 533 F.2d at 377. Because such documentation is under their control and reasonably available to EDF, the law permits the inference that the evidence would be unfavorable to EDF and would fail to show that substantially equal work was required. *See* § 72,16 Devitt, Blackmar, and Wolff.

[39] According to Defendants, this was prior to a restructuring of EDF.

41

Washington." SJ Motion at 36. Furthermore, pursuant to the EPA, it is not the title of the employee that is to be compared. Rather, the factfinder is to compare the actual job responsibilities of the positions at issue. 29 CFR 1620.13 ("Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance"); *see also Laffey*, 567 F.2d at 449 (regulations entitled to deference); *Jehle v. Heckler*, 603 F. Supp. 124, 126 (D.D.C. 1985) (same).

The one and only documentary evidence of the position held by Mr. Nadal is the job description submitted to U.S. immigration officials, which is practically identical to the job description submitted to the U.S. immigration officials for Ms. Gaujacq. When the position held by Ms. Gaujacq is compared with the position held by Mr. Nadal, it is clear that the positions were substantially equal. In a March 16, 2004 letter from Ms. Gaujacq, on behalf of EDFINA, to the U.S. Citizenship and Immigration Services, she described the position of President of EDFINA that was submitted to and approved by the USCIS in order to obtain Mr. Nadal's VISA. Gaujacq Dep at 193-95, Att. 12. This was almost exactly the same job description submitted by EDFINA to the US Immigration Service in order to obtain Ms. Gaujacq's VISA in April 2000. *Id.* at 194-95; EDFINA 53-55 at 54.[40] A company's "representations to the U.S. immigration officials are particularly telling . . . ; a factfinder could well weigh them particularly heavily . . ." *Torrico*, 213 F.Supp.2d at 405 n. 7.[41] Accordingly, this documentary evidence, prepared at the time of each employee's appointment to the position at issue, demonstrates that the positions

---

[40] The only difference in the description is minor in that the last sentence of the above first paragraph read: "Ms. Gaujacq will be charged with explaining the policies, experiences, and goals of Electricite de France *to U.S. energy executives and governmental organizations*." EDFINA 53-55 at 54 (emphasis highlighting difference).

[41] Under immigration regulations, an employer requesting a L-1A VISA, such as EDF, is required to give immigration authorities a "description of the proposed job duties and qualifications, . . ." Att. 25, Instructions for Completing Form I-129 at 6. Such information is giving to U.S. immigration officials under the penalties of perjury. *Id.* at 14.

held by Ms. Gaujacq from August 1, 2000 until May 31, 2004 and the successor position held by Mr. Nadal from June 1, 2004 until the present are substantially equal.

In addition to the job descriptions submitted to U.S. immigration officials, both positions were at a similar level within EDF with regard to reporting structure and supervisory responsibility. Mr. Nadal and Ms. Gaujacq had the same reporting structure, held the same titles and supervised the same amount of employees at EDFINA. *See* Laroche Dep at 47 (same reporting structure), Att. 9; Nadal Decl ¶¶ 33, 34, 37 (same number of EDFINA employees, same amount of EDF employees in office).[42]

In conjunction with Mr. Nadal's placement as President of EDFINA, EDF claims that the strategic importance of EDFINA suddenly changed, thereby requiring a manager with an R1 Ranking. However, EDFINA's mission and activities did not change or increase since Mr. Nadal's appointment as President of EDFINA and Defendants cannot provide any activities that Mr. Nadal does that Ms. Gaujacq did not.[43] Moreover, "comparing jobs, only the skills actually required by those jobs, not the abilities of the persons currently in those positions are relevant." *Goodrich*, 815 F.2d at 1524; *see also Anderson v. Zubieta*, 180 F.3d 329, 342 (D.C. Cir. 1999) (in Title VII wage discrimination claim, finding that what the case law means by 'minimum objective qualifications' are those objective qualifications that can be shown to be truly required to do the job at issue"); *Peltier*, 533 F.2d at 377 ("The crucial question under the Equal Pay Act is not whether one sex possesses additional training or skills, but whether the nature of the duties

---

[42] Additionally, EDF states that "the difference in responsibility level of an R3 and an R1 is so big that it is impossible to go from an R3 to an R1." *See* de Botherel Dep at 64, Att. 3. Accordingly, it is difficult to believe how the same exact position could suddenly carry the responsibilities of an R1 ranking when it had, in all the years previous to June 2004, supposedly carried an R3 ranking. Defendants' explanation for the radically different salaries between Ms. Gaujacq and Mr. Nadal is simply implausible.

[43] In fact, Mr. Nadal, in some respects, performed fewer functions in that Ms. Gaujacq was both President and headed EDF's initiative with NuStart. After Mr. Nadal was appointed as President, Ms. Gaujacq continued in the NuStart initiative that she had been working on as President. When Ms. Gaujacq was terminated, Mr. Georges Serviere replaced Ms. Gaujacq on the NuStart initiative.

actually performed require or utilize those additional skills."); *Mulhall v. Advance Sec.*, 19 F.3d 586, 594 (11th Cir. 1994) ("individual employee qualifications are relevant only to defendant's affirmative defenses").

As EDFINA President and head of EDF's delegation to Washington, Ms. Gaujacq performed all the functions Mr. Nadal claims to have performed. *See* Gaujacq Decl. ¶¶ 21-40 as compared to Nadal Decl. ¶¶ 26-32; *see also* Gaujacq Decl. ¶¶ 18-32. Ms. Gaujacq details her job responsibilities and accomplishments in her declaration and attachment A thereto. Gaujacq Decl. ¶¶ 18-36 and Decl. Exh. 4.

The Declarations of Mr. Nadal and Ms. Gaujacq regarding the actual jobs they performed clearly demonstrate that these jobs were substantially equal, or, at a minimum, demonstrate that there are genuine issues of material facts concerning the equality of the jobs. Further, this is the only testimonial evidence on the equality of the jobs. Mr. Laroche admittedly knows nothing of Ms. Gaujacq's actual job content while assigned as the highest officer in Washington DC. Laroche Dep. at 21, 25, 31, 44-45, Att. 9. Further, the only information Mr. Laroche has regarding Mr. Nadal's actual job content is allegedly based upon Mr. Roussely's "vision" for Mr. Nadal. Laroche Decl. ¶ 15; Laroche Dep. at 44 (work of Mr. Nadal beyond his "field of competence"), 50-52; Laroche Dep at 33-37, Att. 9 (explaining what the "Chairman felt," the "Chairman of EDF decided," and that the "Chairman defined a wider mission"). However, such testimony is inadmissible hearsay. If Defendants expect to rely upon Mr. Roussely's "vision" of Mr. Nadal's job, they will have to provide his testimony.[44] To add to the lack of evidence regarding job content, Defendants have not produced a mission statement for Mr. Nadal for his position in the United States, despite the fact that such a statement is usually created for all EDF employees and such statement was clearly contemplated and expected by Mr. Nadal's

---

[44] According to Mr. de Botherel, Mr. Roussely left EDF in September 2004. de Botherel Decl. ¶ 47.

supervisors. *See* Def. Exh. 34, EDF 945 (3-10-04 email from Betouret to Ponasso regarding Mr.

Nadal working on his assignment letter); Def. Exh. 44, EDF 947 (3-10-04 email from Mr. Nadal

regarding his preparing a mission agreement); Def. Exh. 43, EDF 998 (4-29-04 email from Mr.

Ponasso to Mr. Creuzet wherein Mr. Ponasso discusses request to Mr. Nadal to prepare a draft

assignment letter and notes that it should be finalized in 2-3 weeks); and Nadal Dep at 175-78,

Att. 2 (discussing draft of mission letters although indicating no mission letter was ever

finalized).

After making conclusory statements regarding the supposed inequality of Mr. Nadal's

and Ms. Gaujacq's jobs, Defendants suggest, without any evidentiary support, that the facts of

this case are similar to those in *EEOC v. American Pharmaceutical Assoc.*, 589 F.Supp.23

(D.D.C. 1983) ("APHA"). However, in *APHA*, this Court compared different positions with

clearly different titles. *APHA*, 589 F.Supp. at 24. In this case, the two individuals being

compared were both "head of EDF's delegation to Washington" (see SJ Motion at 36), both held

the title of President of EDFINA and both held a title of General Delegate.[45] The descriptions of

the jobs in *APHA* were undisputed and the person who hired the two employees at issue, as well

as the person who supervised them, gave detailed affidavits explaining the job description and

tasks assigned to the different positions. *Id.* at 25-27. In this case, neither the supervisor, Mr.

Ponasso, nor the individual who placed Ms. Gaujacq and Mr. Nadal into the positions at issue,

Mr. Creuzet, has provided any evidence on the job positions as issue.[46] Accordingly, *APHA* is

clearly distinguishable from the case at hand.

---

[45] Even though Ms. Gaujacq held the title of Director for the last 2 years, she held the title of general delegate for the first 2 years of her position in the United States.

[46] Neither has Mr. Roussely, the individual who supposedly had a "vision" for the position at issue, provided any evidence or explanation of this alleged "vision."

45

B.    Ms. Gaujacq Performed her Job Under Similar
      Working Conditions as Mr. Nadal.

Working conditions encompass an employee's "surroundings," which concern the nature

and character of the environment in which the job is performed, and "hazards," which take into

account physical hazards regularly encountered. *Corning Glass Works*, 417 U.S. at 202; *see also*

*Nyman*, 967 F.Supp. at 1578 (same, *citing* 29 C.F.R. § 1620.18 (1992)); *Goodrich*, 712 F.2d at

1524 (same). Ms. Gaujacq, like Mr. Nadal, worked in an office environment in downtown

Washington D.C., although travel both within the United States and international was required.

*See Nyman*, 967 F.Supp. at 1576 (employees being both in office "require substantially the same

physical and mental exertion") Defendants can cite no difference between Ms. Gaujacq's and

Mr. Nadal's working conditions.

C.    Ms. Gaujacq's Total Compensation was Lower than Mr. Nadal's

Although the position held by Mr. Nadal was substantially equal to the position held by

Ms. Gaujacq when she served as President, Mr. Nadal's starting compensation as President was

roughly two times greater than Ms. Gaujacq's salary for performing the same position with

additional responsibility as compared to Mr. Nadal's position.[47] By replacing a female in the

same job with a higher-paid male, EDF committed "one of the most glaring violations of the

Equal Pay Act." *Thompson v. Sawyer*, 678 F.2d 257, 277 (D.C. Cir. 1982); *see also* 29 C.F.R. §

800.114(c) (1980) ("Replacing a male in the same job with a lower-paid female, or vice versa, is

one of the most glaring violations of the Equal Pay Act").[48]

---

[47] In addition, Mr. Nadal was not as qualified as Ms. Gaujacq with regard to nuclear facilities. *See* Nadal Dep at 150-52. Att. 2; Def. Exh 73 at EDF 4589

[48] It is interesting to note that Mr. de Botherel declares Ms. Gaujacq's salary as of July 1, 2004 (7,330 euros) rather than her salary when she was President of EDFINA and "head of EDF's delegation to Washington" when she was paid substantially less at 6,980 euros per month (*see* exhibit E to de Botherel Decl, May 2004 pay slip) as compared to Mr. Nadal's salary of 13,050 euros per month. *See* de Botherel Decl ¶ 19; *see also id.* ¶ 18.

46

D.    EDF's Defenses Fail

Once a plaintiff establishes a *prima facie* violation of the Equal Pay Act, she will prevail unless the defendant proves one of the four affirmative defenses provided for by the Act. *Nyman*, 967 F.Supp. at 1578; *Corning Glass Works*, 417 U.S. at 196. The burden is then on the defendant "to affirmatively show by a preponderance of the evidence that the difference in pay was justified under one of the Act's four exceptions, which are affirmative defenses . : (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex." *Nyman*, 967 F.Supp. at 1578 (*citing* 29 U.S.C.A. § 206(d)(1) and *Corning Glass Works*, 417 U.S. at 196).

Defendants seem to think that Ms. Gaujacq must prove that EDF paid Mr. Nadal less because he was a man. *See* SJ Motion at 39. On the contrary, the EPA imposes strict liability on companies who pay a man more money than a woman for substantially equal work unless such companies fall under one of the statutory exceptions. *Nyman*, 967 F.Supp. at 1578; *Corning Glass Works*, 417 U.S. at 196. Accordingly, it is the Defendants' heavy burden to prove that Mr. Nadal was paid twice as much as Ms. Gaujacq for some legitimate bona-fide reason, not based upon gender. *See Corning Glass Works*, 417 U.S. at 196-97 (exemption under FSLA is an "affirmative defense on which the employer has the burden of proof"); *Goodrich*, 815 F.2d at 1523-24 (burden on "defendant to prove that unequal payments are made pursuant to some *legitimate*, non sex-based factor") (emphasis added); *Mulhall*, 19 F.3d at 590-91 (Defendants' burden is a heavy one--the exceptions granted within the EPA constitute affirmative defenses" ) (*citing Corning Glass Works*).

Defendants assert the final exception: that the pay differential was based upon a factor other than sex. *See* SJ Motion at 38. They, however, seek to rely on a "grade level" system

inapplicable to Ms. Gaujacq and Mr. Nadal. *See* de Botherel Decl. ¶ 7 and Exhibit A, but *see* Pl's Translation, Att. 26, attached thereto (explaining that the grade level system is not applicable to executives whose "remuneration is determined solely by the board of directors" of EDF) [49] Defendants attempt to piggy-back their executive ranking system on EDF's non-executive pay structure which is irrelevant. The "system" under which Mr. Nadal's and Ms. Gaujacq's salaries were determined is a completely subjective system, which has the result of giving the highest salaries to a elite group mainly occupied by men [50] Specifically, of the 50 EDF executives holding R1 rankings (Mr Nadal's rank), only 5 were women, whereas of the total 160,000 employees at EDF, approximately 45 to 50 percent were women. *See* de Botherel Dep at 36, 66-69, 74. Att. 3.

Defendants then incorrectly rely on the fact that EDF subjectively determined that Mr. Nadal was to be ranked and paid R1, as compared to Ms. Gaujacq, whom they subjectively labeled and paid as an R3. *See Corning Glass Works*, 417 U.S. at 205 (finding employer violated EPA when higher pay based upon seemingly neutral factor was actually a product of discriminatory factors and recognizing that the court must look at whether one sex historically received the benefit of the supposedly neutral factor); *Thompson*, 678 F.2d at 277 (finding

---

[49] The cases cited by Defendants in support of their argument that EDF's executive ranking "system" is a qualified grade level system describe various highly-structured federal grade level systems (GS, EAS, Civil Service, Foreign Service) inopposite to EDF's subjective four level executive ranking "system." *See* SJ Motion at 38.

[50] In his deposition, Mr. de Botherel described the subjective nature of the executive ranking "system." de Botherel Dep at 39-49, Att. 3. He admits that the system is "at the same time objective and subjective" and that there "is always a subjective part to when you evaluate a person's competence level." *Id.* at 46; *see also Id* at 48 ("not a mathematical calculation"); *Id* at 49 ("not a mathematic formula"); de Botherel Decl Exh. B-T at EDF 4449 ("by personalizing the compensation management and decentralizing decisions down to the various levels of management,    "), de Botherel Decl Exh. B-T, generally.

longstanding industry practices are not legitimate factor other than sex because such practices constitute a "continuing structure of sexual discrimination").[51]

While Defendants make much of the historical progress of Ms. Gaujacq and Mr. Nadal through EDF, the fact that Ms Gaujacq was historically paid less than Mr Nadal merely suggests that EDF's violations of the EPA preceded the claim at issue today. *See Corning Glass Works,* 417 U.S. at 205 (rejecting historical rationalization); *Thompson,* 678 F.2d at 277 (same), *supra.* Finally, the suggestion that Mr. Nadal negotiated a higher compensation package (*see* SJ motion at 39) is completely irrelevant to whether EDF can meet its burden in proving its affirmative defense – Courts have specifically and consistently rejected the market theory as explanation for disparity in income between men and women. *See Laffey,* 567 F.2d at 451. "Contrast in pay [as] a consequence of the historical willingness of women to accept inferior financial rewards for equivalent work [is] precisely the outmoded practice which the Equal Pay Act sought to eradicate." *Id.* In other words, the fact that women historically have less bargaining power than men is one of the specific discriminatory effects the EPA is meant to address. *Id.*

E    Title VII standard

Under Title VII, claims of wage discrimination are to be treated very similarly to claims of violations of the EPA. *Id.* There are two notable differences. First, the standard for comparing the job positions is more lenient in that the employees must merely be similarly

---

[51] Further, the fact that Mr. Nadal was already paid as an R1 prior to his placement as head of its delegation in Washington is completely irrelevant to the issue of whether Ms Gaujacq was paid less than Mr Nadal for the substantially equal work. *See Ososky v Wick,* 704 F.2d 1264, 1268 (D.C. Cir 1983) ("The defendant argues that Congress could not have intended that each time the Foreign Service transfers a female employee, it make sure that she is being paid commensurably with equally qualified and equally senior male employees doing equivalent work We disagree *That is exactly what Congress intended*") (emphasis added).[51] EDF's ranking "system" which is based completely on subjective factors and has the result of paying men more than woman for similar work, does not insulate EDF against its violation of the EPA simply because EDF calls it a system *See Laffey,* 567 F 2d at 450 ("'The semblance of [a] valid job classification system may not be allowed to mask the existence of wage discrimination based on sex '") (*quoting Brennan v Prince William Hospital Corp ,* 503 F 2d at 285-86)

situated, rather than in substantially equal positions. *Goodrich*, 712 F.2d at 1490 n.2; *Mulhall*, 19 F.3d at 598. For all the reasons argued above, Mr. Nadal and Ms. Gaujacq were similarly situated employees. *See* section VIII B, *supra*. Second, in order to prevail on a claim of wage discrimination under Title VII, Ms. Gaujacq must also prove Defendants' discriminatory intent *Id.* For all the reasons argued previously in Section IV, Ms. Gaujacq has produced evidence sufficient to create a genuine issue of material fact as to whether EDF intentionally discriminated against her. *See* Section IV(A)(2), *supra*.

F.   Genuine Issues of Fact Prevent Summary Judgment on EPA Claim

"Given the fact intensive nature of the inquiry [into whether two jobs are substantially equal], summary judgment will often be inappropriate *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d Cir. 1985); *see also Goodrich*, 712 F.2d at 1493-94; *Brennan v. Prince William Hospital Corp*, 503 F.2d at 286 (fact intensive nature of inquiry, each case unique). In fact, the Court of Appeals for District of Columbia Circuit has stated that in cases, such as this, when "additional duties" and "special expertise" are the factors ultimately relied upon, the residuary defense will not serve to avoid the trial that would be required to test whether the alleged extra duties and expertise exist and mark the work in question as unequal." *Goodrich*, 712 F.2d at 1493-94. Because Defendants are seeking to rely upon Mr. Nadal's alleged "additional duties" and "special expertise" as its affirmative defense under the fourth exception ("a differential based on any other factor other than sex"), summary judgment is not warranted. Further, genuine issues of material fact as to both whether the positions of Ms. Gaujacq and Mr. Nadal are substantially equal and whether Defendants have met their heavy burden in proving its subjective ranking system qualifies as an affirmative defense, prevent summary judgment on Ms.

Gaujacq's claim pursuant to the EPA. *See id.*; *see also Mulhall* (finding that credibility

determinations inherent in defendant's proving affirmative defenses typically left to factfinder).

## IX.    Count XII:  Defamation *Per Se*

In the District of Columbia, a "plaintiff bringing a defamation action (libel or slander)

must show: (1) that the defendant made a false and defamatory statement concerning the

plaintiff; (2) that the defendant 'published' the statement without privilege to a third party; (3)

that the defendant's fault in publishing the statement amounted to at least negligence; and (4)

either that the statement was actionable as a matter of law irrespective of special harm or that its

publication caused the plaintiff special harm." *Prins v. International Tel. & Tel Corp.*, 757 F.

Supp. 87, 90 (D.D.C. 1991); *see also Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715

A.2d 873, 877 (D.C. 1998) (same); *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C.

2001) (same). "'[A] statement is defamatory if it tends to injure [the] plaintiff in his [or her]

trade, profession or community standing or lower him in the estimation of the community.'"

*Beeton*, 779 A.2d at 923. (*quoting Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594

(D.C. 2000)) (omitting internal quotations).

Furthermore, DC Courts have "not specifically adopt the heightened pleading rule for

defamation cases." *Oparaugo v. Watts*, 884 A.2d 63, 76-77 (D.C. 2005).  Rather, with regard to

claims of defamation, DC Courts "continue to adhere to the standard of whether, construing the

complaint in the light most favorable to the plaintiff, 'it appears beyond doubt that [plaintiff] can

prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* at 77 (*quoting

Crowley v. North Am. Telcoms. Ass'n*, 691 A.2d 1169, 1172-1173 (D.C. 1997)); *see also

Crowley*, 691 A.2d at 1172 (recognizing that "the principal reason some [other] courts demand a

heightened standard of pleading in defamation cases" is to ensure that the "factual allegations are sufficient to permit the opposing party to form responsive pleadings")

A.    EDF's Verbal and Non-Verbal
Statements Were Defamatory *Per Se.*

EDF and Mr. Nadal, individually and/or on behalf of EDF, made false and defamatory statements to employees of EDF, stating or implying, through their words and actions, that Ms. Gaujacq was dishonest and that wrongdoing was committed under her watch, sufficiently serious to warrant an audit, and that Ms. Gaujacq was not competent and responsible enough, or honest enough to be able to sign checks, approve contracts, expenses, or make warranties or representations on behalf of EDF.[52] *See Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 878 (D.C. 1998) (stating that "actionable defamation is not necessarily restricted to verbal conduct" and finding non-verbal action of inactivating plaintiff's access key thereby locking her out of the office could be defamatory).

Specifically, on June 4, 2004, Mr. Nadal took away Ms. Gaujacq's ability to sign checks on behalf of EDFINA, suggesting she was incompetent for this aspect of her position as Vice President ("VP"). *See* EDFINA 005346, Att. 20. On June 11, 2006, Mr. Dreux announced this fact in front of other EDFINA employees in the office at the time and voided checks that Ms. Gaujacq had unknowingly signed. Gaujacq Dep at 310-11, Att. 12; *see also* Def. Exh. 54-56. On June 18, 2004, Mr. Nadal took away Ms. Gaujacq's authority to enter into contracts or incur expenses on behalf of EDFINA, again suggesting she was incompetent to handle this aspect of her position with EDFINA. *Id.*

---

[52] EDF is liable for it own actions and vicariously liable for the actions of Mr. Nadal, an agent of both EDF as its executive and EDFINA as its President, based upon the theory of *respondeat superior*. *See Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 427 (D.C. 2006); *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 29 (D.C. 1979).

From June 28-July 9, 2004, EDF conducted an audit of EDFINA concerning the time period Ms. Gaujacq had been President of EDFINA, thereby attacking Ms. Gaujacq's integrity. Gaujacq Dep at 343-45, Att. 12; Def. Exh. 62 and 63. On July 9, 2004, Mr. Nadal then used the audit to suggest that Ms. Gaujacq had done something inappropriate with respect to EDFINA's contractors, when he stated on a conference call to the auditors, Mr. Dreux and Ms. Gaujacq, that Ms. Gaujacq was paying fees to consultants and contractors of EDFINA without services being rendered and that this was a very serious issue. Gaujacq Dep at 376-77, 482-84, Att. 12.

Because all of these statements tend to injure Ms. Gaujacq in her "'trade, profession or community standing or lower [her] in the estimation of the community,'" they are defamatory *per se. See Beeton,* 779 A.2d at 923; *see also Wallace,* 715 A.2d at 877-78 ("'One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect [her] fitness for the proper conduct of [her] lawful business, trade or profession . . . is subject to liability without proof of special harm.'") (*quoting* Restatement (Second) of Torts § 573 (1977)).

    B.    EDF's Defamatory Statements Are Not Privileged

"The common interest privilege protects otherwise defamatory statements made '(1) . . . in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest.'" *Mastro v. Potomac Elec. Power Co.,* 447 F.3d 843, 858 (D.C. Cir. 2006) (*quoting Moss v. Stockard,* 580 A.2d 1011, 1024 (D.C. 1990)). "Two circumstances fore-close asserting the privilege: first, excessive publication, defined as 'publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest,' . . . and, second,

publication with malice, which, within the context of the common interest privilege, is 'the equivalent of bad faith.'" *Id.* (*quoting Moss*, 580 A.2d at 1024-25). at 1024-25. EDF bears the burden of proving its statements were protected by the common interest privilege. *Id.*

Because all of the verbal and non-verbal defamatory statements were made in bad faith and with malice, none of them are privileged.[53] Specifically, Mr. Nadal made clear that he did not want Ms. Gaujacq at EDFINA after he was assigned his position in the United States. *See* EDF 000947, Att. 19 (Mr. Nadal writes to his superior on March 10, 2004, that "the only situation perfectly matching our agreements is Catherine leaving North America in the very near future, at a date to be determined now, to take a position in a completely different sector ...") (*quoting* Gaujacq translation); Def. Exh. 45-T, EDF000978 (Mr. Nadal reiterates his opinion on April 1, 2004, that the "only appropriate solution is for [Ms. Gaujacq] to exercise new responsibilities in a different area" and that "the quick and total termination of Catherine's activity is by far the preferable solution")      Further, as detailed above, EDF's and Mr. Nadal's were not only malicious, but also discriminatory based upon Ms. Gaujacq's gender *See* Section IV, *supra.*

---

[53] While Defendants claim, without support, that no facts are plead to demonstrate malice on the part of Defendants, as is clear from the facts plead in the Complaint and those stated in Plaintiff's Statement of Facts, *supra*, all of Mr. Nadal's actions and statements were motivated by his malice toward Ms. Gaujacq. Contrary to their reliance on *Novecon Ltd. v. Bulgarian-Am. Enter. Fund*, 190 F.3d 556, 567 (D.C. Cir. 1999) for the suggestion that one looks only to the statements themselves to determine if they were made with malice, the DC Courts look "to the primary motive by which the defendant is apparently inspired ..." *Novecon*, 190 F.3d at 567.

## CONCLUSION

For all of the above reasons, Ms. Gaujacq respectfully requests that EDF and EDFINA's

Motion be denied.

November 20, 2006                    Respectfully Submitted,

                                     Elaine Charlson Bredehoft
                                     D.C. Bar No. 441425
                                     Kathleen Z. Quill
                                     D.C. Bar No. 489079
                                     Carla D. Brown
                                     D.C. Bar No. 474097
                                     CHARLSON BREDEHOFT & COHEN, P.C.
                                     11260 Roger Bacon Drive
                                     Suite 201
                                     Reston, Virginia 20190
                                     (703) 318-6800

                                     Counsel for Plaintiff
                                        Catherine Gaujacq

55