**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CATHERINE GAUJACQ )
)
    Plaintiff, )
)
        v. ) No 1:05CV0969 (JGP)
)
ELECTRICITE DE FRANCE )
   INTERNATIONAL NORTH AMERICA, )
   INC , et al. )
)
    Defendants. )
)

## GENUINE MATERIAL FACTS IN DISPUTE

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rules

56.1 and 7(h) of the United States District Court for the District of Columbia, plaintiff,

Catherine Gaujacq, states that the following material facts are in dispute for the purpose of

plaintiff's opposition to defendants' summary judgment motions. The numbered paragraphs

below correspond to the numbered paragraphs in Defendants' Statement Pursuant to FRCP

and Local Rule 56.1 7(h):

        1      Ms. Gaujacq does not dispute this statement.

        2      At all times relevant to the Complaint, EDF generated and supplied

electric power to industrial, commercial and residential customers in France and in many

other countries, including the United States where its generating capacity is about 360 mega

watts ("MW"). *See* Att. 1, webpages from www.enXco.com. EDF had subsidiaries in the

USA including enXco, Easenergy, EDFINA and IES. EDF, EDFINA and Easenergy provided

R&D, Engineering and consulting services in the United States with an average of 23

engineers working in the United States at various locations on various contracts including

EPRI and with engineers working in France on US contracts (Def. Exh. 9, EDFINA 1374; EDF4093, Att. 2 and EDF4284, Att. 3)

      3.    Ms. Gaujacq does not dispute this statement.

      4.    From its creation to 2004, EDF was a French government owned Company called EPIC (Etablissement Public a caractere Industriel et Commercial) which owned Companies and equity interests worldwide while enjoying a monopoly on the French territory for supply and distribution of electricity (EDF Annual Reports for 2000 – 2003, EDF3500-4147) EDF lost its monopoly on the French electricity market following enactment of European laws starting in 2000 for industrial customers, followed by commercial customers in 2002, with residential customers to follow in 2007. A law enacted on November 17, 2004 changed EDF to a private corporation ("société anonyme"). (Exhs. 8 and 9). Options to buy shares in EDF were sold to EDF affiliates, employees, and retirees at a preferential price, and shares were sold to the public in October 2005, the second worldwide IPO of the year (Def. Exh. 11; EDF4093 and 4419, Att. 4).

      5.    Ms. Gaujacq does not dispute this statement

      6.    On September 1, 1980, EDF hired Ms. Gaujacq as a Junior Executive Employee on training and not solely as an engineer. (Def. Exh. 12).

      7.    EDF regularly promoted Ms. Gaujacq. Ms. Gaujacq was the first woman in the world to be Vice-President Operations for a commercial nuclear power plant, 1994-2000; she became Site Vice-President ("Directeur CNPE Penly") and became an EDF "Dirigeant"("personnel de Direction") on May 1, 1994, thus becoming one of the 350 higher-level Executives in the company worldwide (Def. Exh. 12, Def. Exh. 16, Def. Exh. DeBothrel Decl., Exh. A but see Att. 5, Plaintiff's translation). Ms. Gaujacq was also the first woman in

the world to have management responsibility for a commercial nuclear power plant, 1994-2000 *Id.*

> 8. Ms. Gaujacq does not dispute this statement. In addition, Ms. Gaujacq was promoted based on the demonstration of her managerial and strategical skills and her performances on the different positions she was assigned to during twenty-four years with the company -- the representations of the company for a significant managerial promotion based on her successes as "Directeur CNPE Penly" (Director) and as President of EDFINA were in line with her career expectations. *See* Gaujacq Decl. ¶ 5.

### Gaujacq's Expatriate Contract for Assignment in Washington

> 9. By appointment of the EDF Executive Committee on June 23, 2000, effective August 1, 2000, EDF appointed Ms. Gaujacq to the French position of "Déléguée Générale for the United States and Canada" reporting to Bo Kalstrand, Senior Executive EDF International Branch and Chairman of EDFINA, Inc. (Def. Exh. 13). Consequently, the EDFINA Board of Directors appointed Ms. Gaujacq President of EDFINA on the very same day (Def. Exh. 21). EDFINA is organized under US Laws to provide intelligence, consulting and engineering services. *See* Gaujacq Decl. ¶ 15. Following the restructuring of the EDF Executive Committee, her French title was changed, in July 2002, to "Directeur" (Director) USA/Canada with EDF's then newly organized Americas Branch. By written consents of EDFINA Board members, Fernando Ponasso, Senior Executive EDF Branch Americas, she became Chairman of EDFINA, Inc. (Def. Exh. 14, EDF 0008).

> 10. On July 7, 2000, Ms. Gaujacq entered into a contract with EDF *and EDFINA,Inc* titled "Conditions Particulières Applicables à la Mission de Longue Durée de Catherine Gaujacq à Washington" ("Particular Conditions Applicable to Catherine Gaujacq's

Long Term Mission to Washington," or the "Gaujacq Expatriation Contract"). (Def. Exh. 15).

The "delegation" is the French name given to EDFINA, Inc. (This specific contract completes

and sometimes supercedes a general contract for EDF employees working abroad

) Ms. Gaujacq's employment also governed by "Guide de Gestion des Agents travaillant a

l'Etranger" (*Id.*, Def. Exh. 94). The "Guide de Gestion des Agents travaillant a l'Etranger"

itself replaces and sometimes supercedes the French labor contract for French employees of

the French gas and electricity industries ("Statut du personnel des industries electriques et

gazieres") Att. 6, EDF 1295.

        11.    The Gaujacq 2000 Expatriation Contract did not provide a finite end

date, or an end date of July 31, 2003, for Ms. Gaujacq's United States assignment, and, rather,

was "[e]nvisioned for an initial period of 3 years" and was renewable. (*See* Def. Exh. 15 at

EDF439).

        12.    While EDF's practice is to rotate its executives in all positions all over

the world, many of its executives remain in one location for multiple terms. (*See* Def. Exh. 12

and 16). In fact, Ms. Gaujacq's previous executive position in France was six years. Def.

Exh. 12. In the ten years prior to Gaujacq's appointment, four EDF executives were appointed

as President of EDFINA, Inc. In the ten years prior to Gaujacq's appointment, three EDF

executives were assigned as Vice-Presidents of EDFINA. Christian Nadal's 2004

expatriation contract was five years (Att. 7, EDF 923-924).

        13.    The Gaujacq Expatriation Contract provided Ms. Gaujacq with a

compensation and benefits package to serve as President of EDFINA in Washington. The

"delegation" is the French name given to EDFINA, Inc. (Def. Exh. 15 and 21). Fernando

Ponasso granted Ms. Gaujacq merit pay raises during this contract, one in July 2002 and the

second in July 2004 (Def. Exh. 93). Ms. Gaujacq was also granted annual bonuses based on Fernando Ponasso's appreciation of her annual performance. Some compensation and benefits under the expatriation contract were paid in Euros by EDF International Branch from France (2000-2002) then from EDF Branch Americas in Argentina (2002-2004) on her bank account in France. *Id.* Other benefits, such as housing, US income taxes, airfares, utilities, car, worker's comp, home renter insurance, were provided by EDFINA, Inc. in the US. For three years, Healthcare insurance was provided in the US (AIG-Houston) under a contract with EDF (Def. Exh. 15 Art. 15-17).

14.    EDF did not have consistent practices concerning expatriate compensation and issues were addressed on a case by case. (As evidence of the inconsistencies, Nadal's expatriation contract with EDENOR in Argentina is different from his contract to EDFINA in the United States.) (Att. 7, EDF 923-24; Laroche Decl., Exh. A).

15.    During Ms. Gaujacq's appointment under contract to Washington, she was an employee of both EDF and EDFINA, Inc. Att. 8, Pl. 1421-25). During her contract in Washington, Ms. Gaujacq's ranking was not known to her. *See* Gaujacq Decl. ¶ 54. When EDF implemented the "EDF policy for compensation of High level Executives," Ms. Gaujacq was not notified of the rank that she assumed. EDF emailed her, on March 31, 2004, to advise that her new expatriation would be her third assignment on a R3 position. (Laroche Decl., Exh. A). Ms. Gaujacq was first notified of her ranking, in September 2004, when HR branch Energy Jacques Bouron informed her that the position of "Charge de mission au Directeur de la Production Nucleaire" was ranked R3. (Def. Exh. 81). Moreover, Ms. Gaujacq and EDF had no agreement indicating that she would need to return to France at the end of her assignment. To the contrary, EDF's Human Resources Department contacted Ms.

Gaujacq in April 2004 for a potential position with EDF Energy in London (England). (Def. Exh. 47). In fact, other EDF expatriates assigned to EDFINA received successive different appointments to the same location at the conclusion of their first appointment. (Nadal Decl, ¶ 5; Audie Dep., at 9, Att. 9. (JL Foret, Alexandre Audie, and Richard Schomberg had two successive assignments in the U.S.)

### Gaujacq Contract and Assignment in Washington

16.    As President of EDFINA, Inc, Ms. Gaujacq reported, beginning in 2002, to the Senior Executive EDF Americas Branch and Chairman of EDFINA, Fernando Ponasso in Buenos Aires. Ponasso was her direct Superior. Def. Exh. 93. He was responsible for her annual evaluation, merit raises, bonuses, and had an immediate input in the decisions regarding her transfer (*Id*). The final decision maker for her transfer was Gerard Creuzet, direct Superior of Fernando Ponasso through the EDF Executive Committee (Roussely-Creuzet-Laroche). When Ms. Gaujacq became Vice-President of EDFINA starting June 1, 2004, her direct superior was Nadal, as President of EDFINA, and then Ponasso, as Chairman of EDFINA. Nadal had decision making authority with regard to her merit raises, bonuses, and immediate direct input to her transfer. (DeBotherel Decl., Exh. G; Exh. 94; Laroche Dep., at 44-47, Att. 10; Exh. 15). When he was assigned President of EDFINA on June 1, 2004, Nadal had the same reporting structure that Ms. Gaujacq had as President of EDFINA. (De Botherel Dec., Exh. G; Def. Exh. 94; Def. Exh. 15).

17    As the top-ranking executive of Electricite de France International North America, Ms. Gaujacq directed all business activities of the organization. *See* Gaujacq Decl. ¶ 4. Ms. Gaujacq reviewed administrative and personnel decisions and coordinated the work of outside contractors who provided services to meet the needs of EDFINA, Inc. *Id*

Perhaps most importantly, as President, Ms. Gaujacq worked in close collaboration with leaders of U.S. electrical utilities, building and strengthening ties between the US, and French energy industries. *Id.* This function of the position is key because the exchange of information between Electricite de France and U.S. utility companies directly benefit the U.S energy industry. Ms. Gaujacq was charged with explaining the policies, experiences, and goals of Electricite de France to US Energy executives and governmental organizations. Ms. Gaujacq played a critical role in defining the different avenues to be pursued by Electricite de France in cooperation with the US energy industry in pursuing collaborative research and development projects at a highly advanced level. *See* Plaintiff 125-31, Att. 11. Ms. Gaujacq was a founding member of the consortium incorporated as Nustart, on April 19, 2004 (Def. Exhs. 66 and 90). Ms. Gaujacq was the EDFINA managing Representative to the consortium of energy companies called NuStart Energy Development, LLC ("NuStart"). (Gaujacq Decl. ¶ 34.) Ms. Gaujacq was also appointed a Board member of the EDF affiliates enXco and IES and Ms. Gaujacq had numerous contacts at the highest level with EPRI and Easenergy. Plaintiff, 1360-68, Att. 12.

18.    Ms. Gaujacq was a founding member of the NuStart consortium. Def. Exhs. 66 and 90.

19.    Ms. Gaujacq does not dispute this statement

20.    Ms. Gaujacq does not dispute this statement

21.    EDFINA is a corporation and its mission and purpose are described in its Articles of Incorporation. Plaintiff, 125-31, Att. 11, Plaintiff, 1360-68, Att. 12.

22.    As President of EDFINA, Ms. Gaujacq was responsible for managing *all* employees, including EDF employees working in the United States sponsored by

7

EDFINA, Inc. and by Easenergy ("detaches") Exh. 22 at EDF4558, Att. 12, Pl. 1360-1368, Att. 13, EDF 4525-4526, and the work of outside contractors and consultants who supplied services to EDF and EDFINA in the U.S. Those employees were located in various states. Att. 13, EDF 4525-26.

23. Adja Ba was only employed by EDFINA. Alexandre Audie was employed by EDF and EDFINA from 1999 to 2003. He was only employed by EDFINA from 2003 to October 2004. Alexandre Audie was rehired by EDF in October 2004, while remaining an EDFINA employee. (Att. 9, Audie Dep. at 4, 5, 9, 14, 15 and 19).

24. All EDF employees working in the United States were either EDFINA employees or Easenergy employees under the oversight of EDFINA. (Def. Exh. 22 at EDF4558, Att. 13; EDF 4525-26, Att. 12, Pl. at 1360-61).

### EDF and EDFINA Request an Extension of Ms. Gaujacq's Washington Mission

25. Ms. Gaujacq and her husband, Philippe Gaujacq, occupied two different residences, although both were in Great Falls, Virginia. (Att. 14, Pl. 1448-53

26. Ms. Gaujacq does not dispute the allegations contained in Paragraph

27. Ms. Gaujacq does not dispute the allegations contained in Paragraph 27

28. Phillipe Gaujacq did not become employed as a teacher because, despite his efforts to find employment, there were no opportunities available to him in the local public and private high schools of Loudon and Fairfax, Virginia counties. (Att. 15, P. Gaujacq Dep. at 21, 29-36).

29 In early January 2003, Gerard Creuzet agreed on a three-year contract, with duration from August 1, 2003 to July 31, 2006, that would be renewed on a year by year basis each year no later than mid-January for the period August to July of the next year.

EDF4577, Ex. 25  Ponasso and Creuzet knew that Ms. Gaujacq's husband had given up his employment in France and needed ample notice of changes in her employment in order find a job during the school year. Def. Exh. 15, Art. 10; Def. Exh. 26.  In January 2003, Creuzet extended the contract for the period August 1, 2003 to July 31, 2004. He also pointed out that Ms. Gaujacq should expect a substantial promotion for her next assignment, but probably not before the summer of 2005. Def. Exh. 25 and 26; [EDF 4681 is dated April 1, 2003 and translated April 1, 2004 – translation error]).

      30.  In direct line with his previous representations to Ms. Gaujacq, EDF extended her contract from August 1, 2004 to July 31, 2005. (Att. 16, EDF 1707-18; *see also* Gaujacq Dec. at ¶ 42)  He again pointed out that Ms. Gaujacq should expect a substantial promotion for her next assignment. *Id.* ¶ 42. Ms. Gaujacq met with Chairman Roussely on February 18, 2004, and he confirmed that Ms. Gaujacq could expect a significant promotion in the summer of 2005. On March 18, 2004, Ms. Gaujacq had her annual evaluation in Washington DC with Fernando Ponasso and confirmed Ponasso's agreement that her contract in the USA would last through, at least, 2005. (Att. 16, EDF 1707-18).

Nadal Joins EDFINA

      31.  Mr. Creuzet did not appear to know anything about Nadal's appointment on January 14, 2004 when he met Ms. Gaujacq in Washington DC. Def. Exh. 41 (but see Att. 17, Plaintiff's Translation) Fernando Ponasso communicated to Ms. Gaujacq the official announcement of Nadal's appointment after the meeting in Buenos Aires on March 23, 2004. Att. 18, Pl. 526.

      32.  Ms. Gaujacq does not dispute the allegations contained in Paragraph

      33.  Ms. Gaujacq does not dispute the allegations contained in Paragraph

34.    Nadal was a High Level Executive with EDF rather than "top management." (Def. Exh. 30)

35    The company EDENOR was supplying and distributing electricity for one part of the city of Buenos Aires. Ponasso was the Chairman of EDENOR and Nadal was his direct report. This position was equivalent to the position of "Directeur," one of the 350 highest level Executives with EDF. (Def. Exhs. 28 and 29) Penly Nuclear plant generated approximately Euros 615 millions in annual revenues.

36.    From 2001 to 2003, Nadal had no specific mission. In 2002, EDF proposed an early retirement package to Nadal

37.    Ms. Gaujacq disputes that EDF needed to appoint someone other than her to lead an alleged "new mission" for EDFINA in the United States as she performed the same duties as Nadal did during his mission. Gaujacq Decl. ¶ 39, 110    The Defendants' arguments regarding the change of the position are allegedly based on Laroche's testimony, but Laroche admitted that he did not have any knowledge regarding Ms. Gaujacq's position, duties or performance . (Att. 10, Laroche Dep. at 11, 14, 31, 38, 44, 45, 81).

38.    The terms of Nadal's expatriation contract were negotiated with EDF and EDFINA. The "delegation" is the French name given to EDFINA, Inc. (Def. Exhs. 34 and 37.) Nadal's reporting structure as President of EDFINA is the same as Ms. Gaujacq's was when she was the President of EDFINA. *See* Gaujacq Decl. ¶ 39 However, against EDF policies and unlike EDF practices for employees working abroad, Nadal's expatriation contract appears to have been signed on January 28, 2004 after his nomination as "General Delegate to the USA-Canada."(Def. Exh. 30.)

39.    Ms. Gaujacq does not dispute this statement.

40.    While on expatriate assignment to Washington, Nadal is an employee of both EDF and EDFINA. (Def. Exh. 37; *see also* Gaujacq Decl. at ¶ 12, 39.)

### Ms. Gaujacq Endeavors to Prepare for Nadal's Arrival Despite EDF's Failure to Inform Her of His Mission

41.    On January 28, 2004, Ponasso's human resources assistant called Ms. Gaujacq and informed her Nadal was appointed the General Delegate to the United States and Canada. Def. Exh. 31.

42.    On February 2, 2006, Ms. Gaujacq was informed that Nadal was coming to Washington and she was requested to prepare a statement of his possible assignment with EDFINA. *See* Gaujacq Decl. at ¶ 44. Ms. Gaujacq had no basis to believe that she would be required to leave the United States regardless of Nadal's appointment. *Id.* at ¶ 44. As described above, Ms. Gaujacq had previously been promised that she would receive a substantial promotion for her work as President of EDFINA. *Id* ¶ 44.

43.    On February 19, 2004, Ms. Gaujacq reported to Fernando Ponasso the results of her interview with Chairman Roussely including (1) Nadal's mission as Senior Advisor (2) her request for a new expatriation contract for the period August 1, 2004 to July 31, 2005. (Def. Exh. 32.) In the meantime, she continued working with EDF's Human Resources Department to petition for Nadal's visa. (Def. Exh. 37.)

44.    Ms. Gaujacq does not dispute this statement.

45.    Based on her understanding of Nadal's mission in the United States, Ms. Gaujacq introduced Nadal as a Senior Advisor focusing on gas and equity markets. *See* Gaujacq Decl. at ¶ 47, 48.

*46.*    Mr. Gaujacq did not introduce Nadal as a gas analyst. *Id.*

47    Ms. Gaujacq was aware that Nadal had previously been with EDENOR, but she requested guidance from Fernando Ponasso as to the other terms of his employment. Def. Exh. 32.

48.    During the February 25, 2004 meeting, Ms. Gaujacq advised Nadal she reported to Ponasso, who in turn reported directly to Creuzet. She further attempted to confirm with Nadal his assignment as "Senior Advisor on US gas and equity markets." Def. Exh. 48.

49.    Ms. Gaujacq does not dispute this statement.

50.    On or around February 25, 2004, Ms. Gaujacq signed a retainer with EDFINA's immigration attorney to process Nadal visa application as an International Manager to be employed with EDFINA as Senior Advisor focusing on gas and equity markets, but she explicitly told the immigration lawyer to call Nadal regarding his personal information consistent with EDFINA's practices for all EDF employees coming to work as EDFINA employees. (Def. Exhs. 35 and 37.) The immigration lawyer did not inform Ms. Gaujacq of any issues. Instead of proving the information necessary to obtain his visa, Nadal immediately reacted to the immigration issues by complaining to EDF's Human Resources Department about Ms. Gaujacq. (Def. Exh. 36.)

51.    Ms. Gaujacq properly advised EDF that U.S. immigration laws did not permit Nadal to work as President of EDFINA until he received his visa to work as an EDFINA employee. (Def. Exh. 37.) Ms. Gaujacq also told EDF that it was not recommended to travel in and out too often when a visa approval was pending. *Id.* The rules for obtaining a visa were very strict following the September 11, 2001 tragedy and the time and conditions required to get approval had dramatically increased. *Id.* Nonetheless, Nadal's visa petition

was approved on April 8, 2004, with express processing. ( Att. 19, Pl. 1344-55; Att. 20, CN 179-81.)

## Nadal Wants Ms. Gaujacq to Leave EDFINA

52.    Based on notes from Bethouret dated February 10, 2004, Nadal was reluctant to have Ms. Gaujacq stay after he assumed her duties as President of EDFINA, but Chairman Roussely, H.R. Laroche, and his direct report, H.R. Metais encouraged him to accept her position. (Def. Exh. 39.)

53.    Ms. Gaujacq was invited to meet with Creuzet and Ponasso in March of 2004. On March 23, 2004, Ms. Gaujacq met with Creuzet, the Chief Operating Officer of EDF and Ponasso, Senior Executive EDF Branch Americas and EDFINA Chairman in Buenos Aires. *See* Gaujacq Decl. ¶ 51, 53

54.    When Creuzet came back from calling Chairman Roussely, he said: "[I] will cut the bullshit. Nadal is going to be President of EDFINA and there is nothing else to say. Raison d'état [1]" *Id.* ¶ 52.

55.    Ms. Gaujacq does not dispute the allegations in paragraph 55, except to the extent that they infer that she previously represented Nadal as a "gas analyst." In addition, Ms. Gaujacq redirected the company's immigration attorney to prepare Nadal's visa application to be employed as President of EDFINA on March 24, 2004. (Def. Exh. 40.)

56.    Ms. Gaujacq did not meet or speak to Nadal in person or on the telephone in March of 2004, however, they did speak via email during that time. *See* Gaujacq Decl. ¶ 56.

---

[1] "Raison d'état" translates as "reason of state."

57.    In April 2004, Ms. Gaujacq did not meet with Nadal at EDFINA offices in D.C. through no fault of her own. (Def. Exh. 38.)

58.    *See* Responses to paragraphs 56 and 57 above.

## Ms. Gaujacq Accepts EDF's Invitation to Propose a New Mission in the US

59.    At the March 23 meeting in Buenos Aires, when Creuzet came back from calling Roussely, he said: "I will cut the bullshit. Nadal is going to be President of EDFINA and there is nothing else to say. Raison d'état." See Gaujacq Decl. ¶ 52. Ms. Gaujacq was distressed and upset. Creuzet and Ponasso told Ms. Gaujacq to prepare a new assignment on the Nuclear projects for Ms. Gaujacq in the USA. Ms. Gaujacq then prepared her proposal of a three years expatriation contract focusing on nuclear matters (Def. Exh. 42; Def. Exh. 41, but see Att. 17, Plaintiff's translation).

60.    By email dated March 25, 2004, after speaking with her husband, Ms. Gaujacq proposed to Creuzet a new three-year expatriation assignment in the US as "Directeur Production et Projets Nucleaires, EDFINA" (Director of Generation and Nuclear Projects, EDFINA). (Def. Exhs. 41 and 42.)

61.    By email dated March 29, 2004, Mr. Creuzet approved Ms. Gaujacq's new three year contract and instructed Laroche to prepare the final document – he wrote that he would obtain input from the HR organization and mail it to her when all had signed it. (Def. Exh. 41;Exh. A to Laroche Decl.) On March 31, 2004, the HR organization emailed back its input. *Id.* Ms. Gaujacq accepted the position but reminded him that she needed to stay employed by EDFINA to conduct the NuStart project. By email dated April 8, 2004, Creuzet informed her that to be successful in this mission, Ms. Gaujacq needed to work out a detailed mission letter with Bruno Lescoeur, head of the Energy Branch and that she should

get her new expatriation contract from HR (Metais, Laroche, and Bouron). Def. Exh. 41 (but
See Att. 17, Plaintiff's Translation)  ·

62.    Ms. Gaujacq accepted the position offered by Creuzet and accordingly
reiterated her request to HR to provide her with the signed three-year expatriation contract  In
the meantime, Ms. Gaujacq contacted Lescoeur and emailed him with her proposed detailed
mission letter on May 12, 2004, carbon copying Creuzet and Laroche with this email. (Def.
Exh. 41, but see Att. 17, Plaintiff's Translation; Att. 21, Pl. 839, 811-15.)

63.    Ms. Gaujacq does not dispute this statement

64.    Starting in January 2004, without her knowledge, and with the
complicity of the HR organization (Laroche – Metais – Bouron - Bethouret), Nadal seized
every occasion to discredit Ms. Gaujacq. (Def. Exhs. 34, 36, 38, 43-46, and 48; *see also* Def.
Exh. 41, but see Att. 17, Plaintiff's Translation). During the same period, the Defendants
cannot produce any evidence that Ms. Gaujacq complained to any one in the EDF/EDFINA
organization complaining with regard to Nadal.

65.    Without EDF's Executive Committee knowledge in April 2004, the HR
organization (Mr. Metais and Mr. Bethouret) expressed interest in speaking with Ms. Gaujacq
regarding a new assignment in London (UK). (Def. Exh. 47; Att. 10, Laroche Depo. at 89.)
Ms. Gaujacq confirmed to HR (Mr. Bethouret and Mr. Metais) that had a new assignment
from Creuzet with EDFINA in the USA, with a mission letter pending to Lescoeur Branch
Energy, and she confirmed to Mr. Bethouret that she was not on the market for 2004. *See*
Gaujacq Decl. at ¶ 55. Mr. Bethouret agreed. *Id.* Notably, EDF's HR organization with this
proposal, did not expect Ms. Gaujacq to come back to France, but instead had a job offer for
her in the UK, after her US assignment. *Id.*

66.    The basis for the May 18, 2004 meeting with Mr. Lescoeur, Head of EDF's Energy Branch, was for him to approve Ms. Gaujacq's mission letter dated May 12, 2004 and the US nuclear projects (Att. 22, Pl. 811-15; Def. Exh. 26). Ms. Gaujacq told him that her assignment in the US on the project was very interesting and that she wanted to continue her work in the US nuclear energy renaissance. Ms. Gaujacq had no reason to consider returning to France because she had already been promised that she could stay in the USA on the project. When Ms. Gaujacq contacted Mr. Creuzet, he told her to forget about Mr. Lescoeur's proposal that she return to France because the EDF Executive Committee had made a final decision on her reporting structure to report to EDFINA President with EDF Branch Energy as Engineering Services provider to EDFINA. (Def. Exh. 48.) Ms. Gaujacq then immediately confirmed the agreement. *Id*

67.    On May 25, 2004, Mr. Roussely confirmed Ms. Gaujacq was appointed as Vice-President of EDFINA reporting to Nadal. He wrote "If Gaujacq wants to come back to France, it is [sic] her decision." (Def. Exh. 48.) The EDF Chairman and CEO also deterred Nadal from pursuing her eviction from EDFINA. *Id.* Roussely also directed the HR organization to implement his decisions, unknown to Ms. Gaujacq.

68.    Ms. Gaujacq denies any understanding that Mr. Roussely decided she would report to Nadal. Rather, Ms. Gaujacq believed that management, not HR organizations, make final decisions on transfers. (Def. Exh. 41, but see Att. 17, Plaintiff's Translation; Exh. D, Laroche Decl.)

69.    Ms. Gaujacq resigned from EDFINA's Board in accordance with EDF's Executive Committee decision. (Def. Exh. 49, Att. 23, Pl. 582-87.)

16

**Nadal Takes Office in Washington**

70.    Ms. Gaujacq held the title of Vice-President of EDFINA effective May 31, 2004, and the May 12, 2004 mission letter agreed upon by Creuzet defined her responsibilities and duties associated with her mission. (Def. Exhs. 63 and 22.) Ms. Gaujacq expected to work with Nadal and Dreux as the President and the Vice-Presidents of a company are expected to do. Nadal and Fernando Ponasso knew what her duties were as Vice-President of EDFINA. *Id.*

71.    Although Ms. Gaujacq did not see Nadal in the office she had regular contact with him  and provided to him information that would assist him in his duties as President of EDFINA.  For example, at his request, Ms. Gaujacq told Nadal that she would provide to him her business contacts which were at the Office, and that she would prepare a detailed memo describing the EDFINA organization as of May 31, 2004 so that he could make the necessary adjustments  (Def. Exhs. 51 and 63)

72.    On June 10, 2004, Ms. Gaujacq directed a memorandum, in response to Nadal's request, and copied Ponasso as Chairman of EDFINA to be certain that her duties were consistent with her mission (Def. Exh. 71, Att. 24, Pl. 904-10.)  As Chairman of EDFINA, Fernando Ponasso knew her duties as Vice-President of EDFINA.  (Def. Exh. 63). Ms. Gaujacq copied the EDFINA employees in the Washington, D.C. office to give them the opportunity to provide some input to Nadal before changes took place  (Def. Exh. 51, partial translation.)

73.    Nadal was aware that, in the history of EDFINA, there were various persons authorized to sign checks for EDFINA depending on the staffing of the company:

including, from August 2000 to August 2002, Richard Brien, Louis Roversi, and Ms. Gaujacq. (Def. Exh. 52.)

74.    Nadal did not "assume" Ms. Gaujacq's authority to sign checks, rather, on June 4, 2004, with Mr. Dreux's knowledge, but without Ms. Gaujacq's knowledge, Nadal made a conscious decision to remove her authority to sign checks. (Def. Exh. 54, see also Def. Exh. 49.)

75.    Ms. Gaujacq does not dispute this statement.

76.    Mr. Dreux voided Ms. Gaujacq's checks because he and Nadal were aware of Nadal's decision to strip Ms. Gaujacq of her check signing authority, but had failed to communicate this knowledge to her – instead, Mr. Dreux told Ms. Ba that Ms. Gaujacq was no longer an authorized signatory on EDFINA's accounts and wrote the word "VOID" on each check in her presence and the presence of EDFINA employees *See* Gaujacq Decl at ¶ 63  Humiliated, Ms. Gaujacq then left the office to attend the funeral parade of former President Reagan *Id* ; (Def. Exhs. 54-57.)

77.    Ms. Gaujacq does not dispute this statement.

78.    On June 11, 2004, Nadal called Ms. Gaujacq in response to her email inquiring as to her ability to write checks. He confirmed it was his decision to remove her, but he gave her no reason. *See* Gaujacq Decl. ¶ 63.

79.    Because Nadal invited only Mr. Foret to accompany him to Pittsburgh, Ms. Gaujacq drove to Pittsburgh alone, on Sunday, June 13, 2004 and had meetings prior to the conference, which began on Monday morning, June 14, 2004. She departed, leaving a note for both Nadal and JL Foret and returned to Great Falls, Virginia. (Def. Exh. 57; but see Att. 25, Plaintiff's translation.) Ms. Gaujacq was not planning to meet with Nadal and did not

know that he would be attending until Mr. Foret told her. (Att. 25, Gaujacq Dep. at 330, 335.)

80.    On June 15, 2004, from her residence in Great Falls, Virginia, Ms. Gaujacq emailed Nadal and all of her business partners and colleagues, explaining her absence and apologizing for not attending meetings over the next ten days in the United States. (Def. Exh. 61.) On June 18, 2004, Nadal responded to her email. (Def. Exh. 58.) Ms. Gaujacq returned to the EDFINA offices in Washington, D.C. on Monday June 28, 2004.

81.    Ms. Gaujacq does not dispute this statement.

82.    Ms. Gaujacq clarified her testimony regarding the June 14, 2004 note on the errata sheet of her deposition. (*See* Att. 27, Gaujacq errata sheet.)

83.    Ms. Gaujacq clarified her testimony in the errata sheet (errata sheet) and in her subsequent deposition in June. (Att. 26, Gaujacq Dep. at 703-05.)

84.    In a June 11, 2004 telephone call, Nadal proposed to schedule a meeting with Ms. Gaujacq on June 18, 2004 at the EDFINA office. However, the call was not to discuss Ms. Gaujacq's job responsibilities because Nadal already knew what her assignment was as Vice-President of EDFINA. (Def. Exh. 63.) When Ms. Gaujacq learned that Nadal was coming to Pittsburgh, she told him that they did not have to wait until June 18, 2004 and could talk, meet and/or have dinner together in Pittsburgh. (Def. Exh. 58.) Ms. Gaujacq received Nadal's letter of discharge in her mailbox on June 19, 2004. (Def. Exh. 59.) She returned to the EDFINA offices in Washington, D.C. on Monday, June 28, 2004.

85.    Ms. Gaujacq does not dispute this statement.

86.    As was common during his Presidency, Nadal did not inform Ms. Gaujacq that he was leaving town for three weeks. *See* Gaujacq Decl. at ¶ 64.

87.    Ms. Gaujacq does not dispute this statement.

88.    Ms Gaujacq does not dispute this statement.

89.    Nadal prepared a separate letter, dated June 18, 2004, to give all authorities to Dreux to act on Nadal's behalf. (Def. Exh. 60.) Ms. Gaujacq discovered Nadal second letter to Dreux on July 8, 2004 at the EDFINA Offices. On July 2, Nadal admits to the EDF auditors that all responsibilities are clarified through his letters of June 18. (*See* Def. Exh. 2). Nadal also knew about her duties as Vice-President of EDFINA. (Def. Exhs. 58 and 63.)

90.    There is no evidence that would support this opinion statement that Mr. Dreux was a more appropriate selection for Nadal to assign his authority during his absences. Throughout her tenure as President of EDFINA, Ms. Gaujacq performed her duties in an exemplary manner, and received high evaluations. (*See* Att. 16, Exh. 49 to Gaujacq Dep.) Prior to Nadal joining EDF, EDF was very satisfied with Ms. Gaujacq and there was never any suggestion of performance issues. Def. Facts ¶ 8. Despite Nadal's claims that Ms. Gaujacq's office visits were too infrequent to make her useful or to deputize her to sign checks, in the four years that Ms. Gaujacq had the main check signing authority as President, there is no evidence that there was ever an issue regarding check signing.

91.    Ms. Gaujacq does not dispute this statement.

92.    Ms. Gaujacq was scheduled to attend a meeting in Lyon, France on June 21, 2004, to provide an update on the NuStart program to SEPTEN, a subdivision of the EDF Engineering Division responsible for nuclear designs. On June 15, 2004, from her residence in Great Falls, Virginia, she emailed Nadal and all of her business partners and

colleagues and apologized for not attending her meetings over the next ten days in the United States and in Lyon, France. (Def. Exh. 61.)

93.    Ms. Gaujacq does not dispute this statement.

94.    Even if Nadal did not order the audit, he directed the audit by telling his concerns about EDFINA to the EDF auditors. (Def. Exhs. 22 and 63.) Mr. Creuzet told Ms. Gaujacq that the audit had been ordered to protect her from Nadal. (Def. Exh. 75)

95.    When asked on July 6, 2004, Ms. Gaujacq told the EDF auditors that proprietary documents relating to [NuStart] were not available at the office. She did bring the proprietary documents to the office for the auditors' review, but they were required to sign confidentiality agreements to review them. When the auditors returned the documents, they told Ms. Gaujacq they understood the security requirements that she had imposed prior to their review. (Def. Exhs. 50 and 66.)

96.    On July 9, 2004, during the audit telephone conference, in which Ms. Gaujacq participated in person at EDFINA offices and Nadal participated over the telephone, the EDF auditors stated that certain expenditures that had been authorized by Ms. Gaujacq were not documented. The auditors did not ask her about those documents during the audit. *See* Gaujacq Decl. at ¶ 65. In fact, most of documents were at the EDFINA Washington office. *Id.* Nadal stated that paying for services without a service actually being performed was very serious. *Id.* The alleged "undocumented" services were consulting services from Walker Nolan and consulting services from Francois Ailleret. (Def. Exh. 22; Att. 28, Pl 1289-97.)

97.    Between July 12, 2004 and February 25, 2004, Nadal and Ms. Gaujacq exchanged numerous emails and phone calls, including a conference call on July 9, 2004.

Between June 1, 2004 and July 11, 2004, Ms. Gaujacq was present in the Washington office for 12 days – Nadal however was not present on those days. (Def. Exh. 50 at EDF 4574.)

98.    On July 12, 2004, Ms. Gaujacq requested a meeting with Nadal to update him on her projects and activities. At Nadal's request, Jean-Luc Forêt joined the meeting, however, Mr. Foret was not the EDFINA alternate Managing Executive to Nustart, JL Foret was an experienced Engineer and was working under an H1B visa *See* Gaujacq Decl. at ¶ 67. In fact, George Servieres was Ms. Gaujacq's alternate starting April 19, 2004 *Id* ¶ 67 , ( Def. Exh. 66.)

99.    Ms. Gaujacq does not dispute the allegations in paragraph 99.

100.    Ms. Gaujacq does not dispute the allegations in paragraph 100.

101.    Ms. Gaujacq does not dispute the allegations in paragraph 101

102.    In response to Ms. Gaujacq's refusal, Nadal jumped off from his chair, pointed his finger at her, threatened her, in the presence of JL Foret yelling, "I'm the General Delegate of EDFINA and you have to comply with my orders otherwise, . . . ." (Att. 26, Gaujacq Dep. at 392.)

103.    There is no evidence in Defendants' production of documents that Nadal copied his email to Mr. Ponasso or Bethoret.

104.    Ms. Gaujacq does not dispute the allegations in paragraph 104.

105.    Ms. Gaujacq does not dispute the allegations in paragraph 105.

106.    Ms. Gaujacq never claimed a personal restricted access to the proprietary documents related to Nustart. Nadal knew that the Nustart documents required a high level of security (Def. Exhs. 64 and 65.) Electronic copies of Nustart proprietary documents were in possession of Ms. Gaujacq's EDFINA Managing Representative to

Nustart Alternate, EDFINA Board member, George Servieres and in possession of Creuzet, Lescoeur, Massart and Dupraz. *See* Gaujacq Decl. ¶ 67.

107.    Ms. Gaujacq disputes that she was responsible for maintaining all levels of office security at EDFINA during her Presidency. She did, however, maintain the security of confidential, project-related documents as discussed above.

108.    Ms. Gaujacq denies that her July 9, 2004 email fails to specify that she was being treated differently because of her sex. Defendants' statement represents one of the many disputes that are material facts at issue in this litigation.

109.    On July 9, 2004, Ms. Gaujacq complained again of discriminatory treatment after she discovered the second letter assigning Nadal's authority in his absence to Mr. Dreux. *See* Gaujacq Decl. at ¶ 66. Nadal had no legitimate business reason to discriminate and harass her.

110.    Ms. Gaujacq does not dispute the allegations in paragraph 110.

111.    This statement also contains allegations that are not facts, or in the alternative, are facts heavily disputed by both parties. Ms. Gaujacq's second letter again notified EDF that she was being discriminated against based on her gender. (Def. Exhs. 68 and 69.)

112.    Nadal scheduled a meeting with Ms. Gaujacq on August 17, 2004 regarding her July 22, 2004 email to him complaining of discriminatory treatment. (Def. Exh. 68.)

113.    Because she received no response to her July 22, 2004 email to Mr. Roussely, Chairman of EDF, complaining of Nadal's discriminatory treatment, she faxed him and Mr. Creuzet a letter inquiring, "[A]re you going to stop the illegal behavior of Christian

Nadal against me?" and advising that she would have to protect herself given the company refusal to respond (Def. Exh. 69.)

114. Ms. Gaujacq's July 22, 2004 email stating she would file a "complaint" logically referenced her earlier position that Nadal was discriminating against her, as opposed to the other male Vice President – a complaint that EDF had attempted to ignore (Def. Exhs. 67 and 69.)

115 Ms. Gaujacq does not dispute the allegations in paragraph 115

116 The purpose of Mr. Creuzet's July 23, 2004 telephone call was to discuss her claim of discrimination and request for protection from Nadal. (Def. Exh. 70.) Mr. Creuzet threatened Ms. Gaujacq telling her that: "Your career is dead if you file a claim." *Id.* She explicitly told Creuzet that Nadal was discriminating against her because of her gender, harassing her, defaming her, and discharging her. (*See* Gaujacq Decl. at ¶ 73; *see also* Def. Exh. 70.) de Botherel testified that EDF executives knew Nadal was treating her poorly. de Botherel Dep. at 138, Att. 29.

117 Without any investigation of Ms. Gaujacq's claims that Nadal was discriminating against her, Mr. Laroche disregarded her complaints as "blackmail." Laroche Decl. ¶ 31-35. Despite Mr. Laroche's post-litigation claims that he believed Ms. Gaujacq's claims to be blackmail, at the time that he discussed the claims with Ms. Gaujacq, he told her that he would try to protect her and would speak to Mr. Creuzet immediately. Def. Exh. 70. Ms. Gaujacq advised Mr. Laroche during their July 23, 2004 conversation of her claims, and he was well aware that she was claiming sex discrimination and harassment.

118 In the July 23, 2004 telephone call with Mr. Ponasso, Ms. Gaujacq suggested a change in her reporting structure that would allow her to continue her work in the

United States without Nadal's interference. (Def. Exh. 72.) She advised him that she was more scared after her conversation with Creuzet because he told her "Your career is dead if you file a claim against Nadal." *Id.* She told Mr. Ponasso that she was still considering filing a claim because it did not appear that the company would protect her from Nadal's discriminatory and illegal actions. *Id.* She explicitly told Mr. Laroche that Nadal was discriminating against her because of her gender, harassing her, defaming her, and discharging her. (Def. Exh. 70; Gaujacq Decl. ¶ 73.)

119.    See Paragraph 113-18 above.

120.    By email dated July 25, 2004 to Mr. Creuzet, Mr. Laroche and Mr. Ponasso, Ms. Gaujacq confirmed their conversations – the Defendants understood the nature of her protected activity and knew they could be retaliating. (Def. Exh. 72.) As evidence of this understanding, they asked their legal counsel, Mr. Binet, to advise them regarding their decision. (Def. Exh. 72, Gaujacq Dep. at 420-22, Att. 26.)

121.    Ms. Gaujacq does not dispute the allegations in paragraph 121.

122.    Mr. Laroche and Mr. Metais, with legal counsel Mr. Binet and Nadal, advised Creuzet to sign the July 27, 2004 letter, in a deliberate and desperate effort to try to avoid the enforcement of U.S. employment laws. (Def. Exhs. 72-75.)

123.    Ms. Gaujacq does not dispute the allegations in paragraph 123.

124.    On July 27, 2004, Mr. Lescoeur called Ms. Gaujacq with the purpose of preventing Ms. Gaujacq from filing a claim. (Def. Exh. 75.) On July 27, 2004, Ms. Gaujacq tried to call Yann Laroche and called Metais. (Def. Exh. 75.) On July 28, 2004, Ms. Gaujacq complained to Mr. Metais about the retaliation of the company. (Pl. 668, Att. 30.)

Mr. Metais faxed her, on July 30, 2004, another letter denying my allegations, copying Nadal and legal counsel. (Pl. 684, Att. 31.)

125.    On August 3, 2004, Ms. Gaujacq sought direction from Nadal and Ponasso as to whether she should continue to represent EDF and EDFINA interests at a number of meetings and conference calls, including NuStart and enXco meetings. (Def. Exhs. 76, 77 and 95.) Ms. Gaujacq also asked Nadal and the immigration attorney to get a letter of continuous employment from EDFINA if she were to travel to France either for family or business purpose. (EDFINA 872-74, Att. 32.) Nadal, notwithstanding the orders of Creuzet and Ponasso, refused her two requests.

126.    Ms. Gaujacq does not dispute the allegations in paragraph 126

127.    Ms. Gaujacq disputes this paragraph as described in paragraphs 110-25 above

128    On August 24, 2004, EDF appointed her, effective August 1, 2004, as the "Chargée de Mission" (Mission Representative) reporting to the Director of Nuclear Generation within the Energy Branch. (Def. Exh. 79.) Lescoeur contacted her on August 25 to confirm his decision. (Def. Exhs. 75-82.) On September 8, 2004, Ms. Gaujacq received from HR Bouron some indications about the material conditions of the position (Def. Exh. 81.) Those conditions were unacceptable, and, on September 24, 2004, Ms. Gaujacq wrote to the new Chairman of EDF to complain about her situation and asked for his intervention against the actions of Nadal. She also wrote to the French minister for "Equal opportunity" because there was no French EEOC at this time.

129    Ms. Gaujacq received a fax, on September 30, 2004, from Laurent Stricker, the Director of EDF Nuclear Division in France, providing a mission statement for a

26

new position with DPN. (Def. Exh. 80.) The position was not consistent with EDF's previous representations. *See* Gaujacq Decl. ¶ 77.

### The EPR Assignment

130    The compensation package offered with the new position was 30% lower than the one Ms. Gaujacq received as Vice-President of EDFINA. (Def. Exh. A -- Laroche Declaration; Def. Exhs. 42, 81 and 94.)

131.    After learning of Ms. Gaujacq's EEOC charge, the company continued to try to force her to accept the position in France, while knowing that the position was a demotion. ( Def. Exhs. 79,80 and 82.)

132.    EDF never selected Ms. Gaujacq to "head" the EPR project. EDF proposed the position of "Chargée de Mission" (Mission Representative) reporting to the Director of Nuclear Generation within the Energy Branch (Def. Exh. 80.) The strategic phase of the French EPR project was over (Def. Exh. 83.) Rather, the company's decision to demote Ms. Gaujacq to this position was in retaliation for her complaining of discrimination and filing a charge.

133.    Ms. Gaujacq disputes the allegations in paragraph 133 to the extent that they contain subjective, post-litigation representations regarding EDF's standpoint and what EDF believed to be "extremely interesting", "major" and "necessary." Rather, the position that EDF attempted to force Ms. Gaujacq to accept was a demotion in contrast to her position with EDFINA in the United States. *See* Gaujacq Decl. ¶ 110.

134.    The EPR position was not important to Ms. Gaujacq based on her work in the United States, particularly because the position would be a demotion. *See* Gaujacq Decl ¶ 82.

135.    On October 7, Ms. Gaujacq refused to accept the position of "Chargée de Mission" (Mission Representative) reporting to the Director of Nuclear Generation within the Energy Branch. (Def. Exh. 84.) In October, Bouron (Energy Branch HR) called Ms. Gaujacq and told Ms. Gaujacq her US claim had no value. Ms. Gaujacq then received a second letter with an email from Lescoeur on October 28. (Def. Exhs. 83 and 85.) EDF practice and policy when an employee refuses an offer is for the employee to stay on his/her current position. The French contract kicks in only when the employee has his residence relocated in France. (Def. Exh. 94.)

136    Ms. Gaujacq asked Lescoeur to contact her French lawyer to reach an agreeable solution as soon as possible. (Def. Exh. 85.)    Defendants' translation of the document is misleading. In the meantime, EDFINA notified the USCIS that Ms. Gaujacq was no longer employed by EDFINA. EDFINA 5119-20. Ms. Gaujacq's compensation then changed (*See* Pl. 1021-23, Att. 33). EDFINA contacted the Landlord of Ms. Gaujacq's residence in Great Falls (VA) and refused to pay the rent. EDF also notified her that EDF/EDFINA would no longer provide health insurance coverage to her and her husband.

137    Ms. Gaujacq had refused to take the position and refused the offer. The company policy was not to terminate someone who refuses a new position. It had never happened in the company history. (Gaujacq Decl. ¶ 82, Att.)

138.    The company responded to the EEOC charge that the position was not filled as of January 2005. Plaintiff 375-78, Att. 34.

### EDF's Discriminatory Terminates of Ms. Gaujacq

139.    The company knew that its retaliatory termination of Ms. Gaujacq was illegal. The company proposed a Euros 300,000.00 severance package for her voluntary

departure from the company. Ms. Gaujacq refused, because they refused to provide her with a letter of recommendation from the EDF Chairman and refused to acknowledge their responsibility. This severance package does not exist pursuant to EDF procedures established under French law.

140.    Ms. Gaujacq does not dispute the allegations in paragraph 40, however, consistent with her previous notices to EDF, she further advised the company that she was the victim of discrimination and harassment based on her gender. *See* Gaujacq Decl. ¶ 73.

141.    Defendants' statement that Ms. Gaujacq was terminated for "grave fault" is an attempt to categorize a heavily disputed fact as undisputed. Ms. Gaujacq admits that the company sent her a letter saying it was terminating her for grave fault, however, the basis for her termination was discrimination and retaliation. (*See* Def. Exh. 88, providing EDF's claimed reason for her termination).

142.    Ms. Gaujacq did not receive her full benefits through January 7, 2006. Rather, from November 1, 2004 through January 6, 2005, Ms. Gaujacq did not have the benefit of her expatriation package. *See* Pl. 1021-23, Att. 35; EDFINA 906, Att. 36.

143.    Ms. Gaujacq does not dispute the allegations in paragraph 143.

144.    Ms. Gaujacq does not dispute the allegations in paragraph 144.

145.    Ms. Gaujacq was offered a job at ENTERGY Operations, Inc. as Director, Strategic Programs on March 1, 2005, and started working at ENTERGY on April 4, 2005.

146.    Ms. Gaujacq does not dispute the allegations in paragraph 146.

147.    Ms. Gaujacq does not dispute the allegations in paragraph 147.

148.    The French statute did not apply to Ms. Gaujacq. Starting May 1, 1994, Ms. Gaujacq was a High level Executive (Personnel de Direction, "Dirigeant",Director) and the statute did not apply to her position, nor to any of the positions that Ms. Gaujacq would have been assigned with the company since May 1, 1994. (De Botherel, Exh. A, but see Plaintiff's translation at Att. 5.) EDF's employment policies are described by a French labor contract called "National Statutes of the Employees of the gas and electricity industries." This contract applies to employees of all companies in the French gas and electricity industries. This contract also applies to all employment decisions regarding EDF French High level Executives (Personnel de Direction, "Dirigeant", Director). This contract is not a Law. The translation of page 12/26 to 26/26 is voluntarily misleading and incorrect *Id*; (*See* also Pl. translation, Att. 5.) Ms. Gaujacq was promoted out of this ranking system on May 1, 1994.

Moreover, the EDF contract for employees working abroad recognizes it is subject to territoriality principle of employment laws for its employees abroad. (EDF 1319, Att. 37.)

149.    EDF Executive Compensation is governed by "EDF Executive Compensation Policy" ("La politique de rémunération des Dirigeants") (EDF's Executive Compensation Policy), and may be governed by specific contracts like "the guide for employees working abroad" and expatriation contracts. (EDF 1295, Att. 38 and EDF 1319, Att.37. EDF Executives and employees are also classified under EDF Corporate policies worldwide. (EDF # 1454-1441-1446-1565, Att. 39; EDF # 278, Att. 40; EDF # 4824, Att. 41.)

150.    Starting August 2000, EDF Executive Compensation is governed by "EDF Executive Compensation Policy" ("La politique de rémunération des cadres Dirigeants". (Def. Exh. 91.) The compensations of Executives are individualized (de Botherel

deposition). (Def. Exh. 91.) The Defendants did not produce one document notifying Ms. Gaujacq of her rank or notifying Nadal of his rank. The Defendants did not produce any EDF document indicating the ranking of the positions of "President of EDFINA" or "General Delegate."

151.    The Defendants cannot produce one EDF document notifying Ms. Gaujacq of her rank or notifying Nadal of his rank. The Defendants produced one document where the position of "Directeur du bureau de Washington," then the position of President of EDFINA, appears to be ranked, in August 2003, at the R2+ level, when she was President of EDFINA. EDF 679-81. Moreover, as discussed in paragraph 152 above, EDF's decision to secretly classify Ms. Gaujacq as an R3 is self-serving, but consistent with a pervasive attitude of its discriminatory against female executives.

152.    Despite the size of the Company, Ms. Gaujacq was one of a small group of women to hold an executive level position and, as President of EDFINA, was the only female manager of a subsidiary outside of France.    Specifically, of the 50 EDF executives holding R1 rankings, only 5 were women, whereas of the total 160,000 employees at EDF, approximately 45 to 50 percent were women. (*See* De Botherel Dep at 36, 66-69, 74. Att.29.) In fact, Mr. Yann Laroche, Deputy General Manager of EDF, could name no female manager of a subsidiary or any other expatriate female manager. (*See* Laroche Dep at 25-29, Att. 10.) Further, Mr. Laroche knew of only "one female manager that ranked R1, but she was deputy general manager, she was not the person in charge." (*See* Laroche Dep at 64, Att. 10.)

153.    EDF has maintained numerous pay grade ranking systems throughout Ms. Gaujacq's employment as discussed in paragraph 147 above. (Def. Exhs. 12-16.) If the

current denominations of the EDF Executive ranking system became effective in 2000, then EDF apparently did not apply to the positions Ms. Gaujacq assumed nor to Nadal. In addition, the company refers to another Executive ranking system in Nadal expatriation contract    Ms. Gaujacq's pay was not within the range of her rank because she should have been ranked as an R1, like Nadal.

154.    Ms. Gaujacq disputes this paragraph as stated in paragraph 153 above.

155.    Ms. Gaujacq reached her first ("Dirigeant" "Personnel de Direction") position on May 1, 1994 when she was appointed as "Director" or Site Vice-President of EDF nuclear power plant in Penly, France    Ms. Gaujacq was also promoted in August 2000 when EDF appointed her as "General Delegate to the USA-Canada" and President of EDFINA. EDF's Executive Compensation evolved through out the time Ms. Gaujacq was employed with the Company and became governed by "EDF Executive Compensation Policy" ("La politique de rémunération des cadres Dirigeants"). (Def. Exhs. 12-16 and 91.) The position of Vice-President EDFINA "Nuclear Projects" was her third R3 position (Director of Penly -- President of EDFINA -- VP EDFINA).

156    See paragraph 155 above.

157.    "Salaire mensuel de base" is not a monthly salary (Def. Exh. 15.) EDF's pay records reflect that Gaujacq was paid as "Déléguée Générale (Delegate General) from August 1, 2000 to July 31, 2002 and as "Directeur" (Director) from August 1, 2002 to July 31, 2004    Ms. Gaujacq agrees that, although she performed the same tasks as the EDFINA President and served in that capacity, EDF did not appropriately pay her for her work.

158.    Ms. Gaujacq does not dispute the allegations in paragraph 158

32

159.    Ms. Gaujacq does not dispute the allegations in paragraph 159.

160.    Ms Gaujacq's referenced salary appears to be in the lower ranges of "R3." (Def. Exhs. 92 and 93.) The position of Vice-President EDFINA "Nuclear Projects" was her third R3 position (Director of Penly – President of EDFINA – VP EDFINA) and Ms. Gaujacq was underpaid.

161.    Nadal's referenced salary as of July 1, 2004 appears to be in the very upper ranges of "R-1."

162.    Ms. Gaujacq does not dispute the allegations in paragraph 162.

### Facts Relating to EDF's Tortious Interference with Ms. Gaujacq's Contracts

163.    Ms. Gaujacq does not dispute the allegations in paragraph 163.

164.    EDF never mailed the corrected work certificate shown as Exhibit 88. Instead, EDF informed Ms. Gaujacq could request an appointment to EDF Paris to pick up the corrected document. (Def. Exh. 88.) EDFINA provided her with an incorrect 2004 W2, and the company never provided her with a 2005 W2. (Pl. 1228, Att. 42.)

165.    Ms. Gaujacq complained with regard to the interference with my background checking requirements to access Entergy nuclear plants. EDF 216-30.

### Facts Relating to EDF's Breach of Ms. Gaujacq's Contract

166.    The Guide for employees working abroad is a contract. (EDF 1289-1385 at EDF 1295, Att 38; EDF 1289-1385, at 1319, Att. 37.) EDF Executives and employees are also bound to EDF Corporate policies worldwide. EDF's contracts for employees working abroad recognizes that the company is subject to territoriality principle of employment laws for its employees abroad (EDF 1319, Att. 37.) This contract states that it is mandatory for management to have an evaluative discussion with the employee at the latest

six months before the expiration of the employee's expatriation contract. (Def. Exhs. 15, 42 and 94.) On July 26, 2004, management (Ponasso) was still telling MS. Gaujacq they would change her reporting structure to honor her contract.

       167.   Ms. Gaujacq disputes this statement. See paragraph 166 above.

November 20, 2006              Respectfully Submitted,

Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
Carla D. Brown
D.C. Bar No. 474097
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
   Catherine Gaujacq