IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| CATHERINE GAUJACQ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05CV0969 (JGP) |
| | ) | |
| ELECTRICITÉ DE FRANCE | ) | |
| INTERNATIONAL NORTH AMERICA, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____

## DEFENDANT CHRISTIAN NADAL'S REPLY MEMORANDUM
## IN FURTHER SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT ON COUNTS IV, VI, VIII, and XII

Morgan D. Hodgson (*D.C. Bar No.* 186528)
David A. Clark (*D.C. Bar No.* 473279)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 429-3000

*Counsel for Defendant Christian Nadal*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................... 1

I.  GAUJACQ'S LIMITED ADMISSIBLE EVIDENCE IS INSUFFICIENT
    TO MAKE OUT A PRIMA FACIE CASE OF AIDING AND
    ABETTING GENDER DISCRIMINATION AGAINST NADAL
    (COUNT IV). ............................................................................................................ 3

    A.  Because Gaujacq Lacks Record Support for Any Adverse
        Employment Action or Gender-Based Action by Nadal, Her New
        Claim For Disparate Treatment Fails. ......................................................... 3

    B.  Granting All Reasonable Inferences in Gaujacq's Favor, the
        Evidence of Nadal's Conduct Fails To Establish A Hostile Work
        Environment on the Basis of Gender. .......................................................... 6

    C.  Gaujacq Cannot Rebut Nadal's Legitimate, Nondiscriminatory
        Explanation for His Actions. ....................................................................... 8

II. GAUJACQ CANNOT LINK NADAL TO ANY RETALIATORY ACTS
    FOLLOWING HER JULY 22, 2004 FIRST COMPLAINT TO HIM,
    AND THUS COUNT VI (AIDING AND ABETTING RETALIATION)
    FAILS. ...................................................................................................................... 9

III. GAUJACQ CANNOT ESTABLISH THAT NADAL DEFAMED HER. ........... 12

    A.  The Statements and Actions That Gaujacq Identifies Are Not
        Defamatory in Character and, in Any Event, Were Made Only to
        Interested Persons. ..................................................................................... 13

    B.  Gaujacq Cannot Demonstrate Malice by Nadal To Overcome the
        Otherwise Uncontested Privileged Character of the
        Communications. ........................................................................................ 17

IV. PLAINTIFF CANNOT ESTABLISH TORTIOUS INTERFERENCE ............... 18

    A.  Gaujacq Cannot Show That Nadal Tortiously Interfered with her
        2000 Expatriate Contract. .......................................................................... 19

    B.  Gaujacq Cannot Prevail on a Claim Against Nadal for Interfering
        With An Expatriate Contract She Expected in 2004. ................................ 20

    C.  Having Acted Properly and Justifiably as Gaujacq's Superior and
        Fellow EDF Employee, Nadal Cannot Be Held Responsible for
        "Interfering." .............................................................................................. 22

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE

*Asay v. Hallmark Cards, Inc.,*
   594 F.2d 692 (8th Cir. 1979) ............................................................... 15

*Bortell v. Eli Lilly & Co.,*
   406 F. Supp. 2d 1 (D.D.C. 2005) ........................................................... 6

*Box v. Principi,*
   442 F.3d 692 (8th Cir. 2006) ................................................................. 5

*Brown v. Brody,*
   199 F.3d 446 (D.C. Cir. 1999) .............................................................. 4

*Burlington Northern & Santa Fe Ry. v. White,*
   126 S. Ct. 2405 (2006) ......................................................................... 10

*Casco Marina Dev., L.L.C. v. Dist. of Columbia Redevelopment Land Agency,*
   834 A.2d 77 (D.C. 2003) ....................................................................... 20

*Coles v. Washington Free Weekly, Inc.,*
   881 F. Supp. 26 (D.D.C. 1995), *aff'd mem.,* 88 F.3d 1278 (D.C. Cir. 1996) .................. 15

*Curaflex Health Servs., Inc. v. Bruni P.C.,*
   899 F. Supp. 689 (D.D.C. 1995) ........................................................... 23

*Edwards v. Wallace County College,*
   49 F.3d 1517 (11th Cir. 1995) ............................................................... 6

*Ford Motor Credit Co. v. Holland,*
   367 A.2d 1311 (D.C. 1977) ................................................................... 18

*Forkkio v. Powell,*
   306 F.3d 1127 (D.C. Cir. 2002) ............................................................ 4-5

*George v. Leavitt,*
   407 F.3d 405 (D.C. Cir. 2005) .............................................................. 7

*Greene v. Dalton,*
   164 F.3d 671 (D.C. Cir. 1999) .............................................................. 5

*Haynes v. Level 3 Commc'ns LLC,*
   456 F.3d 1215 (10th Cir. 2006) ............................................................ 5

*Haynes v. Williams,*
   392 F.3d 478 (D.C. Cir. 2004) .............................................................. 3

*Hinson v. Clinch County Bd. of Educ.*,
231 F.3d 821 (11th Cir. 2000) ........................................................................ 5

*Howard Univ. v. Best*,
484 A.2d 958 (D.C. 1984) ........................................................................ 15-16

*Jeffers v. Thompson*,
264 F. Supp. 2d 314 (D. Md. 2003) .................................................................. 5

*Johnson v. City of Fort Wayne*,
91 F.3d 922 (7th Cir. 1996) .............................................................................. 6

*Johnson v. Holway*,
Civ. Act. No. 03-2513(ESH), 2005 U.S. Dist. LEXIS 34787
(D.D.C. Dec. 6, 2005) ................................................................................... 18

*Kerzer v. Kingly Mfg.*,
156 F.3d 396 (2d Cir. 1998) ............................................................................ 8

*Mason v. S. Illinois Univ.*,
233 F.3d 1036 (7th Cir. 2000) ......................................................................... 6

*Mastro v. Potomac Elec. Power Co.*,
447 F.3d 843 (D.C. Cir. 2006) ...................................................................... 17

*Mitchell v. Baldrige*,
759 F.2d 808 (D.C. Cir. 1985) ...................................................................... 10

*Mosrie v. Trussell*,
467 A.2d 475 (D.C. 1983) ............................................................................. 18

*Moss v. Stockard*,
580 A.2d 1011 (D.C. 1990) ...................................................................... 17-18

*Mungin v. Katten Muchin & Zavis*,
116 F.3d 1549 (D.C. Cir. 1997) ...................................................................... 5

*Neuren v. Adduci, Mastriani, Meeks & Schill*,
43 F.3d 1507 (D.C. Cir. 1995) ........................................................................ 5

*Onuoha v. Grafton Sch., Inc.*,
182 F. Supp. 2d 473 (D. Md. 2002) ................................................................ 6

*Prins v. Int'l Tel. & Tel. Corp.*,
757 F. Supp. 87 (D.D.C. 1991) ..................................................................... 15

*Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*,
59 F. Supp. 2d 27 (D.D.C. 1999) .............................................................. 19-21

*Sorrells v. Garfinkel's, Brooks Bros., Miller & Rhoads, Inc.,*
    565 A.2d 285 (D.C. 1989)................................................................................. 20

*Stahl v. Sun Microsystems, Inc.,*
    19 F.3d 533 (10th Cir. 1994)............................................................................. 8

*\*Wallace v. Skadden, Arps, Slate, Meagher & Flom,*
    715 A.2d 873 (D.C. 1998)................................................................... 4, 17-18

*\*Washburn v. Lavoie,*
    357 F. Supp. 2d 210 (D.D.C. 2004)................................................................. 18

*\*Washburn v. Lavoie,*
    437 F.3d 84 (D.C. Cir. 2006) ........................................................................... 17

*Whetstone Candy Co. v. Nat'l Consumers League,*
    360 F. Supp. 2d 77 (D.D.C. 2004).................................................................. 20

*Wiggins v. Phillip Morris, Inc.,*
    853 F. Supp. 458 (D.D.C. 1994)..................................................................... 15

# PRELIMINARY STATEMENT[1]

The purpose of summary judgment is to determine whether undisputed material facts dictate judgment in a party's favor without trial.  Notwithstanding Gaujacq's massive filings, in actuality the parties differ little on the legal standards to apply and even less on the *material* facts.  When Gaujacq's twists on facts are untangled and her unsupported theories scrutinized, no reasonable jury can find in her favor on any Count brought against Christian Nadal.

Gaujacq's opposition does not dispute that, in all, Nadal spent less than three hours in Gaujacq's company during but two face-to-face meetings.  Most of their interaction was in their first meeting in February 2004, which Gaujacq characterizes as business-like and pleasant.  The remaining few telephone calls and relevant emails between them, as well as their only other meeting on July 12, are well-documented in a record that reflects considered, reasonable, and even restrained actions on Nadal's part, all taken in his efforts to manage EDF and EDFINA affairs in the face of Gaujacq's admitted refusals to adhere to his requests and directions.

Beyond her concession of their admittedly limited personal exchanges, Gaujacq's opposition is also striking for the complete absence of even a single assertion (much less any evidence) of a facially sexist comment or sexist act on the part of Nadal, the alleged malefactor.  With no direct evidence of discriminatory or malicious animus, Gaujacq's circumstantial case rests on two emails in March and April 2004 in which Nadal, based on actions that Gaujacq does not dispute having taken by that time, shared with EDF superiors his mistrust of Gaujacq and lobbied EDF to place Gaujacq outside of his new sphere of responsibility.  Gaujacq interprets the emails and Nadal's early dealings with her as showing that Nadal doubted whether he could

---

[1] Nadal adopts the reply filings of corporate defendants Electricité de France, S.A. ("EDF") and Electricité de France International North America, Inc. ("EDFINA") insofar as they relate to claims involving him and addresses herein only those Counts brought against him individually.

work with her before he had "any rational or legitimate justification" for such a belief, and suggests that his doubts equate to gender bias and malice.  *See* Plaintiff's Opposition to Defendant Christian Nadal's Motion for Summary Judgment ("Pl. Nadal Opp."), Dkt. 117, at 6.

Gaujacq's hasty assumption of malice and prejudice toward women by Nadal has no grounding in any fact.  First, Gaujacq points to the initial meeting on February 25, 2004, when Nadal traveled from France to meet his new team at the EDFINA offices and had lunch with Gaujacq.  Nothing suggests bias when Nadal showed "disappoint[ment] in this meeting, in that it appeared to him that Ms. Gaujacq was not aware of his future position with EDFINA."  *See* Pl. Nadal Opp. at 6.  The second fact Gaujacq points to is Nadal's March 5, 2004 meeting with Betouret.  *Id.*  Yet, Gaujacq acknowledges that Nadal merely "requested clarification of the scope of his mission and whether it would include the responsibilities previously set forth in Ms. Gaujacq's mission, either partially or totally."  *Id*.  In other words, having been appointed to serve as EDF General Representative for North America and EDFINA President, and having been told by Gaujacq on February 25 that she did not intend to vacate the President position, Nadal quite naturally sought clarification of his mission.  Nothing so far suggests that Nadal lacked what Gaujacq describes as "rational or legitimate justification" for his actions.

Nadal's March 10 email followed.  Gaujacq had not yet conceded any error on her part about Nadal's assignment.  *See* Statement of Defendants pursuant to FRPC 56.1 and Local Rule 7(h) ("Def."), Dkt. 101-1, Ex. 38.  While Nadal did express strong reservations about sharing responsibilities with Gaujacq, the email in context said much more.  In it, Nadal expressed grave concerns that the goal of his mission in the United States was being "severely attacked" by Gaujacq, that his "transfer is making no progress and cannot advance because of the visa problems" [which Gaujacq was in charge of], and that in light of Gaujacq's statements that "she

will be keeping her position and that I will join the office as someone sent by the President to deal with gas matters and financial communications," he needed "a prompt and strong clarification." He characterized the situation with Gaujacq as "surrealistic" – not at all surprising given the events that had occurred to date – and he insisted that any future mission of Gaujacq be clearly defined, directed by EDF in France, and not interfere with his future position. Nadal's April 1 email expressed similar thoughts – that because Gaujacq had created so much difficulty and controversy she had "passed the point of no return with everyone and in all areas, and this is against all reason and without any necessity." Because of Gaujacq's bizarre actions, Nadal reiterated that she should be assigned new responsibilities in a different area and that he would prefer that her activities for the EDFINA office end promptly. Def. Ex. 45.

Thus, a careful reading of the two emails and preceding events shows that no reasonable fact finder could find either discriminatory intent or malice. Gaujacq should not be allowed to proceed past summary judgment on unreasonable speculation and unsupported theories. *Haynes v. Williams*, 392 F.3d 478, 485 (D.C. Cir. 2004) ("The possibility that a jury might speculate in the plaintiff's favor is insufficient to defeat summary judgment.").

I.  **GAUJACQ'S LIMITED ADMISSIBLE EVIDENCE IS INSUFFICIENT TO MAKE OUT A PRIMA FACIE CASE OF AIDING AND ABETTING GENDER DISCRIMINATION AGAINST NADAL (COUNT IV).**

   A.  **Because Gaujacq Lacks Record Support for Any Adverse Employment Action or Gender-Based Action by Nadal, Her New Claim For Disparate Treatment Fails.**

   Notably, Gaujacq's first argument on Count IV (Pl. Nadal Opp. at 19-21) is a newly-minted one – her Complaint does not even include a disparate treatment claim.[2] The Court

---

[2] Count IV could not have been pled more clearly – it alleges that Nadal "aided and abetted the Company's discrimination against Ms. Gaujacq on account of her gender . . . . This discrimination *was with respect to the terms, conditions, and privileges of Ms. Gaujacq's employment at the company creating a hostile and intolerable work environment . . . .*" Compl. ¶ 265 (emphasis added).

should be highly skeptical about Gaujacq's total recast of her gender discrimination claim at this late date. But ultimately it is of no matter – this claim works no better than the hostile environment claim she originally brought because she cannot show (1) that Nadal was involved in any "adverse employment action" and (2) that any action involving Nadal was taken on the basis of her gender. *See Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). A plaintiff's *prima facie* case must demonstrate an adverse employment action, and that such action was taken "because" of her protected status. *Id.* at 1130-31. Furthermore, as an alleged "aider and abetter," Gaujacq must show that Nadal himself knew of, participated in, and acted in a manner designed to result in an illegal (i.e., on the basis of gender) adverse employment action. *See Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998).

All parties appear to agree on the legal standard for an adverse employment action: one which affects the "terms, conditions, or privileges of . . . employment . . . such that a reasonable trier of fact could find objectively tangible harm." *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). *See* Pl. Nadal Opp. at 20. But, having acknowledged the legal threshold, Gaujacq fails to apply it to her own case. Except for her termination by EDF many months after Nadal ceased to have any involvement with her, Gaujacq suffered no adverse action by Nadal within the meaning of Title VII or the District of Columbia Human Rights Act. Nadal did not deny her a bonus, did not give her a performance appraisal that lowered her salary, did not reduce her benefits, did not change her hours of work, did not demote her, and did not do anything else that produced any tangible harm to her. The minor slights that Gaujacq claims Nadal inflicted – removing her as a signatory on EDFINA checks, asking her to bring company files to the office on short notice, changing her ability to sign contracts on behalf of EDFINA when she ceased to be EDFINA President, allegedly denying her access to a conference call number, and allegedly temporarily

4

deactivating her business credit card – do not qualify under this standard as adverse employment actions.[3]  *Forkkio*, 306 F.3d at 1130-31 (actions imposing purely subjective harms, such as dissatisfaction or humiliation, are not adverse).  Even Nadal's replacement of Gaujacq with another employee for responsibility on the NuStart consortium project does not qualify as adverse action.  *See Haynes v. Level 3 Commc'ns LLC*, 456 F.3d 1215 (10th Cir. 2006) (alteration of job responsibilities is not adverse action); *Box v. Principi*, 442 F.3d 692 (8th Cir. 2006) (same).  In short, the record points to no actions by Nadal that can meet the *prima facie* standard.  Even granting all reasonable inferences in her favor, the only tangible harm Gaujacq suffered – termination by EDF – came many months later, with no evidence whatsoever linking that action to Nadal.[4]

Even if she could meet the threshold adverse action requirement, Gaujacq cannot point to any evidence of action by Nadal sufficient to raise an inference of gender bias for her disparate treatment *prima facie* case.[5]  Gaujacq's theory in this regard is that Nadal wanted her gone from EDFINA from the moment he was assigned to that office because he was hostile towards her as a

---

[3] The conference call number and credit card arguments are also based on sheer speculation, with no evidentiary basis linking them to Nadal.  Gaujacq has no admissible testimony or documentary evidence as required by Rule 56 regarding the source of the conference call number change.  Likewise, she has no evidence that Nadal was responsible for the temporary interruption of her business credit card.  Wholly conclusory statements for which no supporting evidence is offered may not be considered on summary judgment.  *Greene v. Dalton*, 164 F.3d 671, 674-75 (D.C. Cir. 1999).

[4] Because Gaujacq never accepted EDF's offer of a reassignment to France, there is no actionable adverse event on that issue either.  *Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 829 n.10 (11th Cir. 2000) ("A proposed uneffectuated transfer is not an adverse employment action."); *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003) (proposed action that is never carried out does not constitute adverse employment action).

[5] Generally an inference of discrimination for the *prima facie* case is shown when the plaintiff proves differential treatment with respect to an adverse employment action compared to male employees similarly situated in all material respects.  *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549 (D.C. Cir. 1997); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).  Simply comparing herself to any male employee is insufficient as a matter of law.  In this instance she offers no evidence that other employees kept critical EDFINA files at home, performed most of their work out of the office, or operated in a manner to create distrust, so even if an adverse employment action were shown, there is no comparably situated comparator.

woman.  Pl. Nadal Opp. at 2.  But it is a theory only.  *See supra* pp. 2-3.  Gaujacq points to no

evidence – no gender-based comments, or actions, or other suggestive behavior.  As such her

theory of discriminatory animus is rank speculation and cannot meet the "substantial evidence"

standard this Court must apply on summary judgment.  *See Bortell v. Eli Lilly & Co.*, 406 F.

Supp. 2d 1, 11 (D.D.C. 2005).[6]

**B.    Granting All Reasonable Inferences in Gaujacq's Favor, the Evidence of
Nadal's Conduct Fails To Establish A Hostile Work Environment on the
Basis of Gender.**

Despite Gaujacq's lengthy polemic insisting that Nadal was out to get her from the start,

the admissible evidence supporting her hostile work environment claim is as thin as her claim of

disparate treatment.  It is undisputed that prior to June 1, 2004 Nadal and Gaujacq did not even

share the same work environment – they operated in separate countries with minimal contacts

with each other – all of which were mundane.  And, while Gaujacq repeatedly purports to rely on

the two emails in March and April 2004 that she claims show hostility by Nadal, since it is

undisputed that Gaujacq was not privy to any of the emails she now claims were "hostile,"  their

content is irrelevant to this claim.[7]  Moreover, Gaujacq concedes that Nadal was "polite" to her

---

[6] Indeed, the evidence, undisputed by Gaujacq, is that it was only after Nadal experienced Gaujacq's strange behavior with respect to his arrival and assumption of her position that he determined that he did not want to share responsibility with her.  *See* Def. Christian Nadal's Mot. for Summary Judgment ("Nadal Br."), Dkt. 107, at 22 (*citing* Gaujacq's suspicious actions regarding Nadal's visa, unexpected behavior at the Feb. 25th Washington meeting, and general resistance to the transition of authority).

[7] A plaintiff cannot base a hostile work environment claim on conduct of which she is not contemporaneously aware.  *See Mason v. S. Illinois Univ.*, 233 F.3d 1036, 1046 (7th Cir. 2000)("Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other).");  *Onuoha v. Grafton Sch., Inc.*, 182 F. Supp. 2d 473, 483 (D. Md. 2002) (court refused to consider offensive remarks when there was no evidence or allegation showing the conduct occurred in plaintiff's presence or that he was aware of it when it occurred); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 938 (7th Cir. 1996) (harassing conduct must be directed at the employee in order to show racially hostile environment); *Edwards v. Wallace County College*, 49 F.3d 1517 (11th Cir. 1995) (conduct which plaintiff learns about after termination cannot form the basis for hostile work environment).

prior to June 1 and that she was unaware of what she now considers hostile activity.  Declaration of Catherine Gaujacq ("Gaujacq Decl."), Dkt. 116, ¶ 61.

The allegedly "hostile" conduct cited by Gaujacq that is within the proper time frame (Pl. Nadal Opp. at 24-25) consists of four discrete events – Nadal's alleged "interference" with her immigration status after her US assignment ended,[8] the July 12th meeting in which Nadal purportedly demanded documents in a "demeaning" tone and also stood up and pointed at her,[9] and the conference call number and credit card issues earlier mentioned.  The latter two lack evidence sufficient to be considered in opposing summary judgment.[10]  Even including these two, and viewing all the claims in the aggregate, however, the events of which Gaujacq complains do not rise to the "severe and pervasive" standard for a hostile work environment claim.  *See George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005).  Indeed, Gaujacq does not even attempt to argue the standard.  Rather, she argues that the listed events, plus Nadal's assignment of some job duties she previously held in her position as President to male colleagues, was "abusive."  (Pl. Nadal Opp. at 26.)  This is not the legal standard.  *See Leavitt*, 407 F.3d at  416.

---

[8] The "interference" referred to by Gaujacq involves accurate business communications from EDFINA's outside counsel informing USCIS of Gaujacq's recall to France by EDF, which recall made EDFINA's support for Gaujacq's L1-A visa and I-140 petitions moot.  By that time, Gaujacq had already received permanent resident status (a green card) on August 26, 2004.  Gaujacq Decl. ¶ 79.  No reasonable inference can be drawn that such communications were for a discriminatory or retaliatory purpose: given that Gaujacq's EDFINA mission had ended on July 31, 2004, it was simply responsible business practice for EDFINA, as visa sponsor, to inform USCIS of the fact that she no longer served as an officer of the U.S. entity.

[9] Gaujacq's Opposition (at 24-25) misstates even Gaujacq's own sworn testimony as to the one event she deems critical. While she testified that Nadal pointed his finger at her and jumped up from his chair at a meeting when she refused to return EDFINA documents, no sworn testimony or document describes that Nadal "yelled" or "put his fingers in her face."  *See* Pl. Nadal Opp. Att. 6 (Gaujacq Dep. at 76-79, 389-93); Gaujacq Decl. ¶ 69.

[10]  *See* note 3, *supra.*

Gaujacq also has no response to Nadal's argument that she cannot show any connection between any of the perceived slights and her gender. As noted earlier, this case contains not a single gender-based comment or act. Assigning discrete tasks to male colleagues and requiring Gaujacq to comply with his directives about office matters, absent more, is insufficient to establish that Nadal created a hostile environment because of Gaujacq's sex. A severely or pervasively hostile environment almost universally requires much more – either hostile physical acts towards women or repeated verbal slurs or visual behavior directed towards them because they are female. *See, e.g.*, *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994) (no hostile work environment claim when employee's unpleasant environment is due to supervisor's general vulgarities as opposed to sex-related discrimination).

### C.    Gaujacq Cannot Rebut Nadal's Legitimate, Nondiscriminatory Explanation for His Actions.

Because the facts do not even support a *prima facie* case for either a disparate treatment or hostile work environment claim, Nadal's legitimate business justifications need not even come into play. But, if they did, Gaujacq's argument that his explanations are a "pretext" for unlawful discrimination is based on the same circular and conclusory allegations as her *prima facie* case argument – *i.e.*, that Nadal had it in for her. Pl. Nadal Opp. at 2. Nothing in her argument disputes the logical explanations offered by Nadal for the actions he took, but instead Gaujacq chooses to rely on the same conclusory "non-evidence" she relies on in her case in chief. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.").

Notably, Gaujacq does not deny the veracity of the facts underpinning Nadal's decisions. For example, she does not dispute that she and Nadal were not in the office on the same day at any time between Nadal's start (June 1) and his assignment of check-signing authority to Dreux

(June 11).  Thus, Nadal's proffered explanation that he chose Dreux because he was regularly in the office has not been rebutted.  Gaujacq's claim that there had never been an "issue" of check signing in her four previous years as President is immaterial and does not counter Nadal's justification for the change.  Similarly, Gaujacq has not rebutted Nadal's explanation for requesting prompt return of the company's business documents.  The fact that Gaujacq may have found his request difficult to comply with in no way undercuts the legitimacy of the request.

Given the absence of material disputes as to the events that occurred between Nadal and Gaujacq, and Gaujacq's inability to establish the elements of either a claim of disparate treatment or hostile work environment, Count IV against Nadal should be dismissed.

## II.  GAUJACQ CANNOT LINK NADAL TO ANY RETALIATORY ACTS FOLLOWING HER JULY 22, 2004 FIRST COMPLAINT TO HIM, AND THUS COUNT VI (AIDING AND ABETTING RETALIATION) FAILS.

Gaujacq fails to dispute the facts material to this claim, and thus it is ripe for disposition on summary judgment.  Gaujacq indicates that her first "complaint" to Nadal came no earlier than July 22, 2004.  Pl. Nadal Opp. at 30.  It is undisputed that Nadal was unaware that Gaujacq was filing an EEOC charge until he received a copy on August 6, 2004.  Nadal Decl. ¶ 57.  Even granting Gaujacq the benefit of her July 22, 2004 date as the date of her first complaint to Nadal, admissible evidence of adverse actions by him is virtually nil *after* that date, since her Vice-President position ended just one week later.  It is impossible to "retaliate" without knowledge of a complaint of discrimination or knowledge that an employee is opposing a practice unlawful under the discrimination laws.  Nonetheless, Gaujacq looks to events before July 22 – refusal to reinstate check-writing authority (early June); demand for documents and meeting with Forêt (July 12); removal of authority to enter into contracts (June 18) – as "evidence" of retaliation by

Nadal. *See* Pl. Nadal Opp. at 31.[11]  Those actions cannot serve as evidence of retaliation given that they predate the date she first complained to Nadal and, therefore, lack the causal connection essential for a *prima facie* case. *See Mitchell v. Baldrige,* 759 F.2d 808 (D.C. Cir. 1985).

Events involving Nadal after July 22, 2004 do not support her retaliation claim either. The parties agree on the standard – "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2412 (2006), *cited in* Pl. Nadal Opp. at 30.  What events does Gaujacq point to in this time frame?  There are three.[12]  The first is Nadal's supposed refusal to supply a so-called letter of continuous employment for Gaujacq in August 2004.  *See* Pl. Nadal Opp. at 31, Att. 45.  Gaujacq's record citation, however, includes no evidence of Nadal's conduct, but simply recounts her July 31 request for such a letter and includes a response from EDFINA's immigration counsel indicating that he as legal counsel could not issue such a letter.  Indeed, a letter stating that she was still serving as an officer of EDFINA,[13] when she had been reassigned as Chargée de Mission to the Energy Branch (in France), would have been improper. Def. ¶ 128.  Moreover, it is undisputed

---

[11] Gaujacq muddies the timeline of events surrounding her retaliation claim in an effort to use pre-complaint activities as part of her evidence.  For example, she alleges that Nadal "used an EDF audit to suggest that Mrs. Gaujacq had done something inappropriate," while knowing full well that the alleged conversation (wherein Nadal commented that a lack of documentation for expenditures was very "serious") occurred on or around July 9th – roughly two weeks before Gaujacq ever complained to Nadal. *See* Pl. Nadal Opp. at 33.

[12] Two others – Gaujacq's allegations regarding the August 9th failure of her business credit card, and change of call-in number for the August 18th NuStart call  – are not based on admissible evidence and must be disregarded in their entirety.  *See supra,* note 3.

Gaujacq's other claim -- that Nadal regarded Gaujacq's complaints as "blackmail" – cannot form the basis of a retaliation claim because it is false.  Pl. Nadal Opp. at 30 n.22.  Nadal never used the term.  It appears that Gaujacq has confused Nadal with a different senior EDF employee, Yann Laroche, who used the term in his [Laroche's] deposition.

[13] EDF and EDFINA dispute that Gaujacq was ever an employee of EDFINA, but any relationship with EDFINA terminated on July 31, 2004, when she was reassigned to a different branch within EDF.

that Nadal's supervisory responsibilities over her ended on the same date she made this request of him, July 31, 2004. *Id.* Accordingly, EDF personnel in France where she was then assigned – not Nadal – would have been the proper individuals to issue such a document. *See id.* It is also undisputed that Gaujacq was never denied entry into the United States due to any immigration concerns and in fact obtained her permanent green card on August 26, 2004. Pl. Nadal Opp. Att. 6 (Gaujacq Tr. at 438); Gaujacq Decl. ¶ 79. Given these undisputed facts, it is hard to imagine any theory under which this amounts to a retaliatory act by Nadal. The action complained of is not materially adverse; if there was inaction by Nadal personally it was for a legitimate reasons (she did not work for him and she no longer had any role whatsoever at EDFINA), and no harm occurred.

The second claimed act of retaliation relates to Gaujacq's August 3, 2004 inquiry to Nadal and Ponasso regarding attendance at certain future meetings that related to her former EDFINA function. Pl. Nadal Opp. at 31. She asked: "Given my current situation, please advise if the Company doesn't want me to attend to these matters on its behalf?" Def. Ex. 76. Nadal informed her that she should not attend those events, *id.* Ex. 77, which was consistent with her new appointment and different responsibilities as Chargée de Mission of EDF's Nuclear Generation Division in its Energy Branch. *Id.* Ex. 79. Telling an employee whose job duties have changed that she need not continue with responsibilities of her former position can hardly be viewed as negative, much less retaliatory.

The third claimed act of retaliation by Nadal involves Gaujacq's cryptic reference to two letters from EDFINA's outside immigration counsel to USCIS regarding the cessation of Gaujacq's service as an officer of EDFINA – letters sent months after Gaujacq had obtained her green card for permanent residency status. Gaujacq Decl. ¶ 79. EDFINA, as sponsor of

Gaujacq's L-1A work visa and I-140 petition, quite naturally felt obligated to keep USCIS properly informed of changes with respect to Gaujacq's service as an EDFINA officer, as is customary in such situations. Communication to regulatory authorities to correct out-of-date information on an individual on a sponsored visa, when that individual already has permanent residency, is hardly the stuff of a reprisal claim.

Gaujacq's only other contention, that EDF's termination of her for failure to report to her next position in France was "at Nadal's behest" (Pl. Nadal Opp. at 33), is also, predictably, without evidentiary support and belied by the undisputed evidence of record. It is far past the time for Gaujacq to rely on unsupported conclusory claims in her complaint. Nadal is entitled to summary judgment on the claims of aiding and abetting retaliation in Count VI.

## III.    GAUJACQ CANNOT ESTABLISH THAT NADAL DEFAMED HER.

Nadal's moving brief demonstrated: (1) that the innocuous statements and actions relied on by Gaujacq cannot reasonably be viewed as defamatory; and (2) that even if they could be viewed that way, the undisputed record establishes that all such statements and actions were confined to persons with a legitimate interest in their subject matters and were thus legally privileged. *See* Nadal Br. at 27-35. Gaujacq's Opposition adds only two actions or incidents not anticipated and dealt with in detail in Nadal's moving brief – a change by Nadal of who could enter into contracts on behalf of EDFINA and a business meeting in which Gaujacq says she was "demeaned" by Nadal in front of another employee. Neither would support a defamation verdict. Furthermore, Gaujacq makes no challenge whatsoever to Nadal's showing that all of the challenged statements or actions were made to persons with an interest in their subject matters and were thus privileged. Rather, she incorrectly asserts that *Nadal* must prove absence of

malice to prevail[14] and that his two early emails could support a finding of malice.  Once again, these two emails cannot bear this freight, and Gaujacq's defamation count should be dismissed.

> **A.**    **The Statements and Actions That Gaujacq Identifies Are Not Defamatory in Character and, in Any Event, Were Made Only to Interested Persons.**

None of the statements Gaujacq attributes to Nadal[15] is defamatory, and she does not dispute that each was shared only with persons interested in the subject matter.  She first focuses on the June 4, 2004 Nadal letter to Riggs Bank regarding EDFINA check-signing authorizations.  She declares, with no explanation, that the letter (copied from a form Gaujacq herself had sent previously) somehow suggested to Riggs Bank that she was incompetent to sign checks in her role as an EDFINA vice president.  *See* Pl. Nadal's Opp. at 45.  As set out in Nadal's moving brief (at pp. 34-35), the plain communication by EDFINA's President to its bank of a new slate of authorized check signers could not possibly support a defamation verdict.[16]  Moreover nothing in the record indicates that the bank was aware of personnel changes at EDFINA or even that Gaujacq was continuing as Vice President.  There is thus no support for Gaujacq's unreasonable inference that this unadorned business communication reflected on her "competence."  Finally, it was sent to a bank officer responsible for the account and thus was privileged.[17]

---

[14] Gaujacq cites the wrong standard under which these claims should be evaluated, using the lower review standard appropriate for a motion to dismiss rather than the standard for summary judgment.  *See* Pl. Nadal Opp. at 44.  Nadal's summary judgment motion tests the sufficiency of Gaujacq's *evidence* to reach a jury, and the undisputed record does not support Gaujacq's defamation claim.

[15] As set out below, Gaujacq expressly attributes one statement on which she would base her defamation claim to an entirely different individual – Mr. Dreux.

[16] The letter's reference to Gaujacq could not have been more limited and factual: "Mrs. Catherine Gaujacq is no longer official signature holder of Electricité de France International North America, Inc.  She has been replaced by Mr. Christian Nadal.  Therefore our company at this point has only two officials responsible for the signature of checks, Mr. Christian Nadal and Mr. Benoit Dreux."  Nadal Br., Ex. 3.

[17] Gaujacq also inexplicably identifies as defamatory an "announcement" made by *Dreux* – not Nadal – regarding the change in check-signing authority.  Pl. Nadal Opp. at 45.  As addressed by Nadal in his motion, and as has gone unchallenged in Gaujacq's opposition, there is no basis in law or in fact for attributing to Nadal defamation liability for a statement made by another person.  *See* Nadal Br. at 34.

Second, Gaujacq identifies as defamatory two June 18, 2004 letters from Nadal, concerning which EDFINA officers would have authority to enter into contracts and incur expenses on behalf of EDFINA, because they somehow purportedly imply that she was incompetent. The letters, which speak for themselves, contain no suggestion of incompetence and could not support a defamation verdict. In addition, other than Gaujacq herself, the letters were addressed only to Dreux, who, as an affected EDFINA vice president, had an interest in the subject matter that Gaujacq does not dispute. Nadal's communication was thus privileged.

Third, Gaujacq continues to argue that Nadal's statement in connection with EDF's 2004 audit of EDFINA "suggest[ed] that Ms. Gaujacq had done something inappropriate related to one or more of EDFINA's contractors." Pl. Nadal Opp. at 45. And, rather than squarely addressing Nadal's arguments (Nadal Br. at 29-30), she attempts to slide over her own testimony as to the very words she claims are defamatory. At deposition, Gaujacq was asked to state *exactly* what was said in the conference call with the auditors.

> **Q**. Who was on the conference call?
> **A**. Mr. Nadal was on the conference call. The other persons were in the conference room of EDFINA and the other persons, Benoit Dreux and the two auditors.
> **Q**. And you were there?
> **A**. And I was there.
> **Q**. *Tell me exactly what Mr. Nadal said*.
> **A.** My recollection is that *the auditor* said there are some contracts we couldn't find any related documentation and specifically talked -- they specifically talked about two contracts. One was a contract for Mr. Walter Nolan and the other was the contract for Mr. Francois Ailleret.
> **Q**. *Anything else*?
> **A**. Since none of the auditors talked to me about any of those contracts I was really amazed what I was, you know.
> **Q**. *Was anything else said in that conference that concerned you*?
> **A**. This was really concerning me. You've got to remember that it was right after the letter dated June 18 that I had just found what was going on with the second letter sent to Benoit Dreux and when he talked about the -- *the auditors talked about the issue of the contracts, they had not asked me during my own interview and Mr. Nadal over the phone said oh, this is very serious.* I didn't say anything and then I complained to Fernando Ponasso and I complained -- I complained to Fernando Ponasso because I

really thought that -- I mean, he was discriminating with one in every action we could imagine about. And I said that -- well, I don't want to.

Def. Ex. 1 (Gaujacq Tr. 483-484) (emphasis added).

Defamation must, by definition, be based on the words stated by the alleged wrongdoer. *See Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 34 (D.D.C. 1995) (newspaper cannot be held liable for "imagined slights"; "[t]he words actually written must be read in context and be given reasonable interpretations"), *aff'd mem.*, 88 F.3d 1278 (D.C. Cir. 1996); *Prins v. Int'l Tel. & Tel. Corp.*, 757 F. Supp. 87, 91 (D.D.C. 1991) (for defamation claim "'the words themselves'" and the entire context must be considered)(citation omitted); *see also Wiggins v. Phillip Morris, Inc.*, 853 F. Supp. 458, 465 (D.D.C. 1994) (*quoting Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8th Cir. 1979), that "'knowledge of the exact language used is necessary to form responsive pleadings'"). As is clear from her sworn testimony, Gaujacq, when asked to testify as to exactly what Nadal said, responded that he stated "oh, this is very serious" after *the auditors* stated that there were some contracts for which documentation could not be located. There was nothing defamatory about Nadal's remark – he merely commented on the auditors' documentation concerns, as he had every right to do as head of the office being audited. No reasonable jury could conclude that Nadal's statement about missing documentation was untrue, or that it made Gaujacq appear "'odious, infamous, or ridiculous.'" *Howard Univ. v. Best,* 484 A.2d 958, 989 (D.C. 1984) (citation omitted). *See also* Nadal Br. at 30. And everything he said was limited to those persons with an interest in the audit and its results and was thus privileged, an undisputed fact ignored by Gaujacq. *Id.*

Fourth, Gaujacq asserts, in conclusory fashion, that Nadal "demeaned" her in front of a subordinate, Forêt, in demanding that she return company documents. Pl. Nadal. Opp. at 45.

15

Again, what is important is not counsel's gloss, but Gaujacq's sworn testimony as to the precise

words she says Nadal uttered at the July 12 meeting:

> **Q**:  I want you to tell me if you can what he [Nadal] said to you, as close as you
> can remember, *what words he used when he spoke to you,* one thing at a time.
> What did he say to you?
> **A**:  The only thing I recall today, now, that we are speaking is *when he jumped
> out of his office where he was sitting and he tells me I'm the General Delegate of
> EDFINA and you have to comply to my orders or you are going to have to, you
> know.*  That's the only think I recall from this meeting.  That's the only thing I
> recall from this meeting.  The rest of the meeting – and even at this time I tried to
> stay calm but I just couldn't believe what he was doing in front of another male
> again.  I mean  --
> **Q**: Jon Luc, was Jon Luc Forêt present when Christian Nadal said you have to
> comply with my orders?
> **A**. Yes.

Pl. Nadal Opp. Att. 6 (Gaujacq Tr. at 391-92) (emphasis added).   No reasonable juror could

return a defamation verdict for Gaujacq on the basis of the words she claims Nadal uttered –

"you have to comply with my orders," even if spoken as a threat (as Gaujacq's counsel described

them).  While perhaps unpleasant or offensive to Gaujacq, the statement did not defame her.  *See*

*Howard Univ.*, 484 A.2d at 989.   And, as with the rest, the words were concededly privileged,

published only to the individual assigned to the NuStart project (which files were being

requested).

Finally, Gaujacq asserts, without record support, that her "sudden removal" from NuStart

responsibilities "created fear in her that members in the business community would receive a

negative, albeit unfounded, impression of her work."  Pl. Nadal Opp. at 45.  A personnel action

by Nadal that "created fear" of negative views of her does not constitute defamation.  *See also*

Nadal Br. at 30-31.  And again, Gaujacq fails to dispute the applicability of the common interest

privilege to Nadal's actions with respect to meetings of the members of NuStart.  *See id*. at 31.

16

**B.      Gaujacq Cannot Demonstrate Malice by Nadal To Overcome the Otherwise Uncontested Privileged Character of the Communications.**

Although Gaujacq's moving papers suggest otherwise, the burden of defeating the common interest privilege is clearly hers.[18]  *See Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 879 (D.C. 1998) ("In order to overcome the privilege, it is incumbent on the party complaining to show malice.") (internal citation and quotation omitted).  Not only is the burden of proving malice on Gaujacq, but "District of Columbia law makes it quite difficult for a plaintiff to overcome a qualified privilege."  *Washburn v. Lavoie*, 437 F.3d 84, 91 (D.C. Cir. 2006).

Only publication with malice (or excessive publication, not argued here) can overcome the common interest privilege Gaujacq concedes applies to her defamation claims.  *See Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990)(reciting standard).   Gaujacq bases her malice argument on the two emails sent by Nadal more than three months before the first alleged defamatory statement.  *See* Pl. Nadal Opp. at 46 (*citing* Def. Exs. 44 & 45).  The crux of her argument is that the earlier emails show malice because in them Nadal expressed his disfavor for Gaujacq continuing at EDFINA after he commenced his assignment.

The two emails, addressed in detail above at pages 1-3, are insufficient to meet Gaujacq's burden to prove malice.  There was just cause for Nadal's concerns expressed in them, and malice requires proof of "the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will."  *Moss,* 580 A.2d at 1025; *Mosrie v. Trussell,* 467 A.2d 475, 477 (D.C.

---

[18]   Instead of acknowledging her burden, Gaujacq attempts to conceal it by selectively paraphrasing the law in *Mastro v. Potomac Elec. Power Co.*.  *Mastro* states that "[w]hile the defendant bears the burden of proving the elements of the common interest privilege, the burden of defeating the privilege by showing excessive publication or publication with malice lies with the plaintiff."  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006).

1983).  Moreover, because of the common interest privilege, Nadal "'[is] presumed to have been actuated by pure motives'" in publishing the challenged statements.  *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d at 879 (citations omitted).  Thus, Gaujacq's bald assertion of "bad faith" is not enough.  Unless a statement is "'so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice,'" it is insufficient to support a finding of malice on its own.  *Moss,* 580 A.2d at 1024 (*quoting Ford Motor Credit Co. v. Holland*, 367 A.2d 1311, 1314 (D.C. 1977)).  Neither the words or tone of the two emails, or the alleged defamatory statements, can reasonably be considered to have such characteristics.[19]  Finally, the fact finder must look to "to the primary motive by which the defendant is apparently inspired; and, the fact that he feels resentment and indignation towards the plaintiff and enjoys defaming him will not forfeit the privilege so long as the primary purpose is to further the interest which is entitled to protection."  *Mosrie*, 467 A.2d at 477-78.  Thus even proof of frustration, exasperation or even animosity towards Gaujacq would not defeat Nadal's privilege.  *Id.* at 479.

## IV.    PLAINTIFF CANNOT ESTABLISH TORTIOUS INTERFERENCE

In yet another change of direction following Nadal's motion,[20] Gaujacq opposes summary judgment on Count VIII by pointing to two supposed contracts with EDF (the "2000 Expatriate

---

[19]    Gaujacq may not rely on her allegation of defamation "per se" to show malice.  "Proof of defamation *per se* . . . frees a plaintiff only from the burden of proving damages; it does not supply proof of actual malice for purposes of establishing liability."  *Johnson v. Holway*, Civ. Act. No. 03-2513(ESH), 2005 U.S. Dist. LEXIS 34787 at * 98 (D.D.C. Dec. 6, 2005) (rejecting plaintiffs' suggestion that defendants defeated their common interest privilege by making statements that amounted to defamation per se) (*citing Washburn v. Lavoie*, 357 F. Supp. 2d 210, 214 (D.D.C. 2004)).

[20]    Until her opposition brief, Gaujacq's tortious interference claim against Nadal appeared to be premised on a theory that Nadal caused EDF to terminate Gaujacq's employment, leading to damages in the form of lost salary and employment benefits.  *See, e.g.*, Compl. ¶ 317.  Gaujacq now concedes that she cannot recover any damages allegedly flowing from such a claim.  *See* Pl. Nadal Opp. at 40 n.29.

Contract" and a purported "2004 Expatriate Contract"), arguing that Nadal tortiously interfered with both of them.  These new tort theories against Nadal are as flawed as her initial claim.

A.    **Gaujacq Cannot Show That Nadal Tortiously Interfered with her 2000 Expatriate Contract.**

Gaujacq first argues that Nadal can be found liable for interfering with "Ms. Gaujacq's 2000 Expatriate Contract and its extension until the summer of 2004" (Pl. Nadal Opp. at 34-36) – specifically an obligation she asserts is incorporated by reference in that contract to provide her six months' advance notice of any recall to France.  She also claims Nadal breached this contract by refusing, along with EDF, to reimburse approximately $2,500 in business expenses.  *Id*. at 35.

Gaujacq concedes, as she must, that the 2000 Expatriate Contract was to expire by its own terms in "the summer of 2004" (*id*. at 34) and, indeed, it ended on July 31, 2004.  Given that the contract continued until it expired on its own terms, Nadal's March 10 and April 1 emails, suggesting that she return to France sooner, are simply not relevant.  *See id*.  Gaujacq herself admits that the contract continued without interference.  *Id*.  Moreover, neither of Nadal's two emails rises to the level of improper interference at all.  When evaluating tortious interference claims, the defendant's "'[m]otive or purpose to disrupt ongoing business relationships is of central concern . . . .'"  *See Sheppard v. Dickstein, Shapiro, Morin & Oshinsky,* 59 F. Supp. 2d 27, 34 (D.D.C. 1999)(citation omitted).  Accordingly, "'a strong showing of intent to disrupt ongoing business relations'" is required, and a "general intent to interfere or knowledge that the conduct will injure the plaintiff's business dealings is insufficient to impose liability."  *Id*.  Even if the March 10 and April 1 emails could be fairly read as advocating *any* substantial change before the scheduled expiration of Gaujacq's assignment (which they cannot), they would still be insufficient evidence of the kind of intent or conduct that could support a verdict against Nadal.

Without any evidence to establish liability for premature termination of the 2000 contract itself, Gaujacq is left with only minor claimed breaches regarding the six month notice of a return to France and the business expense reimbursement issue. There is no evidence of egregious conduct on Nadal's part, however, with respect to these either of these items and no record evidence that Nadal had any involvement in EDF's decision or actions concerning how much notice to provide to Gaujacq. These minor breaches are also not of the type that support an intentional interference tort claim. The tort protects ongoing commercial relationships from more fundamental or complete disruptions: it does not allow relatively minor disputes over contract performance and administration to be converted into a mechanism for obtaining extra-contractual damages.[21]

**B.      Gaujacq Cannot Prevail on a Claim Against Nadal for Interfering With An Expatriate Contract She Expected in 2004.**

The only other expectancy that Gaujacq points to is what she refers to as her 2004 Expatriate Contract. Pl. Nadal Opp. at 36-43.[22] Gaujacq's theory here is that Nadal was aware of such a contract, which she says provided that she "began her new mission as 'Production and

---

[21] *See, e.g., Whetstone Candy Co. v. Nat'l Consumers League*, 360 F. Supp. 2d 77, 81 (D.D.C. 2004) (citation omitted) (defining required element as "intentional interference inducing or causing a breach or termination *of the relationship or expectancy*") (emphasis added); *Sheppard,* 59 F. Supp. 2d at 34 (the defendant's "'[m]otive or purpose *to disrupt ongoing business relationships* is of central concern . . . .'") (emphasis added)(citation omitted); *Casco Marina Dev., L.L.C. v. Dist. of Columbia Redevelopment Land Agency*, 834 A.2d 77, 83-84 (D.C. 2003) (canceling entire contract); *Sorrells v. Garfinkel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 290-91 (D.C. 1989) (complete termination of employment relationship).

[22] Although Defendants maintain that the record establishes that no binding agreement was ever reached between Gaujacq and EDF concerning a further expatriation assignment for Gaujacq beginning in 2004, it is not necessary to resolve that question for purposes of analyzing the sufficiency of the evidence supporting Gaujacq's claim against Nadal for interfering with this purported agreement. This is true because, as Gaujacq acknowledges, the analysis of this claim is substantially the same whether it is for interference with an actual contract or merely a business expectancy. *See* Pl. Nadal Opp. at 36 n.27. Accordingly, for shorthand purposes only for this motion, Nadal will refer to Gaujacq's 2004 proposal as Gaujacq does on brief – *i.e.*, as the 2004 Expatriate Contract.

EDF International North America Nuclear Projects Director' on April 1, 2004." *Id*. at 36-37. She argues that from that time on Nadal engaged in discriminatory actions and that at the end of July, "Mr. Nadal obtained his goal: EDF officials ordered Ms. Gaujacq back to France and away from EDFINA, thereby breaching the 2004 Expatriate Contract." *Id*. at 37, 40.

No one doubts Gaujacq's disappointment at EDF calling her back to France, but such disappointment is not actionable against Nadal individually.  This is true even if Nadal, as the incoming EDFINA President, *knew* that the staffing he preferred would mean Gaujacq would continue her EDF employment elsewhere. This Court – recognizing the importance of not penalizing the predictable or even intended interferences that result from ordinary business planning and competition – has held that "'a strong showing of intent to disrupt ongoing business relations'" is required, and a "general intent to interfere or knowledge that the conduct will injure the plaintiff's business dealings is insufficient to impose liability." *Sheppard*, 59 F. Supp. 2d at 34 (citation omitted).  Rather, for liability to attach, the defendant's conduct  "'must be more [than] egregious . . . it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement.'"  *Id.* (citation omitted).  None can be shown here.

Pointing once again to Nadal's emails to EDF of March 10 and April 1, Gaujacq asserts that Nadal's communications with EDF on the subject of the next appropriate posting for Gaujacq constitute evidence of intentional interference.  Pl. Nadal Opp. at 37-38.  As set out above, however, these two emails cannot be read as anything more than Nadal's encouragement of EDF to resolve a problem created by Gaujacq's prior actions.  As the high-level EDF executive recently tasked with leading EDF's North American delegation and serving as President of EDFINA, Nadal's emails could not be found by a reasonable jury to amount to the

egregious conduct required for this tort.[23]   For the same reasons, an effort by Nadal to change EDF's mind about areas of responsibility that should remain with EDFINA do not create a jury issue on intent to interfere with Gaujacq's contract.

With no other Nadal actions to point to regarding his supposed influence on EDF's decisions regarding Gaujacq, Gaujacq resorts to reciting the same list of business decisions she claims amount to discrimination, harassment and defamation against her once Nadal took over as EDFINA President and Gaujacq stayed on as a Vice President.  *See* Pl. Nadal Opp. at 38-40.[24] These claimed incidents add nothing to her intentional interference claim.   None are acts of contract interference under the legal standards cited above.   And Gaujacq even acknowledges that is was *her* complaints to EDF executives about friction with Nadal that triggered EDF to recall her to France, not any action that Nadal is alleged to have taken toward Gaujacq in the United States.  *Id.* at 40 ("after Ms. Gaujacq complained to EDF executives about Mr. Nadal's . . . behavior," "EDF officials ordered Ms. Gaujacq back to France . . . .").

### C.    Having Acted Properly and Justifiably as Gaujacq's Superior and Fellow EDF Employee, Nadal Cannot Be Held Responsible for "Interfering."

Gaujacq eventually acknowledges, as she must, that Nadal enjoyed a qualified privilege to act properly and justifiably toward a fellow employee without fear of liability.  *See* Pl. Nadal Opp. at 40.  Gaujacq seeks to escape the privilege under two theories:  (1) that Nadal acted with malice for the purpose of causing Gaujacq's contract to be terminated and therefore lost the privilege; and (2) that Nadal was somehow acting against EDF's interests by advocating to EDF

---

[23] Indeed, it is these same facts that lead to the conclusion that Nadal was privileged as a matter of law in making these communications.  *See infra* Section IV.C.

[24] These include: the change in check-signing authority; Nadal's selection of Dreux but not Gaujacq to act for EDFINA in Nadal's absence; Nadal's reaction to audit findings; and Nadal's demand that Gaujacq return the only copies of EDFINA documents to EDFINA.  *Id.*

that someone other than Gaujacq have responsibility for nuclear matters at EDFINA. *Id.* at 40-41. Neither of these arguments can save this Count.

No jury could reasonably find malice in Nadal's behavior. In her attempt to identify evidence regarding malice, Gaujacq relies on the same arguments and evidence that she offered as proof of the "intentional interference" element of the underlying tort. *See* Pl. Nadal Opp. at 42. Indeed, she refers only to the same two March 10 and April 1, 2004 emails from Nadal to EDF, addressed above, and to the same abbreviated list of additional incidents she characterizes as "discriminatory." *Id.* For reasons stated above, the two emails Gaujacq relies on as the linchpins of her case cannot reasonably be read as showing malice by Nadal.

Gaujacq also argues that Nadal lost his privilege because his actions "were adverse to the corporate interests of EDF." *Id.* at 41 (*quoting Curaflex Health Servs., Inc. v. Bruni P.C.*, 899 F. Supp. 689, 696-97 (D.D.C. 1995) ("When a supervisor or corporate officer fires an employee out of malice or ill will, it ordinarily constitutes conduct that is generally adverse to the interests of the corporation."). The defect in Gaujacq's argument, of course, is that it was not Nadal who decided to end Gaujacq's United States assignment or decided to terminate her. Indeed, as Gaujacq concedes on brief, Nadal's early efforts to have Gaujacq assigned somewhere other than EDFINA were unsuccessful (*see, e.g.,* Pl. Nadal Opp. at 38), and it was her own subsequent complaints to EDF concerning Nadal, rather than any decisions by Nadal, that led EDF to conclude that Gaujacq should return to France. Nor does any evidence support Gaujacq's theory that Nadal somehow forced EDF make a "wrong" decision about Gaujacq's future and that, therefore, no privilege attaches to his conduct.[25]

---

[25] Gaujacq's theory here is that, given her background and experience, it is self-evident that selecting anyone but her to handle the important NuStart project for EDF was by definition a serious corporate misstep and that Nadal's efforts to have EDF steer a different course were therefore "against the corporate interest" and should deprive Nadal of the privilege. *See* Pl. Nadal Opp. at 41 ("Because Ms.

Granting all reasonable inferences in Gaujacq's favor, all of Nadal's challenged actions fall squarely within the reasonable bounds of the employment relationship. They involved, at most, internal company politics motivated on Nadal's part by a belief -- following Gaujacq's actions in Spring 2004 as he assumed his position and her later defiance of his directives -- that Gaujacq could not workably remain under his supervision at EDFINA and would be better placed elsewhere within EDF. Knowing that his views might affect her business prospects is not enough to establish malice. As such, Nadal's actions as Gaujacq's supervisor were privileged, and the tortious inference claim against him should be dismissed.

---

Gaujacq was highly qualified in the nuclear area and because she was the most familiar with this very important NuStart project, EDF's corporate interests were in keeping Ms. Gaujacq in the United States...."). Whatever the viability of Gaujacq's premise, there is no indication on this record that EDF (as Gaujacq's lifetime employer) would not have been fully aware of her particular qualifications and experience when the personnel decisions in question were made. It simply cannot be the law that a jury in this case will be called upon to revisit EDF's business decision regarding which of various qualified employees was the *ideal* person to represent EDF's interests in the NuStart consortium and then to strip Nadal of his immunity for his business input simply because he backed someone other than Gaujacq with the EDF executives who actually made the decision.

## <u>CONCLUSION</u>

For the reasons above, Nadal respectfully requests that this Court enter summary judgment in his favor on Counts IV, VI, VIII and XII.


Dated:  December 8, 2006                    Respectfully submitted,


                                         _____/s/_____
                                         Morgan D. Hodgson (*D.C. Bar No*. 186528)
                                         David A. Clark (*D.C. Bar No*. 473279)
                                         STEPTOE & JOHNSON LLP
                                         1330 Connecticut Avenue, N.W.
                                         Washington, D.C.  20036
                                         (202) 429-3000

                                         *Counsel for Defendant Christian Nadal*