## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHERINE GAUJACQ,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>ELECTRICITE DE FRANCE  )<br>INTERNATIONAL NORTH AMERICA  )<br>INC., ELECTRICITE DE FRANCE, S.A.  )<br>and CHRISTIAN NADAL  )  )  ) | No. 1:05CV0969 (JGP) |

### REPLY MEMORANDUM OF DEFENDANTS EDF AND EDFINA

Laura B. Hoguet *(D.C. Bar No. 200915)*
Dorothea W. Regal *(D.C. Bar No. NY0064)*
Randi Seltzer May *(D.C. Bar No. NY0063)*

Hoguet Newman & Regal, LLP
10 East 40th Street
New York, New York 10016
(212) 689-8808

*Attorneys for Defendants Electricité de*
*France, S.A. and Electricité de France*
*International North America, Inc.*

Of Counsel:
Kathleen L. Lowden

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

I.    THE MATERIAL FACTS OF THIS CASE ARE NOT DISPUTED ...........................1

    A.  The Parties' Rule 56 Statements Reveal Agreement on The Facts..........................2

    B.  Plaintiff's Challenge to Defendants' Declarations Should Be Disregarded .............2

II.   EDF'S DECISIONS WITH RESPECT TO GAUJACQ'S
EMPLOYMENT ARE OUTSIDE THE PURVIEW OF US LAWS.
THE "SINGLE EMPLOYER" DOCTRINE DOES NOT CHANGE
THIS RESULT...................................................................................................3

    A.    EDF's Decisions in France Are Outside US Employment Laws .......................4

    B.    The "Common Employer" Doctrine Does Not Avail Plaintiff...........................8

III.  BASED ON THE UNDISPUTED FACTS, SUMMARY JUDGMENT
DISMISSING PLAINTIFF'S DISCRIMINATION CLAIMS MUST
BE GRANTED .................................................................................................10

    A.    There Is No Evidence That Nadal's Appointment Was Discriminatory .............11

    B.    Plaintiff Has Not Produced Evidence Of Gender Bias On Nadal's Part .............13

    C.    Plaintiff Has Not Shown That She Was Retaliated Against ...............................16

V.    PLAINTIFF HAS NO CLAIM HERE BASED ON
NADAL'S COMPENSATION.............................................................................19

VI.   PLAINTIFF'S CONTRACT AND DEFAMATION
CLAIMS LACK A  LEGALLY SUFFICIENT FOUNDATION ....................................22

CONCLUSION.......................................................................................................25

## TABLE OF AUTHORITIES

### CASES

Page

Anderson v. Group Hospitalization, Inc., 820 F.2d 465 (D.C. Cir. 1987)..........................21

Anderson v. Liberty Lobby, Inc., 477 U.S. 242...................................................................1

Balk v. U.S. Information Agency, Civ. A. No. 81-1565, 1985 WL 1634
    (D.D.C. Mar. 26, 1985)...............................................................................................19

Carter v. Ball, 33 F.3d 450 (4th Cir. 1994).....................................................................22

Carter v. George Washington University, 180 F. Supp. 2d 97 (D.D.C. 2001),
    aff'd, 387 F.3d 872 (D.C. Cir. 2004)............................................................................3

Century International Arms, Ltd. v. Federal State Unitary Enterprise State Corp.
    "Rosvoorouzheinie", 172 F. Supp. 2d 79 (D.D.C. 2001).............................................23

County of Washington v. Gunther, 452 U.S. 161 (1981) .................................................20

Duncan v. G.E.W., Inc., 526 A.2d 1358 (D.C. 1987).......................................................23

EEOC v. Aetna Insurance Co., 616 F.2d 719 (4th Cir. 1980) ..........................................21

EEOC v. American Pharmaceutical Association, 589 F. Supp. 23 (D.D.C. 1983) ...........21

EEOC v. Arabian American Oil Co., 499 U.S. 244 (1991).................................................4

Eli Lilly & Co. v. Home Insurance Co., 764 F.2d 876 (D.C. Cir. 1985)...........................23

Environmental Defense Fund, Inc. v. Massey, 986 F.2d 528 (D.C. Cir. 1993)..............4, 5

Goodrich v. IBEW, 712 F.2d 1488 (D.C. Cir. 1983).......................................................19

Goodrich v. IBEW, 815 F.2d 1519 (D.C. Cir. 1987).......................................................19

Horvath v. Thompson, 329 F. Supp. 2d 1 (D.D.C. 2004).................................................21

Hunter v. Ark Restaurants Corp., 3 F. Supp. 2d 9, 18-19 (D.D.C. 1998)........................10

Jack Baker, Inc. v. Office Space Development Corp., 664 A.2d 1236
    (D.C. 1995) ........................................................................................................23, 24

Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909
    (D.C. Cir. 1984) .........................................................................................................5

Page

Lemmons v. Georgetown University Hospital, 431 F. Supp. 2d 76 (D.D.C. 2006)............3

Malone v. Saxony Co-Op. Apartments, Inc., 763 A.2d 725 (D.C. 2000)....................23, 24

Metrocare v. WMATA, 679 F.2d 922 (D.C. Cir. 1982)....................................21

Minmar Builders, Inc. v. Beltway Excavators, Inc., 246 A.2d 784 (1968) .......................24

Moncrief v. Daro Realty, Inc., No. Civ. A. 03-762, 2005 WL 1119794
    (D.D.C. Apr. 28, 2005) .............................................................................19

Radio & Television Broadcast Technicians Local 1264 v. Broadcast Serv. of
    Mobile, Inc., 380 U.S. 255 (1965) .....................................................................8

Raymond v. U.S., 31 Fed. Cl. 514 (Fed. Cl. 1994)............................................21

Roberson v. Snow, 404 F. Supp. 2d 79 (D.D.C. 2005)........................................21

Rodriguez v. Smithkline Beecham, 224 F.3d 1 (1st Cir. 2000).........................................21

Shekoyan v. Sibley International, 409 F.3d 414 (D.C. Cir. 2005), cert. denied,
    126 S. Ct. 1337 (2006) ................................................................................7

Torrico v. International Business Machines Corp., 213 F. Supp. 2d 390
    (S.D.N.Y. 2002) ......................................................................................6, 7

Torrico v. International Business Machines Corp., 319 F. Supp. 2d 390
    (S.D.N.Y. 2004) ........................................................................................7

Valentino v. U.S. Postal Service, 674 F.2d 56 (D.C. Cir. 1982) .......................................21

YWCA v. Allstate Insurance Co., 275 F.3d 1145 (D.C. Cir.2002) .................................23

**STATUTES**

42 U.S.C. §2000e-1(c)(2)..................................................................................4, 9

42 U.S.C. § 2000e-2(h) ......................................................................................19

29 U.S.C. § 206(d) .............................................................................................19

29 U.S.C. §206(d)(1) .........................................................................................20

29 U.S.C. §213(f)................................................................................................5

Fed. R. Civ. P. 56...............................................................................................3

Fed. R. Civ. P. 56 (e) .........................................................................................1

According to plaintiff--- whose 55-page brief was filed without prior leave as required by this Court's rules---the "sheer volume" of defendants' moving papers "suggests that summary judgment is not appropriate." Opp. at 1.[1]  Plaintiff evidently hopes to defeat summary judgment by making these motions look complicated.  Her papers opposing defendants' motions reveal, however, that these motions are not complicated, but are simple, because plaintiff admits all the material who-said-and-did-what facts upon which defendants' motions are predicated and fails, despite extensive discovery, to put forward any evidence to show that defendants' actions towards her were tainted by gender or would have been any different if her name had been Charles, rather than Catherine Gaujacq.

In opposing summary judgment, plaintiff may not rely on unsupported allegations, conclusory statements or conjecture, but must set forth specific facts that would enable a jury to find in her favor.  Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 ("merely colorable" or "not significantly probative" evidence will not suffice to defeat an otherwise appropriate motion for summary judgment).  Plaintiff has utterly failed to meet this burden, and defendants' motions for summary judgment must therefore be granted.

## I.

## THE MATERIAL FACTS OF THIS CASE ARE NOT DISPUTED

The existence and materiality of disputed facts for the purposes of Rule 56 motions must be determined, not from plaintiff's briefs and other submissions, but solely from her Statement of Genuine Material Issues pursuant to Rule 7(h) of this Court.  Comparison of this statement with defendants' joint Rule 56 Statement makes it clear that there are no *material* disputed fact issues that would prevent the grant of summary judgment in this case.

---

[1]  References to "Opp. __" are to Plaintiff's Opposition to Defendants EDF and EDFINA's Motion for Summary Judgment [Dkt. # 118].  References to "Def. Br." are to the Memorandum of Law in Support of the Motion for Summary Judgment of EDF and EDFINA.  References to "Def. Ex. __" are to Exhibits annexed to the joint Defendants' Statement Pursuant to FRCP 56 and Local Rule 7(h) [Dkt. # 101].

**A.  The Parties' Rule 56 Statements Reveal Agreement on The Facts**

Under Local Rule 7(h) of this Court, "the court may, in determining a motion for summary judgment, assume that any fact identified by the moving party in its statement of material facts is admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  The Appendix to this Reply Memorandum ("App.") reconciles the parties' opposing Rule 56 Statements paragraph by paragraph, showing that plaintiff's Rule 56 Statement admits most of the paragraphs in defendants' joint Rule 56 Statement either outright, or impliedly by not controverting them.  Plaintiff's Rule 56 Statement contains much information that does not meet the requirements of Rule 56(e) because her statements are not supported by citations to admissible evidence, or are argumentative, or mischaracterize documents in the record, or are immaterial.   The bottom line of this reconciliation, set forth in the Appendix and discussed in this Reply Memorandum, is that there are no disputed facts in this case that need to be resolved in order to decide these motions.

**B.  Plaintiff's Challenge to Defendants' Declarations Should Be Disregarded**

Separately from her Rule 56 Statement, plaintiff has filed documents captioned "Genuine Material Facts in Dispute" addressed to the Declarations of EDF's Yann Laroche, Patrick DeBotherel and Christian Nadal that defendants submitted in support of their summary judgment motions.  Plaintiff asserts that "Defendants rely upon these declarations as if they are undisputed facts" and says she wishes to dispute the statements contained in the declarations. (Plaintiff's Genuine Material Facts In Dispute-Nadal Declaration at 1).   Respectfully, plaintiff misunderstands both the role of the Declarations and her burden under Rule 56 as a party opposing summary judgment, and her statements directed to the Declarations must consequently be disregarded.

The Laroche, DeBotherel and Nadal Declarations, and the Betouret Declaration submitted herewith,[2] are the direct testimony of defendants' witnesses, presented in affidavit form, to meet the burden Title VII imposes upon an employer to come forward with legitimate good-faith business reasons for the actions that it took with respect to the plaintiff.  Contrary to plaintiff's suggestion, Rule 56 does *not* require all of the evidence that a party puts before the court on a motion for summary judgment to be undisputed.  Rather, the rule simply permits a party to move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56. It is plaintiff's burden, in order to defeat summary judgment, to come forward with an evidentiary basis for disputing defendants' presentation.  Plaintiff does not meet this burden by submitting her own Declaration and additional "Statements" that purport to disagree with the Laroche, DeBotherel and Nadal Declarations but do not provide an evidentiary basis for such disagreements that meets the standard set by Rule 56(e).  "[S]elf-serving affidavits alone will not protect the non-moving party from summary judgment." Carter v. George Washington Univ., 180 F. Supp. 2d 97, 111 (D.D.C. 2001), aff'd, 387 F.3d 872 (D.C. Cir. 2004);  Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 90 (D.D.C. 2006).

## II.

### EDF'S DECISIONS WITH RESPECT TO GAUJACQ'S EMPLOYMENT ARE OUTSIDE THE PURVIEW OF US LAWS.  THE "SINGLE EMPLOYER" DOCTRINE DOES NOT CHANGE THIS RESULT.

Point II of plaintiff's opposition brief argues that EDF and EDFINA are a "single company" for purposes of Title VII and the Equal Pay Act.  As shown below, the single (or common) employer doctrine does not apply to this case: EDF and EDFINA are not a "single

---

[2]   Declaration of Jean-Louis Betouret, dated December 2, 2006, and previously submitted in opposition to Plaintiff's Motion to Strike Portions of Declarations [Dkt. #129] ("Betouret Decl."). Also submitted herewith is a Reply Declaration of Laura B. Hoguet, dated December 8, 2006 ("Hoguet Reply Decl.") through which counsel puts additional documents in the record.

3

employer" as the courts have defined that term, and even if they were, US employment laws would still be unavailable to reach the actions and decisions of EDF in France.

## A. EDF's Decisions in France Are Outside US Employment Laws

In this era of global enterprise, companies all over the world send managers to the US every day on fixed-term assignments for, no doubt, a great many reasons. It is not the law that, every time such a foreign company assigns a male manager to succeed a female manager in a US post, that female manager is entitled to review by a US judge and jury to determine whether that foreign company's appointment process and compensation policies were tainted by considerations of gender in violation of US law.  Otherwise, every expatriate who arrived in America from a foreign country would be able to make a claim that the terms of his or her assignment, and his or her pay grade, salary and benefits, compared to those of another employee were discriminatory in violation of US laws, which would truly render the application of those laws extraterritorial in scope.

Gaujacq's memorandum in opposition mistakenly argues that because she was physically present in the US, application of Title VII and the Equal Pay Act to decisions EDF made about her in France would not be "extraterritorial." Opp. at 9-13.  As the D.C. Circuit has held, extraterritoriality refers to "the authority of a nation . . . to establish the norms of conduct applicable to events or persons outside its borders." Envtl. Def. Fund, Inc. v. Massey, 986 F.2d 528, 530 (D.C. Cir. 1993). This is what Gaujacq seeks to do when, for example, she asserts that EDF has few women executives, and says that EDF's system for ranking employees "has the result of giving the highest salaries to a group which is mainly occupied by men." Opp. at 5, 26, 48.  Whether EDF hires, fires, promotes and compensates women fairly in France are questions that do not implicate Title VII, because they involve only the "foreign operations of an employer that is a foreign person not controlled by an American employer," which is not covered by Title VII. 42 U.S.C. §2000e-1(c)(2); see also EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 255

(1991) ("Aramco")(pointing out the incongruity of applying US law to a French employer in France).[3]

Though plaintiff asserts in her Rule 56 statement that she was promoted regularly during her EDF career and says she was ranked one of the top 350 executives in EDF's 160,000 employee workforce (App. ¶¶ 7-8),[4] her brief argues that the fact that her successor in Washington, Nadal, was historically paid more than she "merely suggests that EDF's violations of the [Equal Pay Act] preceded the claim at issue today." Opp. at 49 (emphasis added).    In other words, Gaujacq wants to litigate in this Court, and to judge against  the standards of the Equal Pay Act, EDF's compensation system as applied to herself and to Nadal over a period of many years prior to when either of them was posted to the US.  This is, on its face, a demand for extraterritorial application that Title VII, the Equal Pay Act and the D.C. Human Rights Act do not contemplate.[5]

In support of applying Title VII to her claims, plaintiff argues that EDF's decisions concerning her affected the "US operations" of the company (Opp. at 11-13).  This argument does not alter the admitted fact that EDF made the decisions in France and that plaintiff was a French citizen employed by a French company.[6]  Plaintiff does not solve this problem by

---

[3]  Gaujacq blithely ignores the Supreme Court's holding in Aramco and focuses instead on Massey, which is inapposite.  Massey held that the presumption against extraterritorial application of US laws did not apply because the US conduct at issue would be felt in Antarctica – "a continent without a sovereign, and an area over which the United States has a great measure of legislative control," 986 F.2d at 529, and thus application of the statute in question would not "create a potential for 'clashes between our laws and those of other nations'" nor would it "require enforcement in a foreign forum or involve 'choice of laws' dilemmas." Id. at 532-33. In this regard, the court specifically distinguished the statute from Title VII. Id. at 533.

[4]   Plaintiff was one of 350 executives classified "R-3."   EDF also has 50 employees at the top classification of "R-1" and about 180 classified at the second-tier rank of "R-2."  Hoguet Reply Decl. Ex. D (De Botherel Tr. 67).

[5]   The Equal Pay Act does not apply to "any employee whose services during the workweek are performed in a workplace within a foreign country. . . ." 29 U.S.C. §213(f).

[6]  Gaujacq's claim that US law should apply because the "effects" of EDF's conduct were felt by her in

claiming that she was employed by both EDF "and EDFINA" because that is not what the record

shows. Plaintiff's Expatriation Contract was between herself and EDF, EDFINA was not a party

to it, and nothing in the agreement says that she was to be an employee of EDFINA. (Def. Ex.

15). As EDF's General Delegate to the US and Canada, plaintiff was appointed President of

EDFINA (App. ¶¶ 9, 19, 22), but this fact does not make her an "employee" of EDFINA

because, as defendants' moving brief shows (Def. Br. at 20-22), the "employer" as a mater of

law is the company that controls and directs the employee, and in the case of Gaujacq that

company was admittedly EDF, not EDFINA. (App. ¶¶ 15, 68).[7]  This point is underscored by

plaintiff's final argument that she was assigned to report to Nadal commencing June 1, 2004 as

the new President of EDFINA (see App. ¶ 16), because  after June 1 plaintiff did *not* accept

Nadal's direction, but continued to look to EDF officials in Paris and Buenos Aires to take

decisions she wanted. And, it was EDF in Paris that recalled plaintiff back to France. (App. ¶¶

116, 120, 128-37).[8]

In Torrico v. Int'l Bus. Machs. Corp., 213 F. Supp. 2d 390 (S.D.N.Y. 2002) ("Torrico I"),

the court determined that the center of gravity of the employment relationship between a US

company and its US employee temporarily assigned to Chile remained the US, so that US, rather

than Chilean, anti-discrimination laws applied. Id. at 403-04 (denial of motion to dismiss);

---

the US, Opp. at 11, is entitled to no weight. Under the effects test, as set forth in the Restatement (Third) of Foreign Relations Law, the effect in the regulating country of the extraterritorial conduct must be "substantial." Id. at §§402(1)(c) and Comment (d) thereto. Indeed, the D.C. Circuit has suggested that where, as here, the only effect in the US is on a non-US victim, the effects test is not satisfied. Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 924 (D.C. Cir. 1984).

[7]  Plaintiff's arguments that her expatriate benefits, such as rent for her house in Great Falls, Virginia, were paid by EDF through EDFINA and that EDFINA was used as an entity to sponsor EDF employees for immigration purposes (App. ¶¶ 11, 13) similarly do not convert her into an EDFINA employee, because these facts have nothing to do with who directed and controlled her activities.

[8]  Plaintiff has no evidence that Nadal had "input" into this decision.  She suggests this by misreading Betouret's July 26 report (Def. Ex. 73) as saying that Nadal ordered her recall, but from the context, the "President" referred to is clearly EDF's President and CEO Roussely (not Nadal as President of EDFINA).  Nadal is referred to throughout the document (Def. Ex. 73) as "Nadal."

Torrico v. Int'l Bus. Machs. Corp., 319 F. Supp. 2d 390, 404-05 (S.D.N.Y. 2004) ("Torrico II") (denial of summary judgment). Contrary to plaintiff's description (Opp. at 9-10), Torrico stands for the principle that courts should focus not on the physical location where the temporarily-assigned employee performed duties (in that case, Chile; here, the US) but on the place that is the "center of gravity" of the employment relationship (there, the US; here, France). Torrico I, 213 F. Supp. 2d at 403. In this case, the law to be applied, following the principle stated in Torrico, is not the law of the physical location where the temporarily-assigned expatriate worked (here, the US) but is the law of the place that is the "center of gravity" of the employment relationship – here, France.[9] Torrico thus supports EDF's position in this case, not Gaujacq's.[10]

Although plaintiff argues that EDF agreed contractually to the application of US law to its employment decisions affecting Gaujacq, Opp. at 10-11, her argument is based on an incorrect and unreasonable reading of provisions of the Expatriate Contract and EDF's policy guide for oversees employees. The documents recognize, as they must, that an employee who goes overseas, while remaining an employee of EDF under French law, is also subject to laws of the "host" country in matters such as work hours, legal holidays, etc. Gaujacq's Expatriate Contract provides on this subject that:

For all matters relating to the conditions under which work is to be performed, in

---

[9] France is where the employment relationship was created and the terms of employment were negotiated; where Gaujacq worked for EDF for over 20 years (De Botherel Decl. ¶22); where the parties intended that she would return after her temporary posting; where the EDF officers to whom she reported were located (except for Ponasso, who was in Buenos Aires); where she was paid; and where she was domiciled and held citizenship. (App. ¶¶ 1, 5, 6, 11, 15, 16). See Def. Br. at 19-20. See Torrico I, 213 F. Supp .2d at 403-04 (setting forth factors for "center-of-gravity" test); Torrico II, 319 F. Supp. 2d at 404-05.

[10] Nor does the holding of Shekoyan v. Sibley Int'l, 409 F.3d 414 (D.C. Cir. 2005), cert. denied, 126 S. Ct. 1337 (2006), support Gaujacq's position. The plaintiff there, unlike Gaujacq (and Torrico), was not a domestic employee being sent on a temporary foreign assignment, but was a resident alien hired specifically for a permanent position outside the US. Id. at 422. On these facts, the "center of gravity" of Shekoyan's employment relationship would be Soviet Georgia. Thus, the court found that Shekoyan was engaged in "employment in a foreign country" rather than in the US and so was not covered by Title VII. Id. Gaujacq, like Shekoyan, is an alien who was "engaged in employment in a foreign country" (France) and thus US discrimination laws do not apply to her.

particular rules relating to work hours, weekly break, holidays and days off, the rules and regulations of the location . . .at which work is performed shall apply. (Def. Ex. 15, at EDF 439).

Likewise, EDF's policy guide, the "Guide de gestion", which the Expatriate Contract incorporates by reference, says that "in application of the territoriality principle of laws and regulations, the EDF employees working abroad are subject to the employment laws of the host country" and adds in a following sentence (which plaintiff does not provide to the Court), that "With respect to issues addressed in this chapter, the assignment contract must make express reference to local laws." The "issues addressed in this chapter" are holidays and weekly time off, working hours and "on watch or on-call duty," as is expressly stated in the document. Hoguet Reply Decl. Ex. A. Put simply, under her Expatriate Contract and company policy, EDF recognized that Gaujacq's legal holidays, hours of work and the like would be subject to the law of the place where she was being sent to work, but EDF nonetheless retained its employment and contractual relationship with her and continued to make decisions respecting that relationship in France under French law.

### B.   The "Common Employer" Doctrine Does Not Avail Plaintiff

Defendants' moving brief shows that, under applicable law, EDF was plaintiff's "employer", because EDF controlled her work and made decisions concerning her compensation, assignment, supervision, etc. Hence, EDFINA cannot be held liable for discriminating against Gaujacq under Title VII, or under the Equal Pay Act for paying her less than Nadal; EDF made the employment and compensation decisions that are in issue, and EDFINA did not. See Def. Br. at 20-22.

Plaintiff's brief in opposition fails to address this point at all, but concentrates on arguing that EDF and EDFINA should be treated as a single employer under the Supreme Court's four-factor test. Opp. at 6-8, citing <u>Radio & Television Broad. Technicians Local 1264 v. Broad. Serv. of Mobile, Inc.</u>, 380 U.S. 255, 256 (1965). The usual application of the "common

employer" doctrine is to subject an entity that has fewer than 15 employees to Title VII based on the size of the larger entity's workforce. However, plaintiff claims that EDFINA had at least 16 employees.[11] What, then, does she seek to accomplish by invoking the "common employer" rule? If her purpose is to subject EDF in France to regulation under Title VII and the Equal Pay Act on the theory that it is a "common employer" with EDFINA, then surely this would be a case of the tail wagging the dog. This theory could not, in any event, be reconciled with the extraterritoriality provision of Title VII, which states that the foreign operations of a foreign employer "not controlled by an American employer" are outside Title VII. 42 U.S.C. §2000e-1(c)(2). EDFINA is an American company, and it does not control EDF (neither did it employ Gaujacq).

Nor, on the undisputed facts of this case, does EDFINA's relationship to EDF meet the requirements of the common employer test as that test is applied in the case law. EDFINA has its own office, thousands of miles from EDF's other offices; its own budget, from which its expenses are paid, and its own President who, according to Gaujacq's description of duties, is responsible for managing that office and its "'local" staff (that is, staff who were not expatriates…and the work of outside contractors and consultants….", App. ¶22). Just as EDFINA and not EDF is responsible for managing EDFINA's two "local" employees, EDF and not EDFINA is responsible for hiring, firing, and controlling the company's other employees. This is not the centralized "actual and active control of day-to-day labor practices" that is needed to make the "substantial showing" required for application of the "common employer" doctrine, Hunter v. Ark Rests. Corp., 3 F. Supp. 2d 9, 18-19 (D.D.C. 1998) (no interrelationship of

---

[11]  Plaintiff counts EDFINA's two "local" employees, Ba and Audie, plus EDF employees who, like herself, were sponsored by EDFINA for immigration purposes, some of whom worked at the EDFINA office. (App. ¶¶ 23-24). Defendants do not agree that the EDF employees were EDFINA employees for Title VII purposes but, given the presence in this case of overlapping DC Human Rights Act claims that are not subject to workforce size threshold, defendants elected not to complicate this motion by asking the court to resolve the Title VII threshold issue at this time.

operations where two entities are located in different buildings, are operated by different staffs and do not share budgets or the integration of daily operations; even "the occasional interchange of employees" does not show interrelatedness).

As Hunter acknowledges, 3 F. Supp. 2d at 19, the control of a parent over a subsidiary "is not determinative" of single-employer status because common ownership of a subsidiary by a parent corporation is a characteristic of corporate enterprise. EDF and EDFINA do not have common management because, while EDF employees make up the Board of Directors of EDFINA, the reverse is not true -- EDFINA's managers are not the management of EDF. See Hunter, 3 F. Supp. 2d at 18 (mere fact that parent's employee oversees operations of subsidiaries does not show common management if different managers control daily operations and employment practices vis-a-vis parent and subsidiary).

In conclusion, plaintiff's status as an employee of EDF does not make her an employee of EDFINA. Even if EDFINA were her employer, however, EDFINA could not be held liable for any of the decisions of which plaintiff complains in this case because those decisions were made by EDF alone. As a matter of law, EDF cannot be liable under Title VII or the Equal Pay Act because these US laws must not be extended extraterritorially to reach EDF's decisions in France that affected its employee, Gaujacq, who is a citizen of France.

**III.**

**BASED ON THE UNDISPUTED FACTS, SUMMARY JUDGMENT DISMISSING PLAINTIFF'S DISCRIMINATION CLAIMS MUST BE GRANTED**

Plaintiff claims, according to her brief (Opp. at 1), that defendants, "acting in concert", discriminated against plaintiff by "replacing her with Mr. Nadal", "classifying him two ranks above" her, "paying him over two times the amount" paid to her, "promising her positions and then reneging," "harassing her", "creating a hostile work environment for her", and then retaliating against her for complaining. Plaintiff has not, however, come up with evidence to

10

support any of these claims. The record rather establishes without dispute that (i) EDF decided (and it was EDF's decision, not taken "in concert" with either EDFINA or Nadal) that Nadal should succeed plaintiff, whose assignment was ending, because of his background and experience (*not* gender) (App. ¶ 37; Laroche Decl ¶¶ 11-17 ); (ii)  EDF (not EDFINA) agreed to pay Nadal more than plaintiff  to serve as its General Delegate in Washington because he had outranked her, and been paid more than she, for many years before either of them was sent to Washington (App. ¶¶ 33-39, 150-57); (iii) EDF (not EDFINA, and not Nadal) made decisions concerning the duration and scope of plaintiff's assignment based on multiple legitimate business considerations that included, but were not limited to, plaintiff's wishes (App. ¶¶ 59, 61-67); (iv) On the admitted facts as to her actions (App. ¶¶ 71-107), plaintiff's assertion that Nadal's actions towards her were the product of sexism is fantasy, and (vi) again on the admitted facts, plaintiff's complaints about Nadal in July 2004 were not protected activity, but were aimed at causing EDF to reverse its decision that, if plaintiff stayed in Washington, she would have to relinquish control of the NuStart project and report to Nadal as the new President of EDFINA.  (App. ¶¶ 108-25).    No law, and certainly not US antidiscrimination laws, barred EDF from recalling plaintiff for a new post in France when her Expatriate Contract ended and she refused even to bring the NuStart documents to the office where Nadal could see them, much less attend meetings with him or come to the office when he was there.

### A.  There Is No Evidence That Nadal's Appointment Was Discriminatory

Plaintiff's Expatriate Contract states that the term of her mission to Washington was "envisioned for an initial period of three years, renewable for one year by tacit agreement." (Def. Ex. 15).  The parties did renew the agreement for one year, that is, until July 31, 2004. (Opp. at 32; App. ¶ 30).  Thus, absent further agreement, Gaujacq's assignment as head of EDF's delegation in North America, which included her service as President of EDFINA, would expire on July 31, 2004.  Plaintiff admits that EDF had previously rotated the assignment of being head

11

of EDF's delegation in the US among various EDF officials, and that EDFINA had four Presidents in the ten years prior to her arrival in Washington. (App. ¶ 12).   On this evidence, the fact that EDF chose in 2004 to appoint another executive to succeed Gaujacq as head of its delegation in Washington does not support an inference of discrimination.

Defendants' Rule 56 Statement explains that EDF appointed Nadal to Washington in 2004 as a top-level "ambassador" to develop high-level contacts with the investment community and governmental decision makers in light of EDF's upcoming privatization. (App. ¶ 37).[12] Plaintiff's Rule 56 Statement admits that these were EDF's desires and she testified at deposition that Creuzet told her Nadal's coming to the US was "for reason absolutely not related to me in any manner." (Def. Ex. 1, Gaujacq Tr. 210).   She does not suggest that EDF chose Nadal because he was a man, but rather simply avers that she could have done the job as well or better than he and that EDF therefore did not "need" to appoint him. (App. ¶ 37).   Whether Gaujacq would have been as suitable as Nadal to fulfill EDF's business objectives is a "red herring" issue that is not relevant on this motion, however, because as a matter of law EDF was entitled to be the judge of its employees' qualifications for the position provided its decision was not infected by the consideration of gender. See cases cited at Def. Br. 24.

Further to confuse the issue, plaintiff asserts that defendants failed to produce documents "notifying" Gaujacq and Nadal of their rank on the "R-1" to "R-4" scale that EDF adopted in 2000 for its executives.  (App. ¶ 151)  Plaintiff points to no law or requirement that such notice be given (and EDF produced the policy statement provided to executives that outlines the system, Def. Ex. 91).  EDF in fact produced to plaintiff in discovery documents that showed that Nadal was ranked "R-1" and Gaujacq "R-3."  The Laroche, DeBotherel and Nadal Declarations all provide the court with competent evidence of this fact, but for the avoidance of doubt,

---

[12]  Plaintiff's brief erroneously claims that defendants did not use the term "ambassador" to describe Nadal,  Opp. at 40, n.37, but in fact, Laroche used the term in his deposition to explain why EDF chose Nadal for its next Washington delegation head, see  Def. Ex. 4 (Laroche Tr. 66:2-11).

documentary evidence of Nadal's "R-1" rank, previously produced to plaintiff, is submitted with the Hoguet Reply Declaration, with a quotation from Nadal's expatriate contract which specifically refers to his R-1 status (and presumably notified him of it, if he did not already know). Hoguet Reply Decl. ¶3 & Ex. B. Plaintiff may have forgotten her own deposition testimony that EDF's human resources officers in Paris told her, in February 2004, that Nadal was an "R-1" (Gaujacq Tr. 147:5-152:3; Def. Ex. 33), which likely explains why plaintiff, in her brief, has not argued that Nadal is not in fact an "R-1" (Opp. at 47-49). Ample documents before the Court on these motions show that Gaujacq was classified R-3, which is not disputed. (App. ¶ 152).

Plaintiff also argues that EDF discriminated against her by not executing and carrying out the proposed new three-year expatriation contract that she sent to EDF's Chief Operating Officer, Gérard Creuzet, by email on March 25, 2004 (which plaintiff's brief misleadingly characterizes as the "2004 Contract", Opp. at 34-35). EDF does not agree that Creuzet's March 29 email to Gaujacq created a "2004 Contract" binding upon EDF (see Point V below), but whether there was or was not a "2004 Contract" that EDF breached is of no relevance to a decision on her discrimination claim. What is relevant for this purpose is whether plaintiff has put forward evidence that EDF's decisions with respect to her assignment were infected by gender discrimination, and she has not done this.

## B. Plaintiff Has Not Produced Evidence Of Gender Bias On Nadal's Part

Straining vainly to inject gender bias into EDF's decision-making process, plaintiff claims that the allegedly biased Nadal had "input" into that process and, thereby, tainted it. The record shows, however, that Nadal was *not* the decision maker with respect to the defining of his and Gaujacq's job responsibilities. He had "input" only in the sense that he said in emails that the situation resulting from Gaujacq's having instructed EDFINA's lawyers to apply for a visa for him to be a "Senior Advisor" on gas issues was "ridiculous;" that her actions had made it

difficult for them to work together, that he did not trust her, and that Project NuStart was an important part of his new function of which he wanted to retain control. (Def. Exs. 44, 45, & 46; App. ¶ 64). Executives in large organizations fight turf wars every day, and surely an individual's expression of views of this kind that concern a colleague who happens to be female does not expose his employer to the risk of having to stand trial for sex discrimination.

Plaintiff's attack on Nadal as guilty of sex bias is also contradicted by the undisputed evidence of her actions towards him. Gaujacq admits that, after Betouret told her that Nadal had been appointed to be the new General Delegate to Washington and after she had been told, in connection with his visa application, that he was an "R-1", that is the higest level executive of EDF, she told the company's immigration lawyer to apply for a visa for him to work as a "Senior Advisor" reporting to her and working on "gas issues." (App. ¶¶ 41, 45, 47, 48 & 50). Plaintiff now asserts that Nadal was prejudiced against her before they had met (App. ¶ 52), but her proffered support for this contention is an outright misreading of notes made by Betouret of a call with Nadal on February 10, which record that Nadal was "open" to Gaujacq remaining in Washington. (Betouret Decl. ¶ 4; Def. Ex 39; App. ¶ 52). Honestly read, the record does *not* reflect that Nadal wanted to get rid of Gaujacq before he knew her or because she was a woman. Rather, it reflects that he was open to working with her at the outset, but that she took actions that offended him and challenged his authority, which led him to change his mind.

Plaintiff's claim that Nadal "harassed" her after he arrived in Washington is fantasy given her admissions that (i) they met only once during this period (App. ¶ 99; they had met only once before, on February 25, when she had no complaint to made of his behavior, App. ¶ 49); (ii) she did not come into the office when Nadal was there until July 12 (12 days in total since June 1, she says; App. ¶ 97 ); (iii) on June 10 she sent out a memo about work functions, without showing it to him first, which assigned to him responsibility for "gas markets" (App. ¶ 72); (iv) she left a conference in Pittsburgh on June 14, and excused herself from a meeting with Nadal on

14

June 18 and from a meeting she was supposed to attend with him in Lyon, France on June 21,

claiming illness of her mother in law which she admits was a lie (App ¶¶ 79-83); (v) when EDF

auditors wanted to see EDFINA files, including NuStart files, the files were not in the office

because Gaujacq had them at home (App. ¶ 95), and (vi) when Nadal told her, on July 12, that he

wanted the files brought back and he wanted another EDF employee, Jean Luc Foret, who also

worked on NuStart, to join a NuStart conference call, Gaujacq flat out refused, saying NuStart

was confidential and there were too many thousands of documents for her to assemble before

leaving on vacation the next day (but of course, she did not go away on vacation, but stayed at

her home in Great Falls, Virginia). (App. ¶¶ 100-02).  Assuming for the sake of argument that

Nadal raised his voice and pointed his finger at plaintiff when she refused his request for the

NuStart documents on July 12, the only inference to be drawn on this record is that he was angry

because she was insubordinate.  Plaintiff has offered no evidence from which a jury could

properly conclude that Nadal's "real" motive was gender bias.[13]

Equally nonsensical is Gaujacq's argument that Nadal committed an act of "sex

discrimination" by taking check signing authority over from her when he became President of

EDFINA while leaving undisturbed the authority previously held by another Vice President of

the company, Benoit Dreux.  Gaujacq claims to have been insulted and humiliated because Nadal

"stripped" her of check signing authority (App. ¶ 76), but the record reflects that Gaujacq

replaced Richard Brien as one of EDFINA's check signers when she became the company's

President in 2000 and that Nadal used the *same form* of corporate resolution to remove Gaujacq

---

[13] Plaintiff claims that Nadal retaliated against her by changing call-in numbers for a NuStart conference call in August, canceling her credit cards in August and causing EDFINA's lawyer to notify the INS of her employment status after July 31.  Plaintiff has not offered a shred of evidence to indicate that Nadal was responsible for any of these occurrences, nor has she offered any legal authority in support of any assertion that such events were adverse employment actions.  To the contrary, plaintiff admitted in her deposition that she did not know if it were Nadal or Dreux who had terminated her business credit card privileges in August after she had been notified of the termination of her expatriation assignment. (Gaujacq Tr. 507-08).  In fact, Nadal instructed Dreux to change the name of the primary card holder on the card and to let plaintiff continue to have credit card privileges. (Nadal Tr. 435-37).

and install himself as an authorized signer when he became President of EDFINA in 2004. (App. ¶¶ 73-74; Def. Exs. 52 & 54). As Gaujacq's replacing of Brien was not sex discrimination, neither was Nadal's replacing of Gaujacq.  The fact that the authority of the second signer, Benoit Dreux, was left undisturbed is beside the point.

The record also explains Nadal's selection of Dreux to act in his place when he was out of the office: Nadal chose Dreux because Gaujacq, as she admits, did not come into the office regularly, "quarreled" with him on the phone on June 11, and on June 18, the day the appointment letter was signed and on which he was leaving for three weeks in France, broke her appointment with him (and lied to him about the reason, App. ¶¶ 71, 83-86).

### C. Plaintiff Has Not Shown That She Was Retaliated Against

In July 2004, facing the July 31 expiration date of her Expatriate Contract, Gaujacq became increasingly anxious about getting EDF to sign a new three year agreement.  Her anxiety intensified when, during EDF's audit of EDFINA in early July, she perceived that Nadal was accusing her of "wrongdoing." (App. ¶¶ 108-09).  She feared, as she said in a July 22 email, that he would try to remove her as an officer of EDFINA and thus jeopardize her visa.   (App. ¶ 110-11, Def. Ex. 68; plaintiff's green card was approved in August 2004, which put an end to her immigration worries, App. ¶ 27).

After the audit, plaintiff, prompted by her anxiety, complained in fervent emails to Ponasso in Buenos Aires, and to Creuzet and Laroche in Paris, that Nadal was interfering with her work and that his action in giving Dreux check signing authority was "discrimination."  She demanded that, to protect her, EDF must sign the three year contract to stay in the US she had proposed to Creuzet in March, which would put her in charge of NuStart not reporting to Nadal, as she admits  EDF's Executive Committee and Roussely had decided the company could not do. (App. ¶¶ 63, 67-69).  Repeatedly plaintiff said that, if EDF did not do as she asked, she would "file a claim with US authorities."  (App. ¶¶ 113-120).  Laroche, who talked to plaintiff on the

phone on July 23, described her demands as "blackmail."  (App. ¶ 117; Laroche Decl. ¶ 31-35).

An EDF human resources officer, Betouret, prepared a memo summarizing the situation on July 26 which concluded as follows:

> The different emails of Gaujacq confirms her panic at the idea of having to leave the US and that her efforts to obtain a green card would have to be abandoned.  A further remark, and it's new, the second theme is getting worse in that she absolutely refuses to see Nadal interfere in her business in any manner whatsoever.  I have noticed that she loses all sense of caution on this theme at the risk of ruining what could be saved, that is, to stay in the US.

> Arrival of a new email in English addressed to Creuzet, Laroche and Ponasso [on July 26] notifying Creuzet and Laroche of the 3 points already made to Ponasso on Friday the 23rd [the contract, control of NuStart, not reporting to Nadal].

> Various contacts to check that there is no written documentation providing for her maintenance [in the US] beyond the 2004 [expiration date].  That having been done, including by an ultimate verification with Baumgarten [Betouret's predessor] by phone.  On the contrary, the initial contract has never been called into question: It contemplated 3 years up to August 1, 2003 with the possibility of an extension of 1 year by tacit renewal 1 year therefore to August 1, 2004.  That is what has been done.  We are therefore at the normal contractual term that therefore does not even require notice.

> EDF's position (Yann Laroche then Metais who received it from Creuzet), according to a letter verified by a lawyer and after approval by the president [referring to Roussely as President of EDF, not to Nadal as President of EDFINA, Nadal being referred to throughout the Betouret memo as "Nadal"] is to give her notice that her contract is terminated as provided on August 1, 2004. (Def. Ex. 73).

While the antidiscrimination laws protect an employee from being retaliated against for engaging in protected activity, plaintiff was not engaged in such activity when she demanded, under the guise of complaining that her loss of check signing authority was "discrimination," that EDF give her a contract she wanted plus control of NuStart and not reporting to Nadal.  See Def. Br. at 33-35 and cases cited therein.  As Betouret's memo reflects, plaintiff was trying to wrest control of NuStart from Nadal against the decision of the company by threatening to file complaints.  EDF had no legal duty to tolerate this conduct.

Plaintiff now insists that, because she used the code word "discrimination" in her communications to EDF's officials, that they, in France and Buenos Aires, must have known that

she was talking about discrimination based on sex in violation of US law.    Defendants testified that they did not have such an understanding and their testimony is supported by Betouret's memo of July 26, which reports that plaintiff and Nadal had little communication and didn't like or trust each other, and that she had insisted on retaining control of NuStart as if this project were "her personal property."  (App. ¶ 121; Def. Ex. 73: Betouret Decl. ¶¶ 6-9).  The Court need not resolve the question of what EDF knew about plaintiff's claim in order to grant these summary judgment motions, however, because plaintiff's demands upon EDF were not protected activity in any event and EDF's unwillingness to give in to them was therefore not retaliation.  EDF's desire to have Gaujacq return to France to work on the EPR project, her unwillingness to cooperate with Nadal, and the fact that EDF had no contractual obligation to maintain her as an expatriate in Washington past July 31 led to its decision to recall her.  These are good faith, legitimate business reasons that are not retaliatory.

Nor, finally, does the evidence support plaintiff's oft-repeated claim that EDF recalled Gaujacq "immediately" to Paris----her authority in Washington was ended as of August 1, but she was given three months, until November 1, to arrange her affairs and return to France, and during that period her expatriate benefits continued as before.  (App. ¶ 123).  Beginning in October, 2004, plaintiff, equipped with a green card, was looking for a new job in the US.  The issue of whether the job EDF assigned to her in France was a "demotion" is, therefore, another red herring "non-issue" that does not affect these summary judgment motions.  Plaintiff argues that the new job, despite its admitted higher base salary and equivalent rank (App. ¶ 130), was a "demotion" because it was in France and would, therefore, not carry with it expatriate benefits. This Court cannot be put in the position of having to decide whether a foreign company's recall of an employee, which subjects him or her to the loss of expatriate benefits, is an "adverse action" under Title VII.  Were that the law, a great many recalled foreign employees would be plaintiffs in this Court.

**V.**

## PLAINTIFF HAS NO CLAIM HERE
## BASED ON NADAL'S COMPENSATION

When Gaujacq joined EDF in 1980, she was a recent engineering school graduate and, as she says, a "junior executive in training." (App. ¶ 6). When Nadal joined the company in 1988, he was already a senior executive who had served as General Secretary of France's National Coal Board. (App. ¶ 33). As their careers progressed, Nadal continued to hold higher rank than plaintiff and so, at the time he was appointed to be head of EDF's delegation in Washington, he outranked her, and was accordingly paid more under EDF's compensation system. These facts present no issue that could preclude summary judgment for EDF on plaintiff's disparate pay claims under the Equal Pay Act, 29 U.S.C. § 206(d), and Title VII.[14]

This Court does not need to decide whether Nadal's job is "substantially equal" to Gaujacq's, and her factual arguments to the Court on this point are unavailing, because EDF is entitled to judgment as a matter of law whether or not the jobs are "substantially equal"[15] based

---

[14]  By establishing their affirmative defense to the EPA claim, defendants also prevail on the Title VII disparate pay claim.  See 42 U.S.C. § 2000e-2(h) (differentiation in wages not authorized by EPA does not violate Title VII); Goodrich v. IBEW, 712 F.2d 1488, 1492 n.5 (D.C. Cir. 1983) (wage differential does not violate Title VII if it fits within one of EPA defenses).

[15]  Nonetheless, plaintiff has failed to meet her *prima facie* burden to prove the "substantial equality" of the responsibilities of and skills required for the head of EDF's Washington delegation during her tenure (2000-2004) and for the position Nadal filled thereafter. The facts on this issue and the applicable law are set forth in defendants' moving brief (Def. Br. at 36-38) and not repeated here. Plaintiff's recitation of activities purportedly matching Nadal's activities is nothing but a patent attempt to fabricate a question of fact to forestall summary judgment on her disparate pay claims. The fact that Nadal himself is not the EDFINA representative to NuStart, as Gaujacq was, does not support Gaujacq's claim of substantial equality of the jobs; in fact it is proof of a difference. Nadal, with responsibilities beyond merely nuclear energy, delegated another EDF employee to be EDFINA's representative to NuStart and is responsible for supervising that representative. (Nadal Decl. ¶ 31).  The courts of this district properly rely upon the employer's judgment as to the significance of the responsibilities entrusted to plaintiffs and their comparators in EPA cases. Goodrich v. IBEW, 815 F.2d 1519, 1521, 1525 (D.C. Cir. 1987); Moncrief v. Daro Realty, Inc., No. Civ. A. 03-762, 2005 WL 1119794, at *9 (D.D.C. Apr. 28, 2005); Balk v. U.S. Info. Agency, Civ. A. No. 81-1565, 1985 WL 1634, at *6 (D.D.C. Mar. 26, 1985).

Plaintiff also makes the hollow claim that their jobs "were at a similar level" because they had the same reporting structure (Opp. at 43) but fails to cite any legal authority that reporting structure has any

on the affirmative defenses available under the statute, 29 U.S.C. §206(d)(1)(iv) (no violation

where "differential [is] based on any factor other than sex").    The US Supreme Court has

admonished, "Under the Equal Pay Act, the courts . . . are not permitted to 'substitute their

judgment for the judgment of the employer ... who [has] established and applied a bona fide job

rating system,' so long as it does not discriminate on the basis of sex." County of Washington v.

Gunther, 452 U.S. 161, 170-71 (1981) (emphasis added) (citation omitted); see Def. Br. 38-39.

EDF has established, by competent and uncontroverted evidence, the affirmative defense

that the difference in pay between Nadal and Gaujacq was due to EDF's *bona fide* grade level

ranking system applicable to all its executives, set forth in EDF's Executive Compensation

Policy, (App. ¶¶ 148-153; De Botherel Decl. Exs. B & C), under which Nadal had the highest

echelon rank of "R-1" well before he was appointed to Washington in 2004 (DeBotherel Decl.

¶36; Hoguet Reply Decl. Ex. B), and Gaujacq had the lower level rank of "R-3" upon her

appointment to Washington in 2000.  (De Botherel Decl. ¶¶ 6, 23-25).[16]  EDF established, not

only Nadal's higher rank, but also his longer years of executive experience that afford EDF a

defense to plaintiff's claims.  The irrefutable evidence is that Nadal's salary in his previous EDF

job, before his appointment to Washington, was significantly higher than Gaujacq's salary during

her expatriate assignment.[17]  De Botherel testified that "As a general rule, we do not degrade

someone to a lower pay-grade level, regardless of the level of the position to which he or she

may be assigned." DeBotherel Decl.  ¶15.  It is a permissible basis for a pay disparity that the

---

bearing on whether or not jobs are substantially equal.

[16]  Plaintiff's assertions concerning the date on which she attained the "R-3" rank are not material to deciding this motion, as it is undisputed that she was ranked "R-3" when she was appointed the Washington delegation (App. ¶¶ 151, 156; Gaujacq Tr. 87; De Botherel Decl. ¶ 11).

[17]  Nadal was paid a base salary of 11,150 Euros per month in 2003 before his appointment (De Botherel Decl. ¶37 & Ex. F), whereas Gaujacq was paid a base salary of 6,980 Euros per month in 2003. (Hoguet Reply Decl. Ex. C (Dec. 2003 pay bulletin); see also Def. Ex. 20 (Jan. 2004 pay bulletin); De Botherel Decl. ¶28 & Ex. E).

higher-paid employee was continuing a high compensation level of a prior job, as was so in Nadal's case. See EEOC v. Am. Pharm. Ass'n, 589 F. Supp. 23, 25 (D.D.C. 1983) ("APHA") (comparator's salary based on his salary history, background and professional experience); Rodriguez v. Smithkline Beecham, 224 F.3d 1, 6 (1st Cir. 2000) (highly compensated employees paid at level of prior position "pursuant to standing company policies" designed, in part, "to utilize employees at lower level positions without detriment to the employee's compensation").

Plaintiff seeks to discredit EDF's ranking system by labeling it "completely subjective," but she mischaracterizes the testimony of De Botherel's that she cites to support this assertion. What DeBotherel said was: "When you decide whether a person has a certain level of aptitudes, this is at the same time objective and subjective. There's always a subjective part to when you evaluate a person's competence level." Def. Ex. 3 (DeBotherel Tr. 46: 8-13). This inevitable element of subjectivity does not render EDF's pay grade system discriminatory under the law. EEOC v. Aetna Ins. Co., 616 F.2d 719, 726 (4th Cir. 1980) ("An element of subjectivity is essentially inevitable in employment decisions; provided that there are demonstrable reasons for the decision, unrelated to sex, subjectivity is permissible."); Raymond v. U.S., 31 Fed. Cl. 514, 519 (Fed. Cl. 1994) (employer need not show that merit system is devoid of subjectivity). Plaintiff has not established – and cannot do so – that EDF's grade level system is anything other than "an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria." Aetna, 616 F.2d at 725.

Finally, it does not avail plaintiff to insinuate that EDF's executive ranking system discriminates on the basis of sex based on the "statistics" she elicited from De Botherel at his deposition as to approximate numbers of women in executive ranks at EDF. These "statistics" are not probative of sex discrimination,[18]  and plaintiff's argument further underscores the

---

[18] "Statistics 'come in infinite variety' and 'their usefulness depends on all of the surrounding facts and circumstances.'" Valentino v. U.S. Postal Serv., 674 F.2d 56, 68 (D.C. Cir. 1982) (citations omitted);

inappropriateness of asking this Court to decide whether women are adequately represented in a French company which operates under French law under the social and economic conditions of France, which are not the same as those of the US and which the US Congress has not undertaken to regulate.

**VI.**

**PLAINTIFF'S CONTRACT AND DEFAMATION
CLAIMS LACK A LEGALLY SUFFICIENT FOUNDATION**

Defendants stand on their moving brief with respect to plaintiff's defamation claim, as she continues to identify no statement claimed to be defamatory. Def. Br. at 42-44. In response to defendants' summary judgment motion, however, plaintiff has developed new claims for breach of contract that were not pleaded in the Complaint, and which are addressed below.

In her Complaint, plaintiff included a Ninth Claim for Relief against EDF and EDFINA for breach of contract based on EDF's employment manual for expatriate assignments (this claim is addressed in Def. Br. 40-41), and a Tenth Claim for Relief for breach of the implied duty of good faith and fair dealing based on EDF's failure to sign the contract Gaujacq sent to Creuzet on March 25, 2004 (App. ¶ 61). As defendants' moving brief (Def. Br. 41-42) points out, however, a claim for breach of the duty of "good faith and fair dealing" cannot be maintained with respect to a contract that was not entered into.

---

accord Carter v. Ball, 33 F.3d 450, 456 (4th Cir. 1994) (statistical comparison offered without expert testimony as to methodology or relevance properly excluded). The D.C. Circuit has repeatedly held that a simple comparison of the number of minorities in supervisory positions with the number of minority employees company-wide is not probative of discrimination, at least without a comparison of the qualified applicant pool, that is, the number of minority members who are qualified for such positions. Anderson v. Group Hospitalization, Inc., 820 F.2d 465, 470 (D.C. Cir. 1987); Metrocare v. WMATA, 679 F.2d 922, 930 (D.C. Cir. 1982); Valentino, 674 F.2d at 68-70; accord Carter, 33 F.3d at 456-57; Roberson v. Snow, 404 F. Supp. 2d 79, 91 (D.D.C. 2005); Horvath v. Thompson, 329 F. Supp. 2d 1, 10-11 (D.D.C. 2004). A statistical breakdown along gender lines, such as what Gaujacq suggests, could be meaningful only if she could prove that in the absence of gender bias, "one would expect to find the same distribution of men and women at each level," an expectation that is "hardly realistic". Valentino, 674 F.2d at 69. Gaujacq has made no such showing and her raw "statistics" are probative of nothing.

Now, in response to defendants' summary judgment motion, plaintiff asserts that EDF did enter into, and reneged on, a contract with Gaujacq by email on March 29. Plaintiff labels this new contract the "2004 Contract," obscuring the undisputed fact that, although Gaujacq alleges that EDF's Creuzet "agreed in writing" to her proposal of March 25, 2004, Complaint ¶ 202, the "writing" is Creuzet's March 29 email which, as discussed below, was not sufficient to establish the existence of a contract binding upon EDF as a matter of law.

Formation of a contract under American law[19] requires evidence that both parties intended to be bound and had agreed to all material terms. Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995). Where, as here, another material event -- as, for example, the signing of a final written agreement -- must occur before the proposed contract can be accepted, there is no contract. Malone v. Saxony Co-Op. Apartments, Inc., 763 A.2d 725, 730 (D.C. 2000). Measured against this standard, Gaujacq's exchange of emails with Creuzet did not result in a contract binding upon EDF, because both parties in those emails expressed an intention to be bound only by a definitive contract, which was never signed.

Gaujacq's intent on this subject is evidenced by the fact that she drafted and sent Creuzet a definitive contract document, requesting that he give her his comments and the comments of DELCADIR (an EDF staff group that handles human resources issues for executives). (Def. Ex. 41 at EDF 965). EDF's intention is equally clear from Creuzet's reply email, dated March 29, which does not "accept" Gaujacq's proposal as plaintiff claims, but

---

[19]  Choice of law rules applicable in this Court, see, YWCA v. Allstate Ins. Co., 275 F.3d 1145, 1150 (D.C. Cir.2002), would lead to the application of French law to the issue whether a contract was formed; and this result would obtain whether the choice of law analysis was made under the "government interest" test, considering that EDF was a French governmental entity at the time, Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp. "Rosvoorouzheinie", 172 F. Supp. 2d 79, 94 (D.D.C. 2001), or the "substantial interest" (or "significant relationship") test, Eli Lilly & Co. v. Home Ins. Co., 764 F.2d 876, 882 (D.C. Cir. 1985); Duncan v. G.E.W., Inc., 526 A.2d 1358, 1363 (D.C. 1987)). However, since the facts would not permit a finding of contract formation under DC law or under French law, which is more formalistic and even less availing to a finding of informal contract formation than DC law, we believe there is no true conflict and the Court may consider the issue under DC law.

answers in the manner she requested: he says her proposal is consistent with his discussions with her; that he is circulating the proposal for comment by Yann Laroche (the human resources officer to whom DELCADIR reports), and that "I will send you the final agreement as soon as Yann and I have signed it." (Def. Ex. 41 at EDF 965).  Thus, both plaintiff's and Creuzet's emails contemplate that another material event has to occur before EDF will be bound, which is that Laroche (and whomever Laroche might consult) must approve and the parties must sign a final agreement ("contrat définitif").  See Malone, 763 A.2d at 727.  Subsequently, Laroche and several other EDF human resources officials, such as Metais, did address issues raised by Creuzet's email forwarding plaintiff's proposed contract to him, and it was decided that her proposal could not be accepted.  Laroche Decl. ¶¶ 20-27.  Under these circumstances, no "reasonable person in the position of the parties," Minmar Builders, Inc. v. Beltway Excavators, Inc., 246 A.2d 784, 786 (1968) (citations omitted), could conclude that Gaujacq's proposal had been accepted by EDF or that EDF intended to be bound by it.  See Jack Baker, 664 A.2d at 1240-41.

    Plaintiff seems to argue in the alternative that, after back and forth with EDF officials in April and May, EDF entered into another "contract" with her when she was informed, in late May 2004, of the company's decision that Nadal would immediately become President of EDFINA and she would become a Vice President reporting to him. This alternative theory is fatally flawed because there is no evidence that such a contract, necessarily oral because no writing reflects it, was entered into or was complete as to its material terms.  The evidence in fact is that in July Gaujacq was insisting that EDF provide her with a contract.  (App. ¶¶ 111, 113, 116).  Moreover, Gaujacq, notwithstanding directions from Roussely in May 2004 that she must report to Nadal if she were to stay in the US,  in fact refused to go to meetings with him or come to the office when he was there or make office files available to him.  If her "contract" included reporting to Nadal, she breached it from the inception.

24

## **Conclusion**

The summary judgment motion of defendants EDF and EDFINA should be granted in its entirety.


Dated:   December 8, 2006


HOGUET NEWMAN & REGAL, LLP

By:     _____/s/_____
          Laura B. Hoguet  *(D.C. Bar No. 200915)*
          Dorothea W. Regal *(D.C. Bar No. NY 0064)*
          Randi S. May *(D.C. Bar NO. Ny 0063)*

Of counsel:
Kathleen L. Lowden

10 East 40th Street
New York, New York 10016

Attorneys for Defendants
*Electricité de France, S.A. and Electricité de
France International North America, Inc.*

## Conclusion

The summary judgment motion of defendants EDF and EDFINA should be granted in its entirety.


Dated:   December 8, 2006


HOGUET NEWMAN & REGAL, LLP

By:       _____/s/_____
          Laura B. Hoguet  *(D.C. Bar No. 200915)*
          Dorothea W. Regal *(D.C. Bar No. NY 0064)*
          Randi S. May *(D.C. Bar NO. Ny 0063)*

Of counsel:
Kathleen L. Lowden

10 East 40th Street
New York, New York 10016

Attorneys for Defendants
*Electricité de France, S.A. and Electricité de France International North America, Inc.*

25