## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHERINE GAUJACQ,

        Plaintiff,

        v.

ELECTRICITE DE FRANCE
INTERNATIONAL NORTH AMERICA,
INC., ELECTRICITE DE FRANCE, S.A.
and CHRISTIAN NADAL,

        Defendants.

Civil Action No. 1:05CV0969 (JGP)

**APPENDIX  TO DEFENDANTS'
REPLY**

---

For the Court's convenience, this Appendix presents Defendants' Joint Statement Pursuant to Rule 56 of material undisputed facts [Dkt. # 101] together with plaintiff's response, titled Statement of Genuine Material Facts in Dispute [Dkt # 119]. Defendants provide this compilation to assist the Court in determining whether there are any *material* facts that are genuinely in dispute on defendants' summary judgment motions.  Both original documents, with their headings, are reproduced below, and following each paragraph, defendants have set forth in a "Reconciliation" paragraph the following:

- whether plaintiff disputes defendants' statement, either expressly or by providing evidence that controverts it;

- whether plaintiff's commentary puts forward evidence that is supported by testimony or other evidence that meets the requirements of FRCP 56(e), and

- whether plaintiff's commentary raises an issue that is material to the Court's decision on these motions.

For the purpose of resolving these summary judgment motions, differences between the parties' presentations of the facts that are not material are not pertinent, and such immaterial differences are generally not addressed in this Appendix.[1]  At some points, however, this Appendix explains apparent differences between the parties' presentations for the purpose of clarity and to enable the Court to reach a conclusion as to their materiality.

**Defendant EDF**

**Defendants' ¶ 1**:  Defendant Electricité de France, S.A. ("EDF") is a corporation organized under French law and headquartered in Paris.  (Nadal Tr. 469:18-19; *see also* **Exhibit 8**, EDF 4159-4182) (excerpts).

**Plaintiff's ¶ 1**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 1:  No dispute.**

**Defendants' ¶ 2**:  At all times relevant to the Complaint, EDF generated and supplied electric power to commercial and residential customers in France and in many other countries (not, however, including the United States).   (*see* **Exhibit 9**, excerpts from EDF's website www.edf.fr; Laroche Tr. 59:13-60:12).

**Plaintiff's ¶ 2**:  At all times relevant to the Complaint, EDF generated and supplied electric power to industrial, commercial and residential customers in France and in many other countries, including the United States where its generating capacity is about 360 mega watts ("MW").  *See* Att. 1, webpages from www.enXco.com.  EDF had subsidiaries in the USA including enXco, Easenergy, EDFINA and IES.  EDF, EDFINA, and Easenergy provided R&D, Engineering and consulting services in the United States with an average of 23 engineers working in the United States at various locations on various contracts including EPRI and with engineers working in France on US contracts. (Def. Exh. 9, EDFINA 1374; EDF4093, Att. 2 and EDF4284, Att. 3).

**Reconciliation ¶ 2:  No dispute.**

**Defendants' ¶ 3**:  EDF has more than 160,000 employees. (**Exhibit 10**, EDF 4338-4446 (excerpts); De Botherel Tr. 74:6-9).

**Plaintiff's ¶ 3**:  Ms. Gaujacq does not dispute this statement.

---

[1]  Defendants reserve the right to challenge statements contained in plaintiff's Statement of Genuine Facts In Dispute in any context other than the instant summary judgment motions.

**Reconciliation ¶ 3**:  No dispute.


**Defendants' ¶ 4**:   At the time of the events alleged in the Complaint, EDF was a governmental entity under French law. A law enacted on November 17, 2004 changed EDF to a private corporation ("société anonyme"). (**Exhibit 8**, EDF 4162; *see* **Exhibit 9**, excerpts from EDF's website, www.edf.fr).  Shares in EDF were sold to the public in 2005.  However, EDF remains 87.3% owned by the Republic of France. (**Exhibit 11**, EDF 5679-5783 (excerpts).

**Plaintiff's ¶ 4**:   From its creation to 2004, EDF was a French government owned Company called EPIC (Etablissement Public a caractere Industriel et Commercial) which owned Companies and equity interest worldwide while enjoying a monopoly on the French territory for supply and distribution of electricity.   (EDF Annual Reports for 2000-2003, EDF3500-4147).  EDF lost its monopoly on the French electricity market following enactment of European laws starting in 2000 for industrial customers, followed by commercial customers in 2002, with residential customers to follow in 2007.  A law enacted on November 17, 2004 changed EDF to a private corporation ("société anonyme").  (Exs. 8 and 9).  Options to buy shares in EDF were sold to EDF affiliates, employees, and retirees at a preferential price, and shares were sold to the public in October 2005, the second worldwide IPO of the year.  (Def .Exh. 11; EDF4093 and 4419, Att. 4).

**Reconciliation ¶ 4**:  No dispute.

**Plaintiff Gaujacq's Career With EDF**

**Defendants' ¶ 5**:  Plaintiff Catherine Gaujacq is, and was at all times pertinent to this action, a citizen exclusively of France.  (Gaujacq Tr. 8:12-16).

**Plaintiff's ¶ 5**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 5**:   No dispute.


**Defendants' ¶ 6**:  Gaujacq became employed by EDF as an engineer in France in 1980.  (**Exhibit 12**, EDF 4673-74; De Botherel Decl. ¶ 23).

**Plaintiff's ¶ 6**:  On September 1, 1980, EDF hired Ms. Gaujacq as a Junior Executive Employee in training and not solely as an engineer.  (Def. Exh. 12).

**Reconciliation ¶ 6**:  No dispute.

Def. Ex. 12, cited by both parties, identifies Gaujacq as a junior executive for part

of 1981 and as an engineer subsequently.

**Defendants' ¶ 7**:  EDF repeatedly promoted Gaujacq.  She was the first woman in France to have operational responsibility for a nuclear power plant, 1994-2000.  (Gaujacq Tr. 37:3-5, 38:1-4, 40:6-42:21; Complaint ¶ 49).

**Plaintiff's ¶ 7**:  EDF regularly promoted Ms. Gaujacq.  Ms. Gaujacq was the first woman in the world to be Vice-President Operations for a commercial nuclear power plant, 1994-2000; she became Site Vice-President ("Directeur CNPE Penly") and became and EDF "Dirigeant" ("personnel de Direction") on May 1, 1994, thus becoming one of the 350 higher-level Executives in the company worldwide (Def. Exh. 12, Def. Exh. 16, Def Exh. DeBotherel Decl., Exh. A, but see Att. 5, Plaintiff's translation).  Ms. Gaujacq was also the first woman in the world to have management responsibility for a commercial nuclear power plant, 1994-2000. Id.

**Reconciliation ¶ 7:  Plaintiff does not dispute defendants' ¶ 7. Plaintiff's statement that she became "one of the 350 higher level executives" in EDF in 1994 is not supported by the record cited as required by Rule 56(e), and is also not material to a decision of these motions.**

Plaintiff relies for this statement on Def. Exh. 12 & 16 (plaintiff's EDF career summaries) and DeBotherel Decl. Exh. A (text of "Le statut national du personnel des industries électriques et gazières" (French National Statute of Personnel of the Electric and Gas Industries), neither of which shows when plaintiff became an R-3 level executive (that is, one of EDF's 350 third-tier executives).  DeBotherel's Declaration shows that, when Gaujacq became "Directeur CNPE Penly" in 1994, she was promoted to a management level then denominated Level 52 or "U-2".  (De Botherel Decl. ¶¶ 23, 24).  This promotion took Gaujacq outside of the non-management ranks regulated by the National Statute.  (De Botherel Decl. ¶¶ 7, 8, 24 ).  In 2000, EDF's ranking system changed.  (De Botherel Decl. ¶¶ 11-14).  When Gaujacq was appointed General Delegate to Washington in 2000, this was an executive position and she was ranked R-3, in accordance with the EDF ranking system then in effect.  (De Botherel Decl. ¶ 25).  Of the EDF French workforce, approximately 350 are ranked R-3.  (De Botherel Decl. ¶ 13).

**Defendants' ¶ 8**:  Gaujacq considers that from 1980 until 2000 she made a "good progression" through six different positions within EDF, and that she had a very successful career at the company.  She had no complaints about her career or the terms of her employment at EDF prior to 2004.  (Gaujacq Tr. 43:11-20: 44:1-5; 44:13- 20).

**Plaintiff's ¶ 8**:  Ms. Gaujacq does not dispute this statement.  In addition, Ms. Gaujacq was promoted based on the demonstration of her managerial and strategical skills and her performances on the different positions she was assigned to during twenty-four years with the company -- the representations of the company for a significant managerial promotion based on her successes as "Directeur CNPE Penly" (Director) and as President of EDFINA were in line with her career expectations.  See Gaujacq Decl. ¶ 5.

> **Reconciliation ¶ 8:  No dispute.**

**Gaujacq's Expatriate Assignment To Washington**

**Defendants' ¶ 9**:  Effective August 1, 2000, EDF appointed Gaujacq to the position of "Déléguée Générale" (Delegate General) for the United States and Canada of EDF's International Branch – Client Division.  (**Exhibit 13**, EDF 0009, Gaujacq Tr. 43:7-10).  Her title was changed, in 2002, to "Directeur" (Director) USA/Canada for EDF's then newly-organized Americas Branch. (**Exhibit 14**, EDF 0008).

**Plaintiff's ¶ 9**:  By appointment of the EDF Executive Committee on June 23, 2000, effective August 1, 2000, EDF appointed Ms. Gaujacq to the French position of "Déléguée Générale for the United States and Canada" reporting to Bo Kalstrand, Senior Executive EDF International Branch and Chairman of EDFINA, Inc. (Def. Exh. 13).  Consequently, the EDFINA Board of Directors appointed Ms. Gaujacq President of EDFINA on the very same day (EDF. Exh. 21).  EDFINA is organized under US Laws to provide intelligence, consulting and engineering services.  See Gaujacq Decl. ¶ 15.  Following the restructuring of the EDF Executive Committee, her French title was changed, in July 2002, to "Directeur" (Director) USA/Canada with EDF's then newly organized Americas Branch By written consents of EDFINA Board members, Fernando Ponasso, Senior Executive EDF Branch Americas, she became Chairman of EDFINA, Inc. (Def. Exh. 14, EDF 0008).

> **Reconciliation ¶ 9:  Plaintiff does not dispute defendants' statement.**
>
> **Plaintiff's statement that she became Chairman of the Board of EDFINA is not supported by the record as required by Rule 56(e) and is not material to these motions.**

Def. Ex. 14, which plaintiff cites on this point, reflects Gaujacq's nomination to

the post of "Directeur USA/Canada" in August 2002, but does not pertain to the Board of

Directors of EDFINA.

**Defendants' ¶ 10**:  In connection with Gaujacq's expatriate assignment to Washington, she and EDF entered into an agreement titled "Conditions Particulières Applicables à la Mission de Longue Durée de Catherine Gaujacq à Washington" ("Particular Conditions Applicable to Catherine Gaujacq's Long Term Mission to Washington," hereafter the "Gaujacq Expatriation Contract").  (**Exhibit 15**, EDF 438-47).

**Plaintiff's ¶ 10**:  On July 7, 2000, Ms. Gaujacq entered into a contract with EDF and EDFINA, Inc. titled "Conditions Particulières Applicables á la Mission de Longue Durée de Catherine Gaujacq á Washington" ("Particular Conditions Applicable to Catherine Gaujacq's Long Term Mission to Washington," or the "Gaujacq Expatriation Contract"). (Def. Exh. 15).  The "delegation" is the French name given to EDFINA, Inc. (This specific contract completes and sometimes supercedes a general contract for EDF employees working abroad.  Ms. Gaujacq's employment also governed by "Guide de Gestion des Agents travaillant a l'Etranger" (Id. Def. Exh. 94).  The "Guide de Gestion des Agents travaillant a l'Etranger" itself replaces and sometimes supercedes the French labor contract for French employees of the French gas and electricity industries.  ("Statut du personnel des industries electriques et gazieres") Att. 6, EDF 1295.

**Reconciliation ¶ 10:  Plaintiff does not dispute defendants' ¶ 10.  Plaintiff's**

**commentary is are not supported by the record as required by Rule 56(e):**

(i)     Plaintiff's statement that she entered into the Expatriation Contract with

both EDF and EDFINA is contradicted by the contract document, Def. Ex. 15, which

shows that EDF and Gaujacq are the parties to the contract, and EDFINA is not a party to

it;

(ii)     Plaintiff's statement that "delegation" is the "French name given to

EDFINA, Inc." is not supported by any record reference. (Defendants' certified

translation of Def. Ex. 15 translates "Délégation" as "delegation");

(iii)     Plaintiff's statement that EDF's Policy Guide For Representation Working

Abroad" the ("Guide de gestion des agents travaillant a l'étranger") (the "Guide") (Att. 6)

"replaces and sometimes supercedes" the French labor contract for employees of the French gas and electricity industries ("Statut National du personnel des industries electriques et gazieres") is not supported by the record citation provided (and is also not material to these motions).

**Defendants' ¶ 11**:  The Gaujacq Expatriation Contract provided that the duration of plaintiff's assignment in the US was three years, from August 1, 2000 through July 31, 2003, and that the assignment could be extended for one additional year "by tacit agreement" of the parties.  (**Exhibit 15**, at 438-39).

**Plaintiff's ¶ 11**:  The Gaujacq 2000 Expatriation Contract did not provide a finite end date, or an end date of July 31, 2003, for Ms. Gaujacq's United States assignment, and, rather, was "[e]nvisioned for an initial period of 3 years" and was renewable.  (See Def. Exh. 15 at EDF439).

**Reconciliation ¶ 11:  No dispute as to what Def. Ex. 15 says.  Plaintiff's characterization of Def. Ex., 15 does not support her statement that the contract did not have a "finite end."**

The Expatriation Contract, Def. Ex. 15, states:  "Term of the Mission:  Envisioned for an initial period of 3 years, renewable for one year by tacit agreement."  (Ex. 15, at 438-39).  Plaintiff's opposition states that her "2000 Expatriate Contract was effective for three years, with provision to extend it one year if mutually agreeable." (Pl. Opp. 32).

**Defendants' ¶ 12**:  It is the practice of EDF to rotate executives who are assigned to head its delegation in Washington.  (Gaujacq Tr. 55:9-16).  In the ten years prior to Gaujacq's appointment, four EDF executives had had this assignment.  (De Botherel Decl. ¶ 31; *see also* Gaujacq Tr. 52:13-55:8).

**Plaintiff's ¶ 12**:  While EDF's practice is to rotate its executives in all positions all over the world, many of its executives remain in one location for multiple terms.  (See Def. Exh. 12 and 16).  In fact, Ms. Gaujacq's previous executive position in France was six years.  Def. Exh. 12.  In the ten years prior to Gaujacq's appointment, four EDF executives were appointed as President of EDFINA, Inc.  In the ten years prior to Gaujacq's appointment, three EDF executives were assigned as Vice-Presidents of EDFINA.  Christian Nadal's 2004 expatriation contract was five years.  (Att. 7, EDF 923-924)

8

**Reconciliation ¶ 12:  Plaintiff does not dispute defendants' ¶ 12.  Plaintiff's commentary is not supported by the record as required by Rule 56 as follows:**

Plaintiff's statement that "many of its executives remain in one location for multiple terms" is not supported by Def. Exs. 12 & 16 which she cites to support it---these documents are plaintiff's EDF career histories that evidence her career only, not the careers of "many" EDF executives.

**Defendants ¶ 13**:  The Gaujacq Expatriation Contract provided Gaujacq with a compensation and benefits package that was consideration for her undertaking to serve EDF on an international assignment, that included the following:  (1) base salary (39,313 French francs per month in 2000, raised annually to €7330 per month in July 2004);[2] (2) an expatriation supplement; (3) cost of living supplement for Washington, D.C.; (4) rent for a residence; (5) local living expenses (such as taxes, utilities and insurance); (6) the cost of leasing and maintaining a car; (7) tax equalization; (8) a supplement for her spouse's loss of income due to relocating abroad; (9) storage of furniture and personal belongings in France; (10) two round-trip tickets each year to France for her and her spouse; (11) costs and fees for her husband's visa application; (12) a one-time declining indemnity for her prior service as director of a power plant; and (13) a one-time lump sum moving indemnity.  (**Exhibit 15**, at 440-444; **Exhibit 93**, EDF 4679; De Botherel Decl. ¶ 30).

**Plaintiff's ¶ 13**:  The Gaujacq Expatriation Contract provided Ms. Gaujacq with a compensation and benefits package to serve as President of EDFINA in Washington.  The "delegation" is the French name given to EDFINA, Inc. (Def. Exh. 15 and 21).  Fernando Ponasso granted Ms. Gaujacq merit pay raises during this contract, one in July 2002 and the second in July 2004 (Def. Exh. 93).  Ms Gaujacq was also granted annual bonuses based on Fernando Ponasso's appreciation of her annual performance.  Some compensation and benefits under the expatriation contract were paid in Euros by EDF International Branch from France (2000-2002) then from EDF Branch Americas in Argentina (2002-2004) on her bank account in France.  Id.  Other benefits, such as housing, US income taxes, airfares, utilities, car, worker's comp, home renter insurance, were provided by EDFINA, Inc. in the US.  For three years, Healthcare insurance was provided in the US (AIG-Houston) under a contract with EDF (Def. Exh. 15, Art. 15-17).

---

[2]  At the exchange rate prevailing in August 2000, 39,313 French francs was $5,558.72.  At the exchange rate prevailing in July 2004, €7330 was $8,941.13.

**Reconciliation ¶ 13:  Plaintiff does not dispute defendants' ¶ 13.  Plaintiff's commentary is not material and contains statements that are not supported by the record as required by FRCP Rule 56(e):**

(i)     Plaintiff's statement that "delegation" is the "French name given to EDFINA, Inc." is not supported by Def. Ex. 15 & 21 cited to support it, as defendants' certified translation of Def. Ex. 15 translates "Délégation" as "delegation," and Def. Ex. 21 (EDFINA's Board resolution) does not use  the word "Délégation."

(ii)     The Expatriation Contract, Def. Ex. 15, specifies the expatriate benefits described in ¶ 13 as components of a compensation package provided to plaintiff under the agreement, which was between her and EDF.


**Defendants' ¶ 14**:  Consistent with EDF's practice concerning expatriate compensation, Gaujacq's base salary and other remuneration under the expatriation contract while she was in Washington was paid in Euros in France, while some US-based expenses, such as housing, were paid in the US.  (Gaujacq Tr. 71:17-2, 529:14-530:2; Nadal Tr. 441: 14-19, 451:2-8).

**Plaintiff's  ¶  14**:     EDF did not have consistent practices concerning expatriate compensation and issues were addressed on a case by case.  (As evidence of the inconsistencies, Nadal's expatriation contract with EDENOR in Argentina is different from his contract to EDFINA in the United States.)  (Att. 7, EDF 923-24; Laroche Decl., Exh. A).

**Reconciliation ¶ 14:  Plaintiff does not dispute defendants' ¶ 14 .  Plaintiff's commentary, asserting that EDF did not have consistent practices concerning expatriate compensation is not supported by evidence as required by Rule 56(e) and is not material to these motions because EDF's practices concerning expatriation compensation are outside the purview of US employment laws.**

The record reflects that Nadal's contract with EDENOR, the Brazilian energy company of which he was President, was not an EDF expatriation agreement but rather a

separate employment contract (because EDF was a minority, not a controlling shareholder of EDENOR),  (Def. Exs. 28 and 29).

**Defendants' ¶ 15**:  Pursuant to EDF policy pertaining to expatriate assignments, Gaujacq continued to be an EDF employee while stationed in Washington.  She retained her EDF pay ranking at all times, and EDF was committed to employ her in France at the end of her Washington assignment.  (**Exhibit 12,** EDF 4673-**74; Exhibit 15**; EDF 438-447; **Exhibit 16**, EDF 041; **Exhibit 17**, EDF 412, **Exhibit 18**, EDF 414; **Exhibit 19**, EDF 415; **Exhibit 20**, EDF 5185; De Botherel Decl. ¶¶ 22-26).

**Plaintiff's ¶ 15**:  During Ms. Gaujacq's appointment under contract to Washington, she was an employee of both EDF and EDFINA, Inc.  Att. 8, Pl. 1421-25.  During her contract in Washington, Ms. Gaujacq's ranking was not known to her.  See Gaujacq Decl. ¶ 54.  When EDF implemented the "EDF policy for compensation of High level Executives," Ms. Gaujacq was not notified of the rank that she assumed.  EDF emailed her, on March 31, 2004, to advise that her new expatriation would be her third assignment on a R3 position (Laroche Decl, Exh. A).  Ms. Gaujacq was first notified of her ranking, in September 2004, when HR branch Energy Jacques Bouron informed her that the position of "Charge de mission au Directeur de la Production Nucleaire" was ranked R3.  (Def. Exh. 81).  Moreover, Ms. Gaujacq and EDF had no agreement indicating that she would need to return to France at the end of her assignment.  To the contrary, EDF's Human Resources Department contacted Ms. Gaujacq in April 2004 for a potential position with EDF Energy in London (England).  (Def. Exh. 47).  In fact, other EDF expatriates assigned to EDFINA received successive different appointments to the same location at the conclusion of their first appointment.  (Nadal Decl. ¶ 5; Audie Dep., at 9, Att. 9).  (JL Foret, Alexandre Audie, and Richard Schomberg had two successive assignments in the U.S.)

**Reconciliation ¶ 15:  Plaintiff does not dispute defendants' ¶ 15.  Defendants do not dispute plaintiff's commentary for purposes of these motion except the following statements contained in plaintiff's ¶ 15 are not supported by the record as required by Rule 56(e):**

(i)      Att 8, which plaintiff cites to support her statement that she was an employee of both EDF and EDFINA (EDF letter to U.S. Immigration and Naturalization Service re: Gaujacq's visa) does not say that EDFINA was her employer;

(ii)    Plaintiff testified at deposition that she knew her position was ranked R-3 following her 2003 performance review.  (Hoguet Reply Decl., Ex. F, Gaujacq Tr. 87);

(iii)    To the extent plaintiff's statement indicates that EDF did not expect plaintiff to return to France at the end of her U.S. assignment, her statement  is contradicted by the Guide de gestion des agents travaillant a l'étranger ("Management Guide for Agents Working Abroad"), Def. Ex. 94, which contemplates "reintegration in France" and "repatriation" of returning expatriates.

## Gaujacq's Role In The US; Defendant EDFINA

**Defendants' ¶ 16**:  While serving as EDF's Director in Washington, Gaujacq reported, beginning in 2002, to the head of EDF's Americas Branch, Fernando Ponasso[3] in Buenos Aires.  (Gaujacq Tr. 65:15 – 66:4-67:20).  EDF officials in France continued to make all decisions pertaining to her "mission" (job responsibilities), her career, the duration of her stay in Washington and her next assignment.  (Complaint  ¶¶ 5, 14; *see also* Gaujacq Tr. 107:17–109:11, 124:21–126:21, 140:2-141:9, 179:1-186:4, 240:14-241:7, 243:17-245:8, 246:8-14, 248:3-6, 269:8-17, 409:10-15).

**Plaintiff's ¶ 16**:  As President of EDFINA, Inc., Ms. Gaujacq reported, beginning in 2002, to the Senior Executive EDF Americas Branch and Chairman of EDFINA, Fernando Ponasso in Buenos Aires.  Ponasso was her direct Superior.  Def. Exh. 93.  He was responsible for her annual evaluation, merit raises, bonuses, and had an immediate input in the decisions regarding her transfer (Id.)  The final decision maker for her transfer was Gerard Creuzet, director Superior of Fernando Ponasso through the EDF Executive Committee (Roussely-Creuzet-Laroche).  When Ms. Gaujacq became Vice-President of EDFINA starting June 1, 2004, her direct superior was Nadal, as President of EDFINA, and then Ponasso, as Chairman of EDFINA.  Nadal had decision making authority with regard to her merit raises, bonuses, and immediate direct input to her transfer.  (DeBotherel Decl., Exh. G; Exh. 94; Laroche Dep., at 44-47, Att. 10; Exh. 15) When he was assigned President of EDFINA on June 1, 2004, Nadal had the same reporting structure that Ms. Gaujacq had as President of EDFINA.  (De Botherel Dec, Exh. G; Def. Exh. 94, Def. Exh. 15).

**Reconciliation ¶ 16:   Plaintiff does not dispute defendants' ¶ 16.   Plaintiff's commentary  concerning her reporting line is not material to these motions and does**

---

[3] Ponasso left EDF in 2005.  (De Botherel Decl. ¶ 47).

not meet the requirements of Rule 56(e) because it contradicts her deposition testimony and the record as follows:

(i)    Plaintiff testified at deposition that she reported to Ponasso as head of EDF's Americas Branch and also to Gérard Creuzet as EDF's Chief Operating Officer and to Bruno Lescoeur as head of EDF's Energy Branch.  (Hoguet Reply Decl., Ex. F, Gaujacq Tr. 272-73).

(ii)    In July 2004, after Nadal's arrival in Washington, plaintiff told EDF's auditors that she reported to Ponasso "for all the operations of the office" and "for her career" to Creuzet. (Def. Ex. 50).  She supplies no evidence to support her statement that Nadal after June 1 had authority over her compensation or "immediate direct input" into her transfer.  Ponasso gave plaintiff a raise in July 2004. (Def. Ex. 93)

**Defendants' ¶ 17**:  As EDF's Director in Washington, Gaujacq was responsible for collaborating with leaders of US electrical utilities for the purpose of building and strengthening ties between the US and French energy industries and undertaking collaborative research and development projects.  (Complaint ¶ 35).

**Plaintiff's ¶ 17**:  As the top-ranking executive of Electricite de France International North America, Ms. Gaujacq directed all business activities of the organization.  See Gaujacq Dec. ¶ 4.  Ms. Gaujacq reviewed administrative and personnel decisions and coordinated the work of outside contractors who provided services to meet the needs of EDFINA, Inc. Id.  Perhaps most importantly, as President, Ms. Gaujacq worked in close collaboration with leaders of U.S. electrical utilities, building and strengthening ties between the US, and French energy industries. Id.  This function of the position is key because the exchange of information between Electricite de France and U.S. utility companies directly benefit the U.S. energy industry.  Ms. Gaujacq was charged with explaining the policies, experiences, and goals of Electricite de France to US Energy executives and governmental organizations.  Ms. Gaujacq played a critical role in defining the different avenues to be pursued by Electricite de France in cooperation with the US energy industry in pursuing collaborative research and development projects at a highly advanced level.  See Plaintiff 125-31, Att. 11.  Ms. Gaujacq was a founding member of the consortium incorporated as Nustart, on April 19, 2004 (Def. Exh. 66 and 90).  Ms. Gaujacq was the EDFINA managing Representative to the consortium of energy companies called NuStart Energy Development, LLC ("NuStart").  (Gaujacq Decl. ¶ 34).  Ms. Gaujacq was also appointed a Board member of the EDF affiliates

exXco and IES and Ms. Gaujacq had numerous contacts at the highest level with EPRI and Easenergy Plaintiff, 1360-68, Att. 12.

**Reconciliation ¶ 17: Plaintiff does not dispute defendants' ¶ 17. Defendants do not dispute plaintiff's ¶ 17 for purposes of these motions.**

**Defendants' ¶ 18**: In particular, Gaujacq served as a representative to a consortium of energy companies, called NuStart Energy Development, LLC ("NuStart"), which worked on the development of a design for a nuclear energy plant that could be built in the US. (*See* Complaint ¶ 54; Gaujacq Tr. 206:21-208:6).

**Plaintiff's ¶ 18**: Ms. Gaujacq was a founding member of the NuStart consortium. Def. Exs. 66 and 90.

**Reconciliation ¶ 18: No dispute. Plaintiff does not dispute defendants' ¶ 18. Defendants do not dispute plaintiff's ¶ 18 for purposes of these motions.**

**Defendants' ¶ 19**: As EDF's Director in Washington, Gaujacq was appointed President of defendant Electricité de France International North America, Inc. ("EDFINA"). **Exhibit 21**, EDFINA 5385-87). Four previous EDF representatives in Washington had also served as President of this company. (De Botherel Decl. ¶ 31; *see* Gaujacq Tr. 52:13-55:8).

**Plaintiff's ¶ 19**: Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 19: No dispute.**

**Defendants' ¶ 20**: EDFINA is a corporation organized under District of Columbia law that maintains its office in Washington, D.C. (Complaint ¶ 6).

**Plaintiff's ¶ 20**: Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 20: No dispute.**

**Defendants' ¶ 21**: EDFINA acts as EDF's liaison office in the US. EDFINA does not generate income. EDF pays EDFINA's expenses. (Complaint ¶ 4, Response ¶ 4).

**Plaintiff's ¶ 21**: EDFINA is a corporation and its mission and purpose are described in its Articles of Incorporation. Plaintiff, 125-31, Att. 11, Plaintiff, 1360-68, Att. 12.

**Reconciliation ¶ 21: No dispute.**

**Defendants' ¶ 22**:  As President of EDFINA, Gaujacq was responsible for managing its office in Washington, "local" staff (that is, staff who were not expatriates sent to Washington by EDF in France), and the work of outside contractors and consultants who supplied services to EDF in the US.  (*See* Complaint ¶ 35; Response ¶ 35).

**Plaintiff's ¶ 22**:  As President of EDFINA, Ms. Gaujacq was responsible for managing all employees, including EDF employees working in the United States sponsored by EDFINA, Inc.. and by Easengery ("detaches") Exh. 22 at EDF4558, Att. 12, Pl. 1360-1368, Att. 13, EDF 4525-4526, and the work of outside contractors and consultants who supplied services to EDF and EDFINA in the U.S.  Those employees were located in various states.  Att. 13, EDF 4525-26.

Reconciliation ¶ 22:  No dispute.  Plaintiff does not dispute defendants' ¶ 22.

For purposes of these motions, defendants do not dispute plaintiff's ¶ 22.

**Defendants' ¶ 23**:  At all times relevant to the Complaint, EDFINA had two "local" employees (that is, employees who were hired, paid and managed by EDFINA in Washington): Adja Ba and, for some time, Alexandre Audie. (Nadal Decl. ¶¶ 33-34; Nadal Tr. 467:12-468:1; 486:20-487:3; Audie Tr. 22:6-11, 30:1-8; Ba Tr. 26:5-7, **Exhibit 22**, EDFINA 4557- 59 at 58).

**Plaintiff's ¶ 23**:  Adja Ba was only employed by EDFINA.  Alexandre Audie was employed by EDF and EDFINA from 1999 to 2003.  He was only employed by EDFINA from 2003 to October 2004.  Alexandre Audie was rehired by EDF in October 2004, while remaining an EDFINA employee.  (Att. 9, Audie Dep. at 4, 5, 9, 14, 15 and 19).

Reconciliation ¶ 23:  Plaintiff does not dispute defendants' ¶ 23.  Plaintiff's

commentary on defendants' ¶ 23 is not material to these motions.

**Defendants' ¶ 24**:  Other than Ba and Audie, the employees who worked in EDFINA's office in Washington, including Gaujacq, were individuals in the employ of EDF in France who were working in the US on expatriate assignments.  (**Exhibit 22**, EDFINA 4557- 59 at 58; Nadal Decl. ¶¶ 36-37; *see also* Nadal Tr. 416:7-11, 467:12-468:1).

**Plaintiff's ¶ 24**:  All EDF employee working in the United States were either EDFINA employees or Easengery employees under the oversight of EDFINA  (Def. Exh. 22 at EDF4558, Att. 13; EDF 4525-26, Att. 12, Pl. at 1360-61).

Reconciliation ¶  24:    Plaintiff does not dispute defendants' ¶24. Plaintiff's

commentary, which asserts that the individuals who worked at EDFINA  other than

15

**Ba and Audie were employees of EDFINA as well as EDF, is not supported by the record as required by Rule 56(e) and is not material to these motions because EDFINA is not seeking dismissal of this action for failure to meet the 15-employee threshold for applicability of Title VII (though EDFINA reserves the right to raise this issue in other contexts).**

Plaintiff's testimony is clear that employment decisions concerning EDF expatriates are made by EDF in France, not by local subsidiaries, such as EDFINA. (See Gaujacq Tr. 140:2-141:3-9, 160:1-9, 194:3-16, 230:18- 231:20, 241:20-242:12, 245:1-8, 275:13-20, 409:10-15; Atts. 8 and 20).  The record sources plaintiff cites to support her commentary on this issue do not support it. (Def. Ex. 22, Nadal's audit interview notes, state that one of EDFINA's main activities is "representing EDF and cooperating in various areas" including "support and follow-up of expatriates to the United States" ); Att. 13 is a list of EDF Détaches (expatriate employees)  identifying either EDFINA or Easenergy as the entity sponsoring visas for them to work in the US); Att. 12 is a slideshow presentation listing the number of people in the Washington office as well in the US).

### Gaujacq's First Request to Extend Her Washington Mission

**Defendants' ¶ 25**:  While stationed in Washington, Gaujacq and her husband, Philippe Gaujacq, occupied as their residence a house in Great Falls, Virginia.  EDF (through EDFINA) paid the rent for the house pursuant to the Gaujacq Expatriation Contract. (Complaint ¶ 58; P. Gaujacq Tr. 4:22-5:1; Gaujacq Tr. 71:17-72:13).

**Plaintiff's ¶ 25**:  Ms. Gaujacq and her husband, Phillipe Gaujacq, occupied two different residences, although both were in Great Falls, Virginia.  (Att. 14, Pl. 1448-53).

**Reconciliation ¶ 25:  No dispute.**

**Defendants' ¶ 26**:  Gaujacq and her husband, Philippe Gaujacq, came to the US on visas obtained by reason of her employment as EDF's representative in Washington. (Complaint ¶ 37; P. Gaujacq Tr. 18:13-17, 20:5-19).

**Plaintiff's ¶ 26**:  Ms. Gaujacq does not dispute the allegations contained in Paragraph.

> **Reconciliation ¶ 26:  No dispute.**

**Defendants' ¶ 27**:  On March 15, 2002, Gaujacq and her husband applied to the US Immigration and Naturalization Service for permanent resident ("green card") status. (**Exhibit 23**, EDFINA 1034-1071 (excerpts); **Exhibit 24**, EDF 432; Gaujacq Tr. 92:19-93:8; *see also* P. Gaujacq Tr. 17:16-18:17). Gaujacq was granted permanent resident status in August 2004.  (Gaujacq Tr. 8:14–18, 33:16-34:4, *see also* P. Gaujacq Tr. 17:16-18:17; G2529-2532).

**Plaintiff's ¶ 27**:  Ms. Gaujacq does not dispute the allegations contained in Paragraph 27.

> **Reconciliation ¶ 27:  No dispute.**

**Defendants' ¶ 28**:  Gaujacq told EDF that she was applying for permanent resident status in order for her husband to be employed in the US.  (**Exhibit 24**, EDF 432).  However, Philippe Gaujacq did not become so employed.  (Gaujacq Tr. 94:20-95:17; P. Gaujacq Tr. 36:11 – 15; 41:7-9).

**Plaintiff's ¶ 28**:  Phillipe Gaujacq did not become employed as a teacher because, despite his efforts to find employment, there were no opportunities available to him in the local public and private high schools of Loudon and Fairfax, Virginia counties.  (Att. 15, P. Gaujacq Dep. At 21, 29-36).

> **Reconciliation ¶ 28:  Plaintiff does not dispute defendants' ¶ 28.  Defendants do not dispute plaintiff's ¶28 for the purposes of these motions.**

**Defendants' ¶ 29**:  Because her Expatriation Contract "was set to expire at the latest for the summer of 2004," Gaujacq requested in January, 2003, a new contract permitting her to remain in her Washington post for an additional three years.  (Gaujacq Tr. 124:21 – 125:17).  Gaujacq admits that Gérard Creuzet,[4] the Chief Operating Officer of EDF in Paris, "did not accept" this request  (Gaujacq Tr. 125:18-21), but said that any renewal or extension of her contract would be on "a year by year basis." (Gaujacq Tr. 107:17-108:8, 126:1-9; *see also* **Exhibit 25**, EDF 4577).

**Plaintiff's ¶ 29**:  In early January 2003, Gerard Creuzet agreed on a three-year contract, with duration from August 1, 2003 to July 31, 2006, that would be renewed on a year by

---

[4] Creuzet left EDF in September 2004.  (De Botherel Decl. ¶ 47).

year basis each year no later than mid-January for the period August to July of the next year.  EDF4577, Ex. 25.  Ponasso and Creuzet knew that Ms. Gaujacq's husband had given up his employment in France and needed ample notice of changes in her employment in order find a job during the school year.  Def. Exh. 15, Att. 10; Def. Exh. 26.  In January 2003, Creuzet extended the contract for the period August 1, 2003 to July 31, 2004.  He also pointed out that Ms. Gaujacq should expect a substantial promotion for her next assignment, but probably not before the summer of 2005.  Def. Exh. 25 and 26; [EDF 4681 is dated April 1, 2003 and translated April 1, 2004 – translation error]).

**Reconciliation ¶ 29:  Plaintiff does not dispute that defendants' ¶29 is a correct summary of her deposition testimony.  Plaintiff's ¶ 29 does not meet the requirements of Rule 56(e) because it is contradicted by the documents she cites and her testimony.**

(i)    For the proposition that Creuzet in January 2003 agreed on a three year extension of Gaujacq's Expatriate Contract to July 31, 2006, plaintiff cites Def. Ex. 25, an email in which Creuzet, responding to the request for a three-year extension, says: "I think it would be more judicious to do it by renewable periods of one year."  Gaujacq testified concerning this email as follows:

> Q.  Mr. Baumgarten asks in this e-mail if
> Mr. Creuzet will return -- will confirm a three year
> renewal of your assignment and Mr. Creuzet responds
> he thinks it would be more judicious to do it in one
> year periods.
>
> Do you see that?
> A.  I see that, yes.
> Q.  I think if I'm understanding you
> correctly, your testimony is that Mr. Creuzet indeed
> told you that this would be dealt with in one year
> periods, correct?
> A.  Yes, in the perspective of a higher
> management position with EDF.

(ii)    Def. Ex 26, a Creuzet email dated April 1, 2003 which plaintiff also cites, says that Gaujacq's "contract has been extended for one year *and will terminate in the summer of 2004*" (emphasis added).   At her deposition plaintiff testified:

> Q.  Is it correct that you had asked Ponasso
>  and Creuzet in 2003 for a three year contract added
>   on to your existing contract?
> A.  Not adding.  It needed a new contract.
> The first contract I had was set to expire at the
> latest for the summer of 2004.
>
> Q.  July 30, 2004, is that correct?
> A.  Yes.
>
> Q.  In this e-mail that you sent to Mr. Czerny
> in February 2004 you said that you had asked Ponasso
> and Gerard Creuzet the prior year for a new contract
> and then you say that you wanted it to be
> established for a three year period.
> Do you see those words?
> A.  Yes.
> Q.  Had you in fact asked Ponasso and Creuzet
> for a new contract for three years?
> A.  Yes, I did.
> Q.  You wanted to stay, you told them you
> wanted to stay for an additional three years, is
> that correct?
> A.  Yes, and they did not accept and said
> since you're going to have a higher management
> position with EDF it's going to be on a year by year
> basis with no answer later than January to make sure
> my husband could find a job.
> Q.  To keep this simple, because I need to
> keep it simple, you had asked them for a three year
> period, contract for a three year period and they
> had said no, it would be year by year, correct?
> A.  Yes.

**Defendants' ¶ 30**:  While not accepting Gaujacq's request to extend her mission in the US for an additional three years, EDF did agree to a one-year extension, that is, until July 31, 2004.  (**Exhibit 26**, EDF 4681; Gaujacq Tr. 106:11-16, 107:17-108:8, 126:5-9).

**Plaintiff's ¶ 30**:  In direct line with his previous representations to Ms. Gaujacq, EDF extended her contract from August 1, 2004 to July 31, 2005 (Att. 16, EDF 1707-18; see

also Gaujacq Dec. at ¶ 42)  He again pointed out that Ms. Gaujacq should expect a substantial promotion for her next assignment.  Id. ¶ 42.  Ms. Gaujacq met with Chairman Roussely on February 18, 2004, and he confirmed that Ms. Gaujacq could expect a significant promotion in the summer of 2005.  On March 18, 2004, Ms. Gaujacq had her annual evaluation in Washington DC with Fernando Ponasso and confirmed Ponasso's agreement that her contract in the USA would last through, at least, 2005.  (Att. 16, EDF. 1707-18).

**Reconciliation ¶ 30:  Plaintiff's commentary does not dispute that defendants' ¶ 30 is a correct summary of her deposition testimony and Def. Ex. 26. Her ¶30 is not supported by the record as required by Rule 56(e), as follows:**

For the proposition that "EDF extended her contract from August 1, 2004 to July 31, 2005," plaintiff cites Att 16, which are her annual evaluations for 2002 and 2003. These do not reflect action by EDF, but rather  evidence her desire to stay in the US after expiration of her Expatriation Contract (the 2003 evaluation states "Observations Expectations of the Assessed Person: "A new US Contract").   Plaintiff testified that she prepared Att 16 in March 2004 prior to her meeting with Ponasso.  (Hoguet Reply Decl., Ex. F, Gaujacq Tr. 284-90).  Plaintiff testified, as reflected in her ¶ 30, that she had been promised a contract through at least 2005, but EDF did not sign such a contract (hence plaintiff in July 2004 emailed Creuzet and Ponasso that she wanted EDF to give her a new contract as she had requested, Def. Exs. 69, 72).

**EDF Appoints Nadal To Washington**

**Defendants' ¶ 31**:  On January 1, 2004, by an order signed by François Roussely,[5] the Chairman, President and CEO of EDF, EDF appointed defendant Christian Nadal to the position of "Délégué Général" (Delegate General) of EDF for North America, assigned to Washington, D.C.  (**Exhibit 27**, EDF 685) **(confidential)**.

**Plaintiff's ¶ 31**:  Mr. Creuzet did not appear to know anything about Nadal's appointment on January 14, 2004 when he met Ms. Gaujacq in Washington DC.  Def. Exh. 41 (but see Att. 17, Plaintiff's Translation) Fernando Ponasso communicated to Ms.

_____
[5] Roussely left EDF in September 2004. (De Botherel Decl. ¶ 47).

Gaujacq the official announcement of Nadal's appointment after the meeting in Buenos Aires on March 23, 2004, Att. 18, Pl. 526.

**Reconciliation ¶ 31:  Plaintiff does not dispute defendants' ¶ 31.  Defendants do not dispute plaintiff's ¶ 31 for the purpose of this motion.**

Note that plaintiff admits, in her ¶ 41, that Ponasso's human resources deputy, Betouret, told her on January 28, 2004 that Nadal had been appointed as General Delegate to the delegation in Washington, D.C. (Def. Ex. 31, an email from Betouret to a human resources officer of EDF in Paris, states that "Catherine Gaujacq has been told by Fernando Ponasso and then by me about the future appointment of Christian Nadal as General Delegate of EDF in North America effective January 1, 2004.") Hence, while Ponasso provided the information to plaintiff on March 23, she admits it had also been given to her the previous January 28.

**Defendants' ¶ 32**:  Nadal is a French citizen.  (Complaint ¶ 20).

**Plaintiff's ¶ 32**:  Ms. Gaujacq does not dispute the allegations contained in Paragraph.

**Reconciliation ¶ 32:  No dispute.**

**Defendants' ¶ 33**:  He joined EDF in 1988, having previously served as the General Secretary of the French National Coal Board.  (**Exhibit 28**, CN 187-192, at 191; **Exhibit 29**, CN 259; Nadal Decl. ¶ 4).

**Plaintiff's ¶ 33**:  Ms. Gaujacq does not dispute the allegations contained in Paragraph.

**Reconciliation ¶ 33:  No dispute.**

**Defendants' ¶ 34**:  Nadal was a member of EDF's Executive Committee, which constitutes the top management of the company, from 1995-1999.  (Nadal Decl. ¶ 6; *see also* Laroche Tr. 11:8 – 13:14).

**Plaintiff's ¶ 34**:  Nadal was a High Level Executive with EDF rather than "top management." (Def. Exh. 30).

**Reconciliation ¶ 34**:  No dispute.

**Defendants' ¶ 35**:  From 1999 to 2001, Nadal was the Chief Executive Officer of EDENOR, a commercial Argentinean energy company in which EDF held a partial equity interest.  **Exhibit 28**, CN 187-192, at 188; **Exhibit 29**, CN 259; Nadal Tr. 5:11-15, 18:18-19:21).  EDENOR had approximately $1 billion in annual revenue.  (Nadal Tr. 32:20-33:7).

**Plaintiff's ¶ 35**:  The company EDENOR was supplying and distributing electricity for one part of the city of Buenos Aires.  Ponasso was the Chairman of EDENOR and Nadal was his direct report.  This position was equivalent to the position of "Directeur," one of the 350 highest level Executives with EDF.  (Def. Exs**.** 28 and 29)  Penly Nuclear plant generated approximately Euros 615 million in annual revenues.

**Reconciliation ¶ 35**:  **Plaintiff's ¶ 35 does not dispute defendants' ¶ 35. Plaintiff's commentary is not material to a decision of these motions and is not supported by the record as required by Rule 56(e) as follows:**

Plaintiff does not provide record support for her statement that Nadal's position as CEO of EDENOR was equivalent to the position of "Directeur" at EDF, and was comparable to an R-3 position at EDF ("one of the 350 highest executives" in the company"); Def. Exs. 28 & 29, cited to support these statements, are Nadal's resumes, which provide no evidence as to how his EDENOR position would have been ranked at EDF.

**Defendants' ¶ 36**:  In 2002-03 Nadal served as EDF's Executive Vice-President for General Controlling in Paris, reporting to the President and CEO.  (Nadal Tr. 105:3-10; 126:8-14; **Exhibit 28**, CN 187-192, at 188 -189; **Exhibit 29**, CN 259).

**Plaintiff's ¶ 36**:  From 2001 to 2003, Nadal had no specific mission.  In 2002, EDF proposed an early retirement package to Nadal.

**Reconciliation ¶ 36**:  **Plaintiff does not dispute defendants' ¶36.  Plaintiff's ¶ 36 is not supported by any record reference and therefore does not meet the**

requirements of Rule 56(e).  Nor are these statements material to decision of these

motions.

**Defendants' ¶ 37**:  EDF appointed Nadal its Delegate General in Washington in 2004 as a top-level "ambassador" to develop high-level contacts with the investment community and governmental decision-makers in the US.  (Laroche Tr. 65:16-66:11).  Because EDF anticipated in 2004 that privatization and a public offering of its shares would take place in the near future, it saw need to expand the focus of its mission in Washington, and upgrade and broaden this mission in order to create new opportunities for investment. (Laroche Tr. 30:19 – 31:1; De Botherel Tr. 115:21-116:7; Nadal Tr. 156:11-161:8, 164:3-8). EDF's Chairman wanted to appoint an "R-1" executive (that is, an individual in the company's highest pay grade rank, *see* ¶¶ 148-162 below for a description of EDF's pay grade rank system) who had "quite a lot of experience in terms of development and strategy" to head the US delegation. (Laroche Tr. 31:22 – 32:12; Laroche Decl.  ¶¶ 11-17; Nadal Decl. ¶¶ 9-10; *see also* Laroche Tr. 33:6 – 39:2).

**Plaintiff's ¶ 37**:  Ms. Gaujacq disputes that EDF needed to appoint someone other than her to lead an alleged "new mission" for EDFINA in the United States as she performed the same duties as Nadal did during his mission.  Gaujacq Decl. ¶ 39, 110.   The Defendants' argument regarding the change of the position are allegedly based on Laroche's testimony, but Laroche admitted that he did not have any knowledge regarding Ms. Gaujacq's position, duties or performance.  (Att. 10, Laroche Dep. At 11, 14, 31, 38, 44, 45, 81).

**Reconciliation ¶ 37:  Plaintiff does not dispute defendants' ¶ 37, which sets forth the reasons EDF wanted to appoint Nadal).    Plaintiff's ¶ 37 consists of argument, not fact, and the argument is not material to these motions.  Whether plaintiff could have performed the job as well as Nadal is not material, because EDF was entitled to appoint Nadal to succeed plaintiff, whether or not the job was the same and whether or not she was as qualified as he, provided the decision was not based on gender.  Plaintiff has put forward no evidence of gender motivation and her ¶ 37 therefore raises  no material issue of fact.**

**Defendants' ¶ 38**:  The terms of Nadal's assignment to Washington, including his compensation, are contained in an agreement that he negotiated with EDF. (Nadal Decl. ¶ 11; Nadal Tr. 170:11-21). Under this agreement, Nadal's assignment to Washington extends for five years beginning January 1, 2004.  (Nadal Decl. ¶ 12).

**Plaintiff's ¶ 38**:  The terms of Nadal's expatriation contract were negotiated with EDF and EDFINA.  The "delegation" is the French name given to EDFINA, Inc. (Def. Exs. 34 and 37).  Nadal's reporting structure as President of EDFINA is the same as Ms. Gaujacq's was when she was the President of EDFINA.  See Gaujacq Decl. ¶ 39. However, against EDF policies and unlike EDF practices for employees working abroad, Nadal's expatriation contract appears to have been signed on January 28, 2004 after his nomination as "General Delegate to the USA-Canada" (Def. Exh. 30).

**Reconciliation ¶ 38:  Plaintiff does not dispute defendants' ¶ 38.  Plaintiff's commentary is not material and is not supported by the record as required by Rule 56(e), as follows:**

(i)     Def. Exs. 34 & 37, which plaintiff cites to support her statement that EDFINA was a party to Nadal's negotiation of his expatriate contract with EDF do not show this (Def. Exs. 34 and 37 are a February 2004 e-mail from Gaujacq about Nadal's visa application, and a subsequent email from Betouret to Ponasso Nadal and Gaujacq's respective assignments);

(ii)    Def. Ex. 30, which plaintiff cites to describe Nadal's expatriation contract, is a pay stub that does not reflect contract terms;

(iii)   Plaintiff provides no support whatever for her assertion that Nadal's expatriation contract was signed in violation of EDF policies and "unlike EDF practices for employees working abroad."

**Defendants' ¶ 39**:  Nadal's base salary and the value of his compensation and benefits package under his expatriation agreement are greater than that provided to Gaujacq under her Expatriation Contract.

**Plaintiff's  ¶ 39**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 39:  No dispute.**

**Defendants' ¶ 40**:  While on expatriate assignment to Washington, Nadal continues to be an EDF employee.  (**Exhibit 30**, EDF 705 (**confidential**); Nadal Tr. 450:20-451:8; Nadal Decl. ¶¶ 36-37).

**Plaintiff's ¶ 40**:  White on expatriate assignment to Washington, Nadal is an employee of both EDF and EDFINA.  (Def. Exh. 37; see also Gaujacq Decl. at ¶ 12, 39).

**Reconciliation ¶ 40:  Plaintiff does not dispute defendants' ¶ 40 (that Nadal continues to be an employee of EDF).  Plaintiff's ¶ 40 is not supported by the record as required by Rule 56(e) to the extent it asserts that, while on expatriate assignment to Washington, Nadal is an employee of EDFINA as well as EDF.**

Plaintiff cites for this proposition Def. Ex. 37, a February 2004 email from plaintiff to EDF in Paris requesting information for use in preparing Nadal's visa application.  This document shows that EDFINA sponsored his visa application, not that it directed his activities, etc. so to make him its employee as a matter of law.

## Gaujacq's Actions In Response To Nadal's Appointment: January-February, 2004

**Defendants' ¶ 41**:  In January 2004, Ponasso and his human resources assistant in Buenos Aires, Jean-Louis Betouret, informed Gaujacq of Nadal's appointment as Delegate General in Washington.  (**Exhibit 31**, EDF 941; *see also* Gaujacq Tr. 115:2-116:20).

**Plaintiff's ¶ 41**:  On January 28, 2004, Ponasso's human resources assistant called Ms. Gaujacq and informed her Nadal was appointed the General Delegate to the United States and Canada.  Def. Exh. 31.

**Reconciliation ¶ 41:  No dispute.  Plaintiff does not dispute defendants' ¶ 41. Defendants do not dispute plaintiff's ¶ 41.**

**Defendants' ¶ 42**:  On February 18 EDF's Chairman, Roussely, told her that Nadal was appointed to Washington.  Roussely told Gaujacq that she could stay in the US after Nadal arrived.  (Gaujacq Tr. 126:16-135:4).

**Plaintiff's ¶ 42**:  On February 2, 2006, Ms. Gaujacq was informed that Nadal was coming to Washington and she was requested to prepare a statement of his possible assignment with EDFINA.  See Gaujacq Dec. at ¶ 44.  Ms. Gaujacq had no basis to

believe that she would be required to leave the United States regardless of Nadal's appointment. Id. at ¶ 44. As described above, Ms. Gaujacq had previously been promised that she would receive a substantial promotion for her work as President of EDFINA. Id. ¶ 44.

**Reconciliation ¶ 42: No dispute. Plaintiff does not dispute defendants' ¶ 42.**

**Defendants do not dispute plaintiff's ¶ 41 for the purposes of these motions.**

**Defendants' ¶ 43**: On February 19, Gaujacq advised EDF that "I expect a new contract from you" as her assignment to the US was to expire on July 31, 2004 under the Gaujacq Expatriation Contract. (**Exhibit 32**, G1273).

**Plaintiff's ¶ 43**: On February 19, 2004, Ms. Gaujacq reported to Fernando Ponasso the result of her interview with Chairman Rouselly including (1) Nadal's mission as Senior Advisor (2) her request for a new expatriation contract for the period August 1, 2004 to July 31, 2005. (Def. Exh. 32). In the meantime, she continued working with EDF's Human Resources Department to petition for Nadal's visa. (Def. Exh. 37).

**Reconciliation ¶ 43: Plaintiff does not dispute defendants' ¶ 43. Defendants do not dispute plaintiff's ¶ 43 for purposes of these motions.**

**Defendants' ¶ 44**: Nadal met Gaujacq on a visit to Washington on February 25. (Gaujacq Tr. 157:13-158:2).

**Plaintiff's ¶ 44**: Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 44: No dispute.**

**Defendants' ¶ 45**: Prior to Nadal's February 25 visit, Gaujacq informed those working in the Washington office that Nadal would be coming to Washington as a "gas analyst" and "advisor" under her supervision. (Audie Tr. 112:9-113:5; Ba Tr. 143:1-18). When Nadal arrived on February 25, Gaujacq introduced him as a "gas analyst." (Nadal Decl. ¶¶ 16-17).

**Plaintiff's ¶ 45**: Based on her understanding of Nadal's mission in the United States, Ms. Gaujacq introduced Nadal as a Senior Advisor focusing on gas and equity markets. See Gaujacq Decl. at ¶ 47, 48.

**Reconciliation ¶ 45: Plaintiff does not dispute defendants' ¶ 45. Defendants do not dispute plaintiffs' ¶ 45 for purposes of these motions.**

Plaintiff admits Betouret told her on January 28, 2004 that Nadal had been appointed General Delegate for the US and Canada, not as "Senior Advisor": <u>see</u> ¶ 41.

**Defendants' ¶ 46**:  Nadal was not a "gas analyst" in February 2004 or at any time. Nadal's experience and career have nothing to do with gas.  (Nadal Tr. 205:12-206:21; **Exhibit 28**, CN 187-92).

**Plaintiff's ¶ 46**:  Ms. Gaujacq did not introduce Nadal as a gas analyst.  Id.

**Reconciliation ¶ 46:**   **No dispute. Plaintiff does not dispute defendants' ¶ 46. Defendants do not dispute plaintiff's ¶ 46 for purposes of these motions.**

Plaintiff has admitted that she introduced Nadal as a "Senior Advisor focusing on gas and equity markets", see ¶ 45.

**Defendants' ¶ 47**:  Prior to her meeting with Nadal on February 25, Gaujacq knew that Nadal occupied the pay grade rank at EDF of "R-1" (the top pay grade at EDF) and that he had previously been the CEO of EDENOR.  (Gaujacq Tr. 147:5 – 152:3; **Exhibit 33**, EDFINA 753).

**Plaintiffs' ¶ 47**:  Ms. Gaujacq was aware that Nadal had previously been with EDENOR, but she requested guidance from Fernando Ponasso as to the other terms of his employment.  Def. Exh. 32.

**Reconciliation ¶ 47:  No dispute. Plaintiff's ¶ 47 does not deny that she had been informed Nadal was an "R-1."  Defendants do not dispute Plaintiff's ¶ 47 for purposes of these motions.**

Def. Ex. 33, an email from EDF's human resources group in Paris dated February 12, 2004, tells Gaujacq that Nadal is an R-1; she testified, at the pages cited in defendants' ¶ 47, that she had received this email and knew  Nadal was a "high level executive" with the company.

**Defendants' ¶ 48**:  During a meeting with Nadal at lunch on February 25, Gaujacq told him (as reflected in Betouret's memo after speaking with her) that her assignment was

unchanged and that she reported to Creuzet and Ponasso. (**Exhibit 34**, EDF 945-46). She did not discuss EDFINA's organization and business with Nadal on February 25. (Nadal Tr. 199:12-203:16, 205:12-207:12).

**Plaintiff's ¶ 48**:  During the February 25, 2004 meeting, Ms. Gaujacq advised Nadal she reported to Ponasso, who in turn reported directly to Creuzet.  She further attempted to confirm with Nadal his assignment as "Senior Advisor on US gas and equity markets." Def. Exh. 48.

**Reconciliation ¶ 48: No dispute.  Plaintiff does not dispute Defendants' ¶ 48.**

**Defendants do not dispute Plaintiff's ¶ 48 for purposes of these motions, but Def. Ex. 48, cited to support it, does not do so.**

Plaintiff's ¶ 48 admits she told Nadal (in her words, "attempted to confirm" with him) that he was to be "Senior Advisor on US gas and equity markets", but Def. Ex. 48 contradicts this statement; the document is an email chain in May 2004 among EDF executives confirming that Nadal will be President of EDFINA and Gaujacq will be Vice President reporting to Nadal if she wished to stay in the US.   The words "Senior Advisor focusing on US gas and equity markets" do not appear in Def. Ex. 48.

**Defendants' ¶ 49**:  Gaujacq admits that, during their meeting on February 25, Nadal was "business-like," was not rude, and "did not discriminate or harass [her] in any way." (Gaujacq Tr. 161:8-16, 472:14 - 473:5).

**Plaintiff's ¶ 49**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 49:   No dispute.**

**Defendants' ¶ 50**:  Roussely directed Gaujacq to facilitate Nadal's arrival in the US and to oversee the making of a visa application for him to work in the US.  (Gaujacq Tr. 149:13-16).   Gaujacq informed EDFINA's immigration attorney responsible for processing his visa application that Nadal was coming to the United States to be a "senior advisor" who "analyses the US gas markets…." (Nadal Tr. 242:9 – 244:15; **Exhibit 35**, EDFINA 5398-5401, at 5399).  On March 11, the attorney telephoned Nadal in France to say that his visa could not be processed based on the information Gaujacq had provided because Nadal's *curriculum vitae* was devoid of any experience that would qualify him to work as a "gas analyst."  (Nadal Tr. 242:9-244:15; **Exhibit 36**, EDF 960).

**Plaintiff's ¶ 50**:  On or around February 25, 2004, Ms. Gaujacq signed a retainer with EDFINA's immigration attorney to process Nadal visa application as an International Manager to be employed with EDFINA as Senior Advisor focusing on gas and equity markets, but she explicitly told the immigration lawyers to call Nadal regarding his personal information consistent with EDFINA's practices for all EDF employees coming to work as EDFINA employees.  (Def. Exs. 35 and 37.)  The immigration lawyer did not inform Ms. Gaujacq of any issues.  Instead of proving the necessary to obtain his visa, Nadal immediately reacted to the immigration issues by complaining to EDF's Human Resources Department about Ms. Gaujacq.  (Def. Exh. 36).

**Reconciliation ¶ 50:  No dispute. Plaintiff's ¶ 50 does not dispute defendants'**

**¶ 50.  The additional matter plaintiff injects  is not material to these motions and the**

**last sentence is not supported by the record as required by Rule 56(e).**

The record reflects that EDF officials advised plaintiff by email on February 12

(Def. Ex. 33) that they could not send Nadal's contract to her because he is "R-1", saying

that the immigration lawyer should contact Nadal directly for this information.   On

February 19, plaintiff responded by email that EDF's "proposal of personal arrangement

[i.e., to arrange his own visa] raises some specific issues not compatible with US law.

Indeed, only EDFINA US subsidiary can sponsor for EDF a visa for Christian Nadal."

(Def. Ex. 37)  On February 25 (13 days after EDF's email to her), plaintiff informed the

immigration lawyer that he could contact Nadal to get the personal information he

needed.  (Def. Ex. 35).  Nadal complained (Def. 36) that Gaujacq had delayed his visa.

**Defendants' ¶ 51**:  By e-mail dated January 28, Gaujacq told EDF officials in Paris that US immigration laws did not permit Nadal to start work in Washington until he received his visa.  (**Exhibit 31**, EDF 941).  Gaujacq further advised EDF officials by e-mail dated February 19 that Nadal could not come to the US as a tourist while his visa application was pending. (**Exhibit 37**, EDF 943).  In fact, as Gaujacq later admitted, Nadal was permitted to enter the US for up to 90 days during the pendency of his visa application. (**Exhibit 38**, EDF 969-70).

**Plaintiff's ¶ 51**:  Ms. Gaujacq properly advised EDF that U.S. immigration laws did not permit Nadal to work as President of EDFINA until he received his visa to work as an EDFINA employee (Def. Exh. 37).  Ms. Gaujacq also told EDF that it was not recommended to travel in and out too often when a visa approval is pending.  Id.  The

rules for obtaining a visa were very strict following the September 11, 2001 tragedy and the time and conditions required to get approval had dramatically increased.  Id. Nonetheless, Nadal's visa petition was approved on April 8, 2004, with express processing (Att. 19, Pl. 1344-55; Att. 20, CN 179-81.)

**Reconciliation ¶ 51:  No dispute. Plaintiff does not dispute defendants' ¶ 51.**

**Plaintiff's commentary is not material to these motions and does not comply with**

**Rule 56(e), in that it mischaracterizes Def. Ex. 37 cited to support it.**

Def, Ex 37, cited to show that Gaujacq advised EDF that Nadal should not "travel

in and out [of the US] too often" until he received his visa, states "[W]e advise <u>not to</u>

<u>come</u> to US as a 'business tourist' while a visa request has been filed."  (emphasis added)

**Defendants' ¶ 52**:  Prior to his February 25 meeting with Gaujacq, Nadal told Betouret, the human resources officer for EDF's Americas Branch in Buenos Aires, that he was open to the possibility of Gaujacq's remaining in the US after he assumed his duties in Washington. (**Exhibit 39**, EDF 1228A; Nadal Decl. ¶ 15).

**Plaintiff's ¶ 52**:  Based on notes from Bethouret dated February 10, 2004, Nadal was reluctant to have Ms. Gaujacq stay after he assumed her duties as President of EDFINA, but Chairman Roussely, H.R. Laroche, and his direct report, H.R. Metais encouraged him to accept her position (Def. Exh. 39).

**Reconciliation  ¶ 52:  Plaintiff does not dispute defendants' ¶ 52.  Plaintiff's**

**¶ 52 does not meet the requirements of Rule 56(e) because it misreads Def. Ex. 39**

**cited to support it.**

Def. Ex. 39 which contains Betouret's notes of a conversation with Nadal on

February 10, 2004, records that Nadal was "open" to having Gaujacq stay (see Betouret

Declaration ¶ 4, submitted in opposition to plaintiff's Motion To Strike [Dkt. 129].  Def.

Ex. 39 nowhere says that Nadal was "reluctant" to have plaintiff stay.

**EDF Reinstructs Gaujacq:  March 2004**

**Defendants' ¶ 53**:  On March 22, Creuzet, the Chief Operating Officer of EDF in France, went to Buenos Aires to meet with Gaujacq. During the meeting, Creuzet called EDF's Chairman, Roussely, in Paris. (Gaujacq Tr. 179:1-186:4).

**Plaintiff's ¶ 53**: Ms. Gaujacq was invited to meet with Creuzet and Ponasso in March of 2004. On March 23, 2004, Ms. Gaujacq met with Creuzet, the Chief Operating Officer of EDF and Ponasso, Senior Executive EDF Branch Americas and EDFINA Chairman in Buenos Aires. See Gaujacq Decl. ¶ 51, 53.

**Reconciliation ¶ 53:    No dispute.  Plaintiff does not dispute defendants' ¶ 53.**

**Defendants do not dispute plaintiff's ¶ 53 for purposes of these motions.**

**Defendants' ¶ 54**:  Creuzet told Gaujacq during the March 2004 meeting in Buenos Aires: "He said cut the bullshit. Nadal is going to be President of EDFINA and there is nothing else to say.  Raison d'état.[6]  That's what I heard."  (Gaujacq Tr.184:21-185:4).

**Plaintiff's ¶ 54**:  When Creuzet came back from calling Chairman Roussely, he said: "[I] will cut the bullshit, Nadal is going to be President of EDFINA and there is nothing else to say.  Raison d'état"  Id. ¶ 52.

**Reconciliation ¶ 54:    No dispute.**

Defendants' statement quotes the deposition transcript verbatim.

**Defendants' ¶ 55**:  Following her meeting with Creuzet, Gaujacq understood that Nadal was to be the new head of EDF's delegation in Washington. (Audie Tr. 120:22-121:9, 124:12-125:1; Nadal Tr. 252:22-253:9).  She told the people at the EDFINA office that she had been "in error" in her previous statements that Nadal would be working as a "gas analyst" under her supervision. (**Exhibit 38**, EDF 969-70; Gaujacq Tr. 191:18-193:2).   She also directed the company's immigration attorney to draft Nadal's application for a visa to work as "President of EDFINA."  (**Exhibit 40**, G 1334).

**Plaintiff's ¶ 55**:  Ms. Gaujacq does not dispute the allegations in paragraph 55, except to the extent that they infer that she previously represented Nadal as a "gas analyst".  In addition, Ms. Gaujacq redirected the company's immigration attorney to prepare Nadal's visa application to be employed as President of EDFINA on March 24, 2004.  (Def. Exh. 40).

**Reconciliation ¶ 55:    No dispute. Plaintiff does not dispute defendants' ¶ 55.**

**Defendants do not dispute plaintiff's ¶ 55 for purposes of these motions.**

**Defendants' ¶ 56**:  Nadal and Gaujacq did not meet or speak to each other on the telephone in March 2004. (Nadal Decl. ¶39; *see also* Gaujacq Tr. 389:18-390:10, 472:14-473:8).

---

[6]  "Raison d'état" translates as "reason of state."

**Plaintiff's ¶ 56**:  Ms. Gaujacq did not meet or speak to Nadal in person or on the telephone in March of 2004, however, they did speak via email during that time.  See Gaujacq Decl. ¶ 56.

> **Reconciliation ¶ 56:  No dispute.**

**Defendants' ¶ 57**:  In April 2004, Nadal came from Paris to visit the EDFINA office for approximately two weeks.  At Gaujacq's request, Nadal provided her in advance with the dates of his visit. (**Exhibit 38**, EDF 969-70).

**Plaintiff's ¶ 57**:  In April 2004, Ms. Gaujacq did not meet with Nadal at EDFINA offices in D.C. through no fault of her own.  (Def. Exh. 38).

> **Reconciliation ¶ 57:  No dispute. Plaintiff does not dispute defendants' ¶ 57.**

**Defendants do not dispute plaintiff's ¶ 57 for the purposes of these motions.**

Defendants have no information as to whether it was plaintiff's "fault" that she

did not meet Nadal when he was in Washington in April.

**Defendants' ¶ 58**:  Gaujacq did not come in to the EDFINA office while Nadal was in Washington in April 2004. (Gaujacq Tr. 537:8-9).  She and Nadal did not meet or speak on the telephone during that month.  (Nadal Decl. ¶ 39; Nadal Tr. 227:10-19; *see also* Ba Tr. 144:1-146:17; Audie Tr.122:7-20).

**Plaintiff's ¶ 58**:  See Responses to paragraphs 56 and 57 above.

> **Reconciliation ¶ 58:  No dispute.**

## Gaujacq's Proposal For A New Mission in the US

**Defendants' ¶ 59**:  At the March 22 meeting in Buenos Aires, Gaujacq discussed with Creuzet her desire to remain in the United States and to continue to work with NuStart, and Creuzet invited Gaujacq to propose a new mission for herself. (*see* Gaujacq Tr. 179:1-10, 184:8-16).

**Plaintiff's ¶ 59**:  At the March 23 meeting in Buenos Aires, when Creuzet came back from calling Roussely, he said "I will cut the bullshit, Nadal is going to be President of EDFINA and there is nothing else to say.  Raison d'état"  See Gaujacq Decl. ¶ 52.  Ms. Gaujacq was distressed and upset Creuzet and Ponasso told Ms. Gaujacq to prepare a new assignment on the Nuclear projects for Ms. Gaujacq in the USA.  Ms. Gaujacq then prepared her proposal of a three years expatriation contract focusing on nuclear matters (Def. Exh. 42; Def. Exh. 41, but see Att. 17, Plaintiff's translation).

**Reconciliation ¶ 59**:  No dispute.

(Note the transcript of plaintiff's deposition says that Creuzet told her "Cut the

bullshit" (Gaujacq Tr.184:21-185:4).

**Defendants' ¶ 60**:  By e-mail dated March 25, Gaujacq proposed to Creuzet in Paris a
new three-year expatriation assignment in the US as "Directeur Production et Projets
Nucleaires, EDFINA" (Director of Generation and Nuclear Projects, EDFINA).  (**Exhibit
41**, EDF 965-67, at 965; **Exhibit 42**, EDF 4684-91).  Gaujacq proposed that she report,
not to Nadal as head of EDF's delegation in the US and President of EDFINA, but to
EDF's "Branche Energies" (Energy Branch) in France as well as to the Director of the
Americas Branch in Buenos Aires. (**Exhibit 42**, EDF 4684-91 at 4685).

**Plaintiff's ¶ 60**:  By email dated March 25, 2004, after speaking with her husband, Ms.
Gaujacq proposed to Creuzet a new three-year expatriation assignment in the US as
"Directeur Production et Projets Nucleaires, EDFINA" (Director of Generation and
Nuclear Projects, EDFINA).  (Def. Exs. 41 and 42).

**Reconciliation ¶ 60**:  No dispute.

While plaintiff does not expressly admit that Def. Ex. 42, the proposed contract

she emailed to Creuzet, called for her to report to the Energy Branch and to the Director

of the Americas Branch (rather than to Nadal as resident of EDFINA), she does not

dispute that this is what the document says.

**Defendants' ¶ 61**:  Creuzet by e-mail on March 29 responded initially that Gaujacq's
proposal appeared to be in accord with their discussion.  (**Exhibit 41**, EDF 965-67).  By
e-mail dated April 7, however, he told Gaujacq that, after discussing the matter with
Yann Laroche, EDF's senior Human Resources officer, and François Metais, who
supervised a group responsible for executive affairs, it would appear "more appropriate"
to name her to the post "Projets Nucleaires generation 4" (Nuclear Projects 4th
Generation) attached to the Energy Branch, that is, not to EDFINA. (**Exhibit 41** at 966).
By e-mail dated April 8, Creuzet informed Gaujacq that more detailed analysis was
required and that she should determine her future "mission" (job duties or
responsibilities) with Bruno Lescoeur, head of the Energy Branch, and then discuss her
contract with Metais.   (**Exhibit 41** at 967).

**Plaintiff's ¶ 61**:  By email dated March 29, 2004, Mr. Creuzet approved Ms. Gaujacq's
new three year contract and instructed Laroche to prepare the final document – he wrote
that he would obtain input from the HR organization and mail it to her when all had
signed it (Def. Exh. 41; Exh A to Laroche Decl.)   On March 31, 2004, the HR
organization emailed back its input.  Id.  Ms. Gaujacq accepted the position but reminded

him that she needed to stay employed by EDFINA to conduct the NuStart project. By email dated April 8, 2004, Creuzet informed her that to be successful in this mission, Ms. Gaujacq needed to work out a detailed mission letter with Bruno Lescoeur, head of the Energy Branch and that she should get her new expatriation contract from HR (Metais, Laroche and Bouron). Def. Exh. 41 (but See Att. 17, Plaintiff's Translation).

**Reconciliation ¶ 61: No dispute as to the contents of the emails the parties exchanged (Def. Ex. 41), which speak for themselves, and establish the material facts beyond dispute:**

(i)      On March 25 Gaujacq emailed Creuzet (as quoted in Att 17, plaintiff's translation) "Please find attached my mission proposal (from my initial contract as you had asked). Please quickly let me know your comments and those of DELCADIR [an EDF staff group that oversees human resources matters for executives] as well as the position of the company;"

(ii)      On March 29 Creuzet emailed Gaujacq as follows: "Thanks for this proposal which is in line with our conversations last week in Buenos Aires. For my part, I don't have any particular comments; I am forwarding it to Yann [Laroche, EDF's senior human resources official] to get his opinion. Thanks also for the other emails related to CN's arrival as Executive Officer in Washington. I will send you the final contract as soon as Yann and I have signed it;"

(iii)      On April 7 Creuzet emailed Gaujacq as follows: "After discussion with Yann and Francois [Metais, another EDF human resources official], it seems more sensible to appoint you to the position '4th Generation Nuclear Projects' with a single attachment [reporting line] to the Energy Branch, even if it is clear that most of your time will be spent in the United States. I invite you to look with Bruno Lescoeur at the terms of your mission letter;"

(iv)    On April 7 Gaujacq emailed Creuzet stating "Thank you for your reply. However, the description of my position is awkward.  My appointment in the U.S. consortium in the U.S. requires:  1) that I not be only generation 4 …. that I remain Officer of EDFINA in the US …. Please confirm that this proposal is possible.  Who do I need to contact for my contract?;"

(v)    On April 8 Creuzet emailed Gaujacq stating: "It's necessary to look at things in detail in order to allow you to fulfill your mission under the best conditions.  I suggest that you work in the following manner:  1. Finalize your mission letter with Bruno [Lescoeur, head of the Energy Branch].  2. Discuss your contract with François Metais [of DELACADIR, human resources for executives]."

**Defendants' ¶ 62**:    Gaujacq refused to accept the position suggested by Creuzet and reiterated her request that EDF enter into the agreement she requested for a three-year assignment in the US.  (**Exhibit 41** at  966; Gaujacq Tr. 203:8-206:15, 209:4-210:14).

**Plaintiff's ¶ 62**: Ms. Gaujacq accepted the position offered by Creuzet and accordingly reiterated her request to HR to provide her with the signed three-year expatriation contract.  In the meantime, Ms. Gaujacq contacted Lescoeur and emailed him with her proposed detailed mission letter on May 12, 2004, carbon copying Creuzet and Laroche with this email.  (Def. Exh. 41, but see Att. 17, Plaintiff's Translation; Att. 21, Pl. 839, 811-15).

**Reconciliation ¶ 62:  No dispute as to the contents of the emails the parties exchanged (Def. Ex. 41 & Att 21), which speak for themselves, and establish the material facts beyond dispute:**

(i)    In response to Creuzet's April 7 email ("[I]t seems more sensible to appoint you to the position '4th Generation Nuclear Projects' with a single attachment [reporting line] to the Energy Branch") rather than to the position proposed in her email of March 25 ("Director of Generation and Nuclear Projects, EDFINA reporting to the Energy Branch and to the Americas Branch)," Gaujacq did *not* accept this proposal, but

35

rather responded on April 4 that this description of her position was "awkward" and that she needed to be attached to EDFINA (Def. Ex. 41);

(ii)    Gaujacq and Creuzet then had further correspondence about whether or not being attached to EDFINA the way she proposed (not reporting to Nadal as the new President of the Company) was possible (set forth in full in Reconciliation ¶ 61);

(iii)    Plaintiff's additional statement that she emailed Lescoeur with her proposed detailed mission letter on May 12, 2004 is not supported by Att 21 she cites: this is an April 8 email to Metais stating "Bruno Lescoeur, whom I contacted today wants to postpone for a few weeks with my agreement my drafting of the mission letter associated to my new assignment.. . . My expatriation contract however can't wait . . . Thanks to find attached the draft of my new expatriation contract."

**Defendants' ¶ 63**:  In April 2004 EDF's Executive Committee, of which Laroche was a member, decided that Gaujacq could report functionally to the Energy Branch, but must report operationally to Nadal.  (**Exhibit 43**, EDF 998).

**Plaintiff's ¶ 63**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 63**:  **No dispute.**


**Defendants' ¶ 64**:    After meeting with Gaujacq on February 25, Nadal sought clarification from EDF of what his role in the US was to be.  On April 1, he wrote that her actions had made it extremely difficult for them to work together and that he would prefer that she be assigned elsewhere.  When Nadal learned that it had been proposed that Gaujacq remain at EDFINA in charge of nuclear projects, but not reporting to him, he objected by e-mail dated April 7 to Metais that this would diminish the scope of his responsibilities and was not acceptable to him.  (**Exhibit 44**, EDF 947-49 at 947-48; **Exhibit 45**, EDF 978; **Exhibit 46**, EDF 985; Nadal Decl ¶¶ 22-23).

**Plaintiff's ¶ 64**:    Starting in January 2004, without her knowledge, and with the complicity of the HR organization (Laroche – Metais – Bouron – Bethouret), Nadal seized every occasion to discredit Ms. Gaujacq.  (Def. Exs. 34, 36, 38, 43-46, and 48; see also Def. Exh. 41, but see Att.17, Plaintiff's Translation).  During the same period, the Defendants cannot produce any evidence that Ms. Gaujacq complained to any one in the EDF/EDFINA organization complaining with regard to Nadal.

**Reconciliation ¶ 64:   Plaintiff does not dispute defendants' ¶ 64.  Plaintiff's ¶ 64 does not comply with Rule 56(e) because the documents she cites do not support her characterization of them:**

(i)     Plaintiff offers no record support for the existence of any complaint by Nadal about Gaujacq in January or February 2004.  Betouret's notes on January 25 (Def. Ex. 39, quoted in Reconciliation ¶ 52) indicated Nadal at that time was open to her remaining in Washington;

(ii)     On March 9, after Nadal's meeting with Gaujacq in Washington on February 25, Betouret emailed Creuzet (Def. Ex. 34) concerning "Clarification of Christian Nadal and Catherine Gaujacq's assignments," stating based on a March 5 call with Nadal that "[Gaujacq] is doing what is needed to move forward but he is complaining that she 'she wants to control everything.' …. On the assignment, [Nadal] said that [Gaujacq] does not share the files with him, and that she considers that he has a different assignment (mainly distribution) and that their exchanges remain[ed] very superficial on February 25;"

(iii)     On March 10 Nadal emailed Metais (Def. Ex. 44) seeking clarification of his role and hers in Washington: "As you know, the most important factor in establishing my mission agreement for North of America was the President's wish to develop considerably the responsibilities of this position and better coordinate the Group's activities in this area.  I am really afraid, however, that this main goal is being severely attacked.  As Catherine is due to have some meetings with F. Ponasso and G. Creuzet in the next days, I am again asking for your help in avoiding any misunderstanding, inconvenience or potential irreparable situation. . . . And, as agreed, I called JL Betouret

after our conversation last Friday.  He told me that he would contact Catherine to explain to her that the possibility of her remaining in the United States needs to be discussed with G. Creuzet to confirm and specify the conditions of a mission on the nuclear of the fourth generation she spoke to him about. However, as I indicated to you and as shown by the attached e-mails, my transfer is making no progress and can not advance because of the visa problem.  On top of that, in view of the welcome I received in Washington and Catherine's statement indicating that she will be keeping her position, and that I will join the office as someone sent by the President to deal with gas matters and financial communication and that in any case, she will 'keep' everything that is nuclear", I really want a prompt and strong clarification");

(iv)     On March 12 Nadal emailed Betouret and Metais (Def. Ex. 36) concerning the attorney's information about his visa being delayed because of his lack of gas experience:  "I want to inform you of the last news concerning the visa.  I will also inform François Metais because it is important and urgent.  This matter is becoming ridiculous and even acquiring an undignified and very embarrassing aspect");

(v)     On March 26, following Creuzet's meeting with Gaujacq in Buenos Aires, Nadal emailed Betouret and Metais that "there are still at this time some disagreement between the lawyer and Catherine on some points of the visa request procedure.  I think however that the message has gone through this time, that we must wait a few days for the things to settle down but remain vigilant to avoid any new slip-ups."  (Def. Ex. 38);

(vi)     On April 7 Nadal emailed Metais (Def. Ex. 46) that he would prefer that Gaujacq not stay in Washington:  "Thank you, but I don't think that the problems are definitively resolved, quite the contrary.  The Premium 2015 Project [of which plaintiff

38

had said she wished to retain control, Def. Exs. 41 and 42] is one of the key elements of the activity of the Washington Representation to the sendee of the energy department and the company. It seems to me that it is not acceptable, considering Catherine's behavior and her relationships with JL Foret, that she retain this matter and that in addition she be empowered the Energy Department. This remains for me a major issue, this is one of the "solutions" that I wanted to avoid. Sorry."

**Defendants' ¶ 65**:  In April 2004, EDF executives in France and London expressed interest in talking with Gaujacq about new assignments for her. (**Exhibit 47**, EDF 997; Laroche Tr. 89:19 – 25).  Gaujacq refused to consider any option other than remaining in the United States.  (Gaujacq Tr. 221:9-222:14).

**Plaintiff's ¶ 65**:  Without EDF's Executive Committee knowledge in April 2004, the HR organization (Mr. Metais and Mar. Bethouret) expressed interest in speaking with Ms. Gaujacq regarding a new assignment in London (UK).  (Def. Exh. 47; Att. 10, Laroche Tr. at 89).  Ms. Gaujacq confirmed to HR (Mr. Bethouret and Mr. Metais) that [she] had a new assignment from Creuzet with EDFINA in the USA, with a mission letter pending to Lescoeur Branch Energy, and she confirmed to Mr. Bethouret that she was not on the market for 2004.[sic]  See Gaujacq Decl. at ¶ 55.  Mr. Bethouret agreed.  Id.  Notably, EDF's HR organization with this proposal, did not expect Ms. Gaujacq to come back to France, but instead had a job offer for her in the UK, after her US assignment.  Id.

**Reconciliation ¶ 65:  Plaintiff does not dispute defendants' ¶ 65.  Plaintiff's commentary is not material to decision of these motions, and her statement that EDF did not expect Gaujacq to return to France when her assignment in Washington ended is not supported by the record as required by Rule 56(e):**

Plaintiff testified that Bruno Lescoeur, the head of EDF's Energy Branch, asked her to consider a job in France in May 2004.  (Gaujacq Tr. 232:5-233:10, 235:14-237:9).

**Defendants' ¶ 66**:  In a meeting in Paris on May 18, Bruno Lescoeur, head of EDF's Energy Branch, told Gaujacq that EDF wanted her to return to France, and they discussed a new EDF initiative for the introduction to France of European Pressurized Reactors ("EPR").  *See* (Laroche Tr. 89:16-90:3, 91:12-18; Gaujacq Tr. 232:5-233:10, 235:14-237:9).  Gaujacq refused to consider returning to France, saying that she had been promised she could stay in the US.  (Gaujacq Tr. 233:11-16).

**Plaintiff's ¶ 66**:  The basis for the May 18, 2004 meeting with Mr. Lescoeur, Head of EDF's Energy Branch, was for him to approve Ms. Gaujacq's mission letter dated May 12, 2004 and the US nuclear projects.  (Att. 22, Pl. 811-15; Def. Exh. 26).  Ms. Gaujacq told him that her assignment in the US on the project was very interesting and that she wanted to continue her work in the US nuclear energy renaissance.  Ms. Gaujacq had no reason to consider returning to France because she had already been promised that she could stay in the USA on the project.  When Ms. Gaujacq contacted Mr. Creuzet, he told her to forget about Mr. Lescouer's proposal that she return to France because the EDF Executive Committee had made a final decision on her reporting structure to report to EDFINA President with EDF Branch Energy as Engineering Services provider to EDFINA (Def. Exh. 48).  Ms. Gaujacq then immediately confirmed the agreement.  Id.

**Reconciliation ¶ 66**:  Plaintiff does not dispute defendants' ¶ 66.  Plaintiff's commentary is not supported by the record as Rule 56(e) requires:

(i)      Att. 22, cited to support the statement that the purpose of plaintiff's Paris meeting with Lescoeur in May 2004 was to discuss her "mission statement", is the proposed mission letter itself, which makes no mention of the meeting with Lescoeur;

(ii)      Def. Ex. 26, an April 2003 email from Baumgarten, an Americas Branch human resources official, says nothing that supports the first sentence of plaintiff's commentary for which it is cited;

(iii)      Def. Ex 48 is an email from President and CEO Roussely's aide, Igor Czerny, informing Creuzet, Ponasso, Metais, Betouret and Lewandowski that "the President has decided, with regard to Catherine Gaujacq, that if she decides to stay in the US, she will report only to Christian Nadal" and contrary to plaintiff's statement does not say that part of her reporting line is "with EDF Branch Energy as Engineering Services provider to EDFINA" or that she "confirmed" her alleged agreement with Creuzet with anyone.

**Defendants' ¶ 67**:  On May 25, Chairman Roussely directed that Nadal take up his duties in Washington and that, if Gaujacq stayed in the US, she would be required to report to

him. Otherwise, she would return to France.  (**Exhibit 48**, EDF 1016-17; Gaujacq Tr. 409:10-15).

**Plaintiff's ¶ 67**:  On May 25, 2004, Mr. Roussely confirmed Ms. Gaujacq was appointed as Vice-President of EDFINA reporting to Nadal.  He wrote "If Gaujacq wants to come back to France, it is [sic] her decision"  (Def. Exh 48).  The EDF Chairman and CEO also deterred Nadal from pursuing her eviction from EDFINA.  Id.  Roussely also directed the HR organization to implement his decision, unknown to Ms. Gaujacq.

**Reconciliation ¶ 67:  No dispute that Def. Ex. 48, an email from President and CEO Roussely's aide Igor Czerny, was sent to Creuzet, Metais and Ponasso on May 25, 2004.**

The email speaks for itself, as follows: "The President [Roussely] met with Christian Nadal today, Tuesday May 25, 2004.  1) Christian Nadal will move to Washington between June 1st and July 1st, 2004 (his family will join him on July 3rd or July 4th). 2) Christian Nadal will receive the following internal note specifying his position, executed by F. Ponasso and copied to Catherine Gaujacq: Internal Note: - the resignation of C. Gaujacq from the Board and the appointment of C. Nadal as member of the board of EDFINA; - the appointment of C. Nadal as President of EDF INA to replace C. Gaujacq; - the appointment of F. Ponasso as Chairman of the Board. C. Gaujacq would be appointed Vice President of EDF INA with operational reporting to C. Nadal. 3) If Catherine wants to go back  . . .  she can do it. 4) C. Nadal has been dissuaded from renegotiating."

**Defendants' ¶ 68**:  Gaujacq understood that Roussely made the decision that she would report to Nadal.  (Gaujacq Tr. 245:1-8, 275:13-20, 409:10-15).  Gaujacq also knew that missions, proposals and employment decisions for executives must be approved by the highest-level executives of EDF in France.  (Gaujacq Tr. 140:2-141:3-9, 160:1-9, 194:3-16, 230:18- 231:20, 241:20-242:1).

**Plaintiff's ¶ 68**:  Ms. Gaujacq denies any understanding that Mr. Roussely decided she would  report  to  Nadal.    Rather,  Ms.  Gaujacq  believed  that  management,  not  HR

organizations, make final decisions on transfers.   (Def. Exh. 41, but see Att. 17, Plaintiff's Translation; Exh. D, Laroche Decl.)

**Reconciliation ¶ 68:    No dispute. Plaintiff admits the substance of defendants' ¶ 68, which is that EDF had decided that she would report to Nadal. Whether plaintiff believed that the decision had been made by Roussely or "management" is not material for the purposes of these motions.**

**Defendants' ¶ 69**:  In accordance with Roussely's decision, effective May 31 Gaujacq resigned the title of President of EDFINA and Nadal assumed the title of President effective June 1. Gaujacq was appointed a Vice President of the company. (**Exhibit 49**, EDFINA 5355, 5358-62; Gaujacq Tr. 248:3 – 249:8).

**Plaintiff's ¶ 69:**   Ms. Gaujacq resigned from EDFINA's Board in accordance with EDF's Executive Committee decision.  (Def. Exh. 49, Att. 23, Pl. 582-87.)

**Reconciliation ¶ 69:  No dispute.  Plaintiff does not dispute defendants' ¶ 69 and defendants do not dispute plaintiff's ¶ 69**.

**Nadal Takes Office in Washington: June 2004**

**Defendants' ¶ 70**:   Although Gaujacq held the title of Vice-President of EDFINA effective May 31, 2004, that position did not have defined responsibilities or duties associated with it. (Gaujacq Tr. 265:3-9, 350:15-351:2). Gaujacq was expected to discuss with Nadal what her duties and responsibilities would be.  (Nadal Tr. 360:8 – 361:2; 365:20-367:14, 368:3-12; Gaujacq Tr. 350:15 – 351:2).

**Plaintiff's ¶ 70**:  Ms. Gaujacq held the title of Vice-President of EDFINA effective May 31, 2004, and the May 12, 2004 mission letter agreed upon by Creuzet defined her responsibilities and duties associated with her mission.  (Def. Exh. 63 and 22).  Ms. Gaujacq expected to work with Nadal and Dreux and the President and the Vice-President of a company are expected to do.  Nadal and Fernando Ponasso knew what her duties were as Vice-President of EDFINA.  Id.

**Reconciliation ¶ 70:    Plaintiff's ¶ 70, which purports to controvert defendants' ¶ 70, does not do so because it is contradicted by her deposition testimony and by the documents she cites to support it, and therefore does not comply with Rule 56(e).**

(i) Gaujacq's deposition testimony is as follows:

> Mr. Creuzet did not then on May 24 or 25
> ask you to prepare anything new?
> A. No, no. I mean, he just told me you are
> not going to report to the energy branch. You're
> just going to report to Christian Nadal.
> Q. You and Mr. Nadal had not met and
> discussed and agreed upon a new mission letter for
>
> you, had you?
> A. No.
>
> **************
>
> Then the last little bit of these two
> lines, were you telling or planning to tell
>
> Mr. Creuzet that you needed the green card to work
> in the United States?
> A. No. The reason was -- well, the date is,
> I suppose, on or around May 24. And so I was
> telling him that I was in a difficult situation from
> the standpoint of my immigration status because I
> had no mission, no new position defined at EDFINA
> because the position of president was held by Nadal
> as of --
> Q. June 1?
> A. Yes, as of June 1 and I needed to have
> some decision from the company to make sure I was VP
> and it was not on my visa.

(ii)    Def. Ex. 22 are July 2004 audit interview notes of Nadal which state "At the time of the audit, C. Nadal has not met with C Gaujacq yet in order to allocate the roles and duties between the 2 Vice Presidents of the office.";

(iii)   Def. Ex. 63 is a one-page document unrelated to the subject of ¶ 70.

**Defendants' ¶ 71**:  After Nadal's arrival in Washington on or about June 1, he and Gaujacq did not meet and Gaujacq did not go to the EDFINA office in June except on one day, June 11, when Nadal was out of town at a conference in Colorado. (Gaujacq Tr. 310:6-12, Nadal Tr. 369:1-371:13; 505:20 – 506:2; **Exhibit 50**, EDF 4573-76 at 4574).

**Plaintiff's ¶ 71**:  Although Ms. Gaujacq did not see Nadal in the office she had regular contact with him and provided to him information that would assist him in his duties as President of EDFINA.  For example, at his request, Ms. Gaujacq told Nadal that she would provide him with her business contacts which were at the Office, and she would prepare a detailed memo describing the EDFINA organization as of May 31, 2004 so that he could make the necessary adjustments.  (Def. Exs. 51 and 63).

**Reconciliation ¶ 71:  No dispute. Plaintiff does not dispute defendants' ¶ 71.**

**The additional matters plaintiff injects into ¶ 71 are not material and do not comply**

**with Rule 56(e) because her statements are not supported by the cited record**

**sources.**

Def. Ex. 51, cited to support plaintiff's statement that she had "regular contact"

with Nadal and provided him with information, is a June 10, 2004 memo that she testified

she distributed without advance discussion with Nadal (see ¶ 72), and which contains no

business contact information.  Def. Ex. 63 is not related to the subject of this paragraph.

**Defendants' ¶ 72**:  On June 10, Gaujacq distributed to Ponasso and the EDFINA office a memorandum purporting to assign responsibility for gas and finance to Nadal and responsibility for NuStart to herself.  (**Exhibit 51**, EDFINA 836-48 at). Gaujacq did not show this memorandum to Nadal or discuss it with him before circulating it.  (Gaujacq Tr. 294:11-295:20; **Exhibit 50**, EDF 4573-76).

**Plaintiff's ¶ 72**:  On June 10, 2004, Ms. Gaujacq directed a memorandum, in response to Nadal's request, and copied Ponasso as Chairman of EDFINA to be certain that her duties were consistent with her mission (Def. Exh. 71, Att. 24, Pl. 904-10).  As Chairman of EDFINA, Fernando Ponasso knew her duties as Vice-President of EDFINA.  (Def. Exh. 63).  Ms. Gaujacq copied the EDFINA employees in the Washington D.C. office to give them the opportunity to provide some input to Nadal before changes took place. (Def. Exh. 51, partial translation).

**Reconciliation ¶ 72:  No dispute. Plaintiff does not dispute defendants' ¶ 72.**

**Plaintiff's   ¶ 72 does not comply with Rule 56(e) because it is not supported by the**

**record sources cited.**

(i)      Plaintiff admitted at her deposition, see Gaujacq Tr. 294:11-295:20, that

she sent the memo to EDFINA without clearing it with Nadal; she admits had previously

been instructed, and agreed, that he was not coming to Washington as a "Senior Advisor for gas and finance", see ¶ 55;

(ii)    The cited documents do not show what EDF or Nadal considered plaintiff's duties to be:  Att 24 is the mission letter she had previously proposed to EDF; Def. Ex. 71 is Ponasso's email to Creuzet, dated July 23 about Gaujacq's complaints and demands for a new contract; Def. Ex. 63 is an unrelated document;

(iii)    To the extent plaintiff's June 10 memo purported to assign responsibility for gas and finance to Nadal, it was inconsistent with Creuzet's direction to plaintiff that Nadal was the new General Delegate for the US and Canada, not a "Senior Advisor for gas and finance";

(iv)    Def. Ex. 51 is the cover note by which Gaujacq circulated her June 10 memo to Nadal ("As you asked me, please find attached a document that summarizes the general organization of EDFINA today").

**Defendants' ¶ 73**:  Before Nadal assumed the title of President of EDFINA, there were two persons who were authorized to sign checks on EDFINA's bank account: Gaujacq as President, and Benoit Dreux, a Vice-President. (**Exhibit 52**, EDFINA 5350-52; **Exhibit 53**, EDF 1557-59; Ba Tr. 30:1-32:5; *see also* Gaujacq Tr. 89:1-91:11).

**Plaintiff's ¶ 73**:  Nadal was aware that, in the history of EDFINA, there were various persons authorized to sign checks for EDFINA depending on the staffing of the company, including, from August 2000 to August 2002, Richard Brien, Louis Roversi, and Ms. Gaujacq. (Def. Exh. 52).

**Reconciliation ¶ 73:  No dispute.  Plaintiff does not dispute defendants' ¶ 73.**

**Defendants do not dispute plaintiff's ¶ 73 for the purposes of these motions.**

**Defendants' ¶ 74**:   After Nadal assumed the title of President of EDFINA, he was authorized in her place to sign checks on behalf of EDFINA.  (**Exhibit 54**, EDFINA 5346-48; **Exhibit 49**, EDFINA 5358-5359; Nadal Tr. 372:6 – 374:14).

**Plaintiff's ¶ 74**:  Nadal did not "assume" Ms. Gaujacq's authority to sign checks, rather, on June 4, 2004, with Mr. Dreux's knowledge, but without Ms. Gaujacq's knowledge,

Nadal make a conscious decision to remove her authority to sign checks.  (Def. Exh. 54, see also Def. Exh. 49).

**Reconciliation ¶ 74:  No dispute that Nadal, upon becoming President of EDFINA, replaced Gaujacq as an authorized check signer.  Plaintiff's commentary does not meet the requirements of Rule 56(e) in that it does not state facts, is argumentative, and is not supported by the record sources cited.**

(i)     Def. Ex 54 is a letter from Nadal to Riggs Bank, dated June 4, 2004, stating that Gaujacq "is no longer an official signature holder of Electricité de France International North America, Inc.  She has been replaced by Mr. Christian Nadal.  Therefore, our company at this point has only two officials responsible for the signature of checks, Mr. Christian Nadal and Mr. Benoit Dreux."   When Gaujacq was appointed President in 2000, she sent the same form of letter (Def. Ex. 52) to Riggs Bank replacing a former signature holder, Richard Brien, with herself ("M. Richard Brien is no longer an official signature holder of Electricité de France International North America, Inc.  Therefore, our company at this point has only two officials responsible for the signature of checks, Mrs. Catherine Gaujacq and Mr. Louis Roversi");

(ii)    Def. Ex. 49 is Gaujacq's resignation as President of EDFINA and the EDFINA Board resolution adopting her resignation as President.

**Defendants' ¶ 75**:  Gaujacq went to the EDFINA office on June 11, 2004 for approximately one hour, at which time she signed EDFINA checks.  (Complaint ¶ 83; Gaujacq Tr. 310:6-311:20).

**Plaintiff's ¶ 75**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 75:  No dispute.**

46

**Defendants' ¶ 76**:    Because Gaujacq was no longer an authorized signatory on EDFINA's accounts, the checks Gaujacq signed on June 11 were voided, and the word "void" was written on each of them. (**Exhibit 55**, EDFINA 933-37; Ba Tr. 215:8-216:22; Gaujacq Tr. 326:2-330:15).

**Plaintiff's ¶ 76**:  Mr. Dreux voided Ms. Gaujacq's checks because he and Nadal were aware of Nadal's decision to strip Ms. Gaujacq of her check signing authority, but failed to communicate this knowledge to her – instead, Mr. Dreux told Ms. Ba that Ms. Gaujacq was no longer an authorized signatory on EDFINA's accounts and wrote the word "VOID" on each check in her presence and the presence of EDFINA employees.   See Gaujacq Decl. at ¶ 63.  Humiliated, Ms. Gaujacq then left the office to attend the funeral parade of former President Reagan.  Id.; (Def. Exs. 54-57).

**Reconciliation ¶ 76:  No dispute. Plaintiff does not dispute defendants' ¶ 76.**

**Defendants do not dispute plaintiff's ¶ 76 that the checks were voided.  Plaintiff's remaining commentary is not supported by the record as required by Rule 56(e) and is not material to a decision of these motions.**

(i)    Defendants object to plaintiff's characterization of Nadal's action as "stripping" her of authority, as she had replaced Brien as a check signer when she became President of EDFINA in the same way that Nadal replaced her, see ¶ 74;

(ii)    The record references provided for this paragraph do not demonstrate that Nadal "humiliated" plaintiff (Def. Ex. 54 is Nadal's letter to Riggs Bank, quoted in ¶ 76; Def. Ex. 55 is the voided checks; Def. Ex. 56 is an email from Gaujacq to Nadal complaining about her loss of check signing authority, and Def. Ex. 57, a note from Gaujacq explaining her early departure from the Pittsburgh conference on June 14, (see ¶ 79), is unrelated to the check signing issue).

**Defendants' ¶ 77**:  By e-mail on June 11, Gaujacq requested that Nadal telephone the bank to reinstate her check-signing authority.  (**Exhibit 56**, EDF 1025).

**Plaintiff's ¶ 77**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 77:  No dispute.**

**Defendants' ¶ 78**:  In response to Gaujacq's e-mail, Nadal telephoned her from the conference he was attending in Colorado and said that she had no need for check signing authority until her functions and responsibilities were determined, and also that he was unhappy that she had sent out the June 10 memo without discussing it with him.  (Nadal Decl. ¶¶ 42-43; Nadal Tr. 369:1-372:5; 375:18-376:4, 376:18-377:2).  Gaujacq viewed the phone conversation she and Nadal had on June 11 as a "quarrel."  (Gaujacq Tr. 703:3-705:20).

**Plaintiff's ¶ 78**:  On June 11, 2004, Nadal called Ms. Gaujacq in response to her email inquiring as to her ability to write checks.  He confirmed it was his decision to remove her, but gave her no reason.  See Gaujacq Decl. ¶ 63.

**Reconciliation ¶ 78:  Plaintiff does not dispute defendants' ¶ 78.  Defendants do not dispute plaintiff's ¶ 78 for the purpose of these motions.**

Note plaintiff testified that she had a "quarrel" with Nadal in the June 11 call (Gaujacq Tr. 703-705) and that "I was on bad terms with Christian Nadal after the quarrel we had." (Gaujacq Tr. 705).

**Defendants' ¶ 79**:  Gaujacq and Nadal both went to Pittsburgh for a conference on Monday, June 14. Gaujacq departed before meeting with Nadal, leaving a note that her mother-in-law was ill and she had to return home to Washington, D.C. and undoubtedly thereafter to France.  (**Exhibit 57**, EDFINA 771).

**Plaintiff's ¶ 79**:  Because Nadal invited only Mr. Foret to accompany him to Pittsburgh, Ms. Gaujacq drove to Pittsburgh alone, on Sunday, June 13, 2004 and had meetings prior to the conference, which began on Monday morning, June 14, 2004.  She departed, leaving a note for both Nadal and JL Foret to return to Great Falls, Virginia. (Def. Exh. 57; but see Att. 25, Plaintiff's Translation).  Ms. Gaujacq was not planning to meet with Nadal and did not know that he would be attending until Mr. Foret told her. (Att .25, Gaujacq Dep. at 330, 335.)

**Reconciliation ¶ 79:  No dispute. Plaintiff does not dispute defendants' ¶ 79.**

**Defendants do not dispute plaintiff's ¶ 79 for purposes of these motions.  Plaintiff's ¶ 79 contains statements that do not comply with Rule 56(e) because they are not supported by the record sources cited and her deposition testimony, as follows:**

(i)      Plaintiff testified that she learned prior to June 11 that Nadal was planning to attend meetings in Pittsburgh on June 14 and in Lyon, France on June 21 that she regarded as "her" meetings. (Hoguet Reply Decl., Ex. F, Gaujacq Tr. 330:16-331:8);

(ii)     Gaujacq testified that she suggested to Nadal, when they spoke on the phone on June 11, that instead of meeting on June 18 as he requested, they could meet in Pittsburgh on June 14;

(iii)    (Plaintiff's ¶ 84 states: "When Ms. Gaujacq learned that Nadal was coming to Pittsburgh, she told him that they did not have to wait until June 18, 2004 and could talk, meet and/or have dinner together in Pittsburgh".)

**Defendants' ¶ 80**:  Nadal learned from Alexandre Audie, during the week of June 14, that Philippe Gaujacq had told Audie that his wife had left Pittsburgh because one of their dogs had died. Philippe Gaujacq had said nothing about his mother being ill.  (Nadal Tr. 332:13- 335:7; Audie Tr. 109:7-111:14; *see also* P. Gaujacq Tr. 59:10-64:10).

**Plaintiff's ¶ 80**:  On June 15, 2004, from her residence in Great Falls, Virginia, Ms. Gaujacq emailed Nadal and all of her business partners and colleagues, explaining her absence and apologizing for not attending meetings over the next ten days in the United States.  (Def. Exh. 61).  On June 18, 2004, Nadal responded to her email.  (Def. Exh. 58). Ms. Gaujacq returned to the EDFINA offices in Washington, D.C. on Monday, June 28, 2004.

**Reconciliation ¶ 80:  No dispute. Plaintiff does not dispute defendants' ¶ 80.**

**Defendants do not dispute plaintiff's ¶ 80 for the purpose of these motions.**

**Defendants' ¶ 81**:  Gaujacq testified at her deposition in this action that she wrote the note when she left the Pittsburgh conference on June 14 because she had "just learned that [her] mother-in-law is very sick;" that she had returned to Washington, and that she and her husband both traveled to France, where her mother-in-law was "in a coma." (Gaujacq Tr. 337:5–339:21).

**Plaintiff's ¶ 81**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 81:  No dispute.**

49

**Defendants' ¶ 82**:  Following the contrary deposition testimony of Nadal and Audie, Gaujacq submitted errata to her deposition testimony to change her testimony about why she left the Pittsburgh conference.  (Gaujacq Errata 339:17-21).

**Plaintiff's ¶ 82**:  Ms. Gaujacq clarified her testimony regarding the June 14, 2004 note on the errata sheet of her deposition.  (See Att. 27, Gaujacq errata sheet).

> **Reconciliation ¶ 82:  No dispute.**

**Defendants' ¶ 83**:  Gaujacq testified in a subsequent deposition that she had not told the truth to Nadal about the reason for her sudden departure from the conference in Pittsburgh because she had quarreled with him in their call on June 11 and she was not on good terms with him.  (Gaujacq Tr. 703:3-705:20).

**Plaintiff's ¶ 83**:  Ms. Gaujacq clarified her testimony in the errata sheet (errata sheet) and in her subsequent deposition in June.  (Att. 26, Gaujacq Dep. At 703-05).

> **Reconciliation ¶ 83:  No dispute.**

**Defendants' ¶ 84**:  In their June 11 phone call, Nadal and Gaujacq scheduled a meeting for June 18 at the EDFINA office to discuss her job responsibilities.  (Gaujacq Tr. 341:13-16; **Exhibit 58**, EDFINA 800).  Gaujacq did not come into the EDFINA office on June 18.  (Nadal Tr. 337:17-21, 366:14-367:12, 536:18-537:1; Gaujacq Tr. 341:1-342:1).

**Plaintiff's ¶ 84**:  In a June 11, 2004 telephone call, Nadal proposed to schedule a meeting with Ms. Gaujacq on June 18, 2004 at the EDFINA office.  However, the call was not to discuss Ms. Gaujacq's job responsibilities because Nadal already knew what her assignment was as Vice-President of EDFINA.  (Def. Exh. 63).  When Ms. Gaujacq learned that Nadal was coming to Pittsburgh, she told him that they did not have to wait until June 18, 2004 and could talk, meet and/or have dinner together in Pittsburgh.  (Def. Exh. 58.)  Ms. Gaujacq received Nadal's letters of discharge in her mailbox on June 19, 2004 (Def. Exh. 59.)  She returned to the EDFINA offices in Washington D.C. on Monday, June 28, 2004.

**Reconciliation ¶ 84:  Plaintiff does not dispute defendants' ¶ 84.  Plaintiff's statement that "Nadal already knew" what her duties were is not supported by the record cited as required by Rule 56(e).**

> Def. Ex. 63, which pertains to the EDFINA audit, does not bear on this subject.

**Defendants' ¶ 85**:  Gaujacq testified that she was not able to meet Nadal on June 18 due to the illness of her mother-in-law.  (Gaujacq Tr. 341:13-19).  At the second session of

her deposition, Gaujacq admitted that she had not gone to France on June 18 for this reason.  (Gaujacq Tr. 705:18-20).

**Plaintiff's ¶ 85**:  Ms. Gaujacq does not dispute this statement.

      **Reconciliation ¶ 85:  No dispute.**

**Defendants' ¶ 86**:  Nadal had to leave for France after June 18 for three weeks.  (Nadal Tr.  409:15-410:7; Nadal Decl. ¶ 45).

**Plaintiff's ¶ 86**:  As was common during his Presidency, Nadal did not inform Ms. Gaujacq that he was leaving for three weeks.  See Gaujacq Decl. at ¶64.

      **Reconciliation ¶ 86:  No dispute. Plaintiff does not dispute defendants" ¶ 86.**

**Defendants do not dispute plaintiff's ¶ 86 for the purposes of this motion.**

**Defendants' ¶ 87**:  Nadal prepared a letter dated June 18 for Gaujacq and Dreux, setting forth his powers and authority as President and theirs as Vice-Presidents of EDFINA. (**Exhibit 59**; EDF 1026; Nadal Tr. 409:5–412:6).

**Plaintiff's ¶ 87**:  Ms. Gaujacq does not dispute this statement.

      **Reconciliation ¶ 87:  No dispute.**

**Defendants' ¶ 88**:  Nadal prepared the June 18 letter to ensure that they both understood the change in authority after his appointment as President of EDFINA and to prevent unauthorized actions by Gaujacq during his absence.  (Nadal Tr. 409:5-412:6; Nadal Decl. ¶ 44).

**Plaintiff's ¶ 88**:  Ms. Gaujacq does not dispute this statement.

      **Reconciliation Paragraph 88:  No dispute.**


**Defendants' ¶ 89**:  Nadal prepared a separate letter dated June 18 authorizing Dreux to act on his behalf as President in certain particulars during his absence if necessary. (**Exhibit 60**, EDF 1027; Nadal Tr. 409:5-412:6; Nadal Decl. ¶¶ 45-46).

**Plaintiff's ¶ 89**:  Nadal prepared a separate letter, dated June 18, 2004, to give all authorities to Dreux to act on Nadal's behalf (Def. Exh. 60.)  Ms. Gaujacq discovered Nadal second letter to Dreux on July 8, 2004 at the EDFINA offices.  On July 2, Nadal admits to the EDF auditors that all responsibilities are clarified through his letters of June 18.  (See Def. Exh. 2).  Nadal also knew about her duties as Vice-President of EDFINA. (Def. Exs. 58 and 63).

**Reconciliation ¶ 89**:  **Plaintiff does not dispute defendants' ¶ 89.  Plaintiff's ¶89 contains statements that do not comply with Rule 56(e) because they are not supported by the record, as follows:**

(i)    Plaintiff cites Def. Ex. 2, presumably meaning Def. Ex 22, to support her statement that on July 2 "Nadal admits to the auditors that all responsibilities are clarified…."; in fact, what Def. Ex. 22 (audit interview notes) shows is that Nadal told the auditors that, if he and Gaujacq had met on June 18 as scheduled to allocate roles and duties between them, an email would have been sent to Gaujacq specifying their respective new roles.

(ii)    Def. Ex. 63, cited for plaintiff's proposition that "Nadal also knew about her duties as Vice President of EDFINA,", has nothing to do with the subject.

**Defendants' ¶ 90**:  Nadal considered Dreux to be the appropriate person to be authorized to act for EDFINA in his absence because Dreux was generally available for regular consultation with Nadal on business matters in the office.  Gaujacq, by contrast, had repeatedly been unavailable to Nadal, and had demonstrated unprofessional behavior since Nadal's arrival at EDFINA and had repeatedly taken action undermining his authority.  (Nadal Decl. ¶¶ 45-47).

**Plaintiff's ¶ 90**:  There is no evidence that would support this opinion statement that Mr. Dreux was a more appropriate selection for Nadal to assign his authority during his absences.  Throughout her tenure as President of EDFINA, Ms. Gaujacq performed her duties in an exemplary manner, and received high evaluations.  (See. Att.16, Exh. 49 to Gaujacq Dep.)  Prior to Nadal joining EDF, EDF was very satisfied with Ms. Gaujacq and there was never any suggestion of performance issues.  Def. Facts ¶ 8. Despite Nadal's claims that Ms. Gaujacq's office visits were too infrequent to make her useful or to deputize her to sign checks, in the four years that Ms. Gaujacq had the main check signing authority as President, there is no evidence that there was ever an issue regarding check signing.

**Reconciliation ¶ 90**:  **Plaintiff does not dispute defendants' ¶ 90 (that Nadal held the opinions described in this paragraph).  Plaintiff's additional commentary is**

**not a factual statement but is argument, and is not material to a decision of these motions.**

(i)     Contrary to plaintiff's statement, the record contains evidence to show that Nadal had a basis for his opinion that Dreux was a better person to act as his standby than Gaujacq: <u>see</u> ¶¶ 70, 71, 72, 78, 79, 80, 81, 82, 83, 84 and 85. Plaintiff has not presented evidence of a controverted fact; rather, she argues about the basis for Nadal's opinion;

(ii)     Gaujacq's job performance  prior to Nadal's arrival is not in issue on these motions.

**Defendants' ¶ 91**:  Nadal left for France on June 18, 2004 for a three-week trip to France.   (Nadal Tr. 409:20-410:7).

**Plaintiff's ¶ 91**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 91:  No dispute.**

**Defendants' ¶ 92**:  Gaujacq and Nadal were both scheduled to attend a meeting in Lyon, France on June 21, to provide an update on the NuStart program to SEPTEN, a subdivision of the EDF Engineering Division responsible for nuclear design.  (Nadal Tr. 339:13-340:1; Gaujacq Tr. 340:12-341:12).  On June 18 Gaujacq advised EDF by e-mail that that she could not attend the meeting due to the "serious and unexpected" health problem of her mother-in-law.  (**Exhibit 61**, EDFINA 813).  In her second deposition, she admitted that her mother in law's illness had not caused her to leave the US in June. (Gaujacq Tr. 706:13—708:3).

**Plaintiff's ¶ 92**:  Ms. Gaujacq was scheduled to attend a meeting in Lyon, France on June 21, 2004, to provide an update on the NuStart program to SEPTEN, a subdivision of the EDF Engineering Division responsible for nuclear designs.  On June 15, 2004, from her residence in Great Falls, Virginia, she emailed Nadal and all of her business partners and colleagues and apologized for not attending her meeting over the next ten days in the United States and in Lyon, France.  (Def. Exh. 61).

**Reconciliation ¶ 92:  No dispute.**

**Defendants' ¶ 93**:  EDF's Audit Department in France conducted an on-site audit of EDFINA in July 2004, which included interviews and document review by EDF auditors on June 28 to July 9.  (**Exhibit 62**, EDF 1266-88) (excerpts).

**Plaintiff's ¶ 93**:  Ms. Gaujacq does not dispute this statement.

**Reconciliation ¶ 93:  No dispute.**

**Defendants' ¶ 94**:  EDF's audit of EDFINA was ordered by Ponasso, the Director of EDF's Americas Branch in Buenos Aires.  (**Exhibit 63**, EDF 4556; Gaujacq Tr. 417:20-418:12; Nadal Tr. 405:19-406:6).  Nadal did not order EDF's audit of EDFINA.  (Nadal Tr. 405:19- 406:6; De Botherel Tr. 156:7-158:20).

**Plaintiff's ¶ 94**:  Even if Nadal did not order the audit, he directed the audit by telling his concerns about EDFINA to the EDF auditors.  (Def. Exs. 22 and 63).  Mr. Creuzet told Ms. Gaujacq that the audit had been ordered to protect her from Nadal.  (Def. Exh. 75).

**Reconciliation ¶ 94:   Plaintiff does not dispute defendants' ¶ 94.  Plaintiff's commentary that Nadal "directed" the audit is not supported by the record cites provided as required by Rule 56(e).**

Def. Exs. 75, 22 & 63, cited by plaintiff, show that Nadal answered the auditors' questions, but not that he "directed" the audit.

**Defendants' ¶ 95**:  During  the audit, the EDF auditors discovered that "all files relating to [NuStart] (agreement, commitment letter, [Memorandum of Understanding], operating agreement and BP…) are not available at the office and are archived at the domicile of [Gaujacq]."  (**Exhibit 50** at 4575; Nadal Tr. 347:3-349:8, 355:16-356:11).  Gaujacq did bring the NuStart documents to the office for the auditors' review, but after the auditors reviewed them, and signed confidentiality agreements at her insistence, Gaujacq took the documents back to her residence.  (Gaujacq Tr. 377:20-380:6; **Exhibit 50** at 4575; Nadal Tr. 352:4-9, 353:3-6).

**Plaintiff's ¶ 95**:  When asked on July 6, 2004, Ms. Gaujacq told the EDF Auditors that proprietary documents relating to [NuStart] were not available to the office.  She did bring the proprietary documents to the office for the auditors' review, but they were required to sign confidentiality agreements to review them.  When the auditors returned the documents, they told Ms. Gaujacq they understood the security requirements that she had imposed prior to their review.  (Def. Exs. 50 and 66).

**Reconciliation ¶ 95:   Plaintiff does not dispute defendants' ¶ 95 and defendants do not dispute plaintiff's ¶ 95 for purposes of these motions.**

**Defendants' ¶ 96**:  During an audit telephone conference on July 9, in which Nadal and Gaujacq participated, the EDF auditors stated that certain expenditures that had been authorized by Gaujacq were not documented.  Gaujacq explained that the documentation was at her residence, and Nadal stated to Gaujacq that it was very Important to bring in the documents and that the situation involving lack of documentation was "very serious." (Gaujacq Tr. 376:3-377:8, 483:8-484:8; Nadal Decl.¶ 48).

**Plaintiff's ¶ 96**:  On July 9, 2004, during the audit telephone conference, in which Ms. Gaujacq participated in person at EDFINA offices and Nadal participated over the telephone, the EDF auditors stated that certain expenditures that had been authorized by Ms. Gaujacq were not documented.  The auditors did not ask her about those documents during the audit.  See Gaujacq Decl. at ¶ 65.  In fact, most of the documents were at the EDFINA Washington office.  Id.  Nadal stated that paying for services without a service actually being performed was very serious.  Id.  The alleged "undocumented" services were consulting services from Walker Nolan and consulting services from Francois Ailleret.  (Def. Exh. 22; Att. 28, Pl. 1289-97).

**Reconciliation ¶ 96:  No dispute.  Plaintiff does not dispute defendants' ¶ 96.**

**Plaintiff's statement that "most of the documents were at the EDFINA office" does not comply with Rule 56(e) because it is not supported by the record.**

Gaujacq's Declaration ¶ 65, cited to support this statement, does not do so.

**Defendants' ¶ 97**:  Prior to July 12, Nadal had not had a single meeting with Gaujacq since they had first met on February 25.  (Nadal Decl. ¶ 39; Nadal Tr. 360:12-361:5, 365:20-367:14, 535:5-537:1; Gaujacq Tr. 389:18-390:10, 475:3-6, 537:19-538:2; **Exhibit 50**, EDF 4573-76 at 4574).  Since June 1 when Nadal became President of EDFINA, Gaujacq had not come to the EDFINA office on any day when he was there.  (Nadal Tr. 368:3-17, Gaujacq Tr. 389:18-21).

**Plaintiff's ¶ 97**:  Between July 12, 2004 and February 25, 2004, Nadal and Ms. Gaujacq exchanged numerous emails and phone calls, including a conference call on July 9, 2004. Between June 1, 2004 and July 11, 2004, Ms. Gaujacq was present in the Washington office for 12 days – Nadal however was not present those days.  (Def. Exh. 50 at EDF 4574.)

**Reconciliation ¶ 97:  No dispute. Plaintiff does not dispute defendants' ¶ 97.**

**Defendants do not dispute plaintiff's ¶ 97 for the purposes of these motions.**

Note that Def. Ex. 50, notes of Gaujacq's interview with EDFINA's auditors, does not indicate whether or how many days Gaujacq was present in the office, but says

that she told the auditors that: "CN and CG met only once in February 2004 and no meeting or appointment has been scheduled yet."

**Defendants' ¶ 98**:  On July 12, Gaujacq came into the EDFINA office, and Nadal and she met.  (Nadal Tr. 364:5-13).  At Nadal's request, Jean-Luc Forêt, an EDF expatriate who was an alternate EDFINA representative to NuStart, joined the portion of the meeting having to do with NuStart.  (Nadal Tr. 364:5-365:16; Nadal Decl. ¶ 50; Gaujacq Tr. 390:7-18).

**Plaintiff's ¶ 98**:  On July 12, 2004, Ms. Gaujacq requested a meeting with Nadal to update him on her projects and activities.  At Nadal's request, Jean-Luc Forét joined the meeting, however, Mr. Forét was not the EDFINA alternative Managing Executive to NuStart, JL Foret was an experienced Engineer and was working under an H1B visa.  See Gaujacq Decl. at ¶ 67.  In fact, George Servieres was Ms. Gaujacq's alternative starting April 29, 2004.  Id. ¶ 67.  (Def. Exh. 66).

**Reconciliation ¶ 98:  No dispute. Plaintiff does not dispute defendants' ¶ 98.**

**Defendants do not dispute plaintiff's ¶ 98 for purposes of these motions.**

The issue that plaintiff's commentary suggests here is not real and not material.

Defendants did not say that Foret was "the EDFINA alternative Managing Executive" for NuStart, i.e., Gaujacq's backup, but, "an alternate" EDF representative authorized to act with respect to the NuStart project on behalf of EDFINA project, which Gaujacq's deposition testimony says he was.  Gaujacq's testimony is as follows:

> Q.  Were you the only person connected to EDF
> or EDFINA who was authorized to act with respect to
> NuStart on behalf of the company?
> A.  On behalf of EDFINA we were two, Jon Luc
> Foret and I.
> Q.  Mr. Foret was --
> A.  I was the only officer.
> Q.  Mr. Foret was junior to you, is that
> correct?
> A.  Yes.
> Q.  You two were the only people who were
>
>                                      208
> authorized by the relevant documents to act on

behalf of EDF or EDFINA with respect to NuStart?
A.   On behalf of EDFINA, yes.  (Gaujacq Tr. 207-08)

**Defendants' ¶ 99**:  The total amount of time that Gaujacq and Nadal met face to face, combining their February 25 meeting and their meeting on July 12, was less than three hours. (Gaujacq Tr. 475:12-15).

**Plaintiff's ¶ 99**:  Ms. Gaujacq does not dispute the allegations in paragraph 99.

**Reconciliation ¶  99:  No dispute.**

**Defendants' ¶ 100**:  Nadal advised Gaujacq during their July 12 meeting that the NuStart and other documents needed to be in the EDFINA office, and instructed her to return to the office immediately all files pertaining to the NuStart project, and other work-related documents that she maintained at her personal residence, on her company-owned computer or anywhere else.  (Nadal Decl. ¶ 52; Nadal Tr. 377:17-380:21; Gaujacq Tr. 391:18–394:3; 394:8-395:14; 396:15-397:8, 459:4-17; **Exhibit 64**, EDF 1032-33).

**Plaintiff's ¶ 100**:  Ms. Gaujacq does not dispute the allegations in paragraph 100.

**Reconciliation ¶ 100:  No dispute.**

**Defendants' ¶ 101**:  Also during their July 12 meeting, Nadal instructed Gaujacq to arrange for Forêt to participate in a scheduled NuStart conference call, but she refused. (Nadal Decl. ¶ 51; Gaujacq Tr. 396: 5-14, **Exhibit 64**, EDF 1032-33).

**Plaintiff's ¶ 101**:  Ms. Gaujacq does not dispute the allegations in paragraph 101.

**Reconciliation ¶ 101:  No dispute.**

**Defendants' ¶ 102**:  Gaujacq refused to comply with Nadal's instruction to return the NuStart and other documents to the EDFINA office on the stated grounds that he did not need them, there were too many documents for her to bring to the office before she left for vacation the next day, and because the NuStart documents were confidential such that only she was permitted access to them under the NuStart agreement. (Nadal Decl. ¶ 52; *see* Nadal Tr. 304:6-307:4, 364:1-13, 378:18-382:11; *see also* Gaujacq Tr. 392:21-397:8). Gaujacq testified that, in response, Nadal told her "I'm the General Delegate of EDFINA and you have to comply my orders  . . . ."  (Gaujacq Tr. 392:2-6, *see also* Nadal Decl. ¶ 54).  She also said that Nadal stood and pointed his finger at Gaujacq.  (Gaujacq Tr. 79:19-80:2).

**Plaintiff's ¶ 102**:  In response to Ms. Gaujacq's refusal, Nadal jumped off from his chair, pointed his finger at her, threatened her, in the presence of JL Foret yelling, "I'm the General Delegate of EDFINA and you have to comply with my orders otherwise, . . . ." (Att. 26, Gaujacq Dep. At 392).

**Reconciliation ¶ 102**:  No dispute. Plaintiff does not dispute defendants' ¶ 102.  For purposes of these motions, defendants do not dispute plaintiff's testimony at deposition quoted below.  Plaintiff's statement in ¶ 102 does not comply with Rule 56(e) in that it is not supported by her cited  deposition testimony:

> I want you to tell me if you can what he
> said to you, as close as you can remember, what
> words he used when he spoke to you, one thing at a
> time.
>
> What did he say to you?
> A.  The only thing I recall today, now, that
> we are speaking is when he jumped out of his office
> where he was sitting and he tells me I'm the General
> Delegate of EDFINA and you have to comply to my
> orders or you are going to have to, you know.
> That's the only thing I recall from this
> meeting.  That's the only thing I recall from this
> meeting.
> The rest of the meeting -- and even at this
> time I tried to stay calm but I just couldn't
> believe what he was doing in front of another male
> again.  I mean –  (Gaujacq Tr. 381-927)

**Defendants' ¶ 103**:  By e-mails dated July 12 and July 16, Nadal repeated his instruction to Gaujacq to return the EDFINA files (including NuStart documents) to the EDFINA office and to have Forêt participate in the conference call. (**Exhibit 64**, EDF 1032-33; Nadal Tr. 377:17-380:21).  Nadal copied his e-mail to Ponasso and Betouret in Buenos Aires noting that he had requested Gaujacq (1) to meet with him and Forêt to brief them about NuStart, and (2) to gather NuStart documents "to provide to [France] so as to remedy the lack of information they regularly refer to." (**Exhibit 64**, EDF 1032-33).

**Plaintiff's ¶ 103**:  There is no evidence in Defendant's production of documents that Nadal copied his email to Mr. Ponasso or Bethoret.

**Reconciliation ¶ 103:  No dispute.  Plaintiff does not dispute defendants' ¶103.**

EDFINA's production copy of Def. Ex. 64, Exhibit E to the Hoguet Reply Declaration submitted herewith, shows that the email was so copied.

**Defendants'¶ 104**:  By e-mail dated July 20, Gaujacq refused to comply with Nadal's instruction to return the documents on the grounds that she did not have time to gather them before leaving on vacation, the EDFINA office was not secure for maintaining them, and the NuStart documents were subject to disclosure restrictions.   She also insisted that Forêt was not authorized to participate in the NuStart conference call on July 13.  (**Exhibit 65**, EDF 1035-37).

**Plaintiff's ¶ 104**:  Ms. Gaujacq does not dispute the allegations in paragraph 104.

   **Reconciliation ¶ 104:  No dispute.**


**Defendants' ¶ 105**:   Gaujacq did not go anywhere on her vacation in July 2004. (Gaujacq Tr. 397:9- 398:6, 432:2-433:7).

Plaintiff's ¶ 105:  Ms. Gaujacq does not dispute the allegations in paragraph 105.

   **Reconciliation ¶ 105:  No dispute.**

**Defendants' ¶ 106**:  The NuStart agreements permit EDFINA and EDF access to all documents concerning the NuStart project including the agreements, and do not in any way restrict access to the documents to Gaujacq personally.  (**Exhibit 66**, EDFINA 1271-1334 (excerpts) **(confidential)**; *see also* Nadal Tr. 305:21–307:4, 383:17-384:4).

**Plaintiff's ¶ 106**:  Ms. Gaujacq never claimed a personal restricted access to the proprietary documents related to NuStart.  Nadal knew that the NuStart documents required a high level of security (Def. Exs. 64 and 65) Electronic copies of NuStart proprietary documents were in possession of Ms. Gaujacq's EDFINA Managing Representative to NuStart Alternate, EDFINA Board Member, George Servieres and in possession of Creuzet, Lescoeur, Massart and Dupraz.  See Gaujacq Dec. ¶ 67.

   **Reconciliation ¶ 106:  Plaintiff admits defendants' ¶ 106.   Plaintiff's**

**additional commentary is not supported by the record as required by Rule 56(e) as**

**follows:**

   (i)    Plaintiff offers no support for her statement that she "never claimed a

personal restricted access" to the NuStart documents.  Def. Ex 65, plaintiff's email to

Nadal dated July 20, 2004 stated that "Even if I could physically gather theses documents

in one afternoon before I left for vacation, which I could not, the Operating Agreement

prohibits disclosure and distribution of these materials to persons other than the

authorized representative. Therefore, under the Operating Agreement, I cannot legally comply with this request.”;

(ii) Plaintiff’s statement that Serviere and other EDF officials had access to the documents is not supported by Gaujacq’s Declaration ¶ 67 cited to support it, and is contradicted by Def. Ex. 50 (notes of EDF auditors’ interview with Gaujacq), which found that “all files relating to [NuStart] (agreement, commitment letter, [Memorandum of Understanding], operating agreement and BP…) are not available at the office and are archived at the domicile of [Gaujacq].”;

(iii) Plaintiff's statement is also contradicted by her opposition brief in which she states that Nadal's request for the NuStart documents was "unreasonable because the documents were voluminous and subject to a confidentiality agreement to which Mr. Nadal, as well as many other EDFINA employees, were not a signatory." (Opp. 19)

**Defendants’ ¶ 107**: Gaujacq was responsible for maintaining office security at EDFINA during the time she was serving as President of the company. (Gaujacq Tr. 380:21-383:2).

**Plaintiff’s ¶ 107**: Ms. Gaujacq disputes that she was responsible for maintaining all levels of office security at EDFINA during her Presidency. She did, however, maintain the security of confidential, project-related documents as discussed above.

**Reconciliation ¶ 107: No dispute. Plaintiff does not dispute defendants’ ¶107. Defendants take plaintiff’s ¶ 107 to mean that she kept the NuStart documents “secure” by keeping them at her home. Defendants do not dispute that plaintiff did keep the documents at home. Whether they were “secure” there or at the office is not material to a decision of these motions.**

**Gaujacq's Complaints About Nadal**

**Defendants' ¶ 108**:  On July 9, Gaujacq e-mailed Ponasso in Buenos Aires, saying that Nadal's delegation of authority to Dreux in his second June 18 letter, and the reduced scope of authority given to herself and to Dreux in his June 18 letter to each of them, was not justified.  Gaujacq's e-mail states that "[t]hese facts are discriminatory in regard my position, as compared to the situation of Benoit Dreux."  (**Exhibit 67**, EDF 1039).  Gaujacq's July 9 e-mail does not state that the difference between herself and Dreux in respect of their authority was due to her gender.

**Plaintiff's ¶ 108**:  Ms. Gaujacq denies that her July 9, 2004 email fails to specify that she was being treated differently because of her sex.  Defendants' statement represents one of the many disputes that are material facts at issue in this litigation.

**Reconciliation ¶ 108:  Plaintiff does not dispute that she sent Def. Ex. 67 to Ponasso on July 9.  Plaintiff's additional commentary is not supported by this document, and her characterization of it is not evidence admissible on these motions under Rule 56(e).**

Def. Ex. 67, contains plaintiff's complaint to Ponasso on July 9 about Nadal's June 18, 2004 letter.  It states, in its entirety: "Dear Fernando, Sorry to bother you with the daily operations of EDFINA.  However, I think you should know about the attached letters all dated June, 18th.  I received mine at home at the end of June.  I discovered the others thanks to the audit at EDFINA this week.  These decisions are not in compliance with the Board decision dated June 1st.  They prevent me from doing my job as Vice President of the company.  They were not justified by any fact that I'm aware of. I was also removed from the list of officers of the company at the Bank of EDFINA without justification or even information.  These facts are discriminatory in regard of my position, as compared to the situation of Benoit Dreux.  I wanted you to know that.  I'm sure you've got a lot more important stuff to deal with but these are important for me.  Best regards, Catherine."

**Defendants' ¶ 109**:  Gaujacq admits that she complained to Ponasso on July 9 following the audit debriefing call because she thought that during that call Nadal was "alleging wrongdoing" in her administration of EDFINA.  (Gaujacq Tr. 482:7-482:21).  Gaujacq knew about Nadal's second letter to Dreux dated June 18 several days before her July 9 e-mail to Ponasso.  (Gaujacq Tr. 358:13-360:12; *see also* **Exhibit 50** at 4574).

**Plaintiff's ¶ 109**:  On July 9, 2004, Ms. Gaujacq complained again of discriminatory treatment after she discovered the second letter assigning Nadal's authority in his absence to Mr. Dreux.  See Gaujacq Decl. at ¶ 66.  Nadal had no legitimate business reason to discriminate and harass her.

**Reconciliation ¶ 109:  Plaintiff does not dispute defendants' ¶ 109. Plaintiff's statement that "Nadal had no legitimate business reason to discriminate and harass her" is argument not admissible as evidence on these motions under Rule 56(e).**

Note that Gaujacq testified that she complained to Ponasso on July 9 because she was concerned about Nadal's statements to the auditors:

> In paragraph 124 you e-mailed a formal
> complaint to Mr. Ponasso, is that correct?
> A.  Yes.
> Q.  On July 9 of 2004.  I think you mentioned
> that a few minutes ago.
> A.  Yes.
> Q.  Why did you do that on July 9?
> A.  Because that was the day of the debriefing
> of the audit and I heard Mr. Nadal alleging
> wrongdoing and telling that I had some contracts
> with no service provided and that it was serious so
> I really understood that -- that was serious.
> Q.  This was a conference call?
> A.  Yes, and that was Mr. Nadal's comments
> here.

**Defendants' ¶ 110**:  By e-mail to Nadal dated July 22, copied to Ponasso, Gaujacq brought up again his "discriminatory letter" of June 18 to Dreux, and said that he had ordered the audit to embarrass her, that he wanted to attend "[her]" meetings, and that he was looking for illegalities in immigration documents prepared under her supervision. Gaujacq demanded that Nadal explain his actions, and stated that she would record their conversation if he called her.  (**Exhibit 68**, EDF 1044-45).

**Plaintiff's ¶ 110**:  Ms. Gaujacq does not dispute the allegations in paragraph 110.

**Reconciliation ¶ 110:  No dispute.**

**Defendants' ¶ 111**:  Gaujacq's July 22 e-mail reference to "discriminatory letter" pertains to the second June 18 letter to Dreux; Gaujacq's e-mail does not state that the second letter was sent to Dreux and not to her because of her gender.

**Plaintiff's ¶ 111**:  This statement also contains allegations that are not facts, or in the alternative, are facts heavily disputed by both parties.  Ms. Gaujacq's second letter again notified EDF that she was being discriminated against based on her gender.  (Def. Exs. 68 and 69).

**Reconciliation ¶ 111:  Plaintiff admits that she sent the July 22 emails to**

**Nadal (Def. Ex. 68) and to Roussely and Creuzet in Paris.   (Def. 69)**

Def. Ex. 68 is referenced in ¶ 111.  Def. Ex. 69, in its entirety, states as follows:

Despite my repeated requests and your agreements in principle in February, then in March, I am now 9 days away of having an assignment letter or an expatriation contract for my new mission in Washington.  I fulfilled all my commitments; especially on may 31, I accepted my resignation from the position of President at EDFINA for a Vice President position.

Since the "effective" arrival of Christian NADAL, on June 1, 2004, serious incidents happened to me.  Christian NADAL tries, by all means, to prevent me from doing my job and takes discriminatory measures against me.

Being without any contract as of August 1, 2004 would leave me at the mercy of Christian NADAL who would be able, with the stroke of a pen, to render my presence on the US territory illegal.  This situation is unbearable and I decided to defend myself against him by filing a complaint before the US Authorities.

Till now, I continue to accomplish my mission on NuStart and the projects "production and nuclear projects" with assiduousness and with the gratefulness of our American partners.  My complaint against Christian NADAL will inescapably affects negatively the interest of EDFINA/EDF in the nuclear consortium of American NuStart Energy development, LLC, as a result of a contract with the American government (DOE).

Are you going to sign my new assignment letter and the associated expatriation contract?

If not, why?

Are you going to take measures to stop the illegal behavior of Christian Nadal against me?

If not, why?

Are you going to take this commitment by written?

If not, why?

I would like to have a conversation with you regarding my situation before Monday, at any time, day or night, before filing my complaint.  You can call me at this number:  1 703 433-9755.  Thank you for giving me a few minutes of you precious time.  I hope that my 24 years of loyal services at the EDF Group deserve it in your opinion.

Catherine Gaujacq
Vice President
EDF International North Americas


**Defendants' ¶ 112**:  Nadal responded via e-mail to Gaujacq's e-mail of July 22 stating that he did not share her point of view, or her understanding of the events at issue.  Nadal also confirmed that Gaujacq had agreed to continue their discussions at a meeting on August 18 following her vacation.  (**Exhibit 68**, EDF 1044-45).

**Plaintiff's ¶ 112**:  Nadal scheduled a meeting with Ms. Gaujacq on August 17, 2004 regarding her July 22, 2004 email to him complaining of discriminatory treatment.  (Def. Exh. 68).

> **Reconciliation ¶ 112:  No dispute. Plaintiff does not dispute defendants' ¶**
>
> **112.  Plaintiff's ¶ 112 mischaracterizes Def. Ex. 68 cited to support it and is these**
>
> **five not admissible as evidence under Rule 56(e).**

Def. Ex. 68 states:

"Catherine, I have received your e-mail of July 22, 2004.  I do not share your point of view and I do not share either your assessment of the fact s mentioned in your email of July 22.
In accordance with your prior e-mail of July 20, I have well noted that you were in agreement to pursue our discussion at our next meeting of August 17, 2004 at 9:00 a.m.
Cordially, Christian Nadal

**Defendants' ¶ 113**:  On July 22, Gaujacq e-mailed EDF's Chairman, Roussely, and Chief Operating Officer, Creuzet, in Paris stating that she had decided to "defend [her]self against [Nadal] by filing a complaint before the US authorities" because "[b]eing without any contract as of August 1, 2004 would leave [her] at the mercy of Christian Nadal who would be able, with the stroke of a pen to render [her] presence on the US territory illegal."  (**Exhibit 69**, EDF 4580-81).

**Plaintiff's ¶ 113**:  Because she received no response to her July 22, 2004 email to Mr. Roussely, Chairman of EDF, complaining of Nadal's discriminatory treatment, she faxed him and Mr. Creuzet a letter inquiring, "[A]re you going to stop the illegal behavior of Christian Nadal against me?" and advising that she would have to protect herself given the company refusal to respond (Def. Exh. 69).

> **Reconciliation ¶ 113:    Plaintiff does not dispute defendants' ¶ 113.**
>
> **Defendants do not dispute plaintiffs' ¶ 113 but refer to Def. Ex. 69 for the content thereof.**

**Defendants' ¶ 114**:  Gaujacq's July 22, 2004 e-mail did not state that the "complaint" she said she was filing concerned sexual harassment or sex discrimination under US employment laws.

**Plaintiff's ¶ 114**:  Ms. Gaujacq's July 22, 2004 email stating she would file a "complaint" logically referenced her earlier position that Nadal was discriminating against her, as opposed to the other male Vice President – a complaint that EDF had attempted to ignore.  (Def. Exs. 67 and 69).

> **Reconciliation ¶114:  The parties do not dispute the words of Def. Exs. 67 and 69.  Plaintiff's ¶ 114 is argument not admissible as evidence under Rule 56(e).**

**Defendants' ¶ 115**:   On July 23 Gaujacq spoke by telephone with EDF's Chief Operating Officer, Creuzet, and then with its senior Human Resources officer Yann Laroche in Paris, as well as with Ponasso in Buenos Aires.  (Gaujacq Tr. 406:8-411:16, 416:1-3, 417:20-419:9).

**Plaintiff's ¶ 115**:  Ms. Gaujacq does not dispute the allegations in Paragraph 115.

> **Reconciliation ¶ 115:  No dispute.**

**Defendants' ¶ 116**:  Gaujacq told Creuzet on July 23:  "I want my three years expatriation contract.  I want a mission letter.  I want the company to change the reporting structure so that I do not have to report to Nadal on a daily basis."  (**Exhibit 70**,

G 2035-37 at 2035).  She told Creuzet that EDF had an "easy way" to protect her from Nadal, which was to change her reporting structure.  (Gaujacq Tr. 407:19-408:6). Gaujacq's notes reflect that Creuzet told her that "I do not have the time to discuss the differences of views between two managers" and "Your career is dead if you file a claim."  (**Exhibit 70**, G 2035-38 at 2035; Gaujacq Tr. 415:13-16).  Gaujacq's notes do not say that the "claim" she raised to Creuzet was a claim under the US antidiscrimination laws.

**Plaintiff's ¶ 116**:  The purpose of Mr. Creuzet's July 23, 2004 telephone call was to discuss her claim of discrimination and request for protection from Nadal.  (Def. Exh. 70). Mr. Creuzet threatened Ms. Gaujacq telling her that: "Your career is dead if you file a claim".  Id.  She explicitly told Creuzet that Nadal was discriminating against her because of her gender, harassing her, defaming her, and discharging her (See Gaujacq Decl. at ¶ 73; see also Def. Exh. 70).  De Botherel testified that EDF executives knew Nadal was treating her poorly.  De Botherel Dep. At 138, Att. 29.

> **Reconciliation ¶ 116:  Plaintiff does not dispute defendants' ¶ 116.  Plaintiff's statement as to the "purpose of Creuzet's call" does not comply with Rule 56(e) because it is not based on knowledge, and is not supported by the record. Plaintiff's ¶ 116 relies on her own Declaration to supply evidence that, in her call with Creuzet, she explicitly told him that Nadal was discriminating against her based on her gender.**

Def. Ex. 70, plaintiff's July 23 notes that are the source for her Declaration, say that she told Creuzet:  "Since CN took office on June, 1st, 2004 he did a lot of bad things to me, harassed me, discriminated against me.  I asked him to stop but he does not want to stop.  My action is not against the company, It's directed against a wrongdoer.  I'm asking your help how.  You can help me.  I want my 3 years expatriation contract.  I want a mission letter.  I want the company to change the reporting structure so that I do not have to report to CN on a daily basis."

**Defendants' ¶ 117**:  Gaujacq testified that, in her conversation with Laroche on July 23, she told him about her conversation with Creuzet.  Laroche understood from this telephone conversation that Gaujacq "did not wish to return to France, and in the process she was endeavoring to . . . blackmail us."  (Laroche Tr. 88:13-16; Laroche Decl. ¶¶ 31-

35). Gaujacq said nothing in this conversation that indicated that she had asserted a claim of sex discrimination or sexual harassment against Nadal. (Laroche Decl. ¶¶ 31-35).

**Plaintiff's ¶ 117**: Without any investigation of Ms. Gaujacq's claims that Nadal was discriminating against her, Mr. Laroche disregarded her complaints as "blackmail" Laroche Decl. ¶ 31-35. Despite Mr. Laroche's post-litigation claims that he believed Ms. Gaujacq's claims to be blackmail, at the time that he discussed the claims with Ms. Gaujacq, he told her that he would try to protect her and would speak with Mr. Creuzet immediately. Def. Exh. 70. Ms. Gaujacq advised Mr. Laroche during their July 23, 2004 conversation of her claims, and he was well aware that she was claiming sex discrimination and harassment.

**Reconciliation ¶ 117**: Plaintiff does not dispute defendants' ¶ 117 insofar as it describes her conversation with Laroche. Plaintiff's ¶ 117 is not supported by the record as required by Rule 56(e) and is argumentative.

(i)     Plaintiff provides no support for her claim that Laroche disregarded her complaints as blackmail "without any investigation." (Def. Ex. 73, Betouret's report dated July 26, 2004 shows that the investigation was performed; see also Betouret Decl. ¶¶ 4-5);

(ii)     Plaintiff's claim that Laroche said he would "protect" her is not supported by the record cited, Def. Ex. 70;

(iii)     Plaintiff's statement that "Laroche was well aware she was claiming discrimination and harassment" is not supported by record citations and is argumentative.

**Defendants' ¶ 118**: In her telephone conversation with Ponasso on July 23, Gaujacq continued to insist that EDF change the reporting structure so that she could remain in the United States under a new three-year expatriation contract without reporting to Nadal. She refused Ponasso's suggestion that she come to Buenos Aires to discuss the matter. (Gaujacq Tr. 419:1-8; **Exhibit 71**, EDF 1046).

**Plaintiff's ¶ 118**: In the July 23, 2004 telephone call with Mr. Ponasso, Ms. Gaujacq suggested a change in her reporting structure that would allow her to continue her work in the United States without Nadal's interference. (Def. Exh. 72). She advised him that she was more scared after her conversation with Creuzet because he told her "Your career is dead if you file a claim against Nadal." Id. She told Mr. Ponasso that she

was still considering filing a claim because it did not appear that the company would protect her from Nadal's discriminatory and illegal actions.  Id.  She explicitly told Mr. Laroche that Nadal was discriminating against her because of her gender, harassing her, defaming her, and discharging her.  (Def. Exh. 70; Gaujacq Decl. ¶ 73).

**Reconciliation ¶ 118:  Plaintiff does not dispute defendants' ¶ 118.  For purposes of these motions only, defendants do not dispute Plaintiff's ¶ 118, except that the last sentence of plaintiff's ¶ 18 is not supported by the record cited as required by Rule 56(e).**

Plaintiff's notes (Def. Ex. 70) say that Gaujacq said to Ponasso on July 23: "You have my word I won't file the claim before you or [Creuzet] calls back with solutions on Monday but as for now, I'm not satisfied at all with the answer of the company"  and "I cannot accept the meeting in Buenos Aires. There is no way I can accept a meeting with [Nadal] after what he did to me."

**Defendants' ¶ 119**:  Ponasso's e-mail report of this conversation to Creuzet repeats Gaujacq's requests and says that Gaujacq "was clearly upset and hurt" that Nadal had excluded her from the checking accounts.  Ponasso's report does not state or imply that Gaujacq had accused Nadal of discriminating against her based upon her gender. (**Exhibit 71**, EDF 1046).

**Plaintiff's ¶ 119**:  See Paragraph 113-18 above.

**Reconciliation ¶ 119:  Plaintiff does not dispute defendants' ¶ 119 as reflected in Def. Ex. 71.  Plaintiff's cross-reference to her own ¶¶ 113-18 does not provide a basis to challenging defendants' description in ¶ 119 of Def. Ex. 71.**

**Defendants' ¶ 120**:  By e-mail dated July 25 to Creuzet, Laroche and Ponasso (in English), Gaujacq stated again that she would take unspecified "legal action" in the United States unless EDF took the following actions by July 27: (1)  sign a three-year expatriation contract by July 31, allowing her to remain in the United States, (2) provide that she have no direct reporting relationship to Nadal, (3) sign the mission letter, which she had previously proposed, (4) have EDFINA overrule Nadal's change in her check-signing authority and Nadal's June 18, 2004 letter, and (5) pay her attorneys' fees. (**Exhibit 72**, EDF 1047A-50; Gaujacq Tr. 420:12-422:15).

**Plaintiff's ¶ 120**:  By email dated July 25, 2004 to Mr. Creuzet, Mr. Laroche and Mr. Ponasso, Ms. Gaujacq confirmed their conversations – the Defendants understood the nature of her protected activity and knew they could be retaliating.  (Def. Exh. 72)  As evidence of this understanding, they asked their legal counsel, Mr. Binet, to advise them regarding their decision.  (Def. Exh. 72, Gaujacq Dep. At 420-22, Att. 26).

**Reconciliation ¶ 120:  Plaintiff does not dispute defendants' statement in ¶120 that she emailed Creuzet, Ponasso and Laroche on July 25 saying that she would take "legal action" unless EDF took the actions she specified in Def. Ex. 72. Plaintiff's statements that "Defendants understood the nature of her protective activity and knew they could be retaliating" and that their alleged consultation with counsel is evidence of such knowledge, are not admissible on these motions under Rule 56(e) because plaintiff is not competent to testify as to what defendants knew because Def. Ex. 72 does not reflect awareness of the "nature of her protected activity and …that they could be retaliating," and because consultation with counsel is not admissible as  evidence of such awareness.**

**Defendants' ¶ 121**:  On July 26 Ponasso's aide, Betouret, wrote  an analysis of the matter captioned "Gaujacq-Nadal Situation July 2004," expressing his understanding that the "very bad relationship" that had existed between Gaujacq and Nadal before June 1 had worsened thereafter "due either to a total absence of communication, or by only formal communication (e-mails, letters…) based on suspicion and reciprocal hostility." Betouret further addressed Gaujacq's "independent behavior" regarding the NuStart project, noting "she behaved as if it was her personal project."  (**Exhibit 72**, EDF 4588-89).  Betouret's memorandum gives no indication of awareness on his part that Gaujacq had complained at any time that Nadal had discriminated against her or harassed her because of her sex.

**Plaintiff's ¶ 121**:  Ms. Gaujacq does not dispute the allegations in Paragraph 121.

**Reconciliation ¶ 121:  No dispute.**

Def. Ex. 72 is cited erroneously in Defendants' ¶ 121; the correct exhibit is Def.

Ex. 73.

**Defendants' ¶ 122**:  On July 27 EDF decided, with the advice of its counsel in France, to rely upon the Gaujacq Expatriation Contract, which expired by its terms on July 31, and to require Gaujacq to return to France for a new assignment after that date.  (Laroche Decl. ¶¶ 38-39; **Exhibit 73**, EDF 4588-89).

**Plaintiff's ¶ 122**:  Mr. Laroche and Mr. Metais, with legal counsel Mr. Binet and Nadal, advised Creuzet to sign the July 27, 2004 letter, in a deliberate and desperate effort to try to avoid the enforcement of U.S. employment laws.  (Def. Exs. 72-75).

> **Reconciliation ¶ 122:  Plaintiff does not dispute defendants' ¶ 122.  Plaintiff's ¶ 122, insofar as it asserts that defendants acted "in a deliberate and desperate effort to try to avoid the enforcement of US employment laws," is not evidence admissible on these motions under Rule 56(e) because it is not a statement of fact, but is argumentative, and has no record support.**

> Def. Ex. 73, in particular, which plaintiff cites, is a Betouret memo headed "Gaujacq Nadal Situation July 2004" and states: "EDF's position (Yann Laroche then Metais who received it from Creuzet), according to a letter verified by a lawyer and after approval by the president, is to give her notice that her contract is terminated as provided on August 1, 2004."  The word "President" used in this memo refers to EDF's Chairman and President Roussely----not as plaintiff states to Nadal, who is consistently referred to in Def. Ex. 73 as "Nadal."

**Defendants' ¶ 123**:  By letter dated July 27, Creuzet notified Gaujacq that her overseas assignment was terminated effective August 1, but that she would have an additional three months, with the full expatriation remuneration package, to organize her affairs to return to France.   In the same letter, EDF advised Gaujacq that her new position would be in the Energy Branch in France, which she should continue to discuss with Lescoeur, the head of the Energy Branch in France.  (**Exhibit 74**, EDF 1052).

**Plaintiff's ¶ 123**:  Ms. Gaujacq does not dispute the allegations in paragraph 123.

> **Reconciliation ¶ 123:  No dispute.**

**Defendants' ¶ 124**:  On July 27, Lescoeur called Gaujacq from Paris to urge her to accept the EPR project in France as her next assignment.  Lescoeur told Gaujacq, according to her notes, that "I want you on the EPR project in France", and that "A company can remove its Directors and Officers in a subsidiary at any time.  It's its privilege.  There is nothing illegal in these decisions." Lescoeur also told Gaujacq that he did not know about her situation "but it's a dispute between two managers" and that she should not "take a decision against the company too quickly."  (**Exhibit 75**, G600-01; Gaujacq Tr. 426:8-430:8).

**Plaintiff's ¶ 124**:  On July 27, 2004, Mr. Lescouer called Ms. Gaujacq with the purpose of preventing Ms. Gaujacq from filing a claim.  (Def. Exh. 75).  On July 27, 2004, Ms. Gaujacq tried to call Yann Laroche and called Metais.  (Def. Exh. 75).  On July 28, 2004, Ms. Gaujacq complained to Mr. Metais about the retaliation of the company (Pl. 668, Att. 30).  Mr. Metais faxed her on July 30, 2004, another letter denying my allegations, copying Nadal and legal counsel.  (Pl. 684, Att. 31).

  **Reconciliation ¶ 124:   Plaintiff does not dispute defendants' ¶ 124, which is a summary of her notes (Def. 75) and deposition testimony.  Plaintiff's statement that Lescoeur called her on July 27 "with the purpose of preventing [her] from filing a claim" is not admissible under Rule 56(e) because it is not supported by the record cited, Def. Ex. 75.**

**Defendants' ¶ 125**:  On August 3, 2004, Gaujacq sought direction from Nadal and Ponasso as to whether she would continue to represent EDF's and EDFINA's interests at a number of meetings and conference calls, including NuStart meetings, and was informed by Nadal that she should not attend those events.  (**Exhibit 76**, EDFINA 876; **Exhibit 77**, EDF 1101A-02; **Exhibit 95**, EDF 1073).

**Plaintiff's ¶ 125**:  On August 3, 2004, Ms. Gaujacq sought direction from Nadal and Ponasso as to whether she should continue to represent EDF and EDFINA interests at a number of meetings and conference calls, including NuStart and enXco meetings.  (Def. Exs. 76, 77, and 95).  Ms. Gaujacq also asked Nadal and the immigration attorney to get a letter of continuous employment from EDFINA if she were to travel to France either for family or business purpose.  (EDFINA 872-74, Att. 32.)  Nadal, notwithstanding the orders of Creuzet and Ponasso, refused her two requests.

  **Reconciliation ¶ 125:  Plaintiff does not dispute defendants' ¶ 125.  Plaintiff's ¶ 125 is not material to these motions.  Defendants for purposes of these motions**

only do not dispute plaintiffs ¶ 125 except that the last sentence is not supported by

any record reference as required by Rule 56(e).

**Gaujacq Files Her EEOC Charge**

**Defendants' ¶ 126**:  Gaujacq filed a charge of discrimination and retaliation with the EEOC on July 30, naming EDF and EDFINA as respondents. (Complaint ¶ 43).  Gaujacq filed an amended charge that the EEOC received on August 6, 2004.  (**Exhibit 78**, EDFINA 4756-67 (excerpt).

**Plaintiff's ¶ 126**: Ms. Gaujacq does not dispute the allegations in paragraph 126.

> **Reconciliation ¶ 126:  No dispute.**

**Defendants' ¶ 127**:  Until August 6, neither EDF, nor Nadal and EDFINA, knew that Gaujacq had asserted a complaint of sex discrimination or sexual harassment under US employment laws.  (Laroche Tr. 92:17-19; De Botherel Tr. 186: 4-187:3, 221:13- 222:14; *see also* Laroche Decl. ¶¶ 34-35; Nadal Decl. ¶ 57).

**Plaintiff's ¶ 127**:  Ms. Gaujacq disputes this paragraph as described in paragraphs 110-25 above.

> **Reconciliation ¶ 127:    ¶ 127 is disputed.   Plaintiff's statement does not**

comply with Rule 56(e) because it is not supported by referenced in the record.

**The EPR Assignment**

**Defendants' ¶ 128**:  EDF appointed Gaujacq, effective August 1, 2004, to the position of "Chargée de Mission" (Mission Representative) reporting to the Director of Nuclear Generation in the Energy Branch.  (**Exhibit 79**, EDF 007).  Lescoeur told her that he was proposing that her assignment be on the "preparation of the commercial operation of the EPR project."  (**Exhibit 75**, G 600).

**Plaintiff's ¶ 128**:  On August 24, 2004, EDF appointed her, effective August 1, 2004, as the "Chargée de Mission" (Mission Representative) reporting to the Director of Nuclear Generation with the Energy Branch (Def. Exh. 79).  Lescouer contacted her on August 25 to confirm his decision (Def. Exs. 75-82)  On September 8, 2004, Ms. Gaujacq received from HR Bouron some indications about the material conditions of the position (Def. Exh. 81.)  Those conditions were unacceptable, and, on September 24, 2004, Ms. Gaujacq wrote to the new Chairman of EDF to complain about her situation and asked for his intervention against the actions of Nadal.  She also wrote to the French minister for "Equal Opportunity" because there was no French EEOC at the time.

**Reconciliation ¶ 128**:  **Plaintiff does not dispute defendants' ¶ 128.  For purposes of these motions, defendants do not dispute plaintiff's commentary.**

However, her statement that she wrote to the French Minister for "Equal Opportunity because there was no French EEOC at the time," is self-serving and not supported by any record reference or other authority as required by Rule 56(e).

**Defendants' ¶ 129**:  By letter dated September 24, 2004, Laurent Stricker, the Director of EDF's Nuclear Division in France, provided Gaujacq with a mission statement for her new position with the Energy Branch in which she would be in charge of the strategic leadership of the EPR project.  (**Exhibit 80**, EDF 1120-22).

**Plaintiff's ¶ 129**:  Ms. Gaujacq received a fax, on September 20, 2004, from Laurent Stricker, the Director of EDF Nuclear Division in France, providing a mission statement for a new position with DPN (Def. Exh. 80.)  The position was not consistent with EDF"s previous representation.  See Gaujacq Dec. ¶ 77.

**Reconciliation ¶ 129**:  **Plaintiff does not dispute defendants' ¶ 129. Plaintiff's statement that "The position [described in Stricker's fax] was not consistent with EDF's previous representation" is not supported by the record cited as required by Rule 56(e).**

Plaintiff's authority for this statement is her own Declaration  ¶ 77, which states that "The company proposal was a 'placard' (Def. Exh 79, Def. Ex 80, Def. Ex. 82 at G578.  I refused the position (Def. Exh 84).  Lescouer e-mailed me asking that I reconsider and to clarify the position and offer.  (Def. Exh. 83).  I again refused the position." (Def. Exh. 85)  Plaintiff's declaration thus bases her statement on exhibits which do not support her ¶ 129:  Def. Ex. 79 is her formal appointment to the EPR position; Def. Ex. 80 is Stricker's letter referenced in defendants' paragraph, and Def. Ex. 82 is Lescoeur's email asking her to contact him about the position.

**Defendants' ¶ 130**:  The base salary offered with the new position offered Gaujacq was E100,800 annually, which was higher than Gaujacq's last base salary as Director during

her expatriate assignment in Washington.    (**Exhibit 81**, G0063-64; **Exhibit 80**, EDF 1120-22; **Exhibit 94**, EDF 4679).

**Plaintiff's ¶ 130**:  The compensation package offered with the new position was 30% lower than the one Ms. Gaujacq received as Vice-President of EDFINA.  (Def. Exh. A – Laroche Declaration; Def. Exs. 42, 81, and 94).

**Reconciliation ¶ 130:  Plaintiff does not dispute that the base salary offered with the new position was higher, as stated in defendants' ¶ 130.  Defendants do not dispute that the total "compensation package" was lower than what Gaujacq received as an expatriate as stated in plaintiff's ¶ 130.**

The difference was the valuable expatriate benefits Gaujacq received under the Expatriate Contract (Def. Ex. 15) that, as the contract reflects, were consideration for her working outside of France. The EPR job that EDF offered Gaujacq was located in France. (Def. Ex. 81).

**Defendants' ¶ 131**:  After learning of Gaujacq's EEOC charge, EDF continued to urge her to accept the new assignment as head of the EPR project.  (**Exhibit 82**, G578; **Exhibit 83**, EDF 1147-48;  *see also* Laroche Tr. 91:19-24).

**Plaintiff's ¶ 131**:  After learning of Ms. Gaujacq's EEOC charge, the company continued to try to force her to accept the position in France, while knowing that the position was a demotion  (Def. Exs. 79, 80 and 82).

**Reconciliation ¶ 131:    Plaintiff does not dispute defendants' ¶ 131. Plaintiff's ¶ 131, insofar as it characterizes EDF as trying to "force" plaintiff to accept the new position "while knowing that the position was a demotion" is argument, not a statement of fact, and is not supported by citations to the record as required by Rule 56(e).**

The documents cited do not evidence awareness on defendants' part that the EPR position was a "demotion."  Def. Ex. 79 is plaintiff's formal appointment to the EPR

position; Def. Ex. 80 is Stricker's letter describing the position, and Def. Ex. 82 is Lescoeur's email asking plaintiff to contact him.

**Defendants' ¶ 132**:  EDF selected Gaujacq to head the EPR project based on her experience in the nuclear field and her knowledge of the international environment concerning nuclear energy, and considered the job a positive career step for her. (De Botherel Tr. 124:1-9, 132:9-133:5, 208:15-209:11; 140:5–142:5).

**Plaintiff's ¶ 132**:  EDF never selected Ms. Gaujacq to "head" the EPR project.  EDF proposed the position of "Chargée de Mission" (Mission Representative) reporting to the Director of Nuclear Generation within the Energy Branch (Def. Exh. 80.)  The strategic phase of the French EPR project was over (Def. Exh. 83).  Rather, the company's decision to demote Ms. Gaujacq to this position was in retaliation for her complaining of discrimination and filing a charge.

**Reconciliation ¶ 132:  For purposes of these motions, <u>defendants do not dispute plaintiff's statement that she was not selected "head"</u> the EPR project. Plaintiff's ¶ 132 is does not establish that EDF considered the EPR job to be a demotion and that it was retaliation.  Plaintiff's statement is argument and is not supported by the record cited as required by Rule 56(e).**

Def. Ex. 83, which plaintiff cites on this point, is an October 21, 2004 letter from Lescoeur to Gaujacq stating, in respect of the EPR position: "I explained to you its importance on May 18, 2004: it consists in elaborating the organizational, technical and managerial framework that EDF wants to build to run its future site and especially its EPR component, - that, since then, the Board of Directors meeting of June 22 authorized, the President to initiate the process which will culminate with the construction of a first line of EPR, - that the choice of the site, announced yesterday by EDF, adds a note of urgency to the importance of this assignment."

**Defendants' ¶ 133**:  From EDFs standpoint, the EPR project was a "very major project" and considered "extremely interesting" and "very necessary" in light of the French government's decision to launch the project, which has since been launched on a

European scale and worldwide. (Laroche Tr. 89:25-90:3, 91:12 – 24; De Botherel Tr. 132:14-22).

**Plaintiff's ¶ 133**: Ms. Gaujacq disputes the allegations in paragraph 133 to the extent that they contain subjective, post-litigation representations regarding EDF's standpoint and what EDF believed to be "extremely interesting", "major" and "necessary". Rather, the position that EDF attempted to force Ms. Gaujacq to accept was a demotion in contrast to her position with EDFINA in the United States. See Gaujacq Decl. ¶ 110.

**Reconciliation ¶ 133: Plaintiff disputes defendants' ¶ 133 with argument only. Her Declaration ¶ 110, cited to support this argument, does not do so.**

**Defendants' ¶ 134**: Gaujacq testified that the EPR project was important to EDF, though she said it was not important to herself. (Gaujacq Tr. 428: 10-14).

**Plaintiff's ¶ 134**: The EPR position was not important to Ms. Gaujacq based on her work in the United States, particularly because the position would be a demotion. See. Gaujacq Decl. ¶ 82.

**Reconciliation ¶ 134: Plaintiff does not dispute defendants' ¶ 134, which references her testimony that EPR was important to EDF. Plaintiff's ¶ 134 commentary that the EPR job was a "demotion" is not supported by the record cite as required by Rule 56.**

Plaintiff's Declaration ¶ 82, the sole authority offered to support this statement, does not say this.

**Defendants' ¶ 135**: In October, Gaujacq refused to accept the EPR position. (**Exhibit 84**, EDF 1129-31; **Exhibit 85**, EDF 1160-64).

**Plaintiff's ¶ 135**: On October 7, Ms. Gaujacq refused to accept the position of "Chargée de Mission" (Mission Representative) reporting to the Director of Nuclear Generation within the Energy Branch. (Def. Exh. 84). In October, Bouron (Energy Branch HR) called Ms. Gaujacq and told Ms. Gaujacq her US claim had no value. Ms. Gaujacq then received a second letter with an email from Lescouer on October 28. (Def. Exs. 83 and 95) EDF practice and policy when an employee refuses an offer is for the employee to stay on his/her current position. The French contract kicks in only when the employee has his residence relocated in France. (Def. Exh. 94).

**Reconciliation ¶ 135**:  **Plaintiff does not dispute defendants' ¶ 135.  The underlined sentences in plaintiff's ¶ 135 are without support in the record and therefore not admissible under Rule 56(e).**

Def. Ex. 94, the EDF policy guide for expatriate employees, does not say this.

**Defendants' ¶ 136**:  Instead, by e-mail dated October 28, Gaujacq told Lescoeur to contact her lawyer in France to reach a settlement.  (**Exhibit 85**, EDF 1160-64).

**Plaintiff's ¶ 136**:   Ms. Gaujacq asked Lescoeur to contact her French lawyer to reach an agreeable solution as soon as possible.  (Def. Exh. 85).  Defendants' translation of the document is misleading.  In the meantime, EDFINA notified the USCIS that Ms. Gaujacq was no longer employed by EDFINA.   EDFINA 5119-20.  Ms. Gaujacq's compensation then changed (See. Pl. 1021-23, Att. 33).  EDFINA contacted the Landlord of Ms. Gaujacq's residents in Great Falls (VA) and refused to pay the rent.  EDF also notified her that EDF/EDFINA would no longer provide health insurance coverage to her and her husband.

**Reconciliation ¶ 136:  Plaintiff does not dispute defendants' ¶ 136.  Plaintiff's ¶ 136 is not material for the purposes of this motion (and defendants do not agree that their translation of Def. Ex. 85 is misleading).**

(i)      Plaintiff does not specify in what way she considers defendants' translation of Def. Ex. 85 to be misleading;

(ii)     Plaintiff received her salary through January 7, 2005 but, as her Expatriate Contract ended November 1, 2004 (Def. Ex. 74), her expatriate benefits ended at that time;

(iii)    As Gaujacq received a green card in August 2004 (¶ 134), EDFINA's subsequent withdrawal of sponsorship did not affect her.

**Defendants' ¶ 137**:  Gaujacq failed to report to take up her new position in France on November 2, or thereafter.  (Gaujacq Tr. 543:14-544:9; De Botherel Tr. 133:12-134:5; Laroche Tr. 96:22-97:19).

**Plaintiff's ¶ 137**:  Ms. Gaujacq refused to take the position and refused the offer.  The company policy was not to terminate someone who refuses a new position.  It had never happened in the company history.  (Gaujacq Decl. ¶ 82, Att.)

**Reconciliation ¶ 137:  Plaintiff does not dispute defendants' ¶ 137.  Plaintiff's additional statements concerning EDF policy and practice are not supported by competent evidence and are therefore not admissible under Rule 56(e).**

Plaintiff, whose Declaration is  the sole source of evidence cited for these statements, is not a competent witness on this subject due to lack of personal knowledge, Plaintiff has not put evidence of EDF policy and practice as alleged in this paragraph.

**Defendants' ¶ 138**:  The EPR job was filled by another EDF executive, whose pay rank, like Gaujacq's, was "R-3." (De Botherel Tr. 129:21-132:8.)

**Plaintiff's ¶ 138**:  The company responded to the EEOC charge that the position was not filled as of January 2005.  Plaintiff 375-78, Att. 34.

**Reconciliation ¶ 138:  No dispute. Plaintiff does not dispute defendants' ¶ 138.  Defendants do not dispute that the EPR position was unfilled as of January 2005 as stated in plaintiff's ¶ 138.**  The position was filled after January 2005.

## Gaujacq's Employment Termination

**Defendants' ¶ 139**:  Gaujacq's failure to present herself to take up her new post in France on November 2 was ground for dismissal under French law. (Laroche Decl. ¶ 41).  By letter dated November 26, EDF notified Gaujacq to attend a pre-termination interview in Paris on December 10 pursuant to EDF procedures established under French law. (**Exhibit 86**, EDF 1170).

**Plaintiff's ¶ 139**:  The company knew that its retaliatory termination of Ms. Gaujacq was illegal.  The company proposed a Euros 300,000.00 severance package for her voluntary departure from the company.  Ms. Gaujacq refused, because they refused to provide her with a letter of recommendation from the EDF Chairman and refused to acknowledge their responsibility.  The severance package does not exist pursuant to EDF procedures established under French law.

**Reconciliation ¶ 139:  Plaintiff does not dispute defendants' ¶ 139.  Plaintiff's commentary is not supported by record evidence as required by Rule 56(e) and**

pertains to settlement discussions that are not admissible to prove any issue on these motions.

**Defendants' ¶ 140**:  Gaujacq appeared for her pre-termination interview in Paris on December 10,  where she read a prepared statement which, asserted that she had refused the EPR job for a number of reasons (because she claimed she had the right, under EDF internal guidelines for expatriate assignments, to six months' notice of the termination of such an assignment; the right to remain in the US, because EDF had promised her a three-year extension of her assignment in the US; because her departure from the US was not in the company's interest, etc.). (De Botherel Tr. 182:1- 184:2).  Gaujacq further asserted that she had been the victim of "discrimination and moral harassment" on the part of Nadal.  (**Exhibit 87**, EDF 1176-79).  After Gaujacq read her statement, Bouron asked her questions, which she refused to answer.  (De Botherel Tr. at 183:10-184:2).

**Plaintiff's ¶ 140**:  Ms. Gaujacq does not dispute the allegations in paragraph 140, however, consistent with her previous notices to EDF, she further advised the company that she was the victim of discrimination and harassment based on her gender.  See Gaujacq Decl. ¶ 73.

**Reconciliation ¶ 140:  No dispute. Plaintiff does not dispute defendants' ¶ 140.   For the purposes of these motions, defendants do not dispute plaintiff's ¶ 140.**

**Defendants' ¶ 141**:  Gaujacq's employment was terminated effective January 7, 2005 due to "faute grave" (grave fault).  (**Exhibit 88**, EDF 1186-87; Laroche Decl. ¶ 41).

**Plaintiff's ¶ 141**:  Defendants' statement that Ms. Gaujacq was terminated for "grave fault" is an attempt to categorize a heavily disputed fact as undisputed.  Ms. Gaujacq admits that the company sent her a letter saying it was terminating her for grave fault, however, the basis for her termination was discrimination and retaliation.  (See Def. Exh. 88, providing EDF's claimed reason for her termination).

**Reconciliation ¶ 141:  Plaintiff does not dispute ¶ 141's statement that her employment was terminated on the stated ground of "grave fault."  Plaintiff's ¶ 141 otherwise does not state facts, is argumentative, and is unsupported by the record citations, and therefore does not raise a triable issue of fact under Rule 56(e).**

**Defendants' ¶ 142**:  Gaujacq was paid by EDF her full salary and expatriation benefits through January 7, 2005.  (Gaujacq Tr. 435:14-16; De Botherel Decl. ¶ 45).

**Plaintiff's ¶ 142**:  Ms. Gaujacq did not receive her full benefits through January 7, 2006.  Rather, from November 1, 2004 through January 6, 2005, Ms. Gaujacq did not have the benefits of her expatriation package.  See Pl. 1021-23, Att. 35; EDFINA 906, Att. 26.

**Reconciliation ¶ 142:    No dispute.  Plaintiff is correct that she received salary through January 5, 2005, but did not receive expatriate benefits after November 1, 2004.**

Plaintiff's expatriate assignment ended November 1, 2004. (Def. Ex. 74).

## Gaujacq's New Job at ENTERGY

**Defendants' Paragraph 143**:  During August 2004, Gaujacq's application for permanent resident status in the US was approved.  (Gaujacq Tr. 8:17-18).

**Plaintiff's Paragraph 143**:  Ms. Gaujacq does not dispute the allegations in paragraph 143.

**Reconciliation ¶ 143:  No dispute.**

**Defendants' ¶ 144**:  Gaujacq began looking for employment in October 2004.  (Gaujacq Tr. 436:5-437:2).

**Plaintiff's ¶ 144**:  Ms. Gaujacq does not dispute the allegations in paragraph 144.

**Reconciliation ¶ 144:  No dispute.**

**Defendants' ¶ 145**:  Gaujacq was offered a job at ENTERGY Operations, Inc. as Director, Strategic Programs on March 1, 2005.  She started working at ENTERGY on April 1, 2005.  (Gaujacq Tr. 627:2-18).

**Plaintiff's ¶ 145**:  Ms. Gaujacq was offered a job at ENTERGY Operations, Inc. as Director, Strategic Programs on March 1, 2005, and started working at ENTERGY on April 4, 2005.

**Reconciliation ¶ 145:  No dispute.**

**Defendants' ¶ 146**:  Gaujacq supervises 170 people in her position at Entergy.  (Gaujacq Tr. 595:7-9).

**Plaintiff's ¶ 146**:  Ms. Gaujacq does not dispute the allegations in paragraph 146.

**Reconciliation ¶ 146**: No dispute.


**Defendants' ¶ 147**: ENTERGY is in the nuclear power business and is a member of the NuStart consortium. (**Exhibit 89**, excerpts from ENTERGY's website, www.entergy.com; **Exhibit 90**, G1369-71).

**Plaintiff's ¶ 147**: Ms. Gaujacq does not dispute the allegations in paragraph 147.

**Reconciliation ¶ 147**: No dispute.

**Facts Pertaining To Plaintiff's Equal Pay Act Claim**

**Defendants' ¶ 148**: EDF has a grade level ranking system for all its French employees throughout its workforce, which is governed, in part, by a French statute that applies to French employees of EDF. (De Botherel Decl. ¶ 5 & Ex. A thereto). Ranks 1 through 20 are established and regulated by French statute. (De Botherel Decl. ¶ 6).

**Plaintiff's ¶ 148**: The French statute did not apply to Ms. Gaujacq. Starting May 1, 1994, Ms. Gaujacq was a High level Executive (Personnel de Direction, "Dirigeant", Director) and the statute did not apply to her position, nor to any of the positions that Ms. Gaujacq would have been assigned with the company since May 1, 1994. (De Botherel, Exh. A., but see Plaintiff's translation at Att. 5.) EDF's employment policies are described by a French labor contract called "National Statutes of the Employees of the gas and electricity industries." This contract applies to employees of all companies in the French gas and electricity industries.) This contract also applies to all employment decisions regarding EDF French High level Executives (Personnel de Direction, "Dirigeant", Director). This contract is not a Law. The translation of page 12/26 to 26/26 is voluntarily misleading and incorrect. Id.; (See also Pl. translation, Att .5). (h) Ms. Gaujacq was promoted out of this ranking system on May 1994. Moreover, the EDF contract for employees working abroad recognizes it is subject to territoriality principle of employment laws for its employees abroad (EDF. 1319, Att. 37).

**Reconciliation ¶ 148**: **Plaintiff does not dispute defendants' ¶ 148.**

**Plaintiff's additional statements are not material to a decision of these motions, and**

**are not supported by the record as required by Rule 56(e) to the following extent:**

(i)     The National Statute is a law, that is, an enactment of a French legislative

body;

(ii)     Plaintiff 's statement that she was outside [above] the pay ranks covered

by the National Statute beginning in 1994 is contradicted by Def. Exs. 12 & 16 (EDF

career summaries which show that plaintiff was within the statutory rank until she was promoted in 2000 to Delegate General to the US and Canada, an executive position classified as "HC" which is "hors classification," that is, "outside [the statutory] classification" as explained in ¶¶ 24-26 of De Botherel's Declaration;

(iii)    Plaintiff's last sentence concerning the "territoriality principle" is a misreading of the "Guide de gestion", the policy guide for expatriate employees.  The Guide states: that "in application of the territoriality principle of laws and regulations, the EDF employees working abroad are subject to the employment laws of the host country" (Att. 37's translation) is limited in the same way as the Expatriate Contract.  In that section, immediately following the preceding sentence the Guide states:  "with respect to issues addressed in this chapter, the assignment contract must make express reference to local laws."  The issues addressed in that chapter are holidays and weekly time off, working hours and "on watch or on-call duty'"  Hoguet Reply Decl. Ex. A.

**Defendants' ¶ 149**: Executives are classified pursuant to EDF's Executive Compensation Policy ("La politique de rémunération des cadres dirigeants" (EDF's Executive Compensation Policy).  (**Exhibit 91**, EDF 4447-62; De Botherel Decl. ¶ 6).

**Plaintiff's ¶ 149**:   EDF Executive Compensation is governed by "EDF Executive Compensation Policy" ("La Politique de rémunération des Dirigeants") (EDF's Executive Compensation Policy), and may be governed by specific contracts like "the guide for employees working abroad" and expatriation contracts (EDF 1295, Att. 38 and EDF 1319, Att. 37).  EDF Executives and employees are also classified under EDF Corporate policies worldwide (EDF # 1454-1441-1446-1565, Att. 39; EDF # 278, Att. 40, EDF # 4824, Att. 41).

**Reconciliation ¶ 149:  No dispute. Plaintiff does not dispute defendants' ¶149.**

**Defendants do not dispute plaintiff's ¶ 149 for the purposes of this motion.**

**Defendants' ¶ 150**:   EDF's executive ranking system goes from "R-1" (which is the highest possible rank) to "R-4."  (De Botherel Decl. ¶ 11).

**Plaintiff's ¶  150**:  Starting August 2000, EDF Executive Compensation is governed by "EDF Executive Compensation Policy" ("La politique de remuneration des cadres Dirigeants".  (Def. Exh. 91.)  The compensations of Executives are individualized (de Botherel deposition).  (Def. Exh. 91).  The Defendants did not produce one document notifying Ms. Gaujacq of her rank or notifying Nadal of his rank.  The Defendants did not produce any EDF document indicating the ranking of the positions of "President of EDFINA" or "General Delegate."

**Reconciliation ¶ 150**:  Plaintiff does not dispute defendants' ¶ 150.  Plaintiff's additional statements are not material to decision of these motions, and are not supported by the record as required by Rule 56(e), to the following extent:

(i)    The DeBotherel deposition, Declaration and exhibits thereto show that the compensation of executives is individualized within a framework of ranks and pay grades, based on individual performance and achievement.  (Hoguet Reply Decl., Ex. D, De Botherel Tr. 49-50, 87-88; De Botherel Decl. ¶¶ 5-9, 17-18, 20-21 and Exs. A, B, and C thereto);

(ii)    Plaintiff has not shown that any law or policy requires EDF to "notify" an employee of his or her rank. Plaintiff's R-3 rank appears in many documents produced in this case (including an email sent to plaintiff in 2004 and her performance evaluation in 2003):  see Def. Exs. 12, 16, 17, 26, Laroche Decl. Ex. A, and Plaintiff's Att 16;

(iii)    Plaintiff testified at her deposition that she knew her position was ranked R-3 following her 2003 performance review.  (Hoguet Reply Decl., Ex. F, Gaujacq Tr. 87);

(iv)    Plaintiff knew Nadal was ranked "R-1" because she received an email in February  2004 from EDF in Paris so stating in response to her request for a copy of his expatriation agreement ("[W]e  cannot send a contract, especially one for R1,"  (Def Ex 33);

(v)     The Nadal, DeBotherel and Laroche Declarations all state that Nadal is R-1 and Nadal's R-1 rank appears in several documents produced in this case including his expatriate contract for his assignment to Washington.  Hoguet Reply Decl., ¶ 3, Ex. B.

**Defendants' ¶ 151**:  In 2004, when Nadal was appointed to Washington, he was at the highest echelon in the company, "R-1," and Gaujacq was an "R-3," two ranks lower. (De Botherel Decl. ¶ 11).

**Plaintiff's ¶ 151**:  The Defendants cannot produce one EDF document notifying Ms. Gaujacq of her rank or notifying Nadal of his rank.  The Defendants produced one document where the position of "Directeur du bureau de Washington," then the position of President of EDFINA, appears to be ranked, in August 2003, at the R2+ level, when she was President of EDFINA.  EDF 679-81.  Moreover, as discussed in paragraph 152 above, EDF's decision to secretly classify Ms. Gaujacq as an R3 is self-serving, but consistent with a pervasive attitude of its discriminatory against female executives.

**Reconciliation ¶ 151:  Plaintiff does not dispute defendant's ¶ 151. Plaintiff's commentary is not material to a decision on these motions is not a factual statement and is argumentative.**

(i)     Defendants produced documentary evidence to plaintiff to show that Nadal was R-1 in discovery, but were not required to (and did not see the necessity of) attaching such documents to this record, given that the Laroche, DeBotherel and Nadal Declarations all so stated (and plaintiff acknowledged at deposition that she received an email from EDF in Paris (Def. Ex. 33) stating, in response to her request for a copy of Nadal's contract,, that "[W]e  cannot send a contract, especially one for R1."  For avoidance of doubt on this issue, defendants refer to Hoguet Reply Decl. ¶ 3 and Ex. B, an EDF record evidencing Nadal's R-1 status;

(ii)     EDF did not "secretly" classify plaintiff or any other employee, male or female; its policy statement to employees (Def.  Ex.  91) explained the R-1 to R-4 ranking system to employees when it was adopted in 2000;

(iii)    Gaujacq testified that she knew she had been ranked R-3 following her performance evaluation in 2003.  (Hoguet Reply Decl., Ex. F, Gaujacq Tr. 87).

**Defendants' ¶ 152**:  In 2004 there were only 50 people out of all of EDF's French employees with the rank of "R-1." Approximately 350 were ranked "R-3."  (De Botherel Decl. ¶¶ 12-13; De Botherel Tr. 33:21- 34:3, 48:18-49:8, 73:15-18).

**Plaintiff's ¶ 152**:  Despite the size of the Company, Ms. Gaujacq was one of a small group of women to hold an executive level position and, as President of EDFINA, was the only female manager of a subsidiary outside of France.  Specifically, one of the 50 EDF executives holding R1 rankings, only 5 were women, whereas of the total 160,000 employees at EDF, approximately 45 to 50 percent were women.  (See De Botherel Dep. At 36, 66-69, 74, Att. 29.)  In fact, Mr. Yann Laroche, Deputy General Manager of EDF, could name no female manager of a subsidiary or any other expatriate female manager (See Laroche Dep. At 25-29, Att. 10.)  Further, Mr. Laroche knew of only "one female manager that ranked R1, but she was deputy general manager, she was not the person in charge."  (See Laroche Dep. At 64, Att. 10).

**Reconciliation ¶ 152**:  **Plaintiff does not dispute defendants' ¶ 152. Plaintiff's additional commentary is not material to decision of these motions**.

DeBotherel testified that "at least five" of the R-1 executives are female, not "only five." (De Botherel Dep. at 66-67, Att 29)

**Defendants' ¶ 153**:  Executive salaries are determined according to the executive's classification. Salary ranges for the base salaries of executives in ranks "R-1" to "R-3" are determined annually by EDF's Executive Committee.  (De Botherel Decl. ¶ 17).  In 2004, the salaries for Gaujacq and Nadal were within the ranges for their respective ranks.  (**Exhibit 92**, EDF 4463-64; De Botherel Decl. ¶¶ 17-19).

**Plaintiff's ¶ 153**:  EDF has maintained numerous pay grade ranking systems throughout Ms. Gaujacq's employment as discussed in paragraph 147 above.  (Def. Exs. 12-16.)  If the current denominations of the EDF Executive ranking system became effective in 2000, then EDF apparently did not apply to the positions Ms. Gaujacq assumed nor to Nadal.  In addition, the company refers to another Executive ranking system in Nadal expatriate contract.  Ms. Gaujacq's pay was not within the range of her rank because she should have been ranked as an R1, like Nadal.

**Reconciliation ¶ 153**:  **Plaintiff does not dispute defendant's ¶ 153. Defendants do not dispute the statement in plaintiff's ¶ 153 that EDF has maintained numerous pay grade ranking systems.  Plaintiff's statement that "If the**

current [ranking system' became effective in 2000, then EDF apparently did not

apply" it to the positions of plaintiff and Nadal is speculative and, on its face, not

based on personal knowledge; it therefore is not sufficient to establish the facts

under Rule 56(e). Plaintiff's statement that she "should have been ranked as an R-1,

like Nadal" is argumentative and unsupported.

**Defendants' ¶ 154**:  EDF has maintained a pay grade ranking system throughout the time that Gaujacq was employed by EDF (1980-2005). (De Botherel Decl. ¶10). The current denominations of the EDF executive ranking system became effective in 2000. (De Botherel Tr. 117:9-118:7; De Botherel Decl. ¶¶ 11, 14).

**Plaintiff's ¶ 154**:  Ms. Gaujacq disputes this paragraph as stated in paragraph 153 above.

**Reconciliation ¶ 154:  No dispute.  Plaintiff's ¶ 153, referenced in her ¶ 154,**

**admits that EDF maintained pay ranking systems throughout Gaujacq's**

**employment and disclaims knowledge of whether the R1 to R4 system was adopted**

**in 2000.**

**Defendants' ¶ 155**:  During her employment with EDF Gaujacq rose steadily in pay grade rank, starting at the statutory grade 10 for engineers and reaching her first management position in 1994, when she was appointed to manage EDF's nuclear power plant in Penly, France.  This was not an executive position.  (De Botherel Decl. ¶¶ 23-24; **Exhibit 12**, EDF 4673-74; **Exhibit 16**, EDF 041).

**Plaintiff's ¶ 155**:  Ms. Gaujacq reached her first (Dirigeant" "Personnel de Direction") position on May 1, 1994 when she was appointed as "Director" or Site Vice-President of EDF nuclear power plant in Penly, France.  Ms. Gaujacq was also promoted in August 2000 when EDF appointed her as "General Delegate to the USA-Canada" and President of EDFINA.  EDF's Executive Compensation evolved through out the time Ms. Gaujacq was employed with the company and became governed by "EDF Executive Compensation Policy" ("La politique de remuneration des cadres Dirigeants").  (Def. Exs. 12-16 and 91.)  The position of Vice-President EDFINA "Nuclear Projects" was her third R3 position (Directory of Penly – President of EDFINA – VP EDFINA).

**Reconciliation ¶ 155:  No dispute. Plaintiff disputes only that portion of**

**defendants' ¶ 155 which states that her position as Manager of EDF's nuclear plant**

**in Penly, France in 1994 was not "executive" position.    This difference is not material to the decision of these motions.    Plaintiff's statement is not based on personal knowledge but is, rather, based on misreading of the EDF payroll documents cited to support her statement.**

(i)    The cited exhibits, which are EDF payroll records, show that plaintiff reached her first "management" position in 1994 (that is, position outside the National Statue) when she became Director at Penly.  When she was promoted General Delegate US/Canada in 2000, she reached her first "executive" position ("diregeant" in French). This is when she was classified R-3;

(ii)    Metais' email in March 2004, Laroche Decl. Ex. A, notes  concerning the new position then being discussed that it would be her "third R-3 position"---the first being her appointment as Director General in 2000, and the second being her appointment as Director in 2002.  See Def. Ex. 13, EDF 0009; Gaujacq Tr. 43:7-9; (Def. Ex. 14, EDF 0008);

**Defendants' ¶  156**:  Gaujacq was promoted to the executive level, with the rank ultimately denominated "R-3" in August 2000 when EDF appointed her to her expatriate position in Washington.  (De Botherel Decl. ¶ 25).

**Plaintiff's ¶  156**:  See paragraph 155 above.

**Reconciliation ¶  156:  No dispute. Plaintiff does not dispute that she when she was appointed Delegate General to the US/Canada, she was ranked R-3 as stated in defendants' ¶ 156.  Plaintiff's contention here (which is not material to decision of these motions)  is that she was promoted to the "executive" level in 1994, equivalent to what later became R-3, in 1994.  Plaintiff's contention is not supported by the EDF payroll records she cites to support it: see Reconciliation ¶ 155.**

**Defendants' ¶ 157**:  Gaujacq's base salary in August 2000 when she began her assignment in Washington was 39,313 French francs per month.  (**Exhibit 15** at 440-44).  EDF's pay records reflect that Gaujacq was paid as "Déléguée Générale (Delegate General) from August 1, 2000 to July 31, 2002 and as "Directeur" (Director) from August 1, 2002 to July 31, 2004.  She was never paid as "President" of EDFINA.  (De Botherel Decl. ¶28 & Ex. E attached thereto).

**Plaintiff's ¶ 157**:  "Salaire mensuel de base" is not a monthly salary (Def. Exh. 15.)  EDF's pay records reflect that Gaujacq was paid as "Déléguée Générale (Delegate General) from August 1, 2000 to July 31, 2002 as a "Directeur" (Director) from August 1, 2002 to July 31, 2004.  Ms. Gaujacq agrees that, although she performed the same tasks as the EDFINA President and served in that capacity, EDF did not appropriately pay her for her work.

**Reconciliation ¶ 157:  No dispute.  Plaintiff's statement that EDF did not appropriately pay her for her work is argument that should be disregarded under Rule 56(e).**

**Defendants' ¶ 158**:  When Gaujacq's position was changed on August 1, 2002 to "Directeur" (Director), her base monthly salary did not change.  When Gaujacq resigned the title of President of EDFINA and assumed the title of Vice President on May 31, 2004, EDF similarly did not change Gaujacq's compensation as a result.  (De Botherel Decl. ¶¶27-29 & Exhibit E attached thereto).

**Plaintiff's ¶ 158**:  Ms. Gaujacq does not dispute the allegations in paragraph 158.

**Reconciliation ¶ 158:  No dispute.**

**Defendants' ¶ 159**:  On July 26, 2004 EDF notified Gaujacq that her base salary was increased effective July 1, 2004.  (**Exhibit 93**, EDF 4679).

**Plaintiff's ¶ 159**:  Ms. Gaujacq does not dispute the allegations in paragraph 159.

**Reconciliation ¶ 159:  No dispute.**

**Defendants' ¶ 160**:  As of July 1, 2004 Gaujacq's base salary was €7330 per month.  This amount was within the salary range then in effect for executives within the rank "R-3."  (De Botherel Decl. ¶ 18; **Exhibit 92**, EDF 4463-64; **Exhibit 93**, EDF 4679).

**Plaintiff's ¶ 160**:  Ms. Gaujacq's referenced salary appears to be in the lower ranges of "R3" (Def. Exs. 92 and 93.)  The position of Vice-President EDFINA "Nuclear Projects"

was her third R3 position (Director of Penly – President of EDFINA – VP EDFINA) and Ms. Gaujacq was underpaid.

**Reconciliation ¶ 160: No dispute. Plaintiff does not dispute defendants' ¶160. Plaintiff's additional commentary does not meet the requirements of Rule 56 because it is argumentative and does not present evidence supported by citations to the record fairly read.**

(i)     Def. Exs. 92 & 93 show that Gaujacq's salary was in the middle, not the "lower ranges" of R-3 rank;

(ii)     Gaujacq's position after Nadal's arrival (EDF never gave her the title of "Vice President EDFINA "Nuclear Projects," which she appears to have adopted for herself) was R-3, and her prior positions as Director US/Canada and Delegate General US/Canada were R-3 as well.   Her position as Director of Penly was not R-3 (that ranking system was not adopted until 2000, and the Penly position was classed U-2 and considered "management" but not "executive" within EDF's scheme.  (Def. Exs. 12 and 16; De Botherel Decl. ¶¶ 23-25).

**Defendants' ¶ 161**:  Nadal's base salary as of July 1, 2004 was €13,050[7] per month, which was within the salary ranges for executives within the rank of "R-1." (De Botherel Decl. ¶ 19; **Exhibit 30**, EDF 705 **(confidential)**; **Exhibit 92,** EDF 4463-64).

**Plaintiff's ¶ 161**:  Nadal's referenced salary as of July 1, 2004 appears to be in the very upper ranges of "R-1."

**Reconciliation ¶ 161: No dispute. Plaintiff does not dispute defendants' ¶ 161. For purposes of this motion, defendants do not dispute plaintiff's ¶ 161.**

**Defendants' ¶ 162**:  Nadal negotiated the terms and compensation of his expatriation contract with EDF officials in Paris.  (Nadal Decl. ¶ 11, Nadal Tr. 170:11-21).

**Plaintiff's ¶ 162**:  Ms. Gaujacq does not dispute the allegations in paragraph 162.

---

[7] At the exchange rate prevailing in July 2004, €13,050  was $15,918.40 .

**Reconciliation ¶ 162:  No dispute.**


**Facts Pertaining To Gaujacq's Tortious Interference Claim**

**Defendants' ¶  163**:  French law requires an employer to provide a departing employee with a "Certificat de Travail" (work certificate) setting forth certain information about the employee's work history with the employer.  (Complaint ¶¶ 187, 188).

**Plaintiff's ¶  163**:  Ms. Gaujacq does not dispute the allegations in paragraph 163.

**Reconciliation ¶  163:  No dispute.**


**Defendants' ¶  164**:  EDF initially provided Gaujacq with a work certificate that did not contain all of the information concerning her career with the company.  Gaujacq complained that the work certificate was "false," and in response to her complaint, EDF provided a replacement work certificate.  (De Botherel Decl. ¶ 48; EDF 249-250; EDF 231-32).

**Plaintiff's ¶  164**:  EDF never mailed the correct work certificate shown as Exhibit 88. Instead, EDF informed Ms. Gaujacq could request an appointment to EDF Paris to pick up the corrected document.  (Def. Exh. 88.)  EDFINA provided her with an incorrect 2004 W2, and the company never provided her with a 2005 W2.  (Pl. 1228, Att. 42.)

**Reconciliation  ¶ 164:    Plaintiff does not dispute defendants' ¶ 164.**

**Plaintiff's commentary as to W-2's is not supported by any record citation and**

**defendants are not aware of any inaccuracy in the W-2's.**

**Defendants' ¶  165**:  Gaujacq made no complaint concerning the replacement work certificate.

**Plaintiff's ¶  165**:  Ms. Gaujacq complained with regard to the interference with my background checking requirements to access Entergy nuclear plants.  EDF 216-30.

**Reconciliation ¶  165:  Plaintiff does not dispute defendants' ¶ 165.  Plaintiff**

**provides no record support for her statement that defendants "interfered" with her**

**Entergy background checking.**

EDF 216-30 are EDF documents, not attached to plaintiff's motion, which reflect that EDF provided her dates of employment and her last position in response to a reference request.

### Facts Pertaining to Gaujacq's Breach of Contract Claim

**Defendants' ¶ 166**: EDF provides employees with a statement of policies generally applicable to overseas assignments (commonly referred to as "expatriate" assignments) titled Guide de gestion des agents travaillant a l'étranger" ("Management Guide for Representatives Working Abroad," hereafter the "Guide"). The Guide suggests that "it is appropriate" for home management in France to have an "evaluative discussion" with an employee "if possible annually, at the latest six months" before the employee's return to France. (**Exhibit 94**; EDF 1289- 1385 (excerpts); De Botherel Decl. ¶ 40).

**Plaintiff's ¶ 166**: The Guide for employees working abroad is a contract. (EDF 1289-1385 at EDF 1295, Att. 38, EDF 1289-1385, at 1319, Att. 37) EDF Executives and employees are also bound to EDF Corporate policies worldwide. EDF's contract for employees working abroad recognizes that the company is subject to territoriality principle of employment laws for its employees abroad (EDF 1319, Att. 37.) This contract states that it is <u>mandatory</u> for management to have an evaluative discussion with an employee at the latest six months before the expiration of the employee's expatriation contract. (Def. Exs. 15, 42 and 94). Only July 26, 2004, management (Ponasso) was still telling Ms. Gaujacq they would change her reporting structure to honor her contract.

**Reconciliation ¶ 166**: **Plaintiff does not dispute that defendants provided the Guide described in ¶ 166, the contents of which are undisputed. Plaintiff's characterization of the Guide in her ¶ 166 does not comply with Rule 56(e) in that it is not supported by the record cite provided.**

(i)    Att. 38, upon which plaintiff relies to support her statement that the Guide "is a contract," states (according to plaintiff's translation): "Because of the specific character of service abroad, we need to design a contractual formula to reconcile the existence of a maintained relationship through the "Statute" between the employee and the companies EDF-GDF and the compliance to local laws, the general and specific conditions that apply to the specific situation of the employee assigned for a long term

mission abroad.  <u>The contractual formula utilized in this circumstances is based on an individual written agreement called "contract for long term mission" presented in the next paragraph</u>." (emphasis added).  The "contract" in other words, is the individual's agreement with the company, conforming to the template or form contained in the Guide, that sets forth the terms and conditions applicable to his or her specific assignment (e.g., the Gaujacq Expatriation Contract);

(ii)    Plaintiff's statement that in July 2004 Ponasso said EDF "would change her reporting structure to honor her contract" should be disregarded as it is not supported by any record cite;

(iii)    The Guide, in the Chapter entitled "Working Hours" states:  "Pursuant to the legal and statutory principle of territoriality, agents in service abroad are subject to the employment laws of the host country.  With respect to issues addressed in this chapter, the assignment contract must make express reference to local laws."  The issues addressed in that chapter are "Legal Holidays - Weekly Time Off, Weekly Working Hours" and "On Watch or On-Call Duty" (Hoguet Decl.  Ex [a new exhibit]

**Defendants' ¶  167**:  The Guide states that EDF may in its discretion terminate an expatriate assignment "at any time" "if the interest of EDF requires it or for any other justifiable reason."  (**Exhibit 94**; EDF 1289- 1385 (excerpts); De Botherel Decl. ¶ 41).

**Plaintiff's ¶  167**:  Ms. Gaujacq disputes this statement.  See paragraph 166 above.

**Reconciliation ¶  167:  The Guide contains the words quoted in defendants' ¶ 167, and plaintiff asserted in ¶ 10, and defendants do not dispute, that the Guide governs her expatriate assignment to the extent not provided in the Gaujacq Expatriation Contract.**

HOGUET NEWMAN & REGAL, LLP

By: _____/s/_____
Laura B. Hoguet *(D.C. Bar No. 200915)*
Dorothea W. Regal *(D.C. Bar No. NY0064)*
Randi S. May *(D.C. Bar No. NY0063)*

10 East 40th Street
New York, New York 10016

*Attorneys for Defendants*
*Electricité de France, S.A. and Electricité de*
*France*
*International North America, Inc.*

Of Counsel:
Kathleen L. Lowden

By: _____/s/_____
Morgan D. Hodgson *(D.C. Bar No. 186528)*
David A. Clark *(D.C. Bar No. 473279)*
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000

*Attorneys for Defendant Christian Nadal*