## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| ) | |
| CATHERINE GAUJACQ ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:05CV0969 (HHK) |
| ) | |
| ELECTRICITE DE FRANCE ) | |
| INTERNATIONAL NORTH AMERICA, ) | |
| INC., et al. ) | |
| ) | |
| Defendants. ) | |

_____)

### PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS

Plaintiff, Catherine Gaujacq ("Ms. Gaujacq"), by counsel, pursuant to F.R.C.P. 37 and Local Civil Rule 5.2(b), hereby moves the Court for an Order compelling defendants Electricite De France International North America, Inc. ("EDFINA"), Electricite de France International North America ("EDF") and Christian Nadal ("Mr. Nadal"), collectively "Defendants" to fully and completely respond to Plaintiff's Interrogatories and Request for Production.  Ms. Gaujacq further moves the Court: (1) to reopen the depositions of Mr. Nadal, individually and as the corporate designee of EDF, and Yann Laroche, individually and as the corporate designee EDF, at the sole expense of Defendants; and (2) for leave to supplement Plaintiff's Opposition to Defendants' Motion for Summary Judgment to allow the Court to consider the newly learned information, or in the alternative, the sanction of denying Defendants' Motion for Summary Judgment and setting the matter for trial.

For all the reasons set forth in the attached Memorandum, Plaintiff requests the Motion be granted.

April 23, 2008                    Respectfully submitted,

                                  */s/* ELAINE CHARLSON BREDEHOFT
                                  _____
                                  Elaine Charlson Bredehoft
                                  D.C. Bar No. 441425
                                  Carla D. Brown
                                  D.C. Bar No. 474097
                                  Kathleen Z. Quill
                                  D.C. Bar No. 489079
                                  CHARLSON BREDEHOFT & COHEN, P.C.
                                  11260 Roger Bacon Drive, Suite 201
                                  Reston, Virginia 20190
                                  (703) 318-6800
                                  (703) 318-6808 (facsimile)

                                  *Counsel for Plaintiff,*
                                    *Catherine Gaujacq*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CATHERINE GAUJACQ | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 1:05CV0969 (HHK) |
| | ) |
| ELECTRICITE DE FRANCE | ) |
| INTERNATIONAL NORTH AMERICA, | ) |
| INC., et al. | ) |
| | ) |
| Defendants. | ) |

_____)

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S
### MOTION TO COMPEL AND FOR SANCTIONS

Plaintiff, Catherine Gaujacq ("Ms. Gaujacq"), by counsel, pursuant to F.R.C.P. 37 and

Local Civil Rule 5.2(b), hereby moves the Court for an Order compelling defendants Electricite

De France International North America, Inc. ("EDFINA"), Electricite de France International

North America ("EDF") and Christian Nadal ("Mr. Nadal"), collectively "Defendants" to fully

and completely respond to Plaintiff's Interrogatories and Request for Production.  Ms. Gaujacq

further moves the Court to reopen the depositions of Mr. Nadal, individually and as the corporate

designee of EDF, and Yann Laroche, individually and as the corporate designee EDF, at the sole

expense of Defendants; and for leave to supplement Plaintiff's Opposition to Defendants'

Motion for Summary Judgment to allow the Court to consider the newly learned information, or

in the alternative, the sanction of denying Defendants' Motion for Summary Judgment; and to set

this the matter for trial.

## CERTIFICATE UNDER LOCAL RULE 7(m)

Ms. Gaujacq's position as to this Motion was set forth in her Reply in Support of her Motion for Leave to Supplement her Opposition to Summary Judgment. Defendants' opposed her request for leave continuing to claim the information sought is not relevant and was not requested.

## SUMMARY OF ARGUMENT

Quite by accident, Ms. Gaujacq, well beyond the discovery cut-off and briefing and consideration of the Summary Judgment motions, has learned that EDF and Mr. Nadal have intentionally withheld highly relevant documents and information from Ms. Gaujacq in discovery, even though requested and questioned. Defendants have mocked our Judicial System by culling out any information unfavorable to its defenses and favorable to Ms. Gaujacq's claims, and simply selectively producing favorable responsive documents. To complement this subversive and evasive method of responding to discovery, key deponents provided false and materially evasive responses to questions. Most significantly, this information relates to the qualifications and performance of the person EDF chose as the comparator to Ms. Gaujacq on all aspects of her discrimination, Equal Pay and retaliations claims – Mr. Christian Nadal. If the information had been discovered, or is fully discovered now, it would defeat the very heart of Defendants' defenses – that Mr. Nadal was more qualified than Ms. Gaujacq, that Mr. Nadal's performance record was far superior to that of Ms. Gaujacq, justifying his significantly higher ranking, higher pay, greater budget and the replacement of Ms. Gaujacq in the United States at EDFINA by Mr. Nadal because of his superior financial connections and ambassador qualities, gained from his "distinguished career." Even more significantly, the information virtually proves that the proffered reasons for Ms. Gaujacq's demotion and ultimate termination, were pretextual, in comparison to how EDF handled Mr. Nadal's

2

departure, in shame and under criminal and financial investigation, from his earlier position in

Argentina.   Defendants took great advantage of the fact that the responsive documents and

information are housed abroad, and would be extremely difficult to obtain through ordinary

discovery methods.   We have uncovered, however, enough to learn that Defendants have toyed

with this Court and with Plaintiff, have hidden key information that would never be tolerated to be

withheld in the discovery process, and have permitted witnesses to provide false and evasive

testimony, in an effort to continue to hide the truth of Mr. Nadal's tenure in Argentina, a tenure

which resulted in criminal prosecutions and a billion dollar loss to EDF.

## PROCEDURAL HISTORY AND BACKGROUND

Ms. Gaujacq filed her Complaint on May 13, 2005.   Ms. Gaujacq's Complaint alleges:

(i) discrimination and retaliation on the basis of gender, and discriminatory and retaliatory

termination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§ 2000e, et seq., and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq.;

(ii) disparate and unequal pay, in violation of the Equal Pay Act, 29 U.S.C. § 206(d);

(iii) defamation per se; (iv) breach of contract; (v) tortious interference with contractual relations

and business expectancies; and (vi) breach of the duty of good faith and fair dealing.

Fact discovery closed on July 28, 2006 and the trial of this matter has been indefinitely

postponed.

Plaintiff's First Request for Production of Documents to Mr. Nadal was served on

October 28, 2005.  Att. 1.  Mr. Nadal filed his objections and responses to these Requests on

December 12, 2005 and supplemented his Objections and Responses on March 24, 2006.  Att. 2.

Plaintiff's First Request for Production of Documents to EDF was filed on October 28, 2005.  Att. 3.  EDF filed their objections and responses to these Requests on December 12, 2005.  Att. 4.

Plaintiff's Fourth Request for Production of Documents to EDF and EDFINA was filed on April 7, 2006.  Atts. 5 and 6.  EDF/EDFINA filed their objections and responses to these Requests on May 11, 2006.  Att. 7.

Mr. Nadal was deposed in his individual capacity and as a corporate designee in Washington, D.C. on April 4, 2006 and on April 5, 2006.  Yann Laroche was deposed in his individual capacity and as a corporate designee in Paris, France on April 21, 2006.

On October 16, 2006, Defendants filed their Motion for Summary Judgment.  Plaintiff filed her Opposition to Defendants' Summary Judgment Motion on November 20, 2006.

By the end of December 2006, the Parties had submitted to this Court all of their briefs and arguments for and against Summary Judgment.  On February 13, 2007, the Honorable John G. Penn, now deceased, entered an Order directing that the pretrial conference and trial dates would be held in abeyance until the Court resolved the pending dispositive Summary Judgment Motions.  At the time of Judge Penn's passing in September 2007, the pending dispositive Motions had not been ruled upon.

In October 2007, Ms. Gaujacq, through counsel, was notified that the Honorable Henry H. Kennedy, Jr. was assigned to this matter.

Ms. Gaujacq seeks to compel discovery responses after discovering that Defendants Mr. Nadal and EDF, through its officers and directors, concealed material information respecting the reasons Mr. Nadal was appointed to replace Ms. Gaujacq in the United States and Defendants' statement that he was more qualified than Ms. Gaujacq.  Defendants' argument that the

4

discovery record establishes without contradiction that "Mr. Nadal was appointed to succeed Ms. Gaujacq as an 'ambassador-level' executive to Washington with experience and contacts in the financial world and with industry leaders" is contradicted by the information newly discovered by the Plaintiff.  *See* Defs.' EDF/EDFINA's Memo. in Supp. of SJ, dated 10/16/07, pp. 16-20. This newly discovered evidence, which should have been provided to the Plaintiff in discovery, and in response to multiple deposition questions, contradicts Defendants' arguments in favor of summary judgment, and was purposely concealed by the Defendants during discovery.

Both Mr. Nadal and EDF concealed relevant information they knew to be fatal to their claim, in attempting to compare Mr. Nadal's employment history with EDF as far superior (in fact, justifying two ranks higher) than Ms. Gaujacq.  In fact, Mr. Nadal's employment "history" was so significantly inferior, that it appears Mr. Nadal was sent to the United States to perhaps hide him within EDF after multiple criminal inquiries resulted while he was in charge in Argentina.  This evidence and these material facts were purposely concealed by the Defendants during discovery and create a significant jury issue as to Mr. Nadal's qualifications to replace Ms. Gaujacq, based on his historical performance with EDENOR in Argentina.  The evidence strongly suggests that Defendants' motions for Summary Judgment should be denied, and that a genuine jury issue exists with EDF's self-described comparator to Ms. Gaujacq, Mr. Nadal.

Moreover, the seriousness and egregiousness of Mr. Nadal's conduct while in Argentina, when viewing any conduct Defendants contend Ms. Gaujacq guilty of in attempting to justify her removal from EDF, demotion and subsequent termination, cannot compare.  Not removing Mr. Nadal from a position for far more serious conduct, while contending minimal conduct by Ms. Gaujacq, even if true, renders Ms. Gaujacq's removal highly suspect and presents a compelling jury issue on the true motivations – discrimination and retaliation.

5

Similarly, in comparing the Equal Pay claim and the ranking system testified to by Yann Laroche, there is a genuine issue of material fact as to why Mr. Nadal, particularly with his history, would justify a ranking of R-1, the highest at EDF, while Ms. Gaujacq, sporting a virtually spotless career, was ranked only R-3, was paid substantially less than Mr. Nadal and was given a budget half that of Mr. Nadal.  By this Motion, Ms. Gaujacq seeks full and complete disclosure of the criminal investigation and financial information surrounding EDENOR, and all facts relating thereto, in response to her discovery requests, to reopen the three depositions of Mr. Nadal, Mr. Laroche, who is the Deputy General Manager of EDF, and EDF's corporate designee, and to stay any ruling on summary judgment so that the Court can consider any new information raised by this revelation.

## RELEVANT FACTS

Defendants EDF/EDFINA represented that Nadal had served, from 1999 to 2001, as the CEO of an Argentinean energy company in which EDF had an equity interest.  *See* Defs.' Statement of Facts in Supp. of Summary Judgment of 10/16/06 ("Defs.' Facts") at ¶31. Defendants contend that Nadal was appointed to succeed Ms. Gaujacq because the company was moving toward privatization; and that the appointment of an "ambassador" level executive to Washington with experience and contacts in the financial world and with industry leaders was in its interest. *See* Defs.' Facts at ¶ 37.  For purposes of Ms. Gaujacq's claims of disparate pay and treatment, EDF selected Nadal as Ms. Gaujacq's comparator, and the person to whom she should be compared.  *See* Att. 7 at Request No. 22.

However, after the parties submitted their Summary Judgment briefs, the facts regarding EDF, EDENOR, and Mr. Nadal have come to light quite differently, both with respect to EDENOR's financial and criminal affairs.

6

Despite EDF's claim that Ms. Gaujacq was terminated for, in part, acting inappropriately by allegedly paying fees to consultants and contractors of EDFINA without services being rendered, any claimed financial impropriety by Ms. Gaujacq merely scratches the surface of Mr. Nadal's financial ineptitude.  Gaujacq Dep., Att. 8 at  376-77 (stating allegations of Mr. Nadal.) EDF claimed Mr. Nadal was appointed to replace Ms. Gaujacq because he possessed financial sophistication that she did not.  According to EDF/EDFINA, Mr. Nadal was appointed CEO of Edenor in 1999 for the sole purpose of facilitating EDF's acquisition of 60% of Edenor shares from its fellow shareholders.  *See* EDF testimony to the French Congressional Investigation, Att.9 at 12, as translated at Att. 10.  Mr. Laroche testified that EDENOR was a "very major subsidiary" to EDF.  Laroche Dep., Att. 11 at 14-15.  Tellingly, when EDF sold Edenor on April 10, 2007, they sustained a considerable loss, from an acquisition in the amount of $1.4 billion to a sale of approximately $281 million.  *See* Opinion N#2005-A-8, Attachment 12, as translated at Att. 13.

As the CEO of EDENOR, Mr. Nadal did not have experience in international finance, necessary for his position with EDFINA, and he did not have the contacts in the international finance community, contrary to EDF's claims in this litigation.  Mr. Nadal testified his prior managerial focus was that of "day-to-day" manager.  Nadal Dep., Att. 14 at 83.  In fact, Mr. Nadal was inherently less qualified to handle EDFINA's financial affairs, and had a history of gross mismanagement of EDF's subsidiaries.

During Mr. Nadal's presidency at EDENOR, the subsidiary also encountered serious environmental issues.  *See* "Still transformers with a highly toxic substance," translated at Att. 15 at 2.  By Notice published on June 2, 2003, three of EDENOR's managers, including Mr. Nadal, were involved in a judicial interrogation investigating whether criminal offenses had been

committed with regard to "PCBs" leaking from transformers.  *See* Att. 15; *see also* Crim. Pro., A

Worldwide Study, Att. 16 at 40.  At the completion of the criminal interrogation, Argentinean

Justice seized 150 million pesos (approximately $50 million U.S. dollars) of EDENOR property,

as an attachment to satisfy a potential judgment, Att. 7 at 2, as translated at Att. 18.

During his deposition, Mr. Nadal was evasive in his responses, identifying EDENOR's

transformer problems and "claims" surrounding the transformers, but refused to classify the issue

as a dispute.  *See* Nadal Dep., Att.14 at 36-39.  Despite his involvement in the Argentinean

judicial interrogation, Mr. Nadal categorically denied that he had been involved in a criminal

proceeding when he was deposed on April 4, 2006.  Astonishingly, when asked if he had ever

had any criminal proceedings brought against him, he unqualifiedly replied "No."  Nadal Dep.,

8:19-21, Att.14.  Not only did Mr. Nadal fail to mention the criminal investigation when asked

during his deposition, but he described his experience with EDENOR as a "positive" one and

denied that EDF, or its board, ever expressed any dissatisfaction with his performance.  Nadal

Dep., Att. 14 at 84 to 86.  Mr. Nadal provided his responses under oath and confirmed he

understood he was to tell "the truth, the *whole truth* and nothing but the truth."  Nadal Dep., Att.

14 at 7.

Mr. Nadal admitted during his deposition that EDENOR "had to make lots of analysis,

proofs, expertise and so on" regarding the claims relating to the transformers.  Nadal Dep., Att.

14 at 37.  In fact, Patrick de Botherel, who was in charge of salaries for EDF's Directors,

testified that EDF's CEO ordered an audit of EDENOR during this period:

Q:    Why was an audit ordered in July 2004 at EDFINA?

A:    I think that we have to look at the true story.  And maybe look at the process in
      place within EDF when it comes to audits.  Audits are ordered upon instruction of
      the present CEO of EDF.

> Each year it is asked of all branch directors or the high manager, the highly places managers of the company to establish – to establish an audit list which they would like to see done in their field of activity.
>
> These missions are then taken over by the department – the audit department. And then the audit department gives its opinion about this type of audit and submits lists with the proposed audits to the CEO . . .
>
> **So an audit had been launched for the existing subsidiaries in Argentina**, the same thing happened in Mexico, and the same thing happened in the U.S. The only difference was that in the U.S. Mr. Ponasso ordered the date for the audit should be delayed a little bit because EDF EDFINA changed the person in charge, the responsible person . . . .

de Botherel Dep., Att. 19 at 156-58 (Emphasis added.)

In fact, from June 28-July 9, 2004, EDF conducted an audit of EDFINA concerning the time period Ms. Gaujacq had been President of EDFINA (2000-04). Gaujacq Dep., Att. 8 at 343-45. The audits are lengthy, voluminous, and the product of several days of investigation, evaluation, and review. *Id.*; *see also* July 2004 Audit of EDFINA (although in French, demonstrating the voluminous nature of an audit report), Att. 20. On July 9, 2004, Mr. Nadal used the audit to suggest that Ms. Gaujacq had done something inappropriate with respect to EDFINA's contractors, and he stated on a conference call to the auditors, that Ms. Gaujacq was paying fees to consultants and contractors of EDFINA without services being rendered, and that this was a very serious issue. Att. 8 at 376-77.

Despite Ms. Gaujacq's direct request for audits and documents relating to Mr. Nadal's conduct and financial affairs in Argentina, Defendants did not produce the information. Attachment 7 at Nos. 25 & 35. This information would certainly have revealed information regarding the financial and criminal affairs of EDENOR during Mr. Nadal's presidency.

Mr. Nadal was designated to be EDF's corporate designee to testify regarding his own performance during his employment at EDF, including the scope of his authority, his

employment performance, and "[c]omparisons between Ms. Gaujacq and Mr. Nadal with respect to qualifications, educational and work history, [and] performance.  Nadal Dep., Att. 14 at 11, 13-15, Exhs.1 & 2.

Even after Mr. Nadal's debacle in Argentina, EDF allowed him to keep an R1 ranking, but refused to extend the same ranking to Ms. Gaujacq.  Nadal Dep, Att. 14 at 17.

Mr. Laroche, the Deputy General Manager of EDF, who was deposed in Paris, France on April 21, 2006, repeatedly testified that Mr. Nadal's evaluations were positive, even systematically positive.  *See* Laroche Dep., 49 to 53, Att.11.  However, Mr. Laroche, as the second highest ranked office of EDF and a member of the governing Committee of EDF, had to have been aware that, in June, 2003, an Argentinean federal judge investigated Mr. Nadal for criminal charges and found three EDENOR managers criminally liable: Daniel Lello, Luciano Pironio, and Julio Marquez, Att. 22, as translated at Att. 23.

Mr. Laroche failed to disclose the true reason for Mr. Nadal's leaving Argentina -- under a cloud of significant allegations of mismanagement and criminal activity. As a member of the EDF Executive Committee, Mr. Laroche would have had full knowledge of the criminal investigation of EDENOR launched in Argentina, the involvement of Mr. Nadal in the criminal proceeding, and the ultimate finding of criminal liability against EDENOR.   Mr. Laroche was clearly aware of the financial and environmental fiasco initiated during Mr. Nadal's 1999-2001 assignment with EDENOR, yet failed to disclose any of this information during the deposition, and instead, as pointed out above, affirmatively covered up Mr. Nadal's conduct.

## ARGUMENT

Information regarding Nadal's work with EDENOR is critical to Ms. Gaujacq's claims and supports that Defendants' stated basis for replacing her with Nadal is false.  After leading

EDENOR into a criminal scandal, indictments of officers, indictment of EDENOR, and subsequent years of legal proceedings and investigations regarding whether EDENOR's environmental pollution lead to injuries and fatalities, EDF allowed Nadal to keep his R-1 ranking, the highest ranking, and assigned him as the delegate for EDF's prestigious North American branch, EDFINA.  EDF claims that Nadal was, based on his prior experience, more qualified than Ms. Gaujacq, and that it was justified in terminating her for conduct that cannot be compared to that in which Nadal engaged.

In order to defend EDF's inexplicable decision to replace Ms. Gaujacq with Nadal, EDF omitted crucial information regarding Nadal's involvement in EDENOR – that he led the company to criminal indictment, years of legal proceedings and actions, that EDENOR was accused of dangerous environmental pollution, and that, in the end the company sustained a billion dollar loss on the sale of the subsidiary after Mr. Nadal's reign.  Defendants' conduct during the discovery period was subversive, evasive and misleading, at best.  Responsive and relevant documents were clearly withheld, and the actions of Defendants were calculated to hide the criminal conduct and investigation of EDF's Argentine subsidiary, EDENOR, and Nadal, and Mr. Nadal's gross mismanagement of EDENOR's financial affairs.  For this conduct alone, the Court has the authority to re-open discovery and allow Ms. Gaujacq to complete the depositions that she would have taken if Defendants had been forthcoming with this requested information during discovery.  The Defendants have made a mockery of the discovery process by engaging in tactics of successfully hiding responsive information that was relevant and likely to lead to the discovery of relevant and admissible evidence.

11

A.     **Plaintiff is Entitled to Re-Open Discovery at Defendants' Cost**

"A court has, of course, the general power to reopen a case, either on motion of a party or on its own motion, while the matter is still under advisement, for the receipt of further evidence." *Arthur Murray, Inc. v. Oliver*, 364 F.2d 28, 34 (8th Cir. 1966) (*citing* 9 Cyclopedia of Federal Procedure (Third Edition) § 31.108); *Paine v. St. Paul Union Stockyards Co.*, 28 F.2d 463, 467 (8th Cir. 1928). If the Court reopens discovery in this case, the Court may order the "expenses associated with the reopened depositions shall be paid by the Defendants subject to the Court's determination as to reasonableness." *See e.g., Atkins v. Fischer*, 2002 U.S. Dist. LEXIS 26492 at *3 (D.D.C. 2002) (Kollar-Kotelly, J.)(granting costs for court reporting and service of process, as well as, attorney's fees and expert fees that were incurred after discovery was reopened); *see also Perkinson v. Houlihan's/D.C., Inc.*, 108 F.R.D. 667, 676 (D.D.C. 1985).

On motion, the court, in its discretion, may compel a party to respond to a discovery request and order appropriate sanctions. *See* Fed. R. Civ. P. 37(a)(3); *see also National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976) (holding that district courts have wide discretion to determine appropriate sanctions). "[A]n evasive or incomplete . . . answer, or response must be treated as a failure to . . . answer, or respond." Fed. R. Civ. P. 37(a)(4).

Where a party fails to respond and a motion to compel a response is granted, "the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." *See* Fed. R. Civ. P. 37(d)(3). "These expenses are assessed so as to compensate the wronged party for the extra effort it was forced to expend because of the wrongdoer's obstructive behavior." *See*

*McDowell v. District of Columbia*, 2006 U.S. Dist. LEXIS 89138 (2006) (*quoting Perkinson v. Houlihan's/D.C., Inc.*, 110 F.R.D. 55 (D.D.C. Mar. 3, 1986)). (emphasis and quotations omitted). "Furthermore, compensation for incurred expenses is the mildest of all sanctions listed in Rule 37." *Neufeld v. Neufeld*, 169 F.R.D. 289, 290 (S.D.N.Y. 1996).

Nadal, Laroche, and EDF purposefully concealed information relating to the criminal indictment of EDENOR, and the judicial interrogation of Nadal.

**B.    During Depositions, Defendants Withheld Information Respecting Nadal and EDENOR's Criminal Troubles in Argentina which Undermines Defendants' Alleged Business Justification for Replacing Ms. Gaujacq with Nadal**

*1.    Nadal's Testimony on Behalf of Himself and EDF*

During discovery in this matter, while testifying both in his individual capacity and as the corporate designee of EDF as to matters pertaining to his OWN performance, performance during his employment at EDF and his employment performance, Nadal expressly denied that he had ever being subject to any criminal proceedings. Nadal Dep., Att. 14 at 8. Because Nadal was testifying as EDF's corporate designee as to all matters pertaining to his work and work history with EDF, Nadal also made this representation on behalf of EDF. Nadal Dep., Att. 14 at 11, 13-15 and Exhs. 1 & 2. Almost two years later, without any additional disclosures from Nadal, it has become apparent that Nadal's omissions were calculated.

At the time Nadal made this representation on behalf of EDF and himself, he was well aware that EDF's Argentine branch, EDENOR, and its officers were indicted for their work in Argentina. EDENOR 6K, Att. 21 at 77. Despite his own judicial interrogation as part of the criminal proceeding, Mr. Nadal categorically denied that he had been involved in a criminal proceeding when he was deposed on April 4, 2006. When asked if he had ever had any criminal proceedings brought against him, he unqualifiedly replied "No." Nadal Dep., Att. 14 at 8.

13

Yet, roughly one year prior to Nadal's April 4, 2006 deposition, three of EDENOR's employees had been indicted for environmental contamination. EDENOR 6K, Att. 21 at 77. On May 24, 2005, EDENOR and its officers were indicted. *See* Att. 21 at 77; *see also* Judgment of Efrain Faggionatto Márquez of 5/24/05, Att. 22 as translated at Att. 23 (identifying Mr. Nadal as one of the Edenor employees subject to the criminal inquisition.) Argentinean officials seized 150 million pesos (approximately $50 million U.S. dollars) of Edenor property, as an attachment to satisfy a potential judgment. Att. 21 at 77. The criminal investigation of the environmental criminal case against Edenor in Argentina started in 2000, during Mr. Nadal's tenure as CEO of Edenor, by Mr. Nadal's own admission. Att. 14 at 39.

Yet, when Nadal was specifically deposed with respect to his performance and the event surrounding his tenure with EDENOR, he refused to even identify EDENOR's transformer's problems as "claims," instead classifying the matter as only a "dispute." Att. 14 at 36-39.

Failing to mention the criminal investigation and financial mismanagement, Mr. Nadal also described his experience with EDENOR as a "positive" one and denied that EDF, or its board, ever expressed any dissatisfaction with his performance. Nadal Dep., Att. 14 at 84-86. Nadal admitted that he had a "hard time" in Argentina, but refused to identify in any meaningful way the criminal matters:

> Q: And what do you mean by "it was a very hard time"?
>
> Nadal: Well, the – the country is different country from the United States and Europe. It's very difficult negotiations with the – it is different culture. And there are specific problems in emerging countries. And it was very interesting to discover, to deal with; but very, very hard.
>
> Q: But overall you thought it was a positive experience.
>
> Nadal: Yes. And – yes, it was a positive experience, because I got good results. . . .

Nadal Dep., Att. 14 at 85.  Of course, had EDF and Nadal produced the responsive documents, Plaintiff's counsel would have been armed and able to aggressively pursue the questioning in greater detail and with knowledge, rather than being forced to accept the testimony and characterizations of Mr. Nadal.  Instead, Plaintiff was intentionally kept in the dark and misled.

Notwithstanding the criminal investigation and indictments and the billion dollar loss, Nadal kept his R1 ranking when he returned from Argentina.  Nadal Dep., Att. 14 at 17.  Nadal admitted that during his tenure with EDENOR, he reported directly to the Board of EDENOR and to EDF.  Att. 14 at 28.  As such, EDF had full knowledge of Nadal's activities in Argentina, allowed him to move laterally, and, yet, failed to disclose the criminal proceedings that occurred as a result of Nadal's reign.

2.    *Yann Laroche's Responses in Deposition Were Evasive and Misleading*

Mr. Laroche, second in command of EDF as the Deputy General Manager of EDF, who was deposed in Paris, France on April 21, 2006, repeatedly testified that Mr. Nadal's evaluations were positive, even systematically positive.  *See* Laroche Dep., Att. 11 at 52-53.  However, Mr. Laroche, as the second highest ranked Officer of EDF and a member of the Executive Committee of EDF, had to have been aware that, in June, 2003, an Argentinean federal judge investigated Mr. Nadal for criminal charges and found three EDENOR managers criminally liable: Daniel Lello, Luciano Pironio, and Julio Marquez.  *See* Att. 22 as translated at Att. 23.   Mr. Laroche failed to disclose the true reason for Mr. Nadal's leaving Argentina -- under a cloud of significant allegations of mismanagement and criminal activity.

Laroche admitted that, prior to assigning Nadal in the United States, EDF conducted a full analysis of Nadal's prior work history:

Q:        Do you know whether Catherine Gaujacq had had high relations with
          these various parties at any time during 2000-2004?

15

Laroche:    Again, on a personal basis I had not detailed knowledge of Catherine Gaujacq's achievements, since, again, she ranked R3. But when top management or the Chair of EDF decided to select Christian Nadal as its US representative, it would have been in light of all of the elements that he might have obtained. Because obviously it goes without saying that, when you appoint somebody with such a degree of responsibility, because you reach a decision, especially as chairman of the group, you are going to reap all the opinions that you can obtain to assess the situation accordingly.

So again, I have no detailed knowledge of what Ms. Gaujacq achieved, but I am convinced that the Chairman would have certainly made this appointment in full knowledge of the different elements.

Att. 11 at pp. 32-34.

Mr. Laroche was also clearly aware of the financial and environmental fiasco initiated during Mr. Nadal's 1999-2001 assignment with EDENOR, and EDENOR's dire financial condition, yet failed to disclose any of this information during the deposition, and instead, as pointed out above, affirmatively covered up Mr. Nadal's conduct.

Nadal returned from the debacle in Argentina with his R1 intact and was given a horizontal move, rather than a demotion. Laroche, Att. 11 at 85. Yet, Ms. Gaujacq was terminated and given EDF's worse sanction for conduct that, even if true, was trivial at best, and cannot even be argued to be in the same universe with the adverse conduct of Nadal and under Nadal's command in Argentina.

In fact, Laroche admitted there was "no question in any way at all of challenging Catherine Gaujacq's competence in terms of nuclear science, since, if you recall rightly, when the decision was reached to appoint Mr. Nadal, the plan was to maintain Catherine Gaujacq in her responsiblities . . . . ." Att. 11 at 33.

Instead, EDF attempted to justify Ms. Gaujacq's termination by claiming she engaged in a litany of trivial acts that are minor by any comparison to Nadal's conduct. EDF claimed Ms.

16

Gaujacq identified Nadal as a "gas analyst," was not in EDFINA's office regularly enough, failed to return confidential files to an unsecured location upon demand, and did not return to France when summoned (after filing the EEOC Charge). Defs.' SJ Brief at 9-12. Ultimately, EDF claimed it terminated her for refusing to accept a demotion after she reported discrimination. Defs.' R. 56.1 Statement at 29.

EDF accused Ms. Gaujacq of attempting to "blackmail" EDF when she advised its officials that she would pursue her claims with the EEOC if they continued to refuse to address Mr. Nadal's conduct towards her and her claims of discrimination. Laroche, Att. 11 at 91-92.

Even though she had not mismanaged her branch or caused it to become embroiled in a criminal and financial scandal, like Nadal, EDF gave her its second most severe "sanction" by automatically retiring her:

> Q:    Now you could have terminated Catherine Gaujacq's employment and allowed her to still get her, pension; is that correct?
>
> A:    Well, in the scale of sanction, the worse possible sanction is dismissal without pension, which means that the person in question would not perceive any pension whatsoever. The level just underneath that is automatic retirement, where the pension is preserved, but can only be paid to the party concerned when he or she reaches the normal retirement age.
>
> Q:    And what did you do in Catherine Gaujacq's case?
>
> A:    Her sanction consisted in automatically retiring her.

Laroche, Att. 11 at 99.

Thus, any claim by EDF that Ms. Gaujacq was terminated for anything other than retaliation and discrimination is rebutted by a simple comparison between her work history, performance, and termination, with Nadal's work history, performance and "horizontal" move to replace her as President of EDFINA. A jury can easily conclude the true motivations.

17

C.            **Defendants' Responses to Ms. Gaujacq's Discovery Requests Were Subversive, Evasive and Misleading**

In addition to the evasive testimony, Ms. Gaujacq issued numerous discovery requests in

this action that should have elicited documents and detailed responses from Defendants about

Mr. Nadal's involvement in the Argentinean criminal proceedings or financial improprieties.

Yet, no documents respecting the indictments or criminal conviction of the Company over which

Mr. Nadal managed were produced.   The pertinent requests follow:

> **Request for Production No. 21:**     Please produce copies of all performance evaluations done of you.
>
> **RESPONSE:** Mr. Nadal objects to Request No. 21 on the basis of the General Objections set forth above, especially General Objections 1, 8 and 9.  Subject to and without waiving those objections, and consistent with General Objection #8, Mr. Nadal responds that he has no responsive documents to produce in his personal capacity.
>
> **Request for Production No. 22:**     Please produce a copy of your personnel file of Mr. Nadal, and any files maintained by the Company that reference you, your compensation, benefits, performance, evaluations (formal or informal), qualifications and background.
>
> **RESPONSE:** Mr. Nadal objects to Request No. 22 on the basis of the General Objections set forth above, especially General Objections 8 and 9.  Subject to and without waiving those objections, and consistent with General Objection #8, Mr. Nadal responds that he has no responsive documents to produce in his personal capacity.

Attachment 7 at Nos. 21 and 22.

Mr. Nadal's responses fail to include the financial or criminal proceedings that certainly

relate to his background and qualifications with respect to his role with EDF's affiliate in

Argentina.  It is inconceivable that Mr. Nadal would not have control or access to documents

relating to the criminal proceedings or the financial mismanagement, particularly in light of the

criminal investigation being conducted in which he was questioned, or the audits taken of

EDENOR.  No documents mentioning any of this were ever produced.   Moreover, pertinent

requests to EDF should have elicited this information:

**Request for Production No. 22:** Please produce all documents reflecting any comparison, whether favorable or unfavorable, made by the Company between Ms. Gaujacq and any other employee (past or present) of the Company, including, in particular, Mr. Nadal.

**RESPONSE:** EDF objects to this Request on the grounds that it is vague and overbroad and unduly burdensome and calls for the production of documents that are not relevant or reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving this or any other objections, EDF will produce non-privileged documents responsive to this Request as regards Mr. Nadal, if any exist.

*See* Att. 7.

EDF selected Mr. Nadal as Ms. Gaujacq's comparator with respect to Ms. Gaujacq's claims of unequal pay and discrimination based on her gender. It cannot now claim that all aspects of Mr. Nadal's employment with EDF are not relevant. If Defendants had responded to these requests truthfully, they would have produced all of the documents relating to Nadal's work history with EDENOR, including the criminal proceeding related to the environmental pollution, and the financial mismanagement. That this information is relevant to this dispute is affirmed by Mr. Laroche, who conceded that EDF considered Nadal's work history and performance in deciding to replace Ms. Gaujacq with Nadal. Att. 11 at 32-34. Yet, EDF did not produce any documents regarding Nadal and EDENOR's problems in Argentina. Defendants cannot be permitted in this Court, or any Court, to selectively determine what to provide in discovery, to cull out all negative information and provide only helpful information. It renders the entire purpose of discovery meaningless. Additional requests were similarly evaded:

**Request for Production No. 25:**    Please produce all documents regarding Mr. Nadal's contract or contracts relating to his mission, job and/or position and compensation in Argentina Edenor from 2000-2002.

**RESPONSE:** Defendants object to this Request on the ground that it is duplicative of Plaintiff's Prior Documents Requests. Notwithstanding and without waiving this or any other objections, Defendants will produce non-privileged documents responsive to this Request to the extent they have not previously been produced herein, if any exist.

19

**Request for Production No. 30:**    Please produce all documents regarding the audit(s) conducted of Edenor in 2000 and 2001.

**RESPONSE:** Defendants object to this Request on the ground that it calls for documents that are not relevant or reasonably likely to lead to the discovery of admissible evidence. Notwithstanding and without waiving this or any other objections, Defendants will produce non-privileged documents responsive to this Request, if any exist.

Attachment 7 at Nos. 25 & 35.

Both Mr. Nadal and Mr. de Botherel admitted that EDF performed audits and investigations of EDENOR at this time. Mr. Nadal admitted during his deposition that EDENOR "had to make lots of analysis, proofs, expertise and so on." Nadal Dep., Att. 14 at 37. Mr. de Botherel testified that, *each year,* EDF's CEO ordered an audit of EDF subsidiaries, including EDENOR and the direction of the audit is specifically instructed by the branch officials and EDF's "audit department." de Botherel Dep., Att. 19 at 156-58.

During the time period in question, EDF used the audits to investigate the business affairs of the company. For example, when Mr. Nadal arrived in the United States, EDF audited the Washington office of EDFINA. From June 28-July 9, 2004, EDF conducted an audit of EDFINA concerning the time period Ms. Gaujacq had been President of EDFINA (2000-04), and used it to attack Ms. Gaujacq's integrity. Gaujacq Dep., Att. 8 at 343-45. The audits are lengthy voluminous and the product of several days of investigation, evaluation, and review. *Id.*; *see also* July 2004 Audit of EDFINA (although in French, demonstrating the voluminous nature of an audit report), Att. 20. In fact, quite ironically, Mr. Nadal attempted to use the audit at EDFINA to suggest that Ms. Gaujacq had done something inappropriate with respect to EDFINA's contractors, an allegations later disproved by the auditors. Att. 8 at 376-77.

In comparing this alleged behavior of Ms. Gaujacq (which no one has contended caused the company economic losses or resulted in criminal charges) to Mr. Nadal's conduct and

20

resulting consequences to EDENOR and EDF, it is beyond belief that Mr. Nadal's work performance compares more favorably than Ms. Gaujacq's, where Mr. Nadal's conduct resulted in public harm and possible death. Yet none of these audits, investigations or evaluations were ever produced.

Similarly, EDENOR admitted in is Form 6-K report that, now that the criminal proceedings have allegedly been resolved, "The Company's management estimates there are no legal grounds for any action against the Company or its employees in connection with this matter." Att. 21 at 77. As Nadal was specifically named as being an individual who would be subject to judicial interrogation, EDF should have produced those documents relevant to Nadal's involvement.

Ms. Gaujacq requests that the Court compel responses to the above requests, including any and all documents and materials, communications, e-mails, and items of any kind related to the financial and criminal proceedings that involved Mr. Nadal during his tenure at EDENOR. Ms. Gaujacq also requests that the depositions of Mr. Nadal, Mr. Laroche and the corporate designee of EDF be reopened to provide Ms. Gaujacq with a full and fair opportunity to discover all facts related to Mr. Nadal's involvement in the financial and criminal proceeding, EDF's knowledge of Mr. Nadal's involvement when it replaced Ms. Gaujacq with Mr. Nadal as President of its subsidiary, EDFINA, and the true and full comparisons between Ms. Gaujacq and Mr. Nadal, with all the discovered information in hand. This should all be at full expense to Defendants, including the Court Reporter, Interpreter and any expenses, as well as all attorneys' fees and costs.

21

**D.      Specific Relief Requested**

Specifically, Ms. Gaujacq requests:  (1) full and complete responses to Plaintiff's

Requests Nos. 21 and 22 (to Nadal), and 22, 25 and 30 (to EDF), as identified above; (2) to

reopen the depositions of Mr. Nadal, individually and as the corporate designee of EDF, and

Yann Laroche, individually and as the corporate designee EDF, to explore the newly discovered

information, including Mr. Nadal's work in Argentina, the criminal proceedings, and the

financial mismanagement and losses, and to inquire into the comparisons between Ms. Gaujacq

and Mr. Nadal in light of the new information; and to do so at the sole expense of Defendants,

including the Court Reporters, Interpreters, all travel expenses (including international travel to

Mr. Laroche in France, or for Mr. Laroche to travel to Washington D.C.), costs of all transcripts,

and attorney's fees and costs; and (3) leave to supplement Opposition to Motion for Summary

Judgment, or in the alternative, the sanction of denying the Summary Judgment; and (4) setting

the matter for trial.

<u>CONCLUSION</u>

Plaintiff's motion to compel should be granted.  Plaintiff requests that the Defendants be

required to respond fully and completely to all outstanding discovery requests no later than May 15,

2008, including delivering copies of all responsive pleadings and documents.  Ms. Gaujacq further

requests that the Court reopen and grant leave for a continuation of the depositions of Mr. Nadal,

Yann Laroche, individually, and as corporate designees of EDF, as described above, and grant

Ms. Gaujacq leave to supplement her summary judgment filings or dismiss the summary

judgment motion, and set the matter for trial.

April 23, 2008                    Respectfully submitted,

                                  /s/  ELAINE CHARLSON BREDEHOFT
                                  _____
                                  Elaine Charlson Bredehoft
                                  D.C. Bar No. 441425
                                  Carla D. Brown
                                  D.C. Bar No. 474097
                                  Kathleen Z. Quill
                                  D.C. Bar No. 489079
                                  CHARLSON BREDEHOFT & COHEN, P.C.
                                  11260 Roger Bacon Drive, Suite 201
                                  Reston, Virginia 20190
                                  (703) 318-6800
                                  (703) 318-6808 (facsimile)

                                  *Counsel for Plaintiff,*
                                  *  Catherine Gaujacq*

23

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of April, 2008, a copy of Plaintiff's Motion to Compel and for Sanctions and Memorandum in Support of Plaintiff's Motion to Compel and for Sanctions, and Proposed Order, were filed electronically via ECF, to:

Laura B. Hoguet, Esq.
Dorothea W. Regal, Esq.
HOGUET NEWMAN & REGAL, LLP
10 East 40th Street
New York, NY 20016

*Counsel for Defendants EDF, SA
    and EDFINA*

Morgan D. Hodgson, Esq.
David A. Clark, Esq.
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

*Counsel for Defendant Christian Nadal*


/s/ ELAINE CHARLSON BREDEHOFT
_____
Elaine Charlson Bredehoft
D.C. Bar No. 441425
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800
(703) 318-6808 (facsimile)

*Counsel for Plaintiff,
    Catherine Gaujacq*