ATTACHMENT 14

COPY

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF COLUMBIA

2

3    - - - - - - - - - - - - - - - x

                                   :

4    CATHERINE GAUJACQ,            :

                                   :

5              Plaintiff,          :

                                   :

6         vs.                      :    No. 1:05CV0969(JGP)

                                   :

7    ELECTRICITE DE FRANCE         :

     INTERNATIONAL NORTH AMERICA,  :

8    INC , et al,                  :

                                   :

9              Defendants.         :

                                   :

10   - - - - - - - - - - - - - - - x

11                                 Washington, D.C.

12                                 Tuesday, April 4, 2006

13        Deposition of CHRISTIAN NADAL, defendant, called

14   for examination by counsel for the plaintiff, pursuant

15   to notice, at the office of David A. Clark, Esq ,

16   Steptoe & Johnson, LLP, 1330 Connecticut Avenue,

17   Northwest, Washington, D.C  20036, before Carol A.

18   Lowe, a Registered Professional Reporter, beginning at

19   9:40 a.m., when were present on behalf of the

20   respective parties:

21

22

a37d4c8e-b5b5-4f30-9a8e-28d6a2a46385

7

1      A.    Chairman and CEO of EDF.

2      Q.    Have you ever had your deposition taken

3    before?

4      A.    No.

5      Q.    Do you have an understanding of what takes

6    place in a deposition?

7      A.    I work with my lawyers on this aspect.  I --

8    I think.  I guess, yes.

9      Q.    You attended Catherine Gaujacq's deposition;

10   correct?

11     A.    Yes.

12     Q.    And you also attended the deposition of one

13   of the corporate designees of EDF and EDFINA; correct?

14     A.    Yes.

15     Q.    Okay.  And you watched that process.

16     A.    Yes.

17     Q.    Okay.  And you understand that you are giving

18   your answers under oath today; correct?

19     A.    Yes.

20     Q.    And do you understand that to mean that under

21   the penalty of perjury you are telling the truth, the

22   whole truth and nothing but the truth?

8

1    A.    Yes.

2    Q.    Okay.  And do you understand that that oath

3    applies to you?

4    A.    What do you mean?

5    Q.    Do you have any belief that because you are a

6    French citizen that the United States laws do not

7    apply to you?

8    A.    No.  No.  No.  I understand.  Well, I don't

9    know.  It's a legal aspect.  I don't know, but I

10    understand.  I am intending to tell the truth, of

11    course.  And this is what my lawyers told me, also,

12    tell the truth.  I don't know the legal aspect, but I

13    understand.  I will do that.

14    Q.    All right.  Other than Catherine Gaujacq's

15    deposition and Mr. DeBotherel's deposition as a

16    corporate designee of EDF and EDFINA, have you ever

17    attended any other deposition?

18    A.    No.

19    Q.    Have you ever had any criminal proceedings

20    brought against you?

21    A.    No.

22    Q.    Okay.  Have you -- how would you describe

11

1 it again?

2       MS. BREDEHOFT:  Right.  I'll just ask it

3 again.

4    Q.   Now that you've had the time to consult with

5 counsel, is it your understanding that you are

6 testifying on behalf of EDF as a corporate designee as

7 to the topics circled in Attachment A of Deposition

8 Exhibit No. 1?

9    A.   What I understand, I am -- my deposition is

10 from three point of views; the one of EDF as corporate

11 designee, the one of EDFINA and -- as president and

12 obviously corporate designee and personally.

13       MS. REGAL:  Have you finished your --

14    A.   But in these --

15       MS. REGAL:  Go ahead.

16    A.    -- in these elements sometimes things are

17 mixed or, I mean, some questions are maybe directed to

18 EDFINA and not to EDF or those are from EDF only.

19    Q.   Okay.

20       MS. REGAL:  Now, have you finished your

21 answer?

22       THE WITNESS:  Well, yes and no, because I say

13

1  behalf of EDF for?

2      A.   I don't understand the question, because if I

3  have been -- if I am the corporate designee for EDF

4  for these questions, I will do my best to answer.

5          But if -- I see, also, that in -- some items

6  are partially under my responsibility.  And through

7  your questions or -- we would see what is partially

8  EDF and what is not.

9      Q.   Okay.  And when you're referring to

10  partially, that's the parts on Attachment A of

11  Deposition Exhibit No. 1 that have written next to

12  them part, P-A-R-T.

13     A.   Well, this is an example, because maybe in

14  some others I -- I will -- I will do my best to give

15  you the answer from the EDF point of view as I am

16  designee for that; but if my opinion at that time is

17  something is not relevant, I will tell you.

18     Q.   I just want to make sure that we're all on

19  the same page; that the topic areas that are circled

20  there are the topic areas that you have an

21  understanding that you will be speaking to on behalf

22  of EDF.

14

1      A.    I have this understanding.

2      Q.    Okay.

3      A.    I will do my best.

4      Q.    Okay.  Now I'm going to show you what has

5  been marked as Deposition Exhibit No. 2.  And again we

6  provided it to counsel in advance.

7          And in consultation with your counsel I

8  believe the items have been circled on Attachment A as

9  well for this.  And Attachment No. -- Deposition

10 Exhibit No. 2 relates to EDFINA.

11         So I'm just going to ask you again to feel

12 free to consult with your counsel.  Is it your

13 understanding that you are going to be testifying as a

14 corporate designee on behalf of EDFINA with respect to

15 the topic areas that have been circled on Attachment A

16 of Deposition Exhibit No. 2?

17         (The witness conferred with Ms. Regal.)

18         MS. REGAL:  Well, obviously there are some

19 differences that are in the EDF one from the EDFINA

20 one, because some deal with EDFINA as opposed to EDF,

21 but the topics are largely identical.

22     A.    Okay.  Same answer for EDFINA.

15

1    Q.    Okay.  Then I'm going to ask you to take a

2  look at Deposition Exhibit No. 3.  I've provided a

3  copy to you, but it's not a photocopy of the one that

4  was marked.  In other words, it's the identical copy;

5  but we didn't get your services to photocopy that in

6  advance, David.

7         This is the notice of deposition for you

8  individually.  Is that your understanding, that you

9  are also here testifying on behalf of yourself

10  individually?

11    A.    Yes.

12         MS. BREDEHOFT:  Okay.  Now, counsel have

13  discussed the fact that you are wearing essentially

14  three hats today and tomorrow in your deposition.  And

15  just so that -- and I think we wanted to put this on

16  the record, what our understanding and agreement was.

17         It is my understanding that there may be some

18  things that you have learned in preparation for being

19  the corporate designee of EDF or EDFINA that you may

20  not have known in your individual capacity earlier.

21         And if you have the opportunity and can,

22  please let me know that through the course of the

17

1      Q.    Let me just be sure that I understand your

2   answer.

3      A.    Yes.

4      Q.    When you returned from Argentina which was in

5   2002 --

6      A.    Yes.

7      Q.    Is that correct?

8      A.    January 2002.

9      Q.    You then received the official ranking of

10  R-1.  Would that be accurate?

11     A.    Well, it was not a question.  It was a

12  question of reconstructing my position, because each

13  executive of EDF had to be transferred to the -- to

14  the R -- Rs position; R-1, 2, 3 or 4.

15          And we discuss the conditions for my position

16  there; but obviously, according to my previous

17  position before leaving to Argentina, my position was

18  R-1.

19     Q.    Okay.  But you received the R-1 designation

20  when you returned from Argentina in 2002; is that

21  correct?

22     A.    It was my position, yes.  And we discussed my

28

1      A.    It was Henri Ducre.  Henri, Henry but with an

2   I at the end.  And Ducre, D-U-C-R-E.

3      Q.    While you were in Argentina to whom did you

4   report?

5      A.    To the board and to EDF.

6      Q.    The board of --

7      A.    The board of Edenor.

8      Q.    Okay.  And you also reported to EDF.

9      A.    Yes.

10      Q.    Who at EDF did you report to?

11      A.    Well, to the chairman and CEO, Francois

12   Roussely.  To a general -- like a CO or something like

13   that.  And his name was Caperan.  Caperan is

14   C-A-P-E-R-A-N.  And also to the finance division, to

15   people in the international division.

16      Q.    Did you report at all to Fernando Ponasso?

17      A.    Fernando Ponasso was the nonexecutive

18   chairman of the board.  Yes.  I -- I worked with him,

19   yes, also.

20      Q.    I'm sorry.  You said he was what?

21      A.    I worked with him, but I -- he was the

22   nonexecutive chairman of the board.

36

1   more than 12 percent, 13 percent net for

2   shareholders -- I could see it more prudent to -- to

3   do -- to gave -- to give better service to customers

4   and also to the local authorities and to the

5   government.

6           And -- but the position of Ponasso, he was

7   impressed by the -- the strength of the Spanish

8   shareholder.  And he didn't want to have any

9   difficulty with them, because at that time it was not

10  obvious that EDF would become the -- the single

11  shareholder.  It was more likely that the Spanish

12  would become the -- the main shareholder.

13      Q.   Were there any other issues that you

14  disagreed with Fernando Ponasso on other than this one

15  you have just described?

16      A.   Yes, several.  Well, we had an important one.

17  It was an issue about the technical discussion with

18  local authorities about a -- to make it simple, the

19  oil which is in electric transformers may have some

20  risk.

21          In fact, our -- we run that very properly;

22  but, again, I had to defend the company against

37

1  claims. And -- and even when we had no -- we were not

2  guilty, he did not support the position of the

3  company. He stepped -- he stayed backwards and

4  waiting for a result.

5       Q.   What were the claims that you had to defend

6  against?

7       A.   In oil transformers you have -- in electric

8  transformers, I'm sorry, you have oil to cool down the

9  process. And in this oil you may have some components

10 dangerous.

11          And then we had a couple of leaks, because if

12 we operate -- some explosions of transformers and so

13 on. And people claimed that we had dangerous --

14 dangerous substances in the -- in our oil.

15          Then we had to make lots of analysis, proofs,

16 expertise and so on. And, in fact, we -- it is

17 difficult, because this oil may come from -- it's not

18 brand new. We did not pour it ourselves in these

19 transformers. It was poured 10 years before or even

20 sometimes 20 years before. And we didn't know what

21 may -- what may happen.

22          But I defended the company with good faith

1  and making analysis with transparency.  And as he was

2  afraid of the results he stayed backwards, not --

3  again, the same position then before, not helping the

4  company, staying very prudent when at that time we

5  needed to go and -- and defend the company.

6      Q.    So you believed that Mr. Ponasso did not

7  defend the company and should have defended the

8  company during these claims.

9      A.    Yes; should have a bit more.  Yes.

10     Q.    What else should he have done?

11     A.    I'm sorry?

12     Q.    What else did you think that Mr. Ponasso

13  should have done?

14     A.    Well, when we -- we had a lot of technical

15  work about that.  He was not involved in that, but

16  as -- even as a nonexecutive chairman of the board he

17  was supposed to speak with the politicians or -- not

18  in formal meeting but in informal meetings or in

19  private activities but to -- to defend the company,

20  stick to the position of the company.

21          And he avoided these contacts.  And he

22  avoided speaking of -- of the issue with the

39

1  authorities and other people.

2      Q.    What period of time did this dispute take

3  place with the claims against the company about the

4  dangerousness of the transformers and the explosions?

5      A.    I did not say "dispute". I say these facts.

6  Let us say these facts. Well, the first example

7  occurred mainly by the year 2000, end of 1999 and the

8  year 2000, up to the vote of the board in beginning of

9  2001 on the accounting.

10        And the second was mainly in 2001 or maybe

11  end of -- the incidents started -- incidents, I mean

12  technical incidents, started by the end of 2000 and

13  lasting in 2001.

14      Q.    Were those still ongoing when you left in

15  early 2002?

16      A.    Yes. My successor had to deal with some

17  aspects, but the main -- we had replaced some

18  transformers. And we had done the main -- main job in

19  2001.

20      Q.    What position did Fernando Ponasso take after

21  EDF acquired 100 percent of Edenor?

22      A.    He stayed -- for a while he stayed in the

83

1      A.    Yes, but once.

2      Q.    Were you ever presented with any type of

3   performance evaluation while you were in Argentina?

4      A.    Well, each year with the board, yes.

5      Q.    Do you recall what your ratings were?

6            MS. REGAL:   Object to the form of the

7   question.

8      A.    It was not rating, formal rating.   It was a

9   decision to give the bonus or not.   This was the

10  rating.

11     Q.    Did you have an actual document that was

12  called a performance evaluation or performance review

13  or some other type of document like that?

14     A.    Well, the performance evaluation was the --

15  the budget and the results of the company.

16     Q.    Did anyone work with you on a document that

17  evaluated your performance with rankings or ratings or

18  anything?

19     A.    No.   The board made the evaluation each year

20  when voting on the accounting and the results.

21     Q.    Okay.   Was that in writing or was that just a

22  verbal evaluation?

84

1          MS. REGAL:  Object to the form of the

2   question.

3      A.   Well, the documents, the budget results

4   and -- and also a general report on the activities of

5   the company during the year, what I made on each

6   months; but I made one each year, also.

7          And these -- these documents were written,

8   but the decision of the board was the discussion and

9   the vote of the board and of the -- the committee for

10  remunerations.

11     Q.   I'm sorry.  I didn't understand whether you

12  said were or weren't.  Were they written or were they

13  not written?

14     A.   The document -- the budgets report and so on

15  were written.  And the discussions of the board and

16  main shareholders were not written.

17     Q.   Did you consider your time in Argentina as

18  the CEO of Edenor to be a positive experience for you?

19     A.   What do you mean by "positive"?

20     Q.   Did you think that it was something that you

21  really enjoyed doing, that you thought that you were

22  doing an excellent job, you were happy with that

85

1   performance?

2       A.    It was a very hard time; but positive, yes.

3       Q.    And what do you mean by "it was a very hard

4   time"?

5       A.    Well, the -- the country is different country

6   from the United States and Europe.  It's very

7   difficult negotiations with the -- it is different

8   culture.  And there are specific problems in emerging

9   countries.  And it was very interesting to discover,

10  to deal with; but very, very hard.

11      Q.    But overall you thought it was a positive

12  experience.

13      A.    Yes.  And -- yes, it was positive experience,

14  because I got good results.  I could improve -- in

15  spite of difficulties with the shareholders I could

16  improve the -- the results, financial results, of the

17  company but also the quality of service to customers

18  and, also, customer satisfaction.

19          We had -- it's another kind of evaluation of

20  my job.  We had a rating of the customer satisfaction

21  of quality of service.  And these surveys made by

22  outside companies or even by the regulator were in

86

1    progress during my time.

2        Q.    Did the board of Edenor ever express any

3    dissatisfaction with your performance or with you

4    while you were in Argentina?

5        A.    You -- you say dissatisfaction?

6        Q.    Yes.

7        A.    No.

8        Q.    Did EDF express any dissatisfaction with your

9    performance or with you while you were in Argentina?

10        A.    With my performance, no.  We had some

11    differences of view.  We -- some executives in EDF,

12    not all of them, about the strategy and the

13    implementation of EDF, not of Edenor.

14        Q.    Who were the executives at EDF that had

15    differences with you on strategy and implementation?

16        A.    One was the -- the CO or not the -- he had

17    not this title of CO, but it doesn't matter.  It's a

18    very complicated French title.  And his name I already

19    told.  It was Caperan, C-A-P-E-R-A-N.

20            And another one was the -- responsible for

21    international division.  And his name was Kallstrand.

22    Kallstrand is K-A-L-L-S-T-R-A-N-D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CATHERINE GAUJACQ           )
                            )
        Plaintiff,          )
                            )
            v.              )        No 1:05CV0969 (JGP)
                            )
ELECTRICITE DE FRANCE       )
    INTERNATIONAL NORTH AMERICA,  )
    INC , et al             )
                            )
        Defendants          )
                            )

## AMENDED NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, the Plaintiff, Catherine Gaujacq, by counsel, will take the deposition upon oral

examination of the corporate designee(s) of Electricite de France, S A ("EDF"), as to the matters

set forth in Attachment A hereto, at 9:30 a m  on Thursday, March 23, 2006, at the offices of

Steptoe & Johnson, LLP  1330 Connecticut Avenue, NW  Washington, DC  20036  The deposition

will be taken before an officer authorized by law to administer oaths and take testimony and will be

transcribed by a certified Court Reporter  The deposition will continue from day to day until

concluded, and will be used for all lawful purposes



March 17, 2006

Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive,
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
  Catherine Gaujacq

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing AMENDED NOTICE OF DEPOSITION this 17th day of March 2006, by hand delivery, to counsel defendant EDF as follows:

Laura B. Hoguet, Esq.
Dorothea W. Regal, Esq.
HOGUET NEWMAN & REGAL, LLP
10 East 40th Street
New York, New York 10016
(212) 689-8808
lhoguet@hnrlaw.com
dregal@hnrlaw.com

Counsel for Defendants
Electricite de France, S.A. and
Electricite de France International North America

With a courtesy copy sent this same day by email, addressed as follows:

Ronald S. Cooper, Esq.
David Clark, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
rcooper@steptoe.com
dclark@steptoe.com

Counsel for Defendant
Christian Nadal

Elaine Charlson Bredehoft

ATTACHMENT A

1.   All decisions relating to Ms. Gaujacq's employment with EDF and/or EDFINA, including:

   (a)   the decision to appoint Mr. Nadal to replace Ms. Gaujacq as President of EDFINA in the United States;

   (b)   the decision to pay Mr. Nadal a significantly higher salary as President of EDFINA than that paid to Ms. Gaujacq when she held the same position;

   (c)   the decision to remove Ms. Gaujacq from the list of authorized officers of EDFINA with signature authority on the corporate bank accounts;

   (d)   the decision to revoke Ms. Gaujacq powers as vice president of EDFINA, including but not limited to revoking the authority to enter into contracts with third parties; the authority to make any representation and/or warranties on behalf of EDFINA; and, the authority to incur any expenses of behalf of EDFINA;

   (e)   the decision to change the locks on the company book closet where the corporate books were kept;

   (f)   the decision to removed Ms. Gaujacq from her position on the Project with EDFINA in the United States;

   (g)   the decision to refuse to sign Ms. Gaujacq's expatriation contract and/or the expatriation contract proposed by Ms. Gaujacq in 2004, and all representations regarding the signed of that contract;

   (h)   the decision to direct Ms. Gaujacq to return to France immediately, without an assigned position;

   (i)   the decision to give Ms. Gaujacq only four days' notice that her mission in the United States would end on August 1, 2004; and

   (j)   the decision not to propose a position for Ms. Gaujacq in the EDF Energy Branch in France until November 1, 2004.

2    The employment relationship and/or contract between Ms. Gaujacq and EDF and/or EDFINA, including:

   (a)   the drafting of and completion of all contracts between EDF and/or EDFINA and Ms. Gaujacq including amendments to contracts;

   (b)   the terms of Ms. Gaujacq's expatriation contract with EDF;

i

(c)   Ms. Gaujacq's compensation as President of EDFINA;

(d)   the change in Ms. Gaujacq's employment relationship with EDF and/or EDFINA after Mr. Nadal became president of EDFINA, including any new expatriation contracts proposed or agreed to related to this change;

(e)   the new mission proposed for Ms. Gaujacq in or about the September/October 2004 timeframe; and

(f)   the drafting and issuing of the Employment Letter as described in ¶ 187-188 in Ms. Gaujacq's complaint and/or the "certificate de travail" referenced in ¶ 187 of Defendants' answer.

3   Ms. Gaujacq's performance during her tenure as President of EDFINA (and prior EDF employment), including

(a)   Ms. Gaujacq's scope of authority and changes in that authority;

(b)   Ms. Gaujacq's employment responsibilities and performance;

part - (c)   Ms. Gaujacq's performance, and any evaluations (formal or informal) of Ms. Gaujacq at any time;

(d)   any written or oral reprimand, warning, or caution, or any compliment, award, or commendation, given to or concerning Ms. Gaujacq;

(e)   any opportunities, positions, intentions to promote, career plans, or other considerations being given to the future employment of Ms. Gaujacq with EDF and/or EDFINA from August 2000 forward;

part - (f)   any complaints regarding Ms. Gaujacq or her performance, including, but not limited to, any complaints by the SEPTEN group in charge of nuclear reactor designs in Lyon (France) within the France Energy Branch which allegedly had complained on June 20, 2004 about a lack of information from Ms. Gaujacq;

part - (g)   any contention by the EDF and/or EDFINA that Ms. Gaujacq's performance was unsatisfactory, including but not limited to all performance issues referenced in the Response of Defendant EDFINA to Plaintiff's First Set of Interrogatories;

(h)   any allegations that Ms. Gaujacq was paying fees to consultants and contractors of the company without services being performed;

(i)   any allegation that Ms. Gaujacq submitted requests for reimbursement for unauthorized expenses; and

(j)    any allegation that Ms. Gaujacq improperly or inappropriately conducted EDFINA business at her home.

(k)    all complaints or judgments of abuse of rights relating in any manner to Catherine Gaujacq

(l)    EDF and EDFINA's policies, procedures, and practices relating to (a) – (k)

4.    All instructions and/or demands given by Mr. Nadal to Ms. Gaujacq and her response to such instruction, including:

(a)    the instruction of Mr. Nadal for Ms. Gaujacq to bring all files, documents and any electronic email or other data she had at home or on her laptop relating to the multi-national nuclear power joint venture and a key, strategic initiative of EDFINA and EDF (the "Project") to his office; and

(b)    the demand that Ms. Gaujacq provide Mr. Nadal with all of her business and company contacts

(c)    EDF and EDFINA's policies, procedures, and practices relating to (a) – (b)

5    All policies, practices, and procedures in effect any time between 2000 and the present relating to EDF and/or EDFINA employees working abroad, including:

(a)    the amount of notice given to other employees whose United States mission was ending and EDF's policy or standard practice regarding the amount of notice to be given for cessation of a mission; and

(b)    the procedures, including terms of giving notice and terms of transition, to employees being reassigned out of country.

(c)    the procedures, practices, and policies relating to performance problems of employees, particularly those ranked R-1, R-2, and R-3, how those performance problems are handled, EDF's philosophy and objectives when a performance issue is raised, the level of inquiry or investigation taken, and the actions taken

6.    EDF and/or EDFINA EEO policies, practices, and procedures, including

(a)    EEO-1 documents submitted to the EEOC or any other agency;

(b)    any comparative evidence between treatment of female and non-female employees of EDF and/or EDFINA, including information supporting or reflecting any specific argument by Defendants that EDF and/or EDFINA does not discriminate on the basis of gender;

(c)     the policies, practices, or procedures respecting gender discrimination or retaliation for complaints of discrimination in effect as of 1996;

(d)     the policies, actual practices and procedures established for any and all employees who complained of discrimination or retaliation since 2000, and the filing and investigating of such complaints; and

(e)     all information relating to any type of program in place for monitoring, or if any investigation, assessment or evaluation has taken place, as to whether female employees are treated the same or differently from non-female employees with respect to hiring, performance evaluations, salary increases, bonuses, promotions, demotions, disciplinary actions or terminations

7     Complaints of discrimination and/or retaliation by EDF and/or EDFINA employees, including:

(a)     all complaints made by any employee respecting gender discrimination or retaliation because of complaining of discrimination, any investigation, the results of any such investigation, any action taken, any follow-up relating to the complaining employee or the subject of the complaint, and the current employment status (including position held) of the complaining employee and the subject of the complaint;

(b)     all complaints made by Ms Gaujacq (whether oral or written, formal or informal) respecting gender discrimination, unfair, harsh or abusive treatment, or retaliation because of complaining of discrimination, including any investigation taken, the results of any such investigation, any action taken, any follow-up relating to Ms. Gaujacq's complaints, and the subject of the complaint;

(c)     all complaints made by Ms. Gaujacq about Mr Nadal's treatment of her to Fernando Ponasso, Didier Lamethe, Bruno Lescoeur, Mr Cruezet and Mr Laroche; and

(d)     all formal complaints of gender discrimination or retaliation because of complaining of discrimination, filed with the United States Equal Employment Opportunity Commission or any state or local Human Rights Commission, or as a lawsuit, against EDF and/or EDFINA, from 2000 through the present, and any response or rebuttal to any such claim

8.     Methods to determine compensation for employees of EDF and/or EDFINA, including:

(a)     the seniority system, the merit system, the grade level system and all other systems of factors referenced in Defendant's fifth affirmative defense;

(b)     the compensation and method of determining such compensation paid to Christian Nadal from January 2000 to the present;

(c) the compensation and method of determining such compensation paid to Ms. Gaujacq from January 2000 until her termination;

(d) EDF's compensation policies, and promotion and career opportunity practices, for high-level executives; and

(e) the ranking and seniority system for high-level executives, including the EDFINA President's position within this system

(f) positions available for R-1, R-2, and R-3 ranked executives during the period 2004 – present

(g) EDF R-1, R-2, and R-3 employees who have been placed in positions of a lower ranking and the circumstances of each such occasion, including why, the level of compensation, the length of time in such position, and the career path following. This topic covers 2000 – present

9. Information relating to the audit referenced in ¶ 105 of Ms. Gaujacq's complaint, including:

(a) the decision to have auditors come to the United States offices of EDFINA for the purpose of undertaking a special audit of EDFINA operations and finances during the period Ms. Gaujacq had served as EDFINA's President;

(b) the audit report and recommendations; and

(c) any findings or conclusions of the audit, including specifically, any documents suggesting any wrongdoing or accounting improprieties that occurred during Ms. Gaujacq's tenure as President of EDFINA

10. EDF's financial information, including:

(a) any contention that EDF has suffered or been damaged as a result of Ms. Gaujacq's actions;

(b) the financial status of the EDF for the past two years with respect to gross and net revenues, expenses and profit; and

(c) EDFINA's monthly financial statements provided to EDF from August 2000 to January 2005

11. Relationship between EDFINA and EDF, including:

(a) number of people employed by EDFINA and EDF, combined and separately



(b)    which entity employed Ms. Gaujacq;

(c)    human resource and other administrative support provided by EDF to EDFINA;

(d)    EDF contacts with the United States; and

(e)    relationship between management and board of directors of EDFINA and management and board of EDF

12.    NUSTART project, contracts and agreements, including:

(a)    disclosure restrictions and confidentiality provisions of Nustart documents in 2004 as described in ¶134 of Ms. Gaujacq's complaint or otherwise;

(b)    Ms. Gaujacq position and responsibilities related to the Nustart project both while she was president of EDFINA and after Mr. Nadal became president of EDFINA;

(c)    details of Georges Seveiere's succession as EDF's first representative to NuStart in summer 2004 as described in ¶170 of Defendants' answer

(d)    complaints of any nature by Nustart relating to Ms. Gaujacq or Mr. Nadal, or any problems with the Nustart project during Ms. Gaujacq's or Mr. Nadal's tenure

13.    Incident wherein checks voided in the Company's books on or about June 2004, which were signed by Ms. Gaujacq but were voided and/or ripped up by Benoit Dreux

14.    Christian Nadal's employment contract(s), titles and positions with EDF and EDFINA from 2000 to the present

15.    All EPRI agreements.

16.    The partial IPO of EDF/EDFINA.

17.    The decision to deny Mike Slavitt access to the EDFINA's books and the decision to terminate Mike Slavitt, including the reasons for his termination

18.    Ms. Gaujacq's proceeding before the "Conseil des Prudhommes" as referenced in Defendants' initial disclosures at page 6

19.    EDF's production of responsive documents, including the gathering and organizing of all documents produced by EDF in this matter, the authenticity of documents, and the existence of a determination made that no responsive documents existed to any document request served upon EDF by Ms. Gaujacq

20.    Facts supporting each Affirmative Defense asserted by EDF

(21) Information and details relating to EDF's responses to Interrogatories.

(22) The source of all facts included in the filings on behalf of EDF with the EEOC in Ms Gaujacq's case, including the specific details supporting those facts asserted.

23. Mr Nadal's performance during his tenure as President of EDFINA (and prior EDF employment), including

    (a) Mr Nadal's scope of authority and changes in that authority;

    (b) Mr Nadal's employment responsibilities and performance;

    (c) Mr Nadal's performance, and any evaluations (formal or informal) of Mr. Nadal at any time;

    (d) any written or oral reprimand, warning, or caution, or any compliment, award, or commendation, given to or concerning Mr Nadal;

    (e) any opportunities, positions, intentions to promote, career plans, or other considerations being given to the future employment of Mr Nadal with EDF and/or EDFINA from August 1997 forward;

    (f) all complaints or judgments of abuse of rights relating in any manner to Mr Nadal.

(24) Comparisons between Ms Gaujacq and Mr. Nadal with respect to qualifications, educational and work history, performance, compensation, career advancement, and the skills, knowledge, and responsibilities of the EDFINA President position

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHERINE GAUJACQ | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ELECTRICITE DE FRANCE | ) |
| INTERNATIONAL NORTH AMERICA, | ) |
| INC., et al. | ) |
| | ) |
| Defendants | ) |
| | ) |

No 1:05CV0969 (JGP)

## AMENDED NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, the Plaintiff, Catherine Gaujacq, by counsel, will take the deposition upon oral

examination of the corporate designee(s) of Electricite de France International North America, Inc

("EDFINA"), as to the matters set forth in Attachment A hereto, at 9:30 a.m. on Tuesday, April 4,

2006, at the offices of Steptoe & Johnson, LLP 1330 Connecticut Avenue, NW Washington, DC

20036 The deposition will be taken before an officer authorized by law to administer oaths and

take testimony and will be transcribed by a certified Court Reporter. The deposition will continue

from day to day until concluded, and will be used for all lawful purposes



DEPOSITION EXHIBIT
2
NADAL
PENGAD-Bayonne, N. J.

March 17, 2006

Elaine Charlson Bredehoft
D.C. Bar No. 441425
Kathleen Z. Quill
D.C. Bar No. 489079
CHARLSON BREDEHOFT & COHEN, P.C.
11260 Roger Bacon Drive,
Suite 201
Reston, Virginia 20190
(703) 318-6800

Counsel for Plaintiff
Catherine Gaujacq

2

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing AMENDED NOTICE OF DEPOSITION this 17th day of March 2006, by hand delivery, to counsel defendant EDF as follows:

Laura B. Hoguet, Esq.
Dorothea W. Regal, Esq.
HOGUET NEWMAN & REGAL, LLP
10 East 40th Street
New York, New York 10016
(212) 689-8808
lhoguet@hnrlaw.com
dregal@hnrlaw.com

Counsel for Defendants
Electricite de France, S.A. and
Electricite de France International North America

With a courtesy copy sent this same day by email, addressed as follows:

Ronald S. Cooper, Esq.
David Clark, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
rcooper@steptoe.com
dclark@steptoe.com

Counsel for Defendant
Christian Nadal

Elaine Charlson Bredehoft

## ATTACHMENT A

1.  All decisions relating to Ms. Gaujacq's employment with EDF and/or EDFINA, including:

    (a)  the decision to appoint Mr. Nadal to replace Ms. Gaujacq as President of EDFINA in the United States;

    (b)  the decision to pay Mr Nadal a significantly higher salary as President of EDFINA than that paid to Ms Gaujacq when she held the same position;

    (c)  the decision to remove Ms. Gaujacq from the list of authorized officers of EDFINA with signature authority on the corporate bank accounts;

    (d)  the decision to revoke Ms. Gaujacq powers as vice president of EDFINA, including but not limited to revoking the authority to enter into contracts with third parties; the authority to make any representation and/or warranties on behalf of EDFINA; and, the authority to incur any expenses of behalf of EDFINA;

    (e)  the decision to change the locks on the company book closet where the corporate books were kept;

    (f)  the decision to removed Ms. Gaujacq from her position on the Project with EDFINA in the United States;

    (g)  the decision to refuse to sign Ms. Gaujacq's expatriation contract and/or the expatriation contract proposed by Ms Gaujacq in 2004, and all representations regarding the signed of that contract;

    (h)  the decision to direct Ms. Gaujacq to return to France immediately, without an assigned position;

    (i)  the decision to give Ms. Gaujacq only four days' notice that her mission in the United States would end on August 1, 2004; and

    (j)  the decision not to propose a position for Ms. Gaujacq in the EDF Energy Branch in France until November 1, 2004.

2.  The employment relationship and/or contract between Ms. Gaujacq and EDF and/or EDFINA, including:

    (a)  the drafting of and completion of all contracts between EDF and/or EDFINA and Ms Gaujacq including amendments to contracts;

    (b)  the terms of Ms. Gaujacq's expatriation contract with EDF;

(c)    Ms. Gaujacq's compensation as President of EDFINA;

(d)    the change in Ms. Gaujacq's employment relationship with EDF and/or EDFINA after Mr. Nadal became president of EDFINA, including any new expatriation contracts proposed or agreed to related to this change;

(e)    the new mission proposed for Ms. Gaujacq in or about the September/October 2004 timeframe; and

(f)    the drafting and issuing of the Employment Letter as described in ¶ 187-188 in Ms. Gaujacq's complaint and/or the "certificate de travail" referenced in ¶ 187 of Defendants' answer.

3.    Ms. Gaujacq's performance during her tenure as President of EDFINA (and prior EDF employment), including

(a)    Ms. Gaujacq's scope of authority and changes in that authority;

(b)    Ms. Gaujacq's employment responsibilities and performance;

part - (c)    Ms. Gaujacq's performance, and any evaluations (formal or informal) of Ms. Gaujacq at any time;

(d)    any written or oral reprimand, warning, or caution, or any compliment, award, or commendation, given to or concerning Ms. Gaujacq;

(e)    any opportunities, positions, intentions to promote, career plans, or other considerations being given to the future employment of Ms. Gaujacq with EDF and/or EDFINA from August 2000 forward;

part - (f)    any complaints regarding Ms. Gaujacq or her performance, including, but not limited to, any complaints by the SEPTEN group in charge of nuclear reactor designs in Lyon (France) within the France Energy Branch which allegedly had complained on June 20, 2004 about a lack of information from Ms. Gaujacq;

part - (g)    any contention by the EDF and/or EDFINA that Ms. Gaujacq's performance was unsatisfactory, including but not limited to all performance issues referenced in the Response of Defendant EDFINA to Plaintiff's First Set of Interrogatories;

(h)    any allegations that Ms. Gaujacq was paying fees to consultants and contractors of the company without services being performed;

(i)    any allegation that Ms. Gaujacq submitted requests for reimbursement for unauthorized expenses; and

(j)    any allegation that Ms. Gaujacq improperly or inappropriately conducted EDFINA business at her home

(k)    all complaints or judgments of abuse of rights relating in any manner to Catherine Gaujacq.

(l)    EDF and EDFINA's policies, procedures, and practices relating to (a) – (k)

4    All instructions and/or demands given by Mr. Nadal to Ms. Gaujacq and her response to such instruction, including:

(a)    the instruction of Mr. Nadal for Ms. Gaujacq to bring all files, documents and any electronic email or other data she had at home or on her laptop relating to the multi-national nuclear power joint venture and a key, strategic initiative of EDFINA and EDF (the "Project") to his office; and

(b)    the demand that Ms. Gaujacq provide Mr. Nadal with all of her business and company contacts.

(c)    EDF and EDFINA's policies, procedures, and practices relating to (a) – (b).

5.    All policies, practices, and procedures in effect any time between 2000 and the present relating to EDF and/or EDFINA employees working abroad, including:

(a)    the amount of notice given to other employees whose United States mission was ending and EDF's policy or standard practice regarding the amount of notice to be given for cessation of a mission; and

(b)    the procedures, including terms of giving notice and terms of transition, to employees being reassigned out of country

(c)    the procedures, practices, and policies relating to performance problems of employees, particularly those ranked R-1, R-2, and R-3, how those performance problems are handled, EDF's philosophy and objectives when a performance issue is raised, the level of inquiry or investigation taken, and the actions taken.

6    EDF and/or EDFINA EEO policies, procedures, and procedures including

(a)    EEO-1 documents submitted to the EEOC or any other agency;

(b)    any comparative evidence between treatment of female and non-female employees of EDF and/or EDFINA, including information supporting or reflecting any specific argument by Defendants that EDF and/or EDFINA does not discriminate on the basis of gender;

(c)    the policies, practices, or procedures respecting gender discrimination or retaliation for complaints of discrimination in effect as of 1996;

(d)    the policies, actual practices and procedures established for any and all employees who complained of discrimination or retaliation since 2000, and the filing and investigating of such complaints; and

(e)    all information relating to any type of program in place for monitoring, or if any investigation, assessment or evaluation has taken place, as to whether female employees are treated the same or differently from non-female employees with respect to hiring, performance evaluations, salary increases, bonuses, promotions, demotions, disciplinary actions or terminations

7    Complaints of discrimination and/or retaliation by EDF and/or EDFINA employees, including:

(a)    all complaints made by any employee respecting gender discrimination or retaliation because of complaining of discrimination, any investigation, the results of any such investigation, any action taken, any follow-up relating to the complaining employee or the subject of the complaint, and the current employment status (including position held) of the complaining employee and the subject of the complaint;

(b)    all complaints made by Ms. Gaujacq (whether oral or written, formal or informal) respecting gender discrimination, unfair, harsh or abusive treatment, or retaliation because of complaining of discrimination, including any investigation taken, the results of any such investigation, any action taken, any follow-up relating to Ms. Gaujacq's complaints, and the subject of the complaint;

(c)    all complaints made by Ms. Gaujacq about Mr. Nadal's treatment of her to Fernando Ponasso, Didier Lamethe, Bruno Lescoeur, Mr. Cruezet and Mr. Laroche; and

(d)    all formal complaints of gender discrimination or retaliation because of complaining of discrimination, filed with the United States Equal Employment Opportunity Commission or any state or local Human Rights Commission, or as a lawsuit, against EDF and/or EDFINA, from 2000 through the present, and any response or rebuttal to any such claim

8    Methods to determine compensation for employees of EDF and/or EDFINA, including:

(a)    the seniority system, the merit system, the grade level system and all other systems of factors referenced in Defendant's fifth affirmative defense;

(b)    the compensation and method of determining such compensation paid to Christian Nadal from January 2000 to the present;

(c)    the compensation and method of determining such compensation paid to Ms Gaujacq from January 2000 until her termination;

(d)    EDF's compensation policies, and promotion and career opportunity practices, for high-level executives; and

(e)    the ranking and seniority system for high-level executives, including the EDFINA President's position within this system.

(f)    positions available for R-1, R-2, and R-3 ranked executives during the period 2004 – present.

(g)    EDF R-1, R-2, and R-3 employees who have been placed in positions of a lower ranking and the circumstances of each such occasion, including why, the level of compensation, the length of time in such position, and the career path following This topic covers 2000 – present.

9.    Information relating to the audit referenced in ¶ 105 of Ms. Gaujacq's complaint, including:

(a)    the decision to have auditors come to the United States offices of EDFINA for the purpose of undertaking a special audit of EDFINA operations and finances during the period Ms. Gaujacq had served as EDFINA's President;

(b)    the audit report and recommendations; and

(c)    any findings or conclusions of the audit, including specifically, any documents suggesting any wrongdoing or accounting improprieties that occurred during Ms. Gaujacq's tenure as President of EDFINA

10.    EDFINA's financial information, including:

(a)    any contention that EDFINA has suffered or been damaged as a result of Ms. Gaujacq's actions;

(b)    the financial status of the EDFINA for the past two years with respect to gross and net revenues, expenses and profit; and

(c)    EDFINA's monthly financial statements provided to EDF from August 2000 to January 2005.

11    Relationship between EDFINA and EDF, including:

(a)    number of people employed by EDFINA and EDF, combined and separately

(b)   which entity employed Ms. Gaujacq;

(c)   human resource and other administrative support provided by EDF to EDFINA;

(d)   EDF contacts with the United States; and

(e)   relationship between management and board of directors of EDFINA and management and board of EDF.

12    NUSTART project, contracts and agreements, including:

(a)   disclosure restrictions and confidentiality provisions of Nustart documents in 2004 as described in ¶134 of Ms. Gaujacq's complaint or otherwise;

(b)   Ms. Gaujacq position and responsibilities related to the Nustart project both while she was president of EDFINA and after Mr. Nadal became president of EDFINA;

(c)   details of Georges Severere's succession as EDF's first representative to NuStart in summer 2004 as described in ¶170 of Defendants' answer.

(d)   complaints of any nature by Nustart relating to Ms. Gaujacq or Mr. Nadal, or any problems with the Nustart project during Ms. Gaujacq's or Mr. Nadal's tenure.

13.   Incident wherein checks voided in the Company's books on or about June 2004, which were signed by Ms. Gaujacq but were voided and/or ripped up by Benoit Dreux.

14.   Christian Nadal's employment contract(s), titles and positions with EDF and EDFINA from 2000 to the present

15.   All EPRI agreements.

16    The partial IPO of EDF/EDFINA.

17.   The decision to deny Mike Slavitt access to the EDFINA's books and the decision to terminate Mike Slavitt, including the reasons for his termination

18    Ms. Gaujacq's proceeding before the "Conseil des Prudhommes" as referenced in Defendants' initial disclosures at page 6

19.   EDFINA's production of responsive documents, including the gathering and organizing of all documents produced by EDFINA in this matter, the authenticity of documents, and the existence of a determination made that no responsive documents existed to any document request served upon EDFINA by Ms. Gaujacq.

20.   Facts supporting each Affirmative Defense asserted by EDFINA

21. Information and details relating to EDFINA's responses to Interrogatories.

22. The source of all facts included in the filings on behalf of EDFINA with the EEOC in Ms. Gaujacq's case, including the specific details supporting those facts asserted

23. Mr. Nadal's performance during his tenure as President of EDFINA (and prior EDF employment), including

    (a)    Mr. Nadal's scope of authority and changes in that authority;

    (b)    Mr. Nadal's employment responsibilities and performance;

    (c)    Mr. Nadal's performance, and any evaluations (formal or informal) of Mr. Nadal at any time;

    (d)    any written or oral reprimand, warning, or caution, or any compliment, award, or commendation, given to or concerning Mr. Nadal;

    (e)    any opportunities, positions, intentions to promote, career plans, or other considerations being given to the future employment of Mr. Nadal with EDF and/or EDFINA from August 1997 forward;

    (f)    all complaints or judgments of abuse of rights relating in any manner to Mr Nadal.

24. Comparisons between Ms. Gaujacq and Mr. Nadal with respect to qualifications, educational and work history, performance, compensation, career advancement, and the skills, knowledge, and responsibilities of the EDFINA President position