| Year | Annual Interest Rate on Fixed Rate Par Notes | Annually Scheduled Amortization |
|------|----------------------------------------------|---------------------------------|
| 1 | 3 0% | 0 0% |
| 2 | 4 0% | 0 0% |
| 3 | 5 0% | 0 0% |
| 4 | 6 0% | 0.0% |
| 5 | 8 0% | 0 0% |
| 6 | 9 0% | 10 0% |
| 7 | 9 5% | 10 0% |
| 8 through 11 | 10 0% | 10 0%, 10 0%, 10 0%, 50 0% |

An amount of US$ 123 8 million in notes, comprised of two classes (Class "A" amounting to US$ 73 5 million and Class "B" amounting to US$ 50 3 million), was issued under this option.

- The Floating Rate Par Option: For each US$ 1,000 principal amount of outstanding financial debt, creditors received Floating Rate Par Notes for a nominal value equal to (i) US$ 1,000 plus (ii) any accrued and unpaid interest as of December 31, 2005 (excluding penalty interest and additional amounts, if any) in respect of such US$ 1,000 principal amount of outstanding financial debt (or, in the case of Gain Trust Notes, any accrued and unpaid interest as of December 31, 2005 (excluding any penalty interest and additional amounts, if any) in respect of such US$ 1,000 principal amount of Gain Trust Notes) A maximum of US$ 50 million principal amount of outstanding financial debt could be exchanged under this option Interest on Floating Rate Par Notes will be payable semiannually in arrears at an annual rate equal to 1 IBOR plus a spread, and principal will be due and payable in semiannual installments based on the amortization schedule detailed in the table below:

| Year | Annual Spread Floating Rate Par Notes | Annually Scheduled Amortization |
|------|----------------------------------------|---------------------------------|
| 1 | 0 0% | 0 0% |
| 2 | 0 0% | 0 0% |
| 3 | 1 0% | 0 0% |
| 4 through 6 | 1 5% | 0 0%, 0 0%, 5 0% |
| 7 through 14 | 2 0% | 5 0%, 5 0%, 5 0%, 5 0%, 10 0%, 10 0%, 50 0% |

An amount of US$ 12 7 million in notes was issued under this option

- The Combination Option: For each US$ 1,000 principal amount of outstanding financial debt, creditors received (i) a cash payment of US$ 283 and (ii) Discount Notes for a nominal value of US$ 667 A fixed amount of US$ 360 million principal amount of outstanding financial debt could be exchanged under this option Interest on Discount Notes will be payable semiannually in arrears at an annual fixed rate, and principal will be due and payable in semiannual installments based on the amortization schedule detailed in the table below :

| Year | Discount Applicable to Annual Interest Rate | Annually Scheduled Amortization |
|------|---------------------------------------------|---------------------------------|
| 1 | 3 0% | 0 0% |
| 2 | 3 5% | 0 0% |
| 3 | 10 0% | 5 0% |
| 4 | 11 0% | 5 0% |
| 5 through 9 | 12 0% | 5 0%, 5 0%, 10 0%, 10 0%, 60 0% |

An amount of US$ 240 million in notes, comprised of two classes (Class "A" amounting to US$ 152 3 million and Class

"B" amounting to US$ 87 7 million), was issued under this option

30

The Company did not make any payment or capitalize any accrued and unpaid interest or any other accrued and unpaid additional amount on any Outstanding Debt exchanged under the Restructuring, other than as set forth in the above options

Finally, on April 24, 2006, the Company made a cash payment of US$ 102,000,028 to those creditors who had chosen the Combination Option, and an additional payment of US$ 4,735,872 to those creditors who had validly given their consent and tendered their outstanding financial debt, pursuant to the terms of the restructuring proposal. The latter amount represents interest accrued on the original debt principal amount at the interest rate applicable to the notes for the period extending from January 1, 2006 to the date of issuance of the notes, which was, April 24, 2006

Furthermore, in conformity with the options selected by the financial creditors and after applying the pro-ration and allocation mechanism, EDENOR issued the notes under the Global Corporate Notes Program

As a result of the restructuring process, the defaulted debt prior to the restructuring, which amounted to US$ 540.9 million as of February 22, 2006, was reduced to US$ 376.4 million, with an average term of more than 8 years, at an average cost of 8% and final maturity in 2019

During the six-month period ended June 30, 2007, the Company, as required in the trust agreement for the issuance of corporate notes, has partially repurchased at market prices and in successive operations, "discount corporate notes due on 2014" for an nominal value of US$ 36 million. After the aforementioned purchase through market purchases, the balance of the financial debt (principal) amounts to US$ 340,430 thousand

Therefore, the Company's post-restructuring and post-repurchase debt structure as of June 30, 2007 was comprised of the following Notes:

| Type | Class | Debt structure in thousands of US$ | Debt repurchase - in thousands of US$ | | | | Post-repurchase debt structure in thousands of US$ | Balance as of June 30, 2007 (Note 7) in thousands of $ |
| | | | 2/5/2007 | 3/5/2007 | 7/5/2007 | 05/21/2007 | | |
| Fixed Rate Par Note | A | 73,485 | | | | | 73,485 | 227,289 |
| | B | 50,289 | | | | | 50,289 | 155,544 |
| Floating Rate Par Note | A | 12,656 | | | | | 12,656 | 39,145 |
| Discount Note | A | 152,322 | (13,988) | | | | 138,334 | 427,867 |
| | B | 87,678 | (6,682) | (4,750) | (580) | (10,000) | 65,666 | 203,105 |
| Total | | 376,430 | (20,670) | (4,750) | (580) | (10,000) | 340,430 | 1,052,950 |

31

The principal amortization schedule broken down by year of total debt, including the aforementioned repurchases and without considering possible adjustments, prepayments, redemptions or cancellations, is detailed in the table below:

| Year | Amount in thousands of US$ |
|------|----------------------------|
| 2008 | 10,200 |
| 2009 | 10,200 |
| 2010 | 10,200 |
| 2011 | 23,210 |
| 2012 | 33,410 |
| 2013 | 33,410 |
| 2014 | 135,410 |
| 2015 | 13,010 |
| 2016 | 62,520 |
| 2017 | 1,266 |
| 2018 | 1,266 |
| 2019 | 6,328 |
|      | 340,430 |

As of June 30, 2007, the loss resulting from the repurchase of notes amounted to 1,456, which has been included in the statement of income for the six-month period ended as of that date (Note 3 k)

Main covenants

As established in the trust agreement for the issuance of corporate notes, the main covenants assumed in relation to this transaction are the following:

- Based on the level of excess cash (leverage ratio) and subject to maintaining an established minimum cash balance of US$ 15 million, the Company will be subject to the following conditions:

  If EDENOR's Leverage Ratio (defined as Total Financial Debt to Consolidated EBITDA) is higher than 3 5, any excess cash shall be applied, at the Company's discretion, either for the purchase of notes through market purchases or for the optional redemption of notes

  If the Leverage Ratio is equal to or lower than 3 5, but higher than 3 0, the Company, at its discretion, will apply any excess cash as follows:

  A minimum of 50% of such excess cash shall be applied, at the Company's discretion, either for the purchase of notes through market purchases or for the optional redemption of notes; and a maximum of 50% of such excess cash shall be used to make permitted capital expenditures, regulatory capital expenditures or additional capital expenditures;

  A minimum of 75% of such excess cash shall be applied, at the Company's discretion, either for the purchase of notes through market purchases or for the optional redemption of notes; and a maximum of 25% of such excess cash shall be used entirely at the Company's discretion, including, without limitation, for the payment of dividends;

  If the Leverage Ratio is equal to or lower than 3 0, but higher than 2 5, the Company, at its discretion, will apply any excess cash as follows:

32

A minimum of 50% of such excess cash shall be applied, at the Company's discretion, either for the purchase of notes through market purchases or for the optional redemption of notes; and a maximum of 50% of such excess cash shall be used entirely at the Company's discretion, including, without limitation, for the payment of dividends;

If the Leverage Ratio is equal to or lower than 2 5, the Company is exempt from complying with the above-mentioned conditions and therefore any excess cash may be applied at its discretion

- The Company may make permitted capital expenditures up to an agreed-upon annual amount

- Upon the occurrence of an Adverse Event, EDENOR, at its discretion, may elect to defer, reschedule and capitalize up to one year of principal amortization payments and one year of interest payments on any or all series of notes by written notice to the holders on each payment date or prior thereto This provision may be invoked only once in respect of both an Adverse Cash Flow Event and an Adverse Devaluation Event during the term of the Notes Adverse Cash Flow Event means the occurrence of any event or series of events that are outside the Company's control and result in the Company's inability to meet its debt service obligations, to the extent that the minimum cash balance is maintained Adverse Devaluation Event means any measure or series of measures taken by the Argentine government, general market conditions or any other event that results in a 20% or larger devaluation of the Peso in any period of 12 consecutive months after the Issuance Date as compared to its value as of January 1, 2006

- The Company may incur additional indebtedness subject to certain conditions that are described in the trust agreement for the issuance of the corporate notes

- Restricted Payments: No dividends shall be paid until April 24, 2008 or until such time when the Company's Leverage Ratio is lower than 2 5, whichever occurs first Fees payable under the technical assistance agreement shall not exceed US$ 2 million Payments to EASA shall not exceed US$ 2 5 million in any fiscal year

- The Company may suspend compliance with any covenants provided that its leverage ratio is equal to or lower than 2 5

- In the case that the Company carries out a primary equity public offering and as long as the Company's Leverage ratio is higher than 2 5, the Company shall be required to apply 25% of the net cash proceeds of the base offering amount to purchase notes through market purchases, taking into account that the Company shall have a two-year period to make the aforementioned purchases of notes through market purchases and the Company shall have no obligation to make the aforementioned purchases of notes at a price greater than the nominal value of the Notes

As of the date of issuance of these financial statements, the Company is in compliance with its obligations as stipulated in the trust agreement related to the corporate notes issued after the restructuring of the financial debt

33

## 15  BALANCES AND TRANSACTIONS WITH RELATED PARTIES

In the normal course of business, the Company carries out transactions with related parties  As of June 30, 2007 and December 31, 2006, outstanding balances with related parties are as follow:

|  | 2007 | 2006 |
|---|---|---|
| Other receivables (Note 5) | | |
| Electricidad Argentina S A  (*) | 1,358 | 4,429 |
| SACME S A | 448 | 448 |
| Total | 1,806 | 4,877 |
| | | |
| Trade accounts payable (Note 6) | | |
| Errecondo, Salaverri, Dellatorre, Gonzalez & Burgio | (3,240) | (16) |
| SACME S A | (661) | (676) |
| Total | (3,901) | (692) |
| | | |
| Other liabilities (Note 10) | | |
| Electricidad Argentina S A | (1,379) | (4,465) |
| Errecondo, Salaverri, Dellatorre, Gonzalez & Burgio | (309) | (208) |
| Total | (1,688) | (4,673) |

(*) Includes services to be received

34

Transactions carried out with related parties for the six-month periods ended June 30, 2007 and 2006 are as follow:

|  | 2007 | 2006 |
|---|---|---|
| Other Income |  |  |
| Electricidad Argentina S A | 4 | 0 |
| **Total** | 4 | 0 |
| Expenses from services |  |  |
| SACME S A | (1,664) | (1,155) |
| Electricidad Argentina S A | (119) | 0 |
| EDF International | (3,727) | (3,043) |
| **Total** | (5,510) | (4,198) |
| Financial expenses, interest and penalties |  |  |
| EDF International | 0 | (271) |
| Electricidad Argentina S A | (3,073) | (4,793) |
| Errecondo, Salaverri, Dellatorre, Gonzalez & Burgio | (309) | 0 |
| **Total** | (3,382) | (5,064) |
| Financial debt restructuring result |  |  |
| EDF International | 0 | 38,114 |
| Adjustment to present value of notes |  |  |
| EDF International | 0 | 14,926 |

**Operating and Technical Assistance Agreements (As from the international secondary offering, EDF International is no longer a related party – Note 1)**

In compliance with the provisions of both the Bid Package and the Transfer Contract, the Company has entered into an Operating Agreement with EDF International and ENHER, pursuant to which EDF International and ENHER would provide technical advisory services concerning the distribution and sale of electricity and would commit their experience and know-how to the achievement of an efficient and competitive management

On July 16, 1999, ENHER assigned its rights and obligations arising from the above mentioned Operating Agreement to its controlling company ENDESA S A

On May 4, 2001, in compliance with that which has been mentioned in Note 1, ENDESA S A assigned its rights and obligations under the Operating Agreement to EDF International, thus leaving EDF International as the sole operator

This Operating Agreement had an initial 10-year term as from September 1, 1992, which was extended until August 31, 2007

The Company has registered said extension in the National Institute of Copyright (INPI) - Technology Transfer Division under number 9894

On September 15, 2005, EDF International transferred the shares held in EASA (the controlling company of Edenor) and 14% of EDENOR's shares to Dolphin In connection with such transfer, the parties agreed to terminate the aforementioned Agreement and reduce the amount owed to EDF International for unpaid fees which amounted to 25,852

35

However, since the Company still wishes to have access to EDF International's know-how, experience and technical knowledge in the field of electricity distribution and sale, the Company and EDF International have entered into a new Technical Assistance Agreement for a period of 5 years or for such period during which Dolphin continues to be the controlling company of EASA Upon the termination of the Technical Assistance Agreement EDENOR will pay EDF International an amount of US$ 10,000,000 as technical assistance fees in five equal annual installments of US$ 2,000,000 The first annual payment was made on January 9, 2006 and the second payment was made on December 14, 2006

On December 7, 2005, the Company registered the new agreement in the National Institute of Copyright (INPI) - Technology Transfer Division under number 11,197

**Agreement with Electricidad Argentina S A (controlling company)**

On April 4, 2006, the Company and EASA entered into an agreement pursuant to which EASA will provide technical advisory services on financial matters as from September 19, 2005 and for a term of five years In consideration of these services, EDENOR will pay EASA an annual amount of US$2 million plus VAT Any of the parties may terminate the agreement at any time by giving 60 days' notice, without having to comply with any further obligations or paying any indemnification to the other party

**Agreement with Comunicaciones y Consumos S A**

On March 16, 2007, the Company and Comunicaciones y Consumos S A (CYCSA) entered into an agreement pursuant to which the Company granted CYCSA the exclusive right to provide telecommunications services to Company's customers through the use of the Company's network in accordance with the provisions of Decree N° 764/2000 of the Federal Government, which contemplates the integration of voice, data and image transmission services through the existing infrastructure of electricity distribution companies such as the Company's network In accordance with the terms of the agreement, CYCSA will be responsible for all maintenance expenses and expenses related to the adapting of the Company's network for the rendering of such telecommunications services The term of the agreement will be ten years to commence from either the date on which it is approved by the ENRE or the date on which CYCSA is granted the license to render telecommunications services, whichever comes after, which the Company estimates will occur during the second quarter of 2007 The agreement will be automatically renewed upon expiration date for subsequent periods of five years, unless notice to the contrary is given by any of the parties no less than 120 days prior to the expiration of the corresponding period In accordance with the agreement, CYCSA shall periodically request access to the Company's network Such request will be evaluated by the Company and access will be granted based on the available capacity of the network In consideration of the use of the network, CYCSA will grant the Company 2% of the annual charges collected from customers, before taxes, as well as 10% of the profits obtained from the rendering of the services Furthermore, CYCSA will indemnify the Company for any obligation arising from the rendering of the services through the Company's network

**Agreement with Préstamos y Servicios S A**

On March 16, 2007, the Company entered into an agreement with Préstamos y Servicios S A (PYSSA), a company engaged in the rendering of financial services, pursuant to which the Company granted PYSSA the exclusive right to conduct its direct and marketing services through the use of the Company's facilities and mailing services As part of the agreement, the Company agreed to provide physical space for PYSSA employees in some of the Company's offices so that they be able to offer financial and loan services to Company customers Furthermore, the Company agreed to include PYSSA marketing material in the mail sent to customers, including the invoices The agreement has an initial term of 5 years to commence on the date of approval by the ENRE, which the Company estimates will occur in the second quarter of 2007 The agreement will be automatically renewed for subsequent periods of five years, unless any of the parties gives notice to the other of his intention to terminate the agreement no less than 120 days prior to the expiration of the corresponding period In accordance with the terms of the agreement, PYSSA will pay the Company

2% of the monthly charges collected from customers, before taxes, as well as 10% of the profits obtained from its services Furthermore, PYSSA agreed to indemnify the Company for any obligation arising from the rendering of its services

36

## 16  CAPITAL STOCK

### a)  General

As of June 30, 2007, the Company has outstanding capital stock of 906,455,100 shares, represented by 462,292,111 common, book-entry Class A shares with a par value of one peso each and the right to one vote per share; 442,210,385 common, book-entry Class B shares with a par value of one peso each and the right to one vote per share; and 1,952,604 common, book-entry Class C shares with a par value of one peso each and the right to one vote per share  Each and every share maintains the same voting rights, i e  one vote per share  There are no preferred shares of any kind, dividend and/or preferences in the event of liquidation, privileged participation rights, prices and dates, or unusual voting rights  Moreover, there are no significant terms of contracts allowing for the issuance of additional shares nor any commitment of a similar nature  As of that date, the capital increase of 74,844,900 shares resolved by the Board of Directors in the meeting held on June 14, 2007, as per the powers granted by the Shareholders' Meeting held on June 7, 2006, is in the process of registration with the pertinent regulatory authorities (Notes 1 and 23)

As of December 31, 2006, the Company had outstanding capital stock of 831,610,200 shares, represented by 424,121,202 common, book-entry Class A shares with a par value of one peso each and the right to one vote per share; 324,327,978 common, book-entry Class B shares with a par value of one peso each and the right to one vote per share; and 83,161,020 common, book-entry Class C shares with a par value of one peso each and the right to one vote per share

### b)  Restriction on the transfer of the Company's common shares

The Company's by-laws provide that Class "A" shareholders may transfer their shares only with the prior approval of the ENRE  The ENRE must communicate its decision within 90 days upon submission of the request for such approval, otherwise the transfer will be deemed approved

Furthermore, Caja de Valores S A  (the Public Register Office), which keeps the Share Register of the shares, is entitled (as stated in the Company's by-laws) to reject such entries which, at its criterion, do not comply with the rules for the transfer of common shares included in (i) the Argentine Business Organizations Law, (ii) the Concession Agreement and (iii) the Company's by-laws

In addition, Class "A" shares are pledged during the entire term of the concession as security for the performance of the obligations assumed under the Concession Agreement

Additionally, in connection with the issuance of Class 2 Corporate Notes, EASA is required to be the beneficial owner and owner of record of not less than 51% of EDENOR's issued, voting and outstanding shares

Section 10 of the Adjustment Agreement signed with the Grantor of the Concession and ratified through Decree 1,957/06, stipulates that from the signing of the agreement through the ending of the Contractual Transition Period  Neither may the majority shareholders modify their ownership interest nor sell their shares

### c)  Employee Stock Ownership Program (ESOP)

At the time of the privatization of SEGBA (the Company's predecessor), the Argentine Government assigned the Company's Class C shares, representing 10% of the Company's outstanding capital stock, for the creation of an Employee Stock Ownership Program (ESOP) in compliance with the provisions of Law N° 23,696 and its regulatory decrees  Through this program, certain eligible employees (including former SEGBA employees who had been transferred to the Company) were entitled to receive a specified number of Class C shares, to be calculated on the basis of a formula that took into consideration a number of factors including employee salary, position and seniority  In order to implement the ESOP a general transfer agreement, a voting trust agreement and a trust agreement were signed

37

Pursuant to the general transfer agreement, participating employees were allowed to defer payment of the Class C shares over time As a guarrantee for the payment of the deferred purchase price, the Class C shares were pledged in favor of the Argentine government This pledge was released on April 27, 2007 upon full payment to the Argentine Government of the deferred purchase price of all Class C shares Additionally, in accordance with the terms of the original trust agreement, the Class C shares were held in trust by Banco Nación, acting as trustee, for the benefit of the ESOP participating employees and the Argentine Government Furthermore, in accordance with the voting trust agreement, all political rights of participating employees (including the right to vote at ordinary and extraordinary shareholders' meetings) were to be jointly exercised until full payment of the deferred purchase price and release of the pledge in favor of the Argentine Government On April 27, 2007, ESOP participating employees fully paid the deferred purchase price to the Argentine Government, accordingly, the pledge was released and the voting trust agreement was terminated

In accordance with the regulations applicable to the ESOP, participating employees who retired before full payment of the deferred purchase price to the Argentine Government was made, were required to transfer their shares to the Guarantee and Repurchase Fund ( *Fondo de Garantía y Recompra* ) at a price to be calculated in accordance with a formula established in the general transfer agreement As of the date of payment of the deferred purchase price, the Guarantee and Repurchase Fund had not fully paid the amounts due to former ESOP participating employees for the transfer of their Class C shares

A number of former employees of both SEGBA and the Company has brought legal actions against the Guarantee and Repurchase Fund, the Argentine Government and, in few cases, against the Company, in each case in relation to the administration of the Employee Stock Ownership Program The plaintiffs who are former employees of SEGBA were not deemed eligible by the corresponding authorities to participate in the Employee Stock Ownership Program at the time of its creation This decision is being disputed by the plaintiffs who are therefore seeking compensation The plaintiffs who are former employees of the Company are claiming for the unpaid amounts owed to them by the Guarantee and Repurchase Fund either due to non-payment of the transfer of their shares upon retirement in favor of the Guarantee and Repurchase Fund or incorrect calculation of amounts paid to them by the Guarantee and Repurchase Fund In several of these claims, the plaintiffs have obtained attachment orders or preliminary injunctions against the Guarantee and Repurchase Fund on Class C shares and funds deposited in such Fund Due to the fact that the resolution of these legal proceedings are still pending, the Federal Government has instructed Banco Nación to create a Contingency Fund so that a portion of the proceeds of the offering of the Employee Stock Ownership Program Class C shares be kept during the course of the legal actions

In accordance with agreements, laws and decrees that rule the Employee Stock Ownership Program, the Class C shares may only be held by personnel of the Company, therefore before the public offering of the Class C shares that had been disaffected from the Program, such shares were converted into Class B shares and sold In conformity with the by-laws, the political rights previously attributable to Class C shares are at present jointly exercised with those attributable to Class B shares and the holders of the remaining Class C shares will vote jointly as a single class with the holders of Class B shares when electing directors and supervisory committee members As of June 30, 2007, 1,952,604 Class C shares, representing 0 2% of the Company's capital stock, are outstanding

## 17 REGULATORY FRAMEWORK

### a) General

The Company's business is regulated by Law N° 24,065, which created the ENRE The Company is subject to the regulatory framework provided under the aforementioned Law and the regulations issued by the ENRE

The ENRE is empowered to: a) approve and control tariffs, and b) control the quality of both the service and the technical product, as established in the Concession Agreement Failure to comply with the provisions of such Agreement and the rules and regulations governing the Company's business will make the Company liable to penalties that may include the forfeiture of the concession

38

As from September 1, 1996, there has been a change in the methods applied to control the quality of both the product and the service provided by the Company. Within this new framework, compensation between areas and circuits of different quality is not allowed, instead, the specific quality provided to individual customers, rather than an average customer value, must be measured. As a result, fines will be credited to users affected by service deficiencies in future bills. Penalties are imposed in connection with the following major issues:

1. Deviation from quality levels of technical product, as measured by voltage levels and network variations;
2. Deviation from quality levels of technical service, as measured by the average interruption frequency per Kilovatios (KVA) and total interruption time per KVA;
3. Deviation from quality levels of commercial service, as measured by the number of claims and complaints made by customers, service connection times, the number of estimated bills and billing mistakes;
4. Failure to comply with information gathering and processing requirements so as to evaluate the quality of both the technical product and the technical service;
5. Failure to comply with public safety regulations

As of June 30, 2007 and December 31, 2006, the Company has accrued the penalties for resolutions not yet issued by the ENRE corresponding to the six-month control periods elapsed through those dates. As of December 31, 2006, the Company has applied the adjustment contemplated in the Temporary Tariff Regime (TTR) (Note 17 b item vii)

As of June 30, 2007 and December 31, 2006, liabilities for penalties amounting to 251,469 and 241,079, respectively, have been included in non-current liabilities

In addition, as of June 30, 2007, the Company's management has considered that the ENRE has complied with the obligation to suspend lawsuits aimed at collecting penalties

Furthermore, the Company has been notified of certain preliminary attachments levied on funds deposited in its bank accounts as a consequence of the executory proceedings brought by the ENRE against the Company for imposed and unpaid penalties in the amount of 59 and 67 as of June 30, 2007 and December 31, 2006, respectively (Note 5) Additionally, after June 30, 2007 and until the date of issuance of these financial statements, the Company has not been notified of any other attachments (Note 17 b)

Moreover, on July 12, 2006 the National Energy Secretariat issued Resolution N° 942/2006 which modifies the allocation of any excess funds resulting from the difference between surcharges billed and discounts made to customers, deriving from the implementation of the Program for the Rational Use of Electric Power (PUREE), which provides for the application of both tariff incentives and penalties aimed at encouraging customers to reduce consumption. As from July 1, 2006, such excess funds may be applied against the amounts receivable that the Company maintains in the Trade receivables account as Unbilled -National Fund of Electricity, for "Quarterly Adjustment Coefficient of the National Fund of Electricity" (section 1 of Law N° 25,957) for 9,688 and 23,015 as of June 30, 2007 and December 31, 2006, respectively. On August 10, 2006 the ENRE issued Resolution N° 597/2006 which regulates the aforementioned Resolution N° 942/2006 of the National Energy Secretariat and establishes the compensation mechanism to be used

**b) Concession**

The term of the concession is 95 years and may be extended for an additional maximum period of 10 years. The term of the concession is divided into management periods: a first period of 15 years and subsequent periods of 10 years. At the end of each management period, the Class "A" shares representing 51% of EDENOR's capital stock, currently held by EASA, must be offered for sale through a public bidding. If EASA makes the highest bid, it will continue to own the Class "A" shares, and no further disbursements will be necessary. On the contrary, if EASA is not the highest bidder, then the bidder who makes the highest bid must pay EASA the amount of the bid in accordance with the conditions of the public bidding. The proceeds of the sale of Class "A" shares will be delivered to EASA after deducting any amounts receivable to which the Grantor of the concession may be entitled

39

In accordance with the provisions of the Concession Agreement, the Company shall take the necessary measures to guarantee the supply and availability of electricity so as to meet demand in due time and in accordance with stipulated quality levels, for which purpose the Company shall be required to guarantee sources of supply

For such purpose, the Company has the exclusive right to render electric power distribution and sales services within the concession area to all users who are not authorized to obtain their power supply from the Electric Power Wholesale Market (MEM), thus being obliged to supply all the electric power that may be required In addition, the Company shall allow free access to its facilities to any MEM agents whenever required, under the terms of the Concession No cannon must be paid by the Company under the Concession Agreement during the term of the Concession

On January 6, 2002, the Federal Executive Power passed Law N° 25,561 whereby adjustment clauses denominated in US dollars or any other foreign currencies, indexation clauses based on price indexes from other countries, as well as any other indexation mechanisms stipulated in the contracts entered into by the Federal Government, including those related to public utilities, were declared null and void as from such date The resulting prices and rates were converted into Argentine pesos at a rate of 1 peso per US dollar Furthermore, Law N° 25,561 authorized the Federal Executive Power to renegotiate public utility contracts taking certain requirements into account

In accordance with the provisions of Laws N° 25,972, 26,077 and 26,204, both the declaration of economic emergency and the period to renegotiate public utility contracts were extended through December 31, 2005, 2006 and 2007, respectively

As a part of the renegotiation process, the Unit of Renegotiation and Analysis of Public Utility Contracts (UNIREN) proposed the signing of an Adjustment Agreement that would be the basis of a comprehensive renegotiation agreement of the Concession Agreement The Company satisfied the regulatory agency's requirements; provided an answer to the proposal and attended the public hearing convened for such purpose, rejecting in principle the proposal on the grounds that it did not properly address the need to redefine the terms of the agreement as contemplated by the law Nevertheless, the Company ratified its willingness to reach an understanding that would restore the financial and economic equation of the concession agreement On September 21, 2005, the Company signed the Adjustment Agreement within the framework of the process of renegotiation of the Concession Agreement set forth in Law N° 25,561 and supplementary regulations Due to the appointment of a new Economy and Production Minister, on February 13, 2006 a new copy of the Adjustment Agreement was signed under the same terms as those stipulated in the agreement signed on September 21, 2005

The Adjustment Agreement establishes the following :

i)      the implementation of a Temporary Tariff Regime (RTT) effective as from November 1, 2005, including a 23% average increase in the distribution margin, which may not result in an increase in the average tariff of more than 15%, and an additional 5% average increase in the value added distribution (VAD), allocated to certain specified capital expenditures;

ii)     the requirement that during the term of said temporary tariff regime, dividend payment be subject to the approval of the regulatory authority;

iii)    the establishment of a "social tariff" for the needy and the levels of quality of the service to be rendered;

iv)     the suspension of the claims and legal actions filed by the Company and its shareholders in national or foreign courts due to the effects caused by the Economic Emergency Law (Note 26);

v)      the carrying out of a Revision of the Company Tariff Structure (RTI) which will result in a new tariff regime that will go into effect on a gradual basis and remain in effect for the following 5 years In accordance with the provisions of Law N° 24,065, the National Electric Power Regulatory Authority will be in charge of such review;

vi)     the implementation of a minimum investment plan in the electric network for an amount of 178 8 million to be fulfilled by EDENOR during 2006, plus an additional investment of 25 5 million should it be required (item f below);

vii)   the adjustment of the penalties imposed by the ENRE that are payable to customers as discounts, which were notified by such regulatory agency prior to January 6, 2002 as well as of those that have been notified, or whose cause or origin has arisen in the period between January 6, 2002 and the date on which the Adjustment Agreement goes into effect;

40

viii)  the waiver of the penalties imposed by the ENRE that are payable to the Argentine State, which have been notified, or their cause or origin has arisen in the period between January 6, 2002 and the date on which the Adjustment Agreement goes into effect;

ix)  the payment of the penalties imposed by the ENRE, which are described in paragraph vii above, in fourteen semiannual installments, which represent approximately two-thirds of the penalties imposed by the ENRE before January 6, 2002 as well as of those that have been notified, or whose cause or origin has arisen in the period between January 6, 2002 and the date on which the Adjustment Agreement goes into effect, subject to compliance with certain requirements

Said agreement was ratified by the Federal Executive Power through Decree No 1957/06, signed by the President of Argentina on December 28, 2006 and published in the *Official Gazette* on January 8, 2007 This agreement stipulates the terms and conditions that, upon compliance with the other procedures required by the regulations, will be the fundamental basis of the Comprehensive Renegotiation of the Concession Agreement of electric power distribution and sale within the federal jurisdiction, between the Federal Executive Power and the Company

Additionally, on February 5, 2007 the *Official Gazette* published Resolution N° 51/2007 of the ENRE which approves the Company's new electricity rate schedule applicable for consumption recorded as from February 1, 2007 This document provides for the following:

a)  A 23% average increase in distribution costs, service connection costs and service reconnection costs in effect which the Company collects as the holder of the concession of the public service of electric power distribution, except for the residential tariffs;

b)  Implementation of an additional 5% average increase in distribution costs, to be applied to the execution of the works and infrastructure plan detailed in Appendix II of the Adjustment Agreement In this regard, the Company has set up the required fund, which as of June 30, 2007 amounts to 14,417;

c)  Implementation of the Cost Monitoring Mechanism (MMC) contemplated in Appendix I of the Adjustment Agreement, which for the six-month period beginning November 1, 2005 and ending April 30, 2006, shows a percentage of 8 032% This percentage will be applied to non-residential consumption recorded from May 1, 2006 through January 31, 2007;

d)  Invoicing in 55 equal and consecutive monthly installments of the differences arising from the application of the new electricity rate schedule for non-residential consumption recorded from November 1, 2005 through January 31, 2007 (items i) and ii) above) and from May 1, 2006 through January 31, 2007 (item iii) above);

e)  Invoicing of the differences corresponding to deviations between foreseen physical transactions and those effectively carried out and of other concepts related to the Wholesale Electric Power Market (MEM), such as the Specific fee payable for the expansion of the network, Transportation and Others, included in Trade Receivables under Receivables from sales of electricity as Unbilled (Note 4);

f)  Presentation, within a period of 45 calendar days from the issuance of this resolution, of an adjusted annual investment plan, in physical and monetary values, in compliance with the requirements of the Adjustment Agreement

In the year ended December 31, 2006 the Company has recorded the adjustment of the penalties described in paragraph a) of this note, for amount of 46,972

Revenues from the retroactive tariff increase deriving from the implementation of the new electricity rate schedule applicable to non-residential consumption for the period of November 1, 2005 through January 31, 2007, have been fully recognized in the financial statements for the six-month period ended June 30, 2007 Such amount, which totals 218,591, will be invoiced in 55 equal and consecutive monthly installments, as described in item d) of paragraph b) of this note As of June 30, 2007, the installments corresponding to the months of February through June 2007 for a total of 20,594 have already been billed

On April 30, 2007, the *Official Gazette* published Resolution No 434/2007 of the Energy Secretariat which adjusts the

time periods set forth in the Adjustment Agreement signed by the Company and the Grantor of the Concession and ratified by Decree No 1957 of the Federal Government dated December 28, 2006

41

In this regard, the aforementioned Resolution provides that the contractual transition period established in the Adjustment Agreement will be in effect from January 6, 2002 to the date on which the Revision of the Company Tariff Structure (RTI) contemplated in the aforementioned Adjustment Agreement, goes into effect

Furthermore, the Resolution establishes that the new electricity rate schedule resulting from the RTI will go into effect on February 1, 2008 It also stipulates that, in the event that the tariff resulting from the RTI is higher than the tariff established in section 4 of the Adjustment Agreement, the transfer of the increase to the tariff will be made in according to section 13 2 of the Adjustment Agreement, which establishes that the first adjustment will take effect as from February 1, 2008 and the second six months later, maintaining the percentages agreed-upon in the Adjustment Agreement

The aforementioned resolution requires the Company to present an investment plan before May 1, 2007 (which has already been complied with), and the extension of the obligations and commitments set forth in section 22 of the Adjustment Agreement until the date on which the electricity rate schedule resulting from the RTI goes into effect, allowing the Company and its shareholders to resume the claims suspended as a consequence of the Adjustment Agreement if the new electricity rate schedule does not go into effect in the aforementioned time period

Furthermore, on July 7, 2007 the *Official Gazette* published Resolution N° 467/07 of the ENRE pursuant to which the first management period is extended for 5 years to commence as from the date on which the Revision of the Company Tariff Structure (RTI) goes into effect Its original maturity would have taken place on August 31, 2007 (Note 27 c)

**c) Concession of the use of real property**

Pursuant to the Bid Package, SEGBA granted the Company the free use of real property for periods of 3, 5 and 95 years, with or without a purchase option, based on the characteristics of each asset, and the Company would be responsible for the payment of any taxes, charges and contributions levied on such properties and for the taking out of insurance against fire, property damage and third-party liability, to SEGBA's satisfaction

The Company may make all kind of improvements to the properties, including new constructions, upon SEGBA's prior authorization, which will become the grantor's property when the concession period is over, and the Company will not be entitled to any compensation whatsoever SEGBA may terminate the gratuitous bailment contract after demanding the performance by the Company of any pending obligation, in certain specified cases contemplated in the Bid Package At present, as SEGBA's residual entity has been liquidated, these presentations and controls are made to the National Agency of Public Properties (ONABE)

As of the date of issuance of these financial statements, the Company had acquired for an amount of 12,765, nine of these properties whose gratuitous bailment contracts had expired The title deeds of eight of these properties have been executed at a price of 12,375 As for the remaining property, a down payment of 117 has been made while the outstanding amount of 273 will be payable upon the execution of the title deed on a date to be set by the Ministry of Economy

42

## 18. CASH FLOW INFORMATION

### a) Cash and cash equivalents:

For the preparation of the Statement of Cash Flows, the Company considers as cash equivalents all highly liquid investments with original maturities of three months or less

|  | As of June 30, 2007 | As of December 31, 2006 | As of June 30, 2006 | As of December 31, 2005 |
|---|---|---|---|---|
| Cash and Banks | 4,390 | 481 | 2,322 | 11,659 |
| Time deposits | 127,093 | 1,360 | 3,701 | 278,238 |
| Money market funds | 14,729 | 30,832 | 1,350 | 18,242 |
| Total cash and cash equivalents in the Statement of Cash Flows | 146,212 | 32,673 | 7,373 | 308,139 |

### b) Interest paid and collected:

|  | For the six-month periods ended June 30, | |
|---|---|---|
|  | 2007 | 2006 |
| Interest paid during the period | (21,201) | (19,384) |
| Interest collected during the period | 1,568 | 1,482 |

## 19. INSURANCE COVERAGE

As of June 30, 2007, the Company has taken out the following insurance policies for purposes of safeguarding its assets and commercial operations:

| Risk covered | | Amount insured |
|---|---|---|
| Comprehensive (1) | US$ | 417,516,597 |
| Mandatory life insurance | $ | 17,361,000 |
| Theft of securities | US$ | 100,000 |
| Vehicles (theft, third party liability and damages) | $ | 6,768,400 |
| Special equipment | US$ | 610,637 |
| Land freight | US$ | 2,000,000 |
| Imports freight | $ | 2,250,000 |

(1) Includes: fire, partial theft, tornado, hurricane, earthquake, earth tremors, flooding and debris removal from facilities on facilities providing actual service, except for high, medium and low voltage networks

## 20. CLAIM OF THE PROVINCE OF BUENOS AIRES BOARD OF ELECTRIC POWER

On December 1, 2003, the Board of Electric Power of the Province of Buenos Aires (Board) filed a claim against EDENOR in the amount of 284,364 that includes surcharges and interest as of the date of the claim, and imposed penalties for an amount of 25,963, due to the Company's alleged failure to act as collecting agent of certain taxes established by Decrees-law N° 7290/67 and 9038/78 from July 1997 through June 2001

On December 23, 2003, the Company appealed the Board's decision with the Tax Court of the Province of Buenos Aires, which had the effect of temporarily suspending the Company's obligation to pay Such appeals were filed on the grounds that the Federal Supreme Court had declared that the regulations established by the aforementioned Decrees-law were unconstitutional, as they were incompatible with the Province of Buenos Aires' commitment not to levy any taxes on the transfer of electricity

43

On March 20, 2007, the Board of Electric Power of the Province of Buenos Aires amended the original complaint to include an additional claim in the amount of 7,720 that includes surcharges and interest as of the date of the claim for the period of July 2001 through June 2002 -extending the claim to certain Company Directors

On June 27, 2007, the Tax Court of the Province of Buenos Aires pronounced in favor of the appeal duly lodged by the Company

Therefore, no accrual has been recorded for these claims as the Company's management believes that there exist solid arguments to support its position

## 21    LEGAL ACTION FOR ALLEGED ENVIRONMENTAL POLLUTION

On May 24, 2005, three of EDENOR's employees were indicted on charges of polychlorinated biphenyl (PCB)-related environmental contamination  In connection with this alleged violation, the judge ordered a preliminary attachment on the Company's assets in the amount of 150 million to cover the potential cost of damage repair, environmental restoration and court costs  On May 30, 2005, the Company filed appeals against both the charges brought against its employees and the attachment order  On December 15, 2005, the Court of Appeals dismissed the charges against all three defendants and, accordingly, revoked the attachment order against the Company's assets  The decision of the Court of Appeals, which was based on the fact that the existence of pollution could not be proved, also established that the trial judge should order the acquittal of two ENRE public officers who had been indicted on related charges  An appeal against this decision was filed in the *Tribunal de Casación* (the highest appellate body for this matter), which on April 5, 2006 ruled that the appeal against the decision regarding EDENOR's employees and the Company was not admissible (Note 27 a)

The Company's management estimates there are no legal grounds for any action against the Company or its employees in connection with this matter  Accordingly, no accrual has been recorded

## 22    RESTRICTION ON THE DISTRIBUTION OF EARNINGS

In accordance with the provisions of Law N° 19,550, 5% of the net income for the year must be appropriated to the legal reserve, until such reserve equals 20% of capital stock  The Ordinary Shareholder's Meeting held on April 16, 2007, did not appropriate any amount to said legal reserve as of December 31, 2006, due to the existence of accumulated losses as of the end of that year

Moreover, in accordance with the provisions of Law N° 25,063, passed in December 1998, dividends to be distributed, whether in cash or in kind, in excess of accumulated taxable profits as of the fiscal year-end immediately preceding the date of payment or distribution, shall be subject to a final 35% income tax withholding, except for those dividends distributed to shareholders who are residents of countries benefited from conventions for the avoidance of double taxation, who will be subject to a lower tax rate  For income tax purposes, accumulated taxable income shall be the unappropriated retained earnings as of the end of the year immediately preceding the date on which the above-mentioned law went into effect, less dividends paid plus the taxable income determined as from such year and dividends or income from related companies in Argentina

Since the restructuring of the Company's financial debt referred to in Note 14, the Company is not allowed to distribute dividends until April 24, 2008 or until such time when the Company's leverage ratio is lower than 2 5, whichever occurs first  As from such date/time, distribution of dividends will only be allowed under certain circumstances depending on the Company's indebtedness ratio

Certain restrictions on the distribution of dividends by the Company and the need for approval by the ENRE for any distribution have been disclosed in Note 17 b)

**23  INITIAL PUBLIC OFFERING OF CAPITAL STOCK IN LOCAL AND INTERNATIONAL MARKETS**

On April 28, 2006, the Company's Board of Directors decided to initiate the public offering of part of the Company's capital stock in local and international markets, including, but not limited to the trading of its shares in the Buenos Aires Stock Exchange (BCBA) and the New York Stock Exchange (NYSE), United States of America

44