## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHERINE GAUJACQ,

        Plaintiff,

v.

ELECTRICITE DE FRANCE
INTERNATIONAL NORTH
AMERICA, INC.,

ELECTRICITE DE FRANCE, S.A.,

        and

CHRISTIAN NADAL,

        Defendants.

Civil Action 05-00969 (HHK)

## MEMORANDUM OPINION

Catherine Gaujacq ("Gaujacq") brings this action against her former employers,

Electricite de France, S.A. ("EDF") and Electricite de France International North America, Inc.

("EDFINA"), and a former co-worker, Christian Nadal ("Nadal") (collectively, "defendants"),

asserting that during her employment with EDF and EDFINA she was subjected to sex

discrimination, retaliation, and not provided equal pay.  Gaujacq grounds these claims on Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the

Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), and the District of Columbia Human Rights Act,

D.C. Code §§ 2-1401 *et seq.* ("DCHRA").  Gaujacq also asserts several common law causes of

action, specifically, tortious interference with contractual relations, breach of contract, and

defamation.

Before the court are defendants'[1] motions for summary judgment [## 101, 107]. Upon consideration of the motions, the opposition thereto, the argument of counsel at a hearing, and the summary-judgment record, the court concludes that defendants' motions should be granted.

## I. BACKGROUND

Gaujacq, a French national, started working at EDF, a French energy company, as a nuclear engineer in 1980. She worked her way up through a number of positions in the company, and became the first woman in France to be the head of a nuclear power plant. In 2000, Gaujacq came to work in Washington, D.C. as the President of EDFINA, EDF's wholly-owned subsidiary and the site of EDF's main American office. Her rank and salary during that time were that of an R-3 executive.[2]

In January 2004, the head of EDF's Americas Branch informed Gaujacq that Nadal would be replacing her as President of EDFINA in the summer of that year. Nadal at that time was an executive Vice President for EDF in Paris, and his rank and salary were that of an R-1 executive. Gaujacq hoped to remain in Washington and to continue working for EDF after she was no longer President of EDFINA. She shared her desire in this regard with her superiors.

In March and April 2004, Nadal and Gaujacq met once and corresponded by email regarding the upcoming transition. During that time, EDF executives, including Nadal, commented to each other in email messages that Gaujacq was difficult to work with on certain matters such as procuring a visa for Nadal and arranging his start at EDFINA. About the same

---

[1] The court will refer to EDF and EDFINA as "EDF" unless it indicates otherwise.

[2] EDF's executive ranking system involves a series of tiers, with R-1 level being the highest.

time, Gaujacq corresponded with EDF's Chief Operating Officer, Gerard Creuzet ("Creuzet"), regarding her interest in working in the United States after Nadal took over as President. Creuzet was amenable to this arrangement and requested that Gaujacq prepare a work proposal, but neither he nor any of the other EDF executives signed a contract for her to continue working in the United States.

On June 1, 2004, Nadal became President of EDFINA and Gaujacq stepped down, becoming a Vice President. Later that month, Nadal wrote to Gaujacq and EDFINA's other Vice President, Bernard Dreux ("Dreux"), explaining their duties and responsibilities as Vice Presidents. Nadal then wrote to Dreux separately and gave him more authority than he had given Gaujacq, and indicated that Dreux would act as President in his absence. On July 9, 2004, after discovering that she had been given less authority than Dreux, Gaujacq, by email, informed the head of EDF's Americas Branch, that "these facts are discriminatory." Defs.' Stmt. of Undisputed Facts ("Defs.' Facts") ¶ 108. On July 22, she wrote another letter to Nadal and EDF's Americas Branch head stating that the limited authority given to her was "discriminatory" and complaining that Nadal did not treat her well at the office. Defs.' Facts ¶ 110. Also on July 22, Gaujacq informed the Chairman of EDF and Creuzet that she intended to file a complaint with U.S. authorities as a result of Nadal's actions. According to Gaujacq, the next day Creuzet said to her "your career is dead if you file a claim." Defs.' Facts ¶ 116.

On July 27, 2004, Creuzet wrote to Gaujacq terminating her assignment in Washington as of August 2, 2004. The letter stated that she would be given three months to arrange her move back to France from the United States and that on November 1, 2004, EDF would expect her to start at a position in France in the Energy Department that was "appropriate to your level of responsibility and the experience that you have acquired." Defs.' Ex. 74.

On July 30, 2004, Gaujacq filed a complaint with the Equal Employment Opportunity Commission ("EEOC").  On September 24, Gaujacq received a letter from EDF explaining in detail the position she was being offered in France to manage the development of a new series of nuclear reactors.  Gaujacq felt that the position offered to her was one of lower responsibility and, on October 28, she declined to accept it.  After a meeting with Gaujacq to discuss the situation, EDF terminated her employment on January 6, 2005.  This complaint followed.

## II.  DISCUSSION

Gaujacq's complaint sets forth her causes of action in twelve counts.  Counts I through III, V, VII, and IX through XI are brought against EDF.  Counts IV, VI, and VIII are brought against Nadal.  Count XII is brought against both EDF and Nadal.  Specifically, Gaujacq's claims are as follows:

- **Counts I and IV:**  Gaujacq alleges that EDF violated Title VII and the DCHRA, and Nadal the DCHRA, by discriminating against her based on her sex;

- **Count III:**  Gaujacq alleges that EDF and Nadal created a hostile work environment for her by threatening and harassing her;

- **Counts II, V, and VI:**  Gaujacq alleges that EDF violated Title VII and the DCHRA, and Nadal the DCHRA, by retaliating against her after she complained of harassment, discrimination, and unfair treatment at work;

- **Counts VII and VIII:**  Gaujacq alleges that both EDF and Nadal tortiously interfered with contractual relations with her future employer and with EDF itself;

- **Count IX:**  Gaujacq alleges that EDF breached portions of her expatriation contract by substantially modifying it;

- **Count X:**  Gaujacq alleges that EDF breached its duty of good faith and fair dealing by willfully rendering imperfect performance of her contracts with the company;

- **Count XI:**  Gaujacq alleges that EDF violated the EPA by paying her a lower salary than was paid to Nadal for doing a job with the same responsibilities;

4

- **Count XII:** Gaujacq alleges that EDF and Nadal defamed her by making statements at the workplace which stated or implied that Gaujacq did not accomplish her job satisfactorily.

Defendants move for summary judgment[3] on all counts, arguing that Gaujacq was not discriminated against based on her gender and that all employment actions taken towards her were done for legitimate, non-discriminatory reasons. With respect to Gaujacq's defamation and contract claims, defendants argue that the undisputed facts show that they are entitled to judgment as a matter of law. Gaujacq, unsurprisingly, disagrees.

Defendants' arguments in support of their motions and Gaujacq's response to these arguments will be addressed in turn.

## A.    Applicability of Title VII

Tittle VII, in pertinent part, states that it does not apply to "the foreign operations of an employer that is a foreign person not controlled by an American company." 42 U.S.C. § 2000e-1(c)(2). EDF argues that it is not subject to VII because it is a foreign company and the relevant employment decisions that are the subject of this suit were made abroad. This argument is without merit.

---

[3] Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id*. at 255. But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

Title VII applies to foreign companies operating in the United States, *Ward v. W & H Voortman Ltd.*, 685 F. Supp. 231, 232 (M.D. Ala. 1988), and is intended to protect aliens working in the United States as well as citizens. *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 95 (1973). Title VII "does not expressly exempt from its provisions foreign corporations doing business here. If Congress had intended to exempt such foreign corporations it would have done so expressly," as it did with other groups such as private membership clubs, and companies employing aliens abroad. *Ward*, 685 F. Supp. at 232.

In support of its position that Title VII does not provide a basis for Gaujacq's claims of discrimination and retaliation, EDF cites *Equal Employment Opportunity Commission v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*"). EDF's reliance on *Aramco* is misplaced. In *Aramco*, the Court addressed the question "whether Congress intended the protections of Title VII to apply to United States citizens employed by American employers outside of the United States." *Aramco*, 499 U.S. at 248. The Court found that Title VII did not have such a broad reach based on the "presumption against extraterritoriality" which is implicit in all American laws. *Id*. Unlike in *Aramco*, this case involves an alien working in the United States in the American office of a foreign-run company. Thus, the presumption against extraterritoriality does not apply to the circumstances of this case. Instead, the Court's statement that "Title VII was clearly intended to apply with respect to the employment of aliens inside any State," *Espinoza*, 414 U.S. at 95, controls.[4]

---

[4] Moreover, Gaujacq's contract with EDF states that, based on the principle of territoriality, agents working abroad for EDF are subject to the employment laws of the host country. Under D.C. law, "parties to a contract may specify the law they wish to govern, as part of their freedom to contract, as long as there is some reasonable relationship with the state specified." *Kroger v. LegalBill.com LLC*, 436 F. Supp. 2d 97, 103 (D.D.C. 2006) (*quoting*

In sum, EDF, having chosen to operate in the United States, is subject to its laws, and Gaujacq is afforded the protection of those laws, including Title VII.

**B.    Disparate Treatment Gender Discrimination**

Gaujacq asserts that EDF violated Title VII and the DCHRA and that Nadal violated the DCHRA by discriminating against her based on her sex.[5]  Defendants argue that their actions in regards to Gaujacq were for legitimate and non-discriminatory reasons and that Gaujacq has failed to produce any evidence tending to show that their actions were motivated by consideration of Gaujacq's sex.  Gaujacq rejoins that defendants' reasons and explanations are pretextual.

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  When a motion for summary judgment is filed in a Title VII case brought by a plaintiff who claims that she was a victim of disparate treatment, the motion is analyzed in accordance with the procedural framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008).

---

*Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980)) (following choice of law specified in employment contract).  EDF has sufficient contacts with the U.S. to meet the "reasonable relationship" requirement.  *See Norris*, 419 A.2d at 984.

[5]  Because the DCHRA was "modeled on Title VII," courts employ "the Title VII *prima facie* case analysis established in *McDonnell Douglas*" when analyzing motions for summary judgment in cases brought under the DCHRA.  *Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 3 (D.D.C. 1989); *Howard Univ. v. Green*, 652 A.2d 41, 49 n.3 (D.C. 1994).  Therefore, defendants' motions with respect to Gaujacq's Title VII and DCHRA claims are subject to the same analysis.

7

The *McDonnell Douglas* framework consists of a series of shifting burdens. First, the plaintiff must show a *prima facie* case of discrimination. Then the defendant is required to articulate a legitimate non-discriminatory reason for its employment action. The plaintiff then bears the burden of producing evidence on the basis of which a reasonable jury could conclude that the defendant's proffered reasons are pretextual. *McDonnell Douglas*, 411 U.S. at 802-03. The D.C. Circuit recently held, however, that the first step of the *McDonnell Douglas* analysis – determining whether the plaintiff has established a *prima facie* case – is not necessary in cases where the employer offers a legitimate, non-discriminatory reason for making the employment decision contested by the plaintiff. *Brady,* 520 F.3d at 494 ("In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."). Instead, the appropriate inquiry examines whether the plaintiff alleging intentional discrimination has produced sufficient evidence to rebut the employer's asserted "legitimate non-discriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Brady,* 520 F.3d at 494.

Gaujacq's claims of disparate-treatment discrimination are based on the following three actions: (1) EDF removed her from the position of EDFINA President and installed Nadal in her place; (2) Nadal gave Dreux more authority than he gave her; and (3) EDF terminated her employment.[6] The court considers each action in turn.

_____

[6] Gaujacq also alleges a number of other incidents such as Nadal driving a co-worker but not her to a conference, and EDF conducting an audit of the company. These actions do not rise to the level of an adverse employment action. *See, e.g. Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (stating that an adverse employment action is one that has "materially adverse

### 1.    *Gaujacq's Removal as EDFINA President*

With respect to Gaujacq's removal as President, EDF has provided a number of facially-benign reasons for its decision. To begin, Gaujacq's contract with EDF in 2000 stated that the term of her assignment in Washington was for three years, although it could be renewed for an additional year if both sides agreed to an extension. Both sides agreed in 2003 to renew the contract for another year, and the contract was thus due to end in the summer of 2004, as would Gaujacq's term as EDFINA President. In addition, the record shows that EDF regularly rotated the assignment of EDFINA President, and in the 10 years prior to Gaujacq's appointment, four different executives had served in that position. EDF also asserts that it chose Nadal to be President after Gaujacq because the company was moving towards privatization and EDF wished to have Nadal in Washington because of his business experience.

Gaujacq does not produce any evidence to rebut these legitimate, non-discriminatory reasons for Nadal's assignment to the position of President of EDFINA. Therefore, this claim of discrimination fails.

### 2.    *Gaujacq Being Assigned Less Authority than Vice President Dreux*

Gaujacq next asserts that she was discriminated against by defendants when Nadal entrusted Dreux with more authority than her.[7] Defendants' explanation for Nadal's decision to

---

consequences affecting the terms, conditions, or privileges of employment . . . .").

[7] It is doubtful that being assigned less authority than a co-worker, absent any other arguably adverse employment action, qualifies as an adverse employment action under the law of this Circuit. *See, e.g., Forkkio,* 306 F.3d at 1131. Moreover, this is precisely the type of business decision that courts are not authorized to second-guess. *See, e.g., Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (holding that the judiciary is not a "super-personnel department that reexamines an entity's business decisions") (internal citations omitted). For the sake of analysis, however, the court assumes that being assigned less authority could provide a basis for a Title VII action.

assign Dreux greater authority than he assigned to Gaujacq was that he knew, and had worked

with, Dreux better than he did Gaujacq. Without contradiction, defendants point out that after

Nadal became EDFINA's President,  Gaujacq was often absent from work.  Dreux, on the other

hand, regularly was at his post and developed a good working relationship with Nadal, who

trusted Dreux to manage the office in Nadal's absence.  Moreover, and again without

contradiction, defendants have shown that Gaujacq and Nadal did not work well together and that

Gaujacq sometimes simply refused to do what Nadal, her superior, asked her to do.

    In the face of the facially-benign reasons given by defendants for Nadal's decision to

entrust Dreux with more authority that was given to Gaujacq, Gaujacq simply – but at length –

argues that animus based on sex must account for this decision because the only difference

between Dreux and herself was her gender.  The problem for Gaujacq is that saying it does not

make it so.  The difference between Gaujacq and Dreux, in addition to their sex, was that Nadal

worked better with Dreux, trusted him more, and Dreux, unlike Gaujacq, was not insubordinate.

Thus Gaujacq's attempt to show that a male co-worker was treated "more favorably in the same

factual circumstances,"  *Brady*, 520 F.3d at 495, fails.

### 3.    *Termination of Gaujacq's Employment*

    This prong of Gaujacq's discrimination claim is easily resolved.  In September 2004,

EDF offered Gaujacq a position in France to manage the company's development of a new series

of nuclear reactors there.  When Gaujacq refused to accept the position, and after talking with

Gaujacq about her decision, EDF terminated her.

    Obviously, the decision of an employee not to do the work which the employer wishes the

employee to do is a legitimate basis for terminating the employee, as was done here.  Gaujacq

10

had no legal claim to a position of her choosing and has not presented any evidence tending to show that EDF's termination of her was motivated by Gaujacq's sex. Therefore, this prong of Gaujacq's discrimination claim fails.

## C.    Hostile Work Environment

Gaujacq alleges that EDF subjected her to a hostile work environment in violation of Title VII and the DCHRA. A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). When determining whether a work environment is hostile, as that term is used in Title VII litigation, a court must look at such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23.

Gaujacq asserts that she was sexually harassed and subjected to a hostile work environment when Nadal spoke to her in a demeaning, threatening, rude and harassing manner. As an example, she asserts that once she was in Nadal's office to discuss work issues when he told her in a loud voice that he was the General Delegate of EDFINA and that she had to comply with his orders. She also recounts instances when Nadal informed their superiors at EDF of his complaints about Gaujacq's behavior at work.

The circumstances Gaujacq describes do not provide a basis for a hostile work environment claim. Indeed, the circumstances described by Gaujacq are similar to those found wanting as a basis for such a claim in *Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002). In

*Stewart*, the plaintiff, a female employee, asserted that she had been subjected to harassment because one of her superiors yelled at her on the phone for a mistake she had made. *Id*. at 1133. In *Stewart*, the District Court held, and the Court of Appeals affirmed, that while the supervisor did use offensive and inappropriate language, "there is no basis upon which to infer . . . that [the supervisor's] hostility was motivated by [plaintiff's] sex." *Id*. The *Stewart* court noted that the conversation "was obviously grounded in gender-neutral concerns about [plaintiff's] interpersonal relations with co-workers, rather than discriminatory considerations" and that "Title VII does not provide a cause of action for ordinary tribulations of the workplace." *Id*. (internal citations and quotations omitted).

As in *Stewart*, Gaujacq's allegations, even if true, do not show that she was sexually harassed or subjected to a hostile work environment. Instead, Nadal's treatment of her is more indicative of a supervisor frustrated with a subordinate's behavior. Moreover, there is no indication from his language or the circumstances that his behavior was because of her sex. The incidents described by Gaujacq also were rarely directed at her, and were often complaints by Nadal to others about his frustration with her behavior towards him. The undisputed facts therefore show that defendants are entitled to judgment as a matter of law with respect to Gaujacq's hostile work environment claim.

**D.    Retaliation**

When a Title VII defendant files a motion for summary judgment with respect to a claim of retaliation, the motion is analyzed under the burden-shifting framework established in *McDonnell Douglas*. *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006). "First, a plaintiff must establish a *prima facie* case of retaliation; if she meets that burden, the employer must

articulate a legitimate nonretaliatory reason for its action; finally, the plaintiff has the ultimate

burden of establishing that the reason asserted by the employer is pretext for retaliation." *Id*.  As

in disparate-treatment cases, in retaliation cases where the employer has offered a legitimate,

non-discriminatory reason for an employment decision, the first step in the *McDonnell Douglas*

paradigm drops out and the sole inquiry is whether the plaintiff "produced sufficient evidence for

a reasonable jury to find that the employer's asserted [non-retaliatory] reason was not the actual

reason." *Brady,* 520 F.3d at 494.

        Gaujacq  alleges that she was retaliated against in a number of ways after she complained

to various EDF executives on July 9, 2004, and July 23, 2004, about Nadal's alleged

discriminatory treatment of her and later filed a complaint with the EEOC on July 30, 2004.  She

alleges that EDF retaliated against her by: (1) making Nadal the President of EDFINA and

demoting  her to Vice President; (2) decreasing her responsibilities as a Vice President of

EDFINA; (3) offering her an inferior position in France rather than the position she wanted in the

U.S.; and (4) eventually terminating her employment.  For the reasons that follow, each of

Gaujacq's claims fails.

         Gaujacq's first two allegations of retaliatory treatment – her assignment as Vice

President and her corresponding decreased responsibilities – fail because they took place *before*

she engaged in any statutorily-protected activity.  Gaujacq's remaining two assertions of

retaliatory treatment fail because she  fails to rebut the legitimate, non-retaliatory reasons given

in explanation of defendants' actions.

        With respect to EDF's decision not to honor Gaujacq's wish to remain in the United

States and its attempt to reassign her to a position in France, Gaujacq fails to present evidence on

the basis of which a reasonable jury could conclude that EDF's explanation was a pretext for an actual retaliatory motive. EDF explained that it wanted to end the increasingly bad relations between Nadal and Gaujacq. EDF also wanted Gaujacq to work on a new nuclear project in France developing a series of nuclear reactors, an important project for which she was particularly well qualified. The summary-judgment record shows that EDF executives were concerned about Nadal and Gaujacq continuing to work together and did not want them working on related issues in Washington and not communicating. Gaujacq contributed to this concern by proposing that in her new assignment in Washington she would communicate with Nadal only through monthly reports.[8]

Gaujacq's fourth retaliation claim is that her employment was terminated because she had engaged in statutorily-protected activities. As explained *supra*, however, EDF states without contradiction that Gaujacq was terminated because she did not want to do what her employer wanted her to do. Because Gaujacq does not provide any evidence that EDF's articulated reasons for its employment decisions were pretextual, defendants' motion for summary judgment on Gaujacq's retaliation claims must be granted.

**E.    Equal Pay Act Claim**

Gaujacq asserts that EDF violated the EPA by paying Nadal a higher salary than she had been paid for doing the same work as EDFINA President. EDF disputes Gaujacq's charge, maintaining that Nadal's pay was based on a legal, non-discriminatory system.

---

[8] Furthermore, Gaujacq presents no evidence to support her claim that EDF's decision to not honor her desire to remain employed in the U.S. was in retaliation for her complaints to EDF executives. The summary-judgment record shows that Gaujacq told them that if they did not give her the position she wished to have in the U.S., she would file a complaint with the U.S. authorities and take some sort of legal action. The executives viewed this statement as blackmail, and decided to bring Gaujacq back to France and away from the source of her complaints. This response to Gaujacq's threat can not reasonably be considered a retaliatory action.

In order to establish a *prima facie* case under the EPA, a plaintiff must show that her employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d)(1); *see also Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO*, 712 F.2d 1488, 1491-92 (D.C. Cir. 1983).  Once a plaintiff has made a *prima facie* showing of disparate pay, the defendant in defense may either refute the *prima facie* case or plead and prove one of four affirmative defenses to justify the different wages.  *Id*. These defenses allow differing pay if it is given "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  29 U.S.C. § 206(d)(1).

Assuming that Gaujacq makes out a *prima facie* case under the EPA, EDF has shown that it has a system of pay which justifies the different wages paid to Gaujacq and Nadal.  The disparity in pay between Gaujacq and Nadal was based on rank established when the two were originally hired at EDF.  Gaujacq was hired as an engineer directly out of engineering school and worked her way up to the rank of an R-3 executive in EDF.  Nadal joined the company as an executive with experience at other energy companies, previously working as the General Secretary of the French National Coal Board, and by 2004 had attained the rank of R-1 executive. Neither of them changed rank as a result of being named EDFINA President.  EDF has shown, and Gaujacq has not produced any evidence to rebut the assertion, that EDF's pay scale is based on facts other than sex.  Therefore, Gaujacq's EPA claim fails.

F.    **Common Law Claims**[9]

      *1.      Tortious Interference with Contractual Relations*

Gaujacq brings a claim of tortious interference with contractual relations against EDF for interfering with her relationship with ENTERGY Nuclear, the company who hired her after her employment with EDF was terminated.  She brings a claim of tortious interference with contractual relations against Nadal for interfering with her relationship with EDF.

      **i.  Claim against EDF**

Gaujacq asserts that EDF interfered with her business relationship with ENTERGY Nuclear by giving her an incorrect employment letter to provide to future employers.  EDF argues that Gaujacq's facts do not support her claim and her employment with ENTERGY Nuclear today indicates that EDF did not interfere with any business relationship.  EDF is correct.

Under D.C. law, there are four elements of a tortious interference with contract cause of action: "(1) existence of a contract; (2) knowledge of the contract; (3) intentional procurement of its breach by the defendant; and (4) damages resulting from the breach."  *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 289 (D.C. 1989).  For a plaintiff to survive a motion for summary judgment on a tortious interference claim, she must produce sufficient evidence regarding each element.  Gaujacq fails to show the fourth required element because she

---

[9]  While it would be within the court's discretion to refuse to hear these claims, having dismissed all the claims over which it has original jurisdiction, the court will consider them here. *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy . . . .").  This court will hear the D.C. law claims due to considerations of "judicial economy, convenience, and fairness to litigants."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  This court has before it all the relevant facts and finds it both economical of judicial resources and convenient to consider all the claims in this case.

has not shown that she suffered any damages resulting from the alleged tortious interference. Any misinformation which may have been in her employment letter was not a hindrance to her getting the job at ENTERGY Nuclear and Gaujacq has not attempted to prove that she suffered damages in any other way.

### ii. Claim against Nadal

Gaujacq alleges that Nadal interfered with her contractual relationship with EDF, such that she was eventually assigned to a position in France rather than the U.S. Nadal argues that Gaujacq has not shown that he acted intentionally to procure the breach of Gaujacq's contract with EDF.

Gaujacq's claim fails because Gaujacq fails to show that she had a contract, the first element of a tortious interference with contract cause of action, the terms of which Nadal could interfere. To reiterate, Gaujacq claims that Nadal's interference caused her to be offered a position in France rather than the U.S. However, Gaujacq did not have a contract with EDF to stay in the U.S. after her four-year term at EDFINA ended. As established *supra*, her first contract came to its natural end on July 31, 2004, and she did not have a contract to continue working in the U.S. after that time.

### 2.     *Breach of Contract*

Gaujacq maintains that EDF breached both her initial contract and her second contract to work in the U.S. EDF asserts that it did not breach any elements of the initial contract with Gaujacq and that no second contract existed. EDF is correct.

Gaujacq's initial contract to serve as President of EDFINA was always anticipated to extend no longer than four years. The contract, signed in 2000, specified that Gaujacq would serve as President for three years with the option of a one-year extension, which was exercised.

In July 2004, both Gaujacq and EDF had performed the terms of the contract, so no element of this contract was breached.

Gaujacq did not have a second contract with EDF to continue working in America. While she and EDF executives, including Creuzet, had discussed the possibility of Gaujacq continuing to work in the U.S., Gaujacq's superiors at EDF never agreed to another contract for her to do so. Thus, Gaujacq did not have a second contract to work in the U.S. and there was therefore nothing which EDF could have breached.

### 3.    *Breach of Duty of Good Faith and Fair Dealing*

Gaujacq alleges that EDF breached its duty of good faith and fair dealing in regards to her contract of 2000-2004 by ending it on July 31, 2004, and that EDF breached the second contract by offering her a job she neither wanted nor expected to get. EDF argues that, regarding the first contract, the company followed it as expected, and that there was no second contract which dealt with Gaujacq's employment in the U.S. after July 31, 2004. EDF is correct.

A duty of good faith and fair dealing is implied in all contracts, meaning that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006). To comply with this duty, D.C. law requires "faithfulness to an agreed common purpose and consistency with the expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate standards of decency, fairness or reasonableness." *Id*. at 201-02 (*citing* Restatement (Second) of Contracts § 205 cmt. a.).

Gaujacq has not shown that EDF did anything to destroy or injure the rights given to her by contract. Her contract came to its natural and agreed-upon conclusion in July 2004. While

Gaujacq desired that the contract be extended or that she be given a new contract to work in the U.S., EDF never agreed to those terms.

### 4.    *Defamation Per Se*

Gaujacq asserts that both EDF and Nadal defamed her in making statements to employees of EDF stating or implying that she had committed wrongful acts and was not competent at her job.  EDF and Nadal state that there is no evidence that the statements they made were false and that her allegations are too broad to be triable.

In order to state a cause of action for defamation under D.C. law, a plaintiff

"must allege and prove four elements:  (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."

*Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005).

In order to be defamatory, a statement must "injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.  But an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous."  *Howard Univ. v. Best*, 484 A.2d 958, 988-89 (D.C. 1984) (internal quotations and citations omitted).

Gaujacq's defamation claim fails because she does not provide any specific examples of statements or actions which rise to the level of making her appear "odious, infamous, or ridiculous."  *Id.*  She first alleges that EDF audited EDFINA to show that she committed wrongdoing during her tenure as President.  However, EDF asserts, without contradiction, that it

19

regularly conducts audits of its offices. Gaujacq presents no evidence to indicate that the audit was done to defame her. Next, Gaujacq alleges that Nadal defamed her by suggesting she was incompetent when he took away her ability to sign checks, enter contracts, or incur expenses on behalf of EDFINA. This action, as explained *supra*, was a personnel decision made by Nadal based on his experiences with Gaujacq and Dreux. There is no indication from the record that Nadal made or published any statements concerning her ability to do the tasks associated with her job. Moreover, the authority to sign checks was a responsibility that came with the title of President; Gaujacq's predecessor lost the ability to sign checks when Gaujacq became EDFINA President, just as she did when Nadal took over from her.

Finally, Gaujacq asserts that Dreux defamed her when he announced to other EDFINA employees that she was no longer able to sign checks, and voided two checks that Gaujacq had signed. Dreux's action of voiding checks Gaujacq had signed does not provided a basis for a defamation cause of action. While some non-verbal actions can be defamatory, employees must show that the employer's actions have a defamatory implication. *See Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 877-78 (D.C. 1998) (holding that employer's behavior which treated plaintiff in a way normally used for those accused of criminal misconduct was defamatory). Gaujacq has shown only that she was treated as an employee whose responsibilities had changed.

### III.  CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment are granted.

An appropriate order accompanies this memorandum.

Henry H. Kennedy, Jr.
United States District Judge

Dated: August 21, 2008.